**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq.
Joshua N. Howley, Esq.
101 Park Avenue, 28th Floor
New York, New York 10178
Tel. (212) 643-7000
E-mail. steele@sillscummis.com
　　　jhowley@sillscummis.com
*Attorneys for Vitra, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| NINETY-FIVE MADISON COMPANY, L.P., | Case No. 21-10529 (SHL) |
| Debtor. | |

**NOTICE OF MOTION OF VITRA, INC. TO DISMISS THE DEBTOR'S**
**BANKRUPTCY CASE OR, IN THE ALTERNATIVE, TO CONVERT**
**THE DEBTOR'S CASE TO A CASE UNDER CHAPTER 7 OF THE**
**BANKRUPTCY CODE, AND FOR RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing (the "**Hearing**") on the *Motion of Vitra, Inc. to Dismiss the Debtor's Bankruptcy Case or, in the Alternative, to Convert the Debtor's Case to a Case Under Chapter 7 of the Bankruptcy Code, and for Related Relief* (the "**Motion**") filed by Vitra, Inc. (the "**Movant**") in the chapter 11 case of Ninety-Five Madison Company, L.P. (the "**Debtor**") will be held before the Honorable Sean H. Lane, United States Bankruptcy Court for the Southern District of New York (the "**Court**"), on **June 3, 2021 at 10:00 a.m. (prevailing Eastern time)**.

**PLEASE TAKE FURTHER NOTICE** that in light of the COVID-19 pandemic and the Court's General Order M-543 ("**General Order M-543**"), dated March 20, 2020, the Hearing will only be conducted telephonically. Parties wishing to participate in the Hearing must make arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to the General Order M-543.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Bankruptcy Court on the docket of *In re Ninety-Five Madison Company, L.P.*, Case No. 21-10529  (SHL) by registered users of the Bankruptcy Court's electronic filing system and in accordance with General Order M-399 (which is available on the Court's website at http:www.nysb.uscourts.gov); and (d) be served so as to be actually received on **May 27, 2021 at 4:00 p.m. (prevailing Eastern time)** (the "**Objection Deadline**"), by: (i) counsel for Vitra, Inc.: Sills Cummis & Gross P.C., 101 Park Avenue, 28th Floor, New York, New York 10178 (Attn: S. Jason Teele, Esq. and Joshua N. Howley, Esq.); (ii) counsel for the Debtor: Windels, Marx, Lane & Mittendorf, LLP, 156 West 56th Street, New York, New York 10019 (Attn: Charles E. Simpson, Esq.); and (iii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014.

**PLEASE TAKE FURTHER NOTICE** that only those responses that are timely filed, served, and received will be considered at the Hearing.  **Failure to file a timely objection may result in entry of a final order granting the Motion**.

Dated: New York, New York　　　　　　　　**SILLS CUMMIS & GROSS, P.C.**
　　　　April 6, 2021　　　　　　　　　　　*Attorneys for Vitra, Inc.*

　　　　　　　　　　　　　　　　By:　_/s/ S. Jason Teele_
　　　　　　　　　　　　　　　　　　S. Jason Teele, Esq.
　　　　　　　　　　　　　　　　　　101 Park Avenue, 28th Floor
　　　　　　　　　　　　　　　　　　New York, New York 10178
　　　　　　　　　　　　　　　　　　Tel. (212) 643-7000

7987560

**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq.
Joshua N. Howley, Esq.
101 Park Avenue, 28th Floor
New York, New York 10178
Tel. (212) 643-7000
E-mail. steele@sillscummis.com
           jhowley@sillscummis.com
*Attorneys for Vitra, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| NINETY-FIVE MADISON COMPANY, L.P., | Case No. 21-10529 (SHL) |
| Debtor. | |

**MOTION OF VITRA, INC. TO DISMISS THE DEBTOR'S BANKRUPTCY CASE OR,
IN THE ALTERNATIVE, TO CONVERT THE DEBTOR'S CASE TO A CASE UNDER
CHAPTER 7 OF THE BANKRUPTCY CODE, AND FOR RELATED RELIEF**

Vitra, Inc. ("**Vitra**") submits this motion (the "**Motion**") to dismiss the chapter 11 case of Ninety-Five Madison Company, L.P. (the "**Debtor**") or, in the alternative, to convert the Debtor's case to a case under chapter 7 of the Bankruptcy Code (defined below) and for related relief. In support of the Motion, Vitra respectfully states as follows:

**PRELIMINARY STATEMENT**

This chapter 11 case is the product of a long-running dispute between the Debtor, as landlord, and Vitra, as tenant, resulting from significant misconduct by the Debtor and its principal. From the inception of the Lease (defined below) in 2016, the Debtor's principal, Rita Sklar, has engaged in a pattern of bad faith, intentional conduct to obstruct, delay, and prevent Vitra's planned renovations of the Premises (defined below) that were called for in the Lease. This behavior includes, among other things: ignoring and violating a court-approved settlement agreement and multiple arbitration orders; concealing material facts from the New York Supreme Court, the arbitrator, the New York City Landmark Preservation Committee and Vitra;

7954088

actively – and without any authority or justification – locking Vitra out of the Premises; fraudulently inflating pre-occupancy electric bills; ignoring or stalling construction plans that required Debtor approval, or lodging a myriad of objections to delay approving those plans; and denying access to the Premises and Property (defined below) to Vitra's contractors and subcontractors.

The Debtor filed bankruptcy as a last ditch effort to exert leverage over Vitra after it lost in every court and arbitration proceeding, and after Vitra was in the process of enforcing various money judgments entered in its favor. The Debtor's stated goal is to use the force of the automatic stay offensively against Vitra rather than making good on its obligations to Vitra.

But there are two inescapable truths that must be confronted in this case. First, the filing does not serve a valid bankruptcy purpose. The Debtor alleges that is has a single asset – a building located at 95 Madison Avenue in New York City that is valued at over $56 million.[1] *See* Docket No. 10 *Schedule A/B: Assets – Real and Personal Property*. That property is unencumbered. The Debtor's total liabilities are approximately $9.3 million. *See id. Schedule E/F: Creditors Who Have Unsecured Claims*. The Debtor is highly solvent. It has no secured creditors apart from Vitra's judgment claim and few unsecured creditors. *See id. Schedule D: Creditors Who Have Claims Secured By Property*. There is no demonstrable need to reorganize its business. The Debtor filed bankruptcy merely to obtain a tactical litigation advantage over Vitra.

