**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq.
Joshua N. Howley, Esq.
101 Park Avenue, 28th Floor
New York, New York 10178
(212) 643-7000 (Telephone)
*Attorneys for Vitra, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>NINETY-FIVE MADISON COMPANY, L.P.,<br><br>Debtor. | Chapter 11 Proceeding<br><br>Case No. 21-10529 (SHL) |

<u>**DECLARATION OF KAREN STEIN**</u>

I, Karen Stein, declare under penalty of perjury as follows:

1.    I am a representative of Vitra, Inc. ("**Vitra**").[1]

2.    I submit this Declaration in support of Vitra's motion for an order dismissing the chapter 11 case of Ninety-Five Madison Company, L.P. (the "**Debtor**") pursuant to 11 U.S.C. § 1112(b) or, in the alternative, converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code, and granting related relief (the "**Motion**").

3.    I am authorized to submit this Declaration on behalf of Vitra. Except as otherwise indicated herein, all facts set forth in this Declaration are based on either (i) my personal knowledge, information maintained by Vitra, or supplied to me by its representatives, employees, consultants or attorneys, or (ii) relevant documents that I have reviewed. If called upon to testify, I could and would testify competently to the facts set forth herein.

4.    Lois Weinstein, Rita Sklar's half-sister (now deceased) made serious allegations in a 2019 lawsuit that Sklar had engaged in years of fraud, theft and gross mismanagement of the Debtor and other properties owned by Sklar and Weinstein.

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the Verified Petition (the "**Complaint**") in *Lois Weinstein, individually and on behalf of Ninety-Five Madison Company LP v. RAS Property Management, LLC, Rita A. Sklar, individually and Rita Sklar and Steven C. Mero, as Trustees of the Exempt Issue Trust FBO Hannah Rose Gettinger, the Exempt Issue Trust FBO Ruby Hilene Sklar and the Exempt Issue Trust FBO Sadie Pearl Sklar, and Ninety-Five Madison Company, LP*, Index No. 653735/2019, filed in the Supreme Court of New York, County of New York, on June 26, 2019.

6.      The Complaint alleges that Sklar had engaged in years of fraud, theft and gross mismanagement of the Debtor and other properties owned by Sklar and Weinstein. Among the allegations are the following:

(a)      Sklar's "response to any business situation is to seemingly be intransigent, obstructionist and bellicose", Complaint ¶ 12;

(b)      Sklar's mismanagement and conduct has mired the Debtor in at least five major legal battles in recent years. In one, Sklar caused the Debtor to enter into a settlement with the plaintiff, breached the agreement, then engaged in legal maneuvers resulting in the expenditure of far more money in legal fees than the cost of the settlement to the Debtor, *id.* ¶ 14;

(c)      Sklar caused her counsel to file false and frivolous pleadings in Surrogate Court, *id.* ¶ 28;

(d)      Sklar lacks any competence as a real estate manager, *id.* ¶ 29;

(e)      Although not a licensed real estate broker, Sklar regularly holds herself out as one and demands to be paid commissions, *id.* ¶¶ 67, 68;

(f)      Sklar's mismanagement of the Property and other properties owned by Sklar and Weinstein, and controlled exclusively by Sklar, resulted in the properties remaining "vacant and unrented and in several instances, left as vacant land", *id.* ¶ 29;

(g)      Sklar absconded with $4.5 million owed to Weinstein from the sale of another property in 2012, *id.* ¶ 31;

(h)      Sklar consistently withheld information – including partnership tax returns – about the operation of the Debtor, *id.* ¶ 40;

(i)      Sklar fraudulently induced Weinstein to assign her interest in the sale of a

property to an entity owned and controlled by Sklar, *id.* ¶ 48;

(j)     Sklar altered a contract for the sale of a property after it was executed, *id.* ¶ 50; and

(k)     In a Section 1031 exchange transaction, Sklar invested proceeds from the sale of a property in the Debtor, rather than using the money to acquire another property while still claiming the Section 1031 exemption on tax returns. Allegedly, Sklar did this in order to support her lavish lifestyle, which is financed almost entirely from fees the Debtor pays to RAS, *id.* ¶¶ 51-58;

7.     Attached hereto as **Exhibit 2** is a true and correct copy of the order entered by the Supreme Court of New York, New York County, ordering the dissolution of the Debtor.

8.     Attached hereto as **Exhibit 3** is a true and correct copy of that certain Lease, dated as of June 18, 2016, between the Debtor, as landlord, and Vitra, as tenant.

9.     Vitra is the U.S. subsidiary of Vitra International, A.G. ("**Vitra International**"), an internationally renowned manufacturer of high end modern furniture and accessories with production facilities and sales locations in many countries around the world. Vitra International has more than 70 years of experience in the design of modern furniture, and interior stores and showrooms to display and promote its products. It has commissioned distinguished architects and maintains a renowned museum of design in Weil-am-Rhine, Germany.

10.     Vitra International and its subsidiaries have approximately 20 showrooms around the world, mostly in leased premises. In North America, until recently, Vitra had showrooms in Los Angeles, San Francisco, Chicago, New York and Toronto, Canada. Until December 2016, Vitra's New York showroom was located at 29 Ninth Avenue in the Meatpacking District. Vitra had a harmonious relationship with its Ninth Avenue landlord. Vitra has never been involved in litigation with any landlord, except the Debtor.

11.     In 2016, Vitra decided to move its showroom and offices at 29 Ninth Avenue in Manhattan to the Debtor's Property, because its lease was expiring and because lower Madison Avenue, where the Premises is located, is a center for architecture and interior design firms.

12.     On June 18, 2016, the Debtor, as landlord, and Vitra, as tenant, entered into the Lease for a street-level showroom and second floor office space in the Property. The Lease

provided for a term of 11 years and nine months.

13.    The Lease required the Debtor to complete the Landlord's Work within six weeks of execution, *i.e.*, by the end of July 2016. The Debtor was also required to install dunnage for four air conditioning units for use by three tenants, one of which was Vitra, and the fourth unit for the Debtor's future lobby air conditioning. Vitra was responsible for renovating the Premises and committed to spend a minimum of $1,912,500 in hard costs of construction within nine months, which construction could not commence until the Debtor approved Vitra's plans.

14.    This schedule immediately collapsed in the chaos created by Sklar, who insisted on imposing on Vitra her own ideas about how Vitra's showroom should be designed. Sklar threatened to keep Vitra out of the Premises unless Vitra accepted her designs, a threat she has made good on: Vitra still has not been able to complete construction or open for business at the Property nearly five years after the Lease was executed.

15.    Four months after the Lease was signed, the Debtor still had not begun the Landlord's Work. On October 19, 2016, Vitra's project manager sent a letter demanding that Landlord's Work be completed by November 2, 2016, time being of the essence. Sklar responded with rage and threatened to "make Vitra's life miserable." At the time, however, Sklar already had in her possession architectural plans for the mezzanine demolition and a bid for the work. She kept this information secret from Vitra until after Vitra filed an action in the State Court. The Debtor refused to begin undertaking the Landlord's Work until the eve of the State Court trial, in November 2017. The Landlord's Work was soon halted because it was commenced without a permit.

16.    Vitra had hired Gensler, a global design and architecture firm, to design the showroom. Gensler is one of the preeminent architectural firms in the world, and has provided high quality and well-recognized design services covering many millions of square feet of space to both landlords and tenants.

17.    Between July and September 2016, Vitra and Gensler developed their plans for the showroom. On September 21, 2016, Vitra and its project manager met with Sklar to show her

the design Vitra had selected. Sklar claimed that the design wasn't prestigious enough and, in her opinion, didn't properly promote Vitra's brand. She also objected to the location of an interior stair at the right rear of the Premises. Sklar refused to allow Vitra to move forward with the design and threatened to keep Vitra from getting into the Premises on time.

18.    Sklar also claimed that a decommissioned dumbwaiter shaft was not part of the Premises despite the fact that the Lease clearly showed that it is. She later agreed that Vitra could use the dumbwaiter shaft, but only if Vitra paid additional rent.

19.    In or around January 2017, Sklar showed Vitra her own design for the showroom, which she called her "vision" for a "Vitra U.S. Mini Campus at 95 Madison." Sklar's design included her opinions about flooring, signage, door design and use of different areas within the Premises. On January 31, 2018, Sklar expressed her views as to how the back wall of the showroom should look, and proposed that Vitra rent additional space in the basement, for an additional rent of $201,150 per year. Sklar even suggested that Vitra should look at the interior staircase of a building on East 73 Street as an example she was fond of.

20.    Vitra spent hundreds of thousands of dollars preparing four different sets of plans for the showroom, but Sklar rejected them all because they did not comport with her vision of how the Premises should look.

21.    Sklar also compelled Vitra to pay exorbitant rates for electricity during this time. The Lease provides that electricity will be supplied by the Debtor through submeters installed by Vitra, using Landlord's electrical contractor, and that Vitra would pay for its actual consumption and *pro rata* share of any taxes as additional rent. However, Vitra could not install the submeters because Sklar refused to approve its own electrical contractor's scope of work. In December 2016, Sklar wildly over-billed Vitra for electricity retroactively at the rate of $12,105.75 per month. That amounted to $12.15 per square foot per year for space that was unoccupied and without lighting, except construction string lights. At that time, the flat rate for electricity on a commercial lease for occupied space was no more than $3.50 per square foot per year. On that basis, electric charges for a fully occupied premises would amount to $3,517.50 per month. Vitra

paid the fraudulent invoice under protest as Sklar made it clear that she refused to proceed without payment.

22.      By March 2017, Vitra's architect had submitted two full sets of plans to the Debtor. The Debtor responded with voluminous comments, and rejected both sets. Though Vitra had paid its rent, the Debtor had not even begun its required construction that was supposed to be finished in July 2016, and the project was at a standstill. In April 2017, Vitra withheld its rent and the Debtor served a Notice of Default. On May 1, 2017, Vitra commenced an action in the State Court for a "Yellowstone" injunction. Attached hereto as **Exhibit 4** is a true and correct copy of the complaint in *Vitra Inc. v. Ninety-Five Madison Company, L.P.*, Index No. 655408/2019, filed in the Supreme Court of New York, County of New York County, on September 18, 2019.

23.      After several conferences before the State Court, Vitra was directed to have its professionals prepare a new set of plans. The Debtor would have the opportunity to submit comments, and then the parties and their professionals would appear in court. On May 12, 2017, Vitra submitted its third set of plans. The Debtor issued its objections. In June 2017, the parties and their professionals appeared in court. Despite lengthy negotiations, no resolution of the Debtor's objections was reached.

24.      At the next conference, the State Court suggested mediation, and recommended three mediators, one of whom was Stephen G. Crane, J.S.C. (ret.) of JAMS, an esteemed retired judge. After consultation, the parties agreed to mediate before Justice Crane, which mediation was unsuccessful.

25.      Trial was then scheduled for December 5 and 7, 2017. On December 5, 2017, with the encouragement of the State Court, the parties entered into new settlement discussions. Negotiations continued on December 5 and 6, and before the State Court on December 7.

26.      Despite the Lease having been executed twenty one (21) months prior, the Debtor had still failed to start Landlord's Work, the dunnage, or approve Vitra's plans. On December 7, 2017, Vitra and the Debtor entered into the Settlement, which the State Court approved.

27.    Sklar was present at the hearing, and stated under oath that she understood the Settlement, had no questions about it, voluntarily agreed to it, and entered it of her own free will, without coercion. The Settlement was intended to compensate Vitra for the Debtor's months of obstruction and – more importantly – to provide a timetable that would finally enable Vitra to take possession of a completed showroom. The Settlement provided a rent credit to Vitra in the sum of $506,250; approved Vitra's plans and required the Debtor to sign off on permit applications within three days of submission; created a mechanism to resolve the electricity dispute; resolved the dumbwaiter issue in Vitra's favor; provided for timetables and contractor selection for the elevator work and for building an ADA-compliant entrance ramp; set April 15, 2018 as the deadline for completion of the Landlord's Work and dunnage; provided for a rent abatement if those deadlines were not met; and provided a deadline for Vitra to complete its renovation of the Premises based on the completion of Landlord's Work.

28.    After entering into the Settlement, Vitra discovered the Debtor had been in discussions with the Landmarks Preservation Commission with respect to the Property since, at least, October 2017. On February 5, 2018, the LPC designated the Building as a landmark. Sklar knew of the LPC's interest for months, but concealed this fact both from the State Court and Vitra. The Property's landmark status added an additional layer of regulatory approval, and construction delay, because the New York City Department of Buildings cannot issue building permits for work affecting the landmarked elements of the Building unless and until the LPC approves the work plans.

29.    On March 22, 2018, the Debtor locked Vitra out of the Premises. The Arbitrator ordered the Debtor to restore Vitra to possession, which it did on March 29, 2018.

30.    At a hearing before the Arbitrator in April 2018, Vitra raised significant issues relating to the LPC, including the documents that would comprise the newly-required application to the LPC, especially the exhibits reflecting the entryway. By the end of the hearing, Vitra and the Debtor agreed on the exhibits to the application, and it was agreed that the Debtor would submit them to the LPC with Vitra's representative present. However, Sklar unilaterally altered

the exhibits after the hearing and presented them to the LPC without Vitra's representative present and without informing the Arbitrator.

31.    Vitra was therefore compelled to seek further relief from the Arbitrator. Vitra sought various forms of relief, including termination of the Lease or, in the alternative, the appointment of a receiver. Vitra claimed, among other things, that neither the Landlord's Work nor the dunnage had been completed, and Vitra was therefore entitled to a complete rent abatement.

32.    On June 18, 2018, the Arbitrator issued the First Interim Award. Attached hereto as **Exhibit 5** is a true and correct copy of the First Interim Award.

33.    On March 10, 2019, the Arbitrator issued the Third Interim Award. Attached hereto as **Exhibit 6** is a true and correct copy of the Third Interim Award.

34.    By the end of October 2018, the initial approval from the LPC and the Department of Buildings permit needed to start construction were issued, but Sklar continued to obstruct Vitra from building out the showroom. She refused to approve subcontractors or to allow Vitra's contractor and subcontractors to access parts of the Property outside Vitra's Premises. After a series of conference calls, the Arbitrator requested Vitra's and the Debtor's counsel to stipulate to a set of procedures that could be used to normalize construction access and the process to facilitate that access. An agreement was not reached, however, and, on November 13, 2018, Vitra submitted a proposed order to the Arbitrator and the Debtor submitted a counter-proposed order on November 19, 2018.

35.    In the meantime, the Debtor and Sklar continued their obstruction efforts at the LPC. Although the First Interim Award approved Vitra's plans for the entrance to the Premises, and ordered the Debtor to submit Vitra's plans to the LPC, the Debtor did not comply. Instead, the Debtor submitted an application to the LPC with a cover letter seeking to undermine the First Interim Award by arguing in favor of its own plan, which the Arbitrator had rejected. The cover letter did not inform the LPC of the First Interim Award. Vitra submitted the First Interim Award to the LPC upon learning of the Debtor's actions.

36.    On November 22, 2018, the Arbitrator signed Vitra's form of order (the "**November 22 Order**") with only a few revisions. Attached hereto as **Exhibit 7** is a true and correct copy of the November 22 Order.

37.    The Debtor sought reconsideration of the November 22 Order, arguing that it contravened provisions of the Lease and Settlement. On February 24, 2019, the Arbitrator issued the Second Interim Award. Attached hereto as **Exhibit 8** is a true and correct copy of the Second Interim Award.

38.    The Debtor continued to obstruct Vitra's renovations. Among other things, the Debtor obstructed Vitra's subcontractors who were installing two condenser units on the dunnage, running conduit from the condenser units to Vitra's second floor premises, and installing the fire alarm system. On March 12, 2019, the Arbitrator held a hearing to consider the Debtor's misconduct. Sklar did not appear at the hearing, but Debtor's counsel confirmed that this work was approved.

39.    The following day, Sklar refused to allow the rigging subcontractor to use the freight elevator to transport its rigging equipment to the second floor. On March 13, 2019, the Arbitrator ordered the Debtor to allow this subcontractor to use the freight elevator to move its rigging equipment to install the two 750-pound air conditioning units to the courtyard roof. The Debtor and Sklar ignored the order.

40.    On April 10, 2019, after the Debtor and Sklar refused basement access to Vitra's contractor and subcontractors for two days in violation of the Settlement and November 22 Order, the Arbitrator ordered the Debtor to provide, and not interfere with, such access. On the same day, the Arbitrator appointed a temporary receiver (the "**Receiver**") to exercise the Debtor's authority with respect to the renovations that Vitra had been attempting to complete since the Lease was signed in 2016.

41.    On April 15, 2019, the Arbitrator issued an additional order directing the Debtor to provide Vitra access to the freight elevator and threatening significant monetary sanctions for any violations. The Arbitrator wrote that he had "leaned over backwards to accommodate the

[Debtor's] legitimate needs which was met with continuous misbehavior, distortion of facts and bad faith deprivation of the benefits of the bargain that [Vitra] is legally entitled to expect." In response to this order, the Debtor sought the Arbitrator's disqualification based on an allegation of gender bias, which relief was denied by JAMS, the Supreme Court, and the First Department on appeal.

42.     On July 2, 2019, the Arbitrator entered the Fifth Interim Award. Attached hereto as **Exhibit 9** is a true and correct copy of the Fifth Interim Award.

43.     The Debtor and Sklar sought to remove the Receiver on several occasions and refused to honor the award appointing the Receiver. For example, in the Receiver's Affirmation submitted in the Arbitration dated July 6, 2020, she wrote: "Under the [Amended Fifth Interim] Award, I should have the right to direct employees and manage permits but Landlord has interfered with my independent exercise of this authority. Landlord interferes with access to the Building and causes its employees to ignore my directions."

44.     On August 29, 2019, the Arbitrator entered an Order directing the Debtor to file a permit on the New York Department of Buildings' website within two business days or face a monetary sanction of $25,000 per day. The Debtor did not file the permit until twenty one (21) days after the Arbitrator's deadline. Consequently, on January 7, 2020, the Arbitrator awarded Vitra $525,000 in monetary sanctions, which award the Supreme Court upheld, and a money judgment was entered in Vitra's favor. Attached hereto as **Exhibit 10** is a true and correct copy of the January 7, 2020 award.

45.     Most recently, on February 16, 2021, the State Court held oral argument on various motions in the State Court lawsuit. During that argument, the court expressed frustration that the Debtor had failed to pay the Receiver, despite the Debtor's obligation to do so under the Arbitrator's awards. Ultimately, the court gave the Debtor a period to time to pay the Receiver and, failing that, Vitra would have to pay her and then seek to hold the Debtor in contempt. The court stated, "but if [Vitra] is left holding the bag here, you know, I think Mr. Laplaca [Debtor's counsel], you should advise your client that this will now be a violation of a very specific court

order, and failure to comply with it is, shall we say, not a good idea."

46.    The Lease required Vitra to provide the Debtor with a $285,000 security deposit. Vitra paid the security deposit contemporaneously with executing the Lease in 2016.

47.    After Vitra's disputes with the Debtor arose, Vitra's counsel asked Debtor's counsel at which bank its security deposit was held and for confirmation that it was in a trust account in accordance with New York law. The Debtor refused to provide this information or confirm that the security deposit was held in trust. Attached hereto as **Exhibit 11** is a true and correct copy of correspondence between Vitra's and the Debtor's counsel.

48.    More recently, after Vitra garnished the Debtor's account at Rhinebeck Bank as part of its efforts to levy on its judgment, the Debtor's counsel advised Vitra's counsel that Vitra's security deposit was part of the monies that had been garnished, and demanded that Vitra replenish the security deposit. Attached hereto as **Exhibit 12** is a true and correct copy of correspondence between Vitra's and the Debtor's counsel.

49.    Vitra's security deposit is not the only security deposit the Debtor may have unlawfully taken. In a recent lawsuit by Tellas Ltd., a former tenant in the Property, filed in the State Court, it is alleged that the Debtor failed to return a $239,094.96 security deposit. Attached hereto as **Exhibit 13** is a true and correct copy of the complaint in *Tellas Ltd. v. Ninety-Five Madison Company, L.P.*, Index No. 650652/2021, filed in the Supreme Court of New York, County of New York, on January 28, 2021.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Dated: April 6, 2021

_____
Karen Stein

**<u>EXHIBIT 1</u>**

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
INDEX NO. 653735/2019
NYSCEF DOC. NO. 1
21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
RECEIVED NYSCEF: 06/26/2019
Declaration of Karen Stein   Pg 14 of 254

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------X

LOIS WEINSTEIN, individually and on     :
behalf of the Partners of NINETY-FIVE     :   Index No.
MADISON COMPANY LP,     :

                 Petitioner     :   <u>VERIFIED PETITION</u>

      -  against  -     :

RAS PROPERTY MANAGEMENT, LLC,     :
RITA A. SKLAR, individually and RITA     :
SKLAR and STEVEN C. MERO as Trustees     :
of the Exempt Issue Trust FBO Hannah Rose     :
Gettinger, the Exempt Issue Trust FBO Ruby     :
Hilene Sklar and the Exempt Issue Trust     :
FBO Sadie Pearl Sklar ; and NINETY-FIVE     :
MADISON COMPANY, LP,     :

               Respondents.  :

-----------------------------------------------------X

To the Supreme Court:

The petition of LOIS WEINSTEIN respectfully shows:

    1.    Petitioner Lois Weinstein is a resident of the State of New York and is a resident

of New York County.

    2.    Respondent RAS Property Management, LLC ("RAS") is a limited liability

company organized and existing under the laws of the State of New York with an office

at 95 Madison Avenue, New York, NY.

    3.    Respondent Rita A. Sklar  ("Sklar") is a resident of the State of New York and is

the sole member of RAS.

    4.    Respondent's RITA SKLAR and STEVEN C. MERO are Trustees of the Exempt

Issue Trust FBO Hannah Rose Gettinger, the Exempt Issue Trust FBO Ruby Hilene Sklar

and the Exempt Issue Trust FBO Sadie Pearl Sklar each of which, upon information and

belief, owns a beneifical interest in NFMC -- possibly up to 36%.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
INDEX NO. 653735/2019
NYSCEF DOC. NO. 1
21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
RECEIVED NYSCEF: 06/26/2019
Declaration of Karen Stein   Pg 15 of 254

5.   Respondent Ninety-Five Madison Company, LP ("NFMC") is a limited partnership organized and existing under the laws of the State of New York and is the owner of real property known as, and located at, 95 Madison Avenue, New York, NY 10016.

6.   RAS is the general partner of respondent NFMC.

7.   According to K-1's filed by NFMC, Petitioner has a 38% interest as a limited partner in NFMC, although, Petitioner may only hold an 18.5% interest and such K-1s may be fraudulent.

8.   Upon information and belief, RAS holds or controls less than 50% of the ownership of NFMC.

9.   As shall be detailed, it has become critical for the interests of the Limited Partners, and even Rita Sklar herself, that Sklar be divested of any managerial authority over 95 Madison Avenue, and sadly, by virtue of Sklar years of unchecked fraud, theft and gross mismanagement, there is no alternative but that NFMC be dissolved and its principal asset sold.

10.   It is possible that Sklar is suffering from dementia or another mental disorder.

11.   As will be shown, Sklar is completely incapable of managing the affairs of NFMC. Yet she refuses to cede control to professional management.

12.   Her response to any business situation is to seemingly be intransigent, obstructionist and bellicose.

13.   For the past year, Sklar's power has been propped-up by her new counsel Robert Laplaca, who files frivolous and bad faith at Sklar's command.  Through Laplaca and his

firm, Sklar has even sued her prior counsel who had attempted to represent her interests professionally and who apparently reached a departing of ways over Sklar's refusal to heed their advise and counsel, as well as her refusal to pay them.

14. As will be shown, Sklar has mired NFMC in at least five major legal battles.

15. Petitioner only became award of these issues in connection with an action Petitioner was forced to commence in late 2015 against Sklar when Sklar took $4.5 million owed to Petitioner out of the 2012 sale of real property they owned jointly in Queens.

16. What has been uncovered is an absolutely shocking record of fraud, tax fraud, deceit, breach of fiduciary duties, gross negligence and incompetence, oppressive and unfair dealings toward the other limited partners of FNMC,

17. Sklar effectively controls NFMC, employing herself and, upon information and belief, paying herself (or RAS) substantial sums to manage NFMC.

18. Sklar and your Petitioner are half-sisters. In 1970, their mother Hilda Weinstein died leaving to her husband and three daughters, Lois, Rita and Arlene, a portfolio of real estate holdings that Hilda Weinstein had inherited from her father, Louis Shulsky.

19. The most valuable of the properties inherited by Sklar and petitioner was an office building located at 95 Madison Avenue, New York, NY.

20. After a long and costly battle in the Surrogate's Court, Sklar was able to disinherit and buy-out her sister Arlene, and to gain control over Petitioner's property as a co-trustee with Petitioner's uncle Lawrence Weinstein.

21. In or about June 1982, Sklar and Lawrence Weinstein created a partnership to hold 95 Madison Avenue. The partnership was called 95 Madison Avenue Company.

3

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1
21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
Declaration of Karen Stein   Pg 17 of 254
INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

22. In or about 1988, when Petitioner was 34, a 38 percent interest in 95 Madison Avenue Company was transferred to her.

23. In or about 2012, Madison Avenue Company elected to become a Limited Liability Partnership under the New York Limited Partnership law and became NFMC.

