# EXHIBIT A

# AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
## of
## NINETY-FIVE MADISON COMPANY, L.P.

This Amended and Restated Limited Partnership Agreement, dated as of June __, 2021, is made by and between RAS Property Management, LLC ("RAS"), Michael Sklar Management LLC ("Michael Sklar"), and Sharan Sklar Management LLC ("Sharan Sklar"), each as a general partner (the "General Partner"), and the partners listed and identified in Schedule A hereto, as limited partners (the "Limited Partners" and together with the General Partner, the "Partners").

WHEREAS, NINETY-FIVE MADISON COMPANY, L.P. (the "Partnership") is a limited partnership under the New York Revised Limited Partnership Act;

WHEREAS, certain of the Partners entered into the Partnership's Limited Partnership Agreement on June 1, 1982, as amended by that certain First Amendment dated as of December 28, 2012 (the "Original Agreement"); and

WHEREAS, prior to the date of this Agreement, Rita A. Sklar, sole surviving trustee of a trust U/W of Irving Weinstein for the benefit of Lois Michelle Weinstein, assigned all of such trust's limited partner interest in the Limited Partnership directly to Lois M. Weinstein and Lois M. Weinstein was admitted as the Limited Partner under the Original Agreement;

WHEREAS, prior to the date of this Agreement, Rita A. Sklar assigned all of the General Partner interest in the Limited Partnership directly to RAS, and RAS was admitted as the General Partner under the Limited Partnership Agreement;

WHEREAS, prior to the date of this Agreement and after giving effect to further assignments: (i) RAS was the General Partner with a General Partner interest of 32.64%; (ii) the Estate of Lois Weinstein was a Limited Partner with a Limited Partner interest of 18.36%; (iii) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) was a Limited Partner with a Limited partner interest of 15.68%; (iv) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) was a Limited Partner with an aggregate Limited Partner interest of 15.68%; (v) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) was a Limited Partner with a Limited Partner interest of 8.82%; and (vi) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) was a Limited Partner with an aggregate Limited Partner interest of 8.82%;

WHEREAS, prior to the date of this Agreement, RAS assigned its General Partner interest in the Limited Partnership as follows: (i) to Michael Sklar - 1% General Partner interest; (ii) to Sharan Sklar - 1% General Partner interest; (iii) to Rita A. Sklar – 29.64% Limited Partner interest, and (iv) retained a 1% General Partner interest, and Michael Sklar and Sharan Sklar were each admitted as a General Partner under the Limited Partnership Agreement;

WHEREAS, after giving effect to the above transfers of interests and upon the date hereof, the Partners are as follows: (i) RAS is a General Partner with a General Partner interest of 1%; (ii) Michael Sklar, is a General Partner with a General Partner interest of 1%; (iii) Sharan

Sklar, is a General Partner with a General partner interest of 1%; (iv) the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18.36%; (v) Rita A. Sklar is a Limited Partner with a Limited Partner interest of 29.64%; (vi) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 15.68%; (vii) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with an aggregate Limited Partner interest of 15.68%; (viii) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 8.82%; and (ix) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with an aggregate Limited Partner interest of 8.82%;

**WHEREAS**, the Partners desire to amend and restate the Original Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the parties hereto agree as follows:

<h1 style="text-align:center">ARTICLE I<br>DEFINITIONS</h1>

1.01    Whenever used in this Agreement , the following terms shall have the meanings respectively assigned to them in this Article I:

"Affiliate" means any person controlling, controlled by or under common control with another person).

"Accountant" means the public accountant regularly servicing the Partnership.

"Agreement" means this Agreement of Limited Partnership, as it may be amended from time to time.

"Assign" or "Assignment" means a valid sale, exchange, transfer or other disposition of all or any portion of an Interest.

"Assignor" means a Partner who makes an Assignment and "Assignee" means a person who receives an Assignment.

"Bankruptcy" means with respect to any Partner (in the capacity in which such person is a partner), such Partner making an assignment for the benefit of creditors, becoming a party to any liquidation or dissolution action or proceeding with respect to such Partner or any bankruptcy, reorganization, insolvency or other proceeding for the relief of financially distressed debtors with respect to such Partner, or a receiver, liquidator, custodian or trustee being appointed for such Partner or a substantial part of such Partner's assets and, if any of the same occur involuntarily, the same is not dismissed, stayed or discharged within 60 days; or the entry of an order for relief against such Partner under Title 11 of the United States Code.

"Capital Account" means, as to each Partner, the amount of such Partner's Capital Contribution, plus the share of profits allocated to such Partner pursuant to Article VII hereof,

less the sum of (a) the share of losses allocated to such Partner pursuant to Article VII hereof and (b) cash distributions made to such Partner pursuant to Articles VII and IX hereof.

"Capital Contribution" means the property contributed to the Partnership by each Partner pursuant to Section 3.01 hereof. Any reference in this Agreement to the Capital Contribution of a Partner shall include the contributions to the capital of the Partnership made by any predecessor in interest of such Partner in respect of such Interest.

"Capital Proceeds" means any net cash proceeds arising out of the sale or disposition of the Property or the Partnership's other real property assets and/or the financing or refinancing of the Property or the Partnership's other real property assets after the establishment of such reserves as the General Partner may in good faith deem advisable.

"Certificate" means the Certificate of Limited Partnership filed with the Clerk of New York County, New York, as it may be amended from time to time.

"Code" means the Internal Revenue Code of 1954, as amended from time to time, or any successor statute.

"Decider" means Jeff Barringer, Esq. or such other person as shall be appointed in accordance with Section 4.06.

"Entity" means any general partnership, limited partnership, corporation, joint venture, estate, trust, business trust, cooperative or association.

"General Partner" means RAS, Michael Sklar LLC and Sharan Sklar LLC, or any person who becomes a Substitute Partner in respect of any portion of the General Partner Interest of the General Partner as provided in Article VIII hereof.

"Interest" means the interest in the Partnership of a Partner.

"Limited Partner" means the partners listed and identified in Schedule A hereto, and any person who becomes a Substitute Partner in respect of any portion of the Limited Partner Interest of the Limited Partner as provided in Article VIII hereof.

"Partner" or "Partners" means either or both of the General Partners and the Limited Partners.

"Partnership" means the limited partnership governed by this Agreement, as such limited partnership may from time to time be reconstituted.

"Percentage Interest" means the percentage interest from time to time of any Partner in profits and losses and cash distributions by the Partnership.

"Person" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person as the context may require.

"Prime Rate" means the rate of interest announced from time to time by Citibank, N.A. as its "prime rate" or its equivalent.

"Profits and Losses" means the annual net income or net loss of the Partnership for the fiscal year as determined by the General Partner with the advice of the Accountant in determining income, gains, expenses, deductions or losses, as the case may be, reported by the Partnership for Federal income tax purposes.

"Property" means the land located at 95 Madison Avenue, New York, New York, and the improvements constructed thereon.

"Substitute Partner" means any person who is admitted to the Partnership as a Substitute Partner under the provisions of Section 8.03 hereof.

"Uniform Act" means the New York Uniform Limited Partnership Act as adopted and amended from time to time by the State, or any successor statute governing the operation of limited partnerships. Each definition herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires.

"Unanimous Decision" shall have the meaning specified in Section 4.02.


## ARTICLE II
## GENERAL

2.01     Formation. The Partners have previously formed the Partnership pursuant to the Uniform Act of the State of New York. This Agreement shall become effective upon the signing by the Partners.

2.02     Name and Principal Place of Business. The name of the Partnership shall be NINETY-FIVE MADISON COMPANY, L.P., and the location of its principal place of business shall be 95 Madison Avenue, Suite 609, New York, New York 10016 or such other place as the General Partners deem desirable from time to time and designated by notice to the other Partners.

2.03     General and Limited Partners. The General Partners shall be RAS, Michael Sklar and Sharan Sklar. The Limited Partners shall be the partners listed on Schedule A hereto. Except as otherwise provided herein, the General Partners shall have the sole authority to act for and to bind the Partnership.

2.04     Purpose. The specific business and purpose of the Partnership is investment in real property either through direct ownership or through the acquisition of interest in an Entity. In connection therewith, the Partnership shall have the power to (A) make and perform contracts and other undertakings and engage in any and all activities and transactions as may be necessary, incidental or advisable in furtherance of such business and purpose, including, but not limited to, the purchase, sale, transfer, other disposition, mortgage, pledge and exercise of all rights, powers, privileges and other incidence of ownership with respect to the Property or interest in an Entity, (B) liquidate or dissolve the Partnership, (C) borrow or raise money and issue evidences of indebtedness without limitation as to amount or manner and (D) carry on any and all activities related to any of the foregoing.

2.05    Execution and Delivery of Certificates and other Instruments. The Partners shall execute, acknowledge, and deliver and the General Partners shall file and record, or cause to be filed and recorded, all such certificates, notices, statements, or other instruments, to the extent and as the same may be required by law for the continuation of a limited partnership under the laws of the State of New York and for the qualification or authorization of the Partnership to do business as a limited partnership in any other jurisdiction where the Partnership's activities may require it to be so qualified or authorized.

2.06    Duration. The Partnership shall continue in full force and effect until the dissolution and termination of the Partnership pursuant to Article IX hereof.

2.07    Fiscal Year.    The fiscal year of the Partnership shall be the calendar year.


## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.01    Contributions. The Partners acknowledge that their respective capital contributions to the Partnership as of the date hereof are reflected within the Partnership 's books and records.

3.02    Treatment of Other Advances. If any Partner shall advance funds to the Partnership other than the amount of such Partner's Capital Contribution, the amount of such advance shall not be considered a contribution to the capital of the Partnership, but shall be deemed a loan to the Partnership repayable upon such commercially reasonable terms as may be agreed upon by the General Partners and the Partner making such advance. Notice of any such loan and the terms thereof shall be given to all Partners.

3.03    No Additional Contributions to Capital. The Partners shall not be required to make any further contributions to the Partnership capital and are not subject to any further assessments in respect to their Partnership interests.

3.04    Interest on Capital Contributed. No Partner shall receive any interest on such Partner's capital contribution.

3.05    Capital Accounts: No Interest; Withdrawal.

(a)    The capital of the Partnership shall be the aggregate amount of cash or property contributed by the Partners as set forth in Section 3.01 hereof. No interest shall be paid on any Capital Contribution.

(b)    No Partner shall have the right to demand a return of such Partner's Capital Contribution, except as otherwise provided in this Agreement. Moreover, the General Partners shall not be personally liable for the return of the Capital Contribution of any Partner, or any portion thereof, it being expressly understood that any such return shall be made solely from assets of the Partnership. Further, the Limited Partners shall not be required to pay to the Partnership any deficit in its Capital Account upon dissolution or otherwise, except as provided by law, with respect to third-party creditors of the

Partnership. No Partner shall have the right to demand or receive property other than cash for such Partner's interest. Each of the Partners does hereby agree to, and does hereby, waive any right such Partner may otherwise have to cause any asset of the Partnership to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking to have any such asset partitioned

3.06　Liability of Limited Partners. Except as provided in Section 5.03(c) hereof, the Limited Partners shall not be liable for any debts, liabilities, contracts or obligations of the Partnership, except as provided by law.

## ARTICLE IV
## MANAGMENT

4.01　Exercise of Management. The Members hereby designate RAS, Michael Sklar and Sharan Sklar, each to serve as a General Partner of the Partnership. Except as otherwise provided herein, RAS, Michael Sklar and Sharan Sklar, shall jointly manage, conduct and make all decisions regarding the operations and affairs of the Company in accordance with this Agreement.

4.02　Unanimous Decisions. All Unanimous Decisions (defined below) shall require the prior unanimous approval of all of the General Partners. Each General Partner shall have the right to propose a Unanimous Decision. No General Partner shall have any right or power to make any commitment or engage in any undertaking on behalf of the Partnership in respect of a Unanimous Decision, unless or until the same has been approved in accordance with the preceding sentence. In the event that either: (i) one General Partner rejects a proposed Unanimous Decision and the other two General Partners approve such Unanimous Decision; or (ii) one or more General Partners refuse to provide an affirmative response to a Unanimous Decision within ten (10) days (or such earlier or later time set forth in Section 4.03) following its proposal by a General Partner, then such proposed Unanimous Decision shall be deemed to have been deadlocked ("Unanimous Decision Deadlock"). Upon the occurrence of a Unanimous Decision Deadlock, the General Partners shall submit the Unanimous Decision Deadlock to the Decider and the Decider shall either approve or disapprove of the Partnership taking the action which is the subject of such Unanimous Decision. The Unanimous Decision Deadlock may be referred or delivered by email or facsimile to the Decider by notice thereof (the "Deadlock Notice") and any of the General Partners may send a Deadlock Notice. The Deadlock Notice shall: (i) describe the proposed Unanimous Decision being addressed, (ii) the positions and/or proposed answer of each of the General Partners, (iii) the date the Unanimous Decision was raised for consideration; and (iv) the deadline for which Unanimous Decision Deadlock must be resolved. The Decider shall make a decision with respect to the Unanimous Decision Deadlock on or before the earlier of: (A) the deadline proscribed in Section 4.03; or (B) the deadline proscribed in the Deadlock. Each decision of the Decider shall be final and binding on the General Partners and the Partnership, unless otherwise agreed to by the unanimous consent of the General Partners. The Decider shall have the authority to issue decisions respecting the interpretation of the Agreement and to determine questions of process where there is no unanimous agreement of the General Partners.

4.03　The term "Unanimous Decision" as used in this Agreement means any decision with respect to the following matters:

(a)     causing or binding the Partnership to expend an amount in excess of $50,000 per instance for such amounts in excess of $50,000, there shall be a 24 hour deadline on the General Partners deciding whether to give or withhold approval and, if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of such Unanimous Decision Deadlock Notices;

(b)     selecting and retaining the managing agent for the Property shall be decided within two (2) weeks from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(c)     selecting and retaining the leasing agent for the Property shall be decided within two (2) weeks from the issue being first raised by Sharon Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(d)     selecting and retaining an architect in connection with the Property shall be decided within two (2) weeks from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(e)     approval of the terms and conditions of any Property financing or any amendment, modification or refinancing thereof and selecting a lender in connection therewith shall be decided within four (4) weeks from the issue being first raised by a General Partner and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(f)     agreeing and accepting lease terms for individual lessees in connection with the Property shall be decided within two (2) days from the issue being first raised by Sharon Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(g)     agreeing design proposals/scope of work in connection with the Property shall be decided within three (3) days from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of notice of such Unanimous Decision Deadlock;

(h)     agreeing on project budgets in connection with the Property shall be decided within five (5) days from the issue being first raised by a General Partner and if the General Partners fail to agree within such time period, the Decider shall resolve such

Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(i)     agreeing on a marketing plan for the leasing agent in connection with the Property shall be decided within four (4) days from the issue being first raised by, Sharan Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of notice of such Unanimous Decision Deadlock;

(j)     (1) issuance or sale of additional interests in the Partnership or (2) admission of a new Partner in the Partnership;

(k)     commencing or threatening any legal proceeding or litigation on behalf of the Partnership or settling, compromising or taking any other action with respect to any litigation or legal proceeding by, against or involving the Partnership;

(l)     making any distributions of cash or assets by the Partnership other than as set forth herein;

(m)     formation by the Partnership of any corporation, partnership, limited liability company or other legal entity;

(n)     creation of any material lien, charge, encumbrance or mortgage on the Property;

(o)     approval of the sale or disposition of all or substantially all of the assets of the Partnership, the merger or consolidation of the Partnership with any other entity or the liquidation or dissolution of the Partnership;

(p)     approval of any contract or agreement between the Partnership and a Partner or any Affiliate thereof;

(q)     filing or commencement of any Bankruptcy by or on behalf of the Partnership;

(r)     taking any action that is not in the ordinary course of business of the Partnership; and

(s)     all tax matters, including regarding all tax elections, treatments and characterizations.

4.04     Efforts and Reimbursement.

(a)     Each General Partner shall devote so much of such General Partner's time and efforts as shall be necessary or desirable to carry out the duties of the general partner of the Partnership.

(b)     The General Partners may receive reasonable salary or other compensation for such General Partner's time and efforts expended in carrying out the duties of the general partner and supervising the business of the Partnership.

(c)     Each Partner shall be entitled to reimbursement for such Partner's actual, reasonable and necessary direct out-of-pocket expenses incurred in the course of the Partnership business. Such expenses shall be repaid to him on the presentation of supporting vouchers

4.05   <u>Dealing with Affiliated Persons</u>. Subject to the restrictions contained in this Agreement, a General Partner may, for, in the name and on behalf of, the Partnership enter into agreements or contracts for performance of services for the Partnership as an independent contractor with a Partner or an Affiliate (upon approval of the General Partners) and the General Partners may obligate the Partnership to pay compensation for and on account of any such services; provided, however, that such compensation and services shall be on terms not less favorable to the Partnership than if such compensation and services were paid to and/or performed by a person who was not a Partner or an Affiliate.

## ARTICLE V
## OTHER ACTIVITIES AND INDEMNITIES

5.01   <u>Activities of Partners</u>. Any Partner may engage in and have an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operating, construction, rehabilitation, renovation, improvement' management and development of real property whether or not such real property is directly or indirectly in competition with the Property. Neither the Partnership nor the other Partners shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, regardless of the location of such real property and whether or not such venture was presented to such Partner as a direct or indirect result of such Partner's connection with the Partnership or the Property.

5.02   <u>Indemnification of the General Partner</u>. The Partnership will indemnify, defend and hold harmless the General Partners and each such General Partner's successors and assigns from any claim, loss, expense, liability, suit, action or damage resulting from any act or omission performed or omitted by such General Partner pursuant to this Agreement, including, without limitation, reasonable costs and expenses of litigation and appeal (and the reasonable costs and expenses of attorneys engaged by the General Partners in defense of such act or omission), but the General Partners shall not be entitled to be indemnified or held harmless for any act or omission arising from such General Partner's unauthorized act, fraud, bad faith, gross negligence, willful violation of such General Partner's fiduciary duties to the Limited Partners, failure to comply with any condition or agreement contained in this Agreement or the breach of a representation or warranty made by such General Partner. Any indemnity under this Section 5.02 shall be provided out of and to the extent of Partnership assets only, and no Partner shall have any personal liability on account thereof.

