**Presentment Date: August 26, 2022 at 10:00 a.m. (E.T.)**
**Objection Deadline: August 23, 2022 at 4:00 p.m. (E.T.)**

Andrew K. Glenn
Shai Schmidt
Rich Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1125 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 358-5600

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
| | ) |
| Debtor. | ) |
| | ) |

**NOTICE OF PRESENTMENT OF APPLICATION OF DEBTOR NINETY-FIVE MADISON COMPANY, L.P. FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE  RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER AND SALES AGENT *NUNC PRO TUNC* TO AUGUST 18, 2022**

**PLEASE TAKE NOTICE** that on August 19, 2022, Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor and debtor in possession in this Chapter 11 case, submitted the *Application of Debtor Ninety-Five Madison Company, L.P.  for an Order Pursuant to 11 U.S.C §§ 327(a) and 328(a) Authorizing the Retention and Employment of Branton Realty Services LLC as Real Estate Broker and Sales Agent Nunc Pro Tunc to August 18, 2022* (the "Application").

**PLEASE TAKE FURTHER NOTICE** that the Application will be presented to the Honorable David S. Jones, United States Bankruptcy Judge for the Southern District of New York (the "Court"), for signature on August 26, 2022 at 10:00 a.m. (E.T.).

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Application shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and all General Orders applicable to Chapter 11 cases in this Court; (c) be filed with the Clerk of the Court in accordance with the customary practices of the Court and General Order M-399 (with a courtesy copy delivered to the Chambers of the Honorable David S. Jones, United States Bankruptcy Judge); and (d) be served upon and received by (i) counsel to the Debtors, Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, NY 10036 (Attn: Andrew K. Glenn, Shai Schmidt, Rich Ramirez and Naznen Rahman); (ii) the Office of the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Richard Morrissey, Esq.); (iii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (iv) any other party-in-interest entitled to notice of this Application, in accordance with General Order M-399, no later than August 23, 2022, at 4:00 p.m. (E.T.) (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no objection is filed and served by the Objection Deadline, there will be no hearing and the relief requested in the Application may be granted.

**PLEASE TAKE FURTHER NOTICE** that if an objection is filed and served by the Objection Deadline, a hearing (the "Hearing") will be held to consider the Application before the Honorable David S. Jones, United States Bankruptcy Judge. The Court will notify the moving and objecting parties of the date and time of the Hearing.

**PLEASE TAKE FURTHER NOTICE** that the Application has been filed electronically with the Clerk of the Court and may be reviewed by all registered users of the Court's website at: http://www.nysb.uscourts.gov.

Dated: August 19, 2022
New York, New York

NINETY-FIVE MADISON COMPANY, L.P.,
Debtor and Debtor-in-Possession

By: /s/ *Andrew K. Glenn*
Andrew K. Glenn
Shai Schmidt
Rich Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 358-5600
E-mail: aglenn@glennagre.com
         sschmidt@glennagre.com
         rramirez@glennagre.com
         nrahman@glennagre.com

*Counsel to the Debtor*

Andrew K. Glenn
Shai Schmidt
Rich Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 358-5600

*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |

**APPLICATION OF DEBTOR NINETY-FIVE MADISON COMPANY, L.P.**
**FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a)**
**AUTHORIZING THE RETENTION AND EMPLOYMENT OF**
**BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER**
**AND SALES AGENT *NUNC PRO TUNC* TO AUGUST 18, 2022**

Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor in this Chapter 11 case (the "Chapter 11 Case"), respectfully submits this application (the "Application") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, pursuant to Sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), authorizing the Debtor to employ and retain Branton Realty Services LLC ("BRS") as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 18, 2022 .

In support of this Application, the Debtor relies upon the declaration of Woody Heller (the "Heller Declaration"), attached hereto as **Exhibit B**, incorporated herein by reference, and respectfully states as follows:

## JURISDICTION, VENUE, AND STATUTORY BASES FOR RELIEF

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory predicates for the relief requested herein are Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1.

## RELEVANT BACKGROUND

3. On March 22, 2021, the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4. The Debtor is operating its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors have been appointed.

5. The Debtor is the fee simple and title owner of a commercial building located at 95 Madison Avenue, New York New, York 10016, which is subject to a lease among the Debtor and Vitra, Inc. (the "Property" and "Vitra," respectively).

6. Additional background information on the Chapter 11 Case is set forth in the *Declaration of Rita A. Sklar Pursuant to Local Bankruptcy Rule 1007-2* [Dkt. No. 13].

7. The Debtor commenced the Chapter 11 Case due to a systemic problem of lack of liquidity, legal judgments, and litigation expenses that were vastly disproportionate to its ability to service such obligations. To address those issues, the Debtor filed a plan of reorganization (as

may be modified, amended, or supplemented, the "Plan") [Dkt. No. 82] on September 12, 2021

that contemplated that the Debtor would obtain exit financing that would be (i) secured by the

Debtor's interest in the Property and (ii) sufficient to pay all of the Debtor's creditors, including

Vitra, in full. *See* Plan at III.A.  To assist the Debtor in obtaining financing, the Debtor retained a

broker[1] to source exit financing and a law firm[2] to assist with the documentation for such financing.

8.     However, due to challenges posed by the ongoing COVID-19 pandemic and the

sustained downturn in the commercial leasing market, the Debtor subsequently decided not to

move forward with such financing.  Instead, given the current market climate, the Debtor made

the decision in its business judgment to proceed with a sale or other disposition of all or a portion

of the Property (a "Sale Transaction") to an outside buyer (a "Buyer").[3]  The Debtor intends to file

an amended Plan when its exit strategy is finalized.

9.     The Debtor believes the retention of BRS as its real estate broker and sales agent

will enable the Debtor to effectuate a prompt Sale Transaction and obtain the highest and best

value for the Property.

## RELIEF REQUESTED

10.     By this Application and for the reasons set forth herein, the Debtor seeks entry of

the Proposed Order, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy

---

[1]     *See Application of Debtor Ninety-Five Madison Company, L.P. for an Order Pursuant to 11 U.S.C §§ 327(a) and 328(a) Authorizing the Retention and Employment of Cushman & Wakefield as Mortgage Broker* Nunc Pro Tunc *to September 7, 2021* (the "Cushman & Wakefield Retention Application") [Dkt. No. 104] and order approving the Cushman & Wakefield Retention Application [Dkt. No. 122].

[2]     *See Application of Debtor Ninety-Five Madison Company, L.P. for Entry of an Order Authorizing the Retention and Employment of Rosenberg & Estis, P.C. as Special Counsel to the Debtor* Nunc Pro Tunc *to February 18, 2022* (the "Rosenberg & Estis Retention Application") [Dkt. No. 150] and order approving the Rosenberg & Estis Retention Application [Dkt. No. 153].

[3]     The Engagement Agreement provides that a sale of the Property includes, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction by which the Debtor's interest in the Property is transferred to an unaffiliated third party for consideration.

