UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
|  | ) |
| Debtor. | ) |
|  | ) |

### ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER AND SALES AGENT TO DEBTOR NINETY-FIVE MADISON COMPANY, L.P. *NUNC PRO TUNC* TO AUGUST 17, 2022

Upon consideration of the application (the "Application")[1] of Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor and debtor in possession in this Chapter 11 case (the "Chapter 11 Case"), pursuant to Sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), for entry of an order (this "Order"): (a) authorizing the employment and retention of BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to *August 17*, 2022; (b) approving the terms of BRS's employment and retention, as memorialized in that certain engagement agreement dated August **18**17, 2022 (the "Engagement Agreement"), attached as **Exhibit 1** to this Order, including the Fee Arrangement and Indemnification Provisions set forth in the Engagement Agreement; and (c) modifying the timekeeping requirements of Local Rule 2016-1 and the *General Order M-447 Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated January 29, 2013* (the "Fee Guidelines"), and any other applicable procedures and orders of the Court in connection with BRS's engagement; and upon the Declaration of Woody Heller (the "Heller Declaration"), which was filed with the Court as

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Application.

**Exhibit B** to the Application; and the Court having reviewed the Application and the Heller Declaration; and the Court being satisfied, based on the representations made in the Application and in the Heller Declaration, that (i) BRS does not hold or represent any interest adverse to the Debtor's estate, and (ii) BRS is a "disinterested person" as that phrase is defined in Section 101(14) of the Bankruptcy Code; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; **and no objections to the Application having been timely filed;** and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtor's estate and all parties-in-interest and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **[DSJ 8/31/2022]**

It is hereby ORDERED that:

1. The Application is granted to the extent set forth herein.

2. In accordance with Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, the Debtor is hereby authorized and empowered to employ and retain BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 17, 2022, in accordance with the terms and conditions set forth in the Engagement Agreement, and the Debtor is authorized to pay fees and reimburse expenses, and to provide indemnification, contribution, and/or reimbursement to BRS on the terms and at the times specified in the Engagement Agreement.

3. BRS shall be compensated for fees and reimbursed for out-of-pocket expenses by the Debtor in accordance with the terms and conditions of the Application and/or Engagement Agreement, and all fees and out-of-pocket expense reimbursements to be paid to BRS, including without limitation the Commission Fee, shall be subject to Section 328(a) of the Bankruptcy Code.

4. Notwithstanding anything to the contrary contained herein or in the Application and/or Engagement Agreement, BRS shall file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines and any other procedures or orders of the Court; provided, however, that BRS shall not be required to keep or submit detailed time records as part of its fee application.

5. In the event that, during the pendency of these cases, BRS seeks reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys, appropriately redacted to preserve applicable privileges, shall be included in BRS's fee applications and such invoices and time records shall be in compliance with the Local Rules, and shall be subject to the Fee Guidelines and approval of the Court under the standards of Bankruptcy Code Sections 330 and 331, without regard to whether such attorney has been retained under Bankruptcy Code Section 327 and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that BRS shall not seek reimbursement from the Debtor's estate for any attorney's fees incurred in defending against objections to any of BRS's fee applications filed in these cases;

6. Notwithstanding anything to the contrary in the Application, the Heller Declaration, or the Engagement Agreement, during the pendency of this Chapter 11 Case, the Indemnification Provisions of the Engagement Agreement are hereby modified as follows:

3

(a) All requests by indemnified persons for the payment of indemnification as set forth in the Engagement Agreement (such persons, the "Indemnified Persons") shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Agreement **and this Order** and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, and in no case shall an Indemnified Person be indemnified if any losses, claims, damages, liabilities or expenses are finally judicially determined to have resulted from such Indemnified Person's gross negligence, bad faith, or willful misconduct; and **[DSJ 8/31/2022]**

(b) In the event that an Indemnified Person seeks reimbursement from the Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Agreement, the invoices and supporting time records from such attorneys shall be included in BRS's own applications, both interim and final, and such invoices and time records shall be subject to the applicable Fee Guidelines and the approval of the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

7. Any limitation of liability pursuant to the terms and conditions set forth in the Engagement Agreement are hereby eliminated for the duration of this Chapter 11 Case.

