**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) |
|  | ) |
| Debtor. | ) |
|  | ) |

### ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION DEBTOR-IN-POSSESSION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Ninety-Five Madison Company, L.P. (the "Debtor"),

the debtor in this Chapter 11 case, pursuant to Sections 105, 361, 362, 363, 364, 503, 506, and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 4001

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the

Local Rules of the United States Bankruptcy Court for the Southern District of New York (the

"Local Rules"), seeking entry of this Order:

    (i)     authorizing the Debtor to enter into the *Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* (the "DIP Credit Agreement")[1] by and among the Debtor and Madison Avenue Servicing LLC (the "DIP Lender"), substantially in the form attached hereto as **Exhibit 1** (together with all schedules and exhibits attached thereto and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "DIP Documents"), pursuant to the terms and conditions herein, in the DIP Documents,

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion and the DIP Credit Agreement.

and in the Motion;

(ii)     subject to the Carve-Out (as defined herein), granting to the DIP Lender (i) superpriority administrative expense claim status, pursuant to Section 364(c)(1) of the Bankruptcy Code; (ii) a first priority lien pursuant to Section 364(c)(2) of the Bankruptcy Code; and (iii) a first priority, priming lien pursuant to Section 364(d) of the Bankruptcy Code, pursuant to the terms and conditions herein, in the DIP Documents, and in the Motion;

(iii)    modifying the automatic stay imposed by Section 362(d) of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Order and the DIP Documents; and

(iv)     granting related relief.

The Court having considered the relief requested in the Motion, the *Declaration of Sharan Sklar in Support of Debtor's Motion for Entry of Order (I) Authorizing Debtor to Obtain Postpetition Debtor-In-Possession Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, the DIP Documents, and the evidence submitted and arguments made at the hearing held on **December 8** ~~November [16]~~, 2022 (the "Hearing"); and due and sufficient notice of the Hearing having been given in accordance with Bankruptcy Rules 102(1) and 4001(c), and all applicable Local Rules; and the Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; **and based upon and for reasons stated by the Court in an oral ruling rendered on the record during the December 8 hearing, conditioned on finalization of a settlement between Debtor and creditor Vitra, Inc. that has now been finalized and approved (see ECF No. 195);** and it

appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interest of the Debtor and its estate, and will fund the operation of the Debtor's business; and is necessary to preserve the value of the Debtor's estate; and it appearing that the Debtor's entry into the DIP Documents is a sound exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor, **[DSJ 12/14/2022]**

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition Date.</u>  On March 22, 2021, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

B.    <u>Debtor in Possession.</u>  The Debtor is operating its business and managing its property as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed.

C.    <u>Jurisdiction and Venue.</u>  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2.

D.    <u>Notice.</u>  The Hearing was held pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2.  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

E.  <u>Findings Regarding DIP Facility.</u>

(i)  <u>Need for DIP Financing.</u>  The Debtor requires DIP Financing to continue operating its business, to fund the administrative expenses of the Chapter 11 Case as they come due, and to pursue the Transaction.

(ii)  <u>Good Cause.</u>  Good and sufficient cause has been shown for the entry of this Order and authorization of the Debtor to obtain financing pursuant to the terms of the DIP Credit Agreement.

(iii)  <u>Business Judgment.</u>  The Debtor's decision to enter into the DIP Facility is an exercise of its sound business judgment following extensive negotiations with the DIP Lender, an arm's-length process, a search for other financing options, and the Debtor's careful evaluation of their limited available alternatives.

(iv)  <u>Good Faith and Arms' Length Negotiations.</u> The DIP Financing was negotiated in good faith and at arm's length by and among the Debtor, its advisors, and the DIP Lender.  The DIP Lender, in agreeing to provide the DIP Financing, is extending credit to the Debtor in good faith under Section 364(e) of the Bankruptcy Code.

(v)  <u>No Credit Available on More Favorable Terms.</u>  The Debtor is unable to obtain sufficient debtor-in-possession financing on more favorable terms from sources other than the DIP Lender under the DIP Documents.

(vi)  <u>Adequate Protection.</u>  Pursuant to Section 361 of the Bankruptcy Code, the interests of Vitra, Inc. and the New York City Department of Finance (collectively, the "<u>Alleged Prepetition Secured Creditors</u>") in the Property

are adequately protected, from any diminution in value caused by the granting of the priming lien to the DIP Lender, by an equity cushion. The value of the Property far exceeds the Prepetition Secured Creditors' claims. Even considering the $23,000,000 obligation potentially incurred by the Debtor pursuant to the DIP Facility, the Alleged Prepetition Secured Creditors are vastly oversecured.

**BASED UPON THE FOREGOING, IT IS HEREBY ORDERED AS FOLLOWS:**

1. <u>Approval of Motion.</u> The Motion is granted to the extent set forth in this Order and the DIP Documents; provided, however, that if there are any inconsistencies between the terms of the Order and the DIP Documents, the terms of the Order shall govern. This Order shall become effective immediately upon its entry.

2. <u>Authorization of DIP Financing.</u>

(a) The DIP Facility is hereby approved. The Debtor is authorized and directed to execute, issue, deliver, enter into and adopt all DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith. The Debtor is hereby authorized to borrow money under the DIP Facility up to the maximum loan amount.

(b) In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements and financing statements), and, based on the representation of the Debtor's counsel that the fees referenced in this paragraph are exclusively Lender's fees, without further application to the Court, to pay all fees referred to in this Order and the DIP Documents.

3. <u>Binding Effect.</u>  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law.

4. <u>Use of DIP Loan Proceeds.</u>  Subject to the terms and conditions of this Order and the DIP Documents, the proceeds of the Loan shall be used by the Debtor to (a) pay closing costs; (b) fund general corporate needs, including, without limitation, working capital needs; (c) pay any obligations authorized to be paid in accordance with the Budget, except to the extent that further Court authorization is otherwise required; and (d) if necessary, pay all creditor claims in full. Notwithstanding anything to the contrary in the DIP Documents, (x) no salaries or fees shall be paid to any of the General Partners without (i) the unanimous agreement of the General Partners or (ii) further order of the Court and (x) **(y)** no brokerage commissions shall be paid to Two Bins Capital without further order of the Court. **[DSJ 12/14/2022]**

5. <u>Payment of Fees and Expenses.</u>  Immediately upon entry of this Order, the Debtor is authorized to and shall pay or otherwise incur all fees, expenses, and other amounts payable under the terms of the DIP Credit Agreement and the other DIP Documents.

6. <u>DIP Superpriority Claim.</u>  Except to the extent expressly set forth in this Order in respect of the Carve-Out, pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Documents shall constitute allowed superpriority administrative expense claims, without the need to file any proof of claim.

7. <u>DIP Liens.</u>  As security for the obligations under the DIP Facility, effective and perfected upon the date of this Order and without requiring execution, recordation, or filing by the

Parties of instruments, agreements, or other documents, the following liens are hereby granted by the Debtor to the DIP Lender, subject and subordinate to the Carve-Out:

(a) A valid, binding, continuing, enforceable, fully perfected first priority lien on any otherwise unencumbered assets and property (including but not limited to (x) assets and properties that hereafter would otherwise be unencumbered and (y) after-acquired assets and properties) of the Debtor is hereby granted to the DIP Lender, pursuant to Section 364(c)(2) of the Bankruptcy Code

(b) A valid, binding, continuing, enforceable, perfected, senior priming lien upon the Property is hereby granted to the DIP Lender pursuant to Section 364(d) of the Bankruptcy Code.

8. <u>Modification of the Automatic Stay.</u> The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms of this Order and the DIP Documents, including, without limitation, to: (i) permit the Debtor to grant superpriority administrative expense status and certain liens; (ii) permit the Debtor and the DIP Lender to perform acts to assure the perfection and priority of the liens granted herein; (iii) permit the Debtor to incur liabilities and obligations; and (iv) authorize the Debtor to make, and the DIP Lender to retain and apply, payments made in accordance with the DIP Facility.

9. <u>Remedies.</u> The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby further modified to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement), to exercise its rights and remedies under the Order and the DIP Documents upon giving three (3) days written notice to the Debtor.

10.     Order Governs.  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Order and the DIP Documents.

11.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Lender, the Prepetition Secured Creditors, the Debtors and their respective successors and assigns.

12.     Effectiveness. This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

13.     Carve-Out.  As used in this Order, the term "Carve-Out" means the sum of all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under Section 1930(a) of title 28 of the United States Code plus interest at the statutory rate.

14.     Retention of Jurisdiction.  The Court shall retain jurisdiction to enforce the provisions of this Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for the Debtor, notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

SO ORDERED THIS 14TH DAY OF DECEMBER, 2022

_s/ David S. Jones_
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT

**Dated as of November 4, 2022**

Between

NINETY-FIVE MADISON COMPANY, L.P.
a New York limited partnership,
as Borrower

and

MADISON AVENUE SERVICING LLC
a New York limited liability company,
as Lender

| | |
|---|---|
| Location: | 95 Madison Avenue |
| Block: | 858 |
| Lot: | 58 |
| County: | New York County |

# TABLE OF CONTENTS

1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ....................................................... 1
   1.1 Specific Definitions .................................................................................................... 1
   1.2 Index of Other Definitions ...................................................................................... 10
   1.3 Principles of Construction ....................................................................................... 11

2. GENERAL LOAN TERMS ............................................................................................. 12
   2.1 The Loan .................................................................................................................. 12
   2.2 Interest; Monthly Payments .................................................................................... 12
   2.3 Loan Repayment ...................................................................................................... 12
   2.4 Release of Property .................................................................................................. 13
   2.5 Payments and Computations ................................................................................... 13
   2.6 Use of Proceeds ....................................................................................................... 14
   2.7 Fees; Minimum Interest .......................................................................................... 14
   2.8 Extension Options .................................................................................................... 15
   2.9 Future Advances ...................................................................................................... 16
   2.10 No Reliance .............................................................................................................. 17

3. SUPER PRIORITY SECURITY INTEREST ................................................................... 17
   3.1 Grant of Security Interest ........................................................................................ 17
   3.2 Perfection of Security Interest ................................................................................. 17

4. REPRESENTATIONS AND WARRANTIES.................................................................. 18
   4.1 Organization............................................................................................................. 18
   4.2 Proceedings; Enforceability .................................................................................... 18
   4.3 No Conflicts ............................................................................................................. 19
   4.4 Litigation .................................................................................................................. 19
   4.5 Agreements ............................................................................................................... 19
   4.6 Title .......................................................................................................................... 19
   4.7 Intentionally Omitted .............................................................................................. 20
   4.8 Full and Accurate Disclosure .................................................................................. 20
   4.9 Tax Filings ............................................................................................................... 20
   4.10 ERISA; No Plan Assets ........................................................................................... 21
   4.11 Compliance .............................................................................................................. 21
   4.12 Major Contracts ....................................................................................................... 21
   4.13 Federal Reserve Regulations; Investment Company Act; Bank Holding
        Company .................................................................................................................. 21
   4.14 Easements; Utilities and Public Access .................................................................. 22
   4.15 FEMA ...................................................................................................................... 22
   4.16 Leases....................................................................................................................... 22
   4.17 Intentionally Omitted .............................................................................................. 22
   4.18 Ownership of Borrower ........................................................................................... 22
   4.19 Purchase Options ..................................................................................................... 22
   4.20 Intentionally Omitted ............................................................................................... 22

| 4.21 | Hazardous Substances | 23 |
|---|---|---|
| 4.22 | Name; Principal Place of Business | 23 |
| 4.23 | Other Debt | 23 |
| 4.24 | Intentionally Omitted | 23 |
| 4.25 | Insurance | 23 |
| 4.26 | FIRPTA | 24 |
| 4.27 | Fiscal Year | 24 |
| 4.28 | Intentionally Omitted | 24 |
| 4.29 | Intentionally Omitted | 24 |
| 4.30 | Illegal Activity | 24 |
| 4.31 | Patriot Act | 24 |

| 5. | COVENANTS | 25 |
|---|---|---|
| 5.1 | Existence | 25 |
| 5.2 | Property Taxes and Other Charges | 25 |
| 5.3 | Intentionally Omitted | 25 |
| 5.4 | Repairs; Maintenance and Compliance; Alterations | 26 |
| 5.5 | Performance of Other Agreements | 27 |
| 5.6 | Cooperate in Legal Proceedings | 27 |
| 5.7 | Further Assurances | 27 |
| 5.8 | Environmental Matters | 27 |
| 5.9 | Title to the Property | 30 |
| 5.10 | Leases | 30 |
| 5.11 | Estoppel Statement | 31 |
| 5.12 | Acceptable Plan | 31 |
| 5.13 | Intentionally Omitted | 31 |
| 5.14 | Authority Documents | 31 |
| 5.15 | Change in Business or Operation of Property | 31 |
| 5.16 | Debt Cancellation | 31 |
| 5.17 | Affiliate Transactions | 31 |
| 5.18 | Zoning | 31 |
| 5.19 | No Joint Assessment | 31 |
| 5.20 | Principal Place of Business | 32 |
| 5.21 | Change of Name, Identity or Structure | 32 |
| 5.22 | Indebtedness | 32 |
| 5.23 | Licenses | 32 |
| 5.24 | Easements | 32 |
| 5.25 | ERISA | 32 |
| 5.26 | Prohibited Transfers | 33 |
| 5.27 | Liens | 33 |
| 5.28 | Dissolution | 34 |
| 5.29 | Expenses | 34 |
| 5.30 | Indemnity | 34 |
| 5.31 | Patriot Act Compliance | 35 |
| 5.32 | Approval of Major Contracts | 36 |
| 5.33 | Litigation | 36 |
| 5.34 | Intentionally Left Blank | 37 |

87353806v.14

| | 5.35 | Intentionally Left Blank | 37 |
|---|---|---|---|
| | 5.36 | No Distributions | 37 |
| 6. | | INTENTIONALLY OMITTED | **Error! Bookmark not defined.** |
| 7. | | NOTICES AND REPORTING | 38 |
| | 7.1 | Notices | 38 |
| | 7.2 | Borrower Notices and Deliveries | 39 |
| | 7.3 | Financial Reporting | 40 |
| 8. | | INSURANCE; CASUALTY; AND CONDEMNATION | 42 |
| | 8.1 | Insurance | 42 |
| | 8.2 | Casualty | 47 |
| | 8.3 | Condemnation | 48 |
| | 8.4 | Application of Proceeds or Award | 48 |
| 9. | | DEFAULTS | 50 |
| | 9.1 | Events of Default | 50 |
| | 9.2 | Remedies | 53 |
| 10. | | SPECIAL PROVISIONS | 55 |
| | 10.1 | Sale of Loan | 55 |
| | 10.2 | Intentionally Omitted | 56 |
| | 10.3 | Severance of Loan | 56 |
| | 10.4 | Costs and Expenses | 56 |
| 11. | | MISCELLANEOUS | 56 |
| | 11.1 | Intentionally Omitted | 56 |
| | 11.2 | Brokers and Financial Advisors | 56 |
| | 11.3 | Retention of Servicer; Fees | 57 |
| | 11.4 | Survival; Successors and Assigns | 57 |
| | 11.5 | Lender's Discretion | 57 |
| | 11.6 | Governing Law | 58 |
| | 11.7 | Modification, Waiver in Writing | 59 |
| | 11.8 | Trial by Jury | 59 |
| | 11.9 | Headings/Schedules | 60 |
| | 11.10 | Severability | 60 |
| | 11.11 | Preferences | 60 |
| | 11.12 | Waiver of Notice | 60 |
| | 11.13 | Remedies of Borrower | 60 |
| | 11.14 | Prior Agreements | 60 |
| | 11.15 | Offsets, Counterclaims and Defenses | 61 |
| | 11.16 | Publicity | 61 |
| | 11.17 | No Usury | 61 |
| | 11.18 | Conflict; Construction of Documents; Reliance | 61 |
| | 11.19 | No Joint Venture or Partnership; No Third Party Beneficiaries | 62 |
| | 11.20 | Intentionally Omitted | 62 |

87353806v.14

11.21    Assignments and Participations ............................................................ 62
11.22    Waiver of Marshalling of Assets ......................................................... 62
11.23    Registered Obligations ........................................................................ 63
11.24    Set-Off ................................................................................................. 63
11.25    Counterparts ......................................................................................... 64

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Legal Description |
| Exhibit B | Form of Security Instrument |
| Exhibit C | Budget |
| Exhibit D | Form of Order |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Form of Requisition |
| Exhibit G | Form of Note |
| | |
| Schedule 1 | Intentionally Omitted |
| Schedule 2 | Intentionally Omitted |
| Schedule 3 | Litigation |
| Schedule 4 | Existing Violations |
| Schedule 5 | Organization of Borrower |

87353806v.14

**SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

This **SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**, dated as of November 4, 2022 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "*Agreement*"), between MADISON AVENUE SERVICING LLC, a New York limited liability company, having an address at 330 Great Neck Road, Great Neck, New York 11021 (together with its successors and/or assigns, "*Lender*") and NINETY-FIVE MADISON COMPANY, L.P. a New York limited partnership, having an address at 95 Madison Avenue, New York, New York 10016 (together with its permitted successors and/or assigns, "*Borrower*").

## 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

     **1.1**    <u>**Specific Definitions**</u>.  The following terms have the meanings set forth below:

     "*Acceptable Plan*" shall mean a Chapter 11 plan of Borrower that, unless otherwise consented to in advance in writing by Lender, provides for the (i) the execution and delivery to Lender by Borrower of the Security Instrument (or the continuation of the first priority perfected Lien thereof) and the satisfaction of all other requirements of <u>Section 3.2</u> or (ii) indefeasible payment in full of the Debt (other than contingent obligations not then payable) on the effective date of such Chapter 11 plan, in either case in accordance with the terms of this Agreement.

     "*ADA*" shall mean the Americans with Disabilities Act of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et. seq., as amended from time to time.

     "*Advance*" shall mean any portion of the Principal advanced by Lender to Borrower pursuant to the terms of this Agreement.

     "*Affiliate*" shall mean, as to any Person, any other Person:  (I) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) which is the spouse, issue, parent or other family relation (including in-laws) of such Person, or which is a trust or estate, the beneficial owners of which are the spouse, issue, parent or other family relation of such Person; or (v) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

     "*Alteration Threshold*" shall mean an amount equal to 2% of the sum of the Loan Amount.

