# EXHIBIT B

## Agreement

# PURCHASE AND SALE AGREEMENT

Between

## NINETY-FIVE MADISON COMPANY, L.P.,
a New York limited partnership

as SELLER,

and

## MADISON 29 HOLDING LLC,
a New York limited liability company

as PURCHASER,

Premises: 89-95 Madison Avenue
New York, New York 10016
Block: 858
Lot: 58

**February 23, 2024**

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

## TABLE OF CONTENTS

Page

1.  DEFINITIONS.................................................................................................................1

2.  PURCHASE AND SALE. .................................................................................................3

3.  ACCESS. .........................................................................................................................4

4.  PURCHASE PRICE AND DEPOSIT. ..............................................................................4

5.  STATUS OF TITLE. .......................................................................................................10

6.  TITLE INSURANCE; LIENS. ........................................................................................10

7.  APPORTIONMENTS.......................................................................................................13

8.  PROPERTY NOT INCLUDED IN SALE. .......................................................................17

9.  COVENANTS OF SELLER.............................................................................................18

10. ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER;
    SECURITY DEPOSITS; EMPLOYEES; CONDITIONS TO CLOSING. .....................20

11. CONDITION OF THE PROPERTY; REPRESENTATIONS.............................................22

12. DAMAGE AND DESTRUCTION....................................................................................29

13. CONDEMNATION. .........................................................................................................30

14. BROKERS AND ADVISORS. .........................................................................................32

15. TAX REDUCTION PROCEEDINGS...............................................................................32

16. TRANSFER TAXES AND TRANSACTION COSTS.......................................................33

17. DELIVERIES TO BE MADE ON THE CLOSING DATE................................................34

18. CLOSING DATE.............................................................................................................36

19. NOTICES.......................................................................................................................37

20. DEFAULT BY PURCHASER OR SELLER. ...................................................................38

21. FIRPTA COMPLIANCE.................................................................................................39

22. ENTIRE AGREEMENT; ACCEPTANCE OF DEED.......................................................39



| | | |
|---|---|---|
| 23. | AMENDMENTS. | 40 |
| 24. | WAIVER. | 40 |
| 25. | PARTIAL INVALIDITY. | 40 |
| 26. | SECTION HEADINGS. | 40 |
| 27. | GOVERNING LAW. | 40 |
| 28. | PARTIES; ASSIGNMENT AND RECORDING. | 41 |
| 29. | CONFIDENTIALITY AND PRESS RELEASES. | 41 |
| 30. | FURTHER ASSURANCES. | 42 |
| 31. | THIRD PARTY BENEFICIARY. | 42 |
| 32. | JURISDICTION AND SERVICE OF PROCESS. | 42 |
| 33. | WAIVER OF TRIAL BY JURY. | 43 |
| 34. | MISCELLANEOUS. | 43 |
| 35. | ATTORNEYS' FEES. | 44 |
| 36. | EXCULPATION. | 44 |
| 37. | NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES. | 44 |
| 38. | NO CONSEQUENTIAL DAMAGES. | 45 |
| 39. | SUBMISSION FOR COURT APPROVAL. | 45 |

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

Schedules

    A. Description of the Land
    B. Included Personalty
    C. Specified Encumbrances
    D. List of Employees
    E. Survey

Exhibits

    1. Escrow Agent's Wire Instructions
    2. Title Report
    3. Form of Deed
    4. Form of Bill of Sale
    5. Intentionally Omitted
    6. Form of Assignment and Assumption of Sidewalk Shed Contract
    7. Seller Parties



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") made as of the 23 day of February, 2024 (the "<u>Effective Date</u>") between NINETY-FIVE MADISON COMPANY, L.P., a New York limited partnership ("<u>Seller</u>"), having an address at 95 Madison Avenue, New York, New York 10016, Suite 609, and MADISON 29 HOLDING LLC, a New York limited liability company ("<u>Purchaser</u>"), having an address at 135-25 Northern Boulevard, 2nd Floor, Flushing, NY 11354.

### W I T N E S S E T H :

**WHEREAS**, Seller is the owner and holder of the fee simple estate in and to that certain plot, piece and parcel of land (the "<u>Land</u>") known as 89-95 Madison Avenue, New York, New York and more particularly described in <u>Schedule A</u>, together with the building and all other improvements (collectively, the "<u>Building</u>") located on the Land (the Building and the Land being sometimes referred to hereinafter, collectively, as the "<u>Premises</u>");

**WHEREAS** on March 22, 2021, Seller filed a voluntary petition for relief, Case No. 21-10529 (DSJ) (the "<u>Bankruptcy Case</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"); and

**WHEREAS**, Seller desires to sell the Property (as hereinafter defined) to Purchaser, and Purchaser desires to purchase the Property from Seller, upon and subject to the terms and conditions set forth in this Agreement and pursuant to Section 363 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

1. <u>DEFINITIONS</u>

| | |
|---|---|
| Additional Deposit | Section 4(a)(ii) |
| Adjourned Closing Date | Section 6(a)(v) |
| Agreement | Preamble |
| Anti-Money Laundering Laws | Section 11(c)(xviii) |
| Applicable Laws | Section 11(c)(xix) |
| Apportionment Date | Section 7(a) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Deposit | Section 4(a)(i) |
| Broker | Section 14(a) |
| Building | Recitals |
| business day | Section 4(e) |
| Casualty Election Date | Section 12(d) |
| Closing | Section 18 |
| Closing Date | Section 18 |



| | |
|---|---|
| Closing Statement | Section 7(g) |
| Code | Section 11(c)(xvi) |
| Company | Section 6(a)(i) |
| Condemnation Election Date | Section 13(c) |
| Deed | Section 17(a)(i) |
| Default Rate | Section 34(f) |
| Deposit | Section 4(a)(ii) |
| Disclosed Survey Items | Section 5(a) |
| Effective Date | Preamble |
| ERISA | Section 11(c)(xvi) |
| Escrow Agent | Section 4(a)(i) |
| Escrowed Deposit | Section 4(b)(i) |
| Excluded Personalty | Section 8 |
| Filings | Section 4(a)(iv) |
| Final Closing Statement | Section 7(g) |
| Final Order | Section 10(d)(iv) |
| Financial Institution | Section 11(c)(xvii) |
| FIRPTA | Section 21 |
| Hazardous Substances | Section 11(c)(xix) |
| Included Personalty | Section 2(a) |
| Initial Deposit | Section 4(a)(i) |
| Land | Recitals |
| Material Adverse Effect | Section 10(d)(i) |
| Motion | Section 39(b) |
| New Closing Notice | Section 6(c) |
| Notices | Section 19 |
| Non-Objectionable Encumbrances | Section 6(a)(v) |
| Non-Permitted Liens | Section 6(c) |
| OFAC | Section 11(c)(xvii) |
| Option | Section 16(d) |
| Patriot Act | Section 11(c)(xviii) |
| Permitted Encumbrances | Section 5 |
| Person | Section 11(c)(xvii) |
| Premises | Recitals |
| Property | Section 2(a) |
| Property Taxes | Section 7(a)(ii) |
| Purchase Price | Section 4 |
| Purchaser | Preamble |
| Purchaser Party | Section 11(f)(vi) |
| Purchaser's Broker | Section 14(a) |
| Purchaser's Costs | Section 6(b) |
| Purchaser's Representatives | Section 3(a) |
| Report | Section 6(a)(i) |
| Report Objections | Section 6(a)(iii) |
| Representations | Section 11(c) |
| Sale Order | Section 39 |

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

| | |
|---|---|
| Scheduled Closing Date | Section 18 |
| Seller | Preamble |
| Seller Knowledge Individual | Section 11(d) |
| Seller Party | Section 16(d) |
| Seller Related Parties | Section 3(d) |
| Sidewalk Shed Contract | Section 10(a)(i) |
| Specially Designated Nationals and Blocked Persons | Section 11(c)(xvii) |
| Survey | Section 5(a) |
| Survival Period | Section 11(e) |
| Taking | Section 13(a) |
| Tax Certiorari Proceeding | Section 15 |
| Tenant A | Section 9(a)(vi) |
| Tenant A Space | Section 9(a)(vi) |
| Tenant B | Section 9(a)(vii) |
| Tenant B Space | Section 9(a)(vii) |
| Title Cure Period | Section 6(a)(v) |
| Title Objections | Section 6(a)(iv) |
| Title Policy | Section 10(d)(iii) |
| Transfer Taxes | Section 16(a) |
| Transfer Tax Returns | Section 16(a) |
| Transferred Security Deposits | Section 17(a)(vii) |
| Update Exception | Section 6(a)(iv) |
| Update Objection Deadline | Section 6(a)(iv) |
| Update Objections | Section 6(a)(iv) |
| U.S. Person | Section 11(c)(xvii) |
| Utilities | Section 7(f) |
| Violations | Section 6(d) |

2.    PURCHASE AND SALE.

(a)    Seller shall sell, assign and convey to Purchaser, and Purchaser shall purchase and assume from Seller, subject to Bankruptcy Court approval and the terms and conditions of this Agreement, free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to (i) the Premises; and (ii) the fixtures, furnishings, furniture, equipment, machinery, inventory, appliances and other personal property located at the Premises, which is specifically listed on Schedule B attached hereto (collectively, the "Included Personalty"), it being understood that (1) the Included Personalty shall be subject to depletions, replacements or additions thereto in the ordinary course of business of the Premises and (2) any other personal property located at the Premises may be abandoned by Seller, at Seller's option and such abandoned personal property shall become the responsibility of Purchaser. The items described in clauses (i) and (ii) above are sometimes referred to hereinafter, collectively, as the "Property." Any other personal property other than Included Personalty located at the Premises at the time of Closing shall be deemed abandoned by Seller and Seller shall have no obligation to discard same.

**(b)**     The parties hereto acknowledge and agree that the value of the Personalty is *de minimis* and that no part of the Purchase Price is allocable thereto.

3.     ACCESS.

**(a)**     Subject to the provisions of <u>Section 3(b)</u>, Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers and contractors (collectively "<u>Purchaser's Representatives</u>") shall have the right through and including the Closing Date (if the same shall occur, or otherwise until the termination of this Agreement), from time to time, upon the advance notice required pursuant to <u>Section 3(b)</u>, to enter upon and pass through the Premises during normal business hours to examine and inspect the same.

**(b)**     In conducting any inspection of the Premises and its due diligence review, Purchaser shall at all times comply with all laws and regulations of all applicable governmental authorities, and neither Purchaser nor any of Purchaser's Representatives shall (i) contact or have any discussions with any of Seller's employees, agents or representatives, or any contractors providing services to the Premises, unless in each case Purchaser obtains the prior written consent of Seller (which consent shall not be unreasonably withheld or delayed by Seller), it being agreed that all such contacts or discussions shall, pending any such approval, be directed to Michael Sklar at the following email address: <u>msklar@ninetyfivemadison.com</u> (ii) contact or have any discussions or other communications with any tenants of the Premises (or their employees), (iii) not interfere with the business of Seller (or any of its tenants) conducted at the Premises or disturb the use or occupancy of any occupant of the Premises or (iv) damage the Property or perform any invasive or destructive testing of any kind (including, without limitation, boring, drilling, scraping, paint sampling, floor covering removal or sampling, or similar). In conducting the foregoing inspection or otherwise accessing the Premises, Purchaser and Purchaser's Representatives shall at all times comply with, and shall be subject to, the rights of the tenants under the Termination/Surrender Documents (and any persons claiming under or through such tenants). Purchaser shall schedule and coordinate all inspections, including, without limitation, any environmental tests, or other access with Seller and shall give Seller at least two (2) business day's prior notice thereof which notice shall be delivered to Michael Sklar at the following email address: msklar@ninetyfivemadison.com. Seller shall be entitled to have a representative present at all times during each such inspection or other access. Purchaser shall be responsible for the cost of repairing and restoring any damage or disturbance which Purchaser or Purchaser's Representatives shall cause to or exacerbate at the Property. All inspection fees, appraisal fees, engineering fees and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser. In the event that the Closing hereunder shall not occur for any reason whatsoever, Purchaser shall: (A) promptly deliver to Seller, at no cost to Seller, and without representation or warranty, the originals of all tests, reports and inspections of the Premises, made and conducted by Purchaser or Purchaser's Representatives or for Purchaser's benefit which are in the possession or control of Purchaser or Purchaser's Representatives, and (B) promptly return to Seller copies of all due diligence materials delivered by Seller to Purchaser or any Purchaser Representative. Purchaser or Purchaser's Representatives and any others who gain access to the due diligence materials through Purchaser or Purchaser's Representatives shall treat all such due diligence materials as confidential and proprietary to Seller, and shall not disclose to others during the term of this Agreement (or thereafter in the event that the Closing hereunder shall not occur)



any such due diligence materials whether verbal or written, or any description whatsoever which may come within the knowledge of Purchaser, Purchaser's Representatives or such other parties, unless, in each instance, Purchaser obtains the prior written consent of Seller. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Premises or drilling in or on the Premises, or any other invasive testing, in connection with the preparation of an environmental audit or in connection with any other inspection of the Premises without the express written consent of Seller, which may be withheld, conditioned, or delayed, in Seller's sole discretion. If Seller consents to any invasive testing by Purchaser or Purchaser's contractors at the Property (it being expressly agreed that such consent may be withheld by Seller in its sole and absolute discretion), and such invasive testing causes any damage or disturbance (or exacerbates any damage or disturbance) and Purchaser does not repair/restore the damaged area within five (5) days after demand by Seller therefor, Purchaser shall pay to Seller such cost to repair/restore the damaged area (as estimated by a licensed, insured, and reputable contractor selected by Seller) and in the event Purchaser shall become entitled under any other provision of this Agreement to a return of the Deposit, any such repair or restoration cost remaining unpaid shall be withheld from the Deposit and paid to Seller before any remaining balance of the Deposit is returned to Purchaser). Any liens against the Premises, or any portion thereof, arising from the performance of services by third-party contractors in connection with Purchaser's due diligence activities shall be removed by Purchaser as promptly as practicable and in any event not later than ten (10) business days after Purchaser shall have been notified of the filing of such liens. The provisions of this <u>Section 3(b)</u> shall survive the Closing or any termination of this Agreement.

