Joshua Stein
**JOSHUA STEIN PLLC**
110 West 57th Street, Fourth Floor
New York, NY  10019
Telephone: (212) 688-3300
Email: joshua@joshuastein.com

Schuyler G. Carroll
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, New York  10036
Telephone: (212) 790-4521
Email: scarroll@manatt.com

Counsel to Branton Realty Services LLC

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINETY-FIVE MADISON COMPANY, L.P., | ) | Case No. 21-10529 (DSJ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**FINAL APPLICATION OF BRANTON REALTY SERVICES LLC FOR (i) PAYMENT OF REAL ESTATE BROKER AND SALES AGENT COMMISSIONS, (ii) REIMBURSEMENT OF EXPENSES, AND (iii) RELATED RELIEF**

Branton Realty Services LLC ("Branton"), by and through its undersigned counsel, submits this final application (the "Application") pursuant to Section 330 of the Bankruptcy Code, for payment of real estate broker and sale agent commissions and reimbursement of expenses. In support thereof, Branton respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Branton was engaged (the "Engagement") by Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor and debtor in possession in this Chapter 11 case, with the exclusive right to sell sell 95 Madison Avenue, New York, NY (the "Property"). This Court approved the Debtor's sale of the Property. That sale is the result of Branton's marketing efforts.

2. Pursuant to the terms of its Engagement and the Court's order approving that Engagement, Branton is entitled to payment of its commission (the "Commission"), among other things, upon the closing of the sale approved by the Court ( "Closing").

3. If the Closing occurs and this Application has not been resolved, then Branton requests that an escrow be established from the Closing proceeds in order to fund the Commission.

4. Branton is also entitled to reimbursement of its expenses, whether or not a Closing occurs.

## JURISDICTION AND VENUE

5. This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.

6. Venue in this district is proper pursuant to §§ 1408 and 1409. The statutory bases for the relief sought are 11 U.S.C. §§ 105, 327(a), and 328.

## BACKGROUND: BRANTON'S ENGAGEMENT

7. The Debtor engaged Branton as its real estate broker and sales agent for the Property pursuant to the Engagement. The Engagement granted Branton the sole and exclusive right to sell the Property. The Court approved the Engagement *nunc pro tunc* to August 17, 2022,

by order dated August 31, 2022 (Docket No. 181, attached as **Exhibit A**), as amended by order dated May 25, 2023 (Docket No. 243, attached as **Exhibit B**).

8. Branton's Engagement included these terms relevant to this Application:

a. <u>Term</u>. The Engagement term (the "<u>Term</u>") began in 2022. It expired on December 31, 2023, subject to some important further provisions described below. (Listing Agreement for Sale, attached to **Exhibit A** [the "<u>Listing Agreement</u>"] § 1.)

b. <u>Referrals</u>. Owner was required to "refer to Branton all inquiries regarding a Transaction received during the Term." Any negotiations were to be "conducted by or through Branton (subject to direction and input from Owner)." (Listing Agreement § 3.) Language of this type appears in most brokerage agreements. Once a broker starts marketing a property, word travels in the marketplace. Prospects often reach out directly to the owner to try to bypass the broker. Those prospects know that if they can help the owner avoid paying a brokerage commission, that's an easy way to make a prospect's offer more competitive and appealing. Therefore, many real estate brokerage agreements include language like Section 3 of the Listing Agreement. As discussed below, case law interprets this language to mean that the broker is entitled to a commission on any sale that occurs during the term of the agreement.

c. <u>Compensation</u>. The Debtor agreed to pay Branton a Commission of $300,000 plus 1% of the gross sales price upon closing. (Listing Agreement § 5.)

d. <u>Protected Prospects</u>. Within 10 days after the Term expired, Branton was required to give the Debtor a list (the "<u>List</u>") of every party who toured the Property during the Term. (Listing Agreement § 5.) The Listing Agreement then stated:

> If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein.

3

e. <u>Marketing Costs</u>. The Debtor must reimburse certain outstanding "<u>Marketing Costs</u>." The Listing Agreement also required the Debtor to reimburse certain other expenses.

9. As the Debtor's broker, Branton sought to arrange a Transaction for the Property. Submitted with this application is <u>Declaration</u> of Warren M. Heller (the "<u>Heller Declaration</u>"), which provides an extensive and detailed description of Branton's activities to market the Property. In summary, Branton's activities included the following:

10. In order to arrange a transaction, Branton first needed to fully understand the Property and how bidders might look at it when they decided how much to offer for it. That, in turn, required Branton to think about what bidders would want to do with the Property – which would inevitably start with some form of renovation. Based on Branton's preliminary work, it became clear that one important, and probably the most sensible, option would consist of a conversion to residential use.

