Joshua Stein
**JOSHUA STEIN PLLC**
110 West 57th Street, Fourth Floor
New York, NY  10019
Telephone: (212) 688-3300
Email: joshua@joshuastein.com

Schuyler G. Carroll
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, New York  10036
Telephone: (212) 790-4521
Email: scarroll@manatt.com

Counsel to Branton Realty Services LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| NINETY-FIVE MADISON COMPANY, L.P., | Case No. 21-10529 (DSJ) |
| Debtor. | |

**DECLARATION OF WARREN M. HELLER IN SUPPORT OF THE FINAL
APPLICATION OF BRANTON REALTY SERVICES LLC FOR (i) PAYMENT
OF REAL ESTATE BROKER AND SALES AGENT COMMISSIONS, (ii)
REIMBURSEMENT OF EXPENSES, AND (iii) RELATED RELIEF**

I, Warren M. Heller, hereby declare that the following is true to the best of my

knowledge and belief:

1.	I am a member of Branton Realty Services LLC and acted on Branton's behalf

in all activities of Branton described in the Final Application of Branton Realty Services LLC for

(i) Payment of Real Estate Broker and Sales Agent Commissions, (ii) Reimbursement of

Expenses, and (iii) Related Relief. Definitions in the Final Fee Application also apply in this

Declaration.

1

2.	All statements of fact in the Final Fee Application are true and correct to the best of my knowledge, information, and belief.

3.	In addition, I offer the following description of Branton's efforts on behalf of the Debtor during the Term.

4.	After Branton was first engaged by the Debtor, Branton called in favors from consultants and other professional colleagues to confirm the Property's zoning status. They told Branton the zoning was favorable, meaning that no variances or special permissions would be needed for a buyer to execute a residential conversion plan.

5.	The largest variable in any residential conversion would consist of the cost to restore the landmarked façade. The Debtor estimated $2.8 million. Bidders later obtained estimates as high as several times the Debtor's number. Obviously, the cost of any façade renovation would reduce the price that any buyer would pay for the Property. Therefore, Branton needed to find a way to bring order to the uncertainty regarding the cost of this element of the project. Before anyone could estimate the cost of façade renovation, however, one first needed to identify how much work the façade required.

6.	Branton went back to the Debtor to re-examine the scope and update the budget for façade renovation. That also meant going back to the architect who had inspected the facade, asking him to review the scope of work that had been developed based on his initial inspection report. The Debtor then needed to update the budget based on the architect's changes to the scope. Branton worked with the Debtor and incorporated these changes as part of Branton's presentation to bidders.

7.	That process resulted in a revised estimate of $4 million, backed up by multiple supporting bids for components of the work. This was all neatly prepared in a presentation

created by the Debtor and Branton, to give comfort to bidders, who later reduced their cost estimates and thus increased their bids.

8.      The next variable related to how bidders might approach a few fundamental programmatic choices for the Property. It has two entrances: one on Madison Avenue, with three elevators, and a second on East 29th Street, with two more. The Property also has three stairwells. With plenty of precedent for side-street entrances in the neighborhood, the 29th Street entrance could become the main entrance. This would be a threshold decision for any bidder.

9.      The choice of entrance(s), which elevators to keep, and which stairwell to eliminate would drive the layout of all the apartments. That layout would in turn drive the efficiency of every floor and directly affect the anticipated sales proceeds from the apartments.

10.      The next issue with the Property, as with most other office-to-residential conversions, related to its width. Each floor was wider than the floor of a typical residential building. Some apartments on each floor would contain space that would be "too far" from a window. Each bidder would need to figure out how to design efficient and desirable apartments on these wide floors.

11.      As one solution, a converter could move the elevators and stairwells from the sides of the building to the middle. This would enable the core elements (elevators and stairwells) to absorb the depth of the floors. Residential space could be closer to windows, allowing the most efficient use of the floor plate. Any such relocation would cost money, and any bidder would need to compare the cost against the benefit.

12.      The next set of choices revolved around what areas of the Property could be used to create amenity spaces. Everyone's favorite amenity today consists of outdoor space. The Property has a large roof area and one setback terrace on the top office floor. The roof is terrific

3

space. It could be made handicapped-accessible by extending an elevator shaft by one floor and doing the same for the elevator machine room above it.

