Bijan Amini
Jordan Reisch
AMINI LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
jreisch@aminillc.com
- and -
Joshua Stein
Joshua Stein PLLC
110 West 57th Street
Fourth Floor
New York, NY 10019
(212) 688-3300
joshua@joshuastein.com

*Counsel to Branton Realty Services LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| NINETY-FIVE MADISON COMPANY, L.P. | Case No. 21-10529 (DSJ) |
| Debtor. | |

## <u>BRANTON REALTY SERVICES LLC'S PRE-HEARING MEMORANDUM</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................. 1

BACKGROUND .................................................................................................. 4

    I.     Brokerage Contracts................................................................................. 4

    II.    Branton's Retention and Agreement ....................................................... 5

    III.   Branton's Engagement and Referrals by NFMC ..................................... 6

    IV.   NFMC Failed To Refer Mr. Westfried's Inquiries In November And December 2023.................................................................................................. 9

    V.    NFMC Acted In Bad Faith And Violated The LOI With Mr. Heller's Buyer.............. 17

    VI.   Even After NFMC Reached An Agreement With Sunlight, Mr. Heller's Continued Efforts Resulted In NFMC Receiving An Additional $2.2 Million ........... 21

BRANTON IS ENTITLED TO THE COMMISSION ............................................. 21

    I.     The Agreement Granted Branton The Exclusive Right To Sell The Property ............. 22

    II.    NFMC's Purported Referrals Of Mr. Westfried In September 2022 And June 2023 Did Not Satisfy Its Referral Obligations................................................. 24

    III.   Because The Agreement Conferred An Exclusive Right To Sell, Branton Need Not Demonstrate It Was The "Procuring Cause" Of The Transaction ............... 26

    IV.   NFMC Cannot Claim As A Defense The Fact Branton Did Not Show The Property To Sunlight During The Term Because NFMC Prevented Branton From Doing So ..................................................................................... 28

CONCLUSION.................................................................................................... 33

# TABLE OF AUTHORITIES

Cases                                                                              Page(s)

*All Island Ests. Realty Corp. v. Singh*,
   219 A.D.3d 1392 (2023) ........................................................................... 24

*Audrey Balog Realty Corp. v. E. Coast Real Est. Devs., Inc.*,
   202 A.D.2d 529 (1994) ..................................................................... 20, 24

*Calka v. Donahoe*,
   20 Mich. App. 120, 173 N.W.2d 811 (1969) ...................................... 28

*Curtis Properties Corp. v. Greif Companies*,
   212 A.D.2d 259 (1995) ............................................................................ 27

*Doll v. Thornhill*,
   6 So. 2d 793 (La. Ct. App. 1942) ......................................................... 28

*Gaillard Realty Co. v. Rogers Wire Works*,
   215 A.D. 326 (App. Div. 1926) .............................................. 20, 23, 25

*Hammond v. C.I.T. Fin. Corp.*,
   203 F.2d 705 (2d Cir. 1953) .................................................................. 21

*In re Airlift Int'l, Inc.*,
   761 F.2d 1503 (11th Cir. 1985) ............................................................... 3

*In re Klein Sleep Prods., Inc.*,
   78 F.3d 18 (2d Cir. 1996) ......................................................................... 3

*Int'l Network, Inc. v. Woodard*,
   405 P.3d 424 (Col. 2017) ....................................................................... 25

*J.C. Nichols Co. v. Osborn*,
   12 F.Supp.2d 1196 (D. Kan. 1998) ................................................ 25, 28

*Kislak Co. v. Geldzahler*,
   210 N.J. Super. 255 (Law. Div. 1985) ............................................ 21, 26

*Merry-Go-Round Enter. Inc. v. Simon DeBartolo Group, L.P.*,
   180 F.3d 149 (4th Cir. 1999) ................................................................... 3

*Morpheus Cap. Advisors LLC v. UBS AG*,
   23 N.Y.3d 528 (2014) ...................................................................... 19, 21

*Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*,
   211 A.D.2d 262, 629 N.Y.S.2d 382 (1995) .................................... 24, 27

*Sioni & Partners, LLC v. Vaak Properties, LLC*,
   93 A.D.3d 414 (2012) ............................................................................. 24

## PRELIMINARY STATEMENT

1.      This contested matter concerns the brokerage commission in connection with the sale of the building located at 95 Madison Avenue, New York, NY ("Property").  In August 2022, Branton Realty Services LLC ("Branton") was retained as Real Estate Broker and Sales Agent for Ninety-Five Madison Company L.P. ("NFMC" or "Debtor"), the debtor in possession in this Chapter 11 case.[1]

2.      Under Branton's court-approved Listing Agreement ("Agreement") Branton had the exclusive right to sell the Property from August 17, 2022 through December 31, 2023 (the "Term").  During the Term, NFMC was required to "refer" any "inquiry" it received regarding the Property to Mr. Heller and all "negotiations" were required to be conducted "by or through" Mr. Heller.  (Exhibit 1, Agreement §§ 1-3).[2]

3.      Over the course of the Term, the Sklars did in fact refer many inquiries to Mr. Heller.  However, the evidence will show that toward the end of Mr. Heller's Term, the Sklars began to discuss the Property with other brokers, including a broker named Emanuel Westfried of Two Bins Capital LLC, who had previously assisted the Sklars in obtaining DIP financing in late 2022.

---

[1] As the Court is aware, Branton is controlled by its principal, Mr. Heller, while NFMC is controlled by the Sklar family: Michael Sklar, his sister Sharan Sklar, and their mother Rita Sklar.
[2] The documents, deposition testimony, and other materials cited in this Pre-Hearing Memorandum are being submitted as exhibits to the Declaration of Jordan Reisch in Support Branton's Pre-Hearing Memorandum, dated December 17, 2024.  "M. Sklar Dep. Tr." refers to the transcript of the deposition of Michael Sklar taken on October 16, 2024, excerpts of which are Exhibit 2.  "S. Sklar Dep. Tr." refers to the transcript of the deposition of Sharan Sklar taken on October 17, 2024, excerpts of which are Exhibit 3.  "E. Westfried Dep. Tr." refers to the transcript of the deposition of Emanuel Westfried taken on October 15, 2024, excerpts of which are Exhibit 4.  "L. Zhuo Tr." refers to the transcript of the deposition of Lin Zhuo taken on October 10, 2024, excerpts of which are Exhibit 5.

4.     In November and December of 2023, the Sklars had 12 calls with Mr. Westfried totaling more than two hours.

5.     The evidence will show that during these calls: (1) Mr. Sklar and Mr. Westfried discussed the sale of the Property; (2) Mr. Westfried expressed an "interest in selling" the Property; (3) Mr. Westfried said that he thought he could sell the Property; (4) Mr. Westfried indicated he had three people who he could get to buy the Property; (5) Mr. Sklar told Mr. Westfried that he was not going to renew Mr. Heller's contract; (6) Mr. Sklar told Mr. Westfried to call Mr. Heller "if he wanted to deal with this now;" (7) Mr. Westfried indicated that he was not going to call Mr. Heller and preferred to wait until January 1; and (8) Mr. Sklar told Mr. Westfried: "Do not do anything until January 1st."

6.     But Mr. Westfried could not wait.  The evidence will show that on December 8, Mr. Westfried contacted Mr. Sklar to see if someone Mr. Westfried met at a restaurant who was only in town for a few days could tour the Property.  Mr. Sklar agreed to allow the tour, on a weekend, when the building staff would not be present, so word would not get back to Mr. Heller.  On December 11, Mr. Westfried wrote to Mr. Sklar: "I couldn't get him this weekend. He'll actually be back **in early January so I'll just sit tight until everything is clean**."  Mr. Sklar responded "Better. **This is clean break and is fair to woody [Heller]**."

7.     This exchange demonstrates that Mr. Sklar and Mr. Westfried believed it was permissible for them to conceal from Mr. Heller the existence of a prospect who expressed interest in purchasing the Property during the Term, and not refer the inquiry, by simply waiting until the end of Mr. Heller's Term.

8.     That is precisely what they did.

9.      Mr. Westfried was aware of another prospect: Lin Zhuo of Sunlight Development. Mr. Westfried had conversations with Mr. Zhuo in November or December to confirm his interest.

10.     On December 27, Mr. Westfried contacted the Sklars to schedule a tour of the Property on January 2 for him and Mr. Zhuo.

