UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: | Case No. 21-10529 (DSJ) |
|---|---|
| NINETY-FIVE MADISON COMPANY, L.P., | Chapter 11 |
| Debtor. | |

# DECLARATION OF WARREN M. HELLER

I, Warren M. Heller, hereby declare:

1. I am the owner and founder of Branton Realty Services LLC ("Branton"). As I am a solo practitioner, I acted on Branton's behalf in connection with all activities of Branton described in its fee application (Docket No. 362) and Pre-Hearing Memorandum (Docket No. 390).

2. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, certain discovery materials, or my opinion based upon my experience and knowledge of the real estate industry. If called upon to testify, I would testify competently to the matters set forth in this Declaration.

Professional Background

3. I founded Branton based on my more than 40 years of experience in the real estate and investment sales business in New York and other major national markets. Branton offers services specializing in the office, residential, specialty retail, and development sites sectors, in addition to provides services related to structured participating and/or convertible mortgages, equity joint ventures, sales of partial interests, and equity recapitalizations.

4. Prior to founding Branton, I was Vice Chairman and co-head of the Capital Markets Group of Savills in New York City, where I served for 18 years.

5. Over the course of my career, I have closed a significant number of notable real estate transactions in excess of $12 billion, including: Citigroup Center located at 54th Street and Lexington Avenue; The Madison Belvedere apartment building located at 10 East 29th Street; the Rhinelander Mansion leased to Ralph Lauren located at 72nd Street and Madison; and the Drake Hotel development site located at 432 Park Avenue.

6. I currently serve as a governor of The Real Estate Board of New York ("REBNY") and co-chair its Sales Brokers Committee.

Real Estate Brokerage Contracts

7. Real estate brokerage contracts in New York are generally structured in one of two ways. First, an "exclusive agency." Second, an "exclusive right to sell."

8. In an exclusive agency, the owner agrees to work only with the exclusive broker, but the owner reserves the right to sell the property themselves without paying a commission to the broker. In contrast, an exclusive right to sell entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations.

9. There is a reason why sellers often grant their brokers an exclusive right to sell, and it is a good one. Doing so allows their broker to dedicate the time and effort to become experts on the property, develop marketing strategies to maximize its pricing, and fully utilize all available resources, with the assurance that they will be rewarded if the property is sold within the time frame outlined in the agreement.

10. A seller's broker such as I—who is committing to undertake substantial efforts over a period of many months to market the property—almost always operates under an exclusive right to sell agreement.

11. In fact, I don't recall having ever entered into an agreement to market a property under an exclusive agency arrangement in my more than four decades in the industry.

12. Structuring a brokerage agreement as an exclusive right to sell protects the broker from having to compete with the owner and other brokers and enables the broker to give the owner unconflicted advice. For example, once a broker undertakes the time and effort to start marketing a property, word travels in the marketplace. Prospects often reach out directly to the owner to try to bypass the broker. Those prospects know that if they can help the owner avoid paying a brokerage commission, that's an easy way to make their offer more competitive.

13. For this reason, exclusive right to sell agreements often include provisions which require a seller to "refer" any "inquiry" it receives about the property to the broker, and typically require that all "negotiations" be conducted through the broker.

14. An "inquiry" includes contact by any person who "inquires" whether the property is available to be purchased or indicates that they or someone they know is or might be interested in potentially purchasing or attending a tour of the property.

<u>The Agreement</u>

15. In August 2022, Branton was retained as the Real Estate Broker and Sales Agent for Ninety-Five Madison Company L.P. ("NFMC") in connection with the sale of the building located at 95 Madison Avenue, New York, NY ("Property"). The Court approved (<u>BX-2</u>; <u>BX-23</u>) Branton's Listing Agreement (<u>BX-1</u>, "Agreement").[1] The Agreement states that NFMC appoints Branton as NFMC's "exclusive agent and as an advisor, with the exclusive right to market the [P]roperty for a sale" from August 17, 2022 through December 31, 2023 (the "Term") (<u>BX-1</u> §§ 1, 2). It states that NFMC "**shall refer . . . all inquiries**" to Branton and that all "**negotiations**

---
[1] "BX" refers to Branton's trial exhibits.

**shall be conducted by or through Branton** (subject to direction and input from Owner)." (BX-1 § 3) (emphasis added).

16. The Agreement further provides that "Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A" upon (i) "the closing of **any Transaction** during the Term;" or (ii) "if within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party" on Branton's List of protected prospects, which consists of the "names of parties who physically toured the Property during the Term with respect to the Transaction." (BX-1 § 3) (emphasis added).

