UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re | Chapter 11 |
| **NINETY-FIVE MADISON COMPANY, L.P.,** | Case No. 21-10529 (DSJ) |
| Debtor. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### DECLARATION OF JEFFREY A. BARR COUNSEL TO THE ESTATE OF LOIS WEINSTEIN IN OPPOSITION TO THE MOTION OF NINETY--FIVE MADISON COMPANY'S MOTION TO ENJOIN THE NEW YORK SUPREME COURT ACTION IT ITSELF COMMENCED AGAINST ITS OWN EQUITY HOLDERS STYLED AS A MOTION TO ENFORCE THE PLAN INJUNCTION AND CONFIRMATION ORDER

JEFFREY A. BARR, hereby certifies under the penalties of perjury of the United States as follows:

1.      I am counsel to Carol E. Keller and Gail Shields, executors of the Estate of Lois Weinstein (the "Weinstein Estate").   Weinstein Estate is an equity holder in the Debtor possessing an 18.36 percent interest in reorganized debtor Ninety-Five Madison Company, LP ("NFMC"), and until June 5, 2024 18.36% of the fee estate to the building and land, located at 89-95 Madison Avenue, New York, NY  10016 (the "Building"); I am fully familiar with the matters asserted herein and I make this declaration in opposition to NFMC 's motion to stay the proceedings in state court in an action NFMC itself commenced.  The action is entitled <u>Ninety Five Madison Company L.P. v. Kinder Realty Associate, RAS Property Management LLC, Rita A. Sklar and the Estate of Lois Weinstein, Index No. 653034/2024 </u>(the "State Court Action").   A true and correct copy of the Amended Complaint is annexed hereto as Exhibit A.

2. NFMC's motion in this court is a last ditch attempt to prevent it from losing the State Court Action after its default in serving and filing a reply to counterclaims and its failure to adduce any evidence to oppose a motion for summary judgment. NFMC brings this motion returnable two days before the New York Supreme Court is scheduled to hear five motions, one for summary judgment, one to dismiss, one for a default judgment, one for sanctions against it (for it and its counsel's constant attempts to delay and prolong the proceedings) and a cross-motion by NFMC to have the court accept its late filed reply to the counterclaims and possibly to consolidate the State Court Action with an earlier 2019 action commenced in 2019 against NFMC by Lois Weinstein prior to her death. These motions have been fully briefed and submitted.

3. NFMC here seeks to claim that a judgment against it in state court will interfere with the of the Plan of reorganization and that is violated an injunction in the Plan. For the following reasons it will be clear to the Court that the relief requested is unnecessary and improper.

4. Counsel has been very vague thus far in the statements to this Court about the purpose of the State Court Action. This is because the action was brought for an improper purpose. The actions were commenced in large part to secure control of 100% of the assets of NFMC in the hands of Michael and Sharan Sklar who hold at best 2% of the equity and to prevent the distribution of the net proceeds of the June 5, 2024 sale of the Building to the equity holders so they can continue to receive inflated salaries.

5. NFMC has asserted two causes of action in the State Court Action. The first is asserted against all named defendants an alleged "Kinder Loan" in the alleged amount of $7 Million. The second cause of action is asserted against RAS and Rita Sklar for $54,000,000 premised on her breach of fiduciary duty in keeping the Building vacant for many years. (Ironically, the fact that the Building was vacant actually facilitated its sale).

6.     Annexed hereto as Exbibit B is the Weinstein Estate's Answer and Counterclaims filed in response to the amended complaint.  The Answer in short asserts that the first cause of action is barred by the applicable statute of limitations and/or that the alleged loan was paid off in two installments in 2013 and 2015.  The Weinstein Estate has asserted three counterclaims demanding an accounting of the proceeds of the June 5, 2024 sale of the Building; a declaration that NFMC was dissolved the latest time on June 30, 2024 by virtue of a provision of the partnership agreement (Article 9) which provides that the partnership dissolves on the last day of the month in which the Building is sold; and an injunction, in effect, against Michael and Sharan Sklar from interfering with the distribution of the Estate's portion of the sale proceeds.  The injunction can be seen as seeking broader relief to prevent Michael and Sharan Sklar from interfering in the distribution in cash or in kind to all the equity holders.  By stipulation of the parties in the State Court Action, the Weinstein Estate has already received  $4,125,804.07 which was paid to the U.S. Treasury ($2,005,263.73) and to the New York State Department of Taxation ($2,120,540.34).

7.     Annexed hereto as Exhibit C is the late filed and rejected Reply filed by NFMC.  It asserts boilerplate almost nonsensical affirmative defenses.  Notably, it does not contain any of the objections that bankruptcy counsel here is now asserting here as to why the relief demanded in the counterclaims is barred.

8.     In order to fully comprehend what is before this Court in this case's long history, I offer a recitation of these and prior proceedings which led to the March 22, 2021 filing of this case.  For the Court's convenience, the arguments specific to why this motion should be denied are set forth starting on page 13.

## FACTUAL BACKGROUND

9.    This was a one asset bankruptcy case.  The sole asset was an office building located at 95 Madison Avenue, New York, NY (the "Building").  Prior to June, 1982 the Building was held in a partnership jointly owned by a trust established under the will of Hilda Weinstein for the benefit of Lois Weinstein (36%) and Rita Sklar, individually (64%).  Rita Sklar and Lois Weinstein were half-sisters and daughters of Hilda Weinstein.  Hilda Weinstein herself had inherited the Building from her father sometime in the 1940s.  Hilda operated the Building until her death in 1970.

