**UNITED STATES BANKRUPTCY COURT**                    FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  | ) | Chapter 11 |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) | |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

_____

## DECISION ON APPLICATION OF BRANTON REALTY SERVICES LLC FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

**APPEARANCES:**

**GLENN AGRE BERGMAN & FUENTES LLP**
*Counsel for the Reorganized Debtor*
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
By:    Andrew K. Glenn
        Shai Schmidt
        Richard C. Ramirez
        Naznen Rahman

**AMINI LLC**
*Counsel to Branton Realty Services LLC*
131 West 35th Street, 12th Floor
New York, New York 10001
By:    Bijan Amini
        Jordan Reisch

**JOSHUA STEIN PLLC**
*Counsel to Branton Realty Services LLC*
110 West 57th Street, 4th Floor
New York, New York 10019
By:    Joshua Stein

**LAW OFFICES OF JEFFREY A. BARR**
*Counsel to the Estate of Lois M. Weinstein*
211 Duke Ellington Blvd., Suite 7A
New York, New York 10025
By:    Jeffrey A. Barr

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion seeking an order requiring payment of a commission to a commercial real estate broker that the debtor's estate had retained to market the debtor's sole asset, a substantial commercial building in a desirable Manhattan location. The reorganized debtor, Ninety-Five Madison Company, L.P. (the "**Debtor**"), retained the broker, Branton Realty Services LLC ("**Branton**"), on what the Court concludes was an exclusive right to sell basis. Branton intensively marketed the property for more than a year while enduring impediments including indecision and at times a lack of cooperation from individuals associated with the Debtor. Branton's retention agreement required Debtor to "refer" "all inquiries" to Branton. The agreement entitled Branton to a commission on any sale during the exclusivity period or on any sale during the year that followed to a purchaser to whom Branton had shown the property during the exclusivity period.

As the exclusivity period waned, Debtor's principal most engaged in the sale process personally received an inquiry from a buyer's broker regarding a motivated and highly interested purchaser, but Debtor did not refer the inquiry to Branton, assertedly justified by the view that the buyer's broker did not wish to deal with Branton. Before the December 31, 2023 expiration of Branton's exclusivity period, the Debtor received a concrete request for a showing of the property to the interested buyer, and, again, Debtor did not refer that request to Branton. Rather, Debtor agreed, within the exclusivity period, to show the property to that interested party shortly after the exclusivity period ended. That showing occurred on January 2, 2024 and that interested party ultimately bought the building even as another would-be buyer located by Branton made a substantial offer.

1

Branton contends that Debtor violated its contractual obligation to refer all inquiries, arguing this breach entitles Branton to a commission on account of the sale even though Branton never showed the property to the eventual buyer. The Debtor contends that it owes Branton nothing because the buyer neither purchased the property during the term of the brokerage agreement nor appeared on Branton's list of protected prospects who toured the property during the term, which the contract defined as the universe of buyers who would trigger Debtor's obligation to pay a commission. A party that holds an interest in the Debtor, the Estate of Lois Weinstein, also put forth an objection that makes arguments similar to those of the Debtor.

The Court concludes that the Debtor breached its obligations under the agreement, and that that breach entitles Branton to contractual damages. New York law establishes that a broker retained on an exclusive right to sell basis is entitled to its commission not only when the broker's client closes a transaction covered by the brokerage agreement during the exclusivity period, but also, if the broker's client breaches a requirement to refer inquiries to the broker during the exclusivity period, when that broker's client executes a sale outside the exclusivity period to a prospect the client failed to refer to the broker and the broker would have brought about a substantially similar sale but for the client's breach. As detailed below, that is exactly what happened here.

Accordingly, Branton's motion is GRANTED and the Court overrules all objections to it.

## **JURISDICTION**

This Court has jurisdiction over this application under 28 U.S.C. §§ 157, 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This motion is a core proceeding under 28 U.S.C. § 157(b)(2)(B) because it concerns the allowance of a claim for administrative expenses against the bankruptcy estate.

## BACKGROUND

The following constitutes the Court's factual findings. The Court draws them from uncontested pleadings throughout the bankruptcy case and from a two-day evidentiary hearing that the Court conducted on January 22 and 23, 2025.[1] The hearing transcript is docketed at ECF Nos. 408 and 412, and the hearing record includes a number of docketed declarations that were submitted in lieu of live direct testimony. The Court held closing arguments on January 24, 2025, with that transcript docketed at ECF No. 415.

Debtor filed for bankruptcy on March 22, 2021. Petition at 4. The Debtor operated as a Single Asset Real Estate business owning a nearly vacant 16-floor office building built in 1912 at 95 Madison Avenue, New York, NY (the "**Property**") under the control of Ms. Rita A. Sklar through RAS Property Management, LLC, the general partner of the Debtor. *See* Decl. of Rita A. Sklar ¶¶ 1, 4-5, ECF No. 13; Branton Offering Mem. at 4, BX-3. The Sklar family or entities controlled by it had owned the Property for many decades. The Debtor carried no secured debt, such that its valuable property was unencumbered by financing-based liens, but the Debtor had relatively little rent revenue and owed a substantial judgment resulting from litigation with one of its few tenants. *See* Schedule D, ECF No. 10-2 (no secured debt); Statement of Fin. Affairs, ECF No. 12 (limited revenue); Schedule E/F at 2, ECF No. 10-3 (listing prepetition arbitration award won by tenant). Throughout the bankruptcy case, the Debtor described itself as seeking a vehicle to sell the Property or to arrive at some other more tax-advantaged method such as a long-term ground lease to realize the Property's value.

---

[1] Citations to all hearing transcripts referenced in this opinion read "[Month] [Day] Tr." followed by a pincite. Exhibits submitted by Branton begin with BX-, while exhibits submitted by the Debtor begin with DX. Branton's book of exhibits titles each exhibit, so the Court follows those titles. The Debtor's book of exhibits does not give titles to each exhibit, so the Court follows the conventions of the Bluebook for naming Debtor's exhibits.

Well into the bankruptcy case, the Debtor amended its partnership agreement to add Michael Sklar Management LLC and Sharan Sklar Management LLC as additional general partners. Michael and Sharan Sklar are children of Rita Sklar; Michael Sklar serves as manager of Michael Sklar Management LLC and Sharan Sklar manages Sharan Sklar Management LLC. Sklar Decl. ¶ 4, ECF No. 399. The revised partnership agreement provided that "All decisions made hereafter shall be by the vote of a majority of the General Partners." Amend. to Am. and Restated P'ship Agreement of Ninety-Five Madison Co., L.P., ECF No. 194-1. As a practical result, Michael and Sharan Sklar obtained and exercised decision-making authority that previously had been exercised solely by Rita Sklar.

In December 2022, about twenty months after it filed for bankruptcy, the Debtor obtained debtor-in-possession financing from Madison Avenue Servicing LLC with the assistance of Mr. Emanuel Westfried of Two Bins Capital. *See* Westfried Decl. ¶¶ 1, 4-6, ECF No. 400.

Several months earlier, the Debtor had sought to employ Branton "as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 18, 2022." Appl. at 1, ECF No. 176. This Court granted the application to retain Branton under the Listing Agreement for Sale (the "**Agreement**") on August 31, 2022 under 11 U.S.C. §§ 327(a) and 328(a). Retention Order at 2, 5, Ex. 1, ECF No. 181. Mr. Warren "Woody" Heller, who by all accounts is an experienced and respected commercial real estate broker, owns Branton. Heller Decl. ¶¶ 1, 3-6, ECF No. 398.

## FINDINGS OF FACT SPECIFIC TO THE BRANTON RETENTION, MARKETING EFFORT, AND EVENTUAL PROPERTY SALE

### A. The Retention Agreement

The Agreement states, "Owner [the Debtor] hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the exclusive right to

market the Property for a sale." Agreement § 1. "The term of Branton's appointment hereunder (the '**Term**') shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term." *Id.* § 2. Under the Agreement, a "sale" in Section 1 is "a conventional sale of a fee simple interest in the Property . . . and any other transaction (however characterized) by which [the Debtor]'s interest in the Property is transferred to an unaffiliated third party for consideration," *id.* Ex. A, "any such transaction being a '**Transaction**,'" *id.* § 1 (emphasis added). "The intention of the foregoing is that Branton will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A." *Id.* Ex. A.

More specifically, the Agreement provides that "Branton shall be entitled to, and Owner [the Debtor] shall pay, the fee described in Exhibit A (the '**Commission**') as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below." *Id.* § 5. Mathematically, the Commission equaled "$300,000.00 plus one (1%) percent of the gross sales price." *Id.* Ex. A. The Agreement specified that the Debtor had the unqualified right to accept or reject any offer that resulted from Branton's marketing efforts. *Id.* § 1 ("Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion."). New York law governs the Agreement. *Id.* § 13.

Further, and critically for this Decision, the Agreement required that "Owner [the Debtor] shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner)." *Id.* § 3.

The Agreement also required the Debtor to reimburse Branton for certain marketing costs, *id.* § 7, and provided that if one party prevailed in a legal proceeding to enforce its rights under the Agreement against the other party, the prevailing party could recover "reasonable legal fees and disbursements from the other party," *id.* § 14.

Finally, under certain circumstances, Branton could earn its Commission for sales closed after the end of the Term. "Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the '**List**') of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein." *Id.* § 5. The order of this Court approving the Agreement required Branton to "file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code." Retention Order ¶ 4.

