Andrew K. Glenn
Agustina G. Berro
Richard C. Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to Reorganized Debtor*
*Ninety-Five Madison Company, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

**REORGANIZED DEBTOR NINETY-FIVE MADISON COMPANY, L.P.'S RENEWED
MOTION TO (I) ENFORCE THE PLAN INJUNCTION AND CONFIRMATION
ORDER AND (II) DISSOLVE TEMPORARY RESTRAINING ORDER**

**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to Reorganized Debtor*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

JURISDICTION .................................................................................................................. 3

RELIEF REQUESTED ........................................................................................................ 3

BACKGROUND ................................................................................................................. 4

    I.   NFMC and the Chapter 11 Case ................................................................... 5

        A.   NFMC's Partnership Agreement and Related Amendments. ................. 5

        B.   The Court Confirmed the Plan Over the Weinstein Estate's Objection. ................. 5

        C.   Distributions to the Weinstein Estate Under the Plan. ........................... 10

        D.   Retention of Jurisdiction. ....................................................................... 12

    II.   The State Court Action, the TRO, and the TRO's Effects on the Reorganized Debtor. ................................................................................. 13

    III.   This Court Temporarily Enjoins the Weinstein Estate from Prosecuting Its Claims. ............................................................................................... 15

    IV.   The Weinstein Estate Agrees to Dissolve the TRO, But Then Inexplicably Reverses Course. ............................................................... 16

    V.   Despite Its Best Efforts, Because of the TRO the Reorganized Debtor Fails to Pay Necessary and Due Taxes. ............................................... 18

    VI.   The Unpaid and Accumulating Administrative Claims. ............................. 19

BASIS FOR RELIEF ......................................................................................................... 20

    I.   The TRO Should Be Immediately Dissolved. ............................................ 20

    II.   The Weinstein Estate's Dissolution Arguments Should Be Rejected. ......... 22

NOTICE ............................................................................................................................ 26

CONCLUSION .................................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
  390 B.R. 80 (S.D.N.Y. 2008)...................................................................................... 25

*In re Hunter*,
  4 N.Y.3d 260 (2005) .................................................................................................. 24

*In re Investors Funding Corp.*,
  547 F.2d 13 (2d Cir. 1976) ........................................................................................ 21

*In Re Metex Mfg. Corp.*,
  510 B.R. 735 (Bankr. S.D.N.Y. 2014)....................................................................... 25

*In re Neuman*,
  71 B.R. 567 (S.D.N.Y. 1987)..................................................................................... 21

*In re Parade Place, LLC*,
  508 B.R. 863 (Bankr. S.D.N.Y. 2014)....................................................................... 24

*Luan Inv. v. Franklin 145 Corp. (In re Prairie Retail, Inc.)*,
  304 F.3d 223 (2d Cir. 2002) ................................................................................ 15, 20

**Statutes**

U.S. Const. art. III...................................................................................................... 3

11 U.S.C. § 105(a) ..................................................................................................... 21

11 U.S.C. § 501 .......................................................................................................... 11

11 U.S.C. § 502 .......................................................................................................... 11

11 U.S.C. § 524 ........................................................................................................... 3

11 U.S.C. § 1107(a) ..................................................................................................... 5

11 U.S.C. § 1108 .......................................................................................................... 5

11 U.S.C. § 1141 .......................................................................................................... 3

11 U.S.C. § 1141(d) ............................................................................................... 10, 12

28 U.S.C. § 157............................................................................................................. 3

28 U.S.C. § 1334 ............................................................................................................. 3

28 U.S.C. § 1408 ............................................................................................................. 3

28 U.S.C. § 1409 ............................................................................................................. 3

IRS Code § 1031 ........................................................................................................... 13

N.Y. P'SHIP LAW § 64 ..................................................................................................... 9

**Rules**

Fed. R. Bankr. P. 1015(c) ................................................................................................ 3

Fed. R. Bankr. P. 3020(d) ............................................................................................... 3

Fed. R. Bankr. P. 9007 .................................................................................................... 3

Reorganized Debtor Ninety-Five Madison Company, L.P. ("NFMC" or, before the effective date of its Chapter 11 plan of reorganization, the "Debtor" and after the effective date of its plan of reorganization, the "Reorganized Debtor")[1] hereby renews its motion (the "Motion"), along with the accompanying declaration of Andrew K. Glenn, attached hereto as **Exhibit A** (the "Glenn Declaration"),[2] and in support respectfully states as follows:

## PRELIMINARY STATEMENT

In February 2025, when the Reorganized Debtor petitioned this Court for the Temporary Injunction against the Weinstein Estate, it warned that a TRO that the Weinstein Estate had obtained in the New York Action had caused the Reorganized Debtor significant harm, threatened to shut down its business, and leave it unable to pay creditors and satisfy certain indemnity obligations. The Reorganized Debtor further warned that the TRO rendered it unable to meet the obligations it incurs in the ordinary course and was essentially forcing the dissolution of the Reorganized Debtor, which was inconsistent with its Plan and Confirmation Order.

Each of these harms continues today. Since this Court's Temporary Injunction expired, the TRO has remained in place and prevents the Reorganized Debtor from paying administrative expense claims—including any forthcoming payment of the recent Branton Judgement, once that order is settled—in addition to expenses incurred in the ordinary course, such as the General Partners' federal, state, and city taxes, which are now past due.

Prior to the expiration of the Temporary Injunction, the Reorganized Debtor thought it had reached an agreement with the Weinstein Estate to disband the TRO and shift to this Cout all

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Amended Combined Chapter 11 Plan and Disclosure Statement of Debtor Ninety-Five Madison Company, L.P.* [Dkt. No. 294] (as amended or modified, the "Plan").

[2] Citations to "Ex. _" refer to exhibits attached to the Glenn Declaration.

consideration of its disputed dissolution claims and related injunctive relief. Thus, on the day that the Temporary Injunction expired, the Reorganized Debtor and the Weinstein Estate jointly filed a letter with the State Court requesting that "***consistent with the February 11, 2025 ruling of U.S. Bankruptcy Judge David S. Jones, no action should be taken . . . [on] the [Dissolution] Counterclaims (and related injunctive relief) pending further order of the Bankruptcy Court, which still retains jurisdiction over NFMC's confirmed Chapter 11 plan of reorganization***," including that plan's claim allowance and asset distribution provisions."

