# **EXHIBIT A**

## **Declaration of Andrew K. Glenn**

Andrew K. Glenn
Agustina G. Berro
Richard C. Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to Reorganized Debtor*
*Ninety-Five Madison Company, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

**DECLARATION OF ANDREW K. GLENN IN SUPPORT OF REORGANIZED**
**DEBTOR NINETY-FIVE MADISON COMPANY, L.P.'S RENEWED MOTION TO (I)**
**ENFORCE THE PLAN INJUNCTION AND CONFIRMATION ORDER**
**AND (II) DISSOLVE TEMPORARY RESTRAINING ORDER**

I, Andrew K. Glenn, being duly sworn, state the following:

1.      I am the managing partner of the law firm Glenn Agre Bergman & Fuentes LLP,

counsel for the Reorganized Debtor Ninety-Five Madison Company, L.P. I make this declaration

in support of the *Reorganized Debtor's Renewed Motion to (I) Enforce the Plan Injunction and*

*Confirmation Order and (II) Dissolve Temporary Restraining Order* (the "Motion").[1]

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the *Amended and Restated*

*Limited Partnership Agreement of Ninety-Five Madison Company, L.P.*, effective as of June 2021,

---

[1]      Capitalized terms used but not defined herein shall have the meanings given to those terms in the Motion.

by and between RAS Property Management, LLC, Michael Sklar Management LLC and Sharan Sklar Management LLC.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the *Amendment to Amended and Restated Partnership Agreement of Ninety-Five Madison Company, L.P.*, effective as of June 2022, by and between RAS Property Management, LLC, Michael Sklar Management LLC, and Sharan Sklar Management LLC.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the *Second Amendment To The Ninety-Five Madison Company Limited Partnership Agreement*, effective as of August 20, 2024, by and between RAS Property Management, LLC, Michael Sklar Management LLC, and Sharan Sklar Management LLC.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the transcript of the Confirmation hearing on December 19, 2023.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the *Affirmation of Michael Sklar*, filed at Docket No. 98 in the New York Action.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the *Answer to First Amended Complaint with Counterclaims*, filed at Docket No. 28 in the New York Action.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the *Order to Show Cause*, filed at Docket No. 49 in the New York Action.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of the *Order to Show Cause for Default Judgment and Sanctions*, filed at Docket No. 141 in the New York Action.

10.     Attached hereto as **Exhibit 9** the joint letter, filed at Docket No. 229 in the New York Action.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of the *Stipulation and [Proposed] Order*, filed at Docket No. 230 in the New York Action.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of the *Stipulation and [Proposed] Order Pursuant to NYSCEF No. 143*, filed at Docket No. 146 in the New York Action.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of the letter, filed at Dkt. No. 83 in the New York Action.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of the *Notice of Stay*, filed at Docket No. 197 in the Supreme Court of New York, County of New York in the action captioned *Keller, et al v. RAS Prop. Mgmt., et al*., Index No. 653735/2019.


Dated: April 28, 2025
       New York, New York

                                        */s/ Andrew K. Glenn*
                                        Andrew K. Glenn
                                        GLENN AGRE BERGMAN & FUENTES LLP

# EXHIBIT 1

**Amended Partnership Agreement**

# AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
## of
## NINETY-FIVE MADISON COMPANY, L.P.

This Amended and Restated Limited Partnership Agreement, dated as of June __, 2021, is made by and between RAS Property Management, LLC ("RAS"), Michael Sklar Management LLC ("Michael Sklar), and Sharan Sklar Management LLC ("Sharan Sklar"), each as a general partner (the "General Partner"), and the partners listed and identified in Schedule A hereto, as limited partners (the "Limited Partners" and together with the General Partner, the "Partners").

WHEREAS, NINETY-FIVE MADISON COMPANY, L.P. (the "Partnership") is a limited partnership under the New York Revised Limited Partnership Act;

WHEREAS, certain of the Partners entered into the Partnership's Limited Partnership Agreement on June 1, 1982, as amended by that certain First Amendment dated as of December 28, 2012 (the "Original Agreement"); and

WHEREAS, prior to the date of this Agreement, Rita A. Sklar, sole surviving trustee of a trust U/W of Irving Weinstein for the benefit of Lois Michelle Weinstein, assigned all of such trust's limited partner interest in the Limited Partnership directly to Lois M. Weinstein and Lois M. Weinstein was admitted as the Limited Partner under the Original Agreement;

WHEREAS, prior to the date of this Agreement, Rita A. Sklar assigned all of the General Partner interest in the Limited Partnership directly to RAS, and RAS was admitted as the General Partner under the Limited Partnership Agreement;

WHEREAS, prior to the date of this Agreement and after giving effect to further assignments: (i) RAS was the General Partner with a General Partner interest of 32.64%; (ii) the Estate of Lois Weinstein was a Limited Partner with a Limited Partner interest of 18.36%; (iii) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) was a Limited Partner with a Limited Partner interest of 15.68%; (iv) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) was a Limited Partner with an aggregate Limited Partner interest of 15.68%; (v) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) was a Limited Partner with a Limited Partner interest of 8.82%; and (vi) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) was a Limited Partner with an aggregate Limited Partner interest of 8.82%;

WHEREAS, prior to the date of this Agreement, RAS assigned its General Partner interest in the Limited Partnership as follows: (i) to Michael Sklar - 1% General Partner interest; (ii) to Sharan Sklar - 1% General Partner interest; (iii) to Rita A. Sklar - 29.64% Limited Partner interest, and (iv) retained a 1% General Partner interest, and Michael Sklar and Sharan Sklar were each admitted as a General Partner under the Limited Partnership Agreement;

WHEREAS, after giving effect to the above transfers of interests and upon the date hereof, the Partners are as follows: (i) RAS is a General Partner with a General Partner interest of 1%; (ii) Michael Sklar, is a General Partner with a General Partner interest of 1%; (iii) Sharan

Sklar, is a General Partner with a General partner interest of 1%; (iv) the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18.36%; (v) Rita A. Sklar is a Limited Partner with a Limited Partner interest of 29.64%; (vi) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 15.68%; (vii) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with an aggregate Limited Partner interest of 15.68%; (viii) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 8.82%; and (ix) Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with an aggregate Limited Partner interest of 8.82%;

**WHEREAS**, the Partners desire to amend and restate the Original Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

1.01    Whenever used in this Agreement , the following terms shall have the meanings respectively assigned to them in this Article I:

"<u>Affiliate</u>" means any person controlling, controlled by or under common control with another person).

"<u>Accountant</u>" means the public accountant regularly servicing the Partnership.

"<u>Agreement</u>" means this Agreement of Limited Partnership, as it may be amended from time to time.

"<u>Assign</u>" or "<u>Assignment</u>" means a valid sale, exchange, transfer or other disposition of all or any portion of an Interest.

"<u>Assignor</u>" means a Partner who makes an Assignment and "<u>Assignee</u>" means a person who receives an Assignment.

"<u>Bankruptcy</u>" means with respect to any Partner (in the capacity in which such person is a partner), such Partner making an assignment for the benefit of creditors, becoming a party to any liquidation or dissolution action or proceeding with respect to such Partner or any bankruptcy, reorganization, insolvency or other proceeding for the relief of financially distressed debtors with respect to such Partner, or a receiver, liquidator, custodian or trustee being appointed for such Partner or a substantial part of such Partner's assets and, if any of the same occur involuntarily, the same is not dismissed, stayed or discharged within 60 days; or the entry of an order for relief against such Partner under Title 11 of the United States Code.

"<u>Capital Account</u>" means, as to each Partner, the amount of such Partner's Capital Contribution, plus the share of profits allocated to such Partner pursuant to Article VII hereof,

less the sum of (a) the share of losses allocated to such Partner pursuant to Article VII hereof and (b) cash distributions made to such Partner pursuant to Articles VII and IX hereof.

"Capital Contribution" means the property contributed to the Partnership by each Partner pursuant to Section 3.01 hereof. Any reference in this Agreement to the Capital Contribution of a Partner shall include the contributions to the capital of the Partnership made by any predecessor in interest of such Partner in respect of such Interest.

"Capital Proceeds" means any net cash proceeds arising out of the sale or disposition of the Property or the Partnership's other real property assets and/or the financing or refinancing of the Property or the Partnership's other real property assets after the establishment of such reserves as the General Partner may in good faith deem advisable.

"Certificate" means the Certificate of Limited Partnership filed with the Clerk of New York County, New York, as it may be amended from time to time.

"Code" means the Internal Revenue Code of 1954, as amended from time to time, or any successor statute.

"Decider" means Jeff Barringer, Esq. or such other person as shall be appointed in accordance with Section 4.06.

"Entity" means any general partnership, limited partnership, corporation, joint venture, estate, trust, business trust, cooperative or association.

"General Partner" means RAS, Michael Sklar LLC and Sharan Sklar LLC, or any person who becomes a Substitute Partner in respect of any portion of the General Partner Interest of the General Partner as provided in Article VIII hereof.

"Interest" means the interest in the Partnership of a Partner.

"Limited Partner" means the partners listed and identified in Schedule A hereto, and any person who becomes a Substitute Partner in respect of any portion of the Limited Partner Interest of the Limited Partner as provided in Article VIII hereof.

"Partner" or "Partners" means either or both of the General Partners and the Limited Partners.

"Partnership" means the limited partnership governed by this Agreement, as such limited partnership may from time to time be reconstituted.

"Percentage Interest" means the percentage interest from time to time of any Partner in profits and losses and cash distributions by the Partnership.

"Person" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person as the context may require.

"Prime Rate" means the rate of interest announced from time to time by Citibank, N.A. as its "prime rate" or its equivalent.

"Profits and Losses" means the annual net income or net loss of the Partnership for the fiscal year as determined by the General Partner with the advice of the Accountant in determining income, gains, expenses, deductions or losses, as the case may be, reported by the Partnership for Federal income tax purposes.

"Property" means the land located at 95 Madison Avenue, New York, New York, and the improvements constructed thereon.

"Substitute Partner" means any person who is admitted to the Partnership as a Substitute Partner under the provisions of Section 8.03 hereof.

"Uniform Act" means the New York Uniform Limited Partnership Act as adopted and amended from time to time by the State, or any successor statute governing the operation of limited partnerships. Each definition herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires.

"Unanimous Decision" shall have the meaning specified in Section 4.02.

## ARTICLE II
## GENERAL

2.01   Formation. The Partners have previously formed the Partnership pursuant to the Uniform Act of the State of New York. This Agreement shall become effective upon the signing by the Partners.

2.02   Name and Principal Place of Business. The name of the Partnership shall be NINETY-FIVE MADISON COMPANY, L.P., and the location of its principal place of business shall be 95 Madison Avenue, Suite 609, New York, New York 10016 or such other place as the General Partners deem desirable from time to time and designated by notice to the other Partners.

2.03   General and Limited Partners. The General Partners shall be RAS, Michael Sklar and Sharan Sklar. The Limited Partners shall be the partners listed on Schedule A hereto. Except as otherwise provided herein, the General Partners shall have the sole authority to act for and to bind the Partnership.

2.04   Purpose.  The specific business and purpose of the Partnership is investment in real property either through direct ownership or through the acquisition of interest in an Entity. In connection therewith, the Partnership shall have the power to (A) make and perform contracts and other undertakings and engage in any and all activities and transactions as may be necessary, incidental or advisable in furtherance of such business and purpose, including, but not limited to, the purchase, sale, transfer, other disposition, mortgage, pledge and exercise of all rights, powers, privileges and other incidence of ownership with respect to the Property or interest in an Entity, (B) liquidate or dissolve the Partnership, (C) borrow or raise money and issue evidences of indebtedness without limitation as to amount or manner and (D) carry on any and all activities related to any of the foregoing.

2.05 <u>Execution and Delivery of Certificates and other Instruments</u>. The Partners shall execute, acknowledge, and deliver and the General Partners shall file and record, or cause to be filed and recorded, all such certificates, notices, statements, or other instruments, to the extent and as the same may be required by law for the continuation of a limited partnership under the laws of the State of New York and for the qualification or authorization of the Partnership to do business as a limited partnership in any other jurisdiction where the Partnership's activities may require it to be so qualified or authorized.

2.06 <u>Duration</u>. The Partnership shall continue in full force and effect until the dissolution and termination of the Partnership pursuant to Article IX hereof.

2.07 <u>Fiscal Year</u>.    The fiscal year of the Partnership shall be the calendar year.

# ARTICLE III
## CAPITAL CONTRIBUTIONS

3.01 <u>Contributions</u>. The Partners acknowledge that their respective capital contributions to the Partnership as of the date hereof are reflected within the Partnership's books and records.

3.02 <u>Treatment of Other Advances</u>. If any Partner shall advance funds to the Partnership other than the amount of such Partner's Capital Contribution, the amount of such advance shall not be considered a contribution to the capital of the Partnership, but shall be deemed a loan to the Partnership repayable upon such commercially reasonable terms as may be agreed upon by the General Partners and the Partner making such advance. Notice of any such loan and the terms thereof shall be given to all Partners.

3.03 <u>No Additional Contributions to Capital</u>. The Partners shall not be required to make any further contributions to the Partnership capital and are not subject to any further assessments in respect to their Partnership interests.

3.04 <u>Interest on Capital Contributed</u>. No Partner shall receive any interest on such Partner's capital contribution.

3.05 <u>Capital Accounts: No Interest; Withdrawal</u>.

(a)    The capital of the Partnership shall be the aggregate amount of cash or property contributed by the Partners as set forth in Section 3.01 hereof. No interest shall be paid on any Capital Contribution.

(b)    No Partner shall have the right to demand a return of such Partner's Capital Contribution, except as otherwise provided in this Agreement. Moreover, the General Partners shall not be personally liable for the return of the Capital Contribution of any Partner, or any portion thereof, it being expressly understood that any such return shall be made solely from assets of the Partnership. Further, the Limited Partners shall not be required to pay to the Partnership any deficit in its Capital Account upon dissolution or otherwise, except as provided by law, with respect to third-party creditors of the

Partnership. No Partner shall have the right to demand or receive property other than cash for such Partner's interest. Each of the Partners does hereby agree to, and does hereby, waive any right such Partner may otherwise have to cause any asset of the Partnership to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking to have any such asset partitioned

3.06   Liability of Limited Partners. Except as provided in Section 5.03(c) hereof, the Limited Partners shall not be liable for any debts, liabilities, contracts or obligations of the Partnership, except as provided by law.

## ARTICLE IV
## MANAGMENT

4.01   Exercise of Management. The Members hereby designate RAS, Michael Sklar and Sharan Sklar, each to serve as a General Partner of the Partnership. Except as otherwise provided herein, RAS, Michael Sklar and Sharan Sklar, shall jointly manage, conduct and make all decisions regarding the operations and affairs of the Company in accordance with this Agreement.

