# EXHIBIT 1

Andrew K. Glenn
Shai Schmidt
Richard C. Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to Reorganized Debtor*
*Ninety-Five Madison Company, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 21-10529 (DSJ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

**NINETY-FIVE MADISON COMPANY, L.P.'S  EXHIBIT LIST FOR HEARING**
**ON THE FINAL APPLICATION OF BRANTON REALTY SERVICES LLC FOR**
**(I) PAYMENT OF REAL ESTATE BROKER AND SALES AGENT COMMISSIONS,**
**(II) REIMBURSEMENT OF EXPENSES AND (III) RELATED RELIEF**

Ninety-Five Madison Company, L.P. (the "Reorganized Debtor" or ("NFMC"), the

Reorganized Debtor in the above-captioned Chapter 11 case, submits this Exhibit List for the

hearing on the *Final Application of Branton Realty Services LLC For (I) Payment of Real Estate*

*Broker and Sales Agent Commissions, (II) Reimbursement of Expenses, and (III) Related Relief*

[Dkt. No. 362] to be held on January 22-23, 2025 (the "Hearing").[1]

---

[1]  NFMC reserves the right to amend and/or supplement this Exhibit List at any time prior to the hearing, and to use additional exhibits for purposes of rebuttal or impeachment in compliance with all relevant court and federal rules. NFMC also reserves the right to rely upon and use as evidence (i) exhibits included on the exhibit lists of any other party in interest, including Branton Realty Services LLC; and (ii) any pleading, hearing transcript, or other document filed in the above-captioned Chapter 11 case.

EXHIBIT 1 PAGE 1

The Reorganized Debtor may offer into evidence any one or more of the exhibits listed on the following pages at the Hearing.

Dated: January 15, 2025
        New York, New York

By: */s/ Richard C. Ramirez*
Andrew K. Glenn
Shai Schmidt
Richard C. Ramirez
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
sschmidt@glennagre.com
rramirez@glennagre.com
nrahman@glennagre.com

*Counsel to Reorganized Debtor*
*Ninety-Five Madison Company, L.P.*

## Reorganized Debtor's Exhibit List

| DX | Bates Begin | Bates End | Date | Description |
|---|---|---|---|---|
| **DX0001** | Dkt. No. 181 | n/a | 8/18/22 | Listing Agreement |
| **DX0002** | Dkt. No. 362-4 | n/a | 6/4/24 | Declaration of W. Heller in support of Branton Fee Application |
| **DX0003** | NFMC_000119 | n/a | 7/28/22 | E-mails between E. Westfried, M. Sklar and S. Sklar re: Can you send me your resi plan you had for 95 Madison? |
| **DX0004** | n/a | n/a | 8/22/22 | E-mail chain with W. Heller, M. Sklar, S. Sklar, and E. Westfried re: Asbestos/Property & condition report |
| **DX0005** | n/a | n/a | 8/30/22 | E-mail from W. Heller to S. Sklar copying M. Sklar re: Emanuel - Mortgage Broker |
| **DX0006** | BR002088 | BR002105 | 8/31/22 | Order Pursuant to 11 U.S.C. 327(a) and 328(a) Authorizing the Retention and Employment of Branton Realty Services LLC as Real Estate Broker and Sales Agent to Debtor Ninety-Five Madison Company, L.P. Nunc Pro Tunc to August 17, 2022 [Dkt. No. 181] |
| **DX0007** | BR002132 | BR002140 | 8/31/22 | E-mails between M. Sklar, R. Sklar, W. Heller, T. Fleming and A. Glenn re: 95 Madison sale / Net lease  (with attached e-mails from J. Nazarian) |
| **DX0008** | BR002149 | BR002158 | 8/31/22 | E-mail from M. Sklar to W. Heller copying T. Fleming and S. Sklar re: 95 Madison sale / net lease (with attached Atlas LOI) |
| **DX0009** | BR002254 | BR002257 | 8/31/22 | E-mails between M. Sklar, S. Sklar, W. Heller, J. Zimmerman and M. Zimmerman re: Micah Zimmerman- Broker 95 Madison |
| **DX0010** | BR002123 | n/a | 9/12/22 | E-mail from M. Sklar to W. Heller copying S. Sklar, T. Fleming, R. Sklar, and A. Glenn re: 95 Madison - Sale net lease - Shel Capital (with attached spreadsheet) |
| **DX0011** | NFMC-06612 | NFMC-06621 | 9/12/22 | E-mail from M. Sklar to W. Heller copying A. Glenn, R. Sklar, T. Fleming and S. Sklar re: 95 Madison - Sale net lease - Shel Capital (with attached spreadsheet) |
| **DX0012** | BR002142 | BR002143 | 9/14/22 | E-mail from S. Sklar to W. Heller copying M. Sklar re: 95 Madison - Empire Capital / JLL |
| **DX0013** | BR002299 | BR002303 | 9/15/22 | E-mails between M. Sklar, M. Kazmierski, W. Heller and S. Sklar re: MTS Property Tour |
| **DX0014** | BR002144 | n/a | 9/22/22 | E-mail chain with S. Sklar, E. Frank, A. Glenn, W. Heller and M. Sklar re: 95 Madison Ave |

EXHIBIT 1 PAGE 3

| DX | Bates Begin | Bates End | Date | Description |
|---|---|---|---|---|
| DX0015 | BR002129 | n/a | 10/24/22 | E-mail from M. Sklar to H. Dalton copying W. Heller and S. Sklar re: 95 Madison (with Woody Heller.vcf attached) |
| DX0016 | BR002258 | BR002259 | 10/24/22 | E-mail chain with S. Sklar, W. Heller and M. Sklar re: Harley Dalton |
| DX0017 | BR002291 | BR002292 | 11/15/22 | E-mail from M. Sklar to W. Heller copying S. Sklar, A. Kahn and T. Fleming re: 95 Madison |
| DX0018 | BR002295 | n/a | 11/15/22 | E-mail from S. Sklar to W. Heller copying zach@33equities.com re: Introduction |
| DX0019 | BR002261 | BR002262 | 1/25/23 | E-mail chain with S. Sklar, W. Heller, M. Sklar, A. Glenn, T. Fleming and R. Sklar re: 2nd note from Rita to me- information |
| DX0020 | n/a | n/a | 4/10/23 | E-mail from M. Sklar to W. Heller copying S. Sklar re: Bids 95 Madison |
| DX0021 | BR002141 | n/a | 5/5/23 | E-mail from S. Sklar to W. Heller copying T. Taylor and M. Sklar re: Franco Rinaldi |
| DX0022 | n/a | n/a | 6/26/23 | E-mails between W. Heller and M. Sklar copying S. Sklar re: Description of the Unconditional 2nd-Round Bid Process |
| DX0023 | NFMC-06564 | NFMC-06565 | 6/26/23 | E-mail from M. Sklar to W. Heller copying S. Sklar re: Description of the Unconditional 2nd-Round Bid Process |
| DX0024 | BR002293 | n/a | 6/27/23 | E-mail from S. Sklar to W. Heller and M. Sklar re: Avison Young Broker |
| DX0025 | NFMC-06632 | n/a | 6/27/23 | E-mail from M. Sklar to W. Heller copying S. Sklar re: Description of the Unconditional 2nd-Round Bid Process |
| DX0026 | NFMC-06633 | n/a | 6/27/23 | E-mail from W. Heller to S. Sklar and M. Sklar re: Description of the Unconditional 2nd-Round Bid Process |
| DX0027 | BR002145 | BR002146 | 9/6/23 | E-mails between M. Sklar, W. Heller, S. Sklar and A. Sultan re: 95 Madison Avenue |
| DX0028 | NFMC-06576 | n/a | 11/16/23 | E-mails between S. Sklar and M. Sklar re: Broanton - Woody |
| DX0029 | NFMC_000562 | NFMC_000564 | 11/27/23 | E-mails between M. Sklar, S. Sklar and E. Westfried re: 95 Madison (with Zoom invitation for 11/28/23 call) |
| DX0030 | NFMC_000566 | NFMC_000569 | 11/28/23 | E-mail from M. Sklar to E. Westfried copying S. Sklar re: 95 Madison - Plans Update (with attached plans) |
| DX0031 | NFMC_000570 | n/a | 11/28/23 | E-mail from E. Westfried to M. Sklar re: Declined: 95 Madison |
| DX0032 | NFMC-06634 | n/a | 12/11/23 | E-mail from M. Sklar to S. Sklar re: Woody |
| DX0033 | NFMC-06566 | n/a | 12/21/23 | E-mail from M. Sklar to S. Sklar re: Ideas top move forward. |

| DX | Bates Begin | Bates End | Date | Description |
|---|---|---|---|---|
| **DX0034** | NFMC_000575 | NFMC_000576 | 1/1/24 | E-mails between M. Sklar and E. Westfried re: NDA |
| **DX0035** | TB_EW_000013 | TB_EW_000018 | 1/1/24 | E-mail from E. Westfried to L. Zhuo and J. Chou re: NDA 956 Madison 2 Bins Capital Sunlight Group 010124 (with attached NDA) |
| **DX0036** | NFMC_000583 | NFMC_000587 | 1/2/24 | E-mails between M. Sklar and E. Westfried re: NDA 956 Madison 2 Bins Capital Sunlight Group 010124 (with attached NDA) |
| **DX0037** | S00156 | S00157 | 1/2/24 | E-mail from E. Westfried to L. Zhuo re: 95 Madison - Due diligence information |
| **DX0038** | S00158 | S00167 | 1/2/24 | E-mail from E. Westfried to L. Zhuo re: 95 Madison conceptual residential Plans & SF calculations (with attached residential study and SF calculations) |
| **DX0039** | NFMC_000612 | NFMC_000630 | 1/8/24 | E-mails between M. Sklar, E. Westfried, L. Zhuo and J. Chou re: 95 madison offer (with attached Sunlight resume and offer) |
| **DX0040** | TB_EW_000062 | TB_EW_000080 | 1/8/24 | E-mail from L. Zhuo to E. Westfried and J. Chou re: 95 madison offer (with attached Sunlight offer) |
| **DX0041** | BR001226 | BR001231 | 1/9/24 | E-mail from M. Sklar to W. Heller and M. Lefkowitz copying S. Sklar and A. Glenn re: LOI CNY Signed MSL SJS 010924 (with signed CNY LOI attached) |
| **DX0042** | NFMC_000650 | NFMC_000651 | 1/9/24 | E-mails between M. Sklar, E. Westfried, L. Zhuo and J. Chou re: 95 madison offer (with attached Sunlight resume and offer) |
| **DX0043** | NFMC-06577 | NFMC-06595 | 1/9/24 | E-mail chain with S. Sklar, M. Sklar and E. Westfied re:  95 madison offer- Sunlight - Two bins capital (with attached Sunlight resume and offer) |
| **DX0044** | NFMC_000652 | NFMC_000653 | 1/12/24 | E-mail from E. Westfried to M. Sklar re: 95 madison revised offer (forwarding attachment of Sunlight revised offer) |
| **DX0045** | TB_EW_000121 | TB_EW_000122 | 1/12/24 | E-mail from L. Zhuo to E. Westfried re: 95 madison revised offer (with attached Sunlight revised offer) |
| **DX0046** | NFMC-06596 | NFMC-06597 | 1/13/24 | E-mail from M. Sklar to S. Sklar re: 95 madison revised offer (with attached revised Sunlight offer) |
| **DX0047** | NFMC_000654 | NFMC_000726 | 1/20/24 | E-mail from M. Sklar to E. Westfried re: 95 Madison PSA (with attached PSA) |
| **DX0048** | TB_EW_000199 | n/a | 2/1/24 | E-mail fom M. Sklar to E. Westfried re: 95 Madison |
| **DX0049** | TB_EW_000203, TB_EW_000369 | n/a | 2/2/24 | Calendar invitation from E. Westfried to L. Zhuo, M. Sklar, and J. Chou re: Dinner with Emanuel / Lin and Michael (95 Madison Deal) scheduled for 2/6/24 |

3

EXHIBIT 1 PAGE 5

| DX | Bates Begin | Bates End | Date | Description |
|---|---|---|---|---|
| **DX0050** | TB_EW_000372 | n/a | 2/2/24 | E-mail from J. Chou to E. Westfried copying L. Zhuo re: 95 Mad PSA Sunlight development 0202245 |
| **DX0051** | TB_EW_002798 | TB_EW_002800 | 4/17/24 | E-mail from A. Glenn to M. Missry and M. Lefkowitz copying M. Sklar, J. Lau, L. Zhuo, S. Sklar, E. Vallely, brett@getconciergelaw.com and S. Cohen re: 95 Madison - PSA |
| **DX0052** | TB_EW_003037 | n/a | 4/17/24 | E-mails between M. Sklar, E. Westfried, S. Sklar, M. Lefkowitz and A. Glenn re: 95 Madison |
| **DX0053** | BR002079 | BR002080 | 6/6/24 | W. Heller's notes of conversation with E. Westfried and S. Carroll |
| **DX0054** | n/a | n/a | 7/22/24 | Subpoena from Branton Realty to Sunlight Development |
| **DX0055** | n/a | n/a | 9/10/24 | Sunlight Development "About Us" Website Printout |
| **DX0056** | BR002120 | n/a | n/a | List of Protected Prospects |
| **DX0057** | Verizon000055 | Verizon000224 | n/a | E. Westfried's phone records |
| **DX0058** | NFMC_000040 | NFMC_000049 | n/a | Text message chain between M. Sklar and E. Westfried |
| **DX0059** | S00308 | S00322 | n/a | Text message chain between L. Zhuo and E. Westfried |
| **DX0060** | TB_EW_003169 | TB_EW_003177 | n/a | Text message chain between E. Westfried and L. Zhuo |
| **DX0061** | TB_EW_003178 | TB_EW_003184 | n/a | Text message chain between S. Sklar and E. Westfried |
| **DX0062** | TB_EW_003185 | TB_EW_003191 | n/a | Text message chain between S. Sklar, M. Sklar and E. Westfried |
| **DX0063** | Verizon000006 | Verizon000055 | n/a | M. Sklar's phone records |
| **DX0064** | Verizon000055 | Verizon000224 | n/a | E. Westfried's phone records |

4

EXHIBIT 1 PAGE 6

**LISTING AGREEMENT FOR SALE** (this "**Agreement**") dated as of August 18 2022 (**Effective Date**") between Branton Realty Services LLC, a New York limited liability company ("**Branton**"), and Ninety-Five Madison Company, L.P., a New York limited partnership ("**Owner**")

### Background

Owner owns the property known as 95 Madison Avenue, New York, New York (the "**Property**") and desires to engage Branton to arrange a sale or other disposition of all or a portion of the Property to a counterparty (a "**Counterparty**") upon the terms and provisions more fully set forth herein. As used herein, Counterparty includes affiliates, designees, nominees and assignees thereof. On March 22, 2021, Owner filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (Case No. 21-10529) (the "**Bankruptcy Court**").

### Agreement

1.   **Appointment**   Subject to the conditions and limitations contained in this Agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor with the exclusive right to market the Property for a sale, as defined in the third paragraph of Exhibit A (any such transaction being a "**Transaction**"). The terms and conditions of any proposed Transaction shall be subject to review and acceptance by Owner in its sole and absolute discretion. Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion. Branton shall coordinate and work with Owner's designated tax advisor, as necessary, with respect to a Transaction.

2.   **Term**   The term of Branton's appointment hereunder (the "**Term**") shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term.

3.   **Referrals**   Owner shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

4.   **Owner Information**   Owner shall furnish to Branton such information with respect to the Property in writing as Branton may reasonably request in order to render its services effectively. Branton shall under all circumstances (i) be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all written information that has been furnished to it by Owner, (ii) have no obligation to verify the accuracy or completeness of any such information, and (iii) not be responsible for the inaccuracy or incompleteness of any such information provided. All documents and other materials, investigations, reports and information with respect to the Property or Owner shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner, after written authorization from Owner and after delivering an executed confidentiality agreement form (typically acceptable in the ordinary course



REORGANIZED
DEBTOR'S
EXHIBIT

DX0001

EXHIBIT 1 PAGE 7

in similar transactions), and Owner shall be solely responsible for the accuracy of the contents of the same. Subject to the rights of any tenants, Owner shall provide reasonable access to the Property for Branton and, as arranged by Branton, prospective Counterparties.

5.   **Compensation.** Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A (the "Commission") as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below.

Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the "**List**") of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed as the time of expiration, Branton shall be entitled to the Commission provided for herein.

6.   **Brokers**

a.   Branton is authorized to cooperate with outside brokers ("**Outside Brokers**") representing Counterparties in connection with a proposed Transaction. Branton shall obtain from any Outside Broker an agreement, in form and substance reasonably satisfactory to Owner, providing that the Outside Broker shall look solely to the Counterparty for any commissions due to such Outside Broker in connection with the Transaction. Any transaction document executed shall contain an indemnity from the Counterparty in favor of both Owner and Branton against claims of any Outside Broker.

b.   Branton agrees to indemnify, defend and hold Owner harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements and court costs) incurred by and/or asserted against Owner arising out of relating to any claim for fees and/or commissions relating to the Property asserted against Owner by any broker(s) with whom Branton has dealt unless Owner enters into a Transaction document with a Counterparty without getting an indemnity against the claims of any Outside Broker.

c.   Since Owner dealt with other brokers prior to Effective Date with respect to the Property, Owner shall be responsible for any commissions owed to such brokers. Owner agrees to indemnify and hold Branton harmless from and against all claims, actual out-of-pocket costs, liabilities, settlements, and judgments (collectively "claims"), and all costs of defense against such claims (including reasonable attorneys' fees and disbursements), by such other brokers.

7.   **Marketing & Expenses.** Owner shall pay the fees and disbursements of legal counsel engaged by Owner. Owner authorizes Branton to market the Property, including preparing offering materials, all of which materials are to be approved or disapproved in writing

2

EXHIBIT 1 PAGE 8

by Owner (in its sole and absolute discretion) in writing within five (5) business days of presentation to Owner from Broker prior to digital distribution and if not disapproved in writing within five (5) business days same shall be deemed approved. All such materials about the Property or the Transaction whether prepared by Branton or Owner will identify Branton as the exclusive broker for the Property. Owner shall reimburse Branton or pay directly, when billed, Branton's reasonable actual out-of-pocket costs and expenses incurred in preparation of the offering materials and marketing the Property, which costs and expenses have all been approved in writing by Owner (the "**Marketing Costs**") including, but not limited to (a) the cost of producing and distributing descriptive materials (including the costs of photographs, maps, renderings, plot plans and blueprints), (b) cost of producing graphics for the offering materials and (c) third party websites that coordinate marketing efforts, distribute confidentiality agreements and host offering and due diligence materials (like DropBox). Branton shall provide a detailed line-item budget of proposed expenses for Owner's prior written approval. Within five (5) business days of presentation of a budget of proposed expenses Owner shall approve or disapprove in writing such expenses, and if not so disapproved in writing same shall be deemed approved, and Branton shall only expend such amounts as are set forth in the written budget approved by Owner, unless otherwise approved in advance by Owner. The Marketing Costs shall be reimbursed or paid by Owner whether or not a Transaction occurs. The parties anticipate the budget for marketing expenses to be approximately $50,000.00 to $75,000.00

8.      **Representations.** Other than as set forth in paragraph 21, each party represents and warrants to the other that the representing party has full right and authority to enter into and perform its obligations under this agreement, and that the same does not violate or conflict with, or require any consents or approvals under any Agreements by which the representing party is governed or bound.

9.      **Confidentiality; Press Releases.** Branton acknowledges that Branton's services under this Agreement may provide Branton with access to confidential business, professional, personal or private information concerning Owner and its direct or indirect owners and/or their family members. Branton acknowledges the confidential nature of such information and agrees that Branton and Branton's agents will not issue any press releases, grant any interviews or release any other information or announcements to the press or the public or issue any other form of publicity, or otherwise publish or disclose to any third person, any such confidential information, except as specifically required to perform Branton's obligations under this Agreement. Notwithstanding the foregoing, the Parties specifically acknowledge that Branton shall be permitted to issue press releases and market the Property consistent with this Agreement provided that Branton does not disclose any information which would otherwise be deemed confidential pursuant to this Paragraph

10.      **Indemnification.** Owner acknowledges that Branton is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative

EXHIBIT 1 PAGE 9

in the Property or any of the leases, license or other agreements to which the Property is or may be subject (all of the foregoing being called "**Property Conditions**"). Owner agrees to disclose to Branton any and all information which Owner has regarding the Property Conditions and Branton is authorized to disclose any such information to prospective Counterparties, upon the prior written approval of Owner, which approval shall remain in effect until revoked in writing. All documents, materials, investigations, reports and information with respect to Property Conditions shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner only with the initial and prior written approval of Owner and Owner shall be solely responsible for same. Owner agrees to indemnify and hold Branton harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by Branton which arise out of or relate to any of the Property Conditions. This paragraph shall survive the expiration of this Agreement for the period of the applicable statute of limitations as to any such claims.

11.     **Notices**. Any notices required to be given by either party under this Agreement shall be in writing and sent by (i) messenger/personal delivery, (ii) certified mail return receipt requested, (iii) nationally recognized overnight courier service or (iv) email, addressed to the parties as provided below. Notices shall be deemed given upon receipt or rejection, if given by personal delivery; on the day that is five (5) business days following delivery to the postal authorities, if mailed as provided herein; on the business day following delivery to the courier service, if given by overnight courier as provided herein or when sent by e-mail provided no automatic bounce back is received, and further provided that any e-mail sent after 5:00 PM in the recipient's time zone on a business day or at any time on a non-business day shall be deemed given on the next business day. Notwithstanding anything to the contrary contained herein, notice by email pursuant to (iv) above shall not be an acceptable method of providing any legal notice, default notice or termination notice hereunder and the same shall be required to be sent by one of the methods set forth in (i)-(iii) of the first sentence of this paragraph.

> If to Owner: Ninety-Five Madison Company, L.P., 95 Madison Avenue, Suite 609, New York, New York 10016, with a copy by email to Ria Sklar (riasklar@gmail.com), Sharon Sklar (ssklar@ninetyfivemadison.com) and Michael Sklar (msklar@ninetyfivemadison.com)

> with a copy to:

> Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq., email: mlefkowitz@rosenbergestis.com and

> Olshan, 1325 Avenue of the Americas, New York, New York 10019, Attention: Thomas J. Fleming, Esq., email: tfleming@olshanlaw.com

4

EXHIBIT 1 PAGE 10

If to Branton, at 1080 Fifth Avenue, Apt 2B, New York, New York 10128.
Attention:    Mr Warren Heller, email   woody.heller@outlook.com and
wheller@brantonrealty.com

With a copy to

Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York, 10022-
4784  Attention: Mr Jonathan Margolis, email  jmargolis@morrisoncohen.com

A party may change the address to which notices/service of process shall be sent to or served on it
by five (5) days' prior written notice to the other party.  Any notice served by an attorney
representing a party (as set forth in Paragraph 11 above) shall have the effect of a notice served by
the party.

12.    **OFAC**  Each party warrants and represents to the other that, the representing party
and all parties owning (directly or indirectly) an ownership interest in the representing party (A) is
not, and shall not become, a person or entity with whom the other party is prohibited from doing
business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department
of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and
Blocked Persons list) or under any statute, executive order, or other governmental action; and (b)
is not knowingly engaged in, and shall not knowingly engage in, any dealing or transactions or be
otherwise associated with such persons or entities described in clause (a) above.

13.    **Governing Law, Venue, Waiver of Jury Trial**.  This Agreement shall be
governed by and construed in accordance with the laws of the State of New York (without
reference to principles of conflicts of laws)  Any disputes related to or arising from this Agreement
must be brought exclusively in New York County in the State of New York, to the jurisdiction of
which each of the parties hereby submits  Branton and Owner each waive trial by jury in any action
or proceeding under this Agreement

14.    **Fees and Interest**  If either party commences an action or proceeding against the
other party to enforce its rights under the Agreement, the prevailing party shall be entitled to
recover its reasonable legal fees and disbursements from the other party  Any amount due under
this Agreement and not paid when due shall bear interest at the rate of two percent per annum in
excess of the prime commercial lending rate as published from time to time in *The Wall Street
Journal (New York edition)*, but not in excess of the highest rate permitted by applicable law.

15.    **Branton Duties**  In addition to the obligations set forth elsewhere in this
Agreement, Branton hereby agrees to (i) host weekly conference calls as needed, based on the
status of the project, on the same day and time each week during the Term, adjusting for an
alternate day in a week in which a holiday occurs, or the availability of less than two (2) of the
partners, (ii) distribute weekly reports, as applicable once marketing is underway (to be received
one (1) business day prior to the weekly call or meeting provided for in (i)) with updates on market

5

EXHIBIT 1 PAGE 11

conditions, marketing, showings, offers, etc. and (iii) transmit all offers made by Counterparties to Owner in writing.

16.    **Owner Designee.** Branton hereby acknowledges that Rita Sklar, Sharon Sklar and Michael Sklar are representatives ("Representatives") of the Owner. Such Representatives shall designate in writing to Branton a single person (the "Designee") to act on their behalf, and Branton is hereby authorized to act upon direction given by the Designee with respect to requests for information, arranging group calls and other similar non-substantive matters. The Representatives may periodically designate a new Designee, in which case all of the Representatives shall notify Branton in writing thereof, and Branton shall act upon the direction of the new Designee. Notwithstanding the foregoing, the Representatives may periodically request that Branton make itself available for conference calls with the Representatives to discuss any subject concerning the Transaction.

17.    Branton shall look only and solely to Owner's estate and interest in and to the Property (which shall consist of (a) the proceeds, rents and profits therefrom, (b) the proceeds of any lease, sale, conveyance, assignment, transfer, mortgage or refinancing thereof and (c) any insurance proceeds or condemnation awards relating to any portion of the Property) for the satisfaction of any right of Branton arising out of this Agreement or for the collection of judgment or other judicial process or arbitration award requiring the payment of money by Owner and no other property or assets of Owner. Owner's agents, incorporators, shareholders, employees, officers, directors, partners, managers, agents, principals (disclosed or undisclosed), members, joint venturers, or affiliates (collectively, "Owner's Affiliates") shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Branton's rights and remedies under or with respect to this Agreement or any other liability of Owner to Branton.

18.    Branton represents further that it is presently and will at all times remain a licensed real estate broker in the State of New York. As a material inducement to Owner to enter into this Agreement, Branton covenants that Woody Heller ("Heller") will be actively involved in performing the services required of Branton hereunder. In the event of Heller's death or incapacity, this Agreement shall automatically terminate and no Commission shall be due and owing (other than in connection with a pending Transaction or may be due and owing pursuant to the terms of paragraph 5 hereof).

19.    It is understood that Branton is not granted any right or authority to assume or create any obligation or liability or make any representation, warranty or agreement (expressed or implied) on Owner's behalf or to bind Owner in any manner whatsoever.

20.    Notwithstanding anything to the contrary, it is expressly understood and agreed that (i) Owner is under no obligation of any nature whatsoever to either (a) accept any Counterparty identified by Branton or anyone else as a counterparty and/or (b) accept any Counterparty procured by Branton or anyone else and/or to execute and/or deliver any contract of sale or other agreement, (ii) Owner shall have the absolute right in Owner's sole discretion, without explanation or liability

6

EXHIBIT 1 PAGE 12

of any nature whatsoever to Branton, to, at any time, reject any Counterparty and/or the terms of any prospective contract of sale or other agreement with any Counterparty and (iii) Owner shall have no liability to Branton of any nature whatsoever should Owner fail for any reason whatsoever (except in the case of Owner's willful default) to either (i) accept any Counterparty and/or execute and deliver any contract of sale or other agreement and/or (ii) close upon the sale of the Property, it being agreed that if an agreement for a Transaction is executed and delivered with a Counterparty, but the closing thereunder fails to occur for any reason whatsoever (except in the case of Owner's willful default), then Branton shall not be entitled to any Commission whatsoever.