Second, if the Debtor is allowed to remain in bankruptcy, its principal (and sole employee/representative) should be replaced by a trustee. Sklar has proven that she cannot be trusted to carry out agreements that the Debtor is a party to, obey court orders, or act other than in an underhanded, deceitful, and dishonest way. Certainly, she cannot be trusted to perform the

---

[1]     Although the Debtor claims to be a single asset real estate debtor, its counsel advised Vitra's counsel that the objective in this case is to liquidate other Debtor assets to pay all creditors in full. *See also Docket No. 10 Schedule A/B: Assets – Real and Personal Property* (listing accounts receivable of $5 million).  This contradicts the assertion that this is a single asset real estate bankruptcy. It also demonstrates that the Debtor was not insolvent or in financial distress prior to filing and that it does not need or intend to restructure its "sole" asset.

fiduciary duties of a debtor in possession. Sklar's conduct toward Vitra is indicative of her general demeanor. In a recent lawsuit filed by one of the Debtor's limited partners against the Debtor, Sklar and RAS Property Management LLC ("**RAS**"), the entity that manages the Property and is wholly-owned by Sklar, the plaintiff made serious allegations that Sklar has engaged in "years of unchecked fraud, theft and gross mismanagement." That lawsuit led to the dissolution of the Debtor. (The order of dissolution was stayed pending appeal.) If dismissal is not an option, conversion to chapter 7 is the only way to protect creditors and the alleged sole asset of the estate, and ensure that the Debtor faithfully executes its duties under the Bankruptcy Code.

## RELIEF REQUESTED

1.      By this Motion, Vitra requests the entry of an order dismissing the Debtor's chapter 11 case pursuant to 11 U.S.C. § 1112(b) or, in the alternative, converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code, and granting related relief.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.).

3.      Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for this Motion are 11 U.S.C. §§ 105(a) and 1112(b) and Rule 1017 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

**A.      About The Debtor And Sklar's Mismanagement**

4.      The Debtor is a New York limited partnership. Upon information and belief, RAS is the Debtor's general partner and manages the Property, and Sklar is the sole member of RAS.

5.      Lois Weinstein, Sklar's half-sister (now deceased) made serious allegations in a 2019 lawsuit, that Sklar had engaged in years of fraud, theft and gross mismanagement of the Debtor and other properties owned by Sklar and Weinstein. *See* Declaration of Karen Stein (the "**Stein Decl.**"), submitted herewith, at ¶ 4.  Among the allegations are the following:

(a) Sklar's "response to any business situation is to seemingly be intransigent, obstructionist and bellicose";

(b) Sklar's mismanagement and conduct has mired the Debtor in at least five major legal battles in recent years. In one, Sklar caused the Debtor to enter into a settlement with the plaintiff, breached the agreement, then engaged in legal maneuvers resulting in the expenditure of far more money in legal fees than the cost of the settlement to the Debtor;

(c) Sklar caused her counsel to file false and frivolous pleadings in Surrogate Court;

(d) Sklar lacks any competence as a real estate manager;

(e) Although not a licensed real estate broker, Sklar regularly holds herself out as one and demands to be paid commissions;

(f) Sklar's mismanagement of the Property and other properties owned by Sklar and Weinstein, and controlled exclusively by Sklar, resulted in the properties remaining "vacant and unrented and in several instances, left as vacant land";

(g) Sklar absconded with $4.5 million owed to Weinstein from the sale of another property in 2012;

(h) Sklar consistently withheld information – including partnership tax returns – about the operation of the Debtor;

(i) Sklar fraudulently induced Weinstein to assign her interest in the sale of a property to an entity owned and controlled by Sklar;

(j) Sklar altered a contract for the sale of a property after it was executed; and

(k) In a Section 1031 exchange transaction, Sklar invested proceeds from the sale of a property in the Debtor, rather than using the money to acquire another property while still claiming the Section 1031 exemption on tax returns. Allegedly, Sklar did this in order to support her lavish lifestyle which is financed almost entirely from fees the Debtor pays to RAS.

*See id.* at ¶ 6.

6.      Weinstein's lawsuit led to an order of the New York Supreme Court declaring

-4-

that the Debtor was dissolved by operation of law as a result of the appointment of the Receiver (discussed and defined below). *See id.* at ¶ 7. That order was stayed pending appeal.

**B.      The Debtor's Chapter 11 Filing**

7.      On March 22, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition (the "**Petition**") for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

8.      The Debtor is operating its business and in possession of its assets as a "debtor in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      No trustee or examiner has been appointed in the Debtor's case.

10.      The Petition alleges that the Debtor is a "single asset real estate debtor" with assets in the range of $50 million to $100 million and liabilities in the range of $1 million to $10 million. The Debtor's schedules of asset and liabilities list total assets of approximately $66.7 million and total liabilities of approximately $9.3 million.

11.      The Debtor's primary asset is the real property located at 95 Madison Avenue, New York, New York (the "**Property**"). According to Debtor's schedules of assets and liabilities, the Property is valued in excess of $56 million and is wholly unencumbered by a mortgage lien or any other encumbrance. *See* Docket No. 10.

12.      Upon information and belief, the Debtor has no employees and acts exclusively through its principal, Ms. Sklar and/or employees of RAS.

13.      Local Rule 1007-2 requires that an affidavit accompany the petition setting forth crucial information, *inter alia*, about the Debtor, its assets and liabilities, management and finances.  As of the date of this Motion, the Debtor has failed to file that affidavit.

**C.      About Vitra**

14.      Vitra is the U.S. subsidiary of Vitra International, A.G. ("**Vitra International**"), an internationally renowned manufacturer of high end modern furniture and accessories with production facilities and sales locations in many countries around the world. *See* Stein Decl. at ¶ 9. Vitra International has more than 70 years of experience in the design of modern furniture, and

interior stores and showrooms to display and promote its products. *Id*. It has commissioned distinguished architects and maintains a renowned museum of design in Weil-am-Rhine, Germany. *Id*.

15.    Vitra International and its subsidiaries have approximately 20 showrooms around the world, mostly in leased premises. *See id*. at ¶ 10. In North America, until recently, Vitra had showrooms in Los Angeles, San Francisco, Chicago, New York and Toronto, Canada. *Id*. Until December 2016, Vitra's New York showroom was located at 29 Ninth Avenue in the Meatpacking District. *Id*. Vitra had a harmonious relationship with its Ninth Avenue landlord. Vitra has never been involved in litigation with any landlord, except the Debtor. *Id*.