24. Under the restated partnership agreement, defendant RAS, a limited Liability Company wholly owned by Sklar, became the general partner of NFMC.

25. Since her mother's death, Sklar has taken autocratic control over 95 Madison Avenue as well as the other properties which she and Petitioner inherited from their mother.

26. Sklar has consistently lied to Petitioner with respect to a property in Flatbush Brooklyn which was specifically left to Petitioner in her mother's will, falsely representing (1) that Petitioner owned that entire property when in fact, there is another entity that own half of the property (upon information and belief Sklar has never sought to have the other owner contribute to the property taxes or any other expenses related to the property) and (2) Sklar continues (to this day) to control the property by keeping it in the testamentary trust which, under the will of Hilda Weinstein which established the trust, was to be dissolved and distributed to Petitioner on her 30th birthday (Petitioner is now about 65 years old and the property is still in the trust). Sklar has refused to deed this property to Petitioner and has necessitated litigation in the Surrogate's Court with respect to the Estate of Hilda Weinstein.

27. In connection with the Surrogates court litigation Sklar is currently in violation of an order from the Surrogate to account to Petitioner, and contempt proceedings have been commenced.

4

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM

NYSCEF DOC. NO. 1

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 18 of 254

INDEX NO. 653735/2019

RECEIVED NYSCEF: 06/26/2019

28. It will also be shown that in such proceeding, Sklar caused her new counsel Laplaca to file false and frivolous papers claiming that Petitioner lacked the mental capacity (although no such claim was asserted with respect to Petitioner's mental state in connection with the numerous documents Petitioner was directed to sign in connection with the various other transfers subject of other claims). Under threat of sanctions, counsel withdrew the objection.

29. In addition to her probable personality disorders, Sklar also completely lacks any competence as a real estate manager. Under Sklar's mismanagement the properties inherited from Hilda Weinstein, and controlled exclusively by Sklar, have over the years remained vacant and un-rented and in several instances, left as vacant land.

30. As a result of Sklar refused to rent any of the commercial properties, NFMC and the other holdings generally operate at a loss and although the portfolio has significant value, it cannot be mortgaged due to a lack of sufficient income.

31. The situation is now a crisis level because, even with the $4.5 million, Sklar stole from Petitioner, there will be insufficient funds to pay the real estate tax bill coming due in June, 2019.

32. Due entirely to Sklar's incompetence and her intransigence, in a litigation with the major tenant -- an entity called Vitra, Inc. -- NFMC has just received a serious adverse ruling, awarding the prime tenant an abatement of rent of over $900,000, a rent credit of more than $500,000 and an award of its legal fees.

33. Vitra signed a lease to rent a portion of the first floor and the second floor over three years ago. Sklar has actively and without any rational justification has stood in the tenant's way of completing its renovation which is still not complete as a result.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1
INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019
21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
Declaration of Karen Stein   Pg 19 of 254

34. Sklar has even unlawfully changed the locks on the tenant's space and locked them out of possession.

35. The arbitrator, retired Supreme Court Justice Steven Crane, initially described Sklar's actions as "frustrating behavior" which was "flagrantly unlawful" and "bereft of common decency or legal justification".

36. The level of Sklar's obstructionism in approving and reviewing the tenant's work permits apparently recently has reached such a stage that Justice Crane entered an order appointing a receiver to take over the responsibilities of the Landlord with respect to the construction.

37. Petitioner is advised that Sklar and her counsel's response to this ruling is to seek to have Justice Crane disqualified and his ruling overturned -- not on any actual legal basis -- but on the notion that because he referred to Sklar as a "woman" that he must be sexist and therefore decided against her.

38. I am advised that instead of presenting the actual record of the proceedings that might shed negative light on the history Sklar's misconduct in her dealings with the tenant, Laplaca attached scholarly articles about "sexism" to his frivolous and bad-faith papers to overturn.

39. It is respectfully submitted that if a receiver is not appointed in this proceeding to protect and preserve the interests of the limited partners of NFMC, to take over the management of 95 Madison Avenue from RAS and Sklar, to discharge Laplaca, and to seek to lease some portion of the vast vacant office space pending this dissolution proceeding, irreparable harm will be suffered by all the owners of the NFMC.

6

40. Sklar has sought to hide her deficits as a real estate manager by withholding material information about the operation of NFMC from its limited partners. By way of example, RAS refuses to provide to the limited partners of NFMC any partnership tax returns.

41. As stated above, because Sklar, likely due to mental issues, refuses to lease the commercial properties she and Petitioner inherited or  cede control to anyone else; the only apparent source of income to her is to steal from her limited Partners and to abuse her obligations as a fiduciary.

42. In 2012, Sklar realized that without a significant influx of cash she would be unable to continue to live her lavish lifestyle and was in actual danger of losing 95 Madison Avenue.

43. In or about 2012, Sklar advised Petitioner that they should sell a property they jointly owned in Queens -- a rental property located and known as 1625 Putnam Avenue and 1635 Putnam Avenue, Queens NY (the "Putnam Properties") Putnam Avenue, Queens, NY.

44. As a result of Sklar's mismanagement and sever psychological issues, the Putnam Properties had not generated income, but by virtue of the phenomenal increase in real estate values, a buyer was located who was willing to pay $9,300,000 for the Putnam Properties.

45. In 2012, Sklar did not advise petitioner that NFMC was in dire need of an infusion of funds. She did however, represent to Petitioner who had just lost her job as a travel agent, that were the Putman Properties sold, petitioner would receive her share of the sale proceeds.

46. On or about March 6, 2012, utilizing a power of attorney dated March 1, 2012 from Petitioner, Sklar sold the Putnam Properties for the sum of $9,300,000.

47. Upon information and belief, no portion of the sales proceeds has been distributed to Petitioner (other than approximately $800,000 paid to the US. Treasury and the New York State Department of Taxation and Finance and several checks totaling approximately $70,000).

48. Upon information and belief, at the sale, Sklar, fraudulently induced Petitioner to assign her and Sklar's individual interest in the contract of sale to an entity called Madison Exchange, LLC ("Madison").

49. Although the contract was assigned for technical purposes, the actual recorded deed bears the names Rita A. Sklar and Lois M. Weinstein as grantees in their individual capacity as sellers. As previously alleged, Petitioner's signature was written by Sklar utilizing a power of attorney.

50. Upon information and belief, at some point subsequent to the actual execution of the contract of sale, Sklar "doctored" the sales contract, to add the words "d/b/a Kinder Realty Associates" to the sales contract. This "d/b/a" designation however was not contained on the deed recorded on March 19, 2012 and there is no indication that the sellers were any persons other than Sklar and Weinstein as individuals.

51. Upon information and belief, Sklar was seeking unlawfully to evade paying capital gains taxes on the sale of the Putnam Properties, and attempted to do so by purporting to do a "1031 Exchange" whereby the capital gains from the sale of one parcel of investment property through a "Qualified Intermediary" would be rolled into the purchase of another qualifying investment property within a certain time frame.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM INDEX NO. 653735/2019

NYSCEF DOC. NO. 1    21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit    RECEIVED NYSCEF: 06/26/2019
Declaration of Karen Stein    Pg 22 of 254

52. In order for the U.S. Treasury to recognize the transfer, certain rules and procedures have to be followed.

53. In procuring Petitioner's signature on the Exchange Agreement, Sklar concealed her intentions and did not adequately or truthfully advise Petitioner of the purpose of the 1031 exchange.

54. Petitioner was not represented by counsel at the time she executed the Exchange Agreement, the contract of sale of the Putnam Properties, or any other documents pertaining to the sale of the Putnam Properties.

55. Upon information and belief, in the months after the sale of Putnam Properties, Madison informed Sklar that they would have to return the sales proceeds because Sklar and Petitioner had not identified a proper replacement property.

56. Upon information and belief, Sklar never had any intention of finding an actual qualifying replacement property, since the hidden purpose of the sale was to generate cash for NFMC and not to re-invest in a new property (which is what the 1031 Exchange was intended by Congress to be used for).

57. Upon information and belief, Sklar represented to Madison that she wished to invest the proceeds of the sale into NFMC.

58. Upon information and belief, because Sklar and Petitioner already owned interests in NFMC such prior ownership violated the 1031 exchange rules, therefore 1031 exchange could not be performed to defer the payment of capital gains taxes utilizing that property.

59. Thus, upon information and belief, Madison advised Sklar that the funds needed to be returned to the sellers.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO: 1

INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
Declaration of Karen Stein   Pg 23 of 254

60. Upon information and belief, in or about April 2013 defendant Sklar arranged to have the approximately $9,000,000 refunded from Madison be deposited into an account at the Safra National Bank maintained in the name of an entity called Kinder Realty Associates ("Kinder") a general partnership jointly owned by Sklar and Petitioner, but over which Sklar exclusively exercises total control.

61. Sklar fraudulently induced Petitioner to execute a wire transfer instruction to wire the funds being held by Madison to the Kinder bank account.

62. Upon information and belief, Sklar actively concealed her intention of depriving Petitioner of her share of the refunded proceeds after they were deposited into the Kinder bank account.

63. Upon information and belief, in reporting the sale of Putnam Properties to New York State Department of Taxation and Finance, Sklar signed and caused to be filed a Partnership Payment Filing Fee Form which falsely and fraudulently claimed that Kinder had actually owned an interest in the Putnam Properties (when it did not and had never). The form also falsely and fraudulently stated that the proceeds of the sale of the Putnam Properties represented income of the partnership (rather than to Petitioner and Sklar as individuals).

64. Upon information and belief, for years, defendant Sklar caused her accountants to claim losses on property that Petitioner and Sklar owned individually as tax losses for Kinder in spite of the fact that Kinder does not own the properties in question.

65. Upon information and belief, defendant Sklar had for years mismanaged defendant NFMC, keeping the building it owns under-occupied.

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 24 of 254

66. Specifically, of the 150,000 square feet of office space available for rental, RAS has only rented less than 25,000 square feet.

67. Sklar (RAS), despite this appalling vacancy rate, does not list the properties with brokers, instead, Sklar pretends that she has an actual real estate broker's license and purports to list the office space at 95 Madison Avenue, herself. There are no active listings. There is no record of Sklar having an active real estate broker's license.

68. Indeed, notwithstanding the lack of a license, Sklar has on numerous occasions demanded a commission on the sale of the Putnam Properties and insisted that Petitioner pay those sums to Sklar and to her children and grandchildren.

69. In or about June 2016, a broker procured a tenant for a portion of the ground floor and the entire second floor -- Vitra, Inc., a furniture design company.

70. After executing a lease with Vitra, NFMC upon information and belief, failed or refused or attempted not to pay the real estate broker.

71. Upon information and belief, Sklar has developed a reputation for refusing to pay brokers. By refusing to pay a broker their legitimate commissions, Sklar has created a dis-incentive for other brokers to work with NFMC to alleviate the serious vacancy rate at 95 Madison Avenue.

72. Upon information and belief, Sklar, as a general policy, refuses to pay legitimate bills which results in needless and expensive litigation which costs NFMC much more money than if NFMC had simply paid the obligations. Indeed, even after agreeing to a settlement amount of charges, Sklar, for mere sport, often refuses to pay such agreed upon settlement, thus creating even more needless expense and exposure.

73. Sklar has dragged NFMC into at least four current unjustified litigations.

11

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1
INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 25 of 254

74. The first on-going litigation goes back to 2013, when Sklar refused to pay for front doors which had been order for 95 Madison Avenue resulting in the law suit *Fran-Co Remodeling Corp. v. Ninety-Five Madison Avenue LP, et al*, New York Supreme Court, NY Co., Index No. 652666/13. It is certain that NFMC has paid more in legal fees than it owed on the doors which in a settlement, it had agreed to pay for. Apparently, alleging a conspiracy as to delivery charges, Sklar has refused to abide by the terms of the stipulation entered into in that action. As a result, needless additional legal fees continue to mount.

75. In another current litigation entitled *Rosenberg Feldman Smith LLP. v. Ninety-Five Madison Avenue LP*, New York Supreme Court, New York Co., Index No. 653953/2018; Sklar has refused to pay her prior counsel's fee incurred in a dispute she fomented with Vitra, Inc. by utterly failing, without justification to sign work permits and to complete projects and improvements the lease, and settlement agreement, required NFMC to perform.

76. Notwithstanding the fact that The Rosenberg firm saved the day for NFMC by obtaining the tenant's agreement to arbitrate its disputes regarding the lease and thereby managing to eviscerate the tenant's threat to terminate this lease worth $11,000,000 over the life of the lease, Sklar is falsely alleging on NFMC's behalf, legal malpractice as a defense and counterclaim.

77. Sklar has substituted counsel at least twice in the Vitra, Inc. action and is on her third set of lawyers.

78. The costs of litigating such a frivolous and un-winnable claim seems highly irresponsible at best, especially given the unnecessary delay and expense of repeatedly substituting counsel.

79. The exhibits filed in the action commenced by the Rosenberg Firm give a vivid picture of how difficult, un-cooperative and unfit Sklar is and why she must immediately be removed as manager of 95 Madison Avenue and be prevented from causing any further harm to her family's holdings.

80. In the JAMS arbitration entitled *Vitra, Inc. v. Ninety-Five Madison Company, LP,* JAMS No. 1425024190, (which arose out the settlement that Sklar now refuses to comply with) the arbitrator -- retired Supreme Court Justice Hon. Stephen G. Crane, has essentially ruled in favor of the tenant on its claims and in an interim award dated June 18, 2018, provided the tenant $31,735.89 in damages for constructive eviction (when Sklar changed the locks during construction – which, due to Sklar's intransigence, is still not complete); $100,434.39 in electrical overcharges; a rent abatement (which continues to accrue) which currently stands at more than $900,000; and an award of its legal fees. The arbitrator has also over-ridden Sklar's failure and refusal to sign work permits.

81. As discussed earlier, the Arbitrator has just awarded the tenant more than a years' abatement in rent and awarded them their legal fees.

82. As a result of such improper and unjustified actions, NFMC had already been forced, in *Vitra, Inc. v. Ninety-Five Madison Company LP*, Supreme Court New York Co., Index No. 652342/2017, to provide a rent credit of $506,250 to Vitra.

83. Sklar has fomented needless litigation with its neighbor by refusing to permit them to erect a scaffold and shed to protect 95 Madison Avenue, during that construction.

13

84. Indeed the refusal because so serious, that the neighbor had to commence a special proceeding to force NFMC to permit a shed to protect its own property.

85. In the action, *RG-29th Street Owner I, LLC v. Ninety-Five Madison Company, L.P.*, Sklar through Laplaca challenged the court on jurisdictional grounds and has even gone to the Appellate Division to seek a stay of the order of the court.

86. Petitioner cannot imagine what explanation could exist for a refusal to permit the erection of a scaffold to protect the building. Petitioner believes that such refusal could only result from mental illness.

87. In *Harty Built LLC v. Ninety-Five Madison Company, L.P.*, Supreme Court New York Co., Index No. 0157349/2018, Harty Built LLC sued NFMC after performing more than $100,000 worth of work for NFMC, because Sklar refused to pay the final $26,644.50 owed, after having made previous, substantial payments on the account without objection. This action is ongoing.

88. Petitioner believes that it would be manifestly unfair to require that NFMC suffer any further damage from being subject to the effects of Sklar's mental dissorders.

89. Upon information and belief, the annual real estate taxes payable by NFMC are approximately $1.6 million and, when combined with the operating expenses of the building and the wasteful legal expenses incurred by Sklar's intransigence and willful and contumacious actions, significantly exceeds the total annual rental income.

90. Indeed, in its 2017 K-1's provided to Petitioner, NFMC reported a significant loss.

91. In 2013, to address the mounting losses in NFMC, upon information and belief, instead of delivering to Petitioner her share of the proceeds of the sale of the Putnam Properties after such were transferred from Madison to the Kinder account, Sklar

14

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM

NYSCEF DOC. NO. 1

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 28 of 254

INDEX NO. 653735/2019

RECEIVED NYSCEF: 06/26/2019

individually, caused a significant portion of the funds to be paid to herself (approximately $2.5 Million) and to NFMC (approximately $6,000,000).

92. Upon information and belief, at no point had Petitioner ever agreed to contribute her share of the proceeds of the sale of the Putnam Properties to NFMC or Sklar.

93. After the sale of the Putnam Properties, Sklar refused to distribute any funds to Petitioner.

94. Indeed, Sklar suggested that if Petitioner needed money she should sell her used car.

95. Ultimately, Sklar did agree to provide $70,000 to Petitioner, but only on condition that a portion of such funds be paid to Sklar's grandchildren.

96. In or about November 2015, Petitioner demanded an accounting and payment of sums due from the sale of the Putnam Properties.

97. On or about January 27, 2016, Sklar purported to produce an accounting which asserted that of the $9,032,302.75 net proceeds of the Putnam Properties sale, the sum of $7,976,531.74 was owed by petitioner and Sklar to NFMC (the "Purported Accounting").

98. Sklar knew that no funds were actually owed to NFMC and that the Purported Accounting was materially false.

99. Upon information and belief, as shown in the accounting, Sklar caused Kinder to pay NFMC the overwhelming majority of the proceeds of the sale of the Putnam Properties.

100. Upon information and belief, on April 11, 2013, Sklar fraudulently wrote a check for $3,523,242.00 to NFMC out of the account of Kinder.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
INDEX NO. 653735/2019
NYSCEF DOC. NO. 1
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
RECEIVED NYSCEF: 06/26/2019
Declaration of Karen Stein    Pg 29 of 254

101. Upon information and belief, at some point in time, Sklar wrote in the memo section of the check "Total Repayment".

102. Upon information and belief, this representation that there was a repayment of a loan, rather than the actual rendering a loan to NFMC, was an act of fraud and self-dealing.

103. Upon information and belief, according to a memo prepared by Sklar's tax counsel Honigman, Schwartz, Miller and Cohn, ("Honigman") in or about 2014, defendant NFMC badly needed a cash infusion.

104. Upon information and belief, at some point in 2014 Sklar had her counsel prepare a memo (the "Honigman Memo") proposing several scenarios whereby NFMC would either buy out Petitioner's interest in NFMC using Petitioner's own money (obtained improperly from the Putnam Property sale) or whereby Petitioner would lend at a very low interest rate, a portion of Petitioner's share of the sale proceeds from the Putnam Properties to NFMC.

105. Petitioner rejected these proposals.

106. The Honigman Memo expressly states that NFMC needed to borrow the funds from Sklar and Petitioner from the sale of the Putnam Properties.

107. Upon information and belief, Sklar actively concealed from the Honigman Firm the fact that that she had already transferred more than $3,500,000 of the proceeds of the sale of the Putnam Property to NFMC.

108. Upon information and belief, after she received Petitioner's written demand for an accounting and to be paid her portion of the proceeds of the sale, in or about November 2015, Sklar wrote an additional check to NFMC for $2,326,211.32 from the Kinder

16

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1
INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 30 of 254

account, this time fraudulently and falsely marking the check memo, "interest payment" (despite the fact that the earlier check for $3,523,242.00 was purportedly marked "total repayment").

109. This was an unlawful act of self-dealing and fraud.

110. Upon information and belief, as shown in the K-1's, Sklar purports to continue to pay NFMC interest from the account of Kinder on unauthorized, undocumented, fictitious, and fraudulent loans purportedly made by NFMC to Kinder, in the amount of at least $227,246 in 2017 and at least $206,766 in 2016.

111. Upon information and belief, in another act of unlawful self-dealing and fraud, on November 11, 2015 Sklar wrote herself a check from the Kinder account in the amount of $340,137.75 and marked in the memo section, "Part equalization of distribution regarding LMW expenses".

112. Sklar has also demanded that she be paid a real estate broker's commission for arranging the sale of the Putnam Properties, notwithstanding her lack of a proper license -- another act of fraud and self-dealing.

113.        By virtue of Sklar and RAS' s mismanagement, the only way that NFMC can seem to continue to exist and make ends meet is by Sklar going out and stealing the assets of her limited partners, filing false tax documents, and deceiving the limited partners.

114.        By virtue of the fact that much of Sklar's years of fraud, incompetence and perfidy have now come to light, Sklar has nowhere to look to steal in order to continue to prop-up NFMC.

115.        It is unfortunately now necessary to dissolve NFMC and sell its assets.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1
INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 31 of 254

116.        NFMC is not being operated in conformity with the partnership

agreement.

117.        In light of Sklar's (and by extension RAS -- the general partner)

deteriorated mental state, her refusal to permit competent management to operate

95 Madison Avenue, her refusal and inability to rent out the property to prospective

tenants, her proclivity to fight with her existing paying tenants, her acts of self-

dealing and fraud with respect to the limited partners which cannot be justified

under any reading of the business judgment rule and in violation of the various

fiduciary duties she owes, her profligate unjustified expenditures on needless and

frivolous litigation, and her devotion to committing tax fraud, NFMC is not being

operated for any proper or lawful purpose at all.

118.        It is not reasonably practicable for Ninety-Five Madison Company LP

to carry on its business in conformity with the partnership Agreement.

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO: 1

INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 32 of 254

No Prior application for the relief requested herein has been made.

WHEREFORE Petitioner demands

(1) The  judicial dissolution of NINETY-FIVE MADISON COMPANY LP, under

Limited Partnership Act section 212-802.

(2) The discharge of RAS as manager of NFMC;

(3) The appointment of a receiver to engage competent management and to discharge

and eject the present property management while the affairs of NFMC are being

settled and its asset sold by such Receiver.

(4) Appointment of Receiver to Sell 95 Madison Avenue, New York, NY and to

distribute the net proceeds of the sale to the Limited Partners of NFMC in their

proportionate shares.

(5) an accounting of the affairs of NFMC.

(6) such other and further relief as to the court seems just and proper.

Dated:        New York, NY
              May 21, 2019

                                              LOIS M. WEINSTEIN, Petitioner

JEFFREY A. BARR
By:
Attorney for Petitioner
225 Broadway, Suite 3110
New York, NY 10007
(212) 227-1834

FILED: NEW YORK COUNTY CLERK 06/26/2019 03:52 PM
NYSCEF DOC. NO. 1

INDEX NO. 653735/2019
RECEIVED NYSCEF: 06/26/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 33 of 254

VERIFICATION

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK )

LOIS WEINSTEIN, being duly sworn, deposes and says:

I have read the foregoing Verified Petition and that the contents thereof is true, except as to matters asserted on information and belief, and as to those matters, I believe it to be true.

LOIS WEINSTEIN

sworn to before me this
26 day of May, 2019

notary public

**<u>EXHIBIT 2</u>**

FILED: NEW YORK COUNTY CLERK 10/23/2020 01:43 PM
INDEX NO. 653735/2019
NYSCEF DOC. NO. 189
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
RECEIVED NYSCEF: 10/23/2020
Declaration of Karen Stein    Pg 35 of 254

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:** | **HON. ANDREW BORROK** | **PART** |

*Justice*

-----------------------------------------------------------------------X

LOIS WEINSTEIN,

                        Plaintiff,

- v -

RAS PROPERTY MANAGEMENT LLC, RITA SKLAR, RITA SKLAR, STEVEN MERO, NINETY-FIVE MADISON COMPANY LP

                        Defendant.

-----------------------------------------------------------------------X

**PART**       **IAS MOTION 53EFM**

**INDEX NO.**       653735/2019

**MOTION DATE**    07/21/2020

**MOTION SEQ. NO.**    007

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 007) 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176

were read on this motion to/for                 **DISMISS**            .

Upon the foregoing documents, the respondents' motion to dismiss the amended verified petition pursuant to CPLR §§ 3211(a)(1), (a)(3) and (a)(7) is denied, and the petitioners' cross motion (i) for summary judgment pursuant to CPLR §§ 405, 2125 and 3211(c), and (ii) to extend the time to serve the amended petition *nunc pro tunc* pursuant to CPLR § 2004, and (iii) for leave to further amend the petition and file a proposed Second Amended Verified Petition pursuant to CPLR § 3026 is granted as set forth below.

## FACTS RELEVANT TO THE INSTANT MOTION

This proceeding was originally commenced on June 26, 2019 by Lois Weinstein, a limited partner of Ninety-Five Madison Company LP (the **Partnership**), seeking, among other things, judicial dissolution of the Partnership, the appointment of a receiver, and the sale of the

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC
Motion No.  007

Page 1 of 13

1 of 13

Partnership's primary asset, a 16-story commercial building located at 95 Madison Avenue, New York, New York (the **Building**).  In sum and substance, Ms. Weinstein alleged gross mismanagement and waste by RAS Property Management (**RAS**), the Partnership's general partner, and by Rita Sklar, RAS's manager, in the management of the Building.  Ms. Weinstein is defined as the **Limited Partner** in the Partnership Agreement (NYSCEF Doc. No. 151 at 1).