5.03   <u>Liability of the Partners</u>.

(a)     The General Partners shall have no liability or obligation to the Limited Partners or the Partnership for any decision made or action taken in connection with the discharge of such General Partner's duties hereunder, if such decision or action is made or taken in good faith. Notwithstanding the foregoing, each General Partner shall indemnify and save

harmless the Partnership and the Limited Partner from and against any claim, loss, expense, liability, suit, action or damage, including, without limitation, reasonable costs and expenses of litigation and appeal (and the reasonable costs and expenses of counsel) arising out of such General Partner's unauthorized act, fraud, bad faith, gross negligence, willful violation of fiduciary duties to the Limited Partners or failure to comply with any condition or agreement contained in this Agreement

(b)     The Limited Partners shall not have any right by virtue of this Agreement to require the General Partners to make any loan, advance or payment for or on behalf of the Partnership.

(c)     All representations and warranties herein shall survive the execution of this Agreement, and each Partner agrees to indemnify the other Partners and the Partnership for any damages caused as a consequence of the breach of any representation or warranty made by him herein.

**ARTICLE VI**
ACCOUNTING, REPORTS, BOOKS, BANK ACCOUNTS AND FISCAL YEAR

6.01     Bank Accounts. The bank accounts of the Partnership shall be maintained in such banking institutions authorized to do business in New York or such other states as the General Partners shall determine, and subject to the terms of Section 4.03(a) withdrawals shall be made on the signature of Michael Sklar, a General Partner, or of a person designated by the General Partners. The Partnership's funds shall not be commingled with the funds of any other person and shall not be used except for the business of the Partnership. All deposits, including funds not needed in the operation of the Partnership's business, shall be deposited in interest bearing accounts with, or certificates of deposit issued by, any bank or trust company incorporated under the laws of the United States or of any state thereof and having a combined capital and surplus in excess of $50,000,000 or invested in other comparable high grade obligations.

6.02     Books of Account. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Partnership, shall be kept or caused to be kept by the General Partners. The books shall be kept on an accrual basis of accounting, and the fiscal year of the Partnership shall be the calendar year. All the Partnership's books of account, together with an executed copy of this Agreement and copies of such other instruments as the General Partners may execute hereunder, including amendments thereto, shall at all times be kept at the principal office of the Partnership and shall be available during normal business hours for inspection by any Partner or such Partner's duly authorized representative or, at the expense of any Partner, for audit by such Partner's duly authorized representative.

6.03     Financial Reports. The General Partners shall cause the books of the Partnership to be examined and reviewed annually as of the end of each fiscal year by the Accountants. The General Partners shall cause a balance sheet and a report of the receipts, disbursements, net profits and losses and cash available for distribution, and the share of the net profits and losses and cash available for distribution of each of the Partners to be determined and prepared for each fiscal year and shall cause copies thereof to be transmitted to each of the Partners for each fiscal year.

6.04   Tax Returns and Tax Treatment. The General Partners shall, with the advice of the Accountant or other qualified professional, for each fiscal year, file on behalf of the Partnership a United States Partnership Return of Income within the time prescribed by law for such filing including any extension of such time. The General Partners shall also file on behalf of the Partnership such other tax returns and other documents from time to time as may be required by the State of New York any other state or any subdivision thereof. The General Partners shall send a copy of each such tax return and a copy of Schedule K-1 or any successor or replacement form thereof to each Partner prior to filing the United States Partnership Return of Income for each fiscal year. The good faith determination by the General Partners, subject to Section 4.03(t) with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding for such purposes.

6.05   Partnership Representative. As the Partnership is subject to the New Partnership Audit Rules, the Partnership will, with respect to any "final partnership adjustment" (as such term is defined for purposes of Section 6226(a) of the Code (as revised to reflect the New Partnership Audit Rules) or any successor provision, timely make the election provided for in Section 6226(a) of the Code (as revised to reflect the New Partnership Audit Rules) or any successor provision, unless otherwise determined by the General Partners. As the Partnership is subject to the New Partnership Audit Rules, the Partnership's Partnership Representative for purposes of the New Partnership Audit Rules will be Sharan Sklar, or, upon Sharan Sklar's withdrawal as the Partnership Representative, an eligible person selected by the General Partners, and timely elections of such status under Section 6223(a) of the Code (as revised to reflect the New Partnership Audit Rules) shall be made.  This Section 6.05 shall survive any termination of this Agreement.

## ARTICLE VII
## PROFITS AND LOSSES; DISTRIBUTIONS

7.01   Allocations of Profits and Losses.

(a)   Profits and losses shall be allocated to each Partner based on such Partner's Percentage Interest.

(b)   Where a distribution of an asset is made in the manner described in Section 734(a) of the Code, or where a transfer of an Interest permitted by this Agreement is made in the manner described in Section 741(a) of the Code, the General Partners, in such General Partners' discretion may file on behalf of the Partnership, upon the request of any Partner affected thereby, an election under Section 754 of the Code in accordance with the procedures set forth in the applicable Income Tax Regulations.

(c)   Except as provided in Section 7.01(d) hereof, whenever the profits and losses of the Partnership allocable under this Section 7.01 consist of items of different character for tax purposes (e.g. ordinary income, long-term capital gain, interest expense, etc.), the profits and losses of the Partnership allocable to each Partner shall be deemed to include such Partner's pro rata share of each such item, in accordance with his share of the profits and losses from the transaction in which such profits and losses were realized

(d)     Notwithstanding Section 7.01(c) hereof, if the Partnership realizes depreciation recapture taxable as ordinary income under Section 1245 or 1250 (or other comparable Sections) of the Code, the income allocable under Section 7.01(a) hereof to any Partner shall be deemed to include that portion of such depreciation recapture as the total amount of deductions for depreciation or amortization of the Partnership's assets previously allocated to such Partner reduced by any depreciation recapture previously allocated to such Partner (or to any predecessor in interest of such Partner) with respect to such assets bears to the total amount of deductions for depreciation or amortization of such assets previously allocated to both Partners similarly reduced by all depreciation recapture previously allocated to both Partners with respect to such assets, and the balance of any profits and losses realized by that Partner shall be deemed to consist of a pro-rata share of each of the other income items realized by the Partnership as provided in Section 7.01(c) hereof.

7.02     Distribution and Application of Cash.

(a)     Except as otherwise provide by this Agreement or required by law, cash distributions (other than Capital Proceeds) shall be made pro rata to the Partners on the following bases at such time and in such amounts as the General Partners in such General Partners' sole discretion shall determine after giving effect to the following considerations:

> (i)     the cash requirements of the business of the Partnership including the reinvestment of the assets of the Partnership;

> (ii)     the Federal, state and local income tax liability of each of the Partners which tax liability is attributable to each Partner's Interest in the Partnership; and

> (iii)     the general income needs of each of the Partners.

(b)     Cash distributions (other than Capital Proceeds) shall be applied in the following order of priority:

> (i)     To repay any loan payable to a Partner in proportion to the respective amounts of any such loans; and

> (ii)     The balance, if any, to each Partner based on such Partner's Percentage Interest.

(c)     Except as otherwise agreed upon by the Partners, Capital Proceeds shall be distributed pro rata to the Partners and applied in the following order of priority:

> (i)     To repay any loan payable to a Partner in proportion to the respective amounts of any such loans;

> (ii)     To each Partner in an amount not to exceed such Partner's initial Capital Account;

(iii)    The balance, if any, to each Partners based on such Partner's Percentage Interest.

7.03    <u>Certain Additional Allocations.</u>

(a)    Upon liquidation of the Partnership pursuant to Article IX hereof, profits and losses realized upon such liquidation shall be allocated pursuant to Section 7.01(a) hereof and any asset shall be distributed in cash or in kind in accordance with the provisions of Section 9.04 hereof. With respect to assets distributed in kind to the Partners, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be profits and losses realized by the Partnership immediately prior to the liquidation (for the purposes of this Section 7.03(a), "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the appraised fair market value of such assets (as determined pursuant to Section 9.04 hereof) and the Partnership's basis for such assets), (ii) such profits and losses shall be allocated to the Partner or Partners who received such assets in the same proportions as their interests in such assets after such distribution and (iii) any property so distributed shall be treated as a distribution to the Partners pursuant to Section 7.02(c) hereof to the extent of the aforesaid appraised fair market value less the amount of any liability related thereto. Nothing contained in this Section 7.03(a) or elsewhere in this Agreement is intended to treat or cause such distributions to be treated as sales for value.

(b)    For income tax purposes, if the Partnership in any year realizes income or is allowed a deduction (including additional depreciation or amortization as a result of adding an item to its basis) as a result of the transfer of an interest in property to or from a Partner, the difference between the amount taken into account for tax purposes and the amount otherwise taken into account under this Agreement shall be allocated solely to such Partner.

(c)    The Percentage Interest of each Partner shall be as follows:

(i)    RAS is a General Partner with a General Partner interest of 1%;

(ii)    Michael Sklar, is a General Partner with a General Partner interest of 1%;

(iii)    Sharan Sklar, is a General Partner with a General partner interest of 1%;

(iv)    the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18.36%;

(v)    Rita A. Sklar is a Limited Partner with a Limited Partner interest of 29.64%;

(vi)    Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 15.68%;

(vii)    Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with an aggregate Limited Partner interest of 15.68%;

(viii)   Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 8.82%; and

(ix)   Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with an aggregate Limited Partner interest of 8.82%.

(d)   All profits and losses allocated to the Partners and all cash distributions made to the Partners shall be credited or charged, as the case may be, to their Capital Accounts.

## ARTICLE VIII
## TRANSFER OF INTERESTS; WITHDRAWAL

8.01   <u>Transfers</u>. A Partner may sell, assign, give or otherwise transfer all or any part of such Partner's interest in the Partnership, or pledge, hypothecate or otherwise encumber any such interest, only upon the prior written consent of all General Partners; and any successor to any such interest by operation of law shall have no right by virtue thereof to be admitted as a Partner except upon such consent and shall hold such interest subject to all the terms of this Agreement.

8.02   <u>Death or Disability of the Limited Partner</u>.

(a)   The death, insanity, incompetency or Bankruptcy of a Limited Partner shall not terminate or dissolve the Partnership.

(b)   Upon the occurrence of such event with respect to any Limited Partner, the executor, administrator, guardian, committee, trustee or other legal representative or successor in interest of such Limited Partner shall have the rights of such Limited Partner subject to the provisions of this Agreement. Such successor in interest shall not become a Substitute Partner except upon compliance with the provisions of Sections 8.03 and 8.04 hereof.

8.03   <u>Substitute Partner; Admission</u>. No Partner shall have any right to substitute an Assignee as a Partner in such Partner's place without the prior written permission of each General Partner. Any purported substitution of an Assignee as a Partner without such consent shall be void ab initio and shall not bind the Partnership. The consent of the General Partners to an Assignment under Section 8.01 hereof shall not, in and of itself, constitute permission under this Section 8.03. Any Assignee shall not be admitted as a Substitute Partner unless (A) the Assignor shall have indicated such intention of substitution in the instrument effecting the Assignment and the Assignee expressly agrees to be bound, to the same extent as the other Partners, by the provisions of this Agreement and any other documents required in connection therewith and to assume the obligations of the Assignor hereunder, (B) the Assignor and the Assignee shall have executed or delivered such other instruments as the General Partners may deem necessary or desirable to effectuate such admission and (C) the Assignee shall have agreed to pay, as the General Partners shall determine, all reasonable expenses and legal fees relating to the Assignment and such Assignee's admission as a Substitute Partner, including, but not limited to, the cost of any amendment to the Certificate necessary to effect such admission.

8.04    Assignees.

(a)    Any person who acquires in any manner whatsoever any Interest, irrespective of whether such person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to and bound by all the obligations of this Agreement that any predecessor in interest of such person was subject to or bound by. A person acquiring an Interest, including the personal representatives and heirs of a deceased Partner, shall have only such rights, and shall be subject to all the obligations, as are set forth in this Agreement; and, without limiting the generality of the foregoing, such person shall not have any right to have the value of his or her Interest ascertained or receive the value of such Interest or, in lieu thereof, profits attributable to any right in the Partnership, except as herein set forth.

(b)    Any Assignee of an Interest pursuant to an Assignment satisfying the conditions of this Article VIII who does not become a Substitute Partner in accordance with Section 8.03 hereof shall have the right to receive the same share of the profits and losses and distributions of the Partnership to which the Assignor would have been entitled. If such Assignee desires to make an Assignment of such Assignee's Interest, such Assignee shall be subject to all the provisions of this Article VIII to the same extent and in the same manner as any Partner desiring to make an assignment.

(c)    Any Partner who shall Assign all of such Partner's Interest shall cease to be a Partner and shall no longer have any rights or privileges of a Partner except that, unless and until such Partner's Assignee is admitted to the Partnership as a Substitute Partner in accordance with Section 8.03 hereof, such Assignor shall retain all rights and be subject to all obligations under the Uniform Act.

(d)    In the event that an Assignment shall be made, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such Assignment. Such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Agreement. Except as provided in Section 8.04(b), if such an instrument is not so filed, the Partnership need not recognize any such purported Assignment for any purpose.

8.05    Effect of Withdrawal, Death or Incompetency; Election to continue Business. Upon the withdrawal, Bankruptcy, death or incompetency of all of the General Partners, the last General Partner to withdraw, declare Bankruptcy, die or be determined incompetent or such General Partner's legal representative shall promptly notify the Limited Partners of such event, the Partnership shall be dissolved and terminated unless the Limited Partners elect to continue the business of the Partnership, in which case the Partnership shall not dissolve or terminate. If the Limited Partners elect to continue the business of the partnership, either a new general partner shall be admitted to the Partnership or the Partnership shall be reconstituted as a general partnership. After such event shall occur, such General Partner or such General Partner's legal representative shall take no part in the management of the Partnership, but shall retain such General Partner's Percentage Interest in the profits and losses and cash distributions. The withdrawal of such General Partner shall not be deemed to be effective until the expiration of 90

days from the day on which such notice has been mailed to the Limited Partner. The General Partners shall remain liable for obligations incurred by such General Partners under this Agreement through the effective date of such General Partners' withdrawal, whether such withdrawal shall be voluntary or involuntary or whether in compliance with or in violation of this Agreement.

8.06     Amendment of Certificate. Upon the admission of a Substitute Partner or an additional partner or the withdrawal of a Partner, an amendment to the Certificate reflecting such admission or withdrawal shall be filed as required by the Uniform Act.

8.07     Survival of Liabilities. It is expressly understood that no Assignment, pledge or encumbrance of a Partner's Interest, even if it results in the substitution of the Assignee as a Partner, shall release the Partner from any liability to the Partnership which shall survive such Assignment, pledge or encumbrance, including those set forth in the Uniform Act.


# ARTICLE IX
## DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

9.01     Dissolution and Liquidation. The Partnership shall be dissolved and shall liquidate upon the occurrence of any of the following:

(a)     The withdrawal, death, incompetency or Bankruptcy of each of the General Partners if the Partnership is not continued in accordance with Section 8.05 hereof.

(b)     Any event which shall make it unlawful for the existence of the Partnership to be continued;

(c)     The sale or other disposition of the Property or of all or substantially all of the real property assets of the Partnership; or

(d)     The unanimous determination of the General Partners to dissolve and liquidate the Partnership.

The dissolution shall be effective on the last day of the month in which the event causing the dissolution occurs, but the Partnership shall not terminate until all of the assets have been distributed in accordance with this Article.

9.02     Actions of Liquidating Agent Upon Dissolution. Upon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article IX and the Uniform Act. The liquidation shall be conducted and supervised by the General Partners or, if there be no General Partner, by a person who shall be designated for such purpose by the owners of at least 51% of the Partner interests (the General Partners or such person so designated being hereinafter referred to as the "Liquidating Agent"). The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and the Liquidating Agent is hereby expressly authorized and empowered to

effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership. The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation. The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

9.03   Statements on Termination. Each Partner shall be furnished with a statement prepared by the Liquidating Agent which shall set forth the assets and liabilities of the Partnership as at the date of complete liquidation, and each Partner's share thereof. Upon compliance with the distribution plan set forth in Section 9.04 hereof, the Partners shall cease to be such, and the Liquidating Agent shall execute, acknowledge and cause to be filed a certificate of termination of the Partnership.

9.04   Priority on Liquidation; Distribution of Non Liquid Assets.

(a)   The Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable. To the extent the proceeds are sufficient therefor, as the Liquidating Agent shall deem appropriate, the proceeds of such liquidation shall be applied to pay any debts or liabilities of the Partnership other than to Partners and then in accordance with the provisions of Section 7.02(c) hereof.

(b)   If, in the sole discretion of the Liquidating Agent, he shall determine that it is not feasible to liquidate all or part of the assets of the Partnership or that an immediate sale of all or part of such assets would cause an undue loss to the Partners, the Liquidating Agent shall cause the fair market value of the assets not so liquidated to be determined by independent appraisal. Such assets, as so appraised, shall be retained or distributed by the Liquidating Agent as follows:

(i)   The Liquidating Agent shall retain assets having a value (which value shall be equal to the fair market value of such assets less the amount of any liability related thereto) equal to the amount by which the net proceeds of the liquidated assets are insufficient to satisfy the requirements of subparagraph (i) of Section 7.02(c) hereof; and

(ii)   The remaining assets shall be distributed to the Partners pursuant to subparagraphs (ii) and (iii) of Section 7.02(c) hereof.

Any distribution of assets in kind shall be distributed on the basis of the fair market value thereof and any Partner entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Partners so entitled. If the Liquidating Agent, in his or her sole discretion, deems it not feasible to distribute to each Partner an aliquot share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Partners as tenants-in-common as the Liquidating Agent shall determine to be fair and equitable.

9.05   Orderly Liquidation. A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities so as to minimize the

losses normally attendant upon a liquidation.