Rule 2014, and Local Rule 2014-1:

    a.    authorizing the employment and retention of BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 18, 2022;

    b.    approving the terms of BRS's employment and retention, as memorialized in that certain engagement agreement dated August 1**8**, 2022 (the "Engagement Agreement"), attached as **Exhibit 1** to the Proposed Order, including the Fee Arrangement (as defined below) and the Indemnification Provisions (as defined below) set forth in the Engagement Agreement; and

    c.    modifying the timekeeping requirements of Local Rule 2016-1 and the *General Order M-447 Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated January 29, 2013* (the "Fee Guidelines"), and any other applicable procedures and orders of the Court in connection with BRS's engagement.

## BRS'S QUALIFICATIONS

11.    Woody Heller founded BRS based on his over 35 years of experience in the real estate and investment sales business in New York and other major national markets. BRS offers services specializing in the office, residential, specialty retail, and development sites sectors, in addition to provides services related to structured participating and/or convertible mortgages, equity joint ventures, sales of partial interests, and equity recapitalizations.

12.    Mr. Heller, who will be the primary professional for this engagement, has closed a significant number of notable real estate transactions during the course of his career in excess of $12 billion, including: Citigroup Center located at 54th Street and Lexington Avenue; The Madison Belvedere apartment building located at 10 East 29th Street; the Rhinelander Mansion leased to Ralph Lauren located at 72nd Street and Madison; and the Drake Hotel development site located at 432 Park Avenue.

13.    The Debtor has selected BRS as its real estate broker and sales agent because of BRS's excellent reputation in commercial real estate dispositions. Further, given Mr. Heller's

extensive experience in the industry, the Debtor believes BRS will be an invaluable professional that is able to timely and competently effectuate a Sale Transaction.

14.     Accordingly, the Debtor believes that BRS has the necessary capabilities and expertise to serve as real estate broker and sales agent for the Debtor.

### SERVICES TO BE PROVIDED

15.     As provided in the Engagement Agreement, among the services to be provided by BRS are the following:

>    a.     marketing the Property using such advertising, cooperation with outside brokers, and other promotional and marketing activities as may be necessary and agreed upon with the Debtor;
>
>    b.     analyzing offers and proposals from potential Buyers and offering recommendations to the Debtor in connection with any Sale Transaction involving the Property;
>
>    c.     assisting with negotiations regarding any Sale Transaction involving the Property; and
>
>    d.     assisting with the consummation of other necessary transactions involving the Property in relation to a Sale Transaction.

16.     The services that will be rendered by BRS in connection with its proposed engagement are not duplicative of the services to be performed by any of the Debtor's other retained professionals or advisors.  Further, the Debtor believes the foregoing services are critical to the success of any Sale Transaction.

17.     The Debtor submits that BRS's proposed retention, upon the terms and conditions set forth in the Engagement Agreement, are reasonable and based upon industry standards. Further, BRS has stated its desire and willingness to act in this case and render the necessary professional services as real estate broker and sales agent for the Debtor.  The Debtor therefore believes that the engagement of BRS to render the foregoing services is necessary and appropriate.

## PROFESSIONAL COMPENSATION

18.     The Debtor has agreed to compensate BRS in accordance with the terms and conditions of the Engagement Agreement, subject to Court approval and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and any Court order.

19.     Pursuant to the Engagement Agreement, BRS shall earn a commission of $300,000.00 plus one percent (1.0%) (the "Commission Fee") of the amount of the "gross sales price" received from a Sale Transaction, payable to BRS upon closing.  The Engagement Agreement defines "gross sales price" to include any mortgage, loan or other obligations of the Debtor which may be assumed by a Buyer or which a Buyer takes title "subject to", and any purchase money loans or mortgages taken back by the Debtor and the sales price of any fixtures and other personal property sold by any separate agreement between the Debtor and a Buyer as part of the overall Sale Transaction.[4]  In the contemplated amended Plan, the Debtor has agreed to classify BRS's Commission Fee and Marketing Costs as an administrative professional fee claim *pari passu* with the Debtor's other professional fee claims.

20.     BRS will also be reimbursed for certain costs and expenses.  As described in the Engagement Agreement, the Debtor has agreed to reimburse BRS's reasonable actual out-of-pocket costs and expenses incurred in the preparation of any offering materials and marketing of the Property (the "Marketing Costs" and, together with the Commission Fee, the "Fee Arrangement") including (i) the cost of producing and distributing descriptive and offering

---

[4]     The Engagement Agreement provides that if the Debtor enters into a Transaction (as defined in the Engagement Agreement) involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in the Debtor (including without limitation between owners of interests in the Debtor), or by a transaction or integrated set of transactions intended to have the effect of conveying to a Buyer less than 100% of the Property,  the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, the Commission Fee.

materials of the Property, and (ii) third party websites that coordinate marketing efforts, distribute confidentiality agreements, and host offering and due diligence materials (*e.g.*, DropBox). As described in the Engagement Agreement, BRS has agreed to provide a detailed line-item budget of proposed expenses for the Debtor's prior written approval, and BRS will only expend such amounts as are set forth in the written budget approved by the Debtor unless otherwise approved in advance by the Debtor. BRS and the Debtor anticipate the budget for the Marketing Costs will be approximately $50,000.00 to $75,000.00.

## INDEMNIFICATION

21.     The Debtor has also agreed to certain indemnification and reimbursement provisions (the "Indemnification Provisions"). As described in the Engagement Agreement, the Debtor has acknowledged that BRS is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative to the Property or any of the leases, license or other agreements to which the Property is or may be subject (collectively, the "Property Conditions"). BRS has agreed to indemnify, defend and hold the Debtor harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements, and court costs) incurred by and/or asserted against the Debtor arising out or relating to any claim for fees and/or commissions relating to the Property asserted against the Debtor by any broker(s) with whom BRS will deal with unless the Debtor enters into a Transaction (as defined in the Engagement Agreement) document with a Buyer without receiving an indemnity against the claims of any outside broker.

22.     Also, and as described in the Engagement Agreement, the Debtor has agreed to

disclose to BRS any and all information which the Debtor has regarding the Property Conditions, and BRS is authorized to disclose any such information to prospective Buyers upon the prior written approval of the Debtor, and any such approval will remain in effect until revoked in writing.

23.     Finally, the Debtor has agreed to indemnify and hold BRS harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by BRS which may arise out of or relate to any of the Property Conditions.

## BRS'S DISINTERESTEDNESS

24.     To the best of the Debtor's knowledge, information and belief, BRS represents no interest adverse to the Debtor or to its estate in the matters for which BRS is to be retained, except as may be set forth herein and in the Heller Declaration.  The Heller Declaration, executed on behalf of BRS in accordance with the provisions of Section 327(a) of the Bankruptcy Code, the Bankruptcy Rules and the Fee Guidelines, is incorporated herein by reference.  The Debtor's knowledge, information and belief regarding the matters set forth in this Application are based in part upon, and made in reliance upon, the Heller Declaration.