8. Notwithstanding anything to the contrary in the Application and/or Engagement Agreement, to the extent that BRS uses the services of independent contractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, BRS (i) shall pass-

through the cost of such Contractors to the Debtors at the same rate that BRS pays the Contractors; (ii) shall seek reimbursement for actual out-of-pocket expenses only; and (iii) shall ensure that the Contractors are subject to the same conflict checks and disclosures as required of BRS by Rule 2014 of the Bankruptcy Rules.

9. The Debtor and BRS are authorized and empowered to take all actions necessary to effectuate the relief granted by this Order.

10. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

12. **In the event of a conflict between this Order and the Application and/or Engagement Agreement, the terms of this Order shall govern. [DSJ 8/31/2022]**

Dated: New York, New York
        August 31, 2022

                                       *s/ David S. Jones*
                                       HONORABLE DAVID S. JONES
                                       UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**LISTING AGREEMENT FOR SALE** (this "**Agreement**") dated as of August 18 2022 ("**Effective Date**") between Branton Realty Services LLC, a New York limited liability company ("**Branton**"), and Ninety-Five Madison Company, L.P., a New York limited partnership ("**Owner**").

Background

Owner owns the property known as 95 Madison Avenue, New York, New York (the "**Property**") and desires to engage Branton to arrange a sale or other disposition of all or a portion of the Property to a counterparty (a "**Counterparty**") upon the terms and provisions more fully set forth herein. As used herein, Counterparty includes affiliates, designees, nominees and assignees thereof. On March 22, 2021, Owner filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (Case No. 21-10529) (the "**Bankruptcy Court**").

Agreement

1. **Appointment**. Subject to the conditions and limitations contained in this Agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the exclusive right to market the Property for a sale, as defined in the third paragraph of Exhibit A (any such transaction being a "**Transaction**"). The terms and conditions of any proposed Transaction shall be subject to review and acceptance by Owner in its sole and absolute discretion. Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion. Branton shall coordinate and work with Owner's designated tax advisor, as necessary, with respect to a Transaction.

2. **Term**. The term of Branton's appointment hereunder (the "**Term**") shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term.

3. **Referrals**. Owner shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

4. **Owner Information**. Owner shall furnish to Branton such information with respect to the Property in writing as Branton may reasonably request in order to render its services effectively. Branton shall under all circumstances (i) be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all written information that has been furnished to it by Owner, (ii) have no obligation to verify the accuracy or completeness of any such information, and (iii) not be responsible for the inaccuracy or incompleteness of any such information provided. All documents and other materials, investigations, reports and information with respect to the Property or Owner shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner, after written authorization from Owner and after delivering an executed confidentiality agreement form (typically acceptable in the ordinary course

in similar transactions), and Owner shall be solely responsible for the accuracy of the contents of the same. Subject to the rights of any tenants, Owner shall provide reasonable access to the Property for Branton and, as arranged by Branton, prospective Counterparties.

5. **Compensation**. Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A (the "Commission") as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below.

Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the "**List**") of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein.

6. **Brokers**.

a. Branton is authorized to cooperate with outside brokers ("**Outside Brokers**") representing Counterparties in connection with a proposed Transaction. Branton shall obtain from any Outside Broker an agreement, in form and substance reasonably satisfactory to Owner, providing that the Outside Broker shall look solely to the Counterparty for any commissions due to such Outside Broker in connection with the Transaction. Any transaction document executed shall contain an indemnity from the Counterparty in favor of both Owner and Branton against claims of any Outside Broker.

b. Branton agrees to indemnify, defend and hold Owner harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements and court costs) incurred by and/or asserted against Owner arising out or relating to any claim for fees and/or commissions relating to the Property asserted against Owner by any broker(s) with whom Branton has dealt unless Owner enters into a Transaction document with a Counterparty without getting an indemnity against the claims of any Outside Broker.

c. Since Owner dealt with other brokers prior to Effective Date with respect to the Property, Owner shall be responsible for any commissions owed to such brokers. Owner agrees to indemnify and hold Branton harmless from and against all claims, actual out-of-pocket costs, liabilities, settlements, and judgments (collectively "claims"), and all costs of defense against such claims (including reasonable attorneys' fees and disbursements), by such other brokers.