     "*Approved Accountant*" shall mean (i) Gruber Plumber Raffaele Fried, CPAs, PC, (ii) any "Big Four" accounting firm or (iii) any other independent certified public accountant reasonably acceptable to Lender.

"***Approved Accounting Method***" shall mean GAAP or income tax basis accounting, in either case consistently applied, or such other method of accounting as may be reasonably acceptable to Lender.

"***Authority Documents***" means, with respect to any Person, all documents and agreements providing for, or related to, the formation, organization and governance of such Person, including such Person's partnership certificate, partnership agreement, certificate of incorporation, by-laws, stockholder's agreement, certificate of formation, operating, membership or limited liability company agreement, or other similar organization or governing documents, as applicable.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights, or any other federal or state bankruptcy or insolvency law.

"***Bankruptcy Court***" shall mean the United States Bankruptcy for the Southern District of New York.

"***Bankruptcy Rules***" shall mean the Federal Rules of Bankruptcy Procedure, as the .same may from time to time be in effect and applicable to the Chapter 11 Case.

"***Borrower Party***" shall mean Borrower, any Affiliate of Borrower and any Person acting on behalf of or at the direction of Borrower.

"***Budget***" shall mean the Budget for the use of Loan proceeds annexed hereto as Exhibit C, as the same may be amended by Borrower from time in the ordinary course of business and subject to Lender's prior written consent with respect to any change of more than five percent (5%) in any line item, unless such change is the result of cost savings in a particular line item, such consent not to be unreasonably withheld, conditioned or delayed.

"***Business Day***" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

"***Capital Expenses***" shall mean expenses that are capital in nature or required under GAAP to be capitalized.

"***Carve-Out***" shall have the meaning specified in the Order.

"***Chapter 11 Case***" shall mean the pending case in the Bankruptcy Court designated as Case No. 21-10529 (DJS).

"***Closing Date***" shall mean the date upon which the first Advance is made pursuant to this Agreement.

2

"**_Code_**" shall mean the U.S. Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**_Collateral_**" shall mean (i) the Property and (ii) any otherwise unencumbered assets and property (including but not limited to (x) assets and properties that hereafter would otherwise be unencumbered and (y) after-acquired assets and properties) of the Borrower.

"**_Collateral Documents_**" shall mean all documents and agreements guarantying payment of, or granting a Lien upon property as security for the payment of, the Debt

"**_Committees_**" shall mean, collectively, the official committee of unsecured creditors and any other committee formed, appointed or approved in the Chapter 11 Case.

"**_Confirmation Order_**" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedure as approved by the Bankruptcy Court, in form and substance reasonably satisfactory to Lender, authorizing and approving on a final basis, among other things, an Acceptable Plan, and from which no appeal or motion to reconsider has been timely filed, or, if timely filed, such appeal or motion to reconsider has been dismissed or denied, unless Lender waives such requirement.

"**_Control_**" shall mean, with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and common Control shall have correlative meanings (it being acknowledged that (a) a Person shall be deemed to have Control of another Person even if such control is limited to customary "major decision" consent or approval rights of limited partners, shareholders or members, as applicable, and (b) for the avoidance of ambiguity, a Person shall be deemed to Control a corporation if such Person (or such Person together with its Affiliates) holds outstanding shares in such corporation carrying votes in sufficient number to elect a majority of the board of directors of such corporation).

"**_Debt_**" shall mean the unpaid Principal, all interest accrued and unpaid thereon, any Minimum Interest Shortfall Amount and all other sums due to Lender in respect of the Loan or under any Loan Document.  For the avoidance of doubt, any portion of the Principal not advanced to Borrower shall not constitute part of the Debt; provided that Loan proceeds used to fund the Interest Reserve and any other reserves held by Lender in accordance with this Agreement shall be considered as advanced to Borrower

"**_Default_**" shall mean the occurrence of any event hereunder or under any other Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

"**_Default Rate_**" shall mean a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, and (ii) twenty-four percent (24%).

"***Emergency Expenditures***" shall mean the incurrence of expenses that were necessary in order to (i) avoid imminent bodily injury, harm or damage to individuals or the Property, (ii) avoid the suspension of any necessary service to the Property or (iii) comply with Legal Requirements, and, in each such case, with respect to which it would be impractical, in Borrower's reasonable judgment, under the circumstances, to obtain Lender's prior written consent; <u>provided</u> that Borrower shall give Lender notice of such Emergency Expenditures as soon as practicable.

"***Environmental Guaranteed Obligations***" shall mean all of the covenants, obligations, representations and warranties of Borrower set forth in <u>Section 4.21</u> and <u>Section 5.8</u> hereof and any other covenants, obligations, representations and warranties concerning Environmental Laws or Hazardous Substances herein or in any other Loan Document (collectively, the "***Environmental Provisions***"), together with Borrower's obligations set forth in <u>Section 5.30</u> hereof with respect to any Environmental Provisions.

"***Environmental Report***" shall mean that certain Phase I Environmental Site Assessment prepared by GRS Group bearing GRS Project Number: 22-60716.1 and dated October 12, 2022.

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"***ERISA Affiliate***" shall mean any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common Control with Borrower, or is treated as a single employer together with Borrower under Section 414 of the Code or Title IV of ERISA.

"***Fiscal Year***" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"***GAAP***" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"***Governmental Authority***" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"***Interest Period***" shall mean the first (1st) day of each calendar month through the last day of such calendar month (even if such Interest Period extends beyond the Maturity Date).

"***Interest Rate***" shall mean the greater of (i) the Prime Rate (as in effect on each day) plus 2.50% and (ii) the Prime Rate (as in effect on the Closing Date) plus 2.50%.[1]

---

[1] Floor to be set at Closing.

87353806v.14

"**Lease**" or "**Leases**" shall mean, as applicable, any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use, enjoy or occupy all or any portion of any space at the Property or the Improvements and (i) every modification, amendment, extension, renewal and other agreement relating to such lease, sublease, subsublease, letting, license, concession or other agreement and (ii) every guaranty of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Legal Requirements**" shall mean statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the ADA, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document, all or part of the Property, or the construction, ownership, use, alteration, administration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

"**Lien**" shall mean any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan in the principal amount of up to the Loan Amount to be made by Lender to Borrower pursuant to this Agreement.

"**Loan Amount**" shall mean a maximum principal amount of up to$23,000,000.00.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument (if applicable) and all other documents now or hereafter executed and/or delivered with respect to the Loan.

"**Major Contract**" shall mean contracts for maintenance, servicing, or otherwise relating to the operation of the Property under which Borrower is obligated to pay more than $250,000 during the term of the contract.

"**Material Adverse Effect**" shall mean a material adverse effect that has occurred or is reasonably likely to occur on (i) the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument (if

applicable) or the other Loan Document, or (iv) the ability of Borrower to timely perform its obligations under this Agreement or the other Loan Documents.

"***Material Alteration***" shall mean (i) any individual alteration affecting (a) structural elements of the Property, (b) a roof of the Property or (c) any building system of the Property, (ii) any alteration to the Property that will have an adverse effect in any material respect on the zoning or any permits or licenses from any Governmental Authorities with respect to the Property or (iii) any non-structural alteration the cost of which exceeds the Alteration Threshold; provided, however, that in no event shall any of the following constitute a Material Alteration: (A) any tenant improvement work performed pursuant to any lease existing on the Closing Date or entered into hereafter in accordance with the provisions of this Agreement, and (B) alterations performed as part of a Restoration.

"***Maturity Date***" shall mean the date on which the final payment of Principal of the Note becomes due and payable as therein provided, whether at the Stated Maturity Date or the Extended Maturity Date, if applicable, by declaration of acceleration, or otherwise.

"***Minimum Interest Amount***" shall mean, an amount equal to the aggregate amount of interest (but never less than zero) that, if the Debt were not paid prior to the Maturity Date, would have accrued on the maximum amount of Loan proceeds advanced and unpaid at any time under the Loan between the Closing Date and the Reference Date, calculated at the Interest Rate in effect at the time of determination.

"***Monthly Interest Payment Amount***" shall mean, with respect to each Payment Date, an amount equal to the interest accruing on the Principal at the Interest Rate for the Interest Period ending on or about such Payment Date, which interest shall be calculated in accordance with Section 2.2 hereof.

"***Note***" or "***Notes***" shall mean the promissory note or notes evidencing the Loan, as the same may be modified or replaced from time to time.

"***Officer's Certificate***" shall mean a certificate delivered to Lender which is signed by Michael Sklar or Sharan Sklar on behalf of Borrower.

"***Order***" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Case after a hearing under Bankruptcy Rule 4001 (c)(2) or such other procedures as approved by the Bankruptcy Court, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement, which order shall be satisfactory in form and substance to Lender together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) the Debt, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims, substantially in the form of Exhibit D as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of Lender.

"***Other Charges***" shall mean all ground rents, maintenance charges, impositions other than Taxes and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property or any part thereof, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"***Other Taxes***" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"***PACE Loan***" shall mean (i) any "Property-Assessed Clean Energy loan" or (ii) any other indebtedness, without regard to the name given to such indebtedness, which is (a) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (b) repaid through multi-year assessments against the Property.

"***Partnership Agreement***" shall mean that certain Amended and Restated Limited Partnership Agreement of Borrower, made and entered into and effective as of an unspecified date in June 2021.

"***Payment Date***" shall mean the first (1st) day of each calendar month (or, if such day is not a Business Day, the immediately preceding Business Day). The first Payment Date hereunder shall be the first (1st) day of the second (2nd) month immediately succeeding the month in which the Closing Date occurs.

"***Permitted Encumbrances***" shall mean (i) the Liens created by the Loan Documents, (ii) all Liens or other encumbrances disclosed in Exhibit E annexed hereto, (iii) Liens, if any, for Property Taxes or Other Charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien, (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion, provided, however, that from and after the confirmation of an Acceptable Plan, the judgments and mechanics' liens (and related lis pendens) listed on **Exhibit E** shall no longer constitute Permitted Encumbrances and shall have been satisfied and removed of record.

"***Permitted Hazardous Substances***" shall mean commercially reasonable amounts of Hazardous Materials used in the ordinary course of construction or operation of the Property which are in de minimis amounts and used and stored in compliance with all Environmental Laws.

"***Permitted Transfers***" shall mean any of the following:

(i)     a Lease entered into in accordance with the Loan Documents;

(ii)     a Permitted Encumbrance.

(iii)     (a) a transfer that occurs by inheritance, devise, bequest or by operation of law upon the death of a natural person who is the owner of a direct or indirect ownership

interest in Borrower including, without limitation, any distribution from any living trust created by any such natural person, and in the case of any existing living trust, a distribution in accordance with the terms of such living trust; or (b) a transfer of a direct or indirect ownership interest in Borrower for family estate planning purposes to the transferor's spouse, parent, sibling, child or grandchild, or to a trust, partnership, limited liability company or other entity for the benefit of the same; provided, in either case, that no such transfer shall result in the change of Control of Borrower, and as a condition to each such transfer, Lender shall receive not less than thirty (30) days prior written notice of such proposed transfer, and in the event such transfer would result in any Person owning in excess of ten percent (10%) of the ownership interest in Borrower (and such Person did not already own 10% or more of the direct or indirect interests in Borrower prior to such Transfer), then each such Person's name, social security number or employee identification (as applicable), and home address or principal place of business (as applicable); or

(iv)     the transfer of the Borrower's assets to a successor entity controlled by the current partners in Borrower under an Acceptable Plan, so long as such assets remain subject to the Lien created by the Loan Documents.

"***Person***" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"***Plan***" shall mean (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

"***Prime Rate***" shall mean the rate quoted by the *Wall Street Journal* as the prime, base or reference rate, as the same may vary from time to time.

"***Principal***" shall mean the advanced and unpaid principal balance of the Loan at the time in question.

"***Property***" shall mean the parcel of real property and the improvements now or hereafter erected or installed thereon or therein owned by Borrower and to be encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the granting clause of the Security Instrument and referred to therein as the "Property". The Property is located at 95 Madison Avenue, New York, New York 10016 and is more particularly described on Exhibit A.

"***Property Taxes***" shall mean all (i) real estate Taxes, assessments, water rates or sewer rents, maintenance charges, impositions, mortgage recording taxes, vault charges and license fees ("***Real Estate Taxes***"), or (ii) personal property Taxes, in each case, now or hereafter levied or assessed or imposed against all or part of the Property. In no event shall any PACE Loan be considered a Property Tax for purposes of this Agreement.

"**_Reference Date_**" shall mean the last day of the ninth (9th) full calendar month following the Closing Date.

"**_Restoration Threshold_**" shall mean an amount equal to $2,000,000.

"**_Security Instrument_**" shall mean a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, substantially in the form annexed hereto as <u>Exhibit B</u>, to be executed and delivered by Borrower to Lender as provided in this Agreement as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented, increased or otherwise modified from time to time.

"**_Servicer_**" shall mean a servicer selected by Lender to service the Loan, together with its agents, nominees or designees.

"**_State_**" shall mean the state in which the Property is located.

"**_Stated Maturity Date_**" shall mean the first (1st) day of the twenty-fifth (25th) full calendar month following the Closing Date, as the same may be extended pursuant to <u>Section 2.8</u> hereof.

"**_Survey_**" shall mean the survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**_Taxes_**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**_Term_**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

"**_Title Company_**" shall mean Old Republic National Title Insurance Company, through its agent, Gotham Abstract & Settlement, LLC.

"**_Title Insurance Policy_**" shall mean an ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Security Instrument (if applicable) as a first priority lien, subject only to permitted Encumbrances.

"**_Transfer_**" shall mean (i) any direct or indirect sale, conveyance, transfer, encumbrance, pledge, lease, or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign, whether voluntary or involuntary by law or otherwise, whether or not for consideration or of record, of, on, in or affecting (a) all or part of the Property (including any legal or beneficial direct or indirect interest therein) or (b) any direct or indirect interest in Borrower (including any profit interest or rights to distribution of cash), at any tier of ownership, (ii) entering into or subjecting the Property to a PACE Loan or (iii) any change of Control of Borrower "Transfer" shall include, without limitation: (a) a change in

Control of the direct or indirect management of Borrower, (b) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or all interest therein for a price to be paid in installments, (c) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or all Rent, (d) any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation, (e) the issuance of any new or additional legal or beneficial ownership interests in Borrower or any Person having a direct or indirect legal or beneficial ownership in Borrower, including, without limitation issuance of preferred equity or new stock in a corporation or the admission of new partners or members, and (f) the dissolution or termination of Borrower or any Person having a direct or indirect legal or beneficial ownership interest in Borrower or the merger or consolidation of Borrower or such Person with any other Person.

"**Trustee Reports**" shall mean the periodic operating reports with respect to Borrower required to be filed in the Chapter 11 Case, including any supporting documentation required to be submitted therewith.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State in which the Property or any portion thereof is located; <u>provided</u>, <u>however</u>, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State in which the Property is located ("**Other UCC State**"), "**UCC**" shall mean the Uniform Commercial Code as in effect in such Other UCC State for purposes of the provisions of this Agreement relating to such perfection or effect of perfection or non-perfection or priority.

"**Welfare Plan**" shall mean an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

1.2     <u>**Index of Other Definitions**</u>.  The following terms are defined in the sections or Loan Documents indicated below:

"*Award*" - 8.3.2
"*Borrower Obligation*" - 11.23(b)
"*Broker*" - 11.2
"*Casualty*" - 8.2.1
"*Casualty/Condemnation Prepayment*" - 2.3.2
"*Condemnation*" - 8.3.1
"*Embargoed Person*" - 5.31(b)
"*Environmental Laws*" - 4.21
"*Environmental Provisions*" - 1.1 (Definition of Environmental Guaranteed Obligations)
"*Equipment*" - Security Instrument
"*EU Bail-In Legislation Schedule*" – 11.26
"*Event of Default*" - 9.1
"*Extended Maturity Date*" - 2.8
"*Extension Period*" - 2.8
"*Full Replacement Cost*" - 8.1(a)
"*Government Lists*" - 4.31

"*Hazardous Substances*" - 4.21
"*Improvements*" - Security Instrument
"*Indemnified Liabilities*" - 5.30
"*Indemnified Party*" - 5.30
"*Insurance Premiums*" - 8.1.2(a)
"*Insured Casualty*" - 8.2.2
"*Interest Reserve*"- 2.9.2(b)
"*Late Payment Charge*" - 2.5.3
"*Lender's Consultant*" - 5.8.1
"*Licenses*" - 4.11
"*Minimum Interest Shortfall Amount*" -2.7.3
"*Notice*" - 7.1
"*O & M Program*" - 5.8.3
"*OFAC*" - 4.31
"*Other UCC State*" - 1.1 (Definition of UCC)
"*Participant Register*" - 11.23(b)
"*Patriot Act*" - 5.31(a)
"*Patriot Act Offense*" - 4.31
"*Permitted Indebtedness*" - 5.22
"*Policy*" and "*Policies*" - 8.1.2(a)
"*Proceeds*" - 8.2.2
"*Qualified Carrier*" - 8.1.2(a)
"*Real Estate Taxes*" - 1.1 (Definition of Property Taxes)
"*Register*" - 11.23(c)
"*Remedial Work*" - 5.8.2
"*Required Records*" - 7.3.8
"*Restoration*" - 8.4.1
"*Secondary Market Transaction*" - 10.1(a)
"*Significant Casualty*" - 8.2.2
"*Toxic Mold*" - 4.21

### 1.3    Principles of Construction.

(a)    Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, and (iv) the word "including" means "including but not limited to."

(b)    With respect to any cross-reference to, incorporation by reference from, and/or any other reference or allusion to the Loan Documents, such references shall be to referenced defined terms, provisions, sections, schedules, and/or exhibits, as the same are set forth in the Loan Documents as of the Closing Date, and as each of the same may be amended, modified, supplemented, extended, replaced and/or restated from time to time, and shall survive the repayment or satisfaction of the Loan and/or the termination of the Loan Documents.

87353806v.14

## 2.    **GENERAL LOAN TERMS**

    **2.1**    **The Loan**. Subject to and upon the terms and conditions of this Agreement and the Order approving this Agreement, Lender agrees to make the Loan to Borrower. No amount repaid in respect of the Loan may be reborrowed. The Loan shall mature on the Stated Maturity Date unless extended by Borrower, pursuant to and in accordance with the terms hereof, or accelerated by Lender, pursuant to and in accordance with the terms hereof and of the Loan Documents. The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement, the Note and the other Loan Documents.