(c)     Prior to conducting any physical inspection at the Premises; it being acknowledged and agreed that Purchaser shall have no right to perform any boring, drilling and/or sampling of soil on any portion of the Premises, Purchaser and Purchaser's Representatives shall obtain, and during the period of such inspection or testing shall maintain, at its expense, commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, with Seller, its partners, directors, officers and its managing agent, if any, as additional insureds, from an insurer reasonably acceptable to Seller, which insurance policies must have limits for bodily injury and death as reasonably required by Seller. Prior to making any entry upon the Premises, Purchaser shall furnish to Seller a certificate of insurance evidencing the foregoing coverages.

(d)     Purchaser agrees to indemnify and hold Seller and its disclosed or undisclosed, direct and indirect, shareholders, officers, directors, trustees, partners, principals, members, employees, agents, affiliates, representatives, consultants, accountants, contractors, lenders and attorneys or other advisors, and any successors or assigns of any of the foregoing (collectively with Seller, "<u>Seller Related Parties</u>") harmless from and against any and all losses, costs, damages, liens, claims, liabilities or expenses (including, but not limited to, reasonable attorneys' fees, court costs and disbursements) incurred by any Seller Related Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Premises, or any tests, inspections or other due diligence conducted by or on behalf of Purchaser. The provisions of this <u>Section 3(d)</u> shall survive the Closing or any termination of this Agreement.

(e)     Notwithstanding any such access or inspection by Purchaser pursuant to this <u>Section 3</u>, or anything to the contrary herein contained, Purchaser's obligations hereunder shall not be limited or otherwise affected as a result of any fact, circumstance or other



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

matter of any kind discovered following the date hereof in connection with any such inspection, access or otherwise; it being agreed that Seller is permitting Purchaser such right of inspection and access as a courtesy to Purchaser in its preparation for taking title to the Property. Without limiting the generality of the foregoing, (x) Purchaser agrees that it shall not have any so-called "due diligence period" and that it shall have no right to obtain a reduction of the Purchase Price as a result of any fact, circumstance or other matter so discovered (including, without limitation, relating to the physical condition of the Premises, the operations of the Premises or otherwise) and (y) Purchaser shall have no right to terminate this Agreement or obtain a return of the Deposit as a result of any fact, circumstance or other matter so discovered (including, without limitation, relating to the physical condition of the Premises, the operations of the Premises or otherwise) or for any other reason unless expressly provided in this Agreement.

4.     PURCHASE PRICE AND DEPOSIT.

The purchase price to be paid by Purchaser to Seller for the Property (the "Purchase Price") is Sixty-Two Million Eight Hundred Thousand Dollars ($62,800,000.00), subject to apportionment as provided in Section 7, payable as follows:

(a)

(i)     Within two (2) business days of the Effective Date, ***TIME BEING OF THE ESSENCE,*** Purchaser shall deliver to Stewart Title Insurance Company, as escrow agent (the "Escrow Agent"), by wire transfer of immediately available funds (pursuant to the wire instructions attached hereto as Exhibit 1), in cash the sum of FOUR MILLION SEVEN HUNDRED TEN THOUSAND & 00/100 DOLLARS (4,710,000.00) (the "Initial Deposit")

(ii)     Within five (5) days of Purchaser being notified by Seller in writing (which may be via e-mail) that the Sale Order has been issued by the Bankruptcy Court, ***TIME BEING OF THE ESSENCE***, Purchaser shall deposit , by wire transfer of immediately available funds to the Escrow Agent, the sum of ONE MILLION FIVE HUNDRED SEVENTY THOUSAND & 00/100 DOLLARS ($1,570,000.00) (the "Additional Deposit", which together with the Initial Deposit. colllectively, the ("Deposit").

(iii)     The Deposit shall be non-refundable in all respects except as otherwise set forth in this Agreement, including Section 39.

(iv)     Notwithstanding anything to the contrary contained herein, upon Purchaser's deposit of an additional amount of Fifty Thousand & 00/100 Dollars ($50,000.00) by wire transfer with the Escrow Agent, Purchaser shall have the right (and Seller's permission, which shall not be unreasonably withheld or delayed), at Purchaser's sole cost and expense, to file for plan work approval at the New York City Department of Buildings (DoB) and all required city agencies in connection with Purchaser's proposed project at the Premises (the "Filings"). Such deposit shall be credited against the Purchase Price at Closing. Seller shall reasonably cooperate, at Purchaser's sole cost and expense, in executing documents for Seller's approval relating to the Filings. Notwithstanding anything to the contrary contained in Section 3 of the Agreement or herein, following the issuance of the Sale Order by the Bankruptcy Court, Purchaser shall have the right, subject to Seller's prior written consent (which shall not be



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

unreasonably withheld, conditioned or delayed), to pull permits or Filings at the DoB or any other city agencies but in no event shall Purchaser commence any work at the Premises until the closing of the sale of the Premises has occurred pursuant to this Agreement.

**(b)**  (i)  Upon receipt by Escrow Agent of the Initial Deposit and the Filings Deposit (if applicable) (collectively, the "Escrowed Deposit"), Escrow Agent shall immediately notify Seller of same (which notification may be via e-mail) and shall cause the Escrowed Deposit to be deposited into an interest bearing account at Citibank, N.A. or another New York Clearing House Bank selected by Escrow Agent upon receipt by Escrow Agent of a W-9 acceptable to Citibank, N.A., it being agreed that Escrow Agent shall not be liable for (x) any loss of such investment (unless due to Escrow Agent's gross negligence or willful misconduct) or (y) any failure to attain a favorable rate of return on such investment. Escrow Agent shall deliver the Escrowed Deposit, and the interest accrued thereon, to Seller or to Purchaser, as the case may be, under the following conditions:

(1)  The Escrowed Deposit, and the interest accrued thereon, shall be delivered to Seller at the Closing upon receipt by Escrow Agent of a statement executed by Seller and Purchaser authorizing the Escrowed Deposit and the interest accrued thereon to be released; or

(2)  The Escrowed Deposit, and the interest accrued thereon, shall be delivered to Seller following receipt by Escrow Agent of written demand therefor from Seller stating that Purchaser has defaulted in the performance of its obligations under this Agreement, specifying the Section of this Agreement which entitles Seller to the return of the Escrowed Deposit, provided Purchaser shall not have given written notice of objection in accordance with the provisions set forth below; or

(3)  The Escrowed Deposit, and the interest accrued thereon, shall be delivered to Purchaser following receipt by Escrow Agent of written demand therefor from Purchaser stating that Seller has defaulted in the performance of its obligations under this Agreement or that this Agreement was terminated under circumstances entitling Purchaser to the return of the Escrowed Deposit, and specifying the Section of this Agreement which entitles Purchaser to the return of the Escrowed Deposit, in each case provided Seller shall not have given written notice of objection in accordance with the provisions set forth below; or

(4)  The Escrowed Deposit, and the interest accrued thereon, shall be delivered to Purchaser or Seller as directed by written instructions of both Seller and Purchaser.

(ii)  Upon the receipt of a written demand for the Escrowed Deposit by Seller or Purchaser, pursuant to subsection (2) or (3) above, Escrow Agent shall promptly give notice thereof (including a copy of such demand) to the other party. The other party shall have the right to object to the delivery of the Escrowed Deposit, by giving written notice of such objection to Escrow Agent at any time within ten (10) days after such party's receipt of notice from Escrow Agent, but not thereafter. Such notice shall set forth the basis (in reasonable detail) for objecting to the delivery of the Escrowed Deposit. Upon receipt of such notice of objection, Escrow Agent shall promptly give a copy of such notice to the party who filed the written demand.



If Escrow Agent shall have timely received such notice of objection, Escrow Agent shall continue to hold the Escrowed Deposit, and the interest accrued thereon, until (x) Escrow Agent receives joint written notice from Seller and Purchaser directing the disbursement of the Escrowed Deposit, in which case Escrow Agent shall then disburse the Escrowed Deposit, and the interest accrued thereon, in accordance with said direction, or (y) Escrow Agent is directed to disburse the Escrowed Deposit and the interest accrued thereon pursuant to written direction from the Bankruptcy Court, or (z) Escrow Agent obtains written approval of the Bankruptcy Court to deposit the Escrowed Deposit and all interest accrued thereon with the clerk of the Bankruptcy Court and concurrently terminate Escrow Agent's duties hereunder.

(iii)     Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Purchaser, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence or willful misconduct.  Escrow Agent shall have no duties or responsibilities except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless the same is in writing and signed by Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto.  Escrow Agent shall be reimbursed by Seller and Purchaser for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Purchaser and Seller, the prevailing party in any dispute over the Escrowed Deposit shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent.  In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Purchaser or Seller that, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold the Escrowed Deposit, and the interest accrued thereon, and may decline to take any other action. After delivery of the Escrowed Deposit, and the interest accrued thereon, in accordance herewith, Escrow Agent shall have no further liability or obligation of any kind whatsoever.

(iv)     Escrow Agent shall have the right at any time to resign upon ten (10) business days' prior notice to Seller and Purchaser.  Seller and Purchaser shall jointly select a successor Escrow Agent and shall notify Escrow Agent of the name and address of such successor Escrow Agent within ten (10) business days after receipt of notice of Escrow Agent of its intent to resign.  If Escrow Agent has not received notice of the name and address of such successor Escrow Agent within such period, Escrow Agent shall have the right to select on behalf of Seller and Purchaser a bank or trust company licensed to do business in the State of New York and having a branch located in New York County to act as successor Escrow Agent hereunder.  At any time after the ten (10) business day period, Escrow Agent shall have the right to deliver the Escrowed Deposit, and the interest accrued thereon, to any successor Escrow Agent selected hereunder, provided such successor Escrow Agent shall execute and deliver to Seller and Purchaser an assumption agreement whereby it assumes all of Escrow Agent's obligations hereunder.  Upon the delivery of all such amounts and such assumption agreement, the successor Escrow Agent shall become the Escrow Agent for all purposes hereunder and shall have all of the



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

rights and obligations of the Escrow Agent hereunder, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(v)     The interest earned on the Escrowed Deposit shall be paid to the party entitled to receive the Escrowed Deposit as provided in this Agreement; provided, however, Purchaser shall be entitled to a credit against the Purchase Price with respect to any such interest paid to Seller at Closing for any interest accrued thereon and actually paid to Seller. The party receiving such interest shall pay any income taxes thereon. Upon request of the Escrow Agent, each of Seller and Purchaser shall provide its taxpayer identification number. The provisions of this <u>Section 4(b)</u> shall survive the Closing or termination of this Agreement.

(c)     At the Closing, Seller shall be entitled to retain the Deposit and all interest accrued thereon and Purchaser shall deliver the balance of the Purchase Price (i.e., the Purchase Price less the Deposit (including a credit for any interest accrued thereon)) to Seller, as adjusted pursuant to <u>Section 7</u>.

(d)     All monies payable by Purchaser under this Agreement, unless otherwise specified in this Agreement, shall be paid by Purchaser causing such monies to be wire transferred in immediately available federal funds at such bank account or accounts designated by Seller, and divided into such amounts designated by Seller as may be required to consummate the transactions contemplated by this Agreement.

(e)     As used in this Agreement, the term "<u>business day</u>" shall mean every day other than Saturdays, Sundays, all days observed by the federal or New York State government as legal holidays and all days on which commercial banks in New York State are required by law to be closed. Any reference in this Agreement to a "day" or a number of "days" (other than references to a "business day" or "business days") shall mean a calendar day or calendar days.

5.     <u>STATUS OF TITLE</u>.