11. Branton needed to understand all the possible permutations and issues such a project would require. Those permutations and issues started with a zoning analysis, followed by an analysis of the likely cost of the necessary renovation work. The renovation analysis in turn required a thorough understanding of the Property's façade, elevators, lobby, infrastructure, and other components. That provided the backdrop for the next piece of the puzzle: determining the likely layouts and configurations of condominium apartment units, in a way that would maximize sellable space and light and air for the units. Branton had to master all of this, in order to intelligently present the Property to potential bidders.

12. Once Branton had fully researched the Property, Branton prepared extensive marketing materials to be submitted to prospective bidders. Those marketing materials included

an offering memorandum that summarized the results of Branton's analysis and why any bidder should want to bid high for the Property.

13. Branton also helped the Debtor engage tax counsel and tax accountants, agreeing to act as the accountants' client so that the engagement could happen quickly. When Branton realized the Property suffered from two years of unpaid real estate taxes (bearing interest at a high rate) and significant urgent capital expenditure requirements, Branton recommended that the Debtor obtain a debtor-in-possession credit facility (the "DIP Facility"), which the Court ultimately approved in the fourth quarter of 2022, during the Term.

14. Section 11.2 of the DIP Financing agreement disclosed that the broker that arranged the DIP Facility was Two Bins Capital LLC ("Two Bins").

15. Branton marketed the Property extensively to hundreds of prospects, ultimately conducting over 140 tours to 110 groups that were potential prospects – a record number of tours in Branton's multiple decades in the business. Branton generated a total of 47 offers from prospective bidders. Two offers equalled at least $70,000,000. The Debtor wasn't initially ready to accept any of them because the Debtor was trying to decide between a sale and a ground lease, an indecision that ultimately delayed the process for months.

16. During the Term, the Debtor received inquiries about the Property from other brokers. The Debtor forwarded many of those inquiries to Branton. According to Branton's email records, the Debtor did not refer to Branton any inquiries or conversations with Two Bins relating to the Property or its sale.

17. Near the end of the Term, Branton and the Debtor zeroed in on one prospective buyer (the "Branton Buyer"). Negotiations with the Branton Buyer continued into January 2024. The Debtor and the Branton Buyer entered into a letter of intent, which provided the Branton

Buyer with an exclusivity period. The Debtor hemmed and hawed and did everything possible to slow down and ultimately stop negotiations with the Branton Buyer, as more fully described in the Heller Affidavit.

18. Branton was advised that, on or about February 1, 2024, the very day after the Branton Buyer's Exclusivity Period expired, the Debtor's real estate counsel sent a copy of the draft contract with the Branton Buyer to a new buyer ("Madison 29") but had (according to the Debtor) suddenly entered the picture. Apparently that draft contract was to be the basis for a new contract with Madison 29.

19. On March 1, 2024, the Court approved the sale of the Property to Madison 29 (see Docket No. 325). The Court-approved contract with Madison 29 (the "Contract") included a paragraph on brokerage, which included in relevant part this statement:

> 14. BROKERS AND ADVISORS.
>
> (a) Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with this Agreement or the transactions contemplated hereby other than Two Bins Capital LLC ("Purchaser's Broker"). Purchaser hereby agrees to indemnify, defend and hold Seller and the

20. Thus, Two Bins acted as the broker that introduced the Debtor to Madison 29. Two Bins had already become involved with the Property in 2022, as the broker that helped the Debtor set up the DIP Facility. It appears that Two Bins and the Debtor continued their relationship regarding the Property and stayed in touch. According to the contract between the Debtor and Madison 29, Two Bins was the broker that brought Madison 29 to the Property.

21. It is inconceivable that the Debtor and Two Bins had no conversations about the Property between (a) the closing of the DIP Facility; and (b) the end of the Term. To the contrary, it is reasonable to infer that the Debtor continued to speak with Two Bins, and Two Bins maintained a relationship and lines of communication with the Debtor, during the Term.

6

22.     In a situation with property issues as complex as this one, it typically takes some time, perhaps 60 days, from the date a prospect first hears about a property until the prospect has adequately done its preliminary investigation of the property, the parties negotiate a nonbinding LOI, and the seller's attorneys prepare and send out a first draft contract. That is particularly true for this Property, given all its complexities. Those complexities required time, effort, and brainpower for any buyer, including Madison 29, to think through. The Branton Buyer, for example, needed more time than that from its first tour of the Property until it agreed to the terms of its never-signed LOI with the Debtor.

23.     It also seems quite likely that the Debtor used Branton's marketing materials in its dealings with Two Bins and Madison 29 without notifying Branton or requesting Branton's permission.