13.      The roof also hosts a 5,000-gallon domestic water tank and two 9,000-gallon sprinkler tanks. A converter could move all three tanks to the basement to free up more outdoor space on the roof.

14.      Part of the top floor of the Property has a wonderful room with numerous skylights, which once housed a pool. Should that room be maintained with the skylight feature as an amenity space for the building? Should it become part of a premium top floor penthouse? Or should the skylights be removed to create more usable space on the roof? Any bidder would need to think through the answers to those questions.

15.      Next: the basement has 11' 6" ceiling heights, so it could serve as amenity space – gym or otherwise – or as selling space for the retail space above it, or as building storage for the condo apartment owners upstairs. That's another decision any converter would need to make.

16.      The Property has two existing retail spaces of 3,200 and 4,000 usable square feet. The ceiling height is an extraordinary 17 feet. The corner retail unit also has a mezzanine space with 8-foot ceilings. The Property is located in the home furnishing retail district, which is the likely tenant audience. A condo conversion might, however, be more desirable with a high-end restaurant in the retail space, for convenience, prestige, and room service.

17.      Therefore, should the retail space be used for restaurant or home furnishing sales or both? Should the two retail spaces be combined? Should the 29th street access become the main entrance to the residential lobby, and if so, should the lobby be widened by extending into the rear of the retail space, which would both make the lobby more spacious and eliminate

the least valuable retail space? Should the basement become part of the retail component or be used for something else, as mentioned above? Any bidder would need to answer those questions.

18.     The list of Property complexities and programmatic options is long, but in that lies part of its appeal! Branton knew that any bidder would need to think through the costs and benefits of those various options to determine its business plan and frame its bid. Branton needed to fully understand those options to be able to explain them to bidders to expedite their review and enhance their interest in the Property. Branton also knew that the best way to do that was by giving thorough and fully informed Property tours to every potential bidder.

## MARKETING PROGRAM AND NEGOTIATIONS WITH PROSPECTIVE PURCHASERS

19.     In accordance with the Engagement, once Branton understood the Property and its potential and possible options, Branton prepared and circulated marketing materials for the Property and sought to develop interest among potential purchasers.

20.     Toward that end, Branton sent an introductory email to approximately 400 prospects; spoke to all interested prospects and dozens of the others; and conducted over 140 tours of the Property to 110 groups that were potential prospects. This was three times [more than] [as many as?] for any property Branton had handled in the past, including the Chrysler Building.

21.     In its marketing efforts, Branton had to overcome and bring order to many issues that complicated and impeded the process:

      a.  Many prospective bidders and their agents had unsuccessfully dealt with Rita
          Sklar, a principal of Debtor, over the preceding many years, both regarding
          leasing space and purchasing the building. Prospective bidders were highly
          skeptical about whether she would ever go along with any sale of the building,

and more specifically, whether any transaction would even be possible if she were involved.

b. Over the preceding many years, Rita Sklar and other principals of Debtor had dealt with other brokers on a nonexclusive basis. As a result, they unknowingly created potential brokerage claims by (i) giving those brokers Property information; and (ii) accepting introductions to, and receiving offers from, potential purchasers.

c. Debtor had previously hired Cushman & Wakefield ("C&W"), on an exclusive basis, to raise financing for Debtor to renovate the Property. The marketing memorandum C&W prepared for the Debtor included a long list of brokers that C&W had approached for the assignment. To the Debtor's surprise, Branton advised the Debtor that some of those brokers were sales brokers – not finance brokers – that they had already contacted numerous prospective purchasers, as the Debtor's exclusive agent, about buying the Property. These prior introductions by numerous brokers, both unauthorized and authorized, created confusion in the marketplace, made the Property seem shopworn, and made it tough to create much excitement among buyers about a property being offered for the first time after 48 years of single-family ownership.

d. The fact that the Debtor had put an unleveraged asset of this size and value into bankruptcy over a minor claim by a tenant led some prospects to have concerns about the Debtor.

e. During the early stages of the marketing process, Rita Sklar, who was listed as the contact person for Debtor, continued to receive calls from prospective bidders. She didn't refer those callers to Branton. This created confusion in the marketplace as to whether she or Branton was running the marketing process. As a result, during the remainder of the marketing process, Branton had to conceal the names of prospective purchasers from Debtor, so that Rita Sklar could not contact them independently to help her develop her own competing bid for the Property. Rita Sklar's activities further discouraged bidders from participating in the process and reinforced the message that a transaction was unlikely.