11.     Mr. Zhuo did tour the property on January 2, was immediately interested, submitted an offer to purchase the Property less than one week later for $58 million, and ultimately did end up purchasing the Property for $65 million.[3]

12.     The Sklars did not refer any of these inquiries to Mr. Heller even though the Agreement required them to do so.

13.     As a result, Branton is entitled to payment of its commission of $950,000, reimbursement of its expenses,[4] and legal fees incurred in enforcing its rights under the Agreement throughout this proceeding.[5]

---

[3] The evidence will show that Mr. Zhuo is the managing member of Sunlight Development LLC ("Sunlight"), and that Mr. Zhuo and/or Sunlight control the special purpose vehicle created for the purchase of the Property, Madison 29 Holding LLC.

[4] Branton, as a professional retained by the Debtor post-petition, is entitled to its contractual compensation and reimbursement of its expenses under Sections 330 and 503 of the Bankruptcy Code, with administrative priority, based on the Debtor's post-petition breach. *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 26 (2d Cir. 1996) ("breach of contract committed by the [] debtor-in-possession while administering the estate—gives rise to a debt entitled to … administrative expense priority."); *see also Merry-Go-Round Enter. Inc. v. Simon DeBartolo Group, L.P.*, 180 F.3d 149, 156-58 (4th Cir. 1999) (claims from post-conversion breach of postpetition commercial lease entered into by Chapter 11 debtor entitled to administrative priority); *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1509 (11th Cir. 1985) ("The policy behind treating claims arising from post-petition breaches as administrative expenses is clear. The debtor in possession or trustee by assuming or entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors.").

[5] Section 14 of the Agreement provides that: "If either party commences an action or proceeding against the other party to enforce its right under the Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and disbursements from the other party."

# BACKGROUND

I.      Brokerage Contracts

14.     A detailed discussion of the law applicable to this dispute is discussed below.

15.     However, at the outset, it is worth noting that real estate brokerage contracts in New York are generally structured in one of two ways. First, an exclusive agency. Second, an exclusive right to sell.

16.     In an exclusive agency, the owner agrees to work only with the exclusive broker, but the owner reserves the right to sell the property themself without paying a commission to the broker.  In contrast, an exclusive right to sell entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations.

17.     There is a reason why sellers often grant their brokers an "exclusive right to sell," and it is a good one.  Doing so allows their broker to dedicate the time and effort to become experts on the property, develop marketing strategies to maximize its pricing, and fully utilize all available resources, with the assurance that they will be rewarded if the property is sold within the time frame outlined in the agreement.[6]

18.     Structuring a brokerage agreement this way protects the broker from having to compete with the owner and other brokers and enables the broker to give the owner unconflicted advice.  For example, once a broker undertakes the time and effort to start marketing a property, word travels in the marketplace. Prospects often reach out directly to the owner to try to bypass

_____

[6] A seller's broker like Mr. Heller—who is committing to undertake substantial efforts over a period of many months to market the property—will almost always operate under an exclusive right to sell agreement.  In fact, Mr. Heller has **never** entered into an agreement to represent a seller on exclusive agency arrangement in his more than three decades in the real estate industry.

the broker. Those prospects know that if they can help the owner avoid paying a brokerage commission, that's an easy way to make a prospect's offer more competitive and appealing.

19.     For this reason, exclusive right to sell agreements often include provisions which require a seller to "refer" any prospects who inquire about the property to the broker or require that all "negotiations" be conducted through the broker.  Such provisions expose the seller to liability for the commission in the event of a sale to a person who the seller failed to refer to the broker, even though the purchaser is not produced by the efforts of the broker.

II.     Branton's Retention and Agreement

20.     In August 2022, NFMC engaged Branton as the Real Estate Broker and Sales Agent for the Property.  The Court approved the Engagement *nunc pro tunc* to August 17, 2022, by order dated August 31, 2022 (Dkt. 181), as amended by order dated May 25, 2023 (Dkt. 243).

21.     Under the Agreement, Branton had the exclusive right to sell the debtor's property from August 17, 2022 through December 31, 2023 (the "Term").

22.     Specifically, the Agreement provided that "Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the **exclusive right to market the Property for a sale**."  (Agreement § 1) (emphasis added).

23.     The Agreement required that NFMC "**shall refer . . . all inquiries** regarding a Transaction received during the Term" to Branton.  (Agreement § 3) (emphasis added).

24.     The Agreement further required that "**negotiations shall be conducted** by or through Branton (subject to direction and input from Owner)." (Agreement § 3) (emphasis added).

25.     It entitled Branton to compensation of $300,000 plus 1% of the gross sales price (the "Commission") in two circumstances.

        a.    "Upon the closing of **any Transaction** during the Term;" or

b. "If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party" on Branton's list of protected prospects, which consisted of the "names of parties who physically toured the Property during the Term with respect to the Transaction" (the "List").

(*Id.* at § 5, Exhibit A).

III.  Branton's Engagement and Referrals by NFMC

26.  As the Court acknowledged during the April 2024 hearing on the sale of the Property, Mr. Heller, a "highly respected real estate professional," undertook "substantial work" in attempting to cultivate a transaction.[7]

27.  For a more detailed description of the work Mr. Heller undertook on NFMC's behalf, *see generally* Dkt. 362-4, June 4, 2024 Declaration of Warren M. Heller.

28.  All told, over the 16-month Term of the Agreement, Mr. Heller spoke to hundreds of people who were interested in the property and conducted more than 140 tours of the property to 110 groups of potential prospects.  This was three times more tours than any property Branton had handled in the past, including the Chrysler building.[8]

29.  Mr. Heller's efforts produced approximately 47 offers from prospective purchasers. The highest bids came from condo converters, including two offers for $70 million.[9]  For reasons beyond the scope of this submission, NFMC did not accept any of those offers.

---

[7] Dkt. 357, April 18, 2024 Hearing Transcript at 55:22-56:3 ("THE COURT: . . . I recall the arrival of Mr. Heller on the scene, and the confidence he inspired among a lot of people. So, I do acknowledge the [] reputation he enjoys and the confidence his participation inspired in a lot of people."); *id.* at 61:2-8 ("I know from having lived this case over which I've presided, that the Debtor here engaged in a sale and marketing process beginning [] way back in 2022 with, . . . the assistance of a highly respected real estate professional, Mr. Heller . . . and substantial work was done in attempting to cultivate a transaction.").
[8] Dkt. 362-4, Jun. 4, 2024 Declaration of Warren M. Heller ¶ 20.
[9] *Id.* at ¶ 29.

30.     Several of the potential prospects Mr. Heller showed the Property to and negotiated with are ones who were referred by NFMC general partners Michael Sklar and Sharan Sklar.

31.     Throughout the Term, Michael Sklar, Sharan Sklar, and NFMC's legal counsel in this proceeding, referred all (or nearly all) of the inquiries they received to Mr. Heller by either: (A) sending an email directly to Mr. Heller with the name and contact information of the inquirer so that Mr. Heller could reach out to the inquirer; or (B) sending an email to both Mr. Heller and the inquirer to directly put them in touch with one another.  For example:

   a. On August 18, 2022, Andrew Glenn, NFMC's legal counsel in this proceeding, referred a prospective purchaser who owned other buildings near the Property.[10]
   b. On August 31, 2022, Michael Sklar referred a broker named Micah Zimmerman who said he was "in touch with a potential buyer."[11]
   c. On September 14, 2022, Sharan Sklar referred a broker named Harry Hochman who expressed interest in the Property on behalf of a specified prospective purchaser.[12]
   d. On October 24, 2022, Michael Sklar referred a broker named Harley Dalton of Eastdill.[13]
   e. On November 15, 2022, Sharan referred someone named Zach Herring, who "called to learn more about the property."[14]
   f. On November 15, 2022, Michael Sklar referred a broker named Andrew Kahn, **who wanted to show the Property to an unspecified "client who [was] coming in from Italy**."[15]
   g. On December 19, 2022, Sharan Sklar referred someone named Aaron Lunzer, who expressed interest in the Property on behalf of a specified prospective purchaser.[16]
   h. On May 5, 2023, Sharan Sklar referred a broker named Franco Rinaldi who "**said he knew someone who was interested**" in the Property.[17]
   i. On June 27, 2023, Sharan Sklar referred a broker named Noah Kossoff who reached out on behalf of an unspecified prospective purchaser.[18]

---

[10] Exhibit 6, BR002324-25; Exhibit 7, BR002320.
[11] Exhibit 8, BR002254-57.
[12] Exhibit 9, BR002142-43
[13] Exhibit 10, BR002129; Exhibit 11, BR002258-59.
[14] Exhibit 12, BR002295.
[15] Exhibit 13, BR002291-92.
[16] Exhibit 14, BR002147-48.
[17] Exhibit 15, BR002141.
[18] Exhibit 16, BR002293.

j.  On September 6, 2023, Michael Sklar referred a broker named Albert Sultan who expressed interest in 95 Madison on behalf of a prospective purchaser.[19]

32.  Put simply, and by their own admission, Michael Sklar and Sharan Sklar understood that NFMC had an obligation to refer inquiries to Mr. Heller, including inquiries by other brokers.[20]

33.  Michael Sklar and Sharan Sklar's understanding regarding NFMC's obligation to refer inquiries to Mr. Heller is further reinforced by their actions when their mother, Rita Sklar, failed to do so. Specifically, after Rita Sklar repeatedly failed to refer inquiries to Mr. Heller, Michael and Sharan Sklar had to involve NFMC's legal counsel.[21]  Eventually, because Rita Sklar was, in the words of Michael Sklar, "acting independently of [NFMC's] corporate governance" and its "agreement to work through [Mr. Heller]," Michael and Sharan Sklar requested that Mr. Heller "not provide or otherwise disseminate information" to their mother Rita Sklar that would "undermine [Mr. Heller's] work if disclosed to the market."[22]

---

[19] Exhibit 17, BR002145-46.