17. The "fee" described in Exhibit A is "$300,000.00 plus one (1%) percent of the gross sales price."[2] (BX-1 at BR002103).

18. The first paragraph of Exhibit A again provides: "Branton shall earn, and Owner shall pay Branton" the Commission "upon the closing of **any Transaction**." And the fourth paragraph of Exhibit A reiterates: "The intention of the foregoing is that Branton will be paid for **any Transaction** on the basis set forth in the first paragraph of this Exhibit A." The third paragraph of Exhibit A, which defines the term "Transaction," states that a Transaction includes "a conventional sale of the fee simple interest in the property." (*Id.*)

19. The words of the Agreement mean what they say.

20. Branton was entitled to the Commission upon "the closing of **any Transaction** during the Term." (BX-1 § 3)

21. NFMC could not "independently negotiate" a sale or effectuate such a sale during the Term without paying Branton the Commission.

---

[2] Based on NFMC's sale of the Property for $65 million, 1% of the gross sales price is $650,000, which brings the total commission to $950,000 (the "Commission").

22. Thus, the Agreement granted Branton the exclusive right to sell the Property.

Branton's Engagement

23. Prior to Branton's retention, NFMC and its principals Michael Sklar, Sharan Sklar, and Rita Sklar had solicited interest in the Property.

24. Rita Sklar and other principals of NFMC had dealt with other brokers on a nonexclusive basis.

25. As a result, they unknowingly created potential brokerage claims by: (i) giving those brokers Property information; and (ii) accepting introductions to, and receiving offers from, potential purchasers.

26. For example, NFMC had previously hired Cushman & Wakefield ("C&W"), on an exclusive basis, to raise financing for NFMC to renovate the Property. The marketing memorandum C&W prepared for NFMC included a long list of C&W brokers working on the transaction. To NFMC's surprise, I advised them that some of those brokers were sales brokers—not finance brokers—who had already contacted numerous prospective purchasers, as NFMC's purportedly exclusive agent, about the sale of the Property.

27. Part of my initial role was to bring order to what had previously been a very disorganized sales process, to clear up the brokerage mess[3] that NFMC had created in the marketplace, and to avoid future brokerage suits.

28. To do so, it was critical to have all aspects of the sales process, including all negotiations with prospective purchasers, overseen by a single point person.

29. This was explained to, discussed with, and agreed to by NFMC.

30. Ultimately, NFMC designated me to be that point person.

---

[3] (*See e.g.* BX-6).

31. Throughout the Term, Michael Sklar, Sharan Sklar, and Andrew Glenn (NFMC's counsel in this proceeding) referred all (or nearly all) of the inquiries they received to me. They did so by sending me, at or around the time of the inquiry, an email with the name and contact information of the inquirer, copying me on an email response to an inquirer, or calling me to provide the name and contact information of the inquirer.

32. For example:

   a. On August 18, 2022, Andrew Glenn, NFMC's legal counsel in this proceeding, referred an inquiry by a prospective purchaser who owned other buildings near the Property. (BX-6; BX-7).

   b. On August 31, 2022, Michael Sklar referred an inquiry by a broker named Micah Zimmerman who said he was "in touch with a potential buyer." (BX-8).

   c. On September 14, 2022, Sharan Sklar referred an inquiry by a broker named Harry Hochman who expressed interest in the Property on behalf of a specified prospective purchaser. (BX-10).

   d. On September 15, 2022, Michael Sklar referred an inquiry by someone named Michael Kazmerski, who expressed interest in the Property. (BX-11).

   e. On October 24, 2022, Michael Sklar referred an inquiry by a broker named Harley Dalton of Eastdill. (BX-13; BX-14).

   f. On November 15, 2022, Sharan Sklar referred an inquiry by someone named Zach Herring, who "called to learn more about the property." (BX-15).

   g. On November 15, 2022, Michael Sklar referred an inquiry by a broker named Andrew Kahn, who wanted to show the Property to an unidentified "client who [was] coming in from Italy." (BX-16).

h. On December 19, 2022, Sharan Sklar referred an inquiry by someone named Aaron Lunzer, who expressed interest in the Property on behalf of a prospective purchaser. (BX-17).

i. On May 5, 2023, Sharan Sklar referred an inquiry by a broker named Franco Rinaldi who "said he knew someone who was interested" in the Property. (BX-21).

j. On June 27, 2023, Sharan Sklar referred an inquiry by a broker named Noah Kossoff, who reached out on behalf of an unidentified prospective purchaser. (BX-25).

k. On September 6, 2023, Michael Sklar referred a broker named Albert Sultan who expressed interest in 95 Madison on behalf of a prospective purchaser. (BX-26).