10.    In June 1982, the ownership of the Building was changed to a Limited Partnership (as NFMC) and a Partnership Agreement was executed by Rita Sklar and Lawrence Weinstein, Lois Weinstein's uncle and her trustee.  (Both of Lois' parents died in rapid succession and she was left an orphan at age 16.)  A true and correct copy of the 1982 Limited Partnership agreement is annexed hereto as Exhibit D.

11.    When Lois was 30 in 1985, the trust's interest in NFMC was transferred to Lois and she became a limited partner.  As a limited partner, Lois had no participation in the management of the Building which was under the complete control of Rita Sklar, the sole general partner.

12.    Rita Sklar has two children Michael Sklar and Sharan Sklar.  Sharan has one child Hannah Rose Gettinger and Michael has two daughters Ruby and Sadie Sklar.

13.    In 2012, Rita Sklar decided as part of her estate planning to have 18% of Lois's share and 31% of her share in NFMC transferred to six trusts established for Michael and Sharan's children (the "Trusts").  Lois was never married and had no children of her own.  Rita specifically and intentionally did not transfer any portion of the partnership to her children Michael and Sharan but only to her grandchildren who were infants at the time.  Rita Sklar made herself, Lois, and an attorney the co-trustees of the Trust.

14.     The Building has been for many years, a grade "B" office building. The Building was recently designated as a landmark. It is also located in the "design district" also knows as "NoMad." Since 2012, the rate of vacancies in the Building has increased and by 2018 the Building was practically vacant with only a few rent paying tenants.

15.     At some point around 2017, Rita and a Swiss furniture concern Vitra USA, Inc. ("Vitra") began negotiations for a portion of the first and second floor for a furniture showroom. Ultimately a ten year lease was entered into which would provide approximately $1 Million annually in rent. It also set forth a list of responsibilities for the renovations to the space.

16.     From the beginning, there were issues between NFMC and Vitra which escalated into litigation. The litigation was settled on terms that provided for arbitration of disputes with the arbitrator being given broad powers to make decisions and to provide consent if needed for the submission of building permits and the like.

17.     The arbitration proceedings were fierce and contentious. In August 2019, the arbitrator, former N.Y. Supreme Court Justice Stephen G. Crane, issued three orders which precipitated  the instant Chapter 11 filing in 2021. First, the arbitrator awarded a $500,000 sanction against NFMC, second, it excused Vitra from its rental obligations *ab initio*, and finally it appointed a receiver over NFMC and RAS Realty Management LLC, the entity through which Rita Sklar operated as general partner, to take over  NFMC's obligations as they pertained to Vitra. These orders were confirmed by the N.Y. State Supreme Court.

**The Weinstein v. Sklar Actions**

18.     In 2012, Rita Sklar reached the conclusion that a vacant property in Ridgewood Queens (the "Putnam Properties"), which Lois and Rita had also inherited from their mother, should be sold because NFMC was in dire need of funds. The Putnam Properties were sold in March 2012. The

proceeds of that sale were held by a 1031 exchange company for over a year. In April 2013, the 1031 Exchange company was instructed to transfer the entire proceeds to Kinder Realty, a purported partnership set up to receive income from the various inherited properties.

19. On April 10, 2013, Rita Sklar wrote a check on the Kinder account to NFMC for $3,523,242. This check was marked "repayment of loan from Ninety Five Madison Company to Kinder Realty Associates as of 12/31/12." On November 11, 2015, Rita Sklar wrote another check on the Kinder account to for $ 2,326,221.22 marked "interest payment on Kinder loan."

20. In November, 2014, Lois wrote to Rita and demanded an accounting of the Putnam Properties sale proceeds.

21. In 2015, Lois commenced an action against Rita for return of her half of the Putnam Properties sale proceeds.

22. In 2019, Lois commenced two additional actions, one against NFMC, Kinder Realty, RAS and Rita Sklar, setting forth additional causes of action. NFMC never answered this complaint although it was served on June 27, 2019 five months before her death. (This is the action which NFMC now seeks to consolidate with the State Court Action.) Lois also commenced a separate petition in June 2019, to dissolve NFMC.

23. Because, at Lois's death from lung cancer in November 2019, Lois lost her status as a limited partner, the Court, per Hon. Andrew Borrok, ruled that the Estate could not continue the dissolution proceeding derivatively unless it was re-admitted as a limited partner.

24. Later that year, when arbitrator Crane appointed a receiver over NFMC and RAS, the Estate returned to court and sought a judicial declaration whether NFMC had been dissolved pursuant to section 121-401 (e) (ii) of the NY Revised Limited Partnership Act, which provides that if a receivership is imposed over the general partner and such receivership is not vacated within 120

days, the general partner as a matter of law ceases to be a general partner. RAS had not vacate the receivership within the prescribed 120 days. Under the partnership agreement (1982) version and NYRLPA §121-801(d) , if a new general partner was not selected by the limited partners within 90 days of the last general partner ceasing to be a general partner, then the entire partnership was dissolved. Justice Borrok judicially declared that the Partnership dissolved at either of two dates, October 24, 2019 or November 25, 2019 based on two distinct occurrences which spelled out dissolution.