## B. Branton's Marketing and Sale Process

Mr. Heller spoke with "hundreds of people who were interested in the Property and conducted approximately 140 Property tours" during the Term. Heller Decl. ¶ 43. In addition, Michael Sklar and Sharan Sklar referred many inquiries to Mr. Heller during the Term by informing Mr. Heller of the inquiries. *Id.* ¶¶ 31-32. The inquiry referrals from Michael and Sharan Sklar to Mr. Heller included at least one inquiry made by Mr. Westfried and parties associated with him. *See* Email from M. Sklar to W. Heller, S. Sklar, R. Sklar, A. Glenn, T. Flemming re: Prior Offers, BX-9. Michael or Sharan Sklar frequently informed Mr. Heller of inquiries they received on the same day they received them. *See* Email from M. Sklar to W. Heller and S. Sklar re: Referral, BX-8 (Michael Sklar informing Mr. Heller of an inquiry made by a broker who said

6

he was "in touch with a potential buyer" thirty-four minutes after Mr. Sklar received the broker's inquiry); Email from S. Sklar to W. Heller and M. Sklar re: Referral, BX-10 (referring an inquiry from a broker made on behalf of Empire Capital four hours and six minutes after receiving it); Email from M. Sklar to W. Heller, S. Sklar, A. Kahn, T. Flemming re: Referral, BX-16 (informing Mr. Heller of an inquiry sent by a lawyer on behalf of a broker who had a client "coming in from Italy" forty minutes after receiving the lawyer's email).

By contrast, Rita Sklar failed to refer a number of inquiries that she received to Branton, Heller Decl. ¶ 34, which caused conflict within the Debtor's governance structure and made Branton's job more difficult. Eventually, "it was communicated to Rita Sklar that she and [the Debtor] had an obligation to refer all inquiries" to Branton. *Id.* RAS Property Management, LLC, controlled by Rita Sklar, also threatened to sue Branton. Am. Appl. ¶ 9, ECF No. 234. In response, the Debtor sought and the Court approved a modification to the Agreement on May 25, 2023, which granted Branton additional indemnification protections. Order Amending the Order Authorizing the Retention and Emp. of Branton ¶¶ 2-5, ECF No. 243.

Written communications between the Debtor and Branton first mention Mr. Westfried on August 22, 2022. Email from M. Sklar to W. Heller (Aug. 22, 2022, 9:49 AM), DX0004. On September 12, 2022, the Debtor reported to Mr. Heller that Mr. Westfried had transmitted an indication of interest on behalf of Shel Capital and Bluestone Investments. Email from M. Sklar to W. Heller (Sept. 12, 2022, 12:03 PM), DX0011. The leaders of that investment group, Jonathan Bakhash, Rony Kravel, Mor Sagi, Nir Livnat, Jonathan Douek, and Yonatan Binman, described their backgrounds in the real estate industry as stemming from their holdings in the United States, the United Kingdom, Greece, and Israel. *Id.* Mr. Heller pursued this opportunity by speaking directly with Mr. Kravel and giving members of his team a tour of the Property. Heller Decl. ¶ 49.

However, that investment group did not ultimately deliver a firm bid in the price range the Debtor would consider. Jan. 23 Tr. 211:14-212:2, ECF No. 412.

From the initial marketing process, which ended in March 2023, Branton received twenty-two bids. Heller Decl. ¶ 38. The Debtor hesitated to select a bid during this first round, and the Debtor directed Mr. Heller to conduct a second round of bidding. *Id.* ¶ 41. During that second-round process, the Debtor again mentioned Mr. Westfried in communications with Mr. Heller, on June 26 and 27 of 2023. Email from M. Sklar to W. Heller (June 26, 2023, 9:02 AM), DX0022; Email from M. Sklar to W. Heller (June 27, 2023, 12:32 PM), DX0025. This time, the communications regarding Mr. Westfried did not reference any client of his. Email from M. Sklar to W. Heller (June 26, 2023, 9:02 AM), DX0022; Email from M. Sklar to W. Heller (June 27, 2023, 12:32 PM), DX0025. Branton received 25 bids during this second-round process, which occurred after Labor Day 2023. Heller Decl. ¶ 42. By the time this second round concluded, less than four months remained in Branton's exclusivity period. According to Mr. Sklar, all these bids "failed to yield an actionable proposal." Sklar Decl. ¶ 18. Branton never contacted Mr. Westfried himself until after the Term ended. Jan. 23 Tr. 67:7-15.

## C. Mr. Sklar's Communications with Mr. Westfried in Late 2023

Mr. Sklar loosely kept in touch with Mr. Westfried throughout the Term, *i.e.*, the exclusivity period. *See* Text Messages Between M. Sklar and E. Westfried, BX-27. Mr. Sklar credibly testified that, as the end of the Term drew near, the Debtor "was in 'panic mode'" and that he "spent many sleepless nights worrying over how these matters could be resolved without [his] family losing the value of this asset." Sklar Decl. ¶ 19. The frequency of his communications with Mr. Westfried increased. Mr. Sklar called Mr. Westfried on November 6, 2023, for one minute (this degree of precision was facilitated by the introduction of phone records as exhibits

during the evidentiary proceeding), and they had a series of phone calls totaling twenty-six minutes the next day. *See* Jan. 23 Tr. 98:12-14 (Mr. Westfried confirming his cell phone number); Calls Between M. Sklar and E. Westfried, BX-28. Mr. Sklar testified that he recalled nothing about these calls. Jan. 22 Tr. 54:14-16, ECF No. 408. On November 27, 2023, Mr. Sklar asked Mr. Westfried to set up a call for the next day with himself and his sister, Sharan Sklar. Email from E. Westfried to M. Sklar re: Zoom Call, BX-32. The three of them spoke via Zoom the next day. *See* Jan. 22 Tr. 56:9-23; Zoom Invitation for Call Between M. Sklar, S. Sklar, and E. Westfried, BX-33 (setting a 5 PM – 5:30 PM window for the call). Mr. Sklar testified that an important part of those conversations centered on whether the Sklar family itself could convert the Property to a residential condominium building rather than sell it to a buyer who would do the conversion. *See* Jan. 22 Tr. 55:7-8, 56:16-18, 56:24-57:10, 57:25-58:18. In those discussions, Mr. Westfried responded by advising Mr. Sklar and Sharan Sklar that they'd "get crucified" if they tried to convert the Property themselves. Jan. 23 Tr. 60:23-61:4.

Mr. Sklar had telephone conversations with Mr. Westfried at 2:58 PM on Thursday, November 30, 2023, for ten minutes, 1:56 PM on Tuesday, December 5, 2023, for six minutes, and 11:28 AM on Friday, December 8, 2023, for six minutes. *See* Calls Between M. Sklar and E. Westfried, BX-35. In total, in addition to the Zoom call on November 28, 2023, Mr. Sklar had at least thirteen calls totaling eighty-seven minutes with Mr. Westfried from November 6, 2023 to the end of Branton's Term on December 31, 2023. *See* Calls Between M. Sklar and E. Westfried, BX-28; Calls Between M. Sklar and E. Westfried, BX-35; Calls Between M. Sklar and W. Heller, BX-40 (this exhibit also shows calls between Mr. Sklar and Mr. Westfried); Call Between M. Sklar and E. Westfried, BX-42; Calls Between M. Sklar and W. Heller, BX-46 (this exhibit also shows calls between Mr. Sklar and Mr. Westfried). Mr. Sklar testified that he recalled nothing specific

about these calls, even as the written record covered *infra* shows that the Debtor began discussing

potential purchasers with Mr. Westfried. *See* Jan. 22 Tr. 54:14-16 (calls on November 7), *id.* 69:4-

15 (call on November 30); *id.* 72:4-15 (call on December 5); *id.* 72:16-21 (call on December 8);

*id.* 81:18-25 (call on December 11); *id.* 82:7-15 (stating generally that he had limited recollection

of his conversations with Mr. Westfried in December 2023); *id.* 83:1-6 (call on December 20); *id.*

88:22-89:23 (calls on December 29). Mr. Sklar's testimony on cross-examination regarding the

contents of his conversations with Mr. Westfried was surprisingly uninformative, especially

considering 1) the well-developed written record that includes his text messages with Mr.

Westfried and 2) the importance Mr. Sklar doubtless attached to these conversations given his

characterization of the Debtor as being in "panic mode" at that time, Sklar Decl. ¶ 19, worrying

about the Sklar family's ability to sell the Property. The Court infers that, whatever the details,

Mr. Sklar turned to Mr. Westfried, a real estate professional whose testimony paints a picture of a

dealmaker, Jan. 23 Tr. 70:11-13, 77:5-6, as a sounding board about how to achieve a timely and

acceptable disposition of the Property.

At some point before Friday, December 8, 2023 at 1:56 PM, Mr. Sklar's conversations

with Mr. Westfried included discussion of potential purchasers Mr. Westfried could introduce to

the Debtor and bring in for tours of the Property. *See* Jan. 22 Tr. 72:20-73:11; Text Messages

Between M. Sklar and E. Westfried, BX-36 (Mr. Westfried asking Mr. Sklar to arrange a tour for

someone on Sunday, December 10, 2023). Mr. Sklar replied, "Sunday works." Text Messages

Between M. Sklar and E. Westfried, BX-36. Mr. Westfried later texted Mr. Sklar that the prospect

could not make it to a tour during the weekend of December 9-10, 2023 but would be back in the

new year; Mr. Sklar responded, "Better . This is clean break and is fair to woodyv" on December

11, 2023. *Id.*

On December 27, 2023, Mr. Westfried texted Michael and Sharan Sklar and asked, "Can I get tour 1/2 at 2pm with the Chinese buyer? I'm hitting the ground running on this for you guys." Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51 (transcribed exactly). This "Chinese buyer" was a group that included Mr. Linzhong Zhuo[2] and Mr. Jimmy Chou,[3] both of Sunlight Development and Sunlight Group. Jan. 22 Tr. 155:8-9, 169:1-6; Jan. 23 Tr. 121:14-122:4; Email from E. Westfried to L. Zhuo and J. Chou re: Tour & NDA, BX-56. Mr. Zhuo participated in the ultimate purchase of the Property through another entity he worked for, Madison 29 Holding LLC. Jan. 22 Tr. 155:15-20. At some point during December 2023, Mr. Westfried had flagged the Property to Mr. Zhuo and Mr. Chou as for sale, going to far as to send Mr. Chou plans of the building. Jan. 23 Tr. 108:13-18; *see* Email from E. Westfried to J. Chou Attaching 95 Madison Plans, BX-43.