Since that time, and despite the Reorganized Debtor's insistence, the Weinstein Estate has inexplicably refused to take action to dissolve the TRO in the State Court and/or adjudicate its dissolution claims in this Court. This, no doubt, is so that it can maintain what it disingenuously refers to as a "balance of power" in overall litigation negotiations. What it really means is that the Weinstein Estate has sought to create leverage by seemingly obtaining a permanent injunction against the Reorganized Debtor that could saddle its stakeholders with millions of dollars in avoidable taxes, and prevent NFMC from meeting all its obligations without ever having to formally argue its claims.

But that is not all. The Weinstein Estate's verifiably wrong argument that NFMC is or was dissolved must be rejected. In February of 2024, the Reorganized Debtor's now-effective and confirmed Plan contemplated its continued existence as a going concern even after the Sale of 95 Madison Avenue closed. Moreover, under the clear and unambiguous terms of the Partnership Agreement, a majority of the General Partners can amend the Partnership Agreement to the extent that it would otherwise cause a dissolution. To that end, an August 2024 amendment to the Partnership Agreement explicitly removed the Sale as a dissolution-triggering event. And

NFMC's continued existence is further confirmed by the course of conduct of *all* NFMC's partners when they purchased 1031 properties with a portion of the proceeds of the Sale.

The TRO continues to cause significant harm to the Reorganized Debtor, and that damage will only be exacerbated without immediate relief. Administrative expenses are due; ordinary course expenses are due; and professionals are working for free. Given the inaction of the Weinstein Estate, the Reorganized Debtor is forced to file this Motion so that it can resume meeting its financial obligations as contemplated by its Plan and Confirmation Order and without the overhang of baseless threats of dissolution.

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012, Articles VIII.E and XI of the Plan, and paragraphs 19 and 25 of the Confirmation Order (as defined below). The Reorganized Debtor consents, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this renewed Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are Sections 105(d), 524, and 1141 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 1015(c), 3020(d), and 9007.

## RELIEF REQUESTED

4.      Pursuant to Sections 105(d), 524, and 1141 of the Bankruptcy Code, Rules 1015(c),

3020(d), and 9007 of the Bankruptcy Rules, Articles VIII.E and XI of the Plan, and paragraphs 19 and 25 of the *Order Approving and Confirming Debtor's Amended Combined Chapter 11 Plan of Reorganization* [Dkt. No. 300] (the "Confirmation Order"), the Reorganized Debtor requests entry of an order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Order"): (i) enforcing the provisions of the Plan and Confirmation Order to permanently prohibit the Estate of Lois Weinstein (the "Weinstein Estate") from continuing to prosecute in violation of the Plan and Confirmation Order, the Enjoined Claims (as defined below), or otherwise contesting the Reorganized Debtor's right to make distributions in accordance with the Plan, the Reorganized Debtor's continued existence, or the right of the General Partners to control the Reorganized Debtor; (ii) dissolving the TRO (as defined herein); and (iii) permitting the Reorganized Debtor, upon entry of the Proposed Order, to file a notice in a form substantially similar to that attached to the Proposed Order as Annex 1 (the "Enforcement Order Notice") in the case captioned *Ninety-Five Madison Company, LP v. Kinder Realty Associates et al.*, Case No. 653034/2024 (the "New York Action" or the "State Court Action," and the associated court, the "State Court").

## BACKGROUND

5.      As explained below, on February 12, 2025, this Court entered an order [Dkt. No. 414] (the "Temporary Injunction Order"), which granted the *Reorganized Debtor Ninety-Five Madison Company, L.P.'s Motion to Enforce the Plan Injunction and Confirmation Order* [Dkt. No. 404] (the "First Injunction Motion"). Due to the similarities of relief requested in this renewed Motion and in the First Injunction Motion, the Reorganized Debtor has reproduced for the Court's convenience much of the "Background" statement of facts provided in the First Injunction Motion.

## I. NFMC and the Chapter 11 Case.

### A. NFMC's Partnership Agreement and Related Amendments.

6. NFMC is a New York limited partnership whose primary asset was certain real property known as, and located at, 95 Madison Avenue, New York, New York (the "Property").

7. The Partnership Agreement was amended in June 2021 (the "Amended Partnership Agreement"), June 2022 (the "First Amendment"), and August 2024 (the "Second Amendment"). *See generally* Exs. 1-3. The Amended Partnership Agreement afforded the members great flexibility in amending the terms of the Partnership Agreement:

> "The General Partners (***upon the unanimous consent of all of the General Partners***) may, without the consent of the other Partners, ***amend this Agreement for any purpose . . ..***"

*See* Ex. 1 (Amended Partnership Agreement), Art. X (emphasis added).

8. The First Amendment then modified this already flexible provision to allow amendments (and all decisions) to be made only by a vote of a majority of the General Partners:

> "All decisions made hereafter shall be by the vote of a majority of the General Partners, or their Designee. The provisions of the Amended and Restated Partnership Agreement requiring a Unanimous Decision are hereby deleted."

*See* Ex. 2 (First Amendment), § 2.

9. The Second Amendment, which was signed by a majority of the General Partners, then made several additional changes including, and most relevant here, altering the circumstances triggering a dissolution of NFMC. These changes specifically removed a sale of the Property as a dissolution event. *See* Ex. 3 (Second Amendment), § 1.

### B. The Court Confirmed the Plan Over the Weinstein Estate's Objection.

10. On March 22, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the instant case (the "Chapter 11 Case") to address liquidity challenges, legal judgments, and litigation expenses. The Debtor managed its

assets as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code throughout the Chapter 11 Case.