4.02   Unanimous Decisions. All Unanimous Decisions (defined below) shall require the prior unanimous approval of all of the General Partners. Each General Partner shall have the right to propose a Unanimous Decision. No General Partner shall have any right or power to make any commitment or engage in any undertaking on behalf of the Partnership in respect of a Unanimous Decision, unless or until the same has been approved in accordance with the preceding sentence.   In the event that either: (i) one General Partner rejects a proposed Unanimous Decision and the other two General Partners approve such Unanimous Decision; or (ii) one or more General Partners refuse to provide an affirmative response to a Unanimous Decision within ten (10) days (or such earlier or later time set forth in Section 4.03) following its proposal by a General Partner, then such proposed Unanimous Decision shall be deemed to have been deadlocked ("Unanimous Decision Deadlock"). Upon the occurrence of a Unanimous Decision Deadlock, the General Partners shall submit the Unanimous Decision Deadlock to the Decider and the Decider shall either approve or disapprove of the Partnership taking the action which is the subject of such Unanimous Decision. The Unanimous Decision Deadlock may be referred or delivered by email or facsimile to the Decider by notice thereof (the "Deadlock Notice") and any of the General Partners may send a Deadlock Notice. The Deadlock Notice shall: (i) describe the proposed Unanimous Decision being addressed, (ii) the positions and/or proposed answer of each of the General Partners, (iii) the date the Unanimous Decision was raised for consideration; and (iv) the deadline for which Unanimous Decision Deadlock must be resolved. The Decider shall make a decision with respect to the Unanimous Decision Deadlock on or before the earlier of: (A) the deadline proscribed in Section 4.03; or (B) the deadline proscribed in the Deadlock. Each decision of the Decider shall be final and binding on the General Partners and the Partnership, unless otherwise agreed to by the unanimous consent of the General Partners. The Decider shall have the authority to issue decisions respecting the interpretation of the Agreement and to determine questions of process where there is no unanimous agreement of the General Partners.

4.03   The term "Unanimous Decision" as used in this Agreement means any decision with respect to the following matters:

(a)     causing or binding the Partnership to expend an amount in excess of $50,000 per instance for such amounts in excess of $50,000, there shall be a 24 hour deadline on the General Partners deciding whether to give or withhold approval and, if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of such Unanimous Decision Deadlock Notices;

(b)     selecting and retaining the managing agent for the Property shall be decided within two (2) weeks from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(c)     selecting and retaining the leasing agent for the Property shall be decided within two (2) weeks from the issue being first raised by Sharon Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(d)     selecting and retaining an architect in connection with the Property shall be decided within two (2) weeks from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(e)     approval of the terms and conditions of any Property financing or any amendment, modification or refinancing thereof and selecting a lender in connection therewith shall be decided within four (4) weeks from the issue being first raised by a General Partner and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(f)     agreeing and accepting lease terms for individual lessees in connection with the Property shall be decided within two (2) days from the issue being first raised by Sharon Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(g)     agreeing design proposals/scope of work in connection with the Property shall be decided within three (3) days from the issue being first raised by Michael Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of notice of such Unanimous Decision Deadlock;

(h)     agreeing on project budgets in connection with the Property shall be decided within five (5) days from the issue being first raised by a General Partner and if the General Partners fail to agree within such time period, the Decider shall resolve such

Unanimous Decision Deadlock within 48 hours of receipt of notice of such Unanimous Decision Deadlock;

(i)      agreeing on a marketing plan for the leasing agent in connection with the Property shall be decided within four (4) days from the issue being first raised by, Sharan Sklar, a General Partner, and if the General Partners fail to agree within such time period, the Decider shall resolve such Unanimous Decision Deadlock within 24 hours of receipt of notice of such Unanimous Decision Deadlock;

(j)      (1) issuance or sale of additional interests in the Partnership or (2) admission of a new Partner in the Partnership;

(k)      commencing or threatening any legal proceeding or litigation on behalf of the Partnership or settling, compromising or taking any other action with respect to any litigation or legal proceeding by, against or involving the Partnership;

(l)      making any distributions of cash or assets by the Partnership other than as set forth herein;

(m)      formation by the Partnership of any corporation, partnership, limited liability company or other legal entity;

(n)      creation of any material lien, charge, encumbrance or mortgage on the Property;

(o)      approval of the sale or disposition of all or substantially all of the assets of the Partnership, the merger or consolidation of the Partnership with any other entity or the liquidation or dissolution of the Partnership;

(p)      approval of any contract or agreement between the Partnership and a Partner or any Affiliate thereof;

(q)      filing or commencement of any Bankruptcy by or on behalf of the Partnership;

(r)      taking any action that is not in the ordinary course of business of the Partnership; and

(s)      all tax matters, including regarding all tax elections, treatments and characterizations.

4.04    Efforts and Reimbursement.

(a)      Each General Partner shall devote so much of such General Partner's time and efforts as shall be necessary or desirable to carry out the duties of the general partner of the Partnership.

(b)      The General Partners may receive reasonable salary or other compensation for such General Partner's time and efforts expended in carrying out the duties of the general partner and supervising the business of the Partnership.

(c)     Each Partner shall be entitled to reimbursement for such Partner's actual, reasonable and necessary direct out-of-pocket expenses incurred in the course of the Partnership business. Such expenses shall be repaid to him on the presentation of supporting vouchers

4.05    Dealing with Affiliated Persons. Subject to the restrictions contained in this Agreement, a General Partner may, for, in the name and on behalf of, the Partnership enter into agreements or contracts for performance of services for the Partnership as an independent contractor with a Partner or an Affiliate (upon approval of the General Partners) and the General Partners may obligate the Partnership to pay compensation for and on account of any such services; provided, however, that such compensation and services shall be on terms not less favorable to the Partnership than if such compensation and services were paid to and/or performed by a person who was not a Partner or an Affiliate.

## ARTICLE V
## OTHER ACTIVITIES AND INDEMNITIES

5.01    Activities of Partners. Any Partner may engage in and have an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operating, construction, rehabilitation, renovation, improvement· management and development of real property whether or not such real property is directly or indirectly in competition with the Property. Neither the Partnership nor the other Partners shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, regardless of the location of such real property and whether or not such venture was presented to such Partner as a direct or indirect result of such Partner's connection with the Partnership or the Property.

5.02    Indemnification of the General Partner. The Partnership will indemnify, defend and hold harmless the General Partners and each such General Partner's successors and assigns from any claim, loss, expense, liability, suit, action or damage resulting from any act or omission performed or omitted by such General Partner pursuant to this Agreement, including, without limitation, reasonable costs and expenses of litigation and appeal (and the reasonable costs and expenses of attorneys engaged by the General Partners in defense of such act or omission), but the General Partners shall not be entitled to be indemnified or held harmless for any act or omission arising from such General Partner's unauthorized act, fraud, bad faith, gross negligence, willful violation of such General Partner's fiduciary duties to the Limited Partners, failure to comply with any condition or agreement contained in this Agreement or the breach of a representation or warranty made by such General Partner. Any indemnity under this Section 5.02 shall be provided out of and to the extent of Partnership assets only, and no Partner shall have any personal liability on account thereof.

5.03    Liability of the Partners.

(a)     The General Partners shall have no liability or obligation to the Limited Partners or the Partnership for any decision made or action taken in connection with the discharge of such General Partner's duties hereunder, if such decision or action is made or taken in good faith. Notwithstanding the foregoing, each General Partner shall indemnify and save

harmless the Partnership and the Limited Partner from and against any claim, loss, expense, liability, suit, action or damage, including, without limitation, reasonable costs and expenses of litigation and appeal (and the reasonable costs and expenses of counsel) arising out of such General Partner's unauthorized act, fraud, bad faith, gross negligence, willful violation of fiduciary duties to the Limited Partners or failure to comply with any condition or agreement contained in this Agreement

(b)     The Limited Partners shall not have any right by virtue of this Agreement to require the General Partners to make any loan, advance or payment for or on behalf of the Partnership.

(c)     All representations and warranties herein shall survive the execution of this Agreement, and each Partner agrees to indemnify the other Partners and the Partnership for any damages caused as a consequence of the breach of any representation or warranty made by him herein.

## ARTICLE VI
## ACCOUNTING, REPORTS, BOOKS, BANK ACCOUNTS AND FISCAL YEAR

6.01     <u>Bank Accounts</u>. The bank accounts of the Partnership shall be maintained in such banking institutions authorized to do business in New York or such other states as the General Partners shall determine, and subject to the terms of Section 4.03(a) withdrawals shall be made on the signature of Michael Sklar, a General Partner, or of a person designated by the General Partners. The Partnership's funds shall not be commingled with the funds of any other person and shall not be used except for the business of the Partnership. All deposits, including funds not needed in the operation of the Partnership's business, shall be deposited in interest bearing accounts with, or certificates of deposit issued by, any bank or trust company incorporated under the laws of the United States or of any state thereof and having a combined capital and surplus in excess of $50,000,000 or invested in other comparable high grade obligations.

6.02     <u>Books of Account</u>. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Partnership, shall be kept or caused to be kept by the General Partners. The books shall be kept on an accrual basis of accounting, and the fiscal year of the Partnership shall be the calendar year. All the Partnership's books of account, together with an executed copy of this Agreement and copies of such other instruments as the General Partners may execute hereunder, including amendments thereto, shall at all times be kept at the principal office of the Partnership and shall be available during normal business hours for inspection by any Partner or such Partner's duly authorized representative or, at the expense of any Partner, for audit by such Partner's duly authorized representative.

6.03     <u>Financial Reports</u>. The General Partners shall cause the books of the Partnership to be examined and reviewed annually as of the end of each fiscal year by the Accountants. The General Partners shall cause a balance sheet and a report of the receipts, disbursements, net profits and losses and cash available for distribution, and the share of the net profits and losses and cash available for distribution of each of the Partners to be determined and prepared for each fiscal year and shall cause copies thereof to be transmitted to each of the Partners for each fiscal year.

6.04    Tax Returns and Tax Treatment. The General Partners shall, with the advice of the Accountant or other qualified professional, for each fiscal year, file on behalf of the Partnership a United States Partnership Return of Income within the time prescribed by law for such filing including any extension of such time. The General Partners shall also file on behalf of the Partnership such other tax returns and other documents from time to time as may be required by the State of New York any other state or any subdivision thereof. The General Partners shall send a copy of each such tax return and a copy of Schedule K-1 or any successor or replacement form thereof to each Partner prior to filing the United States Partnership Return of Income for each fiscal year. The good faith determination by the General Partners, subject to Section 4.03(t) with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding for such purposes.

6.05    Partnership Representative. As the Partnership is subject to the New Partnership Audit Rules, the Partnership will, with respect to any "final partnership adjustment" (as such term is defined for purposes of Section 6226(a) of the Code (as revised to reflect the New Partnership Audit Rules) or any successor provision, timely make the election provided for in Section 6226(a) of the Code (as revised to reflect the New Partnership Audit Rules) or any successor provision, unless otherwise determined by the General Partners. As the Partnership is subject to the New Partnership Audit Rules, the Partnership's Partnership Representative for purposes of the New Partnership Audit Rules will be Sharan Sklar, or, upon Sharan Sklar's withdrawal as the Partnership Representative, an eligible person selected by the General Partners, and timely elections of such status under Section 6223(a) of the Code (as revised to reflect the New Partnership Audit Rules) shall be made. This Section 6.05 shall survive any termination of this Agreement.

## ARTICLE VII
PROFITS AND LOSSES; DISTRIBUTIONS

7.01    Allocations of Profits and Losses.

(a)    Profits and losses shall be allocated to each Partner based on such Partner's Percentage Interest.

(b)    Where a distribution of an asset is made in the manner described in Section 734(a) of the Code, or where a transfer of an Interest permitted by this Agreement is made in the manner described in Section 74l(a) of the Code, the General Partners, in such General Partners' discretion may file on behalf of the Partnership, upon the request of any Partner affected thereby, an election under Section 754 of the Code in accordance with the procedures set forth in the applicable Income Tax Regulations.

(c)    Except as provided in Section 7.01(d) hereof, whenever the profits and losses of the Partnership allocable under this Section 7.01 consist of items of different character for tax purposes (e.g. ordinary income, long-term capital gain, interest expense, etc.), the profits and losses of the Partnership allocable to each Partner shall be deemed to include such Partner's pro rata share of each such item, in accordance with his share of the profits and losses from the transaction in which such profits and losses were realized

(d)    Notwithstanding Section 7.01(c) hereof, if the Partnership realizes depreciation recapture taxable as ordinary income under Section 1245 or 1250 (or other comparable Sections) of the Code, the income allocable under Section 7.01(a) hereof to any Partner shall be deemed to include that portion of such depreciation recapture as the total amount of deductions for depreciation or amortization of the Partnership's assets previously allocated to such Partner reduced by any depreciation recapture previously allocated to such Partner (or to any predecessor in interest of such Partner) with respect to such assets bears to the total amount of deductions for depreciation or amortization of such assets previously allocated to both Partners similarly reduced by all depreciation recapture previously allocated to both Partners with respect to such assets, and the balance of any profits and losses realized by that Partner shall be deemed to consist of a pro-rata share of each of the other income items realized by the Partnership as provided in Section 7.01(c) hereof.

7.02    Distribution and Application of Cash.

(a)    Except as otherwise provide by this Agreement or required by law, cash distributions (other than Capital Proceeds) shall be made pro rata to the Partners on the following bases at such time and in such amounts as the General Partners in such General Partners' sole discretion shall determine after giving effect to the following considerations:

  (i)    the cash requirements of the business of the Partnership including the reinvestment of the assets of the Partnership;

  (ii)    the Federal, state and local income tax liability of each of the Partners which tax liability is attributable to each Partner's Interest in the Partnership; and

  (iii)    the general income needs of each of the Partners.

(b)    Cash distributions (other than Capital Proceeds) shall be applied in the following order of priority:

  (i)    To repay any loan payable to a Partner in proportion to the respective amounts of any such loans; and

  (ii)    The balance, if any, to each Partner based on such Partner's Percentage Interest.

(c)    Except as otherwise agreed upon by the Partners, Capital Proceeds shall be distributed pro rata to the Partners and applied in the following order of priority:

  (i)    To repay any loan payable to a Partner in proportion to the respective amounts of any such loans;

  (ii)    To each Partner in an amount not to exceed such Partner's initial Capital Account;

(iii)     The balance, if any, to each Partners based on such Partner's Percentage Interest.

7.03     Certain Additional Allocations.

(a)     Upon liquidation of the Partnership pursuant to Article IX hereof, profits and losses realized upon such liquidation shall be allocated pursuant to Section 7.01(a) hereof and any asset shall be distributed in cash or in kind in accordance with the provisions of Section 9.04 hereof. With respect to assets distributed in kind to the Partners, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be profits and losses realized by the Partnership immediately prior to the liquidation (for the purposes of this Section 7.03(a), "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the appraised fair market value of such assets (as determined pursuant to Section 9.04 hereof) and the Partnership's basis for such assets), (ii) such profits and losses shall be allocated to the Partner or Partners who received such assets in the same proportions as their interests in such assets after such distribution and (iii) any property so distributed shall be treated as a distribution to the Partners pursuant to Section 7.02(c) hereof to the extent of the aforesaid appraised fair market value less the amount of any liability related thereto. Nothing contained in this Section 7.03(a) or elsewhere in this Agreement is intended to treat or cause such distributions to be treated as sales for value.

(b)     For income tax purposes, if the Partnership in any year realizes income or is allowed a deduction (including additional depreciation or amortization as a result of adding an item to its basis) as a result of the transfer of an interest in property to or from a Partner, the difference between the amount taken into account for tax purposes and the amount otherwise taken into account under this Agreement shall be allocated solely to such Partner.

(c)     The Percentage Interest of each Partner shall be as follows:

(i)     RAS is a General Partner with a General Partner interest of 1%;

(ii)     Michael Sklar, is a General Partner with a General Partner interest of 1%;

(iii)     Sharan Sklar, is a General Partner with a General partner interest of 1%;

(iv)     the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18.36%;

(v)     Rita A. Sklar is a Limited Partner with a Limited Partner interest of 29.64%;

(vi)     Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 15.68%;

(vii)     Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with an aggregate Limited Partner interest of 15.68%;

(viii)   Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 8.82%; and

(ix)   Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with an aggregate Limited Partner interest of 8.82%.