31.    **Bankruptcy Court Approval.** Notwithstanding anything to the contrary herein, the terms and conditions of the Agreement in all respects are subject to the approval of the Bankruptcy Court. Owner will, promptly after its execution of this Agreement, file an application and proposed order seeking from the Bankruptcy Court approval of its employment of Branton pursuant to the terms of this Agreement, and pursuant to, as applicable, Sections 329(a) and 328(a) of the Bankruptcy Code. Owner agrees and acknowledges to attach a complete copy of this Agreement to the application. Owner will provide Branton the application and proposed order authorizing this Agreement sufficiently in advance of their filing in order for Branton to have ample time to review and discuss any comments it may have with Owner, and the application shall be acceptable to Branton, in form and substance. The proposed order will include, without limitation, the following terms and conditions: (a) finding that none of the fees or commissions payable to Branton hereunder constitute a "bonus" under applicable law; (b) directing that Branton will be exempt from keeping time records for its work hereunder (as Branton will not be billing on an hourly basis); (c) finding that the terms and conditions of this Agreement are reasonable; (d) that the Commission due hereunder to Branton will be paid at the closing of a Transaction with respect to the Property without a further application or order of the Bankruptcy Court; and (e) directing that any unpaid Commission or marketing expenses owed to Branton shall be treated as an administrative claim under Section 507(a)(1) of the Bankruptcy Code. If an order obtaining these terms is not obtained from the Bankruptcy Court within thirty (30) days after both parties have signed this Agreement, then Branton may terminate this Agreement. If Owner obtains an order of the Bankruptcy Court authorizing its use of cash collateral or debtor in possession financing and if the order requires submission of a proposed budget specifying post-petition expenditures, then Owner will include in the budget line items providing for the payment of the expenses to be paid or reimbursed as and when provided pursuant to this Agreement. All amounts projected to be paid to Branton under this Agreement will be included in the carve-out for professionals provided in Owner's bankruptcy case. Should the Bankruptcy Court order a sale of the Property at auction, Branton is authorized to and will act as the exclusive auctioneer upon the terms set forth herein. The Bankruptcy Court will retain jurisdiction over any disputes under this Agreement. If the bankruptcy case is dismissed and the Property is not disposed of under Bankruptcy Court jurisdiction, then any dispute between the parties arising under this Agreement will be resolved in the New York State Supreme Court, County of New York, Commercial Division.

EXHIBIT 1 PAGE 13

22.    **Miscellaneous**.  This Agreement (i) expresses the parties' entire agreement on the matters covered herein, and (ii) supersedes all prior understandings between such parties on such matters.  This Agreement may not be amended or modified except in writing signed by all of the parties.  Neither party may assign this Agreement without the prior consent of the other party, which consent may be withheld in such party's sole discretion.  This Agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

8

EXHIBIT 1 PAGE 14

Executed by the parties to confirm the foregoing.

BROKER:

BRANTON REALTY SERVICES LLC

By _____

Name: Warren Heller
Title: Manager

OWNER:

NINETY-FIVE MADISON COMPANY, L.P.

By: Sharan Sklar Management LLC

By: /s/ Sharan Sklar

Name: Sharan Sklar
Title: Manager

By: Michael Sklar Management LLC

By: /s/ Michael Sklar

Name: Michael Sklar
Title: Manager

EXHIBIT 1 PAGE 15

Exhibit A
Compensation

Brandon shall earn, and Owner shall pay Brandon, a fee upon the closing of any Transaction of $100,000.00 plus one (1%) percent of the gross sales price.

As used herein, "gross sales price" includes any mortgages, loans or other obligations of Owner which may be assumed by the Counterparty or which the Counterparty takes title "subject to", and any purchase money loans or mortgages taken back by Owner, and the sales price of any fixtures and other personal property sold by separate agreement between Owner and the Counterparty as part of the overall sale of the real property.

For purposes of this Agreement, a sale shall also include, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction (however characterized) by which Owner's interest in the Property is transferred to an unaffiliated third party for consideration. It is further agreed that if Owner enters into a Transaction involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in Owner (including without limitation between owners of interests in Owner or their affiliates), or by a transaction or integrated set of transactions intended to have the effect of conveying to such Counterparty less than 100% of the Property or Owner's interest therein, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, a commission hereunder; and the date of such effective legal transfer shall be deemed the closing date of such transaction. For the avoidance of doubt the intent of the above sentence is to calculate the value of 100% of the Property or 100% of Owner's interest in the Property to be sold and then pay the Broker a commission based 100% of such value, not the pro-rata percentage of such Property or interests that are actually sold. If a ground lease is entered into, the parties will use the agreed upon value of the Property in determining the compensation.

The intention of the foregoing is that Brandon will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A.

EXHIBIT 1 PAGE 16

Exhibit B

TIMELINE*

- Assemble and create the marketing brochure and due diligence material: 4 weeks depending on what's available and what has to be ordered
    - photos
    - write the text
    - prepare the graphics of the marketing brochure
    - review and collect the due diligence reports
        - environmental
        - engineering report
        - review any existing proposals
        - set up the marketing and due diligence website
- Initiate the marketing process. 6 weeks but could be longer during the summer
    - Email confidentiality agreements and a deal summary page
    - Send the marketing brochure once the CAs are signed
    - Start conducting tours
    - Review our proposed structure with potential purchasers
    - Address questions, collect whatever additional information is requested
    - Proceed in primal selling mode
    - Prepare draft purchase agreement
- Review first-round bids: 2 weeks
    - Receive and review
    - Prepare a bid summary sheet comparing the relevant metrics of the various purchase proposals
    - Select a handful of bidders to proceed to a second-round bid or choose one bidder to move forward quickly ahead of the pack, or both, depending on the situation and bids received
    - Provide the finalists with the purchase contract to review
- Review second-round bids. 1-2 weeks
    - Review offers and contract comments
    - Interview bidders, if needed/helpful
    - Select a purchaser
    - Finalize and execute a contract, likely subject to a due diligence, but hopefully not
- Buyer due diligence: 0-4 weeks
    - This process is intended for buyers to confirm seller's representations, but most will actually use it to confirm their financing.
    - Finalize unconditional contract
- Proceed to Closing: 6-10 weeks
    - *Normally we should be able to close in 6-8 weeks, but given the financing markets, may need an extra month*

EXHIBIT 1 PAGE 17

\* The parties hereto agree that the referenced timeline is a timeline example in normal market conditions; all parties recognize that the current market is not within normal conditions and marketing efforts may take longer than so indicated on this timeline.

N11368827 v6 V020230 VW08

|2

EXHIBIT 1 PAGE 18

Joshua Stein
**JOSHUA STEIN PLLC**
110 West 57th Street, Fourth Floor
New York, NY  10019
Telephone: (212) 688-3300
Email: joshua@joshuastein.com

Schuyler G. Carroll
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, New York  10036
Telephone: (212) 790-4521
Email: scarroll@manatt.com

Counsel to Branton Realty Services LLC

**EXHIBIT**
C

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| NINETY-FIVE MADISON COMPANY, L.P., | Case No. 21-10529 (DSJ) |
| Debtor. | |

**DECLARATION OF WARREN M. HELLER IN SUPPORT OF THE FINAL
APPLICATION OF BRANTON REALTY SERVICES LLC FOR (i) PAYMENT
OF REAL ESTATE BROKER AND SALES AGENT COMMISSIONS, (ii)
REIMBURSEMENT OF EXPENSES, AND (iii) RELATED RELIEF**

I, Warren M. Heller, hereby declare that the following is true to the best of my

knowledge and belief:

1.      I am a member of Branton Realty Services LLC and acted on Branton's behalf

in all activities of Branton described in the Final Application of Branton Realty Services LLC for

(i) Payment of Real Estate Broker and Sales Agent Commissions, (ii) Reimbursement of

Expenses, and (iii) Related Relief. Definitions in the Final Fee Application also apply in this

Declaration.

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0002**

1

EXHIBIT 1 PAGE 19

space. It could be made handicapped accessible by extending an elevator shaft by one floor and doing the same for the elevator machine room above it.

13.    The roof also hosts a 5,000-gallon domestic water tank and two 4,000-gallon sprinkler tanks. A converter could move all three tanks to the basement to free up more outdoor space on the roof.

14.    Part of the top floor of the Property has a wonderful room with numerous skylights, which once housed a pool. Should that room be maintained with the skylight feature as an amenity space for the building? Should it become part of a premium top floor penthouse? Or should the skylights be removed to create more usable space on the roof? Any bidder would need to think through the answers to those questions.

15.    Next, the basement has 11' 6" ceiling heights, and could serve as amenity space — gym or otherwise — or as selling space for the retail space above it, or as building storage for the condo apartment owners upstairs. That's another decision any converter would need to make.

16.    The Property has two existing retail spaces of 1,200 and 4,000 usable square feet. The ceiling height is an extraordinary 17 feet. The corner retail unit also has a mezzanine space with 8-foot ceilings. The Property is located in the home furnishing retail district, which is the likely tenant audience. A condo conversion might, however, be more desirable with a high-end restaurant in the retail space, for convenience, prestige, and room service.

17.    Therefore, should the retail space be used for restaurant or home furnishing sales or both? Should the two retail spaces be combined? Should the 29th street access become the main entrance to the residential lobby, and if so, should the lobby be widened by extending into the rear of the retail space, which would both make the lobby more spacious and eliminate

EXHIBIT 1 PAGE 20

the least valuable retail space? Should the basement become part of the retail component or be used for something else, as mentioned above? Any bidder would need to answer those questions.

18.     The list of Property complexities and programmatic options is long, but in that lies part of its appeal. Branton knew that any bidder would need to think through the costs and benefits of those various options to determine its business plan and frame its bid. Branton needed to fully understand those options to be able to explain them to bidders to expedite their review and enhance their interest in the Property. Branton also knew that the best way to do that was by giving thorough and fully informed Property tours to every potential bidder.

## MARKETING PROGRAM AND NEGOTIATIONS WITH PROSPECTIVE PURCHASERS

19.     In accordance with the Engagement, once Branton understood the Property and its potential and possible options, Branton prepared and circulated marketing materials for the Property and sought to develop interest among potential purchasers.

20.     Toward that end, Branton sent an introductory email to approximately 400 prospects, spoke to all interested prospects and dozens of the others; and conducted over 140 tours of the Property to 110 groups that were potential prospects. This was three times [more than] [as many as ?] for any property Branton had handled in the past, including the Chrysler Building.

21.     In its marketing efforts, Branton had to overcome and bring order to many issues that complicated and impeded the process:

> ● Many prospective bidders and their agents had unsuccessfully dealt with Rita Sklar, a principal of Debtor, over the preceding many years, both regarding leasing space and purchasing the building. Prospective bidders were highly skeptical about whether she would ever go along with any sale of the building.

EXHIBIT 1 PAGE 21

and more specifically, whether any transaction would even be possible if she were involved.

b. Over the preceding many years, Ron Sklar and other principals of Debtor had dealt with other brokers on a non-exclusive basis. As a result, they unknowingly created potential brokerage claims by (i) giving those brokers Property information, and (ii) accepting introductions to, and receiving offers from, potential purchasers.

c. Debtor had previously hired Cushman & Wakefield ("C&W"), on an exclusive basis, to raise financing for Debtor to renovate the Property. The marketing memorandum C&W prepared for the Debtor included a long list of brokers that C&W had approached for the assignment. To the Debtor's surprise, Branton advised the Debtor that some of those brokers were sales brokers – not finance brokers – that they had already contacted numerous prospective purchasers, as the Debtor's exclusive agent, about buying the Property. These prior introductions by numerous brokers, both unauthorized and authorized, created confusion in the marketplace, made the Property seem shopworn, and made it tough to create much excitement among buyers about a property being offered for the first time after 83 years of single-family ownership.

d. The fact that the Debtor had put an unleveraged asset of this unusual value into bankruptcy over a minor claim by a tenant led some prospects to have concerns about the Debtor.

EXHIBIT 1 PAGE 22

c.   During the early stages of the marketing process, Rita Sklar, who was listed as the contact person for Debtor, continued to receive calls from prospective bidders. She didn't refer those callers to Branton. This created confusion in the marketplace as to whether she or Branton was running the marketing process. As a result, during the remainder of the marketing process, Branton had to conceal the names of prospective purchasers from Debtor, so that Rita Sklar could not contact them independently to help her develop her own competing bid for the Property. Rita Sklar's activities further discouraged bidders from participating in the process and reinforced the message that a transaction was unlikely.

22.   Branton also soon became aware that the Property suffered from two years of unpaid real estate taxes, which were accruing interest at a high rate. Branton advised the Debtor to secure a debt facility with up to five years of term, in an amount sufficient to cover the unpaid taxes, immediate needs of the Property, and projected future obligations over the ensuing two years. All of this was in an effort to protect Debtor from interested buyers who might purchase those debt, rather than buying the Property, to seek foreclosure and take the Property from the Debtor, without the Debtor receiving the full value of the Property it would receive in the event of a sale.

23.   Given the Debtor's tax concerns, specifically its very low basis in the Property, Branton interviewed various tax attorneys for the Debtor, and used those interviews as a means of developing tax strategies for Debtor, while Debtor debated and could not decide which tax counsel to engage. This was beyond the scope of Branton's agreement, and work for which it was not compensated. In fact, Branton actually lent the Debtor money to pay its tax accountant

EXHIBIT 1 PAGE 23

so that the Debtor's tax analysis could move forward, Branton did all these things to be helpful to the Debtor, try to save it money, and keep the deal moving forward.

24.     Once tax counsel was finally engaged, Branton worked with them to explore various tax-advantaged structuring alternatives. Once the best options were chosen, Branton worked with tax accountants to develop the after-tax analysis of the various options being considered. Branton worked with the Debtor to evaluate and discuss the practicalities of the various tax saving alternative structures available to the Debtor. That included finding for the Debtor a specialist in tax-free exchanges, to explain the process of finding and selecting properties that might suit their needs.

25.     Throughout that process, Branton worked closely with the Debtor's bankruptcy counsel to coordinate the various marketing, structuring, timing, and structuring options under consideration, to ensure that every possible option stayed within the boundaries of what the bankruptcy proceedings allowed. All of this required an understanding of the existing and potential alternative uses of the Property, including the possibility of breaking it into multiple mixed-use condominium units.

26.     Over the course of the Term, Branton's efforts produced approximately 47 offers for the Property from prospective purchasers. More specifically, Branton produced 22 first-round bids in March 2023. From those bids, Branton developed for the Debtor a highly detailed spreadsheet analyzing and comparing the various components of each bid. This gave the Debtor a thorough and detailed understanding of how the marketplace viewed the Property. It also allowed the Debtor to compare the pricing levels offered by those looking to: (a) renovate the Property and keep it as an office building, (b) convert it to a rental apartment building, or (c) convert it to a residential condominium.

EXHIBIT 1 PAGE 24

27.    Branton's detailed analysis for the Debtor also identified: (w) how much construction cost each bidder anticipated it would budget for the Property, a crucial consideration in any comparison of bidders; (x) the deal terms of each bid; (y) how each bidder would capitalize a purchase; and, perhaps most importantly, (z) which bidders would be willing to ground lease rather than purchase the Property and how that would affect their pricing.

28.    Branton issued to the Debtor a total of 18 status reports over the course of the Term, often with enormous detail, and explained them in a way to ensure all members of Debtor could understand not just the facts, but the context of each issue.

29.    Not surprisingly, the highest bids came from condo converters, including two for $70,000,000. Any condo converter would need to purchase the Property, not ground lease it. The purchase, however, would not give the Debtor the same tax benefits as a ground lease structure.

30.    Unfortunately, that led to an extended period of time during which the Debtor worked to select tax counsel, which delayed moving forward with any of the bidders. Among other things, the tax attorney's feedback required analysis by his accountants, and Berdon was selected. As a result, and as mentioned above, Branton was requested to become Berdon's client.

31.    Once that tax analysis was complete, it became apparent that an outright sale could generate the highest net result at the price levels being discussed with condo converters. At that point, in the middle of August, the Debtor instructed Branton to initiate a second-round bid among the most competitive condo converter bidders. Branton advised that starting any bid process in mid-August was perilous and suggested delaying the process until after Labor Day. The Debtor nevertheless told Branton to proceed and "do the best we can."

9

EXHIBIT 1 PAGE 25

12.     Branton had remained in regular contact with the anticipated second-round bidders, to push them to move forward at their first-round pricing, and had confirmed that their financial partners were still in place, and that they were ready to participate in a second-round bid process even in late August and submit their offers shortly after Labor Day.

13.     Sadly, that did not happen. As Branton had warned, and despite the assurances from the anticipated second-round bidders, few of the prospects responded in late August, and the second-round bid was not successful. This meant that Branton had to start over to find new bidders and attempt to resuscitate the interest of prior ones who had lost interest, developed deal fatigue, and/or lost faith in Debtor's ability to make a decision and move forward with a transaction. The five month lapse caused by the Debtor between the first and second round bid dates sent an alarming message to the marketplace and destroyed the momentum that Branton had developed during the November 2022 to March 2023 marketing period.

14.     During that time period, the Debtor claims that part of the delay was caused by Branton's request for an indemnity against being sued by principals of the Debtor. That is not true, as Branton continued to perform its duties while the parties worked out the indemnity.

15.     Despite all the internal chaos and delays caused by the Debtor, Branton successfully procured approximately 25 more bids from bidders old and new, during this post-Labor Day 2023 period. One of those bids ultimately came from one of Branton's prospects later included in the List (the "Branton Buyer")[1] in early December 2023.

16.     The Branton Buyer was prepared to pay $60 million, post a 10% deposit, sign an unconditional contract, and post a nonrefundable deposit by December 31, 2023. The Branton Buyer had arranged financial backing for its equity investment as well as debt financing. Both

---

[1]    For privacy, the name of the Branton Buyer has been omitted. The Debtor knows who that buyer is. The name can be provided to the Court.

EXHIBIT 1 PAGE 26

came from a large institutional investor in commercial real estate. The Branton Buyer and its
capital source had agreed to partner on the conversion of numerous office buildings to residential
condos. After careful analysis, they chose the Property as their first project.

37.    The Branton Buyer was ready to go, except they wanted the Debtor to secure
vacant possession of one space encumbered by a lease that extended until 2030. The tenant under
that lease (the "Tenant") had expressed interest in moving out, but no agreement had yet been
reached with the Tenant. The Debtor claimed that it was not comfortable signing a letter of intent
with the Branton Buyer (an "LOI") until the Debtor reached an oral agreement with the Tenant.
As a result, the Branton Buyer missed Branton's year-end deadline for signing a contract.

38.    At the time, Branton could not figure out why Debtor refused to continue
negotiating and eventually enter into a nonbinding LOI with the Branton Buyer before reaching
an agreement with the Tenant. Signing such an LOI would have had no negative consequences,
as confirmed by the Debtor's real estate counsel. Branton urged the Debtor not to pass up the
timing urgency and momentum Branton had created with the Branton Buyer to sign by year-end,
knowing that absent a deadline, deals linger and are harder to complete. In retrospect, was the
Debtor really focused on securing verbal (nonbinding) agreement with Tenant, or was the Debtor
strategically delaying the Branton Buyer beyond expiration of Branton's Term, so that the
Debtor could bring into the picture an alternative buyer that the Debtor had spoken with during
the Term, but not referred to Branton?

39.    On January 9, 2024, the Debtor and the Branton Buyer signed an LOI. It gave
the Branton Buyer exclusivity from Tuesday, January 9, through Friday, January 19, 2024 (the
"Exclusivity Period"). At the end of that Exclusivity Period, however, the contract with the
Branton Buyer was not yet ready to sign and the Debtor had not yet signed a written agreement

11

EXHIBIT 1 PAGE 27

with the Tenant. Early the next week, the Debtor extended the LOI, including the Exclusivity Period, through January 31. At that point, the Debtor refused to further extend the LOI or the Exclusivity Period.

40.     After the Debtor shared the Branton Buyer's contract with the Debtor Buyer, further Property tours and negotiations ensued. The Debtor stopped responding to the Branton Buyer's later offers, which took the form of two more draft contracts. In response to the Branton Buyer's statements that the Debtor had apparently violated the Exclusivity Period, the Debtor announced that it would not speak to the Branton Buyer or its counsel at all until the Branton Buyer gave an unconditional release to the Debtor.

41.     The Debtor's silence made it impossible for the Branton Buyer to proceed. Branton was informed by the Branton Buyer, and Branton's counsel was informed by the Branton Buyer's counsel, that the Debtor's attorney communicated little or no information to the Branton Buyer. Eventually, the Debtor and the Debtor's bankruptcy attorney contacted Branton on Saturday, February 24, advising Branton that (a) a nonbinding contract had been signed with another buyer, presumably the Debtor Buyer, and (b) Branton should tell the Branton Buyer that they are welcome to overbid.

42.     Three days later, the Branton Buyer did exactly that, by giving the Debtor yet another revised contract with a higher bid. Again, the Branton Buyer received no response or other information from the Debtor or its counsel.

43.     On March 1, 2024, the Court approved the sale of the Property to Madison 29 [see Docket No. 325]. The Court-approved contract with Madison 29 (the "Contract") included a paragraph on brokerage, which included in relevant part this statement:

11

EXHIBIT 1 PAGE 28

14   BROKERS AND ADVISORS

(a)   Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged, on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with the Assignment or the transactions contemplated hereby other than Two Bins Capital LLC ("Purchaser's Broker"). Purchaser hereby agrees to indemnify, defend and hold Seller and the

44     Thus, Two Bins acted as the broker that introduced the Debtor to Madison 29. Two Bins had already become involved with the Property in 2022, as the broker that helped the Debtor set up the DIP Facility after Branton's Term had started. It appears that Two Bins and the Debtor continued their relationship regarding the Property and stayed in touch. The Contract confirms that Two Bins was the broker that brought Madison 29 to the Property.

45     It is inconceivable that the Debtor and Two Bins had no conversations about the Property between (a) the closing of the DIP Facility; and (b) the end of the Term. To the contrary, it is reasonable to infer that the Debtor continued to speak with Two Bins, and Two Bins maintained a relationship and lines of communication with the Debtor during the Term.

46     In a situation with property issues as complex as this one, it typically takes some time, perhaps 60 days, from the date a prospect first hears about a property until the prospect has adequately done its preliminary investigation of the property, the parties negotiate a nonbinding LOI, and the seller's attorneys prepare and send out a first draft contract. That is particularly true for this Property, given all its complexities. These complexities required time, effort, and brainpower for any buyer, including Madison 29, to think through. The Branton Buyer, for example, needed more time than that from its first tour of the Property until it agreed to the terms of its never-signed LOI with the Debtor.

47     It also seems quite likely that the Debtor used Branton's marketing materials in its dealings with Two Bins and Madison 29 without notifying Branton or requesting Branton's permission.

11

EXHIBIT 1 PAGE 29

48.     Assuming that the Debtor spoke to Madison 29 or Two Bins as its agent during the Term but failed to refer those discussions to Branton, as seems to have occurred, Branton is entitled to payment of its Commission. Moreover, the Debtor violated the Listing Agreement. If the Debtor had complied with the Listing Agreement, then Branton would have contacted Madison 29 through Two Bins, given Madison 29 at least one tour of the Property, and included Madison 29 on Branton's List. Thus, Branton would have been entitled to a Commission if a Closing were to occur with Madison 29. The timing of Madison 29's entry onto the scene makes it quite clear that the Debtor communicated with Two Bins and through Two Bins to Madison 29 during the Term.

49.     Contemporaneously with the filing of this application, Branton is initiating discovery from the Debtor, Madison 29, Two Bins, and other parties that presumably would have been involved in any such communications.

50.     To the extent the Debtor communicated with Madison 29 or Two Bins in January, those communications likely also violated the Exclusivity Period that the Branton Buyer had negotiated, given that the Exclusivity Period covered most of January. By violating the Branton Buyer's Exclusivity Period, the Debtor also endered the negotiations with the Branton Buyer and the possibility of a Closing with the Branton Buyer. Thus, the Debtor interfered with Branton's ability to collect a Commission on such a Closing.

51.     On March 1, 2024, the Debtor filed its Motion Pursuant to Sections 105, 363, 365 and 1146 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order (I) Approving the Sale of the Property Free and Clear of All Liens, Claims, Encumbrances and Interests (Except Permitted Encumbrances), (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases

14

EXHIBIT 1 PAGE 30

Related Thereto, and (III) Granting Related Relief (the "Sale Motion"). The Sale Motion sought this Court's approval of a sale to Madison 29. The purchase price was listed as $62,800,000. Even after the Term, Branton continued to work with the Branton Buyer to obtain a higher and better offer. Just before this Court approved the Contract, the Branton Buyer submitted a higher offer of $65,000,000. Neither the Debtor nor the Debtor's attorney engaged in any meaningful discussion of that offer. However, the Debtor used the Branton Buyer's higher offer as an opportunity to push Madison 29 to match the $65,000,000 offered by the Branton Buyer. That process put an additional $2,200,000 into the Debtor's pocket.

Executed on June 4, 2024, at New York, New York.

_s/ Warren M. Heller_
**WARREN M. HELLER**

EXHIBIT 1 PAGE 31

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Thursday, July 28, 2022 8:28 AM |
| **To:** | Michael Sklar |
| **Cc:** | Sharan Sklar |
| **Subject:** | Re: Can you send me your resi plan you had for 95 Madison? |

I was just curious to see how it laid out. Whenever he puts together his materials I guess show it to me.

Sent from my iPhone

> On Jul 28, 2022, at 5:03 AM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:
>
> We are going to have a in house broker. We agreed not to muddy the waters.
>
> Michael Sklar
> General Partner
>
> Ninety-Five Madison Company, L.P.
> 917.270.6083 (c) | Msklar@ninetyfivemadison.com ⬛ A little green
> reminder: Please consider the environment before printing this email
>
> -----Original Message-----
> From: emanuel@twobinscapital.com <emanuel@twobinscapital.com>
> Sent: Thursday, July 28, 2022 3:06 AM
> To: Michael Sklar <msklar@ninetyfivemadison.com>
> Subject: Can you send me your resi plan you had for 95 Madison?
>
>
>
> Sent from my iPhone



**REORGANIZED DEBTOR'S EXHIBIT**

**DX0003**

EXHIBIT
15 M.Sklar
6 6 24

**From:** Woody Heller <woody.heller@outlook.com>
**Sent:** Monday, August 22, 2022 1:07 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** Re: Asbestos / Property & condition report

Apologies Michael, I don't know this firm but they might be fine. I'll look for the others we've used shortly.

Woody Heller
woody.heller@outlook.com

(917) 612-1230



On Aug 22, 2022, at 9:49 AM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

Woody :
Will Partners Engineering & Science , Inc. work for phase 1 & conditions report.
https://www.partneresi.com/services/building-assessments/property-condition-assessments
Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.
917.270.6083 (c) | Msklar@ninetyfivemadison.com

 A little green reminder. Please consider the environment before printing this email.

**From:** emanuel@twobinscapital.com <emanuel@twobinscapital.com>
**Sent:** Friday, August 19, 2022 12:41 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** Re: Asbestos / Property & condition report
https://www.partneresi.com/services/building-assessments/property-condition-assessments
Hold off on ordering though.

Sent from my iPhone

REORGANIZED
DEBTOR'S
EXHIBIT

DX0004

EXHIBIT 1 PAGE 33

On Aug 19, 2022, at 12:38 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

Nothing attached. Please resend.
Michael Sklar
General Partner
Ninety-Five Madison Company, L.P.
917-270-xxxx 0 | : MSklar@ninetyfivemadison.com

a very green sentiment Please consider the environment before printing

From: emanuel@twobinscapital.com <emanuel@twobinscapital.com>
Sent: Friday, August 19, 2022 12:34 PM
To: Michael Sklar <MSklar@Flintlockllc.com>
Cc: Sharon Sklar <ssklar@ninetyfivemadison.com>
Subject: [EXTERNAL] Re: Asbestos / Property & condition report

Use these guys. They can do both phase 1 and property condition report. Nationally recognized where any buyer would accept them. But you should hold off as whatever lender you choose should engage them.

Sent from my iPhone

On Aug 19, 2022, at 11:38 AM, Michael Sklar <MSklar@flintlockllc.com> wrote:

Emanuel

I need the names of firms that you can recommend. Need companies that banks and buyers will accept

1. Phase I, asbestos & property condition / engineering reports.
   i. The key points regarding their engagement:
      1. Their reports are to ownership.
      2. Their reports need to be assignable and certified to the "buyer" and their lender
      3. There may be an additional fee for this, payable by "buyer", but we need them to agree to do this in advance
      4. we also need to review the reports first in draft form, and I'd like your comments and input on them please

Can you recommend

Michael Sklar
General Partner
FLINTLOCK CONSTRUCTION Associates, LLC and V_____ _____ _____ |
New York, NY 0000-0
917-570-3100 x 000 x 000 | 000-000-0000 m | 000-000-0000 f |
MSklar@Flintlockllc.com

**From:** Woody Heller <woody.heller@outlook.com>
**Sent:** Tuesday, August 30, 2022 9:40 AM
**To:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Cc:** Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** Emanuel - Mortgage Broker

Sharan,

Just so you know, I received a call from Rony Kravel yesterday who is interested in the building, either as an outright purchase or as a ground lease. He was introduced to the building by Emanuel who took him on a tour roughly two months ago with a woman in her 40s whose name he doesn't recall. I wanted to make sure you're aware of this as apparently, I'm the only broker who hasn't shown the building to prospective purchasers without permission. Having said this, Emanual did direct him to me, which is helpful, but apparently, he was also marketing the building for sale and giving tours, potentially without you knowing. Are you aware of this?