**D.    Vitra's Disputes With The Debtor And Sklar**

**1.    Vitra Leases The Debtor's Premises**

16.    In 2016, Vitra decided to move its showroom and offices at 29 Ninth Avenue in Manhattan to the Debtor's Property, because its lease was expiring and because lower Madison Avenue, where the Premises is located, is a center for architecture and interior design firms. *See id*. at ¶ 11.

17.    On June 18, 2016, the Debtor, as landlord, and Vitra, as tenant, entered into a lease (the "**Lease**") for a street-level showroom and second floor office space (the "**Premises**") in the Property. *See id*. at ¶ 12. The Lease provided for a term of 11 years and nine months. *Id*.

18.    The Lease required the Debtor to complete defined construction (the "**Landlord's Work**") within six weeks of execution, *i.e.*, by the end of July 2016. *See id*. at ¶ 13. The Debtor was also required to install dunnage[2] for four air conditioning units for use by three tenants, one of which was Vitra, and the fourth unit for the Debtor's future lobby air conditioning. *Id*. Vitra was responsible for renovating the Premises and committed to spend a minimum of $1,912,500 in hard costs of construction within nine months, which construction could not commence until the Debtor approved Vitra's plans. *Id*.

---

[2]    Dunnage is an intermediate structural platform used to support large equipment, primarily on the rooftop of a building.

19.     This schedule immediately collapsed in the chaos created by Sklar, who insisted on imposing on Vitra her own ideas about how Vitra's showroom should be designed. *See id.* at ¶ 14. Sklar threatened to keep Vitra out of the Premises unless Vitra accepted her designs, a threat she has made good on: Vitra still has not been able to complete construction or open for business at the Property nearly five years after the Lease was executed. *Id.*

### 2.     Debtor Breaches The Lease And Obstructs Vitra's Efforts To Renovate The Premises

20.     Four months after the Lease was signed, the Debtor still had not begun the Landlord's Work. On October 19, 2016, Vitra's project manager sent a letter demanding that Landlord's Work be completed by November 2, 2016, time being of the essence. Sklar responded with rage and threatened to "make Vitra's life miserable." *See id.* at ¶ 15. At the time, however, Sklar already had in her possession architectural plans for the mezzanine demolition and a bid for the work. *Id.* She kept this information secret from Vitra until after Vitra filed an action in the New York Supreme Court (the "**State Court**"), discussed below. *Id.* The Debtor refused to begin undertaking the Landlord's Work until the eve of the State Court trial, in November 2017. *Id.* The Landlord's Work was soon halted because it was commenced without a permit.

21.     For its part, Vitra hired Gensler, a global design and architecture firm, to design the showroom. *See id.* at ¶ 16. Gensler is one of the preeminent architectural firms in the world, and has provided high quality and well-recognized design services covering many millions of square feet of space to both landlords and tenants. *Id.*

22.     Between July and September 2016, Vitra and Gensler developed their plans for the showroom. *See id.* at ¶ 17. On September 21, 2016, Vitra and its project manager met with Sklar to show her the design Vitra had selected. *Id.* Sklar claimed that the design wasn't prestigious enough and, in her opinion, didn't properly promote Vitra's brand. *Id.* She also objected to the location of an interior stair at the right rear of the Premises. *Id.* Sklar refused to allow Vitra to move forward with the design and threatened to keep Vitra from getting into the

Premises on time. *Id.*

23.     Sklar also claimed that a decommissioned dumbwaiter shaft was not part of the Premises despite the fact that the Lease clearly showed that it is. *See id.* at ¶ 18. She later agreed that Vitra could use the dumbwaiter shaft, but only if Vitra paid additional rent. *Id.*

24.     In or around January 2017, Sklar showed Vitra her own design for the showroom, which she called her "vision" for a "Vitra U.S. Mini Campus at 95 Madison." *See id.* at ¶ 19. Sklar's design included her opinions about flooring, signage, door design and use of different areas within the Premises. *Id.* On January 31, 2018, Sklar expressed her views as to how the back wall of the showroom should look, and proposed that Vitra rent additional space in the basement, for an additional rent of $201,150 per year. Sklar even suggested that Vitra should look at the interior staircase of a building on East 73rd Street as an example she was fond of. *Id.*

25.     In general, Sklar tried to micromanage Vitra's design, involving herself in the smallest details, insisting, without the right to do so, that she knew better than Vitra and its professionals what was in Vitra's best interests. It eventually became apparent that she intended to attempt to force Vitra to adopt her design ideas.

26.     Vitra spent hundreds of thousands of dollars preparing four different sets of plans for the showroom, but Sklar rejected them all because they did not comport with her vision of how the Premises should look. *See id.* at ¶ 20.

27.     Sklar also compelled Vitra to pay exorbitant rates for electricity during this time. The Lease provides that electricity will be supplied by the Debtor through submeters installed by Vitra, using Landlord's electrical contractor, and that Vitra would pay for its actual consumption and *pro rata* share of any taxes as additional rent. *See id.* at ¶ 21. However, Vitra could not install the submeters because Sklar refused to approve its own electrical contractor's scope of work. *Id.* In December 2016, Sklar wildly over-billed Vitra for electricity retroactively at the rate of $12,105.75 per month. That amounted to $12.15 per square foot per year for space that was unoccupied and without lighting, except construction string lights. *Id.* At that time, the flat rate for electricity on a commercial lease for occupied space was no more than $3.50 per square foot

per year. *Id*. On that basis, electric charges for a fully occupied premises would amount to $3,517.50 per month. Vitra paid the fraudulent invoice under protest as Sklar made it clear that she refused to proceed without payment. *Id*.

### 3.    Vitra Sues The Debtor In State Court

28.    By March 2017, Vitra's architect had submitted two full sets of plans to the Debtor. The Debtor responded with voluminous comments, and rejected both sets. Though Vitra had paid its rent, the Debtor had not even begun its required construction that was supposed to be finished in July 2016, and the project was at a standstill.

29.    In April 2017, Vitra withheld its rent and the Debtor served a Notice of Default.

30.    On May 1, 2017, Vitra commenced an action in the State Court for a "Yellowstone" injunction.[3] *See id.* at ¶ 22.