Ms. Weinstein died on November 25, 2019.  Indisputably, no stay or dismissal of this proceeding took place prior to Ms. Weinstein's death.[1]

Inasmuch as the original Verified Petition in this action alleged derivative claims and because the Estate may not maintain derivative claims on behalf of the Partnership, the court originally denied the motion to substitute Carol E. Keller and Gail Shields as the preliminary executors of the Estate of Lois Weinstein (the **Estate)** for Ms. Weinstein as the petitioner (*see* NYSCEF Doc. No. 116).  The respondents then moved to dismiss the petition and the Estate cross-moved for, *inter alia*, leave to file an amended verified petition (the **AVP**) (Mtn. Seq. No. 006).   In a decision and order dated June 15, 2020 (the **Prior Decision**), the court granted the Estate's motion to serve the AVP, ordered service within 20 days of thereof, and permitted the Estate to be substituted in place of Ms. Weinstein as petitioner (NYSCEF Doc. No. 141).  The court denied the respondents' motion to dismiss in its entirety (*id.*).

Per the AVP, the petitioners now seek on behalf of the Estate, individually**,** (i) a declaration that the Partnership was dissolved by operation of law, (ii) the appointment of a Receiver to distribute

---

[1] The action was only stayed, briefly, by operation of law upon Ms. Weinstein's death.

**653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC**                    **Page 2 of 13**
**Motion No.  007**

2 of 13

the assets of the Partnership to the partners and the Estate in their proportionate shares, (iii) a writ of assistance to the Sheriff of the City of New York, to eject RAS and Ms. Sklar from all portions of the Building and (iv) an order requiring the respondents to turn over to the receiver all records concerning operation of the Partnership (NYSCEF Doc. No. 148). The respondents, again, argue that the AVP improperly seeks to assert only derivative claims.

On August 7, 2019, (and also prior to Ms. Weinstein's death), in a separate JAMS arbitration action (the **JAMS Arbitration**) between Vitra, Inc., one of the Building's primary tenants, and the Partnership, the arbitrator, the Hon. Stephen Crane (Ret.) appointed a receiver with authority over "all of the landlord's (RAS Property Management LLC's and Ninety-Five Madison LP's) obligations, responsibilities and prerogatives" (JAMS No. 1425024190; NYSCEF Doc. No. 165, ¶ 14). The appointment was subsequently confirmed by the court (Scarpulla, J.) on October 30, 2019 in "all respects" (*Vitra, Inc. v Ninety-Five Madison Company, LP*, 650656; NYSCEF Doc. No. 170). On the record before the court, this receivership appears to continue to this day (NYSCEF Doc. No. 162, ¶ 43; *see also* NYSCEF Doc. No. 171).

Reference is made to a certain Ninety-Five Madison Company Limited Partnership Agreement (the **Original Partnership Agreement**; NYSCEF Doc. No. 14), dated June 1, 1982, by and between Rita A. Sklar as general partner and Rita A. Sklar and Lawrence Weinstein, trustees of a trust U/W of Irving Weinstein for the benefit of Lois Michelle Weinstein as the limited partner, as amended by the First Amendment to the Ninety-Five Madison Company Limited Partnership Agreement dated December 28, 2012 (the **Amendment**; the Original Partnership Agreement, together with the Amendment, hereinafter, collectively, the **Partnership Agreement**; NYSCEF

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC    Page 3 of 13
Motion No.  007

3 of 13

Doc. No. 64), by and between Rita A. Sklar, as sole member and manager of RAS Property

Management, LLC as the current general partner and Lois M. Weinstein as the current limited

partner.  Capitalized terms used but not defined herein shall have the meaning ascribed thereto in

the Partnership Agreement.

Section 9.1 of the Partnership Agreement provides:

> 9.1  <u>Events Which Cause a Dissolution</u>.  The Partnership shall continue in full force and effect until December 31, 2050, except that the Partnership shall be dissolved prior thereto upon the happening of any of the following events:
> …
> B.  The withdrawal or Bankruptcy of a General Partner if the Partnership is not continued in accordance with Section 8.5 hereof;

(NYSCEF Doc. No. 14, § 9.1)

Section 8.5 of the Partnership Agreement provides:

> <u>Effect of Withdrawal;  Election to Continue Business</u>.  Upon the withdrawal or Bankruptcy of the General Partner, the General Partner or her legal representatives shall promptly notify the Limited Partner of such event and the Partnership shall be dissolved and terminated unless the Limited Partner elects to continue the business of the partnership, either a new general partner shall be admitted to the Partnership or the Partnership shall be reconstituted as a general partnership. … The withdrawal of the General Partner shall not be deemed effective until the expiration of 90 days from the day on which such notice has been mailed to the Limited Partner….

(NYSCEF Doc. No. 14, § 8.5).

As discussed further below, the Estate maintains that pursuant to New York's Revised Limited

Partnership Act (**RLPA**), the Partnership was dissolved by operation of law either as of

November 5, 2019, i.e., 90 days after a receiver was appointed in the JAMS Arbitration, or on

October 24, 2019, i.e., 120 days after this proceeding was commenced by Ms. Weinstein because

in either such event the general partner "withdrew" and the Partnership was not continued.  The

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC                    Page 4 of 13
Motion No.  007

4 of 13

respondents do not dispute that RAS never sent notice to the Limited Partner (i.e., Ms.

Weinstein) of any event of dissolution and that no election to continue the Partnership was made.

## DISCUSSION

### I.    The AVP is Deemed Timely Filed

As noted above, the Estate was required to serve the AVP within 20 days of the Prior Decision,

i.e., by July 6, 2020 (*id.*).  Due to a technology issue with counsel for petitioners' computer, the

amended petition was not actually filed until 12:24 A.M. on July 7, 2020, i.e., 24 minutes into

the 21st day (NYSCEF Doc. No. 162, ¶ 7).  Although the respondents fail to articulate any actual

prejudice from the 24 minute delay in filing, the respondents argue, as part of the instant motion,

that the court should "not countenance such a clear and unnecessary flouting" of the court's

order (NYSCEF Doc. No. 156 at 1).

The court will not penalize the Estate for filing the AVP 24 minutes late due to what counsel

attests was an issue with his computer scanning technology (Barr Affirm., NYSCEF Doc. No.

162, ¶ 7) as the respondents can show no prejudice from this delay.  The cross motion to extend

the time to file the petition to July 7, 2020 is accordingly granted, *nunc pro tunc*.

### II.    Failure to State a Cause of Action

On a motion to dismiss a petition, the court must accept the facts alleged therein as true, the

petitioner must be accorded every possible favorable inference and the court must determine if

the facts alleged by the petitioner fit within any cognizable legal theory (*Lawrence v Miller*, 11

NY3d 588, 595 [2008]).

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC                    Page 5 of 13
Motion No.  007

5 of 13

The respondents argue that the AVP should be dismissed because the Estate is only entitled to

share in the profits and losses of the Partnership under the Partnership Agreement, and cannot

"bind the Partnership" by seeking to remove its general partner, appoint a receiver, dissolve the

Partnership or wind up its affairs (NYSCEF Doc. No. 156 at 2).  In its opposition papers, the

Estate argues that it is not seeking to remove RAS as general partner, but only seeking a

declaration that the Partnership was dissolved by operation of law:

> Respondents misconstrue the [AVP] to seek removal of RAS … [R]emoval is not the
> relief being sought here. The relief is a declaration that RAS ceased to be the general
> partner on either October 24, 2019 or November 5, 2019 and that because no election was
> made within 90 days to continue the partnership, [the Partnership] was dissolved as a
> matter of law [on] January 22, 2020 or February 3, 2020

(NYSCEF Doc. No. 162, ¶ 22, citing AVP, ¶¶ 23-24).


In other words, the AVP seeks as its remedy, distributions of the Partnership assets and the

appointment of a receiver because the Partnership *has already been dissolved* (*id.*, ¶ 23

["Petitioners seek only the distribution to the Estate of the Estate's share of the assets of the

partnership as is their rights under sections 9.2 and 9.4 of the Partnership Agreement and

NYRPLA § 121-804"]).   Inasmuch as this is not explicitly stated in the AVP, the proposed

Second Amended Verified Petition makes this clear (NYSCEF Doc. No. 167, ¶ 33).


The RLPA is a "default statute" imposing rules on a limited partnership if the partnership does

not explicitly opt out of certain provisions (*A&F Hamilton Heights Cluster, Inc. v Urban Green

Mgmt, Inc.*, 186 AD3d 409, 417 [1st Dept 2020]).

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC                    Page 6 of 13
Motion No.  007

6 of 13

FILED: NEW YORK COUNTY CLERK 10/23/2020 01:43 PM
NYSCEF DOC. NO. 189

INDEX NO. 653735/2019
RECEIVED NYSCEF: 10/23/2020

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 41 of 254

Section 121-801 of the RLPA, titled Nonjudicial Dissolution, provides:

A limited partnership is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) at the time, if any, provided in the certificate of limited partnership;

(b) at the time or upon the happening of events specified in the partnership agreement;

(c) subject to any requirement in the partnership agreement requiring approval by any greater or lesser percentage of limited partners and general partners, upon the written consent (1) of all of the general partners and (2) of a majority in interest of each class of limited partners;

(d) an event of withdrawal of a general partner unless (1) at the time there is at least one other general partner and the partnership agreement permits the business of the limited partnership to be carried on by the remaining general partner and that partner does so, or (2) unless the partnership agreement provides otherwise, if within ninety days after the withdrawal of the last general partner, not less than a majority in interest of the limited partners agree in writing to continue the business of the limited partnership and to the appointment, effective as of the date of withdrawal, of one or more additional general partners if necessary or desired; or

(e) entry of a decree of judicial dissolution under section 121-802 of this article.

(NY RLPA § 121-801 [emphasis added]).

Section 121-402(e)(ii) of RLPA provides that a person or entity ceases to be the general partner of a limited partnership if, within 90 days after a receiver is appointed without the general partner's consent or acquiescence, the appointment is not vacated or stayed, or if within 90 days after the expiration of any stay, the appointment is not vacated (NY RLPA, § 121-402[e][ii]).

The Estate maintains that RAS "withdrew" and ceased being the general partner because a receiver was appointed over the Partnership's assets on August 7, 2019 in the JAMS Arbitration and such receivership was not vacated within 90 days (RPLA § 121-402[e][ii]) and, not only was

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC
Motion No.  007

Page 7 of 13

7 of 13

FILED: NEW YORK COUNTY CLERK 10/23/2020 01:43 PM
NYSCEF DOC. NO. 189

INDEX NO. 653735/2019

RECEIVED NYSCEF: 10/23/2020

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 42 of 254

approval of the Limited Partner for the continuation of the business of the Partnership never

obtained, RAS never even sought it.  Therefore, the Estate argues the Partnership was dissolved

on November 5, 2019 – i.e., approximately 21 days before the Limited Partner died.

In their opposition papers, the respondents argue dissolution never occurred because Section 8.5

of the Partnership Agreement first required the general partner to send notice to the Limited

Partner in order for the Limited Partner to elect to continue the Partnership and such notice was

never sent.  Thus, the respondents argue, the Partnership was never dissolved.  The respondents

also argue that the Partnership would have been continued if such notice were made because

81% of the shares of "the Limited Partnership shares" are controlled by Rita Sklar.

The arguments fail.  The respondents cannot use their own failure to send the required notice as a

shield and otherwise frustrate the requirement that consent of the "Limited Partner" be obtained.

The express language of Section 8.5 provides that the right to continue the Partnership was that

of "the Limited Partner" – i.e., Ms. Weinstein –  and not a majority of the limited partnership

interests (NYSCEF Doc. No. 64; NYSCEF Doc. No. 14, § 8.5 ["the Partnership shall be

dissolved and terminated *unless the Limited Partner* elects to continue the business of the

partnership" [emphasis added]).  In any event, on the record before the court, Ms. Sklar was not

during the relevant time period, a limited partner.  Pursuant to the Partnership Agreement she

was originally the general partner, and then she assigned her general partnership interest to RAS.

Under the RLPA, a person or entity also ceases to be a general partner of a limited partnership if,

*inter alia*, within 120 days after the commencement of any proceeding against the general

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC
Motion No.  007

Page 8 of 13

8 of 13

partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed or stayed, or if, within 90 days after the expiration of any such stay, the proceeding has not been dismissed, unless otherwise provided in the partnership agreement or approved by all partners (NY RPLA § 121-402[e][i]).

Ms. Weinstein commenced this proceeding on June 26, 2019 seeking the judicial dissolution of the Partnership and the appointment of a receiver. There was no stay or dismissal of the action prior to the 120th day following June 26, 2019, which was October 24, 2019. The action was stayed only on November 25, 2019 when Ms. Weinstein died, i.e., via the automatic stay imposed upon the death of any party. Therefore, the petitioners argue that the Partnership was dissolved as a matter of law under both Section 8.5 of the Original Partnership Agreement and RPLA Section 121-801(d).

In their opposition papers, the Respondents argue that Section 121-402(e)(i) of the RLPA only applies to actions brought *against* the general partner, and not to actions against the limited partnership itself, and that it is, therefore, inapplicable. The argument is unavailing. The original verified petition was properly brought by Ms. Weinstein *against RAS* and Ms. Sklar, seeking RAS's removal, i.e., it was "a proceeding against the general partner," the 120th days from the date of commencement occurred prior to Ms. Weinstein's death, and there was no election to continue the business of the Partnership.

**653735/2019  WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC**                    **Page 9 of 13**
**Motion No.  007**

9 of 13

In fact, both dissolution dates, whether triggered by Section 121-402(e)(i) or (e)(ii), occurred

prior to Ms. Weinstein's death on November 25, 2019.  Accordingly, the Estate may properly

maintain the instant action to, among other things, distribute the assets of the Partnership to the

limited partners and the Estate in their proportionate shares.


To the extent that the respondents broadly maintain that neither Section 121-402(e)(i) or (e)(ii) is

applicable because those provisions only apply "unless otherwise provided in the partnership

agreement" (NY RLPA § 121-402[e]), this argument also fails.  The Partnership Agreement does

not provide an exhaustive list of events which constitute a general partner withdrawal or

otherwise explicitly opt-out of Section 121-402(e) (*A&F Hamilton Heights Cluster,* 186 AD3d at

417).  In fact, the Partnership Agreement addresses what happens upon the withdrawal of the

general partner – i.e., dissolution unless there is an election to continue the business of the

partnership by the Limited Partner.


## III.    Summary Judgment

The Estate maintains that summary judgment is appropriate in this case as no issues of fact are

actually in dispute.  The respondents argue that the Estate's cross motion for summary judgment,

brought pursuant to CPLR 3211(c), should be denied as procedurally improper because issue has

not been joined (NYSCEF Doc. No. 176 at 14).  Although, "[o]rdinarily, a summary judgment

motion brought prior to service of an answer should be dismissed as premature, … the CPLR

expressly confers upon *nisi prisi* courts the power to dispense with responses to amended

pleadings, in their discretion" (*Stephanie R. Cooper, P.C. v Robert*, 78 AD3d 572 [1st Dept 2010]

[summary judgment may be granted prior to filing of answer where defendant had notice of

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC                Page 10 of 13
Motion No.  007

10 of 13

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 45 of 254

plaintiff's contentions and ample opportunity to submit proof in opposition]; *see also* CPLR §

3211[c]).

Inasmuch as the respondents suggest that there are issues of fact requiring the denial of summary

judgment as to (i) their good faith belief that the provisions LRPA Section 121-402(e) were

inapplicable, and (ii) the parties' intent to "otherwise provide" for the removal of the general

partner in the Partnership Agreement, these are not factual issues requiring denial of the

summary judgment motion. The fact that the respondents may have believed that RLPA Sections

121-402(e)(i) and (e)(ii) were inapplicable is simply irrelevant if they did not provide otherwise

in their Partnership Agreement (*see A&F Hamilton Heights Cluster,* 186 AD3d at 417).

Furthermore, nothing in the Partnership Agreement provides otherwise.  To the contrary, Section

9.1 of Article IX, Dissolution and Termination of the Partnership, provides:

> 9.1  <u>Events Which Cause a Dissolution</u>.  The Partnership shall continue in full force and effect until December 31, 2050, except that the Partnership shall be dissolved prior thereto upon the happening of any of the following events:
> …
> B.  The withdrawal or Bankruptcy of a General Partner if the Partnership is not continued in accordance with Section 8.5 hereof;

(NYSCEF Doc. No. 14, § 9.1)

Because, as discussed above, the general partner did not send out notice seeking to continue the

business of the Partnership and there has been no election by the Limited Partner to continue the

business of the Partnership, the Partnership was dissolved.

For the avoidance of doubt, the respondents' motion for sanctions against the Estate is denied.

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC                    Page 11 of 13
Motion No.  007

11 of 13

Accordingly, it is

ORDERED that the respondents' motion is denied in its entirety; and it is further

ORDERED that the branch of petitioners' cross motion that seeks leave to extent time to serve the amended verified petition is granted, and such time is extended to 21 days, *nunc pro tunc*, and it is further

ORDERED that the branch of petitioners' cross motion that seeks summary judgment in petitioners' favor on and a declaratory judgment with respect to the subject matter of the instant petition is granted; and it is further

ADJUDGED and DECLARED that Ninety-Five Madison Company LP was dissolved by operation of law; and it is further

ORDERED that the parties are directed to submit proposed orders to the court for the liquidation of the Partnership in accordance with the terms of the Partnership Agreement and the RLPA on notice on or before November 23, 2020; and it is further

ORDERED that the branch of the petitioners' cross motion seeking leave to amend is denied as moot.

| | |
|---|---|
| **10/23/2020** | |
| **DATE** | **ANDREW BORROK, J.S.C.** |

653735/2019   WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC          Page 12 of 13
Motion No. 007

12 of 13

| CHECK ONE: | [X] CASE DISPOSED | [ ] NON-FINAL DISPOSITION | |
|---|---|---|---|
| | [ ] GRANTED | [ ] DENIED | [X] GRANTED IN PART | [ ] OTHER |
| APPLICATION: | [ ] SETTLE ORDER | [ ] SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | [ ] FIDUCIARY APPOINTMENT | [ ] REFERENCE |

653735/2019 WEINSTEIN, LOIS vs. RAS PROPERTY MANAGEMENT LLC          Page 13 of 13
Motion No. 007

13 of 13

**<u>EXHIBIT 3</u>**













RIDER TO LEASE DATED JUNE 17, 2016 BETWEEN NINETY-FIVE MADISON COMPANY, LP, a New York limited partnership, as Landlord, and Vim Inc., a New York corporation, as TENANT (the "Rider").

## TABLE OF CONTENTS

| Article | Heading | Page |
|---|---|---|
| 41. | Additional Rent | 1 |
| 42. | Real Estate Tax Escalation | 1 |
| 43. | Building Energy Escalation | 3 |
| 44. | Escalation Terms Agreed To – Supplementing Articles 42 and 43 | 5 |
| 45. | Renewal Option | 5 |
| 46. | Directory | 7 |
| 47. | Consumption of Energy | 8 |
| 48. | Restrictions on Use | 9 |
| 49. | Assignment and Subletting | 10 |
| 50. | Building Hours | 14 |
| 51. | Elevators | 15 |
| 52. | Landlord's Work | 15 |
| 53. | Condemnation Clause | 15 |
| 54. | Modifications Requested by Mortgagee | 16 |
| 55. | Security Deposit | 16 |
| 56. | Building Operations | 16 |
| 57. | Landlord's Liability By Reason of Tenant's Usage | 18 |
| 58. | Insurance | 19 |
| 59. | Surrender at End of Term | 20 |
| 60. | Landlord's Consent | 20 |
| 61. | Arrears | 21 |
| 62. | Window and Metal Cleaning | 22 |
| 63. | Extermination Services | 22 |
| 64. | Air Conditioning Maintenance and Repair | 22 |
| 65. | Cleaning | 23 |
| 66. | Sidewalk Maintenance | 23 |
| 67. | Rubbish Removal | 23 |
| 68. | Attornment | 23 |
| 69. | Use of Landlord's Professional and/or Vendors | 23 |
| 70. | Retail Business Laws | 24 |
| 71. | Inter Floor Staircase and Restored Space Entry | 24 |
| 72. | New Inter Floor Elevator, Building Freight Elevator, Building Passenger Elevator, and Store Entrance | 25 |

73.   Public Assembly ........................................................................................................ 27

74.   Self Certification ...................................................................................................... 28

75.   Core Drilling ............................................................................................................. 28

76.   Coffin and Pussy Bar ............................................................................................... 29

77.   Signage ...................................................................................................................... 29

78.   Tenant's Initial Alterations ...................................................................................... 29

79.   Refurnishing of the Demised Premises During the Lease Term .............................. 30

80.   Restoration of the Demised Premises Upon the Tenant's Move Out ...................... 31

81.   Non-Disturbance Agreement and Subordination ..................................................... 31

82.   Keys to Demised Premises ........................................................................................ 31

83.   Notices ...................................................................................................................... 33

84.   No Waiver .................................................................................................................. 34

85.   Jurisdiction, Etc. ....................................................................................................... 34

86.   Governing Law .......................................................................................................... 36

87.   Captions .................................................................................................................... 36

88.   Lease Construction; Prior Drafts ............................................................................. 36

89.   Complete Agreement, all Modifications Shall Only Be In Writing Signed By The Parties to This
      Agreement ................................................................................................................. 36

90.   Entire Agreement Merger .......................................................................................... 37

91.   Counterparts .............................................................................................................. 37

92.   Creditors ................................................................................................................... 37

93.   Landlord's Right Of Entry for Certain Work ............................................................ 37

94.   Tenant Casualty ........................................................................................................ 37

95.   Rules and Regulations ..............................................................................................

96.   Tenant's Intervening ................................................................................................. 39

97.   Rider ........................................................................................................................ 39

-ii-







[illegible]

determination it shall be determined that Tenant has paid an amount in excess of the required Energy Payment, Landlord shall repay to Tenant (without interest) the amount so overpaid by Tenant.

Pending the resolution of any dispute, Tenant shall pay the additional rent to Landlord in accordance with the Energy Statement furnished by Landlord with the installment of Fixed Rent then or next due, or if an Energy Statement is submitted on or after the expiration or termination of this Lease, within thirty (30) days after submission.

(2) Upon the date of any expiration or termination of this Lease (except termination because of Tenant's default) whether the same be the date hereinabove set forth for the expiration of the Term or any prior or subsequent date, a proportionate share of said additional rent for the comparative year during which such expiration or termination occurs shall immediately become due and payable by Tenant to Landlord, if it was not theretofore already billed and paid. The said proportionate share shall be based upon the length of time that this Lease shall have been in existence during such comparative year. Landlord shall as soon as practicable cause statements of the Building Energy Costs for that comparative year to be prepared and furnished to Tenant. Landlord and Tenant shall thereupon make appropriate adjustments of amounts then owing. Tenant's obligation to make such payments shall survive the expiration or sooner termination of this Lease.

(3) Landlord's and Tenant's obligations to make the adjustments referred to in [illegible] shall survive any expiration or termination of this Lease.

(4) Within ninety (90) days of the expiration of each comparative year during the term of this Lease, Landlord shall use its best efforts to provide Tenant with a written statement of the Tenant's costs for such expired comparative year which are the subject of this Article or, in the alternative, a statement that no increases in such costs are due for such comparative year. Notwithstanding the foregoing, Tenant acknowledges, understands and agrees that the failure on the part of Landlord to issue Landlord's Energy Statement for any period shall not be deemed a waiver of its right to subsequently do so. Any delay or failure of Landlord in billing any Energy Payment hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such Energy Payment hereunder.

(5) In the event Tenant shall fail to make any payment within thirty (30) days of billing provided for in this Article, the unpaid amounts, together with interest thereon at a rate equal to [illegible] per month compounded daily shall be deemed Additional Rent and payable with the next monthly installment of Fixed Rent and interest shall be computed from the date of the bill.

(6) Notwithstanding anything in this Lease to the contrary, Tenant's payment of interest shall not exceed the maximum interest permitted under law.

44.    [Landlord Terms Agreed To - Supplementary Articles 42 and 43]

Tenant acknowledges, understands and agrees, its Landlord has made full disclosure with respect to the conclusion and the specific provisions set forth in Articles 42 and 43 of this Lease, including but not limited to the basis for concluding same, and they have been agreed to by Tenant as a material part of this Lease.

45.    One Renewal Option

(A).    Tenant shall have one renewal Option to renew this Lease for five (5) years, from March 1, 2028 to February 28, 2033 (referred to as the "Renewal Term") unless sooner terminated pursuant to the terms, covenants and conditions of this Lease or pursuant to law.

(B)    This option shall only be exercisable provided:

(1)    Tenant is not then in default under any of the terms, covenants or conditions of this Lease and Tenant is past the to be observed or performed beyond any grace or cure period provided for in this Lease. Tenant shall not require any notice of Tenant's default, but notice shall be provided for monetary default.

(2)    Tenant shall then be in occupancy of the entire Demised Premises. This Option shall not be assignable if any subtenant, assignee or successor shall then be in occupancy of the entire Demised Premises, nor can it be exercised by Tenant on their behalf unless such subtenant or assignee is an entity wholly owned by Tenant or its Guarantor).

(3)    Tenant gives notice to Landlord on or prior to February 28, 2026 which is two (2) years immediately preceding the Renewal Term Commencement Date (3/1/2028). Time is of the essence with respect to the exercise of said Option. Tenant shall not have the right to give any such notice after February 28, 2026 and any notice given after February 28, 2026 purporting to exercise said option shall be void and of no force or effect.

(C)    If Tenant Exercises such Option in accordance with the provisions and limitations of this Article 45 of this Lease, and the Lease Term shall be renewed for the Renewal Term.