9.06　No Goodwill value.　At no time during continuation of the Partnership shall any value ever be placed on the Partnership name, or the right to its use, or to the goodwill appertaining to the Partnership or its business, either as among the Partners or for the purpose of determining the value of any Interest, nor shall the legal representatives of any Partner have any right to claim any such value. In the event of a termination and dissolution of the Partnership as provided in this Agreement, neither the Partnership name, nor the right to its use, nor the same goodwill, if any, shall be considered as an asset of the Partnership, and no valuation shall be put thereon for the purpose of liquidation or distribution, or for any other purpose whatsoever; nor shall any value ever be placed thereon as between the remaining or surviving Partners and the legal representatives of the estate of any deceased, insane, incompetent or bankrupt Partner.

## ARTICLE X
## AMENDMENT

10.01　Amendment. The General Partners (upon the unanimous consent of all of the General Partners) may, without the consent of the other Partners, amend this Agreement for any purpose; provided, however, that the written consent of all the Partners shall be required for any amendment which would:

(a)　increase the amount required to be contributed to the capital of the Partnership by any Partner;

(b)　alter or otherwise affect this Article X;

(c)　change the character of the business of the Partnership as set forth in Article II; or

(d)　alter or otherwise affect any Partner's interest in the profits and losses of, and distributions from, the Partnership (except to the extent provided in Article IV)

10.02　The General Partners shall not amend Article IV without the unanimous consent of all of the General Partners.

## ARTICLE XI
## ACCOUNTING RECORDS

11.01　Method and Period.　Until changed by the Partnership, the books and records of the Partnership shall be kept on an accrual basis and on a fiscal year ending December 31.

11.02　Financial Statements. The books shall be closed at the end of each fiscal year and statements prepared concerning the financial condition of the Partnership and its results from operations. Copies of these statements shall be given to all Partners.

11.03　Tax Returns.　The General Partners shall arrange for the preparation and filing of all necessary tax returns and reports of any other kind for the Partnership. The General Partners shall timely furnish to the other Partners the tax information required by them for federal or state and local tax purposes.

11.04  Examination of Records. All books, records and accounts of the Partnership shall be kept at its office, and shall be open to inspection by all the Partners at reasonable times.

11.05  Tax Elections. In the event of any permitted transfer by any Partner of such Partner's interest in the Partnership, or upon the death of any Partner, the Partnership may, but shall not be required to, elect to cause the basis of the Partnership's assets to be adjusted for federal income tax purposes pursuant to Section 734, 743 and 754 of the Code. Each Partner agrees to supply to the General Partners any necessary information to give effect to any such election. Any additional costs incurred by the Partnership in making such adjustments shall be charged to the Partners whose acquisition of an interest in the Partnership or receipt of a distribution results in such adjustments.

## ARTICLE XII
## POWER OF ATTORNEY

12.01  Appointment of General Partner. Each Limited Partner hereby appoints each General Partner as such Limited Partner's attorney-in-fact to make, execute and file with respect to the Partnership any documents required pursuant to Article VIII and any amendments to the Partnership Agreement which are permitted by Article X, so long as such amendments are required by law or are authorized under this Partnership Agreement, and any other documents which the General Partners may deem necessary or desirable to carry out fully the provisions of this Partnership Agreement, including the following:

(a)  any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of New York or other applicable law;

(b)  a certificate of cancellation of the Partnership and such other instruments or documents as may be deemed necessary or desirable by the General Partners to reflect or to effectuate the dissolution and termination of the Partnership pursuant to the terms of this Agreement; and

(c)  any and all amendments or modifications of the instruments described in the preceding subsections (a) or (b).

12.02  Irrevocable. The foregoing Power of Attorney shall be deemed coupled with an interest and shall be irrevocable and shall survive the subsequent merger, dissolution, or termination of the General Partners.

12.03  Appointment By General Partner. Except as set forth herein, the General Partners shall have the right from time to time to constitute and appoint any single Partner or Partners as their true and lawful attorney, with full power and authority in the name, place and stead of the General Partners to make, execute, sign, acknowledge, deliver, receive, file, and publish on the behalf as General Partners, any and all instruments and documents affecting or relating to the Partnership.

## ARTICLE XIII
## RESTRAINING ORDERS

13.01 <u>Restraining Orders</u>.    In the event that a Partner shall at any time make a pledge, mortgage, assignment, transfer, sale or other disposition of such Partner's interest as a Partner of the Partnership in violation of the provisions hereof, the other Partners shall, in addition to all other rights and remedies which they may have at law or in equity, be entitled to a decree or order restraining and enjoining such pledge, mortgage, assignment, transfer, sale or other disposition, and the offending Partner shall not plead in defense thereto that there would be an adequate remedy at law, it being recognized and agreed that the injury and damage resulting from such a breach would be impossible to measure monetarily.

## ARTICLE XIV
## MISCELLANEOUS

14.01 <u>Governing Law</u>. This Agreement and the rights of parties hereunder shall be governed by and construed in accordance with the laws of the State of New York without reference to its conflicts of laws rules.

14.02 <u>Notices</u>. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as duly given on (a) the date of delivery, if delivered in person, or (b) on the date of mailing if mailed from within the continental United States by registered or certified mail, return receipt requested, to the party entitled to receive the same, by email or facsimile and if to any General Partner, to it at the address of the Partnership set forth in Article II above, and if to the other Partners or Decider, at the addresses set forth in Schedule B to this Partnership Agreement. Any Partner may change such Partner's address by giving notice in writing to the General Partner stating such Partner's new address. Commencing on the day after the receipt by the General Partner of such notice, such newly-designated address shall be such Partner's address for the purpose of all notices or other communications required or permitted to be given pursuant to this Agreement.

14.03 <u>Non-Waiver</u>. No consent or waiver, express or implied, by a Partner to or of any breach or default by any other Partner in the performance by such other Partner of such other Partner's obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other Partner hereunder. Failure on the part of any Partner to complain of any act of the other Partner(s) or to declare such other Partner(s) in default, irrespective of how long such failure continues, shall not constitute a waiver by such Partner of such Partner's rights hereunder.

14.04 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them, and it may not be modified or amended in any manner other than as provided herein. A waiver of any breach or condition of this Agreement shall not be deemed to be a waiver of any subsequent breach or condition of a like or different nature.

14.05 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and their permitted assigns with the same force and effect as if they were parties hereto subject to the terms, covenants and conditions herein set forth, and,

except as otherwise specifically provided herein, reference to a Partner herein shall include the Partner's successors and permitted assigns.

14.06 <u>Successors</u>. No assignment of any right or interest under this Agreement shall be valid unless made in accordance with the terms of this Agreement.

14.07 <u>Captions</u>. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

14.08 <u>Severability</u>. If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

14.09 <u>Further Assurances</u>. Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents and to take all such further action as may be required by law or deemed by the General Partner to be necessary or useful in furtherance of the Partnership's purposes and in order to carry out the provisions of this Agreement.

14.10 <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context shall require.

14.11 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

14.12 <u>Creditors</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership.

*[**Remainder of page intentionally left blank. Signature page to follow**.]*

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the date first above written.

GENERAL PARTNER:

RAS Property Management, LLC

By: _Rita Sklar_____
Name: Rita Sklar
Title: Manager


Michael Sklar Management L.L.C.

By: _____
Michael Sklar


Sharan Sklar Management L.L.C.

JOSHUA GOLDSTEIN
By: _____
Sharan Sklar  by JOSHUA GOLDSTEIN, Authorized Signatory


LIMITED PARTNERS:

The Estate of Lois Weinstein


By: _____


_Rita Sklar_____
Rita Sklar, Individually

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee).

By: _Rita Sklar_____
Rita Sklar, Trustee

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee).

By: _Rita Sklar_____
Rita Sklar, Trustee

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor).

By: _Rita Sklar_____
Rita Sklar, Trustee

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor)).

By: _Rita Sklar_____
Rita Sklar, Trustee

# SCHEDULE B

(i)      RAS is a General Partner with a General Partner interest of 1%;

(ii)     Michael Sklar, is a General Partner with a General Partner interest of 1%;

(iii)    Sharan Sklar, is a General Partner with a General partner interest of 1%;

(iv)    the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18%;

(v)     Rita A. Sklar is a Limited Partner with a Limited Partner interest of 31%;

(vi)    Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 12%;

(vii)   Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 12%;

(viii)  Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 12%; and

(ix)    Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 12%.

# EXHIBIT B

11925669

# NINETY-FIVE MADISON COMPANY L.P.

## Before



Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor)

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor)

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee)

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee)

Ninety-Five Madison Company L.P.

8.82%

8.82%

15.68%

15.68%

18.36%

32.64%

Estate of Lois Weinstein, Limited Partner

RAS Property Management, LLC, General Partner

11925669

# NINETY-FIVE MADISON COMPANY L.P.

### After



Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee)

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor)

Issue Trust for the benefit of Ruby Helene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor)

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee)

Ninety-Five Madison Company L.P.

Rita Sklar, Limited Partner

Estate of Lois Weinstein, Limited Partner

Sharan Sklar, Management L.L.C., General Partner

RAS Property Management, LLC, General Partner

Michael SklarManagement L.L.C. General Partner

8.82%

8.82%

15.68%

15.68%

29.64%

18.36%

1%

1%

1%

# EXHIBIT C

# ]ASSIGNMENT AND ASSUMPTION OF INTERESTS
## (NINETY-FIVE MADISON COMPANY, L.P.)

**THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS** ("Assignment") in is entered into effective as of [[ June  11 , 2021 ,] by and between the **RAS Property Management, LLC,** ("Assignor"), and **Rita A. Sklar,** ("Assignee").

**WHEREAS,** NINETY-FIVE MADISON COMPANY, L.P. (the "Partnership") is a limited partnership under the New York Revised Limited Partnership Act

**WHEREAS,** Assignor is current the General Partner of the Partnership with a General Partner interest of 34%;

**WHEREAS,** Assignor desires to transfer and assign to Assignee a 31% Limited Partner interest (the "Transferred Interest"), [as a gift];

**WHEREAS,** pursuant to additional assignment and assumption of interest agreements, executed simultaneously herewith, the Assignor desires to transfer and assign to (A) to Michael Sklar a 1% General Partner interest; (B) to Sharan Sklar, a 1% General Partner interest; and (C) retain a 1% General Partner interest (together, with this Assignment, collectively the "Transaction");

**WHEREAS,** Assignee desires to accept such assignment of the Transferred Interest, subject to the terms and conditions set forth herein;

**WHEREAS,** after the completion of the Transaction, (i) RAS shall be a General Partner with a General Partner interest of 1%; (ii) Michael Sklar, shall be a General Partner with a General Partner interest of 1%; (iii) Sharan Sklar, shall be a General Partner with a General Partner interest of 1%; and (iv) Rita A. Sklar shall be a Limited Partner with a Limited Partner interest of 31%; of the Partnership;

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Assignment.  Assignor does hereby absolutely and unconditionally gift, convey, give, grant, set over, assign, and deliver to Assignee the Transferred Interest.

2.  Assumption.  Assignee hereby expressly assumes and agrees to perform and to be bound by all of the terms, covenants, conditions and obligations attributable to the Transferred Interest arising after the date hereof pursuant to the terms and conditions of that certain the Partnership's Limited Partnership Agreement on June 1, 1982, as amended by that certain First Amendment dated as of December 28, 2012, and as further amended (the "Partnership Agreement").

3.  Permitted Transfer. Pursuant to the Partnership Agreement, the Assignor is permitted to assign its interest to Assignee.

4. <u>Miscellaneous</u>.

    (a)  <u>Further Acts</u>. Each party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification, and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Assignment and the transactions contemplated herein.

    (b)  <u>Counterparts; Facsimile Signatures</u>. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original Assignment, but all of which, taken together, shall constitute one and the same Assignment, binding on the parties hereto. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. Facsimile, .pdf, .tif, and other electronic signatures to this Agreement shall be valid as if manually signed.

    (c)  <u>Enforcement of this Assignment</u>. The waiver or failure to enforce any provision of this Assignment shall not operate as a waiver of any future breach of any such provision or any other provision hereof.

    (d)  <u>Modifications</u>. The terms of this Assignment may not be modified, amended, or otherwise changed in any manner, except by an instrument in writing executed by each of the parties hereto.

    (e)  <u>Rules of Construction</u>. The Paragraph headings used in this Assignment are for reference purposes only, and are not intended to be used in construing this Assignment. As used in this Assignment, where the context so requires, the use of the neuter gender shall include the masculine and the feminine genders, the masculine gender shall include the feminine and neuter, the feminine gender shall include the masculine and neuter, and the singular number shall include the plural, and vice versa. The provisions of this Assignment shall be construed and enforced in accordance with the laws of the State of New York. This Assignment contains and constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings, if any, with respect thereto.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Assignment as of the day and year first above written

ASSIGNOR:

**RAS Property Management, LLC**

By: _____
Name: Rita Sklar
Title: Manager

ASSIGNEE:

_____
**Rita A. Sklar**

# ]ASSIGNMENT AND ASSUMPTION OF INTERESTS
## (NINETY-FIVE MADISON COMPANY, L.P.)

**THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS** ("Assignment") in is entered into effective as of [[June ] *11*, 20*21*,] by and between the **RAS Property Management, LLC,** ("Assignor"), and **Michael Sklar,** ("Assignee").

**WHEREAS,** NINETY-FIVE MADISON COMPANY, L.P. (the "Partnership") is a limited partnership under the New York Revised Limited Partnership Act

**WHEREAS,** Assignor is current the General Partner of the Partnership with a General Partner interest of 34%;

**WHEREAS,** Assignor desires to transfer and assign to Assignee a 1% General Partner interest (the "Transferred Interest"), [as a gift];

**WHEREAS,** pursuant to additional assignment and assumption of interest agreements, executed simultaneously herewith, the Assignor desires to transfer and assign to (A) to Sharan Sklar a 1% General Partner interest; (B) to Rita A. Sklar a 31% Limited Partner interest, and (C) retain a 1% General Partner interest (together, with this Assignment, collectively the "Transaction");

**WHEREAS,** Assignee desires to accept such assignment of the Transferred Interest, subject to the terms and conditions set forth herein;

**WHEREAS,** after the completion of the Transaction, (i) RAS shall be a General Partner with a General Partner interest of 1%; (ii) Michael Sklar, shall be a General Partner with a General Partner interest of 1%; (iii) Sharan Sklar, shall be a General Partner with a General Partner interest of 1%; and (iv) Rita A. Sklar shall be a Limited Partner with a Limited Partner interest of 31%; of the Partnership;

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Assignment. Assignor does hereby absolutely and unconditionally gift, convey, give, grant, set over, assign, and deliver to Assignee the Transferred Interest.

2.  Assumption. Assignee hereby expressly assumes and agrees to perform and to be bound by all of the terms, covenants, conditions and obligations attributable to the Transferred Interest arising after the date hereof pursuant to the terms and conditions of that certain the Partnership's Limited Partnership Agreement on June 1, 1982, as amended by that certain First Amendment dated as of December 28, 2012, and as further amended (the "Partnership Agreement").

3.  Permitted Transfer. Pursuant to the Partnership Agreement, the Assignor is permitted to assign its interest to Assignee.

4. Miscellaneous.

    (a)   Further Acts. Each party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification, and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Assignment and the transactions contemplated herein.

    (b)   Counterparts; Facsimile Signatures. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original Assignment, but all of which, taken together, shall constitute one and the same Assignment, binding on the parties hereto. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. Facsimile, .pdf, .tif, and other electronic signatures to this Agreement shall be valid as if manually signed.

    (c)   Enforcement of this Assignment. The waiver or failure to enforce any provision of this Assignment shall not operate as a waiver of any future breach of any such provision or any other provision hereof.

    (d)   Modifications. The terms of this Assignment may not be modified, amended, or otherwise changed in any manner, except by an instrument in writing executed by each of the parties hereto.

    (e)   Rules of Construction. The Paragraph headings used in this Assignment are for reference purposes only, and are not intended to be used in construing this Assignment. As used in this Assignment, where the context so requires, the use of the neuter gender shall include the masculine and the feminine genders, the masculine gender shall include the feminine and neuter, the feminine gender shall include the masculine and neuter, and the singular number shall include the plural, and vice versa. The provisions of this Assignment shall be construed and enforced in accordance with the laws of the State of New York. This Assignment contains and constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings, if any, with respect thereto.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Assignment as of the day and year first above written

ASSIGNOR:

**RAS Property Management, LLC**

By: _Rita Sklar_
Name: Rita Sklar
Title: Manager

ASSIGNEE:

**Michael Sklar**

# ]ASSIGNMENT AND ASSUMPTION OF INTERESTS
## (NINETY-FIVE MADISON COMPANY, L.P.)

**THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS** ("Assignment") in is entered into effective as of [[June ] 11, 2021,] by and between the **RAS Property Management, LLC,** ("Assignor"), and **Sharan Sklar,** ("Assignee").

**WHEREAS,** NINETY-FIVE MADISON COMPANY, L.P. (the "Partnership") is a limited partnership under the New York Revised Limited Partnership Act

**WHEREAS,** Assignor is current the General Partner of the Partnership with a General Partner interest of 34%;

**WHEREAS,** Assignor desires to transfer and assign to Assignee a 1% General Partner interest (the "Transferred Interest"), [as a gift];

**WHEREAS,** pursuant to additional assignment and assumption of interest agreements, executed simultaneously herewith, the Assignor desires to transfer and assign to (A) to Michael Sklar a 1% General Partner interest; (B) to Rita A. Sklar a 31% Limited Partner interest, and (C) retain a 1% General Partner interest (together, with this Assignment, collectively the "Transaction");

**WHEREAS,** Assignee desires to accept such assignment of the Transferred Interest, subject to the terms and conditions set forth herein;

**WHEREAS,** after the completion of the Transaction, (i) RAS shall be a General Partner with a General Partner interest of 1%; (ii) Michael Sklar, shall be a General Partner with a General Partner interest of 1%; (iii) Sharan Sklar, shall be a General Partner with a General Partner interest of 1%; and (iv) Rita A. Sklar shall be a Limited Partner with a Limited Partner interest of 31%; of the Partnership;

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Assignment.  Assignor does hereby absolutely and unconditionally gift, convey, give, grant, set over, assign, and deliver to Assignee the Transferred Interest.

2.  Assumption.  Assignee hereby expressly assumes and agrees to perform and to be bound by all of the terms, covenants, conditions and obligations attributable to the Transferred Interest arising after the date hereof pursuant to the terms and conditions of that certain Partnership's Limited Partnership Agreement on June 1, 1982, as amended by that certain First Amendment dated as of December 28, 2012, and as further amended (the "Partnership Agreement").