25.     As set forth in the Heller Declaration, the Debtor submits that BRS is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code, in that the firm and its professionals who will provide services to the Debtor, to the best of their knowledge:

a.      are not creditors, equity security holders or insiders of the Debtor;

b.      are not and were not, within two (2) years before the date of the filing of the Debtor's Chapter 11 petition, a director, officer, or employee of the Debtor; and

c.      do not have an interest materially adverse to the interest of the Debtor's estate, or of any class of creditors or equity security holders, by reason of any direct or

indirect relationship to, connection with, or interest in the Debtor or for any reason.

26.     The Debtor has been informed by BRS that BRS will conduct an ongoing review of its files to ensure that no disqualifying circumstances arise.  If any new relevant facts or relationships are discovered, BRS has informed the Debtor that it will supplement its disclosure to the Court.  Accordingly, the Debtor firmly believes that BRS is disinterested and may thus assist the Debtor with respect to the matters on which it has been engaged.

## BASIS FOR RELIEF

27.     The Debtor seeks to appoint BRS as its real estate broker and sales agent in accordance with Sections 327(a) and 328(a) of the Bankruptcy Code.

28.     Section 327(a) provides that a debtor, subject to Court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a).

29.     Section 328(a) authorizes a debtor, with the court's approval, to employ a "professional person under section 327 . . . of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."  11 U.S.C. § 328(a).  Thus, Section 328(a) of the Bankruptcy Code permits the compensation of professionals on flexible terms that reflect the nature of the services provided and prevailing market conditions.  *See In re River Foal, Inc.*, 161 B.R. 568, 569 (S.D.N.Y. 1993) ("[T]he overall objective of the statutory structure is to permit the marketplace to be the primary determinant of fees for professionals functioning in a bankruptcy context, thereby encouraging qualified persons to assist in bankruptcy matters, while protecting the estate and creditors against overreaching or collusive arrangements.")

30.     Section 328 of the Bankruptcy Code permits the compensation of professionals, including real estate brokers, on more flexible terms that reflect the nature of their services and market conditions. *See Riker, Danzig, Scherer, Hyland & Perretti LLP v. Official Comm. of Unsecured Creditors (In re Smart World Techs., LLC)*, 383 B.R. 869, 874 (S.D.N.Y. 2008) ("By allowing a bankruptcy court to pre-approve attorneys' fees, rather than calculate the fees after the fact, § 328 makes it easier for the estate's trustee to hire [its professionals]."); *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997) ("Under [the] present § 328 the professional may avoid th[e] uncertainty [of what a judge thought the professional's work was worth after it had been completed] by obtaining court approval of compensation agreed to with the trustee (or debtor or committee)."). Accordingly, courts in this jurisdiction have approved similar arrangements for real estate professionals that contain reasonable terms and conditions under Section 328 of the Bankruptcy Code. *See, e.g., The Great Atlantic & Pacific Tea Co., Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. September 15, 2015) [Dkt. No. 926] (authorizing the retention of a real estate advisor under Section 328); *In re Old Carco LLC (f/k/a Chrysler LLC)*, No. 09-50002 (AJG) (Bankr. S.D.N.Y. Feb. 18, 2010), [Dkt. No. 6416] (authorizing retention of real estate broker under Section 328); *In re St. Vincent's Catholic Med. Ctrs. of New York*, No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 18, 2010), [Dkt. No. 304] (same).

31.     The Debtor submits that for all the reasons stated above and in the Heller Declaration, the employment of BRS as real estate broker and sales agent for the Debtor, pursuant to the terms of the Engagement Agreement, is warranted under Sections 327(a) and 328(a) of the Bankruptcy Code. The Debtor believes that the terms of the Engagement Agreement, including the Fee Arrangement, appropriately account for the nature and scope of services that BRS will be

providing as real estate broker and sales agent. The Debtor submits that the most reasonable fee structure under these circumstances is a contingent fee structure pursuant to Section 328(a), as BRS's rendering of services as provided in the Engagement Agreement hinge on the closing of a Sale Transaction contemplated by the Debtor. Similar fixed and contingency fee structures have been approved and implemented by courts in this jurisdiction in other Chapter 11 cases. *See, e.g., In re Internap Tech. Sols. Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); *In re Aegerion Pharms., Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); *In re Aralez Pharms. US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Nov. 1, 2018); *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. Dec. 21, 2017). As set forth in the Heller Declaration, it is standard practice in BRS's industry for professionals providing services relating to the disposition of real property to be compensated on a contingent basis, rather than on an incremental hourly basis, for such services.

32.     The Debtor submits that the terms and conditions of the Engagement Agreement relating to BRS's compensation, including the Fee Arrangement, are competitive in the relevant market for real estate brokerage services. The Debtor further submits that the Fee Arrangement is reasonable, market-based, designed to compensate BRS fairly for its work, and similar to or lower than the compensation terms in other recent bankruptcy engagements. *See, e.g., In re: Nicholas G. A. Denton*, No. 16-12239 (SMB) (Bankr. S.D.N.Y. Aug. 1, 2016) (approving 5.0% commission of the total sale price of the property); *In re: The Christian Brothers' Institute, et al.*, No. 11-22820 (RDD) (Bankr. S.D.N.Y. April 28, 2011) (approving 3.0% commission of the total sale price of the property); *In re 36 West 38th Street, LLC*, No. 15-12480 (JLG) (Bankr. S.D.N.Y. Sep. 3, 2015) (approving 1.0% commission on transaction); *In re Federation Employment and Guidance*

*Service, Inc.*, No. 15-71074 (REG) (Bankr. E.D.N.Y. March 18, 2018) (approving commission rate ranging from 0.9% to 5.4% dependent on completed transaction).

33.     In sum, the Debtor believes that the terms of the Engagement Agreement are reasonable in light of (a) industry practice; (b) market rates charged for comparable services; and (c) BRS's substantial experience in real estate dispositions.  The Debtor further submits that the Indemnification Provisions were negotiated at arm's length and in good faith between the Debtor and BRS.  The Debtor believes that the Indemnification Provisions reflect the customary qualifications and limits on such terms both out of court and in Chapter 11 cases and respectfully submits that the Indemnification Provisions are reasonable.

34.     Because BRS is being retained by the Debtor to perform a specialized and discrete task, it will not be compensated based upon time and effort expended.  Instead, as described above, BRS will be compensated based on the occurrence of a Sale Transaction.  The Debtor has been advised by BRS that – because its compensation is results-oriented and directly related to the benefit received by its clients – it is not its practice to keep detailed time records similar to those customarily kept by attorneys and other professionals who are compensated on an hourly basis in Chapter 11 cases.  The Debtor therefore submits that requiring BRS to record and submit detailed time entries pursuant to the applicable rules and Fee Guidelines would be unnecessary and unduly burdensome to BRS.

35.     In light of the foregoing, the Debtor submits that it has satisfied the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules to support entry of an order authorizing the Debtor to retain and employ BRS on the terms described herein and in the Engagement Agreement.