7. **Marketing & Expenses**. Owner shall pay the fees and disbursements of legal counsel, engaged by Owner. Owner authorizes Branton to market the Property, including preparing offering materials, all of which materials are to be approved or disapproved in writing

#11386827 v6 \029230 \0008

2

*JMH*

by Owner (in its sole and absolute discretion) in writing within five (5) business days of presentation to Owner from Broker prior to digital distribution and if not disapproved in writing within five (5) business days same shall be deemed approved. All such materials about the Property or the Transaction whether prepared by Branton or Owner will identify Branton as the exclusive broker for the Property. Owner shall reimburse Branton or pay directly, when billed, Branton's reasonable actual out-of-pocket costs and expenses incurred in preparation of the offering materials and marketing the Property, which costs and expenses have all been approved in writing by Owner (the "**Marketing Costs**") including, but not limited to (a) the cost of producing and distributing descriptive materials (including the costs of photographs, maps, renderings, plot plans and blueprints), (b) cost of producing graphics for the offering materials and (c) third party websites that coordinate marketing efforts, distribute confidentiality agreements and host offering and due diligence materials (like DropBox). Branton shall provide a detailed line-item budget of proposed expenses for Owner's prior written approval. Within five (5) business days of presentation of a budget of proposed expenses Owner shall approve or disapprove in writing such expenses, and if not so disapproved in writing same shall be deemed approved, and Branton shall only expend such amounts as are set forth in the written budget approved by Owner, unless otherwise approved in advance by Owner. The Marketing Costs shall be reimbursed or paid by Owner whether or not a Transaction occurs. The parties anticipate the budget for marketing expenses to be approximately $50,000.00 to $75,000.00.

8. **Representations**. Other than as set forth in paragraph 21, each party represents and warrants to the other that the representing party has full right and authority to enter into and perform its obligations under this agreement, and that the same does not violate or conflict with, or require any consents or approvals under any Agreements by which the representing party is governed or bound.

9. **Confidentiality; Press Releases.** Branton acknowledges that Branton's services under this Agreement may provide Branton with access to confidential business, professional, personal or private information concerning Owner and its direct or indirect owners and/or their family members. Branton acknowledges the confidential nature of such information and agrees that Branton and Branton's agents will not issue any press releases, grant any interviews or release any other information or announcements to the press or the public or issue any other form of publicity, or otherwise publish or disclose to any third person, any such confidential information, except as specifically required to perform Branton's obligations under this Agreement. Notwithstanding the foregoing, the Parties specifically acknowledge that Branton shall be permitted to issue press releases and market the Property consistent with this Agreement provided that Branton does not disclose any information which would otherwise be deemed confidential pursuant to this Paragraph.

10. **Indemnification**. Owner acknowledges that Branton is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative

#11386827 v6 \029230 \0008

3

to the Property or any of the leases, license or other agreements to which the Property is or may be subject (all of the foregoing being called "**Property Conditions**"). Owner agrees to disclose to Branton any and all information which Owner has regarding the Property Conditions and Branton is authorized to disclose any such information to prospective Counterparties, upon the prior written approval of Owner, which approval shall remain in effect until revoked in writing. All documents, materials, investigations, reports and information with respect to Property Conditions shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner only with the initial and prior written approval of Owner and Owner shall be solely responsible for same. Owner agrees to indemnify and hold Branton harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by Branton which arise out of or relate to any of the Property Conditions. This paragraph shall survive the expiration of this Agreement for the period of the applicable statute of limitations as to any such claims.

11. **Notices**. Any notices required to be given by either party under this Agreement shall be in writing and sent by (i) messenger/personal delivery, (ii) certified mail return receipt requested, (iii) nationally recognized overnight courier service or (iv) email, addressed to the parties as provided below. Notices shall be deemed given upon receipt or rejection, if given by personal delivery; on the day that is five (5) business days following delivery to the postal authorities, if mailed as provided herein; on the business day following delivery to the courier service, if given by overnight courier as provided herein or when sent by e-mail provided no automatic bounce back is received, and further provided that any e-mail sent after 5:00 PM in the recipient's time zone on a business day or at any time on a non-business day shall be deemed given on the next business day. Notwithstanding anything to the contrary contained herein, notice by email pursuant to (iv) above shall not be an acceptable method of providing any legal notice, default notice or termination notice hereunder and the same shall be required to be sent by one of the methods set forth in (i)-(iii) of the first sentence of this paragraph.