    **2.2**    **Interest; Monthly Payments**.

        **2.2.1**    **Generally**. On each Payment Date, through and including the Maturity Date, Borrower shall pay an amount equal to the Monthly Interest Payment Amount. All accrued and unpaid interest and unpaid Principal shall be due and payable on the Maturity Date. If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal at the Interest Rate through and including the last day of the Interest Period in which such payment is made.

        **2.2.2**    **Default Rate**. After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

    **2.3**    **Loan Repayment**.

        **2.3.1**    **Repayment**. Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date and any other amounts due and owing under the Loan Documents, including all interest that would accrue on the outstanding principal balance of the Loan through and including the end of the Interest Period in which the Maturity Date occurs (even if such Interest Period extends beyond the Maturity Date). Borrower shall not have any right to prepay all or any portion of the Principal except in accordance with Section 2.3.2 hereof or Section 2.3.3 hereof. Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to the Minimum Interest Shortfall Amount, if applicable, and any other amounts then due and owing under the Loan Documents (other than Principal) and *Third*, to Principal. If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Minimum Interest Shortfall Amount, if any, applicable to such Principal so accelerated. During the continuance of an Event of Default, all proceeds of repayment, including payment or recovery on the Property (or any portion thereof) (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

87353806v.14

**2.3.2    Mandatory Prepayments**.  The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "*Casualty/Condemnation Prepayment*"), in the manner and to the extent set forth in Section 8.4.2 hereof.   Each Casualty/Condemnation Prepayment, after deducting Lender's out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1 hereof, and if such Casualty/Condemnation Prepayment is made on any date other than a Payment Date, then such Casualty/Condemnation Prepayment shall include interest that would have accrued on the Principal prepaid through and including the last day of the Interest Period in which such payment is made.  Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Minimum Interest Shortfall Amount.  Notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied to the Debt in inverse order of maturity (i.e., applied to portions of the Debt with the most recent maturity first) and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such installments.

**2.3.3    Optional Prepayments**.  Borrower shall have the right to prepay all (but not less than all, except as set forth in Section 2.3.2 hereof or as otherwise expressly provided herein) of the Principal on any Payment Date provided that Borrower gives Lender at least thirty (30) days prior written notice thereof and such prepayment is accompanied by the Minimum Interest Shortfall Amount.  Borrower may modify, revoke or cancel any such prepayment notice so long as (i) Borrower provides written notice to Lender of such modification, revocation or cancellation on or before the date that is five (5) Business Days prior to the prepayment date set forth in such prepayment notice and (ii) Borrower pays all out-of-pocket costs and expenses actually incurred by Lender as a result of such revocation, cancellation or modification, including any amounts pursuant to Section 2.2.6 hereof.  If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid Principal through and including the last day of the Interest Period in which such payment is made notwithstanding that such Interest Period extends beyond the date of such prepayment.

**2.4    Release of Property**.  Upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, Lender shall release the Lien of the Loan  Documents if not theretofore released or, alternatively, shall,  if then permitted by law (including all Legal Requirements) and so long as no Event of Default has occurred and is continuing, assign the Security Instrument (if applicable) and Note, provided that (i) the instrument of assignment shall be without representation or warranty by, or recourse to, Lender, (ii) the assignee shall be a third party not affiliated with Borrower that is refinancing the Loan and (iii) Lender is permitted by applicable law to deliver an assignment in lieu of recording a satisfaction.  Borrower shall pay all Taxes, costs, and expenses associated with the release or assignment of the Lien of the Security Instrument (if applicable), including Lender's reasonable attorneys' fees and costs and its then-current assignment fee.

**2.5    Payments and Computations**.

**2.5.1    Making of Payments**.  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds

immediately available to Lender by 10:00 a.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the first Business Day that is immediately succeeding such due date (notwithstanding such adjustment of due dates, Borrower shall not be entitled to any deduction of interest due under this Agreement, the Note or any of the other Loan Documents). All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including reasonable attorneys' fees and court costs.

**2.5.2** **Computations**. Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

**2.5.3** **Late Payment Charge**. If any amount due under any Loan Document is not paid by Borrower on the date on which it is due, a late charge of ten cents for each dollar so overdue (the "***Late Payment Charge***") shall become immediately due and payable to Lender, for the purpose of defraying Lender's expense incident to handling such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, as liquidated damages for failure to make prompt payment, it being agreed that such expenses and damages might be impossible to ascertain and such Late Payment Charge constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty. Such amount shall be secured by the Loan Documents. The acceptance of a Late Payment Charge hereunder shall not constitute a waiver by Lender of any Default or Event of Default then existing pursuant to the Loan Documents. Lender's failure to collect a Late Payment Charge at any time shall not constitute a waiver of Lender's right thereafter, at any time and from time to time (including upon acceleration of the Note or upon payment in full of the Loan), to collect such previously uncollected Late Payment Charge or to collect subsequently accruing Late Payment Charges.

**2.6** **Use of Proceeds**. Borrower shall utilize the proceeds of the Loan (net of any amounts used to pay Lender's costs pursuant to Section 5.29) for closing costs, working capital, current and past due Real Estate Taxes, expenses of the Chapter 11 Case, payment of claims under an Acceptable Plan and general business purposes as specified in the Budget. Borrowers shall not be permitted to use the proceeds of the Loan (i) to finance in any way any investigation (including, without limitation, discovery proceedings), adversary proceeding, claim, action, suit, offset, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests or claims of Lender (or any of Lender's Affiliates, directors, officers, employees, insiders, agents or representatives) or its rights and remedies under this Agreement, the other Loan Documents, or the Order and (ii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender, except as required by law or as provided in an Acceptable Plan.

**2.7** **Fees; Minimum Interest**.

**2.7.1** **Origination Fee**. On the date hereof, Borrower shall pay to Lender an origination fee of $230,000.00, which origination fee has been fully earned by Lender as of the date hereof.

### 2.7.2 **Intentionally Omitted**.

### 2.7.3 **Minimum Interest Shortfall Amount**.

(a) Upon the repayment or prepayment of the last Principal to be repaid or prepaid (including in connection with or following an acceleration of the Loan), Borrower shall pay to Lender an amount, if any (the "***Minimum Interest Shortfall Amount***"), by which (i) the Minimum Interest Amount, exceeds (ii) the aggregate amount of interest payments calculated at the Interest Rate theretofore actually paid by Borrower to Lender with respect to the Loan (excluding, for the avoidance of doubt, any interest at the Default Rate that is in excess of the Interest Rate and late charges). Lender's right to be paid the Minimum Interest Shortfall Amount shall be deemed to be fully earned by Lender as of the date hereof. Notwithstanding the foregoing, the aggregate amount of payments made by Borrower under this Section 2.7.3 shall not exceed the Minimum Interest Amount.

(b) Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender on or prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs. For these reasons, and to induce Lender to make the Loan, Borrower agrees that, except as expressly provided in Article 8 hereof, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Minimum Interest Shortfall Amount applicable thereto, if any; provided, however, that the foregoing shall not be deemed to imply that the Loan may be voluntarily prepaid in any manner or under any circumstance other than as expressly set forth in this Agreement. Such Minimum Interest Shortfall Amount shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale. Borrower further acknowledges that (i) it is a knowledgeable real estate operator and/or investor; (ii) it fully understands the effect of the provisions of this Section 2.7.3(b), as well as the other provisions of the Loan Documents; (iii) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Minimum Interest Shortfall Amount (if required); and (iv) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Minimum Interest Shortfall Amount and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**2.8 Extension Options**. Borrower shall have the right, at its option, to extend the Term of the Loan until the date that is twelve (12) months after the Stated Maturity Date (the "***Extended Maturity Date***"; and the period of time during such extension period being referred to herein as an "***Extension Period***"), by giving notice of such extension to Lender no less than thirty (30) days and no more than ninety (90) days prior to the commencement of the requested Extension Period.

87353806v.14

(a)     no Default or Event of Default exists at the time such request is made and on the then-scheduled Stated Maturity Date;

(b)     no Material Adverse Effect shall have occurred at the time such request is made and on the then-scheduled Stated Maturity Date; and

(c)     Borrower shall deposit with Lender an interest reserve equal to interest that is anticipated to be due during the Extension Period at the Interest Rate in effect at the commencement of the Extension Period, which reserve may be funded with proceeds of the Loan to the extent available.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Stated Maturity Date hereunder.

**2.9     Future Advances**.

**2.9.1    Loan Advances.**   All Advances shall be evidenced by the Note and secured by the Security Instrument (if and when executed and delivered pursuant to this Agreement). Lender shall not be obligated to make any Advance of less than Five Hundred Thousand and No/100 Dollars ($500,000.00).

**2.9.2    Requisitions**.   Advances shall be made upon requisitions made by Borrower to Lender, which requisitions may not be made more often than once every calendar month.  Each such requisition shall be in the form annexed hereto as Exhibit F and shall be consistent with the Budget.   Each requisition shall be accompanied by appropriate documentation identifying, to Lender's reasonable satisfaction, the expenses to be paid with such Advance.

**2.9.3    Procedure for Advances**.  Advances will be funded by Lender within ten (10) Business Days of receipt of the requisition with all required attachments, in form and substance satisfactory to Lender   The Lender may, in its sole and absolute judgment and discretion, make requested Advances before they are due in such cases that the Lender believes it advisable so to do, and such advances shall be deemed to be made in pursuance and not in modification hereof.  The making of any Advance or part thereof shall not be deemed a waiver of any right or condition.

**2.9.4    Advances for Interest**. On the Closing Date, Borrower shall deposit with Lender funds in the amount of [_____],[2] which constitutes twelve months of interest at the Interest Rate as of the Closing Date (the "***Interest Reserve***").  The Interest Reserve shall not constitute a trust fund and may be commingled with other monies of Lender.  Borrower shall not be entitled to any interest or earnings on the Interest Reserve.  On each Interest Payment Date, provided that no Event of Default shall have occurred and be continuing, Lender shall disburse to itself from the Interest Reserve funds sufficient to pay the Monthly Interest Payment Amount.  At such time or times, if any, as Lender determines that the amount in the Interest Reserve

---

[2] Amount to be filled in on the Closing Date.

constitutes less than three months of interest at the Interest Rate in effect at such time of determination, Lender shall make an additional Advance to increase the amount of the Interest Reserve to equal twelve months of interest at the Interest Rate in effect as of the date of determination, and Lender shall notify Borrower of such determination and the corresponding Advance. In the event that at any time the portion of the remaining Loan proceeds available under the Budget for funding the Interest Reserve is insufficient to fund the Advance described in the preceding sentence, Lender shall so notify Borrower, and Borrower shall within five (5) days of such notice deposit with Lender an amount sufficient to restore the balance in the Interest Reserve to an amount equal to twelve months of interest at the Interest Rate in effect as of the date of determination. Additionally, without regard to the sufficiency of funds in the Interest Reserve or Borrower's request for an Advance, Lender, at its option, may at any time make an Advance to pay all or any portion of the interest or other amounts then due to Lender with respect to the Loan.

**2.10** **No Reliance**. All conditions and requirements of this Agreement are for the sole benefit of Lender and no other person or party shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Lender shall have the right, in its sole and absolute discretion, to waive any such condition or requirement and Borrower shall be authorized to rely on such waiver if and to the extent such waiver is in writing and signed by Lender.

## 3.     SUPER PRIORITY SECURITY INTEREST

**3.1** **Grant of Security Interest**. Pursuant to and as provided in the Order, as security for the full and timely payment of the Debt and performance of Borrower's obligations hereunder, Borrower hereby as of the Closing Date pledges and grants to Lender pursuant to section 364 of the Bankruptcy Code a perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral whether now owned or hereafter acquired, now existing or hereafter created and wherever located, which security interest shall have super priority ahead of any and all administrative expenses and other post-petition and pre-petition claims and/or interests of any kind in the Chapter 11 Case. The Collateral shall not include a security interest in and lien on all of the Borrowers' avoidance power actions and under chapter 5 of the Bankruptcy Code; provided, however, that any proceeds of any such avoidance action (net of costs and expenses, including legal fees, incurred in obtaining such proceeds) shall, within one (1) Business Day of receipt, be deposited into a blocked account at a bank designated by Borrower and reasonably approved by Lender, which account shall be subject to an account control agreement sufficient to give Lender a first priority perfected interest in such account and such proceeds and all such rights and remedies with respect to such proceeds and such account as are customarily obtained by secured creditors. Such proceeds shall be retained undisbursed until the earlier of (i) an Event of Default, at which time Lender may exercise all remedies against such proceeds as are provided in Section 9.2 or otherwise; or (ii) the payment in full of all interest on and principal of the Loan, at which time such proceeds shall be released from the blocked account and Lender's Lien.

**3.2** **Perfection of Security Interest**.

**3.2.1** **Borrower's Actions**. Borrower agrees to use commercially reasonable efforts to mark its books and records (including, but not limited to, its computer records) to

evidence the security interests granted to Lender hereunder. Additionally, Borrower shall, at its expense, promptly and duly execute and deliver, and cause to be recorded, such agreements, instruments and documents and perform any and all actions reasonably requested by Lender at any time and from time to time to perfect, maintain, protect, and enforce Lender's security interest in the Collateral of such Borrower. Borrower authorizes Lender at any time and from time to time to execute and file financing statements or continuation statements and amendments thereto and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as Lender reasonably determines appropriate to perfect the security interests of Lender under this Agreement. Borrower shall upon demand pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Collateral. From time to time, Borrower shall, upon Lender's request, execute and deliver written instruments pledging to Lender the Collateral described in any such instruments or otherwise, but the failure of any Borrower to execute and deliver such confirmatory instruments shall not affect or limit Lender's security interest or other rights in and to the Collateral.

   **3.2.2**  **Execution of Security Instrument**. Upon receipt of the Confirmation Order, Borrower shall execute and deliver the Security Instrument to Lender, together with an assignment of leases and rents and such other ancillary instruments and documents, including Borrower's organizational documents and customary opinions of Borrower's counsel, as Lender shall reasonably request. Additionally, Borrower shall cause the Title Company to deliver to Lender, at Borrower's expense, the Title Insurance Policy.

   **3.2.3**  **Security Interest Not Impaired**. Notwithstanding any failure on the part of any Borrower or Lender to take any of the actions set forth in this Section 3.2, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Order. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the liens and security interests granted by or pursuant to this Agreement or the Order.

**4.**   **REPRESENTATIONS AND WARRANTIES**

   Borrower represents and warrants to Lender as of the date hereof that:

   **4.1**   **Organization**. Borrower is duly organized, validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property is located and in each other jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

   **4.2**   **Proceedings; Enforceability**. Subject to the entry by the Bankruptcy Court of the Order, Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents to which it is a party, and has the power and authority to execute, deliver and perform under the Loan Documents and all the transactions contemplated thereby. The Loan Documents to which Borrower is a party have been duly authorized, executed and delivered by Borrower and constitute legal, valid and binding obligations of

Borrower, enforceable against Borrower in accordance with their respective terms. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.3** **No Conflicts**. The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties. Borrower's rights under the Licenses will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, has been obtained and is in full force and effect.

**4.4** **Litigation**. Except as set forth on Schedule 3, there are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower or the Property, in any court or by or before any other Governmental Authority, which, if adversely determined, might have a Material Adverse Effect.

**4.5** **Agreements**. Borrower is not a party to any agreement or instrument or subject to any restriction which is reasonably likely to have a Material Adverse Effect. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default is reasonably likely to have a Material Adverse Effect. Borrower is not in default, and has not received notice of any event or condition that with the giving of notice or the passage of time would constitute a default, in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound, and to Borrower's knowledge, there are no defaults under any such agreement by any other party thereto.

**4.6** **Title**. Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. The Security Instrument (if applicable) when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on Borrower's interest in the Property and (b) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All Other Taxes

have been paid or are being paid simultaneously herewith. All Taxes and governmental assessments due and owing in respect of the Property have been paid or are being paid simultaneously with the execution and delivery hereof. The Permitted Encumbrances, individually or in the aggregate, do not (i) materially interfere with the benefits of the security intended to be provided by the Security Instrument and the Loan Agreement, (ii) materially and adversely affect the value, operation or use of the Property, or (iii) impair Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property. There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien on the Property, except those that are being paid simultaneously with the execution and delivery hereof. To Borrower's knowledge, the Survey does not fail to reflect any material matter affecting the Property or the title thereto. To Borrower's knowledge, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**4.7     Intentionally Omitted**.

**4.8     Full and Accurate Disclosure**.  No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might have a Material Adverse Effect. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with an Approved Accounting Method consistently applied throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for Taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by the Loan Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**4.9     Tax Filings**.  To the extent required by applicable law, Borrower has duly and timely filed (or has obtained effective extensions for filing) all Tax returns required to be filed and has paid or made adequate provision for the payment of all Taxes payable by Borrower. Borrower's Tax returns (if any) properly reflect the income and Tax liability of Borrower for the periods covered thereby.

**4.10    ERISA; No Plan Assets**.  As of the Closing Date and throughout the Term (a) neither Borrower nor any ERISA Affiliate is obligated to contribute to, or are themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or a "plan" as defined in Section 4975 of the Code, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in operation by Section 3(42) of ERISA, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the Closing Date, neither Borrower nor any ERISA Affiliate maintains, sponsors or contributes to or has any obligation with respect to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).  Borrower has not engaged in any transaction in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material Tax imposed under the provisions of Section 4975 of the Code.

**4.11    Compliance**.  Except as set forth on Schedule 4, (i) Borrower and the Property (including the Improvements) and the intended use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances) and (ii) Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might have a Material Adverse Effect.  Borrower has not committed any act which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  The Property will be used exclusively for office and retail use and other appurtenant and related uses.  No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required of Borrower for the legal use, occupancy and operation of the Property for its current use (collectively, the "*Licenses*"), have been obtained and are in full force and effect.  The use being made of the  Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.12    Major Contracts**.  Borrower has not entered into, nor is bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.  Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to Borrower's knowledge, there are no monetary or other material defaults thereunder by any other party thereto.  Neither Borrower nor any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.  Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.  No Major Contract has as a party an Affiliate of Borrower.