Subject to the terms and provisions of this Agreement, Seller's interest in the Premises shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, subject to the following (collectively, the "<u>Permitted Encumbrances</u>"):

(a)     the state of facts disclosed (the "<u>Disclosed Survey Items</u>") on that certain survey prepared by KaBA Surveying and dated as of September 28, 2022, a copy of which is annexed hereto as <u>Schedule F</u> (the "<u>Survey</u>"), and any further state of facts which are not Disclosed Survey Items as a current survey or inspection of the Premises would disclose provided that such facts do not render title to the Premises uninsurable;

(b)     the standard printed exclusions from coverage contained in the ALTA form of owner's title policy currently in use in New York, with the standard New York endorsement and the liens encumbrances as set forth on <u>Schedule C</u> annexed hereto (the "<u>Specified Encumbrances</u>");

(c)     Non-Objectionable Encumbrances (as hereinafter defined); and any liens, encumbrances or other title exceptions caused directly by Purchaser or Purchaser's representatives and/or approved and/or waived by Purchaser as provided in this Agreement;

RE\59281\0001\5390856v9



**(d)**     Property Taxes (as hereinafter defined) which are a lien but not yet due and payable, subject to proration in accordance with <u>Section 7</u> hereof;

**(e)**     any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Premises, including, without limitation, all zoning, land use, building and environmental laws, rules, regulations, statutes, ordinances, orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any;

**(f)**     all covenants, restrictions and utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, sewer or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Premises, provided that, in the case of any of the foregoing items which shall not be of record, the same do not materially adversely affect the present use of the Premises;

**(g)**     any installment not yet due and payable of assessments imposed after the date hereof and affecting the Premises or any portion thereof;

**(h)**     all Violations (as hereinafter defined) now or hereafter issued or noted;

**(i)**     consents by Seller or any former owner of all or a portion of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut, provided the same do not render title to the Premises uninsurable.

**(j)**     possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under, or above any street or highway, the Premises or any adjoining property, provided the same do not render title to the Premises uninsurable.

**(k)**     all other matters which, pursuant to the terms of this Agreement, are deemed Permitted Encumbrances.

6.     <u>TITLE INSURANCE; LIENS</u>.

**(a)**     (i)     The parties acknowledge that Purchaser has reviewed the following title report: that certain Title Commitment designated Title No. GA-3509-NY-23 (together with all instruments set forth therein, the "<u>Report</u>"), from Gotham Abstract & Settlement LLC (the "<u>Company</u>") as set forth on **Exhibit 2**. At the Closing, Purchaser shall obtain title insurance from the Company with respect to Purchaser's acquisition of the Property and any financing obtained in connection therewith.

(ii)     The parties acknowledge that Purchaser has received the Survey and the Report and Purchaser acknowledges it has reviewed same.



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

(iii)     Purchaser shall have no right to object to any exceptions or other matters disclosed in the Report or Survey except for the following items listed on Schedule B of the Report: 8 (Judgments against Seller (7)) (collectively, the "Report Objections"). All such exceptions and other matters disclosed in the Report and Survey (other than the Report Objections) shall be deemed Permitted Encumbrances.

(iv)     Purchaser shall direct the Company to deliver a copy of any update to the Report to Seller simultaneously with its delivery of the same to Purchaser. If, prior to the Closing Date, the Company shall deliver any update to the Report which discloses additional liens, encumbrances or other title exceptions which were not disclosed by the Report and are not Disclosed Survey Items and which do not otherwise constitute Permitted Encumbrances hereunder (each, an "Update Exception"), then Purchaser shall have until the earlier of (A) five (5) business days after delivery of such update to Purchaser or its counsel or (B) the business day immediately preceding the Closing Date, time being of the essence (the "Update Objection Deadline") to deliver written notice to Seller objecting to any of the Update Exceptions (the "Update Objections"; the Update Objections and Report Objections are, collectively, the "Title Objections"). If Purchaser fails to deliver such objection notice by the Update Objection Deadline, Purchaser shall be deemed to have waived its right to object to any Update Exceptions (and the same shall not constitute Title Objections, but shall instead be deemed Permitted Encumbrances). If Purchaser shall deliver such objection notice by the Update Objection Deadline, any Update Exceptions which are not objected to in such notice shall not constitute Title Objections, but shall be Permitted Encumbrances.

(v)     Purchaser shall not be entitled to object to, and shall be deemed to have approved, any liens, encumbrances or other title exceptions (and the same shall not constitute Title Objections, but shall instead be deemed to be Permitted Encumbrances) (A) over which the Company is willing to either omit (without additional cost to Purchaser or where Seller pays such cost for Purchaser), (B) against which the Company is willing to provide affirmative insurance in a commercially reasonable manner (without additional cost to Purchaser or where Seller pays such cost for Purchaser), (C) which will be extinguished upon the transfer of the Property or is not transferred with the Property pursuant to the Sale Order, or (D) which are the responsibility of any tenant to cure, correct or remove (collectively, the "Non-Objectionable Encumbrances") Notwithstanding anything to the contrary contained herein, if Seller is unable to eliminate the Title Objections by the Scheduled Closing Date, unless the same are waived by Purchaser without any abatement in the Purchase Price, Seller may, from time to time, upon at least two (2) business days' prior notice to Purchaser (except with respect to matters first disclosed during the two (2) business day period prior to the Scheduled Closing Date, as to which matters notice may be given at any time through and including the Scheduled Closing Date) adjourn the Scheduled Closing Date (such date to which Seller adjourns the Scheduled Closing Date is the "Adjourned Closing Date"), for a period not to exceed sixty(60) days in the aggregate (the "Title Cure Period"), in order to attempt to eliminate such exceptions.

**(b)**     If Seller is unable to eliminate any Title Objections that it is obligated to cure pursuant to the terms of this Agreement within the applicable Title Cure Period, then, unless the same is waived by Purchaser, Purchaser may (i) accept the Premises subject to such Title Objections without an abatement of the Purchase Price, in which event (x) such Title Objections shall be deemed to be, for all purposes, Permitted Encumbrances, (y) Purchaser shall close hereunder notwithstanding the existence of same, and (z) Seller shall have no obligations



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

whatsoever after the Closing Date with respect to Seller's failure to cause such Title Objections to be eliminated, or (ii) terminate this Agreement by notice given to Seller within five (5) Business Days following expiration of the applicable Title Cure Period, **_TIME BEING OF THE ESSENCE_**, in which event Purchaser shall be entitled to a return of the Deposit (together with any interest accrued thereon) and reimbursement by Seller of Purchaser's reasonable out-of-pocket expenses in connection incurred by Purchaser in connection with its diligence of the Premises that have accrued as of the date of termination of the Agreement including title, survey, and environmental fees (but specifically excluding legal fees) which shall not exceed Fifteen Thousand and 00/100 Dollars ($15,000.00) in the aggregate (paid receipts for which shall, as a condition to such reimbursement, be delivered to Seller) (the "Diligence Costs") .

(c)     It is expressly understood that in no event shall Seller be required to bring any action or institute any proceeding, or to otherwise incur any costs or expenses in order to attempt to eliminate any Title Objections, or take any other actions to cure or remove any Title Objections, or to otherwise cause title in the Premises to be in accordance with the terms of this Agreement on the Closing Date.  Notwithstanding anything in this Section 6 to the contrary, Seller shall be required to remove, satisfy or cause to be insured over (in a manner reasonably satisfactory to Purchaser), by payment, bonding or otherwise (except by bringing an action or proceeding which Seller shall have no obligation to undertake) (collectively, "Non-Permitted Liens"): (i) subject to Section 5(b), any Title Objections that consist of mortgages, deeds of trust or similar items securing any indebtedness for borrowed money entered into by Seller and which the Premises secures repayment of, (ii) any Title Objections that have been voluntarily recorded or otherwise placed by or with, in each case, the consent of Seller, against the Premises on or following the date hereof (other than with the approval or deemed approval of Purchaser) and (iii) any Title Objections that would not fall within the definition of (c)(i) or (ii) above and that can be removed by the payment of a liquidated sum of money, provided that with respect to such items set forth in this clause (c)(iii), in no event shall Seller be obligated to expend in excess of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) in the aggregate.

(d)     If Seller shall have adjourned the Scheduled Closing Date in order to cure Title Objections in accordance with the provisions of this Section 6, Seller shall, upon the satisfactory cure thereof, promptly reschedule the Scheduled Closing Date, upon at least five (5) business days' prior notice to Purchaser (the "New Closing Notice"); it being agreed, however, that if any Title Objections arise between the date the New Closing Notice is given and the rescheduled Scheduled Closing Date, Seller may again adjourn the Closing for a reasonable period or periods, in order to attempt to cause such exceptions to be eliminated; provided, however, that Seller shall not be entitled to adjourn the new Scheduled Closing Date pursuant to this Section 6 for a period or periods in excess of ninety (90) days in the aggregate.

(e)     Purchaser agrees to purchase the Premises subject to any and all notes or notices of violations of law, or municipal ordinances, orders, designations or requirements whatsoever noted in or issued by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Premises (collectively, "Violations"), or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Premises. Seller shall have no duty to remove or comply with or repair any condition, matter or thing whether or not noted, which, if noted, would result in a violation being placed on the Premises.  Seller shall



have no duty to remove or comply with or repair any of the aforementioned Violations, or other conditions, and Purchaser shall accept the Premises subject to all such Violations, the existence of any conditions at the Premises which would give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations, in each case without any abatement of or credit against the Purchase Price. Notwithstanding the foregoing, Seller shall pay at Closing any and all monetary liens, fines or penalties of a liquidated amount that have been imposed as of the Effective Date thru Closing as a result of any Violations.

(f)     If the Company shall be unwilling to remove any Title Objections which another major national title insurance company selected by Seller (either directly or through an agent) would be willing to remove, then Seller shall have the right to substitute such major national title insurance company for the Company, provided that if Purchaser elects not to use such major national title insurance company, such Title Objections which such major national title insurance company would be willing to remove shall not constitute Title Objections and shall be deemed Permitted Encumbrances.

7.    APPORTIONMENTS.

(a)     The following shall be apportioned between Seller and Purchaser as of 11:59 p.m. on the day immediately preceding the Closing Date (the "Apportionment Date") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year:

(i)     real estate taxes, (i) above, vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises (collectively, "Property Taxes"), on the basis of the respective periods for which each is assessed or imposed, to be apportioned in accordance with Section 7(c);

(ii)     fuel supplied for the Building, if any, as estimated by Seller's supplier, at current cost, together with any sales taxes payable in connection therewith, if any (a letter from Seller's fuel supplier shall be conclusive evidence as to the quantity of fuel on hand and the current cost therefor);

(iii)     any amounts prepaid or payable by the owner of all or a portion of the Property under the Sidewalk Shed Contract (as hereinafter defined);

(iv)     such other items as are customarily apportioned in real estate closings of commercial properties in the City of New York, State of New York.

(b)     Property Taxes shall be apportioned on the basis of the fiscal period for which assessed. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within fifteen (15) business days based on such recalculation. If, as of the Closing Date, the Premises or any portion thereof shall



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

(c)     If there are water meters at the Premises, the unfixed water rates and charges and sewer rents and taxes covered by meters, if any, shall be apportioned (i) on the basis of an actual reading done within thirty (30) days prior to the Apportionment Date, or (ii) if such reading has not been made, on the basis of the last available reading. If the apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and Seller shall deliver to Purchaser or Purchaser shall deliver to Seller, as the case may be, the amount determined to be due upon such readjustment.

(d)     Charges for all electricity, steam, gas and other utility services (collectively, "<u>Utilities</u>") shall not be apportioned as they will be billed to Seller's account up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account.

(e)     Purchaser shall have no right to receive any rental insurance proceeds which relate to the period prior to the Closing Date and, if any such proceeds are delivered to Purchaser, Purchaser shall, within five (5) business days following receipt thereof, pay the same to Seller.

(f)     Prior to the Closing, Seller and Purchaser and/or their respective agents or designees will jointly prepare a preliminary closing statement (the "<u>Preliminary Closing Statement</u>") which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for in this Agreement, and such net due amount will be added to or subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing pursuant to <u>Section 4</u>, as applicable. Within one ninety (90) days following the Closing Date, Seller and Purchaser will jointly prepare a final closing statement reasonably satisfactory to Seller and Purchaser in form and substance (the "<u>Final Closing Statement</u>") setting forth the final determination of the adjustments and prorations provided for herein and setting forth any items which are not capable of being determined at such time (and the manner in which such items shall be determined and paid). The net amount due Seller or Purchaser, if any, by reason of adjustments to the Preliminary Closing Statement as shown in the Final Closing Statement, shall be paid in cash by the party obligated therefor within fifteen (15) Business Days following that party's receipt of the approved Final Closing Statement. The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Final Closing Statement shall be conclusive and binding on the parties hereto except for any items which are not capable of being determined at the time the Final Closing Statement is agreed to by Seller and Purchaser, which items shall be determined and paid in the manner set forth in the Final Closing Statement and except for any other amounts payable hereunder which pursuant to the provisions hereof survive the Closing. Prior to and within ninety (90) days following the Closing Date, each party shall provide the other with such information as the other shall reasonably request (including, without limitation, access to the books, records, files, ledgers, information and data with respect to the Property and/or the Building during normal



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

business hours upon reasonable advance notice) in order to make the preliminary and final adjustments and prorations provided for herein.

**(g)** For the avoidance of all doubt, nothing in this <u>Section 7</u> or anything else to the contrary in this Agreement is intended to or shall impose upon Seller any obligation to pay any amounts to the extent that Seller can defend, discharge, satisfy or otherwise treat them in the Bankruptcy Case.