24.     Assuming that the Debtor spoke to Madison 29 or Two Bins as its agent during the Term but failed to refer those discussions to Branton, as seems to have occurred, Branton is entitled to payment of its Commission. Moreover, the Debtor violated the Listing Agreement. If the Debtor had complied with the Listing Agreement, then Branton would have contacted Madison 29 through Two Bins, given Madison 29 at least one tour of the Property, and included Madison 29 on Branton's List. Thus, Branton would have been entitled to a Commission if a Closing were to occur with Madison 29. The timing of Madison 29's entry onto the scene makes it quite clear that the Debtor communicated with Two Bins and through Two Bins to Madison 29 during the Term.

25.     Contemporaneously with the filing of this application, Branton is initiating discovery from the Debtor, Madison 29, Two Bins, and other parties that presumably would have been involved in any such communications.

26. To the extent the Debtor communicated with Madison 29 or Two Bins in January, those communications likely also violated the Exclusivity Period that the Branton Buyer had negotiated, given that the Exclusivity Period covered most of January. By violating the Branton Buyer's Exclusivity Period, the Debtor also undercut the negotiations with the Branton Buyer and the possibility of a Closing with the Branton Buyer. Thus, the Debtor interfered with Branton's ability to collect a Commission on such a Closing.

27. On March 1, 2024, the Debtor filed its *Motion Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order (I) Approving the Sale of the Property Free and Clear of All Liens, Claims, Encumbrances and Interests (Except Permitted Encumbrances), (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto, and (III) Granting Related Relief* (the "<u>Sale Motion</u>"). The Sale Motion sought this Court's approval of a sale to Madison 29. The purchase price was listed as $62,800,000.

28. Even after the Term, Branton continued to work with the Branton Buyer to obtain a higher and better offer. Just before this Court approved the Contract, the Branton Buyer submitted a higher offer of $65,000,000. Neither the Debtor nor the Debtor's attorney engaged in any meaningful discussion of that offer. However, the Debtor used the Branton Buyer's higher offer as an opportunity to push Madison 29 to match the $65,000,000 offered by the Branton Buyer. That process put an additional $2,200,000 into the Debtor's pocket.

**<u>BRANTON IS ENTITLED TO A COMMISSION UPON CLOSING</u>**

29. The terms of the Engagement demonstrate that if a Closing occurs with Madison 29, Branton is entitled to a Commission, as the Debtor must have had discussions and negotiations with Madison 29 or Two Bins as its agent during the Term.

8

30. Under the terms of the Engagement, New York law makes clear that Branton was engaged with the exclusive right to sell and thus, is entitled to a commission for any sale that occurs with a purchaser that contacted the Debtor during the Term.

**The Listing Agreement Confers on Branton an Exclusive Right to Sell**

31. The Listing Agreement provides in relevant part (emphasis added):

> **1. Appointment**. Subject to the conditions and limitations contained in this agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, ***with the exclusive right to market the Property for a sale*** . . .
>
> **3. Referrals**. Owner shall refer to Branton ***all*** inquiries regarding a Transaction received during the Term and negotiations ***shall be conducted by or through Branton*** (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

32. Under New York law, an exclusive right to sell agreement "entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations." Rachmani Corp. v. 9 East 96th St. Apt. Corp., 211 A.D.2d 262, 268 (1st Dept. 1995) (citing Hammond, Kennedy & Co. v. Servinational, Inc., 48 A.D.2d 394, 397 (1st Dept. 1975) ("If the agreement was considered an exclusive right to sell, then plaintiff would be entitled to a commission even if the defendant alone was responsible for the sale"). It is well settled that "conditions in contracts for compensation of brokers have been enforced in accordance with the letter of the promise to pay" (Mascioni v I. B. Miller, Inc., 261 N.Y. 1, 5 (N.Y. 1933). Section 1 of the Agreement serves two purposes. First, it appoints Branton as the exclusive agent to sell the Property. Second, it confers Branton an "exclusive right to market the Property for a sale." These provisions impose two distinct, but equally important, obligations. While "an exclusive agency . . . precludes the owner from retaining another broker in the making

9
403011551.1

of the sale," "a broker is entitled to a commission upon the sale of the property by the owner . . . where the broker has been given the exclusive right to sell." Far Realty Assoc., Inc. v. RKO Del. Corp., 34 A.D.3d 261, 262 (1st Dep't 2006).