22. Branton also soon became aware that the Property suffered from two years of unpaid real estate taxes, which were accruing interest at a high rate. Branton advised the Debtor to secure a debt facility with up to five years of term, in an amount sufficient to cover the unpaid taxes, immediate needs of the Property, and projected future obligations over the ensuing two years. All of this was in an effort to protect Debtor from interested buyers who might purchase their debt, rather than buying the Property, to seek foreclosure and take the Property from the Debtor, without the Debtor receiving the full value of the Property it would receive in the event of a sale.

23. Given the Debtor's tax concerns, specifically its very low basis in the Property, Branton interviewed various tax attorneys for the Debtor, and used those interviews as a means of developing tax strategies for Debtor, while Debtor debated and could not decide which tax counsel to engage. This was beyond the scope of Branton's agreement, and work for which it was not compensated. In fact, Branton actually lent the Debtor money to pay its tax accountant

so that the Debtor's tax analysis could move forward. Branton did all these things to be helpful to the Debtor, try to save it money, and keep the deal moving forward.

24. Once tax counsel was finally engaged, Branton worked with them to explore various tax-advantaged structuring alternatives. Once the best options were chosen, Branton worked with tax accountants to develop the after-tax analysis of the various options being considered. Branton worked with the Debtor to evaluate and discuss the practicalities of the various tax saving alternative structures available to the Debtor. That included finding for the Debtor a specialist in tax-free exchanges, to explain the process of finding and selecting properties that might suit their needs.

25. Throughout that process, Branton worked closely with the Debtor's bankruptcy counsel to coordinate the various marketing, structuring, timing, and structuring options under consideration, to ensure that every possible option stayed within the boundaries of what the bankruptcy proceedings allowed. All of this required an understanding of the existing and potential alternative uses of the Property, including the possibility of breaking it into multiple mixed-use condominium units.

26. Over the course of the Term, Branton's efforts produced approximately 47 offers for the Property from prospective purchasers. More specifically, Branton produced 22 first-round bids in March 2023. From those bids, Branton developed for the Debtor a highly detailed spreadsheet analyzing and comparing the various components of each bid. This gave the Debtor a thorough and detailed understanding of how the marketplace viewed the Property. It also allowed the Debtor to compare the pricing levels offered by those looking to: (a) renovate the Property and keep it as an office building; (b) convert it to a rental apartment building; or (c) convert it to a residential condominium.

27.     Branton's detailed analysis for the Debtor also identified: (w) how much construction cost each bidder anticipated it would budget for the Property, a crucial consideration in any comparison of bidders; (x) the deal terms of each bid; (y) how each bidder would capitalize a purchase; and, perhaps most importantly, (z) which bidders would be willing to ground lease rather than purchase the Property and how that would affect their pricing.

28.     Branton issued to the Debtor a total of 18 status reports over the course of the Term, often with enormous detail, and explained them in a way to ensure all members of Debtor could understand not just the facts, but the context of each issue.

29.     Not surprisingly, the highest bids came from condo converters, including two for $70,000,000. Any condo converter would need to purchase the Property, not ground lease it. The purchase, however, would not give the Debtor the same tax benefits as a ground lease structure.

30.     Unfortunately, that led to an extended period of time during which the Debtor worked to select tax counsel, which delayed moving forward with any of the bidders. Among other things, the tax attorney's feedback required analysis by tax accountants, and Berdon was selected. As a result, and as mentioned above, Branton was requested to become Berdon's client.

31.     Once that tax analysis was complete, it became apparent that an outright sale could generate the highest net result at the price levels being discussed with condo converters. At that point, in the middle of August, the Debtor instructed Branton to initiate a second-round bid among the most competitive condo converter bidders. Branton advised that starting any bid process in mid-August was perilous and suggested delaying the process until after Labor Day. The Debtor nevertheless told Branton to proceed and "do the best we can."

32.     Branton had remained in regular contact with the anticipated second-round bidders, to push them to move forward at their first-round pricing and had confirmed that their financial partners were still in place, and that they were ready to participate in a second-round bid process even in late August and submit their offers shortly after Labor Day.