[20] S. Sklar Dep. Tr. 38:12-23 ("**A I referred brokers to Woody. Q You referred brokers to Woody. A That's what he asked me to do. Q. Right. And so when a broker came to you and they said they know someone would might be interested, you referred that to Woody? A Yes.**"); *id.* at 103:7-21 ("**Q We looked at emails before where a broker reached out to you or to Michael and said, 'I have someone who is interested in the property,' right? A Uh-huh. Q And you referred those people to Woody. A Yes.**"); M. Sklar Dep. Tr. 74:15-20 ("You are forwarding all of these inquiries to Woody Heller . . . why are you doing that? A. I believe we were supposed to.").

[21] Exhibit 18, BR002144; S. Sklar Dep. Tr. 41:7-42:18 ("Q. And then in the top email, after you connect Mr. Frank and Mr. Heller, you write to your attorney, Andrew Glenn, your brother, and Woody. And you write, 'See email from broker below, **where my mom refused to connect Woody.**' Right? A Yes. **Q So is it fair to say that Rita had some conversation with Mr. Frank and didn't . . . refer it to Mr. Heller? A Yes. Q And that was a problem? A Yes. Q And so you're emailing your attorney? A Yes. . . . Why was it a problem that your mom refused to connect this person and Woody? A Because we were supposed to send brokers to Woody so he could manage the process and can -- and have the conversations.**").

[22] Exhibit 19, BR002261-62.

IV.    NFMC Failed To Refer Mr. Westfried's Inquiries In November And December 2023

34.    As the end of the Term drew near, there were extensive negotiations with one of Branton's prospects—CNY—who was prepared to pay $60 million, post a 10% non-refundable deposit, and sign an unconditional contract by December 31, 2023.  However, CNY wanted NFMC to secure vacant possession of one space encumbered by a lease that extended until 2030 in which the tenant had had expressed interest in moving out, but no agreement had yet been reached.[23]

35.    At the same time, Michael and Sharan Sklar began preparing themselves for the possibility that the Property would not sell during the Term.  Mr. Sklar was concerned that if they did not affect a transaction, the Sklars "were going to lose everything as a family" as their lender "would have taken the building back and sold it or forced a sale, or the Bankruptcy Court would have."[24]

36.    In November 2023, the Sklars began having discussions with another real estate broker who had assisted the Sklars in obtaining DIP financing a year earlier—Emanuel Westfried of Two Bins Capital LLC—to "understand the marketplace."[25]

37.    In November and December of 2023, the Sklars had 12 calls with Mr. Westfried totaling more than two hours.[26]

_____

[23] NFMC claimed that it was not comfortable signing a letter of intent with CNY until the Debtor reached an oral agreement with the Tenant. As a result, the Branton Buyer missed Branton's year-end deadline for signing a contract.  (Dkt. 362-4, Jun. 4, 2024 Declaration of Warren M. Heller ¶¶ 36-37).
[24] M. Sklar Dep. Tr. 172:17-173:19.
[25] M. Sklar Dep. Tr. 239:7-9.
[26] Exhibit 20 (M. Sklar Phone Record Excerpts at Verizon000022, Verizon000027, Verizon000028, Verizon000033, Verizon000034); Exhibit 21, (E. Westfried Phone Record Excerpts at Verizon000157).

38.     Those calls took place on November 7 (25 minutes);[27] November 28 (20 minutes);

November 30 (10 minutes); December 5 (6 minutes); December 8 (8 minutes); December 11 (13

minutes);[28] December 13 (30 minutes); December 20 (10 minutes); and December 29 (12 minutes).

39.     The evidence will show that during these calls:

    a.  Mr. Sklar and Mr. Westfried discussed the sale of the Property[29]
    b.  Mr. Westfried expressed "interest in selling" the Property[30]
    c.  Mr. Westfried said that he thought he could sell the Property[31]
    d.  Mr. Westfried said he had ideas[32] of "three people who he could get" to buy it[33]
    e.  Mr. Sklar told Mr. Westfried that he was not going to renew Mr. Heller's contract[34]
    f.  Mr. Sklar told Mr. Westfried to call Mr. Heller "if he wanted to deal with this now"[35]

---

[27] Approximately one hour after this call between Mr. Sklar and Mr. Westfried, Mr. Sklar had a call with Mr. Heller. Mr. Sklar did not mention his conversation with Mr. Westfried to Mr. Heller.

[28] Approximately one minute before this call between Mr. Sklar and Mr. Westfried, Mr. Sklar had a 17-minute call with Mr. Heller. Mr. Sklar did not mention to Mr. Heller that he would be speaking with Mr. Westfried.

[29] E. Westfried Dep. Tr. 28:13-17 ("Q But specifically about selling the building, did you speak to him about that before January 1st of [2024]? A Yes.").

[30] M. Sklar Dep. Tr. 239:10-21 ("There is no doubt he wanted to become involved with this thing after Woody's contract. . . . Emanuel was absolutely interested in selling this building.").

[31] M. Sklar Dep. Tr. 182:23-183:2 ("Q. Did Emanuel express to you, in words or substance, that he thought he could sell the building? A Yes.").

[32] E. Westfried Dep. Tr. 30:11-20 ("So I called Mike the next day and said, 'I heard you saw Eric and you are struggling with the sale.' And he immediately said, 'Do you have ideas of who would buy this?' I said, 'Yeah, I think I do.'").

[33] M. Sklar Dep. Tr. 230:9-231:4 ("Q But in December, [Westfried] said he had a couple of people he wanted to show it to, didn't he? A. He said he could bring in three people who he could get to sell the building."); E. Westfried Dep. Tr. 76:2-9 ("Q My understanding is in your phone call with Woody you said, in words or substance, that you told Mike in your earlier calls, either October or November, that you had three people that were interested in the building? A I had maybe three, whoever I would approach.").

[34] E. Westfried Dep. Tr. 178:9-19 ("Q Well, did you discuss with Michael what was going to happen to this project after December 31st? A Yeah. He said he was not renewing him. He said, 'He's been asking me. He wants to be extended. There is no way I'm extending him.' Q When did he say those words to you? A Before December 31st.").

[35] M. Sklar Dep. Tr. 229:19-23 ("Q . . . You told Emanuel he has to call Woody? A I told Emanuel that **if he wanted to deal with this now, he really should call Woody**."); E. Westfried Dep. Tr. 187:23-188:7 ("Q I thought you said that Michael told you, in words or substance, **to wait until the beginning of the year? A That was after the November call, the first call, that if you don't want to work with [Mr. Heller], then don't do anything**.").

    g.  Mr. Westfried indicated that he was not going to call Mr. Heller and preferred to wait until January 1[36]

    h.  Mr. Sklar told Mr. Westfried: "Do not do anything until January 1st"[37]

40.    Mr. Westfried specifically testified that several of these conversations took place in **October or November 2023**, including the conversations in which Mr. Westfried said he had "ideas" and "three people who he could get" to buy the Property.[38]

---

[36] E. Westfried Dep. Tr. 30:17-20 ("And he said, 'Great. Woody has an exclusive. You gotta call him.' And I told him I had no interest in calling him. And he said, 'Why not?' I told him why and he said okay." Q What was the reason why? A My reason was -- I remember what I told him. I said, 'He had this thing over a year. I could wait two more months. I don't think he is going to succeed in two months, and I will help you out in January.' And he said, 'Okay, great.'").