33. As these referrals reflect, a broker does not need to specify the identity of their prospect in order for their communication to constitute an inquiry. In fact, it is the exception not the norm, that brokers identify their prospects before a confidentiality agreement is signed.

34. Rita Sklar, on the other hand, did not refer inquiries to Branton (at least not initially). During the early stages of my engagement, Rita Sklar received numerous inquiries from prospective purchasers (because her name appeared in the public records as owner of the Property) and did not refer those inquiries to me. This was problematic for NFMC because it created confusion in the marketplace as to who was running the sales process. (*See e.g.* BX-91 at 3). Michael Sklar, Sharan Sklar, and NFMC's counsel were aware of the problem. Eventually, because Rita Sklar was, in the words of Michael Sklar, "acting independently of [NFMC's] corporate governance" and its "agreement to work through Woody", Michael and Sharan Sklar requested that I "not provide or otherwise disseminate information" to their mother Rita Sklar that would "undermine [my] work if disclosed to the market." (BX-12; BX-20). After many months

7

of back and forth between myself, the Sklars, NFMC's counsel, and Rita Sklar's counsel, it was communicated to Rita Sklar that she and NFMC had an obligation to refer all inquiries to me.

35. All of which is simply to say that the referral obligation was not some ancillary contractual term buried in Branton's Agreement. It was the subject of much discussion and acrimony. The Sklars, NFMC, and their counsel, all understood NFMC's referral obligations.

The Sale Process

36. One of the reasons the Sklars chose to retain me is because they wanted to obtain "price discovery." Prior to my retention, I advised NFMC that (at least) one of the offers that had been made was an excellent offer from a credible buyer, and that they should take it rather than hiring me to take the property to market. NFMC was insistent that they that they preferred to go to market to confirm what pricing was actually available, reinforcing the fact that they wanted me to give them all the market feedback which established the basis upon which they ultimately decided to sell the Property.

37. After I was engaged, I worked with the Sklars and their counsel to collect the necessary property information and prepare my marketing materials. This took several months as NFMC had never done a capital transaction, and none of the needed information was in order. During that time, I prepared 27 property folders on my due diligence site and personally prepared a 72-page Offering Memorandum, highlighting the most compelling aspects of the Property for prospective buyers. (BX-3).

38. During the initial marketing process, which took place from November 2022 to March 2023, I sent an introductory email to approximately 400 prospects and spoke to all interested prospects. This produced 22 first-round bids in March 2023. From those bids, I developed a highly detailed spreadsheet analyzing and comparing the various components of each bid. This

gave NFMC a thorough and detailed understanding of how the marketplace viewed the Property. It also allowed NFMC to compare the pricing levels offered by those looking to: (a) renovate the Property and keep it as an office building; (b) convert it to a rental apartment building; or (c) convert it to a residential condominium. (BX-4 at BR000037-48). Not surprisingly, the highest bids came from condo converters, including two for $70+ million. (BX-4 at BR000005).

39. After the receipt of first-round bids, NFMC took a substantial amount of time of time to select tax counsel and to evaluate tax strategies. Given NFMC very low basis in the property, there was also some debate among the Sklars about the most advantageous structure for a transaction. (*See e.g.* BX-91 at 2-3).

40. After NFMC's lengthy tax analysis, it became apparent that an outright sale would generate the highest net proceeds result based on the price levels being discussed with condo converters.

41. Then, in August 2023, NFMC instructed me to initiate a second-round bid process among the most competitive condo converter bidders. Unfortunately, few of them submitted bids, which meant I had to start over to find new bidders and attempt to resuscitate the interest of prior ones who had lost interest, developed deal fatigue, and/or lost faith in NFMC's ability to make a decision and conclude a transaction.

42. Despite all the internal chaos and delays, I successfully procured approximately 25 more bids from bidders old and new, during this post-Labor Day 2023 period.