25. NFMC appealed the Order and enforcement was stayed pending the appeal. It was not possible for the Appellate Division stay to have resurrected and negated the declaration of Justice Borrok. That could only have occurred after a successful appeal. All that the stay could possibly have done was to stay enforcement, i.e. the liquidation process set forth in the partnership agreement (Article 9) and under the NYRLPA. NFMC commenced this Chapter 11 case one day before the respondent's appeal brief was to be filed. The automatic stay stayed proceedings after March 22, 2021. Notwithstanding the lifting of the automatic stay on confirmation of the plan herein, no further actions have occurred in the appeal of the October 23, 2020 Order and Decision. The judicial dissolution of NFMC remains as a reported precedent. The declaration of dissolution has never been reversed. A true and correct copy of the October 23, 2020 Order and Decision is annexed hereto as Exhibit E. (NFMC argues that subsequent events negated this judicial declaration).

**The Bankruptcy case.**

26. On March 22, 2021, NFMC filed this Chapter 11 case. On April 6, 2021, Vitra made a motion to dismiss this case or to convert it to a Chapter 7 case, or alternatively to have a Chapter 11 trustee appointed to manage Debtor. The gravamen of the motion was that Rita Sklar was impossible to deal with as its landlord. (see Docket Nos. 15-17)

27.     To oppose Vitra's motion, Debtor's counsel at the time, Charles E. Simpson of Windels Marx Lane and Mittendorf, LLP conceived of a plan to admit Rita Sklar's two children Michael and Sharan Sklar as general partners, so that it would appear to the creditors, particularly to Vitra, that Rita Sklar was no longer solely in control of Debtor.  Under this scheme, Michael and Sharan, or holding companies established to hold their interests, were to receive from Rita Sklar a 1% share each in NFMC.

28.     Because NFMC was already dissolved, it is unlikely that the stay imposed in the Appellate Division could have encompassed permitting NFMC to allow the admission of new partners and purported new general partners.  Nevertheless, in this proceeding, thus far, the October 23, 2020 Order and Decision has been disregarded.

29.     In June 2021, with the participation of Charles E. Simpson and counsel for Michael and Sharan, a purported Amended and Restated Limited Partnership Agreement was executed by Rita, Michael and Sharan Sklar.  Significantly, this agreement listed the Estate of Lois Weinstein as a "limited partner" in several places, thus theoretically re-instating purportedly its status as a limited partner.  A true and correct copy of the June  2021 purported "Amended and Restated Partnership Agreement"  is annexed hereto as Exhibit F.  This Court has for the purposes of this case accepted this document as the extant functioning partnership agreement.

30.     The June 2021 Amended and Restated  Partnership Agreement required that decisions on day-to-day matters be unanimous.  Vitra however, was still not convinced that Rita Sklar was safely out of the way and it continued its motion to convert the case to a Chapter 7 or have a Chapter 11 trustee appointed.

31.     In June 2022, a "First Amendment" was created eliminating the requirement of unanimity and making decision making by majority vote only. A true and correct copy of the purported June 21,

2022 amendment is annexed hereto as Exhibit G.   It was at this point that Michael and Sharan Sklar seized the moment and took control over Debtor with new counsel Glenn Agre Bergman & Fuentes LLP who they brought in to stand at their side.

32.     Since assuming control in June 2021, the vacancy rate or the Building remained the same or worse. Indeed, Sharan, a public relations professional, had never been involved in the affairs of NFMC and Michael had not in well over 25 years prior to June 2021 when they were recruited by Charles E. Simpson to present the appearance that Rita Sklar was no longer in sole control.

### The Alleged "Kinder Loan".

33.     Over the span of thirty years, Rita Sklar may have taken distributions from NFMC dressed up as "advances" or "loans".  These distributions were in the form of  checks written to "Kinder Realty Associates." While these checks were marked "loan", it appears that there never was any intention to repay them and there was no other documentation such as a loan instrument or note, a revolving credit agreement or anything of that nature.  Apparently, the distributions were entered in the books of NFMC as a loan and may have appeared on tax returns.

### The Aggrieved Beneficiaries

34.     As stated earlier, in November 2019, Lois Weinstein died.  She left a will that made several specific bequests to her best friends, two of whom she named as her co-executors. She left her residuary estate to Michael and Sharan Sklar.

35.     Apparently, Michael and Sharan have felt aggrieved that they have been excluded from control over NFMC and over their aunt's estate.  In March 2020, they commenced a petition in the Surrogate's Court  to have themselves granted limited letters with respect to their aunt's estate and joined their mother's will contest and petition to have the executors their aunt had specifically chosen removed.  Ironically, the main bases for the petitions were the false claims that the executors were

seeking to sell the Building, which they were not.

36.     The Surrogate's Court, in a decision dated,  December 31, 2020, dismissed the petitions, ruling that they were based on false statements.  A true and correct copy of Surrogate Rita Mella's Order and Decision is annexed hereto as Exhibit H.

37.     Upon information and belief, at some time in 2020 or 2021, Michael and Sharan received advice from their estate counsel (yet another lawyer) that were they to get NFMC to collect on the "Kinder Loan," which they asserted was then approximately $ 6 Million, they could bankrupt their aunt's estate and thereby pay no estate taxes and possibly even bring about the accretion of the specific legacies their aunt had left to her four best friends who had stood by her and helped her for decades.