Mr. Westfried testified that he did not wish to work with Branton, because he believed that 1) his manner of handling a sales process would clash with Branton's and 2) "it would be difficult to persuade any prospective buyer to agree to work with both Branton and myself at the same time." Westfried Decl. ¶ 14. The Court credits this testimony as a fair statement of Mr. Westfried's preference, but the Court does not accept as necessarily true that Mr. Westfried would have refused to engage with Mr. Heller or pursue a deal had Mr. Heller actually approached him. Mr. Heller testified that had not contacted Mr. Westfried in response to the Debtor's referrals in the summer of 2023 because those referrals did not mention a specific client, so Mr. Heller assumed they related to Mr. Westfried's client that Mr. Heller already knew about, the Shel Capital / Bluestone

---

[2] The record refers to Mr. Linzhong Zhuo at various points as "Mr. Linzhong," "Lin," "Mr. Lin," "Mr. Zhuo" and "Mr. Zhou." On examination by the Court, he stated, "My first name is Linzhong and my last name is Zhuo" and proceeded to spell both of his names. Jan. 22 Tr. 154:16-21. Thus, this opinion will refer to him as "Mr. Zhuo."
[3] The hearing transcript refers to Mr. Jimmy Chou at various points as "Mr. Jimmy Chu," "Jimmy Chan," and "Jimmy Chow." Exhibits reveal the correct spelling of his name as Jimmy Chou, *see* Email from E. Westfried to J. Chou Attaching 95 Madison Plans, BX-43, so this opinion will refer to him as "Mr. Chou."

Investments group led by Mr. Rony Kravel. Heller Decl. ¶ 50. At that time, Mr. Heller instead followed up directly with Mr. Kravel and determined that that group's bid had fallen out of the range of competitive bids. *Id.* Nothing in the record suggests that Mr. Heller would not have tried to contact Mr. Westfried based on his inquiry on behalf of a different group, "the Chinese buyer," given that during the Term Mr. Heller conducted around 140 tours of the Property and sent marketing materials to approximately 400 potential investors. *See id.* ¶¶ 38, 43. At this point in the Term, he was urgently pursuing prospective purchasers, *see id.* ¶¶ 73-74, doubtless motivated by self-interest to receive a commission as well as by professional commitment to serving his client. Further, Mr. Zhuo testified unequivocally that he would have gone on a tour of the Property in 2023 if he had been invited to do so, going so far as to say he would have toured the Property in 2023 even if Mr. Heller had offered the tour rather than Mr. Westfried. Jan. 22 Tr. 181:23-183:5, 192:4-24. As subsequent events proved, Mr. Zhuo was a ready and eager purchaser prepared to commit to and finalize a sale.

As the Term approached its end, Mr. Heller continued his work with unmistakable diligence and a sense of time pressure. On December 27, 2023, he arranged for two tours of the Property to be held the following day. *See* Emails Between W. Heller, M. Sklar, S. Sklar re: Tours for Other Prospects, BX-52. On December 28, 2023 he delivered to Michael and Sharan Sklar a letter of intent ("LOI") from a prospective purchaser connected to CNY Group that contemplated a $60 million purchase price for the Property. Email from W. Heller to M. Sklar, S. Sklar re: CNY LOI, BX-53. The Debtor found this purchaser's offer credible. *See* Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66.

On cross-examination, counsel for Branton asked Mr. Sklar about the text messages he had exchanged with Mr. Westfried in the last week of December 2023, asking, "So Woody sending

[sic] you an offer, but you have not told him anything about Mr. Westfried or his clients?" Jan. 22 Tr. 101:25-102:1. Mr. Sklar responded, "I did not." *Id.* 102:2. Counsel for Branton followed up by asking, "You didn't discuss any of Mr. Westfried's conversations with Woody?" *Id.* 102:9-10. Mr. Sklar responded, "No, I did not." *Id.* 102:11. Consistent with these acknowledgments of Mr. Sklar's, Mr. Heller stated in his declaration, "At no point in my communications with the Sklars did they refer to me any of the inquiries made by Emanuel Westfried in November and December of 2023." Heller Decl. ¶ 56.[4] The Debtor's failure to inform Mr. Heller of the interest from the "Chinese buyer" was not a one-off or aberration. Mr. Heller named at least eleven communications between Mr. Westfried and representatives of the Debtor in November and December of 2023 of which the Debtor failed to inform him. *Id.* ¶¶ 54-72. Mr. Heller also stated specifically that "Michael Sklar and Sharan Sklar did not refer to me the inquiry by Emanuel Westfried on December 27, 2023 requesting a tour of the Property for the ultimate purchaser on January 2, 2024." *Id.* ¶ 71 (citing Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51). Setting aside that the verb "refer" has a contested legal meaning that the Court determines below, the Court credits these statements, which went uncontested during Mr. Heller's cross-examination, re-direct examination, and re-cross examination. *See* Jan. 23 Tr. 187:11-219:23. The Debtor put forward no evidence – and the Court has found none – that it ever informed Branton of the November-December 2023 communications its leaders had with Mr. Westfried.

Mr. Zhuo's actions in January and February of 2024 showed his eagerness to purchase the Property. He toured the Property on January 2, submitted an offer on January 8, and, even when

---

[4] Mr. Heller adds, "For the avoidance of doubt, the Sklars did not inform me of any of their calls with Emanuel Westfried totaling more than two hours in November and December of 2023," Heller Decl. ¶ 57, and then lists each of the communications during that time frame he alleges constitutes an inquiry by Mr. Westfried of which the Debtor did not inform him, Heller Decl. ¶¶ 58-72.

the Debtor had committed to an exclusive period with CNY on January 9, pushed Mr. Westfried to 1) get information on the sale process and 2) put a revised offer in front of the Debtor that he thought would beat the terms of the CNY offer. Jan. 23 Tr. 138:25-139:4; Email from E. Westfried to M. Sklar Attaching Sunlight $58M Offer, BX-64; Email from M. Sklar to E. Westfried re: CNY Offer, BX-65; Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66; Text Messages Between E. Westfried and L. Zhuo re: CNY Offer, BX-69. On January 12, 2024, Mr. Zhuo sent a revised offer to Mr. Westfried, which Mr. Westfried passed on to the Debtor that day. Email from L. Zhuo to E. Westfried Attaching Sunlight $60M Offer, BX-72; Email from E. Westfried to M. Sklar Attaching Sunlight $60M Offer, BX-73.

Thus, the Court concludes that Mr. Sklar received communications from Mr. Westfried regarding an interested purchaser in the form of Mr. Zhuo (whom Mr. Westfried did not name to Mr. Sklar), and that neither Mr. Sklar nor anyone else informed Branton of those communications. The Court further finds that these communications began during the Term at a time when Mr. Heller was energetically pursuing all possible sales avenues, including by delivering an LOI regarding CNY's offer on December 26, 2023 and seeking to show the Property to two other prospective purchasers on December 28, 2023. The evidence shows that had Branton been alerted to these communications from a new prospect brought in by Mr. Westfried, Branton would have promptly pursued them.

**D.  The Sale**

The Term ended on December 31, 2023. Agreement § 2. Pursuant to the Agreement, Branton delivered the List to the Debtor on January 4, 2024. Email from W. Heller to A. Glenn re: Post-Termination Protected Prospects, BX-63. The List included CNY Group, *id.*, the most viable potential purchaser developed by Mr. Heller. Throughout January 2024, the Debtor went through

14

back-and-forth negotiations with CNY and with Sunlight Development. The Debtor first considered CNY's offer of $60 million. *See* Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66. The Debtor then turned to Mr. Zhuo's revised proposal, which the Debtor accepted subject to required Court approval; Debtor promptly moved for Court approval of the sale to Mr. Zhuo's group. Mot. to Sell Property Free and Clear of Liens Under Section 363(f), ECF No. 336. The Court set the hearing on that motion for April 18, 2024. Notice of Sale Hr'g, ECF No. 327. Immediately before the hearing, an entity connected to CNY submitted a higher bid, for $65 million. Apr. 18 Tr. 8:23-9:7, 47:12-15, ECF No. 357 (stating fact of competing offer for $65 million from Madison 95 Associates LLC); Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66 (describing relationship between Madison 95 Associates LLC and CNY Group). The Debtor leveraged this offer to win a matching $65 million purchase price from Mr. Zhuo's group and successfully sought approval of the sale to Madison 29 Holding LLC on those terms at a hearing the Court held on April 18, 2024. Apr. 18 Tr. 60:15-20; Second Am. & Restated Order Signed on 6/5/2024 (I) Approving the Sale of the Property Free and Clear of All Liens, Claims, Encumbrances and Interests (Except Permitted Encumbrances), (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto, and (III) Granting Related Relief, ECF No. 363 (the "**Sale Order**").

Branton, alleging breach of the Agreement, has moved for payment of the Commission and other amounts it alleges it has the right to receive under the Agreement as required by the Retention Order. Final Appl. of Branton for (i) Payment of the Commission, (ii) Reimbursement of Expenses, and (iii) Related Relief, ECF No. 362 (the "**Final Appl.**"); Retention Order ¶ 4.