11. On September 12, 2021, the Debtor filed a plan of reorganization (the "First Plan") [Dkt. No. 82], which contemplated that the Debtor would obtain exit financing that would be (i) secured by the Debtor's interest in the Property and (ii) sufficient to pay all of the Debtor's creditors in full. After filing the First Plan, and given challenges posed by the ongoing COVID-19 pandemic and the sustained downturn in the commercial leasing market, the Debtor made the business judgment decision to proceed with a sale or other disposition of the Property in contemplation of an amended plan of reorganization. Concurrently, the Debtor sought debtor-in-possession financing to bridge to the Debtor's emergence from Chapter 11.

12. On October 26, 2022, the Debtor filed a motion seeking authority to enter into a secured, superpriority debtor-in-possession term loan facility with Madison Avenue Servicing LLC as DIP Lender with a maximum principal availability of $23 million [Dkt. No. 187] (the "DIP Facility"). On December 14, 2022, the Bankruptcy Court entered an order approving the DIP Facility [Dkt. No. 197]. The DIP Credit Agreement authorized the Debtor to use the proceeds of the DIP Facility for the payment of claims under a plan of reorganization so long as (i) the plan provided for the payment of the DIP Facility in full, or (ii) any amount outstanding under the DIP Facility after confirmation of the plan was secured by a first-priority lien on the Property.

13. In early 2023, the Debtor launched a formal marketing process for the Sale of the Property. As the Debtor repeatedly informed the Court throughout the process, the Debtor sought a potential disposition that would be tax-efficient given the low basis the Debtor's partners had in the property given that it was owned in the family for generations. On September 27, 2023, the Debtor filed a *Combined Chapter 11 Plan and Disclosure Statement of Debtor Ninety-Five*

*Madison Company, L.P.* [Dkt. No. 274], which was subsequently amended [Dkt. No. 294] that the Court confirmed on December 21, 2023.

14.     Pursuant to the Plan, the Debtor paid Allowed Claims in full with the proceeds of the DIP Facility and an exit facility funded by the DIP Lender. The Plan also contemplated the Debtor consummating a sale of the Property after the Effective Date and using the proceeds of the sale to make distributions to Holders of Allowed Claims. Pursuant to the Plan, the Claims and Interests against the Debtor were classified as follows:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 4 | Equity Interests in the Debtor | Unimpaired | No (deemed to accept) |

15.     The Weinstein Estate objected to the Plan [Dkt. No. 288] (the "Weinstein Estate Objection"), arguing that (i) before the Petition Date, the Supreme Court of the State of New York had entered an order declaring the Debtor was dissolved by operation of law (*id.* ¶ 12), (ii) because the Debtor had been dissolved, the Court could administer the estate only in accordance with what N.Y. Partnership law permits for winding up the Debtor's affairs (*id.* ¶ 15); (iii) N.Y. Partnership law required that the Court appoint a Chapter 11 Trustee or convert the case to a Chapter 7 liquidation (*id.* ¶ 16); and (iv) the Debtor's General Partners – RAS Property Management, LLC, Sharan Sklar Management LLC, and Michael Sklar Management, LLC – should not remain in control of the Reorganized Debtor. *Id.* ¶ 20.

16.     On December 21, 2023, the Court entered the Confirmation Order approving the Plan. In issuing the Confirmation Order, the Court found that "notice of the Plan and the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation has

been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby" (Confirmation Order at 2) and expressly ***"overruled on the merits"*** the Weinstein Estate Objection. *Id.* ¶¶ 3 (Objections), 9 (Objections) (emphasis added); *see also* Ex. 4 (Dec. 19, 2023 Hr'g Tr.) at 94:15-18 ("I've generally reviewed the plan, considered all objections, and I'm satisfied that all legal requirements imposed by the code are met here, and I've overruled the objections").

17. At the Confirmation hearing, the Court considered and rejected the Weinstein Estate's claim that the Debtor was dissolved prepetition by order of the New York Supreme Court, noting that it "was unsupported by admissible evidence or sworn testimony" and had "never been raised" prior to the Weinstein Estate's Objection to confirmation, nearly ***three years*** after the Debtor filed Chapter 11. Ex. 4 (Dec. 19, 2023 Hr'g Tr.) at 69:14-20. The Court further found, based on its review of the First Amendment, that actions must be authorized by "two-thirds vote of the three . . . general partners." *Id.* at 81:13-17.

18. The Confirmation Order and Plan unambiguously reaffirm the Reorganized Debtor's continuing existence as a going concern. Specifically, the Confirmation Order, in pertinent part, provides:

> Except as otherwise provided in the Plan, ***the Debtor will continue to exist after the Effective Date with all the powers under applicable law pursuant to the Debtor's organizational documents in effect prior to the Effective Date***. In accordance with the Terms of the Plan, and except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Debtor's estate shall revest in the Reorganized Debtor.

*Id*. ¶ 31 (Continued Corporate Existence and Vesting of Assets) (emphasis added).

19. Likewise, the Plan reaffirms the Reorganized Debtor's continued existence and provides that the Reorganized Debtor's General Partners will continue to control and operate the Reorganized Debtor pursuant to the Partnership Agreement:

> The Debtor shall **continue in existence post-confirmation**.  After Confirmation of the Plan, **the General Partners will continue to control the Reorganized Debtor** pursuant to the terms of the Partnership Agreement.

Plan, Art. IV.E (emphasis added).  Thus, the Partnership Agreement remained in full force and effect after confirmation of the plan.  This structure is entirely inconsistent with a dissolution.  In that regard, under the New York Partnership law, "dissolution terminates all authority of any partner to act for the partnership lose their authority to act," "[e]xcept so far as may be necessary to wind up partnership affairs or to complete transactions begun but not then finished."  Thus, the Plan's governance provision is entirely inconsistent with dissolution.  N.Y. P'SHIP LAW § 64.

20.  On February 20, 2024, the Reorganized Debtor filed the *Notice of (I) Entry of Order Approving and Confirming Debtor's Amended Combined Chapter 11 Plan of Reorganization and (II) Occurrence of the Effective Date* [Dkt. No. 323], disclosing that the Effective Date occurred on February 14, 2024, the Plan was substantially consummated, and the Reorganized Debtor emerged from Chapter 11.  On the Effective Date, all "terms of the Plan and the Confirmation Order [were] immediately effective and enforceable and **deemed binding** upon . . . **any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan)**, [and] all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan[.]"  Plan, Art. § XII.A. (emphasis added); Confirmation Order at ¶ 9 (Binding Effect) ("[T]he Plan and this Confirmation Order shall be immediately effective . . . and enforceable and **deemed binding upon . . . all Holders of Claims or Interests** and such Holder's respective successive and assigns . . . **regardless of whether any Holder of a Claim or debt has voted on the Plan**.") (emphasis added).