(d)   All profits and losses allocated to the Partners and all cash distributions made to the Partners shall be credited or charged, as the case may be, to their Capital Accounts.

## ARTICLE VIII
### TRANSFER OF INTERESTS; WITHDRAWAL

8.01   Transfers. A Partner may sell, assign, give or otherwise transfer all or any part of such Partner's interest in the Partnership, or pledge, hypothecate or otherwise encumber any such interest, only upon the prior written consent of all General Partners; and any successor to any such interest by operation of law shall have no right by virtue thereof to be admitted as a Partner except upon such consent and shall hold such interest subject to all the terms of this Agreement.

8.02   Death or Disability of the Limited Partner.

(a)   The death, insanity, incompetency or Bankruptcy of a Limited Partner shall not terminate or dissolve the Partnership.

(b)   Upon the occurrence of such event with respect to any Limited Partner, the executor, administrator, guardian, committee, trustee or other legal representative or successor in interest of such Limited Partner shall have the rights of such Limited Partner subject to the provisions of this Agreement. Such successor in interest shall not become a Substitute Partner except upon compliance with the provisions of Sections 8.03 and 8.04 hereof.

8.03   Substitute Partner; Admission. No Partner shall have any right to substitute an Assignee as a Partner in such Partner's place without the prior written permission of each General Partner. Any purported substitution of an Assignee as a Partner without such consent shall be void ab initio and shall not bind the Partnership. The consent of the General Partners to an Assignment under Section 8.01 hereof shall not, in and of itself, constitute permission under this Section 8.03. Any Assignee shall not be admitted as a Substitute Partner unless (A) the Assignor shall have indicated such intention of substitution in the instrument effecting the Assignment and the Assignee expressly agrees to be bound, to the same extent as the other Partners, by the provisions of this Agreement and any other documents required in connection therewith and to assume the obligations of the Assignor hereunder, (B) the Assignor and the Assignee shall have executed or delivered such other instruments as the General Partners may deem necessary or desirable to effectuate such admission and (C) the Assignee shall have agreed to pay, as the General Partners shall determine, all reasonable expenses and legal fees relating to the Assignment and such Assignee's admission as a Substitute Partner, including, but not limited to, the cost of any amendment to the Certificate necessary to effect such admission.

8.04    Assignees.

(a)    Any person who acquires in any manner whatsoever any Interest, irrespective of whether such person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to and bound by all the obligations of this Agreement that any predecessor in interest of such person was subject to or bound by. A person acquiring an Interest, including the personal representatives and heirs of a deceased Partner, shall have only such rights, and shall be subject to all the obligations, as are set forth in this Agreement; and, without limiting the generality of the foregoing, such person shall not have any right to have the value of his or her Interest ascertained or receive the value of such Interest or, in lieu thereof, profits attributable to any right in the Partnership, except as herein set forth.

(b)    Any Assignee of an Interest pursuant to an Assignment satisfying the conditions of this Article VIII who does not become a Substitute Partner in accordance with Section 8.03 hereof shall have the right to receive the same share of the profits and losses and distributions of the Partnership to which the Assignor would have been entitled. If such Assignee desires to make an Assignment of such Assignee's Interest, such Assignee shall be subject to all the provisions of this Article VIII to the same extent and in the same manner as any Partner desiring to make an assignment.

(c)    Any Partner who shall Assign all of such Partner's Interest shall cease to be a Partner and shall no longer have any rights or privileges of a Partner except that, unless and until such Partner's Assignee is admitted to the Partnership as a Substitute Partner in accordance with Section 8.03 hereof, such Assignor shall retain all rights and be subject to all obligations under the Uniform Act.

(d)    In the event that an Assignment shall be made, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such Assignment. Such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Agreement. Except as provided in Section 8.04(b), if such an instrument is not so filed, the Partnership need not recognize any such purported Assignment for any purpose.

8.05    Effect of Withdrawal, Death or Incompetency; Election to continue Business. Upon the withdrawal, Bankruptcy, death or incompetency of all of the General Partners, the last General Partner to withdraw, declare Bankruptcy, die or be determined incompetent or such General Partner's legal representative shall promptly notify the Limited Partners of such event, the Partnership shall be dissolved and terminated unless the Limited Partners elect to continue the business of the Partnership, in which case the Partnership shall not dissolve or terminate. If the Limited Partners elect to continue the business of the partnership, either a new general partner shall be admitted to the Partnership or the Partnership shall be reconstituted as a general partnership. After such event shall occur, such General Partner or such General Partner's legal representative shall take no part in the management of the Partnership, but shall retain such General Partner's Percentage Interest in the profits and losses and cash distributions. The withdrawal of such General Partner shall not be deemed to be effective until the expiration of 90

days from the day on which such notice has been mailed to the Limited Partner. The General Partners shall remain liable for obligations incurred by such General Partners under this Agreement through the effective date of such General Partners' withdrawal, whether such withdrawal shall be voluntary or involuntary or whether in compliance with or in violation of this Agreement.

8.06    Amendment of Certificate. Upon the admission of a Substitute Partner or an additional partner or the withdrawal of a Partner, an amendment to the Certificate reflecting such admission or withdrawal shall be filed as required by the Uniform Act.

8.07    Survival of Liabilities. It is expressly understood that no Assignment, pledge or encumbrance of a Partner's Interest, even if it results in the substitution of the Assignee as a Partner, shall release the Partner from any liability to the Partnership which shall survive such Assignment, pledge or encumbrance, including those set forth in the Uniform Act.

## ARTICLE IX
## DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

9.01    Dissolution and Liquidation. The Partnership shall be dissolved and shall liquidate upon the occurrence of any of the following:

(a)    The withdrawal, death, incompetency or Bankruptcy of each of the General Partners if the Partnership is not continued in accordance with Section 8.05 hereof.

(b)    Any event which shall make it unlawful for the existence of the Partnership to be continued;

(c)    The sale or other disposition of the Property or of all or substantially all of the real property assets of the Partnership; or

(d)    The unanimous determination of the General Partners to dissolve and liquidate the Partnership.

The dissolution shall be effective on the last day of the month in which the event causing the dissolution occurs, but the Partnership shall not terminate until all of the assets have been distributed in accordance with this Article.

9.02    Actions of Liquidating Agent Upon Dissolution. Upon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article IX and the Uniform Act. The liquidation shall be conducted and supervised by the General Partners or, if there be no General Partner, by a person who shall be designated for such purpose by the owners of at least 51% of the Partner interests (the General Partners or such person so designated being hereinafter referred to as the "Liquidating Agent"). The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and the Liquidating Agent is hereby expressly authorized and empowered to

effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership. The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation. The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

9.03    Statements on Termination. Each Partner shall be furnished with a statement prepared by the Liquidating Agent which shall set forth the assets and liabilities of the Partnership as at the date of complete liquidation, and each Partner's share thereof. Upon compliance with the distribution plan set forth in Section 9.04 hereof, the Partners shall cease to be such, and the Liquidating Agent shall execute, acknowledge and cause to be filed a certificate of termination of the Partnership.

9.04    Priority on Liquidation; Distribution of Non Liquid Assets.

(a)    The Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable. To the extent the proceeds are sufficient therefor, as the Liquidating Agent shall deem appropriate, the proceeds of such liquidation shall be applied to pay any debts or liabilities of the Partnership other than to Partners and then in accordance with the provisions of Section 7.02(c) hereof.

(b)    If, in the sole discretion of the Liquidating Agent, he shall determine that it is not feasible to liquidate all or part of the assets of the Partnership or that an immediate sale of all or part of such assets would cause an undue loss to the Partners, the Liquidating Agent shall cause the fair market value of the assets not so liquidated to be determined by independent appraisal. Such assets, as so appraised, shall be retained or distributed by the Liquidating Agent as follows:

(i)    The Liquidating Agent shall retain assets having a value (which value shall be equal to the fair market value of such assets less the amount of any liability related thereto) equal to the amount by which the net proceeds of the liquidated assets are insufficient to satisfy the requirements of subparagraph (i) of Section 7.02(c) hereof; and

(ii)    The remaining assets shall be distributed to the Partners pursuant to subparagraphs (ii) and (iii) of Section 7.02(c) hereof.

Any distribution of assets in kind shall be distributed on the basis of the fair market value thereof and any Partner entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Partners so entitled. If the Liquidating Agent, in his or her sole discretion, deems it not feasible to distribute to each Partner an aliquot share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Partners as tenants-in-common as the Liquidating Agent shall determine to be fair and equitable.

9.05    Orderly Liquidation. A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities so as to minimize the

losses normally attendant upon a liquidation.

9.06    No Goodwill value.    At no time during continuation of the Partnership shall any value ever be placed on the Partnership name, or the right to its use, or to the goodwill appertaining to the Partnership or its business, either as among the Partners or for the purpose of determining the value of any Interest, nor shall the legal representatives of any Partner have any right to claim any such value. In the event of a termination and dissolution of the Partnership as provided in this Agreement, neither the Partnership name, nor the right to its use, nor the same goodwill, if any, shall be considered as an asset of the Partnership, and no valuation shall be put thereon for the purpose of liquidation or distribution, or for any other purpose whatsoever; nor shall any value ever be placed thereon as between the remaining or surviving Partners and the legal representatives of the estate of any deceased, insane, incompetent or bankrupt Partner.

## ARTICLE X
### AMENDMENT

10.01    Amendment. The General Partners (upon the unanimous consent of all of the General Partners) may, without the consent of the other Partners, amend this Agreement for any purpose; provided, however, that the written consent of all the Partners shall be required for any amendment which would:

(a)    increase the amount required to be contributed to the capital of the Partnership by any Partner;

(b)    alter or otherwise affect this Article X;

(c)    change the character of the business of the Partnership as set forth in Article II; or

(d)    alter or otherwise affect any Partner's interest in the profits and losses of, and distributions from, the Partnership (except to the extent provided in Article IV)

10.02    The General Partners shall not amend Article IV without the unanimous consent of all of the General Partners.

## ARTICLE XI
### ACCOUNTING RECORDS

11.01    Method and Period.    Until changed by the Partnership, the books and records of the Partnership shall be kept on an accrual basis and on a fiscal year ending December 31.

11.02    Financial Statements. The books shall be closed at the end of each fiscal year and statements prepared concerning the financial condition of the Partnership and its results from operations. Copies of these statements shall be given to all Partners.

11.03    Tax Returns.    The General Partners shall arrange for the preparation and filing of all necessary tax returns and reports of any other kind for the Partnership. The General Partners shall timely furnish to the other Partners the tax information required by them for federal or state and local tax purposes.

11.04   Examination of Records. All books, records and accounts of the Partnership shall be kept at its office, and shall be open to inspection by all the Partners at reasonable times.

11.05   Tax Elections. In the event of any permitted transfer by any Partner of such Partner's interest in the Partnership, or upon the death of any Partner, the Partnership may, but shall not be required to, elect to cause the basis of the Partnership's assets to be adjusted for federal income tax purposes pursuant to Section 734, 743 and 754 of the Code. Each Partner agrees to supply to the General Partners any necessary information to give effect to any such election. Any additional costs incurred by the Partnership in making such adjustments shall be charged to the Partners whose acquisition of an interest in the Partnership or receipt of a distribution results in such adjustments.

## ARTICLE XII
### POWER OF ATTORNEY

12.01   Appointment of General Partner. Each Limited Partner hereby appoints each General Partner as such Limited Partner's attorney-in-fact to make, execute and file with respect to the Partnership any documents required pursuant to Article VIII and any amendments to the Partnership Agreement which are permitted by Article X, so long as such amendments are required by law or are authorized under this Partnership Agreement, and any other documents which the General Partners may deem necessary or desirable to carry out fully the provisions of this Partnership Agreement, including the following:

(a)   any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of New York or other applicable law;

(b)   a certificate of cancellation of the Partnership and such other instruments or documents as may be deemed necessary or desirable by the General Partners to reflect or to effectuate the dissolution and termination of the Partnership pursuant to the terms of this Agreement; and

(c)   any and all amendments or modifications of the instruments described in the preceding subsections (a) or (b).

12.02   Irrevocable. The foregoing Power of Attorney shall be deemed coupled with an interest and shall be irrevocable and shall survive the subsequent merger, dissolution, or termination of the General Partners.

12.03   Appointment By General Partner. Except as set forth herein, the General Partners shall have the right from time to time to constitute and appoint any single Partner or Partners as their true and lawful attorney, with full power and authority in the name, place and stead of the General Partners to make, execute, sign, acknowledge, deliver, receive, file, and publish on the behalf as General Partners, any and all instruments and documents affecting or relating to the Partnership.

## ARTICLE XIII
## RESTRAINING ORDERS

13.01  <u>Restraining Orders</u>.  In the event that a Partner shall at any time make a pledge, mortgage, assignment, transfer, sale or other disposition of such Partner's interest as a Partner of the Partnership in violation of the provisions hereof, the other Partners shall, in addition to all other rights and remedies which they may have at law or in equity, be entitled to a decree or order restraining and enjoining such pledge, mortgage, assignment, transfer, sale or other disposition, and the offending Partner shall not plead in defense thereto that there would be an adequate remedy at law, it being recognized and agreed that the injury and damage resulting from such a breach would be impossible to measure monetarily.

## ARTICLE XIV
## MISCELLANEOUS

14.01  <u>Governing Law</u>. This Agreement and the rights of parties hereunder shall be governed by and construed in accordance with the laws of the State of New York without reference to its conflicts of laws rules.

14.02  <u>Notices</u>. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as duly given on (a) the date of delivery, if delivered in person, or (b) on the date of mailing if mailed from within the continental United States by registered or certified mail, return receipt requested, to the party entitled to receive the same, by email or facsimile and if to any General Partner, to it at the address of the Partnership set forth in Article II above, and if to the other Partners or Decider, at the addresses set forth in Schedule B to this Partnership Agreement. Any Partner may change such Partner's address by giving notice in writing to the General Partner stating such Partner's new address. Commencing on the day after the receipt by the General Partner of such notice, such newly-designated address shall be such Partner's address for the purpose of all notices or other communications required or permitted to be given pursuant to this Agreement.

14.03  <u>Non-Waiver</u>. No consent or waiver, express or implied, by a Partner to or of any breach or default by any other Partner in the performance by such other Partner of such other Partner's obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other Partner hereunder. Failure on the part of any Partner to complain of any act of the other Partner(s) or to declare such other Partner(s) in default, irrespective of how long such failure continues, shall not constitute a waiver by such Partner of such Partner's rights hereunder.

14.04  <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them, and it may not be modified or amended in any manner other than as provided herein. A waiver of any breach or condition of this Agreement shall not be deemed to be a waiver of any subsequent breach or condition of a like or different nature.

14.05  <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and their permitted assigns with the same force and effect as if they were parties hereto subject to the terms, covenants and conditions herein set forth, and,

except as otherwise specifically provided herein, reference to a Partner herein shall include the Partner's successors and permitted assigns.

14.06 <u>Successors</u>. No assignment of any right or interest under this Agreement shall be valid unless made in accordance with the terms of this Agreement.

14.07 <u>Captions</u>. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

14.08 <u>Severability</u>. If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

14.09 <u>Further Assurances</u>. Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents and to take all such further action as may be required by law or deemed by the General Partner to be necessary or useful in furtherance of the Partnership's purposes and in order to carry out the provisions of this Agreement.

14.10 <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context shall require.

14.11 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

14.12 <u>Creditors</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership.