Woody Heller
woody.heller@outlook.com
(917) 612-1230



REORGANIZED
DEBTOR'S
EXHIBIT

DX0005

EXHIBIT 1 PAGE 35

**REORGANIZED**
**DEBTOR'S**
**EXHIBIT**

**DX0006**

**Exhibit 1**

S. Sklar

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
|  | ) |
| Debtor. | ) |
|  | ) |

## ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER AND SALES AGENT TO DEBTOR NINETY-FIVE MADISON COMPANY, L.P. *NUNC PRO TUNC* TO AUGUST 17, 2022

Upon consideration of the application (the "Application")[1] of Ninety-Five Madison Company, L.P. (the "Debtor"), the debtor and debtor in possession in this Chapter 11 case (the "Chapter 11 Case"), pursuant to Sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), for entry of an order (this "Order"): (a) authorizing the employment and retention of BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to *August 17*, 2022; (b) approving the terms of BRS's employment and retention, as memorialized in that certain engagement agreement dated August **18**~~17~~, 2022 (the "Engagement Agreement"), attached as **Exhibit 1** to this Order, including the Fee Arrangement and Indemnification Provisions set forth in the Engagement Agreement; and (c) modifying the timekeeping requirements of Local Rule 2016-1 and the *General Order M-447 Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated January 29, 2013* (the "Fee Guidelines"), and any other applicable procedures and orders of the Court in connection with BRS's engagement; and upon the Declaration of Woody Heller (the "Heller Declaration"), which was filed with the Court as

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Application.

**Exhibit B** to the Application; and the Court having reviewed the Application and the Heller Declaration; and the Court being satisfied, based on the representations made in the Application and in the Heller Declaration, that (i) BRS does not hold or represent any interest adverse to the Debtor's estate, and (ii) BRS is a "disinterested person" as that phrase is defined in Section 101(14) of the Bankruptcy Code; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; **and no objections to the Application having been timely filed;** and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtor's estate and all parties-in-interest and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **[DSJ 8/31/2022]**

It is hereby ORDERED that:

1.  The Application is granted to the extent set forth herein.

2.  In accordance with Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, the Debtor is hereby authorized and empowered to employ and retain BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 17, 2022, in accordance with the terms and conditions set forth in the Engagement Agreement, and the Debtor is authorized to pay fees and reimburse expenses, and to provide indemnification, contribution, and/or reimbursement to BRS on the terms and at the times specified in the Engagement Agreement.

BR002089

EXHIBIT 1 PAGE 37

3.      BRS shall be compensated for fees and reimbursed for out-of-pocket expenses by the Debtor in accordance with the terms and conditions of the Application and/or Engagement Agreement, and all fees and out-of-pocket expense reimbursements to be paid to BRS, including without limitation the Commission Fee, shall be subject to Section 328(a) of the Bankruptcy Code.

4.      Notwithstanding anything to the contrary contained herein or in the Application and/or Engagement Agreement, BRS shall file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines and any other procedures or orders of the Court; provided, however, that BRS shall not be required to keep or submit detailed time records as part of its fee application.

5.      In the event that, during the pendency of these cases, BRS seeks reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys, appropriately redacted to preserve applicable privileges, shall be included in BRS's fee applications and such invoices and time records shall be in compliance with the Local Rules, and shall be subject to the Fee Guidelines and approval of the Court under the standards of Bankruptcy Code Sections 330 and 331, without regard to whether such attorney has been retained under Bankruptcy Code Section 327 and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that BRS shall not seek reimbursement from the Debtor's estate for any attorney's fees incurred in defending against objections to any of BRS's fee applications filed in these cases;

6.      Notwithstanding anything to the contrary in the Application, the Heller Declaration, or the Engagement Agreement, during the pendency of this Chapter 11 Case, the Indemnification Provisions of the Engagement Agreement are hereby modified as follows:

3

BR002090

EXHIBIT 1 PAGE 38

(a) All requests by indemnified persons for the payment of indemnification as set forth in the Engagement Agreement (such persons, the "Indemnified Persons") shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Agreement **and this Order** and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, and in no case shall an Indemnified Person be indemnified if any losses, claims, damages, liabilities or expenses are finally judicially determined to have resulted from such Indemnified Person's gross negligence, bad faith, or willful misconduct; and **[DSJ 8/31/2022]**

(b) In the event that an Indemnified Person seeks reimbursement from the Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Agreement, the invoices and supporting time records from such attorneys shall be included in BRS's own applications, both interim and final, and such invoices and time records shall be subject to the applicable Fee Guidelines and the approval of the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

7. Any limitation of liability pursuant to the terms and conditions set forth in the Engagement Agreement are hereby eliminated for the duration of this Chapter 11 Case.

8. Notwithstanding anything to the contrary in the Application and/or Engagement Agreement, to the extent that BRS uses the services of independent contractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, BRS (i) shall pass-

4

BR002091

EXHIBIT 1 PAGE 39

through the cost of such Contractors to the Debtors at the same rate that BRS pays the Contractors; (ii) shall seek reimbursement for actual out-of-pocket expenses only; and (iii) shall ensure that the Contractors are subject to the same conflict checks and disclosures as required of BRS by Rule 2014 of the Bankruptcy Rules.

9.      The Debtor and BRS are authorized and empowered to take all actions necessary to effectuate the relief granted by this Order.

10.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

12.      **In the event of a conflict between this Order and the Application and/or Engagement Agreement, the terms of this Order shall govern. [DSJ 8/31/2022]**

Dated: New York, New York
        August 31, 2022

_____*s/ David S. Jones*_____
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

BR002092

EXHIBIT 1 PAGE 40

# EXHIBIT 1

BR002093

EXHIBIT 1 PAGE 41

**LISTING AGREEMENT FOR SALE** (this "**Agreement**") dated as of August $\underline{18}$ 2022 (**Effective Date**") between Branton Realty Services LLC, a New York limited liability company ("**Branton**"), and Ninety-Five Madison Company, L.P., a New York limited partnership ("**Owner**").

### Background

Owner owns the property known as 95 Madison Avenue, New York, New York (the "**Property**") and desires to engage Branton to arrange a sale or other disposition of all or a portion of the Property to a counterparty (a "**Counterparty**") upon the terms and provisions more fully set forth herein. As used herein, Counterparty includes affiliates, designees, nominees and assignees thereof. On March 22, 2021, Owner filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (Case No. 21-10529) (the "Bankruptcy Court").

### Agreement

1.     **Appointment.**    Subject to the conditions and limitations contained in this Agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the exclusive right to market the Property for a sale, as defined in the third paragraph of Exhibit A (any such transaction being a "**Transaction**"). The terms and conditions of any proposed Transaction shall be subject to review and acceptance by Owner in its sole and absolute discretion. Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion. Branton shall coordinate and work with Owner's designated tax advisor, as necessary, with respect to a Transaction.

2.     **Term.**    The term of Branton's appointment hereunder (the "**Term**") shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term.

3.     **Referrals.**    Owner shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

4.     **Owner Information.**    Owner shall furnish to Branton such information with respect to the Property in writing as Branton may reasonably request in order to render its services effectively. Branton shall under all circumstances (i) be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all written information that has been furnished to it by Owner, (ii) have no obligation to verify the accuracy or completeness of any such information, and (iii) not be responsible for the inaccuracy or incompleteness of any such information provided. All documents and other materials, investigations, reports and information with respect to the Property or Owner shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner, after written authorization from Owner and after delivering an executed confidentiality agreement form (typically acceptable in the ordinary course

$\mathcal{G}_{\mathcal{T}}\mathcal{H}$

BR002094

EXHIBIT 1 PAGE 42

in similar transactions), and Owner shall be solely responsible for the accuracy of the contents of the same. Subject to the rights of any tenants, Owner shall provide reasonable access to the Property for Branton and, as arranged by Branton, prospective Counterparties.

5. **Compensation**. Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A (the "Commission") as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below.

Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the "**List**") of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein.

6. **Brokers**.

a. Branton is authorized to cooperate with outside brokers ("**Outside Brokers**") representing Counterparties in connection with a proposed Transaction. Branton shall obtain from any Outside Broker an agreement, in form and substance reasonably satisfactory to Owner, providing that the Outside Broker shall look solely to the Counterparty for any commissions due to such Outside Broker in connection with the Transaction. Any transaction document executed shall contain an indemnity from the Counterparty in favor of both Owner and Branton against claims of any Outside Broker.

b. Branton agrees to indemnify, defend and hold Owner harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements and court costs) incurred by and/or asserted against Owner arising out or relating to any claim for fees and/or commissions relating to the Property asserted against Owner by any broker(s) with whom Branton has dealt unless Owner enters into a Transaction document with a Counterparty without getting an indemnity against the claims of any Outside Broker.

c. Since Owner dealt with other brokers prior to Effective Date with respect to the Property, Owner shall be responsible for any commissions owed to such brokers. Owner agrees to indemnify and hold Branton harmless from and against all claims, actual out-of-pocket costs, liabilities, settlements, and judgments (collectively "claims"), and all costs of defense against such claims (including reasonable attorneys' fees and disbursements), by such other brokers.

7. **Marketing & Expenses**. Owner shall pay the fees and disbursements of legal counsel, engaged by Owner. Owner authorizes Branton to market the Property, including preparing offering materials, all of which materials are to be approved or disapproved in writing

#11386827 v6 029230\0008

2

by Owner (in its sole and absolute discretion) in writing within five (5) business days of presentation to Owner from Broker prior to digital distribution and if not disapproved in writing within five (5) business days same shall be deemed approved. All such materials about the Property or the Transaction whether prepared by Branton or Owner will identify Branton as the exclusive broker for the Property. Owner shall reimburse Branton or pay directly, when billed, Branton's reasonable actual out-of-pocket costs and expenses incurred in preparation of the offering materials and marketing the Property, which costs and expenses have all been approved in writing by Owner (the "**Marketing Costs**") including, but not limited to (a) the cost of producing and distributing descriptive materials (including the costs of photographs, maps, renderings, plot plans and blueprints), (b) cost of producing graphics for the offering materials and (c) third party websites that coordinate marketing efforts, distribute confidentiality agreements and host offering and due diligence materials (like DropBox). Branton shall provide a detailed line-item budget of proposed expenses for Owner's prior written approval. Within five (5) business days of presentation of a budget of proposed expenses Owner shall approve or disapprove in writing such expenses, and if not so disapproved in writing same shall be deemed approved, and Branton shall only expend such amounts as are set forth in the written budget approved by Owner, unless otherwise approved in advance by Owner. The Marketing Costs shall be reimbursed or paid by Owner whether or not a Transaction occurs. The parties anticipate the budget for marketing expenses to be approximately $50,000.00 to $75,000.00.

8.     **Representations**. Other than as set forth in paragraph 21, each party represents and warrants to the other that the representing party has full right and authority to enter into and perform its obligations under this agreement, and that the same does not violate or conflict with, or require any consents or approvals under any Agreements by which the representing party is governed or bound.

9.     **Confidentiality; Press Releases.** Branton acknowledges that Branton's services under this Agreement may provide Branton with access to confidential business, professional, personal or private information concerning Owner and its direct or indirect owners and/or their family members. Branton acknowledges the confidential nature of such information and agrees that Branton and Branton's agents will not issue any press releases, grant any interviews or release any other information or announcements to the press or the public or issue any other form of publicity, or otherwise publish or disclose to any third person, any such confidential information, except as specifically required to perform Branton's obligations under this Agreement. Notwithstanding the foregoing, the Parties specifically acknowledge that Branton shall be permitted to issue press releases and market the Property consistent with this Agreement provided that Branton does not disclose any information which would otherwise be deemed confidential pursuant to this Paragraph.

10.    **Indemnification**. Owner acknowledges that Branton is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative

BR002096

EXHIBIT 1 PAGE 44

to the Property or any of the leases, license or other agreements to which the Property is or may be subject (all of the foregoing being called "**Property Conditions**"). Owner agrees to disclose to Branton any and all information which Owner has regarding the Property Conditions and Branton is authorized to disclose any such information to prospective Counterparties, upon the prior written approval of Owner, which approval shall remain in effect until revoked in writing. All documents, materials, investigations, reports and information with respect to Property Conditions shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner only with the initial and prior written approval of Owner and Owner shall be solely responsible for same. Owner agrees to indemnify and hold Branton harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by Branton which arise out of or relate to any of the Property Conditions. This paragraph shall survive the expiration of this Agreement for the period of the applicable statute of limitations as to any such claims.

11. **Notices**. Any notices required to be given by either party under this Agreement shall be in writing and sent by (i) messenger/personal delivery, (ii) certified mail return receipt requested, (iii) nationally recognized overnight courier service or (iv) email, addressed to the parties as provided below. Notices shall be deemed given upon receipt or rejection, if given by personal delivery; on the day that is five (5) business days following delivery to the postal authorities, if mailed as provided herein; on the business day following delivery to the courier service, if given by overnight courier as provided herein or when sent by e-mail provided no automatic bounce back is received, and further provided that any e-mail sent after 5:00 PM in the recipient's time zone on a business day or at any time on a non-business day shall be deemed given on the next business day. Notwithstanding anything to the contrary contained herein, notice by email pursuant to (iv) above shall not be an acceptable method of providing any legal notice, default notice or termination notice hereunder and the same shall be required to be sent by one of the methods set forth in (i)-(iii) of the first sentence of this paragraph.

> If to Owner, Ninety-Five Madison Company, L.P., 95 Madison Avenue, Suite 609, New York, New York 10016, with a copy by email to: Rita Sklar (ritasklar@gmail.com); Sharan Sklar (ssklar@ninetyfivemadison.com) and Michael Sklar (msklar@ninetyfivemadison.com).

> with a copy to:

> Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq., email: mlefkowitz@rosenbergestis.com and

> Olshan, 1325 Avenue of the Americas, New York, New York 10019, Attention: Thomas J. Fleming, Esq., email: tfleming@olshanlaw.com

$\mathcal{V}\mathcal{K}_1\mathcal{H}$

BR002097

EXHIBIT 1 PAGE 45

If to Branton, at 1080 Fifth Avenue, Apt. 2B, New York, New York 10128, Attention: Mr. Warren Heller, email: woody.heller@outlook.com and wheller@brantonrealty.com.

With a copy to:

Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York, 10022-4784, Attention: Mr. Jonathan Margolis, email: jmargolis@morrisoncohen.com.

A party may change the address to which notices/service of process shall be sent to or served on it by five (5) days' prior written notice to the other party. Any notice served by an attorney representing a party (as set forth in Paragraph 11 above) shall have the effect of a notice served by the party.

12. **OFAC**. Each party warrants and represents to the other that, the representing party and all parties owning (directly or indirectly) an ownership interest in the representing party (a) is not, and shall not become, a person or entity with whom the other party is prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order, or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, any dealing or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13. **Governing Law, Venue, Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of laws). Any disputes related to or arising from this Agreement must be brought exclusively in New York County in the State of New York, to the jurisdiction of which each of the parties hereby submits. Branton and Owner each waive trial by jury in any action or proceeding under this Agreement.

14. **Fees and Interest.** If either party commences an action or proceeding against the other party to enforce its rights under the Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and disbursements from the other party. Any amount due under this Agreement and not paid when due shall bear interest at the rate of two percent per annum in excess of the prime commercial lending rate as published from time to time in *The Wall Street Journal (New York edition)*, but not in excess of the highest rate permitted by applicable law.

15. **Branton Duties**. In addition to the obligations set forth elsewhere in this Agreement, Branton hereby agrees to (i) host weekly conference calls as needed, based on the status of the project, on the same day and time each week during the Term, adjusting for an alternate day in a week in which a holiday occurs, or the availability of less than two (2) of the partners, (ii) distribute weekly reports, as applicable once marketing is underway (to be received one (1) business day prior to the weekly call or meeting provided for in (i)) with updates on market

#11386827 v6/0292303/shbg

5

BR002098

EXHIBIT 1 PAGE 46

conditions, marketing, showings, offers, etc., and (iii) transmit all offers made by Counterparties to Owner in writing.

16. **Owner Designee**. Branton hereby acknowledges that Rita Sklar, Sharan Sklar and Michael Sklar are representatives ("Representatives") of the Owner. Such Representatives shall designate in writing to Branton a single person (the "Designee") to act on their behalf, and Branton is hereby authorized to act upon direction given by the Designee with respect to requests for information, arranging group calls and other similar non-substantive matters. The Representatives may periodically designate a new Designee, in which case all of the Representatives shall notify Branton in writing thereof, and Branton shall act upon the direction of the new Designee. Notwithstanding the foregoing, the Representatives may periodically request that Branton make itself available for conference calls with the Representatives to discuss any subject concerning the Transaction.

17. Branton shall look only and solely to Owner's estate and interest in and to the Property (which shall consist of (a) the proceeds, rents and profits therefrom, (b) the proceeds of any lease, sale, conveyance, assignment, transfer, mortgage or refinancing thereof and (c) any insurance proceeds or condemnation awards relating to any portion of the Property) for the satisfaction of any right of Branton arising out of this Agreement or for the collection of judgment or other judicial process or arbitration award requiring the payment of money by Owner and no other property or assets of Owner, Owner's agents, incorporators, shareholders, employees, officers, directors, partners, manager, agents, principals (disclosed or undisclosed), members, joint venturers, or affiliates (collectively, "Owner's Affiliates") shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Branton's rights and remedies under or with respect to this Agreement or any other liability of Owner to Branton.

18. Branton represents further that it is presently and will at all times remain a licensed real estate broker in the State of New York. As a material inducement to Owner to enter into this Agreement, Branton covenants that Woody Heller ("**Heller**") will be actively involved in performing the services required of Branton hereunder. In the event of Heller's death or incapacity, this Agreement shall automatically terminate and no Commission shall be due and owing (other than in connection with a pending Transaction or may be due and owing pursuant to the terms of paragraph 5 hereof).

19. It is understood that Branton is not granted any right or authority to assume or create any obligation or liability or make any representation, warranty or agreement (expressed or implied) on Owner's behalf or to bind Owner in any manner whatsoever.

20. Notwithstanding anything to the contrary, it is expressly understood and agreed that (i) Owner is under no obligation of any nature whatsoever to either (a) accept any Counterparty identified by Branton or anyone else as a counterparty and/or (b) accept any Counterparty procured by Branton or anyone else and/or to execute and/or deliver any contract of sale or other agreement, (ii) Owner shall have the absolute right in Owner's sole discretion, without explanation or liability

#11386827 v6 V/292 V1 V####

6

of any nature whatsoever to Branton, to, at any time, reject any Counterparty and/or the terms of any prospective contract of sale or other agreement with any Counterparty and (iii) Owner shall have no liability to Branton of any nature whatsoever should Owner fail for any reason whatsoever (except in the case of Owner's willful default) to either (i) accept any Counterparty and/or execute and deliver any contract of sale or other agreement and/or (ii) close upon the sale of the Property, it being agreed that if an agreement for a Transaction is executed and delivered with a Counterparty, but the closing thereunder fails to occur for any reason whatsoever (except in the case of Owner's willful default), then Branton shall not be entitled to any Commission whatsoever.

21. **Bankruptcy Court Approval.** Notwithstanding anything to the contrary herein the terms and conditions of the Agreement in all respects are subject to the approval of, the Bankruptcy Court. Owner will, promptly after its execution of this Agreement, file an application and proposed order seeking from the Bankruptcy Court approval of its employment of Branton pursuant to the terms of this Agreement, and pursuant to, as applicable, Sections 329(a) and 328(a) of the Bankruptcy Code. Owner agrees and acknowledges to attach a complete copy of this Agreement to the application. Owner will provide Branton the application and proposed order authorizing this Agreement sufficiently in advance of their filing in order for Branton to have ample time to review and discuss any comments it may have with Owner, and the application shall be acceptable to Branton, in form and substance. The proposed order will include, without limitation, the following terms and conditions: (a) finding that none of the fees or commissions payable to Branton hereunder constitute a "bonus" under applicable law; (b) directing that Branton will be exempt from keeping time records for its work hereunder (as Branton will not be billing on an hourly basis); (c) finding that the terms and conditions of this Agreement are reasonable; (d) that the Commission due hereunder to Branton will be paid at the closing of a Transaction with respect to the Property without a further application or order of the Bankruptcy Court; and (e) directing that any unpaid Commission or marketing expenses owed to Branton shall be treated as an administrative claim under Section 507(a)(1) of the Bankruptcy Code. If an order obtaining these terms is not obtained from the Bankruptcy Court within thirty (30) days after both parties have signed this Agreement, then Branton may terminate this Agreement. If Owner obtains an order of the Bankruptcy Court authorizing its use of cash collateral or debtor in possession financing and if the order requires submission of a proposed budget specifying post-petition expenditures, then Owner will include in the budget line items providing for the payment of the expenses to be paid or reimbursed as and when provided pursuant to this Agreement. All amounts projected to be paid to Branton under this Agreement will be included in the carve-out for professionals provided in Owner's bankruptcy case. Should the Bankruptcy Court order a sale of the Property at auction, Branton is authorized to and will act as the exclusive auctioneer upon the terms set forth herein. The Bankruptcy Court will retain jurisdiction over any disputes under this Agreement. If the bankruptcy case is dismissed and the Property is not disposed of under Bankruptcy Court jurisdiction, then any dispute between the parties arising under this Agreement will be resolved in the New York State Supreme Court, County of New York, Commercial Division.

311386827 v6 '029230 0008

7

BR002100

EXHIBIT 1 PAGE 48

22.    **Miscellaneous**. This Agreement (i) expresses the parties' entire agreement on the matters covered herein, and (ii) supersedes all prior understandings between such parties on such matters. This Agreement may not be amended or modified except in writing signed by all of the parties. Neither party may assign this Agreement without the prior consent of the other party, which consent may be withheld in such party's sole discretion. This Agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.



#1138o827 v6 \929230 \0008

8

BR002101

EXHIBIT 1 PAGE 49

Executed by the parties to confirm the foregoing.

BROKER:

BRANTON REALTY SERVICES LLC

By _____
Name: Warren Heller
Title: Manager

OWNER:

NINETY-FIVE MADISON COMPANY,
L.P.

By: Sharan Sklar Management LLC

By: /s/ Sharan Sklar
Name: Sharan Sklar
Title: Manager

By: Michael Sklar Management LLC

By: /s/ Michael Sklar
Name: Michael Sklar
Title: Manager

#11386827 v6 \029230 \0008

# Exhibit A
## Compensation

Branton shall earn, and Owner shall pay Branton, a fee upon the closing of any Transaction of $300,000.00 plus one (1%) percent of the gross sales price.

As used herein, "gross sales price" includes any mortgages, loans or other obligations of Owner which may be assumed by the Counterparty or which the Counterparty takes title "subject to", and any purchase money loans or mortgages taken back by Owner and the sales price of any fixtures and other personal property sold by separate agreement between Owner and the Counterparty as part of the overall sale of the real property.

For purposes of this Agreement, a sale shall also include, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction (however characterized) by which Owner's interest in the Property is transferred to an unaffiliated third party for consideration. It is further agreed that if Owner enters into a Transaction involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in Owner (including without limitation between owners of interests in Owner or their affiliates), or by a transaction or integrated set of transactions intended to have the effect of conveying to such Counterparty less than 100% of the Property or Owner's interest therein, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, a commission hereunder, and the date of such effective legal transfer shall be deemed the closing date of such transaction. For the avoidance of doubt the intent of the above sentence is to calculate the value of 100% of the Property or 100% of Owner's interests in the Property to be sold and then pay the Broker a commission based 100% of such value, not the pro-rata percentage of such Property or interests that are actually sold. If a ground lease is entered into, the parties will use the agreed upon value of the Property in determining the compensation.

The intention of the foregoing is that Branton will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A.

#11386827 v6 \029230 \0008

BR002103

EXHIBIT 1 PAGE 51

## Exhibit B

## TIMELINE*

- Assemble and create the marketing brochure and due diligence material: 4 weeks depending on what's available and what has to be ordered
    - o photos
    - o write the text
    - o prepare the graphics of the marketing brochure
    - o review and collect the due diligence reports
        - ▪ environmental
        - ▪ engineering report
        - ▪ review any existing proposals
        - ▪ set up the marketing and due diligence website
- Initiate the marketing process: 6 weeks but could be longer during the summer
    - o Email confidentiality agreements and a deal summary page
    - o Send the marketing brochure once the CAs are signed
    - o Start conducting tours
    - o Review our proposed structure with potential purchasers
    - o Address questions, collect whatever additional information is requested
    - o Proceed in primal selling mode
    - o Prepare draft purchase agreement
- Review first-round bids: 2 weeks
    - o Receive and review
    - o Prepare a bid summary sheet comparing the relevant metrics of the various purchase proposals
    - o Select a handful of bidders to proceed to a second-round bid or choose one bidder to move forward quickly ahead of the pack, or both, depending on the situation and bids received
    - o Provide the finalists with the purchase contract to review
- Review second-round bids: 1-2 weeks
    - o Review offers and contract comments
    - o Interview bidders, if needed/helpful
    - o Select a purchaser
    - o Finalize and execute a contract, likely subject to a due diligence, but hopefully not
- Buyer due diligence: 0-4 weeks
    - o This process is intended for buyers to confirm seller's representations, but most will actually use it to confirm their financing
    - o Finalize unconditional contract
- Proceed to Closing: 6-10 weeks
    - o Normally we should be able to close in 6-8 weeks, but given the financing markets, may need an extra month

#11386822 v6 \029230 \0008

11

BR002104

EXHIBIT 1 PAGE 52

\* The parties hereto agree that the referenced timeline is a timeline example in normal market conditions; all parties recognize that the current market is not within normal conditions and marketing efforts may take longer than so indicated on this timeline.

#11386827 v6 \029230 \0008

12

| | |
|---|---|
| **From:** | Michael Sklar <msklar@ninetyfivemadison.com> |
| **Sent:** | Wednesday, August 31, 2022 6:33 PM |
| **To:** | Woody Heller |
| **Cc:** | Rita Sklar; Rita Ipad Sklar; Fleming, Thomas J.; Andrew K. Glenn |
| **Subject:** | 95 Madison sale / Net lease . |
| **Attachments:** | E mail AG Jeerry Nzarian 080122.pdf; E mail AG Jeerry Nzarian 080422.pdf |

Woody

Andrew received inquiries form Jeremy Nazarian the numbers conveyed to Andrew was 75Mm based on 150k SF.

The square footages is incorrect

**Michael Sklar**
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P

**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar ⊜ ninet_fivemadison.com

 A little green reminder: Please consider the environment before printing this email



REORGANIZED
DEBTOR'S
EXHIBIT

**DX0007**

EXHIBIT
10/16/24
3 MSklar 7T

BR002132

1

EXHIBIT 1 PAGE 54

## Michael Sklar

| | |
|---|---|
| **From:** | Andrew K. Glenn <aglenn@glennagre.com> |
| **Sent:** | Monday, August 01, 2022 2:40 PM |
| **To:** | Michael Sklar; Sharan Sklar |
| **Subject:** | Fwd: 95 Madison Avenue |

?

Begin forwarded message:

**From:** Jeremy Nazarian <jeremy@lyncrestadvisors.com>
**Date:** August 1, 2022 at 2:37:50 PM EDT
**To:** "Andrew K. Glenn" <aglenn@glennagre.com>
**Subject: RE: 95 Madison Avenue**

**[EXTERNAL EMAIL]** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Andrew,

Kindly following up here. Does the family have a counter?

Almost every sizable value-add office building over the last year has traded to someone in my community – 826 Broadway ($40mm), 830 3rd Avenue ($60mm), 1330 6th Avenue ($325mm), 45 East 53rd Street ($105mm), 345 7th Avenue ($107mm).

The Gorjian family will be buying this by themselves or with the equity behind most of the deals above. If there is a price to do a deal, please just let me know. We can save your client time, and transactional costs.

Thank you.

Best,

**Jeremy Nazarian** | Partner
d: +1 (646) 863 1433
m: +1 (516) 510 0941
jeremy@lyncrestadvisors.com



1

BR002133

EXHIBIT 1 PAGE 55

**From:** Jeremy Nazarian
**Sent:** Friday, July 22, 2022 10:50 AM
**To:** Andrew K. Glenn <aglenn@glennagre.com>
**Subject:** Re: 95 Madison Avenue

We are at $75mm. No dd. 90 days closing.

Building is 150k SF

150k @ 500/ft = 75mm

500/ft - basis
150/ft - ti/lc
75/ft - base building, carry, misc

Opex and Ret = $25/ft

Gets us to a low 6% yield on cost assuming $70+ average rents across the board.

RXR and Blackstone just sold 1330 6th Avenue to good friends of mine. Institutionally owned with tenancy. Bought for $600/ft. 5.5-6% cap in place.

Sent from my iPhone

On Jul 21, 2022, at 12:32 PM, Andrew K. Glenn <aglenn@glennagre.com> wrote:

We are hiring a broker to market the building.  If you have a preemptive offer you want to make, to stop a competitive process, please send it.  We don't have a material amount of leasing revenue.  You have the tax information.

Let me know.