31.    After several conferences before the State Court, Vitra was directed to have its professionals prepare a new set of plans. *See id.* at ¶ 23. The Debtor would have the opportunity to submit comments, and then the parties and their professionals would appear in court. *Id*. On May 12, 2017, Vitra submitted its third set of plans. *Id*. The Debtor issued its objections. *Id*. In June 2017, the parties and their professionals appeared in court. *Id*. Despite lengthy negotiations, no resolution of the Debtor's objections was reached. *Id*.

32.    At the next conference, the State Court suggested mediation, and recommended three mediators, one of whom was Stephen G. Crane, J.S.C. (ret.) of JAMS (the "**Arbitrator**"), an esteemed retired judge. *See id.* at ¶ 24. After consultation, the parties agreed to mediate before Justice Crane, which mediation was unsuccessful. *Id*.

33.    Trial was then scheduled for December 5 and 7, 2017. *See id.* at ¶ 25. On December 5, 2017, just before opening statements, and with the encouragement of the State Court, the parties entered into new settlement discussions. *Id*. Negotiations continued on December 5 and 6, and before the State Court on December 7. *Id*.

---

[3]    A Yellowstone injunction tolls a commercial tenant's time to cure alleged lease defaults while challenging the legitimacy of those defaults. *See*, *e.g.*, *First Nat'l Stores, Inc. v. Yellowstone Shopping Ctr., Inc.*, 21 N.Y.2d 630 (1968).

34.     By that time, twenty one (21) months had elapsed since execution of the Lease. Yet, the Debtor had still failed to start Landlord's Work, the dunnage, or approve Vitra's plans. *See id.* at ¶ 26. But, on December 7, 2017, the parties entered into a Settlement Agreement (the "**Settlement**"), which the State Court approved by so-ordering the record. *Id.*

35.     Sklar was present at the hearing, and stated under oath that she understood the Settlement, had no questions about it, voluntarily agreed to it, and entered it of her own free will, without coercion. *See id.* at ¶ 27.

36.     The Settlement was intended to compensate Vitra for the Debtor's months of obstruction and – more importantly – to provide a timetable that would finally enable Vitra to take possession of a completed showroom. The Settlement provided a rent credit to Vitra in the sum of $506,250; approved Vitra's plans and required the Debtor to sign off on permit applications within three days of submission; created a mechanism to resolve the electricity dispute; resolved the dumbwaiter issue in Vitra's favor; provided for timetables and contractor selection for the elevator work and for building an ADA-compliant entrance ramp; set April 15, 2018 as the deadline for completion of the Landlord's Work and dunnage; provided for a rent abatement if those deadlines were not met; and provided a deadline for Vitra to complete its renovation of the Premises based on the completion of Landlord's Work. *See id.* at ¶ 27.

37.     If the Debtor had conducted itself in good faith, the Stipulation would have resolved the disputes between the parties and provided a basis for a harmonious landlord-tenant relationship. That didn't happen.

### 4.     The Debtor Immediately Breaches The Settlement

38.     After entering into the Settlement, Vitra discovered the Debtor had been in discussions with the Landmarks Preservation Commission ("**LPC**") with respect to the Property since, at least, October 2017. *See id.* at ¶ 28. On February 5, 2018, the LPC designated the building as a landmark. *Id.* Sklar knew of the LPC's interest for months, but concealed this fact both from the State Court and Vitra. *Id.* The Property's landmark status added an additional layer of regulatory approval, and construction delay, because the New York City Department of

Buildings cannot issue building permits for work affecting the landmarked elements of the building unless and until the LPC approves the work plans.

39.     On March 22, 2018, the Debtor locked Vitra out of the Premises. *See id.* at ¶ 29. The Arbitrator thereafter ordered the Debtor to restore Vitra to possession, which it finally did on March 29, 2018. *Id.*

40.     At a hearing before the Arbitrator in April 2018, Vitra raised significant issues relating to the LPC, including the documents that would comprise the newly-required application to the LPC, especially the exhibits reflecting the entryway. *See id.* at ¶ 30. By the end of the hearing, the parties agreed on the exhibits to the application, and it was agreed that the Debtor would submit them to the LPC with Vitra's representative present. *Id.* After the hearing, however, Sklar unilaterally altered the exhibits and presented them to the LPC without Vitra's representative present and without informing the Arbitrator. *Id.*

41.     Thus, only three months after the Settlement was approved, Vitra was compelled to seek further relief from the Arbitrator. *See id.* at ¶ 31. Vitra sought various forms of relief, including termination of the Lease or, in the alternative, the appointment of a receiver. Vitra claimed, among other things, that neither the Landlord's Work nor the dunnage had been completed, and Vitra was therefore entitled to a complete rent abatement. *Id.*

42.     On June 18, 2018, the Arbitrator ruled (the "**First Interim Award**") that the Debtor breached the Settlement by not completing the Landlord's Work and the dunnage until April 24, 2018 (nine days after the deadline agreed to by the parties in the Settlement); determined that Vitra was entitled to a nine-day rent abatement pursuant to terms of the Settlement; granted Vitra's request for treble damages under New York law for the seven-day illegal actual eviction; granted Vitra's request to refund approximately $100,000 in excessive electrical charges; approved Vitra's plans for a handicapped ramp at the entrance to the Premises; and ordered the Debtor to submit to the LPC an application for approval of Vitra's entrance design. *See id.* at ¶ 32.

43.    The First Interim Award denied Vitra's request to terminate the Lease as being outside the scope of his authority under the Settlement. And, while finding he had authority to appoint a receiver, the Arbitrator decided to hold Vitra's request in abeyance "pending the faithful and timely observance" by the Debtor of its obligations under the Lease and Settlement.

44.    Vitra moved to reargue two aspects of the First Interim Award: (i) whether the Debtor was obligated to construct dunnage for four air conditioning units; and (ii) Vitra's claim for attorneys' fees as the prevailing party on the First Interim Award. On March 10, 2019, after written submissions and oral argument, the Arbitrator ruled (the "**Third Interim Award**")[4] that the parties had agreed that the Debtor would install dunnage for all four air conditioning units at the same time so that Vitra's occupancy of the second floor office space would not be disturbed by subsequent construction of dunnage. Accordingly, the Arbitrator ruled that, under the Settlement, Vitra's rent was abated and the abatement would continue until the Debtor completed all four dunnage installations. The Third Interim Award also awarded attorneys' fees to Vitra as the prevailing party on the First Interim Award.