(D)    The Annual Fixed Rent shall be the greater of (i) 105% of the fair market annual rental value (as defined herein) for the Demised Premises as of September 1, 2027 which is six (6) months immediately preceding the Renewal Term Commencement Date (3/1/2028) as agreed upon by the parties, or (ii) as determined in accordance with the provisions of this article or (iii) the escalated Annual Fixed Rent then in effect as of February 28, 2028, including:

(1)    the Annual Fixed Rent on February 28, 2028 of $1,260,294 (without giving effect to any abatement or apportionment of Annual Fixed Rent which includes the $X per year fixed percentage escalating amount that adjusts annually upon X [the real increase over base rent], +5%) plus

(2)    all escalation increases pursuant to,





27.   Conservation of Energy







**1)** **Brokerage**

Tenant represents that in dealing with [illegible] Wright Realty Group LLC and Midtown Equities Brokerage LLC, as brokers ("Brokers") in connection with this Lease and Landlord shall pay [illegible] and Wright Realty Group LLC all commissions due pursuant to the terms of a separate agreement and Landlord shall pay Midtown Equities Brokerage LLC all brokerage commissions. [illegible] Midtown Equities Brokerage LLC. Each party shall indemnify the other against any liability and expense (including reasonable attorney's fees) for any other brokerage commission or finder's fee based on alleged action of the other party or its agents or representatives. The parties' liability hereunder shall survive any expiration or termination of this Lease.

**52)** **Landlord's Work**

[largely illegible paragraph regarding Article 13, Demised Premises, Landlord shall not be required to perform any work to prepare the Demised Premises for Tenant's occupancy, except that Landlord shall perform the work set forth on Schedule D annexed hereto ("Landlord's Work"). To the extent any warranty resulted on Schedule D, Landlord's Work shall be of the design, manufacture, quality, quantity and nature designated by Landlord as the standard of the Building ("Building Standard"). To the extent Landlord's Work is to be performed with Tenant in occupancy the utilities provided, Tenant shall cooperate, personnel, furniture and equipment as need, to the extent deemed necessary by Landlord to permit Landlord to perform Landlord's Work during normal business hours on weekdays and/or on holidays and without overtime or other additional expense to Landlord] See Exhibit D.

[illegible sentence] Landlord across any condition or state of subjects in this Demised Premises, then the following will apply:

(i) [illegible] scaffolding shall be painted dark green or any other color required by law.

(ii) Such scaffolding shall be covered at a height above the large display windows of the Demised Premises.

(iii) If possible the support [illegible] such scaffolding shall be erected as far as possible from of the Building; and

(iv) The basement or [illegible] of the entrance of the Demised Premises shall be maintained in [illegible] with as possible [illegible] or required requirements and the use of [illegible] through [illegible] in the Demised Premises will be carried on through one customary entrance.

**1)** **Exculpatory Clause**

[illegible] herein to the contrary notwithstanding, Landlord's liability [illegible] or [illegible] to perform its obligations hereunder shall be limited to its interest in the Land and Building. Tenant shall [illegible] enforce any judgment or other remedy against any other of Landlord or an individual stockholder interest in Landlord.








appointed by the American Arbitration Association, having at least fifteen (15) years continuous experience in real estate leasing. Any decision of the arbitrator shall be final and binding upon the parties, judgment on such judgment shall be entered in any court, and either party shall have a right to petition enforcement of such determination [illegible] by specific performance. If Tenant loses the case it shall pay Landlord's counsel's actual fees, plus expenses and the expenses and fees of the arbitrator. If Landlord loses the case, it shall pay only Landlord's counsel's actual fees and one-half of the expenses and fees of the arbitrator and Tenant shall pay Tenant's counsel's actual fees and one-half of the fees of the arbitrator.

61. [illegible]

If Tenant is in arrears in payment of Fixed Rent or additional rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items Landlord sees fit, irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payment shall be credited.

62. Window and Metal Cleaning

Tenant understands, acknowledges and agrees that maintenance of the Demised Premises including window [illegible] and [illegible], and [illegible] of the metal at the interior and exterior, is critical to the safety and appearance of the Building. Therefore:

(a) Tenant shall maintain a cleaning contract for the windows and shall have the [illegible] of all windows cleaned by the Building's designated cleaning contractor and as per said contractor's specifications. Windows in the Demised Premises shall be cleaned as follows:

(i) interiors [illegible];
(ii) exterior [illegible];
(iii) [illegible] and transoms [illegible].

Tenant shall maintain a contract for such services and shall furnish Landlord with a copy thereof within thirty (30) days after commencement of the term hereof. If Tenant fails to obtain and/or furnish such contract, Landlord may obtain such contract on behalf of Tenant, and Tenant shall reimburse Landlord, on demand, as Additional Rent, for the cost of such contract.

(b) Tenant shall maintain a contract with the Building's designated contractor for the purpose of maintaining (cleaning and/or refinishing) the metal, both interior and exterior, of the entrance vestibule, and windows of the Demised Premises. The metal shall be [illegible] at such intervals and in such manner as [illegible] [illegible] [illegible] the painted metal below the windows which shall be maintained as per Landlord's specifications. Tenant shall maintain a contract for such service and shall furnish Landlord with a copy thereof within thirty (30) days after commencement of the term hereof or pay Landlord for such services on demand, as Additional Rent, the amount of such services. If Tenant fails to obtain and/or furnish such contract, Landlord may obtain such contract on behalf of Tenant, and Tenant shall reimburse Landlord, on demand, as Additional Rent, for the cost of such contract.

[illegible]

(C)    For purposes of clarification, Tenant's responsibility regarding the maintenance of windows and metal shall exclude the ornate decorative metal work above the metal window panes of the windows of the Demised Premises.

6.7    Extermination Services

Any necessary extermination services shall be furnished to Landlord's exterminator and paid for by Tenant. Landlord represents that all tenant's have equal treatment.

6.8    Air Conditioning Maintenance and Repair

Tenant shall maintain the air conditioning system and equipment in the Demised Premises in good working order and shall comply with all governmental laws, rules, orders and regulations, and pay all fees with respect thereto, throughout the Term. Tenant shall install new air conditioning equipment and shall work be shown as plant approved by Landlord. Tenant shall be required to comply with all of the applicable provisions of this lease, with respect hereto, and if Landlord's option said equipment or system shall become the property of Landlord at the expiration or earlier termination of this lease (not as a lien of any kind or a right of Tenant or any third party).

Throughout the Term, Tenant shall purchase and maintain a full service maintenance and service contract for such system and equipment with a contractor approved by Landlord and furnish Landlord with information thereof (on each January 1 during the Term). If Tenant fails to carry such contract, Landlord may obtain such contract on behalf of Tenant, and Tenant shall reimburse Landlord, as Annual or Additional Rent, for the cost of such contract.

7.    Cleaning

(A)    Landlord shall not be required to provide any cleaning services to the Demised Premises. Tenant shall arrange to have the Demised Premises cleaned at its sole and full expense. Tenant will have the following three options:

A.    Employ the cleaning contractor of the Building.
B.    Employ a permitted employee of Tenant who shall be entry covered by all requisite Governmental Rules and Regulations, Rules and Routines.
C.    Selecting a cleaning company or any organizing all cleaning and cleaning, this cleaning person(s) shall be employed by the Building's cleaning contractor at live a percentage of profits earns its associated to the cleaning person(s).

(B)    Cleaning of the Demised Premises shall be as follows:

(i)    ____

public - politics weekly
most - totals monthly
any - was weekly
any - compact litter per car
and floors - this week's

(xi) [illegible]

(xii) [illegible]

(C) If Tenant [illegible] contractor approved by Landlord [illegible] Tenant shall maintain a contract for such services and shall furnish Landlord with a copy thereof within thirty (30) days of the commencement of the term hereof. If Tenant fails to obtain and furnish such contract, Landlord may obtain such contract on behalf of Tenant and Tenant shall reimburse Landlord, on demand, as Additional Rent, for the cost of such contract.

[illegible] Sidewalk Maintenance

Sidewalk sweeping, cleaning, and snow removal shall be the responsibility of Tenant. Tenant may use Landlord's employees or vendors to perform this work. The hourly charge(s) for such services shall be agreed to in the Lease with adjustments of the hourly charges to reflect Landlord's increased costs over the Lease Term and shall be charged to Tenant as Additional Rent. As used herein, "sidewalk sweeping, cleaning, and snow removal" shall cover the area of the sidewalk [illegible] display windows [illegible] in front of the Demised Premises on Madison Avenue.

[illegible] Refuse and Rubbish Removal

Tenant shall be responsible for Tenant's refuse and rubbish removal from the Building and shall contract directly with Landlord's vendor to perform such services. Tenant shall [illegible] refuse and rubbish removal in conformity with Building regulations and only through the freight entrance of the Building. If Tenant fails to maintain such contract and/or pay bills related to such company, Landlord may obtain such services on behalf of Tenant, and Tenant shall reimburse Landlord, on demand, as Additional Rent, for the cost of such contract.

[illegible] Attorney's Fees

Throughout the Lease and Rider, reference is made to "attorneys' fees." These fees shall be defined as the fees actually billed by the attorneys plus all out-of-pocket expenses related thereto.

[illegible] Use of Landlord's Professionals and Vendors

(A) Notwithstanding any contrary provisions in Articles [illegible] of this Lease, Tenant shall use only those engineers and contractors (as described on Exhibit "[illegible]") approved by Landlord in connection with (i) Tenant's installation [illegible] (ii) any subsequent alterations, installations, additions or improvements to the Demised Premises and (iii) removal of any alterations, installations, additions or improvements from the Demised Premises at the expiration or sooner termination of this Lease, all of which shall be performed strictly in accordance with Article [illegible] of this Lease.

(B) A list of the approved Building architect, engineers, contractors and vendors acceptable to Landlord [illegible]

[illegible]

(i) Landlord's architect, structural engineer and contractor shall have final review and approval of any and all structural requirements of the [illegible] Floor Staircase, [illegible] Floor Elevator, and [illegible] Store Entry, at Tenant's sole cost and expense;

(ii) strict compliance with Landlord's [illegible] and contractors plans and specifications with respect to the installation of the [illegible] Floor Staircase, [illegible] Floor Elevator and [illegible] Store Entry, including but not limited to the fabrication and installation of [illegible] or any [illegible] of structural support, necessary or required to install these items in the Demised Premises and/or reinforce the slab;

(iii) express agreement that the location of the [illegible] Floor Staircase shall be subject to the approval of Landlord's architect and structural engineer (See EXHIBIT __);

(iv) express agreement to submit floor plan(s) with the location of the [illegible] [illegible] and [illegible] weight and the required or desired mode of installation to Landlord and Landlord's architect and structural engineer for review and approval of [illegible], design and the structural requirements, including the method of weight distribution and any required beams and columns necessary to support these items;

(v) payment of all fees, costs and expenses relating to the above-referenced work and its [illegible]; and

(vi) strict compliance with all laws, rules and regulations relating to these [illegible] imposed by any federal, state and governmental or regulatory authority, [illegible] including but not limited to the City of New York.

D. [illegible] Floor Elevator, Building Freight Elevator, Building Passenger Elevators and Store Entrance.

(a) [illegible] Floor Elevator as defined in Exhibit D:

(1) Tenant acknowledges and agrees that the [illegible] Floor Elevator shall not be exclusive for Tenant's use throughout the Term, however Tenant will have [illegible] until the 3rd Floor of the Building is leased by a tenant (the "Third Floor Tenant") [illegible] [illegible] in the Lower Level of the Building. In the event that a lease is concluded between Landlord and the Third Floor Tenant, Landlord shall include the following provision in such Third Floor Tenant's Lease: "Neither the Third Floor Tenant nor any person or entity [illegible] through the Third Floor Tenant may use the [illegible] Floor Elevator unless the Third Floor Tenant delivers to [illegible] (i) a general indemnity for the benefit of Tenant and its [illegible] and [illegible] and any other person or entity [illegible] by Tenant and (ii) insurance coverage in form, substance and amount as [illegible] by other full floor tenants in the Building plus insurance [illegible] for any additional liability due to usage of the [illegible] Floor Elevator, naming both Tenant and Landlord as additional insureds. Until such insurance and indemnity are delivered to both Landlord and Tenant, the Third Floor Tenant [illegible] not be permitted to use the [illegible] Floor Elevator [illegible]

[illegible]

(c)    During the periods of deliveries and services, as a Tenant shall pay all costs related to the New ninety-first Elevator including but not limited to maintenance, repair, replacement, the performance of all mandated tests, and such conditions and to a Tenant such have use of the New ninety-first Elevator for both passenger and freight usage at any time.

(d)    If the may have a New Elevator is no longer dedicated.

i.    During Tenant's hours of operation as a retail store Tenant such use it for customers and manually carrying off package and Tenant's products. The Third Floor Tenant may only use the New ninety-first Elevator for normal passenger usage. Neither Tenant nor the Third Floor Tenant may use any dollies or hand trucks.

ii.    After Tenant's hours of operation as a retail store the elevator may be used for freight by Tenant and the Third Floor Tenant. No hand trucks shall be permitted in the New ninety-first Elevator.

iii.    Tenant agrees that the Third Floor Tenant shall be entitled to use the New Lower-Floor Elevator at times When Tenant is closed for business.

iv.    Costs related to maintenance, repair, replacement of parts, the performing of all mandated tests, such conditions and all other related costs (the "Expense Costs") shall be equally shared between Tenant and Landlord. Landlord shall pay all Invoices for the Elevator costs and Tenant shall bill Landlord then for twenty five (25) days the date such invoice along with supporting documentation and fifty percent (50% payment) to and to Landlord. In the event that Landlord fails to timely payment Invoices or or between twenty (20) days after notice, Tenant may, at its option, offset such unpaid amounts from the a rent Rent.

Tenant's hours of operation as a retail store.

i.    Incorporate Saturday – Friday 10am – convenient Saturday and Sunday 11am – 6pm.

ii.    These hours shall be adjusted for the actual hours Tenant operates as a retail store throughout the Lease Term.

(10)    Usage of the Buildings freight Elevator designated in health a a a X—Annexed to the Present Survey to this ("Freight Elevator.")

(i)    The Freight Elevator shall be operation to the and only for conveying on conveyor that will not go onto the New floor Floor elevator (ii) Use of the Freight Elevators shall only be by prior appointment, (iii) there will be an hourly fee charged of $250 as of the date of this Lease, with increase after the Lease Term to follow Landlord's increase every. (iv) The Freight Elevator shall be available up on request except on Holidays and more days the Building to cover



i.   Monday – Friday   ─   after 6pm ─ 6- (Minimum number of hours required)
ii.  Saturday   ─   9am to 6pm ─ 8 hour minimum required.
iii. Sunday   ─   11am to 6pm ─ 8 hour minimum required.

(c)   Use of the Building's Program Elevator as shown on Exhibit __ (the "Program Elevator").

Any category of Tenant shall be permitted to use its Passenger Elevator pursuant to rules and regulations promulgated by Landlord with regard thereto.

(d)   Use of Tenant's Madison Avenue Store Entrance as shown on Exhibit A ("Tenant's Madison Avenue store entrance").

(i)   Only employees and visitors to Tenant shall be allowed to use Tenant's Madison Avenue store entrance.

(ii)   No coffee or food trucks shall be permitted through Tenant's Madison Avenue store entrance.

(iii)   No deliveries to food supplies, merchandise, furniture, equipment or construction material shall be permitted through Tenant's Madison Avenue store entrance. Such material shall only be permitted through the Freight Entrance.

(iv)   Construction workers, maintenance and trade workers wearing garments and all contractors shall only be permitted to use the Freight Entrance.

V.   Public Assembly

The parties acknowledge that Tenant does not require a permanent public Assembly Certificate of Occupancy and/or insurance.

a.   an ACI I/Change of Use filing will not be filed by Tenant.
b.   Tenant will file a regular ACI2 in connection with Tenant's renovations.
c.   If Tenant hosts an event that requires a Temporary Public Assembly Permit "Permit") consent to enable the Tenant, the following shall apply:

i.   The critical only be for the CT Floor.
ii.  One shall only be issued Friday through Sunday.
iii. Each Permit at this time is only valid for one day. Tenant is allowed to apply for multiple Permits so that Tenant can line up to four events a year, each event lasting for up to two consecutive days as permissible by law.
iv.  Landlord shall not be required to expend any time or money obtaining such permits.
v.   If Tenant obtains a Temporary Public Assembly Permit it shall strictly comply with and conform to all code requirements including but not limited to employing a doorman and a licensed Fire Watch person.

Tenant's visitors and client shall not be permitted access to the Passenger Elevators.



74.    SHL Certification

Tenant's Initial Alterations will be (i) Certified except for fire prevention, fire trap (?) Door Closure, and Structural Slab Landlord and (ii) professional review and approval of Tenant's plan.

- i.    Tenant shall cure any violations arising from Tenant's initial Alterations using its initial (?) installation, facilities, general contractor, and/or sub-contractors. If any of the team is not available, Tenant shall use Landlord's professionals and contractors. All expenses related to curing these violations shall be paid for by Tenant.
- ii.    After Tenant's Initial Alterations no SHL Certification shall be provided for any Tenant alterations.

75.    Core Drilling

- i.    Tenant may perform core drilling beyond the Building structural concrete slab and any Building walls at (i) second floor of the Building and (ii) in one location from the first floor to the lower level (all inspections (?) per (?) Landlord's and (ii) professional approval) and shall be subject to restoration at the end of the Term by Landlord's professional and Contractor(s) at Tenant's expense.

76.    Coffee and Pastry Bar

- i.    Tenant may use up to 200 inside square feet (?) 1000 Demised Premises for a coffee and pastry bar while running Demised Premises (?) purposes subject to the following:

- i.    Cooking and smoking shall be strictly prohibited.

- ii.    Tenant shall be required to obtain all permits and approvals required to operate the coffee and pastry bar under Applicable Laws, including a Health Department license.

- iii.    The coffee and pastry bar shall be only used as an amenity for (?) a potential Guest and Visitors to the premises and shall not be retail (?).
- iv.    The coffee and pastry bar shall not be advertised or or used as an independent coffee and pastry shop destination.
    Signage shall not be visible outside of the Demised Premises (?) be seen.
- v.    If the coffee and pastry bar is managed or run by any party other than Tenant, it shall be treated as a sublet in accordance with the provisions of Article III and Tenant shall be required to comply with all of the provisions thereof and the Tenant Insurance Article V.
- vi.    The coffee and pastry bar shall only be permitted for Tenant and shall not be permitted for any sublessees or occupants thereof.
- vii.    Any sink or dishwasher installed for this usage shall be subject to restoration for Landlord's professionals and Vendors at Tenant's cost.

- j.    Of Food and Drink
- i.    Only 200 (?) shall run the service coffee and food shall be approved and (?)



 ii.   Hot Food that can be Served – Pastries, Cookies, and whole fruit.

e.   Plumbing pipes to the Cart – See Section 77
    i.   One new drill permitted to set a beam.
    ii.   Landlord shall designate route in the lower level along the beam and the new drill and thereafter following common direction, will re-routing pipes as determined by Landlord.

77.   **Signage**

1.   All signage both exterior and interior shall be subject to Landlord's prior written approval and shall comply with Applicable Laws.

2.   Tenant agrees this condition shall have sole discretion to remove or store any signage made by Tenant in connection with the installation of all signs.

3.   Interior Signage.   No signage may be attached to the inside of the exhibit (including the blind, cash zone, Demi-Celin, Heliotrope area), or to the first course of the Unique Premises.

4.   The following shall apply to Interior Signage and other Premises.

    a.   Interior signs in the Demised Premises shall be appropriate to the design of the interior with respect to material and lighting to illuminate same.   All signage shall be appropriate to a Landmarked building and subject to review and approval by Landlord as to design, material and illumination.

    b.   Tenant shall submit a detailed detail of any proposed signage sign to Landlord and Landlord's architect for review and approval.

    c.   No signs whatsoever (weather of a temporary or a permanent nature) may be placed on or adjacent to the windows of the Demised Premises visible from the street without first receiving Landlord's approval in writing.

    5.   Variance of Tenant existing signs of materials on its exterior windows is approved by Landlord.

78.   **Tenant's Initial Alterations** (See Exhibit "D" Building Standard)

(A)   Tenant agrees, at its sole cost and expense, promptly after the date of execution of this Lease, to furnish and install all of the work necessary to complete the Demised Premises and ready the same for Tenant's occupancy in accordance with the provisions of the Lease ("Tenant's Initial Alterations").   Tenant represents that it will expend with respect to Tenant's Initial Alterations within sixty (?) months from the commencement of the Lease a minimum of $2,100,000 for "hard costs" plus a minimum of $12,500 for "Hard Costs" for the hard level First Floor ("Minimum Combination Corridor").   For the purposes hereof, "hard costs" shall consist of actual cost of work performed and material furnished by contractors, subcontractors, and suppliers in connection with the performance of such work towards Building standard items and their upgrades but shall not include the fees, etc. nothing the Plan and









[illegible] engineering, design, plan review and [illegible] for telephones, equipment and outlets [illegible] computer equipment, wiring, outlets [illegible] Tenant's trade fixtures, equipment, and movable office furniture [illegible] movable office furniture. In the event Tenant does not expend the Minimum Construction Threshold, any deficiency shall be payable on the first day of the tenth month after Lease Commencement to Landlord unless such amount has been deposited with Landlord and [illegible] applied to Tenant Improvements [illegible] within eighteen (18) months of the date of the commencement of the Lease. Any amount which is not applied to Tenant Improvements shall upon the expiration of such eighteen (18) months be paid to Landlord as an additional amount of security deposit in the nineteenth (19th) month after Lease Commencement.

(B) On a monthly basis Tenant shall submit to Landlord a detailed statement (a "Construction Cost Statement") [illegible] Tenant and a certificate of Tenant's architect (the "TA Certificate") [illegible] After the first Construction Cost Statement and TA Certificate, [illegible] subcontractors, material suppliers and laborers and other evidence satisfactory to Landlord of the payment by Tenant of [illegible] Construction Cost Statement previously submitted, together with [illegible] Waivers of Liens. [illegible] Demised Premises [illegible] Landlord, no later than thirty days thereafter.

(C) Tenant's Initial Alterations shall be approved and performed in accordance with the terms of this Lease and shall meet or exceed the minimum Building Standard. Landlord shall not be obligated to perform any work or incur any expense with respect to the Demised Premises and Tenant's Initial Alterations unless expressly provided for in Exhibit "C" hereto.

(D) If Tenant fails to perform and/or complete its obligations [illegible] governmental bodies, and as a result thereof Landlord incurs any costs or damages, Landlord may, at its option, complete such work, [illegible] and charge Tenant for all amounts related thereto.

70. [illegible]

[illegible] as follows:

(A) [illegible]

(B) [illegible]

(C) [illegible] New York City [illegible]

(f) [illegible] as per the recommendations of the Building's [illegible].

All Work described in this Article shall be performed [illegible] Tenant Work and in accordance with Building Standards and in a manner consistent with the standards of Class "A" office buildings in New York City.

[illegible] Restoration of the Demised Premises Upon the Tenant's Move-Out

As a material [illegible] of this Lease, Tenant agrees that upon move-out and at Tenant's sole cost and expense:

(a) Tenant shall remove all of its furniture, [illegible], data processing and telephone equipment, personal property, and all debris from the Demised Premises and leave the Demised Premises broom clean. Tenant shall remove all of the above items so as to minimize damage to the Demised Premises' walls, columns, floor, and finished ceilings, and all common areas of the Building.

(b) All air conditioning [illegible] and [illegible], auxiliary heat and air conditioning system(s), lighting fixtures attached to the ceiling, columns or walls, the finished ceilings, [illegible], [illegible] and all shelving, [illegible] and appliances [illegible] of the Demised Premises, and all [illegible], shall not be removed by Tenant. Tenant agrees that at Landlord's option [illegible] on written notice to Tenant within [illegible] days prior to the [illegible] at the termination of this Lease, that all such property shall become the property of the Landlord or alternatively shall be removed from the Demised Premises at Tenant's sole cost and expense.

(c) [illegible] Landlord shall [illegible] the following work to be done by [illegible] and all costs [illegible] shall be billed to Tenant as Additional Rent.

(1) [illegible] Landlord's [illegible] any items listed in [illegible] air conditioning system(s) and [illegible] and shelving, [illegible], appliances and [illegible] shall be removed from the Demised Premises and disposed of by Landlord and all [illegible] incurred by Landlord shall be billed to Tenant as Additional Rent.

(2) The following work shall be performed by Tenant, at Tenant's cost, unless [illegible]:

(i) perform the following work on all air conditioning units [illegible] prior to move-out by Tenant's air conditioning contractor:

[illegible]

[illegible]

[illegible] including but not limited to [illegible] (if required) [illegible] and/or [illegible]

Landlord's bill to attorneys. Tenant's obligation to pay for all such costs and expenses shall survive the expiration or sooner termination of this Lease, or Tenant's surrender, whichever is later.

31.    Non-Disturbance Agreement and Subordination

The terms of this article summarizes those set forth in Article I.