3.  Permitted Transfer.  Pursuant to the Partnership Agreement, the Assignor is permitted to assign its interest to Assignee.

4. <u>Miscellaneous</u>.

    (a)  <u>Further Acts</u>. Each party hereto agrees to perform any further acts, and to execute and deliver (with acknowledgment, verification, and/or affidavit, if required) any further documents and instruments, as may be reasonably necessary or desirable to implement and/or accomplish the provisions of this Assignment and the transactions contemplated herein.

    (b)  <u>Counterparts; Facsimile Signatures</u>. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original Assignment, but all of which, taken together, shall constitute one and the same Assignment, binding on the parties hereto. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. Facsimile, .pdf, .tif, and other electronic signatures to this Agreement shall be valid as if manually signed.

    (c)  <u>Enforcement of this Assignment</u>. The waiver or failure to enforce any provision of this Assignment shall not operate as a waiver of any future breach of any such provision or any other provision hereof.

    (d)  <u>Modifications</u>. The terms of this Assignment may not be modified, amended, or otherwise changed in any manner, except by an instrument in writing executed by each of the parties hereto.

    (e)  <u>Rules of Construction</u>. The Paragraph headings used in this Assignment are for reference purposes only, and are not intended to be used in construing this Assignment. As used in this Assignment, where the context so requires, the use of the neuter gender shall include the masculine and the feminine genders, the masculine gender shall include the feminine and neuter, the feminine gender shall include the masculine and neuter, and the singular number shall include the plural, and vice versa. The provisions of this Assignment shall be construed and enforced in accordance with the laws of the State of New York. This Assignment contains and constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior understandings, if any, with respect thereto.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Assignment as of the day and year first above written

ASSIGNOR:

**RAS Property Management, LLC**

By: _Rita Sklar_
Name: Rita Sklar
Title: Manager

ASSIGNEE:

_Sharan Sklar_
Sharan Sklar
by JOSHUA GOLDSTEIN, Authorized Signatory

# EXHIBIT D

SL GREEN REALTY CORP.
One Vanderbilt Avenue
New York, New York 10017

**BY EMAIL**

June 11, 2021

Charles E. Simpson
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street, New York, NY 10019

Re:  89-95 Madison Avenue, New York, NY (the "**Property**")

Dear Charles:

This letter (the "**Proposal**") outlines the basic terms and conditions upon which an affiliate of SL Green Realty Corp. ("**Property Manager**"), would consider providing property management and leasing services for the above captioned Property on behalf of your client (the "**Owner**").

This Proposal is a summary of the general terms upon which Property Manager would provide the services outlined herein. Should your client wish to retain Property Manager, we would expect to negotiate and enter into a binding property management and leasing agreement (the "**Property Management and Leasing Agreement**"), which would include the terms herein.

| | |
|---|---|
| **Management Functions:** | Property Manager shall be responsible for the day-to-day management, maintenance and operation of the Property (the "Management Functions"). Property Manager shall, in the performance of the Management Functions, use diligent and commercially reasonable efforts to manage, maintain and operate the Property in a manner consistent with the services provided by property managers of comparable Class A properties in the market area in which the Property is located. Property Manager shall perform the following Management Functions: |

- Keep Owner informed of the financial condition of the Property
- Keep Owner informed on a regular basis of the physical condition of the Property
- Arrange for payment of all bills relating to the operation, care, upkeep and maintenance of the Property
- Use diligent and commercially reasonable efforts to collect rent and other income under leases affecting the Property on a timely basis and to otherwise enforce compliance with the terms of such leases and exercise remedies under such leases, including, without limitation, the engagement of, and selection of, collection agencies and/or legal counsel to file and prosecute action to recover possession of any leased space and to recover any rent, and, any settlement, compromise or release of such action
- Keep a complete, detailed and accurate set of books of account in accordance with the requirements of this Agreement
- Select, supervise, discharge and arrange for payment of all personnel required to implement the provisions of this Agreement

- Arrange for payment of all real and personal property taxes and special assessments when due and prior to delinquency
- Select, employ, direct and supervise the work of, and discharge, all vendors, agents and other independent contractors
- Enter into or renew contracts for electricity, gas, telephone, water, sewer, cleaning, security, landscaping, HVAC, elevator maintenance, insect control and other services
- Arrange for and maintain insurance coverage on behalf of Owner with limits as are appropriate for the Property
- Advertise the Property by such forms of advertisement as Property Manager deems appropriate
- Aid in the sale, financing and/or refinancing of the Property
- Forward to Owner promptly upon receipt any and all notices of violations of laws or contract breaches concerning the Property
- Furnish to tenants of the Property such services as are required to be furnished by Owner under such tenants' leases and such other services as Owner shall stipulate
- Execute leases, lease modifications and other tenant-related matters as Agent for Owner

In the performance of its duties, Property Manager will act as the agent of Owner, including with respect to incurring costs in connection with the management, maintenance, and operation of the Property. Owner will provide Property Manager an indemnity in connection with its work at the Property.

| | |
|---|---|
| **Budget and Business Plan:** | Property Manager will prepare and submit a proposed Annual Budget (and at its election, a proposed Annual Business Plan) for each calendar year that shall set out reasonable details in respect of the projected operation, management and maintenance of as well as proposed capital expenditures for the Property. |
| **Reimbursement:** | Property Manager will have no responsibility to make any disbursements for expenses incurred in connection with leasing or management, present or future loans, fees or expenses payable or reimbursable to property manager, or other expenditures out of its own funds. |
| **Leasing and Marketing:** | Leasing Agent. Property Manager, by itself or through an affiliate ("Leasing Agent"), shall be the exclusive leasing agent for the Property. Leasing Agent may engage the services of a third-party leasing agent as a sub-agent for the Property. In the performance of its duties as exclusive leasing agent for the Property, Leasing Agent will use commercially reasonable efforts to obtain desirable tenants for the Property in accordance with a current schedule of rents and a leasing plan approved by Owner. |
| **Compensation for Property Management and Leasing:** | Management Fee. Owner shall pay Property Manager a monthly management fee in respect of its managing the Property equal to the greater of (i) three percent (3%) of gross receipts actually received by Owner during the prior calendar month from tenants, licenses or other occupants under all leases, licenses or other occupancy agreements at the Property, and (ii) $350,000 (the "Management Fee"). |

<u>Additional Services.</u> If Property Manager is called upon by Owner to perform any services not customarily provided by a property manager or otherwise described herein, it is agreed that Property Manager shall receive such additional compensation therefor in a reasonable amount, which amount shall be agreed upon between Property Manager and Owner prior to the commencement of such services.

<u>Construction Fee.</u> There shall be a construction management fee of 7.5% of costs relating to both base-building capital projects and tenant fit-outs.

<u>Refinancing Fee.</u> As consideration for the arrangement of any refinancing for the Property, Owner shall pay a financing fee to Property Manager equal to one percent (1.0%) of the gross loan amount.

<u>Accounting.</u> As consideration for the accounting services provided by the Property Manager, the Owner shall pay a $50,000 per annum accounting fee.

<u>Disposition Fee.</u> As consideration for the arrangement of the disposition of the Property, Owner shall pay a disposition fee to Property Manager equal to one percent (1.0%) of the gross sales price.

<u>Leasing Fee.</u> As consideration for the performance by Property Manager, or SLG Leasing, as applicable, of its duties as exclusive leasing agent, Owner shall pay leasing commissions to Property Manager at rates set forth on the to be negotiated Property Management and Leasing Agreement. In the event a third-party broker (an "Outside Broker") is the procuring cause of a transaction whereby a tenant leases vacant space in the building, the Property Manager shall be paid a commission at fifty percent of the to be determined rates (the "Override") and the Outside Broker shall be paid a commission at one hundred percent of the to be determined rates (a "Full Commission").

<u>Marketing Fund.</u> Owner shall create a $250,000 market fund for leasing efforts for the Property.

<u>Advertising.</u> Within the limits of an Approved Annual Budget, Property Manager will advertise the Property by such forms of advertisement as Property Manager shall deem appropriate.

**Reporting:**   Property Manager shall maintain and make available to owner a comprehensive, complete and accurate system of office records, books and accounts.

**Term:**   The initial term (the "Initial Term") of this Agreement shall be for a period of one year. Property Manager shall have the right to extend the Initial Term up to three years from the expiration of the Initial Term.

**Bank Account:**   Property Manager shall set up and maintain one or more bank accounts for the Property, in Property Manager's name as agent for Owner (the "Property Account"). All rents and other gross revenues (including security deposits) received in respect of the Property shall be deposited directly into the Property Account. Property Manager is authorized to draw on the Property Account on behalf of Owner as and when required in connection with the operation or maintenance of the Property to pay

3

amounts, subject to the limits in the Approved Annual Budget or as otherwise specifically permitted in the to be negotiated Property Management and Leasing Agreement.

**Confidentiality:** This Proposal shall be kept confidential, shall not be reproduced or disclosed, and shall not be used other than to employees, consultants or agents of Owner on a "need-to-know" basis for the purpose of assisting Owner in the consummation of an agreement.

Owner and Property Manager understand and agree that this Proposal is non-binding and is merely an expression of interest in consummating the agreement described herein. It does not include all of the material terms which must necessarily be part of such agreement and is subject, in all events, to the preparation, negotiation, execution and delivery by each of Owner and Property Manager; provided, however, that the provision entitled "Confidentiality" hereof is intended to bind Owner and Property Manager upon full execution of this Term Sheet, each of which, upon such execution, shall be afforded all rights and remedies at law or in equity upon any breach thereof. If the terms herein are acceptable, please sign and return to us by June __, 2021; this Proposal shall be null and void if not countersigned and returned on or prior to such date.

We look forward to working with you on this agreement.

Very truly yours,

SL GREEN REALTY CORP.

By: _____
   Name:

Agreed to and accepted as of this
__ day of June, 2021

By: _____
   Name:

# EXHIBIT E

# AVISON YOUNG

# Proposal for
# property management services



# Table
# of contents

**Property management services**      4

**Property accounting services**      6

**Property management fees**      8

**References**      10

**Appendix**

**About Avison Young**      12

**Bios**      14

**Sample Property Management Agreement**      16



# Team

## 95 Madison Avenue



**Arthur Mirante**
Principal, Tri-State President



**Rich Hillgardner**
Director, Real Estate
Management Services



**Heather Hernandez**
Senior Property Manager



# Property management services



Our Property Management proposal will provide for the following services and functions:

- Heather Hernandez, Senior Property Manager, will be the manager assigned to the properties. She will oversee the operational effectiveness and accurate rent collections and financial reporting as well as to provide key stakeholders with all communications and updates.

- Review with ownership the operating budgets and expenses for each asset to gain a better understanding of where resources are being spent.

- Develop a staffing plan that balances the daily needs at each property and provides a staff that can meet the budget for the overall portfolio.

- Develop a transition plan to guide the orderly transition of the properties to AY management.

- Review all building equipment and operations and right-size the maintenance plan and operating procedures with owner's needs.

- Review all current service contracts to determine service levels, benchmark costs, and re-bid contracts where required.

- Hire and train a new building Superintendent, holding all proper licenses and certificates.

- Manage and supervise all building staff and third-party vendors.

- Schedule, supervise and complete maintenance. Services include, but not limited to:
  - Cleaning and rubbish removal
  - HVAC/boilers
  - Fire alarm/life safety systems
  - Elevators
  - Plumbing, lighting and electrical
  - Pest control

- Provide and operate a work order system to track maintenance from initiation to completion for all maintenance and tenant service requests

- Review, maintain and file all federal, state and city regulatory permits, licenses and certificates

- Ensure code compliance and resolve any open notice of violations or deficiencies



# Property accounting services



The AY Property Management Accounting team provides accounting for entities under Generally Accepted Accounting Principles (GAAP). With a specific Accounting Lead, you will have the confidence of knowing that a dedicated Property Accounting team will work seamlessly and efficiently with the Property Management team, creating an extension of your team.

## At a glance: Accounting services

– **Financial reporting**

– **Lease administration and rent collections**

– **Budgeting**

– **Cash management + working capital**

– **Banking**

– **Control of service**

– **Audits**

## Financial reporting

Our disciplined process for financial reporting ensures that results are provided promptly and accurately:

– Approval levels are put into place depending on the client's requirements

– The Property Accountant reviews the G/L at the end of the month and works closely with the Property Manager to ensure that all purchase orders have been received and all accruals are recorded

– Prior accruals and balance sheet items are reviewed and adjusted each month by the Property Accountant

– A detailed variance analysis is provided

– Financial statements and other management information are provided to our client by the date stipulated in the management agreement

– Yardi Voyager is the web-based, full service accounting platform we will use for you

## Budgeting

Developing a budget for the property and monitoring it regularly is an essential part of maximizing your value. Key elements in our process include:

– Senior management is involved in setting assumptions, review, and discussion with our client

– The accounting and operational support groups work together to prepare the initial draft budget, with significant input and direction from the Property Manager

– The full budget package is prepared and then presented to our client on an annual basis

– The budget is linked to the financial reporting package, with detailed variance analysis provided with each monthly report to our client

## Cash Management

– Purchase orders or contracts are required for all disbursements



– No cash payments for rent or any other item of service are allowed. All payments must be made by check or other financial instrument.

– We ensure a significant separation of responsibilities throughout the cash cycles.

**Working Capital**

– Receivables are reviewed in detail each month, beginning with an initial review by the Property Administrator by the 10th of the month. By the end of the third week, the Property Manager has implemented a plan of action for collection.

**Audits**

At AY, we recognize the importance of the audit function and are always professional and cooperative in our relationships with auditors. Over the years, we have worked extensively with audit firms including the Big Four (KPMG, Deloitte, PWC, E&Y), smaller national and international firms, as well as local and regional firms.

The nature of the assignments performed include full financial statement audits (including balance sheet, income statement, cash flow statements and the corresponding notes to the financial statements), operating cost statement audits/review engagements, and due diligence work.

We provide extensive support to the audit team in order to ensure a timely and cost-effective completion of the engagement. Our support typically includes:

– Electronic and/or physical copies of all accounting system information, and full access to banking information

– Full access to payments information and tenant information

– Full access to accounting and management staff, including the timely resolution of audit queries and information requests

– Completion of all questionnaires as required

# Property management fees



AY believes in a competitive and transparent management fee structure that incentivizes performance.

Our proposed fee is designed to give you the following:

– A fixed competitive and measurable fee.

– A fee structure that is easily incorporated into annual budgets.

– A fully transparent fee.

For the property management and accounting services, we propose *a flat fee of $114,000.00* per annum billed monthly and we will honor this pricing for the first twelve (12) months of the assignment. Should the assignment continue into a second year of service, we would be happy to review the overall job scope with you and re-evaluate our pricing structure.

Not included in the management fee is the payroll, plus benefits and payroll taxes of any building Superintendent or maintenance staff on Avison Young payroll.  This maintenance staff will be billed monthly, without mark-up and fully reimbursed by Client.



# References



Avison Young is proud to provide property management services and partner with both private and institutional owners. Selected references are provided for your convenience.

Institutional
**Brian Ray**
Alchemy-ABR Investment Partners
bray@alchemy-abr.com
212.220.1986

Private Client
**Steven Spitz**
steven@corefourcapco.com
516.490.4700





# Appendix

**About Avison Young**

Avison Young is a global real estate advisor built to create real economic, social, and environmental value, powered by people. We believe there is a vital role for our sector in creating healthy, productive workplaces for employees; cities that are centers of prosperity for its citizens and; built spaces and places that create a net benefit to the economy, the environment and the community. Our people organize around our clients' opportunities and work as colleagues to focus on their success.

 The service breadth to meet any need

 The people to make it happen

 The scale to make it count

 The values to make it matter

**Avison Young at a glance**

**1978**
year founded

**5,000**
real estate professionals

**100+**
offices worldwide

**15+**
countries worldwide

**400msf**
under property management





● Avison Young Office Locations

■ Avison Young Market Coverage/Experience

## Our Service Offerings

**Occupier Services**

Consulting Services
Facility Management
Occupier Project Management
Occupier Solutions
Occupier Valuation & Advisory
Tenant Representation
Transaction Management

**Investor Services**

Agency Leasing
Capital Markets
Consulting Services
Debt & Mortgage Services
Investment & Asset Management
Investor Project Management
Net Lease
Property Management
Valuation & Advisory Services

**Sectors/Specialties**

Flexible Solutions
Hospitality
Industrial
Multi-Family
Office
Retail
Associations & Non-profits
Automotive Properties
Data Centers

Healthcare
Life Sciences
Private Equity
Project Management
Specialty
Senior Housing
Sustainability

# Bios



### Arthur Mirante | Relationship Manager

**Principal, Tri-State President**
**arthur.mirante@avisonyoung.com | 212 279 1896**

Christine brings over 20 years of Property Management experience, most recently as Senior Property Manager with Cushman & Wakefield where she managed all aspects of Class A multi-tenant commercial properties. Christine has a diversified Real Estate background in Property/Facilities Management, Commercial Condominium Management, Financial Management, Leasing, Project Management and Sourcing. She has been assigned to major client accounts including JP Morgan Chase Headquarters, UBS Headquarters, Citibank and CUNY Law School.

Christine has worked on a number of significant projects including the installation of a Sub-metered Electric System and Energy Management Software Program for a multi-tenant client property consisting of 1.3 million sf. She managed the expedited construction and renovation for 8 new tenants in a 15-month time frame for a midtown multi-tenant property. Christine also liaised with City agencies on behalf of a client to facilitate construction work and maintenance of an MTA station and a public park. Additionally, she was also part of the Sourcing Team responsible for developing a fully automated sourcing methodology for a client's Northeast Portfolio consisting of several million square feet.

Christine graduated with Her MBA in Marketing from Pace University and is a member of the New York City Chapter of BOMA.



### Rich Hillgardner | Property Management Account Executive

**Director, Real Estate Management Services**
**richard.hillgardner@avisonyoung.com | 212 729 3708**

Rich Hillgardner is the Director, Real Estate Management Services Market Leader in Avison Young's New York City Office.