## NOTICE

36.     Notice of this Application shall be provided to: (a) the U.S. Trustee; (b) the Debtor's creditors; and (c) any party that has filed a notice of appearance and request for service of documents.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

37.     No prior application for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE the Debtor respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 19, 2022
         New York, New York

NINETY-FIVE MADISON COMPANY, L.P.
Debtor and Debtor-in-Possession


By: */s/ Michael Sklar*
     Michael Sklar
     General Partner

**<u>EXHIBIT A</u>**

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |

**ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE
RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS
REAL ESTATE BROKER AND SALES AGENT TO DEBTOR
<u>NINETY-FIVE MADISON COMPANY, L.P. *NUNC PRO TUNC* TO AUGUST 18, 2022</u>**

Upon consideration of the application (the "<u>Application</u>")[1] of Ninety-Five Madison

Company, L.P. (the "<u>Debtor</u>"), the debtor and debtor in possession in this Chapter 11 case (the

"<u>Chapter 11 Case</u>"), pursuant to Sections 327(a) and 328(a) of title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), for entry of an order (this "<u>Order</u>"): (a)

authorizing the employment and retention of BRS as real estate broker and sales agent for the

Debtor, *nunc pro tunc* to *August 18*, 2022; (b) approving the terms of BRS's employment and

retention, as memorialized in that certain engagement agreement dated August 18, 2022 (the

"<u>Engagement Agreement</u>"), attached as **<u>Exhibit 1</u>** to this Order, including the Fee Arrangement

and Indemnification Provisions set forth in the Engagement Agreement; and (c) modifying the

timekeeping requirements of Local Rule 2016-1 and the *General Order M-447 Amended*

*Guidelines for Fees and Disbursements for Professionals in Southern District of New York*

*Bankruptcy Cases, dated January 29, 2013* (the "<u>Fee Guidelines</u>"), and any other applicable

procedures and orders of the Court in connection with BRS's engagement; and upon the

Declaration of Woody Heller (the "<u>Heller Declaration</u>"), which was filed with the Court as **<u>Exhibit</u>**

---

[1]        Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Application.

**B** to the Application; and the Court having reviewed the Application and the Heller Declaration; and the Court being satisfied, based on the representations made in the Application and in the Heller Declaration, that (i) BRS does not hold or represent any interest adverse to the Debtor's estate, and (ii) BRS is a "disinterested person" as that phrase is defined in Section 101(14) of the Bankruptcy Code; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtor's estate and all parties-in-interest and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore,

It is hereby ORDERED that:

1.      The Application is granted to the extent set forth herein.

2.      In accordance with Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, the Debtor is hereby authorized and empowered to employ and retain BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 18, 2022, in accordance with the terms and conditions set forth in the Engagement Agreement, and the Debtor is authorized to pay fees and reimburse expenses, and to provide indemnification, contribution, and/or reimbursement to BRS on the terms and at the times specified in the Engagement Agreement.

3.      BRS shall be compensated for fees and reimbursed for out-of-pocket expenses

by the Debtor in accordance with the terms and conditions of the Application and/or Engagement Agreement, and all fees and out-of-pocket expense reimbursements to be paid to BRS, including without limitation the Commission Fee, shall be subject to Section 328(a) of the Bankruptcy Code.

4.      Notwithstanding anything to the contrary contained herein or in the Application and/or Engagement Agreement, BRS shall file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines and any other procedures or orders of the Court; provided, however, that BRS shall not be required to keep or submit detailed time records as part of its fee application.

5.      In the event that, during the pendency of these cases, BRS seeks reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys, appropriately redacted to preserve applicable privileges, shall be included in BRS's fee applications and such invoices and time records shall be in compliance with the Local Rules, and shall be subject to the Fee Guidelines and approval of the Court under the standards of Bankruptcy Code Sections 330 and 331, without regard to whether such attorney has been retained under Bankruptcy Code Section 327 and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that BRS shall not seek reimbursement from the Debtor's estate for any attorney's fees incurred in defending against objections to any of BRS's fee applications filed in these cases;

6.      Notwithstanding anything to the contrary in the Application, the Heller Declaration, or the Engagement Agreement, during the pendency of this Chapter 11 Case, the Indemnification Provisions of the Engagement Agreement are hereby modified as follows:

(a)     All requests by indemnified persons for the payment of indemnification as set forth

in the Engagement Agreement (such persons, the "Indemnified Persons") shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Agreement and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, and in no case shall an Indemnified Person be indemnified if any losses, claims, damages, liabilities or expenses are finally judicially determined to have resulted from such Indemnified Person's gross negligence, bad faith, or willful misconduct; and

(b)     In the event that an Indemnified Person seeks reimbursement from the Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Agreement, the invoices and supporting time records from such attorneys shall be included in BRS's own applications, both interim and final, and such invoices and time records shall be subject to the applicable Fee Guidelines and the approval of the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

7.      Any limitation of liability pursuant to the terms and conditions set forth in the Engagement Agreement are hereby eliminated for the duration of this Chapter 11 Case.

8.      Notwithstanding anything to the contrary in the Application and/or Engagement Agreement, to the extent that BRS uses the services of independent contractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, BRS (i) shall pass-through the cost of such Contractors to the Debtors at the same rate that BRS pays the Contractors;

4

(ii) shall seek reimbursement for actual out-of-pocket expenses only; and (iii) shall ensure that the Contractors are subject to the same conflict checks and disclosures as required of BRS by Rule 2014 of the Bankruptcy Rules.

9.     The Debtor and BRS are authorized and empowered to take all actions necessary to effectuate the relief granted by this Order.

10.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.    The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2022
        New York, New York

                                        _____
                                        THE HONORABLE DAVID S. JONES
                                        UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**LISTING AGREEMENT FOR SALE** (this "**Agreement**") dated as of August _18_ 2022 (**Effective Date**") between Branton Realty Services LLC, a New York limited liability company ("**Branton**"), and Ninety-Five Madison Company, L.P., a New York limited partnership ("**Owner**").

## Background

Owner owns the property known as 95 Madison Avenue, New York, New York (the "**Property**") and desires to engage Branton to arrange a sale or other disposition of all or a portion of the Property to a counterparty (a "**Counterparty**") upon the terms and provisions more fully set forth herein. As used herein, Counterparty includes affiliates, designees, nominees and assignees thereof. On March 22, 2021, Owner filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (Case No. 21-10529) (the "**Bankruptcy Court**").

## Agreement

1. **Appointment**. Subject to the conditions and limitations contained in this Agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the exclusive right to market the Property for a sale, as defined in the third paragraph of Exhibit A (any such transaction being a "**Transaction**"). The terms and conditions of any proposed Transaction shall be subject to review and acceptance by Owner in its sole and absolute discretion. Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion. Branton shall coordinate and work with Owner's designated tax advisor, as necessary, with respect to a Transaction.

2. **Term**. The term of Branton's appointment hereunder (the "**Term**") shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term.