    If to Owner, Ninety-Five Madison Company, L.P., 95 Madison Avenue, Suite 609, New York, New York 10016, with a copy by email to: Rita Sklar (ritasklar@gmail.com); Sharan Sklar (ssklar@ninetyfivemadison.com) and Michael Sklar (msklar@ninetyfivemadison.com).

with a copy to:

Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq., email: mlefkowitz@rosenbergestis.com and

Olshan, 1325 Avenue of the Americas, New York, New York 10019, Attention: Thomas J. Fleming, Esq., email: tfleming@olshanlaw.com

If to Branton, at 1080 Fifth Avenue, Apt. 2B, New York, New York 10128, Attention: Mr. Warren Heller, email: woody.heller@outlook.com and wheller@brantonrealty.com.

With a copy to:

Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York, 10022-4784, Attention: Mr. Jonathan Margolis, email: jmargolis@morrisoncohen.com.

A party may change the address to which notices/service of process shall be sent to or served on it by five (5) days' prior written notice to the other party. Any notice served by an attorney representing a party (as set forth in Paragraph 11 above) shall have the effect of a notice served by the party.

12. **OFAC**. Each party warrants and represents to the other that, the representing party and all parties owning (directly or indirectly) an ownership interest in the representing party (a) is not, and shall not become, a person or entity with whom the other party is prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order, or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, any dealing or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13. **Governing Law, Venue, Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of laws). Any disputes related to or arising from this Agreement must be brought exclusively in New York County in the State of New York, to the jurisdiction of which each of the parties hereby submits. Branton and Owner each waive trial by jury in any action or proceeding under this Agreement.

14. **Fees and Interest.** If either party commences an action or proceeding against the other party to enforce its rights under the Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and disbursements from the other party. Any amount due under this Agreement and not paid when due shall bear interest at the rate of two percent per annum in excess of the prime commercial lending rate as published from time to time in *The Wall Street Journal (New York edition)*, but not in excess of the highest rate permitted by applicable law.

15. **Branton Duties**. In addition to the obligations set forth elsewhere in this Agreement, Branton hereby agrees to (i) host weekly conference calls as needed, based on the status of the project, on the same day and time each week during the Term, adjusting for an alternate day in a week in which a holiday occurs, or the availability of less than two (2) of the partners, (ii) distribute weekly reports, as applicable once marketing is underway (to be received one (1) business day prior to the weekly call or meeting provided for in (i)) with updates on market

#11386827 v6 \029230 \0008

conditions, marketing, showings, offers, etc., and (iii) transmit all offers made by Counterparties to Owner in writing.

16. **Owner Designee**. Branton hereby acknowledges that Rita Sklar, Sharan Sklar and Michael Sklar are representatives ("Representatives") of the Owner. Such Representatives shall designate in writing to Branton a single person (the "Designee") to act on their behalf, and Branton is hereby authorized to act upon direction given by the Designee with respect to requests for information, arranging group calls and other similar non-substantive matters. The Representatives may periodically designate a new Designee, in which case all of the Representatives shall notify Branton in writing thereof, and Branton shall act upon the direction of the new Designee. Notwithstanding the foregoing, the Representatives may periodically request that Branton make itself available for conference calls with the Representatives to discuss any subject concerning the Transaction.

17. Branton shall look only and solely to Owner's estate and interest in and to the Property (which shall consist of (a) the proceeds, rents and profits therefrom, (b) the proceeds of any lease, sale, conveyance, assignment, transfer, mortgage or refinancing thereof and (c) any insurance proceeds or condemnation awards relating to any portion of the Property) for the satisfaction of any right of Branton arising out of this Agreement or for the collection of judgment or other judicial process or arbitration award requiring the payment of money by Owner and no other property or assets of Owner, Owner's agents, incorporators, shareholders, employees, officers, directors, partners, manager, agents, principals (disclosed or undisclosed), members, joint venturers, or affiliates (collectively, "Owner's Affiliates") shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Branton's rights and remedies under or with respect to this Agreement or any other liability of Owner to Branton.