**4.13    Federal Reserve Regulations; Investment Company Act; Bank Holding Company**.  No part of the proceeds of the Loan  will be used for the purpose of purchasing or

acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

 **4.14** **Easements; Utilities and Public Access**. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

 **4.15** **FEMA**. No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located the flood insurance required pursuant to Section 8.1.1 hereof is in full force and effect with respect to the Property.

 **4.16** **Leases**. As of the Closing Date, other than the leases with Vitra Inc., Douglas J. Lister, Architect and Lee & Low Books Incorporated, the Property is not subject to any Leases or other occupancy agreement, including any ground lease or similar lease agreement, and no Person (other than Borrower) has, or claims, any possessory interest in the Property or right to occupy the same.

 **4.17** **Intentionally Omitted**.

 **4.18** **Ownership of Borrower**. Borrower's exact legal name is: Ninety-Five Madison Company, L.P. Borrower is of the following organizational type (e.g., corporation, limited liability company): limited partnership, and the jurisdiction in which Borrower is organized is: New York. Borrower's U.S. federal tax I.D. number is 13-3118512. The membership interests in Borrower are owned free and clear of all Liens, warrants, options and rights to purchase. Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it. The organizational chart attached hereto as Schedule 5 is true, complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

 **4.19** **Purchase Options**. Neither the Property nor any part thereof are subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

 **4.20** **Intentionally Omitted**.

**4.21** **Hazardous Substances**. Except as set forth in the Environmental Report, (i) the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "*Environmental Laws*"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, proceeding, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property ("*Toxic Mold*") or any other substances or materials which are included under or regulated by Environmental Laws, but excluding substances of kinds ordinarily used or stored in properties similar to the Property for the purpose of cleaning or other maintenance or operations and otherwise in compliance with Environmental Laws (collectively, "*Hazardous Substances*"); (iii) to Borrower's knowledge, after due inquiry (which is limited to its review of the Environmental Report), no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to Borrower's knowledge, after due inquiry (which is limited to its review of the Environmental Report), no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to Borrower's knowledge, after due inquiry (which is limited to its review of the Environmental Report), no Toxic Mold is on or about the Property which requires remediation; (vi) no underground storage tanks or underground storage receptacles exist on the Property and the Property has never been used as a landfill; and (vii) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of any Borrower Party or which are in any Borrower Party's possession which have not been provided to Lender.

**4.22** **Name; Principal Place of Business**. Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein. The principal place of business of Borrower is its primary address for notices as set forth in Section 7.1 hereof, and Borrower has no other place of business.

**4.23** **Other Debt**. There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.24** **Intentionally Omitted**.

**4.25** **Insurance**. Borrower has obtained and has delivered to Lender certificates of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under

any of the Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**4.26** **FIRPTA**.  Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

**4.27** **Fiscal Year**.  Each fiscal year of Borrower commences on January 1.

**4.28** **Intentionally Omitted**.

**4.29** **Intentionally Omitted**.

**4.30** **Illegal Activity**.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

**4.31** **Patriot Act**.  None of Borrower, any partner in Borrower or member of such partner or any owner of a direct or indirect interest in Borrower (i) is listed on any Government Lists, (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (iv) is currently under investigation by any Governmental Authority for alleged criminal activity.  For purposes of this Agreement, the term "***Patriot Act Offense***" shall mean any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism, (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or the (E) Patriot Act.  "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.  For purposes of this Agreement, the term "***Government Lists***" shall mean (x) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("***OFAC***"), (y) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (z) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists"

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 hereof shall survive in perpetuity.

## 5. <u>COVENANTS</u>

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1** <u>Existence</u>. Borrower shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses and all applicable governmental authorizations, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

**5.2** <u>Property Taxes and Other Charges</u>. Borrower shall pay all Property Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and the Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Property Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Property Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) unless such contested Property Taxes or Other Charges have been paid, Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon, which shall not be less than one hundred twenty-five percent (125%) of the Property Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof pay the amount of such Property Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in <u>clauses (i)</u> through <u>(viii)</u> of this <u>Section 5.2</u>. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of this Agreement or the Security Instrument (if applicable) being primed by any related Lien.

**5.3** <u>Intentionally Omitted</u>.

87353806v.14

### 5.4 Repairs; Maintenance and Compliance; Alterations.

**5.4.1 Repairs; Maintenance and Compliance**. Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.4.2 hereof and normal replacement of Equipment with Equipment of equivalent value and functionality). Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement, provided, however, that Borrower shall not be required to cure any violations issued against the Property, including, without limitation, those listed on Schedule 4 attached hereto), except, in each case, to the extent the same ca be cured by the payment of money only, as long as the Chapter 11 Case exists. Borrower shall notify Lender in writing within three (3) Business Days after Borrower first receives notice of any material instance of such non-compliance. Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.4.2 Alterations**. Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) are required by Legal Requirements, including, without limitation, the New York City Facade Inspection Safety Program, (ii) masonry work or other alterations reasonably associated with, and performed contemporaneously with, alterations required pursuant to the New York City Façade Inspection Safety Program, provided such additional alterations have an aggregate cost of not more than $1,000,000, or (iii) (a) do not constitute a Material Alteration, (b) do not adversely affect Borrower's financial condition, the value of the Property or the net operating income of the Property and (c) are in the ordinary course of Borrower's business. Except as required by Legal Requirements, Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed. In connection with any Material Alteration, (i) at Lender's election, if the aggregate cost for the Material Alteration is expected to exceed the Alteration Threshold, (A) Lender shall have received and approved (which approval shall not be unreasonably withheld or delayed), any general contractor's agreement, architect's agreement and the plans and specifications for such work prepared by a licensed architect, in such instances where it is customary to have such plans and specifications prepared by a licensed architect (*e.g.,* work of a structural nature), and (B) Lender shall have approved (which approval, including as to any reasonable list of proposed general contractors or architects submitted by Borrower, shall not be unreasonably withheld or delayed) the general contractor and architect retained for such work; (ii) if, in connection with any work the cost of which equals or exceeds the Alteration Threshold, Lender has retained a construction consultant (at Borrower's sole cost and expense) to monitor the work in question, Lender shall have received a report from such construction consultant that all of the work completed has been done substantially in compliance with the approved plans and specifications and applicable Legal Requirements; and (iii) Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred twenty-five percent (125%) of the cost of the Material Alteration as estimated by Lender, which amount shall periodically be disbursed to Borrower during the course of such Material Alteration in accordance with Lender's customary procedures and requirements relating to disbursement of

26

funds for Advances. Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (x) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with the plans and specifications approved by Lender, if applicable, (y) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (z) all material Licenses necessary for the use, operation and occupancy of the portion of the Property that is the subject of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of construction consultant and any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.4.2.

5.5 **Performance of Other Agreements**. Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property.

5.6 **Cooperate in Legal Proceedings**. Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

5.7 **Further Assurances**. Borrower shall, at Borrower's sole cost and expense: (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; (ii) provide all such information as Lender may reasonably require to ensure Borrower's ongoing compliance with Sections 5.26 and 5.31 hereof, including ensuring compliance with all "know your customer" procedures as Lender may from time-to-time institute with respect to loans that are of a similar size and nature as the Loan ; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, bankruptcy, judgment and pending litigation searches with respect to Borrower and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

5.8 **Environmental Matters**.

5.8.1 **Hazardous Substances**. So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property, and expressly require tenants at the Property to keep the Property, free from Hazardous Substances (other than Permitted Hazardous Substances) and in compliance with all Environmental Laws, (ii) keep the Property free from any liens or encumbrances imposed pursuant to any Environmental Laws, (iii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance (other than Permitted Hazardous Substances) is on or near the Property, (B) the Property is in violation of any

27

Environmental Laws or (C) any condition on the Property or any property adjacent thereto shall pose a threat to the health, safety or welfare of humans, (iv) not use construction materials containing asbestos nor install any improvements at the Property with any materials that contain asbestos and (v) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer, licensed industrial hygienist or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

### 5.8.2 **Environmental Monitoring**.

(a) Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all investigations, actions or claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that is reasonably likely to cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Laws and (iv) actual or threatened (in writing) liens or other encumbrances imposed pursuant to any Environmental Laws, whether due to any act or omission by Borrower or any other Person. Upon becoming aware of the presence of mold or fungus at the Property, Borrower shall (A) undertake an investigation to identify the source(s) of such mold or fungus and shall develop and implement an appropriate remediation plan to eliminate the presence of any Toxic Mold, (B) perform or cause to be performed all acts reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of the Property affected by Toxic Mold, including providing any necessary moisture control systems at the Property), and (C) provide evidence reasonably satisfactory to Lender of the foregoing. Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Laws or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b) Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if a Default or Event of Default has occurred and is continuing, or if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower (and otherwise by Lender). Such inspections and audit may include soil borings and ground water monitoring. If Borrower fails to provide any such inspection or audit within sixty (60) days after such request, Lender may order same, and Borrower hereby grants to

Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)     If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense, and with respect to any Toxic Mold, Borrower shall take all action necessary to clean and disinfect any portions of the Improvements affected by Toxic Mold in or about the Improvements, including providing any necessary moisture control systems at the Property.  If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under any applicable Environmental Laws or as necessary to maintain the fair market value of the Property or to allow the continued use, occupation or operation of the Property ("***Remedial Work***"), Borrower shall commence all such Remedial Work within thirty (30) days after becoming aware of the same and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.  All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense.   Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Laws, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work.  Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty-five percent (125%) of the cost of such Remedial Work as reasonably estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such  contest.

(d)     Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.8.3   O & M Program**.  In the event any environmental report delivered to Lender in connection with the Loan  recommends the development of or continued compliance with an operation and maintenance program for the Property (including with respect to the presence of asbestos, lead-based paint and/or moisture mitigation) ("***O & M Program***"), Borrower shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the Term, including any extension or renewal thereof, comply in all material respects with the terms and conditions of the O & M Program.

**5.9     Title to the Property**. Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.10    Leases**.

**5.10.1   Generally**.  Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect.

**5.10.2   Leases**. Borrower shall not enter into a proposed Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which consent, so long as no Event of Default is continuing, shall not be unreasonably withheld or delayed (it being acknowledged and agreed that it is reasonable for Lender to condition any approval on Borrower funding additional tenant improvement and/or leasing commission reserves with respect to any Lease in connection with any such approval); provided, however, that any Lease with a Borrower Party shall be subject to the prior written consent of Lender in its sole and absolute discretion.

**5.10.3   Additional Covenants with Respect to Leases**. Borrower:  (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) shall not collect any of the rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the rents (except as contemplated by the Loan  Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, not to be unreasonably

30

withheld, conditioned or delayed, except that Borrower may terminate the existing Lease to Vitra Inc. in its reasonable discretion.

**5.11    Estoppel Statement**.  After request by Lender, Borrower shall, within ten (10) days, furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, and (v) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

**5.12    Acceptable Plan**.  Promptly upon the execution and delivery of this Agreement, Borrower shall diligently seek Bankruptcy Court confirmation of an Acceptable Plan.

**5.13    Intentionally Omitted**.

**5.14    Authority Documents**.  Borrower shall not, without Lender's prior written consent, directly or indirectly make any change, amendment or modification to its Authority Documents or permit any change, amendment or modification to the Partnership Agreement, in each case, which would be reasonably likely have a Material Adverse Effect.

**5.15    Change in Business or Operation of Property**. Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as an office and retail property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.16    Debt Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**5.17    Affiliate Transactions**.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the direct or indirect members of Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, provided that the terms are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**5.18    Zoning**.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**5.19    No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal

property, or any other procedure whereby the lien of any Taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.20   Principal Place of Business**.  Borrower shall not change its principal place of business or chief executive office from the address set forth in <u>Section 7.1</u> hereof without first giving Lender thirty (30) days' prior written notice.

**5.21   Change of Name, Identity or Structure**.  Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.  Borrower shall execute and deliver to Lender, and hereby authorizes Lender to file or record, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

**5.22   Indebtedness**. Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which (a) are not evidenced by a note, (b) do not exceed, at any time, a maximum aggregate amount of two percent (2%) of the Loan  Amount and (c) are paid within thirty (30) days of the date incurred (collectively, "***Permitted Indebtedness***").

**5.23   Licenses**.  Borrower shall not Transfer any License required for the operation of the Property.

**5.24   Easements**.  Borrower will not enter into, modify, waive in any material respect or release any easements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, <u>provided</u> that Lender's consent shall not be unreasonably withheld with respect to any easements to be granted by or to Borrower in the ordinary course of business for access, water and sewer lines, telephone or other fiber optic or other data transmission lines, electric lines or other utilities or for other similar purposes, so long as none of the foregoing shall (i) have priority over the Lien and security interest created by this Agreement, the Security Instrument (if applicable) and the other Loan Documents, (ii) materially impair the utility and operation of the Property or (iii) reasonably be expected to, or actually have, a Material Adverse Effect.

**5.25   ERISA**.

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any assignee of any of its rights under the Note, this Agreement or the other Loan  Documents) to be

a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

(b)     Borrower's covenant in underline clause (a) above is based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan  Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions of an available prohibited transaction exemption are satisfied.

(c)     Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(d)     Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender, that:  (i) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) the assets of Borrower do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA of any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.26**     **Prohibited Transfers**. Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the out-of-pocket costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

**5.27**     **Liens**. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged in accordance with this Agreement.  Within thirty (30) days after Borrower first receives notice of such Lien, Borrower shall release, pay, discharge or bond any Lien recorded or filed against all or any portion of the Property.  Notwithstanding the preceding sentence, Borrower may, no later than thirty (30) days after Borrower first receives notice of an involuntary Lien, contest any such claim of involuntary Lien without cost or expense to Lender, but only upon posting, and concurrently supplying to Lender a certified copy of a statutory bond or other security sufficient under applicable law fully to protect any and all of the Property encumbered by such claim of involuntary Lien and otherwise sufficient in Lender's sole opinion to protect Lender against any judgment in favor of the Lien claimant.

**5.28    Dissolution**.  Borrower shall not (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of the Property, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan  Documents, (iv) modify, amend, waive or terminate its organizational documents without Lender's prior written consent which consent shall not be unreasonably withheld, conditioned or delayed, or (v) modify, amend, waive or terminate its qualification and good standing in any jurisdiction, in each case without obtaining the prior consent of Lender, except in connection with a Permitted Transfer.

**5.29    Expenses**.

(a)    Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender or Servicer in connection with the Loan, including:   (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and  Lender's ongoing performance under and compliance with the Loan  Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan  Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan  Document; (iv) filing and recording of any Loan   Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens in the Collateral (including fees and expenses for title and lien searches, intangibles, personal property taxes, mortgage recording Taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan  Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer in connection with the Loan  or any modification thereof; (ix) any costs and expenses incurred under Sections 10.1 and 10.3 hereof; and (x) enforcing any obligations of or collecting any payments due from Borrower under any Loan  Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan  in the nature of a "work-out", or any insolvency or bankruptcy proceedings.

(b)    The obligations and liabilities of Borrower under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.30    Indemnity**. Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its

Affiliates or any of the foregoing, but excluding any third party who acquires title to the Property or the membership interests in Borrower and is not a nominee, designee or Affiliate of Lender (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, out-of-pocket costs and expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation by Borrower contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument (if applicable), the Property or any interest therein, or receipt of any rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this Section 5.30 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid. The obligations and liabilities of Borrower under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan  Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

### 5.31 Patriot Act Compliance.

(a) Borrower will comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  Lender shall have the

right, from time-to-time, to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by this Agreement, the Security Instrument (if applicable) and the other Loan Documents and shall be immediately due and payable.  For purposes of this Agreement, the term "***Patriot Act***" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same was restored and amended by the Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline over Monitoring Act (USA FREEDOM ACTS OF 2015), as the same may be amended from time to time, and corresponding provisions of future laws.

(b)	At all times throughout the Term, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or other assets of Borrower shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder, with the result that the investment in Borrower (whether directly or indirectly), would be prohibited by law (each, an "***Embargoed Person***"), or the Loan made by Lender would be in violation of law, (ii) no Embargoed Person shall have any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (iii) none of the funds of Borrower shall be derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

**5.32**	__Approval of Major Contracts__.  Borrower shall not, without Lender's prior consent:(i) enter into, surrender or terminate any Major Contract to which Borrower is a party or to which Borrower or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable); (ii) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (iii) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which Borrower or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

**5.33**	__Litigation__.

(a)	Borrower shall promptly provide notice to Lender upon receipt of notice or knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code other than the Chapter 11 Case), Liens or claims of Lien, either filed or threatened in writing against Borrower, any Borrower Party or the Property.

(b)     Borrower shall not initiate or settle any litigation (or permit any other Person to settle any such litigation) other than (i) any non-material litigation in the ordinary course of business (*e.g.*, bodily injury litigation that is fully covered by insurance (other than with respect to any deductibles payable pursuant to Section 8.1 hereof) and has actually been tendered to and accepted in writing by Borrower's insurance company), or (ii) claims filed in the Chapter 11 Case, in each case without Lender's prior written consent.

**5.34    Intentionally Left Blank**.

**5.35    Intentionally Left Blank**.

**5.36    No Distributions**.    Borrower shall not make any distributions or other disbursements to any direct or indirect owner of Borrower.    Notwithstanding the foregoing, Borrower shall have a one-time right on the date hereof to make disbursements to Sharan Sklar and/or Michael Sklar in an aggregate amount not to exceed $250,000.00 to any amounts owed by Borrower, which payments Borrower shall be entitled to make from the Loan proceeds advanced on the Closing Date.

## 6.    CONDITIONS PRECEDENT TO INITIAL ADVANCE

**6.1**    Lender shall not be required to make the first Advance unless and until all of the conditions specified below in this Section shall have been satisfied or waived by Lender in its sole discretion:

**6.1.1**    The Order shall be in full force and effect and shall not have been modified or amended, reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed (unless, in each case set forth above, otherwise agreed to by Lender). Borrower and Lender shall be entitled to rely in good faith upon the Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

**6.1.2**    No Material Adverse Change (as hereinafter defined) shall have occurred after the date of this Agreement.

**6.1.3**    Lender shall have received a copy of the Budget.

**6.1.4**    Borrower shall have executed and delivered to Lender the Note, substantially in the form annexed hereto as Exhibit G.

**6.1.5**    No Event of Default shall have occurred and be continuing.

**6.1.6**    Lender shall have received an opinion of counsel in the form previously approved by Lender.

**6.1.7**    Lender shall have received an incumbency certificate of Borrower, including copies, certified by a representative of Borrower, of Borrower's organizational

37

documents and resolutions authorizing the execution of this Agreement and the other Loan Documents, all in the form previously approved by Lender.