**(h)** The provisions of this <u>Section 7</u> shall survive the Closing for a period of one hundred twenty (120) days only.

8.     <u>PROPERTY NOT INCLUDED IN SALE</u>.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by the parties hereto that (a) any fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures in, on, around or affixed to the Building) owned or leased by any tenant, managing agent, leasing agent, contractor, or employee at the Building and (b) all pictures, paintings, drawings, prints, sculptures, tapestries or other items of art now or hereafter located in any areas of the Building (collectively, the "<u>Excluded Personalty</u>"), shall not be included in the Property to be sold to Purchaser hereunder.

9.     <u>COVENANTS OF SELLER</u>.

**(a)** During the period from the Effective Date until the Closing Date, except to the extent expressly required or restricted by the Bankruptcy Court, Seller shall:

(i) be permitted to enter into any agreements with respect to all or any portion of the Property provided that such agreements expire by their terms on or prior to the Closing Date or, in accordance with their terms, would not be effective following the Closing Date, or, in the case of Contracts, may be terminated by the owner of the Premises without penalty upon not more than thirty (30) days' (or less) prior notice unless the same are deemed in good faith to be necessary by Seller to respond to an emergency at the Premises;

(ii) not grant any lien or cause or permit any instrument to be recorded that would encumber the Premises;

(iii) maintain in full force and effect the insurance policies currently in effect with respect to the Premises (or replacements continuing similar coverage);

(iv) subject to <u>Sections 6(d)</u> and <u>9(b)</u> hereof, use commercially reasonable efforts to operate and manage the Premises in a manner consistent in all material respects with past practice, except that Seller shall not be required to make any capital improvement or replacement to the Premises and provided further Seller shall have no obligation to enter into any new leases;

(v) continue to pay on a timely basis all real estate taxes and assessments, water and sewer charges and utilities;

RE\59281\0001\5390856v9



(vi)     operate and manage the Premises in all material respects in accordance with applicable legal requirements;

(vii)     Provide Purchaser with copies of all notices and bills for the Property (including but not limited to utility bills and insurance bills), and proof of payment of all bills and maintenance of all insurance policies for the Property;

**(b)**     During the period from the Effective Date until the Closing Date, Seller shall not, to the extent the same would be binding on or affect the Premises or any owner thereof after the Closing, except as permitted under this Agreement or applicable law, without Purchaser's prior approval:

(i)     enter in any new lease or any renewal or expansion thereof that would survive Closing,

(ii)     amend or modify (other than non-material amendments or modifications) or renew any of the Contracts; or

(iii)     make any material alteration, capital improvements or capital repairs to the Property, except that Seller shall make any and all capital improvements and repairs required in the event of an emergency to preserve the Premises; provided, however, that Seller shall provide Purchaser with reasonable prior written notice (or in the case of an emergency, written notice promptly thereafter) of any capital improvement/repair.

**(c)**     Whenever in <u>Section 9(b)</u> Seller is required to obtain Purchaser's approval with respect to any transaction described therein, Purchaser shall, within seven (7) business days after receipt of Seller's request therefor, notify Seller of its approval or disapproval of same and, if Purchaser fails to notify Seller of its disapproval within said seven (7) business day period with the reasonable basis therefor, Purchaser shall be deemed to have approved same.

10.     <u>ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER; SECURITY DEPOSITS; EMPLOYEES; CONDITIONS TO CLOSING</u>.

**(a)**     <u>Assignment</u>.   On the Closing Date, Seller agrees to assume and assign to Purchaser, pursuant to Section 365 of the Bankruptcy Code and the instruments referenced in <u>Sections 17 (c)(ii)</u> and <u>(iii)</u>, without recourse, representation or warranty (except as expressly set forth in this Agreement), all of Seller's right, title and interest in, and Purchaser agrees to assume Seller's obligations accruing on and after the Closing Date under, the documents described in <u>clauses (i)</u> and <u>(ii)</u> below:

(i)     that certain sidewalk shed maintenance contract between Seller and Everest Scaffolding Inc. (as subsequently assigned to Andamio  Scaffolding LLC ) with respect to maintenance of a sidewalk shed (the, "<u>Sidewalk Shed Contract</u>"), which Purchaser is assuming as a matter of life, health and safety, so long as Seller provides evidence that any and all payments are up to date as of the date of Closing, any monies owed prior to Closing shall be paid, and a letter evidencing such; and



(ii)    the transferable permits and licenses, if any, relating to the Property and the other intangible Personalty.

(b)    <u>Tenant A and Tenant B</u>. Seller and Purchaser acknowledge, confirm and agree to the foregoing:

(i)    "Tenant A" shall mean the Tenant currently occupying [\_\_\_\_] square feet on the 12th floor of the Building (the "<u>Tenant A Space</u>") and "Tenant B" shall mean the Tenant currently occupying 5,900 square feet on the 12th floor of the Building (the "<u>Tenant B Space</u>").



(c)    <u>Conditions to Obligations of Seller</u>. The obligation of Seller to effect the Closing shall be subject to the fulfillment or written waiver by Seller at or prior to the Closing Date of the following conditions:

(i)    <u>Representations and Warranties</u>. The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date.

(ii)    <u>Performance of Obligations</u>. Purchaser shall have paid the full balance of the Purchase Price, executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Purchaser hereunder on the Closing Date; and in all material respects performed all other obligations required to be performed by it under this Agreement on or prior to the Closing Date.



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

(iii)    Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order, transferring the Property free and clear of all Liens (except Permitted Encumbrances) and including that Purchaser is a good faith purchaser entitled to protections of Section 363 (m) and Section 363 (n) of the Bankruptcy Code, which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1.

(d)    Conditions to Obligations of Purchaser. The obligations of Purchaser to effect the Closing shall be subject to the fulfillment (or written waiver by Purchaser) at or prior to the Closing Date of the following conditions:

(i)    Representations and Warranties. The representations and warranties of Seller contained in Section 11(c) shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date (or, for any representations and warranties made as of a specific date, then the same shall be true and correct as of such date), except for any modifications or inaccuracies thereof that arise from either (A) events or circumstances that occur from and after, or exist following, the date hereof and are outside of the reasonable control of Seller or (B) any act taken by Seller, or an omission made by Seller, in either case that is not expressly prohibited hereunder, provided, however, in the event of any breach of a representation or warranty, the conditions set forth in this Section 10(g)(i) shall be deemed satisfied unless all such breaches of representations and warranties when taken together have a Material Adverse Effect on the value of the Premises. For the purposes hereunder, a "Material Adverse Effect" shall mean a reduction in the value of the Premises equal to or greater than an amount equal to fifteen percent (15%) of the Purchase Price.

(i)    Performance of Obligations.  Seller shall have executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Seller hereunder on the Closing Date and Seller shall in all material respects have performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

████████████████████████████████████████████████████

(iii)    Purchaser shall have received an Owner's Policy of Title Insurance or a marked up and executed title commitment which is the equivalent thereof on the most recent ALTA form then in effect to be issued upon Closing by the Company or another major national insurance company in accordance with Section 6(e) hereof, and insuring for an amount equal to the Purchase Price that all requirements pertaining to the Seller or Property have been satisfied and that fee title to the Property shall be vested in Purchaser upon Closing, subject to no exceptions other than the Permitted Encumbrances (the "Title Policy").

(iv)    Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order, transferring the Property free and clear of all Liens (except Permitted Encumbrances) and including that Purchaser is a good faith purchaser entitled to protections of Section 363 (m) and Section 363 (n) of the Bankruptcy Code, which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1, and such Sale Order shall not then be stayed ("Final Order").



(e)     Failure of Condition.  If Purchaser is unable to timely satisfy (and Seller has not waived in writing) the conditions precedent to Seller's obligation to effect the Closing other than the condition precedent set forth in <u>Section 10(f)(iv)</u>, then such failure shall constitute a default hereunder and <u>Section 20(a)</u> shall govern.  If Seller is unable to timely satisfy the conditions precedent to Purchaser's obligation to effect the Closing, provided that Seller used commercially reasonable efforts to cause such conditions to be satisfied, then, (i) Seller may, if it so elects and without any abatement in the Purchase Price, adjourn the Scheduled Closing Date for a period or periods not to exceed thirty (30) days in the aggregate and (ii) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing continue not to be satisfied (and Purchaser has not waived the same in writing) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Seller's default hereunder, then Seller or Purchaser shall be entitled to terminate this Agreement by notice thereof to the other party (provided, that if such failure of condition precedent is the result of Seller's default hereunder, then <u>Section 20(b)</u> shall govern).  If this Agreement is so terminated other than by reason of Purchaser's default, then Purchaser shall be entitled to receive a refund of the Deposit (and all accrued interest thereon) and Seller shall reimburse Purchaser for the Diligence Costs (paid receipts for which shall, as a condition to such reimbursement, be delivered to Seller) and neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof.  For the avoidance of doubt, the parties acknowledge that any failure of Seller to timely satisfy the conditions precedent to Purchaser's obligations to effect the Closing, which failure results from an act or omission of a third party shall not be deemed a default by Seller hereunder, and Purchaser's sole remedy by reason thereof shall be to terminate this Agreement in accordance with <u>clause (ii)</u> above and to receive the Deposit (and all accrued interest thereon) and Diligence Costs (paid receipts for which shall, as a condition to such reimbursement, be delivered to Seller), in accordance with the foregoing provisions of this <u>Section 10(h)</u>.

11.     CONDITION OF THE PROPERTY; REPRESENTATIONS.

(a)     PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OTHER SELLER RELATED PARTY, NOR ANY OTHER PERSON ACTING ON BEHALF OF SELLER, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY SUCCESSOR OR ASSIGN OF ANY OF THE FOREGOING PARTIES, HAS MADE OR SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION WARRANTIES OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY OR THE ZONING AND OTHER LAWS, REGULATIONS AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN.     PURCHASER FURTHER ACKNOWLEDGES THAT ALL MATERIALS WHICH HAVE BEEN PROVIDED BY ANY OF THE SELLER RELATED PARTIES HAVE BEEN PROVIDED WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED AS TO THEIR

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS OR COMPLETENESS AND PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST SELLER OR ANY OF THE OTHER SELLER RELATED PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS THEREFROM. PURCHASER IS ACQUIRING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER, OR ANY OF THE OTHER SELLER RELATED PARTIES, EXCEPT FOR THE REPRESENTATIONS EXPRESSLY SET FORTH HEREIN (WHICH REPRESENTATIONS, FOR THE AVOIDANCE OF DOUBT, PURCHASER ACKNOWLEDGES SHALL NOT SURVIVE THE CLOSING HEREUNDER). PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON ANY SUCH MATERIALS PROVIDED TO IT BY SELLER IN CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT SHALL RELY SOLELY ON ITS OWN INDEPENDENTLY DEVELOPED OR VERIFIED INFORMATION. THE PROVISIONS OF THIS <u>SECTION 11(A)</u> SHALL SURVIVE CLOSING.

        **(b)**     PURCHASER ACKNOWLEDGES AND AGREES THAT IT IS PURCHASING THE PROPERTY "<u>AS IS</u>" AND "<u>WITH ALL FAULTS</u>", BASED UPON THE CONDITION (PHYSICAL OR OTHERWISE) OF THE PROPERTY AS OF THE DATE OF CLOSING, REASONABLE WEAR AND TEAR AND, SUBJECT TO THE PROVISIONS OF <u>SECTION 13</u> OF THIS AGREEMENT, LOSS BY CONDEMNATION EXCEPTED. PURCHASER ACKNOWLEDGES AND AGREES THAT ITS OBLIGATIONS UNDER THIS AGREEMENT SHALL NOT BE SUBJECT TO ANY FINANCING CONTINGENCY OR OTHER CONTINGENCIES OR SATISFACTION OF CONDITIONS AND PURCHASER SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT OR RECEIVE A RETURN OF THE DEPOSIT (OR THE ACCRUED INTEREST THEREON) EXCEPT AS EXPRESSLY PROVIDED FOR IN <u>SECTIONS 10(H)</u>, <u>12(A)(II)</u>, <u>13(A)(II)</u>, <u>20(B)</u>, AND <u>39(G)</u>. THE PROVISIONS OF THIS <u>SECTION 11(B)</u> SHALL SURVIVE CLOSING.

        **(c)**     Seller hereby represents and warrants to Purchaser (each a "<u>Representation</u>" and collectively, the "<u>Representations</u>") that, as of the date hereof (unless any Representation is made as of a specified date, in which case, the same shall be made as of such date):

        (i)     Subject to the entry of the Sale Order, (I) Seller has full power and authority to enter into and perform this Agreement in accordance with its terms, (II) this Agreement and all documents executed by Seller which are to be delivered to Purchaser at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Seller, and at the time of Closing will be the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, and do not and, at the time of Closing will not, violate any provision of any agreement or judicial order to which Seller or the Property is subject, except as such enforceability may be limited by (1) bankruptcy, insolvency or similar laws of general application relating to or affecting the enforcement of creditors' rights and (2) general principles of equity relating to the availability of equitable remedies. Subject to entry of the Sale Order, no other proceedings are necessary to authorize this Agreement and the transactions contemplated hereby, or the performance or compliance by each Seller Party with any of the terms, provisions or conditions hereof.