**As a Result of Branton's Exclusive Right to Sell, Branton is Entitled to a Commission on Any Sale to a Buyer that Contacted the Debtor During Branton's Term**

33. A contract giving rise to an exclusive right of sale must "clearly and expressly provide[ ] that a commission [is] due upon sale by the owner or exclude[ ] the owner from independently negotiating a sale." Morpheus Cap. Advisors LLC v. UBS AG, 23 N.Y.3d 528, 535 (N.Y. 2014). The Agreement's language is substantially similar to language that the Court of Appeals already endorsed as "clear and express." Id. n.2 (citing Audrey Balog Realty Corp. v. E. Coast Real Estate Devs., 202 A.D.2d 529, 530 (2d Dep't 1994) ("The brokerage agreement here required the defendant 'to refer all inquiries or offers' . . . to the attention of [the respondent], as exclusive Broker, for negotiation on [the defendant's] behalf. . . thus, the respondent had an exclusive right to sell, not merely an exclusive agency and is entitled to commissions on all sales procured prior to the termination of the agreement, regardless of whether or not the respondent put in any effort at all in procuring the sales.").

34. Here, the Agreement makes clear that Branton holds the "exclusive right to market the property for a sale," requires the Debtor to refer "all" inquiries regarding a potential transaction to Branton, and expressly states that all negotiations "shall be conducted by or through Branton." In other words, the plain language of the Agreement is an "affirmative and unequivocal statement" that it is Branton's sole right to sell the Property during the term and that Branton is entitled to a Commission on any sale.

35. When Two Bins or Madison 29 showed interest in Madison 29's possible acquisition of the Property, the Debtor did not refer either of those parties to Branton, even

10
403011551.1

though the Listing Agreement required the Debtor to do exactly that. It appears that the Debtor also improperly used the offering memorandum (and potentially other marketing materials) prepared by Branton to inform and expedite Madison 29's interest in the Property, a violation of Branton's Listing Agreement, Branton's intellectual property rights, and a misuse of the materials that Branton had prepared.

36. Based on the purchase price in the Contract of $65,000,000, Branton is entitled to a Commission in the amount of $950,000 if the Debtor achieves a Closing with Madison 29. Branton is also entitled to a Commission if a Closing occurs with the Branton Buyer.

## BRANTON IS ENTITLED TO REIMBURSEMENT OF EXPENSES

37. In addition to the above, Branton is entitled to reimbursement of its Marketing Costs, to the extent not previously reimbursed, in the aggregate amount of $2,400 plus $3,000 for legal fees in negotiating Branton's engagement of Berdon on the Debtor's behalf and for website hosting of the due diligence materials and offering memorandum. Attached as **Exhibit C** are invoices for all such unreimbursed Marketing Costs and legal fees. The Debtor is required to reimburse Marketing Costs when billed, whether or not a Closing occurs.

## RELIEF REQUESTED AND BASIS

38. Branton respectfully requests this Court to authorize, approve and direct payment from the proceeds of any Closing, including a Closing with Madison 29, a Commission in the amount of $300,000 plus 1% of the actual final gross sales price, as the Listing Agreement requires. If Madison 29 closes under the Contract submitted to the Court, then the Commission would be $950,000. A different price would produce a different Commission, all as the Listing Agreement requires. That Commission is required to be paid at Closing directly from the purchase price. Listing Agreement § 5.

403011551.1

39. Bankruptcy Code Section 328(a) states that a professional person retained under Bankruptcy Code Section 327 may be employed on "any reasonable terms and conditions of employment, including on a . . . fixed or percentage fee basis, or on a contingent fee basis." The orders approving the Engagement are consistent with that principle and Branton's Commission is reasonable under the circumstances.

40. Branton respectfully requests this Court to order that, if the Closing occurs before this Application has been resolved, the Debtor to escrow the sum of $950,000 on account of Branton's Commission from the sale proceeds.

41. Branton respectfully requests this Court to direct the Debtor to reimburse Branton for the remaining unreimbursed Marketing Costs in the amount of $2,400 plus $3,000 for legal fees in negotiating Branton's engagement of Berdon on the Debtor's behalf, a total of $5,400.

## RESERVATION OF RIGHTS

42. Branton reserves all rights to supplement or amend this Application, particularly because Branton is presently unaware of certain facts that may be relevant to this Application. Branton is in the process of seeking discovery to develop those facts quickly.

*[No Further Text on This Page.]*

## CONCLUSION

WHEREFORE, Branton respectfully requests that the Court order the relief listed above, and grant such other relief as this Court deems proper and just.

Dated: June 4, 2024
       New York, New York

*[signature: Joshua Stein]*

Joshua Stein
**JOSHUA STEIN PLLC**
110 West 57th Street, Fourth Floor
New York, NY 10019
Telephone: (212) 688-3300
Email: joshua@joshuastein.com


Schuyler G. Carroll
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 790-4521
Email: scarroll@manatt.com

Counsel to Branton Realty Services LLC