33.     Sadly, that did not happen. As Branton had warned, and despite the assurances from the anticipated second-round bidders, few of the prospects responded in late August, and the second-round bid was not successful. This meant that Branton had to start over to find new bidders and attempt to resuscitate the interest of prior ones who had lost interest, developed deal fatigue, and/or lost faith in Debtor's ability to make a decision and move forward with a transaction. The five-month lapse caused by the Debtor between the first and second round bid dates sent an alarming message to the marketplace and destroyed the momentum that Branton had developed during the November 2022 to March 2023 marketing period.

34.     During that time period, the Debtor claims that part of the delay was caused by Branton's request for an indemnity against being sued by principals of the Debtor. That is not true, as Branton continued to perform its duties while the parties worked out the indemnity.

35.     Despite all the internal chaos and delays caused by the Debtor, Branton successfully procured approximately 25 more bids from bidders old and new, during this post-Labor Day 2023 period. One of those bids ultimately came from one of Branton's prospects later included in the List (the "Branton Buyer")[1] in early December 2023.

36.     The Branton Buyer was prepared to pay $60 million, post a 10% deposit, sign an unconditional contract, and post a nonrefundable deposit by December 31, 2023. The Branton Buyer had arranged financial backing for its equity investment as well as debt financing. Both

---

[1]     For privacy, the name of the Branton Buyer has been omitted. The Debtor knows who that buyer is. The name can be provided to the Court.

came from a large institutional investor in commercial real estate. The Branton Buyer and its

capital source had agreed to partner on the conversion of numerous office buildings to residential

condos. After careful analysis, they chose the Property as their first project.

37.     The Branton Buyer was ready to go, except they wanted the Debtor to secure

vacant possession of one space encumbered by a lease that extended until 2030. The tenant under

that lease (the "Tenant") had expressed interest in moving out, but no agreement had yet been

reached with the Tenant. The Debtor claimed that it was not comfortable signing a letter of intent

with the Branton Buyer (an "LOI") until the Debtor reached an oral agreement with the Tenant.

As a result, the Branton Buyer missed Branton's year-end deadline for signing a contract.

38.     At the time, Branton could not figure out why Debtor refused to continue

negotiating and eventually enter into a nonbinding LOI with the Branton Buyer before reaching

an agreement with the Tenant. Signing such an LOI would have had no negative consequences,

as confirmed by the Debtor's real estate counsel. Branton urged the Debtor not to pass up the

timing urgency and momentum Branton had created with the Branton Buyer to sign by year-end,

knowing that absent a deadline, deals linger and are harder to complete. In retrospect, was the

Debtor really focused on securing verbal (nonbinding) agreement with Tenant, or was the Debtor

strategically delaying the Branton Buyer beyond expiration of Branton's Term, so that the

Debtor could bring into the picture an alternative buyer that the Debtor had spoken with during

the Term, but not referred to Branton?

39.     On January 9, 2024, the Debtor and the Branton Buyer signed an LOI. It gave

the Branton Buyer exclusivity from Tuesday, January 9, through Friday, January 19, 2024 (the

"Exclusivity Period"). At the end of that Exclusivity Period, however, the contract with the

Branton Buyer was not yet ready to sign and the Debtor had not yet signed a written agreement

with the Tenant. Early the next week, the Debtor extended the LOI, including the Exclusivity Period, through January 31. At that point, the Debtor refused to further extend the LOI or the Exclusivity Period.

40.      After the Debtor shared the Branton Buyer's contract with the Debtor Buyer, further Property tours and negotiations ensued. The Debtor stopped responding to the Branton Buyer's later offers, which took the form of two more draft contracts. In response to the Branton Buyer's statements that the Debtor had apparently violated the Exclusivity Period, the Debtor announced that it would not speak to the Branton Buyer or its counsel at all until the Branton Buyer gave an unconditional release to the Debtor.

41.      The Debtor's silence made it impossible for the Branton Buyer to proceed. Branton was informed by the Branton Buyer, and Branton's counsel was informed by the Branton Buyer's counsel, that the Debtor's attorney communicated little or no information to the Branton Buyer. Eventually, the Debtor and the Debtor's bankruptcy attorney contacted Branton on Saturday, February 24, advising Branton that (a) a nonbinding contract had been signed with another buyer, presumably the Debtor Buyer, and (b) Branton should tell the Branton Buyer that they are welcome to overbid.