[37] E. Westfried Dep. Tr. 181:11-25 ("'Do not do anything until January 1st. I do not want you doing anything.' . . . Michael said this to me. Q . . . When did Michael say that to you? A I don't remember when, but he definitely said it. He was very clear about 'Woody has until the end of the year. Don't -- if you don't want to work with him, then don't do anything.'"); *id.* at 223:15-224:4 ("Q . . . is it fair to state that you were taking deliberate steps not to engage in any active attempts at selling this with them before January 1st? A I was told not to, so I did what I was told. Q And when you say you were told, you were told by Michael? A He sets the stage very clearly. If you want to work on it now, it's with Woody. If you don't, sit tight.").

[38] E. Westfried Dep. Tr. 28:13-30:16 ("Q But specifically about selling the building, did you speak to him about that before January 1st of [2024]-- A Yes. Q On how many occasions? A I have no - - a handful of times. I mean, there was one -- it was nothing until the end of October. That's the first time I reached out him and called him about this sale. **Q End of October 2023? A. Yes**. . . . Q. And so give me the progression from the end of October . . . A. "So I get a call from the lender, Eric Goodman. . . . he calls me and says, 'You will never believe who I had dinner with the other night, a three-hour dinner. Mike Sklar. And he's got nothing,' he said, 'His sale is going poorly. He is very concerned I told him to call you. If he doesn't call you, you should call him.' So **I called Mike the next day** and said, 'I heard you saw Eric and you are struggling with the sale.' And he immediately said, **'Do you have ideas of who would buy this?' I said, 'Yeah, I think I do.'**"); E. Westfried Dep. Tr. 76:2-20 ("Q My understanding is in your phone call with Woody you said, in words or substance, that you told Mike in your earlier calls, either **October or November, that you had three people that were interested in the building? A I had maybe three, whoever I would approach. . . . After I got off that phone call at the end of November, I remember hanging up and calling and being, like, Holy shit. I really gotta start thinking about this thing because in a month from now this guy is going to call me and be, like, where are these buyers?**").

41.     Because Mr. Westfried understood that Mr. Heller's exclusivity ran through December 31,[39] Mr. Westfried was "waiting for the clock to run out."[40]

42.     But, ultimately, Mr. Westfried could not wait.

43.     On December 8, Mr. Westfried contacted Mr. Sklar to see if someone Mr. Westfried met at a restaurant who was only in town for a few days could tour the Property.  Mr. Sklar agreed to allow the tour, on a weekend, when the building staff would not be present, so word would not get back to Mr. Heller.[41]

44.     Had Mr. Sklar followed through with personally giving a tour to the prospect Mr. Westfried met at a restaurant, without referring the inquiry to Mr. Heller, it would have been impossible for Mr. Heller to include the person on the List, even though the Agreement entitled Mr. Heller to the Commission if an agreement was signed any Party "who physically toured the Property during the Term," regardless of who gave the tour.  That was the point.  Mr. Sklar was prepared to personally give a tour of the Property to a prospect during the Term, conceal that fact from Mr. Heller and leave no trace, to withhold payment of the Commission to Mr. Heller.

---

[39] E. Westfried Dep. Tr. 176:2-8 ("Q What did you understand about Woody's exclusivity? A That it ran until December 31st.").

[40] E. Westfried Dep. Tr. 36:20-23.

[41] Exhibit 22, Text Messages Between Michael Sklar and Emanuel Westfried (NFMC_000044-45); E. Westfried Dep. Tr. 170:10-171:18 ("Q So this call that you had with him on December 8th with Michael, now with the notes with your texts in front of you, what's your recollection based on this? A This is probably me saying . . . 'Hey, I met this guy in a Chinese restaurant that is in town that seems like these are the types of buildings he wants to buy. Can I get him through there?' Q And what did he say to you, if you recall? A He – I remember what he said. He said, 'Can we do it on a weekend?' . . . I remember he preferred to do it on a weekend. Q So in the phone call you spoke to him about having a potential purchaser, correct? A Looks like that, yes."); *id.* at 183:2-7 ("I'm like 'You know what, the guy is only here for a limited period of time. Fuck it. I will go call Mike and tell him I need access for this guy' and let Mike make the decision if he wants to let him in or not."); *id.* at 185:2-10 ("Q But had he been available, you were prepared to take him in on that Sunday? A Absolutely. Q And Michael gave you the green light to do that? A What does his text say? 'Sunday works.' So, yeah, sounded like he was cool to let me take him in.").

45.     Ultimately, Mr. Westfried was not able to get in touch with the person he met at the restaurant and the tour did not take place.

46.     On December 11, 2023, Mr. Westfried wrote to Mr. Sklar: "I couldn't get him this weekend. He'll actually be back **in early January so I'll just sit tight until everything is clean**. He's interested for sure. Keep you posted if I get him earlier. Keep me posted on your side as well."[42]

47.     Mr. Sklar responded: "**Better. This is clean break and is fair to woody**[]."[43]

12/11/2023 9:20:55 AM

I couldn't get him this weekend. He'll actually be back in early January so I'll just sit tight until everything is clean. He's interested for sure

12/11/2023 9:22:48 AM

Keep you posted if I get him earlier. Keep me posted on your side as well

12/11/2023 10:02:38 AM

Better . This is clean break and is fair to woodyv

48.     This text message exchange plainly demonstrates that Mr. Sklar and Mr. Westfried believed it was permissible for them to conceal from Mr. Heller the existence of a prospect who expressed interest in purchasing the Property during the Term, and not refer the inquiry, by simply waiting until the end of Mr. Heller's Term.[44]

---

[42] *Id.* (emphasis added).
[43] *Id.* (emphasis added).
[44] But Mr. Sklar grew nervous. Hours later on December 11, Michael Sklar sent Sharan Sklar an email **titled "Woody"**, writing "My thought on Woody to be discussed with Michael Lefkowitz. 1. Should woody continue with the people he has contacted? **2. We will Owe his commission in both cases. 3. What direction we should go. If we flounder we will be in big trouble**." Exhibit 39, NFMC-06634 (emphasis added).

49.     That is precisely what they did.

50.     In addition to the buyer Mr. Westfried met at a restaurant, Mr. Westfried knew of another individual—Lin Zhuo of Sunlight Development—who "was very hungry to come into" Manhattan and "wanted something to make a big splash."[45]

51.     Mr. Westfried had a conversation with Mr. Zhuo in **November or December**[46] to gauge his interest but intentionally only gave Mr. Zhuo an "overview" that provided all of the necessary information one would need to understand the opportunity at a high level without indicating the actual property address.[47]

52.     By the end of December, Mr. Westfried wanted to get his ducks in a row to be ready as soon as the clock struck midnight on New Years Eve.

---

[45] E. Westfried Dep. Tr. 38:13-20.

[46] E. Westfried Dep. Tr. 159:9-160:2 ("Q So the Madison Ave opportunity, you think you might have mentioned it to him in person? I did. Q . . . So the conversation you had with him about the Madison Avenue property was something you had with him in person in December? A Or November. I don't remember exactly. Q So sometime in November or December you spoke to Mr. Lin about 95 Madison, correct? A About a building like 95 Madison. Q What you called the Madison Avenue opportunity. A Yes.").

[47] E. Westfried Dep. Tr. 37:14-38:8 ("Q Other than talking to Michael about the building in that time frame before January, did you talk to anybody else? A I spoke to Lin. I didn't give him specifics because I was told that Woody has it until January. And I was basically kind of sitting in the penalty box waiting for the clock to run out and start. So I told Lin, 'I know of a building. I did this loan. His family is all messed up. They're fighting. They're not sure that they want to do with this thing. They reached out to me. And I think in the New Year, they want to sell this thing. It's on Madison Avenue. It's a beautiful building by Madison Square Park.' Very generic kind of overview."); *id.* at 124:11-21 ("Q Generically is what? A Generically is, 'Hey, I got an opportunity for you on Madison Avenue. 100 by 100 on a corner, landmark building, totally vacant. Right by Madison Square Park. Nice high ceiling heights. Is this interesting to you?' **At that point what is the difference if I say 95 Madison or 103 Madison?**").

14

53.     On **December 27, 2023**, Mr. Westfried text messaged Michael and Sharan Sklar: "**Can I get a tour 1/2 [January 2nd] at 1pm with the Chinese buyer.[48] I'm hitting the ground running on this for you guys**."  Michael Sklar agreed.[49]



> Wed, Dec 27 at 12:43 PM
>
> Can I get tour 1/2 at 2pm with the Chinese buyer? I'm hitting the ground running on this for you guys.
>
> Thu, Dec 28 at 10:03 AM
>
> Michael  95 Madison Ave
>
> M  Yes lets catch up tomorrow .
>
> Ok. Call me anytime.