43. All told, over the course of the Term, I spoke to hundreds of people who were interested in the Property and conducted approximately 140 Property tours to 110 groups (three times more tours than any property I had handled in the past, including the Chrysler building). In

addition, I sent NFMC a total of 18 formal status reports, often with enormous detail, explaining my negotiations with the various bidders. (BX-4).

Shel Capital

44. Branton's original fee application, which was filed prior to the discovery process in this matter, states that "[a]ccording to Branton's email records, the Debtor did not refer to Branton any inquiries or conversations with Two Bins relating to the Property or its sale."

45. Now, with the benefit of discovery, I wish to clarify this statement.

46. Early on in my engagement, in August 2022, I received a call from Rony Kravel, a Principal of Shel Capital, who expressed interest in the Property and indicated that he had toured the Property several months earlier, with his broker "Emanuel," who told Mr. Kravel to call me directly. (DX0005).[4] At the time, I indicated to Michael and Sharan Sklar that this "Emanuel" was a mortgage broker who may have conducted a Property tour without their knowledge. (*Id.*).

47. Several weeks later, in September 2022, Michael Sklar and Sharan Sklar sent me a set of materials to get started. (BX-9). This included an excel spreadsheet containing the information for eight prospective purchasers from whom NFMC had received offers prior to my retention. Having been shown this spreadsheet in connection with this proceeding, I can see that it includes, among other things, the names of the prospective purchasers, their contact information, their address, their broker, their broker's contact information, their broker's address, and the details of the offers they made. One of the eight prospective purchasers listed was Shel Capital, and its principal Rony Kravel, with whom I had already communicated. The broker that was listed for Shel Capital was Emanuel Westfried of Two Bins Capital.

---

[4] "DX" refers to Debtor NFMC's trial exhibits.

48. After receiving the spreadsheet, I subsequently communicated with each of the eight prospective purchasers and/or their brokers to determine whether the identified purchasers were still potentially interested and on what terms.

49. As to Shel Capital, I had numerous discussions directly with its principal, Mr. Kravel, and gave them a Property tour in January 2023. I did not, and never had reason to, speak with Shel's broker.

50. Months later, on June 26, 2023, in connection with the second-round bid process (described above), it appears that Michael Sklar suggested that I reach out to certain individuals who had previously expressed interest, including "Emanuel," "if they have a bidder in range." (DX0022). I explained to Mr. Sklar that I believed "Emanuel's" bidder [Shel Capital] was not "in range," but was instead one of the lowest bidders. (*Id.*). The following day, it appears that Mr. Sklar asked me to touch base with "Emanuel." (BX-24 at 3). As I had never communicated with "Emanuel" in the course of my numerous discussions with Rony Kravel of Shel Capital, I asked Michael Sklar to provide "Emanuel's" contact information. Mr. Sklar did not respond. (BX-24 at 4). I did, however, subsequently reach out to my contact at Shel Capital, Mr. Kravel, in connection with the second round bid process, and was informed that Shel was not, in fact, interested at a price level of relevance, relative to the interest level of others bidders, as I had informed Mr. Sklar. (DX0022).

51. I find the argument quite confusing that the September 2022 or June 2023 emails somehow absolve Michael Sklar from referring separate inquiries by Emanuel Westfried in November and December 2023—during which I understand the Sklars had many calls with Emanuel Westfried totaling more than two hours and communicated by text message frequently, including to arrange Property tours for two new prospects.

52. If a broker contacts an owner and makes an inquiry on behalf of Prospect A and then a year later the same broker contacts the owner to make an inquiry on behalf of Prospect B—those are separate inquiries that must each be referred.

53. Moreover, an owner who wanted to sell their property, and had retained an exclusive broker to do exactly that, would refer both inquiries to their exclusive broker, not conceal the second inquiry the broker made on behalf of Prospect B so as to circumvent the exclusive broker.

November and December 2023

54. I was in regular contact with Michael Sklar and Sharan Sklar in November and December 2023.

55. I spoke to Michael Sklar, by phone, on November 7, November 12, November 14, December 11, December 18, December 19, December 26, and December 27, for a total of almost two and a half hours. (BX-28; BX-29; BX-30; BX-35; BX-40; BX-42; BX-46). I also exchanged countless emails with the Sklars and their counsel in November and December 2023.

56. At no point in my communications with the Sklars did they refer to me any of the inquiries made by Emanuel Westfried in November and December of 2023.