38.     On January 13, 2022, Michael and Sharan Sklar persuaded Debtor's successor counsel (Glenn Agre) to commence an adversary proceeding in this Court to collect the "Kinder Loan" solely from the Estate of Lois of Weinstein and Kinder Realty Associates, but curiously not from Rita Sklar.  See Ninety-Five Madison Company v. Kinder Realty Associates and Carol E. Keller and Gail Shields as preliminary executors of the Estate of Lois Weinstein, 22-AP 1001 (S L).  The proceeding was brought as a turn over proceeding under 11 U.S.C. § 541. (Docket No. 142).

39.     On February 13, 2022 the Defendant Weinstein Estate moved to dismiss the complaint. Defendant raised several grounds including statute of limitations, and that the proceeding did not fit the statutory requirements of a turn over proceeding and finally that the abstention doctrine would prevent the bankruptcy court from exercising jurisdiction.   (See Docket 147).

40.     U.S. Bankruptcy Judge Sean H. Lane granted the motion to dismiss on the record on August 18, 2022.  See Docket No. 15  in 22- AP- 1001 (shl). Due to a change in judges, the Honorable David S. Jones, issued the actual dismissal order.  Judge Lane cautioned debtor's counsel

that he had serious reservations about the validity of the claims, and advised them if they were going to bring the action again it should not be in the bankruptcy court but should be asserted in the state court where related litigations had already been going forward for several years. Debtor never commenced such an action in state court until June 12, 2024.

41. This Court confirmed a plan of reorganization in an Order dated December 21, 2023. (Docket No. 300).

42. Debtor applied March 1, 2024 for an order to sell the Building. (Docket Nos. 325,326).

43. On June 5, 2024, NFMC sold the Building for $65,000,000, of which the Court is very much aware in light of the litigation with Branton Realty Services, which has asserted an administration claim for payment of its commission pending before the Court. (Docket No. 362)

44. Article 9 of the 1982 partnership agreement and Article 9.01(c) the June 2021 purported amended and restated limited partnership provide for the dissolution of NFMC in the event of the sale of the Building. The 2021 version provides that the dissolution is effective as of the last day of the month in which the sale occurs. (See Exhibits D and F).

45. Thus under NFMC's own governing documents, the partnership was dissolved post-confirmation and post-effective date, on June 30, 2024 as a matter of law.

**The State Court Action.**

46. Anticipating that on dissolution they would be required to relinquish control over NFMC and seeking to prevent any distribution to their mother and the Weinstein Estate, NFMC, now entirely under the control of Michael and Sharan Sklar, commenced the State Court Action seeking $7 million on the "Kinder Loan" and $54,000,000 against Rita Sklar and RAS Property Management for breach of fiduciary duty. See Exhibit A.

47.     While the summons and initial complaint were filed on June 12, 2024, the Estate of Weinstein was never served and Rita Sklar was only served in September 2024.

48.     In the meantime, since the date of the Building sale, Rita, Michael and Sharan Sklar planned several 1031 Exchanges and identified a number of properties to shelter the capital gains. By December 2, 2024, NFMC had closed on four of these identified properties (with the assistance and encouragement of the Estate of Weinstein when it appeared that the parties were at an impasse.) After the 1031 Exchanges, there remained with the 1031 Exchange intermediary approximately $22,000,000 available to pay taxes for the unsheltered portion of the sale proceeds and to pay the Estate Taxes of the Estate of Weinstein with the remainder to be held for the legitimate expenses of this Chapter 11 case and then distribution to the equity holders.

49.     Due to dissention between Michael, Sharan and Rita Sklar and the Weinstein Estate, it was necessary for the Estate to move to seek temporary injunctive relief. The T.R.O. obtained on December 4, 2024 which counsel attaches to their papers, expressly provides that only 1031 exchange purchases are allowed without the further order of the court. Since entry of T.R.O., upon the stipulation of all parties, the T.R.O. has been modified twice. Lois Weinstein's estate taxes ($2,120,540.34 to the US Treasury and $2,005,263.73 to the New York State Department of Taxation) were paid as were over $4,000,000 estimated capital gains taxes for Michael and Sharan and the Trusts and $275,000 for Rita Sklar's tax counsel. There simply is no truth to the assertion that the T.R.O., the purpose of which is to maintain the *status quo*, prevents in any way the application of these funds to pay the obligations of NFMC in winding up this Chapter 11 case. If anything, it is protecting the funds from waste.

50.     The one thing that Justice Anar Rathod Patel would not permit at this time without the agreement of all parties was the payment of $440,000 to Michael and Sharan Sklar as purported

salaries and the payment of over $200,000 to a contractor so that Sharan Sklar could renovate one of the properties purchased, 138 State Street, Brooklyn, NY so that she and her husband and child can move into it after a two year holding period.

51.     It was clear to Justice Patel that Michael and Sharan were using the funds of NFMC under their control to pay for the vexatious and frivolous litigation before her Part and the state court is entertaining a motion for  sanctions.  It was also immediately clear to the Court that the Plaintiff's claims were stale and barred by the applicable statutes of limitations. No amount of fumfering on counsel's part has overcome the obvious conclusion that the claims are stale and time barred.

52.     Counsel for NFMC has steadfastly refused to provide any details regarding the proceeds of the sale of the Building.  Justice Patel ordered counsel to provide a closing statement.  Five days past the date Justice Patel ordered for that production, counsel produced a one page summary sheet.  I have previously attached a copy in correspondence to the Court on December 3, 2024. (Docket No. 385). A true and correct copy of the closing statement is annexed hereto as Exhibit  I .