## ARGUMENTS, DISCUSSION, AND ANALYSIS

As the applicant, Branton bears the burden of proof and must establish its entitlements by a preponderance of the evidence. *See In re River Rd. Hotel Partners, LLC*, 536 B.R. 228, 235 (Bankr. N.D. Ill. 2015) ("Whether § 330 or § 328 controls . . . the applicant[] bears the burden of proof."), *aff'd sub nom. Bletchley Hotel at O'Hare Field LLC v. River Rd. Hotel Partners, LLC*, No. 15 C 8063, 2016 WL 4146480 (N.D. Ill. Aug. 4, 2016). Branton would also bear the burden of proof if a state court heard this case as a freestanding lawsuit. *Cushman & Wakefield, Inc. v. 214 E. 49th St. Corp.*, 639 N.Y.S.2d 1012, 1014 (App. Div. 1st Dep't 1996) ("Plaintiff [Cushman & Wakefield, the broker,] was required to prove its case by a preponderance of the evidence. It failed to sustain that burden.").

### A. Breach-of-Contract Claims by Professionals Retained Pursuant to Court Order

As noted, the Debtor sought and obtained this Court's approval to retain Branton pursuant to Section 328(a) of the Bankruptcy Code, which permits the retention of "a professional person . . . on any reasonable terms and conditions of employment," 11 U.S.C. § 328(a), with those terms set forth in the Agreement. The Agreement was annexed to both the retention application and the order approving it. Appl. Ex 1; Retention Order Ex. 1.

At the outset, the Court rejects the Debtor's argument that "for Branton to be entitled to the Purported Commission pursuant to 11 U.S.C. § 328(a), the precise contractual terms and conditions that trigger payment must first be satisfied." Obj. ¶ 17, ECF No. 392 (citing *Riker, Danzig, Scherer, Hyland & Perretti LLP v. Off. Comm. of Unsecured Creditors (In re Smart World Techs., LLC)*, 383 B.R. 869, 876 (S.D.N.Y. 2008)). It is undisputed that the ultimate purchaser led by Mr. Zhuo did not tour the Property during the Term or appear on the List as evidence of Branton's entitlement to the Commission for a sale occurring after the Term ended – the two

16

contractually specified scenarios in which the Debtor would owe Branton the Commission. The Debtor argues that these considerations require the Court to rule for the Debtor.

Under controlling Second Circuit precedent, however, "breach of contract committed by the trustee or debtor-in-possession while administering the estate . . . gives rise to a debt entitled to the same administrative expense priority." *Nostas Assocs. v. Costich* (*In re Klein Sleep Prods., Inc.*), 78 F.3d 18, 26 (2d Cir. 1996). As the presiding Bankruptcy Court is responsible for allowing or disallowing claims for payment of administrative expenses, *see* Plan Art. II.C, ECF No. 300-1 ("The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims."), and has the authority to enforce its own orders, *see id.* Art. XI.8 ("Notwithstanding the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of, or related to, the Chapter 11 Case and the Plan, including jurisdiction . . . to hear and determine all applications under Sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred."), it seems inescapable that a party could enforce an alleged right to payment of administrative expenses by seeking relief from this Court. In the case of a professional retained under 11 U.S.C. § 328(a) alleging a breach of contract, an application like Branton's represents at least one logical and permissible way to enforce such a right.

The Bankruptcy Code does preempt some types of administrative claims by professional service providers against debtors, such as claims based on equitable theories that lack support under 11 U.S.C. §§ 327, 328 or 330. *See McCutchen, Doyle, Brown & Enersen v. Off. Comm. of Unsecured Creditors* (*In re Weibel, Inc.*), 176 B.R. 209, 212 (B.A.P. 9th Cir. 1994). However, the Debtor goes a step too far by effectively arguing that this Court may not interpret the Agreement or consider the parties' obligations under it using the state contract law that would define the

parties' rights, duties and remedies under the Agreement if the parties were not in bankruptcy court. In fact, the Court-approved Agreement specifies that it "shall be governed by and construed in accordance with the laws of the State of New York." Agreement § 13.

In none of the Debtor's cited authorities does a court decline to use background principles of state contract law to interpret a contract made by a debtor with court authorization under 11 U.S.C. § 328(a), let alone such a contract that names New York law as its governing law. Four of the nine allegedly relevant cases cited by the Debtor – *In re Weibel, Inc.*, 176 B.R. at 212, *In re Carwile*, 460 B.R. 464, 465 (Bankr. W.D. Ky. 2011), *DeRonde v. Shirley* (*In re Shirley*), 134 B.R. 940, 944 (B.A.P. 9th Cir. 1992), and *In re XO Commc'ns, Inc.*, 398 B.R. 106, 110 (Bankr. S.D.N.Y. 2008) – do not involve fees sought pursuant to a Section 328(a) retention at all. *In re Smart World Techs., LLC* does not decide a retained professional's breach of contract claim but rather evaluates an ex-post change made by a bankruptcy judge on the urging of creditors to a contingency fee arrangement previously approved under Section 328(a). *Riker, Danzig, Scherer, Hyland & Perretti LLP v. Off. Comm. of Unsecured Creditors* (*In re Smart World Techs., LLC*), 383 B.R. 869, 871 (S.D.N.Y. 2008), *aff'd*, 552 F.3d 228 (2d Cir. 2009). *In re ASARCO, L.L.C.* has materially similar facts to *In re Smart World Techs.*, with parties trying to retroactively alter a fee arrangement governed by Section 328(a). *See ASARCO, L.L.C. v. Barclays Cap., Inc.* (*In re ASARCO, L.L.C.*), 702 F.3d 250, 265 (5th Cir. 2012). *In re Relativity Fashion* presents a posture largely similar to *In re Smart World Techs.* and *In re ASARCO* – an ex-post attempt by some parties to subject professionals retained under Section 328(a) to the standards of Section 330 – combined with a contractual dispute over whether one professional had met the requirements for payment of a contingency fee under the contract. *See In re Relativity Fashion, LLC*, No. 15-11989 (MEW), 2016 WL 8607005, at *10 (Bankr. S.D.N.Y. Dec. 16, 2016).

18

Beyond those seven cases, in *In re CK Liquidation Corp*, the funds sought by the professional at issue pertained to a billing period after the conversion of the debtor's case from Chapter 11 to Chapter 7, with the professional not having been retained by the debtor's Chapter 7 trustee. *Morse v. Ropes & Gray, LLP* (*In re CK Liquidation Corp.*), 343 B.R. 376, 384-85 (D. Mass. 2006). Lastly, *In re Sunergy California LLC* if anything slightly favors Branton's position, as the cited proceeding occurred parallel to a contested fee application, the latter of which presented the proper avenue for litigating the dispute. *See RKF Global, PLLC v. Nuti Hart LLP* (*In re Sunergy California LLC*), 651 B.R. 781, 791 (Bankr. E.D. Cal. 2023) ("RKF's exclusive remedy is by way of its contested fee application under § 330. In the course of its prosecution of that fee application, it will be able to present all of the facts that it believes support the adversary proceeding that is preempted."). None of these cases involve, as the case before this Court does, a professional retained under 11 U.S.C. § 328(a) arguing the debtor breached a court-approved retention agreement and owes contractual damages to the retained professional by virtue of that breach.

Additionally, the Estate of Lois Weinstein filed an objection, Obj. of Est. of Lois Weinstein, ECF No. 365, but did not participate in the evidentiary proceeding. To the extent its arguments are not waived or do not duplicate those advanced by the Debtor, the Estate of Lois Weinstein attempts to force a review of Branton's entitlements under Section 330 of the Bankruptcy Code. While the Retention Order required Branton to "file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code," Retention Order ¶ 4, the Retention Order dictated that "all fees and out-of-pocket expense reimbursements to be paid to [Branton], including without limitation the Commission [], shall be subject to Section 328(a) of the Bankruptcy Code," *id.* ¶ 3. "Sections 328 and 330 establish a two-

19

tiered system for judicial review and approval of the terms of the professional's retention." *Riker, Danzig, Scherer, Hyland & Perretti v. Off. Comm. of Unsecured Creditors* (*In re Smart World Techs., LLC*), 552 F.3d 228, 232 (2d Cir. 2009). Section 330 explicitly describes itself as "subject to" Section 328. 11 U.S.C. § 330(a)(1). Thus, "[t]hese two inquiries are mutually exclusive [and] 'there is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328.'" *In re Smart World Techs., LLC*, 552 F.3d at 232–33 (quoting *Friedman Enters. v. B.U.M. Int'l, Inc.* (*In re B.U.M. Int'l, Inc.*)*, 229 F.3d 824, 829 (9th Cir. 2000)). "[S]ection 328(a) permits a bankruptcy court to forgo a full post-hoc reasonableness inquiry if it pre-approves the employment of a professional person under [S]ection 327." *Id.* at 232. As the Court granted the motion to retain Branton "[i]n accordance with Sections 327(a) and 328(a) of the Bankruptcy Code," Retention Order ¶ 1, this Court may not ex-post subject Branton's fee application to review under Section 330.

The Debtor chose to make a contract with Branton, including the terms of the contract that dictated New York law would govern it. This Court approved those terms as reasonable under Section 328(a). Thus, Branton, as a professional retained under Section 328(a), may seek payment of its fees as an administrative expense by alleging the Debtor committed a breach of the Agreement under New York law, and this Court may decide that application.