21.  As contemplated by the Plan, on March 1, 2024, the Reorganized Debtor filed a motion [Dkt. No. 325] seeking an order approving the Sale of the Property to Madison 29 Holdings LLC (the "<u>Purchaser</u>").  On June 5, 2024, the Court approved the Sale [Dkt. No. 363] (the "<u>Sale</u>

Order"). In entering the Sale Order, the Court explicitly found that the Sale was "***integral to the implementation of the 'Plan'***" (*id.* § VIII.W (emphasis added)) and empowered the Reorganized Debtor "to use the proceeds from the Sale to satisfy all Allowed Claims and to repay the Exit Facility" as contemplated by the Plan. *Id.* § V.9.

C.  **Distributions to the Weinstein Estate Under the Plan.**

22.     On the Petition Date, the Weinstein Estate owned approximately 18% of the Debtor's prepetition partnership interests. The Weinstein Estate also filed Proof of Claim No. 9 for $4.5 million on the purported basis of "[r]eceipt of $5,849,453.32 converted from Creditor's funds" (the "Weinstein Proof of Claim"). As of the date of this filing, the Weinstein Proof of Claim remains Disputed.[3]

23.     The Reorganized Debtor retains a right of setoff and is entitled to withhold distributions until its claims against the Weinstein Estate have been adjudicated. Specifically, the Plan provides that ***even to the extent that a Claim or Interest is not Disputed*** "but is held by a Holder that is or may be liable to the Debtor, no payments or Distributions shall be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Bankruptcy Court or such other court having jurisdiction over the matter." Plan, Art. VI; *see also id.* Art. VII.D.

24.     Nor is the Weinstein Estate entitled to prosecute any litigation against the Debtor or the estate for any Claim that arose before the Effective Date of the Plan. All Claims of any nature whatsoever were released, exculpated, and discharged pursuant to the Plan. Specifically, Articles VIII.B and VIII.D of the Plan, in pertinent part, provide:

> Pursuant to Section 1141(d) of the Bankruptcy Code . . . the distributions, rights, and treatment that are provided in the Plan ***shall be in complete*** satisfaction,

---

[3]     "Disputed" means "with respect to any Claim or Interest, a Claim or Interest or any portion thereof that is not Allowed but that has not been disallowed by a Final Order." Plan, Definitions ¶ 33.

> *discharge*, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action *of any nature whatsoever*, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date . . . in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; or (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code.

Plan, Art. VIII.B (emphasis added).

> Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability to any Person or Entity for, and each Exculpated Party is hereby *released and exculpated from*, any Cause of Action arising from the Petition Date to the Case Closing Date related to *any act or omission in connection with, relating to, or arising out of, the Debtor's restructuring efforts, the Chapter 11 Case, the filing of the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the DIP Facility, any Sale Transaction, any Restructuring Transaction*, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, the funding of the Plan, the occurrence of the Effective Date, the pursuit of Confirmation, the pursuit of the Effective Date, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined by a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

> The Exculpated Parties have, and upon the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the distribution of consideration pursuant to the Plan and, therefore, *are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the distributions made pursuant to the Plan*.

Plan, Art. VIII.D (emphasis added).

25.     Finally, <u>Article VIII.E</u> of the Plan permanently enjoins all persons or entities holding claims or interests that have been discharged by the Plan from, among other things, commencing or continuing actions or proceedings on account of such claims or interests except as

expressly provided for in the Plan (the "Plan Injunction"). Specifically, Article VIII.E of the Plan, in pertinent part, provides:

> [A]ll Persons or Entities that have held, hold, or may hold Claims or Interests that have been released or discharged pursuant to this Article VIII of this Plan and Section 1141(d) of the Bankruptcy Code shall be ***permanently enjoined***, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, the Exculpated Parties, or the Released Parties: (1) ***commencing or continuing in any manner any action or other proceeding of any kind*** on account of or in connection with or ***with respect to any such Claims or Interests*** . . . and (5) ***commencing or continuing in any manner any action or other proceeding of any kind*** on account of or in connection with or with respect to any such Claims or Interests ***released or settled pursuant to the Plan***.

Plan, Art. VIII.E. (emphasis added).

26.     In the Confirmation Order, the Court found that the Plan Injunction and the Plan's discharge provisions were compliant with both the Bankruptcy Code and applicable law (Confirmation Order ¶ 25 (Jurisdiction)), and that they "are (a) essential to the Plan, (b) necessary to preserve and enforce the provisions and consummate the implementation of the Plan, and (c) are appropriately tailored to achieve those purposes." *Id.* ¶ 28 (Injunction).

27.     Notwithstanding the foregoing, NFMC has given the Weinstein Estate significant distributions—***totaling over $4 million***—which is well in excess of what it would have received had the distributions been made proportionate to its partnership interest in NFMC. It did so to facilitate the Weinstein Estate's tax obligations. On the other hand, the Weinstein Estate has continued to try to enforce the TRO, so that NFMC's other partners cannot pay their taxes.

### D.     Retention of Jurisdiction

28.     This Court retained exclusive jurisdiction over matters "arising out of, or related to, the Chapter 11 Case and the Plan," (Confirmation Order ¶¶ 17 (Retention of Jurisdiction), 49 (Retention of Jurisdiction)) specifically including the jurisdiction to "***issue injunctions***, enter and implement other orders, and take such other actions as may be necessary or appropriate ***to restrain***

12

***interference by any Person with the consummation, implementation, or enforcement of this Plan***, the Confirmation Order, or any other order of the Bankruptcy Court," to "hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, ***any transactions or payments contemplated*** hereby or ***under any agreement, instrument, or other document*** governing or relating to any of the foregoing," and to "***take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan*** or to maintain the integrity of this Plan following consummation[.]" Plan, Art. XI.6, 9-10 (emphasis added).