*[**Remainder of page intentionally left blank. Signature page to follow.**]*

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the date first above written.

GENERAL PARTNER:

RAS Property Management, LLC

By: Rita Sklar
Name: Rita Sklar
Title: Manager

Michael Sklar Management L.L.C.

By: 
Michael Sklar

Sharan Sklar Management L.L.C.

JOSHUA GOLDSTEIN
By: 
Sharan Sklar by JOSHUA GOLDSTEIN, Authorized Signatory

LIMITED PARTNERS:

The Estate of Lois Weinstein

By: 

Rita Sklar
Rita Sklar, Individually

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee).

By: ___*Rita Sklar*___
Rita Sklar, Trustee

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee).

By: ___*Rita Sklar*___
Rita Sklar, Trustee

Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor).

By: ___*Rita Sklar*___
Rita Sklar, Trustee

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor)).

By: ___*Rita Sklar*___
Rita Sklar, Trustee

## SCHEDULE B

(i)      RAS is a General Partner with a General Partner interest of 1%;

(ii)    Michael Sklar, is a General Partner with a General Partner interest of 1%;

(iii)   Sharan Sklar, is a General Partner with a General partner interest of 1%;

(iv)   the Estate of Lois Weinstein is a Limited Partner with a Limited Partner interest of 18%;

(v)    Rita A. Sklar is a Limited Partner with a Limited Partner interest of 31%;

(vi)   Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 12%;

(vii)  Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) is a Limited Partner with a Limited Partner interest of 12%;

(viii) Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 12%; and

(ix)   Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor) is a Limited Partner with a Limited Partner interest of 12%.

# EXHIBIT B

# NINETY-FIVE MADISON COMPANY L.P.

## Before

| Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Lois Weinstein, Settlor) | Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Rita Sklar, Trustee) | Issue Trust for the benefit of Hannah Rose (Sklar) Gettinger (Rita Sklar, Trustee) | Estate of Lois Weinstein, Limited Partner |

Issue Trust for the benefit of Ruby Hilene Sklar and Issue Trust for the benefit of Sadie Pearl Sklar (Lois Weinstein, Settlor)

RAS Property Management, LLC, General Partner

8.82%

15.68%

15.68%

18.36%

8.82%

32.64%

Ninety-Five Madison Company L.P.

11925669

# NINETY-FIVE MADISON COMPANY L.P.

## <u>After</u>



11925669

# EXHIBIT 2

**First Amendment**

## AMENDMENT TO AMENDED AND RESTATED PARTNERSHIP AGREEMENT OF NINETY-FIVE MADISON COMPANY, L.P.

THIS AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Amendment") of Ninety-Five Madison Company, L.P., a New York limited partnership (the "Limited Partnership"), is made and effective as of June __, 2022 (the "Effective Date") by and between RAS Property Management, LLC ("RAS"), Michael Sklar Management LLC ("Michael Sklar"), and Sharan Sklar Management LLC ("Sharan Sklar"), each as a general partner (the "General Partners").

## RECITALS

WHEREAS, the General Partners desire to amend the Amended and Restated Partnership Agreement; and

WHEREAS, the General Partners reserved the right to amend the Amended and Restated Partnership Agreement in Section 10.01 thereof by unanimous consent of the General Partners; and

NOW, THEREFORE, in consideration of the premises and mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the General Partners agree as follows:

1. Capitalized terms shall have the meanings ascribed to them in the Amended and Restated Partnership Agreement.

2. All decisions made hereafter shall be by the vote of a majority of the General Partners, or their Designee. The provisions of the Amended and Restated Partnership Agreement requiring a Unanimous Decision are hereby deleted.

3. All provisions in the Amended and Restated Partnership Agreement appointing the Decider or delegating any responsibilities or decisions to the Decider are hereby deleted. Jeffrey Barringer is hereby removed as Decider.

4. The General Partners further agree:

   a. Each General Partner shall have the right to, but shall not be obligated to, select a third party "advisor/surrogate" ("Designee") to represent their interest in any partnership matter and that individual will be authorized to make any decisions on their behalf. A Designee shall be authorized to act once written notice is provided to the General Partners of the Designee, which notice may be revoked at any time.

   b. A budget of $150,000 per year per partner until a Disposition has closed will be available to cover the cost of each Designee and the expense will be paid by the Limited Partnership.

   c. Any partner shall be permitted to expend personal funds for amounts in excess of the budget limit so stated.

d. General partners may elect to represent themselves, however, they will not be paid for their time so spent.

e. In light of the financial status of the Limited Partnership, no further fees or salaries will be paid to Rita Sklar, Michael Sklar or Sharan Sklar absent the consent of all general partners.

5. The General Partners shall be prohibited from obligating any General Partner or its principals to guarantee any indebtedness of the Partnership without the written consent of that General Partner.

6. The Limited Partnership shall transfer ownership and/or control of substantially all of the Limited Partnership's assets (the "Property") through a sale, ground lease, net lease or otherwise (a "Disposition"). The General Partners, after consultation with the below named experts, shall select the most favorable Disposition meeting the criterion outlined herein:

a. The General Partners agree that the Limited Partnership shall engage the services of Woody Heller and his company to market the Property for a Disposition and a recognized tax expert (with qualifications on par with a tax partner at PriceWaterhouseCoopers), who have experience in and with the New York city commercial real estate market (the "Advisors").

b. The Letters of Engagement of both Advisors shall reflect the fees, terms and conditions of other similarly qualified professionals, for similar projects in the New York City real estate market.

c. Both professionals shall evaluate all proposed transactions and select and recommend the best overall outcome as it affects the holders of a majority of the limited partnership interests and considering the tax basis and consequences for each limited partner, while also taking into account timing and risk.

d. The above criterion and selected and recommended offers, shall guide the decisions of the General Partners.

7. All communications and negotiations with parties interested in the Property shall be handled solely by the Advisors. The Advisors shall provide regular written reports to all of the General Partners concerning the status of their work.

8. All other terms and conditions of the Amended and Restated Partnership Agreement remain in full force and effect.

GENERAL PARTNERS:
RAS Property Management, LLC

By: _Rita Sklar_____
     Name:   Rita Sklar
     Title:    Manager

Michael Sklar Management LLC

By: _____
     Name:   Michael Sklar
     Title:    Manager

Sharan Sklar Management LLC

By: _____
     Name:   Sharan Sklar
     Title:    Manager

## EXHIBIT 3

**Second Amendment**

## SECOND AMENDMENT TO THE
## NINETY-FIVE MADISON COMPANY
## LIMITED PARTNERSHIP AGREEMENT

THIS SECOND AMENDMENT TO THE AGREEMENT OF LIMITED PARTNERSHIP (this "Second Amendment") of Ninety-Five Madison Company, L.P., a New York limited partnership ( "NFMC"), is made and effective as of August 20 , 2024 (the "Effective Date"), upon a vote and signature by NFMC's general partners RAS Property Management, LLC ("RAS"), Michael Sklar Management LLC ("Michael Sklar"), and Sharan Sklar Management LLC ("Sharan Sklar"), each as a general partner (RAS, Michael Sklar, and Sharan Sklar, together, the "General Partners").

### RECITALS

**WHEREAS**, NFMC adopted the Amended and Restated Limited Partnership Agreement, effective June 2021 and hereto annexed as Exhibit A ("Restated Agreement"). By a first amendment to the Restated Agreement, effective date June 2022 ("First Amendment"), NFMC adopted the First Amendment which amended the Restated Agreement. A true copy of the First Amendment hereto annexed as Exhibit B;

**WHEREAS**, pursuant to the First Amendment, the General Partners identified above are NFMC's only General Partners, each with an equal percentage;

**WHEREAS**, pursuant to the authority provided in the First Amendment, NFMC hereby amends the First Amendment and Restated Agreement in accordance with and by this Second Amendment;

**NOW, THEREFORE**, pursuant to the First Amendment, and Restated Agreement, NFMC intends to be and hereby adopts and considers itself bound to this Second Amendment as follows:

### AMENDMENT

1.      Section 9.01 of the 2021 Restated Agreement entitled "Dissolution and Liquidation" is hereby replaced with the following language:

Dissolution and Liquidation. The Partnership shall be dissolved and shall liquidate upon the occurrence of any of the following:

(a) The withdrawal, death, incompetency or Bankruptcy of each of the General Partners if the Partnership is not continued in accordance with Section 8.05 hereof.

1

(b) Any event which shall make it unlawful for the existence of the Partnership to be continued; or

(c) The determination of a majority of the General Partners to dissolve and liquidate the Partnership.

The dissolution shall be effective on the last day of the month in which the event causing the dissolution occurs, but the Partnership shall not terminate until all of the assets have been distributed in accordance with this Article.

2.      Any reference in the Restated Agreement, or First Amendment to language which indicates that NFMC will dissolve or begin dissolution upon the sale of all, or substantially all, of its assets is hereby deleted.

3.      Further, NFMC intends to enter into one or more like-kind exchanges of one or more real property(ies) pursuant to Internal Revenue Code § 1031 in connection with the sale of 95 Madison Avenue, New York, New York ("Property") on or about June 3, 2024. ("Like-Kind Exchange"). NFMC expressly adopts the NFMC resolution hereto annexed as Exhibit C, which provides, among other things, that a majority of the General Partners named therein are hereby authorized to sign any and all documents in connection with NFMC's use of Property sale proceeds currently held by a qualified intermediary for any Like-Kind Exchange. The Exhibit C Resolution may be used in its existing form to demonstrate authorization of a majority of the General Partners to bind NFMC in connection with the purchase and sale of real property as indicated in the Resolution. Any activity undertaken by a General Partner in connection with the powers enumerated in Exhibit C are specifically and expressly conducted within the role as General Partner of NFMC and may not prompt personal liability of any kind for acting in accordance therewith.

4.      The language in section 4(e) in the First Amendment is deleted and replaced with the following language: "Work performed by any General Partner on behalf of and for the benefit of NFMC shall be compensated commensurate with the work performed, subject to approval of the majority of the General Partners."

5.      Other than as hereby amended, the remaining provisions of the Restated Agreement shall remain in full force and effect.

6.      This Second Amendment may be executed in several counterparts using electronic signatures, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, NFMC hereby executes this Second Amendment upon at least two General Partners of three total General Partners signing hereof, giving same a binding effect on NFMC, its General Partners, all limited partners of NFMC, as of the date first above written.

**[signatures on following page]**

GENERAL PARTNERS:

RAS Property Management, LLC

By: _____
Name: Rita Sklar
Title: Manager

Michael Sklar Management LLC

By: _____
Name: Michael Sklar
Title: Manager

Sharan Sklar Management LLC

By: _____
Name: Sharan Sklar
Title: Manager

**<u>EXHIBIT 4</u>**

**Confirmation Hearing Transcript**

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 21-10529-dsj

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   NINETY-FIVE MADISON COMPANY, LP,

8

9         Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  December 19, 2023

17                  10:29 am

18

19

20

21  B E F O R E :

22  HON DAVID S. JONES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  UNKNOWN

1 THE COURT: Well, the modified exculpation, as I
2 understand it, is solely through either confirmation or
3 effective date and there's an intent to seek further
4 exculpation or equivalent at the time of the sale. And I
5 think, so where do you go at the time of sale is first you
6 object and say it's not pursued in good faith and it's
7 violative of your client's rights and shouldn't be approved;
8 it's procedurally flawed. And second -- so A, don't approve
9 the sale, and B, don't include a good faith filing or
10 exculpate them, because it's coming at the price of them
11 outrageously railroading and trampling my client's rights.
12 That's me parroting you, not my finding.
13 MR. KARCHER: Thank you, Your Honor.
14 THE COURT: Okay? So I do want to hear from you
15 again. I'll ask, is there anything legally unavailable for
16 me to rule on that as I just described, in your view? U
17 think you just said no, but I want to nail that down.
18 MR. KARCHER: No.
19 THE COURT: Okay, great. All right. So let me
20 come to Mr. Barr with the same -- you just heard that
21 discussion. I really have the same questions for you and
22 I'll welcome any other objection or comment you want to
23 make.
24 MR. BARR: Your Honor, I'd like to go to what --
25 how Your Honor started these proceedings. Your Honor had an

1 idea of having this sale, I guess the contemplation of the
2 sale had to occur within six months. I would say three
3 months, and my reason is that if you look at the operating
4 reports, you could see that they're already operating at a
5 deficit of about two to -- I think it's more than $200,000 a
6 month. But once if they -- and that's based on drawing on
7 11 -- I think 11, almost 12 million of the facility to date,
8 and that includes paying salaries to Sharon and Michael and,
9 you know, unfortunately very large legal bills.
10 But they have real estate taxes that are going to
11 be due of $1,000,750 to New York City. And then once they
12 pay the creditors, they use the facility to pay the
13 creditors, I think that these numbers are going to jump to
14 like $500,000 a month. And that --
15 THE COURT: I'm sorry. What -- just, what numbers
16 specifically?
17 MR. BARR: What it's going to cost for them to
18 continue to operate. If they don't -- if there's not a --
19 they're talking in terms of a sale, but there's not -- the
20 concern is that if the sale doesn't happen, they're going to
21 run through the entire facility within three to six months,
22 is sort of my estimation. And if that's the case, they're
23 going to be facing bank foreclosure. So that's a reason
24 under, you know, under Section 11 of 1129, and also 5, you
25 know, (a)(2), that these are general -- you know, that the

1 equity holders are going to lose out because they're not
2 going to -- there's going -- there's going to
3 (indiscernible) some forced sale.
4 THE COURT: No, I understand your point. You're
5 talking about 1129(a)(11), and which essentially is, you
6 know, feasibility or the lack of any -- likelihood of
7 further liquidation or reorganization. I've got it.
8 Okay. So how about...? So that's one. We'll
9 think about that. I'll hear from the Debtors in a minute on
10 that. How about the other issue -- the other sort of order
11 modifications and thoughts that I exchanged with Mr.
12 Karcher?
13 MR. BARR: I don't think I have a position with
14 respect to those, Your Honor.
15 THE COURT: Okay. And am I right? So, I want --
16 the estate's basic concern, right, is I think you want money
17 sooner rather than later. You've got some obligations. I'm
18 sure you want to wind up the estate. And on top of that,
19 you share the concern about tax structure and tax impacts of
20 the transaction?
21 MR. BARR: Well, my overall concern is that I
22 believe, based on past conduct and discussions, that the
23 estate is not going to receive any distribution from the
24 sale and that they're going to -- they're going to try to
25 keep the Debtor structured as a limited partnership, and

1 we'll have no -- you know, basically no managerial rights.
2 We're not in the partnership. We only have an economic
3 interest. And that we're not going to get this money, and
4 they're going to use it for some purpose; I don't know what.
5 So, my -- what I think is a significant issue that
6 has been ignored entirely -- I'm not faulting anyone in
7 particular -- but I do believe that it actually is relevant
8 to tax structure. And that is prior to the filing of the
9 bankruptcy, Ninety-Five Madison was dissolved by the Supreme
10 Court. Now there's a stay -- there's the bankruptcy stay,
11 of course. But you know, it's questionable about what they
12 could continue to do with the --
13 THE COURT: Can I jump in on that, because I know
14 you argued that in your papers. I'll just observe that it
15 was unsupported by admissible evidence or sworn testimony,
16 and the Debtors have -- I mean, that's very much subject to
17 dispute. I mean, I see there was a lot of headshaking going
18 on even as you said that. And I'm just not sure --- we've
19 come down a long road. This has never been raised. We're
20 at the confirmation. Debtors have presented a plan and I'm
21 not even looking at a motion to do anything that you might
22 do, appoint a trustee or take any other relief.
23 MR. BARR: Well, I have actually --
24 THE COURT: This is just --
25 MR. BARR: -- scheduled -- I'm sorry, Your Honor.