Andrew K. Glenn
Managing Partner
aglenn@glennagre.com
W: (212) 358-5600

2

BR002134

EXHIBIT 1 PAGE 56

M: (908) 581-3659

**GLENN AGRE
BERGMAN & FUENTES**

1185 Avenue of the Americas, 22nd Floor
New York, NY 10036

**From:** Jeremy Nazarian <jerem__@lyncrestadvisors.com>
**Sent:** Thursday, July 21, 2022 6:15 PM
**To:** Andrew K. Glenn <a_lenn@_lenna_re.com>
**Subject:** RE: 95 Madison Avenue

**[EXTERNAL EMAIL]** This email originated from outside of the organization. Do not click
links or open attachments unless you recognize the sender and know the content is safe.

Hi Andrew,

I just tried you, but the dial tone sounded like you might be overseas. If you're on
vacation, hope you're having a great time. I just got back from Israel and it's hotter
here.

Did you get any clarity from your client on next steps for 95 Madison? Would just like
to get back to the Gorjians regarding trying to structure a fee sale or ground lease.

Thank you.

Best,

**Jeremy Nazarian** | Partner
d:  +1 (646) 863 1433
m: +1 (516) 510 0941
jerem_@lyncrestadvisors.com



**From:** Jeremy Nazarian
**Sent:** Wednesday, June 29, 2022 11:27 AM
**To:** a_lenn@_lenna_re.com
**Subject:** RE: 95 Madison Avenue

3

BR002135

EXHIBIT 1 PAGE 57

Hey – I just called Cobby to confirm (didn't want to misspeak), and they would indeed be open to a structured ground lease on the asset.

**Jeremy Nazarian** | Partner
d: +1 (646) 863 1433
m: +1 (516) 510 0941
[erem▒▒]ncrestadvisors.com



**From:** Jeremy Nazarian
**Sent:** Tuesday, June 28, 2022 10:08 AM
**To:** a_lenn▒▒lenna▒re.com
**Subject:** Re: 95 Madison Avenue

Hi Andrew,

Kindly following up on the below.

Best regards, Jeremy

Sent from my iPhone

> On Jun 22, 2022, at 11:07 AM, Jeremy Nazarian
> <[erem▒▒]ncrestadvisors.com> wrote:
>
> Andrew,
>
> Per our conversation, the Gorjians would like to move forward in short order to purchase 95 Madison Avenue.
>
> Whilst I would usually agree that a marketing process would be the best route to maximize value, I'd beg to differ given the current environment. Credit is hard-pressed to find on product like this, rent and growth assumptions are stagnant, cost of capital is only rising, and foreign demand is unfortunately not here.
>
> The client would like to request the following:
> - Rent Roll
> - Itemized Expenses
> - Stacking Plan / Floorplans
> - Any recent capital improvements / local law work
>
> After receiving the above, we could turn around an offer within a very short period of time. The offer would carry no financing contingencies – something valuable when debt for a full repositioning is priced at

4

BR002136

EXHIBIT 1 PAGE 58

8%+ today. There would also be no brokerage fee, saving your client on transactional costs as well.

Re: references.

As I noted below, I sold the Gorjians 192 Lexington Avenue for $90mm. The building sits on the SWC of 32nd & Lexington adjacent to 184 Lex which they also own.
The seller was Denise Caminite, and she can be reached at 724.712.7562. Please just let me know if you're reaching out so I can give her a heads up – she golfs these days.

Re: indicative pricing expectations.

It's very hard to give a number without knowing what is going on inside the building / how much it would cost us to get the product to market. To be honest, I'd be lying if I gave one.

What I can say is that the family has the equity to buy the building all-cash if they needed to. I can also say that their required rate of return is lower than any private equity or institutional REIT with a holding period and IRR requirement that they need to adhere to. They are also clearly aggressive and know the area well given their purchase of 192 Lexington Avenue, and their ownership of 184 Lexington Avenue, 220 East 24th Street, 50 Lexington Avenue, and 116-118 East 31st Street alongside more institutional quality assets within the portfolio such as 636 11th Avenue (550k SF; Ogilvy HQ; NYSE: WPP).

Looking forward to your feedback, and to hopefully get the ball rolling.

Best regards,

**Jeremy Nazarian** | Partner
d: +1 (646) 863 1433
m: +1 (516) 510 0941
`erem____l____ncrestadvisors.com`



**From:** Jeremy Nazarian
**Sent:** Thursday, June 2, 2022 11:49 AM
**To:** a_lenn__ lenna_re.com
**Subject:** 95 Madison Avenue

Andrew,

Very nice speaking with you.

BR002137

EXHIBIT 1 PAGE 59

As discussed, a client of mine asked that I reach out to the ownership of 95 Madison Avenue with respect to a potential sale.
The client is the Gorjian family whom I sold 192 Lexington Avenue (SWC 32nd & Lexington) to in 2018 for $90mm.

Given it's close proximity to 95 Madison – they are very familiar with the location and asset.
In addition to 192 Lexington Avenue, the family owns and manages roughly 3,000,000 square feet across Manhattan.

Portfolio can be viewed here: Gorjian Portfolio

Pending ownership's feedback/thoughts – we would be happy to sign an NDA to review the financials with the ultimate hope of submitting a non-contingent offer for the family's consideration.
We would also be happy to provide references to sellers who could attest to the Gorjian's competitiveness and ability to close expeditiously.

Looking forward.

Best regards,


**Jeremy Nazarian** | Partner
d: +1 (646) 863 1433
m: +1 (516) 510 0941
jeremy@lyncrestadvisors.com



LynCrest

****************************Important Notice ****************************
This email and any files transmitted with it are confidential and may be subject to the attorney-client or other privileges. Use or disclosure of this email or any such files by anyone other than the intended recipient is prohibited. If you are not the intended recipient, please notify the sender immediately and delete this message from your system.

****************************Important Notice ****************************
This email and any files transmitted with it are confidential and may be subject to the attorney-client or other privileges. Use or disclosure of this email or any such files by anyone other than the intended recipient is prohibited. If you are not the intended recipient, please notify the sender immediately and delete this message from your system.

BR002138

EXHIBIT 1 PAGE 60

**Michael Sklar**

Andrew K. Glenn
Managing Partner
aglenn@glennagre.com
W: (212) 970-1601
M: (908) 581-3659

**GLENN AGRE**
**BERGMAN & FUENTES**

1185 Avenue of the Americas, 22nd Floor
New York, NY 10036

**From:** Jeremy Nazarian <jeremy@lyncrestadvisors.com>
**Sent:** Thursday, August 4, 2022 3:45 PM
**To:** Andrew K. Glenn <aglenn@glennagre.com>
**Subject:** 95 Madison Avenue // The Gorjian Family

**[EXTERNAL EMAIL]** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Andrew,

Nice speaking with you.

Per our conversation, the Gorjian family would like to make a deal with the ownership of 95 Madison with strong terms and a quick closing.

Given our nature, there is no bureaucracy in decision making. We are comprised simply of three sons, and a father who must give his blessing.
We simply need feedback on a price that will be acceptable for a deal. Following an accepted price and terms, we can review our diligence while negotiating the PSA in order to expedite the process.

Furthermore, our portfolio's leverage averages 50% meaning that we have the equity to close these types of vacant / value-add transactions with ease and without any financing contingencies.

1

To put your mind at ease, I would strongly recommend you call the seller of 192 Lexington Avenue which was a building they recently bought for $90mm. You can discuss the nature of the deal with her and hear it from the horse's mouth. The seller's name is Denise Caminite and she can be reached at 724-712-7562. I'll give her a heads up that you may call.

Please also note that I am not looking to collect any fee from your client.

If satisfactory to your client, we would like a time to come tour the building next week so that we can get the ball rolling. Thank you. Looking forward.

Best regards,

**Jeremy Nazarian** | Partner
d: +1 (646) 863 1433
m: +1 (516) 510 0941
jerem▬▬l▬ncrestadvisors.com

**LynCrest**

*******************************Important Notice *******************************
This email and any files transmitted with it are confidential and may be subject to the attorney-client or other privileges. Use or disclosure of this email or any such files by anyone other than the intended recipient is prohibited. If you are not the intended recipient, please notify the sender immediately and delete this message from your system.

BR002140

EXHIBIT 1 PAGE 62

| From: | Michael Sklar <msklar@ninetyfivemadison.com> |
| --- | --- |
| Sent: | Wednesday, August 31, 2022 8:09 PM |
| To: | 'Woody Heller' |
| Cc: | Fleming, Thomas J.; Sharan Sklar |
| Subject: | FW: 95 Madison sale / net lease |
| Attachments: | 95 Madison Atlas  LOI Sale 07_06_21.pdf; 95 madison Atlas 052421.pdf; Atlas 95 Madison Avenue Partner _LOI_07-19-21.pdf |

Woody :

Rita Spoke to Jeffrey Goldberger . I did as well .

Broker is Andrew Sasson

Asasson = ACkmanziff.com.

212-944-8739
516-286-5312

Please follow up.


**Michael Sklar**
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.


**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar = ninet.fivemadison.com

A little green reminder: Please consider the environment before printing this email



REORGANIZED
DEBTOR'S
EXHIBIT

DX0008

EXHIBIT
M.Sklar

BR002149

1

EXHIBIT 1 PAGE 63



40 West 57th Street
29th Floor
New York, NY 10019

Phone 212.554.2250
Fax 212.554.2263

July 6, 2021

Ms. Rita Sklar
95 Madison Avenue
Room 1201
New York, NY 10016

RE:     **89-95 Madison Avenue, Manhattan, NY known as "The Emmet Building"**

Dear Rita:

This is a letter of intent designed to express the terms of a possible agreement between the owners of the property referenced above ("Seller") and Atlas Capital Investors VI, L.P. or an affiliate thereof ("Purchaser") with respect to a fee interest in the property referenced below.

| | | |
|---|---|---|
| 1) | Purchaser: | Atlas Capital Investors VI, L.P. (or an affiliate thereof). |
| | | Atlas Capital Investors VI, L.P. is a sponsor equity fund of Atlas Capital Group, LLC ("Atlas"). Atlas is a full-service real estate investment, development and management firm. The firm was founded in 2006 to invest in opportunistic and value-added real estate transactions in core gateway cities, with a primary focus on New York and Los Angeles. Atlas' portfolio consists of over $5.0 billion of residential, office, and retail real estate assets. In-house disciplines include construction, leasing, development, asset management, property management, accounting, financial analysis and legal. |
| 2) | Property: | 89-95 Madison Avenue, located in Manhattan, NY, containing approximately 146,000-sf. |
| 3) | Purchase Price: | $85,000,000, All Cash for a 100% fee simple interest in the Property. No financing contingency. |

BR002150

EXHIBIT 1 PAGE 64

4)      Timing & Deposit:      Purchaser is immediately prepared to enter into a binding Purchase and Sale Agreement ("PSA"). Purchaser shall post a non-refundable deposit of $4,250,000 ("Deposit") into escrow with Fidelity National Title Company upon the execution of the PSA by both Purchaser and Seller.

5)      Closing:      Closing shall occur by December 31, 2021. To accommodate any tax planning relating to the sale that the Seller might want to structure, Seller shall have the right to set the closing date anytime within that period with 30 days prior notice to the Purchaser.

6)      Assignment:      Purchaser may assign its rights under the PSA to a Purchaser Affiliate. The term "Purchaser Affiliate" shall mean any corporation, limited liability company or other legal entity controlling, controlled by, or under common control of Purchaser or any affiliate.

7)      Condition of Premises:      Purchaser shall accept the Property as-is, where is, with all faults, except to the extent expressly provided otherwise in the Purchase & Sale Agreement.

8)      Brokerage Commission:      Purchaser shall be responsible for any brokerage commission due to Ackman Ziff pursuant to a separately executed brokerage commission agreement.

9)      Non-Binding Letter of Intent:      This document is a non-binding Letter of Intent, it does not purport to include all the material terms of the proposed transaction, and should not be construed as a binding or final purchase offer or commitment.

Please do not hesitate to contact me directly at (212) 554-2255 with any questions or comments you may have. Thank you for your consideration.

Very truly yours,

ATLAS CAPITAL GROUP, LLC.

By: _____

Jeffrey A. Goldberger
Principal

BR002151

EXHIBIT 1 PAGE 65



450 Park Avenue, 4th Floor
New York, NY 10022

Phone 212.554.2250
Fax 212.554.2263

May 24, 2021

Mr. Andrew Sasson
Ackman-Ziff
711 Third Avenue, 11th Floor
New York, NY 10017

RE:     89-95 Madison Avenue, Manhattan, NY (known as "The Emmet Building")

Dear Mr. Sasson:

This is a letter of intent designed to express the terms of a possible agreement between the owners of the property referenced above ("Seller") and Atlas Capital Investors VI, L.P. or an affiliate thereof ("Purchaser") with respect to a fee interest in the property referenced below.

| | | |
|---|---|---|
| 1) | Purchaser: | Atlas Capital Investors VI, L.P. (or an affiliate thereof). |
| | | Atlas Capital Investors VI, L.P. is a sponsor equity fund of Atlas Capital Group, LLC ("Atlas"). Atlas is a full-service real estate investment, development and management firm. The firm was founded in 2006 to invest in opportunistic and value-added real estate transactions in core gateway cities, with a primary focus on New York and Los Angeles. Atlas' portfolio consists of over $5.0 billion of residential, office, and retail real estate assets. In-house disciplines include construction, leasing, development, asset management, property management, accounting, financial analysis and legal. |
| 2) | Property: | 89-95 Madison Avenue, located in Manhattan, NY, containing approximately 146,000-sf. |
| 3) | Purchase Price: | $85,000,000, All Cash for a 100% fee simple interest in the Property. No financing contingency. |

BR002152

EXHIBIT 1 PAGE 66

4)   Timing & Deposit:   Purchaser is immediately prepared to enter into a binding Purchase and Sale Agreement ("PSA"). Purchaser shall deposit $4,250,000 ("Deposit") into escrow with Fidelity National Title Company upon the execution of the PSA by both Purchaser and Seller. The Deposit shall be fully refundable until expiration of the Due Diligence Period (as defined below), at which point the Deposit shall become non-refundable, subject to the terms of the PSA.

5)   Due Diligence:   The Due Diligence period shall be thirty (30) calendar days (the "Due Diligence Period"). The Due Diligence Period shall commence upon mutual execution of the PSA.

6)   Closing:   Closing shall occur thirty (30) days after the expiration of the Due Diligence Period.

7)   Assignment:   Purchaser may assign its rights under the PSA to a Purchaser Affiliate. The term "Purchaser Affiliate" shall mean any corporation, limited liability company or other legal entity controlling, controlled by, or under common control of Purchaser or any affiliate.

8)   Condition of Premises:   Purchaser shall accept the Property as-is, where is, with all faults, except to the extent expressly provided otherwise in the Purchase & Sale Agreement.

9)   Brokerage Commission:   Seller shall be responsible for Seller's broker representation pursuant to a separately executed brokerage commission agreement.

10)   Non-Binding Letter of Intent:   This document is a non-binding Letter of Intent, it does not purport to include all the material terms of the proposed transaction, and should not be construed as a binding or final purchase offer or commitment.

BR002153

EXHIBIT 1 PAGE 67

Please do not hesitate to contact me directly at (212) 554-2255 with any questions or comments you may have. Thank you for your consideration.

Very truly yours,

ATLAS CAPITAL GROUP, LLC.

By: _____
Jeffrey A. Goldberger
Principal

BR002154

EXHIBIT 1 PAGE 68



# Atlas Capital Group

Atlas Capital Group, LLC is a full service real estate investment, development and management firm. The firm was founded in 2006 to invest in opportunistic and value-added real estate transactions in core gateway cities, with a primary focus on New York and Los Angeles. Atlas' vertically-integrated team includes more than 100 professionals staffed across real estate disciplines, including construction, leasing, development, asset management, property management, accounting, and legal.

To date, Atlas has invested approximately $3.0 billion of equity in the United States across 55 office, retail, residential, hotel, industrial, and mixed-use real estate investments comprising approximately 9.0 million square feet and $5.4 billion of total capitalization.

The Founding Principals have been partners for 19 years and together have over 50 years of experience in the real estate industry in diverse roles including operator, developer, allocator, lender, and attorney.

Atlas' senior executives have been with the company for an average of 8 years and have an average of 17 years of experience in the industry.

Atlas has 100+ employees between its NYC and LA offices, representing all verticals necessary to operate our properties and to execute any business plan.

Atlas balances the investment strategy by being flexible across asset classes: Office, Residential, Industrial, and Retail, often in a Mixed-Use format.

Atlas Transaction History:

-58 Investments in the US

-10.7M square feet acquired and developed

In-house property operations, construction, and business plan execution through 100+ person team based locally in New York and Los Angeles

Atlas is competitively positioned to execute business plans ranging from light value-add to comprehensive adaptive re-use.

## HISTORICAL INVESTMENTS - NEW YORK METRO AREA

- 220 E. 63rd St.
- 100-104 5th Ave.
- 641-635 Sixth Ave.
- 845 West End Ave.
- Buckingham Hotel
- Alex Hotel
- Flatotel
- 249-255 W. 17th St.
- St. John's Center
- 218 W. 18th St.
- The Factory
- The Nash
- 434 Broadway
- 311 W. 43rd St.
- 422 W. 15th St.
- 24-02 Queens Plaza S.
- 225 W. 23rd St.
- 23-30 Borden Ave.
- 42 Crosby St.
- 325 Bowery
- 1604 Broadway
- 61-71 Wythe Ave.
- 548 W. 22nd St.
- 601 W. 110th St.
- 110 Leroy St.
- 15 Park Row



## HISTORICAL INVESTMENTS - LOS ANGELES METRO AREA

- Fourth & Traction
- 1215 E. 7th St.*
- Santa Fe Commerce Center*
- 788 S. Alameda St.*
- 1060 N. Vignes St.*
- Chinatown Station*
- Arts District Crossing*
- ROW DTLA*
- 1211 East Washington*
- 2640 Washington Blvd.*
- 2501 S. Santa Fe Ave.*
- 712 South Olive
- Westlake Village
- Valley Country Market
- 2030 East Maple Ave.
- 1845S S. Figueroa St.
- 912-9211 Oakdale Ave.
- 2000 East 8th St.
- 101 S. Marengo Ave.



BR002155

17

EXHIBIT 1 PAGE 69



CAPITAL GROUP

CONFIDENTIAL

<div align="center">

**JULY 19, 2021**

**SUMMARY OF PRINCIPAL TERMS**

</div>

*Set forth below is a summary of the principal terms of the proposed investment by the current owner of the Property ("Seller") and an affiliate of Atlas Capital Group LLC ("Atlas"), in the approximately 146,000 sf office and retail building located at 95 Madison Avenue, New York, NY (the "Property").*

*This term sheet is not a binding investment offer and does not create any obligation on Seller or Atlas. Neither Seller nor Atlas shall have any obligation with respect to the matters set forth in this term sheet until such time as Seller and Atlas have entered into a definitive written purchase and sale agreement with terms acceptable to both Atlas and Seller in the sole and absolute discretion of each.*

| | |
|---|---|
| **The Property:** | The Property consists of the land and improvements located at 95 Madison Avenue, New York, NY |
| **Atlas Capital Group LLC:** | Atlas Capital Investors VI, L.P. (or an affiliate thereof). |
| | Atlas Capital Investors VI, L.P. is a sponsor equity fund of Atlas Capital Group, LLC ("Atlas"). Atlas is a full-service real estate investment, development, and management firm. The firm was founded in 2006 to invest in opportunistic and value-added real estate transactions in core gateway cities, with a primary focus on New York and Los Angeles. Atlas' portfolio consists of over $5.5 billion of residential, office, and retail real estate assets. In-house disciplines include construction, leasing, development, asset management, property management, accounting, financial analysis and legal. |
| **Investment:** | Atlas is proposing to purchase a forty-nine (49.0%) percent, controlling ownership interest of the Property outlined in the "Investment Capitalization" section below. Pursuant to Atlas's Investment, Atlas and Seller will form a new venture ("Investment JV") for the purpose of owning the Property. |
| **Timing:** | Target closing date of September 30, 2021. To be further discussed. |
| **Investment Capitalization:** | The imputed purchase price for the Property shall be calculated as if the Investment JV were acquiring a one-hundred (100%) percent interest in the Property for a price of $90,000,000. At closing, Atlas shall pay Seller approximately $44,100,000 for a forty-nine (49%) percent ownership interest in the Venture. Seller shall use the proceeds to pay off any liens existing at the time of closing so that the property is contributed to the Venture lien and debt free. |

BR002156

EXHIBIT 1 PAGE 70

| | |
|---|---|
| **Financing:** | Atlas will immediately endeavor to finance the property to provide for all the capital required to reposition the building and to lease the vacant space. It is estimated the property will need approximately $25,000,000 for base building improvements and future tenant improvements. The debt facility will also provide the necessary capital required for leasing commissions, building carrying costs, and interest expense for the loan. Seller shall not be obligated to sign on to any recourse guaranties as a part of any financing obtained by Atlas. |
| **Investment JV Contributions and Distributions:** | It is anticipated that there will be no need for additional equity contributions to develop the property above the contemplated debt facility. However, if required, Seller shall have no obligations to fund its pro-rata share of future capital calls after the Closing; however, should Seller forego funding, its pro-rata ownership interest will be diluted proportionately and non-punitively based on the total equity capital contributed by the members in the aggregate. |
| | Seller though shall always have the right to participate in its pro-rata share of future capital calls regardless of participation in prior calls at their discretion. |
| | Any net distributable cash flow shall be distributed pro rata to Seller and Atlas in accordance with their respective ownership percentage interests. |
| **Reporting:** | Atlas, on behalf of Investment JV, shall provide to Seller customary reporting for an investment of this nature, including but not limited to the following: |

Property Level Reporting:

- Monthly reports in respect to the Property to include an unaudited balance sheet, income statement, equity statement, cash flow statement and activity write-up & material variance explanation as well as associated commentary within thirty (30) days following the end of each calendar month and the end of each calendar quarter and sixty (60) days following the end of each fiscal year.
- Any tax returns and information to be delivered to Investment JV ninety (90) days following the end of each fiscal year. Atlas will ensure timely filing of all requisite federal, state and local tax filings unless timely extensions of time to file are obtained.
- Copy of all compliance certificates issued to the lender(s) under any debt financing, such certificates to be provided to Seller within five (5) business days after delivery to lender(s).
- All financial statements reference herein will be prepared on the basis of accounting used for federal income tax purposes, which is a basis of accounting other than accounting principles generally accepted in the United States of America.
- A certified rent roll within forty-five (45) days after each calendar quarter.
- Any other information as reasonably requested by Seller.

2

BR002157

EXHIBIT 1 PAGE 71

- Seller and Atlas pre-approve Mazars USA, LLP for all tax compliance and assurance services.

Investment JV Reporting:

- Quarterly reports to include an unaudited balance sheet, income statement, equity statement, cash flow statement and activity write-up & material variance explanation as well as associated commentary within forty-five (45) days following the end of each calendar quarter and ninety (90) days following the end of each fiscal year.
- All financial statements reference herein will be prepared on the basis of accounting used for federal income tax purposes, which is a basis of accounting other than accounting principles generally accepted in the United States of America.
- A Leasing Summary/Status Report within forty-five (45) days after the end of each calendar month.
- Any other information as reasonably requested by Seller.

| | |
|---|---|
| **Closing Costs:** | Atlas and Seller will each be responsible for their respective legal and due diligence costs, and will share the cost of any new title policy associated with Atlas' investment. Additionally, Seller shall be responsible for paying additional costs such as transfer tax associated with the transaction. |
| **Non-Binding:** | This term sheet is not a binding investment offer and does not create (and shall not be construed as creating) any obligation on the part of Seller, current ownership, or any other party. Neither Seller, current ownership, nor any other party shall have any obligation with respect to the matters set forth in this letter of interest until such time as each of Seller and Atlas has entered into a definitive written purchase and sale agreement. |

Please do not hesitate to contact me directly at (212) 554-2255 with any questions or comments you may have. Thank you for your consideration.

Very truly yours,

ATLAS CAPITAL GROUP, LLC.

By: _____

Jeffrey A. Goldberger
Principal

3

| | |
|---|---|
| **From:** | Michael Sklar <msklar@ninetyfivemadison.com> |
| **Sent:** | Wednesday, August 31, 2022 4:27 PM |
| **To:** | Woody Heller |
| **Cc:** | Sharan Sklar |
| **Subject:** | Micah Zimmerman- Broker 95 Madison. |

Woody :

Please contact Micah   I have had no discussions with him regarding the property. He has not toured the property .

**Michael Sklar**
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.

**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar@ninet fivemadison.com

 A little green reminder: Please consider the environment before printing this email

**From:** Zimmerman, Micah <Micah.Zimmerman@elliman.com>
**Sent:** Wednesday, August 31, 2022 3:53 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** Re: Connection

Hi Michael,

I'm in touch with a potential buyer for 95 Madison. Are you available for a call tomorrow afternoon to discuss putting a deal together

Best,
Micah

On Aug 18, 2022, at 1:58 PM, Michael Sklar <msklar@ninet fivemadison.com> wrote:

When submitted to court NP

**Michael Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar@ninet fivemadison.com

 A little green reminder: Please consider the environment before printing this email

1



**REORGANIZED DEBTOR'S EXHIBIT**

**DX0009**

EXHIBIT
M. Sklar
R   10/18/4

BR002254

EXHIBIT 1 PAGE 73

**From:** Zimmerman, Micah <Micah.Zimmerman█elliman.com>
**Sent:** Thursday, August 18, 2022 1:29 PM
**To:** Michael Sklar <msklar█ninet_fivemadison.com>
**Subject:** Re: Connection

Wonderful,

Since the demise was overstated can you send the contact information of the representative.

Best,
Micah

On Aug 17, 2022, at 10:13 AM, Michael Sklar <msklar█ninet_fivemadison.com> wrote:

The demise of the representative is greatly overstated.

**Michael Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar█ninet_fivemadison.com

 A little green reminder: Please consider the environment before printing this email

**From:** Zimmerman, Micah <Micah.Zimmerman█elliman.com>
**Sent:** Wednesday, August 17, 2022 10:09 AM
**To:** Michael Sklar <msklar█ninet_fivemadison.com>
**Subject:** Re: Connection

Hi Michael,

Jonathan had mentioned that the representative that was going to be hired is no more. If you have some time Thursday afternoon it would be great to schedule a call to see how either my team or Douglas Elliman can help hurry this process and get the building sold.

Best,
Micah



**MICAH ZIMMERMAN**
LICENSED REAL ESTATE SALESPERSON
DOUGLAS ELLIMAN REAL ESTATE
OFFICE: 212.350.8500
MOBILE: 336.501.0882
Micah.Zimmerman█elliman.com
575 MADISON AVENUE, NEW YORK, NY 10022
MY LISTINGS

2

BR002255

EXHIBIT 1 PAGE 74

FACEBOOK / TWITTER / YOUTUBE / INSTAGRAM / LINKEDIN
*CLICK HERE* NYS HOUSING DISCRIMINATION DISCLOSURE NOTICE & FORM
*CLICK HERE* NYS TENANTS' RIGHTS TO REASONABLE ACCOMMODATIONS FOR PERSONS WITH DISABILITIES
At Douglas Elliman, we won't ask you for your social security number, bank account or other highly confidential informatio
email. *Wire Fraud is Real*. Before wiring ANY money, call the intended recipient at a number you know is valid to confirm
instructions. Additionally, please note that the sender does not have the authority to bind a third party to a real estate cont
written or verbal communication.

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender
immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute t
without the author's prior permission. We will never send or ask for sensitive or non-public information via e-mail, including
account, social security information or wire information. We have taken precautions to minimize the risk of transmitting sof
viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liabil
any loss or damage caused by software viruses. The information contained in this communication may be confidential and
subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic m
from us in the future then please respond to the sender to this effect. Please note that any views or opinions presented in
mail are solely those of the author and do not necessarily represent those of the Company.

Douglas Elliman may engage a third party vendor to answer telephone, email, text, and internet inquiries. This vendor act s
agent for Douglas Elliman, and keeps all information confidential.