### 5.    Additional Orders And Further Misconduct By The Debtor And Sklar

45.    By the end of October 2018, the initial approval from the LPC and the Department of Buildings permit needed to start construction were issued, but Sklar continued to obstruct Vitra from building out the showroom. *See* Stein Decl. at ¶ 34. She refused to approve subcontractors or to allow Vitra's contractor and subcontractors to access parts of the Property outside Vitra's Premises. *Id*. After a series of conference calls, the Arbitrator requested counsel to stipulate to a set of procedures that could be used to normalize construction access and the process to facilitate that access. *Id*. Agreement proved impossible. *Id*. On November 13, 2018, Vitra submitted a proposed order. *Id*. The Debtor submitted a counter-proposed order on November 19, 2018. *Id*.

---

[4]    A second interim award, issued by the Arbitrator on February 24, 2019, is discussed below.

46.     In the meantime, the Debtor and Sklar continued their obstruction efforts at the LPC. Although the First Interim Award approved Vitra's plans for the entrance to the Premises, and ordered the Debtor to submit Vitra's plans to the LPC, the Debtor did not comply. *See id.* at ¶ 35. Instead, the Debtor submitted an application to the LPC with a cover letter seeking to undermine the First Interim Award by arguing in favor of its own plan, which the Arbitrator had rejected. *Id*. The cover letter did not inform the LPC of the First Interim Award. *Id*. Vitra submitted the First Interim Award to the LPC upon learning of the Debtor's actions. *Id*.

47.     On November 22, 2018, the Arbitrator signed Vitra's form of order (the "**November 22 Order**") with only a few revisions.  *See id.* at ¶ 36. The November 22 Order, *inter alia*, (i) directed Vitra to provide monthly construction cost statements as required by Article 78 of the Lease and pay two outstanding freight elevator charges, (ii) set out procedures for contractors' access during normal business hours to "all areas of the Building associated with (Vitra's) Initial Alterations" including the basement, courtyard roof, and top of the elevator shaft, (iii) required the freight elevator to be available during those hours, (iv) provided for access to the back stairs and side entrance, (v) provided for timely review of insurance certificates, (vi) regulated the voluntary progress review meetings between the Debtor and Vitra's construction manager and contractor, and (vii) as provided for in the Settlement, prohibited the Debtor from dealing directly with Vitra's contractor except in emergencies. It also required each party to appoint the third-party inspector of its choice, and provide notice to the other before either party communicates with the LPC. In other words, the November 22 Order was intended to facilitate Vitra's renovations, while preserving the Debtor's right to seek compensation to the extent provided in the Lease. But the significant point was that the Debtor could not set arbitrary conditions to delay or interfere with Vitra's construction, as contemplated by the Settlement.

48.     The Debtor sought reconsideration of the November 22 Order, arguing that it contravened provisions of the Lease and Settlement. *See id.* at ¶ 37. On February 24, 2019, the Arbitrator issued a second interim award (the "**Second Interim Award**"). *See id.* The Second Interim Award provided that the protocols in the November 22 Order were necessary, that they

were not inconsistent with Article 78 of the Lease or otherwise, and that the Lease requires the Debtor to provide ordinary building services during working hours without extra charge, except for the freight elevator. It also rejected the Debtor's argument that Vitra was at fault for not starting work on its renovations before obtaining approval from the LPC, finding that the delays were attributable to the Debtor's calculated efforts to undermine Vitra's application, in breach of the implied covenant of good faith.

49.    Notwithstanding the First Interim Award, Second Interim Award, Third Interim Award and the November 22 Order, the Debtor continued to obstruct Vitra's renovations. *See id.* at ¶ 38. Among other things, the Debtor obstructed Vitra's subcontractors who were installing two condenser units on the dunnage, running conduit from the condenser units to Vitra's second floor premises, and installing the fire alarm system. *See id.* On March 12, 2019, the Arbitrator held a hearing to consider the Debtor's misconduct. *Id.* Sklar did not appear at the hearing, but Debtor's counsel confirmed that this work was approved. *Id.*

50.    The following day, Sklar refused to allow the rigging subcontractor to use the freight elevator to transport its rigging equipment to the second floor. *See id.* at ¶ 39. On March 13, 2019, the Arbitrator ordered the Debtor to allow this subcontractor to use the freight elevator to move its rigging equipment to install the two 750-pound air conditioning units to the courtyard roof. The Debtor and Sklar ignored the order. *Id.*

51.    On April 10, 2019, after the Debtor refused basement access to Vitra's contractor and subcontractors for two days in violation of the Settlement and November 22 Order, the Arbitrator ordered the Debtor to provide, and not interfere with, such access. *See id.* at ¶ 40. On the same day, given the Debtor's unrelenting obstruction, the Arbitrator appointed a temporary receiver (the "**Receiver**") to exercise the Debtor's authority with respect to the renovations that Vitra had been attempting to complete since the Lease was signed in 2016. *Id.*

52.    On April 15, 2019, the Arbitrator issued an additional order directing the Debtor to provide Vitra access to the freight elevator and threatening significant monetary sanctions for any violations. *See id.* at ¶ 41. The Arbitrator wrote that he had "leaned over backwards to

-14-

accommodate the [Debtor's] legitimate needs which was met with *continuous misbehavior, distortion of facts and bad faith deprivation of the benefits of the bargain that [Vitra] is legally entitled to expect*."  In response to this order, the Debtor sought the Arbitrator's disqualification based on an allegation of gender bias, which relief was denied by JAMS, the Supreme Court, and the First Department on appeal. *See id.* at ¶ 41.

53.     On July 2, 2019, the Arbitrator entered a fifth award (the "**Fifth Interim Award**"), which he amended in an amended award (the "**Amended Fifth Interim Award**") dated August 8, 2019, in which he appointed Danielle C. Lesser, Esq. of Morrison Cohen LLP to serve as the Receiver of the Debtor due to the Debtor's unrelenting misconduct. *See id.* at ¶ 42. Ms. Lesser was appointed "in respect of all of Landlord's obligations, responsibilities and prerogatives under the Lease, the Settlement Agreement, and pursuant to the Orders of the arbitrator[.]" The Amended Fifth Interim Award found that Ms. Lesser's appointment was warranted "[i]n view of the Respondent's actions, misconduct and repeated violations of its obligations, responsibilities and prerogatives as Landlord regarding the Claimant's Initial Alterations[.]"