(A).    Landlord represents that as of the date of execution of this Lease, the Building is not encumbered by a mortgage or ground lease. If, during the term of this Lease, Landlord enters into a mortgage and/or enters into a ground lease for the Building, Landlord shall use its reasonable efforts to obtain from the mortgagee or ground lessor an agreement in the standard form of said mortgagee or ground lessor reasonably acceptable to Tenant to the effect that, if there shall be foreclosure of the mortgage or superior lease, the mortgagee or superior lessor will not make Tenant a party defendant to such foreclosure, nor Tenant, disturb Tenant's possession under this Lease, or terminate or disturb Tenant's leasehold estate or rights hereunder, and will recognize Tenant as the direct tenant of the mortgagee or successor lessor, provided that Tenant is not in default beyond and after notice and expiration of any applicable grace or cure period provided for in this Lease (such agreement or any agreement of similar import being qualitatively referred to as a "Non-Disturbance Agreement").

(B)    Landlord shall have no liability to Tenant for Landlord's failure to obtain a Non-Disturbance Agreement. Landlord's agreement to use reasonable efforts hereunder shall not (i) impose any obligation upon Landlord, (ii) decrease any costs or expenses of Landlord, (iii) delay Landlord's entering of the ground lease or mortgage or (iv) require Landlord to institute any legal or other proceedings in connection with obtaining such Non-Disturbance Agreement.

(C)    Landlord's obligation to obtain a Non-disturbance Agreement as provided for hereunder ceases upon expiration or sooner termination of the term of this Lease.

32.    Keys to Demised Premises

(A).    In furtherance of the safety and security of the Building, a record of all access codes, keys, or other entry mechanisms (including magnetic cards and/or cards), and passwords (collectively) for accessing the Demised Premises shall be given to Landlord and in the event of any change in the office security, key components in said entry doors, Tenant shall immediately furnish a complete set of keys or the new codes and/or passwords thereto to Landlord. If Tenant fails to provide the foregoing to Landlord, Landlord shall have the right to change the codes or entry mechanisms and provide all of them to a single copy and a password to Tenant and retain said keys, codes, and/or passwords as noted herein. In respect of emergency, Landlord is required to gain access to the Demised Premises and said keys, codes, and/or passwords provided in the event the same to the Demised Premises. Tenant acknowledges, understands and agrees that Landlord shall not be liable for any adverse consequences to the Demised Premises as a result of such entry, and Tenant hereby waives any and all claims against Landlord in connection therewith.



(B)   Tenant shall at all times provide Landlord with a full set of keys to all rooms and closets having locks on their doors. If Tenant fails to provide any or all such keys, Landlord may hire a locksmith to change all locks involved, give Tenant one set of keys to same locks, and bill all costs therefor to Tenant.

(C)   Landlord and Tenant acknowledge, understand and agree that access to the Demised Premises when Tenant is not open for business will cause Tenant's security alarm system to activate.

8.   Notice.

All notices, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when: (a) delivered by hand, or (b) received by addressee, if sent by Express Mail, Federal Express, or other nationally recognized express delivery service (receipt requested), in each case to the appropriate address or fax below (or to such other address as a party may designate as to itself by notice to the other parties similarly given). Any and all bills and notices shall also be sent to Tenant by facsimile:   (to:   Accounts Payable (646) 391-9816)

IF TO LANDLORD:          Ninety Five Madison Company L.P.
                         95 Madison Avenue
                         6th Floor
                         New York, NY 10016
                         Attention: Ellen A. Bilzi

WITH A COPY TO:

IF TO TENANT:            Vince Inc., 9th Avenue, New York, NY 10011 and's ...Demised Premises Office's ...and Copies to Tenant

WITH A COPY TO:          Vince International A/s          (Insurance)
                         ...Street 13, Rotterdam, Switzerland 1017

9.   No Waiver.

The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term of any other term of this Agreement. Any waiver must be in writing.

10.   Intentionally Blank.





If, for any reason, Tenant defaults in the payment of any Fixed Rent and/or Additional Rent and fails to cure such monetary default within ten (10) business days, Landlord may pursue all available legal and equitable remedies, including but not limited to those provided for in Articles 18 and 19 of this Lease.

The submission of this Lease to Tenant shall not constitute an offer to Landlord to negotiate and execute a Lease with Tenant and is made subject to Landlord's acceptance, execution and delivery thereof.

## 86.    Governing Law.

This Agreement and all amendments or changes hereto and hereby, and disputes hereunder shall be governed by, and all disputes arising hereunder shall be resolved in accordance with, the laws of the State of New York, without regard to the conflicts of laws principles thereof.

## 87.    Caption.

The captions in this Agreement are for convenience of reference only and shall not be given any effect in the interpretation of this Agreement.

## 88.    Lease Construction; Conflict.

(i)    If there is any inconsistency between (i) the terms of the pre-printed portion of this Lease, and (ii) the terms of the Rider and/or Schedule(s) and Exhibit(s) to this Lease, the terms of the Rider and/or Schedule(s) and Exhibit(s) shall control.

(ii)    If there is any inconsistency between (i) the terms of the pre-printed portion of this Lease and any Rider and Schedule and Exhibit(s) to this Lease, and (ii) the manual and/or altered sequence of the pre-printed portion of this Lease and/or the Rider and/or Schedules and Exhibits to this Lease, the inserted and/or altered language shall control.

(iii)    In the event of any action, dispute or proceeding relating to this Lease, no weight shall be given to any deletions or striking out of any of the terms contained in any draft of this Lease, and no such deletion or striking out shall be deemed into evidence in any such action, dispute or proceeding.

## 89.    Exclusive Agreement; all Modifications Shall Only Be In Writing signed By The Parties to This Agreement.

This agreement supersedes all prior agreements among the parties with respect to its subject matter, is intended as a complete and exclusive statement of the terms of this agreement among the parties with respect thereto and cannot be amended, changed or terminated orally.  No party may

in advance of the event, with certificates of insurance acceptable to Landlord.   Additionally, each Tenant contract shall include a provision that requires that any staff working at Tenant's demised Premises shall be payrolled and fully covered by all required governmental rules and regulations, taxes and insurance.

77.      Rider.   In the event of any conflict between the provisions of this Rider and Exhibits and the provisions of the printed form of lease to which this Rider is annexed, the provisions of this Rider and Exhibits shall control and govern.



SCHEDULE "A"
TO AGREEMENT OF LEASE
BY AND BETWEEN
NINETY-FIVE MADISON COMPANY, L.P. AS LANDLORD, AND
VITRA INC., AS TENANT

RENT SCHEDULE

| Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 6/1/16 - 5/31/17 | $412,500.00 | $34,375.00 |
| 6/1/17 - 5/31/18 | $427,250.00 | $36,437.50 |
| 6/1/18 - 5/31/19 | $879,242.00 | $73,216.80 |
| 6/1/19 - 5/31/20 | $901,499.78 | $75,124.98 |
| 6/1/20 - 5/31/21 | $928,544.77 | $77,378.75 |
| 6/1/21 - 5/31/22 | $956,401.11 | $79,700.09 |
| 6/1/22 - 5/31/23 | $985,093.14 | $82,091.10 |
| 6/1/23 - 5/31/24 | $1,014,645.93 | $84,553.83 |
| 6/1/24 - 5/31/25 | $1,045,085.31 | $87,090.44 |
| 6/1/25 - 5/31/26 | $1,076,437.87 | $89,703.16 |
| 6/1/26 - 5/31/27 | $1,108,731.01 | $92,394.25 |
| 6/1/27 - 2/28/29 + | $1,141,992.94 / $956,401.72 | $95,166.06 |

+  Constitutes a lesser amount for period of less than a year.
++ Nine (9) months.



EXHIBIT A

DEMISED PREMISES (1 OF 2)

GROUND FLOOR CENTER STORE



EMMET BUILDING
MAIN FLOOR PLAN

EXHIBIT B

DEMISED PREMISES (2 OF 2)

ENTIRE SECOND (2ND) FLOOR



EXHIBIT C

GROUND FLOOR CENTER STORE

CURRENT CONDITION





MADISON AVENUE
95 MADISON AVENUE
Current Condition

**EXHIBIT D**

**LANDLORD'S WORK**

Demolish, movement and remove and close up existing door and frame in the necessary repair area of demolition and remove all related debris.

Erect new demising wall for the expanded lobby as shown on the attached plan.

Premises to be delivered in broom clean condition.

Landlord to deliver an ACM for the Demised Premises;

- Ground floor retail store – approximately 4,000USF
- Entire second (2nd) floor – approximately 4,060USF

Store to be completed by [...] 2016

[handwritten annotations illegible]

5. Existing tenor floor uniforms to remain. Tenant will fit any work related thereto as per its plans or to its needs.

6. Tenant shall install an enclosed elevator lobby:
   a. In front of the passenger elevators on the 2nd floor with a card read access system to control visitors.
   b. In front of the freight elevators on the 2nd floor for security of Tenant's premises.

7. Tenant at Tenant's cost shall install submeters and have them programmed by the Building's meter reading company to measure Tenant's consumption of electricity. All of this work shall be performed by Building contractors and vendors.

8. All work comprising Tenant's Initial Alterations shall be reviewed and be subject to approval by Landlord, *such building approval*





EXHIBIT G

PLAN APPROVAL – ALREADY AGREED TO

I.    See:    Attached ground floor center store plans – Exhibit "ABC"
"LANDLORD'S WORK" – EXHIBIT D
"TENANT'S WORK" – EXHIBITS EAC
Articles 72, 73, 74, 75 and 76

II.    Electric Power
A) Landlord has on the floor:
1) Main floor – 200 amps/120 Volts
2) Entire 3rd Floor – 300 amps/270 Volts

If conditional 50 amps of electric power for the main floor is available in the Building, if tenant. All work related to additional electric power shall be at Tenant's own and expense listed Landlord's professionals and contractors/permits for inspection.

III.    Air Conditioning Equipment and Fans:

A. Main Floor (Ground Floor Center Store)

1.    Standing air cooler unit within Tenant's Premises.

2.    Two (1) window blinds (in) rear courtyard of the Building for an inside and discharge. (See attached ground floor center store plan)

3.    One 2nd window to courtyard for additionally required air unit's air discharge from the main air conditioning and unit/s or auxiliary air conditioning unit (if needed);

B. Entire Second (3rd) Floor

1.    Shall be cooled within thirty (30) tons air conditioning units.

2.    Interior components within Landlord's Premises.

3.    Exterior components located in rear area of Landlord designated location or will be within Landlord's designated (30) and prohibit visibility, or damaged at at Tenant's own rear 3rd floor courtyard area/"

4.    If additional units are required that do not fit within the Landlord designated location, and nuisance or auxiliary systems may be located in 3rd floor or in the rear while wall off the year of The Building (the Landlord permitted)

IV.    Sales to Store

a)    See Approved Drawings – Exhibit A

b)    approximate size of floor: 19 wide x 60' unit

Page 1 of 2



V.      Tenant shall pay 25% of all costs related to preparing the 2nd Floor roof and adjacent walkway areas for usage by Tenant of ductwork and pipes related to its air conditioning system.      *RAF*

EXHIBIT F

Modifying Rider paragraph 42. Real Estate Tax Escalation

Attached is a memorandum, including a chart, that describes how a rent credit amount was calculated, how the rent credit will be credited, and how the rent credit is to be recalculated in the future.  As shown in the chart, the maximum rent credit amount is $28,782 for each year, with the exceptions that  i) the maximum rent credit amount  is $17,422 for the period of July 1, 2016–June 30, 2017  and ii) the maximum rent credit amount is $22,536 for the period of July 1, 2027–February 28, 2028.  During the term of the Lease, the total amount of these rent credits shall not exceed $337,573, and there shall be no rent credits after February 28, 2028.

April 29, 2016

## INTRODUCTION & BACKGROUND REGARDING RENT CREDIT

Base Year 2015-16 remains BUT

A. Starting 2016-17 first the date of Lease Expiration, Tenant gets a rent credit of [illegible] (maximum amount) each Jan. 1 & July 1 (rent saved for the 1st & last Lease term periods), the total maximum rent credit amount is $933,579

B. [illegible] Confirmed anyway?

  1. Mr. Simeon [illegible] – Montague Mims Scimiera and Cono LLP
      – 213-480-1420

  2. Mr. Joel Norman's firm – [illegible] Oshiro

    [illegible] on a [illegible] to 2 1/2 Weeks [illegible]

    the [illegible]

II. [illegible] 2015-17.9 (first fix year)

  A. The City's Monthly Index reflects (BUT [illegible], still) no Vacancy Allowances (using the rental rate chart below)

  B. [illegible] the City is already charging 95 Member with its rental income [illegible] on vacant spaces

    1. [illegible] from the M.V. City "Notice of Property Value" dated [illegible] 13, 2016, which shows [illegible] as [illegible] at the Real Estate Taxes

    For the 7 2016 – June 30, 2017

    [illegible] x [illegible]         $6,360,348 (less all SF)

    2. [illegible] Actual 2015 Income – [illegible]
    March 1, 2016 for [illegible] year 2015 on Confirmed filing

    Total [illegible] Income – $7,624,574

    [illegible]         $2,902,037 (plus all SF)

    3. [illegible] City's [illegible] Income [illegible]
    [illegible]         $4,243,982

8. The City increases (and decreases) the Billable Assessed Value to reflect the assessed value over multiple years which includes both value increases and value decreases. For 45 Broadway, the increases [illegible] are estimated to be:

| | | Billable AV (also Transitional Assessed Value) | Increase over Prior Year |
|---|---|---|---|
| Base | 2015-16 | $12,810,800 | N/A |
| [illegible] | 2016-17 | $13,703,850 | $1,892,650 |
| Estimated | 2017-18 | $14,703,901 | $[illegible] |

*Total Billable AV Increase for 2016-17 & 2017-18: $2,192,951*

9. The Maximum Rent Credit calculation [illegible]:

A. [illegible] (based on [illegible] of $44.99 PSF), including $1,700,7[illegible] projected for currently vacant space.

B. A "gross up" credit for the 2016-17 Billable Assessed Value of $13,703,850 and 2017-18 estimated Billable AV of $14,703,901 with Billable AV increases totaling $2,192,901.

10. The Rent Credit noted herein will be the current Rent Credit that Tenant will receive. Due to certiorari appeals, final values for the years will differ from the initial values that the City establishes to be billed after 2017-18. Such final values may be the result of settlements or appeal decisions. Final values that represent value reductions for 2015-16, 2016-17 and 2017-18 will be entered into the formula and:

A. The Rent Credit based on the new figures will be calculated.

B. Tenant's payment in each will be calculated against actual payments made and the difference will be credited or charged to Tenant.

C. The 2015-16 Base Year amount will become the final [illegible].

95 Madison Avenue-Vitra, Inc.

1. MAXIMUM RENT CREDITS AND RESULTING ANNUAL FIXED RENT AFTER DEDUCTING MAXIMUM RENT CREDITS

| Tax Year | Maximum Rent Credit | Annual Fixed Rent Fixed in Lease | Annual Fixed Rent After Max Rent Credit |
|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| Total | [illegible] | [illegible] | [illegible] |

2. ACTUAL AND ESTIMATED TAX CALCULATIONS USED TO DETERMINE MAXIMUM RENT CREDITS

| | Billable AV | Taxes | Tenant Portion ([illegible]) | |
|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | |
| [illegible] | [illegible] | [illegible] | [illegible] | |
| [illegible] | [illegible] | [illegible] | [illegible] | Maximum rent credit is [illegible] |
| [illegible] | | [illegible] | | |
| [illegible] | [illegible] | [illegible] | [illegible] | |
| [illegible] | [illegible] | [illegible] | [illegible] | Maximum rent credit is [illegible] |
| [illegible] | | [illegible] | | |

**95 MADISON AVENUE-TERMS RELATED TO RENT CREDIT FOR**
**CERTAIN PROPERTY TAX INCREASES**

1. The City of New York January [illegible] Notice of Property Value [illegible] the City's values for the property and also [illegible] how the City determined the property's [illegible] value for the tax year July 1, [illegible] – June 30, 2016. Per this Notice, the City has valued the property based on gross income of [illegible] but the property's actual gross income, before any deductions, was only [illegible]. Thus, the property's gross income was almost one third of the income that the City has used to value the property. Based on this, the property's gross income could more than double, and the gross income increase should not provide any basis for the City to increase the property's value.

2. As shown in the attached City of New York February 2016 bill, as well as the [illegible] schedule for tax year 2015/2016 (i.e., July 1, 2015–June 30, 2016), the [illegible] assessed value is [illegible] and the property's total property taxes are [illegible]. [illegible] represents the amount of the property taxes attributable to Tenant's [illegible] portion of the property. This [illegible] of the total property taxes is hereinafter referred to as "Tenant's Portion."

3. For tax year 2016/2017 (i.e., July 1, 2016–June 30, 2017), the Tenant shall receive a rent credit equal to the amount by which Tenant's Portion of the property taxes exceeds [illegible], up to a maximum rent credit amount of [illegible]. The [illegible] has been calculated using the [illegible] tax rate in the most recent City bill, which is attached. The rent credit is to be applied as follows: [illegible] on July 1, 2016 and half on January 1, 2017.

4. Following the fixed period of July 1, 2017 to February [illegible], for each tax year following the year 2016/2017, the Tenant shall receive a rent credit equal to the amount by which Tenant's Portion of the property taxes exceeds [illegible], up to a maximum rent credit amount of [illegible]. The rent credit shall be applied as follows: half on July 1 of the applicable tax year and half on the following January 1.

5. For the period of July 1, [illegible] to February [illegible], the Tenant shall receive a rent credit equal to the amount by which Tenant's Portion of the property taxes exceeds [illegible], up to a maximum rent credit amount of [illegible]. The rent credit is to be applied as follows: half on July 1, [illegible] and half on January 1, [illegible].

6. If in any year [illegible] tax year, the Tenant's Portion of the property taxes is [illegible] than [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] Tenant [illegible]

liability as a result of there being revised, reduced rent credit amounts, and (ii) within 35 days of the Landlord's providing Tenant with the aforementioned documentation, the parties shall reutilize amounts owed. This true-up process shall include the payment of any amounts owed due to revised rent credit amounts.

- Notwithstanding any language herein that is construed otherwise, the maximum amount of any rent credits that Landlord owes Tenant shall not exceed: (i) $17,422 for tax year 2016-2017, and (ii) $29,702 for each tax year that follows the 2016-2017 tax year, except that the maximum amount shall be $22,336 for the final period of July 1, 2027 to February 28, 2028.

# EXHIBIT – I –

## 95 Madison Avenue – Vendors

ACP-N Asbestos Testing and Removal
SAI Environmental Consultants Inc
Mr Vasilies Belios
Tel.    718-238-6202
Fax    718-238-6007
Cell    917-699-0720


Cleaning
Silver Clean Corp.
Mr Marv Silverman
Cell    631-366-5600
Fax    631-824-0400


Electric
Premiere Electrical Maintenance
Mr Jim Buller
Tel    718-846-0200
Fax    718-846-0208
Cell    646-596-2036


Expeditor
James MacDonald Ltd
Mr James MacDonald
Tel    212-393-0101
Fax    212-393-0021


Local Law VI
Proven Analysis Mentor Inc
Mr John Desjardins
Tel and Fax    631-271-398
Cell    516-315-605


Plumbing + Sprinklers
Old Time Mechanical LLC
Mr Jonah Shapiro
Tel    212-673-0700
Cell    917-213-8810



Electrician - The Building's electrician shall do all work related to: 1. bringing in any new power required by Tenant; 2. installing any new electric power and connecting the power to the new main panel boxes in the Demised Premises; and 3. providing electric meters and programming these meters using Landlord's meter reading company;

Expeditor – Filing and plan review

Plumbing – Install any connection back to the main Building lines from the Demised Premises to a turn off valve.

Sprinklers –
1. If existing distribution of the sprinkler system is maintained: Tenant will use Landlord's vendor.
2. If new distribution lines will be installed, Tenant's general contractor may select its own contractor for this work and Tenant shall at Tenant's cost hire Landlord's contractor for inspections of this work.



EXHIBIT J
MAKING THE MAIN FLOOR, CENTER STORES, ENTRY STEP
AND ADJACENT FLOOR SLAB ADA COMPLIANT

(A)     Landlord's architect and structural engineer shall, at
        Landlord's sole cost, prepare plans to make the step ADA
        compliant and obtain bids for the work from both Landlord's
        recommended contractors and Tenant's recommended
        contractors, including a bid from JT Magen (if JT Magen is
        Tenant's CM or GC).

(B)     Landlord will pay the Construction Manager or General
        Contractor selected by Tenant the amount of the lowest bid
        obtained by Landlord, when approved to do so by Tenant's
        architect.

(C)     Tenant shall have the right to expand the scope of work to
        suit its architectural requirements, using Tenant's architect and
        Landlord's structural engineer to modify plans described in (A)
        above.

(D)     If any unforseen structural issue arises to the area covered
        by the plan described in I above, Tenant and Landlord shall
        share the extra charges related thereto 50-50.

(E)     Tenant shall assume responsibility for performing the work
        filed for.

(F)     If Landlord's plan as described in (A) above is expanded,
        Landlord's structural engineer shall design and if work at
        Tenant's cost, and supervise and do all work required for
        obtaining Building Department approval (including on-site
        inspections) with Tenant and Landlord each paying one-half of
        the cost of Landlord's structural engineer.

EXHIBIT I

- I    Plan Review Days
  - a.  When receive plans by 2:00 PM
  - b.  Thereafter, ten (10) business days
  - c.  If any changes requested by Landlord ii.i.a. to be incorporated, same process (Sub a + b above) until all changes made
  - d.  Tenant may submit any and all plans for ruling approval
  - e.  Landlord ___ay Building Department documents by individually all changes are made related to that issue and approved by Landlord and its professionals for Self Certification
  - f.  Items to be filed as an Alt II will no Building Department documents issued if changes approved by Landlord and its professionals and can be filed because signed.  Items that will be filed as an Alt II shall include Local Law V requirements, work related to making the Madison Avenue store entrance ATA/v compliant, ___ related to the restoration of fifth-story and work related to the 10th floor elevator.
  - g.  Days submitted from plan review
    - i.  Monday – June 27 July 6, 2016
    - ii.  The day before fresh Husbands until the day after Most Kippur
  - h.  Tenant to appropriate to ___ respond to Landlord's plan review and Plan with Landlord's professionals and vendors including:
    - i.  Architect
    - ii.  Structural engineer
    - iii.  Exped____
    - iv.  Local Law V Consultant and MEP engineer___

- J.  ___ntionally
  - a.  They (contract ___) provide the plans review comp (CDecor ___) 7 business days after the day plans received by 2:00 PM and agreement to meet list our professionals contractors meeting with a support on screen five filings ___ earliest day after plans received by 2:00 PM
  - b.  Future will use Jenkins and Hunington (J&H) to ___ review, ___ and approve preparation of documents
    - i.  Tenant's architect (that color swing coating exchange ___ the coordination jointly with J&H)
    - ii.  Tenant to provide additional ___ (to be added for building, for ____ approved by J&H no later than July ___2016)

**EXHIBIT 4**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x
VITRA, INC.,

                      Plaintiff,

     -against-

NINETY-FIVE MADISON COMPANY, L.P.,

                  Defendant.

-----------------------------------------------------------------x

Index No.:

Date Purchased:

**SUMMONS**

Basis of Venue:
Defendant's principal place of
business
95 Madison Avenue
New York, New York

**TO THE ABOVE NAMED DEFENDANT**:

     **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve
a copy of your Answer, or, if the Complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this
summons, exclusive of the day of service (or within thirty (30) days after the service is complete
if this summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or to answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Dated: New York, New York
      September 17, 2019

                                   Respectfully submitted,

                                   **SILLS CUMMIS & GROSS P.C.**
                                   Attorneys for Plaintiff
                                   Vitra, Inc.

                                   By: _____
                                     David F. Segal
                                 101 Park Avenue, 28th Floor
                                 New York, New York 10178
                                 (212) 643-7000

TO:

NINETY-FIVE MADISON COMPANY, L.P.
95 Madison Avenue
New York, New York

6669423 v1

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
NYSCEF DOC. NO. 1

INDEX NO. 655408/2019
RECEIVED NYSCEF: 09/18/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 124 of 254

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------X

VITRA, INC.,

                            Plaintiff,

     -against-

NINETY-FIVE MADISON COMPANY, L.P.,

                           Defendant.

---------------------------------------------------------------X

Index No. _____

**VERIFIED COMPLAINT**

Plaintiff, Vitra, Inc. ("Vitra"), by and through its attorneys, Sills Cummis & Gross P.C., as and for its Verified Complaint against defendant, Ninety-Five Madison Company, L.P. ("Landlord"), states as follows:

## THE PARTIES

1.     Vitra is a domestic business corporation organized and existing under the laws of the State of New York, having a place of business in New York, New York.

2.     Vitra sells high end contemporary furniture with its own showrooms and retail stores in major cities in the United States.

3.     Upon information and belief, Landlord is a domestic limited partnership organized and existing under the laws of the State of New York, having a place of business at 95 Madison Avenue, New York, New York.

4.     Upon information and belief, Landlord is the fee owner of the premises known as the Emmet Building located at 95 Madison Avenue, New York, New York (the "Building").