Rich manages and supports the New York Office's Real Estate Management Services portfolio of buildings ranging from commercial office and retail properties to industrial and residential assets and educational institutions. Rich is responsible for the day-to-day operations of Avison Young's managed buildings and delivering professional service to our clients.

He also serves on the Executive Committee of Avison Young's U.S. Real Estate Management Services Affinity Group.

Prior to joining Avison Young, Rich was a Senior Property Manager at Cushman & Wakefield. He worked on a number of significant projects, including 1285 Avenue of the Americas, where he supported the $250 million transformation of 900,000 square feet of real estate from back office operations into a new front office headquarters and trading environment for 4,000 employees.

In his 20-plus years in the New York real estate industry, Rich has been assigned to major accounts such as Citibank, UBS and Salomon Smith Barney, serving in Financial Management, Facilities Management and Property Management functions.



## Heather Hernandez | Property Management Point of Contact

**Senior Property Manager**
heather.hernandez@avisonyoung.com | 212 279 6587

Heather Hernandez is a Senior Property Manager in Avison Young's Real Estate Management Services Group based in New York.

Heather is responsible for overseeing the day-to-day management and operations of 211 East 43rd Street, a property managed on behalf of owners Clarion Partners and Alchemy ABR. In the short time that Heather has managed the asset, she is responsible for dismissing over 60 property violations from previous ownership resulting in a cost savings of over $60,000 in fines. She successfully negotiated 0% increases on multi-year service contracts and reduced property repairs by 244% with the implementation of standardized practices and remediating operational inefficiencies. A cost savings in R&M of over $150,000 in just two years.

Prior to joining Avison Young, Heather worked with Related Companies managing The Shops at Columbus Circle at Time Warner Center for over eight years. She then went on to become Vice President of Asset Management for Ashkenazy Acquisitions overseeing their luxury shopping center, commercial and restaurant portfolio throughout the United States. After that, she worked with Nightingale Realty, managing their New York portfolio. In that time, she has managed and coordinated over $50 million in capital improvement projects and tenant buildouts. She specializes in the stabilization and enhancement of properties resulting in overall reduction of expenditures and increased revenue.



**AVISON
YOUNG**

## MANAGEMENT SERVICES AGREEMENT

THIS AGREEMENT, made as of the _____ day of _____, 20___, by and between _____ ("Agent") and the entities executing this Agreement below (as or on behalf of the owners listed in Exhibit A and hereinafter referenced, collectively, as the "Owner").

WHEREAS, Owner is or will be the fee owner of certain real property (the "Property"), as more particularly described on Exhibit A attached hereto and made a part hereof;

WHEREAS, Agent is experienced, through its officers, employees and affiliates in managing commercial rental property; and

WHEREAS, Owner desires to avail itself of Agent's experience to the end that the Property may be managed.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein set forth, Agent and Owner hereby agree as follows:

Section 1.        Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Agent" shall have the meaning provided in the introductory paragraph hereto.

"Agreement" shall mean this Management Services Agreement.

"Approved Budget" shall have the meaning provided in Section 4.3.

"Operating Account" shall have the meaning provided in Section 7.1.

"Term" shall have the meaning set forth in Section 11.1 hereof.

"Hazardous Matter," "Hazardous Waste," and "Hazardous Substance" shall mean any material which may be dangerous to health or to the environment, including without implied limitation all "hazardous matter," "hazardous waste," and "hazardous substances," and "oil" as defined in or contemplated by any applicable federal, state or local law, rule, order or regulation relating to the protection of human health and the environment or hazardous or toxic substances or wastes, pollutants or contaminants, including all of the following statutes and their implementing regulations, as the same may have been amended from time to time:   (i) Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq.; (ii) Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; (iii) Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §136; (iv)Hazardous Materials Transportation Act, 49 U.S.C. §§1801-1812; (v) Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.; (vi) Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq.; (vii) Clean Air Act, 42 U.S.C. §7401 et seq.; (viii) Safe Drinking Water Act, 42 U.S.C. §3808 et seq.; or (ix) Applicable or equivalent laws and regulations of the state in which the

Property is located relating to hazardous matter, substances or wastes, oil or other petroleum products, and air or water quality.

"Owner" shall have the meaning provided in the introductory paragraph hereto.

"Property" shall have the meaning provided in the first recital hereto.

"Property Expenses" shall mean all expenses of operating and maintaining the Property, including (without limitation) utility bills, insurance premiums, mortgage loan payments, management fees and costs, maintenance costs, costs of janitorial and grounds-keeping services, costs of supplies, repairs and other operating expenses representing expenses incurred in the operation and maintenance of the Property.

Section 2.    <u>Appointment</u>.  Owner hereby employs the Agent and the Agent hereby accepts such appointment, on the terms and conditions hereinafter provided, as the sole and exclusive management and operating agent for the Property.  Owner acknowledges that Agent is in the business of the operation and management of commercial real property and that Agent may provide services for other property owners that may be in direct competition with the Property.

Section 3.    <u>Authority</u>.

3.1    <u>General</u>.  Owner hereby authorizes Agent to exercise such powers with respect to the Property as are necessary and appropriate to carry out its duties hereunder.  Agent shall have no right or authority, expressed or implied, to commit or otherwise obligate Owner in any manner whatsoever except to the extent specifically provided herein or specifically authorized in writing by the Owner.  Agent shall have no right or interest in the Property, or any claim of lien with respect thereto, arising out of this Agreement or the performance of its services hereunder.  Agent shall be the agent of Owner solely to perform the duties as set forth in this Agreement.

3.2    <u>Specific Authority</u>. Owner hereby grants to Agent the power and authority to manage and operate the Property; to purchase supplies therefore, to negotiate contracts therefore; to open bank accounts in the name of the Property; to pay on behalf of Owner all Property Expenses set forth in the Approved Budget or otherwise allowed pursuant to this Agreement.  Agent agrees to secure Owner's approval for all extraordinary expenditures that are not included in the Approved Budget, except (a) as otherwise allowed pursuant to this Agreement, (b) expenditures not over $1,000 that are of a routine operational nature, and (c) emergency repairs if such repairs are necessary, in the opinion of the Agent, to protect the Property from immediate risk of damage or to maintain services Owner is required to provide.

3.3    <u>Delegation</u>.  Agent may delegate any of its duties hereunder through employees, agents or independent contractors; provided that Agent shall remain responsible for the selection of such service providers.

Section 4.    <u>Responsibilities of Agent as Property Manager.</u>

4.1    <u>Standards and Compliance with Laws</u>.  Agent will perform its duties and obligations in a professional manner.  Agent agrees that the services provided by Agent at the Property shall be

of a scope and quality not less than those generally performed by professional managers of properties similar in type and quality to the Property which is located within the same city as the Property. Agent shall apply for, obtain, and maintain all licenses and permits required in connection with the management, operation, maintenance and advertising of the Property, and shall, at Owner's expense, but in accordance with the Approved Budget, comply in all material respects with applicable laws, ordinances, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions, boards and offices, any national or local board of fire underwriters, any environmental agency, or any other body exercising functions similar to those of any of the foregoing which may be applicable to the Property and its operation. Agent shall, at Owner's expense and only if in accordance with an Approved Budget or otherwise reimbursable to Agent under this Agreement, promptly remedy any violation of any such law, ordinance, rule, regulation, or order known to Agent to the extent such remedy is in its control and shall promptly notify Owner of any such violation. it being understood that Agent shall in no event be required to advance funds for the remedy of such violation if at such time there are insufficient funds in the Operating Account to pay for such remedy. Agent agrees that during the term of this Agreement it shall (a) cooperate with Owner and (b) use its good faith efforts, skill, judgment, and abilities to supervise and direct the management, operation and maintenance of the Property in accordance with the Owner's requirements and procedures and the Approved Budget.

Agent shall with reasonable diligence endeavor to secure compliance by the tenants of the Property with the terms and conditions of their respective leases. Agent shall perform such other acts as it deems necessary and proper in the discharge of its duties under this Agreement. Agent may obtain services or goods for the Property from direct or indirect affiliates of Agent if such services and goods are at least of equal quality and cost, and otherwise competitive with comparable goods and services in the building management industry, and Agent obtains the prior written consent of Owner in each such instance that Agent plans to obtain services or goods from any such affiliate (which consent may be issued via electronic mail (email) or facsimile and be in the form of a "blanket" authorization for contracts of certain types or amounts).

4.2     Employees; Independent Contractor.    All matters pertaining to the employment, supervision, compensation, promotion and discharge of Agent's employees are the responsibility of the Agent.   Agent shall fully comply with all acts and regulations having to do with workmen's compensation, social security, unemployment insurance, hours of labor, wages, working conditions and other employer-employee related subjects. In performing its services hereunder, Agent shall be an independent contractor and not an employee of the Owner.

4.3     Approved Budgets.  Agent shall prepare and submit to Owner a proposed operating budget, a capital budget in a format approved by Owner (whose approval shall not be unreasonably withheld or delayed), for the operation, repair, maintenance of the Property and the construction of projects with respect to the Property for the calendar year commencing on January 1, following the date of this Agreement and each calendar year thereafter.  The proposed budgets for the succeeding years shall be submitted no later than November 1 of each calendar year thereafter. Owner will review the proposed budgets and then will consult with the Agent in the ensuing period prior to the commencement of the forthcoming calendar year in order to agree on an approved business plan, operating budget and capital budget (collectively the "Approved Budget").  In the event Owner has not approved the proposed budget by the beginning of the next calendar year,

Agent shall utilize the Approved Budget for the previous calendar year, until such time as the proposed budget is approved in writing by Owner, with it being understood that Owner shall, in any event, remain responsible to pay Property Expenses that are not discretionary or controllable, such as taxes, assessments, insurance, utilities, and contracts that have obligations that increase based on increases in the Consumer Price Index (CPI), even if such costs have increased from the previous calendar year.

4.4     Collection of Rents and Other Income.  The Agent shall use reasonable efforts to collect all rents (including escalation billings resulting from tenant participation in increases in expenses, taxes and common area maintenance charges, if provided for in the leases) and other charges which may become due at any time from any tenant or from others for services provided in connection with or for the use of the Property or any portion thereof.  Agent shall collect and identify any income due the Owner from miscellaneous services provided to tenants or the public including, but not limited to, parking income, if applicable.  All monies so collected shall be deposited in the Operating Account.  Agent may not, without the prior written approval of Owner, terminate any lease; lock out a tenant, institute suit for rent or for use and occupancy, or proceedings for recovery of possession. Agent shall not write off any material income items (for this purpose only, material shall mean $500 or more per item) without prior approval of Owner.

4.5     Competitive Bidding.  All contracts for repairs, capital improvements, goods and services for the Property shall be paid for out of the Operating Account unless otherwise instructed by Owner in writing and shall be awarded on the basis of competitive bidding and solicited in the following manner (unless an alternative bidding procedure is requested by Agent and approved by Owner, which approval may be issued via electronic mail (email) or facsimile and be in the form of a "blanket" authorization for contracts of certain types or amounts):

        (a)     To the extent that qualified bidders are available, a minimum of two (2) written bids shall be obtained for each purchase between $5,000 and $7,000 and a minimum of three (3) written bids shall be obtained for each purchase over $7,000.

        (b)     Agent may accept the low bid without prior approval from Owner, if the expenditure is for a budget approved item and will not, at the time of the expenditure, exceed the annual budgeted accounting category of the applicable Approved Budget.

        (c)     Agent may request in writing that Owner waives competitive bidding rules with respect to a particular contract, good, service or Property by its written approval, which approval shall not be unreasonably delayed or withheld by the Owner and which approval may be issued by Owner as provided above in this Section 4.5.

4.6     Maintenance and Repair of Property.  Agent shall maintain or, in accordance with applicable tenant leases, enforce the maintenance of the buildings, appurtenances and grounds constituting the Property in accordance with standards reasonably acceptable to Owner, including within such maintenance, without limitation thereof, interior and exterior cleaning, painting and decorating, plumbing, carpentry, grounds care, and such other normal maintenance and repair work as may be necessary or desirable.  Agent may contract with qualified independent contractors for the maintenance and repair of air-conditioning systems and elevators, and for extraordinary repairs beyond the capability of regular maintenance employees.  Agent will systematically and promptly

receive and investigate all service requests from tenants, take such action thereon as may be reasonably justified, and will keep records of same. Complaints of a serious nature will be reported to Owner after investigation by Agent.

4.7 <u>Capital Improvements</u>. Each Approved Budget shall constitute an authorization for Agent to expend money for all improvements provided therein, including approval of expenditures for all capital improvements set forth in each Approved Budget.

4.8 <u>Service Contracts</u>. Agent shall not enter into any contract for cleaning, maintaining, repairing or servicing the Property or any of the constituent parts of the Property without the prior written consent of Owner, unless included in an Approved Budget. All service contracts shall: (a) be for a term of no more than one (1) year, unless such contract is not economically feasible for a period of one year, and then such contract shall be for the shortest period possible, (b) be in the name of Owner, (c) include a provision for cancellation thereof without payment of a fee or penalty by Owner or Agent upon not more than 30 days' written notice and (d) shall require that all contractors provide evidence of sufficient insurance. Unless Owner specifically waives such requirements, either by memorandum or as an amendment to the contract, all service contracts shall be subject to bid under the procedure as specified in Section 4.5. Provided that the bidding requirements set forth in Section 4.5 and as specified in this Section are followed, Agent may enter into such service contracts for the account of Owner, or in Agent's discretion, present such service contracts to Owner for execution.

4.9 <u>Taxes</u>. The Agent, in cooperation with Owner, shall review bills for real estate and personal property taxes, improvement assessments and other like charges which are or may become liens against the Property and cooperate with owner in the appeal of such taxes. Owner shall be solely responsible for obtaining any necessary lender approvals prior to directing Agent to pursue any such appeals. If Owner hires an independent tax consultant, Agent shall cooperate with such consultant in supplying pertinent data to the consultant. Agent shall pay taxes and mortgages or deeds of trust, if any, from the Operating Account unless otherwise directed. Agent, from funds provided by Owner, shall remit to vendors or the state where the Property is located by self-assessment, or sales tax on all purchases as required by law.

4.10 <u>Preparing and Filing 1099s</u>. The Agent is responsible for maintaining accurate 1099 information as well as preparing and filing 1099s as legally required with respect to any service or construction contracts entered into or administered by Agent hereunder.

4.11 <u>Environmental Disclosure</u>. Agent agrees, to the extent required by law, to disclose to prospective tenants any and all information which Owner has conveyed to Agent regarding the condition of the Property, including but not limited to, the presence and location of Hazardous Matter, Hazardous Waste and Hazardous Substance and underground storage tanks in, on, or about the Property. In addition, Agent agrees to disclose to Owner any and all additional information regarding the Property it acquires while it is the Agent thereof, including without limitation, the presence and location of Hazardous Matter, Hazardous Waste and Hazardous Substances.

4.12 <u>Debts and Liabilities to Third Parties</u>. All debts and liabilities arising in connection with the ownership and operation of the Property are and shall be the obligations of Owner and, provided such debts and liabilities have been incurred in accordance with the terms of this

Agreement, the Agent shall not be responsible or liable for any of such obligations by reason of its management, supervision and operation of the Property for and on behalf of Owner.

Section 5.    Responsibilities of Owner.

5.1    Information.  Owner shall promptly furnish Agent with all documents and records required for the management of the Property, including but not limited to all leases, amendments and correspondence related thereto; the status of rental payments; mortgage loan information and payment instructions; copies of service contracts in effect; and a summary of all applicable insurance policies and Owner's process for handling claims.

5.2    Sufficient Funds.  Owner shall at all times maintain sufficient funds in the Operating Account to enable Agent to pay all obligations of the Property and other obligations provided for herein in a timely manner.  If collections are projected to be insufficient or will not be received in time to satisfy this requirement, Owner shall promptly provide Agent with the necessary funds, in advance.  If Owner has not provided said funds within ten (10) days' after Agent's request therefore, Agent may, at Agent's sole option, terminate this Agreement.  Should a deficit occur in the Operating Account, Agent may, but shall not be required to, advance funds for Owner's account to cover such deficit.  If Agent shall make a payment to the Operating Account due to a deficit occurring therein, upon notification by Agent, Owner shall immediately remit to Agent sufficient funds to remove the deficit and Agent shall thereafter be authorized to draw such funds out of the Operating Account to reimburse itself.

5.3    Property Expenses.  The expense of all employees, contractors and entities retained by the Owner or by the Agent on behalf of the Owner and listed in Exhibit D shall be a Property Expense payable by Owner.  In addition, all costs reasonably and necessarily incurred by Agent in the performance of its duties hereunder shall be a Property Expense for which Owner shall reimburse Agent.

5.4    Obligations under Contracts.  Owner expressly assumes all obligations under any contracts which Agent executes on behalf of Owner under the terms of this Agreement and shall indemnify and hold Agent harmless from all liabilities, costs, and expenses arising in connection with such contracts.  Agent shall not be liable for any failure of performance by any third-party contractor and shall not be liable to Owner for any defects and any workmanship for services rendered by such third-party contractor.

5.5    Owner's Disclosure.  Owner agrees to disclose to Agent any and all information which Owner has regarding the condition of the Property, including but not limited to, the presence and location of Hazardous Matter, Hazardous Waste and Hazardous Substances and underground storage tanks in, on, or about the Property.  Owner agrees to assist Agent in Agent's disclosure of environmental matters to prospective tenants pursuant to Section 4.12.

Section 6.    Insurance.

Owner, at its expense, will obtain and keep in force:

6.1    Property Insurance. All-risk insurance, property insurance and comprehensive boiler and machinery insurance covering all buildings and improvements now existing or hereafter erected upon the Property, with such additional endorsements as may be necessary to include coverage for vandalism and malicious conduct, fire, hail, windstorm, sinkholes, U.S. certified acts of terrorism, floods, water damage, earthquake and debris removal and demolition (with limits deemed appropriate by Agent with respect to such floods, water damage, earthquake and debris removal and demolition coverage) in amounts at least equal to the replacement cost of the buildings and improvements, with deductibles reasonable acceptable to Agent and

6.2    Liability Insurance. Owner will provide commercial general liability insurance coverage (ISO form CG 00 01 01 96 or broader), including umbrella liability insurance with limits of no less than $1,000,000 per occurrence and $10,000,000 in the aggregate. Owner's insurance will include premises/operations, products/completed operations, independent contractors, advertising liability, personal injury liability and contractual liability including the tort liability of another assumed in a business contract. The Owner's insurance will include the Agent, its officers, employees and affiliates as an additional insured (using ISO form CG 20 11 or substitute providing equivalent or broader coverage). Owner hereby waives all rights of subrogation against Agent with respect to losses payable under such policy (ies). All such liability insurance shall be primary and on an occurrence form.