3. **Referrals**. Owner shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

4. **Owner Information**. Owner shall furnish to Branton such information with respect to the Property in writing as Branton may reasonably request in order to render its services effectively. Branton shall under all circumstances (i) be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all written information that has been furnished to it by Owner, (ii) have no obligation to verify the accuracy or completeness of any such information, and (iii) not be responsible for the inaccuracy or incompleteness of any such information provided. All documents and other materials, investigations, reports and information with respect to the Property or Owner shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner, after written authorization from Owner and after delivering an executed confidentiality agreement form (typically acceptable in the ordinary course

#11386827 v6 029230 00008

in similar transactions), and Owner shall be solely responsible for the accuracy of the contents of the same. Subject to the rights of any tenants, Owner shall provide reasonable access to the Property for Branton and, as arranged by Branton, prospective Counterparties.

5. **Compensation**. Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A (the "Commission") as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below.

Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the "**List**") of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein.

6. **Brokers**.

a. Branton is authorized to cooperate with outside brokers ("**Outside Brokers**") representing Counterparties in connection with a proposed Transaction. Branton shall obtain from any Outside Broker an agreement, in form and substance reasonably satisfactory to Owner, providing that the Outside Broker shall look solely to the Counterparty for any commissions due to such Outside Broker in connection with the Transaction. Any transaction document executed shall contain an indemnity from the Counterparty in favor of both Owner and Branton against claims of any Outside Broker.

b. Branton agrees to indemnify, defend and hold Owner harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements and court costs) incurred by and/or asserted against Owner arising out or relating to any claim for fees and/or commissions relating to the Property asserted against Owner by any broker(s) with whom Branton has dealt unless Owner enters into a Transaction document with a Counterparty without getting an indemnity against the claims of any Outside Broker.

c. Since Owner dealt with other brokers prior to Effective Date with respect to the Property, Owner shall be responsible for any commissions owed to such brokers. Owner agrees to indemnify and hold Branton harmless from and against all claims, actual out-of-pocket costs, liabilities, settlements, and judgments (collectively "claims"), and all costs of defense against such claims (including reasonable attorneys' fees and disbursements), by such other brokers.

7. **Marketing & Expenses**. Owner shall pay the fees and disbursements of legal counsel, engaged by Owner. Owner authorizes Branton to market the Property, including preparing offering materials, all of which materials are to be approved or disapproved in writing

by Owner (in its sole and absolute discretion) in writing within five (5) business days of presentation to Owner from Broker prior to digital distribution and if not disapproved in writing within five (5) business days same shall be deemed approved. All such materials about the Property or the Transaction whether prepared by Branton or Owner will identify Branton as the exclusive broker for the Property. Owner shall reimburse Branton or pay directly, when billed, Branton's reasonable actual out-of-pocket costs and expenses incurred in preparation of the offering materials and marketing the Property, which costs and expenses have all been approved in writing by Owner (the "**Marketing Costs**") including, but not limited to (a) the cost of producing and distributing descriptive materials (including the costs of photographs, maps, renderings, plot plans and blueprints), (b) cost of producing graphics for the offering materials and (c) third party websites that coordinate marketing efforts, distribute confidentiality agreements and host offering and due diligence materials (like DropBox). Branton shall provide a detailed line-item budget of proposed expenses for Owner's prior written approval. Within five (5) business days of presentation of a budget of proposed expenses Owner shall approve or disapprove in writing such expenses, and if not so disapproved in writing same shall be deemed approved, and Branton shall only expend such amounts as are set forth in the written budget approved by Owner, unless otherwise approved in advance by Owner. The Marketing Costs shall be reimbursed or paid by Owner whether or not a Transaction occurs. The parties anticipate the budget for marketing expenses to be approximately $50,000.00 to $75,000.00.

8.   **Representations**. Other than as set forth in paragraph 21, each party represents and warrants to the other that the representing party has full right and authority to enter into and perform its obligations under this agreement, and that the same does not violate or conflict with, or require any consents or approvals under any Agreements by which the representing party is governed or bound.

9.   **Confidentiality; Press Releases.** Branton acknowledges that Branton's services under this Agreement may provide Branton with access to confidential business, professional, personal or private information concerning Owner and its direct or indirect owners and/or their family members. Branton acknowledges the confidential nature of such information and agrees that Branton and Branton's agents will not issue any press releases, grant any interviews or release any other information or announcements to the press or the public or issue any other form of publicity, or otherwise publish or disclose to any third person, any such confidential information, except as specifically required to perform Branton's obligations under this Agreement. Notwithstanding the foregoing, the Parties specifically acknowledge that Branton shall be permitted to issue press releases and market the Property consistent with this Agreement provided that Branton does not disclose any information which would otherwise be deemed confidential pursuant to this Paragraph.

10.   **Indemnification**. Owner acknowledges that Branton is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative

#11386827 v6 \029230 \0008

3

to the Property or any of the leases, license or other agreements to which the Property is or may be subject (all of the foregoing being called "**Property Conditions**"). Owner agrees to disclose to Branton any and all information which Owner has regarding the Property Conditions and Branton is authorized to disclose any such information to prospective Counterparties, upon the prior written approval of Owner, which approval shall remain in effect until revoked in writing. All documents, materials, investigations, reports and information with respect to Property Conditions shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner only with the initial and prior written approval of Owner and Owner shall be solely responsible for same. Owner agrees to indemnify and hold Branton harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by Branton which arise out of or relate to any of the Property Conditions. This paragraph shall survive the expiration of this Agreement for the period of the applicable statute of limitations as to any such claims.

11.    **Notices**.  Any notices required to be given by either party under this Agreement shall be in writing and sent by (i) messenger/personal delivery, (ii) certified mail return receipt requested, (iii) nationally recognized overnight courier service or (iv) email, addressed to the parties as provided below.  Notices shall be deemed given upon receipt or rejection, if given by personal delivery; on the day that is five (5) business days following delivery to the postal authorities, if mailed as provided herein; on the business day following delivery to the courier service, if given by overnight courier as provided herein or when sent by e-mail provided no automatic bounce back is received, and further provided that any e-mail sent after 5:00 PM in the recipient's time zone on a business day or at any time on a non-business day shall be deemed given on the next business day.  Notwithstanding anything to the contrary contained herein, notice by email pursuant to (iv) above shall not be an acceptable method of providing any legal notice, default notice or termination notice hereunder and the same shall be required to be sent by one of the methods set forth in (i)-(iii) of the first sentence of this paragraph.

If to Owner, Ninety-Five Madison Company, L.P., 95 Madison Avenue, Suite 609, New York, New York 10016, with a copy to be given by email to: Rita Sklar (ritasklar@gmail.com); Sharan Sklar (ssklar@ninetyfivemadison.com) and Michael Sklar (msklar@ninetyfivemadison.com).

with a copy to:

Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq., email: mlefkowitz@rosenbergestis.com and

Olshan, 1325 Avenue of the Americas, New York, New York 10019, Attention: Thomas J. Fleming, Esq., email: tfleming@olshanlaw.com

If to Branton, at 1080 Fifth Avenue, Apt. 2B, New York, New York 10128, Attention: Mr. Warren Heller, email: woody.heller@outlook.com and wheller@brantonrealty.com.

With a copy to:

Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York, 10022-4784, Attention: Mr. Jonathan Margolis, email: jmargolis@morrisoncohen.com.