18. Branton represents further that it is presently and will at all times remain a licensed real estate broker in the State of New York. As a material inducement to Owner to enter into this Agreement, Branton covenants that Woody Heller ("**Heller**") will be actively involved in performing the services required of Branton hereunder. In the event of Heller's death or incapacity, this Agreement shall automatically terminate and no Commission shall be due and owing (other than in connection with a pending Transaction or may be due and owing pursuant to the terms of paragraph 5 hereof).

19. It is understood that Branton is not granted any right or authority to assume or create any obligation or liability or make any representation, warranty or agreement (expressed or implied) on Owner's behalf or to bind Owner in any manner whatsoever.

20. Notwithstanding anything to the contrary, it is expressly understood and agreed that (i) Owner is under no obligation of any nature whatsoever to either (a) accept any Counterparty identified by Branton or anyone else as a counterparty and/or (b) accept any Counterparty procured by Branton or anyone else and/or to execute and/or deliver any contract of sale or other agreement, (ii) Owner shall have the absolute right in Owner's sole discretion, without explanation or liability

of any nature whatsoever to Branton, to, at any time, reject any Counterparty and/or the terms of any prospective contract of sale or other agreement with any Counterparty and (iii) Owner shall have no liability to Branton of any nature whatsoever should Owner fail for any reason whatsoever (except in the case of Owner's willful default) to either (i) accept any Counterparty and/or execute and deliver any contract of sale or other agreement and/or (ii) close upon the sale of the Property, it being agreed that if an agreement for a Transaction is executed and delivered with a Counterparty, but the closing thereunder fails to occur for any reason whatsoever (except in the case of Owner's willful default), then Branton shall not be entitled to any Commission whatsoever.

21. **Bankruptcy Court Approval.** Notwithstanding anything to the contrary herein the terms and conditions of the Agreement in all respects are subject to the approval of, the Bankruptcy Court. Owner will, promptly after its execution of this Agreement, file an application and proposed order seeking from the Bankruptcy Court approval of its employment of Branton pursuant to the terms of this Agreement, and pursuant to, as applicable, Sections 329(a) and 328(a) of the Bankruptcy Code. Owner agrees and acknowledges to attach a complete copy of this Agreement to the application. Owner will provide Branton the application and proposed order authorizing this Agreement sufficiently in advance of their filing in order for Branton to have ample time to review and discuss any comments it may have with Owner, and the application shall be acceptable to Branton, in form and substance. The proposed order will include, without limitation, the following terms and conditions: (a) finding that none of the fees or commissions payable to Branton hereunder constitute a "bonus" under applicable law; (b) directing that Branton will be exempt from keeping time records for it's work hereunder (as Branton will not be billing on an hourly basis); (c) finding that the terms and conditions of this Agreement are reasonable; (d) that the Commission due hereunder to Branton will be paid at the closing of a Transaction with respect to the Property without a further application or order of the Bankruptcy Court; and (e) directing that any unpaid Commission or marketing expenses owed to Branton shall be treated as an administrative claim under Section 507(a)(1) of the Bankruptcy Code. If an order obtaining these terms is not obtained from the Bankruptcy Court within thirty (30) days after both parties have signed this Agreement, then Branton may terminate this Agreement. If Owner obtains an order of the Bankruptcy Court authorizing its use of cash collateral or debtor in possession financing and if the order requires submission of a proposed budget specifying post-petition expenditures, then Owner will include in the budget line items providing for the payment of the expenses to be paid or reimbursed as and when provided pursuant to this Agreement. All amounts projected to be paid to Branton under this Agreement will be included in the carve-out for professionals provided in Owner's bankruptcy case. Should the Bankruptcy Court order a sale of the Property at auction, Branton is authorized to and will act as the exclusive auctioneer upon the terms set forth herein. The Bankruptcy Court will retain jurisdiction over any disputes under this Agreement. If the bankruptcy case is dismissed and the Property is not disposed of under Bankruptcy Court jurisdiction, then any dispute between the parties arising under this Agreement will be resolved in the New York State Supreme Court, County of New York, Commercial Division.