        **6.1.8**   Lender shall have received evidence of Borrower's good standing in the State of New York.

        **6.1.9**   All blanks (including, without limitation, those with footnotes) contained herein shall be filled in and finalized.

        **6.1.10**   Borrower shall have paid, or directed Lender to make an Advance to pay for:

        (a)    all outstanding real estate taxes and charges, fines, fees, penalties and interest in connection therewith and in connection with all violations affecting the Property through the date of the initial Advance, it being understood that the inclusion of these items on the title invoice referenced in 6.1.10(d) below and the payment of the same to the Title Company shall be deemed payment for the purposes hereof.

        (b)    all charges due to Approved Oil which are required to be paid in order to cause Approved Oil to authorize the recording of a UCC-3 termination statement termination that certain UCC-1 filed in CRFN 2022000126536 (the "UCC-3").

        (c)    a brokerage fee in the amount of $149,500 to Two Bins Capital in connection with the making of the Loan.

        (d)    that certain invoice of Gotham Abstract Company in connection with searches required in connection with the making of the Loan (estimated to be approximately $[_____]).

        (e)    that certain invoice bearing account number 900-97034755 issued by First Insurance Funding in connection with the insurance policy with respect to the Property in the amount of $167,383.31.

        (f)    all other closing costs related to the Loan or otherwise payable under the Agreement.

        **6.1.11**   Borrower shall cause Approved Oil to authorize the recording of the UCC-3.

## 7.    <u>NOTICES AND REPORTING</u>

    **7.1**   <u>Notices</u>.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or delivered by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

| | |
|---|---|
| If to Lender: | Madison Avenue Servicing LLC |
| | 330 Great Neck Road |
| | Great Neck, New York 11021 |
| | Attention: Eric Goodman |
| | |
| with a copy to: | Seyfarth Shaw LLP |
| | 620 Eighth Avenue |
| | New York, New York 10018 |
| | Attention: Marc Gurell, Esq. |
| | |
| If to Borrower: | Ninety-Five Madison Company, L.P. |
| | 95 Madison Avenue |
| | New York, New York 10016 |
| | Attention: Michael Sklar and Sharan Sklar |
| | |
| | and |
| | |
| | Ninety-Five Madison Company, L.P. |
| | c/o Michael Sklar |
| | 161 West 75th Street, Apt. 8B |
| | New York, New York 10023 |
| | |
| with a copy to: | Rosenberg & Estis, P.C. |
| | 733 Third Avenue |
| | New York, New York |
| | Attention: Michael E. Lefkowitz, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (iii) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (iv) in the case of electronic mail, upon the date of receipt.

**7.2    Borrower Notices and Deliveries**. Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, mediation, arbitration, governmental proceedings or claims or investigations pending or threatened in writing against Borrower that relates to the Property or the Collateral (other than bodily injury litigation that is fully covered by insurance), and any updates thereto; and (ii) any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower or any Affiliate of any of the foregoing within two (2) Business Days of such filing; and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender. In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender <u>provided</u> that Borrower shall be permitted to update such

representations and warranties in writing to reflect any changes in facts since the date of this Agreement so long as no fact disclosed in such update is the result of any breach of any covenant, agreement or other obligation of Borrower under the Loan Documents and does not constitute any Default or Event of Default by Borrower, or any change that has a Material Adverse Effect, in each case as determined by Lender in its reasonable judgment and (y) within thirty (30) days, tenant estoppel certificates from any tenants not in occupancy on the Closing Date addressed to Lender, its successors and assigns in form and substance reasonably satisfactory to Lender. For the avoidance of doubt, Lender shall not require a tenant estoppel certificate from Vitra Inc.

### 7.3 Financial Reporting.

**7.3.1 Bookkeeping.** Borrower shall keep on a calendar year basis, in accordance with an Approved Accounting Method and, to the extent required under Section 10.1 hereof, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower or any Affiliate of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire. After an Event of Default, Borrower shall pay any out-of-pocket costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**7.3.2 Trustee Reports.** (a) During the pendency of the Chapter 11 Case, Borrower shall furnish to Lender a complete copy of each Trustee Report filed in the Chapter 11 Case within one (1) Business Day of such filing. Each such report shall be accompanied by an Officer's Certificate certifying, to the signer's knowledge, (a) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with an Approved Accounting Method (subject to normal year-end adjustments), (b) that as of the date of such Officer's Certificate, no litigation (excluding the Chapter 11 Case) exists involving Borrower or the Property in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taken in relation thereto and (c) that Borrower has not incurred any indebtedness other than Permitted Indebtedness.

**7.3.3 Annual Reports.** After the Chapter 11 Case is closed, Borrower shall furnish to Lender annually, within ninety (90) days after each calendar year, (i) an annual balance sheet, profit and loss statement, statement of cash flow, and statement of change in financial position of Borrower audited by an Approved Accountant and (ii) an annual operating statement of the Property detailing the revenues received, the expenses incurred and major capital improvements for the period of calculation and containing appropriate year-to-date information. Such financial statements (A) shall be in form and substance satisfactory to Lender, (B) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual net operating income and (C) shall be accompanied by an Officer's Certificate certifying (w) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has

been prepared in accordance with an Approved Accounting Method, and, to the extent required under Section 10.1 hereof, (y) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, and (z) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taken in relation thereto.

      **7.3.4**   **Monthly Reports**. After the Chapter 11 Case is closed, Borrower shall furnish the following items to Lender within ten (10) days after the end of each calendar month: (i) monthly and year-to-date operating statements, noting net operating income and other information necessary and sufficient under an Approved Accounting Method to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender; (ii) a balance sheet for such calendar month; (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by Borrower during each calendar month as of the last day of such calendar month; and (v) a rent roll identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, and a delinquency report for the Property. Each such statement shall be accompanied by an Officer's Certificate certifying, to the signer's knowledge, (a) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with an Approved Accounting Method (subject to normal year-end adjustments), and, to the extent required under Section 10.1 hereof, (b) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (c) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taken in relation thereto and (d) that Borrower has not incurred any indebtedness other than Permitted Indebtedness.

      **7.3.5**   **Other Reports**.   Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

      **7.3.6**   **Intentionally Omitted**.

      **7.3.7**   **Intentionally Omitted**.

      **7.3.8**   **Breach**. If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Article 7 within thirty (30) days after the date upon which such Required Record is due Borrower shall pay to Lender, at Lender's option and in its discretion (and without limiting any other rights or remedies of Lender hereunder), an amount equal to $10,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days' prior written notice of such failure. In addition, thirty (30) days after Borrower's failure to deliver any

Required Records, Lender shall have the option (and without limiting any other rights or remedies of Lender hereunder), upon fifteen (15) days' prior written notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

## 8. INSURANCE; CASUALTY; AND CONDEMNATION

### 8.1 Insurance.

**8.1.1 Coverage**. Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term policies of insurance with respect to the Property providing at least the following coverages:

(a) property insurance with respect to the Improvements and, if applicable, the personal property insuring against any peril now or hereafter included within the "Special" or "All Risks" Causes of Loss form (which shall not exclude fire, lightning, windstorm (including named storms), hail, explosion, riot, civil commotion, aircraft, vehicles and smoke), in each case: (i) in an amount equal to one hundred percent (100%) of the "*Full Replacement Cost*," which for purposes of this Agreement shall mean actual replacement value exclusive of costs of excavations, foundations, underground utilities and footings waiving of depreciation; (ii) to be written on a no coinsurance form or containing an agreed amount endorsement with respect to the Improvements and, if applicable, personal property waiving all co-insurance provisions; (iii) except as otherwise permitted herein, providing for no deductible in excess of $50,000, unless approved in advance in writing by Lender; (iv) at all times insuring against at least those hazards that are commonly insured against under a "Special" or "All Risks" Causes of Loss form of policy, as the same shall exist on the Closing Date, and together with any increase in the scope of coverage provided under such form after the Closing Date; and (v) providing Law & Ordinance coverage, including Coverage for Loss to the Undamaged Portion of the Building, Demolition Costs and Increased Cost of Construction in amounts acceptable to Lender. The Full Replacement Cost shall be re-determined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Section 8.1.1(a).

(b) if any portion of the Improvements or, if applicable, personal property is at any time located in an area identified in the Federal Register by the Federal Emergency Management Agency or any successor thereto as an area having special flood, flood hazard insurance in an amount equal to Full Replacement Cost or other amount acceptable to Lender, which shall include the maximum limit of building and, if applicable, contents coverage available through the National Flood Insurance Program, in all cases with deductibles acceptable to Lender; provided, that, the insurance provided pursuant to this Section 8.1.1(b) shall be on terms consistent with the "All Risk" insurance policy required in Section 8.1.1(a) hereof. If there is no portion of the Improvements identified as being in a 'Special Flood Hazard Area', flood coverage is required at a limit reasonably determined by Lender.

(c)　commercial general liability insurance against all claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, including "Dram Shop" or other liquor liability coverage if Borrower sells or distributes alcoholic beverages from the Property, such insurance: (i) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 and a per occurrence limit of not less than $1,000,000; (ii) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; (iii) to contain a "Per Location General Aggregate Limit" endorsement; (iv) to not contain any exclusion for non-structural renovation or maintenance work; and (v) to cover at least the following hazards: (A) premises and operations; (B) products and completed operations on an "if any" basis; (C) independent contractors; (D) contractual liability for all insured contracts; and (E) contractual liability covering the indemnities contained in this Agreement to the extent the same is available.

(d)　loss of rents and/or business interruption insurance: (i) with loss payable to Lender; (ii) covering all risks required to be covered by the insurance provided for in Sections 8.1.1(a), (b), (e), (g) and (k) hereof; (iii) in an amount equal to one hundred percent (100%) of the projected gross income from the Property on an actual loss sustained basis for a period beginning on the date of Casualty and continuing until the Restoration of the Property is completed, or the expiration of eighteen (18) months, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such business interruption/loss of rents insurance shall be determined prior to the date hereof and at least once each year thereafter based on the greatest of: (A) Borrower's reasonable estimate of the gross income from the Property and (B) the highest gross income received during the Term for any full calendar year prior to the date the amount of such insurance is being determined, in each case for the succeeding eighteen (18) month period; and (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.

(e)　if applicable, equipment breakdown/boiler and machinery insurance covering all mechanical and electrical equipment in such amounts as shall be reasonably be required by Lender, on terms and in amounts consistent with the commercial property insurance policy required under Section 8.1.1(a) hereof or in such other amount as shall be reasonably required by Lender (if applicable to the Property).

(f)　workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(g)　during any period of restoration, renovation or construction, Builder's Risk "All Risk" insurance in such amount as Lender shall require but in no event less than one hundred percent (100%) of the replacement cost of the existing building, plus one

hundred percent (100%) of the hard costs as identified in the project budget, but excluding foundations and any other improvements not subject to physical damage. Such policy shall include Borrower as Named Insureds, with Lender as Mortgagee and as Loss Payee and be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall include permission to occupy, coverage for loss by testing, collapse, theft, and earth movement, and, if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or such greater amount as Lender shall require, with a sublimit for earth movement and, if applicable, flood and named windstorm, in an amount approved by Lender. Such insurance Policy shall also include coverage for:

(i)     loss suffered with respect to materials, equipment, heating and air conditioning machinery, machinery, and supplies, in each case owned by Borrower or required to be insured by Borrower, whether on-site, in transit, or stored offsite and with respect to temporary structures, hoists, sidewalks, retaining walls and underground property in each case owned by Borrower or required to be insured by Borrower;

(ii)     soft costs that are recurring costs, which shall include delayed opening loss of income/revenue coverage for a period of recovery of not less than twelve (12) months commencing from the date the restoration, renovation or construction was to be completed, as well as costs to reproduce plans, specifications, blueprints and models in connection with any restoration following a casualty with coverage in an amount of no less than one hundred percent (100%) of such soft costs as identified in an approved project budget;

(iii)     demolition, debris removal and increased cost of construction, including increased costs arising out of changes in applicable Legal Requirements and codes; and

(iv)     operation of building laws;

(h)     umbrella liability insurance in an amount not less than $25,000,000 per occurrence and $75,000,000 in the aggregate, with terms and conditions consistent with the commercial general liability insurance policy required under Section 8.1.1(c) hereof.

(i)     auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000 (if applicable). If owned autos are used to secure the loan, coverage must include Physical Damage (Comprehensive and Collision).

(j)     insurance against employee dishonesty in amounts acceptable to Lender (if applicable to the Property and Borrower).

(k)     intentionally left blank.

(l)     such other insurance (including, but not limited to, pollution legal liability insurance, earthquake insurance, mine subsidence insurance, windstorm insurance if

44

windstorm insurance is excluded under the "all risk" or "special form" policy, and insurance related to any construction work) as may from time to time be reasonably required by Lender in order to protect its interests.

### 8.1.2 Policies.

(a)     All insurance provided for in Section 8.1.1 hereof shall be obtained under valid and enforceable policies (the "*Policies*" or in the singular, the "*Policy*"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and approved by Lender.  The insurance companies must have a financial strength rating of "A" or better and a financial size category of "X" or better by A.M. Best Company, Inc., and a rating of (i) "A-" or better by S&P, and (ii) if Moody's rates the insurance company, "A3" or better by Moody's (each such insurer shall be referred to below as a "*Qualified Carrier*").  Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 8.1.1 hereof, Borrower shall deliver carrier-issued binders and certificates of the renewal Policies, and thereafter, complete copies of the Policies when issued.  Upon renewal of the Policies, Borrower shall deliver evidence satisfactory to Lender of payment of the premiums due thereunder (the "*Insurance Premiums*").  Renewal certificates (A) for property coverage must be accompanied by an endorsement specifically naming Lender (and its successors or assigns) as Mortgagee and Lender's Loss Payee, portions of the policy indicating that a certificate naming Lender (and its successors or assigns) as Mortgagee and Lender's Loss Payee automatically adds them to the policy, or written confirmation from an insurance company underwriter, explicitly confirming agreement to process the request to add Lender (and its successors or assigns) as Mortgagee and Lender's Loss Payee, and (B) for liability coverage must be accompanied by (x) an endorsement specifically naming Lender (and its successors or assigns) as Additional Insured, portions of the policy confirming that coverage is automatic where required by written contract or agreement, (y) portions of the policy confirming a certificate naming Lender (and its successors or assigns) as Additional Insured automatically amends to the policy, or (z) written confirmation from an insurance company underwriter explicitly confirming the insurer's agreement to process the request to add Lender (and its successors or assigns) as Additional Insured.

(b)     Except to the extent required pursuant to Section 8.1.1 hereof, Borrower shall not obtain (or permit to be obtained) (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Carrier, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 8.1.1 hereof to be furnished by, or which may be reasonably required to be furnished by, Borrower.  In the event Borrower obtains (or causes to be obtained) separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause complete copies of each Policy to be delivered as required in Section 8.1.1 hereof.  Any umbrella or blanket Policy remains subject to review and approval by Lender based on the schedule of locations and values and such other evidence as may be required by Lender. Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 8.1.

(c)     All Policies of insurance provided for or contemplated by Section 8.1.1 hereof shall name Borrower as the named insured and, in the case of liability policies, except for the Policies referenced in Sections 8.1.1(f) and (i) hereof, shall (i) name Lender as additional insured, as their respective interests may appear, and in the case of property coverages, including but not limited to the all-risk/special form coverage, rent loss, business interruption, boiler and machinery, earthquake and flood insurance, shall name Lender as mortgagee/lender's loss payable by a standard noncontributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender, (ii) include a waiver of subrogation in favor of Lender, and (iii) be primary and non-contributory with respect to any insurance maintained by Lender.

(d)     All property Policies of insurance provided for in Section 8.1.1 hereof shall not be cancelled without providing thirty (30) days' written notice to the insurer; however, only ten (10) days' written notice shall be required when the cancellation is due to non-payment of premium.

(e)     All property Policies of insurance provided for in Section 8.1.1 hereof shall provide that:

(1)     no (A) act, failure to act, violation of warranties, declarations or conditions, or negligence by Borrower, or anyone acting for Borrower, or by any tenant under any Lease or other occupant, (B) occupancy or use of the Property for purposes more hazardous than those permitted, (C) foreclosure or similar action by Lender, or (D) failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(2)     each Policy shall provide that (A) the issuers thereof shall give written notice to Lender if the Policy has not been renewed ten (10) days prior to its expiration and (B) Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non-payment of Insurance Premiums; and

(3)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

Additionally, Borrower further covenants and agrees to promptly send to Lender any notices of non-renewal or cancellation it receives from the insurer with respect to the Policies required pursuant to this Section 8.1.

(f)     Borrower shall furnish to Lender, on or before thirty (30) days after the close of Borrower's fiscal year, a statement certified by Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(g)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without

notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by this Agreement and the Security Instrument (if applicable) and shall bear interest at the Default Rate.

(h)     In the event of a foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest exclusively in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

**8.2     Casualty**.

**8.2.1     Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "***Casualty***"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

**8.2.2     Settlement of Proceeds**.  If a Casualty covered by any of the Policies (an "***Insured Casualty***") occurs where the loss does not exceed the Restoration Threshold, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a commercially reasonable and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "***Proceeds***").  In the event of an Insured Casualty where the loss equals or exceeds the Restoration Threshold (a "***Significant Casualty***"), Lender may, in its sole discretion, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in a non-interest bearing escrow account and disbursed in accordance herewith.  If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender.  The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.  Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with

47

the terms of this Agreement, that such remaining net Proceeds will be sufficient to pay the Debt in full.

**8.3**     **Condemnation**.

**8.3.1**     **Notice; Restoration**. Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "***Condemnation***") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.   Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

**8.3.2**     **Collection of Award**. Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "***Award***") and to make any compromise, adjustment or settlement in connection with such Condemnation. Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt.  Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.  Lender shall hold such Award in a non-interest bearing escrow account and disburse such Award in accordance with the terms hereof.

**8.4**     **Application of Proceeds or Award**.

**8.4.1**     **Application to Restoration**.  If an Insured Casualty or Condemnation occurs where:  (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid Principal; (ii) in the reasonable judgment of Lender, the Property can be restored within six (6) months, and prior to six (6) months before the then-stated Stated Maturity Date and prior to the expiration of the rental or business interruption insurance with respect thereto to the Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt; (iii) less than (x) thirty percent (30%), in the case of an Insured Casualty or (y) fifteen percent (15%), in the case of a Condemnation, of the area of the Improvements has been damaged, destroyed or rendered unusable as a result of such Insured Casualty or Condemnation; and (iv) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower for the cost of restoring,

repairing, replacing or rebuilding the Property, as applicable (the "***Restoration***"), in the manner set forth herein. Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms of this Agreement.