RE\59281\0001\5390856v9



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

(ii)     Seller has not received written notice of any pending condemnation or eminent domain proceedings against the Premises.

(iii)     Schedule E is a true, correct, and complete list of all employees at the Premises.  To Seller's actual knowledge, there are no employees at the Premises who (i) are union personnel or (ii) who shall be required to be offered employment by Purchaser.  At least forty-five (45) days prior to Closing, Purchaser shall notify the Seller in writing of any and all employees which the Purchaser does not elect to assume the employment of and Seller shall cause any and all such employees which Purchaser does not elect to assume the employment of to be terminated.

(iv)     Subject to the Bankruptcy Case, within the past one (1) year, Seller has not received written notice of any pending claim, litigation, action, hearing or administrative proceeding (y) affecting the Premises or (z) against Seller which would materially adversely affect the ability of Seller to perform its obligations under this Agreement or the use or operation of the Premises;

(v)     There are no brokerage agreements entered into by Seller with respect to the leasing of the Premises, there are no unpaid leasing or brokerage commissions with respect to the Premises.

(vi)     Seller is not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to Title I of ERISA or a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), and the assets of Seller are not deemed "plan assets" of one or more such plans for purposes of Section 406 of ERISA or Section 4975 of the Code.  In addition, Seller is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and no transaction by or with Seller contemplated by this Agreement will violate any state statute applicable to any governmental plan that is similar to Section 406 of ERISA or Section 4975 of the Code.

(vii)     Seller is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "Person") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC "Specially Designated Nationals and Blocked Persons") or otherwise.  Neither Seller nor any Person who owns an interest in Seller (other than the owner of publicly traded shares) is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(viii)    Neither Seller nor any of Seller's Representatives, nor any Person providing funds to Seller: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.  For purposes of this Subsection (xviii) and Section 11(g)(vii), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(d)    Any and all uses of the phrase, "to Seller's Actual Knowledge" or other references to Seller's knowledge in this Agreement, shall mean the actual, present, conscious knowledge of Michael Sklar (the "Seller Knowledge Individual") as to a fact at the time given without any investigation or inquiry.  Without limiting the foregoing, Purchaser acknowledges that the Seller Knowledge Individual has not performed and is not obligated to perform any investigation or review of any files or other information in the possession of Seller, or to make any inquiry of any persons, or to take any other actions in connection with the representations and warranties of Seller set forth in this Agreement.  Neither the actual, present, conscious knowledge of any other individual or entity, nor the constructive knowledge of the Seller Knowledge Individual or of any other individual or entity, shall be imputed to the Seller Knowledge Individual.

(e)    The representations and warranties of Seller contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing and from and after such date Seller's representations and warranties shall automatically be null and void and of no further force and effect.

(f)    The representations and warranties of Seller set forth in Section 11(c) are subject to the following limitations: in the event that, prior to the Closing, Purchaser or any Diligence Party shall obtain knowledge of any information that is contradictory to, and would constitute the basis of a breach of, any representation or warranty or failure to satisfy any



condition on the part of Seller, then, promptly thereafter (and, in all events, prior to Closing), Purchaser shall deliver to Seller notice of such information specifying the representation, warranty or condition to which such information relates, and Purchaser further acknowledges that such representation, warranty or condition will not be deemed breached in the event Purchaser shall have, prior to Closing, obtained knowledge of any information that is contradictory to such representation or warranty and shall have failed to disclose to Seller as required hereby and Purchaser shall not be entitled to bring any action after the Closing Date based on such representation, warranty or condition. Without limiting the generality of the foregoing, Purchaser shall be deemed to know that any representation or warranty contained herein is untrue, inaccurate or breached to the extent that (1) Purchaser or any Diligence Party has knowledge of any fact or information which is inconsistent with such representation or warranty or (2) this Agreement or the Sidewalk Shed Contract or other information with respect to the Property delivered or made available to Purchaser or any Diligence Party contain provisions inconsistent with any of such representations and warranties. "<u>Diligence Party</u>" shall mean any of the following: (i) Purchaser, (ii) Linzhong Zhuo and (iii) any direct or indirect officers, directors, employees, agents, consultants, affiliates, attorneys and representatives of Purchaser, or Linzhong Zhuo who were involved in the negotiation of this Agreement, were involved in the preparation of the Diligence Reports or the performance of the due diligence conducted in order to prepare the same, or who otherwise approved the transactions contemplated hereunder. "<u>Diligence Reports</u>" mean the results of any examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations prepared by or for or otherwise obtained by or on behalf of Purchaser in connection with the Property.

  **(g)** The provisions of <u>Sections 11(a)</u> and <u>11(b)</u> shall be deemed incorporated by reference and made a part of all documents or instruments delivered by Seller to Purchaser in connection with the sale of the Property. Except for the representations and warranties contained in <u>Section 11(c)</u> (as modified by the Schedules hereto), neither Seller nor any other person makes any other express or implied representation or warranty with respect to Seller, the Property, any assumed liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in <u>Section 11(c)</u> hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Property (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its affiliates). The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The provisions of this <u>Section 11(g)</u> shall survive Closing. Purchaser hereby represents and warrants to Seller as of the date hereof and as of Closing that:

  (i) Purchaser is duly formed and in good standing under the laws of the State of New York and is not subject to any law, order, decree, restriction or agreement



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.

(ii)     Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms and this Agreement and all documents executed by Purchaser which are to be delivered to Seller at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Purchaser and are, and at the time of Closing will be the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

(iii)     Neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited, or requires Purchaser to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser. The person signing this Agreement on behalf of Purchaser is authorized to do so.

(iv)     There are no judgments, orders or decrees of any kind against Purchaser unpaid and unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, which would have a material adverse effect on Purchaser, its financial condition or its ability to consummate the transactions contemplated by this Agreement.

(v)     Purchaser is not acquiring the Property with the assets of (a) an employee benefit plan (as defined in Section 3(3) of ERISA whether or not subject to Title I of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended, or (c) an entity the assets of which, under applicable law, are deemed to constitute the assets of a plan described in the foregoing clauses (a) or (b).

(vi)     Purchaser is not now nor shall it be at any time prior to or at the Closing a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those Specially Designated Nationals and Blocked Persons or otherwise. Neither Purchaser nor Purchaser Party is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(vii)     Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws ; (B) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. Such laws, regulations and sanctions shall be deemed to include the Patriot Act, the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(viii)  Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(ix)  Purchaser is not partnering nor has it colluded with, whether directly or indirectly, any general partner of Seller including, but not limited to, any of Rita A. Sklar, Michael Sklar and/or Sharan Sklar, and/or any of their affiliates in connection with Purchaser's offer or negotiation of this Agreement, the consummation of the transaction contemplated hereunder and/or the ownership or operation of the Property thereafter.

(h)  Notwithstanding anything to the contrary set forth in this Agreement, Seller makes no warranty with respect to the absence or presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Premises (or any parcel in proximity thereto) or in any water on or under the Premises. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined) including, without limitation, any action brought by any governmental authority. The term "Hazardous Materials" means (a) those substances that are now or may hereafter be included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) mold, (h) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "Environmental Laws" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos

RE\59281\0001\5390856v9



(including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes. Except with respect to any claims arising out of any breach of covenants, representations or warranties expressly with respect thereto set forth in Section 11(c) above, and subject to the other provisions of this Agreement limiting or eliminating Seller's liability with respect thereto, Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller, and the other Seller Related Parties from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The provisions of this Section 11(g) shall survive Closing.

12.    DAMAGE AND DESTRUCTION.

(a)    If all or any part of the Building is damaged by fire or other casualty occurring on or after the date hereof and prior to the Closing Date, whether or not such damage affects a material part of the Building, then:

(i)    if the estimated cost of repair or restoration is less than $6,000,000.00 neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage. In such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building and/or to rebuild the Building to substantially the same condition as it existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Premises or to repair or restore any damages, in no event to exceed the amount of the loss. In the event such amount spent by Seller shall exceed the amount of the deductible on such casualty insurance policy, then Purchaser shall deliver such excess amount to Seller, within five (5) business days of its receipt of any casualty insurance proceeds received on account of such casualty.

(ii)    if the estimated cost of repair or restoration exceeds $6,000,000.00, Purchaser shall have the option, exercisable on or prior to the Casualty Election Date (as defined below), *__TIME BEING OF THE ESSENCE__*, to terminate this Agreement by delivering notice of such termination to Seller, whereupon the Deposit (together with any interest



accrued thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other in respect thereof except for such provisions which are expressly provided in this Agreement to survive the termination hereof. If a fire or other casualty described in this <u>clause (ii)</u> shall occur and Purchaser does not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage and, in such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building and/or to rebuild the Building to substantially the same condition as existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Premises or to repair or restore any damages, in no event to exceed the amount of the loss. In the event such amount spent by Seller shall exceed the amount of the deductible on such casualty insurance policy, then Purchaser shall deliver such excess amount to Seller, within five (5) business days of its receipt of any casualty insurance proceeds received on account of such casualty.

(**b**)     The estimated cost to repair and/or restore contemplated in <u>clause (a)</u> above shall be established by estimates obtained by Seller from independent contractors approved by Purchaser using its commercially reasonable discretion and shall be conclusive.

(**c**)     The provisions of this <u>Section 12</u> supersede any law applicable to the Premises governing the effect of fire or other casualty in contracts for real property.

(**d**)     "<u>Casualty Election Date</u>" means (i) the tenth (10th) day following Seller's delivery of the estimates as described in <u>clause (b)</u> above or, (ii) if Purchaser timely delivers a Restoration Dispute Notice, the tenth (10th) business day following final resolution of such dispute by arbitration determination or agreement of the parties.

(**e**)     In the event of any fire or other casualty occurring within ten (10) business days of the then Scheduled Closing Date, the Scheduled Closing Date shall then be extended to the tenth (10th) business day following the Casualty Election Date; provided, however, the Scheduled Closing Date shall not be extended if the damage caused by such fire or other casualty has been substantially restored prior to the Scheduled Closing Date.

13.     <u>CONDEMNATION</u>.

(**a**)     If, prior to the Closing Date, any part of the Premises is taken (other than a temporary taking), or if Seller shall receive an official notice from any governmental authority having eminent domain power over the Premises of its intention to take, by eminent domain proceeding, any part of the Premises (a "<u>Taking</u>"), then:



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

(i)     if such Taking involves five percent (5%) or less of the Building as determined by an independent architect chosen by Seller and approved by Purchaser using its commercially reasonable discretion (which determination shall be conclusive), neither party shall have any right to terminate this Agreement, and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (A) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (B) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking.

(ii)    if such Taking involves more than five percent (5%) of the Building as determined by an independent architect chosen by Seller and approved by Purchaser using its commercially reasonable discretion (which determination shall be conclusive), each party shall have the option, exercisable on or prior to the Condemnation Election Date (as defined below), time being of the essence, to terminate this Agreement by delivering notice of such termination to the other party, whereupon the Deposit (together with any interest earned thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other in respect thereof except pursuant to the provisions of this Agreement which are expressly provided to survive the termination hereof. If a Taking described in this clause (ii) shall occur and Purchaser does not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (A) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (B) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for the reasonable expenses incurred by Seller in connection with such Taking.

(b)     The provisions of this Section 13 supersede any law applicable to the Premises governing the affect of condemnation in contracts for real property.

(c)     "Condemnation Election Date" means (x) the tenth (10th) business day following Seller's delivery of an independent architect's determination as described in clause (a)(ii) above or, (y) if Purchaser timely delivered a notice disputing such independent architect's determination, the tenth (10th) business day following final resolution of such dispute by arbitration determination or agreement of the parties.

(d)     In the event of any Taking occurring within ten (10) business days of the then Scheduled Closing Date, the Scheduled Closing Date shall then be extended to the tenth (10th) business day following the Condemnation Election Date.

RE\59281\0001\5390856v9



14. <u>BROKERS AND ADVISORS</u>.

**(a)** Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "<u>Broker</u>") in connection with this Agreement or the transactions contemplated hereby other than Two Bins Capital LLC ("<u>Purchaser's Broker</u>"). Purchaser hereby agrees to indemnify, defend and hold Seller and the other Seller Related Parties harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the transactions contemplated hereby. Purchaser shall pay Purchaser's Broker any commission due Purchaser's Broker in connection with the transaction contemplated by this Agreement pursuant to a separate agreement between Purchaser and Purchaser's Broker.

**(b)** Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any Broker in connection with this Agreement or the transactions contemplated hereby other than Purchaser's Broker. Seller hereby agrees to indemnify, defend and hold Purchaser and its direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors and any successors or assigns of the foregoing, harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (other than Purchaser's Broker) engaged by or claiming to have dealt with Seller in connection with this Agreement or the transactions contemplated hereby.

**(c)** The provisions of this Section 14 shall survive the termination of this Agreement or the Closing.

15. <u>TAX REDUCTION PROCEEDINGS</u>.