42.      Three days later, the Branton Buyer did exactly that, by giving the Debtor yet another revised contract with a higher bid. Again, the Branton Buyer received no response or other information from the Debtor or its counsel.

43.      On March 1, 2024, the Court approved the sale of the Property to Madison 29 (see Docket No. 325). The Court-approved contract with Madison 29 (the "Contract") included a paragraph on brokerage, which included in relevant part this statement:

14.    BROKERS AND ADVISORS.

    **(a)**    Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with this Agreement or the transactions contemplated hereby other than Two Bins Capital LLC ("Purchaser's Broker"). Purchaser hereby agrees to indemnify, defend and hold Seller and the

44.    Thus, Two Bins acted as the broker that introduced the Debtor to Madison 29. Two Bins had already become involved with the Property in 2022, as the broker that helped the Debtor set up the DIP Facility after Branton's Term had started. It appears that Two Bins and the Debtor continued their relationship regarding the Property and stayed in touch. The Contract confirms that Two Bins was the broker that brought Madison 29 to the Property.

45.    It is inconceivable that the Debtor and Two Bins had no conversations about the Property between (a) the closing of the DIP Facility; and (b) the end of the Term. To the contrary, it is reasonable to infer that the Debtor continued to speak with Two Bins, and Two Bins maintained a relationship and lines of communication with the Debtor, during the Term.

46.    In a situation with property issues as complex as this one, it typically takes some time, perhaps 60 days, from the date a prospect first hears about a property until the prospect has adequately done its preliminary investigation of the property, the parties negotiate a nonbinding LOI, and the seller's attorneys prepare and send out a first draft contract. That is particularly true for this Property, given all its complexities. Those complexities required time, effort, and brainpower for any buyer, including Madison 29, to think through. The Branton Buyer, for example, needed more time than that from its first tour of the Property until it agreed to the terms of its never-signed LOI with the Debtor.

47.    It also seems quite likely that the Debtor used Branton's marketing materials in its dealings with Two Bins and Madison 29 without notifying Branton or requesting Branton's permission.

48. Assuming that the Debtor spoke to Madison 29 or Two Bins as its agent during the Term but failed to refer those discussions to Branton, as seems to have occurred, Branton is entitled to payment of its Commission. Moreover, the Debtor violated the Listing Agreement. If the Debtor had complied with the Listing Agreement, then Branton would have contacted Madison 29 through Two Bins, given Madison 29 at least one tour of the Property, and included Madison 29 on Branton's List. Thus, Branton would have been entitled to a Commission if a Closing were to occur with Madison 29. The timing of Madison 29's entry onto the scene makes it quite clear that the Debtor communicated with Two Bins and through Two Bins to Madison 29 during the Term.

49. Contemporaneously with the filing of this application, Branton is initiating discovery from the Debtor, Madison 29, Two Bins, and other parties that presumably would have been involved in any such communications.

50. To the extent the Debtor communicated with Madison 29 or Two Bins in January, those communications likely also violated the Exclusivity Period that the Branton Buyer had negotiated, given that the Exclusivity Period covered most of January. By violating the Branton Buyer's Exclusivity Period, the Debtor also undercut the negotiations with the Branton Buyer and the possibility of a Closing with the Branton Buyer. Thus, the Debtor interfered with Branton's ability to collect a Commission on such a Closing.

51. On March 1, 2024, the Debtor filed its Motion Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order (I) Approving the Sale of the Property Free and Clear of All Liens, Claims, Encumbrances and Interests (Except Permitted Encumbrances), (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases

Related Thereto, and (III) Granting Related Relief (the "Sale Motion"). The Sale Motion sought this Court's approval of a sale to Madison 29. The purchase price was listed as $62,800,000. Even after the Term, Branton continued to work with the Branton Buyer to obtain a higher and better offer. Just before this Court approved the Contract, the Branton Buyer submitted a higher offer of $65,000,000. Neither the Debtor nor the Debtor's attorney engaged in any meaningful discussion of that offer. However, the Debtor used the Branton Buyer's higher offer as an opportunity to push Madison 29 to match the $65,000,000 offered by the Branton Buyer. That process put an additional $2,200,000 into the Debtor's pocket.

Executed on June 4, 2024, at New York, New York.

   **/s/ Warren M. Heller**
   **WARREN M. HELLER**

403013507.2