54.     Messrs. Sklar, Westfried, and Zhuo then arranged, during the last week of December, for the tour to take place on January 2.

55.     On December 29, Mr. Sklar and Mr. Westfried had a 10-minute phone call.[50]

56.     Around the same time, Mr. Westfried communicated to Mr. Zhuo that they would be taking a tour of the Property.[51]

---

[48] The "Chinese buyer" referenced in the December 27 text message is Mr. Zhuo, who did tour the building on January 2, was immediately interested, and ultimately ended up purchasing the Property.

[49] Exhibit 23, Text Messages Between E. Westfried, M. Sklar, and S. Sklar (TB_EW_003190).

[50] M. Sklar Phone Record Excerpts at Verizon000034.

[51] E. Westfried Dep. Tr. 204:13-21 ("Q And did he agree he would give you access on the 2nd? A Yes. Q And had you communicated that to Lin at this point? A I probably saw him the last week of December and told him it's coming up. Let's come see it."); *id.* at 210:21-25 ("Q When did you communicate that you were going to see the building on the 2nd to Lin? A In December. I told him, "I can get you -- now it's live. Let's go see it. I can get you in. Does the 2nd work for you?' He said, 'Sure. Tell me any time you want to be there, I will go.'").

57.     At 7:47 AM on New Year's Day, January 1, Mr. Westfried text messaged Mr. Sklar: "Happy new year michael. Please send NDA for 95 madison. **For tomorrows walk through let me know who will tour me around**."[52]

> 1/1/2024 7:47:21 AM
>
> Happy new year michael.
>
> Please send NDA for 95 madison. For tomorrows walk through let me know who will tour me around.

58.     By that afternoon, Mr. Sklar was ready to assume Mr. Heller's responsibilities and sent the NDA—that Mr. Heller prepared and previously had prospective buyers' sign—to Mr. Westfried.[53]

59.     Mr. Westfried then sent Mr. Zhuo the NDA and wrote: "**See you guys tomorrow at 2pm at 95 Madison Avenue**."[54]

60.     On the morning of January 2, Mr. Westfried returned the NDA that had been signed by him and Mr. Zhuo.[55]

61.     That afternoon, Mr. Westfried and Mr. Zhuo attended a tour of the Property.[56]

62.     Less than one week later, on January 8, Sunlight made an offer to purchase the Property for $58 million.[57]

---

[52] Exhibit 22, Text Messages Between M. Sklar and E. Westfried (NFMC_000044-45) (emphasis added).  Mr. Westfried testified that he likely had a calendar reminder to text Mr. Sklar on January 1.  E. Westfried Dep. Tr. 205:22-25 ("Q So this matter was in the forefront for you as of January 1st? A Knowing me, I had a calendar reminder, 'Text Michael.'").

[53] Exhibit 24, Jan. 1, 2024 Email from M. Sklar to E. Westfried (NFMC_000582).

[54] Exhibit 25, Jan. 1, 2024 Email from E. Westfried to L. Zhuo (TB_EW_000013).

[55] Exhibit 26, Jan. 2, 2024 Email from E. Westfried to M. Sklar (NFMC_000583-87).

[56] E. Westfried Dep. Tr. 52:6-9 (Q My understanding is he went to look at the building in early January. A January 2nd.").

[57] Exhibit 27, Jan. 8, 2024 Email from E. Westfried to M. Sklar (NFMC_000612-30).

63.     It is undisputed that Mr. Sklar did not refer the November and December 2023 inquiries by Mr. Westfried to Mr. Heller.

64.     This was a substantial deviation from the past practice between the parties, in which the Sklars referred inquiries to Mr. Heller.

65.     By Mr. Sklar's own admission, the reason he stopped referring inquiries to Mr. Heller during the Term is because: "**We were looking at going forward to moving away from Woody** and not continue with his exclusive."[58]

V.     NFMC Acted In Bad Faith And Violated The LOI With Mr. Heller's Buyer

66.     Instead of proceeding with the $58 million offer that Sunlight had made on January 8, on January 9 at 5:55pm, NFMC decided to execute a Letter of Intent with Mr. Heller's prospect, CNY ("CNY LOI").[59]

67.     The CNY LOI contained exclusivity and confidentiality provisions which stated as follows:

> 6. Exclusivity: During the period following the execution of this LOI until . . . January 19th, 2024[60] . . . the Seller [NFMC] *shall not engage in any offers, negotiations, or discussions with any third party* regarding the sale of the Premises.
>
> 10. Confidentiality: Both parties agree to keep the terms and details of this LOI and the ensuing negotiations strictly confidential, except as required by law or with the prior written consent of the other party.[61]

---

[58] M. Sklar Dep. Tr. 296:7-12.
[59] Exhibit 28, Jan. 9, 2024 CNY LOI (BR001226-31).
[60] The exclusivity period was subsequently extended from January 23-31. *See* Exhibit 29 (BR000876).
[61] *Id.* at 4.

68.     Approximately four hours before entering into the CNY LOI, at 2:08 PM, Mr. Sklar emailed Mr. Westfried to inform him that NFMC would not be moving forward with Sunlight's offer and was instead going in a different direction.

> 1) Something moved quickly, we have someone we will be signing LOI with today. **When I sign, I have exclusionary period and will not be able to discuss**. Things do not always work out but: 2) Property will be as is – Environmental , Landmark 3) Deliver no tenants or letter to terminate 4) There is enough information to due diligence. Closing 60 days after PSA. Time of essence. No retrading." [62]

69.     In doing so, Mr. Sklar (1) evidenced that he understood the exclusivity and confidentiality provisions of the CNY LOI; and (2) knowingly disclosed terms of the CNY LOI.

70.     Eight minutes later, at 2:17 PM, Mr. Westfried asked Mr. Sklar when he was available to discuss.[63] Mr. Sklar immediately called Mr. Westfried and the two spoke for seven minutes at 2:17 PM.[64]

71.     At 7:58 PM, Mr. Westfried and Mr. Zhuo had a five-minute phone call.[65]

72.     At approximately the same time, Mr. Zhuo sent Mr. Westfried a text message which appears to have memorialized what Mr. Zhuo was told by Mr. Westfried on this call, including the fact that the owner of 95 Madison had another offer for above $60 million.[66] It stated:

> ***Madison Ave owner has an offer for above 60*** 5 percent dep and close in 60 days without dd. ***He told Emanuel*** we would just sent out contact for his deal. And if in two weeks that didn't happen then he will come back to us. Do you think if we offer 60 mm no DD, we can also get the contract? Whoever sign faster can get the contract isn't that better for the owner. I looked at this property only once. We already decide to want contact asap. I hope this can show him that how fast we can execute. He wants somebody who can really execute and a piece of mind.

---

[62] Exhibit 30, Jan. 9, 2024 Email from M. Sklar to E. Westfried (NFMC_000650-51) (emphasis added).
[63] *Id.*
[64] E. Westfried Phone Record Excerpts at Verizon000175.
[65] *Id.*
[66] Exhibit 31, Text Messages Between E. Westfried and L. Zhuo (S00308-310).

73.     Mr. Zhuo testified that he received this information from Mr. Westfried.[67] Mr. Westfried could only have received information from Mr. Sklar.

74.     Mr. Sklar continued to discuss the sale of the Property with Mr. Westfried even after signing the CNY LOI.

75.     At 8:03 PM, just two hours after Mr. Sklar signed the CNY LOI, and immediately following Mr. Westfried's 7:58 PM call with Mr. Zhuo, Mr. Sklar and Mr. Westfried had a 14-minute call.[68]

76.     The following morning, January 10, Mr. Zhuo suggested to Mr. Westfried that Sunlight make another offer of $62 million with owner financing or $60 million all cash.[69] Mr. Zhuo told Mr. Westfried to ask Mr. Sklar for a counteroffer and expressed that he was very interested in purchasing the Property.[70]

77.     Mr. Westfried told Mr. Zhuo that he was "trying to meet [Mr. Sklar] **in person**."[71]

78.     Mr. Sklar and Mr. Westfried did meet in person, at the Baccarat Hotel, for approximately 30 or 40 minutes. The meeting took place at approximately 5:30 PM on January 10, less than 24 hours after Mr. Sklar had signed CNY LOI.[72]

---

[67] L. Zhuo Dep. Tr. 68:12-15 (Q. How did you learn of the other offer . . . that the owner of [95] Madison Avenue received before January 9th? A. I think through Emanuel."); *id.* at 70:16-19 ("Q. And you testified that you learned of this other offer from Mr. Westfried, correct? A. Yes.").
[68] M. Sklar Phone Record Excerpts at Verizon000038.
[69] Exhibit 31, Text Messages Between E. Westfried and L. Zhuo (S00308-310).
[70] *Id.*
[71] *Id.* (emphasis added).
[72] M. Sklar Dep. Tr. 333:9-16 ("Q. So you came down from Harlem to see him that day at the Baccarat Hotel. A. Yes. Q. You made that trip. A. Yes. Q. To sit and talk to him? A. Yes."); E. Westfried Dep. Tr. 273:11-14 ("Q And that was at 5:28 on th[e] 10th? A. Yes. Q How long did you meet with him for? A . . . 30 minutes, 40 minutes.").