57. For the avoidance of doubt, the Sklars did not inform me of any of their calls with Emanuel Westfried totaling more than two hours in November and December of 2023.

58. Michael Sklar did not inform me of his call with Emanuel Westfried on November 7, 2023, either when we spoke—one hour later—or otherwise. (BX-28).

59. Michael and Sharan Sklar did not inform me of their zoom call with Emanuel Westfried on November 28, 2023. (BX-32; BX-33).

60. Michael Sklar did not inform me of his call with Emanuel Westfried on November 30, 2023. (BX-35).

61. Michael Sklar did not refer to me the inquiry Emanuel Westfried made in November 2023 when he told Michael Sklar that he had "ideas" about people who may be interested in purchasing the Property.

62. Michael Sklar did not refer to me the inquiry Emanuel Westfried made in November 2023 when he told Michael Sklar that he had "three people" who he could get to purchase the Property.

63. Michael Sklar did not inform me of his call with Emanuel Westfried on December 5, 2023. (BX-35).

64. Michael Sklar did not inform me of his call with Emanuel Westfried on December 8, 2023. (BX-35).

65. Michael Sklar did not refer to me the inquiry by Emanuel Westfried on December 8, 2023 requesting a Property tour on behalf of a prospect Mr. Westfried met at a restaurant who was only in town for a few days. (BX-36).

66. Michael Sklar did not inform me that he agreed to give Mr. Westfried and said prospect a tour on Sunday December 10, 2023, a weekend, when the building staff would not be present. (BX-36).

67. Michael Sklar also did not inform me of his agreement with Emanuel Westfried, on December 11, 2023, for said prospect to tour the Property in January. (BX-36).

68. Michael Sklar did not inform me of his call with Emanuel Westfried on December 11, 2023, either when we spoke—one minute prior to his call to Mr. Westfried—or otherwise. (BX-35).

13

69. Sharan Sklar did not inform me of her calls with Emanuel Westfried on December 13, 2023. (BX-39).

70. Michael Sklar did not inform me of his call with Emanuel Westfried on December 20, 2023 either when we spoke—for nearly an hour—the following week, or otherwise. (BX-42; BX-46).

71. Michael Sklar and Sharan Sklar did not refer to me the inquiry by Emanuel Westfried on December 27, 2023 requesting a tour of the Property for the ultimate purchaser on January 2, 2024. (BX-51).

72. Michael Sklar did not inform me of his call with Emanuel Westfried on December 29, 2023 to coordinate that Property tour. (BX-54).

73. In the final days of December 2023, I was physically present in New York City and actively working to sell the Property. This included extensive contact with the Sklars, CNY, CNY's broker, and other potential prospects. (*See e.g.* BX-47; BX-48; BX-49; BX-50; BX-52; BX-53). On December 26 and 27, 2023, Michael Sklar and I had two phone calls totaling nearly an hour as well as a zoom call. (BX-46; BX-47). On December 27, I emailed Michael Sklar asking for the building to be opened the following day, December 28 at 2 PM, so I could give tours to two prospective purchasers. (BX-52). I had to arrange those tours through Michael Sklar, rather than through the building superintendent directly, as was usually the case, because they required the building superintendent to make a dedicated trip to unlock the building during the holidays at an additional cost.

74. Put differently, Michael Sklar was aware that I was physically present in New York, actively working to sell the property, and giving Property tours the final week of December 2023. (BX-52).

75. But rather than refer the inquiries by Emanuel Westfried—including the inquiry on December 27, 2023 requesting a tour for the ultimate purchaser (BX-51)—Michael Sklar and Sharan Sklar instead chose to conceal from me the existence of, and the interest by, Emanuel Westfried and his buyer.

CNY and Sunlight

76. While Michael and Sharan Sklar were speaking with another broker behind my back in November and December 2023, I was dutifully working to sell the Property on NFMC's behalf.

77. In December 2023, I had extensive negotiations with CNY who was prepared to pay $60 million, post a 10% non-refundable deposit, and sign an unconditional contract. However, CNY wanted NFMC to secure vacant possession of one space encumbered by a lease that extended until 2030. The tenant had expressed interest in moving out, but no agreement had yet been reached. NFMC claimed that it was not comfortable signing a letter of intent or entering into a contract with CNY until it reached an oral agreement with the tenant. As a result, CNY could not enter into an agreement to purchase the Property before December 31, 2023.