53.     It seems clear from the closing statement that NFMC held back $251,350 for an unstated purpose.  From the sales proceeds it also escrowed $995,000 to cover its potential liability to Branton in that litigation before the Court.  It also seems that several law firms not retained with bankruptcy court approval were paid at the closing significant sums for unspecified services.

**LEGAL ARGUMENT  -- NFMC's MOTION SHOULD BE DENIED.**

54.     In counsel's motion papers, it is asserted that "senior debt and administration expenses" need to be paid.  Yet counsel does not identify those other than salaries for Michael and Sharan Sklar what the other "senior" debt might be.  The balance I assume would consist of legal fees for counsel.

55.     Pending the determination of the Branton claim, this case is all but completed.  All creditors, except for the Estate of Weinstein, Rita Sklar and Branton have been paid in full.  The

Estate has indicated that it would agree to the expungement of its claim, and has indicated to counsel that papers achieving this should be prepared. Yet counsel has not prepared such papers.

56.     Counsel has gone to significant lengths to hide from this Court, the true nature of the action it commenced in Supreme Court and the actual claims asserted therein. It should be clear from reading the complaint that Michael and Sharan Sklar hiding behind NFMC have brought the action to have an excuse not to distribute the proceeds of the sale in cash and in kind to their mother or to their aunt's estate. (Most likely using NFMC funds, special counsel Rosenberg and Estes LLP has also commenced an action against Rita Sklar seeking to have her removed as Trustee of four of the six Trust and to have Michael Sklar appointed in her stead. See Ruby Hilene Sklar, by Michael Sklar, as Trustee v. Rita A. Sklar et al, NY. Supreme Court, NY Co. Index No. 653516/2024.)

57.     Counsel takes issue with the Weinstein Estate's defenses and counterclaims. There is no longer any automatic stay in effect. The Weinstein Estate should be free to seek whatever legal and equitable remedies that the law allows with respect to an action NFMC itself commenced.

58.     Contrary to counsel's assertions none of the counterclaims seeks relief that interferes with any order of this Court nor the actual implementation of the Plan, particularly in light of the dissolution that has occurred subsequent to the confirmation order.

59.     Oral argument on the five motions in the State Court Action has been set for February 13, 2025 before Justice Patel. There is no co-incidence that NFMC's motion in this court is noticed for February 11, 2025.

60.     Counsel both here and in the State Court action claim that NFMC has not been dissolved. For support they point only to two documents, the December 21, 2023 Order confirming the Plan and a writing dated August 22, 2024 which purports to be a post-dissolution amendment signed only by Michael and Sharan Sklar. The August 22, 2024 writing purports to remove those portions of Article

9.1(c) of the Amended and Restated Partnership agreement which provide that the partnership dissolves on the sale of the Building. A true and correct copy of this writing is annexed hereto as Exhibit J.

61.     NFMC claims that the Plan confirmation order allows and indeed commands Debtor to continue in business as a going concern. The confirmation order was entered December 21, 2023. Under the terms of the Plan, Debtor had several options as to how to fund the Plan. One option was the sale of the Building which would then have triggered dissolution and liquidation. That happened on June 5, 2024 more than five months after the confirmation order.

62.     Under the governing documents of NFMC, Partnership Agreement Article 9 in particular, the act of selling the Building triggered dissolution.

63.     Counsel then points to the August 22, 2024 writing and claims that the June 21, 2022 "First Amendment" eliminated the unanimity requirement for decision making.   See Exhibit G.

64.     Counsel's  argument here and in State Court fails for at least two reasons.

65.     First, at the moment of dissolution under the terms of the partnership agreement, all general partners ceased to be general partners, so the purported August 22, 2024 amendment was made without authority.

66.     The second fatal flaw in NFMC's argument is that the August 22, 2024 writing is a nullity because, it was only signed by two former general partners. The June 21, 2022 First Amendment which changed "decision" making from unanimous to majority, did not change the terms of the amendment provision of the partnership agreement, Article 10, which still required the "consent" of all general partners to make amendments.

67.     Article 10 by its own specific terms states that Article 10 itself cannot be amended without all partners, limited and general consenting to the amendment of Article Ten. Article 10.10

of the 1982 partnership agreement and Article 10.1(b) provide that any provision of the agreement other than Article Ten can be amended by the written consent of all general partners (not a mere majority as counsel mistakenly believes).  However, in order to have Article 10 amended to eliminate this unanimity among the general partners requirement for amendments, **all partners** -- general and limited, would have had to have consented in writing to such an amendment of Article 10.  The June 21, 2022 purported amendment which addresses day to day <u>decision</u> making, does not even mention Article Ten and was not <u>consented</u> to by all the partners.  Therefore Article 10 requiring unanimous consent of all general partners to an amendment remained the rule.  Therefore, counsel's argument fails also because only Michael and Sharan Sklar signed the August 22, 2024 purported amendment.

68.    The Weinstein Estate in the Supreme Court Action has moved for summary judgment and the Rita Sklar defendants have moved to dismiss the entire action.  The first cause of action which NFMC chose to bring in state court seeks $7,000,000 on the "Kinder Loan." That claim is barred by the applicable six year statute of limitations.  Judge Lane was expressly clear that the state court should be the court to determine that issue.  The injunction and prohibition which NFMC now seeks to invoke in this Court is aimed at preventing the state court from determining this issue. This is blatantly improper.