**B. The Nature of the Agreement**

Branton asserts that the Agreement gave it an exclusive right to sell the Property, such that any sale during the Term would entitle Branton to its negotiated commission. The Debtor argues Branton had merely an exclusive agency, and that as such Debtor's entitlement to sell the Property

20

without using Branton's services was not as restricted as Branton contends. Branton has the better

of this disagreement. In New York,

> [t]he distinction between an exclusive agency and an exclusive right to sell is well
> established in a body of Appellate Division case law. As stated nearly a century ago, the
> general rule is that where an exclusive right of sale is given a broker, the principal cannot
> make a sale without becoming liable for the commissions. But where the contract is merely
> to make the broker the sole agent, the principal may make a sale without the broker's aid,
> if such sale is made in good faith and to some purchaser not procured by the broker. Put
> differently, a broker is entitled to a commission upon the sale of the property by the owner
> only where the broker has been given the exclusive right to sell; an exclusive agency merely
> precludes the owner from retaining another broker in the making of the sale.

*Morpheus Cap. Advisors LLC v. UBS AG*, 15 N.E.3d 1187, 1191 (N.Y. 2014) (internal citations

omitted) (cleaned up) ("*Morpheus*"). The parties agree that *Morpheus* states the governing law.

Final Appl. ¶ 33; Obj. ¶ 32.

The governing contract here exactly fits the *Morpheus* definition of an exclusive right of

sale contract: "[A] contract giving rise to an exclusive right of sale must clearly and expressly

provide that a commission is due upon sale by the owner or exclude the owner from independently

negotiating a sale." *Morpheus*, 15 N.E.3d at 1192 (internal citations omitted) (cleaned up).

*Morpheus* recognizes that certain terms in an agreement may "clearly and expressly provide that

a commission is due upon sale by the owner or exclude the owner from independently negotiating

a sale," such as by "providing that a Success Fee is payable 'regardless of whether the broker has

actually procured the Purchase Agreement,'" requiring the seller to "proceed only through the

broker and . . . not directly or through others negotiate the sale," or requiring that the seller "refer

all inquiries or offers" to the broker. *Id.* at 1192 & n.2 (internal citations omitted). Branton's

Commission entitlement upon any sale during the Term satisfies this requirement.

Moreover, New York courts have consistently held that a clause in a brokerage agreement

requiring a seller to refer all inquiries to the broker creates an exclusive right to sell. *Gaillard*

*Realty Co. v. Rogers Wire Works, Inc.*, 213 N.Y.S. 616, 622 (App. Div. 1st Dep't 1926) ("I cannot

21

read the provision of the contract, that 'all inquiries with respect to said property' were to be referred to the plaintiff, otherwise than as giving the plaintiff the sole right to sell the property."); *Audrey Balog Realty Corp. v. E. Coast Real Est. Devs., Inc.*, 610 N.Y.S.2d 812, 812 (App. Div. 2d Dep't 1994) ("The brokerage agreement here required the defendant 'to refer all inquiries or offers on the available 80 units to the attention of the respondent, as exclusive Broker, for negotiation on the defendant's behalf, and commissions payable hereunder shall be due and payable to the respondent, regardless of whether the respondent has actually procured the Purchase Agreement.' Thus, the respondent had an exclusive right to sell, not merely an exclusive agency."); *Morpheus*, 15 N.E.3d at 1192 n.2; *Dominick & Dominick LLC v. Deutsche Oel & Gas AG*, No. 14-CV-06445 (PKC), 2016 WL 11259075, at *5 (S.D.N.Y. Aug. 15, 2016) ("Examples of contractual language that satisfy New York's clear statement rule include . . . where an owner specifically agreed that 'during the term of this agreement all inquiries with respect to the property are to be referred to the broker.'") (internal citations omitted), *aff'd sub nom. Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x 58 (2d Cir. 2018).

As a dispositive additional ground establishing that Branton had an exclusive right to sell, the Agreement required the Debtor to "refer to Branton all inquiries regarding a Transaction received during the Term," plain language that, under the governing law just described, grants Branton an exclusive right to sell the Property. Agreement § 3. The rest of Section Three supports that conclusion by requiring that "negotiations . . . be conducted by or through Branton." *Id.*

Furthermore, the Agreement defines the word "sale" as "a conventional sale of a fee simple interest in the Property . . . and any other transaction (however characterized) by which [Debtor]'s interest in the Property is transferred to an unaffiliated third party for consideration," *id.* Ex. A, "any such transaction being a 'Transaction,'" *id.* § 1. The third paragraph of Exhibit A, which

defines a "sale" and, transitively, a "Transaction," does not mention Branton at all; thus, something constituting a "sale" or a "Transaction" does not need to directly involve or result from the work of Branton to trigger Branton's entitlement to the Commission. The Agreement further states "Branton shall be entitled to . . . the Commission . . . upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below." *Id.* § 5. Thus, the Agreement gave Branton an exclusive right to sell the Property.

## C. The Meaning of "All Inquiries" and Its Implications for Debtor's Referral Obligations

### 1. Defining an "Inquiry"

The Agreement required that the Debtor "refer to Branton all inquiries regarding a Transaction received during the Term." Agreement § 3. The Debtor and Branton dispute what constitutes an "inquiry." The Debtor reported to Branton expressions of interest from Mr. Westfried or parties associated with him in 2022 and the first half of 2023. *See* Email from M. Sklar to W. Heller (Sept. 12, 2022, 12:03 PM), DX0011; Email from M. Sklar to W. Heller (June 26, 2023, 9:02 AM), DX0022; Email from M. Sklar to W. Heller (June 27, 2023, 12:32 PM), DX0025. However, Mr. Westfried had a series of communications with Mr. Sklar in November and December 2023 that constituted one or more inquiries of which the Debtor never informed Branton. The Debtor did not tell Branton about the so-called "random Chinese guy" for whom Mr. Sklar attempted to set up a tour of the Property on the weekend of December 9-10, 2023. *See* Jan. 23 Tr. 104:16-19; Text Messages Between M. Sklar and E. Westfried, BX-36; Jan. 22 Tr. 102:9-11. More importantly, Mr. Westfried sent an explicit communication of buyer interest to Mr. Sklar on December 27, 2023 by text stating, "Can I get tour 1/2 at 2pm with the Chinese buyer? I'm hitting the ground running on this for you guys." Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51.

Branton labels the attempt to set up a tour for December 9-10 of 2023 and Mr. Westfried's text messages of December 27, 2023 as separate "inquiries" under the Agreement. Heller Decl. ¶¶ 65-66, 71. The Debtor's brief defines "inquiry" as Black's Law Dictionary does, "a question someone asks to elicit information." *Inquiry*, *Black's Law Dictionary* (12th ed. 2024); *see also Inquiry*, *Black's Law Dictionary* (11th ed. 2019). That same source offers as a secondary definition, "the act or process of posing questions to elicit information." *Inquiry*, *Black's Law Dictionary* (12th ed. 2024); *see also Inquiry*, *Black's Law Dictionary* (11th ed. 2019). Thus, even under the authorities the Debtor cites, Mr. Westfried's communications regarding a potential December 9-10 tour and his text message of December 27, 2023 constitute inquiries. They sought to elicit whether he could show the Property to a described prospective buyer. Even if the Court were to adopt a narrower definition of "inquiry" for the purposes of interpreting the Agreement, the Court would still hold that Mr. Westfried made an "inquiry" to the Debtor for purposes of the Agreement on December 27, 2023, because the Court reads the word "inquiries" in the Agreement in context with the words that follow it, "regarding a Transaction received during the Term." Agreement § 3. The message in question came from a person known to represent buyers and communicated that a described third person had an interest in purchasing the property that the seller had held out for sale. Under the Agreement, any sale of the Property counted as a "Transaction." *Id.* § 1; *id.* Ex. A. Thus, Mr. Westfried made an inquiry "regarding a Transaction" "during the Term" and, under the Agreement, the Debtor needed to refer it.

The Debtor contends that it could not have referred Sunlight Development or Mr. Zhuo to Branton during the Term because the Debtor never learned their identities until after the Term ended. Obj. ¶ 66-67. Debtor cites no authority for this proposition, and it clashes with the Agreement's plain language. The Agreement required the Debtor to refer "all inquiries **regarding**

a Transaction," Agreement § 3 (emphasis added), not just inquiries made by or on behalf of a prospective purchaser whose identity was known. Mr. Westfried's communications in early and late December constituted "inquires regarding a Transaction." This conclusion is buttressed by the Debtor's own conduct. The Debtor forwarded to Branton multiple emails that described prospective purchasers with less detail than Mr. Westfried described Mr. Zhuo in the December 27, 2023 text messages. *Compare* Email from M. Sklar to W. Heller and S. Sklar re: Referral, BX-8 (Mr. Sklar informing Mr. Heller of an inquiry made by a broker who said he was "in touch with a potential buyer") *and* Email from M. Sklar to W. Heller, S. Sklar, A. Kahn, T. Flemming re: Referral, BX-16 (informing Mr. Heller of an inquiry sent by a lawyer on behalf of a broker who had a client "coming in from Italy") *with* Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51 (naming "the Chinese buyer").

Debtor argues in parallel that Branton's List of protected prospects includes only prospective purchasers, not brokers, which Debtor argues shows that an "inquiry" must come from a purchaser rather than a broker. Obj. ¶¶ 68-69. This contention mischaracterizes the nature and function of the List. The List included only "the names of parties who physically toured the Property during the Term." Agreement § 5. By contrast, the referral-of-inquiries requirement has a much broader reach, mandating referral of "all inquiries regarding a Transaction received during the Term." *Id.* § 3. A referral requirement exists to give a broker the maximum possible exposure to the universe of potential purchasers. By contrast, a broker uses a list of protected prospects to protect its right to compensation as to the prospects whose interest he developed, as shown by their choice to tour the property. The Agreement does not tie these clauses together in any way. Mr. Heller explained that he included only prospective purchasers, not brokers, on the List to protect the Debtor. He stated,

25

> If I put a broker on a protection list without identifying the principal, I could make the
> claim that any principal that subsequently makes an inquiry through the broker would be
> protected, which, in fact, would not be true or fair to the owner. So I only list the principals
> themselves independent of whether they [were] referred by a broker.