## II.     <u>The State Court Action, the TRO, and the TRO's Effects on the Reorganized Debtor.</u>

29.     On June 12, 2024, the Reorganized Debtor, then represented by Rosenberg & Estis, initiated the New York Action alleging, among other things, that the Weinstein Estate, together with its co-defendants Kinder Realty Associates, RAS Property Management, and Rita A. Sklar (collectively, the "<u>Sklar Parties</u>"), borrowed $7 million from the Reorganized Debtor and failed to pay back the loan.[4]

30.     On December 2, 2024, the Weinstein Estate filed multiple counterclaims against the Reorganized Debtor, including claims for declaratory judgment that the Reorganized Debtor has been dissolved such that (i) the Reorganized Debtor lacks the legal authority to perform a tax deferred exchange under IRS Code § 1031;[5] (ii) the Weinstein Estate is entitled to an immediate distribution of $8.4 million or 18.36% of the Sale proceeds, whichever is greater (even though this

---

[4]     On February 12, 2025, Rita A. Sklar filed counterclaims and cross-claims for unjust enrichment, conversion, breach of contract, and breach of fiduciary duty against the Reorganized Debtor as well as General Partners Michael Sklar and Sharan Sklar (such claims, the "<u>Sklar Claims</u>").  On February 13, 2025, the State Court entered an order that, *inter alia*, dismissed the Reorganized Debtor's First Amended Complaint in its entirety with prejudice and directed that the State Court Action would proceed on the Sklar Claims.

[5]     The Reorganized Debtor used approximately $22 million of the Sale proceeds to purchase real property through a like-kind exchange under IRS Code § 1031. Ex. 5 (New York Action Dkt. No. 98).

amount is higher than what the Plan and the absolute priority rule allow because it is not net of payments the Reorganized Debtor is required to make under the Plan and does not reflect the costs of the Reorganized Debtor's continued administration), and (ii) all property acquired in the name of the Reorganized Debtor since June 2024 belongs to the former limited partners according to their proportional share and the former limited partners have equitable title to such properties (the "Declaratory Judgment Claims"). Ex. 6 (New York Action Dkt. No. 28) ¶¶ 8, 12).

31.    The Weinstein Estate also sought a permanent injunction barring the Reorganized Debtor from using $8.4 million of the Sale proceeds for any purpose other than distributing those proceeds to the Weinstein Estate (the "Injunction Claim" and, together with the Declaratory Judgment Claims, the "Enjoined Claims"). *Id.* ¶ 16.

32.    On December 4, 2024, the court presiding over the New York Action issued a temporary restraining order (the "TRO") barring the Reorganized Debtor "from using, paying out or disbursing ***any of the funds from the [S]ale . . . for any purpose***" pending a hearing on the Weinstein Estate's request for a permanent injunction.  Ex. 7 (New York Action Dkt. No. 49) at 2 (emphasis added). In entering the TRO, the court relied, in part, on the Weinstein Estate's false claim that the Reorganized Debtor wrongfully continued its existence post-Confirmation and its misrepresentations about its entitlements under the Plan.  Ex. 6 (New York Action Dkt. No. 28) ¶¶ 9-12. Critically, since the TRO was issued, and in addition to an inability to pay its outstanding bankruptcy claims, the Reorganized Debtor has had to seek State Court approval to first lift the TRO to pay outsized but necessary expenditures incurred in the ordinary course.

33.    On January 7, 2025, the State Court also entered the *Order to Show Cause for Default Judgment and Sanctions* (the "Show Cause Order").  The Show Cause Order, among other things, provides that NFMC must show cause why an order and judgment should be issued

granting judgment on the Weinstein Estate's counterclaims that NFMC was "dissolved as of June 30, 2024 and that any property purchased in the name of Ninety-Five Madison Company LP since the dissolution belongs to the limited partners according to their proportionate shares; *that the former general partners are without authority to continue the operation of the business of Plaintiff*, other than to wind up its affairs and distribute its assets to the former limited partners; and any other relief demanded in the Counterclaims."  Ex. 8 (New York Action Dkt. No. 141) (emphasis added).

### III.    This Court Temporarily Enjoins the Weinstein Estate from Prosecuting Its Claims.

34.    On January 24, 2025, the Reorganized Debtor filed the First Injunction Motion in this Court.  The First Injunction Motion petitioned the Court for an order that, *inter alia*, prohibited the Weinstein Estate from continuing to prosecute, in violation of the Plan and the Confirmation Order, the Enjoined Claims, or otherwise contesting the Reorganized Debtor's right to make distributions in accordance with the applicable provisions of the Plan, the Reorganized Debtor's continued existence, or the right of the General Partners to control the Reorganized Debtor.

35.    After a hearing and on February 12, 2025, the Court entered the Temporary Injunction Order.  Pursuant to the Temporary Injunction Order, this Court made several findings.

36.    First, the Court "concluded (among other determinations, and without altering or limiting the scope of the Court's ruling on the record) that the relief afforded by this order . . . [was] necessary, appropriate, and **within this Court's jurisdiction and power 'to interpret and enforce its own orders,**' *Luan Inv. v. Franklin 145 Corp. (In re Prairie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir. 2002)[.]"  Temporary Injunction Order at 2 (emphasis added).

37.    Second, the Court held that the "relief afforded by this order . . . is necessary . . . here in particular **to ensure adherence to the court-ordered confirmation of Reorganized**

**Debtor's Plan including without limitation its claim allowance and asset-distribution provisions**[.]" *Id.* (emphasis added).

38.     <u>Third</u>, the Court held that the order's relief was necessary and appropriate "to ensure adherence to the court-ordered confirmation of Reorganized Debtor's Plan['s] **specific provision that the 'Debtor shall continue in existence post-confirmation' and 'the General Partners will continue to control the Reorganized Debtor pursuant to the terms of the Partnership Agreement'[.]"** *Id.* at 2-3 (emphasis added) (quoting Plan).