18 (Pages 66 - 69)

1 closely enough into similarity where we have confirmation to
2 be followed by a sale on terms and through a process
3 contemplated at the time of confirmation at or before. So I
4 think we're okay there.
5      The other piece that I want to say is I do want to
6 come back to what I said up front, which is I am going to
7 direct the modification of the order exactly as I described
8 up front. I'm going to -- for me to confirm and find
9 adequate safeguards on feasibility and to protect against
10 the estate running out of money as it goes through the civil
11 process, I'm going to modify the definition of outside date,
12 I believe is the defined term, which is defined as being
13 until December 31, 2024. I'm going to direct that that be
14 modified to June 30, 2024, but with the specific proviso
15 that that date can be extended by timely application,
16 presumably by Debtors, or I guess it could be by any party
17 in interest on notice with an opportunity to be heard. That
18 way, I don't want to hamstring pursuit of a value maximizing
19 transaction that might not be final by then. But I want to
20 incentivize prompt pursuit of a transaction and prompt
21 completion of a transaction.
22      And I'm mindful of the concerns voiced by the
23 estate, that they're concerned about never seeing money and
24 about the estate just -- excuse me -- the bankruptcy estate
25 bleeding money such that the estate of Lois Weinstein may

1 never actually receive economic benefit from the
2 transaction. And I think shortening the timeframe in that
3 manner is responsive to that concern and adequately
4 addresses it.
5      The estate of Louis Weinstein proposed a three
6 month outside date. I think that's too soon. I think to
7 finalize a transaction that hasn't, as far as I -- well, I
8 think we've been told that isn't yet geared to in principle
9 and get all the way through closing by March 31 seems to
10 fast. So, I think I think six months is the sweet spot.
11      Let me put that more specifically. I'm looking at
12 the as filed amended combined Chapter 15 plan of
13 reorganization and disclosure statement and the definition,
14 which most recently was Definition Number 53, defining the
15 term "outside date", I think could be modified to read as
16 follows, or equivalent.
17      "Outside date means now June 30, 2024, without
18 prejudice to further extension to no later than December 31,
19 2024, by order of the Court for good cause shown in an
20 application presented with notice and an opportunity for any
21 affected party to object." Okay? I think that just
22 tightens up the process, better safeguards the rights of
23 parties in interest who aren't driving the bus of the
24 transaction as it were, and yet still preserves the estate's
25 ability to maximize value.

1      Okay. I think those were the main additional
2 rulings or conditions I wanted to impose on confirmation. I
3 will just reiterate what I said earlier. There's a lot of
4 contention and difficulty between, I would just say partners
5 generically with -- and equity stakeholders in this Debtor
6 enterprise. I don't think I need to resolve that. At this
7 time, I think those issues are not going to be extinguished
8 by this ruling.
9      And as I said, my confirming of the plan, as I
10 conceive it, does not eliminate any party's ability to
11 object to a proposed sale on grounds including that it
12 results from improper corporate governance or is in bad
13 faith or anything else. That's partly by way of making
14 clear that the objecting parties' rights are protected and
15 not, I think, diminished by confirmation today.
16      It's also by way of notice to the Debtors that if
17 possible, and if they're able to cultivate an agreed upon
18 path, that's great. And if not, they'll need to just be
19 mindful of making sure that they're really in a correct
20 posture, that their proposed path of action is economically
21 superior, meets all their fiduciary obligations, and is in
22 the best interests of the estate. Okay. So that's -- but
23 all that's reserved for another day.
24      I will specifically address the objection raised
25 by the estate of Lois Weinstein, or the contention that was

1 raised regarding whether or not the 2022 amended partnership
2 agreement is in fact a current and valid governing
3 instrument of the Debtors.
4      The Debtors have been operating as Debtors in
5 possession for -- throughout the case. They continue to do
6 so. That has never been challenged, or the subject of any
7 filed motion to unseat them at any time, up until today.
8 Mr. Barr has referenced that he is filing or is developing
9 such a motion. But that said, we are here at the
10 confirmation date after more than two years of difficult and
11 expensive proceedings, all of which have been driven by the
12 debtors in possession.
13      And I've reviewed the amended partnership
14 agreement, and it does appear to me to in key part authorize
15 actions to be taken by two-thirds vote of the three, I think
16 it's general partners, who are RAS, or Rita Sklar, and then
17 Michael Sklar and Sharan Sklar. So, this plan has been
18 developed and proposed in conformity with that. There may
19 be other requirements that were gotten into, including
20 consultation rights, and so forth. I'm not making any
21 finding as to compliance or noncompliance with those. But I
22 think that confirmation alone is appropriate and is not made
23 inappropriate by any existing or ongoing dispute regarding
24 full compliance with the partnership agreement.
25      I think all I need to find is that the plan has

21 (Pages 78 - 81)

1 that I would say sound like they're not dead yet and you
2 never know if something else might come in.
3 And so, in the circumstances, I think it can't be
4 said that this process is likely to fail. So rather, I
5 think there's at least a sufficient likelihood that their
6 current path is likely to yield a viable transaction that
7 avoids the pitfalls that Section 1129(a)(11) guards against.
8 1129(a)(12) requires payment of U.S. Trustee
9 fees. That's taken care of. Retiree benefits, talked about
10 in (a)(13) I think are not applicable here. And so, let's
11 see. I'm going to -- I think this is -- we're hitting a
12 point of diminishing returns in the utility of my walk-
13 through of the code because there's no other provision that
14 is objected to or in dispute.
15 So let me just say a catch all sentence. I've
16 generally reviewed the plan, considered all objections, and
17 I'm satisfied that all legal requirements imposed by the
18 code are met here, and I've overruled the objections, other
19 than to the extent they're accommodated by the oral rulings
20 and modifications I've made today.
21 I do this sometimes, which most judges don't, but
22 when I make an oral ruling, I want to make sure that
23 anything that I said by mistake can be corrected on the
24 spot, and any omission I've made that needs to be cured can
25 be cured. I don't ask objecting parties because that

1 invites re-argument, which I'm not soliciting. So, I'm just
2 going to ask the Debtors, is there anything I omitted or
3 misstated that we should clean up on the record today?
4 MR. GLENN: I don't believe so, Your Honor. We
5 got your message very clear. Thank you.
6 THE COURT: Okay. Great. All right, thank you.
7 So, what I'm going to do is this. I'll direct you to order
8 the transcript and submit a revised proposed confirmation
9 order. Please circulate it and let people know what's
10 coming to the Court, and then get it down to me in redline
11 off of your prior -- copying all parties in interest and let
12 me know.
13 Let me say I'm going to guard against
14 contentiousness. First, let me say I recognize that the
15 professionals on the case, I have the impression, are
16 constructive and terrific people. I think there's some --
17 sometimes some party contentiousness here, or client
18 contentiousness. Please proceed in a fair and constructive
19 way to make reasonable asks to implement my oral rulings
20 without relitigating and re-trading. Okay? But I will want
21 you to pursue this path. Get me a proposed order, which I
22 will then plan to approve.
23 Today is Tuesday. You get diminishing staff
24 availability later in the week, so hopefully you can get to
25 us -- if you're -- keep us posted when we can expect to hear

1 from you, okay? It may be -- this is maybe more than the
2 usual quick, super quick turnaround, but ideally, we can
3 hear from you, today would be great. If not today, let us
4 know, and then hopefully tomorrow at latest, okay?
5 MR. GLENN: Thank you, Your Honor. I have an
6 unusual request to accommodate Your Honor's timeframe. Is
7 the recording of this available for us to implement the
8 changes that way, before we get the transcript? Or do we
9 have to wait for the transcript?
10 THE COURT: We get audio recordings, and I don't
11 know how fast, so let me -- I'm hoping that the wonderful
12 Ms. Calderon -- ah, I can see little dots, which tells me
13 Ms. Calderon is going to tell me the answer.
14 MR. GLENN: Okay.
15 THE COURT: Okay. According to Ms. Calderon, you
16 have to order the audio from the Clerk's office, but I think
17 that can be done. Okay?
18 MR. GLENN: Okay.
19 THE COURT: So, you can try to find the Clerk's
20 office and there should be a human you can get the audio
21 from. It should become available quickly. And if that fails,
22 you can also reach out to Ms. Calderon -- and she confirms,
23 yes, it's a quick turnaround.
24 MR. GLENN: Okay. Great. And literally, Judge,
25 our intent is to cut and paste whatever you've said into the

1 confirmation order so there's no doubt about, you know, the
2 language and whatnot, unless there's some, you know,
3 technical issue that we need to be mindful of.
4 And you know, I'll conclude by saying this. I
5 think what I've heard from Mr. Barr is that he wants the
6 assets sold and Mr. Sklar's testimony, barring a miracle, is
7 exactly what Your Honor interpreted it to be. We have no
8 real alternative but to pursue a sale. And we intend to do
9 that. We have done that.
10 And I'm going to reach out first and foremost to
11 Mr. Karcher to see how we can restore some of the ties. And
12 you know, we did reach out to Mr. Barr a while ago about a
13 resolution, and we had reached out to the Court at some
14 point before about a judicial mediator. Maybe there's a way
15 to do this? I'm a little skeptical, but it will not stop me
16 personally from trying.
17 THE COURT: Okay, great. Thank you. Let me
18 actively encourage this. I would encourage counsel-to-
19 counsel communications in this circumstance. I think, you
20 know, just from my observation of the case and how it's
21 gone, I think direct client-to-client communications may not
22 be that successful, but this may be a circumstance where
23 capable counsel can have a more detached perspective and
24 maybe can have a constructive conversation. So, I would
25 encourage you to have such conversations up front. See

25 (Pages 94 - 97)

## **EXHIBIT 5**

**New York Action Dkt. No. 98**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — — — X

NINETY-FIVE MADISON COMPANY, LP,

                    Plaintiff,

     -against-

KINDER REALTY ASSOCIATES, RAS
PROPERTY MANAGEMENT, LLC, RITA A.
SKLAR and THE ESTATE OF LOIS WEINSTEIN,

                 Defendants.

— — — — — — — — — — — — — — — — — — — — — — — — — — — X

Index No. 653034/2024

**AFFIRMATION IN SUPPORT**

       **Michael Sklar**, affirms the following under penalty of perjury pursuant to NY-CPLR §

2106:

       1.     I am the principal of Michael Sklar Management LLC ("MLS"), which is one

of three General Partners of Ninety-Five Madison Company, L.P. ("NFMC") and, as such,

submit the following of my own personal knowledge, which I know to be true.

       2.     I submit this affirmation in support of Plaintiff's application for a temporary

restraining order, and to vitiate the temporary restraining order that was issued on December

4, 2024 ("TRO").

       3.     As set forth below, the TRO was obtained improperly, in violation of the rights

of NFMC, and its general partners, including the other two general partners Sharan Sklar

Management LLC ("SJS") and RAS Property Management LLC ("RAS").

**A.**     **Partnership structure of NFMC**

4.      NFMC is a limited partnership operating under the laws of New York, with its primary business address formerly at 95 Madison Avenue, New York, New York ("Property").

5.      Rita Sklar ("Rita"), who resides in New York County, serves dual roles as both a general partner in defendant Kinder Realty Associates and the managing member of RAS.

6.      As described in the Complaint in this action, Rita and RAS solely managed the business of NFMC, to the exclusion of all others, for decades.

7.      The Estate of Lois Weinstein ("Estate") is a limited partner in NFMC, with further ties to Rita and Kinder as a limited or general partner in Kinder.

8.      Further, the other limited partners include Rita Sklar personally, and trusts held for the benefit of Hannah Rose (Sklar) Gettinger, Ruby Hilene Sklar, and Sadie Pearl Sklar.

9.      The limited partners have no vote or role in NFMC other than serving as the beneficial owners of NFMC, which is managed exclusively by the General Partners MLS, SJS, and RAS, each of the General Partners having exactly 1% ownership and 1 corresponding vote each, with majority vote authorizing NFMC to act. A true copy of the NFMC operating documents hereto annexed as **Exhibit A**.

## B.      Background on NFMC

10.      On January 1, 1989, Defendants, including Kinder, RAS, Rita, and Lois Weinstein, orchestrated the issuance of a loan totaling approximately $11,000,000.00 from NFMC to themselves, recognized as the "Kinder Loan."

11.      The Kinder Loan was documented through comprehensive bookkeeping by Defendants, including in the books of Kinder and NFMC memorializing money transfers from one entity to the other.

12.     Rita facilitated payments by NFMC to Kinder and RAS as a principal of both, as well as an agent for Lois Weinstein.

13.     Over the years, NFMC, directed by Rita and RAS, extended numerous loan advances at favorable rates to Defendants, further entrenching financial ties and demonstrating a continuing financial relationship driven by common interests.

14.     Rita, on behalf of herself and the Defendants, and Weinstein meticulously documented the Kinder Loan in the financial records of NFMC and Kinder, demonstrating accountability and attempts to align with fiscal management principles expected in partnership arrangements.

15.     The initial disbursement of the Kinder Loan funds was in January 1989, marking the beginning of a series of monetary transactions between NFMC and the Defendants.

16.     Partial repayments of the loan were made over several years.

17.     This evidence of repayment constitutes Defendants' acknowledgment of the debt and efforts to fulfill their obligations, albeit incompletely. Despite these repayments, however, a substantial balance of $7,033,065.73 remains outstanding.

18.     This amount encompasses the principal Kinder Loan disbursement, accrued interest, and various costs and expenses minus the payments already made.

19.     Despite demand for repayment, Defendants have collectively failed to satisfy their financial obligations under the terms of the Kinder Loan, resulting in financial loss to NFMC.

20.     Rita, acting through Kinder and RAS, breached the terms of the loan agreement by neglecting repayment responsibilities, directly violating fiduciary duties owed to NFMC as both a partner and manager.

21.     This breach resulted in significant financial damage to NFMC, calculated to be no less than $7,000,000.

22.     While in the course of marshalling assets for NFMC in and around the time that NFMC had filed for bankruptcy in March 2021, General Partners demanded Defendants repay the Kinder Loan.

23.     Upon their failures to do so, an adversary proceeding was commenced in the bankruptcy action to sue Defendants to recover the Kinder Loan. That action was dismissed without prejudice by the bankruptcy court because the issue has been actively litigated in State court, the United States District Judge Jones reasoning that NFMC should proceed to prosecute its claims with respect to recovery on the Kinder Loan in State court or Surrogates court.

24.     The aforementioned litigation has included not just claims concerning the Kinder Loan, but also claims against RAS and Rita for gross mismanagement of NFMC assets, alleging corporate waste in the amount of millions of dollars.

**C.      The Improperly Obtained TRO.**

25.     Weinstein now improperly seeks to obstruct the Plaintiff from fulfilling its financial obligations by urging the Court to freeze a portion of the proceeds from the Property's sale ("Proceeds").

26.     **The sale generated $46 million**, none of which has been distributed to the General Partners, all of which was considered for reinvestment in assets in NFMC.

27.     Concerning the sale proceedings, approximately $22 million was used to secure purchases of real property through a like-kind exchange under IRC Code § 1031, **leaving approximately $22 million** remaining to be sent back from the qualified intermediary to NFMC (Proceeds).