> On Aug 12, 2022, at 5:37 PM, Michael Sklar <msklar_ninet_fivemadison.com> wrote:
>
> Micah:
>

# > We are in the process of hiring a representative . I will put you in contact when deal is signed .

>
> Michael Sklar
> General Partner
>
> Ninety-Five Madison Company, L.P.
> 917.270.6083 (c) | Msklar_ninet_fivemadison.com
> Π A little green reminder: Please consider the environment before printing this email
>
> -----Original Message-----
> From: Jonathan Zimmerman <jonathan.zimmerman_mac.com>
> Sent: Friday, August 12, 2022 5:34 PM
> To: Micah Zimmerman <Micah.Zimmerman_elliman.com>; Michael Sklar
<msklar_ninet_fivemadison.com>; Sharan Sklar <ssklar_ninet_fivemadison.com>
> Subject: Connection
>
> Dear all,
>
> Please now be in direct contact so that Micah can be put into contact with the person
managing the sale of 95 Madison at the right time.
>
> Best,
>
>
> Jz
>
> *******************************
> Jonathan Zimmerman
> Tel (IT): +393470730610
> Tel (UK): +447960247801

EXHIBIT 1 PAGE 75

> Tel (USA): +19174145476
>

BR002257

EXHIBIT 1 PAGE 76

| | |
|---|---|
| **From:** | Michael Sklar <msklar@ninetyfivemadison.com> |
| **Sent:** | Monday, September 12, 2022 12:04 PM |
| **To:** | Woody Heller |
| **Cc:** | Sharan Sklar; Fleming, Thomas J.; Rita Sklar; Rita Ipad Sklar; Andrew K. Glenn |
| **Subject:** | 95 Madison - Sale net lease - Shel Capital |
| **Attachments:** | Sale 95 Madison.xlsx; Shell_Capital_Via_Emanuel 042722.pdf; SJS MLS EW Shell_Capital_Via_Emanuel 042822.pdf |

Woody :

I updated the spreadsheet to include Shell capital . Also attached is proposal & email .

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.
917.270.6083 (c) | Msklar@ninetyfivemadison.com

 A little green reminder: Please consider the environment before printing this email



REORGANIZED
DEBTOR'S
EXHIBIT

DX0010

BR002123

EXHIBIT 1 PAGE 77

# SHEL CAPITAL &
# BLUESTONE INVESTMENTS

275 West 39th Street, Suite 1406
New York, NY 10018

Attention: Emanuel Westfried

Dear Emanuel,

Attached please find an outline detailing our offer and intention to acquire 95 Madison Avenue.

### 1. Description of Purchaser

**Shel Capital** – The firm was founded by Jonathan Bakhash and Rony Kravel. The company owns and operates 30+ buildings in New York City. Jonathan and his family have been active in the NY real estate market for 40 years and own 1MM sf of office space in Manhattan. Some of these office buildings include 276 5th Ave, 129 West 35th Street, 29 West 40th street, 145 West 28th Street and 27 west 90th street. Separately, the owners of the company also have a management and leasing arm. Combined they represent over 500 buildings and 16,000 units in New York.

**Bluestone Investments:** The partnership was founded by Meir Sagi, Nir Livnat, Jonathan Gaunk and Yonatan Binman. The partners own and operate over $1 billion of real estate between the US, UK, Greece and Israel. With over 70 years of collective experience, the team has a proven track record in investments ranging from income generating real estate projects to financially structured instruments (both debt and equity) in capital markets globally, as well as investments in shipping and in green-energy projects. The group has invested and developed unique iconic real estate projects across the world with major footprints in the U.S. London, Greece and Israel.

### 2. Purchase Price:
    a. Option A – Purchase the leasehold position. Terms as follows:
        i. Term – 99 years
        ii. $14,000,000 to be paid at closing
        iii. Payment terms of the lease
            1. Year 1&2 - $0
            2. Year 3+ - $3,490,000 growing at 10% every 5 years. ("CPI lookback every 10 years no greater than 2.5%)

    b. Option B – Purchase the fee simple interest for $100,000,000

EXHIBIT 1 PAGE 78

## 3. Underwriting and Capital Assumptions

It is our intention to redevelop 93 Madison into one of the premier boutique office buildings downtown. We anticipate the construction work to take one full year from closing and plan to invest over $40,000,000 in Hard Costs. We have already reviewed and discussed with our consultants to underwrite our business plan. These consultants include:

- Howard Zimmerman Architects and Engineers, DPC. (For Landmarks)
- Brad Zizmor, A+I (Architect and Designer)
- Peter Bernstein, Alexander Wolf and Son (Contractor)
- Chris Spano CJS Builders (Contractor)
- Various Leasing Experts

## 4. Deposit Amount(s) Including Hard Deposit Amount at Contract Signing

Purchaser shall deposit with the Seller's escrow agent 10% of the purchase price upon the signing of the Agreement. Any accrued interest thereon will be applied to Purchase Price at closing. In the event that the Purchaser fails to execute the acquisition of the Property pursuant to the terms of the Agreement, the Deposit will be non-refundable and deemed liquidated damages for the benefit of the Seller.

## 5. Closing Contingencies

None

## 6. Internal Approval Process

Approved

## 7. Closing

Both parties shall endeavor to close on the Property within 60 days or when the Agreement is executed with a clean title.

## 8. Access to Property

During the period in which the Agreement is in effect, Purchaser shall have reasonable access to the Property for the purpose of conducting inspections and studies as the Purchaser may deem necessary.

Should the aforementioned general terms and conditions be acceptable please so indicate by executing this letter in the space provided below as Seller and return the same to Purchaser.

Sincerely,

*Barry Kraus*

Barry Kraus
Principal
1/27/2021

EXHIBIT 1 PAGE 79

EXHIBIT 1 PAGE 80

| Guarantor Name | WC Jayal Sons LLC | Centro Maryland Imperia | Various Injection Industries | Altitmade Properties | Withinside Properties | Finova Financial Group LLC. |
|---|---|---|---|---|---|---|
| Guarantor Address | 406 Park Avenue New York / New York 10022 | 421 Greenwich Street, New York, New York 1001 | 421 Greenwich Street, New York, New York 1001 | 1430 Broadway, New York, New York 10015 | 1430 Broadway, New York, New York 10018 | 1410 Avenue of America New York |
| Contact | Philip Wilkerson III | Oliel Ingersyan | E Lot Ingersvin | Jill-a Salwin | E le Schwarz | Andrew Dibrom |
| Guarantor Telephone Number | 213-234-7477 | 212-234-7477 | 212-245-7477 | 212-743-2400 | 212-742-2800 |  |
| Broker | Hanley Dotion | Hanley Dotion | Hanley Dotion | Hanna Sawson | Hanna Sawson | Har-y Diston |
| Brokerage Firm | Faull System | Faull Gechst | Faull Gechst | Bim properties LLC | Raw properties LLC | Faull Sechst |
|  |  |  |  |  |  | BI I44 System |
| Address | 40 West 57th street / 2nd floor | 40 West 57th street / 2nd floor | 40 West 57th street / 3rd floor | 1440 Broadway, Suite 1603, New York, New York 10018 | 1440 Broadway, Suite 1615, New York, New York 10018 | 40 West 57th street / 3rd floor |
| By whom |  |  |  |  |  |  |
| Bid date | 2/14/2011 | 8/2/2011 | 2/15/2011 | 6/27/2011 | 2/24/2011 | 6/1/2011 |
| Term 1.5 bwati | $73,000,000 | $73,000,000 | $67,500,000 | $90,000,000 | $70,000,000 | $70,000,000 |
| Purchase price to Market | 100.00% | 100.00% | 90.00% | | 77.78% | |
| Commission fee on | $4,630,000 | $5,300,000 | $4,050,000 | $2,00 | $0.00 | Purchaser |
| Net | $67,680,000 | $70,600,000 | $63,450,000 | $90,000,000 | $70,000,000 | |
| Brokerage by Guarantor | Net market / source value | Net market / source value | Net market / source value | Buyer | Buyer | |
| Gross SF | | | | | | |
| 13 / Lost Conversion St | | | | | | |
| Non Refundable deposit | $3,000,000 | | | | | $3,500,000 cash |
| Deposit of currency fee | 3.00% | | | | | 5 Days |
| Additional deposit at end of due dil | $3,000,000 | | | | | |
| Mid part | | | | | | |
| Timing | Due diligence w/ 6 see exec PSA | | Exhauer PSA | | | 12) Days following execution 45 day due diligence |
| Exclusive period | | | 60 days | 120 | 120 | 30 days |
| Closing | 60 days after PSA cost after to fully involvement | | | | 90 days will 2.60 day extension with a days notice and additional $500,000 deposit | during 120 days |
| Financing terms | By also buyer in a Bankruptcy (verm) | | | | | |
| Early negotiation of every | Tree a 4 ucon to free | | | | | |
| Standstill period | | | | | 43 days | 43 days |
| Reverse to exempt AS-II | | | | | | |
| Renewal replacement reserve | | | | | Kind with no reserve | |
| Free and clear of liens | | | | | | |
| Free and clear if no addition | | | | | Name the abnormal | |

| Expressed interest | Company | Contact | tel # | Mobile | Email | |
|---|---|---|---|---|---|---|
| 1 | Evolutron advisors | Jerry Nasaran | 646-863 1433 | 518-510 0941 | jnasaray@sportsfieldadvisors.com | Contacted Antonio Glenn. I did not speak to him. He did not tour building. |
| 2 | Kaufman Investments | Michael Kazmerski | 212-471-4323 | | mkazmerski@kaufmanorganization.com | Toured building with MLS. No proposal |
| 3 | | Mohyan | | | | He toured with Rami Bassili. No proposal |
| 4 | Douglas Illiman | Mitch Zimmerman | 212 350 8500 | 336 301 0862 | Mitch.Zimmerman@elliman.com | is my cousins son. I did not tour building. I did not discuss the building with him |
| 5 | Two Birds Capital | Emanuel Westphac | | 917 282 8726 | emanuel@twobirdscapital.com | |
| 6 | ILL Capital markets | Harry Hochman | 212 949 0655 | 636 618 3642 | Harry Hochman@am.jll.com emalto:Harry Hochman@am.jll.com> | |

| Floors | Useable | Loss factor | Rentable | Useable | Useabel mezzanine | Useable cellar | Source |
|---|---|---|---|---|---|---|---|
| Cellar | | | | | | 5113 | |
| Store corner | | | | 2858 | | | |
| Store Center | | | | 4061 | | | |
| Store Mezzanine | | | | | 850 | | |
| 2 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 3 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 4 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 5 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 6 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 7 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 8 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 9 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 10 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 11 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 12 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 13 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 14 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 15 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 16 | 7666 | 27% | 10501 | | | | The Phillips group 1 |
| | | | | | | | |
| Totals | | | 159139 | 6919 | 850 | 5113 | |
| vert rentable ( irregular) | | 27% | | 9478 | 1164 | 7004 | |
| Totals | | | 159139 | 9478 | 1164 | 7004 | 176786 |

EXHIBIT 1 PAGE 83

03103

EXHIBIT 1 PAGE 84

| | |
|---|---|
| **From:** | u=Michael Sklar/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A3107E500DC94D07B57F2DE007E3F80F-MSKLAR |
| **Sent:** | Mon, 12 Sep 2022 12:03:46 -0400 (EDT) |
| **To:** | "Woody Heller" <woody.heller@outlook.com> |
| **Cc:** | "Andrew K. Glenn" <aglenn@glennagre.com>; "Rita Ipad Sklar" <ritasklar@aol.com>; "Rita Sklar" <ritasklar@gmail.com>; "Fleming, Thomas J." <TFleming@olshanlaw.com>; "Sharan Sklar" <ssklar@ninetyfivemadison.com> |
| **Subject:** | 95 Madison - Sale net lease - Shel Capital |
| **Attachments:** | SJS MLS EW Shell_Capital_Via_Emanuel 042822.pdf;Shell_Capital_Via_Emanuel 042722.pdf;Sale 95 Madison.xlsx |

Woody

I updated the spreadsheet to include Shell capital . Also attached is proposal & email

**Michael Sklar**
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
**Ninety-Five Madison Company, L.P.**
917.270.6083 (c) | Msklar@ninet.fivemadison.com
A little green reminder: Please consider the environment before printing this email



REORGANIZED
DEBTOR'S
EXHIBIT

DX0011

EXHIBIT
11   M Sklar
10/16/2...

NFMC-06612

EXHIBIT 1 PAGE 85

**Michael Sklar**

| | |
|---|---|
| **From:** | Sharan Sklar |
| **Sent:** | Saturday, September 10, 2022 9:33 PM |
| **To:** | Michael Sklar |
| **Subject:** | Re: List for Woody |

Mike,

I took a look at the list you gave woody of proposals. It does not look like you included Emanuel's people. This is what I have in email. I do not Have the Shel Proposal, just the proof of funds.
s.


Chris Okada

Kevin Fallon
Principal & Managing Director
L&L HOLDING COMPANY
142 West 57th Street, New York, NY 10019
Email: Kevin.Fallon⬚ll-holdin⬚.com | Tel: 212-920-3369
www.ll-holdin⬚.com



**From:** Rony Kravel <ron⬚⬚shelca⬚ital.com>
**Date:** April 28, 2022 at 8:38:55 AM EDT
**To:** Emanuel Westfried <emanuelwestfried⬚aol.com>
**Cc:** Yonatan Binman <⬚onatan⬚bluestone-inv.com>, Jon Bakhash <⬚on⬚shelca⬚ital.com>
**Subject: 95 Madison Offer**

Emanuel,
Good morning. Attached please find our offer to lease/acquire the interest at 95 Madison. Yonatan will separately send you proof of funds directly. We look forward to working with you on this transaction. Thank you.


--
Regards,
Rony Kravel

Principal
Shel Capital
646-214-0381

1

**NFMC-06613**

EXHIBIT 1 PAGE 86

**-- Sharan Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
 212.979.6306 (c) | ssklar@ninetyfivemadison.com

2

**NFMC-06614**

EXHIBIT 1 PAGE 87

# SHEL CAPITAL &
# BLUESTONE INVESTMENTS

225 West 35th Street, Suite 1400
New York, NY 10001

Attention: Emanuel Westfried

Dear Emanuel,

Attached please find an outline detailing our offer and intention to acquire 95 Madison Avenue.

1. **Description of Purchaser**

   **Shel Capital** – The firm was founded by Jonathan Bakhash and Rony Kravel . The company owns and operates 30+ buildings in New York City. Jonathan and his family have been active in the NY real estate market for 40 years and own 1MM+ sf of office space in Manhattan. Some of these office buildings include 276 5th Ave, 225 West 35th Street, 29 west 30th street, 145 West 28th Street and 23 west 20th street. Separately, the owners of the company also have a management and leasing arm. Combined, they represent over 500 buildings and 15,000 units in New York.

   **Bluestone Investments:** The partnership was founded by Mor Sagi, Nir Livnat, Jonathan Douek and Yonatan Binman. The partners own and operate over $1 billion of real estate between the US, UK, Greece and Israel. With over 70 years of collective experience, the team has a proven track record in investments ranging from income generating real estate projects to financially structured instruments (both debt and equity) in capital markets globally, as well as investments in shipping and in green-energy projects. The group has invested and developed unique iconic real estate projects across the world with major footprints in the U.S, London, Greece and Israel.

2. **Purchase Price:**
   a. Option A – Purchase the leasehold position. Terms as follows:
      i. Term – 99 Years
      ii. $14,000,000 to be paid at closing
      iii. Payment terms of the lease:
         1. Year 1&2 - $0
         2. Year 3+ - $2,050,000 growing at 10% every 5 years. (CPI lookback every 10 years no greater than 2.5%)

   b. Option B – Purchase the fee simple interest for $100,000,000

NFMC-06615

EXHIBIT 1 PAGE 88

### 3. Underwriting and Capital Assumptions

It is our intention to redevelop 95 Madison into one of the premier boutique office buildings downtown. We anticipate the construction work to take one full year from closing and plan to invest over $40,000,000 in Hard Costs. We have already reviewed and discussed with our consultants to underwrite our business plan. These consultants include:

- Howard Zimmerman Architects and Engineers, DPC. (For Landmarks)
- Brad Zizmor , A + I (Architect and Designer)
- Peter Bernstein, Alexander Wolf and Son (Contractor)
- Chris Spano CJS Builders (Contractor)
- Various Leasing Experts

### 4. Deposit Amount(s) including Hard Deposit Amount at Contract Signing

Purchaser shall deposit with the Seller's escrow agent 10% of the purchase price upon the signing of the Agreement. Any accrued interest thereon will be applied to Purchase Price at closing. In the event that the Purchaser fails to execute the acquisition of the Property pursuant to the terms of the Agreement, the Deposit will be non-refundable and deemed liquidated damages for the benefit of the Seller.

### 5. Closing Contingencies

None

### 6. Internal Approval Process

Approved

### 7. Closing

Both parties shall endeavor to close on the Property within 60 days or when the Agreement is executed with a clean title.

### 8. Access to Property

During the period in which the Agreement is in effect, Purchaser shall have reasonable access to the Property for the purpose of conducting inspections, and studies as the Purchaser may deem necessary.

Should the aforementioned general terms and conditions be acceptable, please so indicate by executing this letter in the space provided below as Seller and return the same to Purchaser.

Sincerely,

*Rony Kravel*

Rony Kravel

Principal

4/27/2022

NFMC-06617

| Purchaser Name | NFMC | Atlas Ca...l Grou... | Savannah | GOG | WC ac...uisitions LLC | Tribecca Investment...arties | Innovo Pr...erties Gro... | RE LLC | Nightingale Properties | Jhell Capital & Bluestone Investment |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchaser Address | | 60 West 57th Street, New York New York 10019 | 430 Park Avenue 12th fl, New York, New York 10022 | 407 Broom Street, New Yor... New York 10013 | Park Avenue  New York , New York 10022 | 21 Greenwich street, New York New York 10013 | 1370 Avenue of the Americas | | 1430 Broadway, New York New York 10018 | 35 West 35th Street New York , New York 10001 |
| ...tact | | Jeffr... Goldberger | Christopher Schlank | 100 V...LEYVA | Phillip Waterman St | Elliot Ingerman | Andrew Ch... | | Elie Schwartz | ...on  Fravel |
| Purchaser te...hone Number | | 212-544-7750 | 212-229-0501 | 212-235-0890 | 212-224-7477 | 212-224-7477 | | | 212-742-3800 | |
| Broker | | Andrew Sasson | Hans...Dalton | Hans...Dalton | Hans...Dalton | Hans...Dalton | Hans...Dalton | | Rema Bassekal | Manuel Westfried |
| Broker ...e Firm | | Ackerman-277 | Eastil Secured | Eastil Secured | Eastil Secured | Eastil Secured | Eastil Secured | | RBM properties LLC | Levo Bros Co. Rat LLC |
| Broker tele...Fone | | 212-964-8799 | 917-414-0935 | 917-414-0935 | 917-414-0935 | 917-414-0935 | 917-414-0935 | | | 917  782-8226 |
| Broker email | | | | | | | | | | |
| ...ddress | | 711 3rd Avenue , New York  New York 10017 | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | | 1430 Broadway, suite 1601, New York, New York 10018 | 45 Madison Avenue, 2nd floor  NY  NY 10021 |
| ...Oi Date | | 7...2021 | ...15 2022 | ...15/2022 | ...15...022 | ...1...022 | ...1..2022 | | ...15/2022 | ...15 2022 |
| Total ...$ SPA | | $85 000 000 | $97...00 000 | $97 500 000 | $97 500 000 | $97 500 000 | $57 500 000 | | $0.00 | ...300...0 000 |
| ...mission % OR | | | 850 000 | 0 | $ 650,000 | $ 650,000 | | | $97 500 000 | |
| ...ao | | 85,000,000 | 9...50 000 | 97 500 000 | 99  650 000 | $93 650 000 | | | 97 500 000 | |
| Broker...t.b. Purchaser | | B - Purchaser | Seller | Purchaser | Not indicated assume seller | Not indicated assume seller | Purchaser | | B - sel | |
| Gross SF Rentable | 86 @ 27% loss fa | 143 000 | 18...837 | 167 000 | | | | | | |
| SF...met... based on SF | | 582 19 | $501 82 | 583 83 | | | | | | |
| Fee Refundable de-osit | | 250 000 00 | 1..000 000 | 3 500 000 | 600 000 | | 3 500 000 00 | | | 10,000 000 |
| Fe osit out of ...urchase | | 5.00% | 10 30% | 3.55% | 3 69% | 0.00% | 3.55% | 0.00% | | 10 00% |
| Additional de-osit at end of due dil...ance | | | | | | | | | | |
| ...ll Cash | | All Cash | | | | | | | | |
| ...osit | | Immediate PSA | | 45 days extend by 30 days for $MM | Due diligence 60 d...n after PSA | 60 after PSA | 45 D...Due diligence , 90 da...a | | | |
| ...adue ...eriod | | | 60 d... standstill then PSA | | | 60 d... | | | 10 days with 2 20 day extension with 3 days notice  with additional  500,000 ...eposit | 12... |
| ...o ...m | | | | | 80 days after PSA with One 10-dy ad ourinment  by Seller (not is a  Bankrupcy ? Var... | | 120 D... following execution | | | |
| ...transfer taxes | | | | | | | | | | |
| deliver free and clear of liens | | | | free and clear of liens | free and clear of liens | | | | | |
| ...tandstill...eriod | | | | | | | | | | |
| ...roperty...acci.ied AS is | | Pr...rty accepted as is | | | | | | | | 5 da... |
| tenant...ia le base rent | | | | | | | | | | ...base Vitra not ...xtco |
| tenant ...ia le base rent | | | | | | | | | | |
| free and clear of liens | | | | | | | | | | |
| free and clear of violation | | | | | | | | | | ...here are violations |
| ...otes | | Quote is old  I spoke to Jeffrey Goldsinger week ending 2/20/22. He confirmed that he s still interested  He indicated that he would purchase for 90 MM. Update quote sent . He wants family to resolve issues . The quoted rentable square footage is low. I discussed issue of the rentable 30 Indicated he has done his due dili ance | ...ere are requesting a standstill period for due diligence  pending ...  purchase and sale agreement. ... PSA 60 days | | | | | | | | ...st to cure ...lations at 135 %. ...Raw work ...standst...e | ...ost to cure violations at ...25 % , Local law work ...standstill |

| | WC acquisitions LLC | Tribecca investment properties | Tribecca investment properties | Nightingale Properties | Nightingale Properties | Innovo Properties Group RE LLC |
|---|---|---|---|---|---|---|
| Purchaser Name | | | | | | |
| Purchaser Address | 400 Park Avenue New York , New York 10022 | 321 Greenwich street, New York , New York 10013 | 321 Greenwich street, New York , New York 10013 | 1430 Brodaway , New York, New York 10018 | 1430 Brodaway , New York, New York 10018 | 1370 Avnenue of the Americas |
| Contact | Philip Waterman III | Elliot Ingerman | Elliot Ingerman | Elie Schwartz | Elie Schwartz | Andrew Chung |
| Purchaser telephone Number | 212-224-7477 | 212-224-7477 | 212-224-7477 | 212-742-2800 | 212-742-2800 | |
| Broker | Harley Dalton | Harley Dalton | Harley Dalton | Rama Bassalali | Rama Bassalali | Harley Dalton |
| Brokerage Firm | Easdil Secured | Easdil Secured | Easdil Secured | RBM properties LLC | RBM properties LLC | Easdil Secured |
| Telephone Number | | | | | | 917-414-0935 |
| | | | | | | hdalton@ eastdilsecured.com |
| Address | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | 40 West 57th street , 23rd floor | 1430 Broadway, suite 1605, New York, New York 10018 | 1430 Broadway, suite 1605, New York, New York 10018 | 40 West 57th street , 23rd floor |
| Website | | | | | | |
| LOI Date | 2/15/2022 | 6/2/2021 | 2/15/2022 | 6/23/2021 | 2-5-2022 | 6/3/2021 |
| Total  $ MM | $72,000,000 | $75,000,000 | $67,500,000 | $90,000,000 | $70,000,000 | $70,000,000 |
| Reduction due to Market | 100.00% | | 90.00% | | 77.78% | |
| Comission @ .06 | $4,320,000 | $4,500,000 | $4,050,000 | $0.00 | $0.00 | Purchaser |
| Net | $67,680,000 | $70,500,000 | $63,450,000 | $90,000,000 | $70,000,000 | |
| Brokerage by Purchaser | Not indicated assume seller | Not indicated assume seller | Not indicated assume seller | Buyer | Buyer | |
| Gross Sf | | | | | | |
| SF ( net ) baased on SF | | | | | | |
| Non Refundable deposit | $3,600,000 | | | | | $3,500,000.00 |
| Deposit pct of purcahse | 5.00% | | | | | 5.00% |
| additionl deposit at end of due dil | $3,600,000 | | | | | |
| All Cash | | | | | | |
| Limin | Due diligance 60 days after PSA | | 60 after PSA | | | 120 Days following execution. 45 day due diligance |
| exclsive period | | | 60 days | 120 | 120 | 90 days |
| Closing | 90 days after PSA with One 10 dy adjournment | | | 90 days with 2 30 day extension with days notice aith additional $000,000 deposit. | | closing 120 days |
| Transfer taxes | by Seller (not in a Bankrupcy ? Verify) | | | | | |
| Deliver free and clear of liens | free and clear of liens | | | | | |
| Standstill period | | | | | 15 days | 45 days |
| Property  acepted AS is | | | | | | |
| Tenant paying base rent | | | | | Issue Vitra not paiign | |
| Free and clear of liens | | | | | | |
| Free and clear if violation | | | | | There are violatoins | |
| Notes | | . | | | Cost to cure vilations at 125 % . Local law work outstandign | |

| Expressed interest | Company | Contact | tel # | Mobile | Email | |
|---|---|---|---|---|---|---|
| 1) | Lyndcrest advisors | Jerry Nazarian | 646-863-1433 | 516-510-0941 | Jerem...@lyncrestadvisors.com | Contacted Andrew Glenn . I did not speak to him . He did not tour buildin |
| 2) | Kaufman Investments | Michael Kazmerski | 212-471-4323 | | mkazmierski@kaufmanor anization.com | Toured building with MLS. No proposal |
| 3) | | Molnyan | | | | He toured with Rama Bassali. No broker. |
| 4) | Couglas Elliman | Micah Zimmerman | 212-350-8500 | 336-501-0882 | Icah.Zimmerman@elliman.com | is my cousins son. I did not tour building. I did not discuss the building with hi |
| 5) | Two Bira Capital | Emanuel WestFried | | 917-282-8726 | emanuel@twobirsca ital.com | |

**NFMC-06619**

EXHIBIT 1 PAGE 92

| Floors | Useable | Loss factor | Rentable | Useable | Useabel mezzanine | Useable cellar | Source |
|---|---|---|---|---|---|---|---|
| Cellar | | | | | | 5113 | |
| Store corner | | | | 2858 | | | |
| Store Center | | | | 4061 | | | |
| Store Mezzanine | | | | | 850 | | |
| 2 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 3 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 4 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 5 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 6 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 7 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 8 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 9 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 10 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 11 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 12 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 13 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 14 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 15 | 7750 | 27% | 10617 | | | | MAD 08/16/11 |
| 16 | 7666 | 27% | 10501 | | | | The Phillips group 1 |
| | | | | | | | |
| Totals | | | **159139** | **6919** | **850** | **5113** | |
| vert rentable ( irregular) | | 27% | | 9478 | 1164 | 7004 | |
| Totals | | | 159139 | 9478 | 1164 | 7004 | 176786 |

**NFMC-06620**

EXHIBIT 1 PAGE 93

03103

**NFMC-06621**

EXHIBIT 1 PAGE 94

| | |
|---|---|
| **From:** | Sharan Sklar <ssklar@ninetyfivemadison.com> |
| **Sent:** | Wednesday, September 14, 2022 11:39 AM |
| **To:** | Woody Heller |
| **Cc:** | Michael Sklar |
| **Subject:** | FW: 95 Madison - Empire Capital / JLL |

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0012**

Hi Woody,

Below is the broker I told that you were representing us (EXCLUSIVELY) and sent him your way.

For context, he has called us a few time and they did a presentation about their services once for Mike and I. They asked if they could work up the property, just to show us their thoughts. We said NO thank you.

Can I just connect him to you or do I need to put something specific in writing. I don't like the way he said "as always" as if we had been talking all along. I also don't get his request to speak with our attorney.

Let me know.

Sharan

-- **Sharan Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

---

**From:** "Hochman, Harry" <Harry.Hochman@am.jll.com>
**Date:** Wednesday, September 14, 2022 at 7:33 AM
**To:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Cc:** "Cobucci, Luca" <Luca.Cobucci@am.jll.com>, "Jambu, Vickram" <Vickram.Jambu@am.jll.com>
**Subject:** 95 Madison - Empire Capital / JLL

Dear Sharan,

Thanks for the call yesterday and it was great speaking with you as always! We represent a group called Empire Capital that we just sold a 150k square foot office building to at 830 3rd Avenue. They are interested in 95 Madison and they are very active buyers in the market with a great reputation. We'd love the opportunity to get them involved in the process and see if they can provide the best solution for you and your family.

https://therealdeal.com/2022/08/31/empire-capital-strikes-back-buys-midtown-office-with-namdar/

Would it be possible to arrange a call with Woody regarding this matter? Additionally, is there an attorney that you're working with that's helping coordinate Woody's marketing efforts? It would be great to understand who it is because we could add value to your process if we have connectivity with him or her. Thank you for your consideration.