54.     The Debtor and Sklar, sought Ms. Lesser's removal on several occasions and refused to honor the award appointing Ms. Lesser as Receiver. For example, in Ms. Lesser's Affirmation submitted in the Arbitration dated July 6, 2020, she wrote:  "Under the [Amended Fifth Interim] Award, I should have the right to direct employees and manage permits but Landlord has interfered with my independent exercise of this authority. Landlord interferes with access to the Building and causes its employees to ignore my directions." *See id.* at ¶ 43.

55.     On August 29, 2019, the Arbitrator entered an Order directing the Debtor to file a permit on the New York Department of Buildings' website within two business days or face a monetary sanction of $25,000 per day. *See id.* at ¶ 44. Needless to say, the Debtor filed the permit twenty one (21) days after the Arbitrator's deadline. *Id.* Consequently, on January 7, 2020, the Arbitrator entered awarded Vitra $525,000 in monetary sanctions, which award the

Supreme Court upheld, and a money judgment was entered in Vitra's favor. *Id*. Vitra was in the process of collecting that judgment when the Debtor filed for bankruptcy.

56.    Most recently, on February 16, 2021, the State Court held oral argument on various motions in the State Court lawsuit. *See id.* at ¶ 45. During that argument, the court expressed frustration that the Debtor had failed to pay the Receiver despite the Debtor's obligation to do so under the Arbitrator's awards. *Id*. Ultimately, the court gave the Debtor a period to time to pay the Receiver and, failing that, Vitra would have to pay her and then seek to hold the Debtor in contempt. The court stated, "but if [Vitra] is left holding the bag here, you know, I think Mr. Laplaca [Debtor's counsel], you should advise your client that this will now be a violation of a very specific court order, and failure to comply with it is, shall we say, not a good idea." *Id*.

57.    In sum, the Debtor – acting through Sklar – reneged on the promises it made to Vitra in the Settlement, disregarded is obligations under the Lease, withheld information from Vitra, took deliberate steps to obstruct Vitra's access to the Property and the renovation of the Premises, disregarded the Arbitrator's orders, and intentionally deceived the State Court, the Arbitrator, the LPC and Vitra.

**6.    Sklar And the Debtor Absconded With Vitra's Security Deposit**

58.    The Lease required Vitra to provide the Debtor with a 285,000 security deposit. *See id.* at ¶ 46. Vitra paid the security deposit contemporaneously with executing the Lease in 2016. *See id.*

59.    After Vitra's innumerable problems described herein with the Debtor arose, Vitra asked the Debtor at which bank its security deposit was held and for confirmation that it was in a trust account in accordance with New York law. *See id.* at ¶ 47. The Debtor refused to provide this information or confirm that the security deposit was held in trust. *Id*.

60.    More recently, after Vitra garnished the Debtor's account at Rhinebeck Bank as part of its efforts to levy on its judgment, the Debtor's counsel advised Vitra's counsel that Vitra's security deposit was part of the monies that had been garnished, and demanded that Vitra

replenish the security deposit. *See id.* at ¶ 48. If the security deposit was held in trust as New York law requires, it would not have been susceptible to garnishment. Vitra therefore believes that the Debtor and Sklar stole the security deposit by comingling it with its own funds in violation of NY Gen Oblig Law § 7-103, which requires landlords to hold funds deposited as security under a lease in a trust.

61.     Vitra's security deposit is not the only security deposit the Debtor may have unlawfully taken. In a recent lawsuit by Tellas Ltd., a former tenant in the Property, filed in the State Court, it is alleged that the Debtor failed to return a $239,094.96 security deposit. *See id.* at ¶ 49.

## ARGUMENT

### A.     Standard For Dismissing Or Converting The Debtor's Case

62.     Bankruptcy Code section 1112(b) requires a court to dismiss or convert a case to chapter 7, whichever is in the best interests of creditors and the estate, on request of a party in interest, and after notice and a hearing, "for cause" unless the court determines that the appointment of a trustee or an examiner under Bankruptcy Code section 1104(a) is in the best interests of creditors and the estate. *See* 11 U.S.C. § 1112(b)(1).

63.     Rather than provide a definition of "cause," the Bankruptcy Code enumerates sixteen examples, any one of which is sufficient to justify the dismissal or conversion of a case. *See* 11 U.S.C. § 1112(b)(4). These examples, however, are not exhaustive, and courts are free to consider other factors in determining whether cause to dismiss or covert exists. *See In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n. 3 (Bankr. S.D.N.Y. 2009); *In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) ("A finding of cause is not limited to the grounds stated in 1112(b)").

64.     While the movant bears the burden of establishing cause, it must do so merely by preponderance of the evidence. *See In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010) (quoting *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 170 (Bankr. S.D.N.Y. 2004)). Bankruptcy courts enjoy wide discretion in determining whether the facts of a particular case

constitute "cause" for dismissal or conversion under section 1112(b). *See In re Kholyavka*, 2008 WL 3887653, at *5 (Bankr. E.D. Pa. 2008) (quoting H. Rep. 595, 95th Cong., 1st Sess. 405 (1977), U.S. Code Cong. & Admin. News 1978, p. 5963)). As demonstrated below, more than sufficient cause exists to dismiss or convert the Debtor's case.

**B.     The Debtor's Case Was Filed In Bad Faith And Should Be Dismissed**

65.     The requirement that a debtor file a bankruptcy petition in good faith is implicit in section 1112(b), and bad faith is a widely recognized ground for dismissal or conversion. *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.07(1). The Second Circuit endorsed the principle that a chapter 11 case can be dismissed as a bad faith filing in *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997).

66.     A debtor's good faith is intended "to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws," *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994), and to ensure that the hardships imposed on creditors by operation of the automatic stay and other provisions of the Bankruptcy Code, are justified by fulfillment of statutory objectives. *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3rd Cir. 1999) ("When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code"). When a debtor has "no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *SGL Carbon*, 200 F.3d at 166. Petitions filed by debtors in such circumstances are subject to dismissal as bad faith filings.