6669328

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
INDEX NO. 655408/2019
NYSCEF DOC. NO. 1
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
RECEIVED NYSCEF: 09/18/2019
Declaration of Karen Stein    Pg 125 of 254

## THE LEASE AGREEMENT

5.       Pursuant to a written commercial Agreement of Lease dated June 18, 2016 (the "Lease"), Landlord leased to Vitra a portion of the Building described as "the ground floor center store, containing approximately 4000 usable square feet, and the entire second (2nd) floor containing approximately 8060 usable square feet" (the "Premises").

6.       The Lease is for a term of eleven years and nine months.

7.       In Article 2 of the Lease, it was agreed that the Vitra shall use the Premises for "a retail store for the sale of high end furniture and accessories, showrooms and related offices for the sale of [Vitra] designed and manufactured products and other related items sold by [Vitra]."

8.       Landlord and Vitra understood that, in order for the Premises to be used as intended, alterations and renovations were required.

## THE PARTIES ENTER INTO A STIPULATION OF SETTLEMENT

9.       From the inception of the Lease, Landlord obstructed, harassed and prevented Vitra from performing the alterations and renovations necessary to utilize the Premises.

10.      Despite its own misconduct, on April 21, 2017, Landlord, through its counsel, purported to serve Vitra with a Notice of Default ("2017 Notice of Default").

11.      In an action commenced by Vitra against Landlord (the "Prior Action"), this Court issued a *Yellowstone* injunction in connection with the 2017 Notice of Default.

12.      On December 7, 2017, with the assistance of the Court, the Prior Action was settled.  On the record in open Court, the parties entered into a Stipulation of Settlement, which

2

6669328

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
NYSCEF DOC. NO. 1

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 126 of 254

INDEX NO. 655408/2019
RECEIVED NYSCEF: 09/18/2019

was thereafter so-ordered by Justice Scarpulla on February 20, 2018 (the "So-Ordered Settlement").

13.    Paragraph 28 of the So-Ordered Settlement provides, in pertinent part, as follows:

> *Any and all disputes arising out* of the interpretation and enforcement of this Stipulation and *Tenant's alterations* through the time Tenant substantially opens for business *shall be referred to the Honorable Steven Crane, as arbiter, for binding determination.* [Emphasis added].

14.    The Stipulation also provides that Judge Crane's rulings are final and binding.

## THE PENDING ARBITRATION

15.    Vitra was compelled to initiate the dispute-resolution procedure as provided in the So-Ordered Settlement, and commenced an arbitration before Justice Crane at JAMS, only two months after the Prior Action was "settled."

16.    Arbitration hearings began in April 2018, and have continued for the past one and a half years.

### Justice Crane Issues a *Yellowstone* Injunction

17.    On April 10, 2018, Justice Crane issued a preliminary injunction, which provided, *inter alia*, that Vitra is entitled to uninterrupted use, occupancy and possession of the Premises.

18.    Despite the foregoing, in May 2018, Landlord purported to serve a second notice of default, asserting that Vitra was in default of Article 78(A) and (B) of the Lease, Article 17(1) of the Lease, and Articles 56 A(i), (ii) and (vi), Exhibit E and Exhibit K of the Lease.

19.    On consent of the parties, Justice Crane issued a *Yellowstone* injunction in connection therewith, which remains in effect to date.

3

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
INDEX NO. 655408/2019
NYSCEF DOC. NO. 1
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
RECEIVED NYSCEF: 09/18/2019
Declaration of Karen Stein   Pg 127 of 254

## Justice Crane Issues Orders and Awards Governing Vitra's Construction

20.    Since then, and continuing to date, Justice Crane has ruled upon a multitude of construction-related disputes in accordance with the So-Ordered Stipulation.

21.    On October 10, 2018, Justice Crane issued an Order directing that Vitra was to proceed with the installation of the entry door to the Premises substantially in accordance with Plan A-865. Plan A-865 modified Plan A-864, which had been approved by Landlord, in order to conform to the requirements of the Landmarks Preservation Commission ("LPC").

22.    Landlord violated the October 10, 2018 Order regarding an Exhibit to be submitted to LPC and, in an attempt to undermine the Order, wrongfully submitted a letter to the general counsel of LPC.

23.    On November 22, 2018, Justice Crane issued a Construction Protocol Order, which was intended to facilitate Vitra's construction of the Premises.

24.    Landlord, however, violated the Construction Protocol Order.

25.    On April 10, 2019, Justice Crane signed an Order *nunc pro tunc* as of a hearing held on March 12, 2019, determining that Landlord had violated the Construction Protocol Order. Moreover, between March 13, 2019 and April 15, 2019, Justice Crane issued three additional Orders directed at Landlord's continued wrongful misconduct and interference with Vitra's ability to perform its construction.

26.    In the Order dated April 15, 2019, Justice Crane noted that "his efforts to accommodate [Landlord's] legitimate needs had been met with continuous misbehavior,

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
NYSCEF DOC. NO. 1

INDEX NO. 655408/2019
RECEIVED NYSCEF: 09/18/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 128 of 254

distortion of fact and bad faith deprivation of the benefits of the bargain that [Vitra] is legally entitled to expect…"

27.    On February 24, 2019, Justice Crane issued the Second Interim Award in which, among other things, Justice Crane ruled that the Lease required Landlord to accommodate Vitra's work, even if it costs Landlord money to do so.

28.    The Second Interim Award also noted the history of Landlord's interference with Vitra's work and stated that it was a "classic case of a Claimant being excused from performing a condition of its contract because it was prevented from doing so by the other party to the contract."

29.    Then, as a result of Landlord's continued obstruction with Vitra's performance of its work, on August 7, 2019, Justice Crane issued the Amended Fifth Interim Award, in which he appointed Danielle C. Lesser, Esq., of Morrison Cohen LLP, as temporary receiver in respect of all of the Landlord's obligations, responsibilities and prerogatives under the Lease, the So-Ordered Settlement, and pursuant to the Orders of the Arbitrator, in respect of and through the date of completion of Vitra's Initial Alterations, and that date in which Vitra substantially opens for business in the Premises.

30.    Following the Landlord's ongoing misconduct, Justice Crane issued an Order dated August 29, 2019, in which, *inter alia*, Landlord and its principal, Rita Sklar, are prohibited, in the absence of an emergency, from entering any of the space leased by Vitra.  Ms. Sklar's access, except in an emergency, is conditioned on at least two business days advance notice, specifying the purpose of the visit or access, the individual or individuals who will be entering the Premises, the time of day and when entry is proposed and the expected length of the visit.

5

6669328

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
NYSCEF DOC. NO. 1

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 129 of 254

INDEX NO. 655408/2019
RECEIVED NYSCEF: 09/18/2019

### Landlord Attempts to Hold Vitra in Default

31.     On February 14, 2019, Landlord submitted a motion to Justice Crane to hold Vitra in breach of Article 78 of the Lease (the "Motion").

32.     Vitra opposed the Motion, and a hearing was scheduled before Justice Crane on September 10, 2019.

33.     On September 8, 2019, Landlord's counsel advised that Landlord was withdrawing the Motion.

34.     At the hearing on September 10, 2019, and in reliance on JAMS Rule 13(b), Justice Crane accepted the withdrawal of the Motion, but deemed it to be with prejudice.

### LANDLORD'S LATEST NOTICE OF DEFAULT

35.     On September 9, 2019, Landlord purported to serve Vitra with a Notice of Default (the "2019 Notice of Default").

36.     The 2019 Notice of Default enumerates over twenty-nine (29) purported defaults.

37.     Among other things, the 2019 Notice of Default alleges construction-related failures.  All such construction-related issues must be referred to Justice Crane for binding arbitration pursuant to the So-Ordered Settlement.

38.     The 2019 Notice of Default also alleges violations of Article 78 of the Lease. Such violations are barred by both the pending *Yellowstone* injunction and Landlord's withdrawal of its Motion with prejudice.

6

39.     The 2019 Notice of Default further alleges violations of the Lease which have been superseded or modified by the various Orders issued by Justice Crane.

40.     The 2019 Notice of Default then states, in relevant part:

> If Tenant shall have failed to comply with or remedy all of the defaults stated above within such fifteen (15) days, or if the said defaults or omissions complained of shall be of a nature that the same cannot be completely cured or remedied within said fifteen (15) day period and if Tenant shall not have diligently commenced curing such defaults within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such defaults, then Landlord **may** pursue all of its legal and equitable remedies under the Lease, including its right to terminate the Lease, upon written five (5) days' notice of cancellation upon Tenant. [Emphasis added].

41.     Vitra disputes the validity of the 2019 Notice of Default and disputes that it is in default of its obligations under the Lease.

## LANDLORD IGNORES ITS OWN OBLIGATIONS UNDER THE LEASE

42.     Despite Landlord's insistence that Vitra abide by the terms of the Lease, Landlord itself has failed to do so.

43.     Article 4 of the Lease provides, in pertinent part:

> [Landlord] shall maintain and repair the pubic portions of the building, both exterior and interior...

44.     There presently exists a leak from the Landlord's second floor courtyard roof into a portion of Vitra's ground floor premises.

45.     Vitra has complained to Landlord about the leak on numerous occasions since at least October 2018.

7

6669328

46.     Landlord has failed to repair the leak, and merely placed a tarp or other covering over the second floor courtyard roof.  However, water continues to leak into a portion of Vitra's ground floor premises.

47.     Vitra has paid its contractor more than $3,600,000 to date for its construction services regarding the initial alterations, and Vitra's fit-out of the Premises.

## AS AND FOR A FIRST CAUSE OF ACTION

48.     Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 47 as though more fully set forth at length herein.

49.     As a result of the foregoing, Vitra claims that the Notice of Default is defective, null and void, and/or of no force and effect, and/or is insufficient to constitute a notice of default or notice to cure predicate to a notice terminating the Lease.

50.     Upon information and belief, Landlord contests the foregoing claim by Vitra.

51.     There is thus a dispute as to the respective rights and legal relations by and between Vitra and Landlord pursuant to the Lease.

52.     Because of such dispute, a judicial determination and declaration as to the respective rights of the parties is desirable and necessary in order that Vitra's rights may be determined and adjudged without Vitra experiencing a loss of its valuable and unique rights under the Lease.

53.     Vitra will suffer irreparable harm unless the status quo is maintained and termination of the Lease is prevented pending the determination of this action on the merits.

8

6669328

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 132 of 254

54.    Vitra has no adequate remedy at law.

55.    Vitra requests judgment declaring that the 2019 Notice of Default is defective, null and void, and/or of no force and effect, and/or is insufficient to constitute a notice of default or notice to cure predicate to a notice terminating the Lease, and preliminarily and permanently enjoining and restraining Landlord, its principals, officers, agents and employees, and anyone acting by, through or under Landlord, from taking any action, issuing any notice and/or commencing any action or proceeding to terminate the Lease or to remove or evict Vitra from the Premises on any of the grounds set forth in the 2019 Notice of Default.

### AS AND FOR A SECOND CAUSE OF ACTION

56.    Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 55 as though more fully set forth at length herein.

57.    If it is determined that Vitra is in default of the Lease as alleged in the 2019 Notice of Default, in whole or in part, Vitra is ready, willing and able to cure such defaults short of vacating the Premises.

58.    Vitra will suffer irreparable harm unless the status quo is maintained, the expiration of the curative period as contained in the 2019 Notice of Default is enjoined, stayed and tolled, and Vitra is afforded an adequate opportunity to cure.

59.    Vitra has no adequate remedy at law.

60.    Vitra requests judgment declaring and directing what must be done to cure the defaults alleged in the 2019 Notice of Default to enable Vitra to protect its valuable, long-term

6669328

tenancy, and preliminary and permanently enjoining, staying and tolling the expiration of the curative period therefor to afford Vitra an adequate opportunity to cure the same.

## AS AND FOR A THIRD CAUSE OF ACTION

61.     Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 60 as though more fully set forth at length herein.

62.     NYC Administrative Code § 22-902 prohibits a landlord from harassing a commercial tenant.

63.     Landlord's persistent and ongoing misconduct since the inception of the Lease, culminating in the frivolous 2019 Notice of Default, constitutes harassment under NYC Administrative Code §22-902.

64.     As a result of Landlord's harassment, civil penalties pursuant to Administrative Code § 22-903 should be imposed on Landlord.

65.     Furthermore, this Court should award such other relief as the court deems appropriate, including but not limited to punitive damages and reasonable attorneys' fees and court costs.

## AS AND FOR A FOURTH CAUSE OF ACTION

66.     Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 65 as though more fully set forth at length herein.

67.     Vitra has notified Landlord of a leak from the Landlord's second floor courtyard roof into a portion of Vitra's ground floor premises.

10

6669328

68.    Pursuant to Article 4 of the Lease, Landlord "shall maintain and repair the pubic portions of the building, both exterior and interior."

69.    Landlord has failed and refused to repair the leak located within its portion of the Building.

70.    As a result of the foregoing, Landlord has breached the Lease.

71.    As a result of Landlord's breach, Vitra has and will sustain significant damage to its newly refurbished premises in an amount to be determined at trial, but not less than $1,000,000.00.

### AS AND FOR A FIFTH CAUSE OF ACTION

72.    Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 71 as though more fully set forth at length herein.

73.    Pursuant to Article 4 of the Lease, Landlord has a duty to maintain the public portions of the Building, whether exterior or interior.

74.    Landlord has negligently failed to maintain the public portions of the Building by, among other things, failing to repair the leak from the second floor courtyard roof into Vitra's ground floor premises.

75.    As a result of Landlord's negligence, Vitra has sustained, and will sustain, damages to its newly refurbished premises.

76.    Based upon the foregoing, Vitra has been damaged in an amount to be determined at trial, but not less than $1,000,000.00.

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
INDEX NO. 655408/2019
NYSCEF DOC. NO. 1
21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
RECEIVED NYSCEF: 09/18/2019
Declaration of Karen Stein    Pg 135 of 254

## AS AND FOR A SIXTH CAUSE OF ACTION

77.    Vitra repeats, reiterates and realleges each and every allegation set forth in Paragraphs 1 through 76 as though more fully set forth at length herein.

78.    Landlord has an obligation to repair the leak that exists from the second floor courtyard into a portion of Vitra's ground floor premises.

79.    Upon information and belief, Landlord disputes the foregoing.

80.    There is thus a dispute as to the respective rights and obligations by and between Landlord and Vitra pursuant to the Lease.

81.    Because of such dispute, a judicial determination and declaration as to the respective rights of the parties is desirable and necessary.

82.    Vitra has no adequate remedy at law.

83.    Vitra requests judgment declaring that Landlord is required to comply with its obligations under the Lease and repair the leak from the second floor courtyard into a portion of Vitra's ground floor premises.

**WHEREFORE**, Vitra requests judgment against Landlord as follows:

A.    On the First Cause of Action, declaring that the Notice of Default is defective, null and void, and/or of no force and effect, and/or is insufficient to constitute a notice of default or notice to cure predicate to a notice terminating the Lease, and preliminarily and permanently enjoining and restraining Landlord, its principals, officers, agents and employees, and anyone acting by, through or under Landlord, from taking any action, issuing any notice and/or

12

6669328

commencing any action or proceeding to terminate the Lease or to remove or evict Vitra from the Premises on any of the grounds set forth in the Notice of Default.

B.    On the Second Cause of Action, declaring and directing what must be done to cure the defaults alleged in the Notice of Default to enable Vitra to protect its valuable, long-term tenancy, and preliminary and permanently enjoining, staying and tolling the expiration of the curative period therefor to afford Vitra an adequate opportunity to cure the same.

C.    On the Third Cause of Action, the imposition of civil penalties pursuant to Administrative Code § 22-903, together with punitive damages and reasonable attorneys' fees and court costs.

D.    On the Fourth Cause of Action, damages in an amount to be determined at trial, but not less than $1,000,000.00.

E.    On the Fifth Cause of Action, damages in an amount to be determined at trial, but not less than $1,000,000.00.

F.    On the Sixth Cause of Action, declaring that Landlord is required to comply with its obligations under the Lease and repair the leak from the second floor courtyard into a portion of Vitra's ground floor premises.

6669328

FILED: NEW YORK COUNTY CLERK 09/18/2019 09:47 AM
INDEX NO. 655408/2019
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 09/18/2019

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 137 of 254

G.    Together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 17, 2019

**SILLS CUMMIS & GROSS P.C.**


By: _____
        David F. Segal
101 Park Avenue, 28th Floor
New York, New York 10178
(212) 643-7000

*Attorneys for Plaintiff*
*Vitra, Inc.*

14

6669328

## VERIFICATION

STATE OF NEW YORK     )
                             )SS.:
COUNTY OF NEW YORK  )

Melissa Shelton, being duly sworn, deposes and says:

1.    I am the President of Vitra, Inc., the Plaintiff herein.

2.    I have read the foregoing Complaint and know the contents thereof; the same are true to my own knowledge, except as to those matters upon information and belief; and as to those matters, I believe them to be true. The basis of such information and belief are my own knowledge, and the books and records maintained by Plaintiff, and its agents and employees.

3.    This verification is made by me and not by Plaintiff because the Plaintiff is a corporation such that an individual with knowledge must verify on its behalf.

_____
MELISSA SHELTON

Sworn to before me this
17th day of September, 2019

_____
Notary Public

DAVID M ZIDEK JR
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ZI6394330
Qualified in New York County
My Commission Expires 07-01-2023

15

6669328

**EXHIBIT 5**

JAMS ARBITRATION
---

VITRA, INC.,

    Claimant,

    -and-                 JAMS No. 1425024190

NINETY-FIVE MADISON COMPANY, L.P.,

    Respondent.

---

### INTERIM AWARD

The undersigned Arbitrator, having been designated pursuant to a stipulation of settlement in open court on December 7, 2017, in *Vitra, Inc. v Ninety-Five Madison Company, L.P.* ("the Action") then pending in Supreme Court of the State of New York, County of New York under Index No. 652342/2017, (hereinafter "Settlement Agreement") and pursuant to a stipulation after mediation waiving any conflicts from the circumstance that the undersigned acted as mediator before the action was settled, and having read the written statements and affidavits with exhibits submitted by the parties, and having conducted oral argument on May 14, 2018, does hereby find, conclude and AWARD as follows:

The Claimant, referred to in the papers as Plaintiff, as it once was, seeks, under the Settlement Agreement and its arbitration provisions, a declaration that the lease dated June 16, 2016 ("the Lease") is terminated by rescission or because of constructive

1

eviction, or, alternatively, to have the Arbitrator appoint a receiver to exercise all of Landlord's authority with respect to the premises being leased by the Claimant. In addition, the Claimant seeks certain forms of damages.

The Respondent opposes the claims insisting that it never agreed in the Settlement Agreement to submit to arbitration the issue of terminating the Lease or appointing a receiver. In effect, it argues that the claims are not arbitrable. Moreover, the Lease itself limits the Claimant's remedies as tenant to specific performance or an injunction.

Before considering the additional forms of relief for damages or seeking remedies for the landlord's alleged obstruction, the Arbitrator will deal with the issue of arbitrability.

**ARBITRABILITY**

Paragraph Twenty-eight of the Settlement Agreement reads as follows:

> Any and all disputes arising out of or relating to the interpretation and enforcement of this stipulation and tenant's alterations prior to the opening – prior to tenant's substantially opening for business -- ….
> And all disputes arising out of or relating to the interpretation and enforcement of this stipulation and Tenant's alterations through the time tenant substantially opens for business shall be referred to the Honorable Steven [sic] Crane, as arbiter, for binding determination as provided in accordance with the rules of JAMS, and except as provided [sic]. If Justice Crane is not available or unwilling to act, Justice

2

Scarpulla shall resolve any such disputes. Justice Crane, Justice Scarpulla and/or any other arbiter mutually agreed to by the parties and the court shall award attorneys' fees and the costs of the dispute proceeding, including JAMS's cost [sic] and fees, to the prevailing party.

Notwithstanding, the JAMS rules or the Civil Practice Law and Rules, the parties' dispute shall be determined as follows: (A), each party shall be entitled to submit a written statement together with any affidavits and/or exhibits as they deem appropriate; (B), the parties waive any other right to present evidence at such proceeding and waive the right to conduct any discovery; (C), the parties and their representatives shall have the right to appear for purposes of presenting their arguments in support of their respective positions; (D), the determination of Justice Crane, Justice Scarpulla or any other arbiter shall be final and binding upon the parties. The parties hereby waive any right to appeal any such determination; (E), judgment on any such determination may be entered in the Supreme Court of the State of New York, County of New York.

The Claimant argues that the Lease limitations to specific performance and injunction were waived when the landlord agreed to the Settlement Agreement, *inter alia*, in its reference to the JAMS Rules. The Claimant contends that the parties are referring to the JAMS Comprehensive Rules effective July 1, 2014. Rule 11 authorizes the Arbitrator to resolve arbitrability disputes. Rule 24(c) authorizes the Arbitrator to "grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy."

3

While the Arbitrator agrees with the Claimant that his powers in rendering an Award are broad, and not limited to the remedies specified in the Lease, they must be "within the scope of the Parties' agreement." The Settlement Agreement limits the disputes the Arbitrator may determine to "the interpretation and enforcement of this agreement…." So, let us look more closely at the Settlement Agreement.

First of all, the Settlement Agreement settled all claims and counterclaims in the Action. It then addressed the Lease between the parties and various areas of friction that led to the Action. The Settlement Agreement embodied Respondent-Landlord's approval of Claimant-Tenant's plans dated May 12, 2017; Respondent's undertaking to sign documentation required by the Department of Buildings ("DOB") to issue a permit under these plans; Claimant's promise to pay all items of rent and additional rent starting January 1, 2018; a provision for arbitrating real estate escalation; Respondent's approval of installation of sub-meters to be programmed by a designated entity with a procedure for averaging the first two months of actual billing to determine monthly electric charges retroactive to June 1, 2016, followed by a true-up; a provision for expenditure of Tenant's Work in the amount of $1,912,500 unless Landlord's Work is not completed by December 31,

4

2017,[1] in which case the Claimant would have nine months from actual completion of Landlord's Work to expend and pay the $1,912,500; a rent credit of $506,250; a lease extension; the Respondent's acknowledgment that the dumbwaiter is part of the Claimant's premises; Claimant's undertaking to provide the Respondent with required language for the scope of work for each ACP-5 required for Tenant's Work; notification provisions when certain steps have been accomplished; and an undertaking that the Respondent would install its future lobby air conditioning unit and ductwork in the existing interconnecting stairway. There were other details of similar tenor covered by the remainder of the Settlement Agreement.

It is clear that the Settlement Agreement settled the nine causes of action alleged by the Claimant and the two Counterclaims of the Respondent. Notable is the ninth cause of action in which the Claimant sought a declaration that the Lease was terminated and demanded a return of all monies it had expended including its security deposit.

The Arbitrator concludes that his authority under paragraph twenty-eight of the Settlement Agreement allows him (1) to interpret and enforce the Settlement Agreement and determine

---

[1]    There was a further provision in paragraph twenty-three relating to the completion of Landlord's Work. If the dunnage to the courtyard roof and Landlord's Work were not completed by April 15 or 16, 2018, then the Claimant's rent would be abated daily.

5

disputes relating thereto, and (2) to entertain disputes relating to Tenant's alterations until the Claimant substantially opens for business.    The claim for termination of the Lease for the Respondent's frustration of its purpose or for any other reason such as constructive eviction was settled in the Settlement Agreement.    Rather, in interpreting the Settlement Agreement, the Arbitrator holds that he is limited to the items, generally construction-oriented, that it sets forth.    These items exclude, by way of settlement, the right to dispute the continued viability of the Lease for the Respondent's continuing, frustrating behavior.

On the other hand, the Respondent's objection to Claimant's alternative request for the appointment of a limited receiver is without foundation.    The Settlement Agreement specifies that if there is a conflict between the Lease and the Settlement Agreement, the latter shall control.    (Paragraph Twenty-seven).    The provision of Article 60 of the Lease, limiting the Tenant's remedies to injunction or specific performance, conflicts with ¶28 of the Settlement Agreement incorporating JAMS Rules.    JAMS Comprehensive Rule 24(c) allows the Arbitrator to grant "any remedy or relief that is just and equitable...within the scope of the parties' agreement, including, but not limited to, specific performance...or any other equitable or legal remedy."    A temporary receivership under Article 64 of the CPLR is a provisional remedy along with

6

attachment, injunction, and notice of pendency (CPLR 6001). It is
a remedy within the sweep of Rule 24(c) and, if appropriate, the
Respondent subjected itself to such a remedy when agreeing to
arbitration in the Settlement Agreement—as long as the dispute
itself arises out of or relates to the interpretation and
enforcement of the Settlement Agreement or Tenant's alterations
prior to opening.

Accordingly, the Claimant's claims for termination of the
Lease and a declaration of constructive eviction resulting in the
same termination are denied as not arbitrable.

**TEMPORARY RECEIVERSHIP**

This equitable remedy is, as discussed above, available to
redress the grievances the Claimant presents about the
Respondent's unresponsiveness and obstructionism. In exercising
his discretion, the Arbitrator will hold in abeyance the Claimant's
application for the appointment of a Temporary Receiver to take on
the Landlord's obligations, responsibilities and prerogatives in
the oversight and approval of Tenant's alterations until it opens
for business, pending the faithful and timely observation by the
Respondent of its exercise of these obligations, responsibilities
and prerogatives. Provision will be made for the renewal on short
notice of Claimant's application for such a Receiver in the event
of any further violation of the Respondent's obligations,

7

prerogatives   and   responsibilities   relating   to   Tenant's alterations.