6.3    Special Requirements. The Owner's insurance will include the Agent, its officers, employees and affiliates as an additional insured (using ISO form CG 20 11 or substitute providing equivalent or broader coverage). Owner hereby waives all rights of subrogation against Agent with respect to losses payable under such policy (ies).

At all times during the Term, during the course of any construction or renovation of any improvements or alterations at or on the Property, Owner shall maintain or cause to be maintained builder's risk insurance on all work being performed at or on the Property, in such amounts as Owner may reasonably require to afford one hundred percent (100%) coverage against loss, and owner's contingent or protective liability insurance, covering claims not covered by or under the terms of the above mentioned commercial general liability insurance with limits equivalent to those required in Section 6.2.

All policies required to be carried shall be obtained from responsible companies qualified to do business in the state in which the Property is located and in good standing therein, with a current A.M. Best's rating of 'A-' or better and a Financial Category Class of IX or better.

Owner shall furnish Agent with a certificate of insurance evidencing the coverage's described above and naming Agent, its officers, employees and affiliates as additionally insured. Such certificate must be in a form acceptable to Agent and must provide Agent with no less than thirty (30) days' advance written notice of cancellation or reduced coverage of any of the foregoing required policies. All such policies shall be issued by insurance companies satisfactory to Agent which is licensed in the state where the Property is located.

In the event of a claim covered by this insurance, the Agent shall:

(a) notify Owner and the insurance carrier as soon as reasonably possible after Agent receives notice of any such loss, or injury; and

(b) Prepare and complete Owner's and/or insurance carrier's incident report.

The Agent shall furnish whatever information is requested by the Owner for the purpose of establishing the placement of insurance coverage's and shall aid and cooperate in every reasonable way with respect to such insurance and any loss covered thereunder.

6.4    Agent's Insurance.  Agent shall obtain and keep in force at Agent's expense and shall furnish a certificate of insurance to Owner evidencing the following insurance with the following limits of coverage:

(a) Worker's Compensation - statutory limits;

(b) Employers' Liability - $500,000;

(c) Commercial General Liability - $1,000,000 per occurrence and $2,000,000 aggregate;

(d) Business Auto Liability, including hired and non-owned auto coverage - $1,000,000 combined single limit; and

(e) Umbrella/Excess - $2,000,000 per occurrence and $2,000,000 aggregate.

The certificate shall provide that Owner will be given at least thirty (30) days' prior written notice of cancellation of the policy.  All such policies shall be issued by insurance companies licensed in the state where the Property is located.  Owner will not reimburse Agent for Agent's cost of such insurance or for any and all other coverage's that Agent obtains for its own account, other than workers' compensation insurance for on-site employees. Agent hereby waives all rights of subrogation with respect to losses payable under such policies.

6.5    Subcontractor's Insurance.    Agent shall require that all independent contractors brought onto the Property have insurance coverage at the independent contractor's expense, in the following minimum amounts:

(a) Workers Compensation - statutory limits;

(b) Employer's Liability - $500,000;

(c) Commercial General Liability - $1,000,000 per occurrence and $2,000,000 aggregate;

(d) Business Auto Liability including hired and non-owned auto coverage - $1,000,000 combined single limit; and

(e) Umbrella/Excess - $2,000,000 per occurrence and $2,000,000 aggregate.

This insurance will be primary and noncontributory with respect to insurance outlined in 6.2, 6.3 and 6.4. All such policies shall be issued by insurance companies licensed in the state where the Property is located. Agent shall ensure that Agent and Owner are named as additional insured on the independent contractor's insurance policies listed in Section 6.5 (c), (d) and (e). The independent contractor will be required to waive all rights of subrogation with respect to the Owner and the Agent.

6.6 <u>Certificates of Insurance</u>. Agent shall obtain and keep on file Certificates of Insurance:

(a) For any lease with a tenant that requires that such party maintain any insurance coverage, Agent shall obtain insurance certificates annually, or more frequently, as required, and review the certificates for compliance with such lease or contract terms.

(b) For any independent contractors performing services for Agent on the Owner's premises, Agent must obtain Owner's permission to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous as determined by Agent.

Section 7. <u>Bank Accounts</u>.

7.1 <u>Operating Account</u>. The Agent shall deposit all rents and other funds collected from the operation of the Property, including any and all advance rents, in a bank approved by Owner in a separate or combined account or accounts at the direction of Owner (the "Operating Account") for the Property in the name of: Agent, as agent for Owner. The bank shall be informed in writing that the account and funds therein are held for and owned by the Owner. Out of each account, Agent shall pay the operating expenses of the Property and any other payments relative to the Property as required by the terms of this Agreement. If more than one account is required to operate the Property, each account must have a unique name.

7.2 <u>Access to Accounts</u>. Through the use of signature cards, Agent and other authorized representatives of the Owner shall be permitted access to any and all funds in the bank accounts described in Section 7.1.

Section 8. <u>Financial Reporting and Record Keeping</u>.

8.1 <u>Books of Accounts</u>. Agent, in the conduct of its responsibilities to Owner, shall maintain adequate and separate books and records for the Property, the entries to which shall be supported by sufficient documentation to ascertain that said entries are properly and accurately recorded to the Property. Such books and records shall be maintained by Agent at Agent's office or at such other location as may be mutually agreed upon in writing. Agent shall ensure such control over accounting and financial transactions as is reasonably required to protect Owner's assets from theft, error or fraudulent activity on the part of Agent's employees or other agents. The Agent shall insure that all books and records, documentation, data and other information required to be maintained during the term of this agreement shall be prepared and reported in a timely and accurate manner, and in accordance with required accounting policies and procedures.

8.2    **Monthly Reports**.  The Agent shall prepare and submit to the Owner (i) by the fifteenth (15th) business day of each month the information required under item Exhibit B for the preceding calendar month and all other information Owner may reasonably request with thirty (30) days' advance notice of any additional reasonable reporting request.

8.3    **Supporting Documentation**.  Supporting documentation for all expenditures and financial reports shall be provided as requested by Owner.

8.4    **Accounting Principles**.  All financial statements and reports required by Owner will be prepared in accordance with generally accepted accounting principles.

8.5    **Ownership of Books and Records**.  All books, records, lease and sale information, computer programs provided by Owner, correspondence and property related records are the property of Owner and should be considered confidential and proprietary to Owner.

Section 9.    **Compensation**.

9.1    **Management Fee**.  For the management of the Property, Agent shall receive as compensation the fees as depicted in Exhibit C based on a stated fixed further detailed in Exhibit C. Agent is hereby authorized to withdraw its monthly fee for the prior month from the Operating Account on or after the first day of each month.  Additionally, in any circumstance where Agent is entitled to reimbursement by Owner hereunder, Agent shall be authorized to reimburse itself from the Operating Account if Owner fails to reimburse Agent within ten (10) business days following delivery of a written invoice to Owner.

9.2    **Construction Coordination Fee**.  As additional compensation and in connection with the coordination of any approved construction and capital improvement projects, the amount of additional compensation for those services shall be equal to five percent (5%) for $0 to $250,000, four percent (4%) for $250,000 to $750,000, and three percent (3%) over $750,000, as further detailed in Exhibit C of the total aggregate costs of the project.  Construction and capital projects shall include, but not be limited to, tenant improvement construction, building renovations, roof replacements, exterior structural and waterproofing projects, and common area rehabilitations and capital repairs and replacements not typically performed on an annual or biannual basis.  The fee shall be based on the total costs for the project.  Costs shall include the cost for construction, demolition, installations, related repairs and replacements, evacuations, permits and other such costs for putting improvements into place and the costs of any architect, engineer, designer, consultant or other such professional costs and expenses.  Agent shall be reimbursed direct expenses related to construction coordination.  Such expenses shall include ordinary and reasonable telephone charges, postage and premium mail charges, travel and meals, copying and any other costs incurred in the direct performance of the coordination of construction projects defined herein.

Section 10.    **Non-Discrimination**. Agent shall comply with the provisions of Title VII of the Civil Rights Act of l968, as amended, and Executive Order 11063; Titles VI and VIII of the Civil Rights Act of 1964, and, where applicable, Executive Order 11246, as amended, and any applicable state or local laws prohibiting discrimination. Neither Owner nor Agent shall, in the rental of the Property, in the provision of services, or in any other manner, discriminate against any person on the ground of race, color, creed, religion, sex, national origin, or any other basis prohibited by law.

Section 11.    Term and Termination.

11.1    Term.  The Term of this Agreement shall become effective on the date hereof and shall continue in full force and effect through the last day of the twelfth (12th) month after the date of this Agreement and shall thereafter continue unless terminated in writing by either Owner or Agent upon thirty (30) days' prior written notice.  Notwithstanding any provisions of this Agreement to the contrary, Owner shall have the right at any time to terminate this Agreement, with or without cause, by providing at least sixty (60) days' prior written notice thereof to Agent and Agent shall have the right at any time to terminate this Agreement, with or without cause, for any reason, by providing at least ninety (90) days' prior written notice thereof to the Owner.

11.2    Termination.  In addition to the foregoing, this Agreement may be terminated by Owner or Agent for Cause (as hereinafter defined) or by Owner in the event of the sale or transfer of the Property, provided at least thirty (30) days' prior written notice of such sale is given to Agent.

11.3    Termination of Agent for Cause.  "Cause" for termination of Agent shall mean (i) a default by the Agent in any material respect in the performance or observance of any covenant, or term of this Agreement, provided that the breach shall be material and adverse to the Owner and that the Agent shall fail either (x) to cure, terminate or remove such default within thirty (30) days after written notice thereof from Owner to the Agent, or (y) if such default cannot be cured within the aforesaid thirty (30) day period, then such additional period as may be necessary and appropriate to cure such default (provided Agent has commenced to cure such deficiency within such thirty (30) day period and Agent has provided Owner with a commercially reasonable written timetable to cure such default); or (ii) if the Agent engages in gross negligence or commits intentional fraud.

11.4    Termination of Owner for Cause.  "Cause" for termination of Owner shall mean (i) a default by the Owner in its payment obligations, which default is not cured within thirty (30) days after written notice thereof from Agent; (ii) a default by the Owner in any material respect in the performance or observance of any covenant, or term of this Agreement other than the making of payment, provided that Owner shall fail either (x) to cure, terminate or remove such default within thirty (30) days after written notice thereof from Agent to Owner, or (y) if such default cannot be cured within the aforesaid thirty (30) day period, then such additional period as may be necessary and appropriate to cure such default (provided Owner has commenced to cure such deficiency within such thirty (30) day period and Owner has provided Agent with a commercially reasonable written timetable to cure such default); or (iii) if the Owner commits intentional fraud.

11.5    Effect of Termination.  Upon termination of this Agreement, Agent shall, as soon as practicable, but in no event later than the sixtieth (60th) day after notice of termination is given in accordance with this Article:

(a)    Surrender and deliver to Owner:

(1)    All funds held by Agent in connection with the Property; and

(2)    Any other monies of Owner in possession of Agent or in any bank account.

(b)     Deliver to Owner as received any monies due Owner under this Agreement but received by Agent after the effective date of such termination;

(c)     Deliver to Owner all materials, equipment, tools and supplies, keys, contracts and documents relating to the Property which are owned by Owner, and such other accountings, papers, and records as Owner shall request pertaining to the Property;

(d)     Assign to Owner, without recourse, all of Agent's interest, if any, in such existing contracts relating to the operation and maintenance of the Property; provided that Owner shall be responsible for obtaining any necessary third-party consents with respect to such assignments;

(e)     Vacate any portion of the Property then occupied by Agent as a consequence of this Agreement; and

(f)     Furnish all such information and take all such action as Owner shall reasonably require in order effectuating an orderly and systematic ending of Agent's duties and activities hereunder. Within thirty (30) days after any such termination, Agent shall deliver to Owner any written reports required hereunder for any period not covered by prior reports at the time of termination. With regard to the originals of all papers and records pertaining to the Property, the possession of which are retained by Agent after termination, Agent shall: (i) make the same available for inspection and reproduction by Owner at reasonable times upon request of Owner and at Owner's request; (ii) deliver same into Owner's possession in the event Owner in good faith requires same for use in a legal or quasi-legal proceeding; and (iii) not destroy the same without first offering to deliver the same to Owner.

11.6     Compensation Owed to Agent Upon Termination.     Upon termination, all compensation, reimbursements and any other amounts owed by Owner to Agent shall be paid promptly but in no event later than Agent's fulfillment of its obligations owed pursuant to Section 11.5.

Section 12.     Indemnification.

12.1     Indemnification by the Owner. The Owner agrees to indemnify, defend, and hold the Agent, its officers, directors and employees harmless to the fullest extent permitted by law from and against any and all liabilities, losses, interest, damages, costs or expenses (including, without limitation, reasonable attorneys' fees, whether suit is instituted or not, and if instituted, whether incurred at any trial or appellate level or post judgment) threatened or assessed against, levied upon, or collected from, the Agent, arising out of, from, or in any way related to, the management of the Property, including without limitation any and all liabilities, losses, damages, costs or expenses incurred by the Agent arising out of, from or relating to, any event or occurrence which may have taken place during, prior or subsequent to the term of this Agreement, as well as those arising out of, from or relating to the acts or omissions of Owner. Notwithstanding the foregoing, Owner shall not be required to indemnify the Agent with respect to any liability, loss, damages, cost or expense to the extent suffered as a result of the gross negligence or willful misconduct of the Agent or of the employees of the Agent. Agent shall not be liable for any good faith error of judgment or for any mistake of fact or law, or for anything which it may do or refrain from doing in

good faith and in pursuance of its duties and activities hereunder, except in cases of, and to the extent of, the willful misconduct or gross negligence of Agent or of its employees.

12.2    Indemnification by the Agent.  The Agent agrees to indemnify and hold the Owner, their respective officers, directors and employees harmless to the fullest extent permitted by law from and against any and all liabilities, losses, interest, damages, costs or expenses (including without limitation, reasonable attorneys' fees, whether suit is instituted or not and if instituted, whether incurred at any trial or appellate level or post judgment), threatened or assessed against, levied upon, or collected from, the Owner to the extent arising from the gross negligence or willful misconduct of the Agent or any of the employees of the Agent.  Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner with respect to any liability, loss, damage, and cost or expense to the extent that the same is covered by proceeds of insurance maintained by the Owner or Agent.  In addition, the maximum and aggregate liability and obligation of Agent to Owner arising under or in connection with this Agreement, whatever the claim and for any reason shall be limited to the amount of the Management Fee theretofore received by it under this Agreement.

12.3    Notice of Indemnification.  A party's duty to indemnify pursuant to the provision of this Section 12 shall be conditioned upon the giving of notice by such party of any suit or proceeding and upon the indemnifying party being permitted to assume in conjunction with the indemnitor, the defense of any such action, suit or proceeding in accordance with this Section.

12.4    Third Party Claim Procedure.  If a third party (including, without limitation, a governmental organization) asserts a claim against a party to this Agreement and indemnification in respect of such claim is sought under the provisions of this Section by such party against another party to this Agreement, the party seeking indemnification hereunder (the "Indemnified Party") shall promptly (but in no event later than ten (10) business days prior to the time in which an answer or other responsive pleading or notice with respect to the claim is required) give written notice to the party against whom indemnification is sought (the "Indemnifying Party") of such claim.  The Indemnifying Party shall have the right at its election to take over the defense or settlement of such claim by giving prompt written notice to the Indemnified Party at least five (5) business days prior to the time when an answer or other responsive pleading or notice with respect thereto is required. If the Indemnifying Party makes such election, it may conduct the defense of such claim through counsel or representative of its choosing (subject to the Indemnified Party's approval of such counsel or representative, which approval shall not be unreasonably withheld), shall be responsible for the expenses of such defense, and shall be bound by the results of its defense or settlement of claim to the extent it produces damage or loss to the Indemnified Party.  The Indemnifying Party shall not settle any such claim without prior notice to and consultation with the Indemnified Party and no such settlement involving any equitable relief or which might have a material and adverse effect on the Indemnified Party may be agreed to without its written consent.  So long as the Indemnifying Party is diligently contesting any such claim in good faith, the Indemnified Party may pay or settle such claim only at its own expense.  Within twenty (20) business days after the receipt by the Indemnifying Party of written request by the Indemnified Party at any time, the Indemnifying Party shall make financial arrangements reasonably satisfactory to the Indemnified Party, such as the posting of a bond or a letter of credit, to secure the payment of its obligations under this Section 12 in respect of such claim.  If the Indemnifying Party does not make such election, or having made such election does not proceed diligently to defend such claim, or does not make the financial

arrangements described in the immediately preceding sentence, then the Indemnified Party may, upon three (3) business days' written notice and at the expense of the Indemnifying Party, take over the defense of and proceed to handle such claim in its exclusive discretion and the Indemnifying Party shall be bound by any defense or settlement that the Indemnified Party may make in good faith with respect to such claim. The parties agree to cooperate in defending such third-party claims and the defending party shall have access to records, information and personnel in control of the other party or parties which are pertinent to the defense thereof.

12.5   <u>Remedies Cumulative</u>. Except as otherwise provided herein, the rights and remedies expressly provided herein are cumulative and not exclusive of any rights or remedies which the parties hereto may otherwise have at law or in equity. Nothing herein shall be construed to require any of the parties hereto to elect among remedies.

Section 13.   <u>Miscellaneous</u>.