A party may change the address to which notices/service of process shall be sent to or served on it by five (5) days' prior written notice to the other party. Any notice served by an attorney representing a party (as set forth in Paragraph 11 above) shall have the effect of a notice served by the party.

12. **OFAC**. Each party warrants and represents to the other that, the representing party and all parties owning (directly or indirectly) an ownership interest in the representing party (a) is not, and shall not become, a person or entity with whom the other party is prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order, or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, any dealing or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13. **Governing Law, Venue, Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of laws). Any disputes related to or arising from this Agreement must be brought exclusively in New York County in the State of New York, to the jurisdiction of which each of the parties hereby submits. Branton and Owner each waive trial by jury in any action or proceeding under this Agreement.

14. **Fees and Interest.** If either party commences an action or proceeding against the other party to enforce its rights under the Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and disbursements from the other party. Any amount due under this Agreement and not paid when due shall bear interest at the rate of two percent per annum in excess of the prime commercial lending rate as published from time to time in *The Wall Street Journal (New York edition)*, but not in excess of the highest rate permitted by applicable law.

15. **Branton Duties**. In addition to the obligations set forth elsewhere in this Agreement, Branton hereby agrees to (i) host weekly conference calls as needed, based on the status of the project, on the same day and time each week during the Term, adjusting for an alternate day in a week in which a holiday occurs, or the availability of less than two (2) of the partners, (ii) distribute weekly reports, as applicable once marketing is underway (to be received one (1) business day prior to the weekly call or meeting provided for in (i)) with updates on market

conditions, marketing, showings, offers, etc., and (iii) transmit all offers made by Counterparties to Owner in writing.

16. **Owner Designee**. Branton hereby acknowledges that Rita Sklar, Sharan Sklar and Michael Sklar are representatives ("Representatives") of the Owner. Such Representatives shall designate in writing to Branton a single person (the "Designee") to act on their behalf, and Branton is hereby authorized to act upon direction given by the Designee with respect to requests for information, arranging group calls and other similar non-substantive matters. The Representatives may periodically designate a new Designee, in which case all of the Representatives shall notify Branton in writing thereof, and Branton shall act upon the direction of the new Designee. Notwithstanding the foregoing, the Representatives may periodically request that Branton make itself available for conference calls with the Representatives to discuss any subject concerning the Transaction.

17. Branton shall look only and solely to Owner's estate and interest in and to the Property (which shall consist of (a) the proceeds, rents and profits therefrom, (b) the proceeds of any lease, sale, conveyance, assignment, transfer, mortgage or refinancing thereof and (c) any insurance proceeds or condemnation awards relating to any portion of the Property) for the satisfaction of any right of Branton arising out of this Agreement or for the collection of judgment or other judicial process or arbitration award requiring the payment of money by Owner and no other property or assets of Owner, Owner's agents, incorporators, shareholders, employees, officers, directors, partners, manager, agents, principals (disclosed or undisclosed), members, joint venturers, or affiliates (collectively, "Owner's Affiliates") shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Branton's rights and remedies under or with respect to this Agreement or any other liability of Owner to Branton.

18. Branton represents further that it is presently and will at all times remain a licensed real estate broker in the State of New York. As a material inducement to Owner to enter into this Agreement, Branton covenants that Woody Heller ("**Heller**") will be actively involved in performing the services required of Branton hereunder. In the event of Heller's death or incapacity, this Agreement shall automatically terminate and no Commission shall be due and owing (other than in connection with a pending Transaction or may be due and owing pursuant to the terms of paragraph 5 hereof).

19. It is understood that Branton is not granted any right or authority to assume or create any obligation or liability or make any representation, warranty or agreement (expressed or implied) on Owner's behalf or to bind Owner in any manner whatsoever.

20. Notwithstanding anything to the contrary, it is expressly understood and agreed that (i) Owner is under no obligation of any nature whatsoever to either (a) accept any Counterparty identified by Branton or anyone else as a counterparty and/or (b) accept any Counterparty procured by Branton or anyone else and/or to execute and/or deliver any contract of sale or other agreement, (ii) Owner shall have the absolute right in Owner's sole discretion, without explanation or liability

#11.386827 v6 \0\292\0\xxxxx

6

of any nature whatsoever to Branton, to, at any time, reject any Counterparty and/or the terms of any prospective contract of sale or other agreement with any Counterparty and (iii) Owner shall have no liability to Branton of any nature whatsoever should Owner fail for any reason whatsoever (except in the case of Owner's willful default) to either (i) accept any Counterparty and/or execute and deliver any contract of sale or other agreement and/or (ii) close upon the sale of the Property, it being agreed that if an agreement for a Transaction is executed and delivered with a Counterparty, but the closing thereunder fails to occur for any reason whatsoever (except in the case of Owner's willful default), then Branton shall not be entitled to any Commission whatsoever.

21. **Bankruptcy Court Approval.** Notwithstanding anything to the contrary herein the terms and conditions of the Agreement in all respects are subject to the approval of, the Bankruptcy Court. Owner will, promptly after its execution of this Agreement, file an application and proposed order seeking from the Bankruptcy Court approval of its employment of Branton pursuant to the terms of this Agreement, and pursuant to, as applicable, Sections 329(a) and 328(a) of the Bankruptcy Code. Owner agrees and acknowledges to attach a complete copy of this Agreement to the application. Owner will provide Branton the application and proposed order authorizing this Agreement sufficiently in advance of their filing in order for Branton to have ample time to review and discuss any comments it may have with Owner, and the application shall be acceptable to Branton, in form and substance. The proposed order will include, without limitation, the following terms and conditions: (a) finding that none of the fees or commissions payable to Branton hereunder constitute a "bonus" under applicable law; (b) directing that Branton will be exempt from keeping time records for its work hereunder (as Branton will not be billing on an hourly basis); (c) finding that the terms and conditions of this Agreement are reasonable; (d) that the Commission due hereunder to Branton will be paid at the closing of a Transaction with respect to the Property without a further application or order of the Bankruptcy Court; and (e) directing that any unpaid Commission or marketing expenses owed to Branton shall be treated as an administrative claim under Section 507(a)(1) of the Bankruptcy Code. If an order obtaining these terms is not obtained from the Bankruptcy Court within thirty (30) days after both parties have signed this Agreement, then Branton may terminate this Agreement. If Owner obtains an order of the Bankruptcy Court authorizing its use of cash collateral or debtor in possession financing and if the order requires submission of a proposed budget specifying post-petition expenditures, then Owner will include in the budget line items providing for the payment of the expenses to be paid or reimbursed as and when provided pursuant to this Agreement. All amounts projected to be paid to Branton under this Agreement will be included in the carve-out for professionals provided in Owner's bankruptcy case. Should the Bankruptcy Court order a sale of the Property at auction, Branton is authorized to and will act as the exclusive auctioneer upon the terms set forth herein. The Bankruptcy Court will retain jurisdiction over any disputes under this Agreement. If the bankruptcy case is dismissed and the Property is not disposed of under Bankruptcy Court jurisdiction, then any dispute between the parties arising under this Agreement will be resolved in the New York State Supreme Court, County of New York, Commercial Division.