#11386827 v6 \029230 \0008

7

22. **Miscellaneous**. This Agreement (i) expresses the parties' entire agreement on the matters covered herein, and (ii) supersedes all prior understandings between such parties on such matters. This Agreement may not be amended or modified except in writing signed by all of the parties. Neither party may assign this Agreement without the prior consent of the other party, which consent may be withheld in such party's sole discretion. This Agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Executed by the parties to confirm the foregoing.

BROKER:

BRANTON REALTY SERVICES LLC

By: /s/ Warren Heller
Name: Warren Heller
Title: Manager

OWNER:

NINETY-FIVE MADISON COMPANY, L.P.

By: Sharan Sklar Management LLC

By: /s/ Sharan Sklar
Name: Sharan Sklar
Title: Manager

By: Michael Sklar Management LLC

By: /s/ Michael Sklar
Name: Michael Sklar
Title: Manager

#11386827 v6 \029230 \0008

Exhibit A
Compensation

Branton shall earn, and Owner shall pay Branton, a fee upon the closing of any Transaction of $300,000.00 plus one (1%) percent of the gross sales price.

As used herein, "gross sales price" includes any mortgages, loans or other obligations of Owner which may be assumed by the Counterparty or which the Counterparty takes title "subject to", and any purchase money loans or mortgages taken back by Owner and the sales price of any fixtures and other personal property sold by separate agreement between Owner and the Counterparty as part of the overall sale of the real property.

For purposes of this Agreement, a sale shall also include, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction (however characterized) by which Owner's interest in the Property is transferred to an unaffiliated third party for consideration. It is further agreed that if Owner enters into a Transaction involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in Owner (including without limitation between owners of interests in Owner or their affiliates), or by a transaction or integrated set of transactions intended to have the effect of conveying to such Counterparty less than 100% of the Property or Owner's interest therein, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, a commission hereunder, and the date of such effective legal transfer shall be deemed the closing date of such transaction. For the avoidance of doubt the intent of the above sentence is to calculate the value of 100% of the Property or 100% of Owner's interests in the Property to be sold and then pay the Broker a commission based 100% of such value, not the pro-rata percentage of such Property or interests that are actually sold. If a ground lease is entered into, the parties will use the agreed upon value of the Property in determining the compensation.

The intention of the foregoing is that Branton will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A.

# Exhibit B
# TIMELINE*

- Assemble and create the marketing brochure and due diligence material: 4 weeks depending on what's available and what has to be ordered
    - photos
    - write the text
    - prepare the graphics of the marketing brochure
    - review and collect the due diligence reports
        - environmental
        - engineering report
        - review any existing proposals
        - set up the marketing and due diligence website
- Initiate the marketing process: 6 weeks but could be longer during the summer
    - Email confidentiality agreements and a deal summary page
    - Send the marketing brochure once the CAs are signed
    - Start conducting tours
    - Review our proposed structure with potential purchasers
    - Address questions, collect whatever additional information is requested
    - Proceed in primal selling mode
    - Prepare draft purchase agreement
- Review first-round bids: 2 weeks
    - Receive and review
    - Prepare a bid summary sheet comparing the relevant metrics of the various purchase proposals
    - Select a handful of bidders to proceed to a second-round bid or choose one bidder to move forward quickly ahead of the pack, or both, depending on the situation and bids received
    - Provide the finalists with the purchase contract to review
- Review second-round bids: 1-2 weeks
    - Review offers and contract comments
    - Interview bidders, if needed/helpful
    - Select a purchaser
    - Finalize and execute a contract, likely subject to a due diligence, but hopefully not
- Buyer due diligence: 0-4 weeks
    - This process is intended for buyers to confirm seller's representations, but most will actually use it to confirm their financing
    - Finalize unconditional contract
- Proceed to Closing: 6-10 weeks
    - Normally we should be able to close in 6-8 weeks, but given the financing markets, may need an extra month

#11386827 v6 \029230 \0008

11

\* The parties hereto agree that the referenced timeline is a timeline example in normal market conditions; all parties recognize that the current market is not within normal conditions and marketing efforts may take longer than so indicated on this timeline.