        **8.4.2**   **Application to Debt**. Except as provided in <u>Section 8.4.1</u> hereof, any Proceeds and/or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note and/or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in <u>Section 8.4.3</u> hereof. Any prepayment of the Loan made pursuant to this <u>Section 8.4.2</u> shall be without any Minimum Interest Shortfall Amount, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Minimum Interest Shortfall Amount, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.

        **8.4.3**   **Procedure for Application to Restoration**. If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the escrow account established by Lender upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be reasonably approved by Lender prior to commencement of any work. Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement. No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt. Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt.

87353806v.14

# 9.    **DEFAULTS**

**9.1    Events of Default**.  An "*Event of Default*" shall exist with respect to the Loan if any of the following shall occur:

(a)    (i) any portion of the Debt is not paid when due, unless such failure is due to Lender's failure to apply funds in the Interest Reserve to the Monthly Interest Payment Amount or (ii) Borrower shall fail to pay when due any other sum required to be paid hereunder or in any other Loan  Document;

(b)    any of the Property Taxes are not paid when due (unless, with respect to Real Estate Taxes, Lender is paying Real Estate Taxes pursuant to the terms of this Agreement), subject to Borrower's right to contest Property Taxes in accordance with Section 5.2 hereof;

(c)    the Policies are not kept in full force and effect, or are not delivered to Lender within ten days after Lender's written request;

(d)    a Transfer other than a Permitted Transfer occurs;

(e)    any certification, representation or warranty made by Borrower herein or in any other Loan  Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made; provided, however, that if such representation or warranty which was false or misleading in any material respect is, by its nature, curable and did not result in a Material Adverse Effect, and Borrower was not aware that such representation or warranty was false or misleading in any material respect when made, then the same shall not constitute an Event of Default unless Borrower has not cured the same within thirty (30) days after receipt by Borrower of written notice from Lender of such breach;

(f)    Borrower breaches any covenant contained in Sections 5.15, 5.22, or 5.28 hereof;

(g)    except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

(h)    an Event of Default as defined or described elsewhere in this Agreement or in any other Loan  Document occurs;

(i)    a Default occurs under any term, covenant or provision set forth herein or in any other Loan  Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(j)    any Loan Document shall fail to be in full force and effect to give Lender the Liens, rights, powers and privileges purported to be created thereby, or if any

Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Lender the Liens, rights, powers and privileges purported to be created thereby;

(k)  Borrower assigns or enters into an agreement to assign its rights under the Loan, this Agreement or any of the other Loan Documents or any interest herein or therein without Lender's prior written consent in its sole discretion;

(l)  the occurrence of any of the following in the Chapter 11 Case:

(i)  the filing of any plan of reorganization or liquidation by the Borrower in the Chapter 11 Case, or entry of an order confirming such plan, that is not an Acceptable Plan, unless such plan provides for the termination Lender's obligation to make additional Advances and repayment in full in cash of the entire Debt, including any amounts owed pursuant to any Order then in effect on or before the effective date of such plan;

(ii)  the filing of a motion, or the execution of a written agreement, or the filing of any plan of liquidation or reorganization or disclosure statement attendant thereto by Borrower in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, unless such financing pays in full the entire Debt; (B) to grant any Lien upon any Collateral (or the proceeds of any Collateral), including any cash or cash proceeds of property of the Borrower not encumbered by any Lien as of the date hereof; (C) except as provided in any Order, as the case may be, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (D) any other action or actions materially adverse to Lender or its rights and remedies hereunder or its interest in the Collateral;

(iii)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Order without the written consent of Lender or the filing of a motion for reconsideration with respect to the Order;

(iv)  the payment of, or application for authority to pay, any pre-petition claim without Lender's prior written consent unless otherwise permitted under this Agreement;

(v)  subject to entry of the Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Lender or any of the Collateral;

(vi)  the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower; or the sale without Lender's consent, of any part of the Collateral or all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan or otherwise that does not provide for payment in full in cash of the entire Debt and termination of Lender's obligation to make further Advances;

(vii)     the entry of an order by the Bankruptcy Court invalidating, subordinating, or designating the vote of any claim owned or controlled by Lender or its Affiliates against Borrower;

(viii)    the commencement of a suit or action against Lender and, as to any suit or action brought by any Person other than Borrower or officer or employee of Borrower, the continuation thereof without dismissal for thirty (30) days after service thereof on Lender, that asserts or seeks by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any Committee or any other party in interest in the Chapter 11 Case, a claim or any legal or equitable remedy that would (A) have the effect of subordinating any or all of the Debt or the Liens of Lender under the Loan Documents to any other claim, or (B) have a material adverse effect on the rights and remedies of Lender under any Loan Document or the collectability of all or any portion of the Debt;

(ix)      the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Debt;

(x)       the failure of Borrower to perform any of its obligations under any Order;

(xi)      an order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not contain a provision for termination of Lender's obligation to make Advances and payment in full in cash of the entire Debt;

(xii)     an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court or any other court of competent jurisdiction without the express prior written consent of the Lender, (A) to revoke, reverse, stay for a period in excess of ten (10) days, vacate, rescind, modify, supplement or amend the Order, this Agreement or any other Loan Document, in each case in a manner that is adverse to Lender, or (B) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect of the Debt, except for the Carve-Out, or (C) to grant or permit the grant of a Lien on the Collateral other than Permitted Encumbrances;

(xiii)    an order shall be entered by the Bankruptcy Court that is not stayed pending appeal (A) granting relief from the automatic stay to any creditor of the Borrowers with respect to any claim which in the aggregate could reasonably be expected to result in a Material Adverse Effect or (B) reversing, modifying, or revoking, without the consent of Lender, any order of the Bankruptcy Court with respect to the Chapter 11 Case and having a material adverse effect on Lender's rights under the Loan Documents; *provided*, *however*, that it shall not be an Event of Default if relief from the automatic stay is granted (A) solely for the purpose of allowing such creditor to determine the liquidated amount of its claim against a Borrower, or (B) to permit the commencement of and/or prosecution of a proceeding to collect against an insurance company;

(xiv)     the Chapter 11 Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Chapter 11 Case), suspended or

52

converted to a case under Chapter 7 of the Bankruptcy Code, or the Borrowers shall file any pleading requesting any such relief, or an application shall be filed by the Borrowers for the approval of, or there shall arise in the Chapter 11 Case, (A) any other claim having priority senior to or *pari passu* with the claims of the Lender under the Loan Documents and the Orders or any other claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, other than the Carve-Out, or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens granted herein, except as expressly provided herein;

(xv)     the Borrower (A) taking any action or (B) failing to take all reasonable actions necessary to oppose any action by any other party to (i) impair any of the material rights and remedies of the Lender, (ii) impair, invalidate, disallow, subordinate or otherwise modify all or any portion of the Liens securing the Debt or (iii) avoid, subordinate disallow or require disgorgement by the Lender of any amounts received in respect of the Debt, except as any of the foregoing may be expressly permitted hereunder and by the Order; or

(xvi)     the entry of an order in the Chapter 11 Case granting (A) any other super-priority administrative claim or (B) Lien equal or superior to that granted to Lender, other than the Carve-Out Expenses, in each case as set forth in the Order.

(m)     a Default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document or the Order not otherwise specified in this <u>Section 9.1</u>, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; <u>provided</u>, <u>however</u>, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days.

## 9.2     <u>Remedies</u>.

### 9.2.1     <u>Acceleration</u>.     Upon the occurrence of an Event of Default (other than an Event of Default described in <u>paragraph (f)</u> or <u>(g)</u> of <u>Section 9.1</u> hereof) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand (and Borrower hereby expressly waives any such notice or demand), that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Late Payment Charges, Minimum Interest Shortfall Amount, if any, and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in <u>paragraph (f)</u> or <u>(g)</u> of <u>Section 9.1</u> hereof, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Minimum Interest Shortfall Amount, if any, and any other amounts owing by Borrower) shall immediately and automatically become due and

payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**9.2.2** **Remedies Cumulative**. Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

**9.2.3** **Severance**.

(a) During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of Principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments; or (ii) in the event Lender elects to accelerate less than the entire outstanding Principal, Lender may foreclose the Security Instrument to recover so much of the Principal as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of the sums secured by the Security Instrument and not previously recovered.

(b) During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the

preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

        **9.2.4**   **Delay**.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed necessary.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the rents or any other collateral.

        **9.2.5**   **Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of ten (10) Business Days (or such longer period as is provided in the Loan Documents) after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan  Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all out-of-pocket costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender within ten (10) days after written demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan  Documents) and shall bear interest thereafter at the Default Rate.  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

        **9.2.6**   **Intentionally Omitted**.

        **9.2.7**   **Cooperation**.  In the event Lender exercises its remedies hereunder and takes possession of the Property, Borrower agrees to cooperate fully with Lender in order to ensure a seamless transition of the Property from Borrower to Lender or its designee.

## 10.    SPECIAL PROVISIONS

        **10.1**   **Sale of Loan**. Subject to the limitations set forth in <u>Section 10.3</u> hereof:

        (a)    Lender shall have the right (i) to sell or otherwise transfer the Loan or any portion thereof as a whole loan or (ii) to sell participation interests in the Loan, provided, however in no event shall Lender sell or otherwise transfer the Loan or any portion thereof, or sell any participation interest therein to (i) Vitra Inc., (ii) Shulsky Properties Inc., or (iii) Marvin Shulsky.  The transactions referred to in <u>clauses (i)</u> or <u>(ii)</u> are each hereinafter referred to as a "***Secondary Market Transaction***".  At Lender's election, each note and/or component comprising the Loan  may be subject to one or more Secondary Market Transactions.

(b)     Upon request, Borrower shall furnish to Lender from time to time such financial data and financial statements as Lender reasonably determines to be necessary, advisable or appropriate for complying with any Legal Requirements (including those applicable to Lender or any Servicer) within the timeframes necessary, advisable or appropriate in order to comply with such Legal Requirements.

**10.2     Intentionally Omitted**.

**10.3     Severance of Loan**.  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan  as hereinafter provided.  Without limiting the foregoing, Lender may (a) cause the Note and the Security Instrument (if applicable) to be split into a first and second mortgage loan, (b) create one or more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure), (c) create multiple components of the Note or Note (and allocate or reallocate the principal balance of the Loan  among such components), in each such case described in clauses (a) through (c) above, in whatever proportion and whatever priority Lender determines.  Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material term of the Loan, including, without limitation, any economic term, or (ii) materially increase the obligations, or decrease the rights, of Borrower under the Loan Documents, except to a de minimis extent; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan  (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan  immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification.  In the event of a Casualty or Condemnation where the Proceeds or Award, as the case may be are not made available for Restoration in accordance with this Agreement, such Proceeds or Award, as the case may be, shall be applied to the Notes (or components thereof) in sequential order. In addition, upon an Event of Default, payments may be applied by Lender among the Notes (or components thereof) in such order and proportion as Lender may elect.  If requested by Lender, Borrower (and Borrower's constituent members, if applicable) shall execute within two (2) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance.  Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 10.3 and, provided that such modification shall comply with the terms of this Section 10.3, it shall become immediately effective.

**10.4     Costs and Expenses**.  Lender shall be responsible for Lender's own costs and expenses under Section 10.1 and Section 10.3 hereof.

## 11.     MISCELLANEOUS

**11.1     Intentionally Omitted**.

**11.2     Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in

connection with the Loan other than Two Bins Capital ("**Broker**") whose fees shall be paid by Borrower pursuant to a separate agreement. Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower in connection with the transactions contemplated herein. The provisions of this <u>Section 11.2</u> shall survive the expiration and termination of this Agreement, the other Loan Documents and the repayment of the Debt.

**11.3** <u>**Retention of Servicer; Fees**</u>. Lender reserves the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement or otherwise, together with such other powers as are reasonably incidental thereto. Except as otherwise expressly provided herein, Borrower shall pay any reasonable fees and expenses of Lender or Servicer, as appliable (i) in connection with a release of the Property (or any portion thereof), (ii) in connection with an assumption or modification of the Loan, (iii) in connection with the enforcement of the Loan Documents or (iv) in connection with any other action or approval taken by Lender or Servicer, as applicable, hereunder on behalf of Lender (which shall not include ongoing regular servicing fees relating to the day-to-day servicing of the Loan, for which Borrower shall not be charged).

**11.4** <u>**Survival; Successors and Assigns**</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement and the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All of Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**11.5** <u>**Lender's Discretion**</u>. Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion, shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive. Additionally, whenever in this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender in Lender's reasonable discretion, or Lender agrees to not withhold, condition or delay its consent, the decision of Lender to approve or disapprove, to consent, condition, delay or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion, shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender while an Event of Default is continuing unless otherwise specifically herein provided.

**11.6    Governing Law**.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS WERE NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT, EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THE LOAN DOCUMENTS, AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    DURING THE PENDENCY OF THE CHAPTER 11 CASE, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES RELATING TO THE LOAN. THEREAFTER, IF BORROWER DOES HAVE A NEW YORK ADDRESS: ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER AT THE ADDRESS FOR BORROWER SET FORTH HEREIN AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY

CHANGED ADDRESS FOR BORROWER SET FORTH HEREIN, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH AGENT AND OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE AN AUTHORIZED AGENT IF BORROWER CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK. NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO INSTITUTE ANY LEGAL SUIT, ACTION OR PROCEEDING FOR THE ENFORCEMENT OR FORECLOSURE OF ANY LIEN ON ANY COLLATERAL FOR THE LOAN IN ANY FEDERAL OR STATE COURT IN ANY JURISDICTION(S) THAT LENDER MAY ELECT IN ITS SOLE AND ABSOLUTE DISCRETION, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**11.7** **Modification, Waiver in Writing**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount. Lender shall have the right to reduce or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**11.8** **Trial by Jury**. BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

87353806v.14

**11.9** **Headings/Schedules**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Schedules attached hereto are hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**11.10** **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.11** **Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**11.12** **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**11.13** **Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**11.14** **Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

87353806v.14

**11.15** **Offsets, Counterclaims and Defenses**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents. Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower. Additionally, and without limiting any of the other provisions contained herein, Borrower hereby unconditionally and irrevocably waives, to the maximum extent permitted by applicable law, any rights it may have to claim or recover against Lender in any legal action or proceeding any special, exemplary, punitive or consequential damages.

**11.16** **Publicity**. All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any of Lender's Affiliates, a Loan purchaser, Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender. Lender shall have the right to issue any of the foregoing without Borrower's approval.

**11.17** **No Usury**. Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 11.17 shall control every other agreement in the Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated Term until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**11.18** **Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan

Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. To the extent permitted by applicable law, Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**11.19 <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.**

(a) Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**11.20 <u>Intentionally Omitted</u>.**

**11.21 <u>Assignments and Participations</u>.** In addition to any other rights of Lender hereunder, the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated or otherwise transferred by Lender and any of its successors and assigns to any Person in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from Borrower or any other Person. Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender in all respects. Except as expressly permitted herein, Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**11.22 <u>Waiver of Marshalling of Assets</u>.** To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members or partners, as applicable, and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the

administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection, or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**11.23** **Registered Obligations**.

(a)     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Note is, and any other promissory notes issued under the Loan Documents shall be, registered as to both principal and any stated interest.

(b)     If Lender sells a participation interest in the Loan, such Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan  or other obligations under the Loan Documents (the "***Participant Register***"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan  Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Department of Treasury regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)     Lender or its designee, acting for this purpose solely as a non-fiduciary agent of Borrower, shall maintain a register (the "***Register***") for the recordation of the name and address of each Lender, the outstanding Principal, accrued and unpaid interest and other fees due it hereunder (any such amount a "***Borrower Obligation***") and whether such Lender is the original Lender or an assignee pursuant to an assignment under Section 11.21 hereof.  The Register shall be made available for inspection by Borrower or Lender at any reasonable time and from time to time upon reasonable prior notice. The entries in the Register shall be conclusive, absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the owner of any Borrower Obligation held by such holder, as indicated in the Register, for all purposes of this Agreement.

**11.24** **Set-Off**.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or

owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**11.25  <u>Counterparts</u>**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

87353806v.14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**NINETY-FIVE MADISON COMPANY, L.P.,**
a New York limited partnership

By: _____
Name: Michael Sklar
Title: Authorized Signatory

STATE OF New York )
                  ) ss.
COUNTY OF New York )

On the 2ND day of November in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Michael Sklar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

JOHN J. FRANCO
NOTARY PUBLIC, STATE OF NEW YORK
No. 01FR6411890
Qualified in Nassau County
Commission Expires December 07, 2024

[signatures continue on following page]

LENDER:

**MADISON AVENUE SERVICING LLC,**
a New York limited liability company

By: _____
Name: Eric Goodman
Title: Authorized Signatory

<u>**EXHIBIT A**</u>

<u>**LEGAL DESCRIPTION**</u>

ALL that certain plot piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of Madison Avenue and the southerly side of 29th Street;

RUNNING THENCE southerly along the easterly side of Madison Avenue, 98 feet 9 inches (98.75 feet per tax map) to the center line of the block;

THENCE easterly along said center line of the block, 100 feet;

THENCE northerly parallel with Madison Avenue, 98 feet 9 inches (98.75 feet per tax map) to the southerly side of 29th Street; and

THENCE westerly along the southerly side of 29th Street, 100 feet to the point or place of BEGINNING.

Said premises being known as 89-95 Madison Avenue, New York, NY 10016, and being designated as Tax Block: 858; Lot: 58 on the Tax Map of the City of New York, County of New York.

87353806v.14

**EXHIBIT B**

**FORM OF SECURITY INSTRUMENT**

---

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,**
**SECURITY AGREEMENT AND FIXTURE FILING**


Dated as of [_____], 20[__]

**NINETY-FIVE MADISON COMPANY, L.P.,**
as Borrower
(Borrower)

to

**MADISON AVENUE SERVICING LLC,**
as Lender
(Lender)

---

| | |
|---|---|
| Property Location: | 89-95 Madison Avenue<br>New York, New York 10016 |
| Block: | 858 |
| Lot: | 58 |
| County: | New York |


DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York 10018
Attention: Christopher J. Palmese, Esq.