Seller may file and/or prosecute an application for the reduction of the assessed valuation of the Premises or any portion thereof for real estate taxes or a refund of Property Taxes previously paid (a "<u>Tax Certiorari Proceeding</u>") to the City of New York for any fiscal year. Seller shall have the right to withdraw, settle or otherwise compromise Tax Certiorari Proceedings affecting real estate taxes assessed against the Premises (a) for any fiscal period prior to the fiscal year in which the Closing shall occur without the prior consent of Purchaser, and (b) for the fiscal year in which the Closing shall occur or any fiscal year thereafter, provided, in the case of this <u>clause (b)</u>, Purchaser shall have consented with respect thereto, which consent shall not be unreasonably withheld or delayed. The amount of any tax refunds (net of attorneys' fees and other costs of obtaining such tax refunds) with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs shall be apportioned between Seller and Purchaser as of the Apportionment Date with a prior allocation of the portion thereof which must be returned to tenants pursuant to the terms of the Leases; Seller hereby agreeing to be responsible for the return of such refund to such tenants for the period up to and including the Apportionment Date and Purchaser having such obligation for the return of such refunds attributable to the period from and after the



Closing Date. If, in lieu of a tax refund, a tax credit is received with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs, then (i) within thirty (30) days after receipt by Seller or Purchaser, as the case may be, of evidence of the actual amount of such tax credit (net of attorneys' fees and other costs of obtaining such tax credit), the tax credit apportionment shall be readjusted between Seller and Purchaser, and (ii) upon realization by Purchaser of a tax savings on account of such credit, Purchaser shall pay to Seller an amount equal to the savings realized (as apportioned). All refunds, credits or other benefits applicable to any fiscal period prior to the fiscal year in which the Closing shall occur shall belong solely to Seller (and Purchaser shall have no interest therein) and, if the same shall be paid to Purchaser or anyone acting on behalf of Purchaser, same shall be paid to Seller within five (5) days following receipt thereof and, if not timely paid, with interest thereon from the fifth day following such receipt until paid to Seller at a rate equal to the Default Rate. Notwithstanding anything to the contrary contend herein, if any Tax Certiorari Proceeding in respect of the Premises, relating to the fiscal year in which the Closing shall occur or any fiscal year thereafter, are pending at the time of Closing, then, at Purchaser's request Seller shall, if possible, cause Purchaser to be substituted for Seller in such Tax Certiorari Proceeding, or if such substitution is not possible, Seller shall permit Purchaser to control the conduct of such Tax Certiorari Proceeding. Seller and Purchaser shall otherwise cooperate with each other with respect to all Tax Certiorari Proceeding. The provisions of this Section 15 shall survive the Closing.

16.     <u>TRANSFER TAXES AND TRANSACTION COSTS</u>.

**(a)**     Seller shall be responsible for and shall pay any New York State and New York City real estate and real property transfer taxes that are otherwise payable with respect to the sale (such transfer taxes, and any interest and penalties with respect thereto, the "<u>Transfer Taxes</u>") applicable to transfers pursuant to Chapter 11 of the Bankruptcy Code. Accordingly, Seller shall prepare, and at the Closing, Seller and Purchaser shall execute, acknowledge and deliver, and promptly following the Closing, Seller shall cause to be filed, all such returns required to be filed with New York State and New York City with respect to the sale of the Property by Seller to Purchaser (such returns so required to be filed, the "<u>Transfer Tax Returns</u>") reflecting that no Transfer Taxes are due and payable with respect to the sale by Seller to Purchaser of the Property, provided however, if any such Transfer Taxes are due, Seller shall be solely responsible for the payment thereof.

**(b)**     Seller shall be responsible for the costs of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property. Seller shall also be responsible for the payments that become due that are expressly allocated to Seller pursuant to Section 9(a)(vi).

**(c)**     Except as otherwise provided above, Purchaser shall be responsible for (i) the costs and expenses associated with its due diligence, (ii) the costs and expenses of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property, (iii) all premiums and fees for title examination and title insurance and endorsements obtained and all related charges and survey costs in connection therewith, (iv) all costs and expenses incurred in connection with any financing obtained by Purchaser, including without limitation, loan fees, mortgage recording taxes, financing costs and lender's legal fees, (v) all escrow and/or closing fees, and (vi) any recording fees for documentation to be recorded in



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

connection with the transactions contemplated by this Agreement. Purchaser shall also be responsible for the payments that become due that are expressly allocated to Purchaser pursuant to Section 9(a)(vi).

(d)     If, on the Closing Date, any person listed on **Exhibit 8** attached hereto (each a "Seller Party") directly or indirectly owns (including through one or more entities) any beneficial interest in Purchaser or has an option, right or other agreement (collectively, an "Option") to acquire such a beneficial interest, then Purchaser will pay to Seller, as additional Purchase Price under this Agreement, an amount equal to (i) the excess, if any, of (A) the amount of federal income tax (and any interest and penalties with respect thereto) incurred by Seller and its direct or indirect beneficial owners pursuant to Section 707(b)(2) of the Code or Section 1239 of the Code, on the sale of the Property by Seller to Purchaser, as a result of a Seller Party owning or having an Option to acquire a direct or indirect beneficial interest in Purchaser, over (B) the amount of federal income tax that Seller and its direct or indirect beneficial owners would have incurred on the sale of the Property by Seller to Purchaser, if a Seller Party did not own a direct or indirect beneficial interest in Purchaser; multiplied by (ii) two (2). For purposes of clauses (A) and (B), the federal income tax incurred by Seller and its direct and indirect beneficial owners will be computed as though the income and gain from the sale of the Property by Seller to Purchaser was the only income and gain of the Seller and its direct and indirect beneficial owners. Notwithstanding anything to the contrary set forth in Section 37 or otherwise set forth in this Agreement, this Section 16(d) shall survive the Closing until the expiration of any applicable statute of limitations.

(e)     The provisions of this Section 16 shall survive the Closing provided that the provisions of Section 16(d) shall survive the Closing for the period set forth therein.

17.     DELIVERIES TO BE MADE ON THE CLOSING DATE.

(a)     Seller's Documents and Deliveries:  On the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)     A duly executed and acknowledged Bargain and Sale Deed Without Covenants Against Grantor's Acts in the form of **Exhibit 3** (the "Deed");

(ii)     A duly executed Bill of Sale in the form of **Exhibit 4**;

(iii)     Originals or, if originals are unavailable, copies, of plans and specifications, technical manuals and similar materials for the Building to the extent same are in Seller's possession;

(iv)     A completed and duly executed Internal Revenue Service Form W-9;

(v)     Originals or, if originals are unavailable, copies, of all permits, licenses and approvals relating to the ownership, use or operation of the Premises, to the extent same are in Seller's possession;



(vi)     Keys and combinations in Seller's possession relating to the operation of the Premises;);

(vii)     A certificate (the Seller's Certificate") pursuant to which Seller shall certify that all of Seller's representations and warranties set forth in this Agreement are true and correct in all material respects as of the Closing Date.

**(b)**     <u>Purchaser's Documents and Deliveries</u>: On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following:

(i)     Payment of the balance of the Purchase Price payable at the Closing by 1:00 P.M., Eastern Standard Time, on the Closing Date (time being of the essence), as adjusted for apportionments under <u>Section 7</u>, in the manner required under this Agreement;

(ii)     If required by the Company, then to the Company, if Purchaser is a corporation, (1) copies of the certificate of incorporation and by-laws of Purchaser and of the resolutions of the board of directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true and correct by the Secretary or Assistant Secretary of Purchaser; (2) a good standing certificate for Purchaser issued by the state of incorporation of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (if not incorporated in the State of New York) dated within thirty (30) days of the Closing Date; and (4) an incumbency certificate executed by the Secretary or Assistant Secretary of Purchaser with respect to those officers of Purchaser executing any documents or instruments in connection with the transactions contemplated herein;

(iii)     If required by the Company, then to the Company, if Purchaser is a partnership, (1) copies of Purchaser's partnership agreement and partnership certificate and consent of the partners of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, all of the foregoing being certified as true and correct by the general partner of Purchaser, (2) a good standing certificate issued for Purchaser by the state of organization of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (30) days of the Closing Date; and (4) with respect to the general partner of Purchaser, an incumbency certificate executed by an officer (if such general partner is a corporation) or manager(s)/managing member(s), as applicable (if such general partner is a limited liability company) of Purchaser with respect to individuals executing any documents or instruments on behalf of Purchaser in connection with the transactions contemplated herein; and

(iv)     If required by the Company, then to the Company, if Purchaser is a limited liability company, (1) copies of Purchaser's articles of organization and operating agreement and consent of the members of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, all of the foregoing being certified as true and correct by the manager(s)/managing member(s), as applicable, of Purchaser; (2) a good standing certificate issued for Purchaser by the state of organization of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (if not organized in the State of



New York) dated within thirty (30) days of the Closing Date; and (4) an incumbency certificate executed by an officer or manager(s)/managing member(s), as applicable, of Purchaser with respect to individuals executing any documents or instruments on behalf of Purchaser in connection with the transactions contemplated herein.

(c)     Jointly Executed Documents:  Seller and Purchaser shall, on the Closing Date, each execute, acknowledge (as appropriate) and exchange the following documents:

(i)      The Transfer Tax Returns;

(ii)     An Assignment and Assumption of the Sidewalk Shed Contract in the form of **Exhibit 6**; and

(iii)    Any other affidavit, document or instrument required to be delivered by Seller or Purchaser or reasonably requested by the Company (so long as such request does not add additional warranties or covenants to Seller), pursuant to the terms of this Agreement or applicable law in order to effectuate the transfer of title to the Premises.

(iv)    Any and all documents necessary or reasonably required in connection with the Sale Order.

18.    CLOSING DATE.

(a)     The closing of the transactions contemplated hereunder (the "Closing") shall occur, and the documents referred to in Section 17 shall be delivered upon tender of the Purchase Price provided for in this Agreement, at 10:00 A.M., Eastern Standard Time via mail in escrow with the Escrow Agent and the Company on the date that is the later to occur of (i)

████████████████████████████████████████

Agreement as the "Scheduled Closing Date"; and the actual date of the Closing, the "Closing Date"), *TIME BEING OF THE ESSENCE* as to Purchaser's obligation to close the transactions contemplated hereunder on the Scheduled Closing Date, (or, if Seller shall have extended the original Scheduled Closing Date pursuant to the terms of this Agreement, on such extended Scheduled Closing Date so designated by Seller).  Seller shall have a one-time right to extend the Scheduled Closing Date by up to thirty (30) days, such right exercisable by Seller giving notice thereof to Purchaser at least five (5) days prior to the then Scheduled Closing Date.

19.    NOTICES.

All notices, demands, requests or other communications (collectively, "Notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, (b) national overnight delivery service, or (c) personal delivery, addressed as per the below, and in each case of clauses (a) - (c) immediately preceded by a corresponding e-mail notice to the e-mail address(es) set forth below:

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

If given to Seller:                Ninety-Five Madison Company, L.P.
                                           95 Madison Company, Suite 609
                                           New York, New York 10016
                                           Attention: Michael Sklar and Sharan Sklar
                                           Email: msklar@ninetyfivemadison.com
                                           ssklar@ninetyfivemadison.com

With a copy being simultaneously delivered by the same method of delivery to:          Rosenberg & Estis, P.C.
                                             733 Third Avenue
                                           New York, New York 10017
                                           Attention: Michael E. Lefkowitz, Esq.
                                           Email: mlefkowitz@rosenbergestis.com

With a copy being simultaneously delivered by the same method of delivery to:          Glenn Agre Bergman & Fuentes
                                             1185 Avenue of the Americas
                                           New York, New York 10036
                                           Attention: Andrew Glenn, Esq.
                                           Email: aglenn@glennagre.com

If given to Purchaser:            Madison 29 Holding LLC
                                             c/o Sunlight Development
                                           135-25 Northern Boulevard, 2nd Floor
                                           New York, New York 11354

With a copy being simultaneously delivered by the same method of delivery to:          Jay Lau, Esq.
                                             Christodoulou & Lau, P.C.
                                           40 Cutter Mill Road, Suite 504
                                           Great Neck, New York 11021
                                           Email: jlau@laupc.com

If given to Escrow Agent:         Heather Gregg, Esq.
                                             Commercial Escrow Counsel & Underwriter
                                           Stewart Title Insurance Company
                                           2 Grand Central Tower
                                           140 East 45th Street, 33rd Floor
                                           New York, NY 10017
                                           Email: heather.gregg@stewart.com

Any Notice so sent by certified or registered mail, national overnight delivery service or personal delivery shall be deemed given on the date of receipt or refusal as indicated on the return receipt, or the receipt of the national overnight delivery service or personal delivery service. A Notice may be given either by a party or by such party's attorney. Seller or Purchaser may designate, by not less than five (5) business days' notice given to the others in accordance



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

with the terms of this <u>Section 19</u>, additional or substituted parties to whom Notices should be sent hereunder.