79.     Mr. Sklar maintains that this was a one-way conversation in which Mr. Westfried did most of the talking and Mr. Sklar was effectively mute.[73]

80.     Mr. Sklar testified that he had these continuing conversations with Mr. Westfried to "keep his options open" with Mr. Westfried's buyer, Sunlight.[74]

81.     Just two days after the meeting at the Baccarat hotel, on January 12, Sunlight made a revised offer of $60 million (without owner financing) or $62 million (with owner financing).[75]

82.     This matched (or just beat) the $60 million offer in the CNY LOI.

83.     Mr. Sklar and Mr. Westfried continued to communicate through the end of January. They had calls on January 12 (3 minutes); January 19 (8 minutes); January 20 (5 minutes); and January 26 (4 minutes).[76]

84.     On January 31, hours before CNY's exclusivity expired, Mr. Sklar and Mr. Westfried arranged to speak the following day[77]

---

[73] M. Sklar Dep. Tr. 333:23-335:6 ("A I wanted to see what he had -- I wanted to see as much as information as he had. Q Okay. So you went down to have a discussion with him about the building. A I wanted to listen to what he had to say. Q Only -- I'm just asking you, you went down to listen to what he said about the building? A Yes. Q So you decided to go down and have a discussion with him about the building? A Different. Q Oh, I see. Only he talked; you didn't talk? Is that the conversation you had? A I did not talk anything about the deal or deals on the table. Q This was a one-way discussion? A He wanted it two-way. That's why he invited me to a bar. Q. And you wanted to have a discussion. That's why you went to the bar? A I wanted to see what's – I wanted to hear what he was thinking.").

[74] M. Sklar Dep. Tr. 339:13-340:5 ("Q Then why were you even picking up his calls? A I wanted to keep my options open with everybody. Q Okay. And so when he called you at 4:50 p.m., whatever conversation you had, you wanted to keep your options open with him? A Yes. That's why you pick up the phone and say hello. Q Same with the meeting you had at the Baccarat Hotel? A Yes. Q That conversation, whatever that discussion was, you were looking to keep your options open? A Correct").

[75] Exhibit 32, Jan. 12, 2024 Email from E. Westfried to M. Sklar (NFMC_000652-63).

[76] M. Sklar Phone Record Excerpts at Verizon000039, Verizon000042, Verizon000044.

[77] Exhibit 33, Text Messages Between M. Sklar and E. Westfried (NFMC_000047-48).

VI. <u>Even After NFMC Reached An Agreement With Sunlight, Mr. Heller's Continued Efforts Resulted In NFMC Receiving An Additional $2.2 Million</u>

85.     On February 1, the day after CNY's exclusivity expired, NFMC reached an agreement in principle to sell the Property to Sunlight for $62.8 million.[78]

86.     On Saturday February 24, NFMC's counsel in this proceeding contacted Mr. Heller and advised him that (a) a nonbinding contract had been signed with another buyer, and (b) Mr. Heller should tell the CNY that they are welcome to overbid.[79]

87.     On March 1, NFMC filed a motion to approve the sale to Madison 29.[80]

88.     Even after the motion, Mr. Heller continued to work with CNY to obtain a higher and better offer.

89.     Just before the Court was set to hear the motion to approve the sale to Sunlight, CNY submitted a higher offer of $65 million. NFMC used that higher offer as a bargaining tactic with Sunlight and gave Sunlight the opportunity to match CNY's $65 million offer.[81]

90.     Sunlight did so.  As a result, NFMC received an additional $2.2 million.[82]

## **<u>BRANTON IS ENTITLED TO THE COMMISSION</u>**

91.     Branton understands that NFMC intends to oppose Branton's fee application on four principal bases. First, NFMC contends that the Agreement did not grant Branton the exclusive right to sell the Property and instead only conferred an exclusive agency. Second, NFMC contends that it somehow complied with its referral obligations under the Agreement by referring Mr. Westfried to Mr. Heller in December 2022 and June 2023. Third, NFMC argues that Branton must

---

[78] Exhibit 34, Feb. 1, 2024 Email from M. Sklar to E. Westfried (TB_EW_000199).
[79] Dkt. 362-4, Jun. 4, 2024 Declaration of Warren M. Heller ¶ 41.
[80] Dkt. 325.
[81] Exhibit 35, Apr. 17, 2024 Email from Andrew Glenn (TB_EW_002798-800).
[82] Dkt. 363, Second Amended and Restated Order Signed on 6/5/2024 Approving the Sale of the Property to Madison 29.

(but cannot) demonstrate that NFMC's breach was the proximate cause of Branton's damages.

Fourth, NFMC contends that Branton must (but cannot) demonstrate that the conditions of the "tail provision" or "survival clause" were satisfied.

92.     Branton will address each of these arguments in turn.

I.     The Agreement Granted Branton The Exclusive Right To Sell The Property

93.     As described above, there are two ways that real estate brokerage contracts are generally structured: (1) an exclusive agency; or (2) an exclusive right to sell.

94.     As the New York Court of Appeals explained in *Morpheus Cap. Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 534 (2014):

> The distinction between an exclusive agency and an exclusive right to sell is well established in a body of Appellate Division case law . . . The general rule is that where an exclusive right of sale is given [to] a broker, the principal cannot make a sale [herself] without becoming liable for the commissions. But where the contract is merely to make the broker the sole agent, the principal may make a sale [herself] without the broker's aid . . . Put differently, [a] broker is entitled to a commission upon the sale of the property by the owner only where the broker has been given the exclusive right to sell; an exclusive agency merely precludes the owner from retaining another broker in the making of the sale. . . We have endorsed this dichotomy implicitly in the past . . . and now do so explicitly.

95.     A contract giving rise to an exclusive right to sell must "clearly and expressly provide" that (A) "a commission [is] due upon sale by the owner;" or (B) "**exclude[ ] the owner from independently negotiating a sale**."  *Id.* at 535 (emphasis added).

96.     The Agreement does both.

97.     First, it states that the Commission is due upon the closing of "any Transaction during the Term."  (Agreement § 5).

98.     Second, it "exclude[d] the owner from independently negotiating a sale" by requiring that: (A) "Owner shall refer . . . all inquiries" to Branton; and (B) "negotiations shall be conducted by or through Branton. . ."  (Agreement § 3).

99.     New York courts have repeatedly recognized that the inclusion of such language "excludes the owner from independently negotiating a sale" and is sufficient to confer upon the broker an exclusive right to sell.

100.     For example, in *Gaillard Realty Co. v. Rogers Wire Works*, the owners agreed that "during the term of this agreement all inquiries with respect to [the] property are to be referred to [the broker]." 215 A.D. 326 (App. Div. 1926). The court found that it "cannot read the provision of the contract that 'all inquiries with respect to said property' were to be referred to the [broker] otherwise than as giving the [broker] the sole right to sell the property" and that the inclusion of such language meant the parties "clearly intended that the [broker] was to have the exclusive right to sell the [owner's] property." *Id.* at 332-33.

101.     Similarly, in *Audrey Balog Realty Corp. v. E. Coast Real Est. Devs., Inc.*, the court found that the broker held "an exclusive right to sell, not merely an exclusive agency" where "the brokerage agreement [] required the defendant 'to refer all inquiries or offers . . . to the attention of [the respondent], as exclusive Broker, for negotiation on [the owner's] behalf." 202 A.D.2d 529, 530 (1994) (emphasis added); *see also Hammond v. C.I.T. Fin. Corp.*, 203 F.2d 705, 707 (2d Cir. 1953) (finding trial court's determination that contract conferred an "exclusive right to sell" to be reasonable given the "agreement to refer all leads" to the broker).

102.     One court even went as far as to say that "the presence of a referral term has been recognized as an essential component of an exclusive agreement so much so that it has been found, of itself, to confer upon a broker the exclusive right to sell." *Kislak Co. v. Geldzahler*, 210 N.J. Super. 255, 267 (Law. Div. 1985).