78. On January 2, 2024, when Mr. Sklar called me (BX-61), approximately three hours after the Property tour taken by Emanuel Westfried and Lin Zhuo, Mr. Sklar continued to conceal the existence of, and the interest by, Emanuel Westfried and his buyer.

79. On January 4, 2024, I sent NFMC and its counsel the List of parties who toured the Property during the Term. (BX-62; BX-63). Sunlight Development, Madison 29, and Lin Zhuo were not on the List.

80. On January 9, 2024—after weeks of negotiation between NFMC, CNY, their respective counsel, CNY's broker, and myself—NFMC finally signed a Letter of Intent with CNY

15

(BX-66, "CNY LOI").[5] The CNY LOI contained exclusivity and confidentiality provisions that restricted NFMC from discussing the sale of the Property with any third party from January 9 through 19. (*Id*. at §§ 6, 10). The exclusivity period was subsequently extended from January 23 through 31. (BX-74).

81. Michael Sklar did not disclose to me that he was discussing the sale of the Property with Emanuel Westfried during the exclusivity period.

82. Eventually, NFMC's counsel stopped engaging with CNY, which made it impossible for CNY to advance its offer.

83. On February 24, NFMC's counsel in this proceeding contacted me and told me that (A) a nonbinding contract had been signed with another buyer, and (B) I should tell CNY that they were welcome to make a more attractive offer.

84. Shortly thereafter, NFMC sought court approval of the sale to Madison 29 for $62.8 million. (BX-82).

85. Even after they did so, I continued to work with CNY to obtain a higher and better offer.

86. Before the hearing on the motion to approve the sale to Madison 29 (BX-85), CNY submitted a higher offer of $65 million.

87. I understand that NFMC then agreed to proceed with the sale to Madsion 29, if Madison 29 matched CNY's offer of $65 million, which Madison 29 did, and the sale was then approved. (BX-84; BX-85; BX-87; BX-88).

---

[5] The CNY LOI was between NFMC and Madison 95 Associates LLC, a single purpose entity whose members included principals of CNY and Aries Capital Corp.

88. In other words, instead of choosing to sell the Property to CNY for $65 million, which would have resulted in NFMC's obligation to pay Branton's Commission, NFMC instead chose to sell the Property to Madison 29, for $65 million, which would not.

89. Nevertheless, NFMC received an additional $2.2 million from my continued efforts to sell the Property.

Conclusion

90. From my perspective, this case is a perfect illustration of why the referral clause exists in exclusive right to sell listing agreements. The referral clause is to prevent precisely what occurred in this case. Otherwise, brokers with the exclusive right to sell would always be in competition with their owners, and owners would be incentivized to keep prospective buyers (and their brokers) on the sidelines to top offers we procure, to avoid paying our fee. It is not possible for sales brokers who operate in my capacity to work under these circumstances, particularly when we dedicate 16 months of service (and more) and go to great lengths on behalf of our clients. No broker could devote that amount of time and effort and undertake the process that I did for NFMC, unless they knew they'd be paid once a transaction was ultimately concluded.

91. I understand that NFMC now raises various technical arguments to suggest that they didn't violate my agreement and therefore don't owe me a fee for my services. For better or worse, I make a practice of representing first-time and one-time sellers who aren't in a position to defend themselves against unscrupulous brokers, not knowing how or when they are being taken advantage of, and I hope they will treat me the same way, rather than look for ways to circumvent my agreement and avoid compensating me. This is particularly true when I take great care to help and protect them, while delivering an excellent result in a very challenging market.

92. The reality of what happened is clear. I ask the court to consider this reality when determining whether it constitutes a violation of my agreement, and respectfully request that the Court award Branton its Commission, reimbursement of its expenses,[6] and legal fees incurred in enforcing its rights under the Agreement throughout this proceeding.[7]

93. I deeply appreciate the time and attention Your Honor has already afforded this matter and I thank you for your consideration.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, NY this 15 day of January, 2025.

/s/ Warren M. Heller
Warren M. Heller

---

[6] Branton has incurred expenses including Marketing Costs, legal fees in negotiating NFMC's engagement of its tax advisor, and costs for website hosting of the due diligence materials and offering memorandum, in the aggregate amount of $6,600, which have not previously been reimbursed. (BX-89).

[7] Branton has also incurred significant legal fees in connection with in enforcing its rights under the Agreement throughout this proceeding, documentation for which can be submitted at the appropriate juncture.