69.    The second cause of action against RAS and Rita Sklar for $54,000,000 is likewise barred by a three year statute of limitations and by the indemnity provisions incorporated into the Plan itself which release any such claim committed since the inception of the bankruptcy (March  22, 2021).  See Plan section VIII (C) pp. 34-36 (Docket No. 300 Exhibit 1).  While the plan does specifically carve out from the release to RAS and Rita Sklar, claims against RAS and Rita Sklar for any act prior to the filing date (Plan, section VIII (C) at p. 35, its seems clear that because Rita Sklar and RAS are "Related Parties" as the term is defined in the Definitions section §66, neither RAS nor

Rita Sklar can be sued for any act occurring after the filing date (March 22, 2021). Because the State Court action was commenced by the filing of a summons on June 12, 2024, three years had clearly already elapsed from March 22, 2021. The tolling under 11 U.S.C. § 108 (a) is unavailing because the Debtor did not commence that action within that two year grace period. Thus, if any party has violated the injunction imposed by the Confirmation Order ¶ 26 at p. 22, it is NFMC and its counsel, not the Weinstein Estate.

70. When Counsel proposed putting into the Plan a prohibition against the Debtor or any one general partner suing any other general partner for any act committed during the pendency of the bankruptcy case, the US Trustee questioned the need. Michael Sklar stated that his mother was very litigious and he needed protection from her. (See Docket 301, transcript pp. 43, 51-52 and p. 72).

71. As is turns out, it is Michael Sklar who has sued Rita Sklar in direct violation of the prohibition, release and injunction. Thus, if any party should be enjoined it is NFMC for violating the injunction set forth in Article VIII of the Plan.

72. The Weinstein Estate defendant's three counterclaims asserted in the State Court Action are valid and this Court should not interfere with the state court's adjudication of those claims.

73. The First Counterclaim seeks an accounting which limited partners are entitled to on the dissolution. The one page closing summary disgorged from NFMC in the State Court Action is insufficient for this purpose. Debtor has throughout the history of this case, intentionally kept information about Debtor and its activities from the Weinstein Estate.

74. Debtor has long ago ceased filing monthly reports.

75. In the second counterclaim, the Weinstein Estate seeks a declaration that NFMC has been dissolved, if not by the October 23, 2020 Order and Decision of Justice Borrok, then certainly by the terms of the partnership agreement itself mandating dissolution on the sale the Building. (Section

9.01(c)). NFMC seeks to get this Court to enjoin the adjudication by the State Court of that fundamental issue. This attempt should be rejected.

76.     Corporate, partnership and limited partnership existence are issues of state law not federal law. Under the Abstention Doctrine, this Court must permit the state court to make the determination regarding NFMC existence.

> In the dissolution context, the Second Circuit has held that, "given the comprehensive regulation of corporate governance and existence by New York" and "New York['s] strong interest in the creation and dissolution of its corporations[,]" a federal district court may exercise its discretion to abstain from a suit seeking to dissolve a corporate entity. Friedman v. Revenue Mgmt. of N.Y., Inc., 38 F.3d 668, 671 (2d Cir. 1994). Accordingly, federal district courts in the Second Circuit "have routinely, and almost uniformly, elected to exercise Burford abstention over claims for the dissolution of a corporation formed under state law." Busher v. Barry, 14-cv-4322 (NSR), 2019 U.S. Dist. LEXIS 220082, 2019 WL 6895281, at *20 (S.D.N.Y. Dec. 18, 2019). Gallaway v. Ahamed, 2022 U.S. Dist. LEXIS 138629 *; 2022 WL 3107330 (Dist. Conn. (August 22, 2022). Burford v. Sun Oil Corp., 319 U.S. 315 (1943).

77.     The answer here is that while NFMC may or may not have entered and emerged from bankruptcy, arguable as an already dissolved entity, it unquestionably was dissolved by its own governing documents post-confirmation. Thus under 11 USC § 1141, NFMC's continued existence is not a matter for this Court to determine. This Court is required to apply the Abstention Doctrine and not to interfere in the state court adjudication of whether NFMC has been dissolved.

78.     Denying the instant motion is entirely equitable and necessary to the actual purposes of the Plan. It should be clear that the Sklar family cannot and should not be operating or owning any business entity jointly. Nor is it particularly fair, equitable or practical for Michael and Sharan Sklar with only 2% of the ownership to dictate to the other 98% of ownership what forms of investment their equity is going to take. The dissolution and liquidation and distribution of the assets in cash and in kind to the limited partner is in all parties' best interests and is required by the Plan.

79.     Were NFMC to account to the limited partners (as demanded in state court) for the Building sale proceeds, the Court would see that of the four properties purchased through the 1031 Exchange, three have triple net leases with fortune 500 companies that will require no management

services or minimal management which could be performed by an accountant for a minimal fee.  The fourth property is a two unit townhouse that also requires minimal management which can be performed by any local property manager. Michael and Sharan Sklar wish to continue to be managers so that they can pay themselves $220,000 each per year out of their mother's and children's principal and income.

80.     It should be clear that Sharan and Michael Sklar's ambitions here should be checked by this Court because they are plainly inequitable and not supported by the law.