Jan. 23 Tr. 210:14-19. The Court will not punish Mr. Heller for protecting the interests of his

clients by omitting brokers from his List. An inquiry for purposes of the Agreement's referral

clause does not need to be made on behalf of a prospective purchaser with a known identity. Thus,

Mr. Westfried's communications with the Debtor in early December 2023, in which he attempted

to set up a tour of the Property on the weekend of December 9-10, along with his text message of

December 27, 2023, each count as an "inquiry" for the purposes of the Agreement.

### 2. The Agreement Required Debtor to Refer "All Inquiries" – Not Just All Inquirers

The Debtor further contends that by informing Branton in 2022 and the summer of 2023

that Mr. Westfried had expressed interest in the Property, it met its referral obligations under the

Agreement. *See* Obj. ¶¶ 47-51; Email from M. Sklar to W. Heller (Sept. 12, 2022, 12:03 PM),

DX0011; Email from M. Sklar to W. Heller (June 26, 2023, 9:02 AM), DX0022; Email from M.

Sklar to W. Heller (June 27, 2023, 12:32 PM), DX0025. This argument rests on a misreading of

the Agreement. As Branton observes, the Debtor had an obligation to refer "all inquiries." Reply

¶ 14, ECF No. 397; Agreement § 3. As determined above, Mr. Westfried's requests for tours of

the Property on behalf of different prospective purchasers, which he made in early and late

December of 2023, respectively, each constituted a separate "inquiry" "regarding a Transaction"

for purposes of the Agreement. It follows *a fortiori* that those inquiries were separate from Mr.

Westfried's inquiries in 2022 and the summer of 2023. The earlier referrals of those 2022 and

summer 2023 expressions of interest from Mr. Westfried did not discharge Debtor's contractual

duties by constituting referrals of the not-yet-occurred December 2023 inquiries. A referral of one

inquiry at one time cannot, and did not here, satisfy a party's obligation to refer another inquiry received six months later.

## D.  If Debtor Received an Inquiry, Debtor Had to Inform Branton of It

The Debtor and Branton dispute what counts as a "referral" of an inquiry. This dispute centers on Mr. Sklar's declaration that, "[d]uring my interactions with Mr. Westfried in 2023, there were times that the Property and its ongoing sale process was discussed. During those discussions, I always made clear to Mr. Westfried that Branton was the exclusive broker and that any sale efforts by Two Bins of the Property during Branton's Term had to be through Branton." Sklar Decl. ¶ 27. The Debtor contends that this was enough to satisfy the Agreement's referral obligation. Obj. ¶¶ 52-54. The Court disagrees. As a preliminary matter, "[t]he party to whom the duty is owed usually has the burden of proving the occurrence of conditions precedent to the performance of the duty. The party burdened by the duty, however, usually has the burden of proving the discharge of his duty[.]" *Lindenbaum v. Royco Prop. Corp.*, 567 N.Y.S.2d 218, 219 (App. Div. 1st Dep't 1991) (internal quotations omitted). Here, as noted above, Branton was owed the duty by Debtor to refer all inquiries, and Branton has proven that the Debtor received two inquiries from Mr. Westfried regarding a Transaction during the Term—conditions precedent that triggered Debtor's referral obligation. The Debtor thus has the burden to show it referred those inquiries to Branton.

As a literal matter, Mr. Sklar does not appear to have "referred" each of Mr. Westfried's inquiries to Branton even if the referral obligation could be satisfied by telling the inquirer to contact Branton. None of the Debtor's written communications with Mr. Westfried during November or December of 2023 contain any such clear instruction. *See* Text Messages Between M. Sklar and E. Westfried, BX-27; Email from E. Westfried to M. Sklar re: Zoom Call, BX-32;

Zoom Invitation for Call Between M. Sklar, S. Sklar, and E. Westfried, BX-33; Email from M. Sklar to E. Westfried Attaching 95 Madison Plans, BX-34; Text Messages Between M. Sklar and E. Westfried, BX-36; Text Messages Between M. Sklar and E. Westfried, BX-41; Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51. Mr. Westfried stated in his declaration that Mr. Sklar instructed him to reach out to Branton, Westfried Decl. ¶ 12, and the Court finds that Mr. Sklar conveyed to Mr. Westfried that Mr. Heller had an exclusive through the end of 2023, but there is no evidence that each "inquiry," including that of Mr. Zhuo, was "referred" even by a specific instruction given to Mr. Westfried to contact Mr. Heller.

Furthermore, even if each of Mr. Westfried's inquiries had triggered a separate instruction from the Debtor to contact Mr. Heller, that would not have been enough. The First Department of New York's Appellate Division has held in materially identical circumstances,

> [W]hen the parties agreed that, during the term of the contract, 'all inquiries with respect to said property are to be referred to us [plaintiff],' they clearly meant that the defendant was to make known to the plaintiff any opportunity which came to the defendant to dispose of the property to a prospective purchaser during the term of the agreement.

*Gaillard Realty Co. v. Rogers Wire Works, Inc.*, 213 N.Y.S. 616, 621 (App. Div. 1st Dep't 1926). Section Three of the Agreement reads "Owner shall refer to Branton all inquiries regarding a Transaction received during the Term[.]" Agreement § 3. This Court reads the language in the Agreement to have the same effect as the nearly-identical language interpreted by the relevant New York appellate courts to require the *property owner* to inform its retained broker of any inquiries, not merely to tell the inquiring party to "call my broker."

Debtor places great weight on *Akerman v. Dobbs*, 580 N.Y.S.2d 793 (App. Div. 2d Dep't 1992), but as that case did not involve breach of a referral requirement, *Gaillard* presents facts closer to the dispute before this Court. The Debtor attempts to distinguish *Gaillard* by arguing that there the contract at issue included a provision stating, "[i]n the event of a sale being effected

through another broker, the commission payable by you [defendant property owner] to us [plaintiff

broker] upon the closing of title is to be 7 1/2 per cent. of the total amount involved." *Gaillard*

*Realty Co.*, 213 N.Y.S. at 618. Debtor contends that the existence of this provision in *Gaillard*

makes that case irrelevant to interpreting the Agreement between the Debtor and Branton. The

Debtor neglects to quote the remainder of that sentence in *Gaillard*, "the purpose being to enable

us to offer a full commission of 5 per cent. to any broker who may procure a purchaser for the

property." *Id.* The phrase that the Debtor failed to quote explains why the phrase it quoted exists

– to allow the owner's retained broker to offer a commission to a cooperating broker. These phrases

do not change the *Gaillard* agreement's effect as creating an exclusive right to sell, and they shed

no light on what this precedent requires of parties bound by referral requirements. Similarly, the

Debtor's attempt to distinguish *Gaillard* as irrelevant because the brokerage contract in question

required the defendant property owner to pay a commission to the plaintiff broker even upon a sale

"to a purchaser procured by the defendant, or its former superintendent, without the intervention

or assistance of the plaintiff," *id.* at 622, also fails. *Gaillard*'s observations regarding the

commission being payable even if the former superintendent procured a buyer is completely

consistent with that agreement creating an exclusive right to sell and with the Agreement here. Just

like Debtor here sold the Property without informing Branton of an inquiry that Debtor received

during the Term from an inquirer who ended up purchasing the Property, in *Gaillard*, "the

defendant, without notifying the plaintiff and without referring to it any inquiries concerning the

sale of the property, sold its said plant." *Id.* at 620. Further, as noted above, the Agreement vested

Branton with an exclusive right to sell by requiring referral of all inquiries, and *Gaillard* found an

exclusive right to sell based on nearly identical language as in the Agreement. *Compare id.* at 622

("I cannot read the provision of the contract, that 'all inquiries with respect to said property' were

to be referred to the plaintiff, otherwise than as giving the plaintiff the sole right to sell the property.") *with* Agreement § 3 ("Owner shall refer to Branton all inquiries regarding a Transaction received during the Term[.]"). *Gaillard* was decided nearly a century ago, but it remains both good law and persuasive. Were the referral requirement not to mandate disclosure by the principal to the broker, "there would be no force whatever to the provision of the contract that all inquiries with respect to the property were to be referred to the plaintiff." *Gaillard Realty Co.*, 213 N.Y.S. at 621.

Debtor's counsel, in closing arguments, suggested that the lack of a time-is-of-the-essence provision in the Agreement somehow should insulate his client from liability. Jan. 24 Tr. 40:6-24. Presumably, Debtor's suggestion is that the lack of such a provision meant that the Debtor did not need to inform Branton of Mr. Westfried's most important inquiry within the five days between the inquiry's occurrence on December 27, 2023 and the end of the Term. That argument fails. First, the Debtor consistently made same-day referrals of those inquiries that the Debtor chose to refer, so the issue here is not one of timing. *See* Email from M. Sklar to W. Heller and S. Sklar re: Referral, BX-8 (referral made thirty-four minutes after inquiry received); Email from S. Sklar to W. Heller and M. Sklar re: Referral, BX-10 (referral made four hours and six minutes after inquiry received); Email from M. Sklar to W. Heller, S. Sklar, A. Kahn, T. Flemming re: Referral, BX-16 (referral made forty minutes after inquiry received). Second, Debtor's breach here is not an untimely referral, but an intentional decision not to make a referral at all. The Debtor needed to inform Branton of Mr. Westfried's inquiries, and the Debtor failed to do so. This failure by the Debtor breached the contract. *Hammond v. C.I.T. Fin. Corp.*, 203 F.2d 705, 707 (2d Cir. 1953) ("[T]he contract had already been breached by the failure to refer.").