39.     Accordingly, and in light of the foregoing findings, the Temporary Injunction Order held that the Weinstein Estate was "enjoined for thirty (30) days commencing on the date hereof from continuing to prosecute any claim or cause of action seeking a judicial declaration or injunction in the New York Action that (i) the Reorganized Debtor was or is legally dissolved; (ii) the Reorganized Debtor, including its management, are without authority to continue the operation of the business of the Reorganized Debtor; and (iii) the Weinstein Estate or any other limited partner is entitled to an immediate distribution of funds from the sale proceeds of the Property" (the foregoing paragraph 2 of the Injunction Order, the "<u>Temporary Injunction</u>").

40.     On March 10, 2025, the Weinstein Estate and the Reorganized Debtor entered into a so-ordered stipulation [Dkt. No. 418] that extended the Temporary Injunction to March 31, 2025.

## IV.     <u>The Weinstein Estate Agrees to Dissolve the TRO, But Then Inexplicably Reverses Course.</u>

41.     On March 31, 2025, the day that the Temporary Injunction expired, the Weinstein Estate and the Reorganized Debtor filed a joint letter in the State Court Action.  *See* Ex. 9 (New York Action Dkt. No. 229).  In the joint letter, the parties informed the State Court that they had reached an agreement in principle regarding the Weinstein Estate's prosecution of the Enjoined Claims:

For the present, the Parties mutually believe that **consistent with the February 11, 2025 ruling of U.S. Bankruptcy Judge David S. Jones, no action should be taken in this Court with respect to the adjudication of the dissolution and asset distribution disputes in the Counterclaims (and related injunctive relief) pending further order of the Bankruptcy Court**, which still retains jurisdiction over NFMC's confirmed Chapter 11 plan of reorganization, including that plan's claim allowance and asset-distribution provisions . . . Accordingly, until that time, **the Parties respectfully request that the Court hold the Counterclaims pending a resolution in the Bankruptcy Court or a settlement.**

*Id.* (emphasis added).

42.     Consequently, the Weinstein Estate and the Reorganized Debtor began negotiations on a joint stipulation for submittal to this Court. The parties negotiated that the joint stipulation would provide for (i) a permanent injunction in the State Court Action of the Enjoined Claims; (ii) the full dissolution of the TRO; and (iii) the withdrawal of the Weinstein Proof of Claim in the Reorganized Debtor's bankruptcy case.

43.     On April 2, 2025, and after the Weinstein Estate and the Reorganized Debtor conferred, counsel to the Reorganized Debtor prepared and submitted for the Weinstein Estate's approval a joint stipulation that encompassed the foregoing agreement. *See* Ex. 10 (New York Action Dkt. No. 230).

44.     On April 3, 2025, and during a meet and confer between the parties, the Weinstein Estate declined to agree to the joint stipulation. Instead, counsel to the Weinstein Estate informed the Reorganized Debtor that it preferred to negotiate with the Sklar Parties regarding the Sklar Claims against the Reorganized Debtor as well as regarding payments for certain due taxes, as explained below. In other words, the TRO is brazenly being used by the Weinstein Estate to maintain a "balance of power" between itself and the Reorganized Debtor in state court litigation.

45.     The partners of NFMC have not been able to pay their taxes based on the existence of the TRO. Thus, the Weinstein Estate is using the fact that the TRO precludes the parties from paying taxes as a cudgel to agree to a broader settlement. As a result, NFMC understands that the

partners are now incurring significant penalties: 5% per month and 7% annualized interest. This is completely inappropriate.

## V.   Despite Its Best Efforts, Because of the TRO the Reorganized Debtor Fails to Pay Necessary and Due Taxes.

46.    As noted above, since the TRO was issued, the Reorganized Debtor has had to first seek the State Court's approval to lift the TRO to then pay necessary expenditures, with such approval made by stipulation on consent by all parties in the State Court Action. Relevant here, certain tax-related orders entered by the State Court (New York State Action Dkt. Nos. 143, 146) (the "Tax Orders) included the following requirement:

> [U]pon determination . . . of the estimated and final amounts due in taxes by the NFMC Parties [], such amounts shall be memorialized in a further stipulation between the Parties, directing such amounts to be paid by 1031 Legal, to the extent such funds are in the possession of 1031 Legal, **so that payment is made before tax penalties are incurred by any NFMC Party for failing to pay estimated taxes on or before . . . April 15, 2025**[.]

Ex. 11 (Tax Orders) at 2 (emphasis added).

47.    Beginning in mid-March, General Partners Michael and Sharan Sklar and the Reorganized Debtor's professionals contacted the RS Parties and the Weinstein Estate's professionals on multiple occasions and over several weeks regarding preparation and payment of each party's respective final taxes before April 15, 2025 as contemplated by the Tax Orders. The Reorganized Debtor further prepared a draft stipulation and a schedule with placeholders for the parties to review and to complete for each side's respective taxpayers.

48.    Over the next several weeks, the Reorganized Debtor repeatedly asked the RS Parties and the Weinstein Estate for their tax information and offered to arrange meetings with the Reorganized Debtor's accountant to discuss issues and answer any questions. In response, the Reorganized Debtor received no answers, delays, or demands unrelated to the payment of taxes at the eleventh hour from the RS Parties. Moreover, the Weinstein Estate—and for reasons that

remain unclear—initially agreed to enter into a stipulation with the Reorganized Debtor for payment of those two parties' taxes, but then suddenly repudiated the agreement.

49.     On April 11, 2025, and in a last-ditch effort to pay taxes on time and avoid penalties, the Reorganized Debtor filed a proposed order with its known tax information for entry by the State Court. The State Court declined to enter the proposed order and instead, on April 12, 2025, provided the RS Parties and the Weinstein Estate days to object to it.

50.     Both parties objected. The RS Parties cited its demands unrelated to the payment of taxes as the basis for its objection. The Weinstein Estate's objection curiously claimed the Reorganized Debtor's proposed order did not provide for the payment of its taxes despite repudiating the agreement it had reached with the Reorganized Debtor. The Weinstein Estate also filed its own counter-proposed order that included tax figures for the RS Parties that the RS Parties did not authorize for submittal to the State Court.