28.     On December 2, 2024, the Estate, by attorney Jeff Barr, filed an order to show cause with emergency temporary relief ("Estate OSC"). I am advised by counsel that the Estate OSC's papers failed to include an explanation for why it would be prejudicial to the Estate for the Estate to notice the Estate OSC pursuant to 22 NYCRR 202.7(f), which I'm advised requires a moving party to notice all other parties affected by requested emergency relief to state the time, place, and form of relief requested ("202.7 Notice").

29.     I am advised by counsel that, in the absence of an affirmation attesting to why it would be prejudicial to notice an adversary party at all, a 202.7 Notice is required and a predicate to obtaining emergency relief.

30.     I am advised that no such 202.7 Notice was given and, without notice or warning, the Court issued the TRO without NFMC having any opportunity to appear and oppose.

31.     This is extremely prejudicial to NFMC and its General Partners.

**D.     The TRO was sought for an improper purpose, to impede the distribution of salaries to NFMC General Partners. This _must_ happen in this calendar year.**

32.     On August 22, 2024, at 5:00pm, a meeting of NFMC General Partners was called and noticed. A recording of that meeting was taken ("August Meeting").

33.     All General Partners were noticed and requested to attend.

34.     Among other things, the attached meeting minutes and resolution resulted from that August Meeting, a true copy hereto annexed as **Exhibit B**.

35.     Of the important things discussed at the August Meeting was the issuance of salaries and compensation to the General Partners for the considerable time and investment put into conducting NFMC business, which interfered substantially with the employment of certain General Partners.

36.     That resolution at Exhibit B authorized the issuance of a salary to the General Partners for work conducted, which serves to substitute lost income from the General Partners having to deal with NFMC business.

37.     The salaries voted on by the General Partners carried 2 votes to 1, authorizing the payment of salaries to the General Partners of $220,000, to be received for this tax year and immediately upon the return of funds from the qualified intermediary.

38.     The foregoing is a lawful discharge of the business of NFMC, and personally impacts the General Partners of NFMC.

39.     However, on December 4, 2024, upon the issuance of the TRO, the Estate, working with Rita (the sole opposition to the issuance of salaries *which Rita would also receive in equal proportion*), the Estate restrained and enjoined the return of $22 million dollars in sale proceeds to NFMC, freezing that money with a third-party qualified intermediary.

40.     This has devastating effects on NFMC, as well as MLS and SJS.

41.     Notably, this was done so that Defendants could "financially squeeze" MLS and SJS, knowing that MLS and SJS committed substantial time and resources that earned both of them salaries from NFMC (and cost both of them time and money from earning money elsewhere).

42.      Payment of all taxes was authorized in the resolution and vote of all General Partners, a vote that counsel for the Rita Sklar Defendants sat in on and for which notes were

recorded, copy of said meeting minutes sent to Kari Parks thereafter, making it undisputed that all General Partners voted to pay the taxes mentioned herein. However, because the Proceeds are restrained, such payments cannot be made. Meeting minutes annexed as **Exhibit C**.

E.    **The TRO was sought for an improper purpose, to force the payment of over $1 million in purportedly unearned legal fees claimed by Attorney Jeff Barr.**

43.    Critically, it could not have been to preserve the assets of NFMC for the payment of claims purportedly owed to the Estate. This can be stated factually in that NFMC, via the completion of 1031 exchanges, has over $20 million in real property, which it is required to keep for at least 2 years (absent judicial intervention). This guarantees a source from which the Estate may be paid.

44.    Moreover, the amount of funds restrained by the Estate OSC exceeds 3x the claimed amounts owed to the Estate in its entirety.

45.    One of the primary reasons claimed by the Estate, through attorney Jeff Barr, for the rightful restraint of funds of NFMC is the payment of taxes. As set forth below, this is patently false.

46.    Instead, Jeff Barr has claimed unsubstantiated amounts to be owed him, exceeding $1 million in total for ***legal fees***.  A true copy of a letter filed by NFMC's bankruptcy counsel hereto annexed as **Exhibit D**, which explains the background of Jeff Barr's claimed amounts to be owed, which further refers to a petition filed in Surrogates Court requiring Jeff Barr to account for the wild invoiced amounts claimed to be owed to Jeff Barr by the Estate. A true copy of that petition hereto annexed as **Exhibit E**.

47.    Notably, had All General partners agreed and permitted the taxes of the Estate and associated real estate taxes to be paid without tying that payment to paying other

unjustified and unsubstantiated sums, the taxes would have already been paid. This is addressed in the subsequent section, which NFMC requests the Court to resolve by way of a direction for NFMC to pay the taxes for the Estate directly.

48.     That said, with respect to the TRO, the Estate OSC has no risk of not being paid, and there is further no suggestion that funds are being dissipated from NFMC unlawfully or without legal process, leaving no grounds for injunctive relief.

**F.      NFMC asks for an order, directing NFMC to pay the taxes for the Estate and the real estate taxes directly and immediately, with the balance of the funds claimed by Jeff Barr to be held in escrow until the determination of the Estate's OSC.**

49.     NFMC requests this Court vitiate the TRO, authorize and direct NFMC pay the Estate taxes in their entirety, and keep the balance of the funds claimed to be owed to the Estate by NFMC, plus 20%, in escrow for the duration of the pendency of the Estate's OSC.

50.     The foregoing would allay any concern of NFMC's liquidity and ability to pay the Estate, which I am advised by counsel *is not* the standard for issuing a temporary restraining order, but which is exceedingly higher.

**G.      The Estate cannot show irreparable harm, balancing of the equities, or a likelihood of success on the merits.**

51.     The Estate is not, and was never entitled, to temporarily restrain the Proceeds in NFMC.

52.     Plainly, the Estate OSC utterly fails to demonstrate irreparable harm in the absence of a temporary restraining order. There is no evidence whatsoever to suggest that the Estate would not be paid every dollar it claims to be owed. And for the avoidance of doubt, NFMC proposed as part of the emergency relief requested to escrow 120% of the total claimed

amount due the Estate for the duration of the pendency of Motion Sequences 001-002, subject to further order of the Court.

53.     Moreover, NFMC and its General Partners would be egregiously harmed if the Estate OSC temporary restraining order were to stand. Simply, the General Partners have sacrificed time away from opportunities to make an income to attend to NFMC business, which itself has been a full time job. According to the NFMC operating documents, NFMC is permitted to issue salaries to the General Partners, which was brought to a vote on a meeting of the General Partners, which expressly authorized by majority vote the issuance of salaries to all General Partners, payable before the end of 2024. Paying this amount outside the 2024 calendar year will cause serious injury as such salaries are needed to offset losses claimed within the year; absent a voted and completely authorized salary distribution, such will absolutely cause damage in the form of an increase tax burden amounting tens of thousands of dollars.

54.     Moreover, each day the real estate taxes, Federal taxes, and State taxes are not paid, the Estate incurs serious damages as a result, which the Estate OSC temporary restrain prevents NFMC from paying.

55.     Moreover, starting the beginning of the year, on January 15, 2025, NFMC and its General Partners, as well as its Limited Partners, must pay taxes out of the Proceeds; failure to do so will result in serious and egregious tax penalties.

56.     In that there is no harm to the Estate for lifting the Estate OSC TRO, and there is egregious and severe penalties and consequences for imposing the Estate OSC TRO, the Estate OSC restraint must be lifted.

**WHEREFORE**, NFMC requests this Court (i) issue a temporary restraining order, restraining and enjoining the enforcement of the TRO, and ultimately vitiating the TRO, (ii) directing and authorizing Legal 1031 Exchange Services LLC to remit to NFMC all funds in its possession, (iii) directing NFMC to immediately and directly to pay the taxes owed by the Estate, and (iv) directing NFMC hold in escrow 120% of the total amount claimed to be owed by the Estate, and (v) to permit NFMC to operate in accordance with its operative documents.

Dated: December 12, 2024
     New York, New York

I affirm this 12th day of December, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

**Michael Sklar**

**EXHIBIT 6**

**New York Action Dkt. No. 28**

SUPPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - IA Part 45

-------------------------------------------------------------------X

NINETY-FIVE MADISON COMPANY, LP     :    Index No. 653034/2024

           Plaintiff,         :

                        :    ANSWER TO FIRST

      - against -          :    AMENDED COMPLAINT with

                        :    <u>COUNTERCLAIMS</u>

KINDER REALTY ASSOCIATES, RAS       :
PROPERTY MANAGEMENT, LLC, RITA A.   :
SKLAR and THE ESTATE OF LOIS WEINSTEIN,   :

                        :

          Defendants.      :

-------------------------------------------------------------------X

       Carol E. Keller and Gail Shields as Executors of the Estate of Lois Weinstein, sued here as

THE ESTATE OF LOIS WEINSTEIN, as and for their answer to the First Amended Complaint,

do allege as follows:

       1. Deny having knowledge or information sufficient to form a belief of the allegations of

paragraph 1 of the Complaint.

       2. Deny the allegations of paragraph 2 of the Complaint.

       3. Deny having knowledge or information sufficient to form a belief as to the truth of the

allegations of paragraph 3 of the Complaint.

       4. Deny having knowledge or information sufficient to form a belief as to the truth of the

allegations of paragraph 4 of the Complaint.

       5. Deny the allegations of paragraph 5 of the Complaint.

       6. The allegations of paragraph 6 consist of legal conclusions that need not be admitted nor

denied, but to the extent that they may be deemed allegations of fact deny having knowledge or

information sufficient to form a belief as to the truth of the allegations of paragraph 6 of the

Complaint.

1

7. The allegations of paragraph 7 consist of legal conclusions that need not be admitted nor denied, but to the extent that they may be deemed allegations of fact deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7 of the Complaint.

8. Deny the allegations of paragraph 8, 9, 21 and 22.

9. Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 10 through 14, 16 through 18 and 19.

10. The allegations of paragraphs 15, 19 and 20, consist of conclusions of law that need not be admitted nor denied, but to the extent that they may be deemed to state factual matters, they are denied.

11. Certain of the allegations of paragraphs 23 through 203 consist of legal conclusions that need not be admitted nor denied, but to the extent that they may be deemed allegations of fact deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 23 through 203 of the Complaint.

12. Deny the allegations of paragraphs 204 through 208 of the Complaint.

13. Deny having knowledge of information sufficient to form a belief as to the truth of the allegations of paragraphs 209 through 220 of the Complaint.

14. The allegations of paragraphs 221 and 222 consist of conclusions of law that need not be admitted nor denied, but to the extent that they may be deemed to state factual matters, they are denied.

15. Defendant repeats all prior responses as if set forth fully herein.

16. Deny the allegations of paragraphs 224 through 230 of the Complaint.

17. Repeats the responses contained in all prior paragraphs as if set forth fully herein.

2

18.     Certain of the allegations of paragraphs 231 through 245 consist of legal conclusions that need not be admitted nor denied, but to the extent each of such allegation may be deemed to state allegations of fact, deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 231 through 245 of the Complaint.

AS AND FOR A FIRST AFFIRMATIVE DEFENSE

19.     The applicable statute of limitations bars all claims asserted in the Complaint.

AS AND FOR A SECOND AFFIRMATIVE DEFENSE

20.     The alleged loans were actually distributions of income to the limited partners but disguised as "loans" to avoid the payment of taxes.

21.     Alleged loans were not true loans and were never intended to be repaid.

22.     The purported calculation of interest is fraudulent.

AS AND FOR A THIRD AFFIRMATIVE DEFENSE

23.     The plaintiff, having been dissolved by the Judgment of the Supreme Court of the State of New York by the October 23, 2020 Order of Justice Andrew Borrok in the proceeding entitled Lois Weinstein v. RAS Property Management et al New York County Index No. 656735/2019 and by the express terms of the Original Partnership Agreement dated June 1, 1982 (Section 9.1(d)) (dissolution on sale of Property defined as 95 Madison Avenue) and a purported amended partnership agreement dated as of June 1, 2021, the Plaintiff lacks the authority or legal capacity to bring this action and its maintenance is ultra vires.

AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

24.     All sums allegedly due, have been paid in full. Any interest on such obligations was either paid, or is barred by the applicable statute of limitations.

3

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

25.   All sums allegedly due, have been paid in full.  Any interest on such obligations was either paid, or is barred by the applicable statute of limitations.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

26.   The Estate of Lois Weinstein is not a legal entity that can be sued.

27.   By virtue of the foregoing, this action must be dismissed as to defendant the Estate of Lois Weinstein.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

28.   Kinder Realty Associates is no longer in existence and it cannot therefore be sued. Only its former members can be sued.

29.   By virtue of the foregoing, the action must be dismissed as to defendant Kinder Realty Associates.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

30.   The relief requested herein is barred by equitable principles.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

31.   The relief requested herein is barred by the doctrine of laches.


## AS AND FOR A FIRST COUNTERCLAIM FOR AN ACCOUNTING

1.   Upon information and belief,  Plaintiff sold its sole asset, an office building located at and known as 99 Madison Avenue, New York, NY 10016 on or about June 5, 2024, for $65,000,000.00.

2.   Defendant holds an 18.36 percent interest in Plaintiff, and is entitled to an accounting including a copies of the closing statement and its proportional share of the assets of Plaintiff.

4

3. Upon information and belief, Plaintiff was first dissolved by the Judgment of the Supreme Court of the State of New York by the October 23, 2020 Order of Justice Andrew Borrok in the proceeding entitled Lois Weinstein v. RAS Property Management et al New York County Index No. 656735/2019 and on June 30, 2024, by the express terms of the original partnership agreement and a purported amended partnership agreement dated as of June 2021.

4. Plaintiff, upon information and belief, through its purported general partners, without authority or legal right, has sought to continue its existence and to engage in a 1031 exchange, thereby depriving the Defendant of its right to receive approximately $8,500,000.00 of the net sale proceeds of the June 5, 2024 sale.

5. Despite requests for information and an accounting, the Plaintiff has refused to provide any detail to Defendant.

6. By virtue of the Defendant's status as a current or former limited partner of in Plaintiff, a fiduciary relationship exists between Plaintiff and Defendant.

7. Defendant has no adequate remedy at law.

8. By virtue of the foregoing, Defendant is entitled to an accounting of the sale proceeds by Plaintiff and other relevant information.

AS AND FOR A SECOND COUNTERCLAIM FOR DECLARATORY RELIEF

9. The plaintiff has been legally declared dissolved by the Judgment of the Supreme Court of the State of New York by the October 23, 2020 Order of Justice Andrew Borrok in the proceeding entitled Lois Weinstein v. RAS Property Management et al New York County Index No. 656735/2019 and by the express terms of the original partnership agreement and a purported

5

amended partnership agreement dated as of June 2021 which provides that the Partnership is dissolved on the last day of the month in which 95 Madison Avenue is sold.

10.      95 Madison Avenue, New York, NY was sold on or about June 5, 2024. Under the purported June, 2021 amended partnership agreement and the Original June 1, 1082 Partnership Agreement, the Plaintiff was dissolved by its own operating documents as of June 30, 2024.

11.      By virtue of the foregoing, the Plaintiff is without authority to continue its business, including engaging in a 1031 exchange using any portion of funds which rightfully should be distributed to Defendant from the sale proceeds.

12.      By virtue of the foregoing, a judiciable controversy exists and Defendant is entitled to a judicial declaration that (1) Plaintiff has been dissolved; (2) Plaintiff lacks the legal authority to perform a 1031 exchange under any circumstances and certainly not with Defendant's portion of the sale proceeds that should be distributed to Defendant forthwith; (3) that Defendant Estate is entitled to an immediate distribution of $8,400,000 or 18.36 percent of the sale proceeds. whichever sum is greater and (4) all property acquired in the name of Ninety-Five Madison Company LP since June 2024 belongs to the former limited partners according to their proportional share and the limited partners have equitable title to such properties.