Best regards,

**Exhibit
2**

S. Sklar

1

EXHIBIT 1 PAGE 95

BR002142

**HarryHochman**
Director
JLL Capital Markets
330 Madison Ave Floors 2-5
New York,NY10017
T+1 212 843 4655
M+1 646 618 3645
Harry.Hochman@am.jll.com


us.jll.com/capitalmarkets

Jones Lang LaSalle Americas, Inc.
a licensed real estate brokerage company.

Click here for information regarding the New York State
Human Rights Law, as required by the State of New York.



One of the 2022 World's Most Ethical Companies®

Jones Lang LaSalle

For more information about how JLL processes your personal data, please click here

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

BR002143

EXHIBIT 1 PAGE 96

| From: | Michael Sklar <msklar@ninetyfivemadison.com> |
| --- | --- |
| Sent: | Thursday, September 15, 2022 2:41 PM |
| To: | Woody Heller |
| Cc: | Sharan Sklar |
| Subject: | RE: MTS Property Tour |

I am. I walked building end of April. I just wanted to provide context .

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email


-----Original Message-----
From: Woody Heller <woody.heller@outlook.com>
Sent: Thursday, September 15, 2022 2:39 PM
To: Michael Sklar <msklar@ninetyfivemadison.com>
Cc: Sharan Sklar <ssklar@ninetyfivemadison.com>
Subject: Re: MTS Property Tour

Please just refer these inquiries to me. Thanks

Woody Heller
woody.heller@outlook.com
(917) 612-1230

> On Sep 15, 2022, at 2:14 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:
>
> Michael Kazmerski was noted in the spread sheet  I sent . He walked the building. No offers. No price discussions
>
> Michael Sklar
> Sole  Member
> Michael  Sklar Management LLC
> as a General Partner of Ninety-Five Madison Company, L.P.
> Ninety-Five Madison Company, L.P.
>
> 917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
> P A little green reminder: Please consider the environment before printing this email
>
>
> -----Original Message-----
> From: Michael Kazmierski <mkazmierski@kaufmanorganization.com>
> Sent: Thursday, September 15, 2022 2:03 PM

REORGANIZED
DEBTOR'S
EXHIBIT

DX0013


EXHIBIT
6 M Sklar
10/16/24

BR002299

1

EXHIBIT 1 PAGE 97

> To: Michael Sklar <msklar@ninetyfivemadison.com>
> Subject: RE: MTS Property Tour
>
> Hi Michael - Just left you a VM.  Would be great to touch base and hope you are doing well.  Give me a call when you can.
>
>
>
> Sincerely,
>
>
>
> Michael A. Kazmierski
>
> President & Principal
>
> Kaufman Investments
>
> Kaufman Organization
>
> 450 Seventh Avenue, 19th Floor
>
> New York, NY 10123
>
> 212-471-4323 (direct)
>
> mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com>
>
>

https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&amp;data=05%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637988640579640373%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=fa%2BroIRtW70nki0LdFKwInOEoI6%2FeIQ%2BIhwMaMqaD8M%3D&amp;reserved=0
<blocked::https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&amp;data=05%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637988640579952825%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=lvWRc4dCGKqI8Xb%2FF3oUv1vdkS4h1OWsFLlxwWtSOOM%3D&amp;reserved=0>

>
>
>
> From: Michael Sklar <msklar@ninetyfivemadison.com>
> Sent: Friday, April 29, 2022 12:06 PM
> To: Michael Kazmierski <mkazmierski@kaufmanorganization.com>
> Subject: RE: MTS Property Tour
>
>
>
> [EXTERNAL]
>
> Sound good.

> 
> 
> 
> Michael Sklar
> 
> General Partner
> 
> 
> 
> Ninety-Five Madison Company, L.P.
> 
> 917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
> 
> P A little green reminder: Please consider the environment before printing this email
> 
> 
> 
> From: Michael Kazmierski <mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com>
> 
> Sent: Friday, April 29, 2022 10:25 AM
> To: Michael Sklar <msklar@ninetyfivemadison.com <mailto:msklar@ninetyfivemadison.com> >
> Subject: RE: MTS Property Tour
> 
> 
> Hi Michael - Glad we could catch up Wednesday and enjoyed our discussions.  Let's touch base in a few weeks and happy to hop on the phone in the interim if you would like to talk out any ideas you may have.
> 
> 
> 
> Have a good weekend!
> 
> 
> 
> Sincerely,
> 
> 
> 
> Michael A. Kazmierski
> 
> President & Principal
> 
> Kaufman Investments
> 
> Kaufman Organization
> 
> 450 Seventh Avenue, 19th Floor
> 
> New York, NY 10123
> 
> 212-471-4323 (direct)
> 

BR002301

EXHIBIT 1 PAGE 99

> mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com>
>
> https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&amp;data=0
5%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C6379886
40579952825%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn
0%3D%7C3000%7C%7C%7C&amp;sdata=lvWRc4dCGKql8Xb%2FF3oUv1vdkS4h1OWsFLlxwWtSOOM%3D&amp;reserved
=0
<blocked::https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&a
mp;data=05%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%
7C637988640579952825%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiL
CJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=lvWRc4dCGKql8Xb%2FF3oUv1vdkS4h1OWsFLlxwWtSOOM%3D&am
p;reserved=0>
>
>
>
> From: Michael Sklar <msklar@ninetyfivemadison.com <mailto:msklar@ninetyfivemadison.com> >
> Sent: Wednesday, April 27, 2022 8:48 AM
> To: Michael Kazmierski <mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com> >
> Subject: RE: MTS Property Tour
>
>
>
> [EXTERNAL]
>
> See you at 11:00 at 115 5th . I appreciate the offer but I will not be able to do lunch.
>
>
>
> Michael Sklar
>
> General Partner
>
>
>
> Ninety-Five Madison Company, L.P.
>
> 917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
>
> P A little green reminder: Please consider the environment before printing this email
>
>
>
> From: Michael Kazmierski <mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com>
>
> Sent: Tuesday, April 26, 2022 4:14 PM
> To: Michael Sklar <msklar@ninetyfivemadison.com <mailto:msklar@ninetyfivemadison.com> >
> Subject: RE: MTS Property Tour
>
>
>
> Hi Michael,

4

BR002302

EXHIBIT 1 PAGE 100

> 
> 
> We will start at 100 Fifth Avenue (cross 15th Street) at 11am.  Did you want to do lunch at Ilili after?  Look forward to catching up.
> 
> 
> 
> Michael A. Kazmierski
> 
> President & Principal
> 
> Kaufman Investments
> 
> Kaufman Organization
> 
> 450 Seventh Avenue, 19th Floor
> 
> New York, NY 10123
> 
> 212-471-4323 (direct)
> 
> mkazmierski@kaufmanorganization.com <mailto:mkazmierski@kaufmanorganization.com>
> 
> 

https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&amp;data=05%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637988640579952825%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=lvWRc4dCGKql8Xb%2FF3oUv1vdkS4h1OWsFLlxwWtSOOM%3D&amp;reserved=0
<blocked::https://nam12.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.kaufmanorganization.com%2F&amp;data=05%7C01%7C%7Cb59a91cb5be845cacf0f08da9749d374%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637988640579952825%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=lvWRc4dCGKql8Xb%2FF3oUv1vdkS4h1OWsFLlxwWtSOOM%3D&amp;reserved=0>

> 
> 
> 
> -----Original Appointment-----
> From: Michael Kazmierski
> Sent: Wednesday, April 20, 2022 2:10 PM
> To: Michael Kazmierski; Michael Sklar
> Subject: MTS Property Tour
> When: Wednesday, April 27, 2022 11:00 AM-12:30 PM (UTC-05:00) Eastern Time (US & Canada).
> Where: 100 Fifth Avenue (Start)
> 
> 
> 
> 
> 

BR002303

EXHIBIT 1 PAGE 101

| | |
|---|---|
| **From:** | Sharan Sklar <ssklar@ninetyfivemadison.com> |
| **Sent:** | Thursday, September 22, 2022 3:23 PM |
| **To:** | Andrew Glenn |
| **Cc:** | Woody Heller; Michael Sklar |
| **Subject:** | Fw: 95 Madison Ave |

See email from the broker below, where my mom refused to connect Woody...

Sharan

**From:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Sent:** Tuesday, August 30, 2022 2:12 PM
**To:** Ethan Frank <EFrank@Hildrethadvisors.com>
**Cc:** Michael Sklar <msklar@ninetyfivemadison.com>; Woody Heller <woody.heller@outlook.com>
**Subject:** Re: 95 Madison Ave
Hi Ethan,
I think you may have spoken with my mother this morning. My apologies for any confusion. I am happy to connect you with our agent, Woody Heller, cc'd here.
Best,
Sharan
-- **Sharan Sklar**
General Partner
**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

**From:** Ethan Frank <EFrank@Hildrethadvisors.com>
**Date:** Tuesday, August 30, 2022 at 9:28 AM
**To:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** Re: 95 Madison Ave
Hi - The building is not listed for sale online. If you are trying to sell the building, I don't see why you wouldn't direct me to your broker, since I would be submitting an offer to purchase.
If you do not have it listed, I can also make you an offer direct so you don't have to pay a broker fee.
Thanks
**Ethan Frank**
Director of Acquisitions
Hildreth Real Estate Advisors
O: 917 920 3175
C: 404 786 1355
Efrank@hildrethadvisors.com
https://www.hildrethadvisors.com/

REORGANIZED
DEBTOR'S
EXHIBIT

DX0014

Exhibit
6
S. Sklar

BR002144

| From: | Michael Sklar <msklar@ninetyfivemadison.com> |
|---|---|
| Sent: | Monday, October 24, 2022 6:38 PM |
| To: | Harley Dalton |
| Cc: | Woody Heller; Sharan Sklar |
| Subject: | 95 Madison- |
| Attachments: | Woody Heller.vcf |

Harley :

Branton realty has been retained to represent Ninety-Five Madison in the disposition of 95 Madison. Please give him a call . He will be better able to answer questions.

**Woody Heller**
Branton Realty Services LLC

(917) 612-1230 Mobile
woody.heller@outlook.com

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar ninet fivemadison.com <mailto:Msklar ninet fivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0015**



EXHIBIT
5   M.Sklar
10/16/24

BR002129

| From: | Michael Sklar <msklar@ninetyfivemadison.com> |
|---|---|
| **Sent:** | Monday, October 24, 2022 8:25 PM |
| **To:** | Woody Heller |
| **Cc:** | Sharan Sklar |
| **Subject:** | RE: |

Please call her direct. I have been rude to her and I owe her an apology . I just did not want to create a mess with what you are doing .

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar_ninet_fivemadison.com <mailto:Msklar_ninet_fivemadison.com>
A little green reminder: Please consider the environment before printing this email

**From:** Woody Heller <woody.heller@outlook.com>
**Sent:** Monday, October 24, 2022 8:02 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** RE:

I'm at ULI – the very helpful real estate conference I attend every six months. This time it's in Dallas; I return Thursday evening. I will see her boss here and discuss with him, although I already did 6 weeks ago. But don't worry, I'll handle

Woody Heller
wood .heller@outlook.com
(917) 612-1230

**From:** Michael Sklar <msklar@ninet fivemadison.com>
**Sent:** Monday, October 24, 2022 9:42 AM
**To:** Woody Heller <woody.heller@outlook.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** RE:

**Harley Dalton**
Vice President

40 W. 57th Street, 23rd Fl, New York, NY 10019
**o** 212 315 7411 **m** 917 414 0935 hdalton@eastdilsecured.com



**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0016**



EXHIBIT

BR002258

1

EXHIBIT 1 PAGE 104

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar  ninet  fivemadison.com <mailto:Msklar  ninet  fivemadison.com>
P A little green reminder: Please consider the environment before          this

**From:** Woody Heller <wood .heller outlook.com>
**Sent:** Monday, October 24, 2022 10:18 AM
**To:** Michael Sklar <msklar ninet  fivemadison.com>
**Cc:** Sharan Sklar <ssklar ninet  fivemadison.com>
**Subject:** Re:

Who is she, I don't recall?

Woody Heller
wood .heller outlook.com

(917) 612-1230

> On Oct 24, 2022, at 10:07 AM, Michael Sklar <msklar ninet  fivemadison.com> wrote:
>
> Please call Harley Dalton. I have not returned her calls . I do not want to create a problem. I still need to respond to her.
>
> If you feel it is better I can.
>
> Michael Sklar
> Sole Member
> Michael Sklar Management LLC
> as a General Partner of Ninety-Five Madison Company, L.P.
> Ninety-Five Madison Company, L.P.
>
> 917.270.6083 (c) | Msklar ninet  fivemadison.com <mailto:Msklar  ninet  fivemadison.com>
> P A little green          Please consider      environment before          this email

2

BR002259

EXHIBIT 1 PAGE 105

| **From:** | Michael Sklar <msklar@ninetyfivemadison.com> |
|---|---|
| **Sent:** | Tuesday, November 15, 2022 4:27 PM |
| **To:** | Woody Heller |
| **Cc:** | 'Andrew Kahn/USA'; Fleming, Thomas J.; Sharan Sklar |
| **Subject:** | RE: 95 Madison |

Woody

Please contact Andrew Kahn. He may have a prospect for a net lease.

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar⬛ninet﹍fivemadison.com <mailto:Msklar⬛ninet﹍fivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**From:** Fleming, Thomas J. <TFleming@olshanlaw.com>
**Sent:** Tuesday, November 15, 2022 3:47 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
**Cc:** 'Andrew Kahn/USA' <Andrew.Kahn@cushwake.com>
**Subject:** 95 madison

This email will introduce to Andrew Kahn a tenant's broker at Cushman Wakefield who would like to show some space at 95 Madison to a client of his who is coming in from Italy.
He would like to do this on Thursday at 11:30 am
There is no financial or other obligation for 95 Madison as Andrew works for his tenant-client. I have explained to Andrew that 95 Madison has 3 GPs and no one GP has control of the enterprise.
Each of you should feel free to ask questions of the other. I am making an introduction, nothing more.

**Thomas J. Fleming**

**O L S H A N**

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
(Entrance is on 53rd Street between Sixth and Seventh Avenues)
New York, NY 10019
Direct: 212.451.2213
Facsimile: 212.451.2222
Email: TFlemin﹍olshanlaw.com
Web: www.olshanlaw.com

REORGANIZED
DEBTOR'S
EXHIBIT

DX0017

EXHIBIT
8  M Sklar
10/16/24

1

BR002291

EXHIBIT 1 PAGE 106

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

2

BR002292

EXHIBIT 1 PAGE 107

Sharan Sklar <ssklar@ninetyfivemadison.com>
**Sent:** Tuesday, November 15, 2022 6:00 PM
**To:** Woody Heller
**Cc:** zach@33equities.com
**Subject:** Re: Introduction

Hi Woody,

Please meet Zach Herring , who called to learn more about the property.

His number is 646-512-2019. He learned about the property from his attorney at Morris and Cohn.

Best,

Sharan

-- **Sharan Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

REORGANIZED
DEBTOR'S
EXHIBIT

DX0018

Exhibit
3
S. Sklar

BR002295

| | |
|---|---|
| **From:** | Sharan Sklar <ssklar@ninetyfivemadison.com> |
| **Sent:** | Wednesday, January 25, 2023 12:17 PM |
| **To:** | Michael Sklar; Woody Heller |
| **Cc:** | Andrew K. Glenn; Fleming, Thomas J.; Rita Sklar; Rita Ipad Sklar |
| **Subject:** | Re: 2nd note from Rita to me- information |

In the interest of the process I agree.

-- **Sharan Sklar**
General Partner

**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

---

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Date:** Tuesday, January 24, 2023 at 3:29 PM
**To:** Woody Heller <woody.heller@outlook.com>
**Cc:** Andrew Glenn <aglenn@glennagre.com>, Thomas Fleming <TFleming@olshanlaw.com>, Rita Sklar <ritasklar@gmail.com>, Rita Ipad Sklar <ritasklar@aol.com>, Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** FW: 2nd note from Rita to me- information

Woody :

Rita has gone into the marketplace and is acting independently of the corporate governance and agreement to work through you . Most recently I have been advised that she is in contact with Zar Group , ZG capital, Bobby Zar and James Tamborlane. Rita has also repeatedly undermined our work on various fronts I am requesting that you not provide nor disseminate information to Rita that would undermine your work if disclosed to the market. Any review of this issue can be taken up in the context of Partner meetings.



Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

---

**From:** Woody Heller <woody.heller@outlook.com>
**Sent:** Tuesday, January 24, 2023 2:01 PM
**To:** Sharan Sklar <ssklar@ninetyfivemadison.com>; Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** 2nd note from Rita to me

REORGANIZED
DEBTOR'S
EXHIBIT

**DX0019**

**Exhibit 7**
S. Sklar

BR002261

Hand delivered to my apartment last night

Woody Heller
[woody.heller@outlook.com](mailto:woody.heller@outlook.com)
(917) 612-1230

BR002262

EXHIBIT 1 PAGE 110

## Michael Sklar

| | |
|---|---|
| **From:** | Michael Sklar |
| **Sent:** | Monday, April 10, 2023 4:26 PM |
| **To:** | Woody Heller |
| **Cc:** | Sharan Sklar |
| **Subject:** | RE: Bids 95 Madison |

Woody :

We have a right to have the bids. I have asked repeatedly. Please send them .

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

**From:** Woody Heller <woody.heller@outlook.com>
**Sent:** Monday, April 10, 2023 2:20 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** RE: Bids 95 Madison



The bid sheet has much more information and is more up to date, but we can discuss at S. Speak then

Woody Heller
woody.heller@outlook.com
(917) 612-1230

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Sent:** Monday, April 10, 2023 12:48 PM
**To:** Woody Heller <woody.heller@outlook.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** Bids 95 Madison

Woody

Sharan and I are reviewing your matrix of the bids. In order to evaluate your matrix and where we stand, Sharan and I need a copy of all bids received. We need this now to move forward.

Please send all bids received.

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0020**

1

EXHIBIT 1 PAGE 111

Hi Woody,

This is the person I told you about, who said he knew someone who was interested in 95. As I mentioned he is a broker, but not a commercial broker.

Franco Rinaldi
+1 (646) 403-0661
Compass

Best,

Sharan

**-- Sharan Sklar**
Sole Member
Sharan Sklar Management LLC
as a General Partner of Ninety-Five Madison, L.P.

**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

REORGANIZED
DEBTOR'S
EXHIBIT

DX0021

Exhibit
4

S. Sklar

BR002141

**From:** Woody Hel er <wheller@brantonfealy.com>
**Sent:** Monday, June 26, 2023 12:33 PM
**To** M chael Sklar <msklar@ninetyfivemad son com>; Sharan Sklar <ssklar@ninetyfivemadison com>
**Subject:** RE: Description of the Unconditional 2nd-Round Bid Process

Thanks, quick response to your point #1 below:

* Rama was trying to introduce Joe Moinian who I dealt with directly and Joe decided not to pursue. I also spoke to Rama so he knows that Joe wasn't interested.
* Sasson: I don't know who this is?
* Jeff Go doerger I know Jeff we I I called and emailed him a total of three times and ne never responded. To this point, I also reached out to the others who bid before I was engaged. I think they were all bidding based on expectation of renovating the build ng for office usage. None of them were sti I nterested, essentially playing defense on their own office portfolios and thinking that they can't raise money for office.
* Emanue he did suggest that one group call me, with whom I dealt. I'd have to check my notes to recall which group that was, but I think it was one of our lowest bidders.

**Woody Heller**
Founding Partner

 Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com



---

**From:** Michae Sk ar <msk ar@ninetyfivemadison.com>
**Sent:** Monday, June 26, 2023 9:02 AM
**To** Woody Heller <whe ler@brantonrealty.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** RE: Description of the Uncond t onal 2nd-Round Bid Process

1) There were people that expressed nterest.- Rama, Sasson, Jeffrey Goldberger, Emanuel Should give them a opportunity if they have a bidder in range or on the high side on a sale basis
2) Rita will get a copy of this tomorrow. We will need a vote to satisfy our obligation under the partnership .
3) All else ooks good.

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

---

**From:** Woody He er <whel er@brantonrealty.com>
**Sent:** Friday, June 23, 2023 5:08 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** Descript on of the Unconditional 2nd Round Bid Process

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0022**

EXHIBIT 1 PAGE 113

1. A group of 3-5 bidders are invited to participate in an unconditional second-round bidding process to PURCHASE the property.
   a. The participants are selected based on having expressed interest at or above $80 million, some of them at or above $70 million.
2. The first step is for me to contact the potential participants to confirm:
   a. Their continued interest
   b. That they are still at a purchase price of relevance
   c. Reiterate their willingness to participate in this type of process
   d. Confirm that they can/will respond within the proposed time period
   e. And that they are also accepting of the other proposed conditions outlined below.
3. Next, we need to have Fried Frank prepare a "reasonable" purchase contract.
4. Once the contract is ready, I will send it and the bidding instructions to the consent of our counsel.
5. I propose that bidders be provided a 4-week period to complete their:
   a. Remaining due diligence
   b. Contract negotiations (see below)
   c. Secure their equity and debt
6. By the end of the first of the four weeks, bidders are to submit their contract comments.
7. By the end of the second week, or sooner, we will reissue the contracts to the bidders, inclusive of their requested contract comments that we're prepared to accept.
   a. We can either consolidate the comments into one universal redraft or if the comments are sufficiently different, redraft them individually. By way of example, we don't want to make a concession to all the bidders if only one group requested it.
8. At the end of the 4-week period, bidders will submit:
   a. An executed and unconditional contract, with whatever remaining changes they want beyond what was provided in our initial redraft
   b. A preliminary deposit (I propose $1 million), which will be refunded if they are not chosen as the winner. The point being, that if they are chosen and then don't post the balance of the sub deposit, then we keep their preliminary deposit as liquidated damages and move on to the next best bidder.
9. Once the winning bidder is chosen, I propose that we give them three business days to post the balance of the deposit, which I propose to be 10% of the purchase price. They may elect a different amount, but it will factor into my decision of who we choose as the winning bidder.
10. Once the full deposit is received, we will countersign the sale contract, and at that point the buyer is fully committed, and we are holding their 10% deposit.
11. We will need to determine how much time we want to close, which will be a function of whether we elect to pursue a 1031 transaction. If so, we will want the flexibility to extend the closing. If not, we will want to close as quickly as possible. Towards that end, I suggest that the contract stipulate a 60-day closing, w/one 15-day extension, time of the essence — meaning it has no longer be delayed. However, the seller can extend the closing with three one-month extensions, to accommodate finding 1031 property(s), provided we provide a 15-day notice before each extension.
12. Thereafter we close.

Please let me know if you have any questions or comments. Thank you very much.



**Woody Heller**
Founding Partner

To  (917) 612-xxxx
Email  wheller@branton-realty.com
Website  brantonrealty.com

**Michael Sklar**

| From: | Michael Sklar |
| --- | --- |
| Sent: | Monday, June 26, 2023 9:02 AM |
| To: | Woody Heller; Sharan Sklar |
| Subject: | RE: Description of the Unconditional 2nd-Round Bid Process |

1) There were people that expressed interest - Rama, Sasson, Jeffrey Goldberger, Emanuel. Should give them a opportunity if they have a bidder in range or on the high side on a sale basis.
2) Rita will get a copy of this tomorrow. We will need a vote to satisfy our obligation under the partnership.
3) All else looks good.

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.



917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

REORGANIZED
DEBTOR'S
EXHIBIT

DX0023

From: Woody Heller <wheller@brantonrealty.com>
Sent: Friday, June 23, 2023 5:08 PM
To: Michael Sklar <msklar@ninetyfivemadison.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
Subject: Description of the Unconditional 2nd-Round Bid Process

1. A group of 3-5 bidders are invited to participate in an unconditional second round bidding process to PURCHASE the property.
   a. The participants are selected based on having expressed interest at or above $60 million, some of them at or above $70 million.
2. The first step is for me to contact the potential participants to confirm:
   a. Their continued interest
   b. That they are still at a purchase price of relevance
   c. Reiterate their willingness to participate in this type of process.
   d. Confirm that they can/will respond within the proposed time period.
   e. And that they are also accepting of the other proposed conditions outlined below
3. Next, we need to have Fried Frank prepare a "reasonable" purchase contract.
4. Once the contract is ready, I will send it and the bidding instructions to the chosen list of participants.
5. I propose that bidders be provided a 4-week period to complete their:
   a. Remaining due diligence
   b. Contract negotiations (per below)
   c. Secure their equity and debt.
6. By the end of the first o the four weeks, bidders are to submit their contract comments
7. By the end of the second week, or sooner, we will re-issue the contracts to the bidders, inclusive of their requested contract comments that we're prepared to accept
   a. We can either consolidate the comments into one universal redraft, or if the comments are sufficiently different, modify them individually. By way of example, we don't want to make a concession to all the bidders if only one group request it.
8. At the end of the 4-week period, bidders will submit:

1

EXHIBIT 1 PAGE 115

**NFMC-06564**

a. An executed and unconditional contract, with whatever remaining changes they want beyond what we provided in our initial redraft.

b. A preliminary deposit (I propose $1 million), which will be refunded if they are not chosen as the winner. The point being, that if they are chosen and then don't post the balance of the full deposit, then we keep their preliminary deposit as liquidated damages and move on to the next best bidder.

9. Once the winning bidder is chosen, I propose that we give them three business days to post the balance of the deposit, which I propose to be 10% of the purchase price. They may elect a different amount, but it will factor into our decision of who we choose as the winning bidder.

10. Once the full deposit is received, we will countersign the sale contract, and at that point the buyer is fully committed, and we are holding their 10% deposit.

11. We will need to determine how much time we want to close, which will be a function of whether we elect to pursue a 1031 transaction. If so, we will want the flexibility to extend the closing. If not, we will want to close as quickly as possible. Towards that end, I suggest that the contract stipulate a 60-day closing, w/one 15-day TOE (time of the essence - meaning it can no longer be delayed) extension. However, the seller can extend the closing with three one-month extensions, to accommodate finding 1031 property(s), provided we provide a 15-day notice before each extension.

12. Thereafter we close.

Please let me know if you have any questions or comments. Thanks very much.

---

**Woody Heller**
Founding Partner



Tel: (917) 414-1330
Email: wheller@brantonrealty.com
Website: brantonrealty.com

NFMC-06565

EXHIBIT 1 PAGE 116

Hi Woody,

This is the AY broker. I think you must have spoken to someone else. He followed up today.

"Hi! Wanted to follow up today as I haven't heard back from anyone RE 95 Madison Ave. I reached out to a group who just closed on a 200,000+ SF corner office conversion property nearby grand central and they mentioned they haven't seen it yet."

Noah Kossoff
9178801475
Noah.Kossoff@avisonyoung.com

Best,

Sharan

**-- Sharan Sklar**
Sole Member
Sharan Sklar Management LLC
as a General Partner of Ninety-Five Madison, L.P.

**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

REORGANIZED
DEBTOR'S
EXHIBIT

DX0024

Exhibit
5
S. Sklar

BR002293

| From: | "Michael Sklar" <msklar@ninetyfivemadison.com> |
|---|---|
| Sent: | Tue, 27 Jun 2023 12:32:26 -0400 (EDT) |
| To: | "Woody Heller; Sharan Sklar" |
| Subject: | RE: Description of the Unconditional 2nd-Round Bid Process |

1. Sasson was working with Jeff Goldberg. I know you are not a fan but as a sale it could
2. Emanuel- called . Please touch base.

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company,



REORGANIZED
DEBTOR'S
EXHIBIT

DX0025

EXHIBIT 1 PAGE 118

NFMC-06632

May I take your Jeff Goldberg comment as a proxy for your vote? ??. Happy to have him participate in a multi-bidder process if we proceed with a sale through the unconditional bid process, provided he's interested. I don't have Emanuel's contact info, p

REORGANIZED
DEBTOR'S
EXHIBIT

DX0026



EXHIBIT
14 MSklar
10/16/24

NFMC-06633

EXHIBIT 1 PAGE 119

| | |
|---|---|
| **From:** | Michael Sklar <MSklar@Flintlockllc.com> |
| **Sent:** | Wednesday, September 6, 2023 7:56 AM |
| **To:** | Woody Heller |
| **Cc:** | msklar@ninetyfivemadison.com; Sharan Sklar |
| **Subject:** | FW: 95 Madison Avenue |

Michael Sklar

Sr. Project Manager

FLINTLOCK CONSTRUCTION SERVICES, LLC |202 West 40th Street , 6th floor | New York, NY 10018
212.921.2125 x 327(p) | 212.921.2130 (f) | 914.450.1974 (c) | MSklar Flintlockllc.com
<mailto:MSklar Flintlockllc.com>
P A little green reminder: Please consider the environment before printing this email

**From:** Albert Sultan <ASultan@Ksrny.com>
**Sent:** Tuesday, September 5, 2023 10:40 PM
**To:** Michael Sklar <MSklar@Flintlockllc.com>
**Subject:** [EXTERNAL] RE: 95 Madison Avenue

Michael, following up here, can we discuss tomorrow?