**1.     The Debtor Is Not Need Of Rehabilitation Because It Is Solvent And Not Suffering Financial Distress**

67.     The most conspicuous element of the good faith requirement is that the debtor needs chapter 11 relief. *See In re Liberate Techs.*, 314 B.R. 206, 211 (Bankr. N.D. Cal. 2004). When a debtor is solvent, "the only bankruptcy policy implicated is the avoidance of piecemeal liquidation that destroys the going concern value of an enterprise." *Id.* at 212. As this Court ruled in *In re Johns-Manville Corp.*, "[t]he key aim of Chapter 11 of the Code . . . [is] avoidance of

liquidation. The drafters of the Code announced this goal, declaring that reorganization is more efficient than liquidation because assets that are used for production in the industry for which they are designed are more valuable than those same assets sold for scrap." 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984).

68.     When insolvency or financial distress are not present, there must be another valid reason for seeking bankruptcy protection that renders the debtor in need of rehabilitation. Courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11." *SGL Carbon*, 200 F.3d at 166; *see also*, *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 376-77 (Bankr. D. Del. 2018) (dismissing chapter 11 cases as bad faith filing where the debtors were solvent and not in financial distress at the time the bankruptcy petitions were filed, and were not facing material litigation); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989) (dismissing a chapter 11 petition as a bad faith filing after determining the debtor was not in financial distress and sought bankruptcy protection to avoid an unfavorable bargain); *Md. Port Admin. v. Premier Auto. Servs. (In re Premier Auto. Servs.)*, 492 F.3d. 274 (4th Cir. 2007) (applying the holding of SGL Carbon to uphold dismissal of chapter 11 petition as a bad faith filing where the debtor was solvent and it was determined the sole reason for filing was avoiding eviction); *Mushkogee Envtl. Conservation Co. v. Scriminger (In re Muskogee Envtl. Conservation Co.)*, 236 B.R. 57, 68 (Bankr. N.D. Ok. 1999) (finding that chapter 11 did not exist for the purpose of allowing a debtor the option of litigating a dispute with a party in an alternative forum when debtor had no other need or use for the bankruptcy court).

69.     Here, the Debtor is plainly solvent and there is no need for it to reorganize in bankruptcy. Its sole asset is the Property, which is valued in excess of $56 million and is entirely unencumbered. The sum total of claims against the Debtor is approximately $9.3 million. In short, the value of the Debtor's assets far exceed its aggregate liabilities. The sole purpose of the filing was to obtain a stay of the litigation with Vitra and its judgment collection efforts. But, the Debtor is not in need of rehabilitation because it could satisfy all of its liabilities, but chose not to

do so. The Debtor evidently did not explore options that would allow it to avoid bankruptcy, such as borrowing against its enormous equity in the Property to pay creditors.

## 2.    Pending Lawsuits Against The Debtor Do Not Justify The Filing

70.    The Debtor filed its petition ostensibly to exploit the advantage offered by the automatic stay to stop the lawsuit by Vitra and Vitra's judgment collection efforts.

71.    Bankruptcy petitions filed prematurely in response to litigation, merely to obtain the benefit of the automatic stay, have been dismissed as bad faith filings. In *SGL Carbon*, *supra*, "the leading case on dismissal for prematurity", *In re Schur Mgmt. Co.*, 323 B.R. 123, 126 (Bankr. S.D.N.Y. 2005), the debtor filed chapter 11 in response to a criminal antitrust complaint, an antitrust class action lawsuit, and numerous individual lawsuits. The Third Circuit dismissed the petition, holding that there was "no evidence that distraction [caused by the pending lawsuits] posed a serious threat to the company's operational well-being" and "no evidence that the possible antitrust judgment might force [the debtor] out of business." *SGL Carbon*, 200 F.3d at 162-63.

72.    In *In re Schur Mgmt. Co.*, a single asset real estate case like the present case, an individual was injured at the debtor's premises and brought a personal injury lawsuit. 323 B.R. at 125. The debtor filed chapter 11 on the eve of trial. *Id*. A *pro se* claimant filed a handwritten objection to the bankruptcy filing claiming it would prevent her from obtaining a fair judgment or settlement in the personal injury action. *Id*. at 126. The debtor consented to lift the stay to permit the claimant's lawsuit to proceed but objected to dismissal of its case. *Id*. In deciding whether to dismiss the petition, the court adopted the reasoning of *SGL Carbon*, and found that the debtor had ". . . no present need to file, only the mere possibility of a future need to file. They have not articulated any need for the protection of the bankruptcy laws at this stage of the State Court Litigation." *Id*. at 127 (internal quotations omitted). The court cautioned that "a Chapter 11 petition should not be used as a mechanism to orchestrate pending litigation . . . or as a litigation tactic." *Id*. at 130 (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) and *In re HBA East, Inc*., 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) (internal quotations omitted)).

73.     In the Debtor's case, neither the litigation pending against it nor Vitra's judgment support the need to file bankruptcy by an otherwise solvent company with unencumbered assets that are worth far more than its liabilities. And, as discussed previously, the Debtor did not even seek to avoid bankruptcy by, for example, borrowing against the Property, before filing the petition. The only reason the petition was filed – as Debtor's counsel conceded to Vitra's counsel – was to stop the litigation and Vitra's judgment enforcement efforts (*i.e.*, to "orchestrate pending litigation"). *Id*. However, even if Vitra were to fully levy on the judgement entered in its favor, the impact on the Debtor's assets would be negligible. *Vitra's judgment amounts to less than one-half of one percent of the lowest range of the Property's value*. Moreover, the Debtor cannot credibly argue that the pending litigation causes a threat to the operation of its business or is so distracting as to necessitate a stay.

### 3.     The C-TC 9ᵗʰ Avenue Partnership Factors Strongly Favor Dismissal

74.     *C-TC 9th Ave. P'ship* involved a single asset real estate debtor that filed a chapter 11 petition in response to a secured creditor's foreclosure action. The Second Circuit held that the bankruptcy court did not abuse its discretion in dismissing the case where "on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *C-TC 9th Ave. P'ship*, 113 F.3d at 1309-10. The Second Circuit identified eight factors that tend to indicate that a debtor does not have a genuine intent to reorganize or a reasonable prospect of emerging successfully from bankruptcy, as follows:

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)     the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)      the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)      the debtor has little or no cash flow;

(7)      the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)      the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311 (citation omitted).