**TREBLE DAMAGES**

Claimant is seeking $31,735.89 in damages pursuant to RPAPL §853 representing compensation tripled for the nine days during which it was evicted in March, 2018, at the rate of $1,175.40 per day.  The Respondent repeats the excuse it used to justify the original lock-out in March which the Arbitrator then rejected in directing that the Claimant be restored to possession.  This excuse was that the Respondent and its contractor were concerned for the safety of others who might be in the premises during construction of a brick wall.  The Respondent contends that no damages for the lockout period should be awarded because it was protecting the Claimant and its representatives from injury.

Having rejected the Respondent's excuse previously, along with its observation that the contractor, whose insurance would not cover the tenant's injuries, the Arbitrator is constrained to award the Claimant its actual damages of $10,578.63[2] trebled, due to the Respondent's flagrantly unlawful behavior in changing the Tenant's locks, bereft of common decency or legal justification. The Claimant is, thus, awarded $31,735.89 with interest at 9% per annum from March 20, 2018, until paid.

---

[2]  This is derived from the monthly rent of $36,437.50 divided by 31 days to make the daily rent $1,175.40.  The Respondent, on the other hand, has divided by 30 days for a larger loss figure for the nine days of $10,931.25.

8

**RESPONDENT'S NON-COMPLIANCE WITH THE SETTLEMENT AGREEMENT**

<u>Electrical Billing</u>

The Claimant asserts that the temporary sub-meter was installed on January 19, 2018, but the Respondent has thwarted its electrical consultant in providing Claimant the meter readings and billing. Paragraphs 6, 7 and 8 of the Settlement Agreement address the sub-metering and the procedure for averaging Claimant's electric consumption. There was to be a retroactive adjustment in the charges from June 1, 2016, on the basis of the meter readings with a requirement that the Respondent pay the Claimant's overpayments on April 1, 2018, by way of rent credits the following month. Therefore, Claimant's utility consultant took readings and made calculations for which the Claimant should have been billed for monthly electric charges of $354.89 per month or $8,517.36 for the retrospective 24 months – June 2016 through May 2018. Respondent had billed and Claimant paid $108,951.75 for this period. It claims a refund owing of $100,434.39.

The Respondent contends that a $75,000.00 tapping fee for Claimant's extra amperage must be credited against the $108,951.75 leaving a balance from which the actual amount of usage between June 18, 2016 and April 10, 2018, of $11,934.48, should be deducted. This results in a rent credit to Claimant of $22,917.27.

In reply, the Claimant points out that the Respondent's consultant's computations fail to comply with the Settlement

9

Agreement in that it averages consumption over sixty days instead of the average of billing for the two months after installation of the sub-meter. Further the Respondent's consultant adds a monthly meter reading charge and building taxes. The sub-meter was not read for 20 months and charges for reading or for taxes are not provided for in the Settlement Agreement. Finally, there is no provision in the Lease for a tap in fee, and Claimant never agreed to one. The Claimant is responsible only for the actual cost of installing additional risers and equipment.

The Respondent's consultant's figures are not in conformity with the Settlement Agreement. The diminution of the Respondent's grossly excessive overcharges for electricity by a tap in fee is not in conformity with Article 46(H) of the Lease. Accordingly, the Claimant is entitled to diminish its rent and additional rent payments in the sum of $100,434.39.

Landlord's Work and Landlord's Construction

The Claimant complains that the Landlord's Work was supposed to have been completed by December 31, 2017, and that it refuses to provide a schedule of completion that would permit Claimant to inspect and begin planning its own work. As of April 17, 2018, the Claimant asserts that the Landlord's Construction was not completed thereby abating rent. Here also Claimant complains that the Respondent has not provided Claimant with any plans which it needs for its air conditioning unit.

10

The Respondent asserts that its Landlord's Work was completed on April 24, 2018. Therefore, Claimant is entitled to a nine-day abatement in rent of $10,578.63 for Respondent's failure to complete its work on time. The Respondent attributes the Claimant's contest of the completion of Landlord's Work to the need for third party inspections, a walk through and DOB signoffs. The Respondent establishes that the inspections have been performed and a letter of completion was issued by the DOB. Nevertheless, it argues that none of these subsequent conditions is required by the Settlement Agreement or the Lease. In contrast, Article 56(A)(x) of the Lease imposes such an obligation on the Claimant, *i.e.*, approvals by DOB and "as built" plans.

Accordingly, the Respondent has established the date of completion of Landlord's Work and Landlord's Construction and, indeed, has delivered the dunnage plans to the Claimant at the Arbitrator's request. The Claimant is accordingly entitled to $10,578.63 as an abatement of rent for the period of delay in the Respondent's completion as authorized in paragraph 23 of the Settlement Agreement.

Electrical Connections

The Settlement Agreement at paragraph 17 required the Respondent to designate on Tenant's plans the location in the basement where the Claimant was to connect its electrical service. The Claimant claims that Respondent caused it extra expense,

11

without showing what this consisted of, for changing the designation made on January 29, 2018, for electrical connections to a different location on February 25 requiring revision of plans.

The Respondent explains that both parties retained electrical consultants who met concerning the riser and panel plans. The first location was designated subject to verification of capacity by the Claimant's consultant. He determined that different risers had to be used, and the consultants worked together to designate the final selection. That the experts were delayed in getting the electrical connection location correct does not make the Respondent responsible.

For lack of any quantifiable damages and Claimant's failure to attribute the relocation solely to Respondent, this claim will be dismissed.

Handicapped Ramp

Paragraph 22 of the Settlement Agreement obligated the Claimant to design and construct, at Respondent's expense, a ramp that was ADA compliant. The Claimant was to provide the Respondent with a statement of expected cost. The Claimant proclaims that it satisfied these obligations on January 18, 2018. The Respondent had 30 days to select a competitive bid; otherwise, the Claimant could proceed with its vendor. The Claimant alleges that the Respondent did not respond within these 30 days, so Claimant hired its own vendor as provided in the Settlement Agreement. Claimant

12

advised Respondent that it had missed the date for a competitive
bid.   Thereafter, the Respondent refused to consent to the work
because the design was oblivious to a penetration test result
showing inadequate supporting stone. The Respondent never shared
the report of the penetration test with Claimant.

The Respondent asserts that it accepted as its total cost
obligation the Claimant's total cost for an ADA compliant ramp and
related stone work.   Apparently the cost was predicated on
Claimant's engineer's plans from May 15, 2017,[3] but these
contemplated a single door. The Respondent reports that Landmarks[4]
requires two doors.   In view of this requirement new plans and
their review are allegedly necessary.   It also claims that engineer
Silman requested that a test probe be done to determine the depth
of the underlying stone; Silman determined that stone needed
replacing and new plans were required.   Respondent avers that no
new plans have yet been submitted.

In reply, the Claimant asserts that the Landmarks Commission
has given preliminary approval to the Claimant's plan including

---

[3]   Actually, Paragraph 1 of the Settlement Agreement provided that the
Respondent approved the Claimant's plans with the date May 12, 2017, and
paragraph 2 obligated the Respondent to sign all necessary documents required
by DOB for issuance of a permit with respect to these plans within three
business days.
[4]   The Claimant alleges that on December 7, 2017, when the Settlement Agreement
was made, Ms. Sklar of the Respondent knew of the imminent Landmarks
designation and had cooperated in achieving it, all while concealing the
possibility from the Claimant and the court.

for handicapped accessibility, subject only to supplying shop drawings.

Since the Respondent in Paragraph 1 of the Settlement Agreement has reviewed and approved the Claimant's May 12, 2017, plans and proclaims that it approved the ADA compliant ramp, nothing more from the Respondent is necessary. The change from one door to two doors at the behest of the Landmarks Commission not only is to be laid at the Respondent's feet, but it appears that Landmarks has approved the Tenant's ramp design in any event. No further Landlord approval is required until shop drawings are created by the subcontractor. The Respondent has not supplied to the Claimant the results of the penetration test and is hereby directed to do so.

Elevator Work

The Respondent delayed the progress of elevator work by demanding certificates of insurance that Claimant contends were not required by Article 58 of the Lease. Nonetheless, certificates satisfactory to the Respondent were supplied. Secondly, the Respondent has not responded to Claimant's list of proposed contractors nor recommended elevator contractors as paragraph 19 obligated Respondent to do by January 15, 2018. Finally, the Respondent has not supplied a proper line drawing of the new elevator control room, related walkway and adjacent elevator lobby by January 31, 2018, as required by paragraph 16 of the Settlement

14

Agreement.   At an April 10 hearing before the Arbitrator the Respondent submitted two alternative drawings whereas Claimant needs a single definitive drawing.

The Respondent blames the Claimant for delays in the elevator work.   It accuses the Claimant of delay in retaining Jenkins & Huntington, named in paragraph 19 of the Settlement Agreement, which had previously inspected the shaftway and pit and drew plans. Apparently the Claimant did not obtain a price proposal until April.   The Claimant has not paid the $5,000 deposit for plans to be drawn.   The Respondent also refutes the lack of authority in the Lease for demanding certificates of insurance.   Articles 3 and and 56(A)(vii) are the sources for the request for certificates. Lastly, Respondent contends that Claimant was given a line drawing before December 7, 2017, the date of the Settlement Agreement. Because Claimant complained about the lack of a line drawing the Respondent provided a new one.   To the extent there is a difference in the new line drawing from the earlier one, Respondent undertakes to provide a single, authoritative drawing.

Paragraph 19 crafted a default if the Respondent's representative, Wexler, did not supply names of general contractors acceptable to the Claimant.   Wexler did not.   The default was Archstone.   Therefore, Archstone is deemed the general contractor for the elevator work contemplated in paragraph 19. Secondly, the Respondent shall provide a single, authoritative

15

line drawing as required by paragraph 16 of the Settlement Agreement within five (5) business days of the date of this INTERIM AWARD. Lastly, any claim the Claimant predicates on the delay from the disagreement over certificates of insurance is academic since the Claimant provided satisfactory certificates to the Respondent.

Permitting

The Settlement Agreement in paragraph 2 states "Landlord shall sign all necessary documentation required by the Department of Buildings for the issuance of a permit with respect to the May 12, 2017 plans within three business days of being provided such documentation." The Claimant learned that the building was designated a landmark on February 5. It coordinated directly with the Landmarks Commission about requirements for design of the entry way and obtained informal approval. So, the original plans were modified accordingly and on March 12 the Commission informally approved subject to receipt of the application signed by the Respondent Landlord and Claimant's submission of shop drawings when prepared. On February 22, 2018, Claimant submitted the application which Respondent first ignored and then refused to sign until five copies of drawings required by the Lease were supplied. Ms. Sklar also objected because some boxes on the application had not been checked. And, she required details that only the shop drawings could supply, drawings that could not be

16

created until DOB approved the plans and issued a permit. This standoff was resolved in the hearing before the undersigned on April 10, 2018. The parties agreed on the form and contents of the application to Landmarks and on the drawings that would be attached. In violation of that agreement, Ms. Sklar altered the application without the Claimant's approval and submitted it without notice to Claimant's representative who wanted to be present at the filing.

The Respondent reverts to the single door contained in the May 12, 2017, plans that were approved in the Settlement Agreement (already discussed in connection with the Handicapped Ramp). The Respondent suggests that Claimant resubmit the plans without the storefront work and later submit the storefront for Respondent's review in accordance with Exhibit K of the Lease and its procedures. It contends that even if Landmarks blessed Claimant's modified plans, this does not preempt the Respondent's right to review and approve in its discretion.

The Respondent asserts that the Arbitrator on April 13 confirmed the Respondent's right of approval despite Landmarks approval. This may or may not be accurate but need not be addressed here because the Respondent will be seeing the shop drawings and may have rights to make objections at that time.

The Respondent approved the May 12 plans and obligated itself to sign all necessary documentation required by DOB to issue a

17

permit with respect to them within three business days. If this conflicts with Exhibit K of the Lease, the Settlement Agreement provisions control (¶27). The Respondent has not argued that the application to the Landmarks Commission falls outside of "all necessary documentation required by the Department of Buildings for the issuance of a permit with respect to the May 12, 2017 plans." Consequently, the Arbitrator presumes that the Landmarks application and its contents are embraced by paragraph 2 of the Settlement Agreement.

Accordingly, it is declared that the Respondent has reviewed and approved of the Landmarks application and its contents and that the Respondent will have no further approval rights with respect thereto until shop drawings are created and submitted to it.

**RESPONDENT'S CONTINUING BAD FAITH**

The Claimant piles on to the alleged violations of the Settlement Agreement and other alleged misbehavior of the Respondent and its sole representative, Rita Sklar, suggesting they are obstructing Claimant in remodeling and opening. As an example, it refers to Ms. Sklar's absolute refusal to communicate with Claimant's representative, Nate Rubin and refusal to respond to his phone, fax and hand-delivered inquiries.

The response is that Mr. Rubin has treated the Respondent and its professionals with disdain and verbal abuse. Respondent says

it and they will continue to work with him despite large unpaid bills he and Claimant owe to the professionals who continue to move the work forward.  If issues arise, they can be arbitrated.

The Arbitrator deems this portion of the Claimant's presentation to represent support for its application for a termination of the Lease, already found to be beyond the scope of the arbitration clause in the Settlement Agreement.

**RESPONDENT'S REFERENCES TO THE CLAIMANT'S DEFAULT UNDER THE LEASE**

To the extent the Respondent's papers are replete with references to Claimant's failure to commence Tenant's Work and to its general contractor's directive to furlough all work on May 2, 2018, the Respondent has asked for no relief.  Therefore, there is no occasion at this juncture for the Arbitrator to dispose of the default issue.  Whether or not there was a default, the Arbitrator issued a <u>Yellowstone</u> injunction on consent.  The alleged default may become academic when the Claimant begins its work.  Because the Settlement Agreement in paragraph 9 affords the Claimant until September 30, 2018, or nine months after the completion of Landlord's Work, to spend $1,912,500, the Claimant may not even be in default.

**CONCLUSION**

Any argument not addressed in this INTERIM AWARD was found to be unavailing, without merit, academic or unnecessary to reach.

The Arbitrator concludes and AWARDS as follows:

1.  The Respondent's objection to the arbitrability of the Claimant's claim for termination of the Lease is sustained, and the claims for termination of the Lease and declaration of a constructive eviction resulting in termination are dismissed as beyond the scope of the arbitration agreement in the Settlement Agreement.

2.  The Respondent's objection to the arbitrability of the Claimant's alternative claim for the appointment of a temporary receiver is overruled and that claim is declared to be arbitrable under the Settlement Agreement.

3.  The Claimant's claim for the appointment of a limited and temporary receiver to take on the Landlord's obligations, responsibilities and prerogatives in the oversight and approval of Tenant's alterations until it opens for business, is held in abeyance pending the faithful and timely observation by the Respondent of its exercise of these obligations, prerogatives and responsibilities. In the event of the Respondent's violation of these obligations, prerogatives and responsibilities, the Claimant is hereby granted leave, on three (3) days' notice, to renew the application being held in abeyance.

4.  Claimant's claim for treble damages for actual eviction is hereby granted and the Respondent is directed to pay to the

Claimant the sum of $31,735.89 with interest at 9% per annum from March 20, 2018, until paid.

5. The Claimant's claim for rent credit for overcharges for electricity is granted, and the Claimant is entitled to diminish its rent and additional rent payments in the sum of $100,434.39.

6. The Claimant's claim for an abatement of rent for the period of delay in the Respondent's completion of Landlord's Work and Landlord's Construction is granted in the amount of $10,578.63.

7. The Claimant's claim with respect to electrical connections is denied and this claim is dismissed.

8. The Claimant's claim regarding the handicapped ramp is granted and it is DECLARED that no further submission nor approval to the Respondent is required until shop drawing are created by the subcontractor; and the Respondent is hereby directed to supply to the Claimant the results of the penetration test within three (3) business days of the date of this INTERIM AWARD.

9. The Claimant' claim respecting elevator work is granted to the following extent and otherwise denied as academic, and Archstone is deemed to be the general contractor for this work; and the Respondent is hereby directed to provide the Claimant with a single, authoritative line drawing as

required by paragraph 16 of the Settlement Agreement within five (5) business days of the date of this INTERIM AWARD.

10.     The Claimant's claim with respect to the Landmarks Commission application and permitting is granted and it is DECLARED that the Respondent has reviewed and approved of the Landmarks application and its contents and that the Respondent will have no further approval rights with respect thereto until shop drawings are created and submitted to it.


_____
Stephen G. Crane, Arbitrator


State of New York )
                  :   ss:
County of New York)

     I, Stephen G. Crane, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my INTERIM AWARD.


JUNE 18, 2018                      _____
Date                              Stephen G. Crane


22

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Vitra, Inc. vs. Ninety Five Madison Company, L.P.
Reference No. 1425024190

I, Annie Goodwin, not a party to the within action, hereby declare that on June 19, 2018, I served

the attached Interim Award on the parties in the within action by Email and by depositing true copies thereof

enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW

YORK, addressed as follows:

Mr. David F. Segal
Sills Cummis & Gross P.C
101 Park Avenue
28th Floor
New York, NY  10178
Phone: 212-643-7000
dsegal@sillscummis.com
   Parties Represented:
   Vitra, Inc.

Richard Feldman Esq.
Stephen M. Rosenberg Esq.
Rosenberg Feldman Smith, LLP
551 Fifth Avenue
24th Floor
New York, NY  10176
Phone: 212- 682-3454
rfeldman@rfs-law.com
SRosenberg@rfs-law.com
   Parties Represented:
   Ninety Five Madison Company, L.P.

Mr. Mark Levenson
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, NJ  07102
Phone: 973-643-7000
mlevenson@sillscummis.com
   Parties Represented:
   Vitra, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on June 19, 2018.

Annie Goodwin
agoodwin@jamsadr.com

**<u>EXHIBIT 6</u>**

[illegible]

---

[illegible], INC.,

Claimant,

-vs.-

NINETY-FIVE MADISON COMPANY, L.P.,

Respondent.

[illegible]

---

**THIRD INTERIM AWARD**

The undersigned Arbitrator, having been designated pursuant to a stipulation of settlement in open court on December [illegible] in [illegible] v. Ninety-Five Madison Company, L.P. ("the Action") then pending in Supreme Court of the State of New York, County of New York under Index No. [illegible] (hereinafter "Settlement Agreement") and pursuant to a stipulation after mediation waiving any conflicts from the circumstance that the undersigned acted as mediator before the Action was settled, and having received the Claimant's application by letter of its counsel dated February [illegible] renewing its motion made by letter dated [illegible] for reassignment, in part, and, in effect, renewal, in part, of this Arbitrator's First Interim Award dated [illegible] and having read Respondent's opposition by its prior counsel's letter dated [illegible], and having read Claimant's reply thereto by

[illegible]

[illegible]

[The body of this page is too faded and illegible to reliably transcribe.]

[illegible]

ATTORNEYS' FEES

[illegible]

The Claimant shall submit, within 30 days of the date of this THIRD INTERIM AWARD its application for its reasonable attorneys' fees with all supporting information about these fees, the attorneys' rates who worked on the case and their background and experience.  The Respondent shall have 15 days thereafter to respond and opposition to the application.  The Claimant shall have 7 days thereafter to reply.

_Stephen G. Crane_
Stephen G. Crane, Arbitrator

State of New York )
                              ) ss.:
County of New York)

I, Stephen G. Crane, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my THIRD INTERIM AWARD

_May 4, 2018_                                        _Stephen G. Crane_
Date                                                         Stephen G. Crane

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Vista, Inc. v. Ninety Five Madison Company, L.P.
Reference No. 1425624100

I, Patrick Mulrenny, not a party to the within action, am the reader thereof. On March 11, 2019, I served the attached Interim Award on the parties in the within action by email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Mr. David F. Segal
Gibbons & Crane P.C.
101 Park Avenue
28th Floor
New York, NY 10178
Phone: 212-xxx-xxxx
segal@gibbonslaw.com
    Parties Represented:
    Vista, Inc.

Mr. Mark Governor
Silly Cummins & Gross P.C.
One Riverfront Plaza
Newark, NJ 07102
Phone: 973-xxx-xxxx
mlevenson@gibbonslaw.com
    Parties Represented:
    Vista, Inc.

Mr. Eliott Laplain
Kaplan Rinaldi Esq.
Verrill Dana LLP
33 Riverside Ave.
Westport, CT 06880
Phone: 203-222-0885
llaplain@verrilldana.com
lrinaldi@verrilldana.com
    Parties Represented:
    Ninety Five Madison Company, L.P.
    Ninety Five Madison Company

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on March 11, 2019.

Patrick Mulrenny
PMulrenny@adrservices.com

**<u>EXHIBIT 7</u>**

JAMS ARBITRATION
NEW YORK, NEW YORK

----------------------------------------x

VITRA, INC.,

                                                JAMS NO. 1425024190

                    Claimant,

                                                **ORDER**

       -against-

NINETY-FIVE MADISON COMPANY, L.P.,

                    Respondent.

----------------------------------------x

       After considering arguments heard in telephone conference calls on October 11, 15, 22,
26 and 30, 2018, it is hereby **ORDERED**

       1.       Claimant will begin providing the Construction Cost Statements and related
documents, as provided for in the Lease, beginning on November 15, 2018, and continuing on or
about the 15th day of each month thereafter until the sum of $1,912,500 in costs, as referred to in
Article 78 of the Lease, has been paid;

       2.       In consideration of Respondent having withdrawn all claims for freight elevator
charges during October 2018, upon presentation of bills from Respondent, Claimant will
promptly pay for two freight elevator charges, approved in writing by Nate Rubin and Archstone,
respectively, each in the sum of $250.00, for an aggregate sum of $500.00;

       3.       (a)       Except when the Building is closed pursuant to the provisions of the
Lease, Archstone and its subcontractors shall have access to all areas of the Building associated with
Claimant's Initial Alterations including, but not limited to, the basement, sub-basement and
bathroom in the basement, the 2nd floor courtyard roof, and the third floor (with respect to the
inter-floor elevator) when needed and without conditions, on weekdays between 8 a.m. and 5
p.m., during which times the freight elevator shall also be available. Additionally, Archstone

will endeavor to provide two (2) business days advance notice to Respondent, for work on weekends when required by Archstone. If an emergency or urgent situation arises, Landlord shall use its best efforts to provide access in a shorter time period;

(b)    Respondent shall provide a key to Chris Murdock, or other Site Superintendent of Archstone daily, for the back staircase (Staircase D) of the Building by 8 a.m. for such access. The provisions of the Lease regarding bringing materials into the Premises remain in effect;

(c)    The parties were advised by Claimant's general contractor, Archstone Builders LLC ("Archstone") that if access from the 29th Street entrance to the Building is required between 11:00 a.m. and 12:00 p.m., Archstone will provide the personnel to facilitate same, at its expense. Notwithstanding the foregoing, should Archstone issue a charge for that personnel, such charge shall be borne solely by Landlord;

(d)    Access to and through the Building shall be without charge to Claimant;

(e)    Claimant shall advise Archstone that is shall clean all public areas used by contractors or subcontractors by 5:00 p.m. on a daily basis; and

(f)    Respondent shall provide egress through the 29th Street door of the Building to 29th Street at all times that contractors and professionals are in the Building;

4.    All future certificates of insurance, as well as renewals or amendments of certificates of insurance, will be reviewed by Respondent or its representatives who shall provide the results of such review to Claimant's representatives within a reasonable period of time under the circumstances after they have been delivered to Respondent or its designated representative generally not to exceed two (2) business days. The review of all such insurance certificates shall be at Respondent's sole cost and expense;

5.    The weekly meetings that Claimant is prepared to participate in are *voluntary* and the only expected attendees are Nathaniel Rubin, Rita Skaar and Archstone. These meetings are to be used solely for the purposes of reporting on the progress of construction, discuss issues that have arisen, coordination, and requests for information, and any other topics mutually agreed to, and will generally not exceed 60 minutes in duration. During such meetings, Archstone has agreed to provide Respondent with a two week "look-ahead" anticipated schedule regarding forthcoming construction, in the form previously provided. Either party has the right to cancel such meetings in the future without recourse.

6.    Other than the weekly meetings, and except in the event of an emergency, Respondent shall not have any direct communications with Archstone, its laborers or its subcontractors. If an issue arises that is of concern to Respondent, Respondent shall first speak with, or send a fax to Nathaniel Rubin, Claimant's project manager, describing the issue. Nathaniel Rubin has agreed to be generally available, on reasonable notice, to speak and communicate with Respondent, and attempt to address any issues Respondent has regarding Claimant's Initial Alterations. If the issue is not resolved with Mr. Rubin within a reasonable period of time, Respondent shall employ the protocol for raising issues during construction as provided for in the Stipulation of Settlement.

7.    Claimant has the right, at its sole cost and expense, to engage the services of Catalm Special Inspectors as its independent, third-party inspector. Respondent has the right to have Skyline Engineering, its independent, third-party inspector, present for such inspections.

8.    Claimant's attorneys shall, within seven days from notice of a joint request from Richard Feldman, Esq. and Robert Lanlaco, Esq., and upon receiving the necessary information and/or documentation, deposit the sum of $154,359.85, representing the full extent of the charging lien

asserted by Respondent's former attorneys, Rosenberg Feldman Smith LLP, with the Clerk of the Court in the action commenced by said firm against Respondent. In Supreme Court, New York County, bearing Index No. 657951/2018. Upon such deposit being made, Claimant will be deemed to have complied with its obligations for the payment of rent through October 2018 to the extent of such payment.