13.1   <u>Notices</u>. Any notice or other communication required or permitted to be made or given under this Agreement, shall be in writing and shall be deemed to have been received by the party to whom it is addressed: (i) on the date indicated on the certified mail return receipt if sent by certified mail return receipt requested; (ii) on the date actually received if hand delivered or if transmitted by fax (receipt of which is confirmed to sender); (iii) three (3) business days after such notice was deposited in the United States Mail postage prepaid; or (iv) one (1) business day after such notice was delivered to an overnight delivery service, addressed, delivered or transmitted in each case as follows:

<u>If to the Owner:</u>     _____

                                                  _____

                                                  _____

                                                  Attention: _____

                                                  Phone: _____

                                                  Fax: _____

<u>If to the Agent:</u>     _____

                                                  _____

                                                  _____

                                                  Attention: _____

                                                  Phone: _____

                                                  Fax: _____

<u>With a copy to:</u>     Avison Young
                                                  1 S. Wacker Drive, Suite 3000
                                                  Chicago, IL 60606
                                                  Attention: Legal Counsel

Each such notice shall be deemed delivered (a) on the date of transmission with confirmed answer back by fax, and (b) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

13.2     Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which Counterparts together shall constitute one and the same instrument.

13.3     Time is of the Essence.  All dates and times in this Agreement are of the essence.

13.4     Assignment. Neither Agent nor Owner may assign their rights or obligations under this Agreement without the prior written consent of the other.

13.5     Governing Law.  The nature, validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the state where the Property is located.

13.6     Captions.  Captions are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

13.7     Entire Agreement and Amendment.   This Agreement constitutes the entire agreement between the parties hereto related to property management services for the Property and no modification hereof shall be effective unless made by a supplemental agreement in writing executed by all of the parties hereto.

13.8     No Joint Venture.  The Agent shall not be deemed to be a partner or a joint venturer with the Owner, nor shall the Agent have any obligation or liability, in tort or in contract, with respect to the Property, either by virtue of this Agreement or otherwise.

13.9     Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstances, shall be held invalid, the remainder of the Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

13.10   Successors.  Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.

13.11   Pronouns.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

13.12   Attorneys' Fees.  If any party commences an action against the other party to interpret or enforce any of the terms of this Agreement or as the result of a breach by the other party of any terms hereof, the losing (or defaulting) party shall pay to the prevailing party all reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action, including those incurred in any appellate proceedings, and whether or not the action is prosecuted to a final judgment.

13.13   Further Assurances.  Each party agrees to execute and deliver any and all additional instruments and documents and do any and all acts and things as may be necessary or expedient to more fully effectuate this Agreement and carry on the business contemplated hereunder.

13.14   Equitable Remedies.  In the event of a breach or threatened breach of this Agreement by any party, the remedy at law in favor of the other party will be inadequate and such other party, in addition to any and all other rights which may be available, shall accordingly have the right of specific performance in the event of any breach, or injunction in the event of any threatened breach of this Agreement by any party.

13.15   Force Majeure.  Inability of either party to commence or complete its obligations hereunder by the dates herein required resulting from delays caused by strikes, picketing, acts of God, war, governmental action or inaction, emergencies or other causes beyond either party's reasonable control which shall have been timely communicated to the other party, shall extend the period for the performance of the obligations for the period equal to the period(s) of any such delay(s).

13.16   Third Party Rights.  The provisions of this Agreement are for the exclusive benefit of the parties to this Agreement and no other party (including without limitation, any creditor of the Owner or the Agent) shall have any right or claim against the Owner or the Agent by reason of those provisions or be entitled to enforce any of those provisions against the Owner or the Agent.

13.17   Survival.  All covenants, agreements, representations and warranties made herein or otherwise made in writing by any party pursuant hereto shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

13.18   Remedies Cumulative.  The rights and remedies given in this Agreement and by law to a non-defaulting party shall be deemed cumulative, and the exercise of one of such remedies shall not operate to bar the exercise of any other rights and remedies reserved to a non-defaulting party under the provisions of this Agreement or given to a non-defaulting party by law.

13.19   No Waiver.  One or more waivers of the breach of any provision of this Agreement by any party shall not be construed as a waiver of a subsequent breach of the same or any other provision, nor shall any delay or omission by a non-defaulting party to seek a remedy for any breach of this Agreement or to exercise the rights accruing to a non-defaulting party of its remedies and rights with respect to such breach.

13.20   Signage.  The Agent shall have the right to place one or more appropriate signs upon the Property indicating that the Agent is providing management services for the Property.

13.21   Construction.  This Agreement shall be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted.


[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed by their duly authorized officers where applicable and sealed as of the date first above written.

<u>AGENT</u>:

By: _____

_____
Managing Director

<u>OWNER</u>:

By: _____
Print Name: _____
Print Title: _____

**EXHIBIT A**

**PROPERTY DESCRIPTION**

| Building Address | Square Footage |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Total Portfolio | |

# EXHIBIT B

# <u>MONTHLY REPORT</u>

## I.   Operations Reports
- Executive Summary
- Property Visitation Report
- Rent Roll
- Variance Report with Explanations
- Property Condition Report
- Delinquency Report with Explanations

## II.   Financial Statements
- Balance Sheet
- Income Statement
- General Ledger

## III.   Other Schedules
- Management Fee Calculation
- Balance Sheet Detail Report
- Bank Reconciliations
- Cash Receipts Ledger
- A/P Outstanding
- Accrued Expenses Schedule

**EXHIBIT C**

**FEE SCHEDULE**

The Management Fee shall be a fixed amount equal to _____ per annum or _____ per month.

The Management Fee shall be paid in accordance with Section 9.1 of this Agreement each calendar.

In accordance with Section 9.2, the Construction Management Fee shall be calculated with respect to each project, and shall be equal to (see sliding scale) the dollar amount expended in connection with any project, as follows.

> $15,000 to $250,000................................5%
> $250,001 to $750,000.............................4%
> Over $750,000........................................3%

**EXHIBIT D**

**REIMBURSEMENT SCHEDULE**

Owner shall reimburse Agent for the Following costs of assigned personnel

Property Manager _____% of Gross Salary _____
Engineer          _____% of Gross Salary _____

The above costs include salary, benefits and all other associated costs.
Overtime wages will be billed at actual cost differential.

For administrative and property manager visits to the property from the _____ office, costs of travel will be billed per current IRS mileage rates.

95 Madison Avenue

**AVISON**
**YOUNG**

# We look forward to the opportunity of working together

For more information, please contact:

**Arthur Mirante**
Principal, Tri-State President
o: 212 729 1896 | m: 646 732 8120
arthur.mirante@avisonyoung.com

**Rich Hillgardner**
**Director**
Real Estate Management Services
o: 212 729 3708 | m: 516 521 2084
richard.hillgardner@avisonyoung.com

avisonyoung.com
©2021 Avison Young New York, LLC. All rights reserved

# RICH M. HILLGARDNER JR.

37 Narwood Road, Massapequa, NY 11758
516.521.2084 | rootr2000@gmail.com

Resourceful manager and excellent communicator, with a strong background in leading team members to deliver exceptional services and efficient real estate operations. Interface with clients, owners/investors, tenants and business partners at all levels.

## CORE COMPETENCIES

- Expertise in operating and maintaining a first-class facility for both corporate occupier and institutional clients.
- Provide guidance to team in crafting scope of work for service contracts and direct supply and demand management team on developing RFP's, contractor bid review and leveling.
- Oversee all aspects and requirements of client's ISO 14001 environmental and energy management systems in accordance with polices and local, state, and federal regulations and deliver on environmental objectives and initiatives.
- Lead planning and budgeting functions and drive achievement on financial targets and forecasts while minimizing operational risks.
- Responsible for the hiring and development of all levels of property management staff.

## PROFESSIONAL EXPERIENCE

### AVISON YOUNG, Director, New York, NY (May 2018 to Present)

- Responsible for the overall service delivery and customer service and support to our NY-based facilities and institutional/private clients.
- Supervise department, Property Managers, Facilities Managers and building staff while providing oversight and support of day-to-day operations.
- Develop and mentor staff while driving key initiatives to completion.
- Oversee creation of operating and capital budgets, monthly management reports and all Key Performance Indicator reporting required by Client and Master Service Agreements.

### CUSHMAN & WAKEFIELD, Sr. Property Manager, New York, NY (November 2012 to May 2018)

- Responsible for managing all engineering, janitorial, maintenance and repair, and workplace safety of 1.2M sf of New York City real estate at 1285 Avenue of the Americas, 299 Park Avenue and 787 Seventh Avenue.
- Supported the $250M transformation of 900,000 sf of real estate from back office operations into new front office headquarters and trading environment for 4,000 employees at 1285 Avenue of the Americas.
- Assist Design and Construction Department in the planning, developing, executing and close-out of all capital projects in excess of $25M/year in the New York City Campus locations.
- Direct Critical Systems teams to ensure all facility and mission critical maintenance maintains optimal performance and 100% uptime.
- Responsible for customer service delivery on all aspects of client's real estate activities.
- Prepare and manage $16M annual operating budget and approve all spending and budget variance explanations to Sr. Management.

<u>CUSHMAN & WAKEFIELD, General Manager, Stamford, CT</u> (March 2009 to November 2012)

- Managed and directed all base building property operations of 1.1M sf of North American headquarters facilities in Stamford, CT (677 Washington Blvd., 400 Atlantic Street, One Stamford Forum and 29 Federal Street).
- Supervised and directed facility union operating engineers on all maintenance and repair issues.
- Responded to and ensured employee HVAC, janitorial, and other quality of life requests were addressed appropriately.
- Developed, managed, and reported on $20M annual operating budget for Stamford Portfolio.


<u>CUSHMAN & WAKEFIELD, Sr. Financial Manager, New York, NY</u> (November 1999 to March 2009)

- Managed all accounting and financial reporting activities for a global financial services firm. Real estate portfolio consisted of over 5.7M sf of Class A office space.
- Reviewed lease terms and abstracts, supervised the billing and collecting of all rents and escalations, set up rent rolls for new clients, and prepared annual budgets.
- Prepared, reviewed, and analyzed monthly financial reports, including accruals, cash flow and balance sheet analysis, variance explanations and reforecasting for clients and property managers, and conducted monthly presentations to team.
- Met with clients and property managers on a regular basis to discuss property-related issues and initiatives, such as forecasting, leasing, collections and policies.
- Responsible for the administration and billing of management fees related to Cushman & Wakefield's master service agreement with its client.


<u>GUMLEY-HAFT REAL ESTATE, Assistant Controller, New York, NY</u> (October 1996 to October 1999)

- Supervised accounts payable department staff and daily accounting work flow.
- Responsible for the preparation and analysis of monthly financial reports to the clients, including budget variances.
- Monitored the daily cash flow and balances of over 100 accounts for luxury co-op and condominium client buildings.
- Analyzed capital improvement funding and financing alternatives.


<u>EDUCATION, ORGANIZATIONS AND DISTINCTIONS</u>

Florida State University, BS, Finance and Real Estate, dean's list, 1994
Florida State University, Real Estate Society and Mentoring Program Member
US Green Building Council, LEED AP, Certified, April 2015
Building Owners and Managers Association, Southern Connecticut Chapter, Board Member, 2011 to 2012
Building Owners and Managers Institute, Real Property Administrator, Certified, June 2007
Building Owners and Managers Association, New York Chapter, Member, 2000 to Present
Building Owners and Managers Association, New York Chapter, Asset Management Committee Member, 2018 to Present
Occupational Safety and Health Administration, CPR and First Responder Training, Completed
Habitat for Humanity, Long Island Chapter, Volunteer since 2019
Volunteer Youth Football and Baseball Coach in Massapequa programs, 2005 to Present
Proficient in Microsoft Office Suite, Yardi Voyager, MRI, Business Integration Group CMMS, Workspeed, AngusAnywhere, Argus, SharePoint, WebEx and Zoom Meeting

# Heather Alexakis-Hernandez

98-05 67th Avenue, Apt. 4C
Rego Park, NY 11374

heatherd74@hotmail.com
917-640-1343 (Cell)

## WORK EXPERIENCE

**Avison Young**                                                                          12/17-Present
**Sr.  Property Manager**

- Supervised Engineering, Janitorial & Security Departments
- Responsible for the day to day management of property financials including but not limited to the preparation and implementation of the annual budget, cash flow reporting, monthly P&L, variance reports, forecasting and delinquency reports
- Financial responsibilities included the tracking and management of property expenditures and payments for all operational and capital projects
- Coordinated and managed all capital expenditure projects ranging from $10-$20M per property including building renovations and tenant build outs

**Nightingale Realty, LLC**

*Property Manager*                                                                      11/15 – 12/16

- Responsible for overseeing the New York portfolio comprised of 580,000sf commercial class A office & commercial & luxury retail
- Monitored loan compliance and coordinated monthly cash reserve lender requests
- Performed routine property inspections and maintain compliance with all applicable government regulations
- Administered and maintained Tenant and Vendor Certificates' of Insurance
- Actively participated in the collections process by regularly communicating with tenants, monitoring arrears and issuing default letters as needed
- Provided additional services to tenants and enhanced work order revenue
- Engaged contractors and technical expertise to service the property
- Solicited, negotiated and administered service contracts
- Responsible for onsite building tours

**Ashkenazy Acquisitions (Jones Lang LaSalle)**

*Vice President, Asset Management*                                               6/14 – 11/15

- Responsible for the fiscal, marketing and operational performance for over 1 million square feet of assets within the companies iconic portfolio comprised of luxury and commercial retail, commercial class A office, parking and residential properties
- Monitored, and supervised property managers and their related day to day responsibilities
- Conducted routine meetings, site visits and/or conference calls with property management to discuss asset-level strategies, tenant and/or vendor related matters as well as operational issues
- Responsible for overseeing tenant and capital improvement projects ranging from $10-$30M per property
- Monitored and identified opportunities to increase revenue while reducing expenditures
- Analyzed utility infrastructures and strategized opportunities to increase revenue stream and eliminate inefficiencies
- Supervised and/or negotiated new tenant deals, lease renewals, tenant disputes, A/R collection and litigation cases
- Negotiated and leased specialty tenants, short term leases and kiosks
- Monitored and analyzed tenant sales on a monthly basis
- Responsible for overseeing the negotiation of project contracts at the local level
- Worked closely with third (3rd) party brokers to establish leasing goals and support leasing efforts
- Prepared and presented investor budgets, business plans, monthly, quarterly and annual reporting
- Responsible for the oversight and verification of construction draw process including, requisition review, anticipated cost report, budget tracking, use of contingency, lien waivers and disbursement tracking
- Collaborated with in-house and external counsel towards various objectives
- Oversaw marketing campaigns and budgets for designated properties
- Rewarded and recognized performance and executed on progressive discipline, as needed
- Liaison to city agencies and community outreach programs
- Provided corporate visibility through membership and participation in various professional, civic and business organizations
- Former Board member for the Waterfront Partnership Management Authority: Baltimore, MD

# Heather Alexakis-Hernandez

98-05 67th Avenue, Apt. 4C
Rego Park, NY 11374

heatherd74@hotmail.com
917-640-1343 (Cell)

**Related Companies (The Shops at Columbus Circle at Time Warner Center)**    7/06 – 6/14
*Operations Manager*

- Responsible for overseeing 368,000sf of commercial luxury retail with a $40 million portfolio
- Supervised Engineering, Hospitality, Janitorial & Security Departments
- Responsible for the day to day management of property financials including but not limited to the preparation and implementation of the annual budget, cash flow reporting, and the monthly P&L variance reports
- Financial responsibilities included the tracking and management of property expenditures and payments
- Responsible for determining qualitative milestones and objectives for the property
- Coordinated and managed all capital expenditures
- Responsible for the selection and final award of contract services, vendor negotiations, and overall monitoring of vendor performance to assure full compliance with standards established within the service agreements
- Developed and implemented new Landlord protocols/procedures to enhance communication with tenants
- Developed an online tenant portal
- Supervised all tenant related matters including build-outs and renovations
- Responsible for emergency response and business continuity planning
- Performed routine property inspections and maintained compliance with all applicable government regulations
- Responsible for the leasing of retail storage units
- Developed and implemented staffing plans and promoted continuous education for all on-site personnel
- Established goals and objectives for the performance of on-site staff in meeting objectives in a timely and efficient manner; Conducted weekly staff meetings to discuss/review overall property operations
- Prepared employee evaluations and made promotion/compensation recommendations according

**LLNS**    4/03 – 6/06
*Executive Assistant to the Chairman, President and Executive Directors*

- Prepared extensive personal/business travel scheduling (domestic and international)
- Planned and scheduled office events
- Exhibited negotiation and problem resolution skills daily
- Demonstrated ability to work both independently and as a team player; interacted with high level clients

**Reckson Associates Realty Corporation**    7/99 – 4/03
*Assistant Portfolio Asset Manager*

- Created, prepared and maintained Excel Monthly Management Reports
- Coordinated and provided assistance in the preparation and assembly of the Annual Business Plan
- Tracked and reported collection issues
- Printed and analyzed the expenses in the General Ledger for coding accuracy
- Managed portfolio expenditures and prepared monthly P&L variance reports
- Created and prepared accounting procedure manuals for the On-site Management Staff throughout portfolio

**TGM Associates L.P.**    6/97 – 6/99
*Administrative Assistant to the Accounting Department*

- Prepared documentation to open, close and amend bank accounts and signatory records
- Maintained monthly logs and master files for all bank and mortgage related information
- Maintained daily log of cash deposits; Created and prepared monthly intercompany billings
- Prepared and transmitted wire transfers daily; performed bank reconciliations; quarterly mailings & reporting
- Assisted in the assembly of the annual budget; input budget and journal entries; maintained the general ledger
- Coordinated Federal and State tax returns
- Provided support for the annual audit; maintained database for new and existing accounts
- Prepared and coordinated legal, insurance and mortgage confirms

# Heather Alexakis-Hernandez

98-05 67th Avenue, Apt. 4C
Rego Park, NY 11374

heatherd74@hotmail.com
917-640-1343 (Cell)

**EDUCATION**

**Baruch College: BBA Operations Management**
Overall GPA 3.7; Major GPA 3.9

Dale Carnegie Certificate Programs:
Effective Communication and Human Relations;
Advanced Courses in Team Building and Leadership Skills

**SKILLS**
Proficient in Outlook, PowerPoint, Excel, Microsoft Word
Knowledge of accounting programs including IBS, Skyline, Mainframe, CMS Open, MRI (SIM) and JDE;

Notary Public



# An introduction to Avison Young

AVISON YOUNG

**Avison Young creates real economic, social, and environmental value, powered by people.**

AVISON
YOUNG



# At Avison Young, we believe in creating positive impact wherever we go.

There is a vital role for commercial real estate to create healthy, productive workplaces for employees, cities that are centres of prosperity for its citizens, and built spaces and places that create a net benefit to the economy, the environment and the community.