22.     **Miscellaneous**.  This Agreement (i) expresses the parties' entire agreement on the matters covered herein, and (ii) supersedes all prior understandings between such parties on such matters.  This Agreement may not be amended or modified except in writing signed by all of the parties.  Neither party may assign this Agreement without the prior consent of the other party, which consent may be withheld in such party's sole discretion.  This Agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

#11386827 v6 \029230 \0008

Executed by the parties to confirm the foregoing.

BROKER:

BRANTON REALTY SERVICES LLC

By _____
Name: Warren Heller
Title: Manager

OWNER:

NINETY-FIVE MADISON COMPANY,
L.P.

By: Sharan Sklar Management LLC

By: /s/ Sharan Sklar
Name: Sharan Sklar
Title: Manager

By: Michael Sklar Management LLC

By: /s/ Michael Sklar
Name: Michael Sklar
Title: Manager

Exhibit A
Compensation

Branton shall earn, and Owner shall pay Branton, a fee upon the closing of any Transaction of $300,000.00 plus one (1%) percent of the gross sales price.

As used herein, "gross sales price" includes any mortgages, loans or other obligations of Owner which may be assumed by the Counterparty or which the Counterparty takes title "subject to", and any purchase money loans or mortgages taken back by Owner and the sales price of any fixtures and other personal property sold by separate agreement between Owner and the Counterparty as part of the overall sale of the real property.

For purposes of this Agreement, a sale shall also include, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction (however characterized) by which Owner's interest in the Property is transferred to an unaffiliated third party for consideration. It is further agreed that if Owner enters into a Transaction involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in Owner (including without limitation between owners of interests in Owner or their affiliates), or by a transaction or integrated set of transactions intended to have the effect of conveying to such Counterparty less than 100% of the Property or Owner's interest therein, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, a commission hereunder, and the date of such effective legal transfer shall be deemed the closing date of such transaction. For the avoidance of doubt the intent of the above sentence is to calculate the value of 100% of the Property or 100% of Owner's interests in the Property to be sold and then pay the Broker a commission based 100% of such value, not the pro-rata percentage of such Property or interests that are actually sold. If a ground lease is entered into, the parties will use the agreed upon value of the Property in determining the compensation.

The intention of the foregoing is that Branton will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A.

Exhibit B

- Assemble and create the marketing brochure and due diligence material: 4 weeks depending on what's available and what has to be ordered
    o photos
    o write the text
    o prepare the graphics of the marketing brochure
    o review and collect the due diligence reports
        ▪ environmental
        ▪ engineering report
        ▪ review any existing proposals
        ▪ set up the marketing and due diligence website
- Initiate the marketing process: 6 weeks but could be longer during the summer
    o Email confidentiality agreements and a deal summary page
    o Send the marketing brochure once the CAs are signed
    o Start conducting tours
    o Review our proposed structure with potential purchasers
    o Address questions, collect whatever additional information is requested
    o Proceed in primal selling mode
    o Prepare draft purchase agreement
- Review first-round bids: 2 weeks
    o Receive and review
    o Prepare a bid summary sheet comparing the relevant metrics of the various purchase proposals
    o Select a handful of bidders to proceed to a second-round bid or choose one bidder to move forward quickly ahead of the pack, or both, depending on the situation and bids received
    o Provide the finalists with the purchase contract to review
- Review second-round bids: 1-2 weeks
    o Review offers and contract comments
    o Interview bidders, if needed/helpful
    o Select a purchaser
    o Finalize and execute a contract, likely subject to a due diligence, but hopefully not
- Buyer due diligence: 0-4 weeks
    o This process is intended for buyers to confirm seller's representations, but most will actually use it to confirm their financing
    o Finalize unconditional contract
- Proceed to Closing: 6-10 weeks
    o Normally we should be able to close in 6-8 weeks, but given the financing markets, may need an extra month

#11386827 v6 \029230 \0008

11

\* The parties hereto agree that the referenced timeline is a timeline example in normal market conditions; all parties recognize that the current market is not within normal conditions and marketing efforts may take longer than so indicated on this timeline.

**<u>EXHIBIT B</u>**
**Woody Heller Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) |
| | ) |
| Debtor. | ) |
| | ) |

## DECLARATION OF WOODY HELLER IN SUPPORT OF APPLICATION OF DEBTOR NINETY-FIVE MADISON COMPANY, L.P. FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER AND SALES AGENT *NUNC PRO TUNC* TO AUGUST 18, 2022

I, Woody Heller, pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the founder of Branton Realty Services LLC ("BRS").

2.      This declaration (the "Declaration") is submitted in connection with the application (the "Application")[1] of Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor and debtor in possession in this Chapter 11 case (the "Chapter 11 Case"), for authorization to retain and employ BRS as real estate broker and sales agent for the Debtor *nunc pro tunc* to August 18, 2022, and to provide disclosures required under Sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 2014, and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

3.      Unless otherwise stated, I have personal knowledge of the facts hereinafter set forth, and all matters set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information supplied to me or my views.  If I were called to testify, I would

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

testify competently to the facts discussed herein.

4.    To the extent that any information disclosed herein requires subsequent amendment or modification upon BRS's completion of further analysis or as additional relevant information becomes available to it, one or more supplemental declarations will be submitted to the Court reflecting the same.

## BRS'S QUALIFICATIONS

5.    I founded BRS based on my over 35 years of experience in the real estate and investment sales business in New York and other major national markets.  BRS offers services specializing in the office, residential, specialty retail, and development sites sectors, in addition to services related to structured participating and/or convertible mortgages, equity joint ventures, sales of partial interests, and equity recapitalizations.

6.    I understand the Debtor has selected BRS as its real estate broker and sales agent because of BRS's extensive experience and excellent reputation in commercial real estate dispositions.

7.    BRS provides a broad range of commercial real estate services to its clients.  I have closed a number of notable real estate transactions over the course of my career in excess of $12 billion, including: Citigroup Center located at 54th Street and Lexington Avenue; The Madison Belvedere apartment building located at 10 East 29th Street; the Rhinelander Mansion leased to Ralph Lauren located at 72nd Street and Madison; and the Drake Hotel development site located at 432 Park Avenue.

8.    Accordingly, I believe BRS has the necessary capabilities and expertise to serve as real estate broker and sales agent for the Debtor to effectuate a Sales Transaction in an efficient and timely manner.

## SERVICES TO BE PROVIDED

9.    As provided in the Engagement Agreement, BRS has agreed to provide the following services:

   a.    marketing the Property using such advertising, cooperation with outside brokers, and other promotional and marketing activities as may be necessary and agreed upon with the Debtor;

   b.    analyzing offers and proposals from potential Buyers and offering recommendations to the Debtor in connection with any Sale Transaction involving the Property;

   c.    assisting with negotiations regarding any Sale Transaction involving the Property; and

   d.    assisting with the consummation of other necessary transactions involving the Property in relation to a Sale Transaction.