---

This **MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "**Security Instrument**"), is made as of [_____], 20[__], by **NINETY-FIVE MADISON COMPANY, L.P.**, a New York limited partnership, having an address at 95 Madison Avenue, New York, New York 10016 ("**Borrower**"), to **MADISON AVENUE SERVICING LLC**, a New York limited liability company, having an address at 630 Fifth Avenue, Suite 2310, New York, New York 10111 (together with its successors and assigns, hereinafter referred to as "**Lender**").

# W I T N E S S E T H :

Borrower and Lender have entered into a Super-Priority Debtor-in-Possession Loan And Security Agreement dated as of [_____] (as amended, modified, restated, consolidated or supplemented from time to time, the "**Loan Agreement**") pursuant to which Lender has made a secured loan to Borrower in the original principal amount of up to $23,000,000.00 (the "**Loan**"). The Loan is evidenced by that certain Promissory Note, dated as of [_____], made by Borrower to Lender in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "**Note**"). Capitalized terms used herein without definition are used as defined in the Loan Agreement.

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Security Instrument, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended or supplemented, being hereinafter collectively referred to as the "**Loan Documents**"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Borrower for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) the costs and expenses of enforcing any provision of any Loan Document or protecting the Property or the security interest granted herein, and (iii) any indemnification or reimbursement obligations of Borrower to Lender (all such sums being hereinafter collectively referred to as the "**Debt**"), this Security Instrument constitutes a lien on, and Borrower hereby irrevocably mortgages, grants, bargains, sells, conveys, transfers, pledges, sets over and assigns, and grants a security interest, to and in favor of Lender, **WITH POWER OF SALE**, all of Borrower's right, title and interest in and to the real property described in Exhibit A (the "**Premises**"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "**Improvements**");

**TOGETHER WITH:** all right, title, interest and estate of Borrower now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "**Property**"):

(a) all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, excess or unused zoning floor area development rights, abatements, zoning floor area bonuses, zoning incentives or awards, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements,

Ex. B - 2

hereditaments and appurtenances of any nature whatsoever, in any way belonging, appurtenant to, relating or pertaining to the Premises and the Improvements or otherwise owned by or available to Borrower; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(b)     all machinery, furniture, furnishings, equipment, computer software and hardware, fittings, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises or the Improvements or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (including, without limitation, furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, washtubs, sinks, gas and electric fixtures, stoves, ranges, ovens, disposals, dishwashers, hood and fan combinations, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, kitchen equipment, laundry equipment, plants and shrubbery) (hereinafter collectively referred to as the "**Equipment**"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Borrower in and to any of the Equipment that may be subject to any "security interest" as defined in the Uniform Commercial Code, as in effect in the State where the Property is located (the "**UCC**"), superior in lien to the lien of this Security Instrument;

(c)     all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or the Improvements;

(d)     all leases, subleases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "**Leases**") and all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding or in lieu of rent or rent equivalents), royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Premises or the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of

the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Borrower or any of its agents or employees, and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "**Rents**"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(e)     all proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(f)     the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(g)     all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications (including the Plans and Specifications), designs, drawings, surveys, title insurance policies, permits, certificates of use and occupancy (or their equivalent), consents, licenses, management agreements (including any construction management agreement), leasing agreements, contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Property),  and causes of action that now or hereafter relate to, are derived from or are used in connection with the Property, or the construction, use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "**Intangibles**");

(h)     all reciprocal easement or operating agreements, declarations, development agreements, developer's or utility agreements, and any similar such agreements or declarations now or hereafter affecting the Property or any part thereof;

(i)     all contracts, options and other agreements for the sale of the Premises, the Improvements, the fixtures, the Equipment or any other party of the Property entered into by Borrower nor or in the future, including cash or securities deposited to secure performance by parties of their obligations; and

(j)     all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**AND**, without limiting any of the other provisions of this Security Instrument, Borrower expressly grants to Lender, as secured party, a security interest in all of those portions of the Property that are or may be subject to the provisions of the Uniform Commercial Code of the State in which the Property is located and of the State in which Borrower was organized, applicable to secured transactions, and this Security Instrument shall constitute a security agreement and financing statement for purposes of the Uniform Commercial Code.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Borrower, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Security Instrument shall automatically extend to all Rents acquired by the Borrower after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

**TO HAVE AND TO HOLD** the Property unto Lender and its successors and assigns, forever;

**PROVIDED, HOWEVER**, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

**AND** Borrower represents and warrants to and covenants and agrees with Lender as follows:

## PART I - GENERAL PROVISIONS

1.    <u>Payment of Debt and Incorporation of Covenants, Conditions and Agreements</u>. Borrower shall pay the Debt at the time and in the manner provided in the Loan Documents. All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Without limiting the generality of the foregoing, Borrower (i) agrees to insure, repair, maintain and restore damage to the Property, pay Taxes, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement. In the event of any inconsistency between the provisions of this Security Agreement and the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control.

2.    <u>Leases and Rents</u>.

(a)    Borrower does hereby absolutely and unconditionally assign to Lender all of Borrower's right, title and interest in all current and future Leases and Rents, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment shall not be construed to bind Lender to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Lender. Nevertheless, subject to the terms of this Section, Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents subject to the requirements of the Loan Agreement. Upon an Event of Default, without the need for notice or demand, the license granted to Borrower herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents collected thereafter (including Rents past due and unpaid), whether or not Lender enters upon or takes control of the Property. Borrower hereby grants and assigns to Lender the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such

license may be applied toward payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

(b)     Borrower shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in [Section 5.10] of the Loan Agreement.

3.     <u>Use of Property</u>.  Borrower shall not initiate, join in, acquiesce in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property.  If under applicable zoning provisions the use of the Property is or shall become a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Lender.  Borrower shall not (i) change the use of the Property, (ii) permit or suffer to occur any waste on or to the Property or (iii) without the consent of Lender pursuant to the terms and provisions of the Loan Agreement, take any steps to convert the Property to a condominium regime or cooperative form of ownership.

4.     <u>Transfer or Encumbrance of the Property</u>.

(a)     Borrower acknowledges that (i) Lender has examined and relied on the creditworthiness and experience of the principals of Borrower in owning and operating properties such as the Property in agreeing to make the Loan, (ii) Lender will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for the Debt, and (iii) Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover the Debt by a sale of the Property.  Borrower shall not sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Transfer.

(b)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Transfer in violation of this <u>Section 4</u>.  This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property (and every other Transfer) regardless of whether voluntary or not.  Any Transfer made in contravention of this <u>Section 4</u> shall be null and void and of no force or effect.  Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and documentation of any Permitted Transfer.

5.     <u>Changes in Laws Regarding Taxation</u>.  If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any.  If Lender is advised by its counsel that the payment of such tax or interest and penalties by Borrower would be unlawful, taxable to Lender or unenforceable, or would provide the basis for a defense of usury, then Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

6.     No Credits on Account of the Debt.  Borrower shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes assessed against the Property, and no deduction shall otherwise be made or claimed from the assessed value of the Property for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

7.     Further Acts, Etc.  Upon foreclosure, the appointment of a receiver or any other relevant action, Borrower shall, at its sole cost, cooperate with Lender to ensure the orderly and efficient transition of the Property to Lender or its designee and cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Property.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including such rights and remedies available to Lender pursuant to this Section.  Notwithstanding anything to the contrary in the immediately preceding sentence, Lender shall not execute any document as attorney-in-fact of Borrower unless (x) Borrower shall have failed or refused to execute the same within five (5) Business Days after Lender's request therefor, or (y) in Lender's good faith determination it would be materially prejudiced by the delay involved in making such a request.  Lender shall give prompt notice to Borrower of any exercise of the power of attorney as provided for in this Section 7, along with copies of all documents executed in connection therewith.

8.     Recording of Security Instrument, Etc.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, shall cause this Security Instrument, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Security Instrument, any mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law so to do.  Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Security Instrument.

9.     Right to Cure Defaults.  Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender is authorized to enter upon the Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the out-of-pocket cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured

by this Security Instrument and the other Loan Documents and shall be due and payable to Lender upon demand.

10. <u>Remedies</u>.

(a) Upon the occurrence of any Event of Default, Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, by Lender itself or otherwise, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i) declare the entire Debt to be immediately due and payable;

(ii) institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Security Instrument, in which case the Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien of this Security Instrument for the balance of the Debt not then due;

(iv) sell for cash or upon credit the Property and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to the power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

(vi) recover judgment on the Note either before, during or after any proceeding for the enforcement of this Security Instrument;

(vii) apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Borrower or of any person, firm or other entity liable for the payment of the Debt;

(viii) enforce Lender's interest in the Leases and Rents and enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and employees therefrom, and thereupon Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Property and conduct the business thereat; (B) complete any construction on the Property in such manner and form as Lender deems advisable; (C) make alterations, additions, renewals, replacements and

improvements to or on the Property; (D) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Property to the payment of the Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Property, as well as just and reasonable compensation for the services of Lender, and its counsel, agents and employees;

(ix)     require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Borrower, and require Borrower to vacate and surrender possession of the Property to Lender or to such receiver, and, in default thereof, evict Borrower by summary proceedings or otherwise; or

(x)     pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Borrower relating to the Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien on the remaining portion of the Property.

(b)     The proceeds of any sale made under or by virtue of this Section 10, together with any other sums which then may be held by Lender under this Security Instrument, whether under the provisions of this Section or otherwise, shall be applied by Lender to the payment of the Debt in such priority and proportion as Lender in its sole discretion shall deem proper.

(c)     Lender may adjourn from time to time any sale by it to be made under or by virtue of this Security Instrument by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)     Upon the completion of any sale or sales pursuant hereto, Lender, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Lender is hereby irrevocably appointed the true and lawful attorney of Borrower, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold and for that purpose Lender may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Borrower hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof.  Any sale or sales made under or by virtue of this Section 10, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the

estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Borrower.

(e)     Upon any sale made under or by virtue of this <u>Section 10</u>, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Lender may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Lender is authorized to deduct under this Security Instrument or any other Loan Document.

(f)     No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of this Security Instrument upon the Property or any part thereof, or any liens, rights, powers or remedies of Lender hereunder, but such liens, rights, powers and remedies of Lender shall continue unimpaired as before.

(g)     Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this <u>Section 10</u> at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(h)     Lender may resort to any remedies and the security given by this Security Instrument or in any other Loan Document in whole or in part, and in such portions and in such order as determined by Lender's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document. The failure of Lender to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated. All out-of-pocket costs and expenses of Lender in exercising its rights and remedies under this <u>Section 10</u> (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Borrower immediately upon notice from Lender, with interest at the Default Rate for the period after notice from Lender, and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Security Instrument.

(i)     The interests and rights of Lender under the Loan Documents shall not be impaired by any indulgence, including (A) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (B) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any

portion thereof or (C) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

11. <u>Right of Entry</u>. In addition to any other rights or remedies granted under this Security Instrument, Lender and its agents shall have the right to enter and inspect the Property at any reasonable time during the term of this Security Instrument. The out-of-pocket cost of such inspections or audits shall be borne by Borrower should Lender determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender. The out-of-pocket cost of such inspections, if not paid for by Borrower following demand, may be added to the principal balance of the sums due under the Note and this Security Instrument and shall bear interest thereafter until paid at the Default Rate.

12. <u>Security Agreement</u>. This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. Borrower by executing and delivering this Security Instrument has granted and hereby grants to Lender, as security for the Debt, a security interest in the Property to the full extent that the Property may be subject to the UCC (such portion of the Property so subject to the UCC being called in this Section the "**<u>Collateral</u>**"). The foregoing sentence is intended to grant in favor of Lender a first priority continuing lien and security interest in all of Borrower's assets. Borrower authorizes Lender and its counsel to file UCC financing statements in form and substance satisfactory to Lender, describing the collateral as "all assets of Borrower, whether now owned or existing or hereafter acquired or arising and wheresoever located, and all proceeds and products thereof, including all fixtures on the Premises" or words to that effect, and any limitations on such collateral description, notwithstanding that such collateral description may be broader in scope than the Collateral described in this Security Instrument. This Security Instrument shall also constitute a "fixture filing" for the purposes of the UCC. As such, this Security Instrument covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first Section of this Security Instrument. If an Event of Default shall occur, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender, Borrower shall at its expense assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral, sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper. In the event of any change in name, identity or structure of Borrower, Borrower shall notify Lender thereof and promptly after request shall execute, file and record such UCC forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Collateral,

and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional UCC forms or continuation statements, Borrower shall, promptly after request, execute, file and record such UCC forms or continuation statements as Lender shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Borrower's obligations under the Loan Documents.

13.     Actions and Proceedings. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole discretion, decides should be brought to protect its or their interest in the Property. Lender shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

14.     Marshalling and Other Matters. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law. The lien of this Security Instrument shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Lender and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Lender of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Lender to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, change, modification or disposition of any portion of the Debt or of any of the collateral security therefor; and Lender may foreclose, or exercise any other remedy available to Lender under other Loan Documents without first exercising or enforcing any of its remedies under this Security Instrument, and any exercise of the rights and remedies of Lender hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Lender's rights and remedies thereunder.

15.     Notices. All notices, consents, approvals and requests required or permitted hereunder shall be in writing, and shall be sent, and shall be deemed effective, as provided in the Loan Agreement.

16.     Inapplicable Provisions. If any term, covenant or condition of this Security Instrument is held to be invalid, illegal or unenforceable in any respect, this Security Instrument shall be construed without such provision.

17.     Headings. The headings in this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

18.     Duplicate Originals.  This Security Instrument may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

19.     Definitions.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form; and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the words "Property" shall include any portion of the Property and any interest therein, the word "including" means "including but not limited to" and the words "attorneys' fees" shall include any and all attorneys' fees, paralegal and law clerk fees, including fees at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property and Collateral and enforcing its rights hereunder.

20.     Homestead.  Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof.

21.     Assignments.  Lender shall have the right to assign or transfer its rights under this Security Instrument without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Security Instrument.

22.     Waiver of Jury Trial.  EACH OF BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS SECURITY INSTRUMENT OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

23.     Waiver of Counterclaim.  Borrower hereby waives, to the fullest extent permitted by law, the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of, or in any way connected with, the Debt or Borrower's obligations under the Loan Documents.

24.     Waiver of Foreclosure Defense.  Borrower hereby waives, to the fullest extent permitted by law, any defense Borrower might have by reason of Lender's failure to make any tenant of the Property a party defendant in any foreclosure instituted by Lender.

25.     Waiver of Notices Generally.  Borrower hereby waives, to the fullest extent permitted by law, its rights to notice from Lender except when this Security Instrument or the other Loan Documents expressly provides for Lender to give notice to Borrower.

26.     Waiver of Statute of Limitations and Laches.  Borrower hereby waives, to the fullest extent permitted by law, the benefit of any statute of limitations or laches defense to payment or performance of the Debt or Borrower's obligations under the Loan Documents.

27.     Consents.  Any consent or approval by Lender in any single instance shall not be deemed or construed to be Lender's consent or approval in any like matter arising at a subsequent date, and the failure of Lender to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Lender be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Lender pursuant hereto shall be narrowly construed to be applicable only to Borrower and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Lender a venturer or partner with Borrower nor shall privity of contract be presumed to have been established with any such third party.  If Lender deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Borrower shall reimburse Lender for all out-of-pocket costs reasonably incurred in connection with the employment of such persons, firms or corporations.

28.     Loan Repayment.  Provided no Event of Default exists, this Security Instrument shall be satisfied and discharged or assigned of record by Lender prior to the Maturity Date only in accordance with the terms and provisions set forth in the Loan Agreement.

29.     Intentionally Omitted.

30.     Governing Law.   THIS SECURITY INSTRUMENT IS, AND SHALL BE DEEMED TO BE, A CONTRACT ENTERED INTO UNDER AND PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL BE IN ALL RESPECTS GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

31.     Intentionally Omitted.

32.     Variable Interest Rate.  The Loan secured by this Security Instrument is a variable interest rate loan, as more particularly set forth in the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF**, Borrower has executed this instrument as of the day and year first above written.

**BORROWER:**

**NINETY-FIVE MADISON COMPANY, L.P.,**
a New York limited partnership

By: _____
Name: Michael Sklar
Title: Authorized Signatory

STATE OF _____ )
                                 ) ss.
COUNTY OF _____)

On the _____ day of _____ in the year _____, before me, the undersigned, a notary public in and for said state, personally appeared Michael Sklar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

## EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain plot piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of Madison Avenue and the southerly side of 29th Street;

RUNNING THENCE southerly along the easterly side of Madison Avenue, 98 feet 9 inches (98.75 feet per tax map) to the center line of the block;

THENCE easterly along said center line of the block, 100 feet;

THENCE northerly parallel with Madison Avenue, 98 feet 9 inches (98.75 feet per tax map) to the southerly side of 29th Street; and

THENCE westerly along the southerly side of 29th Street, 100 feet to the point or place of BEGINNING.

Said premises being known as 89-95 Madison Avenue, New York, NY 10016, and being designated as Tax Block: 858; Lot: 58 on the Tax Map of the City of New York, County of New York.

87353806v.14

**<u>EXHIBIT C</u>**

**<u>BUDGET</u>**

[To be inserted at Closing]

87353806v.14

**EXHIBIT D**

**FORM OF ORDER**

[Attached]

87353806v.14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
| | ) |
| Debtor. | ) |
| | ) |

### ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION DEBTOR-IN-POSSESSION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor in this Chapter 11 case, pursuant to Sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), seeking entry of this Order:

(i)     authorizing the Debtor to enter into the *Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* (the "DIP Credit Agreement")[1] by and among the Debtor and Madison Avenue Servicing LLC (the "DIP Lender"), substantially in the form attached hereto as **Exhibit 1** (together with all schedules and exhibits attached thereto and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "DIP Documents"), pursuant to the terms and conditions herein, in the DIP Documents,

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion and the DIP Credit Agreement.

and in the Motion;

(ii)     subject to the Carve-Out (as defined herein), granting to the DIP Lender (i) superpriority administrative expense claim status, pursuant to Section 364(c)(1) of the Bankruptcy Code; (ii) a first priority lien pursuant to Section 364(c)(2) of the Bankruptcy Code; and (iii) a first priority, priming lien pursuant to Section 364(d) of the Bankruptcy Code, pursuant to the terms and conditions herein, in the DIP Documents, and in the Motion;

(iii)    modifying the automatic stay imposed by Section 362(d) of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Order and the DIP Documents; and

(iv)    granting related relief.