20.     <u>DEFAULT BY PURCHASER OR SELLER.</u>

**(a)**     If (i) Purchaser shall default in the payment of the Purchase Price or in the performance of any of its other obligations to be performed on the Closing Date, or (ii) Purchaser shall (x) default in the performance of any of its material obligations to be performed prior to the Closing Date or (y) breach Purchaser's representation and warranty set forth in <u>Section 11(f)(ix)</u> hereof, and, with respect to any default under <u>clause (ii)(x)</u> only, such default shall continue for five (5) business days after notice to Purchaser (provided that in no event shall a breach of Purchaser's representation set forth in <u>Section 11(f)(ix)</u> be deemed to be curable), Seller's sole remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to retain the Deposit (and any interest earned thereon) as liquidated damages for Purchaser's default and/or breach hereunder, it being agreed that the damages by reason of Purchaser's default and/or breach are difficult, if not impossible, to ascertain, and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement except for those that are expressly provided in this Agreement to survive the termination hereof. If Seller terminates this Agreement pursuant to a right given to it hereunder and Purchaser takes any action which interferes with Seller's ability to sell, exchange, transfer, lease, dispose of or finance all or any portion of the Property or take any other actions with respect thereto (including, without limitation, the filing of any lis pendens or other form of attachment against any portion of the Property), then the named Purchaser (and any permitted assignee of Purchaser's interest hereunder) shall be jointly and severally liable for all loss, cost, damage, liability or expense (including, without limitation, reasonable attorneys' fees, court costs and disbursements and actual damages, but in no event shall either party have any liability for consequential damages or lost profits) incurred by Seller by reason of such action to contest by Purchaser. Notwithstanding the foregoing, none of the above liquidated damages shall be deemed to reduce, waive or limit in any respect the additional obligations of Purchaser to indemnify Seller as provided in this Agreement.

**(b)**     If (i) Seller shall default in any of its obligations to be performed on the Closing Date or (ii) Seller shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this <u>clause (y)</u> only, such default shall continue for five (5) business days after notice to Seller, Purchaser as its sole remedy by reason thereof (in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, the right to bring such actions or proceedings being expressly and voluntarily waived by Purchaser following and upon advice of its counsel) shall have the right subject to the other provisions of this <u>Section 20(b)</u> (A) to seek to obtain specific performance of Seller's obligations hereunder, provided that any action for specific performance shall be commenced within thirty (30) days after such default, and if Purchaser prevails thereunder, Seller shall reimburse Purchaser for all reasonable legal fees, court costs and all other reasonable costs of such action, (B) to terminate this Agreement and receive a return of the Deposit (together with any interest earned thereon), and reimbursement for its Diligence Costs (paid receipts for which shall, as a condition to such reimbursement, be delivered to Seller), it being understood that if Purchaser fails to commence an action for specific performance within sixty (60) days after such default, Purchaser's sole remedy shall be to receive a return of the Deposit (together with any interest earned thereon), and reimbursement for its Diligence Costs (paid receipts for which shall,



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

as a condition to such reimbursement, be delivered to Seller), or (C) to waive such default and close hereunder without any reduction in the Purchase Price. If Purchaser elects to seek specific performance of this Agreement pursuant to <u>clause (A)</u> above, then as a condition precedent to any suit for specific performance, Purchaser shall on or before the Closing Date, time being of the essence, fully perform all of its obligations hereunder which are capable of being performed (other than the payment of the Purchase Price, which shall be paid as and when required by the court in the suit for specific performance). If Purchaser elects to terminate the Agreement pursuant to <u>clause (B)</u> above, upon such return and delivery of the Deposit (together with any interest accrued thereon), and reimbursement for its Diligence Costs (paid receipts for which shall, as a condition to such reimbursement, be delivered to Seller), this Agreement shall terminate and neither party hereto shall have any further obligations hereunder except for those that are expressly provided in this Agreement to survive the termination hereof. Notwithstanding the foregoing, Purchaser shall have no right to seek specific performance, if Seller shall be prohibited from performing its obligations hereunder by reason of any law, regulation, or other legal requirement applicable to Seller.

(c)     The provisions of this <u>Section 20</u> shall survive the termination hereof.

21.     <u>FIRPTA COMPLIANCE</u>.

Seller shall comply with the provisions of the Foreign Investment in Real Property Tax Act, Section 1445 of the Internal Revenue Code of 1986 (as amended, "<u>FIRPTA</u>"). Seller acknowledges that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. To inform Purchaser that withholding of tax is not required upon the disposition of a United States real property interest by Seller, Seller hereby represents and warrants that Seller is not a foreign person as that term is defined in the Internal Revenue Code and Income Tax Regulations. On the Closing Date, Seller shall deliver to Purchaser a completed and duly executed Internal Revenue Service Form W-9.

22.     <u>ENTIRE AGREEMENT; ACCEPTANCE OF DEED</u>.

(a)     This Agreement contains all of the terms agreed upon between Seller and Purchaser with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, between Seller and Purchaser are merged into this Agreement.

(b)     All agreements, covenants, liabilities, indemnities, representations, warranties and other obligations of Seller under this Agreement shall merge with the Deed and have no further effect or validity after Closing, and the acceptance of the Deed by Purchaser shall be deemed full compliance by Seller with all of Seller's obligations hereunder and an acknowledgement and agreement by Purchaser that Seller is discharged therefrom and shall have no further obligation or liability with respect thereto, except for those provisions of this Agreement which expressly shall survive the Closing.

RE\59281\0001\5390856v9



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

**(c)** The provisions of this <u>Section 22</u> shall survive the Closing or the termination hereof.

23. <u>AMENDMENTS</u>.

This Agreement may not be changed, modified or terminated, except by an instrument executed by Seller and Purchaser. The provisions of this <u>Section 23</u> shall survive the Closing or the termination hereof.

24. <u>WAIVER</u>.

No waiver by either party of any failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply. The provisions of this <u>Section 24</u> shall survive the Closing or the termination hereof.

25. <u>PARTIAL INVALIDITY</u>.

If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law. The provisions of this <u>Section 25</u> shall survive the Closing or the termination hereof.

26. <u>SECTION HEADINGS</u>.

The headings of the various sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. The provisions of this <u>Section 26</u> shall survive the Closing or the termination hereof.

27. <u>GOVERNING LAW</u>.

This Agreement shall be governed by the laws of the State of New York without giving effect to conflict of laws principles thereof except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The provisions of this <u>Section 27</u> shall survive the Closing or the termination hereof.

28. <u>PARTIES; ASSIGNMENT AND RECORDING</u>.

**(a)** Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed), except: (a) the rights

RE\59281\0001\5390856v9



and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (b) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; and (c) as otherwise provided in this Agreement. Seller hereby agrees that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, none of the representations or warranties made by Seller hereunder shall inure to the benefit of any person or entity that may, after the Closing Date, succeed to Purchaser's interest in the Property.

(b) Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in Purchaser, without first obtaining Seller's consent thereto. The transfer, directly or indirectly, of the record or beneficial ownership of a majority of the equity interests of Purchaser, whether in a single transaction or a series of related or unrelated transactions shall constitute an assignment of this Agreement. Notwithstanding the foregoing, Purchaser, upon notice to Seller not less than ten (10) days prior to Closing, shall have the right to assign this Agreement to, or to designate as a nominee for the purpose of taking title to the Property, any newly formed limited liability company, partnership or corporation in which Linzhong Zhuo has a controlling interest. A true and complete copy of such assignment, in which (i) the assignee assumes all of Purchaser's obligations and liabilities under this Agreement, whenever accruing and (ii) the assignee shall re-make each of the representations and warranties made by Purchaser in <u>Section 11</u>, shall be delivered to Seller not less than ten (10) days prior to Closing. The assignor shall not be released from any of its liabilities or obligations under this Agreement by virtue of or in connection with any such assignment.

(c) Neither this Agreement nor any memorandum hereof may be recorded without first obtaining Seller's consent thereto. Any breach of the provisions of this clause (c) shall constitute a default by Purchaser under this Agreement. Purchaser agrees not to file any lis pendens or other instrument against all or a portion of the Premises in connection herewith. In furtherance of the foregoing, Purchaser (i) acknowledges that the filing of a lis pendens or other evidence of Purchaser's rights or the existence of this Agreement against all or a portion of the Premises could cause significant monetary and other damages to Seller, and (ii) hereby agrees to indemnify Seller from and against any and all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees incurred in the enforcement of the foregoing indemnification obligation) arising out of the breach by Purchaser of any of its obligations under this <u>clause (c)</u>.

(d) The provisions of <u>Section 28(a)</u> and <u>28(c)</u> shall survive the Closing or the termination hereof. The provisions of <u>Section 28(b)</u> shall survive the termination hereof.

29.    <u>CONFIDENTIALITY AND PRESS RELEASES</u>.

(a) Until the Closing and except for any disclosures that are necessary or required pursuant to the Bankruptcy Case, Purchaser and its partners, members, attorneys, agents, employees and consultants will treat the information disclosed to it by Seller, or otherwise gained through Purchaser's access to the Property and Seller's books and records, as confidential, giving it the same care as Purchaser's own confidential information, and make no use of any such



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

disclosed information not independently known to Purchaser from a third party not under an obligation of confidentiality to Seller or its affiliates except in connection with the transactions contemplated hereby. In the event of a termination of this Agreement, Purchaser shall promptly return all such confidential information to Seller.

**(b)** Neither Purchaser nor Seller shall issue any press releases (or other public statements) with respect to the transaction contemplated in this Agreement without approval of the other party, provided that in no event shall any press release (or other public statements) with respect to this transaction indicate the Purchase Price (or any of the other terms hereof) or, at Seller's request, the identity of the Seller.

**(c)** The provisions of <u>Section 29(a)</u> shall survive the termination of this Agreement and the provisions of <u>Section 29(b)</u> shall survive the termination hereof or the Closing.

30. <u>FURTHER ASSURANCES</u>.

Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement. The provisions of this <u>Section 30</u> shall survive the Closing.

31. <u>THIRD PARTY BENEFICIARY</u>.

This Agreement is an agreement solely for the benefit of Seller and Purchaser (and their permitted successors and/or assigns). No other person, party or entity shall have any rights hereunder nor shall any other person, party or entity be entitled to rely upon the terms, covenants and provisions contained herein. The provisions of this <u>Section 31</u> shall survive the Closing or the termination hereof.

32. <u>JURISDICTION AND SERVICE OF PROCESS</u>.

The parties hereto agree to submit to personal jurisdiction in the State of New York in any action or proceeding arising out of this Agreement and, in furtherance of such agreement, the parties hereby agree and consent that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the parties in any such action or proceeding may be obtained within or without the jurisdiction of any court located in New York and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the parties by registered or certified mail to or by personal service at the last known address of the parties, whether such address be within or without the jurisdiction of any such court. Any legal suit, action or other proceeding by one party to this Agreement against the other arising out of or relating to this Agreement shall be instituted only in the Bankruptcy Court and each party hereby waives any objections which it may now or hereafter have based on venue and/or forum non-conveniens of any such suit, action or proceeding and submits to the jurisdiction of such courts. The parties each hereby acknowledge and agree that (i) the Bankruptcy Court shall have jurisdiction over any dispute arising out of this Agreement, including any default by either party under this Agreement or any claim to the Deposit and (ii) any such dispute will be resolved on an expedited basis with the filing of a motion in Bankruptcy Court rather than an adversary proceeding The provisions of this <u>Section 32</u> shall survive the Closing or the termination hereof.



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

33.    WAIVER OF TRIAL BY JURY.

Seller and Purchaser hereby irrevocably and unconditionally waive any and all right to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this agreement.  The provisions of this <u>Section 33</u> shall survive the Closing or the termination hereof.

34.    MISCELLANEOUS.

(a)    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. PDF signatures to this Agreement transmitted via e-mail and/or DocuSign shall be deemed original signatures for all purposes hereunder.

(b)    Any consent or approval to be given hereunder (whether by Seller or Purchaser) shall not be effective unless the same shall be given in advance of the taking of the action for which consent or approval is requested and shall be in writing.  Except as otherwise expressly provided herein, any consent or approval requested of Seller or Purchaser may be withheld by Seller or Purchaser in its sole and absolute discretion.

(c)    Intentionally Omitted.

(d)    Notwithstanding anything in this Agreement to the contrary, Seller shall have the right to consummate the transactions contemplated by this Agreement in a manner that qualifies as a tax-deferred exchange, in whole or in part, under the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), the Treasury Regulations thereunder, and IRS Revenue Procedure 2000-37 (a "<u>1031 Transaction</u>").  Without limiting the foregoing, Seller shall have the right to assign or transfer all or any portion of its rights under this Agreement to a qualified intermediary, an exchange accommodation title holder or one or more single member limited liability companies that are owned by any of the foregoing persons in accordance with the provisions of Section 1031 of the Code, the Treasury Regulations thereunder, and IRS Revenue Procedure 2000-37, provided that no such assignment or transfer of rights under this Agreement shall effect a release of Seller from its obligations under this Agreement or impose any additional obligation or liability except to a de minimis extent on Purchaser.  Purchaser shall cooperate with Seller with respect to any 1031 Transaction, including executing any and all documents reasonably requested in connection therewith and making any payments due under this Agreement to or at the direction of the qualified intermediary or the exchange accommodation title holder.  All agreements and other documents necessary for Seller to effect its 1031 Transaction shall be prepared at the expense of Seller, by Seller's counsel.  Seller agrees to pay or cause to be paid, and indemnify and hold harmless Purchaser from and against, any and all liability, claim, action, damage, cost and expense (including reasonable attorneys' fees), fine or penalty related to, arising out of or in connection with Purchaser's cooperation in effectuating any 1031 transaction requested by Seller.