103.     NFMC cannot legitimately contend that the Agreement merely conferred an "exclusive agency."

104.     To do so would mean that NFMC possessed, at all times during the Term, the right to sell the Property without the involvement of Mr. Heller.  *Morpheus Cap. Advisors LLC*, 23 N.Y.3d at 535 ("where the contract is merely to make the broker the sole agent, the principal may make a sale [herself] without the broker's aid").

105.     Such an interpretation is contrary to both: (1) the plain terms of the Agreement which required NFMC to refer all inquiries to Mr. Heller for negotiation on NFMC's behalf; and (2) the course of conduct between the parties, in which NFMC consistently referred all prospects to Mr. Heller.[83]

II.     <u>NFMC's Purported Referrals Of Mr. Westfried In September 2022 And June 2023 Did Not Satisfy Its Referral Obligations</u>

106.     At the very beginning outset of Mr. Heller's engagement, in September 2022, Mr. Sklar sent Mr. Heller what was effectively a set of "onboarding materials."

107.     This included an excel spreadsheet containing the information for eight prospective purchasers from whom NFMC had received offers prior to Mr. Heller's retention.[84]  It includes, among other things, the names of the prospective purchasers, their contact information, their address, their broker, their broker's contact information, their broker's address, and the details of the offers they made. One of the eight prospective purchasers listed was a company named Shel Capital and its principal Rony Kravel.  Shel Capital appears to have made an offer several months earlier, in either February or April of 2022. The broker that was listed for Shel Capital was Emanuel Westfried of Two Bins Capital.

---

[83] With the exception of those prospects Rita Sklar failed to refer, prompting the involvement of legal counsel, as described above.

[84] Exhibit 36, Sep. 12, 2022 Email from M. Sklar to W. Heller (NFMC-06612-21 at NFMC-06617).

108.     Because these were "cold" offers, which had been sent to NFMC several months before Mr. Heller's retention, Mr. Heller had to follow up with each of the eight prospective purchasers and/or their brokers to determine whether the identified purchasers were still potentially still interested and on what terms.

109.     The evidence will show that Mr. Heller did so.  In particular, the evidence will show that sometime after he received this spreadsheet, Mr. Heller received a call from Rony Kravel of Shel Capital, who indicated that Emanuel told him to call Mr. Heller directly. Mr. Heller subsequently had numerous discussions, on NFMC's behalf, with Mr. Kravel and Shel Capital. As a result, Mr. Heller did not, and never had reason to, speak with Mr. Westfried.

110.     Some nine months later, in June 2023, Mr. Sklar appears to have asked Mr. Heller to contact, among others, a person by the first name of "Emanuel."[85]  Mr. Sklar provided no other information.  Mr. Heller will testify that, of the hundreds of people Mr. Heller spoke with on behalf of NFMC, Mr. Heller did not recall anyone by the first name of "Emanuel."  Mr. Heller responded by asking Mr. Sklar for "Emanuel's contact info."[86]  Mr. Sklar did not respond.

111.     So far as Branton can tell, NFMC's argument appears to be that because it had "referred" Mr. Westfried in September 2022 and June 2023, it had no obligation to refer Mr. Westfried after any of the 12 calls totaling more than two hours that the Sklars had with Mr. Westfried in November and December 2023 about selling the Property.

112.     NFMC's position is contrary to the plain language of the Agreement.

113.     The Agreement requires that NFMC "**shall refer . . . all inquiries**" to Mr. Heller. (Agreement § 3) (emphasis added).

---

[85] Exhibit 37, Jun. 23-24, 2024 Emails Between M. Sklar and W. Heller (NFMC-06564-55, NFMC-06632-33).
[86] *Id.* at NFMC-06633.

114.     The term "inquiry" is extremely broad.

115.     In *Gaillard Realty*, the court explained:

> [W]hen the parties agreed that during the term of the contract 'all inquiries with respect to said property are to be referred to us [brokers]' they clearly meant that **the [owner] was to make known to the [brokers] any opportunity which came to the [owner] to dispose of the property to a prospective purchaser during the term of the agreement**. Otherwise, there would be no force whatever to the provision of the contract that all inquiries with respect to the property were to be referred to the plaintiff. **That this was the intent of the parties is fully borne out by the fact that the [owner] did refer to the [brokers]** offers which it received for the property.

215 A.D. at 331

116.     If a broker contacts an owner and makes an inquiry on behalf of Prospect A and then a year later the same broker contacts the owner to make an inquiry on behalf of Prospect B— those are separate "opportunities" which came to the owner to dispose of the property to two different prospective purchasers.  Both are inquiries that must be referred.

117.     Furthermore, the evidence will show that both Branton and NFMC understood the referral obligation to require referral of any person who (1) "inquires" whether the property is available to be purchased; (2) indicates that they know someone who is or might be interested in potentially purchasing the property or attending a tour of the property; or (3) expresses an interest in purchasing the property or attending a tour of the property either on their own behalf or on behalf of someone else.  *See e.g. supra* ¶ 31.

III.     Because The Agreement Conferred An Exclusive Right To Sell, Branton Need Not Demonstrate It Was The "Procuring Cause" Of The Transaction

118.     NFMC contends that Branton bears the burden of establishing that it was the "procuring cause" of the sale of the Property to Sunlight.

119.     NFMC is wrong. In particular, NFMC's argument relies upon the (incorrect) premise that the Agreement established an exclusive agency and not exclusive right to sell.

120.     Generally, to prevail on a cause of action to recover a commission, a broker must establish "(1) that it is duly licensed, (2) that it had a contract, express or implied, with the party to be charged with paying the commission, and (3) that it was the **procuring cause of the sale**." *All Island Ests. Realty Corp. v. Singh*, 219 A.D.3d 1392 (2023) (emphasis added).

121.     "To establish that a broker was the procuring cause of a transaction, the broker must establish that there was a **direct and proximate link**, as distinguished from one that is indirect and remote between the bare introduction of the parties to the transaction and the consummation of the sale." *Id.* (emphasis added)

122.     However, where a broker has been granted an exclusive right to sell, the broker "**need not show that it was the procuring cause of the sale**." *Sioni & Partners, LLC v. Vaak Properties, LLC*, 93 A.D.3d 414, 417 (2012) ("a broker with an exclusive right to sell need not show that it was the procuring cause of the sale") (emphasis added) (citing *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D.2d 262, 268, 629 N.Y.S.2d 382 (1995) ("an exclusive right to sell agreement entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations")).

123.     Instead, an exclusive right of sale brokerage agreement entitles the broker to the commission provided for in the contract **where the owner breaches the agreement by failing to refer an inquiry**. *See Gaillard Realty*, 215 A.D. at 333 ("[owner] clearly broke its contract with [broker] [by failing to refer an inquiry], and that by reason of such breach … the [broker] became entitled to recover damages measured by the amount of the commissions to which it would have been entitled in the absence of such breach of contract."); *Audrey Balog Realty Corp.*, 202 A.D.2d at 530 ("the broker had an exclusive right to sell, not merely an exclusive agency . . . and is entitled

to commissions . . . regardless of whether or not the [broker] put in any effort at all in procuring the sales.").

124.    Courts in other jurisdictions have held similarly. *See e.g. J.C. Nichols Co. v. Osborn*, 12 F.Supp.2d 1196, 1201 (D. Kan. 1998) ("[E]very court that has considered the issue has ruled that ... where the seller has breached a referral provision and then sold the property without the broker, the seller's breach entitles the broker to the commission set out in the agreement.") (collecting cases); *Int'l Network, Inc. v. Woodard*, 405 P.3d 424, 431 (Col. 2017) ("Other jurisdictions faced with this question generally agree that the seller's breach of the referral clause of an exclusive right-to-sell agreement during the listing period entitles the broker to the commission based on the subsequent sale of the property") (collecting cases); *Kislak*, 210 N.J. Super. at 267 ("The appropriate measure of damages for breach of a term requiring referral of all inquiries to the listing broker, which is part and parcel of the exclusive agreement is the stipulated commission in that agreement.").

IV.    <u>NFMC Cannot Claim As A Defense The Fact Branton Did Not Show The Property To Sunlight During The Term Because NFMC Prevented Branton From Doing So</u>

125.    NFMC contends that Branton must (but cannot) demonstrate that the conditions of the Agreement's "tail provision" or "survival clause" were satisfied.