81.     NFMC moves here to compel the Weinstein Estate to withdraw the counterclaim for an injunction on the grounds that an injunction which prevents Michael and Sharan Sklar from interfering with the proper liquidation and distribution of the sale proceeds would somehow interfere with the administration of this Case. It takes aim at the T.R.O. entered on December 4, 2024 to which it did not object to in this Court for over a month and a half until the instant motion.  Indeed in a letter to the Court dated December 13, 2024, Mr. Ramirez stated with respect to my December 3, 2024 letter (see Docket No. 385) which advised this Court about the issuance of the T.R.O., that **"Mr. Barr dedicates the majority of his Letter to describing state court actions that do not concern this Court or the Chapter 11 Case**." (Docket No 388).

82.     Mr. Ramirez was correct on December 13, 2024.  The state court T.R.O. does not interfere with this Court's retention of jurisdiction and it does not interfere with effectuation of the Plan.   Indeed the T.R.O. aids the Plan's implementation. The T.R.O. is temporary and it will likely expire unless extended as a preliminary injunction or permanent injunction after the hearing scheduled for February 13, 2025.  An injunction that prevents dissipation of assets will also aid the effectuation of the Plan.

83.     There are safeguards incorporated into the T.R.O. to assure that there will be sufficient funds to meet the Debtor's final Chapter 11 obligations.  Counsel's sole complaint is that the T.R.O. holds in abeyance Michael and Sharan Sklar's use of the sale proceeds to pay themselves unauthorized salaries in derogation of the rights of the equity holders.  These funds are safely still held by the 1031 Exchange company where they should remain unless all parties agree to their disbursement or are released by the order of the court. The level of consideration and care that the Supreme Court has given to this matter is evident from the augments presented and addressed at the most recent hearing.   See Transcript of January 6, 2025 hearing annexed hereto as Exhibit K.

84.     It is anticipated that after the Supreme Court has issued its ruling on dissolution and, assuming that it dismisses the claims for the "Kinder Loan" as, at best, time-barred, the Weinstein Estate will seek to move in this Court for effectuation of the Plan based on the June 30, 2024 dissolution and the need that the various equity holders receive a distribution of their ownership interests now that NFMC is dissolved.

85.     NFMC's motion to stay the proceedings in state court and to vacate the T.R.O. and to prevent the state court from exercising its equitable powers over NFMC is improper and contrary to law.

86.     Justice Patel, has already heard considerable arguments on this case.  She has before her four fully briefed sets of papers.  Mr. Glenn himself and one of his associates, Mr. Ramirez, recently put in appearances in that action and Mr. Glenn filed an affirmation and memorandum of law on January 16, 2025 in the State Court Action.

87.     The issue of the necessity of the T.R.O. and mechanisms for paying necessary obligations through the use of stipulations to release specific funds has been accomplished so far on two occasions.   Annexed hereto as Exhibit L is the most recent stipulation entered in the State Court

Action releasing over $4,000,000 to pay Michael's, Sharan's and the Trusts' estimated capital gains taxes related to the sale of the Building and to pay Rita Sklar's tax advisor.

88.    The state court T.R.O. was issued on December 3, 2024.  The order was crafted and timed specifically so that it could not interfere with any of the planned 1031 Exchange purchases until the 120 day window for purchasing replacement properties had closed (December 2, 2024). Counsel's statements to the contrary are, at best, misguided.

**The State Court Action does not Violate 11 U.S.C. 1141.**

89.    NFMC now makes the false claim that the counterclaims asserted in the State court proceeding -- an action NFMC itself commenced to collect on an antecedent pre-petition alleged claim -- are barred by the Debtor's discharge which occurred upon confirmation of the Plan.  NFMC bases this on the misguided argument that the October 23, 2020 Order and Decision is somehow a pre-petition claim discharged in Bankruptcy.

90.    The October 23, 2020 Order and Decision is not a claim which falls under 11 U.S.C. §1141 (d).  While it is a judgment, it is not a money judgment and it is not a type of claim that 11 U.S.C. § 1141 addresses.  It was a judicial declaration that provides that Debtor had already been dissolved when it filed for bankruptcy protection. The stay of the Order issued by the Supreme Court Appellate Division only stayed the liquidation process set forth under the 1982 Partnership Agreement.  NFMC has always asserted that the Appellate Division stay of the enforcement of the October 23, 2020 Order and Decision somehow negated the dissolution which had already occurred either October 24, 2019 or November 25, 2019.   Fortunately, however, the Court does not even need to resolve this question because of subsequent events -- the sale of the Building.

91.    NFMC's fatal error here is that regardless of the effect of the October 23, 2020 Order and Decision, the Appellate Division stay or the December 21, 2023 Confirmation Order, dissolution

unquestionably occurred **post discharge** on June 30, 2024 by virtue of the June 5, 2024 sale of the Building. Accordingly, the counterclaim seeking a declaration that NFMC was dissolved *inter alia* by the June 5, 2024 sale of the Building should be allowed to go forward in the state court and should not be stayed by this Court. Because nothing in the Plan effected or sought to abrogate the Partnership Agreement (in any of its manifestations), 11 U.S.C. § 1129 (11) should not be a factor here.