30

Debtor's breach of the referral requirement was compounded by its resulting, or coinciding, failure to honor the remainder of that same sentence in the Agreement. Immediately after requiring the referral of "all inquiries regarding a Transaction received during the Term," the Agreement goes on, "and negotiations shall be conducted by or through Branton (subject to direction and input from Owner)." Agreement § 3. This requirement reinforced Branton's protections and entitlement to be involved in whatever sale efforts were to occur during the Term. It minimized the risk to Branton that the Debtor or commercial rivals would attempt to engineer a Transaction in a way that would deprive Branton of the Commission it was due upon any Transaction during the Term or during the next year to any prospect on Branton's List. The inclusion of the negotiation entitlement in the same sentence as the requirement that Debtor refer "all inquiries" establishes the parties' agreement that, during the Term, Branton was to be Debtor's sole agent for finding or pursuing prospects and attempting to develop a sale on terms that acceptable to Debtor.

Notwithstanding these requirements, the Debtor not only failed to refer Mr. Westfried's inquiries to Branton, but it compounded its attempted run-around of Branton's entitlements by separately negotiating with Mr. Westfried in connection with his (as then unnamed) prospect before the end of the Term. Mr. Sklar sent plans for the conversion of the Property to residential uses to Mr. Westfried on November 28, 2023. Email from M. Sklar to E. Westfried Attaching 95 Madison Plans, BX-34. Mr. Westfried passed them on to Mr. Chou on December 19, 2023. Email from E. Westfried to J. Chou Attaching 95 Madison Plans, BX-43. The record does not establish whether Mr. Westfried passed the plans on with the knowledge or encouragement of Mr. Sklar or any other Debtor representative, but that act clearly was a marketing and preliminary negotiating step. Regardless, as December went on, Mr. Westfried and Mr. Sklar had discussions that pertained to marketing and negotiating a sale of the Property, *see* Jan. 23 Tr. 104:7-19, culminating in exchanges

about arranging a tour for a prospective buyer, *see* Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51. These discussions led to a motivated and eager prospect visiting the Property on January 2, 2024 with Mr. Westfried and promptly making and aggressively pursuing a compelling offer to purchase it. This breach was a further and material impediment to Mr. Heller's intensive efforts to find a buyer and achieve a suitable sale before the Term expired.

**E.  Causation: Debtor Cannot Set Up Failure of a Condition as a Defense**

The Court now turns to the question of causation. The Debtor asserts Mr. Westfried's stated reluctance to work with Mr. Heller means that even if Debtor had not breached the referral requirement, Branton would not have successfully closed a Transaction before the end of the Term or given the eventual buyer a tour so that Branton could put the eventual buyer on the List, such that Branton cannot show the alleged breach prevented Branton from fulfilling either of the two routes by which Branton could earn compensation under the Agreement. *See* Obj. ¶¶ 55-65. The Debtor is correct that Mr. Westfried had told Mr. Sklar that he did not want to do a sale transaction involving Mr. Heller. However, the facts do not wholly support Debtor's contention, and the law rejects it.

Branton was intensively marketing the Property to the very end of the Term, Heller Decl. ¶¶ 73-74, and Branton unquestionably would have aggressively pursued a referral of the inquiry by Mr. Westfried had the Debtor informed Branton of it as the Agreement required. Further, the Agreement required negotiations about the Property to be conducted "by or through Branton," Agreement § 3, and, had Debtor followed the Agreement by referring Mr. Westfried's December 27, 2023 inquiry and abiding by the requirement that negotiations proceed by or through Branton, the sale may have been finalized during the Term. At a minimum, Mr. Heller more likely than not

would have included Mr. Zhuo, Sunlight Development, Sunlight Group, and their affiliates on his protected "List" by giving Mr. Zhuo a tour during the Term.

Branton scheduled tours for two prospective purchasers for December 28, 2023. *See* Heller Decl. ¶ 73; Emails Between W. Heller, M. Sklar, S. Sklar re: Tours for Other Prospects, BX-52. It unquestionably would have been possible for Branton to give Mr. Westfried or his clients a tour during the Term even if Branton had been notified of Mr. Zhuo's interest (and Mr. Westfried's renewed interest) late in December of 2023. Given Branton's incentive to include as many parties on the List as possible, *see* Agreement § 5, and Mr. Heller's efforts to conduct tours on December 28, 2023, Heller Decl. ¶ 73, Mr. Heller certainly would have agreed to conduct such a tour. Furthermore, Mr. Zhuo testified that he was eager to find and buy a suitable Manhattan property, and he would have toured the Property in 2023 had he been offered the chance. Jan. 22 Tr. 181:23-183:5, 192:4-24. Mr. Zhuo's actions lend credibility to his testimony – he energetically pursued the purchase immediately after he toured the Property on January 2, 2024. Jan 23 Tr. 138:25-139:6; Email from E. Westfried to M. Sklar Attaching Sunlight $58M Offer, BX-64 (sent to Debtor on January 8, 2024); Text Messages Between E. Westfried and L. Zhuo re: CNY Offer, BX-69; Email from L. Zhuo to E. Westfried Attaching Sunlight $60M Offer, BX-72 (sent on January 12, 2024); Email from E. Westfried to M. Sklar Attaching Sunlight $60M Offer, BX-73 (also sent on January 12, 2024).

Debtor relies only on Mr. Westfried's statement that he would not work with Branton, Westfried Decl. ¶ 14, to support its argument on the facts. The Court does not fully credit this aspect of Mr. Westfried's testimony, viewing Mr. Westfried as stating his preference but not an unalterable demand. Mr. Westfried's testimony demonstrated that he is a nimble and energetic real estate dealmaker, Jan. 23 Tr. 70:11-13, 77:5-6, 111:5-13, and real estate brokers generally have a

strong interest in earning fees by brokering deals. *Cf. Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("The desire to earn management fees is a motive generally possessed by hedge fund managers[.]") (further citations omitted). Further, Mr. Westfried's extensive communications with Mr. Sklar during November and December of 2023 show his interest in brokering a deal to sell the Property; in fact, the Court finds they constitute "negotiations" which were contractually required to be done "by or through" Branton. *See* Calls Between M. Sklar and E. Westfried, BX-28; Calls Between M. Sklar and E. Westfried, BX-35; Text Messages Between M. Sklar and E. Westfried, BX-36; Calls Between M. Sklar and W. Heller, BX-40 (this exhibit also shows calls between Mr. Sklar and Mr. Westfried); Call Between M. Sklar and E. Westfried, BX-42; Calls Between M. Sklar and W. Heller, BX-46 (this exhibit also shows calls between Mr. Sklar and Mr. Westfried); Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser, BX-51.

Thus, based on the Court's observation of the witnesses, the Court concludes it is more likely than not that, had the Debtor informed Branton as required that Mr. Westfried was working with a motivated buyer whose identity was unknown to the Debtor, outreach by Mr. Heller to the practical Mr. Westfried would have overcome Mr. Westfried's professed preference not to deal with Branton. Mr. Westfried demonstrated eagerness and a knack for dealmaking, *see* Jan. 23 Tr. 70:11-13, 77:5-6, 111:5-13, and specifically he understood that Mr. Zhuo sought investment opportunities like the Property, Jan. 22 Tr. 156:1-22, and made deals on an accelerated timeframe, Jan. 23 Tr. 130:4-13. Mr. Sklar described himself as desperate to sell the Property given the Debtor's mounting financial problems, *see* Sklar Decl. ¶ 19, and Mr. Zhuo had a strong interest in finding development projects like the Property, *see* Jan. 22 Tr. 165:4-8, 192:4-24. Mr. Heller doggedly sought to bring in credible buyers during the Term. Heller Decl. ¶¶ 38, 42-43. And, had

Debtor not breached the Agreement's referral requirement, Mr. Heller would have insisted that he be involved in sale discussions during the Term, backed by the Agreement's requirement that "negotiations shall be conducted by or through Branton," Agreement § 3. In these circumstances, the probable result is that Mr. Westfried would have relented such that Mr. Zhuo and his group would have toured the Property during the Term and proceeded with the sale. These conclusions necessarily involve weighing a counterfactual scenario, which Debtor labels "speculative," but that evidentiary need results from Debtor's breach which should not be rewarded, and the Court finds this result more probable than not but for the breach. Further, the Court finds little doubt that, if put in touch with Mr. Heller during 2023, Mr. Zhuo and his group would have pursued and completed the purchase on substantially similar terms.

On the law, "[i]t is well settled that conditions in contracts for compensation of brokers have been enforced in accordance with the letter of the promise to pay. However, it is equally settled that a party may not frustrate the performance of an agreement by bringing about the failure of a condition precedent." *Curtis Props. Corp. v. Greif Cos.*, 628 N.Y.S.2d 628, 631–32 (App. Div. 1st Dep't 1995) (quoting *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 629 N.Y.S.2d 382, 386 (App. Div. 1st Dep't 1995) (further citations omitted)). "As a matter of law, having entered into an agreement under which the broker's compensation is conditioned on its right to represent defendants' interests with a third party, defendants are precluded from taking any action which would defeat that condition." *Id.* at 631. "[T]he failure of the condition may not be set up as a defense to the underlying obligation under the contract where the party charged with the duty to fulfill the condition has failed to make a good-faith effort to bring it about. *A fortiori,* failure of the condition cannot be utilized as a defense where, as here, the party resisting the contractual obligation has affirmatively acted to obviate its fulfillment." *Rachmani Corp. v. 9 E. 96th St.*

*Apartment Corp.*, 629 N.Y.S.2d 382, 387 (App. Div. 1st Dep't 1995) (citing *Gulf Oil Co. v. Am. La. Pipe Line Co.*, 282 F.2d 401, 404 (6th Cir. 1960)). Similarly, in the context of a motion to dismiss that required merely evaluating the pleadings' sufficiency, a cause of action for breach of a brokerage commission obligation is established "[i]f the efforts of the broker are rendered a failure by the fault of the principal" and if but for "plaintiff being prevented from continuing to act as broker in the said negotiation up to the time of execution of the [agreement], it would have earned and become entitled to a commission," where the terms of a sale independently reached by the client "were substantially similar to offers of proposed purchases by others submitted by plaintiff to the defendants." *Julien J. Studley, Inc. v. Coach, Inc.*, 770 N.Y.S.2d 336, 338 (App. Div. 1st Dep't 2004) (quoting, *inter alia*, *Sibbald v. Bethlehem Iron Co.,* 83 N.Y. 378, 383 (1881); *Williams & Co. v. Collins, Tuttle & Co.*, 176 N.Y.S.2d 99, 106 (App. Div. 1st Dep't 1958), *lv. denied*, 156 N.E.2d 463; other citations omitted).