51.     On April 14, 2025, and due to the RS Parties and Weinstein Estate's objections, the State Court declined to enter the proposed order for taxes due April 15, 2025. As of the date hereof, the parties have not been able to come to a consensual stipulation for submittal to the State Court. The taxes, which were due April 15, 2025, remain past due.

## VI.    The Unpaid and Accumulating Administrative Claims.

52.     Since the issuance of the TRO, multiple administrative claims against the Reorganized Debtor have been asserted and/or become due and owing, including due and owing pursuant to orders and judgments entered by this Court.

53.     In addition to outstanding professional fees, those claims include: an administrative expense of $1,594,151.98[6] as a result of this Court's *Decision and Order* [Dkt. No. 420] (Opinion

---

[6]     As of the date hereof, the Reorganized Debtor is in active discussions with Branton's counsel regarding certain amounts asserted in respect of this figure.

dated March 27, 2025) entered in favor of Branton Realty Services LLC in respect of a commission and fees (the "Branton Judgement"); approximately $60,442.33[7] in indemnity obligations incurred by Purchaser Madison 29 Holding LLC [Dkt. No. 403] (Order approving administrative expense payment) (the "Indemnification Obligations"); and approximately $16,937.50 in fees to a mediator [Dkt. No. 379] (Order approving mediator's engagement). Due to the TRO, these administrative expenses remain outstanding. The Reorganized Debtor is unable to close its bankruptcy case until at least all administrative expense claims are satisfied.

**BASIS FOR RELIEF**

## I.     The TRO Should Be Immediately Dissolved.

54.     In the Temporary Injunction Order, this Court concluded that injunctive relief against the Weinstein Estate's claims was (i) "necessary, appropriate, and within this Court's jurisdiction and power to interpret and enforce its own orders"; (ii) necessary and appropriate "to ensure adherence to the court-ordered confirmation of Reorganized Debtor's Plan including without limitation its claim allowance and asset-distribution provisions"; and (iii) necessary and appropriate "to ensure adherence to the court-ordered confirmation of Reorganized Debtor's Plan['s] specific provision that the 'Debtor shall continue in existence post-confirmation' and 'the General Partners will continue to control the Reorganized Debtor pursuant to the terms of the Partnership Agreement[.]'" Temporary Injunctive Order at 1-2 (quoting Plan).

55.     Moreover, the Reorganized Debtor's confirmed Plan—including, without limitation, all discharge, injunction, exculpation, and release provisions contained therein—which addressed all Claims against and Interests in the Debtor, binds all Holders of Claims against, and Interests in, the Debtor and the Reorganized Debtor, including the Weinstein Estate.

---

[7]     This figure is derived from Dkt. No. 403 in addition to an invoice delivered to the Reorganized Debtor.

56.     Finally, and fundamentally, Section 105(a) of the Bankruptcy Code provides bankruptcy courts with broad statutory authority to enforce their own orders, including confirmation orders. *See* 11 U.S.C. § 105(a); *Luan Inv. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization."). This includes the power to enjoin state court actions that impede reorganization proceedings. As the District Court explained long ago:

> Section 105(a) contemplates injunctive relief in precisely those instances where parties are attempting to obstruct the reorganization . . . **Injunctions against state court actions are proper if the Bankruptcy Court "finds that the action would embarrass [sic], burden, delay or otherwise impede the reorganization proceedings."**

*In re Neuman*, 71 B.R. 567, 572 (S.D.N.Y. 1987) (quoting *In re Investors Funding Corp.*, 547 F.2d 13, 16 (2d Cir. 1976) (internal citations and quotations omitted; emphasis added).

57.     Based on the foregoing, the TRO should be immediately dissolved. This is necessary for several reasons.

58.     First, the TRO should be dissolved because the TRO has entirely incapacitated the Reorganized Debtor from making distributions to other creditors that it is required to make under the Plan, including paying the Branton Judgement, the Indemnification Obligations to the Purchaser, and meeting other obligations the Reorganized Debtor incurs in the ordinary course of its business. Further, the Reorganized Debtor has already begun to miss due and owing obligations on time, such as required tax payments. As explained herein, the damage to the Reorganized Debtor has been extensive and is only expected to worsen.

59.     Second, the Weinstein Estate should be permanently enjoined from prosecuting its claims in the State Court Action because it has already agreed that "no action should be taken in this Court with respect to the adjudication of the . . . [Enjoined Claims] (and related injunctive

relief) pending further order of the Bankruptcy Court[.]" Ex. 9 (New York Action Dkt. No. 229). The Weinstein Estate has further conceded that this Court "still retains jurisdiction over NFMC's confirmed Chapter 11 plan of reorganization, including that plan's claim allowance and asset distribution provisions[.]" *Id*. Accordingly, to the extent the Weinstein Estate still intends to pursue causes of action related to the dissolution of the Reorganized Debtor, it should be required to do so before this Court, who should reject them and as explained below.

60.     <u>Third</u>, and as the First Injunction Motion explained, this Court has ample authority to issue the Proposed Order. The Court retained exclusive jurisdiction to hear matters "arising out of, or related to, the Chapter 11 Case and the Plan." Confirmation Order ¶¶ 17 (Retention of Jurisdiction), 49 (Retention of Jurisdiction). This includes the jurisdiction to issue injunctions to restrain any person from interfering with the implementation of the Plan or the enforcement of the Plan, Confirmation Order, or any other order of this Court, and to "take any action and issue such orders" as may be necessary to enforce and implement the Plan and to maintain the integrity of the Plan following consummation. Plan, Art. XI.10. Here, termination of the TRO is more than within this Court's purview and critical to its reorganization process.