AS AND FOR A THIRD COUNTERCLAIM FOR A PERMANENT INJUCTION

13.      Plaintiff should be enjoined from investing Defendant Estate's portion of the sale proceeds and Plaintiff should be compelled to turn over such funds to the Estate.

14.      Defendant Estate owes approximately $6,350,000 in Federal and State Estate Taxes and Real Estate taxes on two properties and administrative claims and specific bequests which it cannot pay without its share of the funds from the sale of 95 Madison Avenue.

6

15.    Two of Plaintiff's purported general partners are the residuary beneficiaries of the Defendant Estate and even they will suffer possible irreparable injury in the event an injunction is not issued.

16.    Because NFMC has been dissolved, and because no valid direct claim exists on NFMC's part to any portion of the 18.36 % interest held by the Estate, approximately $8,400,000 of the sale proceeds should be distributed to Defendant Estate, the Defendant is entitled to an injunction against the use of such funds for any other purpose.

17.    It would be extremely detrimental to the Estate were any portion of the Estate's distribution be tied up in a future real estate venture.

18.    No adequate remedy exists at law.

WHEREFORE, Defendant Estate of Lois Weinstein demands

-- That the complaint be dismissed in its entirety;

-- That Plaintiff be compelled on the First Counterclaim, to provide an Accounting;

-- A judicial declaration that Ninety-Five Madison Company be and the same hereby is dissolved and the partnership terminated and the liquidating agent of the NFMC be directed to distribute to the Estate 18.36 % of the net sales proceeds of the sale of 95 Madison Avenue as requested in the Second Counterclaim;

-- A permanent injunction, enjoining Plaintiff, its agents and its 1031 Exchange intermediary from investing any portion of the 18.36 % of the net sales proceeds of the sale of 95 Madison Avenue belonging to the Estate on the Third Counterclaim;

-- Such other and further relief as to the Court seems just and proper, including costs, disbursements and counsel fees.

7

Dated:    New York, NY
          December 1, 2024

                              Yours, Etc.

                              JEFFREY A. BARR
                              By:
                              Attorney for Defendant
                              Estate of Lois Weinstein
                              211 Duke Ellington Blvd. Suite 7A
                              New York, NY 10025
                              (212) 227-1834

Rosenberg & Estis PC
733 Third Avenue,
New York NY 10017
(212) 867-6000

Gusrae Kaplan Nusbaum PLLC
120 Wall Street, 25th Floor
New York, NY 10005
(212) 269-1400

8

**EXHIBIT 7**

**New York Action Dkt. No. 49**

At Part 45 of the Supreme Court of the State
of New York, County of New York,
60 Centre Street, New York, NY 10007
on the _3rd_ day of December, 2024

PRESENT: Hon. ANAR RATHOD PATEL,
A.J.S.C.

---------------------------------------------------------------------X

NINETY-FIVE MADISON COMPANY, LP       :    Index No. 653034/2024

               Plaintiff,          :

                              :    ORDER TO SHOW CAUSE

      - against -            :    with REQUEST FOR TRO

                              :

KINDER REALTY ASSOCIATES, RAS        :    Motion Sequence No. 002
PROPERTY MANAGEMENT, LLC, RITA A.   :
SKLAR and THE ESTATE OF LOIS WEINSTEIN,  :

               Defendants.       :

---------------------------------------------------------------------X

UPON the Affirmation of Jeffrey A. Barr dated December 1, 2024, the Affirmation of Carol E. Keller dated December 2, 2024 and the exhibits annexed thereto and read in support thereof; the First Amended Complaint dated November 27, 2024; the Answer and Counterclaims dated December 1, 2024 of Defendant "The Estate of Lois Weinstein" and all prior papers and proceedings heretofore had herein,

LET Defendant NINETY-FIVE MADISON COMPANY, LP show cause before this Court on February 13, 2025 at 9:30 A.M. at the Courthouse located at 60 Centre Street, Part 45, Room 428, New York, NY 10007 why an order and judgment should not be issued

Pursuant to CPLR 3211 (a) (1),(2),(3),(5) and (7); CPLR 3212 (a) and (b); CPLR 6301 and 6311and CPLR 3001 dismissing the first amended complaint, enjoining Plaintiff and its officers, successors and assigns from taking any action with the proceeds of the sale of 95 Madison Avenue, New York NY 10016 which contravenes the limited partners' rights to a distribution of such funds;

1

issuing a judicial declaration that under NY Amended Partnership law section 121-801 (a) due to the sale of 95 Madison Avenue, New York, NY on June 5, 2024, Ninety-Five Madison Company LP was dissolved as of June 30, 2024 and that any property purchased in the name of Ninety-Five Madison Company LP since the dissolution belongs to the limited partners according to their proportionate shares; that the former general partners are without authority to continue the operation of the business of Plaintiff, other than to wind up its affairs and distribute its assets to the former limited partners; plus grant such other and further relief as to the Court seems just and proper.

Sufficient cause allegedly appearing therefore, it is hereby Ordered that

*ARP*    ^Pending the hearing of the motion, Plaintiff, its officers, agents, general partners, former general partners, liquidation agents, and Legal 1031 Exchange Services, LLC, are hereby temporarily restrained from using, paying out or disbursing any of the funds from the sale of 95 Madison Avenue, New York, NY for any purpose other than preserving such funds with the limited exception that funds may be used to complete the purchase by December 3, 2024 of any property identified to Legal 1031 Exchange Services, LLC within the 45 day period subsequent to June 5, 2024.; and it is further **

Defendant alleges full compliance with Rule 202.70 24 (g) by NYSCEF.

Sufficient cause having been alleged, let service of this Order and the papers upon which it is based via the NYSCEF system to all parties who have appeared and to Legal 1031 Exchange Svc, LLC by overnight courier (US Postal service or FedEx or UPS) on or before

_____December 4, 2024_____ be deemed good and sufficient.

E N T E R.

** ORDERED that answering papers, if any, are to be served on all counsel electronically via NYSCEF on or before January 13, 2025; and it is further

ORDERED that all reply papers, if any, are to be served on all counsel electronically via NYSCEF on or before January 27, 2025.

_A. R. Patel_____
HON. ANAR RATHOD PATEL, J.S.C.

2

**EXHIBIT 8**

**New York Action Dkt. No. 141**

At Part 45 of the Supreme Court of the State
of New York, County of New York,
60 Centre Street, New York, NY 10007
on the <u>7th</u> day of January, 2025

PRESENT: Hon. ANAR RATHOD PATEL,
                        A.J.S.C.

-----------------------------------------------------------------------X

NINETY-FIVE MADISON COMPANY, LP        :    Index No. 653034/2024

                      Plaintiff,           :

                                        :    ORDER TO SHOW CAUSE

          - against -             :     FOR DEFAULT JUDGMENT

                                        :   AND SANCTIONS

KINDER REALTY ASSOCIATES, RAS         :

PROPERTY MANAGEMENT, LLC, RITA A.    :   Motion Sequence No. 6

SKLAR and THE ESTATE OF LOIS WEINSTEIN,  :

                                         :

                    Defendants.       :

-----------------------------------------------------------------------X

UPON the Affirmation of Jeffrey A. Barr dated January 6, 2025, the Affirmation of Gail

Shields, dated January 7, 2025 and the exhibits annexed thereto and read in support thereof; the

First Amended Complaint dated November 27, 2024; the Answer and Counterclaims dated

December 1, 2024 of Defendant "The Estate of Lois Weinstein" (the "Counterclaims") and all

prior papers and proceedings heretofore had herein, including Plaintiff's default in serving and

filing its Reply to the Answer and Counterclaims and Plaintiff's record of willful and contumacious

conduct,

LET Defendant NINETY-FIVE MADISON COMPANY, LP show cause before this Court

on February 13, 2025 at 9:30 A.M. at the Courthouse located at 60 Centre Street, Part 45, Room

428, New York, NY 10007 why an order and judgment should not be issued

Pursuant to CPLR 3215 granting judgment on the Counterclaims, <u>inter alia,</u>

issuing a judicial declaration that under NY Revised Limited Partnership Law section 121-801

(a) due to the sale of 95 Madison Avenue, New York, NY on June 5, 2024, Ninety-Five

1

Madison Company LP was dissolved as of June 30, 2024 and that any property purchased in the name of Ninety-Five Madison Company LP since the dissolution belongs to the limited partners according to their proportionate shares; that the former general partners are without authority to continue the operation of the business of Plaintiff, other than to wind up its affairs and distribute its assets to the former limited partners; and any other relief demanded in the Counterclaims;

Pursuant to 22 N.Y.C.R.R. § 130-1.1 for sanctions against Plaintiff's counsel and individually against Michael Sklar and Sharan Sklar;

-- plus grant such other and further relief as to the Court seems just and proper.

Sufficient cause allegedly appearing therefore, and it is further

ORDERED, that service of this Order and the papers upon which it is based electronically via the NYSCEF system to all parties who have appeared on or before _____January 8, 2025_____ be deemed good and sufficient; it is further

ORDERED, that opposition papers, if any, shall be served electronically on all parties by NYSEF no later than January 16, 2025; and that any reply thereto shall be electronically filed via NYSEF no later than January 27, 2025.

E N T E R.

_____
HON. ANAR RATHOD PATEL, A.J.S.C.
January 7, 2025
New York, New York

2

## EXHIBIT 9

**New York Action Dkt. No. 229**

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn
1185 Avenue of the Americas, Floor 22
New York, New York 10036
(212) 970-1600

*Counsel to Ninety-Five Madison Company, L.P.*

**LAW OFFICES OF JEFFREY A. BARR**
Jeffrey A. Barr
211 Duke Ellington Blvd., Suite 7A
New York, New York 10025
(212) 227-1834

*Counsel to the Estate of Lois Weinstein*

March 31, 2025

**Via NYSCEF**

Hon. Anar R. Patel, A.J.S.C.
Supreme Court of the State of New York
County of New York, Commercial Division, Part 45
60 Centre Street, Courtroom 428
New York, New York 10007

  Re:  *Status of Bankruptcy Action and Related Injunction Order*

Dear Justice Patel:

  Counsel to Ninety-Five Madison Company, L.P. ("NFMC") and to the Estate of Lois Weinstein (the "Weinstein Estate" and, with NFMC, the "Parties") file this joint letter as directed by the so-ordered stipulation dated March 10, 2025 [NYSCEF No. 212] (the "Stipulation"). The Stipulation instructs the parties to provide an update to the Court by the date hereof regarding the status of the Bankruptcy Court's Injunction Order.[1]

  The Parties write to inform the Court that they have reached an agreement in principle regarding the Weinstein Estate's further prosecution of its Counterclaims. For the present, the Parties mutually believe that consistent with the February 11, 2025 ruling of U.S. Bankruptcy Judge David S. Jones, no action should be taken in this Court with respect to the adjudication of the dissolution and asset distribution disputes in the Counterclaims (and related injunctive relief) pending further order of the Bankruptcy Court, which still retains jurisdiction over NFMC's confirmed Chapter 11 plan of reorganization, including that plan's claim allowance and asset-distribution provisions.

  While the Parties continue to negotiate specifics, the Parties are seeking guidance from the Bankruptcy Court on the timing of further briefing, if needed. Accordingly, until that time, the Parties respectfully request that the Court hold the Counterclaims pending a resolution in the Bankruptcy Court or a settlement.

---

[1] Captilized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Stipulation.

1

We are available to discuss the foregoing at the Court's convenience.

Respectfully submitted,

**GLENN AGRE BERGMAN & FUENTES LLP**      **LAW OFFICES OF JEFFREY A. BARR**

*/s/ Andrew K. Glenn*                                          */s/ Jeffrey A. Barr*
Andrew K. Glenn                                              Jeffrey A. Barr
Richard C. Ramirez                                           211 Duke Ellington Blvd. Suite 7A
1185 Avenue of the Americas                            New York, New York 10025
New York, New York 10036                              (212) 227-1834

*Counsel to Ninety-Five Madison Company, L.P.*      *Counsel to the Estate of Lois Weinstein*

## EXHIBIT 10

**New York Action Dkt. No. 230**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

NINETY-FIVE MADISON COMPANY, L.P.,

Plaintiff,

v.

KINDER REALTY ASSOCIATES, RAS
PROPERTY MANAGEMENT, LLC, RITA A.
SKLAR, and THE ESTATE OF LOIS
WEINSTEIN,

Defendants.

RITA A. SKLAR,

Defendant-Counterclaim Plaintiff,

v.

NINETY-FIVE MADISON COMPANY, L.P.,

Plaintiff-Counterclaim Defendant.

RITA A. SKLAR,

Defendant-Counterclaim Plaintiff-Third-Party
Plaintiff,

v.

MICHAEL SKLAR and SHARAN SKLAR,

Third-Party Defendants.

Index No. 653034/2024

The Honorable Anar Rathod Patel

**STIPULATION AND
[PROPOSED] ORDER**

WHEREAS on June 12, 2024, Plaintiff Ninety-Five Madison Company, L.P. ("**NFMC**") initiated this action via summons and complaint, <u>see</u> Dkt. 1 (June 12, 2024);

WHEREAS on November 29, 2024, NFMC filed an "**Amended Complaint**" asserting one breach-of-contract claim against Defendants–Counterclaim Plaintiffs "**Kinder**" Realty Associates, "**RAS**" Property Management, LLC, "**Rita**" A. Sklar (together, the "**Sklar Defendants**"), and the "**Estate**" of Lois Weinstein and one breach-of-fiduciary-duty claim against RAS and Rita, <u>see</u> Dkt. 28 (Nov. 29, 2024);

WHEREAS on December 2, 2024, the Estate answered the Amended Complaint and asserted three counterclaims against NFMC and moved, by order to show cause, to dismiss the Amended Complaint, <u>see</u> Dkt. 33 (Dec. 2, 2024);

WHEREAS on December 13, 2024, the Sklar Defendants moved, by order to show cause, to dismiss the Amended Complaint, <u>see</u> Dkt. 75 (Dec. 13, 2024);

WHEREAS on February 12, 2025, the Sklar Defendants answered the Amended Complaint, filed counterclaims against NFMC, and third-party claims against third-party defendants "**Michael**" and "**Sharan**" Sklar (with NFMC, Kinder, RAS, Rita, and the Estate, the "**Parties**"), <u>see</u> Dkt. 194 (Feb. 12, 2025);

WHEREAS on February 13, 2025, the Court dismissed the Amended Complaint with prejudice, <u>see</u> Dkts. 199, 200 (Feb. 13, 2025);

WHEREAS during the February 13, 2025 hearing on, <u>inter alia</u>, the Estate and the Sklar Defendants' dismissal motions, the Court "again request[ed] that [the Parties] revisit mediation in this case;"

WHEREAS the Parties to this case and the related action, <u>Sklar v. Sklar</u>, 653516/2024, have reaffirmed their desire to reach a global resolution of all claims and potential claims against each other and to pursue mediation as originally outlined in NFMC, the Estate, and the Sklar Defendants' unanimous mediator selection, <u>see</u> Dkt. 20 (Oct. 25, 2025);

WHEREAS the Parties are attempting to schedule that for the third week of May or first week of June 2025;

WHEREAS on March 11, 2025, the Court declined to So Order the Parties' proposed stipulation regarding a complete stay of future deadlines pending mediation and directed the Parties to file a proposed stipulation that sets forth a discovery schedule on the Estate's remaining counterclaims and the Sklar Defendants' counter-, cross-, and third-party claims, <u>see</u> Dkt. 214 (Mar. 11, 2025);