**From:** Albert Sultan
**Sent:** Tuesday, August 8, 2023 12:53 PM
**To:** Msklar flintlockLLC.com
**Subject:** RE: 95 Madison Avenue

Michael, hope all is well. I know you were looking to sell or JV the asset at some point a few months back. I have a user looking to buy in this area. We were in contract for something else just now but there are issues with the loan that the Seller has and we were coming in to recap it. Is there a scenario where you would sell or recap the asset now? Area, floor plate and deal size all work perfect. Ultimately the user intends to occupy 70,000 SF for themselves. I've attached a link for a recent deal I did nearby as well so you get a sense as to my experience in the neighborhood. Call me if you want to discuss.

Columbia Pro ert Trust Sells 149 Madison Avenue for 77M therealdeal.com



**Albert Sultan**

M 732.859.5995      E ASultan Ksrn .com
F 212.954.5532      O 212.417.9217

REORGANIZED
DEBTOR'S
EXHIBIT

DX0027



1

BR002145

EXHIBIT 1 PAGE 120

1385 Broadway, 22nd Floor
New York, NY 10018
www.ksrn .com

**From:** Albert Sultan
**Sent:** Thursday, January 05, 2023 1:47 PM
**To:** Msklar  flintlockLLC.com
**Subject:** 95 Madison Avenue

Hi Michael, happy New Year and hope all is well. In the coming few weeks you are going to see a building trade in the area at which I am the broker for. The building is similar in size and location to yours and I know that you've had the asset vacant for a while. I am reaching because I'd love to help you monetize it whether it be through a joint venture or a potential sale or ground lease for the site. I have a few ideas I wanted to run by you, if you have some time give me a call to discuss, thanks.



**Albert Sultan**

M 732.859.5995     E ASultan Ksrn .com
F 212.954.5532     O 212.417.9217

1385 Broadway, 22nd Floor
New York, NY 10018
www.ksrn .com

2

No worries . Yes, I will. Thanks for the heads up.

Sent from my iPhone

> On Nov 16, 2023, at 4:50 AM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

WH – Woody asked about extension of his contract . I said that as of today we have no real proposals on the table, and I am not sure we will be extending. Not the best response . Sorry . I was tired .
Can you play good cop .
Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.
917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

REORGANIZED
DEBTOR'S
EXHIBIT

DX0028

**Exhibit
12**
S. Sklar

EXHIBIT 1 PAGE 122

NFMC-06576

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Monday, November 27, 2023 11:07 AM |
| **To:** | Michael Sklar |
| **Cc:** | Sharan Sklar |
| **Subject:** | Re: 95 Madison |

Yes.
Sent from my iPhone

> On Nov 27, 2023, at 11:02 AM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:
>
> Emanuel
>
> Do you have a time to talk to Sharan & me tomorrow at 5:00?
>
> Michael Sklar
> Sole Member
> Michael Sklar Management LLC
> as a General Partner of Ninety-Five Madison Company, L.P.
> Ninety-Five Madison Company, L.P.
>
> 917.270.6083 (c) | Msklar_ninet_fivemadison.com <mailto:Msklar_ninet_fivemadison.com>
> P A ittle green reminder: Please consider the environment before printing this email



REORGANIZED
DEBTOR'S
EXHIBIT

DX0029



EXHIBIT
M. Klar
10 16 24

NFMC_000562

EXHIBIT 1 PAGE 123

| **Subject:** | 95 Madison |
| **Location:** | https://us02web.zoom.us/j/87107227887?pwd=Ykk0L3pleGZKM0lJVENuVStTT1dPZz09&from=addon |

| **Start:** | Tue 11/28/2023 5:00 PM |
| **End:** | Tue 11/28/2023 5:30 PM |
| **Show Time As:** | Tentative |

| **Recurrence:** | (none) |

| **Meeting Status:** | Not yet responded |

| **Organizer:** | Michael Sklar |
| **Required Attendees:** | Emanuel Westfried; Sharan Sklar |

| **Categories:** | Orange Category |

Flintlock Construction is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://us02web.zoom.us/j/87107227887?pwd=Ykk0L3pleGZKM0lJVENuVStTT1dPZz09&from=addon

Meeting ID: 871 0722 7887
Passcode: 221272

---

One tap mobile
+16469313860,,87107227887# US
+16465588656,,87107227887# US (New York)

---

Dial by your location
• +1 646 931 3860 US
• +1 646 558 8656 US (New York)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 301 715 8592 US (Washington DC)
• +1 346 248 7799 US (Houston)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 669 444 9171 US
• +1 669 900 9128 US (San Jose)
• +1 689 278 1000 US

NFMC_000563

EXHIBIT 1 PAGE 124

- +1 719 359 4580 US
- +1 253 205 0468 US
- +1 253 215 8782 US (Tacoma)

Meeting ID: 871 0722 7887

Find your local number: https://us02web.zoom.us/u/keq2LfQ3a5

NFMC_000564

EXHIBIT 1 PAGE 125

**From:** Michael Sklar
**Sent:** Tuesday, November 28, 2023 5:28 PM
**To:** emanuel@twobinscapital.com
**Cc:** Sharan Sklar
**Subject:** FW: 95 Madison - Plans Update
**Attachments:** 231113-95 Madison_Update.pdf

**Categories:** Branton

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

REORGANIZED
DEBTOR'S
EXHIBIT

DX0030

Exhibit
15
S. Sklar

EXHIBIT 1 PAGE 126

NFMC_000566



**95 MADISON AVE, NY**

SCHEMATIC STUDY - CELLAR & 1 FL.

SX-02

PROJECT NUMBER

DATE
01/12/22

SCALE
1/16" = 1'-0"

Renderings Design +
Architecture, PLLC

58 Fourth Street,
Brooklyn NY 11231
P (646) 863-5873
F (646) 863-5873

**1ST FLOOR**

COMMON
1028 SF

COMMERCIAL
7289 SF

COMMON
1235 SF

EXISTING STAIR TO
REMAIN TO CELLAR

EXISTING FREIGHT (1ST
TO CELLAR)

EXISTING FREIGHT (1ST
TO 16FL)

EXISTING STAIR TO
REMAIN (UP)

EXISTING ELEVATOR &
STAIR CORE TO REMAIN

RESIDENTIAL
ENTRY

EXISTING STAIR
TO REMAIN

EXISTING FREIGHT (1ST
TO CELLAR)

EXISTING FREIGHT (1ST
TO 16FL)

**CELLAR FLOOR**

AMENITY
2845 SF

COMMERCIAL
3501 SF

EXISTING STAIR CORE TO REMAIN

EXTEND EXISTING
ELEVATOR TO CELLAR

NRMC_008667

11/13/2022 11:01:06 AM

EXHIBIT 1 PAGE 127



SCHEMATIC STUDY - 2ND TO 16TH FLOORS

95 MADISON AVE., NY

| | |
|---|---|
| PROJECT NUMBER | |
| DATE | 6/13/22 |
| SCALE | 1" = 20'-0" |
| | SK-03 |

Montclug Design +
Architecture, PLLC
38 fourth Street
Brooklyn NY 11231
(646) 663-5873
F (646) 663-5873

16TH FLOOR

- EXISTING FREIGHT ELEV. & STAIR CORE TO REMAIN
- REMOVED 16 FL
- EXISTING 39'-8 1/2"
- ROOF TERRACE
- 25'-7 3/4" EXISTING
- EXISTING ELEVATOR & STAIR CORE TO REMAIN
- REFUSE AREA

0BR 820 SF
1BR 861 SF
1BR 1030 SF
2BR 1177 SF
2BR 1165 SF
1BR 848 SF
2BR 1224 SF

2-15 FLOOR

- EXISTING FREIGHT ELEV. & STAIR CORE TO REMAIN
- REMOVED 2-15 FL
- EXISTING 39'-8 1/2"
- EXISTING 22'-1 3/4"
- REMOVED 2ND FL
- EXISTING ELEVATOR & STAIR CORE TO REMAIN
- REFUSE AREA

18'-4 3/4"
22'-0"
25'-0"
30'-5 1/4"
38'-8 3/4"
22'-0"
32'-7 3/4"

0BR 825 SF
1BR 862 SF
1BR 994 SF
2BR 1190 SF
1BR 858 SF
0BR 594 SF
1BR 810 SF
2BR 1147 SF

NPMC_000058

11/13/2023 11:01:09 AM



ROOF

ELEVATOR
BULKHEAD

STAIR 1
BULKHEAD

ELEVATOR & STAIR
BULKHEAD

ROOF TERRACE
7878 SF

MIN 50%
COMMON ROOF
TERRACE

96' - 8"

11/13/2025 11:01:09 AM

95 MADISON AVE, NY

Workshop Design +
Architecture PLLC

58   Fourth   Street
Brooklyn NY 11231
P   (646) 863-5858
F   (646) 863-5873

SCHEMATIC STUDY - ROOF

| PROJECT NUMBER | Project Name |
| DATE | 11/13/22 |
| DRAWN | Author |

SCALE   1" = 20'-0"

SK-04

Copyright © 2015  Workshop  DA

EXHIBIT 1 PAGE 129

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Tuesday, November 28, 2023 6:31 PM |
| **To:** | Michael Sklar |
| **Subject:** | [EXTERNAL] Declined: 95 Madison |

REORGANIZED
DEBTOR'S
EXHIBIT

DX0031

EXHIBIT 1 PAGE 130

NFMC_000570

My thought on Woody to be discussed with Michael Lefkowitz.

1. Should woody continue with the people he has contacted?
2. We will Owe his commission in both cases.
3. What direction we should go . If we flounder we will be in big trouble.

REORGANIZED
DEBTOR'S
EXHIBIT

DX0032

Exhibit
16
S. Sklar

EXHIBIT 1 PAGE 131

NFMC-06634

**Michael Sklar**

| | |
|---|---|
| **From:** | Michael Sklar |
| **Sent:** | Thursday, December 21, 2023 7:49 AM |
| **To:** | Sharan Sklar |
| **Subject:** | Ideas top move forward. |

We should make a list and pick a direction . Sometimes it clarifies the thought  The vultures are calling .

1) Emanuell
2) Woody
3) City
4) ???
5) Shulsky Properties

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

REORGANIZED
DEBTOR'S
EXHIBIT

DX0033

Exhibit
19
S. Sklar

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Monday, January 1, 2024 4:58 PM |
| **To:** | Michael Sklar |
| **Subject:** | Re: NDA |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

lin@sunlightgroupny.com

Sent from my iPhone

On Jan 1, 2024, at 4:54 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

Please send addresses e-mail?

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar▪ninet▪fivemadison.com <mailto:Msklar▪ninet▪fivemadison.com>
P A little green reminder: Please consider the environment before printing this email

From: emanuel@twobinscapital.com <emanuel@twobinscapital.com>
Sent: Monday, January 1, 2024 4:34 PM
To: Michael Sklar <msklar@ninetyfivemadison.com>
Subject: Re: NDA

Emanuel Westfried - Two Bins Capital

Linzhong Zhuo - Sunlight Group NY

Sent from my iPhone

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0034**

EXHIBIT
24 M Sklar
10/16/24
97

On Jan 1, 2024, at 4:22 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

EXHIBIT 1 PAGE 133

NFMC_000575

Emanuel:

Please send the entities

1. Broker with your information.
2. Buyer with full information

If you want I can send PDF and you can fillin by hand?

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c)
| Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

See you guys tomorrow at 2pm at 95 Madison Avenue. The seller wants you to sign this NDA.


Sent from my iPhone

Begin forwarded message:

> **From:** Michael Sklar <msklar@ninetyfivemadison.com>
> **Date:** January 1, 2024 at 5:43:20 PM EST
> **To:** emanuel@twobinscapital.com
> **Subject:** NDA 956 Madison 2 Bins Capital Sunlight Group 010124
>
> 📄 NDA 95 Madison 2 bins Sunlight Group 010124.pdf
>
>
> Please sign and have client sign.
>
> Michael Sklar
> Sole Member
> Michael Sklar Management LLC
> as a General Partner of Ninety-Five Madison Company, L.P.
> Ninety-Five Madison Company, L.P.
>
> 917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
> P A little green reminder: Please consider the environment before printing this email

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0035**

EXHIBIT 1 PAGE 135

TB_EW_000013

# EXHIBIT 7

EXHIBIT 1 PAGE 136

| **From:** | Linzhong Zhuo <lin@sunlightgroupny.com> |
| **Sent:** | Tue, 2 Jan 2024 09:53:46 -0500 (EST) |
| **To:** | emanuel@twobinscapital.com |
| **Subject:** | Fwd: NDA 956 Madison 2 Bins Capital Sunlight Group 010124 |
| **Attachments:** | NDA 95 Madison 2 bins Sunlight Group 010124.pdf |

Queens office: 135-25 Northern Blvd, 2FL, Flushing NY11354
Brooklyn office: 201 46th St, 1st Floor, Brooklyn, NY 11220
Office: (347) 707-0555 / (718) 439-6600
Email: hilda@sunlightgroupny.com
www.sunlightgroupny.com



EXHIBIT 1 PAGE 137

TB_EW_000014

January 1, 2023

Ninety Five Madison Company
95 Madison Avenue , Suite 609
New York , New York 10023
Att Michael Sklar Msklar@ninety-fivemadison.com

**Confidentiality Agreement for 95 Madison Avenue, New York, NY (the "Premises")**

Dear Mr. Sklar :

　　　　We agree:

　　　　1　　　　*Confidential Information.* The "**Confidential Information**" means the following, including any that we previously received from you, relating to the Premises or to Owner: (i) offering memo, leases, contracts, brochures, studies, environmental reports, financial information, and other data and documents that you give us; (ii) copies of any of the foregoing; (iii) information we obtain through site visits; (iv) the facts that we signed this agreement, have or may have an interest in the Premises or a Transaction, or received Confidential Information; and (v) terms of any actual or possible Transaction. Confidential Information does not, however, include information that: (a) is or becomes publicly available except through violation of this agreement; (b) was available to us on a nonconfidential basis before you gave it to us; (c) becomes available to us on a nonconfidential basis from a person other than you (or your representatives) who we do not know is bound by an obligation of confidentiality; or (d) we developed independently of you.

　　　　2　　　　*Preservation of Confidentiality.* We will preserve confidentiality of all Confidential Information, by taking commercially reasonable measures toward that end, including at least the same measures we use for our own confidential information. We will not use or share any Confidential Information except to evaluate a Transaction. On your written request, we will promptly return to you (or at our option destroy) all Confidential Information. We may, however, keep backup or archival copies of Confidential Information as our standard data retention procedures require.

　　　　3　　　　*Additional Recipients.* We may disclose Confidential Information to our affiliates, directors, insurers,officers, principals, professional advisers (including legal counsel, consultants, accountants, and financial advisors), staff, and actual and prospective debt and equity sources and their representatives (collectively, "**Additional Recipients**"), all only as needed to help us consider a Transaction. We will instruct each Additional Recipient to comply with the previous paragraph.

1

EXHIBIT 1 PAGE 138

TB_EW_000015

4    *Required Disclosure.* If any government (including judicial authority) or regulatory authority requires us to disclose Confidential Information, we shall, if legally permitted, promptly notify Owner. We will reasonably cooperate with efforts to block disclosure, at no cost to us. During those efforts we will not disclose Confidential Information unless legally required. We may disclose Confidential Information in any litigation between us and Owner but we will take such actions as are reasonably available to preserve confidentiality.

5    *No Liability.* No party has any obligation to enter into a Transaction, unless and until the parties (or their affiliates) in their sole and absolute discretion negotiate and exchange binding documents to that effect (the "**Definitive Documents**"). Owner makes no representation, and shall have no liability due to our reliance, on any Confidential Information. That does not limit the effect of any Definitive Documents. Either party hereto shall have the right for any or no reason and at any time prior the execution of Definitive Documents to cease communication and negotiations regarding the Tranaction completed herein.

Either party hereto shall have the right for any or no reason and at any time prior the execution of Definitive Documents to cease communication and negotiations regarding the Tranaction completed herein.

6    *Prohibitions.* Without your discretionary consent, we shall not: (i) enter the Premises, except space open to the public; or (ii) communicate about the Premises or a possible Transaction with Owner or any known employee, ground lessor or lessee, lender, management company, supplier or service provider, tenant, or subtenant of Owner or the Premises.

7    *Other Brokers.* We have not dealt and will not deal with any broker, agent, or finder (a "**Broker**") except any Broker who has filled out and signed the Buyer's Broker Acknowledgment below before we deliver(ed) this agreement to Owner. We shall indemnify and hold Owner harmless from and against any and all loss, costs, damages, liability, expense, and judgments (including reasonable attorneys' fees and disbursements and costs of collection) incurred because any Broker claims to have dealt with us for any Transaction, including any Buyer's Broker. We shall and Owner shall have no obligation to) compensate any Buyer's Broker. Any Buyer's Broker constitutes an Additional Recipient. This paragraph shall survive closing of any Transaction and expiration of our obligations on Confidential Information.

8    *Miscellaneous.* This agreement expresses the parties' entire agreement, superseding all prior understandings, on the matters covered. It shall: (i) apply to all Confidential Information until the earlier of (a) execution and delivery of Definitive Documents or (b) one year from the date of this agreement; (ii) be governed by New York law without regard to conflict of laws; and (iii) bind the parties and their successors and assigns. Signatures may be delivered by email, PDF, or counterparts. In

2

EXHIBIT 1 PAGE 139

TB_EW_000016

the event of a breach or threatened breach of this agreement, Owner may suffer irreparable injury, so either of them may obtain injunctive relief. If anything in this agreement is invalid, illegal, or unenforceable, then the remainder shall remain fully effective. If any dispute arises about this agreement or the parties' relationship: (i) the prevailing party shall recover reasonable attorneys' fees and disbursements and costs of collection; (ii) any litigation must be commenced only in a state or federal court in Manhattan; (iii) the parties consent to that jurisdiction and venue; (iv) THE PARTIES WAIVE TRIAL BY JURY; and (v) any recovery of damages shall be limited to actual damages, and not punitive, consequential, special, or indirect damages.

*No Further Text on This Page.*

We look forward to receiving and reviewing Confidential Information and discussing a possible Transaction.

Very truly yours,

Sunlight Group NY

By: X _____

Name: Mr. Linzhong Zhuo

Street Address:

135-25 northern Blvd
Floor 2 ,
Flushing New York

Telephone:

Email: NY lin@sunlightgroupny.com

Title: _president _____

**BUYER'S BROKER
ACKNOWLEDGMENT**

3

EXHIBIT 1 PAGE 140

TB_EW_000017

*If this paragraph is not signed below, then no Buyer's Broker
exists and references above to Buyer's Broker shall not apply.*

The Broker signing this Buyer's Broker Acknowledgment below ("**Buyer's Broker**"): (i) joins in all the above obligations on Confidential Information and indemnification for Brokers' claims; (ii) shall be subject to all restrictions and prohibitions in the above agreement; (iii) has not been engaged by and will not act for Owner regarding the Premises or for any Transaction; (iv) waives any claim against Owner for commission or other compensation on account of any Transaction, whether or not consummated; and (v) shall not introduce the Premises to anyone except the party that signed the above agreement. This paragraph shall survive closing of any Transaction and any expiration of obligations on Confidential Information.

Very truly yours,

Two Bins Capital
15 Bond Street
Suite 304
great Neck, NY 11021

By: X_____

Name: _Emanuel Westfried _____

Title: _Broker_____

Telephone: _(917)-282-8726_____

Email: _emanuel@twobinscapital.com

4858-0737-1574, v. 23

4

EXHIBIT 1 PAGE 141

TB_EW_000018

| From: | emanuel@twobinscapital.com |
| --- | --- |
| Sent: | Tuesday, January 2, 2024 10:14 AM |
| To: | Michael Sklar |
| Subject: | Re: NDA 956 Madison 2 Bins Capital Sunlight Group 010124 |
| Attachments: | NDA 95 Madison 2 bins Sunlight Group 010124.pdf |

Sent from my iPhone

> On Jan 1, 2024, at 5:43 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

> <Outlook-zm1 4 n >
> NDA 95 Ma ison 2 bi s Su li ht Grou 010124 df

> Please sign and have client sign.

> Michael Sklar
> Sole Member
> Michael Sklar Management LLC
> as a General Partner of Ninety-Five Madison Company, L.P.
> Ninety-Five Madison Company, L.P.

> 917.270.6083 (c) | Msklar ninet fivemadison.com <mailto:Msklar ninet fivemadison.com>
> P A little green reminder: Please consider the environment before printing this email

**REORGANIZED DEBTOR'S EXHIBIT**

**DX0036**



EXHIBIT
25 M. Sklar
10 16 24
AT

NFMC_000583

EXHIBIT 1 PAGE 142

January 1, 2023

Ninety Five Madison Company
95 Madison Avenue , Suite 609
New York , New York 10023
Att Michael Sklar Msklar@ninety-fivemadison.com

**Confidentiality Agreement for 95 Madison Avenue, New York, NY (the "Premises")**

Dear Mr. Sklar :

We agree:

1        *Confidential Information.* The "**Confidential Information**" means the following, including any that we previously received from you, relating to the Premises or to Owner: (i) offering memo, leases, contracts, brochures, studies, environmental reports, financial information, and other data and documents that you give us; (ii) copies of any of the foregoing; (iii) information we obtain through site visits; (iv) the facts that we signed this agreement, have or may have an interest in the Premises or a Transaction, or received Confidential Information; and (v) terms of any actual or possible Transaction. Confidential Information does not, however, include information that: (a) is or becomes publicly available except through violation of this agreement; (b) was available to us on a nonconfidential basis before you gave it to us; (c) becomes available to us on a nonconfidential basis from a person other than you (or your representatives) who we do not know is bound by an obligation of confidentiality; or (d) we developed independently of you.

2        *Preservation of Confidentiality.* We will preserve confidentiality of all Confidential Information, by taking commercially reasonable measures toward that end, including at least the same measures we use for our own confidential information. We will not use or share any Confidential Information except to evaluate a Transaction. On your written request, we will promptly return to you (or at our option destroy) all Confidential Information. We may, however, keep backup or archival copies of Confidential Information as our standard data retention procedures require.

3        *Additional Recipients.* We may disclose Confidential Information to our affiliates, directors, insurers,officers, principals, professional advisers (including legal counsel, consultants, accountants, and financial advisors), staff, and actual and prospective debt and equity sources and their representatives (collectively, "**Additional Recipients**"), all only as needed to help us consider a Transaction. We will instruct each Additional Recipient to comply with the previous paragraph.

1

NFMC_000584

EXHIBIT 1 PAGE 143

4     *Required Disclosure.* If any government (including judicial authority) or regulatory authority requires us to disclose Confidential Information, we shall, if legally permitted, promptly notify Owner. We will reasonably cooperate with efforts to block disclosure, at no cost to us. During those efforts we will not disclose Confidential Information unless legally required. We may disclose Confidential Information in any litigation between us and Owner but we will take such actions as are reasonably available to preserve confidentiality.

5     *No Liability.* No party has any obligation to enter into a Transaction, unless and until the parties (or their affiliates) in their sole and absolute discretion negotiate and exchange binding documents to that effect (the "**Definitive Documents**"). Owner makes no representation, and shall have no liability due to our reliance, on any Confidential Information. That does not limit the effect of any Definitive Documents. Either party hereto shall have the right for any or no reason and at any time prior the execution of Definitive Documents to cease communication and negotiations regarding the Tranaction completed herein.

Either party hereto shall have the right for any or no reason and at any time prior the execution of Definitive Documents to cease communication and negotiations regarding the Tranaction completed herein.

6     *Prohibitions.* Without your discretionary consent, we shall not: (i) enter the Premises, except space open to the public; or (ii) communicate about the Premises or a possible Transaction with Owner or any known employee, ground lessor or lessee, lender, management company, supplier or service provider, tenant, or subtenant of Owner or the Premises.

7     *Other Brokers.* We have not dealt and will not deal with any broker, agent, or finder (a "**Broker**") except any Broker who has filled out and signed the Buyer's Broker Acknowledgment below before we deliver(ed) this agreement to Owner. We shall indemnify and hold Owner harmless from and against any and all loss, costs, damages, liability, expense, and judgments (including reasonable attorneys' fees and disbursements and costs of collection) incurred because any Broker claims to have dealt with us for any Transaction, including any Buyer's Broker. We shall and Owner shall have no obligation to) compensate any Buyer's Broker. Any Buyer's Broker constitutes an Additional Recipient. This paragraph shall survive closing of any Transaction and expiration of our obligations on Confidential Information.

8     *Miscellaneous.* This agreement expresses the parties' entire agreement, superseding all prior understandings, on the matters covered. It shall: (i) apply to all Confidential Information until the earlier of (a) execution and delivery of Definitive Documents or (b) one year from the date of this agreement; (ii) be governed by New York law without regard to conflict of laws; and (iii) bind the parties and their successors and assigns. Signatures may be delivered by email, PDF, or counterparts. In

2

NFMC_000585

EXHIBIT 1 PAGE 144

the event of a breach or threatened breach of this agreement, Owner may suffer irreparable injury, so either of them may obtain injunctive relief. If anything in this agreement is invalid, illegal, or unenforceable, then the remainder shall remain fully effective. If any dispute arises about this agreement or the parties' relationship: (i) the prevailing party shall recover reasonable attorneys' fees and disbursements and costs of collection; (ii) any litigation must be commenced only in a state or federal court in Manhattan; (iii) the parties consent to that jurisdiction and venue; (iv) THE PARTIES WAIVE TRIAL BY JURY; and (v) any recovery of damages shall be limited to actual damages, and not punitive, consequential, special, or indirect damages.

*No Further Text on This Page.*

We look forward to receiving and reviewing Confidential Information and discussing a possible Transaction.

Very truly yours,

Sunlight Group NY

By: X _____

Name: Mr. Linzhong Zhuo

Street Address:

135-25 northern Blvd
Floor 2 ,
Flushing New York

Telephone:

Email: NY lin@sunlightgroupny.com

Title: _president _____

**BUYER'S BROKER
ACKNOWLEDGMENT**

3

NFMC_000586

EXHIBIT 1 PAGE 145

*If this paragraph is not signed below, then no Buyer's Broker*
*exists and references above to Buyer's Broker shall not apply.*

The Broker signing this Buyer's Broker Acknowledgment below ("**Buyer's Broker**"): (i) joins in all the above obligations on Confidential Information and indemnification for Brokers' claims; (ii) shall be subject to all restrictions and prohibitions in the above agreement; (iii) has not been engaged by and will not act for Owner regarding the Premises or for any Transaction; (iv) waives any claim against Owner for commission or other compensation on account of any Transaction, whether or not consummated; and (v) shall not introduce the Premises to anyone except the party that signed the above agreement. This paragraph shall survive closing of any Transaction and any expiration of obligations on Confidential Information.

Very truly yours,

Two Bins Capital
15 Bond Street
Suite 304
great Neck, NY 11021

By: _____

Name: _Emanuel Westfried _____

Title: _Broker_____

Telephone: _917_-282-8726_____

Email: _emanuel@twobinscapital.com_

4858-0737-1574, v. 23

4

NFMC_000587

EXHIBIT 1 PAGE 146

 Gmail

Shelene Zhong <shelene@sunlightgroupny.com>

## Fwd: 95 Madison - Due diligence information
1 message

Lin Zhuo <lin@sunlightgroupny.com>                                    Tue, Aug 6, 2024 at 10:49 PM
To: Shelene Zhong <shelene@sunlightgroupny.com>

---------- Forwarded message ----------
From: emanuel@lwobiniscapital.com <emanuel@lwobiniscapital.com>
Date: Tue, Jan 2, 2024 at 3:42 PM
Subject: Fwd: 95 Madison - Due diligence information
To: Linzhong Zhuo <lin@sunlightgroupny.com>,

Sent from my iPhone

Begin forwarded message:

**From:** Michael Sklar <MSklar@limhicksone.com>
**Date:** January 2, 2024 at 3:35:58 PM EST
**To:** emanuel@lwobiniscapital.com
**Cc:** emanuel@lwornisone.com
**Subject:** 95 Madison – Due diligence information

**ShareFile Attachments**                            Expires June 30, 2024

95 Mad son 112023.zip                                    GB

Michael Sklar uses ShareFile to share documents securely.

Michael Sklar

Sr. Project Manager

REORGANIZED
DEBTOR'S
EXHIBIT

DX0037

EXHIBIT
6/6/24

S00156

EXHIBIT 1 PAGE 147

FLINTLOCK CONSTRUCTION SERVICES, LLC | 202 West 40th Street , 6th floor | New York, NY 10018

212.921.2125 x 327(p) | 212.921.2130 (f) | 914.450.1974 (c) | MSidlar@Flintlockll.com
<mailto:MSidlar@Flintlockll.com>

P A little green reminder: Please consider the environment before printing this email.