75.      The application of the *C-TC* factors supports the conclusion that the Debtor here filed this chapter 11 case in bad faith. First, the Debtor has only one asset; the Property. Second, the debtor has no secured creditors (other than the judgment lien that attaches to Vitra's judgment claim) and only a handful of creditors, and the total amount of their claims is small in comparison to the value of the Property. Third, although the Property is not the subject of a foreclosure action – because the Property is wholly unencumbered – Vitra had undertaken efforts to collect on a judgment before the Petition Date, and the filing was designed to stop those efforts. Fourth, although a former tenant is also suing the Debtor for its failure to return a security deposit, that lawsuit was in the very early stages on the Petition Date. The Vitra litigation and judgment are the primary factors that caused the Debtor to file bankruptcy. This is essentially a two party dispute that could be resolved in the State Court. Fifth, although the petition was not filed to frustrate the efforts of a conventional secured creditor to enforce its rights, Vitra does have a lien on the Debtor's property under New York law, and the petition was filed to stop Vitra's judgment collection efforts. Sixth, Vitra believes the Debtor has little or no cash flow. Seventh, the Debtor's petition discloses that real estate taxes are more than $1.2 million in arrears, so it appears the Debtor cannot meet its current expenses Finally, the Debtor has no or only a few employees.

76.      When coupled with the lack of financial distress and the fact that the Debtor's filing is nothing more than litigation tactic, it is obvious that the Debtor's petition was filed in bad faith and should be dismissed.

**C.      Alternatively, the Debtor's Case Should Be Converted to Chapter 7**

77.      There are two separate and independent grounds for converting the Debtor's case. First, the pattern of conduct by Rita Sklar, the Debtor's principal and sole representative, demonstrates that she cannot be trusted to protect the estate and the interests of creditors, and perform the fiduciary duties imposed on a debtor in possession. Second, because the Property has a value that is substantially greater than the total of all claims against the Debtor, there is no benefit that can be conferred upon creditors through a plan that could not otherwise be obtained through conversion.

**1.      Failure To Protect The Interests Of The Estate And Creditors**

78.      The officers and managing employees of a corporate debtor have a fiduciary duty to creditors and shareholders. "This creates an obligation to treat all parties, not merely the shareholders, fairly." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355–56, (1985); *see also In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001) (citing extraordinary instances of self-dealing by the debtor's principal and the court's total lack of confidence in the principal's ability and inclination to comply with his fiduciary duties as "cause" under section 1112(b)).

79.      As described in this Motion, Sklar has demonstrated a pattern of conduct indicating that she is wholly incapable of discharging the fiduciary duties of a debtor in possession. She has reneged on agreements; ignored orders by the Arbitrator; concealed material information; and apparently absconded with the security deposits posted by Vitra and a former tenant. While those examples manifested themselves most obviously in the context of the Debtor's dealings with Vitra, it is difficult to deny that there have simply been too many questionable tactics employed prior to the Petition Date to withstand close scrutiny. It cannot be in the best interests of this estate to bury that scrutiny through the terms of a plan. Instead, conversion is the appropriate remedy because appointment of a chapter 7 trustee will ensure an unbiased analysis of the estate's assets and the repayment of creditors in a more efficient and cost effective manner than will occur through a contested plan process. And, if the Debtor

proposes to pay creditors less than the full amount of their claims, it will be impossible to satisfy the 'best interests of creditors' test embodied in section 1129(a)(7) and other confirmation requirements.

80.    In addition, the estate may have valuable claims or causes of action against Sklar and other members of Sklar's family who own interests in the Debtor. Those claims and cause of action should be investigated and, to the extent necessary, pursued for the benefit of the estate and creditors. It is unimaginable that Sklar will actually investigate herself and members of her own family. An independent trustee would have the authority, free of self-interest, to look into those matters.

81.    The Debtor has already proved that it is incapable of fulfilling its duties and responsibilities as a debtor in possession. Local Rule 1007-2 requires an affidavit to be filed with the petition, setting forth information about, *inter alia*, the Debtor and its assets and liabilities, management, finances, and payroll. *See* L.B.R. 1007-2. Moreover, the Debtor has not filed any applications for "first day" relief. These motions are to obtain permission to take certain actions necessary to maintain the Debtor's business operations that cannot be taken unless the court first issues an order authorizing the debtor to take the actions. Although single asset real estate debtors commonly do not require the same kind of first day relief as other types of operating companies, such debtors commonly seek authority to continue using their pre-petition bank accounts and cash management system, pay pre-petition payroll and taxes, establish adequate protection for utility providers. The absence of any need for first day relief raises questions about how the Debtor is operating and under what authority. If the Debtor happens to be operating without first obtaining the appropriate authority form the Court, that fact would also cast doubt on whether the Debtor and Sklar are worthy fiduciaries.

## 2.    Conversion Will Benefit The Estate And Creditors More Than A Plan

82.    To confirm a plan, the Debtor will have to comply with all of the solicitation and confirmation requirements of the Bankruptcy Code. One of those requirements is that the plan must be in the best interests of creditors. *See* 11 U.S.C. § 1129(a)(7). It requires that, for a given

class of claims, each holder of a claim or interest in such class must either (i) accept the plan or (ii) "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain" in a hypothetical chapter 7 liquidation (*i.e.*, creditors must receive at least what they would receive in a chapter 7 liquidation). *Id*. Here, only payment of all creditors' claims in full will satisfy the 'best interests of creditors' test, because the Debtor has unencumbered property with a value far in excess of the total amount of all claims. Creditors can be paid in chapter 7 far quicker and more efficiently than a potentially contested plan process.

83.    In light of Sklar's history of mismanagement and her pattern of misconduct, the matter of a plan should not be left to her discretion. Instead, the estate – and the liquidation of it – should be handled by an independent fiduciary.

## **CONCLUSION**

84.    Based on the foregoing facts and authorities, protecting the interests of creditors and the estate requires that the Debtor's case be dismissed or, in the alternative, converted to chapter 7.

Dated:  New York, New York　　　　　**SILLS CUMMIS & GROSS, P.C.**
　　　　　April 6, 2021　　　　　　　　　*Attorneys for Vitra, Inc.*

　　　　　　　　　　　　　　　　By:   */s/ S. Jason Teele*
　　　　　　　　　　　　　　　　　　　S. Jason Teele, Esq.
　　　　　　　　　　　　　　　　　　　Joshua N. Howley, Esq.
　　　　　　　　　　　　　　　　　　　101 Park Avenue, 28th Floor
　　　　　　　　　　　　　　　　　　　New York, New York 10178
　　　　　　　　　　　　　　　　　　　Tel. (212) 643-7000