9.    As agreed to in the July 27, 2018 hearing before the Arbitrator, each side, without exception, will provide the other's attorney with at least one business day notice in advance of any communication with Landmarks Preservation Commission ("LPC") in order to allow the other party an opportunity to properly participate in such communication.

10.    Respondent has stated that it is in the process of engaging Archstone, at Respondent's sole cost and expense, to perform certain duct work construction from Respondent's new demising wall into the Lobby of the Building (the "Duct Work Construction"). Claimant has agreed to allow Archstone access to the Premises in order to facilitate such Duct Work Construction, provided that Archstone completes same no later than November 30, 2018. After November 30, 2018, Archstone will be completing the installation of Vitra's wall in the vicinity of Respondent's New Demising Wall, and Archstone will not have access through Claimants' Premises to complete the Duct Work Construction.

11.    Claimant shall be entitled to proceed with the sanding of the ground floor premises currently scheduled for December 1, 2018, and Respondent is hereby directed to cooperate and facilitate such construction by turning off the smoke detectors, and ☐ providing the Building personnel required for Claimant's contractor to perform such construction. Respondents' demand of $250 per hour, for a minimum of 8 hours, and Claimant's objections thereto, are reserved to the parties for a future hearing.

12.    Where Respondent's cooperation, request for information and/or coordination is requested by Claimant's representatives, Respondent shall respond and/or agree to meet within one (1) business day, and in all respects to promptly facilitate the construction, without imposing conditions for same, but without prejudice to the claims of the parties as to the financial obligation and responsibility therefor, and the right to submit those claims to the Arbitrator for resolution.

13.    Except to the extent expressly set forth in this ~~Stipulation~~ Order, Claimant and Respondent expressly reserve all of their rights, remedies and claims against each other, whether or not previously asserted, including, but not limited to, costs, expenses and attorneys' fees.

14.    To the extent any of the terms and conditions of this ~~Stipulation~~ Order conflict with the terms and conditions of the Stipulation of Settlement, the terms and conditions of the Stipulation of Settlement shall prevail.

Dated: November 2, 2018

Stephen G. Crane, Arbitrator

**<u>EXHIBIT 8</u>**

AAA ARBITRATION

ETSA, INC.,

    Claimant,

      -against-

NINETY-FIVE MADISON COMPANY, L.P.,

    Respondent.

## SECOND INTERIM AWARD

The undersigned Arbitrator, having been designated pursuant to a stipulation of settlement in open court in *Vetsa, Inc., et al., Inc. v. Ninety-Five Madison Company, L.P.* ("the Action") then pending in Supreme Court of the State of New York, County of New York under Index No. 650542/2017 (hereinafter "Settlement Agreement") and pursuant to a stipulation after mediation waiving any objection from the circumstance that the undersigned acted as mediator before the action was settled, and having entered an award dated November 21, 2020, regulating the relationship of Claimant the Respondent during the period thereafter until completion of tenant's work, and having issued to the Respondent's application by email and letter of its counsel dated November 20, 2018, for reconsideration of the November 21, 2018, order and the written reasons thereinabove set forth in the Arbitrator's letter of its counsel dated December 5, 2018, opposing the Respondent's

[illegible]

7

the Respondent's counter-order did not [illegible] the
Applicant adopted the Claimant's order.

The Motion for Reconsideration

By its letter, dated September 10, 2018, the Respondent's
counsel requested a hearing for "reconsideration of your Honor's
decision to issue the order requiring Trachi verbally as written"
and written articulation of the reasons for such decision,
[illegible] the three [illegible] reasons. It as an [illegible] the
Respondent [illegible] that [illegible] has been [illegible]
by [illegible] twenty-nine of the Settlement Agreement (an)
premises of the JAMS Rules, an articulation of the reasons but the
[illegible] favoring the Defendant is [illegible] [illegible]
[illegible], (b) Respondent [illegible] that the order [illegible]
[illegible] and imposed punitive conditions on the Respondent
that [illegible] substantial liability that [illegible]. The Respondent's
[illegible] relied on at least length against [illegible] the Court
[illegible] the Settlement Agreement in writing, [illegible]
to the Lease that the Tenant want an for [illegible] it [illegible] the
the Respondent had done in [illegible] the [illegible] order.

The Claimant opposed a motion The reconsideration and
written articulation of the Arbitrator's reasons for issuing the
order. It asked the Summary denial of the Respondent's request.
The Claimant that fundamental fairness [illegible] the [illegible] and accused
it of [illegible] the title of Respondent's [illegible], that

[illegible]

[illegible]

[Page too faded/illegible to reliably transcribe body text.]

[Page too faded/illegible to reliably transcribe]

[The body text on this page is too faded and degraded to read reliably.]

[Page content is too faded and degraded to read reliably.]

[illegible]

[Page too faded to read reliably]

[Page content too faded/illegible to transcribe reliably]

[illegible]

[illegible]

The Arbitrator concludes and AWARDS as follows:

1. The Claimant's Cross-Motion is denied.

2. The Respondent's motion for reconsideration and ancillary relief is denied.

Stephen B. Crane, Arbitrator

State of New York )
ss.:
County of New York)

I, Stephen B. Crane, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument which is my SECOND INTERIM AWARD.

[illegible]
Date

Stephen B. Crane

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Winc, Inc. vs. Ninety Five Madison Company, L.P.
Reference No. 19-5024190

I, Patrick Mulfarley, am a party to the within action. Iam by deponent say on February 25, 2019, I ... and the attached I hereon, I served the parties to the within action by Email and by depositing true copies ... in sealed invested envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW YORK, addressed as follows:

Mr. David F. Segal
Gibb Cuments & Gross P.C
101 Park Avenue
36th Floor
New York, NY  10178
Phone: 212-663-7888
dsegal@cullenmun.com
    Parties Represented:
    Winc, Inc.

Mr. Robert Lepson
Brown Proveth Inc.
Verrill Daner LLP
12  Riverside Ave.
Westport, CT  06880
Phone: 203-222-0000
rlepson@verrilldana.com
rmoseti@verrilldana.com
    Parties Represented:
    Ninety Five Madison Company, L.P.
    Ninety-Five Madison Company

Mr. Mark Loveman
Gibb Cuments & Gross P.C
One Riverfront Plaza
Newark, NJ  07102
Phone: 973-643-7000
mloveman@cullenmun.com
    Parties Represented:
    Winc, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK, on February 25, 2019.

Patrick Mulfarley

**<u>EXHIBIT 9</u>**

[illegible]

[illegible]

Claimant

-and- [illegible]

[illegible]

Respondent

**FIFTH INTERIM AWARD**

[illegible]

[illegible]

[illegible]

ORDERED, that [...]

# PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: [illegible]
[illegible]

I, [illegible], [illegible] on [illegible], I [illegible] [illegible] by Email and by [illegible] [illegible] in the United States Mail at [illegible] NEW YORK, addressed as follows:

[illegible]
[illegible]
[illegible] Park Avenue
[illegible] Floor
New York, NY [illegible]
Phone: [illegible]
[illegible]
Parties Represented:
[illegible]

[illegible]
[illegible]
[illegible]
Newark, NJ [illegible]
Phone: [illegible]
[illegible]
Parties Represented:
[illegible]

[illegible]
[illegible]
[illegible] LLP
[illegible] Ave.
Westport, CT [illegible]
Phone: [illegible]
[illegible]
[illegible]
Parties Represented:
[illegible]
[illegible]

I declare under penalty of perjury the foregoing to be true and correct. Executed at [illegible], NEW YORK on [illegible], 2019.

[illegible]
[illegible]

**<u>EXHIBIT 10</u>**

[illegible]

---

[illegible]

Claimant,

-and-

[illegible]

Respondent.

[illegible]

---

## SECOND PARTIAL FINAL AWARD

The undersigned Arbitrator, having been [illegible]

[Page too faded to read reliably]

[illegible]

[page too faded to read reliably]

[illegible]

[Page too faded to reliably transcribe body text.]

[faded illegible text]

State of New York )
                  ) ss
County of New York )

I, Stephen G. Crane, do hereby affirm upon my oath as
Arbitrator that I am the individual described in and who
executed this instrument which is my FIRST INTERIM AWARD.

_____                    _____
Date                                       Stephen G. Crane

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

*In re Ninety Five_ including Ninety Five Madison Company, L.P.*
*Reference No. 1420924-1a)*

I, Shelara Wiggin-McDuffie, am a person in a civil action hereto declare that on  January 7, 2020, I served the attached Second Partial Final Award, made on the parties in this action herein by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail at New York, NEW YORK, addressed as follows:

David J. Kagan                                    Mr. Mark Levenson
Silk Cassuth & Gross P.C.                         Silk Cassuth & Gross P.C.
101 Park Avenue                                   Five Becssont Plaza
28th Floor                                        Newark, NJ  07102
New York, NY  10172                               Phone 973-643-7000
Phone  212-643-7000                               mlevenson@silkcassuth.com
legal@silkcassuth.com                                 Parties Represented
    Parties Represented                               Villas Inc
    Villas Inc

Mr. Robert Laplaca
Sebastian Rocatelli Esq.
Verrill Dana LLP
11 Riverside Ave
Wepston, CT  06880
Phone 203-222-0884
laplaca@verrilldana.com
srocatelli@verrilldana.com
    Parties Represented
    Ninety Five Madison Company L.P.
    Ninety Five Madison Company

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on  January 7, 2020.

Shelara Wiggin-McDuffie
swaygintmcduffie@consultmc.com

**EXHIBIT 11**

# Jason Teele

| | |
|---|---|
| **From:** | Gregory A. Kopacz |
| **Sent:** | Monday, April 5, 2021 8:21 PM |
| **To:** | Gregory A. Kopacz |
| **Subject:** | FW: Ninety-Five Madison/Vitra |

---

**From:** Joshua N. Howley <jhowley@sillscummis.com>
**Sent:** Wednesday, January 15, 2020 9:59 AM
**To:** Robert Laplaca <rlaplaca@verrill-law.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

Rob, I'm following up again.  If Landlord if refusing to provide the information just say so.  In that event, Vitra will decide whether to commence a new lawsuit against Landlord.

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**  

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500   **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500   **map**

---

**From:** Joshua N. Howley <jhowley@sillscummis.com>
**Sent:** Tuesday, January 7, 2020 7:12 PM
**To:** Robert Laplaca <rlaplaca@verrill-law.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

Hi Rob – following up.  Thank you.

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**  

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500   **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500   **map**

---

**From:** Robert Laplaca <rlaplaca@verrill-law.com>
**Sent:** Friday, January 3, 2020 4:28 PM
**To:** Joshua N. Howley <jhowley@sillscummis.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

*** External Email ***

Rita's traveling and back on Tuesday.  I'll get you then.

Rob

---

**Robert Laplaca** PARTNER
33 Riverside Avenue
Westport, CT 06880
**T** (203) 222-3110

rlaplaca@verrill-law.com
http://www.verrill-law.com/robert-laplaca/
http://www.verrill-law.com/you-might-be-a-winner





---

**From:** Joshua N. Howley [mailto:jhowley@sillscummis.com]
**Sent:** Friday, January 3, 2020 4:26 PM
**To:** Robert Laplaca <rlaplaca@verrilldana.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

Rob, I'm following up.  I would appreciate a status update.

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**  

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500   **map**

101 Park Avenue, 28th Floor, New York, NY 10178

p (212) 643-7000  |  f (212) 643-6500   **map**

---

**From:** Joshua N. Howley <jhowley@sillscummis.com>
**Sent:** Tuesday, December 31, 2019 2:09 PM
**To:** Robert Laplaca <rlaplaca@verrill-law.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

Rob –  I would appreciate the requested information by Friday.  Thank you.

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500   **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500   **map**

---

**From:** Robert Laplaca <rlaplaca@verrill-law.com>
**Sent:** Tuesday, December 31, 2019 1:52 PM
**To:** Joshua N. Howley <jhowley@sillscummis.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

**\*\*\* External Email \*\*\***

---

Josh:  Let me look into it further for you.  I remind you that if you bring a lawsuit and you lose, under the lease we get attorneys' fees and its not visa versa.

Rob

**Robert Laplaca** PARTNER
33 Riverside Avenue
Westport, CT 06880
**T** (203) 222-3110

rlaplaca@verrill-law.com
http://www.verrill-law.com/robert-laplaca/
http://www.verrill-law.com/you-might-be-a-winner


vCard



---

**From:** Joshua N. Howley [mailto:jhowley@sillscummis.com]
**Sent:** Tuesday, December 31, 2019 1:01 PM
**To:** Robert Laplaca <rlaplaca@verrilldana.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** FW: Ninety-Five Madison/Vitra

Rob,

I am following up.  Landlord is leaving Vitra no choice but to commence a lawsuit regarding the commingling of the security deposit.

Josh

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500  **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500  **map**

---

**From:** Joshua N. Howley <jhowley@sillscummis.com>
**Sent:** Friday, December 27, 2019 1:48 PM
**To:** Robert Laplaca <rlaplaca@verrill-law.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madison/Vitra

Rob,

It is unfortunate that, for reasons I cannot comprehend, Landlord continues to refuse to provide any specific information regarding the location and amount of Vitra's security deposit.  I have been requesting such information for weeks.  Vitra has no confidence that Landlord has maintained its security deposit in a separate trust account as required by law, and not comingled it with other funds.

The recent attached response from M&T Bank relating to Vitra's information subpoena and restraining notice provides that M&T has "no open accounts for the debtor."  Therefore, I am confused by your vague statement below that you don't believe there have been any changes since Mr. Syracuse's response.  Please clarify.

I remind your that, pursuant to NY CLS Gen Oblig. § 7-103, the landlord must give notice to a tenant that pays a security deposit, specifying the name and address of the bank where such deposit is held and the amount held by the bank, which must have a place of business within the state. If a landlord does not provide timely notice to the tenant of the bank where the funds were held, pursuant to NY CLS Gen Oblig.  § 7-103, it creates a rebuttable presumption that the funds are comingled.

Vitra reserves all rights and remedies in this regard, including but not limited to the filing a new lawsuit against Landlord seeking the return of the security deposit.

Josh

**Joshua N. Howley**
Member of the Firm



**website** | **bio** | **vCard** | **newsroom** | **email**

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500  **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500  **map**

---

**From:** Robert Laplaca <rlaplaca@verrill-law.com>
**Sent:** Thursday, December 26, 2019 10:45 AM
**To:** Joshua N. Howley <jhowley@sillscummis.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madision/Vitra

**\*\*\* External Email \*\*\***

---

Josh:  The security deposit is not part of the arbitration.  I've explained the lease provisions to you.  I don't believe there have been any changes since Mr. Syracuse's response.

Rob

---

**Robert Laplaca** PARTNER
33 Riverside Avenue

Westport, CT 06880
**T** (203) 222-3110

rlaplaca@verrill-law.com
http://www.verrill-law.com/robert-laplaca/
http://www.verrill-law.com/you-might-be-a-winner





---

**From:** Joshua N. Howley [mailto:jhowley@sillscummis.com]
**Sent:** Thursday, December 26, 2019 9:54 AM
**To:** Robert Laplaca <rlaplaca@verrilldana.com>
**Cc:** Mark Levenson <MLevenson@sillscummis.com>
**Subject:** RE: Ninety-Five Madision/Vitra

Rob, I hope you had a nice Christmas.  Do you intend to respond to my below email seeking an update about Vitra's security deposit?  Thanks.

**Joshua N. Howley**
Member of the Firm

**website** | **bio** | **vCard** | **newsroom** | **email** 

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500   **map**

101 Park Avenue, 28th Floor, New York, NY 10178
p (212) 643-7000  |  f (212) 643-6500   **map**

> Rob – please see the below email from Landlord's prior counsel about Vitra's security deposit.  Can you please confirm that it remains at M&T Bank in an interest bearing account?  Thank you.
>
> **Joshua N. Howley**
> Member of the Firm
> <image001.gif>
> **website** | **bio** | **vCard** | **newsroom** | **email** <image002.gif><image004.gif><image005.gif>
>
> One Riverfront Plaza, Newark, NJ 07102
> p (973) 643-5341  |  m (201) 736-2344  |  f (973) 643-6500  **map**
>
> 101 Park Avenue, 28th Floor, New York, NY 10178

p (212) 643-7000  |  f (212) 643-6500   **map**

---

**From:** Syracuse, Vincent J. <Syracuse@thsh.com>
**Sent:** Thursday, July 26, 2018 4:36 PM
**To:** David F. Segal <dsegal@sillscummis.com>
**Cc:** Regelmann, Carl F. <Regelmann@thsh.com>
**Subject:** Ninety-Five Madision/Vitra

David,

It has come to my attention that you recently contacted M&T Bank regarding the status of the Vitra Security Deposit.  I can confirm that the Vitra Security Deposit in an interest bearing account in accordance with the terms of the lease. I would appreciate it if you would direct any future inquiries regarding my client's obligations under the lease to me.

Vince Syracuse

Vincent J. Syracuse
**Tannenbaum Helpern Syracuse & Hirschtritt LLP**
900 Third Avenue
New York, New York 10022
Email: syracuse@thsh.com
Tel: (212) 508-6722
Fax: (212) 656-1916
Cell: (917) 414-1057
**Follow us on Twitter: @THSHLAW and LinkedIn**
**Follow our Litigation Department: @THSH_Litigation**

www.thsh.com

<image003.jpg>

*Notice: This message, and any attached file, is intended only for the use of the addressee and may contain information that is privileged and confidential.  If you are not the intended recipient, you are hereby notified that any dissemination or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by reply e-mail and delete all copies of the original message.  Thank you.*

NOTICE: The contents of this email and any attachments to it contain confidential and/or legally privileged information from the law firm of Sills Cummis & Gross P.C. This information is only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the contained information is strictly prohibited and that the documents should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us by email immediately.

**Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way from its use.

This email message has been scanned for viruses by Mimecast.

This email and any attachment was sent from the law firm Verrill Dana, LLP. It may contain information that is privileged and confidential. If you suspect that you were not intended to receive it, please delete it and notify us as soon as possible. Thank you.

**<u>EXHIBIT 12</u>**

## Jason Teele

**From:** Gregory A. Kopacz
**Sent:** Monday, April 5, 2021 7:43 PM
**To:** Gregory A. Kopacz
**Subject:** 95 Madison

**From:** Robert Laplaca <rlaplaca@verrill-law.com>
**Date:** January 19, 2021 at 1:23:57 AM EST
**To:** Mark Levenson <MLevenson@sillscummis.com>, "Joshua N. Howley" <jhowley@sillscummis.com>
**Subject: 95 Madison**



Mark and Josh:

I understand that the Sheriff may be executing and levying upon an NFMC bank account at Rhinebeck Bank today, known as Acct no. 1110028568.  It is my understanding that this account has $166,882.75.

Please take notice that the money in this account was segregated from the Vitra security deposit account at M&T Bank last year as conditional payment of rent during the period of the governmental shutdown due to the COVID-19 pandemic in March-May 2020 which precluded construction work in the city.  The Settlement Agreement at Paragraph Twenty-three provides that rent is not abated "to the extent Landlord is prevented from [installing dunnage] by force majeure" and the Lease at Article 31 provides that Landlord "may use, apply or retain the whole or any part of the security so deposited in the extent required for the payment of any rent or additional rent" without notice to Tenant.   Demand at that time was not made to replenish the account.

Nevertheless, all of the funds that were withdrawn from the security account at M&T Bank were deposited in the above Rhinebeck Bank account in an interest-bearing account as provided for in the Lease at Article 55 (Security Deposit) and have not been withdrawn by Landlord.

Accordingly, if Vitra contends that Landlord had no right to access these funds for payment of rent, then Vitra should not execute on these funds.  If Vitra, nevertheless, obtains these funds through execution, Landlord hereby demands, pursuant to Article  31 of the Lease, that Vitra within five (5) days pay to Landlord $166,882.75 (or such amount executed upon from the about account) to replenish the security account.

Rob

**Robert Laplaca** PARTNER
Verrill Dana LLP
355 Riverside Avenue
Westport, CT 06880
**T** (203) 222-3110

rlaplaca@verrill-law.com
http://www.verrill-law.com/robert-laplaca/
http://www.verrill-law.com/you-might-be-a-winner





This email and any attachment was sent from the law firm Verrill Dana, LLP. It may contain information that is privileged and confidential. If you suspect that you were not intended to receive it, please delete it and notify us as soon as possible. Thank you.

## **EXHIBIT 13**

21-10529-shl   Doc 15-1   Filed 04/06/21   Entered 04/06/21 18:29:20   Exhibit
Declaration of Karen Stein   Pg 252 of 254

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| TELLAS LTD., | Index No. _____ |
| Plaintiff, | |
| -against- | **SUMMONS WITH NOTICE** |
| NINETY-FIVE MADISON COMPANY, LP | Date Index No. Purchased: |
| Defendant. | |

To the above-named defendant:

YOU ARE HEREBY SUMMONED to appear in this action by serving a notice of appearance on the Plaintiff at the address of its counsel set forth below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer or appear, a judgment will be entered against you by default for the relief demanded below.

Dated: New York, New York
        January 28, 2021

                                        OLSHAN FROME WOLOSKY LLP


                        By:   */s/ Jeremy M. King*_____
                              Jeremy M. King
                              Khasim K. Lockhart
                              *Attorneys for Plaintiff*
                              1325 Avenue of the Americas
                              New York, New York 10019
                              (212) 451-2300

5693533-2

FILED: NEW YORK COUNTY CLERK 01/28/2021 04:07 PM
NYSCEF DOC. NO. 1

INDEX NO. 650652/2021

RECEIVED NYSCEF: 01/28/2021

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 253 of 254

## **NOTICE**

<u>The nature of the action is:</u>

Plaintiff TellaS Ltd. ("TellaS" or "Plaintiff") is a New Jersey limited company.  Defendant Ninety-Five Madison Company, LP ("Ninety-Five Madison" or "Defendant") is a domestic limited partnership.

On May 27, 2008, TellaS and Ninety-Five Madison entered into an 11-year lease agreement (the "Lease Agreement") whereby Ninety-Five Madison served as landlord and TellaS served as tenant for the premises located at 95 Madison Avenue, New York, NY 10016, 10th Floor (the "Premises").  As reflected in Section 32 of the Lease Agreement, TellaS submitted a $239,094.96 security deposit (the "Security Deposit") upon entering into the Lease Agreement. TellaS was also required to install bathrooms on the Premises, subject to Ninety-Five Madison's prior written consent (the "Bathroom Renovations").  Notwithstanding years of requests for, and financial expenditures in anticipation of, Ninety-Five Madison's written consent to install bathrooms on the Premises, Ninety-Five Madison withheld its consent for the entire duration of the Lease Agreement.  Upon termination of the Lease Agreement, Ninety-Five Madison failed to return the Security Deposit, as required under Section 32 of the Lease Agreement.

Beginning in June of 2019, TellaS made the first of numerous demands upon Ninety-Five Madison for the return of the Security Deposit.  Most recently, TellaS, via counsel, served legal demand letters upon Ninety-Five Madison between December 30, 2020 and January 12, 2021, demanding the release of the Security Deposit.  Despite TellaS's demands, Ninety-Five Madison continues to withhold the Security Deposit, thus in breach of Section 32 of the Lease Agreement.

At present, the balance owed to TellaS pursuant to the Lease Agreement is at least USD $264,080.39, which reflects the interest earned on the Security Deposit as of December 31, 2019. Despite TellaS's efforts, the balance of monies owed to TellaS remains unpaid.  As such, Defendant is liable for, *inter alia*, the Security Deposit amount of USD $264,080.39 plus prejudgment and post-judgment interest from the date the monies were due until paid in full. TellaS is also entitled to its fees incurred in connection with the failed Bathroom Renovations due to Ninety-Five Madison's unreasonable withholding of consent.

Plaintiff designates the place of trial as New York County.  The basis of venue is Defendant's residence and the county in which a substantial part of the events or omissions giving rise to the claim occurred.  Venue is also proper pursuant to Section 74 of the Lease Agreement.

If you do not appear within the applicable time limitation stated above, a judgment will be entered against you by default for the sum of $264,080.39, with interest from the date of January 1, 2020 and the costs expended by TellaS in connection with the Bathroom Renovations.

<u>The relief sought is:</u>

FILED: NEW YORK COUNTY CLERK 01/28/2021 04:07 PM
NYSCEF DOC. NO. 1

INDEX NO. 650652/2021

RECEIVED NYSCEF: 01/28/2021

21-10529-shl    Doc 15-1    Filed 04/06/21    Entered 04/06/21 18:29:20    Exhibit
Declaration of Karen Stein    Pg 254 of 254

Plaintiff seeks judgment in its favor (a) awarding monetary damages in an amount to be determined at trial but which exceeds the jurisdictional limits as a result of Defendant's breach of the Lease Agreement, breach of the covenant of good faith and fair dealing, and/or unjust enrichment; (b) awarding prejudgment and post-judgment interest; and (c) awarding such other and further relief to Plaintiff that the Court determines to be just and proper.

3

5693533-2