Our nimble, agile team has global insight, local market expertise and access to some of the smartest technology in the commercial real estate industry – all at the ready to work on creating your competitive advantage.

As a private company, you will collaborate with an empowered partner who is invested in your success as much as you are.

# Real estate for real impact

Avison Young is built on the belief that commercial real estate isn't just about the buildings and the square footage and the occupancies. At its best it's about **spaces and places** that improve lives and help businesses thrive for the employees, citizens and communities that make impact matter.

 The service breadth to meet any need

 The people to make it happen

 The scale to make it count

 The values to make it matter



# Services

All the services you expect combined with the human capital you need to achieve your goals.



## For investors

Agency Leasing

Capital Markets

Consulting Services

Debt and Mortgage Services

Investment and Asset Management

Investor Project Management

Net Lease

Property Management

Valuation and Advisory Services



## For occupiers

Consulting Services

Facility Management

Occupier Project Management

Occupier Solutions

Occupier Valuation & Advisory Services

Tenant Representation

Transaction Management

## Sectors

Flexible Solutions

Hospitality

Industrial

Multi-Family

Office

Retail

# Global presence



**5,000** real estate professionals

**14** countries

**400 msf** under property management

**100+** offices

Bulgaria
Canada
Czech Republic
France
Germany

Hungary
Israel
Korea
Mexico
Poland

Republic of Ireland
Romania
United Kingdom
United States

Korea

# Built to serve you, wherever you are

## 2008 - 2009



### Strengthen the core

Roll up Canada-based offices of top-tier commercial real estate brand and hired leading global CEO.

Launch five-year plan to "play offense" and significantly grow the business during a period of historic industry displacement.

## 2010 - 2012



### Build out US platform

Enter US market and build major market presence in Chicago, Washington, DC, Atlanta, Dallas, Houston, Los Angeles, New York, & San Francisco.

Begin opportunistic expansion into secondary markets.

## 2013 - 2018



### Launch overseas, in-fill services

Open offices in UK, Germany, Mexico, Romania.

Add in-fill geographically and by service line capabilities, including hospitality.

## 2019+



### Expand internationally, enhance services

Open new and in-fill service line capabilities in Europe and Asia.

Continue to add top talent and key services globally and enhance integrated occupier and investor service offerings.

# AVANT
by AVISON YOUNG

## Making cities and location-based decisions more transparent and efficient

Leverage real-time micro data and macro analytics wrapped in modern technology to make efficient and informed decisions.

AVANT makes key market data more accessible and understandable, allowing clients to make informed, strategic decisions and realize the full potential of their real estate.

☐ Grounded in a data-first and data-always mindset

☐ Wrapped around human, modern and digestible technology

☐ Focused on making cities and our clients' real estate strategies more transparent, efficient and productive



Analytics

Cities

Mobile

Occupier Leasing

Web



See it in action



# ESG and wellness

## Value for clients and communities

ESG and Wellness at Avison Young is delivered through a combination of dedicated professionals, services, online training and support, executive oversight and a Global Citizenship Affinity Group to imbed best practices, programs and transparent reporting of results into the heart of the organization.

Through this approach, we work to effect change through ESG and Wellness at a human scale to help create healthy, productive, prosperous spaces and places that deliver a net benefit to the economy, the environment and the community.



# A framework aligned to global standards

We prioritize our resources and policies and accountability using universally adopted frameworks.

The UN SDGs are the world's blueprint to achieve a better and more sustainable future for all. They address urgent global challenges, including building resilient communities, and addressing inequalities, climate change and environmental degradation.

We've identified eight SDGs where we believe we can make our greatest contribution – focusing on clean energy and climate action; good health and social justice; and sustainable cities and responsible consumption.





# Our partnership, at work for you

The **firm's equity** is in the hands of a broad base of principals.

Unique ownership structure that creates the incentive for internal collaboration and **aligns our solutions with client objectives.**

**Intelligent solutions** that deliver a better client experience and better results.

# We're different.






**Attractive**

and differentiated ownership structure



**Global Coverage**

and expanding into more markets

**Unique**

client-centric model

**Experienced**

management team

# What could we do in collaboration with you?

AVISON
YOUNG

# EXHIBIT F



**Olmstead Properties** INC.

Management, Leasing, and Consulting

575 Eighth Avenue
New York, NY 10018
212.564.6662
Fax: 212.564.6667
www.olmsteadinc.com

June 10, 2021

Mr. Michael Sklar
161 West 75th Street
New York, New York 10023

RE: **95 MADISON AVENUE, NEW YORK, NY, 10016**

Dear Michael,

It was a pleasure meeting with you to discuss 95 Madison Avenue. Thank you for the opportunity to submit a proposal for the management and leasing of 95 Madison Avenue.

Olmstead Properties has been an Owner/Manager of commercial real estate in New York metropolitan area for over ninety years. We currently own and mange in excess of four million square feet.

Our strategy on your property would be to act as a "Surrogate Owner", creating value by getting the building leased, enhancing the overall operation of the building, and ensuring that the building develops the reputation as the "Best Building on the Block"

Our approach to property management and leasing begins and ends with the Owner's objectives. The Owner's short and long-term objectives in the areas of financial requirements, marketplace positioning, and corporate image drive our approach to all aspects of leasing and property management.

Our strategy can be summarized as follows:

- Providing Tenant services and fostering good Landlord/Tenant relations.
- Providing efficient Lease administration.
- Enhancing the property's "curb appeal".
- Evaluation building systems and operational procedures.
- Ensuring efficient contract bidding and vendor performance.
- Implementing preventative and recurring maintenance plans.
- Evaluating capital spending plans.
- Ensuring Local Law compliance.
- Evaluating and implementing security and life safety procedures.
- Evaluating and implementing a leasing campaign and to lease up the building.



We are different from other management companies in distinct ways:

- Our philosophy on how a property should be leased and managed. By having one person responsible for overseeing the project allows for relationships to grow and the ownership to always know that they have one person (who is supported by the rest of the team) to be their direct contact person.
- Our proven track record of efficiently taking over the leasing and management of a project and ensuring that the transition is painless from both the tenants perspective, as well as ownership's.

Feel free to visit our website, www.olmsteadinc.com for further information about our company and our portfolio. We greatly appreciate your consideration of our services and look forward to hearing from you.

Sincerely,

**OLMSTEAD PROPERTIES, INC**

By: _____
Samuel W. Rosenblatt
President

By: _____
Steven H. Marvin
Executive Managing Director

Form MA 4/90
(Blank Rate)

| |
|---|
| **Standard Management Agreement**<br>Issued by<br>**Management Division**<br>**The Real Estate Board of New York, Inc.**<br>Copyright 1975. All Rights Reserved. Reproduction in whole or part prohibited. |

**Agreement** made this 10ᵗʰ day of June 2021, between _____ LLC

**PARTIES**

Hereinafter designated as "Owner"

and Olmstead Properties, Inc. 575 Eighth Avenue, Suite 2400, New York, NY 10018,

Hereinafter designated as "Agent"

## WITNESSETH:

In consideration of the mutual promises and covenants herein contained, Owner and Agent agree as follows:

### ARTICLE I.

**EXCLUSIVE AGENCY**

Owner hereby appoints Agent as the sole and exclusive renting, sale and management agent of Owner's property known as 95 Madison Avenue.

### ARTICLE II.

**RENTING OF PREMISES**

(a) Agent shall use its best efforts in disposing of vacant space, and in keeping the premises rented to desirable tenants, and to this end is hereby authorized on behalf of Owner to enlist the services of other real estate brokers.

**ADVERTISING AND SIGNS**

(b) Subject to Owner's approval and at Owner's expense, Agent shall advertise the premises or portions thereof, prepare and secure renting signs, renting plans, circular matter and other forms of advertising.

**AGENT TO NEGOTIATE LEASES**

(c) All inquiries received by Owner for sale of the property or for any leases or renewals or agreements for the rental or operation of the premises or any part thereof shall be referred to Agent, and all negotiations connected therewith shall be conducted solely by or under the direction of Agent.

**COLLECTION OF RENT**

(d) Agent shall use its best efforts in the management of the property and due diligence in collecting the rents and other income therefrom.

**LEGAL PROCEEDINGS**

(e) Agent may, in the name of and at the expense of Owner, institute any and all legal actions or proceedings for the collection of rent or other income from the property or the ousting or dispossessing of tenants or other persons therefrom, and such expense may include the engaging of counsel approved by Owner for any such matter.

**REPAIRS**

(f) Agent is authorized, in the name of and at the expense of Owner, to make or cause to be made such ordinary repairs and/or alterations to the premises as may be advisable or necessary, and to purchase such supplies as may be advisable or necessary. The expense to be incurred for any one item of alteration or repair shall not exceed the sum of $10,000.00, unless authorized by Owner, except under such circumstances as Agent shall deem to be an emergency. Agent shall allow to Owner any rebate or discount which Agent shall obtain.

**SERVICE CONTRACTS**

(g) Agent is authorized, in the name of and at the expense of Owner, to make contracts for electricity, gas, steam, telephone, window cleaning, vermin extermination, and other services or such of them as Agent shall deem advisable.

**EMPLOYEES**

(h) Agent agrees in behalf of Owner to supervise the work of, and to hire and discharge employees. Agent agrees to use reasonable care in the hiring of such employees. It is expressly understood and agreed, however, that all employees are in the employ of Owner solely and not in the employ of Agent and that Agent is in no wise liable to employees for their wages or compensation nor to Owner or others for any act or omission on the part of such employees.

**MONTHLY STATEMENTS**

(i) Agent shall render to Owner a monthly statement of receipt and disbursements remitting any balance shown to be due Owner. The disbursements shall include the compensation of Agent on the basis hereinafter provided.

**REIMBUREMENT OF AGENT**

(j) Owner shall reimburse Agent promptly for any monies which Agent may elect to advance for the account of Owner. Nothing herein contained, however, shall be construed to obligate Agent to make any such advances.

**SEPARATION OF OWNER'S MONIES**

(k) All monies received by Agent for or on behalf of Owner (less any sums properly deducted by Agent pursuant to any of the provisions of this Agreement) shall be deposited in a bank in a special account maintained by Agent for the deposit of monies of Owners and not mingled with the funds of Agent.

**BONDING EMPLOYEES**

(l) Agent's employees who handle or are responsible for Owner's monies shall be bonded by a fidelity bond.

**INTEREST AND TAX PAYMENTS**

(m) Agent shall not pay interest or amortization on mortgages, taxes, assessments, water charges or premiums on insurance, unless Owner in writing expressly directs Agent so to do.

**SPECIAL SERVICES**

(n) (1) In connection with Unemployment Insurance and Social Security taxes, Agent will not perform any services beyond the furnishing of a copy of the payroll, unless specifically instructed by Owner to prepare additional reports, in which event Owner shall pay to Agent an additional fee of all out-of-pocket costs incurred per employee per month, but not less than all out-of-pocket costs incurred per building month.

(n) (2) If it becomes advisable or necessary to make extraordinary repairs or engage in extensive reconstruction or rehabilitation of the premises or any part thereof, or if Agent is called upon to perform any extraordinary services not customarily a part of the usual services performed by a managing agent, it is agreed by the parties hereto that Agent shall receive an additional fee of 5% of the cost of the work for any construction or renovation work required herein in excess of $100,000 per project.

**SAVE HARMLESS**

### ARTICLE III.

**REIMBURSEMENT**

(a) Owner agrees: (1) To hold and save Agent free and harmless from damages or injuries to person or property by reason of any cause whatsoever either in and about the premises or elsewhere when Agent is carrying out the provisions of this contract or acting under the express or implied directions of Owner; (2) To reimburse Agent upon demand for any monies which the latter is required to pay out for any reason whatsoever, either in connection with, or as an expense in defense of, any claim, civil or criminal action, proceeding, charge or prosecution made, instituted or maintained against Agent or Owner and Agent jointly or severally, affecting or due to the condition or use of the premises, or acts or omissions of Agent or employees of Owner or Agent, or arising out of or based upon any law, regulation, requirement, contract or award relating to the hours of employment working conditions, wages and or compensation of employees or former employees of Owner, or otherwise: (3) to defend promptly and diligently, at Owner's sole expense, any claim, action or proceeding brought against Agent or Agent and Owner jointly or severally arising out of or connected

Please Initial: Owner:_____ Agent:_____

with any of the foregoing, and to hold harmless and fully indemnity Agent from any judgment, loss or settlement on account thereof. It is expressly understood and agreed that the foregoing provisions of this article shall survive the termination of this Agreement, but this shall not be construed to mean that Owner's liability does not survive as to other provisions of this Agreement. Nothing contained in subdivision (1) and (2) of this article shall relieve Agent from responsibility to Owner for gross negligence.

**COMPLIANCE WITH LAWS**    (b) If Owner shall fail or refuse to comply with or abide by any rule, order, determination, ordinance or law of any Federal, State or Municipal Authority, Agent upon giving twenty-four hours' written notice mailed to Owner at its address first hereinabove set forth, may terminate this Agreement.

**INSURANCE**    (C) Owner agrees to carry public liability, elevator liability, steam-boiler, workmen's compensation, payroll hold-up insurance, superintendent's fidelity bond and such other insurance as may be necessary for the protection of the interests of Owner and Agent. In each such policy of insurance Owner agrees upon request to designate Agent as a party insured with Owner; the carrier and the amount of coverage in each policy shall be mutually agreed upon by Owner and Agent. A certificate of each policy issued by the carrier shall be delivered promptly to Agent by Owner.

### ARTICLE IV.

**GENERAL**    Agent is clothed with such other general authority and powers as may be necessary or advisable to carry out the spirit and intent of this Agreement.

### ARTICLE V.

**AGENT'S COMPENSATION**    Owner agrees to pay Agent the following compensation which has been negotiated between owner and Agent:

   (1) (a) For Management: Three percent (3%) monthly of all amounts due and collected, but no less than Twenty Thousand Dollars ($20,000.00) per month.

   (b) For services rendered in connection with labor union relations, and in the computation of withholding taxes, hospitalization and group life insurance, New York State Disability Insurance and the like, Agent shall receive an additional fee for all out-of-pocket costs incurred per employee per month.

   (c) It is understood that the foregoing shall be in addition to reimbursements to Agent for any expenses incurred by Agent for Owner, pursuant to Article (f).

**Rider to be added**    (2) For Renting or Sale: On any new lease and on any renewal or extension of lease or continuation of tenancy upon a statutory or month to month basis or on a sale, a commission in accordance with the rates and rules attached hereto and made a part hereof.

### ARTICLE VI.

**RENEWAL**    (a) This agreement shall become effective on the 1st day of July 2021 and shall continue in full force and effect until the 30th day of June 2023. Thereafter it shall continue in full force and effect, from month to month unless either party hereto shall serve written notice of cancellation personally or by registered or certified mail sent to the ad-dress first hereinabove set forth, in which event this Agreement shall terminate thirty days after the service of such notice.

**SALE**    (b) Anything in this article to the contrary notwithstanding, in the event of a bona fide sale or demolition of property, Owner may terminate this Agreement upon not less than thirty days' notice served in the manner hereinabove set forth.

**BANKRUPTCY**    (c) In the event a petition in a bankruptcy is filed by or against either Owner or Agent, or in the event that either shall make an assignment for the benefit of creditors or take advantage of any insolvency act, either party hereto may forthwith terminate this Agreement without notice.

**PENDING NEGOTIATONS**    (d) Upon and after the termination of this Agreement by reason of the provisions of subdivisions (a) or (b) of this Article VI, Owner shall recognize Agent as the broker in any pending negotiation for a lease of said premises, or any part thereof, whether being carried on by Agent or an outside Broker, and in the event of the consummation thereof Owner shall pay to Agent a commission therefore at the rate prescribed in Article V hereof.

   (e) Either party may designate a different address for the service of notices pursuant to this Agreement by serving written notice to such effect upon the other by registered mail.

### ADDITIONAL PROVISIONS

SEE ATTACHED RIDER

   This Agreement shall be binding on the parties hereto, their heirs, executors, administrators, successors and assigns, and may not be changed orally but only by a writing signed by the party to be charged thereby.

   **In Witness Whereof**, the parties hereto have executed this Agreement and have affixed their seals hereunto the day and year first above written.

_____

By: _____

**Olmstead Properties, Inc.**

By: _____
     Samuel W. Rosenblatt
     President

Please Initial: Owner:_____ Agent:_____

# Rider To Management Agreement Between

_____

### And
## Olmstead Properties, Inc.

Agent shall receive the following compensation for its duties hereunder:

1.  For any lease executed with a tenant not then occupying space in the premises, a commission, payable on the first day of the month following the date on which such tenant actually occupies such space pursuant to a fully executed lease and commences to pay rent under such new lease, at the following rates:

    a)  For leases in which there is no outside broker, at 100% of the rates set forth in Schedule A annexed hereto and made part of hereof.

    b)  For leases in which a broker not in the employ of Agent (outside broker) is due a commission, at 150% of the rates set forth in Schedule A; provided, however, that one full commission shall be paid to the outside broker, and 1/2 of one full commission shall be retained by the Agent.

2.  For leases executed with a then existing tenant:

    a)  For additional space in the premises, a commission in the amount of 100% of the rates set forth in Schedule A hereto.

    b)  The commission due pursuant to any lease renewal of an existing tenant shall be computed at 50% of the rates stipulated in Schedule A herein.

3.  All leases shall require prior written approval of Owner.

### Schedule A

**Leases**

| | |
|---|---|
| On the first and second years | 5% |
| The third year | 4% |
| The fourth, fifth, sixth, and seventh years | 3% |
| The eighth year and beyond | 2% |
| For selling furniture, fixtures, and/ or good will | 10% |

**SALES**

| | |
|---|---|
| For selling or exchange real estate on the selling price, up to and including $500,000.00 | 6% |
| On the excess above $500,000.00 | 2% |