10.    I believe that BRS's proposed retention, upon the terms and conditions set forth in the Engagement Agreement, are reasonable and based upon industry standards.  Further, BRS desires and is willing to act in this case and render the necessary professional services as real estate broker and sales agent for the Debtor.

## PROFESSIONAL COMPENSATION

11.    The Debtor has agreed to compensate BRS in accordance with the terms and conditions of the Engagement Agreement, subject to Court approval and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and any Court order.

12.    Pursuant to the Engagement Agreement, BRS shall earn a commission of $300,000.00 plus one percent (1.0%) (the "Commission Fee") of the amount of the "gross sales price" retrieved from a Sale Transaction, payable to BRS upon closing.  The Engagement Agreement defines "gross sales price" to include any mortgage, loan or other obligations of the

Debtor which may be assumed by a Buyer or which a Buyer takes title "subject to", and any purchase money loans or mortgages taken back by the Debtor and the sales price of any fixtures and other personal property sold by any separate agreement between the Debtor and a Buyer as part of the overall Sale Transaction.[2] In the contemplated amended Plan, the Debtor has agreed to classify BRS's Commission Fee and Marketing Costs as an administrative professional fee claim *pari passu* with the Debtor's other professional fee claims.

13. BRS will also be reimbursed for certain costs and expenses. As described in the Engagement Agreement, the Debtor has agreed to reimburse BRS's reasonable actual out-of-pocket costs and expenses incurred in the preparation of any offering materials and marketing of the Property (the "<u>Marketing Costs</u>" and, together with the Commission Fee, the "<u>Fee Arrangement</u>") including (i) the cost of producing and distributing descriptive and offering materials of the Property, and (ii) third party websites that coordinate marketing efforts, distribute confidentiality agreements, and host offering and due diligence materials (*e.g.*, DropBox). As described in the Engagement Agreement, BRS has agreed to provide a detailed line-item budget of proposed expenses for the Debtor's prior written approval, and BRS will only expend such amounts as are set forth in the written budget approved by the Debtor unless otherwise approved in advance by the Debtor. BRS and the Debtor anticipate the budget for the Marketing Costs will be approximately $50,000.00 to $75,000.00.

## INDEMNIFICATION

14. The Debtor has also agreed to certain indemnification and reimbursement

---

[2] The Engagement Agreement provides that if the Debtor enters into a Transaction (as defined in the Engagement Agreement) involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in the Debtor (including without limitation between owners of interests in the Debtor), or by a transaction or integrated set of transactions intended to have the effect of conveying to a Buyer less than 100% of the Property, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, the Commission Fee.

provisions (the "<u>Indemnification Provisions</u>").  As described in the Engagement Agreement, the Debtor has acknowledged that BRS is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative to the Property or any of the leases, license or other agreements to which the Property is or may be subject (collectively, the "<u>Property Conditions</u>").  BRS has agreed to indemnify, defend and hold the Debtor harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements, and court costs) incurred by and/or asserted against the Debtor arising out or relating to any claim for fees and/or commissions relating to the Property asserted against the Debtor by any broker(s) with whom BRS will deal with unless the Debtor enters into a Transaction (as defined in the Engagement Agreement) document with a Buyer without receiving an indemnity against the claims of any outside broker.

15.     Also, as described in the Engagement Agreement, the Debtor has agreed to disclose to BRS any and all information which the Debtor has regarding the Property Conditions, and BRS is authorized to disclose any such information to prospective Buyers upon the prior written approval of the Debtor, and any such approval will remain in effect until revoked in writing.

16.     Finally, the Debtor has agreed to indemnify and hold BRS harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by BRS which may arise out of or relate to any of the Property Conditions.

17.     I believe the Indemnification Provisions were negotiated at arm's length and in good faith between the Debtor and BRS.  I believe that the Indemnification Provisions reflect the

customary qualifications and limits on such terms for similar transactions, and respectfully submit that the Indemnification Provisions are reasonable.

18.     Because BRS is being retained by the Debtor to perform a specialized and discrete task, it will not be compensated based upon time and effort expended.  Instead, BRS will be compensated based on the occurrence of a Sale Transaction.  BRS has advised the Debtor that – because its compensation is results-oriented and directly related to the benefit received by its clients – it is not BRS's practice to keep detailed time records similar to those customarily kept by attorneys and other professionals who are compensated on an hourly basis in Chapter 11 cases.  I understand it is standard practice in BRS's industry for professionals providing services relating to the disposition of real property to be compensated on a percentage or contingent fee basis, rather than on an incremental hourly basis, for such services.  Consistent with industry practice, BRS intends to bill the Debtor on a contingent fee basis for its real estate broker services as set forth in the Engagement Agreement.

19.     Therefore, I submit that the requirement to file detailed time records and periodic fee applications pursuant to the applicable rules and Fee Guidelines would be unnecessary and unduly burdensome under the circumstances.

20.     No promises have been made or received by BRS as to payment or compensation in connection with this Chapter 11 Case other than in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and such other procedures that have been or may be fixed by order of this Court.

21.     I believe the terms and conditions of the Engagement Agreement relating to BRS's compensation, including the Fee Arrangement, are competitive in the relevant market for real estate services, is consistent with, and typical of, compensation arrangements entered into by real

estate professionals of similar stature to BRS in connection with the rendering of similar services under similar circumstances. After discussions with the Debtor, I believe that the compensation structure is reasonable, market-based, and designed to compensate BRS fairly for its work. I also believe that the commissions to be charged by BRS are reasonable in light of (a) industry practice; (b) market rates charged for comparable services; and (c) BRS's substantial experience in real estate dispositions.

## BRS'S DISINTRESEDNESS

22.     BRS has undertaken to determine whether it has any conflicts or other relationships across its business that might cause it to be ineligible for employment by the Debtor in this case. Based on a conflicts search conducted by BRS of all BRS entities and operations, and as further described herein, to the best of my knowledge, information and belief, BRS represents no interest adverse to the Debtor or to its estate in the matters for which BRS is proposed to be retained.

23.     In addition to the foregoing, through diligent inquiry, I have ascertained that BRS is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code in that BRS, to the best of its knowledge:

     a.   is not a creditor, equity security holder or insider of the Debtor;

     b.   is not and was not, within two (2) years before the date of the filing of the Debtor's Chapter 11 petition, a director, officer, or employee of the Debtor; and

     c.   does not have an interest materially adverse to the interest of the Debtor's estate, or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtor or for any reason.

24.     Based upon the above, I believe that BRS is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code. Further, pursuant to Bankruptcy Rule 2014,

to the best of my knowledge BRS has no connections with the debtor, its creditors, any other party in interest or their respective attorneys and accountants.  If BRS discovers additional information that requires disclosure, BRS will file a supplemental disclosure statement with the Court.

25.     Neither I nor any of the BRS's professionals who may provide services for the Debtor is related to any Judge of this Court, the United States Trustee assigned to this Chapter 11 Case, or any person employed in the office of the United States Trustee.

26.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 19, 2022

By: /s/ *Woody Heller*
    Woody Heller
    Founder, Branton Realty Services LLC