The Court having considered the relief requested in the Motion, the *Declaration of Sharan Sklar in Support of Debtor's Motion for Entry of Order (I) Authorizing Debtor to Obtain Postpetition Debtor-In-Possession Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (Iv) Granting Related Relief*, the DIP Documents, and the evidence submitted and arguments made at the hearing held on November [16], 2022 (the "Hearing"); and due and sufficient notice of the Hearing having been given in accordance with Bankruptcy Rules 102(1) and 4001(c), and all applicable Local Rules; and the Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interest of the Debtor and its estate, and will fund the operation of the Debtor's business; and is necessary to preserve the value of the Debtor's estate; and it appearing that the Debtor's entry into the DIP

Documents is a sound exercise of the Debtor's business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      Petition Date.  On March 22, 2021, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

B.      Debtor in Possession.  The Debtor is operating its business and managing its property as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed.

C.      Jurisdiction and Venue.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2.

D.      Notice.  The Hearing was held pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2.  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion or the entry of this Order shall be required.

E.      Findings Regarding DIP Facility.

  (i)      Need for DIP Financing.  The Debtor requires DIP Financing to continue operating its business, to fund the administrative expenses of the Chapter 11 Case as they come due, and to pursue the Transaction.

(ii)   <u>Good Cause.</u>  Good and sufficient cause has been shown for the entry of this Order and authorization of the Debtor to obtain financing pursuant to the terms of the DIP Credit Agreement.

(iii)  <u>Business Judgment.</u>  The Debtor's decision to enter into the DIP Facility is an exercise of its sound business judgment following extensive negotiations with the DIP Lender, an arm's-length process, a search for other financing options, and the Debtor's careful evaluation of their limited available alternatives.

(iv)  <u>Good Faith and Arms' Length Negotiations.</u> The DIP Financing was negotiated in good faith and at arm's length by and among the Debtor, its advisors, and the DIP Lender.  The DIP Lender, in agreeing to provide the DIP Financing, is extending credit to the Debtor in good faith under Section 364(e) of the Bankruptcy Code.

(v)  <u>No Credit Available on More Favorable Terms.</u>  The Debtor is unable to obtain sufficient debtor-in-possession financing on more favorable terms from sources other than the DIP Lender under the DIP Documents.

(vi)  <u>Adequate Protection.</u>  Pursuant to Section 361 of the Bankruptcy Code, the interests of Vitra, Inc. and the New York City Department of Finance (collectively, the "<u>Alleged Prepetition Secured Creditors</u>") in the Property are adequately protected, from any diminution in value caused by the granting of the priming lien to the DIP Lender, by an equity cushion.  The value of the Property far exceeds the Prepetition Secured Creditors' claims. Even considering the $23,000,000 obligation potentially incurred by the

Debtor pursuant to the DIP Facility, the Alleged Prepetition Secured Creditors are vastly oversecured.

**BASED UPON THE FOREGOING, IT IS HEREBY ORDERED AS FOLLOWS:**

1.     <u>Approval of Motion.</u>  The Motion is granted to the extent set forth in this Order and the DIP Documents; provided, however, that if there are any inconsistencies between the terms of the Order and the DIP Documents, the terms of the Order shall govern.  This Order shall become effective immediately upon its entry.

2.     <u>Authorization of DIP Financing.</u>

(a)     The DIP Facility is hereby approved.  The Debtor is authorized and directed to execute, issue, deliver, enter into and adopt all DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith.  The Debtor is hereby authorized to borrow money under the DIP Facility up to the maximum loan amount.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements and financing statements), and, based on the representation of the Debtor's counsel that the fees referenced in this paragraph are exclusively Lender's fees, without further application to the Court, to pay all fees referred to in this Order and the DIP Documents.

3.     <u>Binding Effect.</u>  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law.

4.　　　Use of DIP Loan Proceeds.　Subject to the terms and conditions of this Order and the DIP Documents, the proceeds of the Loan shall be used by the Debtor to (a) pay closing costs; (b) fund general corporate needs, including, without limitation, working capital needs; (c) pay any obligations authorized to be paid in accordance with the Budget, except to the extent that further Court authorization is otherwise required; and (d) if necessary, pay all creditor claims in full. Notwithstanding anything to the contrary in the DIP Documents, (x) no salaries or fees shall be paid to any of the General Partners without (i) the unanimous agreement of the General Partners or (ii) further order of the Court and (x) no brokerage commissions shall be paid to Two Bins Capital without further order of the Court.

5.　　　Payment of Fees and Expenses.　Immediately upon entry of this Order, the Debtor is authorized to and shall pay or otherwise incur all fees, expenses, and other amounts payable under the terms of the DIP Credit Agreement and the other DIP Documents.

6.　　　DIP Superpriority Claim.　Except to the extent expressly set forth in this Order in respect of the Carve-Out, pursuant to Section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Documents shall constitute allowed superpriority administrative expense claims, without the need to file any proof of claim.

7.　　　DIP Liens.　As security for the obligations under the DIP Facility, effective and perfected upon the date of this Order and without requiring execution, recordation, or filing by the Parties of instruments, agreements, or other documents, the following liens are hereby granted by the Debtor to the DIP Lender, subject and subordinate to the Carve-Out:

(a)　　　A valid, binding, continuing, enforceable, fully perfected first priority lien on any otherwise unencumbered assets and property (including but not limited to (x) assets and properties that hereafter would otherwise be unencumbered and (y) after-acquired assets and

properties) of the Debtor is hereby granted to the DIP Lender, pursuant to Section 364(c)(2) of the Bankruptcy Code

(b)     A valid, binding, continuing, enforceable, perfected, senior priming lien upon the Property is hereby granted to the DIP Lender pursuant to Section 364(d) of the Bankruptcy Code.

8.     <u>Modification of the Automatic Stay.</u>  The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms of this Order and the DIP Documents, including, without limitation, to: (i) permit the Debtor to grant superpriority administrative expense status and certain liens; (ii) permit the Debtor and the DIP Lender to perform acts to assure the perfection and priority of the liens granted herein; (iii) permit the Debtor to incur liabilities and obligations; and (iv) authorize the Debtor to make, and the DIP Lender to retain and apply, payments made in accordance with the DIP Facility.

9.     <u>Remedies.</u>  The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby further modified to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement), to exercise its rights and remedies under the Order and the DIP Documents upon giving three (3) days written notice to the Debtor.

10.     <u>Order Governs.</u>  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Order and the DIP Documents.

11.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in this Chapter 11 Case, including, without limitation, the DIP Lender, the Prepetition Secured Creditors, the Debtors and their respective successors and assigns.

12.     Effectiveness.  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

13.     Carve-Out.  As used in this Order, the term "Carve-Out" means the sum of all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under Section 1930(a) of title 28 of the United States Code plus interest at the statutory rate.

14.     Retention of Jurisdiction.  The Court shall retain jurisdiction to enforce the provisions of this Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for the Debtor, notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

SO ORDERED THIS _____ DAY OF _____, 2022

_____
THE HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

<u>**EXHIBIT E**</u>

**PERMITTED ENCUMBRANCES**

1.    All matters referenced in that certain landmark designation recorded in CRFN 2018000311506;

2.    All matters referenced in that certain landmark designation recorded in CRFN 2020000218455;

3.    Notice of Sidewalk Violation No. 76154 filed on 5/10/2000;

4.    Judgment in favor of Criminal Court of the City of New York (Index No. CR310061784140);

5.    Judgment in favor of Criminal Court of the City of New York (Index No. CR310061784150);

6.    Judgment in favor of Workers' Compensation Board of New York State (Index No. 450754/17);

7.    Judgment in favor of Midtown Equities Brokerage LLC (Index No. 654321/16);

8.    Judgment in favor of Vitra Inc., (Index No. 652342/17);

9.    Judgment in favor of a Temporary Receiver (Index No. 652342/17);

10.   Judgment in favor of Danielle C. Lesser, as a temporary receiver (Index No. 652342/17);

11.   Judgment in favor of Vitra Inc. (Index No. 652342/17);

12.   Mechanics' Lien filed by Harty Built LLC on 6/6/2018 (Index No. 37) and any lis pendens filed by lienor in connection therewith; and

13.   Mechanics' Lien filed by Andamio Scaffolding LLC on 8/25/2021 (Index No. 192) and any lis pendens filed by lienor in connection therewith.

87353806v.14

# EXHIBIT F

# FORM OF REQUISITION

Date_____

DISBURSEMENT REQUEST NO. _____

To:     [LENDER]

Re:     Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement (the
        "Agreement") dated _____, by and between _____
        ("Borrower") and _____ ("Lender")

In accordance with the terms of the Agreement, you are hereby authorized and requested to make disbursement of funds held by you in the amount shown below.  Attached hereto are invoices or other appropriate documentation supporting the disbursement hereby requested, as required by the Agreement.  All capitalized terms herein have the meanings ascribed to them in the Agreement.

Draw #                      _____

Draw Amount:                _____

TOTAL DRAW AMOUNT:          _____

The undersigned requests that this draw be funded and that the disbursement funds be deposited as follows:

        Fund to (Name of Bank) _____,
        Account Number _____

The undersigned hereby certifies that:

(i)     to its knowledge, no Event of Default and no event or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default has occurred or exists as of the date hereof;

(ii)    all conditions of the Agreement of the disbursement of the Loan proceeds hereby requested have been fulfilled or waived.

87353806v.14

**<u>BORROWER</u>:**

_____

By: _____
Name:
Title:

87353806v.14

## FORM OF NOTE

### PROMISSORY NOTE

Up to $23,000,000.00

New York, New York
[_____], 202[_]

FOR VALUE RECEIVED, NINETY-FIVE MADISON COMPANY, L.P., a New York limited partnership, as maker, having its principal place of business at 95 Madison Avenue, New York, New York 10016 ("**Borrower**"), hereby unconditionally promises to pay to the order of MADISON AVENUE SERVICING LLC, a New York limited liability company, having an address at 630 Fifth Avenue, Suite 2310, New York, New York 10111 (together with its successors and/or assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of TWENTY-THREE MILLION AND 00/100 DOLLARS ($23,000,000.00), or so much thereof as is advanced pursuant to that certain Secured, Super-Priority Debtor-in-Possession Loan And Security Agreement dated as of the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (together with all extensions, renewals, replacements, restatements or modifications hereof, being hereinafter collectively referred to as, this "**Note**") at the Interest Rate, and to be paid in accordance with the terms of this Note and the Loan Agreement.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

### ARTICLE I
### PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and the other Loan Documents from time to time outstanding, at the rates and at the times specified in the Loan Agreement, and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and the other Loan Documents shall be due and payable on the Maturity Date.  This Note may not be prepaid in whole or in part except as expressly permitted under the Loan Agreement.

### ARTICLE II
### DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender upon the happening of any Event of Default.

## ARTICLE III
## LOAN DOCUMENTS

This Note is secured by the Loan Documents and, if and when recorded, the Security Instrument. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE IV
## SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed to constitute interest, the interest contracted for, charged or received by Lender shall never exceed the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by this Note, under the laws of any Governmental Authority whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan (the "Maximum Legal Rate"), (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward the payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE V
## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party(ies) against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE VI
## WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly required by the Loan Agreement. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender and any other Person shall release, modify, amend, waive, extend, change, discharge,

terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and its partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable, notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. (Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.)

## ARTICLE VII
## TRANSFER

Upon the transfer of this Note by Lender, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE VIII
## INTENTIONALLY OMITTED

## ARTICLE IX
## GOVERNING LAW

**THIS NOTE IS, AND SHALL BE DEEMED TO BE, A CONTRACT ENTERED INTO UNDER AND PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL BE IN ALL RESPECTS GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.**

## ARTICLE X
## WAIVER OF JURY TRIAL

**EACH OF BORROWER AND, BY ITS ACCEPTANCE HEREOF, LENDER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY,**

INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

## ARTICLE XI
## SUCCESSORS AND ASSIGNS

This Note shall be binding upon, and shall inure to the benefit of, Borrower and Lender and their respective successors and permitted assigns. Lender shall have the right to assign or transfer its rights under this Note in connection with any assignment of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Note. Borrower shall not have the right to assign or transfer its rights or obligations under this Note without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

## ARTICLE XII
## NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 7.1 of the Loan Agreement.

## ARTICLE XIII
## JOINT AND SEVERAL LIABILITY

If Borrower consists of more than one Person, the obligations and liabilities of each such Person constituting Borrower hereunder and under the other Loan Documents shall be joint and several.

## ARTICLE XIV
## TIME OF ESSENCE

Time shall be of the essence with respect to all of Borrower's obligations under this Note.

## ARTICLE XV
## SEVERABILITY

IF ANY PROVISION OF THIS NOTE SHOULD BE HELD UNENFORCEABLE OR VOID, THEN THAT PROVISION SHALL BE DEEMED SEPARABLE FROM THE REMAINING PROVISIONS AND SHALL NOT AFFECT THE VALIDITY OF THIS NOTE, EXCEPT THAT IF THAT PROVISION RELATES TO THE PAYMENT OF ANY MONETARY SUM, THEN LENDER MAY, AT ITS OPTION, DECLARE THE DEBT IMMEDIATELY DUE AND PAYABLE.

[NO FURTHER TEXT ON THIS PAGE]

87353806v.14

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER**:

**NINETY-FIVE MADISON COMPANY, L.P.**,
a New York limited partnership


By: _____
Name: Michael Sklar
Title: Authorized Signatory


STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

On the _____ day of _____ in the year _____, before me, the undersigned, a notary public in and for said state, personally appeared Michael Sklar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

87353806v.14

# **SCHEDULE 1**

**Intentionally Omitted**

87353806v.14

## SCHEDULE 2

**Intentionally Omitted**

87353806v.14

## SCHEDULE 3

## LITIGATION

1.  **Harty Built LLC v. Ninety-Five Madison Company, L.P.**
    Index No.: 157349/2018
    File Date: 8/7/2018
    Jurisdiction: New York Supreme Court, New York County

2.  **Rosenberg Feldman Smith, LLP v. Ninety-Five Madison Company, L.P.**
    Index No.: 653953/2018
    File Date: 8/9/2018
    Jurisdiction: New York Supreme Court, New York County

3.  **Lois Weinstein, individually, and on behalf of Kinder Realty Associates, and on behalf of Ninety-Five Madison Company, L.P. v. RAS Property Management, LLC, Rita A. Sklar, Kinder Realty Associates, and Ninety-Five Madison Company, L.P.**
    Index No.: 153224/2019
    File Date: 3/27/2019
    Jurisdiction: New York Supreme Court, New York County

4.  **Vitra, Inc. vs. Ninety-Five Madison Company, L.P.**
    Index No.: 655408/2019
    File Date: 9/18/2019
    Jurisdiction: New York Supreme Court, New York County

5.  **Carol Keller and Gail Shields, as Preliminary Executors of the Estate of Lois Weinstein v. Ninety-Five Madison Company, L.P., RAS Property Management, LLC, Rita A. Sklar, individually, Rita A. Sklar and Steven C. Mero, as Surviving Trustees of the Exempt Issue Trust FBO Hannah Rose Gettinger, the Exempt Issue Trust FBO Ruby Hilene Sklar and the Exempt Issue Trust FBO Sadie Pearl Sklar**
    Index No.: 650975/2020
    File Date: 2/12/2020
    Jurisdiction: New York Supreme Court, New York County

6.  **Tellas Ltd. v. Ninety-Five Madison Company, L.P.**
    Index No.: 650652/2021
    File Date: 1/28/2021
    Jurisdiction: New York Supreme Court, New York County

87353806v.14

## SCHEDULE 4

## EXISTING VIOLATIONS

|  | Violation Type | Violation No. |
|---|---|---|
| 1. | Sidewalk Violation | Violation No.: 3176154 |
| 2. | ECB Violation | Violation No.: 011788986Z |
| 3. | ECB Violation | Violation No.: 012100760Y |
| 4. | ECB Violation | Violation No.: 0197093665 |
| 5. | ECB Violation | Violation No.: 037020449Z |
| 6. | ECB Violation | Violation No.: 037021416R |
| 7. | ECB Violation | Violation No.: 038254653Y |
| 8. | DOB Violation | Violation No.: NRF00397 |
| 9. | DOB Violation | Violation No.: 01735 |
| 10. | DOB Violation | Violation No.: 00342 |
| 11. | DOB Violation | Violation No.: 01813 |
| 12. | DOB Violation | Violation No.: 01600 |
| 13. | DOB Violation | Violation No.: 01668 |
| 14. | DOB Violation | Violation No.: 00056 |
| 15. | DOB Violation | Violation No.: 00932 |
| 16. | DOB Violation | Violation No.: 01350 |
| 17. | DOB Violation | Violation No.: NRF00087 |
| 18. | DOB Violation | Violation No.: 9027/686367 |
| 19. | DOB Violation | Violation No.: 2000549 |
| 20. | DOB Violation | Violation No.: 909583 |
| 21. | DOB Violation | Violation No.: 00202 |
| 22. | FDNY Violation | Violation No.: 11161939R |
| 23. | FDNY Violation | Violation No.: 11208759P |
| 24. | FDNY Violation | Violation No.: 11401708J |
| 25. | FDNY Violation | Violation No.: 11626800J |
| 26. | FDNY Violation | Violation No.: 11708956P |
| 27. | FDNY Violation | Violation No.: 11788986Z |

87353806v.14

| | | |
|---|---|---|
| 28. | FDNY Violation | Violation No.: 12004853N |
| 29. | FDNY Violation | Violation No.: 12782000M |
| 30. | FDNY Violation | Violation No.: 12782100J |
| 31. | FDNY Violation | Violation No.: E541425S3 |
| 32. | FDNY Violation | Violation No.: E626261 |
| 33. | FDNY Violation | Violation No.: E626261P1 |
| 34. | FDNY Violation | Violation No.: E626262 |
| 35. | FDNY Violation | Violation No.: E626262P1 |
| 36. | FDNY Violation | Violation No.: 12105847J |

87353806v.14

# SCHEDULE 5

# ORGANIZATION OF BORROWER