(e)    The parties acknowledge that each party and its counsel have reviewed and approved this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall

RE\59281\0001\5390856v9



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

not be employed in the interpretation of this Agreement (or any amendments, exhibits or schedules hereto) or of any agreements entered into arising from, relating to or in connection with this Agreement.

**(f)** If any payment to be made under this Agreement shall not be paid when due hereunder, the same shall bear interest (which shall be paid together with the applicable payment hereunder) from the date due until so paid at a rate per annum equal to the Prime Rate (as such rate may vary from time to time) as reported in *The Wall Street Journal* plus 5% (the "<u>Default Rate</u>"). To the extent a payment provision in this Agreement does not specify a period for payment, then for purposes hereof such payment shall be due within five (5) business days of the date such payment obligation is triggered.

**(g)** The provisions of this <u>Section 34</u> shall survive the Closing or the termination hereof.

35. <u>ATTORNEYS' FEES</u>.

In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation.

36. <u>EXCULPATION</u>.

Purchaser agrees that it does not have and will not have any claims or causes of action against any Seller Related Party arising out of or in connection with this Agreement or the transactions contemplated hereby. Without limiting the generality of the foregoing provisions of this <u>Section 36</u>, Purchaser hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against the Seller Related Parties, and hereby unconditionally and irrevocably releases and discharges such Seller Related Parties from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser against such Seller Related Parties, in connection with or arising out of this Agreement or the transactions contemplated hereby. The provisions of this <u>Section 36</u> shall survive the termination of this Agreement and the Closing.

37. <u>NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES</u>.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.



38.   NO CONSEQUENTIAL DAMAGES.

Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof (provided that such limitation with respect to lost profits shall not limit Seller's right to recover contract damages in connection with Purchaser's failure to close in violation of this Agreement).

39.   SUBMISSION FOR COURT APPROVAL.

**(a)**   Purchaser and Seller acknowledge that this Agreement and the transactions contemplated hereby are subject to approval by the Bankruptcy Court and entry of the Sale Order. In the event of any discrepancy between this Agreement and the Sale Order, the Sale Order shall govern. For purposes of this Agreement, a "Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Seller and Purchaser each in their reasonable discretion, and consistent with the terms of this Agreement. Purchaser shall be deemed to have approved any non-material modifications made to the Sale Order by the Bankruptcy Court.

**(b)**   Seller shall file a motion (the "Motion") with the Bankruptcy Court seeking the entry of the Sale Order within five (5) business days following the Effective Date.

**(c)**   Seller shall provide Purchaser with copies of all documents and submissions to the Bankruptcy Court. Seller shall also provide Purchaser with updates of the Bankruptcy Court proceeding.

**(d)**   Seller shall use commercially reasonable efforts and take all commercially reasonable actions to have the Bankruptcy Court hold a hearing to consider the entry of the Sale Order as promptly as practicable, but no later than forty-five (45) days after the filing of the Motion.

**(e)**   From and after the Effective Date, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order. Purchaser has not colluded in connection with its offer or negotiation of this Agreement. From and after the Effective Date, Purchaser shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order or consummation of the transactions contemplated hereby.

**(f)**   Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Purchaser or Seller be required to agree to any amendment of this Agreement and such actions shall be at Seller's sole expense.



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

(g)     This Agreement may be terminated, and Purchaser shall receive a refund of its Deposit at any time prior to the Closing, by written notice of either party to the other, upon the issuance of an order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the transaction contemplated by this Agreement, and such order having become final, binding and non-appealable; provided that no party may terminate this Agreement under this Section 39(g)(i) if the issuance of such order was caused by such party's failure to perform any of its obligations under this Agreement.

*[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]*



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

**IN WITNESS WHEREOF**, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

<u>**SELLER:**</u>

**NINETY-FIVE MADISON COMPANY, L.P.,** a New York limited partnership

GENERAL PARTNER 1:

By: _____
Name: Michael Sklar
Title: Sole member Michael Sklar Management LLC as a general Partner of
GENERAL PARTNER 2: Ninety-Five Madison Co LP

By: _____
Name: Sharan Sklar
Title: Sole Member, Sharan Sklar Management LLC,
A General Partner Ninety-Five Madison Company, L.P.

<u>**PURCHASER:**</u>

MADISON 29 HOLDING LLC, a New York limited liability company

By: _____
Name: Madison 29 Holding LLC
Title: Manager

The undersigned hereby acknowledges
and consents to the provisions of
<u>Sections 4(b)</u>:

**Stewart Title Insurance Company**, as
Escrow Agent

By: _____
Name:
Title:



**IN WITNESS WHEREOF**, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

**SELLER:**

**NINETY-FIVE MADISON COMPANY, L.P.,** a New York limited partnership

GENERAL PARTNER 1:

By: _____
Name: _____
Title: _____

GENERAL PARTNER 2:

By: _____
Name: _____
Title: _____

**PURCHASER:**

MADISON 29 HOLDING LLC, a New York limited liability company

By: _____
Name: Madison 29 Holding LLC
Title: Manager

The undersigned hereby acknowledges
and consents to the provisions of
Sections 4(b):

**Stewart Title Insurance Company**, as
Escrow Agent

By: _Heather Gregg_____
    Name: Heather Gregg, Esq.
    Title: Commercial Escrow Counsel

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

## SCHEDULE A

### Description of the Land

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly side of Madison Avenue and the southerly side of 29th Street;

THENCE southerly along the easterly side of Madison Avenue, 98 feet 9 inches to the center line of the block;

THENCE easterly along said center line of the block, 100 feet;

THENCE northerly parallel with Madison Avenue, 98 feet 9 inches to the southerly side of 29th Street; and

THENCE westerly along the southerly side of 29th Street, 100 feet to the point or place of BEGINNING.

FOR INFORMATION ONLY, NOT INSURED: SAID PREMISES BEI NG KNOWN AS AND BY 95 Madison Avenue, New York, NY

BLOCK:       858
LOT:         58
COUNTY:      NEW YORK



## SCHEDULE B

### Included Personalty

1. Lobby desk
2. Phones in lobby, super's office.
3. All custodial supplies.
d. All existing parts and equipment that could be reinstalled installed in Building.
e. All installed toilet fixtures.
f. All tools (except antiques).
g. Contents of super's office.



SCHEDULE C

Specified Encumbrances

1: Landmark Designations

   A. Notice of Landmark Designation in CRFN 2018000311506
      With regards thereto:
      Premises have been designated as a Landmark. The premises are accordingly
      subject to the restricted use(s) as provided for in Chapter 74 Section 3020 of the
      New York City Charter and Chapter 3 of Title 25 of the Administrative Code of the
      City of New York

   B. Notice of Landmark Designation in CRFN 2020000218455
      With regards thereto:
      Premises have been designated as a Landmark. The premises are accordingly
      subject to the restricted use(s) as provided for in Chapter 74 Section 3020 of the
      New York City Charter and Chapter 3 of Title 25 of the Administrative Code of the
      City of New York

2: Sidewalk Lien

| | |
|---|---|
| **CTRL NO:** 001280134 - 01 | **DEBTORS:** 01 |

| | |
|---|---|
| **DOCKET DATE:** 05/10/2000 | **TYPE:** SL - SIDEWALK LIEN |
| **EFFECTIVE DATE:** 05/10/2000 **ENDING:** | **COUNTY:** 31 NEW YORK (MANHATTAN) |
| **CLERK / SEQ #** : MDAVIS 118 | **COURT:** NONE |
| **BLOCK:** 00858 **LOT:** 00058 | **INDEX NUMBER:** 76154 |

| **DEBTOR** | **CREDITOR** |
|---|---|
| Sklar Equities Inc | N Y C Department Of Transportation |
| 89 MADISON AVE | 40 NORTH |
| NEW YORK NY | NEW YORK NEW YORK 10013 |

3. ECB Liens

| | | |
|---|---|---|
| Ninety-Five Madison Company L P | **ECB Viol No.** 12125402P | **JUDGMENT DATE:** |
| 95  MADISON AVENUE | **DECISION DATE:** 12/27/22 | Original Amount: $0.00<br>Sat Date: 11/17/23 |
| NEW YORK  NY  10016 | **ECB BOOK DATE:** 03/31/23 | |
| Ninety-Five Madison Company L P | **ECB Viol No.** 12125723X | **JUDGMENT DATE:** |
| 95  MADISON AVENUE | **DECISION DATE:** 12/28/22 | Original Amount: $0.00<br>Sat Date: 11/17/23 |
| NEW YORK  NY  10016 | **ECB BOOK DATE:** 03/31/23 | |



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

## SCHEDULE D

### List of Employees

None



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

# SCHEDULE E

## Survey





DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 1

<u>Escrow Agent's Wire Instructions</u>



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 2

Title Report




DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 3

Form of Deed

THIS INDENTURE, made as of the _____ day of _____, by [_____],
having an address c/o [_____] (hereinafter referred to as "Grantor"),
to [_____], a [_____] having an address c/o
[_____] (hereinafter referred to as "Grantee").

WITNESSETH, that Grantor, in consideration of Ten Dollars ($10.00), lawful
money of the United States, paid by Grantee, does hereby grant and release unto Grantee, the heirs
or successors and assigns of Grantee forever:

ALL that certain plot, piece or parcel of land with the building and improvements
thereon erected, situate, lying and being, more particularly described on Exhibit A attached hereto
and made a part hereof (the "Premises");

TOGETHER WITH all right, title and interest, if any, of Grantor in and to any
streets and roads abutting the Premises to the center lines thereof;

TOGETHER WITH the appurtenances and all the estate and rights of Grantor in
and to the Premises.

TO HAVE AND TO HOLD the Premises unto Grantee, the heirs or successors and
assigns of Grantee forever.

AND Grantor, in compliance with Section 13 of the Lien Law, covenants that
Grantor will receive the consideration for this conveyance and will hold the right to receive such
consideration as a trust fund to be applied first for the purpose of paying the cost of the
improvements at the Premises and will apply the same first to the payment of the cost of the
improvements before using any part of the total of the same for any other purpose.

IN WITNESS WHEREOF, Grantor has duly executed this deed the day and year
first above written.

GRANTOR:     *[Seller's Signature Block to be confirmed:*

[_____]

By: _____
    Name:
    Title:



STATE OF NEW YORK      )
                                ) ss.:
COUNTY OF NEW YORK     )

         On the _____ day of _____ in the year 20__ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual taking
acknowledgment

<table>
<tr><td><b>Bargain and Sale Deed</b><br>Without Covenant Against Grantor's Acts</td><td>SECTION:   [___]<br>BLOCK:     [___]<br>LOT:       [___]<br>COUNTY:  New York</td></tr>
</table>

[_____]

TO

[_____]

STREET
ADDRESS:  [_____]
               New York, New York

RETURN BY MAIL TO:

[   ]



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

Exhibit A

<u>Legal Description</u>
(see attached)



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 4

## FORM OF BILL OF SALE

[_____], having an office c/o [_____] ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by _____, a _____, having an address at _____ ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all Included Personalty (as such term is as defined in that certain Purchase and Sale Agreement dated _____, _____ between Seller and Purchaser) owned by Seller and which are located at, and used or usable in connection with, the real property known as _____, New York, New York.

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

This Bill of Sale is made by Seller without recourse and without any expressed or implied representation or warranty whatsoever.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this ___ day of _____, 20__.

[_____]

By: _____
     Name:
     Title:

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 5

Intentionally Omitted



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

## EXHIBIT 6

### ASSIGNMENT AND ASSUMPTION OF SIDEWALK SHED CONTRACT

[_____],having an office c/o [_____] ("Assignor"), in consideration of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to _____, a _____ having an address at _____ ("Assignee"), all right, title and interest of Assignor under the Sidewalk Shed Contract Documents with respect to the real property located at [_____], New York, New York (the "Premises").

Assignee hereby expressly assumes all of the obligations imposed upon the owner of the Premises under the Sidewalk Shed Contract which accrue from and after the date hereof.

This Assignment and Assumption is made by Assignor without recourse and without any express or implied representation or warranty whatsoever except to the extent expressly provided in the Purchase Agreement.

This Assignment and Assumption shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Reference is hereby made to [that certain Purchase and Sale Agreement between Assignor and Assignee dated as of _____ __, 2024 with respect to the Premises (the "Purchase Agreement"). Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Purchase Agreement.

Any inconsistency between the terms herein and the terms set forth in the Purchase Agreement shall be resolved in favor of the terms of the Purchase Agreement.

DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Assumption to be executed as of this _____ day of _____, 20__.

**ASSIGNOR:**

[_____]

By: _____
    Name:
    Title:

**ASSIGNEE:**

[_____]

By: _____
    Name:
    Title:



DocuSign Envelope ID: F2F2CBE9-A26B-4317-AE19-F980085EEEE3

EXHIBIT 7

<u>SELLER PARTIES</u>

1. Rita A. Sklar
2. Michael Sklar
3. Sharan Sklar