126.    As discussed earlier, one of the methods by which Branton could be compensated under the Agreement, was if within one year **after** the Term expired, NFMC signed a contract with a party on Branton's List of protected prospects, which consisted of the "names of parties who physically toured the Property during the Term with respect to the Transaction." (Agreement § 5, Exhibit A).

127.    This language is what is sometimes referred to as a "tail" provision or "survival" clause in a brokerage agreement.

128.     NFMC's argument appears to be that because the ultimate buyer is not on the List, that fact alone is dispositive and means Branton's claim cannot succeed.

129.     NFMC further contends Branton bears the burden of proving that—in an alternative universe—in which Mr. Sklar did make the referral to Mr. Heller, Mr. Heller would have given Mr. Zhuo a tour and that Sunlight would be included on Branton's List.  NFMC contends that Branton cannot make that showing because Mr. Westfried would have somehow prevented Mr. Heller from doing so by simply refusing to engage with Mr. Heller.

130.     NCMS's arguments fail for two reasons.

131.     First, NFMC cannot claim the non-occurrence of a condition (Sunlight touring the Property during the Term) as a defense, when NFMC prevented that from occurring by failing to refer Mr. Westfried's inquiries.

132.     "It is well settled that conditions in contracts for compensation of brokers have been enforced in accordance with the letter of the promise to pay. However, it is equally settled that a party may not frustrate the performance of an agreement by bringing about the failure of a condition precedent." *Curtis Properties Corp. v. Greif Companies*, 212 A.D.2d 259, 264 (1995) ("As a matter of law, having entered into an agreement under which the broker's compensation is conditioned on its right to represent defendants' interests with a third party, defendants are precluded from taking any action which would defeat that condition.").

133.     For example, in *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.,* the First Department was confronted with a claim that no payment was due to a broker because transfer of title to a particular party was made a condition precedent to the obligation to pay the broker's commission.  211 A.D.2d 262, 270 (1995).  It wrote:

> where the occurrence of the condition is largely or, as here, exclusively within the control of one of the parties, it is said that the express language of the condition

gives rise to the implied language of promise . . . Having conditioned the payment of plaintiff's brokerage commission on the transfer of the premises to Owners, the sponsor implicitly promised to use his good-faith best efforts to bring about this result . . . **the failure of the condition may not be set up as a defense to the underlying obligation under the contract where the party charged with the duty to fulfill the condition has failed to make a good-faith effort to bring it about**. *A fortiori,* **failure of the condition cannot be utilized as a defense where, as here, the party resisting the contractual obligation has affirmatively acted to obviate its fulfillment**.

*Id.* (emphasis added) (citations omitted).

134.     *Doll v. Thornhill* is on point. 6 So. 2d 793, 793 (La. Ct. App. 1942). In *Doll,* the

seller's contract with the broker contained a referral provision. *Id.* at 793. The seller failed to refer

an offer he received to the broker and later sold the property to the prospect who had not been

referred. *Id.* at 794. The court rejected the argument that the eventual sale would not have taken

place if the prospect had been referred to the broker, writing:

> . . . [W]e find that [seller] clearly violated the plain provisions of his contract in not referring [prospect] to [broker] as soon as the former evidenced any interest in the property. **It will not do for him to say that had he done so, no sale would have resulted**. A real estate agent is supposedly an expert in his business, and **we must presume that he could have accomplished what [seller] accomplished**, or that he **could have persuaded one of the parties to recede sufficiently from his position** for the consummation of a trade. At any rate, **he was entitled to the opportunity to try**. To uphold the contention made here by [seller] would establish a dangerous rule and would open the door in many cases to the perpetration of fraud upon agents who conscientiously try to carry out their mandates.

*Id.* at 795.

135.     Accordingly, courts in other jurisdictions have found brokers to be entitled to

commissions where the seller violated a brokerage agreement with a survival clause by failing to

refer an inquiry during the term.  *See e.g. Calka v. Donahoe*, 20 Mich. App. 120, 130, 173 N.W.2d

811, 815 (1969) (where seller violated brokerage agreement with a survival clause providing for

commission upon sale within 12 months of expiration to any person with whom the broker

"negotiated" during the term—by failing to refer an inquiry during the term—broker was entitled to commission); *J.C. Nichols Co. v. Osborn*, 12 F. Supp. 2d 1196, 1200 (D. Kan. 1998) (where seller violated brokerage agreement with a survival clause providing for commission upon sale within 120 days of expiration to any person to whom the property was shown during the term—by failing to refer an inquiry during the term—broker was entitled to commission).

136.    Here, NFMC cannot claim as a defense the fact that Sunlight did not "physically tour" the Property during the Term when NFMC affirmatively acted to obviate the fulfillment of that condition by failing to refer Mr. Westfried's inquiries.

137.    NFMC's argument that Branton bears the burden of proving that had Mr. Sklar made the referral of Mr. Westfried to Mr. Heller, Mr. Zhuo would have "physically toured" the Property during the Term fails for another reason as well.

138.    It is not even clear how one could "prove" what would have occurred in some hypothetical scenario that never took place.

139.    Any suggestion as to what would or would not have occurred had Mr. Sklar referred Mr. Westfried to Mr. Heller is complete speculation, particularly given that, at that time, Mr. Heller and Mr. Westfried had never even spoken to one another.

140.    What we do know is that, historically, over the course of the Term, Mr. Heller spoke to hundreds of people who were interested and conducted more than 140 tours of the Property.[87]

---

[87] Dkt. 362-4, Jun. 4, 2024 Declaration of Warren M. Heller ¶ 20.

141.     The evidence will also show that, if Mr. Zhuo had been offered a tour the Property in December, he would have availed himself of the opportunity to do so just as quickly as he did in January as there was "no difference" between December and January to Mr. Zhuo.[88]

142.     Even if the referral were made as late as December 27, when Mr. Westfried reached out to Michael Sklar and Sharan Sklar to set up a tour for Mr. Zhuo on January 2—the evidence will show that Mr. Heller was present in New York City at the time and was actively giving tours to prospective purchasers during the holiday season.  In fact, on December 27, hours after Mr. Westfried text messaged Mr. Sklar to set up a tour for Mr. Zhuo on January 2—Mr. Heller emailed Mr. Sklar asking for the building to be opened the following day, December 28 at 2 PM, so Mr. Heller could give tours to two prospective purchasers.[89] Mr. Heller had to arrange those tours through Mr. Sklar because they required the building superintendent to make a dedicated trip to unlock the building during the holidays at an additional cost. The point being that not only was Mr. Heller available and prepared to give tours of the Property during this time frame, but that Mr. Sklar was aware of that fact.

143.     But instead of referring the inquiries from Mr. Westfried, Mr. Sklar instead chose to conceal from Mr. Heller the existence of and the interest by Mr. Westfried and his buyer, Mr. Zhuo.

---

[88] L. Zhuo Dep. Tr. 80:3-81:16 ("Q. If the opportunity was presented to you in December of '23, would you still have been interested? A. December '23, you say if opportunity were present to me, like in December 2023? Q. Yeah. A. Would I be interested? Q. Yeah. A. I think so. Q. Would you have wanted to move quickly? A. I think so. Q. If you were told that you could tour the Property in December, would you have gone on a tour in December? A. I think so. Q . . . If you had toured the building in December and you received all the due diligence materials in December, would you still have chosen to make an offer? A. It happens, but I like the Property, I would make an offer. Q. There was no reason why you wouldn't want to make an offer if you were presented with the information earlier? A. Yeah, if I like the Property, I would make an offer, yeah. . . I don't think the, you know, December, January, make a difference to me.").

[89] Exhibit 38, December 27 Email from W. Heller to M. Sklar.

144.     In any event, in the words of *Doll*, Mr. Heller is an "expert in his business" and we "must presume" that Mr. Heller "could have accomplished" what Mr. Sklar did or that he "could have persuaded" Mr. Westfried to have Mr. Zhuo tour the Property in November or December. At any rate, Mr. Heller was "entitled to the opportunity to try."

## CONCLUSION

145.     As will be demonstrated at the hearing, NFMC breached the Agreement by failing to refer the inquiries of Mr. Westfried in November and December of 2023.  As a result, Branton is entitled to payment of its $950,000 Commission, reimbursement of its expenses, and legal fees incurred in enforcing its rights under the Agreement throughout this proceeding.

Dated: December 17, 2024
      New York, NY

AMINI LLC

/s/ Jordan Reisch
Bijan Amini
Jordan Reisch
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
jreisch@aminillc.com
- and -
Joshua Stein
Joshua Stein PLLC
110 West 57th Street
Fourth Floor
New York, NY 10019
(212) 688-3300
joshua@joshuastein.com

*Counsel to Branton Realty Services LLC*