92.     The Second Circuit Court of Appeals recently held in <u>1934 Bedford LLC v. Loeb & Loeb,</u> 2012 LEXIS 13075 (May 26, 2023)," [a]s we have held, bankruptcy courts in this Circuit may exercise post-confirmation jurisdiction if the exercise of jurisdiction is (1) "provided in the plan of reorganization," In re Johns-Manville Corp., 7 F.3d 32, 34 (2d Cir. 1993), and (2) necessary "to effectuate a plan of reorganization," Reese v. Beacon Hotel Corp., 149 F.2d 610, 611 (2d Cir. 1945)" <u>1934 Bedford LLC v. Loeb & Loeb,</u> 2012 LEXIS 13075 (May 26, 2023).

93.     The exercise of jurisdiction by this Court is not necessary here to effectuate a plan of re-organization. Dissolution and liquidation of NFMC is completely consistent with the Plan now that the Building has been sold. This was what the original partners contemplated by incorporating dissolution terms in the Partnership Agreement. And it remained the intention and was even retained in the 2021 Amended and Restated Partnership Agreement prepared by Charles E. Simpson during the pendency of the case in the section 9.01(c). Thus dissolution on sale is completely consistent with enforcement and implementation of the Plan.

94.     Out of the $46,334,945.75 net sale proceeds of the Building wired to the 1031 Exchange intermediary, NFMC purchased four properties for approximately $23,000,000. After payment of Michael and Sharan and the Trust estimated taxes and the Weinstein Estate's federal and state estate taxes, approximately $ 13,600,000 remains in the hands of Legal 1031 Exchange LLC (as per the

T.R.O.).  The remaining cash can be distributed or invested or used to pay any remaining obligations in the Chapter 11 case and the remainder distributed to the equity holders.

95.     The four properties acquired require minimal management.  The do not justify $440,000 in annual salaries not consented to by the equity holders.  Three are out of state commercial properties with triple net leases, and one is a two unit townhouse in Brooklyn Heights, New York. Other than to maintain title in NFMC for two years during its liquidation process, there is no need for NFMC to continue to exist.  The Plan itself provides specifically for the sale of Building and resulting distribution of the net proceeds to the equity holders.

96.     Likewise, the issuance of a T.R.O. to maintain the *status quo* and the possible issuance of a permanent injunction preventing Michael and Sharan Sklar from interfering with the orderly distribution of the assets of NFMC to its equity holders, as Mr. Ramirez himself stated in his December 13, 2024 letter, "does not concern the Court or the Chapter 11 Case."

97.     The instant motion can only be seen as a last ditch attempt by Michael and Sharan Sklar to maintain control of NFMC and to pay themselves and their counsel considerable fees out of the funds belonging to 98% of the equity holders (half of whom they are suing using those partners' own funds).  If one does not accept as true that Michael and Sharan Sklar legitimately received each a 1% interest in an already dissolved entity, then they are imposing these unnecessary costs entirely without authority on 100% of the equity holders.

**The Red Herring Legal Fees Argument.**

98.     The frequent references in counsel's papers to filings in Surrogate's Court and challenges to the legal fees that I have charged over the past 10 years seems to be a red herring that counsel is using to hide their clients' improper motives.

99.     Michael and Sharan Sklar and several of the their manifold counsel have already received a full informal accounting in the administration of the Aunt's estate and copies of the billing records. The fact that Mr. Sklar has filed a petition to compel an accounting in Surrogate's Court only signifies that he is content to pay more lawyers more money and to thereby lessen his ultimate inheritance. It also signifies his desire to delay any settlement of that estate and to delay his own receipt of his inheritance (which is already worth several million dollars) for a purpose understood only by him.

100.    The legal fees incurred by the Estate of Lois Weinstein are in large measure attributable to the numerous unsuccessful and ill-advised litigations he and his sister have commenced against the Weinstein Estate (illogically, since they are the residuary beneficiaries of that estate).

101.    The legal fees which I have charged over a span of ten years, which Mr. Sklar seeks to challenge as excessive, pale in comparison with the more than $4,000,000 and still climbing, legal fees he, using Debtor's funds, has paid to his numerous sets of counsel in this one asset Chapter 11 case since he assumed control in June 2021. If one applies the *Loadstar* analysis, my services have been performed at bargain rates. Again, my right to be paid fees is completely irrelevant to the issues presented on this motion.

102.    The relevant issues include the (1) that NFMC was dissolved on June 30, 2024; (2) because Article 10 of the Partnership Agreement has never been amended, unanimous consent would still have been required of all general partners to have amended the Partnership Agreement and therefore the August 22, 2024 post dissolution writing is a nullity; (3) that the Abstention Doctrine should apply here and the State Supreme Court should be allowed to decide the issue of state law on NFMC's continued existence as well as (4) the validity of the "Kinder Loan" claim and (5) whether the T.R.O. only assists and aids this Court in effectuating the Plan and overseeing the administration

of the case and ensuring that there are sufficient funds for all entitled parties to be paid and protecting all parties interests equally and fairly.

103.    This Court, at a minimum,  should also insist that the T.R.O. or a preliminary injunction remain in effect and to keep the remaining liquid assets restrained until further order of either this Court or the State Supreme Court, or upon the stipulation of all the parties.


WHEREFORE, equity holder Estate of Lois Weinstein respectfully requests that the Court deny NFMC's motion and grant such other and further relief as seems just and proper.


Dated: February 3, 2025
          New York, New York

Respectfully submitted,
By:___/s/__*Jeffrey A Barr*_____
Jeffrey A. Barr
Estate of Lois Weinstein
211 Duke Ellington Blvd, Suite 7A
New York, NY 10025
(212) 227-1834
JeffreyABarr@gmail.com