Just so here. As discussed, Debtor had the obligation to refer "all inquiries," not just inquiries it thought might result in a Transaction, and the Agreement's very same sentence required that negotiations be conducted "by or through Branton." Debtor cannot put up Mr. Westfried's previously-expressed preference not to work with Branton as an excuse to allow Mr. Westfried to develop the sale during the Term. Debtor never even made the key inquiry known to Branton, much less adhered to its agreement that negotiations were to be done by or through Branton, despite Debtor's receiving Mr. Westfried's inquiry during the Term and having preliminary discussions with him about a prospective buyer whose specific identity Debtor seemingly did not know. Underlying the idea of both a referral obligation and a related negotiation right is that the principal's agent be given the chance to make the sale. Here, the Debtor gave Branton no chance at all. Thus, the Debtor "br[ought] about the failure of a condition precedent," *Curtis Props. Corp.*,

36

628 N.Y.S.2d at 632, to Branton's entitlements under the Agreement, and such "failure of the condition may not be set up as a defense to the underlying obligation under the contract," *Rachmani Corp.*, 629 N.Y.S.2d at 387, because the Debtor, "the party charged with the duty to fulfill the condition[,] has failed to make a good-faith effort to bring it about," *id.* "Having conditioned the payment of [Branton's] brokerage commission on the transfer of the [Property], the [Debtor] 'implicitly promised to use [] good-faith best efforts to bring about this result.'" *Id.* (quoting *Stendig, Inc. v. Thom Rock Realty Co.*, 558 N.Y.S.2d 917, 919 (App. Div 1st Dep't 1990)). The Court therefore rejects Debtor's argument that Mr. Westfried's expressed resistance to working with Branton breaks the causal chain or precludes an award based on Debtor's failure to give Branton the contractually-required opportunity to accomplish the sale.

## F. Damages

Having concluded that 1) Branton may seek compensation for breach of the Agreement via a fee application or application for allowance of administrative expenses, 2) the Agreement conferred on Branton an exclusive right to sell the Property during the Term, 3) the Debtor received an "inquiry" "regarding a Transaction" involving Mr. Zhuo "during the Term," 4) the Debtor failed to "refer" that inquiry to Branton as required by the Agreement and also failed to abide by the requirement that "negotiations" be "conducted by or through Branton," and 5) Branton has shown on the facts and under the law that the Debtor, by breaching its referral and negotiation obligations, forfeited the right to invoke Branton's failure to close a Transaction during the Term or include Mr. Zhou's investment group on the List as a defense, the Court turns to the issue of damages.

Debtor's counsel in closing stated, "there's no New York cases he cited for the proposition that if a breach occurs during the term [of] an exclusive right to sell th[en] that creates an obligation

for a transaction that closes thereafter." Jan. 24 Tr. 66:2-7 (cleaned up). Branton's counsel may

not have cited any such case, but the Court has found New York precedent to that effect:

> The record before us . . . supports the allegations that Coach [the defendant] breached the
> exclusivity provision of the brokerage agreement prior to its termination. The agreement
> required that both Studley [the plaintiff-broker] and Coach apprise the other of "all space
> offerings and solicitations meeting Coach's general parameters which are received by
> Coach or Studley during the term of the Agreement from Coach's landlord and/or their
> representatives . . . and that all dealings for such space will be handled through Studley."
> *With regard to its commission, plaintiff asserts the provision in the agreement that entitles
> it to payment if, during the term of the agreement, negotiations for a transaction were
> initiated even if the transaction was completed after termination. Plaintiff sufficiently
> asserts it is entitled to recover a commission due to the pre-termination breach of the
> brokerage agreement's exclusivity provision.*

*Julien J. Studley, Inc.*, 770 N.Y.S.2d at 338 (emphasis added). *Studley* further instructs that the

broker can establish its entitlement to commission damages where the supposedly independently

negotiated transaction was on terms "substantially similar to offers of proposed purchases by

others submitted by plaintiff." *Id.* That requirement is met here: CNY, the rival bidder and a party

on Branton's List, made a strongly competitive bid that the seller agreed was suitable, and CNY

increased its bid just prior to the sale approval hearing, which forced the ultimate purchaser to

match CNY's $65 million offer. *See* Email from W. Heller to A. Glenn re: Post-Termination

Protected Prospects, BX-63 (listing CNY Group); Email from M. Sklar to W. Heller, M.

Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66 (letter of intent by Madison

95 Associates LLC, CNY Group's designee, to purchase the Property for $60 million); Apr. 18 Tr.

8:23-9:7, 47:12-15 (noting Madison 95 Associates had raised its offer for the Property to $65

million); Sale Order, Findings of Fact and Conclusions of Law III.F(1) (stating final sale price of

$65 million).

The Court thus applies New York precedents for calculating damages for breach of an

exclusive right to sell. "[B]y reason of such breach of contract on the defendant's part the plaintiff

became entitled to recover damages, measured by the amount of the commissions to which it would

38

have been entitled in the absence of such breach of contract." *Gaillard Realty Co. v. Rogers Wire Works, Inc.*, 213 N.Y.S. 616, 622 (App. Div. 1st Dep't 1926); *see also Hammond v. C.I.T. Fin. Corp.*, 203 F.2d 705, 708 (2d Cir. 1953) ("Since the district court found that the plaintiff would have been as successful in negotiating the Redmond [sale] as was the defendant, the damages consist of the loss sustained when Redmond was not referred to the plaintiff, i.e., five per cent of the sales price.").

The Property ultimately sold for $65 million. Sale Order, Findings of Fact and Conclusions of Law Part III.F(1). As noted above, the Debtor achieved this increased offer from Mr. Zhuo's group in large part as a result of Branton's efforts. Mr. Heller delivered the $60 million CNY LOI on December 26, 2023, before his Term expired. Email from W. Heller to A. Glenn re: CNY LOI, BX-48 (sent in the name of CNY's designee, Madison 95 Associates LLC). Branton included CNY on the List. Email from W. Heller to A. Glenn re: Post-Termination Protected Prospects, BX-63. The Debtor found this offer from CNY credible enough to sign the LOI and enter an exclusive negotiations period. *See* Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar Attaching Executed CNY LOI, BX-66. Mr. Heller also played a role in CNY's escalating bids for the Property that eventually reached $65 million. Apr. 18 Tr. 9:2-7 (confirming fact of competing offer for $65 million); *id.* 47:12-15 (competing bidder identified as Madison 95 Associates LLC); *id.* 55:3-21 (counsel for Madison 95 Associates LLC stating that his client would take care of any fee due to Branton if Debtor accepted his client's purchase offer). The Court thus finds support in the record that Branton could and did deliver credible purchase offers equivalent to those the Debtor accepted. Mr. Zhuo's group's increase in its offer from $60 million to $65 million can only have been motivated by the competing bid in that amount made by the prospect on Branton's List, CNY. And the Court further finds it more probable than not that, had Debtor not breached its

referral and negotiation-related contractual commitments, Branton would have engaged with Mr.

Westfried, connected directly or indirectly with the highly motivated Mr. Zhuo, and secured a

comparable offer from him. As noted, in circumstances that were not materially distinguishable,

the Second Circuit affirmed a damages award in the amount of a broker's full contractual

commission entitlement based on the premise that "the plaintiff would have been as successful in

negotiating [with the ultimate purchaser] as was the defendant, [so] the damages consist of the loss

sustained when [the eventual purchaser] was not referred to the plaintiff." *Hammond*, 203 F.2d at

708. The same result follows here: Branton is entitled to the Commission it would have been due

had it brokered the ultimate sale. At a sale price of $65 million, that translates to a Commission of

$950,000, *see* Agreement Ex. A ("Branton shall earn, and Owner shall pay Branton, a fee upon

the closing of any Transaction of $300,000 plus one (1%) of the gross sales price."), plus certain

expenses and reasonable legal fees as required by the Agreement, *see id.* §§ 7, 14.

## CONCLUSION

The Court grants Branton's administrative expense fee application in the amount of $950,000

plus reimbursement of its expenses plus reasonable legal fees and disbursements incurred in

enforcing the Agreement. The Court overrules all objections to the application. Branton shall

docket a proposed order, on notice, effectuating this ruling, which shall quantify and substantiate

whatever expenses and fees it asserts are due. Branton shall submit to chambers by email a

Microsoft Word version of the docketed proposed order. Debtor shall have a minimum of seven

days to object to the proposed order including the proposed order's assertion of fees and

expenses, during which time the parties are to attempt to reach agreement on what constitutes a

reasonable figure for such fees and expenses. Debtor's time to appeal shall commence upon the

Court's approval and entry of a separate order effectuating this ruling. It is so ordered.


Dated: New York, New York
        March 27, 2025

                                            _____*s/ David S. Jones*_____
                                            Honorable David S. Jones
                                            United States Bankruptcy Judge