## II.     <u>The Weinstein Estate's Dissolution Arguments Should Be Rejected.</u>

61.     The Weinstein Estate's arguments that NFMC was dissolved likewise fail.[8]

62.     The Partnership Agreement originally provided that it could only be amended with the unanimous consent of all General Partners; this also applied to the dissolution provision. *See* Ex. 1 (Amended Partnership Agreement), Art. X. Thereafter, the General Partners unanimously

---

[8]     In opposition to the First Injunction Motion, the Weinstein Estate filed a declaration (the "<u>Barr Declaration</u>") of Jeffrey A. Barr, counsel to the Weinstein Estate. *See* Dkt. No. 409. In this Motion, and because the Court directed the parties to only file one pleading each, the Reorganized Debtor addresses the dissolution arguments raised by the Weinstein Estate in both State Court and this Court.

agreed that all amendments would only be subject to majority approval in the First Amendment to the Partnership Agreement.

63.     To resolve any doubt about the matter, the Partnership Agreement was amended by agreement of a majority of the General Partners to allow the Reorganized Debtor to continue as a going concern after a sale of the Property.  Indeed, the Second Amendment explicitly removes the provision of the Amended Partnership Agreement requiring dissolution upon the Sale.  *See* Ex. 3 (Second Amendment), § 1.  This amendment was signed by two General Partners and, thus, satisfied the requirement that a simple majority of General Partners agree to an amendment.  Rita Sklar, moreover, has also agreed that NFMC should not dissolve because she has agreed to NFMC's acquisition of 1031 properties.  *See* Ex. 3 (Second Amendment), § 2.  In short, the Sale did not (and could not) cause the dissolution of NFMC as the Weinstein Estate argues.

64.     The Weinstein Estate is demonstrably wrong that the First Amendment that changed all unanimity decision-making to a majority vote "does not by its terms apply to section 10 governing amendments" because "Section 10 was not listed among the sections changed."  Ex. 12 (New York Action Dkt. No. 83); Barr Declaration ¶ 67.  That is misleading and irrelevant.  The First Amendment in June 2022 includes no specific list of "the exact decisions that were being changed from unanimous to majority decision" as the Estate claims.  *Id*.

65.     Instead, the First Amendment – which was signed by all General Partners, including Rita Sklar on behalf of RAS Property Management, LLC – explicitly provides that "***[a]ll decisions*** made hereafter shall be by the vote of a majority of the General Partners" and that "the provisions of the Amended and Restated Partnership Agreement requiring a Unanimous Decision are hereby deleted."  Ex. 2 (First Amendment), § 2.  Section 10.01 of the Partnership Agreement, titled "Amendment," is one such affected provision as it previously provided that amendments required

"the unanimous consent of all of the General Partners[.]" Ex. 1 (Amended Partnership Agreement). The First Amendment could not be more unambiguous that this unanimous requirement was eliminated.

66. Nor was NFMC judicially dissolved by Justice Borrok's decision on October 23, 2020 as can be easily seen from the First Department's December 10, 2020 order granting a stay of enforcement of Justice Borrok's order. Barr Declaration ¶¶ 25, 75. *See* Ex. 13 (*Keller, et al v. RAS Prop. Mgmt., et al*., Index No. 653735/2019, Dkt. No. 197). That stay was never lifted, and NFMC has operated for years since that decision without dissolving. Further, the Plan and Confirmation Order, which postdates Justice Borrok's decision, make NFMC's prior and continuing existence abundantly clear. *See* Confirmation Order at 31 ("[T]he Debtor will continue to exist . . ."); Plan at IV.E ("The Debtor shall continue in existence post-confirmation."). Indeed, this Court explicitly overruled this dissolution argument when the Estate raised it at the confirmation hearing. *See* Ex. 4 (Dec. 19, 2023 Hr'g Tr.) at 68:21-69:22, 94:15-20. The issue should thus be res judicata. *See In re Parade Place, LLC*, 508 B.R. 863, 870 (Bankr. S.D.N.Y. 2014) ("[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.") (quotations omitted); *In re Hunter*, 4 N.Y.3d 260, 274 (2005) ("Under the doctrine of res judicata, a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter."). After all, it is absurd to suggest that a non-existent entity could seek and secure relief under federal bankruptcy laws. The reality is that the Plan is a contract and its confirmed provisions regarding the continued existence of the Reorganized Debtor constitute an agreement by the majority of the General Partners of NFMC to continue the entity's existence at the time of the Plan. *See In re Metex Mfg.*

*Corp.*, 510 B.R. 735, 741 (Bankr. S.D.N.Y. 2014) ("Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtors and creditors alike.") (quoting *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 88 (S.D.N.Y. 2008)).

67.     Beyond the issues of dissolution and authority, the Weinstein Estate has no serious claim for immediate disbursement of its *pro rata* share of the gross sale proceeds (before payment of any creditors and administrative costs).  The Plan is binding upon the Weinstein Estate, and the proceeds of the Sale are a necessary and "integral" component of effectuating the Plan—which mandates payment to creditors—as this Court held in its Sale Order.  And here, it cannot be ignored that the Weinstein Estate is a limited partner of the Reorganized Debtor.  As a limited partner, its claim to the proceeds of the Sale has the lowest priority rung under the Bankruptcy Code's distribution scheme and cannot be paid until all creditor claims are satisfied.  *See, e.g.*, Plan, Art. III.B.4. (classifying equity interests in NFMC in Class 4 behind general unsecured claims, secured claims, and priority claims).  It thus defies credulity that "under NFMC's own governing documents, the partnership was dissolved post-confirmation and post-effective date, on June 30, 2024," as the Weinstein Estate contends.  Barr Declaration ¶ 45.

68.     Accordingly, the Weinstein Estate fails to prove NFMC's dissolution, lack of authority, or its entitlement to an immediate disbursement.  Its dissolution claims should accordingly be rejected and permanently enjoined.

## CONCLUSION

WHEREFORE, the Reorganized Debtor respectfully requests entry of an order substantially in the form of the Proposed Order granting the relief requested herein and such other relief as is just and proper.

Dated: April 28, 2025
      New York, New York

By: /s/ *Andrew K. Glenn*
Andrew K. Glenn
Agustina G. Berro
Richard C. Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
E-mail: aglenn@glennagre.com
      aberro@glennagre.com
      rramirez@glennagre.com
      nrahman@glennagre.com

*Counsel to the Reorganized Debtor Ninety-Five
Madison Company, L.P.*