WHEREAS the Parties conferred and have devised a March 21, 2025 stipulation and proposed order setting forth a proposed discovery schedule by following the same proportionate deadlines as those So-Ordered by the Court in its initial Preliminary Conference Order, <u>see</u> Dkt. 19 (Oct. 22, 2024);

WHEREAS on March 28, 2025, the Court held a virtual conference at which it provided further guidance on a revised stipulation and proposed amended Preliminary Conference order;

IT IS HEREBY STIPULATED AND AGREED by and between the Parties that:

1. NFMC, Michael, and Sharan will answer or file CPLR 3211 motions regarding all counter-, cross-, and third-party claims no later than April 11, 2025;

2.     Demands for Discovery and Interrogatories shall be served on or before April 18, 2025;

3.     Responses to Demands for Discovery with objections and Interrogatories shall be served on or before May 9, 2025;

4.     The parties shall produce all documents on a rolling basis and shall complete all document productions, including the production of privilege logs, on or before June 20, 2025;

5.     All party depositions shall be completed by August 20,  2025;

6.     All non-party depositions shall be completed by August 22, 2025;

7.     Parties shall serve expert disclosures on or before September 5, 2025;

8.     Expert Discovery shall be completed on or before November 5, 2025;

9.     Impleader shall be completed on or before August 8, 2025;

10.    All discovery shall be completed by November 12, 2025 and any discovery not then completed may be considered waived, precluded, or otherwise as appropriate pursuant to Commercial Division Rule 13(a) and CPLR 3126. The failure to provide a document, or to otherwise provide discovery, may result in preclusion at trial;

11.    A Trial Readiness Conference will be held on _____ at _____ in person in Courtroom 428. On this date, a Trial Readiness Order (TRO) will be issued directing that Plaintiff serve and file a Note of Issue and within ten (10) days of the date of the TRO; and

12.    The Note of Issue / Certificate of Readiness shall be filed on or before _____.

Dated: April 2, 2025
New York, New York

**GLENN AGRE BERGMAN & FUENTES LLP**

/s/ Richard C. Ramirez
Andrew K. Glenn
Richard C. Ramirez
1185 Avenue of the Americas
New York, New York 10036
aglenn@glennagre.com
rramirez@glennagre.com

*Counsel for NFMC*

**LAW OFFICES OF JEFFREY A. BARR**

/s/ Jeffrey A. Barr
Jeffrey A. Barr
211 Duke Ellington Blvd. Suite 7A
New York, New York 10025
(212) 227-1834
jeffreyabarr@gmail.com

*Counsel for the Estate of Lois Weinstein*

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Kari Parks
Kari Parks
120 Wall Street
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

*Counsel for Kinder Realty Associates, RAS Property Management, LLC, and Rita A. Sklar*

**ABRAHAM ESQ. PLLC**

/s/ Joshua E. Abraham
Joshua E. Abraham
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
(646) 245-6710
Josh@abrahamesq.com

*Counsel for Michael Sklar and Sharan Sklar*

_____
Hon. Anar Rathod Patel, J.S.C.

## EXHIBIT 11

**New York Action Dkt. No. 146**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION

---

NINETY-FIVE MADISON COMPANY, LP,

Plaintiffs,

v.

KINDER REALTY ASSOCIATES, RAS
PROPERTY MANAGEMENT, LLC, RITA
A. SKLAR, and THE ESTATE OF LOIS
WEINSTEIN,

Defendants.

Index No. 653034/2024

The Honorable Anar Rathod Patel, A.J.S.C.

STIPULATION AND [PROPOSED]
ORDER PURSUANT TO NYSCEF NO.
143

---

WHEREAS Plaintiff Ninety-Five Madison Company, LP ("**NFMC**") and Defendants "**Kinder**" Realty Associates, "**RAS**" Property Management, LLC, Rita A. Sklar, and the "**Estate**" of Lois Weinstein (together, the "**Parties**"), together with non-parties holding limited partner interests in NFMC (collectively with the Parties, the "**NFMC Parties**") desire to minimize all NFMC Parties' unnecessary costs, fees, interest, penalties, and any other harms potentially arising out of NFMC's June 2024 "**Sale**" of the "**Property**" located at 95 Madison Avenue, New York, New York;

WHEREAS the Parties understand that January 15, 2025 is certain NFMC Parties' deadline to file estimated tax payments;

WHEREAS the December 3, 2024 temporary restraining order ("**TRO**") issued in the above-captioned action "temporarily restrain[s]" NFMC "from using, paying out or disbursing any of the funds from the [S]ale;"

1

WHEREAS the October 2, 2024 TRO issued by The Honorable Anar Rathod Patel in Sklar v. Sklar, No. 653516/2024, temporarily restrains Ms. Sklar from "act[ing] on behalf of [ . . . ] or otherwise impact[ing] assets belonging to" Rita A. Sklar MLS 2012 Irrevocable Trusts and Lois M. Weinstein MLS 2012 Irrevocable Trusts for the benefit of Ruby Hilene Sklar and Sadie Pearl L. Sklar;

WHEREAS on December 30, 2024, the Court so-ordered a stipulation pursuant to which the Parties agreed to authorize "**Legal 1031**" Exchange Services, LLC to directly pay $4,110,004.07 to the United States Treasury and New York State Department of Taxation to pay the Estate's federal and estate taxes;

WHEREAS on January 8, 2025, the Parties filed a stipulation and proposed order authorizing Legal 1031 to directly pay "**Withers**" Bergman LLP $275,000 to cover Rita A. Sklar's overdue tax, trusts, and estate planning bills and to retain Withers's future services, including his assistance to help Ms. Sklar and the Trusts pay their respective estimated taxes (the "**January 8 Stipulation**");

WHEREAS the January 8 Stipulation also provided, inter alia, that "upon determination by Withers of the estimated and final amounts due in taxes by the NFMC Parties respectively, such amounts shall be memorialized in a further stipulation between the Parties, directing such amounts to be paid by 1031 Legal, to the extent such funds are in the possession of 1031 Legal, so that payment is made before tax penalties are incurred by any NFMC Party for failing to pay estimated taxes on or before January 15, 2025 or final taxes on or before April 15, 2025;"

WHEREAS Withers has preliminarily reviewed the financials provided by NFMC's accountants, including Bart Raffaele (Gruber Palumberi Raffaele Fried, PC) and Alan M. Blecher

(CBIZ, Inc.), and determined that the trusts established under the Lois M. Weinstein MLS 2012 Irrevocable Trust Agreement are not required to pay estimated taxes on January 15, 2025;

WHEREAS the Parties understand that Legal 1031 cannot issue checks directly to the relevant tax authorities to timely pay the NFMC Parties' January 15, 2025 estimated tax payments, but can wire the same amount to an account that is capable of timely mailing those estimated tax payments via check;

IT IS HEREBY STIPULATED AND AGREED that on January 13, 2025, NFMC will instruct Legal 1031 to wire $4,402,283 to NFMC, which represents the January 15, 2025 estimated tax payments of the following equity holders;

| Taxpayer | Federal | State | NYC |
|---|---|---|---|
| Trust FBO Ruby Hilene Sklar – Rita A. Sklar MLS 2012 Irrevocable Trust | $706,482 | $253,881 | $114,789 |
| Trust FBO Sadie Pearl Sklar – Rita A. Sklar MLS 2012 Irrevocable Trust | $706,482 | $253,881 | $114,789 |
| Trust FBO Hannah Rose Sklar Gettinger – Rita A. Sklar SJS 2012 Irrevocable Trust | $1,412,968 | $546,422 | $229,577 |
| Michael Sklar Management LLC | $19,612 | $7,700 | N/A |
| Sharan Sklar Management LLC | $24,500 | $11,200 | N/A |

IT IS FURTHER STIPULATED AND AGREED that within one business day, and in any event no later than with a January 15, 2025 postmark, NFMC (whether directly or through its accountants) will transmit each of these parties' estimated tax payment checks, **in the exact amounts listed above, with** vouchers, and any other materials necessary to timely pay those estimated taxes;

IT IS FURTHER STIPULATED AND AGREED that all other terms of this action's TRO and the Sklar v. Sklar TRO remain in full force and effect pending further orders.

IT IS FURTHER STIPULATED AND AGREED that nothing contained in this or the December 30, 2024 or January 8, 2025 stipulations shall be construed to expand or limit any Party's, NFMC Party's, Withers's, or any accountant's rights or responsibilities.

Dated: January 13, 2025
     New York, New York

ROSENBERG & ESTIS, P.C.

/s/ *Matthew Blum*

Matthew S. Blum
733 Third Avenue
New York, New York 10017
(212) 867-6000
mblum@rosenbergestis.com

*Counsel for Plaintiff Ninety-Five Madison Company, LP*

LAW OFFICES OF JEFFREY A. BARR

/s/ *Jeffrey Barr*

Jeffrey A. Barr
211 Duke Ellington Boulevard
Suite 7A
New York, New York 10025
(212) 227-1834
jeffreyabarr@gmail.com

*Counsel for Defendant the Estate of Lois Weinstein*

GUSRAE KAPLAN NUSBAUM PLLC

/s/ *Kari Parks*

Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

*Counsel for Defendants Kinder Realty Associates, RAS Property Management, LLC, and Rita A. Sklar*

SO ORDERED:

Hon. Anar Rathod Patel, J.S.C.
January 14, 2025

4

**EXHIBIT 12**

**New York Action Dkt. No. 83**

Law Offices
**Jeffrey A. Barr**
211 Duke Ellington Boulevard, *Suite 7A*
New York, N.Y. 10025
*(212) 227-1834*
*Fax (212) 964-4360*

Admitted in NY                                    Email: JeffreyABarr@gmail.com

December 22,  2024

Honorable Anar Rathod Patel, J.S.C.
Supreme Court of the State of New York, Part 45
60 Centre Street, Rm 428
New York, NY 10007

Re:    Ninety-Five Madison Company v. Kinder Realty Associates et al
       New York County Index No. 653034/2024

Your Honor:

I represent the mis-named defendant "The Estate of Lois Weinstein."  I am writing to supplement my letter of December 13 in light of the pre-motion conference scheduled for December 23, 2024 at 10:30 am.

The most significant fact before the Court is that Plaintiff Ninety-Five Madison Company LP ("NFMC") has been dissolved by operation of law (twice). The two individuals, Michael and Sharan Sklar, if they (or their presumably wholly owned subsidiary LLCs) ever were cloaked with legitimate authority to serve as general partners, lost any such purported authority after June 30, 2024.

The maintenance of this entire action is *ultra vires*.  Likewise any attempt by Sharan and Michael further to control the assets of the dissolved NFMC is unlawful and improper. The Court was correct to impose a T.R.O. which should not be lifted except to allow limited payments essential to maintain the *status quo* and to prevent further irreparable harm to the parties.

The papers which Mr. Blum efiled purportedly on behalf of NFMC on December 13, 2024 do not support Plaintiff's claim that NFMC is still a functioning entity.

Section 10 of each version of the partnership agreement sets forth that the agreement cannot be amended without the unanimity of the general partners.  The June 2021 amendment purporting to change unanimity of decision making to majority vote does not by its own terms apply to section 10 governing amendments for two reasons. First, the purported June 2021 amendment was very specific as to the exact decisions that were being changed from unanimous to majority decision and Section 10 was not listed among the sections changed.  Second, Section 10 even in that purported amendment was left unchanged and it still called for unanimity to amend the partnership agreement.  Thus, the purported August 22, 2024  resolution which is efiled as Docket # 64  is a nullity.  It recites that was only signed by Michael and Sharan. Whatever their claims to authority might have been prior to June 30, 2024, they were no longer

general partners by virtue of the automatic earlier dissolution on June 30, 2024. Neither Rita Sklar nor RAS Property Management LLC signed that purported document and even if they had, it was too late to amend the partnership agreement after dissolution.

In an attempt to deflect attention from Michael and Sharan's completely inappropriate conduct, including their insistence that they each immediately be paid $220,000 as "salaries" out of the sale proceeds, Plaintiff's counsel seems to be attacking the legal fees that I have charged my clients over a 10 year period (largely in defending against a multitude of baseless claims such as are asserted in the instant action). For the record, since Michael and Sharan wrested control of NFMC in June 2021, they have spent approximately $3,654,143.90 of the equity owners' money in legal fees as shown in the bankruptcy court docket sheet and the closing statement of the sale of 95 Madison. Approximately $617,893.74 of this amount appears to have been paid to Mr. Blum's firm.

Respectfully,

Jeffrey A. Barr

cc: All Counsel via Efiling

<u>**EXHIBIT 13**</u>

***Keller, et al v. RAS Prop. Mgmt., et al*.**, **Index No. 653735/2019, Dkt. No. 197**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

CAROL E. KELLER and GAIL SHIELDS, as
Preliminary Executors of the Estate of Lois Weinstein,
Individually,

Index No. 653735/2019

Andrew Borrok, J.S.C.

IAS Part 53

           Plaintiffs,

     -against-

**NOTICE OF STAY**

RAS PROPERTY MANAGEMENT, LLC,
RITA A. SKLAR, RITA SKLAR, STEVEN
MERO AS TRUSTEES, AND NINETY-FIVE
MADISON COMPANY, L.P.

           Defendants.

-------------------------------------------------------------------X

      PLEASE TAKE NOTICE that on December 10, 2020, the Appellate Division, First

Department, issued an order granting a stay of the within action pending the determination of the

appeal brought by Defendants RAS Property Management, LLC, Rita A. Sklar and Ninety-Five

Madison Company, L.P. before the Appellate Division, First Department, of this Court's

Decision and Order dated October 23, 2020.  A copy of the order is annexed.

Dated: January 13, 2021

VERRILL DANA LLP

By:____/s/ Robert Laplaca_____
Robert Laplaca
50 Main Street, Suite 1000
White Plains, New York 10606
P: (203) 222-3110
F: (203) 226-8025
rlaplaca@verrill-law.com

*Attorneys for Defendants RAS Property*
*Management, LLC, Rita A. Sklar, Rita Sklar*
*and Ninety-Five Madison Company, L.P.*

14576991

# Supreme Court of the State of New York

## Appellate Division, First Judicial Department

Present – Hon.  Dianne T. Renwick,                    Justice Presiding,
                Ellen Gesmer
                Jeffrey K. Oing
                Anil C. Singh
                Manuel J. Mendez,                     Justices.

---

| | | |
|---|---|---|
| Carol E. Keller and Gail Shields, as | Motion No. | **3533** |
| Preliminary Executors of the Estate of Lois | Index No. | 653735/19 |
| Weinstein, Individually, | Case No. | 2020-04298 |
|       Plaintiffs-Respondents, | | |

-against-

RAS Property Management, LLC, Rita A.
Sklar, Rita Sklar, as Trustee, and Ninety-Five
Madison Company, L.P.,
      Defendants-Appellants,

Steven Mero, as Trustee,
      Defendant.

---

An appeal having been taken to this Court from an order of the Supreme Court, New York County, entered on or about October 23, 2020,

And defendants-appellants, RAS Property Management, Rita A. Sklar and Ninety-Five Madison Company, LP, having moved to stay enforcement of the aforesaid order, and all proceedings in the underlying action, pending hearing and determination of the appeal taken therefrom,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

It is ordered that the motion is granted on condition that the appellants perfect the appeal for the May 2021 Term of this Court.

ENTERED: December 10, 2020

Susanna Molina Rojas
Clerk of the Court