Attachments.txt
1K

S00157

EXHIBIT 1 PAGE 148

 Gmail

Shelene Zhong <shelene@sunlightgroupny.com>

# Fwd: 95 Madison conceptual residential Plans & SF calculations .
1 message

Lin Zhuo <lin@sunlightgroupny.com>
To: Shelene Zhong <shelene@sunlightgroupny.com>

Tue, Aug 6, 2024 at 10:43 PM

---------- Forwarded message ----------
From: emmittual@iwebmeeuptial.care-somanjunial.com
Date: Tue, Jan 2, 2024 at 3:19 PM
Subject: Fwd:    Madison conceptual residential Plans & SF calculations .
To: Lin Zhong Zhuo <lin@sunlightgroupny.com>

Sent from my iPhone

Begin forwarded message:

> From: Michael Sklar <mel   
> Date: January 2, 2024 at 3:06:41 PM EST
> To: emmitual@iwebmeeuptial.com
> Subject: 95 Madison conceptual residential Plans & SF calculations .

1. SF calculation Montrey Anderson 110322
2. 95 Madison Residential Study V2 080821
3. 95 Madison residential study 111323

Michael Sklar

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P

917 270.6023 (c) |   mfmennetViVansV   n 6 m0l0 Matt.hr@ninetyfivemadison   |1n-

F     fdtily/jrv         bls            ttn tl'y    amennuennert/astr              tis pnool

**REORGANIZED DEBTOR'S EXHIBIT**

**DX0038**

3 attachments

231113-95 Madison_Update V3.pdf
1437K

EXHIBIT 1 PAGE 149

**210818 95 Madison Study V2.pdf**
481K

**Square footage calculations 95 Madison Ave_MDA_11.03.22.pdf**
104K

S00159

EXHIBIT 1 PAGE 150

95 MADISON SF CALCULATIONS

| Floor | Gross SF | Deductions | Retail/ Storage USF | Office USF | Loss factor | Rentable SF |
|-------|----------|------------|---------------------|------------|-------------|-------------|
| SUB-CELLAR | 3,256 | 3,256 | 0 | 0 | 0.00% | 0 |
| CELLAR | 8,793 | 3,568 | 5,225 | 0 | 0.00% | 5,225 |
| 1ST FLOOR | 9,650 | 2,421 | 7,229 | 0 | 0.00% | 7,229 |
| 1ST FLOOR MEZ | 892 | 0 | 892 | 0 | 0.00% | 892 |
| 2ND FLOOR | 9,111 | 984 | 0 | 8,127 | 27.00% | 11,133 |
| 3RD FLOOR | 9,111 | 984 | 0 | 8,127 | 27.00% | 11,133 |
| 4TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 5TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 6TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 7TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 8TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 9TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 10TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 11TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 12TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| 13TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 14TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 15TH FLOOR | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| 16TH FLOOR | 8,502 | 863 | 0 | 7,639 | 27.00% | 10,464 |

Montroy • Danniree Architecture LLP
95 MADISON AVENUE
11TH FLOOR
NEW YORK, NY 10016

900160

EXHIBIT 1 PAGE 151

95 Madison Ave, NY

| Floor | Existing | [illegible] | [illegible] | Total |
|---|---|---|---|---|
| Cellar | [illegible] | | | [illegible] |
| 1 | [illegible] | | | [illegible] |
| 2 | [illegible] | | | 8,746 |
| 3 | [illegible] | | | 8,700 |
| 4 | [illegible] | 12 | | [illegible] |
| 5 | [illegible] | 70 | | [illegible] |
| 6 | [illegible] | 75 | | [illegible] |
| 7 | [illegible] | [illegible] | | [illegible] |
| 8 | [illegible] | [illegible] | | [illegible] |
| 9 | [illegible] | [illegible] | | [illegible] |
| 10 | [illegible] | [illegible] | | [illegible] |
| 11 | [illegible] | [illegible] | | [illegible] |
| 12 | [illegible] | [illegible] | | [illegible] |
| 13 | [illegible] | [illegible] | | [illegible] |
| 14 | [illegible] | [illegible] | | [illegible] |
| 15 | [illegible] | [illegible] | | [illegible] |
| 16 | [illegible] | [illegible] | [illegible] | [illegible] |
| Roof | | | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| [illegible] | [illegible] |
|---|---|
| [illegible] | [illegible] |

| | Permitted | | [illegible] | | Proposed | |
|---|---|---|---|---|---|---|
| | FAR | FA | FAR | FA | FAR | FA |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | | | [illegible] | [illegible] |

| Density | [illegible] | Proposed [illegible] |
|---|---|---|

| Building Height | [illegible] | [illegible] | Proposed |
|---|---|---|---|
| [illegible] | [illegible] | | |
| [illegible] | [illegible] | [illegible] | [illegible] |

C6
C5-2
C5-3
C6-4A
C4-5A
C6-2A
R8B
BROADWAY

SCHEMATIC STUDY

95 MADISON AVE, NY

SK-01

workshop

**CELLAR FLOOR**

COMMERCIAL
3501 SF

AMENITY
2845 SF

COMMERCIAL FREIGHT
(1ST FLR/CELLAR)

STAIR 2

ELEVATOR & STAIR 1 & REFUSE

**1ST FLOOR**

COMMON
1028 SF

COMMERCIAL
7288 SF

COMMERCIAL FREIGHT
(1ST FLR/CELLAR)

STAIR 2

RESIDENTIAL
ENTRY

COMMON
1235 SF

ELEVATOR & STAIR 1 & REFUSE

SCHEMATIC STUDY - CELLAR & 1FL

SK-02

95 MADISON AVE, NY

workshop

EXHIBIT 1 PAGE 153

2BR
1190 SF
1BR
994 SF
1BR
862 SF
0BR
825 SF
1BR
810 SF
1BR
940 SF
0BR
584 SF
2BR
1135 SF
STAIR 2
ELEVATOR & STAIR 1 & REFUSE
REMOVED: 2ND FL
2BR
1177 SF
1BR
1030 SF
1BR
881 SF
0BR
820 SF
1BR
848 SF
2BR
1267 SF
2BR
1217 SF
ELEVATOR & STAIR 1 & REFUSE
16TH FLOOR
SCHEMATIC STUDY - 2ND TO 16TH FLOORS
95 MADISON AVE, NY
SK-03
workshop



ROOF

ROOF TERRACE
7966 SF
MIN 50%
COMMON USE
3984 SF

STAIR
BULKHEAD

ELEVATOR
BULKHEAD

STAIR 2
BULKHEAD

A

95 MADISON AVE, NY

SCHEMATIC STUDY - ROOF

SK-04

EXHIBIT 1 PAGE 155



EXHIBIT 1 PAGE 156

EXHIBIT 1 PAGE 157

ROOF TERRACE
7678 SF

MIN. 30%
COMMON ROOF
TERRACE

ELEVATOR
BULK HEAD

STAIR 1
BULK HEAD

MECH. BULK / STAIR
BULK HEAD

95 MADISON AVE, NY

SCHEMATIC STUDY - ROOF

SK-04

EXHIBIT 1 PAGE 158

| From: | emanuel@twobinscapital.com |
| --- | --- |
| Sent: | Monday, January 8, 2024 6:21 PM |
| To: | Michael Sklar |
| Subject: | Fwd: 95 madison offer |
| Attachments: | Offer from Sunlight_1.8 (1).pdf; Sunlight Dev_Resume_12.11_2024.pdf |

See below and attached. Please call when free to discuss.

Sent from my iPhone

Begin forwarded message:

> **From:** Linzhong Zhuo <lin@sunlightgroupny.com>
> **Date:** January 8, 2024 at 6:15:37 PM EST
> **To:** emanuel@twobinscapital.com, Jimmy Chou <lgcenterprise@gmail.com>
> **Subject: 95 madison offer**
>
> Hi Emanuel,
>
> Please see the attached for 95 madison offer and our resume.
>
> thanks,
> Lin



REORGANIZED
DEBTOR'S
EXHIBIT

DX0039

EXHIBIT
26 Millar
10 16 24

NFMC_000612

EXHIBIT 1 PAGE 159



# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $58 million

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P.

Financing info: $35 million, 2-year term @ 5% interest rate

Due Diligence: 45 days

Down Payment Deposit: 5%

Closing date: 60 days after Due Diligence

**Delivery Conditions:**

Deliver vacant land; No environmental issue; Subject to local law 11; Subject to landmark compliance; Subject to clean title; Real estate tax deduction appeal

**Buyer Attorney Info:**

Jay Lau, Esq.

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: Jlau  lau  c.com

Owner Name:  Sunlight Development LLC

Signature By:

Date:  1/8/2024

NFMC_000613

EXHIBIT 1 PAGE 160

www.sunlightdevelopment.com

# Sunlight Development

Phone:718-439-6600 | Fax:718-439-6688 | linzhuo123@gmail.com

201 46th FL1, Brooklyn, New York, 11220

## Profile

Sunlight Development offers a full spectrum of construction services ranging from construction management, general contract to consulting services. Our competency and competitiveness have applied to inclusively various construction sites. Numerous projects we have built in the past include high-end multi-family residences, high-end condominiums, and superior commercial properties.

## Professional Services

- Site evaluation
- Engineering evaluation
- Site plan development
- Cost control plan
- Construction work
- Construction management

## Current and Past Construction Projects:

Completed:

136-20 Booth Memorial Ave, Queens, NY (complete 2019), $24 million, 24-family + commercial building

Owned & Sold

201 46th St, Brooklyn, NY (complete 2016) $18 million, 50,000-SF commercial building

Owned & Managed

5011 Queens Blvd, Queens, NY (complete 2021) $35 million, 75-unit rental building  Owned & Managed

146-17 Northern Blvd, Brooklyn NY (complete 2021) $20 million, 35-unit condo & commercial building

GC

38-42 11th St, Queens, NY (complete 2019) $30 million, 150-room hotel  GC

97-21 64th Road, Queens, NY 11374 (complete 2020) $40 million, 80,000-SF mixed-use building

Owned & Managed

136-18 Maple Ave, Queens, NY (complete 2022) $100 million, 20-story mixed-use building

Owned & Managed

113 Columbia Heights, Brooklyn, NY (complete 2022) $14 million, 5-unit condo building  Owned & Sold

NFMC_000614

EXHIBIT 1 PAGE 161

www.millerchronicles.com

323 East 79th St, New York, NY (under construction), $63 million, 17-story condo building     GC

134-16 35th Ave, Queens, NY (under construction) $56 million, 69-unit condo building     Owned & Sold

415 Degraw St, Brooklyn, NY (under construction), $20 million, 6-unit condo building     Owned & Sold

36 Remsen St, Brooklyn, NY (under construction), $11 million, 5-unit condo building     Owned & Sold

Under Construction:

138-18 Northern Blvd, Queens, NY (under construction) $140 million, 127-unit mixed-use building

30-55 Vernon Blvd, Queens, NY (under construction) $100 million, 119-unit mixed-use building

21-11 31st Ave, Queens, NY (under construction), $17 million, mid-rise mixed-use building

**More than 500,000 SF is under construction currently…**

NFMC_000615

EXHIBIT 1 PAGE 162



NFMC_000616

EXHIBIT 1 PAGE 163

**Few Project References:**

Location: 136-18 Maple Ave, Queens, NY

Status: Complete

Building Type: $100 million, 20-story mixed-use building



NFMC_000617

EXHIBIT 1 PAGE 164





EXHIBIT 1 PAGE 165

ww





NFMC_000619

EXHIBIT 1 PAGE 166

Location: 5011 Queens Boulevard, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



NFMC_000620

EXHIBIT 1 PAGE 167

Location: 97-29 64 Road, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



NFMC_000621

EXHIBIT 1 PAGE 168





NFMC_000622

EXHIBIT 1 PAGE 169

li r n coll

Location: 134-15 35th St, New York, NY

Status: Complete

Building Type: 12-story mixed-use building



NFMC_000623

EXHIBIT 1 PAGE 170





NFMC_000624

EXHIBIT 1 PAGE 171



NFMC_000625

EXHIBIT 1 PAGE 172

Location: 323 East 79th St, New York, NY

Status: Complete

Building Type: 17-story condo building



NFMC_000626

EXHIBIT 1 PAGE 173





NFMC_000627

EXHIBIT 1 PAGE 174





NFMC_000628

EXHIBIT 1 PAGE 175

Location: 3055 Vernon Boulevard, New York, NY

Status: Under construction

Building Type: 9-story mixed-use building



NFMC_000629

EXHIBIT 1 PAGE 176





NFMC_000630

EXHIBIT 1 PAGE 177

From: Linzhong Zhuo <lin@sunlightgroupny.com>
Sent: Mon, 8 Jan 2024 18:13:18 -0500 (EST)
To: emanuel@twobinscapital.com; Jimmy Chou <lgcenterprise@gmail.com>
Subject: 95 madison offer
Attachments: Sunlight Dev_Resume_12.11_2024.pdf;Offer from Sunlight_1.8 (1).pdf

Hi Emanuel,

Please see the attached ofr 95 madison offer and our resume.

thanks
Tin

REORGANIZED
DEBTOR'S
EXHIBIT

DX0040


EXHIBIT

EXHIBIT 1 PAGE 178

TB_EW_000062

# Sunlight Development

Phone:718-139-6800  Fax:718-139-6688 | linzhuo123@gmail.com

201 46th Pl 1, Brooklyn, New York, 11220

## Profile

Sunlight Development offers a full spectrum of construction services ranging from construction management, general contract to consulting services. Our competency and competitiveness have applied to inclusively various construction sites. Numerous projects we have built in the past include high-end multi-family residences, high-end condominiums, and superior commercial properties.

## Professional Services

- Site evaluation
- Engineering evaluation
- Site plan development
- Cost control plan
- Construction work
- Construction management

## Current and Past Construction Projects:

Completed

136-20 Booth Memorial Ave, Queens, NY (complete 2019), $24 million, 24-family – commercial building

Owned & Sold

20½ 46'' St, Brooklyn, NY (complete 2016) $18 million, 50,000SF commercial building

Owned & Managed

5011 Queens Blvd, Queens, NY (complete 2021) $35 million, 75-unit rental building  Owned & Managed

146-17 Northern Blvd, Brooklyn NY (complete 2021) $20 million, 35-unit condo & commercial building

GC

18-42 11th St, Queens, NY (complete 2019) $30 million, 150-room hotel     GC

97-21 64th Road, Queens, NY (complete 2020) $40 million, 80,000-SF mixed-use building

Owned & Managed

120-18 Maple Ave, Queens, NY (complete 2022) $100 million, 20-story mixed-use building

Owned & Managed

113 Columbia Heights, Brooklyn, NY (complete 2020) $5 million, 5-unit condo building  Owned & Sold

EXHIBIT 1 PAGE 179

TB_EW_000063

323 East 79th St. New York, NY (under construction), $63 million, 17-story condo building    GC

134-16 35th Ave, Queens, NY (under construction) $56 million, 69-unit condo building    Owned & Sold

415 Degraw St. Brooklyn, NY (under construction), $20 million, 6-unit condo building    Owned & Sold

36 Remsen St, Brooklyn, NY (under construction), $11 million, 5-unit condo building    Owned & Sold

**More than 500,000 SF is under construction currently...**



EXHIBIT 1 PAGE 181

TB_EW_000065

Few Project References:

Location: 136-18 Maple Ave, Queens, NY

Status: Complete

Building Type: $100 million, 20-story mixed-use building



EXHIBIT 1 PAGE 182

TB_EW_000066

TB_EW_000067





EXHIBIT 1 PAGE 183





EXHIBIT 1 PAGE 184

TB_EW_000068

Location: 5011 Queens Boulevard, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 185

TB_EW_000069

Location: 97-29 64 Road, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 186

TS_EW_000070





EXHIBIT 1 PAGE 187

TB_EW_000071

Location: 134-15 35th St. New York, NY

Status: Complete

Building Type: 12-story mixed-use building



EXHIBIT 1 PAGE 188

TB_EW_000072





EXHIBIT 1 PAGE 189

TB_EW_000073



EXHIBIT 1 PAGE 190

TB_EW_000074

Location: 323 East 79th St. New York, NY

Status: Complete

Building Type: 17-story condo building



EXHIBIT 1 PAGE 191

TB_EW_000075





EXHIBIT 1 PAGE 192

TB_EW_000076





EXHIBIT 1 PAGE 193

TB_EW_000077

Location: 3055 Vernon Boulevard, New York, NY

Status: Under construction

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 194

TB_EW_000078





EXHIBIT 1 PAGE 195

TB_EW_000079



**SUNLIGHT**
DEVELOPMENT

135-25 Northern Blvd 2FL, Flushing, New York 11354

Tel: 718-439-6608 Fax: 718-439-6688

Web: http://www.sunlightdevelop.com Email: info@sunlightdevelop.com

# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $58 million

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P.

Financing Info: $35 million, 2-year term @ 5% interest rate

Due Diligence: 45 days

Down Payment Deposit: 3%

Closing date: 60 days after Due Diligence

**Delivery Conditions:**

Deliver vacant land; No environmental issue; Subject to local law 11; Subject to landmark compliance; Subject to clean title; Real estate tax deduction appeal

**Buyer Attorney Info:**

Jay Lau, Esq

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: jaulau@gmail.com

Owner Name: Sunlight Development LLC

Signature By:

Date: 1/8/2024

EXHIBIT 1 PAGE 196

TB_EW_000060

| | |
|---|---|
| **From:** | Michael Sklar |
| **To:** | woody.heller@outlook.com; Michael Lefkowitz |
| **Cc:** | Andrew K. Glenn; Sharan Sklar |
| **Subject:** | LOI CNY Signed MSL SJS 010924 |
| **Date:** | Tuesday, January 9, 2024 5:55:57 PM |
| **Attachments:** | LOI CNY Signed MLS SJS 010924.pdf |

Woody / Michael:

Attached is signed LOI for CNY .

Michael Sklar

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

P A little green reminder: Please consider the environment before printing this email

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0041**

**Exhibit
22**

S. Sklar

BR001226

EXHIBIT 1 PAGE 197

Mr. Woody Heller
Branton Realty

January **7**, 2024

Subject: Acquisition of 95 Madison Avenue, New York, NY 10016

Dear Mr. Heller:

I am writing this Letter of Intent ("LOI") on behalf of Madison 95 Associates LLC (an SPE whose members include principals of CNY Group and Equity Partner (it being understood that the "Equity Partner" will be identified in a signed writing delivered to Seller within three (3) business days of the execution of this LOI) (the foregoing being collectively hereinafter referred to as the "Buyer") to express our interest in acquiring the 16-story building located at 95 Madison Avenue, New York, NY 10016, Block 858, Lot 58 (the "Property"). We believe this sale and acquisition aligns with our strategic goals and represents a significant opportunity for growth for both parties.

Terms of the proposed acquisition are as follows:

1.  Property Details: The Buyer wishes to acquire the Property and the entire building located at the Property (the "Building" and together the Property and the Building thereon are hereinafter referred to as the "Premises").

2.  Consideration: The Buyer agrees to purchase Premises for a total consideration of $60,000,000.

3.  Delivery: Ninety-Five Madison Company, L.P. (the "Seller"), shall deliver the Premises as follows:

    (i)    The Seller shall ensure the Premises is delivered fee simple to the Buyer.

    (ii)   The Seller will deliver the Premises and title free and clear of all liens and encumbrances, excluding any permitted exceptions as per an agreed upon Purchase and Sale Agreement.

    (iii)  It has been represented to the Buyer that there are several violations against the Premises, both physical and financial. The Seller has provided an updated violation report to show which violations are still in place. The Buyer shall accept title to the Premises subject to any and all violations issued against the Premises but Seller shall be responsible for the payment of liquidated fines and penalties levied against Seller in connection with violations issued against the Premises.

    (iv)   It has been represented to the Buyer that the following two office tenants remain on the 12th floor of the Building: (a) Tenant A whose lease expires end of year 2024 with a landlord termination option to terminate the lease in 120 days of due notice and the payment of $5,000; and (b) Tenant B occupying 5,900 sf whose lease matures in 2030. The Buyer has offered to pay up to $250,000 for Tenant B to vacate their 5,900 square foot space (the "Tenant B Space"). The Seller agrees that the $250,000 can only be used for the buyout of Tenant B and for no other purpose or expense on Seller's part.

    (v)    In connection with Tenant B, Seller shall, in Seller's sole discretion, either (i) cause Tenant B to vacate the Tenant B Space as referenced in Section (iv) above pursuant to a letter agreement between Seller and Tenant B whereby Tenant B shall agree to vacate the Tenant B Space within six (6) months of Closing (the "Tenant B Vacate Agreement"); it being agreed to by the parties that a draft of the Tenant B Vacate Agreement shall be an exhibit to the Purchase and Sale Agreement; or (ii) enter into a signed agreement with Tenant B prior to the Closing (a copy of which signed writing must be delivered to Buyer prior to Closing) pursuant to which Tenant B agrees to be



EXHIBIT 1 PAGE 198

BR001227

relocated within the Building to a space of the Buyer's choice (i.e. commercial, ground floor retail or another unit) pursuant to the Tenant B Relocation Notice, as hereinafter defined (the "Tenant B Relocation Agreement"); it being agreed to by the parties that a draft of the Tenant B Relocation Agreement shall be an exhibit to the Purchase and Sale Agreement. If Seller elects to proceed pursuant to subsection (ii) above, then Seller shall send a notice to Tenant B by January 31, 2024 advising Tenant B that they are being relocated within six (6) months of the date of the Tenant B Relocation Notice (the "Tenant B Relocation Notice").

    a.  In the event that Tenant B executes the Tenant B Vacate Agreement, then to the extent the Tenant B Vacate Agreement requires payment(s) to be made to Tenant B in consideration for its agreement to vacate the premises demised by its lease (the "Vacate Consideration"), then the Buyer shall be responsible for any and all Vacate Consideration due Tenant B up to the aggregate amount of $250,000.00 (the "Vacate Consideration Limit"). In no event shall the Buyer's Vacate Consideration payment obligations exceed the Vacate Consideration Limit. If the Vacate Consideration does exceed the Vacate Consideration Limit, then at the Closing, Seller shall place into escrow the remainder of the Vacate Consideration above the Vacate Consideration Limit, which shall be paid to Buyer at Closing. For the avoidance of doubt and by way of example, if the Vacate Consideration due to Tenant B pursuant to the Tenant B Vacate Agreement is the aggregate amount of $500,000.00, then Buyer shall be responsible for paying Tenant B $250,000.00 and Seller shall place into escrow $250,000.00. Notwithstanding anything to the contrary contained herein, if the parties proceed pursuant to this subsection a., then at Closing any and all obligations of Seller under the Tenant B Vacate Agreement shall be assigned by Seller to Buyer, and assumed by Buyer, and Seller shall have no further obligations or liabilities with respect to the Tenant B Vacate Agreement following Closing.

    b.  In the event that Tenant B agrees to the Tenant B Relocation Agreement, then Seller shall place into escrow the amount of $4,640,200.00 [which will cover Buyer's costs of relocating Tenant B, providing temporary services and a tenant protection plan required by the Department of Buildings and a diminution of value based on lost rental of space occupied by Tenant B over approximately 6.5 years] (the "Seller Relocation Escrow"). The Seller Relocation Escrow shall be paid to Buyer at Closing or as otherwise provided for in the Purchase and Sale Agreement.

(vi)  The Seller will provide the Buyer with copies of all written material communications between the Seller and either Tenant A or Tenant B that relate to their buyout, relocation and/or termination of their respective leases. The Seller shall be responsible to evidence its election to terminate the lease with Tenant A in a timely fashion pursuant to the lease with Tenant A, and to deliver either the Tenant B Vacate Agreement, or the Tenant B Relocation Agreement, to Buyer (and applicable escrow to Stewart Title) at Closing. The termination of Tenant A's Lease and either (i) the fully executed Tenant B Vacate Agreement or (ii) the fully executed Tenant B Relocation Agreement, (and funding of the escrow) shall be a condition of Closing.

(vii)  The Seller has provided the GRS environmental report dated 10/12/22 in the Seller's data room which can be certified to the Buyer at a cost of approximately $500 to be paid for at the Buyer's expense.

4.  Due Diligence: During our diligence, currently underway, the Buyer will pay for various costs of the investigation of the Premises. The Seller will provide all information including but not limited to all tenant leases, all landmark documentation or any other city agency mandatory repairs (i.e. Local Law 11 & 10) that have been performed in conjunction with landmarks, any other mandated municipal requirements landmark or otherwise, any information and documentation on any violations, outstanding levies, real estate taxes, union agreements, labor agreements or any bankruptcy related documentation. During this period, the Seller shall provide the Buyer with access to all necessary documents, records, and information related to the Premises. We realize the majority of the information is contained in the Seller's data room to which Seller has already provided access; The Seller will provide any additional property information that they have, which is not contained in the Seller's data room upon reasonable request of the Buyer.

5.  Good Faith Negotiations. The parties will negotiate the final PSA targeted to be signed by January 19, 2024, which may be extended upon mutual written agreement of the Seller and the Buyer.



EXHIBIT 1 PAGE 199

BR001228

6. Exclusivity: During the period following the execution of this LOI until the earlier of: (i) the signing of the Purchase and Sale Agreement, (ii) January 19th, 2024, or (iii) sooner termination of this LOI by the Buyer at its sole discretion, whichever occurs earlier, the Seller shall not engage in any offers, negotiations, or discussions with any third party regarding the sale of the Premises. During the due diligence period the Buyer will pay for various costs of the investigation of the Premises. The Seller will provide all information including but not limited to all tenant leases, all landmark or any other city agency mandatory repairs (i.e. Local Law 11 & 10) that have been performed in conjunction with landmarks, any other mandated municipal requirements landmark or otherwise, any information and documentation on any violations, outstanding levies or real estate taxes, union agreements, labor agreements, or any bankruptcy related documentation.

7. Purchase and Sale Agreement: The Seller has provided a copy of the Purchase and Sale Agreement prepared by the Seller's counsel for review by the Buyer's counsel. The Buyer shall provide the Seller with its written mark up of the proposed Purchase and Sale Agreement.

8. Deposit: The Buyer agrees to a 10% deposit upon signing of a Purchase and Sale Agreement in the form of a Letter of Credit to be held in escrow by Stewart Title. Upon approval by the Bankruptcy Court of the executed Purchase and Sale Agreement between the Seller and the Buyer, the Letter of Credit will convert to a cash deposit. The Seller will confirm the Letter of Credit is acceptable to the bankruptcy court judge.

9. Closing: The closing of the purchase shall occur within 60 days, Time is of the Essence, from receiving Bankruptcy Court approval of the purchase. The closing shall be subject to the satisfaction of all necessary legal and regulatory requirements.

10. Confidentiality: Both parties agree to keep the terms and details of this LOI and the ensuing negotiations strictly confidential, except as required by law or with the prior written consent of the other party.

11. Brokers: It is understood that Branton Realty, Mr. Woody Heller, is the exclusive representative for the Seller of the Premises and Aries Capital Corp., Mr. Nicholas Barone is the exclusive representative for the Buyer of the Premises; both the Seller and the Buyer will be responsible for paying their respective brokers pursuant to the broker's respective agreement with the Buyer or Seller, as the case may be, and both brokers shall be entitled to a standard brokerage commission payable at Closing (pursuant to the terms of their respective agreement).

This LOI is non-binding except for the exclusivity and confidentiality provisions contained herein and is intended to outline the general terms and conditions of the proposed transaction. Except as noted, it is not a contract and does not create any legally binding obligations between the parties. Any final agreement shall be subject to the negotiation and execution of a mutually acceptable purchase and sale agreement.

We believe that this acquisition presents a unique opportunity for both parties, and we look forward to working closely with you to a successful sale and acquisition for both parties. Should you have any questions or require additional information, please do not hesitate to contact me.

Thank you for considering our proposal. We anticipate a positive response and the opportunity to proceed with the necessary negotiations.

Sincerely yours,

ARIES CAPITAL CORP

[signatures appear on following page]



BR001229

EXHIBIT 1 PAGE 200

Accepted and Agreed to:

**Accepted and Agreed to by Seller:**

**Ninety-Five Madison Company, L.P.**

By: _____
Name: <u>Sharan Sklar</u>
Title: <u>Sole Member, Sharan Sklar Management LLC</u>, A General Partner Ninety-Five Madison Company, L.P.


By: _____
Name: <u>MiChael Sklar</u>
Title: <u>Sole member, Michael Sklar, Manages LLC, A general Partner Ninety Five Madison L.P.</u>


**Accepted and Agreed to by Buyer:**

**Madison 95 Associates LLC**

By: _____
Name: _____
Title: _____

EXHIBIT 1 PAGE 201

BR001230

Accepted and Agreed to:

**Accepted and Agreed to by Seller:**

**Ninety-Five Madison Company, L.P.**

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


**Accepted and Agreed to by Buyer:**

**Madison 95 Associates LLC**

By: _____
Name: Kenneth Colao
Title: MANAGER

BR001231

EXHIBIT 1 PAGE 202