**From:** emanuel@twobinscapital.com
**Sent:** Tuesday, January 9, 2024 2:17 PM
**To:** Michael Sklar
**Subject:** Re: 95 madison offer

When are you free to talk?

Sent from my iPhone

On Jan 9, 2024, at 2:08 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:

1. Something moved quickly , we have someone we will be signing LOI with today . When I sign, I have exclusionary period and will not be able to discuss. Things do not always work out but :
2. Property will be as is – Environmental , Landmark
3. Deliver no tenants or letter to terminate
4. There is enough information to due  diligence. Closing 60 days after PSA. Time of essence. No retrading

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**From:** emanuel@twobinscapital.com <emanuel@twobinscapital.com>
**Sent:** Monday, January 8, 2024 6:21 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** Fwd: 95 madison offer

See below and attached. Please call when free to discuss.

Sent from my iPhone

Begin forwarded message:

> **From:** Linzhong Zhuo <lin@sunlightgroupnw.com>
> **Date:** January 8, 2024 at 6:15:37 PM EST
> **To:** emanuel@twobinscapital.com, Jimmy Chou <lpcenterprise@gmail.com>
> **Subject: 95 madison offer**

Hi Emanuel,



REORGANIZED
DEBTOR'S
EXHIBIT

DX0042



EXHIBIT
McSklar
28  10/16/24

NFMC_000650

EXHIBIT 1 PAGE 203

Please see the attached for 95 madison offer and our resume.

thanks,
Lin

<Offer from Sunlight_1.8 (1).pdf>
<Sunlight Dev_Resume_12.11_2024.pdf>

NFMC_000651

EXHIBIT 1 PAGE 204

| | |
|---|---|
| **From:** | u=Michael Sklar/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A3107E500DC94D07B57F2DE007E3F80F-MSKLAR |
| **Sent:** | Tue, 9 Jan 2024 07:57:41 -0500 (EST) |
| **To:** | "Sharan Sklar" <ssklar@ninetyfivemadison.com> |
| **Subject:** | FW: 95 madison offer- Sunlight - Two bins capital |
| **Attachments:** | Sunlight Dev_Resume_12.11_2024.pdf;Offer from Sunlight_1.8 (1).pdf |

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.
917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**From:** emanuel@twobinscapital.com <emanuel@twobinscapital.com>
**Sent:** Monday, January 8, 2024 6:21 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>
**Subject:** Fwd: 95 madison offer
See below and attached. Please call when free to discuss.
Sent from my iPhone
Begin forwarded message:

> **From:** Linzhong Zhuo <lin@sunlightgroupny.com>
> **Date:** January 8, 2024 at 6:15:37 PM EST
> **To:** emanuel@twobinscapital.com, Jimmy Chou <lgcenterprise@gmail.com>
> **Subject: 95 madison offer**
>
>
> Hi Emanuel,
> Please see the attached for 95 madison offer and our resume.
> thanks,
> Lin

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0043**

**Exhibit
21**
S. Sklar

EXHIBIT 1 PAGE 205

NFMC-06577

# Sunlight Development

Phone:718-439-6600 | Fax:718-439-6688 | linzhuo123@gmail.com

201 46th FL1, Brooklyn, New York, 11220

## Profile

Sunlight Development offers a full spectrum of construction services ranging from construction management, general contract to consulting services. Our competency and competitiveness have applied to inclusively various construction sites. Numerous projects we have built in the past include high-end multi-family residences, high-end condominiums, and superior commercial properties.

## Professional Services

- Site evaluation
- Engineering evaluation
- Site plan development
- Cost control plan
- Construction work
- Construction management

## Current and Past Construction Projects:

Completed:

136-20 Booth Memorial Ave, Queens, NY (complete 2019), $24 million, 24-family + commercial building

Owned & Sold

201 46th St, Brooklyn, NY (complete 2016) $18 million, 50,000-SF commercial building

Owned & Managed

5011 Queens Blvd, Queens, NY (complete 2021) $35 million, 75-unit rental building  Owned & Managed

146-17 Northern Blvd, Brooklyn NY (complete 2021) $20 million, 35-unit condo & commercial building

GC

38-42 11th St, Queens, NY (complete 2019) $30 million, 150-room hotel                         GC

97-21 64th Road, Queens, NY 11374 (complete 2020) $40 million, 80,000-SF mixed-use building

Owned & Managed

136-18 Maple Ave, Queens, NY (complete 2022) $100 million, 20-story mixed-use building

Owned & Managed

113 Columbia Heights, Brooklyn, NY (complete 2022) $14 million, 5-unit condo building  Owned & Sold

EXHIBIT 1 PAGE 206

NFMC-06578

323 East 79th St, New York, NY (under construction), $63 million, 17-story condo building          GC

134-16 35th Ave, Queens, NY (under construction) $56 million, 69-unit condo building     Owned & Sold

415 Degraw St, Brooklyn, NY (under construction), $20 million, 6-unit condo building     Owned & Sold

36 Remsen St, Brooklyn, NY (under construction), $11 million, 5-unit condo building      Owned & Sold


Under Construction:

138-18 Northern Blvd, Queens, NY (under construction) $140 million, 127-unit mixed-use building

30-55 Vernon Blvd, Queens, NY (under construction) $100 million, 119-unit mixed-use building

21-11 31st Ave, Queens, NY (under construction), $17 million, mid-rise mixed-use building


**More than 500,000 SF is under construction currently…**

EXHIBIT 1 PAGE 207

NFMC-06579

www.sunlightgroupny.com



EXHIBIT 1 PAGE 208

NFMC-06580

**Few Project References:**

Location: 136-18 Maple Ave, Queens, NY

Status: Complete

Building Type: $100 million, 20-story mixed-use building



EXHIBIT 1 PAGE 209

NFMC-06581





EXHIBIT 1 PAGE 210

**NFMC-06582**





EXHIBIT 1 PAGE 211

NFMC-06583

Location: 5011 Queens Boulevard, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 212

NFMC-06584

Location: 97-29 64 Road, New York, NY

Status: Complete

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 213

**NFMC-06585**





EXHIBIT 1 PAGE 214

NFMC-06586

www.sunlightgroupny.com

Location: 134-15 35th St, New York, NY

Status: Complete

Building Type: 12-story mixed-use building



EXHIBIT 1 PAGE 215

**NFMC-06587**





EXHIBIT 1 PAGE 216

**NFMC-06588**



EXHIBIT 1 PAGE 217

**NFMC-06589**





www.sunlightgroupny.com

Location: 323 East 79th St, New York, NY

Status: Complete

Building Type: 17-story condo building

MATTEO
323

NFMC-06590

EXHIBIT 1 PAGE 219

NFMC-06591





EXHIBIT 1 PAGE 220

**NFMC-06592**

Location: 3055 Vernon Boulevard, New York, NY

Status: Under construction

Building Type: 9-story mixed-use building



EXHIBIT 1 PAGE 221

NFMC-06593





www.sunlightgroupny.com

EXHIBIT 1 PAGE 222



135-25 Northern Blvd 2FL, Flushing, New York 11354

Tel: 718-439-6600  Fax: 718-439-6688

Web: http://www.sunlightgroupny.com  Email: info@sunlightgroupny.com

# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $58 million

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P.

Financing info: $35 million, 2-year term @ 5% interest rate

Due Diligence: 45 days

Down Payment Deposit: 5%

Closing date: 60 days after Due Diligence

**Delivery Conditions:**

Deliver vacant land; No environmental issue; Subject to local law 11; Subject to landmark compliance; Subject to clean title; Real estate tax deduction appeal

**Buyer Attorney Info:**

Jay Lau, Esq.

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: Jlau@laupc.com

Owner Name:  Sunlight Development LLC

Signature By:

Date:   1/8/2024

EXHIBIT 1 PAGE 223

NFMC-06595

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Friday, January 12, 2024 9:15 PM |
| **To:** | Michael Sklar |
| **Subject:** | Fwd: 95 madison revised offer |
| **Attachments:** | 95 Offer from Sunlight_1.12.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** Linzhong Zhuo <lin@sunlightgroupny.com>
> **Date:** January 12, 2024 at 9:12:41 PM EST
> **To:** emanuel@twobinscapital.com, Jimmy Chou <lgcenterprise@gmail.com>
> **Subject: 95 madison revised offer**
>
>
> Hi Emanuel,
>
> Here is the revised offer
>
> thanks,
> Lin

REORGANIZED
DEBTOR'S
EXHIBIT

DX0044



EXHIBIT
2 M. Sklar
10.16.24

NFMC_000652

EXHIBIT 1 PAGE 224



135-25 Northern Blvd 2FL, Flushing, New York 11354

Tel: 718-439-6600  Fax: 718-439-6688

Web: http://www.sunlightgroupny.com  Email: info@sunlightgroupny.com

# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $62 million ($60 mm without owner finance)

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P

Financing info: $35 million, 2-year term @ 5% interest rate

Due Diligence: No DD

Down Payment Deposit: 5%

Closing date: 60 days

**Delivery Conditions:**

Deliver vacant and clean title.

**Buyer Attorney Info:**

Jay Lau, Esq.

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: Jlau@lau-c.com

Owner Name:  Sunlight Development LLC

Signature By:

Date:  1/12/2024

NFMC_000653

EXHIBIT 1 PAGE 225

| | |
|---|---|
| **From:** | Linzhong Zhuo <lin@sunlightgroupny.com> |
| **Sent:** | Fri, 12 Jan 2024 21:12:08 -0500 (EST) |
| **To:** | emanuel@twobinscapital.com; Jimmy Chou <lgcenterprise@gmail.com> |
| **Subject:** | 95 madison revised offer |
| **Attachments:** | 95 Offer from Sunlight_1.12.pdf |

Hi Emanuel,

Here is the revised offer. I'm thinking if the owner can send out the contract to us next week, we are willing to offer him one extra million. But this 1 million extra offer is only good if he can send us the contract next week.

thanks,
Lin

**REORGANIZED DEBTOR'S EXHIBIT**

**DX0045**



EXHIBIT 1 PAGE 226

TB_EW_000121



**SUNLIGHT**
DEVELOPMENT

135-25 Northern Blvd 2FL, Flushing, New York 11354

Tel: 718-439-6600 Fax: 718-439-6688

Web: http://www.sunlightpropny.com   Email: info@sunlightpropny.com

# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $62 million ($60 mm without owner finance)

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P.

Financing Info: $35 million, 2-year term @ 5% interest rate

Due Diligence: No DD

Down Payment Deposit: 5%

Closing date: 60 days

**Delivery Conditions:**

Deliver vacant and clean title.

**Buyer Attorney Info:**

Jay Lau, Esq.

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: lau@lclpc.com

Owner Name: Sunlight Development LLC

Signature By: 

Date: 1/12/2024

EXHIBIT 1 PAGE 227

TD_EW_000122

| | |
|---|---|
| **From:** | Michael Sklar <msklar@ninetyfivemadison.com> |
| **Sent:** | Sat, 13 Jan 2024 09:20:43 -0500 (EST) |
| **To:** | Sharan Sklar <ssklar@ninetyfivemadison.com> |
| **Subject:** | Fwd: 95 madison revised offer |
| **Attachments:** | 95 Offer from Sunlight_1.12.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** emanuel@twobinscapital.com
> **Date:** January 12, 2024 at 9:15:10 PM EST
> **To:** Michael Sklar <msklar@ninetyfivemadison.com>
> **Subject: Fwd: 95 madison revised offer**
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Linzhong Zhuo <lin@sunlightgroupny.com>
>> **Date:** January 12, 2024 at 9:12:41 PM EST
>> **To:** emanuel@twobinscapital.com, Jimmy Chou <lgcenterprise@gmail.com>
>> **Subject: 95 madison revised offer**
>>
>>
>> Hi Emanuel,
>> Here is the revised offer.
>>
>> thanks,
>> Lin

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0046**

**Exhibit
23**
S. Sklar

EXHIBIT 1 PAGE 228

NFMC-06596



# Offer

**Offer Content:**

Address: 95 Madison Ave, New York, NY 10016

Buyer name: Sunlight Development LLC / New LLC to form

Block 858, Lot 58

Lot size: 9,875 SF

Purchase price: $62 million ($60 mm without owner finance)

Seller Name: Michael Sklar / NINETY-FIVE MADISON COMPANY, L.P.

Financing info: $35 million, 2-year term @ 5% interest rate

Due Diligence: No DD

Down Payment Deposit: 5%

Closing date: 60 days

**Delivery Conditions:**

Deliver vacant and clean title.

**Buyer Attorney Info:**

Jay Lau, Esq.

Christodoulou & Lau, P.C.

40 Cutter Mill Road, Suite 504, Great Neck, NY 11021

Tel: 516-829-9770

Fax: 516-829-9788

E-mail: Jlau@laupc.com

Owner Name:  Sunlight Development LLC

Signature By:

Date:  1/12/2024

EXHIBIT 1 PAGE 229

NFMC-06597

| | |
|---|---|
| **From:** | Michael Sklar |
| **Sent:** | Saturday, January 20, 2024 9:13 AM |
| **To:** | Emanuel Westfried |
| **Subject:** | 95 Madison PSA |
| **Attachments:** | 95 Madison - Purchase and Sale Agreement (FF Draft 8.5.23)-60742879-v8.docx; |
| | Personal Property 073023.xlsx |

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

_____
Confidentiality Notice: The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.

**REORGANIZED
DEBTOR'S
EXHIBIT**

**DX0047**

EXHIBIT 1 PAGE 230

NFMC_000654

# PURCHASE AND SALE AGREEMENT

Between

## NINETY-FIVE MADISON COMPANY, L.P.,
a New York limited partnership

as SELLER,

and

[_____]
a [_____]

as PURCHASER,

Premises: 89-95 Madison Avenue
New York, New York 10016
Block: 858
Lot: 58

**[_____ ____], 2023**

US\60742879.8

EXHIBIT 1 PAGE 231

NFMC_000655

# TABLE OF CONTENTS

Page

1.  DEFINITIONS ..................................................................................................1

2.  PURCHASE AND SALE. .................................................................................3

3.  ACCESS. ..........................................................**Error! Bookmark not defined.**

4.  PURCHASE PRICE AND DEPOSIT. ..............................................................4

5.  STATUS OF TITLE. .......................................................................................10

6.  TITLE INSURANCE;  LIENS. ......................................................................11

7.  APPORTIONMENTS ......................................................................................13

8.  PROPERTY NOT INCLUDED IN SALE. ......................................................17

9.  COVENANTS OF SELLER ............................................................................18

10. ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER; SECURITY DEPOSITS; EMPLOYEES; CONDITIONS TO CLOSING. ......................20

11. CONDITION OF THE PROPERTY; REPRESENTATIONS. ..........................22

12. DAMAGE AND DESTRUCTION ..................................................................29

13. CONDEMNATION. ........................................................................................30

14. BROKERS AND ADVISORS. ........................................................................32

15. TAX REDUCTION PROCEEDINGS. .............................................................32

16. TRANSFER TAXES AND TRANSACTION COSTS. .....................................33

17. DELIVERIES TO BE MADE ON THE CLOSING DATE ..............................34

18. CLOSING DATE ............................................................................................36

19. NOTICES ........................................................................................................37

20. DEFAULT BY PURCHASER OR SELLER. ...................................................38

21. FIRPTA COMPLIANCE. ...............................................................................39

22. ENTIRE AGREEMENT; ACCEPTANCE OF DEED ......................................39

US\60742879.8

EXHIBIT 1 PAGE 232

NFMC_000656

| | | |
|---|---|---|
| 23. | AMENDMENTS. | 40 |
| 24. | WAIVER | 40 |
| 25. | PARTIAL INVALIDITY. | 40 |
| 26. | SECTION HEADINGS. | 40 |
| 27. | GOVERNING LAW | 40 |
| 28. | PARTIES; ASSIGNMENT AND RECORDING. | 41 |
| 29. | CONFIDENTIALITY AND PRESS RELEASES. | 41 |
| 30. | FURTHER ASSURANCES. | 42 |
| 31. | THIRD PARTY BENEFICIARY. | 42 |
| 32. | JURISDICTION AND SERVICE OF PROCESS | 42 |
| 33. | WAIVER OF TRIAL BY JURY. | 43 |
| 34. | MISCELLANEOUS. | 43 |
| 35. | ATTORNEYS' FEES. | 44 |
| 36. | EXCULPATION. | 44 |
| 37. | NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES. | 44 |
| 38. | NO CONSEQUENTIAL DAMAGES. | 45 |
| 39. | SUBMISSION FOR COURT APPROVAL. | 45 |

US\60742879.8

EXHIBIT 1 PAGE 233

NFMC_000657

Schedules

A.      Description of the Land
B.      Seller's Excluded Personalty
C.      List of Leases
D.      List of Contracts
E.      List of Security Deposits
F.      Arrearage Schedule
G.      Specified Encumbrances


Exhibits

1.      Escrow Agent's Wire Instructions
2.      Title Report
3.      Form of Deed
4.      Form of Bill of Sale
5.      Form of Notice to Tenants
6.      Form of Assignment and Assumption of Leases and Contracts
7.      Sale Order
8.      Seller Parties

US\60742879.8

EXHIBIT 1 PAGE 234

NFMC_000658

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") made as of the ___ day of _____, 2023 (the "<u>Effective Date</u>") between NINETY-FIVE MADISON COMPANY, L.P., a New York limited partnership ("<u>Seller</u>"), having an address at 95 Madison Avenue, New York, New York 10016, Suite 609, and [_____], a [_____] ("<u>Purchaser</u>"), having an address at [_____].

### W I T N E S S E T H :

       **WHEREAS**, Seller is the owner and holder of the fee simple estate in and to that certain plot, piece and parcel of land (the "<u>Land</u>") known as 89-95 Madison Avenue, New York, New York and more particularly described in <u>Schedule A</u>, together with the building and all other improvements (collectively, the "<u>Building</u>") located on the Land (the Building and the Land being sometimes referred to hereinafter, collectively, as the "<u>Premises</u>");

       **WHEREAS** on March 22, 2021, Seller filed a voluntary petition for relief, Case No. 21-10529 (DSJ) (the "<u>Bankruptcy Case</u>") under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"); and

       **WHEREAS**, Seller desires to sell the Property (as hereinafter defined) to Purchaser, and Purchaser desires to purchase the Property from Seller, upon and subject to the terms and conditions set forth in this Agreement and pursuant to Section 363 of the Bankruptcy Code*].*

       **NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

      1.    <u>DEFINITIONS</u>

| | |
|---|---|
| Additional Rent | Section 7(b)(ix) |
| Adjourned Closing Date | Section 6(a)(v) |
| Agreement | Preamble |
| Anti-Money Laundering Laws | Section 11(f)(vii) |
| Apportionment Date | Section 7(a) |
| Asbestos | Section 11(g) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Base Rents | Section 7(b)(i) |
| Bid Deposit | Section 4(a)(i) |
| Broker | Section 14(a) |
| Building | Recitals |
| business day | Section 4(e) |
| Casualty Election Date | Section 12(d) |
| Closing | Section 18 |

| | |
|---|---|
| Closing Date | Section 18 |
| Closing Statement | Section 7(g) |
| Company | Section 6(a)(i) |
| Condemnation Election Date | Section 13(c) |
| Contracts | Section 10(a)(ii) |
| Cure Payments | Section 10(b) |
| Deed | Section 17(a)(i) |
| Default Rate | Section 34(f) |
| Deposit | Section 4(a)(ii) |
| Diligence Party | Section 11(d) |
| Diligence Reports | Section 11(d) |
| Disclosed Survey Items | Section 5(a) |
| Effective Date | Preamble |
| Environmental Laws | Section 11(g) |
| ERISA | Section 11(f)(v) |
| Escrow Agent | Section 4(a) |
| Estoppel Letter | Section 9(a)(v) |
| Excluded Personalty | Section 8 |
| Extended Closing Date | Section 18(b) |
| Extension Deposit | Section 18(b) |
| Extension Notice | Section 18(b) |
| Extension Right | Section 18(b) |
| Final Order | Section 10(f)(iii) |
| Financial Institution | Section 11(f)(vi) |
| FIRPTA | Section 21 |
| Hazardous Materials | Section 11(g) |
| Land | Recitals |
| Leases | Section 10(a)(i) |
| Material Adverse Effect | Section 10(g)(i) |
| Motion | Section 39(b) |
| New Closing Notice | Section 6(c) |
| Notices | Section 19 |
| Non-Objectionable Encumbrances | Section 6(a)(v) |
| OFAC | Section 11(f)(vi) |
| Option | Section 16(d) |
| Overage Rent | Section 7(b)(iii) |
| Patriot Act | Section 11(f)(vii) |
| PCBs | Section 11(g) |
| Permitted Encumbrances | Section 5 |
| Person | Section 11(f)(vi) |
| Personalty | Section 2(a) |
| Premises | Recitals |
| Property | Section 2(a) |
| Property Taxes | Section 7(a)(ii) |
| Purchase Price | Section 4 |
| Purchaser | Preamble |

US\60742879.8

EXHIBIT 1 PAGE 236

NFMC_000660

| | |
|---|---|
| Purchaser Party | Section 11(f)(vi) |
| Purchaser's Representatives | Section 3(a) |
| Rents | Section 7(a)(i) |
| Report | Section 6(a)(i) |
| Report Objections | Section 6(a)(iii) |
| Representations | Section 11(c) |
| Sale Order | Section |
| Sale Order Outside Date | Section 43(g) |
| Scheduled Closing Date | Section 18 |
| Second Deposit | Section 4(a)(ii) |
| Seller | Preamble |
| Seller's Broker | Section 14(a) |
| Seller's Excluded Personality | Section 2(a) |
| Seller Knowledge Individual | Section 11(c) |
| Seller Party | Section 16(d) |
| Seller Related Parties | Section 3(d) |
| Specially Designated Nationals and Blocked Persons | Section 11(f)(vi) |
| Survey | Section 5(a) |
| Taking | Section 13(a) |
| Tax Certiorari Proceeding | Section 15 |
| Tenant's Excluded Personality | Section 8 |
| Title Cure Period | Section 6(a)(v) |
| Title Objections | Section 6(a)(iv) |
| Title Policy | Section 10(g)(iii) |
| Transfer Taxes | Section 16(a) |
| Transfer Tax Returns | Section 16(a) |
| Transferred Security Deposits | Section 17(a)(vii) |
| Update Exception | Section 6(a)(iv) |
| Update Objection Deadline | Section 6(a)(iv) |
| Update Objections | Section 6(a)(iv) |
| U.S. Person | Section 11(f)(vi) |
| Utilities | Section 7(f) |
| Violations | Section 6(d) |

2.     PURCHASE AND SALE.

(a)     Seller shall sell, assign and convey to Purchaser, and Purchaser shall purchase and assume from Seller, subject to Bankruptcy Court approval and the terms and conditions of this Agreement, free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to (i) the Premises; (ii) the fixtures, furnishings, furniture, equipment, machinery, inventory, appliances and other personal property owned by Seller, located at the Premises (collectively, the "Personality") other than any of Seller's property listed on Schedule B attached hereto ("Seller's Excluded Personality"), it being understood that the Personality shall be subject to depletions, replacements or additions thereto in the ordinary course of business of the Premises; and (iii) the Leases and Contracts in effect on the Closing Date (subject to Section 9).  The items described in clauses (i), (ii) and (iii) above are sometimes referred to hereinafter, collectively, as the "Property." Other than Seller's Excluded

- 3 -

US\60742879.8

EXHIBIT 1 PAGE 237

NFMC_000661

Personalty and Tenant's Excluded Personalty (as hereinafter defined), all Personalty located at the Premises at the time of Closing shall be deemed abandoned by Seller and Seller shall have no obligation to discard same.

(b)     The parties hereto acknowledge and agree that the value of the Personalty is *de minimis* and that no part of the Purchase Price is allocable thereto.  Although it is not anticipated that any sales tax shall be due and payable, Purchaser agrees that Purchaser shall pay any and all State of New York and City of New York sales and/or compensating use taxes imposed upon or due in connection with the transactions contemplated hereunder under applicable laws.  Purchaser shall file all necessary tax returns with respect to all such taxes and, to the extent required by applicable law, Seller shall join in the execution of any such tax returns.  The provisions of this Section 2(b) shall survive the Closing.

3.          ACCESS.

(a)     Subject to the provisions of Section 3(b), Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers and contractors (collectively "Purchaser's Representatives") shall have the right through and including the Closing Date (if the same shall occur, or otherwise until the termination of this Agreement), from time to time, upon the advance notice required pursuant to Section 3(b), to enter upon and pass through the Premises during normal business hours to examine and inspect the same.

(b)     In conducting any inspection of the Premises and its due diligence review, Purchaser shall at all times comply with all laws and regulations of all applicable governmental authorities, and neither Purchaser nor any of Purchaser's Representatives shall (i) contact or have any discussions with any of Seller's employees, agents or representatives, or with any tenants at the Premises, or any contractors providing services to the Premises, unless in each case Purchaser obtains the prior written consent of Seller, it being agreed that all such contacts or discussions shall, pending any such approval, be directed to Woody Heller at the following e-mail address: wheller@brantonrealty.com (ii) not interfere with the business of Seller (or any of its tenants) conducted at the Premises or disturb the use or occupancy of any occupant of the Premises or (iii) damage the Property or perform any invasive or destructive testing of any kind (including, without limitation, boring, drilling, scraping, paint sampling, floor covering removal or sampling, or similar).  In conducting the foregoing inspection or otherwise accessing the Premises, Purchaser and Purchaser's Representatives shall at all times comply with, and shall be subject to, the rights of the tenants under the Leases (and any persons claiming under or through such tenants).  Seller may from time to time establish reasonable rules of conduct for Purchaser and Purchaser's Representatives in furtherance of the foregoing.  Purchaser shall schedule and coordinate all inspections, including, without limitation, any environmental tests, or other access with Seller and shall give Seller at least five (5) business days' prior notice thereof which notice shall be delivered to Woody Heller at the following e-mail address: wheller@brantonrealty.com. Seller shall be entitled to have a representative present at all times during each such inspection or other access.  Purchaser agrees to pay to Seller on demand the cost of repairing and restoring any damage or disturbance which Purchaser or Purchaser's Representatives shall cause to or exacerbate at the Property.  If Purchaser does not pay to Seller such cost within five (5) days after demand by Seller therefor, Purchaser shall pay to Seller such cost with interest at the Default Rate (and in the event Purchaser shall become entitled under any other provision of this Agreement to

- 4 -

US\60742879.8

EXHIBIT 1 PAGE 238

NFMC_000662

a return of the Deposit, any such repair or restoration cost remaining unpaid or reasonably anticipated to be paid thereafter shall be withheld from the Deposit and paid to Seller before any remaining balance of the Deposit is returned to Purchaser). All inspection fees, appraisal fees, engineering fees and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser. In the event that the Closing hereunder shall not occur for any reason whatsoever, Purchaser shall: (A) promptly deliver to Seller, at no cost to Seller, and without representation or warranty, the originals of all tests, reports and inspections of the Premises, made and conducted by Purchaser or Purchaser's Representatives or for Purchaser's benefit which are in the possession or control of Purchaser or Purchaser's Representatives, and (B) promptly return to Seller copies of all due diligence materials delivered by Seller to Purchaser or any Purchaser Representative and all abstracts thereof (provided that Purchaser may redact any such abstracts prepared by or on behalf of Purchaser with respect to any portions thereof that are covered by attorney-client privilege or are proprietary to the business of Purchaser). Purchaser or Purchaser's Representatives and any others who gain access to the due diligence materials through Purchaser or Purchaser's Representatives shall treat all such due diligence materials as confidential and proprietary to Seller, and shall not disclose to others during the term of this Agreement (or thereafter in the event that the Closing hereunder shall not occur) any such due diligence materials whether verbal or written, or any description whatsoever which may come within the knowledge of Purchaser, Purchaser's Representatives or such other parties, unless, in each instance, Purchaser obtains the prior written consent of Seller. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Premises or drilling in or on the Premises, or any other invasive testing, in connection with the preparation of an environmental audit or in connection with any other inspection of the Premises (and in the event Purchaser shall become entitled under any other provision of this Agreement to a return of the Deposit, any such repair or restoration cost remaining unpaid or reasonably anticipated to be paid thereafter shall be withheld from the Deposit and paid to Seller before any remaining balance of the Deposit is returned to Purchaser). Any liens against the Premises, or any portion thereof, arising from the performance of services by third-party contractors in connection with Purchaser's due diligence activities shall be removed by Purchaser as promptly as practicable and in any event not later than ten (10) business days after Purchaser shall have been notified of the filing of such liens. The provisions of this <u>Section 3(b)</u> shall survive the Closing or any termination of this Agreement.

(c)     Prior to conducting any physical inspection at the Premises; it being acknowledged and agreed that Purchaser shall have no right to perform any boring, drilling and/or sampling of soil on any portion of the Premises, Purchaser shall obtain, and during the period of such inspection or testing shall maintain, at its expense, commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, with Seller, its partners, directors, officers and its managing agent, if any, as additional insureds, from an insurer reasonably acceptable to Seller, which insurance policies must have limits for bodily injury and death of not less than Five Million Dollars and 00/100 ($5,000,000.00) for any one occurrence and not less than Five Million Dollars and 00/100 ($5,000,000.00) for property damage liability for any one occurrence. Prior to making any entry upon the Premises, Purchaser shall furnish to Seller a certificate of insurance evidencing the foregoing coverages.

(d)     Purchaser agrees to indemnify and hold Seller and its disclosed or undisclosed, direct and indirect, shareholders, officers, directors, trustees, partners, principals,

US\60742879.8

EXHIBIT 1 PAGE 239

NFMC_000663

members, employees, agents, affiliates, representatives, consultants, accountants, contractors, lenders and attorneys or other advisors, and any successors or assigns of any of the foregoing (collectively with Seller, "Seller Related Parties") harmless from and against any and all losses, costs, damages, liens, claims, liabilities or expenses (including, but not limited to, reasonable attorneys' fees, court costs and disbursements) incurred by any Seller Related Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Premises, or any tests, inspections or other due diligence conducted by or on behalf of Purchaser. The provisions of this Section 3(d) shall survive the Closing or any termination of this Agreement.

(e)     Notwithstanding any such access or inspection by Purchaser pursuant to this Section 3, or anything to the contrary herein contained, Purchaser's obligations hereunder shall not be limited or otherwise affected as a result of any fact, circumstance or other matter of any kind discovered following the date hereof in connection with any such inspection, access or otherwise; it being agreed that Seller is permitting Purchaser such right of inspection and access as a courtesy to Purchaser in its preparation for taking title to the Property. Without limiting the generality of the foregoing, (x) Purchaser agrees that it shall not have any so-called "due diligence period" and that it shall have no right to obtain a reduction of the Purchase Price as a result of any fact, circumstance or other matter so discovered (including, without limitation, relating to the physical condition of the Premises, the operations of the Premises or otherwise) and (y) Purchaser shall have no right to terminate this Agreement or obtain a return of the Deposit except as expressly provided in Sections 10(h), 12(a)(ii), 13(a)(ii), 20(b), and 39(g) hereof.

4.     PURCHASE PRICE AND DEPOSIT.

The purchase price to be paid by Purchaser to Seller for the Property (the "Purchase Price") is *[TBD: _____]* Dollars *($|_____|)*, subject to apportionment as provided in Section 7, payable as follows:

(a)

(i)     Simultaneously with the execution of this Agreement by Purchaser, Purchaser shall deliver to Seller in the form of a bank or certified check an amount equal to One Million Dollars ($1,000,000.00) (such deposit, the "Bid Deposit", and together with the Second Deposit, if delivered in accordance with Section 4(a)(ii) hereof, and the Extension Deposit, if delivered in accordance with Section 18(b) hereof, each individually and collectively, the "Deposit").

(ii)     Within three (3) business days of Purchaser being notified by Seller in writing (which may be via e-mail) of being selected as the winning bidder and provided the Bankruptcy Court has approved same, (x) Seller shall cash Purchaser's Bid Deposit and deposit same with the Company (as hereinafter defined), as escrow agent (the "Escrow Agent"), and (y) Purchaser shall deliver to the Escrow Agent via wire transfer in immediately available federal funds in accordance with the wire instructions set forth on **Exhibit 1**, an amount that when combined with the Bid Deposit is equal to *[TBD: _____ **at least ten percent (10%) of the Purchase Price]**, (such amount, the "Second Deposit") TIME BEING OF THE ESSENCE

- 6 -

US\60742879.8

EXHIBIT 1 PAGE 240

NFMC_000664

with respect to Purchaser's obligation to deliver the Second Deposit to the Escrow Agent in accordance with this Section 4(a)(ii)(y).

(iii)    In the event Purchaser is selected by Seller as the winning bidder but fails to timely deliver the Second Deposit in accordance with Section 4(a)(ii)(y) above TIME BEING OF THE ESSENCE (such failure, a "Second Deposit Default"), then (x) Seller shall be entitled to cash and retain the Bid Deposit (and any interest earned thereon) as liquidated damages for Purchaser's Second Deposit Default, it being agreed that the damages by reason of Purchaser's Second Deposit Default are difficult, if not impossible, to ascertain, (y) this Agreement shall terminate and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement, and (z) Seller shall be permitted to select another bidder as purchaser, such election to be made in Seller's sole and absolute discretion.

(iv)    In the event Purchaser is not selected as the winning bidder, then within a reasonable amount of time following Seller's selection of another bidder (and for the avoidance of doubt, after such other bidder timely deposits the Second Deposit), then provided no Second Deposit Failure has occurred with respect to Purchaser, Seller shall promptly return to Purchaser the Bid Deposit and thereafter this Agreement shall terminate and Purchaser and Seller shall have no further rights or obligations under this Agreement.

(b)    (i)    Upon receipt by Escrow Agent of the Deposit, Escrow Agent shall immediately notify Seller of same (which notification may be via e-mail) and shall cause the Deposit to be deposited into an interest bearing account at *[TBD:_____]* or another New York Clearing House Bank selected by Escrow Agent and approved by Seller, it being agreed that Escrow Agent shall not be liable for (x) any loss of such investment (unless due to Escrow Agent's gross negligence, willful misconduct or breach of this Agreement) or (y) any failure to attain a favorable rate of return on such investment. Escrow Agent shall deliver the Deposit, and the interest accrued thereon, to Seller or to Purchaser, as the case may be, under the following conditions:

(1)    The Deposit, and the interest accrued thereon, shall be delivered to Seller at the Closing upon receipt by Escrow Agent of a statement executed by Seller and Purchaser authorizing the Deposit and the interest accrued thereon to be released; or

(2)    The Deposit, and the interest accrued thereon, shall be delivered to Seller following receipt by Escrow Agent of written demand therefor from Seller stating that Purchaser has defaulted in the performance of its obligations under this Agreement, provided Purchaser shall not have given written notice of objection in accordance with the provisions set forth below; or

(3)    The Deposit, and the interest accrued thereon, shall be delivered to Purchaser following receipt by Escrow Agent of written demand therefor from Purchaser stating that Seller has defaulted in the performance of its obligations under this Agreement or that this Agreement was terminated under circumstances entitling Purchaser to the return of the Deposit, and specifying the Section of this Agreement which entitles Purchaser to the return of the Deposit, in each case provided Seller shall not have given written notice of objection in accordance with the provisions set forth below; or

- 7 -

US\60742879.8

EXHIBIT 1 PAGE 241

NFMC_000665

(4)    The Deposit, and the interest accrued thereon, shall be delivered to Purchaser or Seller as directed by written instructions of both Seller and Purchaser.

(ii)    Upon the receipt of a written demand for the Deposit by Seller or Purchaser, pursuant to underlined subsection (2) or underlined (3) above, Escrow Agent shall promptly give notice thereof (including a copy of such demand) to the other party.  The other party shall have the right to object to the delivery of the Deposit, by giving written notice of such objection to Escrow Agent at any time within ten (10) days after such party's receipt of notice from Escrow Agent, but not thereafter.  Such notice shall set forth the basis (in reasonable detail) for objecting to the delivery of the Deposit.  Upon receipt of such notice of objection, Escrow Agent shall promptly give a copy of such notice to the party who filed the written demand.  If Escrow Agent shall have timely received such notice of objection, Escrow Agent shall continue to hold the Deposit, and the interest accrued thereon, until (x) Escrow Agent receives joint written notice from Seller and Purchaser directing the disbursement of the Deposit, in which case Escrow Agent shall then disburse the Deposit, and the interest accrued thereon, in accordance with said direction, or (y) Escrow Agent is directed to disburse the Deposit and the interest accrued thereon pursuant to written direction from the Bankruptcy Court, or (z) Escrow Agent obtains written approval of the Bankruptcy Court to deposit the Deposit and all interest accrued thereon with the clerk of the Bankruptcy Court and concurrently terminate Escrow Agent's duties hereunder.

(iii)    Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Purchaser, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence, willful misconduct or default.  Escrow Agent shall have no duties or responsibilities except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless the same is in writing and signed by Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto.  Escrow Agent shall be reimbursed by Seller and Purchaser for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Purchaser and Seller, the prevailing party in any dispute over the Deposit shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent. In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Purchaser or Seller that, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold the Deposit, and the interest accrued thereon, and may decline to take any other action.  After delivery of the Deposit, and the interest accrued thereon, in accordance herewith, Escrow Agent shall have no further liability or obligation of any kind whatsoever.

(iv)    Escrow Agent shall have the right at any time to resign upon ten (10) business days' prior notice to Seller and Purchaser.  Seller and Purchaser shall jointly select a successor Escrow Agent and shall notify Escrow Agent of the name and address of such successor Escrow Agent within ten (10) business days after receipt of notice of Escrow Agent of its intent to resign.  If Escrow Agent has not received notice of the name and address of such

- 8 -

US\60742879.8

EXHIBIT 1 PAGE 242

NFMC_000666

successor Escrow Agent within such period, Escrow Agent shall have the right to select on behalf of Seller and Purchaser a bank or trust company licensed to do business in the State of New York and having a branch located in New York County to act as successor Escrow Agent hereunder. At any time after the ten (10) business day period, Escrow Agent shall have the right to deliver the Deposit, and the interest accrued thereon, to any successor Escrow Agent selected hereunder, provided such successor Escrow Agent shall execute and deliver to Seller and Purchaser an assumption agreement whereby it assumes all of Escrow Agent's obligations hereunder. Upon the delivery of all such amounts and such assumption agreement, the successor Escrow Agent shall become the Escrow Agent for all purposes hereunder and shall have all of the rights and obligations of the Escrow Agent hereunder, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(v)     The interest earned on the Deposit shall be paid to the party entitled to receive the Deposit as provided in this Agreement; provided, however, Purchaser shall be entitled to a credit against the Purchase Price with respect to any such interest paid to Seller at Closing for any interest accrued thereon and actually paid to Seller. The party receiving such interest shall pay any income taxes thereon. Upon request of the Escrow Agent, each of Seller and Purchaser shall provide its taxpayer identification number. The provisions of this <u>Section 4(b)</u> shall survive the Closing or termination of this Agreement.

(c)     At the Closing, Seller shall be entitled to retain the Deposit and all interest accrued thereon and Purchaser shall deliver the balance of the Purchase Price (i.e., the Purchase Price less the Deposit (including a credit for any interest accrued thereon)) to Seller, as adjusted pursuant to <u>Section 7</u>.

(d)     All monies payable by Purchaser under this Agreement, unless otherwise specified in this Agreement, shall be paid by Purchaser causing such monies to be wire transferred in immediately available federal funds at such bank account or accounts designated by Seller, and divided into such amounts designated by Seller as may be required to consummate the transactions contemplated by this Agreement.

(e)     As used in this Agreement, the term "<u>business day</u>" shall mean every day other than Saturdays, Sundays, all days observed by the federal or New York State government as legal holidays and all days on which commercial banks in New York State are required by law to be closed. Any reference in this Agreement to a "day" or a number of "days" (other than references to a "business day" or "business days") shall mean a calendar day or calendar days.

5.     <u>STATUS OF TITLE</u>.

Subject to the terms and provisions of this Agreement, Seller's interest in the Premises shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, subject to the following (collectively, the "<u>Permitted Encumbrances</u>"):

(a)     the state of facts disclosed (the "<u>Disclosed Survey Items</u>") on that certain survey prepared by KaBA Surveying[1] and dated as of September 28, 2022 (the "<u>Survey</u>"),

---

[1] Client/Broker: TBD re handwritten remarks on survey indicating top of elevator shaft.

US\60742879.8

EXHIBIT 1 PAGE 243

NFMC_000667

and any further state of facts which are not Disclosed Survey Items as a current survey or inspection of the Premises would disclose;

(b)     the standard printed exclusions from coverage contained in the ALTA form of owner's title policy currently in use in New York, with the standard New York endorsement and the easements, conditions, restrictions, agreements and encumbrances as set forth on <u>Schedule G</u> annexed hereto;

(c)     Non-Objectionable Encumbrances (as hereinafter defined); and any liens, encumbrances or other title exceptions caused directly by Purchaser or approved and/or waived by Purchaser as provided in this Agreement;

(d)     Property Taxes (as hereinafter defined) which are a lien but not yet due and payable, subject to proration in accordance with <u>Section 7</u> hereof;

(e)     any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Premises, including, without limitation, all zoning, land use, building and environmental laws, rules, regulations, statutes, ordinances, orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any;

(f)     all covenants, restrictions and utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, sewer or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Premises, provided that, in the case of any of the foregoing items which shall not be of record, the same do not materially adversely affect the present use of the Premises;

(g)     any installment not yet due and payable of assessments imposed after the date hereof and affecting the Premises or any portion thereof;

(h)     all Violations (as hereinafter defined) now or hereafter issued or noted;

(i)     the rights and interests held by tenants under the Leases in effect at Closing and others claiming by, through or under such Leases (and any non-disturbance agreements and memorandum of lease relating thereto);

(j)     consents by Seller or any former owner of all or a portion of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut;

(k)     possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under, or above any street or highway, the Premises or any adjoining property;

- 10 -

US\60742879.8

EXHIBIT 1 PAGE 244

NFMC_000668

(l) any lien or encumbrance (including, without limitation, any mechanics' lien or materialmen's lien), the removal of which is the obligation of a tenant under a Lease; and

(m) all other matters which, pursuant to the terms of this Agreement, are deemed Permitted Encumbrances.

6. <u>TITLE INSURANCE; LIENS</u>.

(a) (i) The parties acknowledge that Purchaser has reviewed the following title report: that certain Title Commitment dated *[Updated Old Republic Title Report to be inserted:* _____], and designated Title No. GA-3181-NY-22 (together with all instruments set forth therein, the "<u>Report</u>"), from Gotham Abstract & Settlement LLC, as agent for Old Republic National Title Company (the "<u>Company</u>") as set forth on **Exhibit 2**. At the Closing, Purchaser shall obtain title insurance from the Company (on a direct basis through *[Purchaser to provide:* _____]) with respect to Purchaser's acquisition of the Property and any financing obtained in connection therewith.

(ii) The parties acknowledge that Purchaser has received the Survey and the Report and Purchaser acknowledges it has reviewed same.

(iii) Purchaser shall have no right to object to any exceptions or other matters disclosed in the Report or Survey except for the following items listed on Schedule B of the Report: [_____] (collectively, the "<u>Report Objections</u>"). All such exceptions and other matters disclosed in the Report and Survey (other than the Report Objections) shall be deemed Permitted Encumbrances.

(iv) Purchaser shall direct the Company to deliver a copy of any update to the Report to Seller simultaneously with its delivery of the same to Purchaser. If, prior to the Closing Date, the Company shall deliver any update to the Report which discloses additional liens, encumbrances or other title exceptions which were not disclosed by the Report and are not Disclosed Survey Items and which do not otherwise constitute Permitted Encumbrances hereunder (each, an "<u>Update Exception</u>"), then Purchaser shall have until the earlier of (A) five (5) business days after delivery of such update to Purchaser or its counsel or (B) the business day immediately preceding the Closing Date, time being of the essence (the "<u>Update Objection Deadline</u>") to deliver written notice to Seller objecting to any of the Update Exceptions (the "<u>Update Objections</u>"; the Update Objections and Report Objections are, collectively, the "<u>Title Objections</u>"). If Purchaser fails to deliver such objection notice by the Update Objection Deadline, Purchaser shall be deemed to have waived its right to object to any Update Exceptions (and the same shall not constitute Title Objections, but shall instead be deemed Permitted Encumbrances). If Purchaser shall deliver such objection notice by the Update Objection Deadline, any Update Exceptions which are not objected to in such notice shall not constitute Title Objections, but shall be Permitted Encumbrances.

(v) Purchaser shall not be entitled to object to, and shall be deemed to have approved, any liens, encumbrances or other title exceptions (and the same shall not constitute Title Objections, but shall instead be deemed to be Permitted Encumbrances) (A) over which the Company is willing to insure (without additional cost to Purchaser or where Seller

- 11 -

US\60742879.8

EXHIBIT 1 PAGE 245

NFMC_000669

pays such cost for Purchaser), (B) against which the Company is willing to provide affirmative insurance (without additional cost to Purchaser or where Seller pays such cost for Purchaser), (C) which will be extinguished upon the transfer of the Property or is not transferred with the Property pursuant to the Sale Order, or (D) which are the responsibility of any tenant under the Leases to cure, correct or remove (collectively, the "Non-Objectionable Encumbrances") Notwithstanding anything to the contrary contained herein, if Seller is unable to eliminate the Title Objections by the Scheduled Closing Date, unless the same are waived by Purchaser without any abatement in the Purchase Price, Seller may, from time to time, upon at least two (2) business days' prior notice to Purchaser (except with respect to matters first disclosed during the two (2) business day period prior to the Scheduled Closing Date, as to which matters notice may be given at any time through and including the Scheduled Closing Date) adjourn the Scheduled Closing Date (such date to which Seller adjourns the Scheduled Closing Date is the "Adjourned Closing Date"), for a period not to exceed ninety (90) days in the aggregate (the "Title Cure Period"), in order to attempt to eliminate such exceptions.

(b) It is expressly understood that in no event shall Seller be required to bring any action or institute any proceeding, or to otherwise incur any costs or expenses in order to attempt to eliminate any Title Objections, or take any other actions to cure or remove any Title Objections, or to otherwise cause title in the Premises to be in accordance with the terms of this Agreement on the Closing Date.

(c) If Seller shall have adjourned the Scheduled Closing Date in order to cure Title Objections in accordance with the provisions of this Section 6, Seller shall, upon the satisfactory cure thereof, promptly reschedule the Scheduled Closing Date, upon at least five (5) business days' prior notice to Purchaser (the "New Closing Notice"); it being agreed, however, that if any Title Objections arise between the date the New Closing Notice is given and the rescheduled Scheduled Closing Date, Seller may again adjourn the Closing for a reasonable period or periods, in order to attempt to cause such exceptions to be eliminated; provided, however, that Seller shall not be entitled to adjourn the new Scheduled Closing Date pursuant to this Section 6 for a period or periods in excess of ninety (90) days in the aggregate.

(d) Purchaser agrees to purchase the Premises subject to any and all notes or notices of violations of law, or municipal ordinances, orders, designations or requirements whatsoever noted in or issued by any federal, state, municipal or other governmental department, agency or bureau or any other governmental authority having jurisdiction over the Premises (collectively, "Violations"), or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Premises. Seller shall have no duty to remove or comply with or repair any condition, matter or thing whether or not noted, which, if noted, would result in a violation being placed on the Premises. Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations, or other conditions, and Purchaser shall accept the Premises subject to all such Violations, the existence of any conditions at the Premises which would give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations, in each case without any abatement of or credit against the Purchase Price. Seller shall not be responsible for any fines or penalties that have heretofore arisen or that may hereafter arise in connection with any Violations (and the lien of any such fines or penalties shall constitute Permitted Encumbrances).

US\60742879.8

EXHIBIT 1 PAGE 246

NFMC_000670

(e)     If the Company shall be unwilling to remove any Title Objections which another major national title insurance company selected by Seller (either directly or through an agent) would be willing to remove, then Seller shall have the right to substitute such major national title insurance company for the Company, provided that if Purchaser elects not to use such major national title insurance company, such Title Objections which such major national title insurance company would be willing to remove shall not constitute Title Objections and shall be deemed Permitted Encumbrances.

7.     APPORTIONMENTS.

(a)     The following shall be apportioned between Seller and Purchaser as of 11:59 p.m. on the day immediately preceding the Closing Date (the "Apportionment Date") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year:

(i)     subject to Section 7(b), prepaid rents, fixed rents and any other amounts payable by tenants to Seller pursuant to the Leases (including, without limitation, operating expense escalation payments, real estate tax escalation payments and percentage rent, if any, payable under the Leases) (collectively, "Rents");

(ii)     real estate taxes, sewer rents and taxes, water rates and charges (to the extent not accounted for pursuant to clause (i) above), vault charges and taxes, business improvement district taxes and assessments and any other governmental taxes, charges or assessments levied or assessed against the Premises (collectively, "Property Taxes"), on the basis of the respective periods for which each is assessed or imposed, to be apportioned in accordance with Section 7(c);

(iii)     administrative charges, if any, permitted under the Leases or applicable law, on security deposits held pursuant to the Leases;

(iv)     fuel supplied for the Building, if any, as estimated by Seller's supplier, at current cost, together with any sales taxes payable in connection therewith, if any (a letter from Seller's fuel supplier shall be conclusive evidence as to the quantity of fuel on hand and the current cost therefor);

(v)     prepaid fees for licenses and other permits assigned to Purchaser at the Closing;

(vi)     any amounts prepaid or payable by the owner of all or a portion of the Property under the Contracts;

(vii)     wages and fringe benefits (including, without limitation, vacation pay, sick days, health, welfare, pension and disability benefits) and other compensation payable to all employees;

(viii)     all other operating expenses with respect to the Property; and

- 13 -

US\60742879.8

EXHIBIT 1 PAGE 247

NFMC_000671

(ix)     such other items as are customarily apportioned in real estate closings of commercial properties in the City of New York, State of New York.

(b)     (i)     Monthly base rents (collectively, "<u>Base Rents</u>") under the Leases shall be adjusted and prorated on an if, as and when collected basis.  Base Rents collected by Purchaser or Seller after the Closing Date from tenants who owe Base Rents for periods prior to the Closing Date, shall be applied, (A) first to rents due and payable for the calendar month in which the Closing occurs, (B) next to all rents due and payable for the period preceding the calendar month in which the Closing occurs, and (C) next to all rents due and payable for the period after the calendar month in which the Closing occurs.  Each such amount, less reasonable collection costs, shall be adjusted and prorated as provided above, and the party receiving such amount shall, within five (5) business days, pay to the other party the portion thereof to which it is so entitled.

(ii)     Purchaser shall bill tenants owing Base Rents for periods prior to the Closing Date, on a monthly basis and Purchaser shall use commercially reasonable efforts to collect such past due Base Rents; <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to commence any actions or proceedings to collect any such past due Base Rents.  Rents collected by Purchaser after the Closing Date to which Seller is entitled shall be paid to Seller within five (5) business days after receipt thereof by Purchaser.  Purchaser shall provide Seller with monthly reports setting forth the status of such collection efforts.  In addition to the foregoing, Seller may take all steps it deems appropriate, including litigation, to collect Base Rents delinquent as of the Closing Date which are still uncollected; provided, however, that Seller may not cause any Lease to be terminated.

(iii)     With respect to any Lease that provides for the payment of additional or escalation rent based upon increases in real estate taxes, operating expenses, labor costs, cost of living indices or porter's wages (collectively, "<u>Overage Rent</u>"), such Overage Rent shall be adjusted and prorated on an if, as and when collected basis.

(iv)     Purchaser shall (A) promptly render bills for any Overage Rent payable for any accounting period that expired prior to the Closing Date, but which is to be paid after the Closing Date; (B) bill tenants for such Overage Rent attributable to an accounting period that expired prior to the Closing Date, on a monthly basis; and (C) use commercially reasonable efforts in the collection of such Overage Rent; <u>provided</u>, <u>however</u>, that Purchaser shall have no obligation to commence any actions or proceedings to collect any such Overage Rents.  In addition to the foregoing, Seller shall have the right to pursue tenants to collect such delinquencies (including, without limitation, the prosecution of one or more lawsuits); provided, however, that Seller may not cause any Lease to be terminated.  Seller shall furnish to Purchaser all information relating to the period prior to the Closing Date necessary for the billing of such Overage Rent, and Purchaser shall deliver to Seller, concurrently with delivery to tenants, copies of all statements relating to Overage Rent for any period prior to the Closing Date.  Purchaser shall bill tenants for Overage Rents for accounting periods prior to the Closing Date in accordance with and on the basis of such information furnished by Seller.

(v)     Overage Rent payable for the accounting period in which the Closing Date occurs shall be apportioned between Seller and Purchaser based upon the ratio that

- 14 -

US\60742879.8

EXHIBIT 1 PAGE 248

NFMC_000672

the portion of such accounting period prior to the Closing Date bears to the entire such accounting period. If, prior to the Closing Date, Seller receives any installments of Overage Rent attributable to Overage Rent for periods from and after the Closing Date, such sums shall be apportioned at the Closing Date less reasonable collection costs. If Purchaser receives any installments of Overage Rent attributable to Overage Rent for periods prior to the Closing Date, such sums (less reasonable collection costs actually incurred by Purchaser) shall be paid to Seller within five (5) business days after Purchaser receives payment thereof.

        (vi)    Any payment by tenants of Overage Rent shall be applied to Overage Rents then due and payable in the following order of priority: (A) first, in payment of Overage Rents for the period preceding the accounting period in which the Closing Date occurs; (B) second, in payment of Overage Rents for the accounting period in which the Closing Date occurs (subject to apportionment pursuant to this <u>Section 7</u>) and (C) third, in payment of Overage Rents for the accounting period following the one in which the Closing Date occurs.

        (vii)    To the extent any portion of Overage Rent is required to be paid monthly by tenants on account of estimated amounts for the current period, and at the end of each calendar year (or, if applicable, at the end of each lease year or tax year or any other applicable accounting period), such estimated amounts are to be recalculated based upon the actual expenses, taxes and other relevant factors for that calendar (lease or tax) year, with the appropriate adjustments being made with such tenants, then such portion of the Overage Rent shall be prorated between Seller and Purchaser on the Closing Date based on such estimated payments (i.e., with (x) Seller entitled to retain all monthly installments of such amounts with respect to periods prior to the calendar month in which the Closing Date occurs, to the extent such amounts are as of the Closing Date estimated to equal the amounts ultimately due to Seller for such periods), (y) Purchaser entitled to receive all monthly installments of such amounts with respect to periods following the calendar month in which the Closing Date occurs, and (z) Seller and Purchaser apportioning all monthly installments of such amounts with respect to the calendar month in which the Closing Date occurs). At the time(s) of final calculation and collection from (or refund to) tenants of the amounts in reconciliation of actual Overage Rent for a period for which estimated amounts have been prorated, there shall be a re-proration between Seller and Purchaser, with the net credit resulting from such re-proration, after accounting for amounts required to be refunded to tenants, being payable to the appropriate party (i.e., to Seller if the recalculated amounts exceed the estimated amounts and to Purchaser if the recalculated amounts are less than the estimated amounts).

        (viii)    To the extent that any amounts are paid or payable to Seller by a tenant under a Lease in advance of the period to which such expense applies, whether as a one time payment or in installments (e.g. for real property tax escalations), such amounts shall be apportioned as provided above but based upon the period for which such payments were or are being made.

        (ix)    To the extent tenants pay items of Rent which are not Base Rents or Overage Rents, such as charges for electricity, steam, water, cleaning, overtime services, sundry charges or other charges of a similar nature (collectively, "<u>Additional Rent</u>"), such rent shall be applied based on the period covered by such Additional Rent charge (i.e., the period the applicable work, utility or service was provided). In the case of any Additional Rent payable for

US\60742879.8

EXHIBIT 1 PAGE 249

NFMC_000673

a period that expired prior to the Closing Date, but which is to be paid after the Closing Date, Purchaser shall pay the entire amount thereof to Seller within five (5) business days after receipt thereof, less any reasonable collection costs actually incurred. Purchaser shall (A) promptly render bills for any Additional Rent payable for any period that expired prior to the Closing Date, but which is to be paid after the Closing Date; (B) bill tenants for such Additional Rent attributable to a period that expired prior to the Closing Date, on a monthly basis, and (C) use commercially reasonable efforts in the collection of such Additional Rent; provided, however, that Purchaser shall have no obligation to commence any actions or proceedings to collect any such Additional Rent. In addition to the foregoing, Seller shall have the right to pursue tenants to collect such delinquencies (including, without limitation, the prosecution of one or more lawsuits); provided, however, that Seller may not cause any Lease to be terminated. Seller shall furnish to Purchaser all information relating to the period prior to the Closing Date necessary for the billing of such Additional Rent, and Purchaser shall deliver to Seller, concurrently with delivery to tenants, copies of all statements relating to Additional Rent for any period prior to the Closing Date. Purchaser shall bill tenants for Additional Rent relating to periods prior to the Closing Date in accordance with and on the basis of such information furnished by Seller. Additional Rent payable for the period in which the Closing Date occurs shall be apportioned between Seller and Purchaser based upon the same method used to apportion the underlying expense being billed to such tenant, or if such expense is not being apportioned, then based upon the ratio that the portion of such accounting period prior to the Closing Date bears to the entire such accounting period.

(x)     To the extent any payment received from a tenant after Closing does not indicate whether the payment is for an item of Base Rent, Overage Rent or Additional Rent, and the same cannot be clearly determined from the context of such payment, then such payment will be applied (x) first to payment of any Base Rent then due or delinquent, in accordance with paragraphs (i) and (ii) above, (y) second to payment of any Additional Rent then due or delinquent, in accordance with paragraph (x) above and (z) third to any Overage Rent then due or delinquent, in accordance with paragraphs (iii)-(ix) above.

(c)     Property Taxes shall be apportioned on the basis of the fiscal period for which assessed. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation, but, promptly after the assessment and/or tax rate for the current year are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within five (5) business days based on such recalculation. If, as of the Closing Date, the Premises or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

(d)     If there are water meters at the Premises, the unfixed water rates and charges and sewer rents and taxes covered by meters, if any, shall be apportioned (i) on the basis of an actual reading done within thirty (30) days prior to the Apportionment Date, or (ii) if such reading has not been made, on the basis of the last available reading. If the apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties

- 16 -

US\60742879.8

EXHIBIT 1 PAGE 250

NFMC_000674

shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and Seller shall deliver to Purchaser or Purchaser shall deliver to Seller, as the case may be, the amount determined to be due upon such readjustment.

(e)     Charges for all electricity, steam, gas and other utility services (collectively, "Utilities") shall not be apportioned as they will be billed to Seller's account up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account.

(f)     Purchaser shall have no right to receive any rental insurance proceeds which relate to the period prior to the Closing Date and, if any such proceeds are delivered to Purchaser, Purchaser shall, within five (5) business days following receipt thereof, pay the same to Seller.

(g)     Prior to the Closing, Seller and Purchaser and/or their respective agents or designees will jointly prepare a preliminary closing statement (the "Closing Statement") which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for in this Agreement, and such  net due amount will be added to or subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing pursuant to Section 4, as applicable.  The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Closing Statement shall be final, conclusive and binding on the parties hereto but shall not limit any obligation of either party hereto to deliver to the other party after Closing any amounts expressly required to be so delivered pursuant to this Section 7.

(h)     For the avoidance of all doubt, nothing in this Section 7 or anything else to the contrary in this Agreement is intended to or shall impose upon Seller any obligation to pay any amounts to the extent that Seller can defend, discharge, satisfy or otherwise treat them in the Bankruptcy Case.

(i)     The provisions of this Section 7 shall survive the Closing.

8.     PROPERTY NOT INCLUDED IN SALE.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by the parties hereto that any fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures in, on, around or affixed to the Building) owned or leased by any tenant, managing agent, leasing agent, contractor, or employee at the Building (collectively, "Tenant's Excluded Personalty", and together with Seller's Excluded Personalty, collectively, the "Excluded Personalty"), shall not be included in the Property to be sold to Purchaser hereunder.  Excluded Personalty shall also include all pictures, paintings, drawings, prints, sculptures, tapestries or other items of art now or hereafter located in any areas of the Building.

9.     COVENANTS OF SELLER.

(a)     During the period from the Effective Date until the Closing Date, except to the extent expressly required or restricted by the Bankruptcy Court, Seller shall:

- 17 -

US\60742879.8

EXHIBIT 1 PAGE 251

NFMC_000675

(i)     be permitted to enter into any agreements with respect to all or any portion of the Property provided that such agreements (other than any collective bargaining agreements and/or other union contracts relating to the employees and/or the operation of the Property that Seller is obligated to enter into in accordance with law) expire by their terms on or prior to the Closing Date or, in accordance with their terms, would not be effective following the Closing Date, or, in the case of Contracts, may be terminated by the owner of the Premises without penalty upon not more than thirty (30) days' (or less) prior notice unless the same are deemed in good faith to be necessary by Seller to respond to an emergency at the Premises;

(ii)     not grant any lien or cause or permit any instrument to be recorded that would encumber the Premises;

(iii)     maintain in full force and effect the insurance policies currently in effect with respect to the Premises (or replacements continuing similar coverage);

(iv)     subject to Sections 6(d) and 9(b) hereof, use commercially reasonable efforts to operate and manage the Premises in a manner consistent in all material respects with past practice, except that Seller shall not be required to make any capital improvement or replacement to the Premises and provided further Seller shall have no obligation to enter into any new Lease or extend any existing Lease and at Seller's option but without any obligation upon Seller, Seller will be permitted to terminate any existing Leases; and

(v)     use commercially reasonably efforts to obtain from each Tenant an executed Tenant estoppel letter (each an "Estoppel Letter") which Estoppel Letter shall include the specific items addressed in the applicable estoppel provision under such Tenant's Lease.  Tenant's delivery of a certificate which satisfies the requirements under such Tenant's Lease shall be deemed to be Tenant's delivery of an Estoppel Letter (it being acknowledged that if Tenant's Lease provides for a tenant estoppel certificate containing certain specified items and "such other information as shall be required of Tenant", then the delivery by the Tenant of a certificate without any items other than the specified items shall be deemed to be the delivery of an Estoppel Letter)  Seller agrees to forward to Purchaser copies of any Estoppel Letter promptly upon receipt thereof. In the event any Estoppel Letter contains statements confirming any of Seller's representations or warranties set forth in this Agreement, then Seller shall be deemed not to have made such representations or warranties as to such Lease.  In the event any Estoppel Letter contains statements or allegations that a default or potential default exists on the part of Seller, as landlord under such Lease in question or contains any information inconsistent with any representations of Seller contained in this Agreement and the closing of the purchase and sale transaction contemplated herein occurs, then such Estoppel Letter shall be deemed acceptable to Purchaser, notwithstanding the existence of such allegations, statements or information and Seller shall have no liability whatsoever to Purchaser hereunder or otherwise with respect to the existence of such allegations, statements or information. Notwithstanding the foregoing, the delivery of any Estoppel Letter from any Tenant(s) shall not be a condition precedent to, nor shall the failure to obtain any Estoppel Letter from any Tenant(s) excuse the performance of Purchaser's obligations hereunder.

(vi)     Seller shall cause the termination of all employees at the Premises to occur at, or prior to, the Closing Date, at such time as Seller elects in its sole discretion.

- 18 -

US\60742879.8

EXHIBIT 1 PAGE 252

NFMC_000676

(b)     During the period from the Effective Date until the Closing Date, Seller shall not, to the extent the same would be binding on or affect the Premises or any owner thereof after the Closing, except as permitted under Section 9(a), without Purchaser's prior approval which approval shall not be unreasonably withheld, conditioned or delayed:

(i)     enter in any new Lease or any renewal or expansion thereof that would survive Closing; provided that (x) any agreement entered into by Seller as landlord with a tenant to confirm the terms of any right or option exercised by such tenant shall not require Purchaser's consent, (y) Seller shall be permitted to terminate any existing Leases without Purchaser's consent, and (z) Seller shall be permitted to relocate any existing tenants within the Building with the prior written consent of Purchaser, not to be unreasonably withheld, conditioned, or delayed (and Purchaser acknowledges that any cost of relocating any such tenant that is the obligation of Seller shall, if not completed prior to Closing, be prorated among the parties in accordance with Section 7 above and Seller shall have no obligation with respect to (and Purchaser shall indemnify and hold Seller harmless from) any such relocation costs that may be incurred from and after Closing).

(ii)     amend or modify (other than non-material amendments or modifications) or renew any of the Contracts; or

(iii)     enter into any new Contracts which are not terminable without penalty upon thirty (30) days' advance notice or less.

(c)     Whenever in Section 9(b) Seller is required to obtain Purchaser's approval with respect to any transaction described therein, Purchaser shall, within five (5) business days after receipt of Seller's request therefor, notify Seller of its approval or disapproval of same and, if Purchaser fails to notify Seller of its disapproval within said five (5) business day period with the reasonable basis therefor, Purchaser shall be deemed to have approved same.

10.     ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER; SECURITY DEPOSITS; EMPLOYEES; CONDITIONS TO CLOSING.

(a)     Assignment.   On the Closing Date, Seller agrees to assume and assign to Purchaser, pursuant to Section 365 of the Bankruptcy Code and the instruments referenced in Sections 17 (c)(ii) and (iii), without recourse, representation or warranty (except as expressly set forth in this Agreement), all of Seller's right, title and interest in, and Purchaser agrees to assume Seller's obligations accruing on and after the Closing Date under, the documents described in clauses (i), (ii) and (iii) below:

(i)     the unexpired leases, licenses and other occupancy agreements demising space at the Premises, whether written or oral, together with all amendments and modifications thereof and supplements relating thereto (collectively, "Leases"; the term Leases shall not include subleases, licenses and occupancy agreements entered into by tenants under the Leases to which Seller is not a party) which are then in effect;

(ii)     to the extent transferable, the service, maintenance, supply and other agreements to which Seller is a party and that are executory contracts relating to the operation of the Property, together with all modifications and amendments thereof and

- 19 -

US\60742879.8

EXHIBIT 1 PAGE 253

NFMC_000677

supplements relating thereto (collectively, "Contracts") which are then in effect and not terminated as of the Closing Date; and

(iii)     the transferable permits and licenses, if any, relating to the Property and the other intangible Personalty.

(b)     Consents and Cure Payments. For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have obtained all required consents in respect of the assignment of any Lease or Contract if, and to the extent that, pursuant to the Sale Order or other order of the Bankruptcy Court, Seller is authorized to assume and assign the Leases and Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code and any applicable cure payment or obligations (pursuant to section 363 or 365 of the Bankruptcy Code) due by Seller, and required by the Bankruptcy Court to be made or assumed by Purchaser, in order to cure any default with respect to any Lease or Contract (each, a "Cure Payment").

To the extent that any assumed Lease or Contract is subject to a cure amount pursuant to sections 363 or 365 of the Bankruptcy Code or otherwise, immediately after the Closing, Purchaser shall directly pay or otherwise provide for the amount of any applicable Cure Payment.

(c)     Security Deposits.  Prior to the Closing, Seller shall have the right (i) to apply any security deposits held under Leases in respect of defaults by tenants under the applicable Leases and (ii) to return the security deposit of any tenant thereunder who in the good faith judgment of Seller is entitled to the return of such deposit pursuant to the terms of its Lease or otherwise by law.  At the Closing, Seller shall give Purchaser a credit for the cash security deposits and turn over any letter of credit held by Seller as security under the Leases, in each case to the extent, then held by Seller and not applied to defaults or returned to tenants as above provided, subject to the apportionment of administrative charges pursuant to Section 7(a)(iii) above.

(d)     Intentionally Omitted.

(e)     Intentionally Omitted.

(f)     Conditions to Obligations of Seller.  The obligation of Seller to effect the Closing shall be subject to the fulfillment or written waiver by Seller at or prior to the Closing Date of the following conditions:

(i)     Representations and Warranties.  The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date.

(ii)     Performance of Obligations.  Purchaser shall have paid the full balance of the Purchase Price, executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Purchaser hereunder on the Closing Date; and in all material respects performed all other obligations required to be performed by it under this Agreement on or prior to the Closing Date.

- 20 -

US\60742879.8

EXHIBIT 1 PAGE 254

NFMC_000678

(iii)     Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order, transferring the Property free and clear of all Liens (except Permitted Encumbrances) and including that Purchaser is a good faith purchaser entitled to protections of Section 363 (m) and Section 363 (n) of the Bankruptcy Code, which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1.

(g)     Conditions to Obligations of Purchaser.   The obligations of Purchaser to effect the Closing shall be subject to the fulfillment (or written waiver by Purchaser) at or prior to the Closing Date of the following conditions:

(i)     Representations and Warranties.  The representations and warranties of Seller contained in Section 11(c) shall be true and correct in all material respects as of the Closing Date, as though made at and as of the Closing Date (except for any representations and warranties made as of a specific date in which event the same shall be true and correct as of such date), except for any modifications or inaccuracies thereof that arise from either (A) events or circumstances that occur from and after, or exist following, the date hereof and are outside of the reasonable control of Seller or (B) any act taken by Seller, or an omission made by Seller, in either case that is not expressly prohibited hereunder,  provided, however, in the event of any breach of a representation or warranty, the conditions set forth in this Section 10(g)(i) shall be deemed satisfied unless all such breaches of representations and warranties when taken together have a Material Adverse Effect on the value of the Premises. For the purposes hereunder, a "Material Adverse Effect" shall mean a reduction in the value of the Premises equal to or greater than an amount equal to twenty-five percent (25%) of the Purchase Price.

(ii)     Performance of Obligations.  Seller shall have executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Seller hereunder on the Closing Date and Seller shall in all material respects have performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

(iii)     Purchaser shall have received an Owner's Policy of Title Insurance or a marked up and executed title commitment which is the equivalent thereof on the most recent ALTA form then in effect to be issued upon Closing by the Company or another major national insurance company in accordance with Section 6(e) hereof, and insuring for an amount equal to the Purchase Price that all requirements pertaining to the Seller or Property have been satisfied and that fee title to the Property shall be vested in Purchaser upon Closing, subject to no exceptions other than the Permitted Encumbrances (the "Title Policy").

(iv)     Entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order, transferring the Property free and clear of all Liens (except Permitted Encumbrances) and including that Purchaser is a good faith purchaser entitled to protections of Section 363 (m) and Section 363 (n) of the Bankruptcy Code, which shall include a waiver of the stay in Bankruptcy Rules 6004(h), 6006(d) and Local Rule 6004-1, and such Sale Order shall be a Final Order.

(h)     Failure of Condition.  If Purchaser is unable to timely satisfy (and Seller has not waived in writing) the conditions precedent to Seller's obligation to effect the

US\60742879.8

EXHIBIT 1 PAGE 255

NFMC_000679

Closing other than the condition precedent set forth in <u>Section 10(f)(iii)</u>, then such failure shall constitute a default hereunder and <u>Section 20(a)</u> shall govern. If Seller is unable to timely satisfy the conditions precedent to Purchaser's obligation to effect the Closing, then, (i) Seller may, if it so elects and without any abatement in the Purchase Price, adjourn the Scheduled Closing Date for a period or periods not to exceed thirty (30) days in the aggregate and (ii) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing continue not to be satisfied (and Purchaser has not waived the same in writing) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Seller's default hereunder, then Seller or Purchaser shall be entitled to terminate this Agreement by notice thereof to the other party (provided, that if such failure of condition precedent is the result of Seller's default hereunder, then <u>Section 20(b)</u> shall govern). If this Agreement is so terminated other than by reason of Purchaser's default, then Purchaser shall be entitled to receive the Deposit (and all accrued interest thereon) and neither party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof. For the avoidance of doubt, the parties acknowledge that any failure of Seller to timely satisfy the conditions precedent to Purchaser's obligations to effect the Closing, which failure results from an act or omission of a third party shall not be deemed a default by Seller hereunder, and Purchaser's sole remedy by reason thereof shall be to terminate this Agreement in accordance with <u>clause (ii)</u> above and to receive the Deposit (and all accrued interest thereon) in accordance with the foregoing provisions of this <u>Section 10(h)</u>.

11.     <u>CONDITION OF THE PROPERTY; REPRESENTATIONS.</u>

(a)     PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OTHER SELLER RELATED PARTY, NOR ANY OTHER PERSON ACTING ON BEHALF OF SELLER, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY SUCCESSOR OR ASSIGN OF ANY OF THE FOREGOING PARTIES, HAS MADE OR SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION WARRANTIES OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY OR THE ZONING AND OTHER LAWS, REGULATIONS AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN. PURCHASER FURTHER ACKNOWLEDGES THAT ALL MATERIALS WHICH HAVE BEEN PROVIDED BY ANY OF THE SELLER RELATED PARTIES HAVE BEEN PROVIDED WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED AS TO THEIR CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS OR COMPLETENESS AND PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST SELLER OR ANY OF THE OTHER SELLER RELATED PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS THEREFROM. PURCHASER IS ACQUIRING THE PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION

US\60742879.8

EXHIBIT 1 PAGE 256

NFMC_000680

PROVIDED BY SELLER, OR ANY OF THE OTHER SELLER RELATED PARTIES, EXCEPT FOR THE REPRESENTATIONS EXPRESSLY SET FORTH HEREIN (WHICH REPRESENTATIONS, FOR THE AVOIDANCE OF DOUBT, PURCHASER ACKNOWLEDGES SHALL NOT SURVIVE THE CLOSING HEREUNDER). PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON ANY SUCH MATERIALS PROVIDED TO IT BY SELLER IN CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT SHALL RELY SOLELY ON ITS OWN INDEPENDENTLY DEVELOPED OR VERIFIED INFORMATION. THE PROVISIONS OF THIS SECTION 11(A) SHALL SURVIVE CLOSING.

(b)    PURCHASER ACKNOWLEDGES AND AGREES THAT IT IS PURCHASING THE PROPERTY "AS IS" AND "WITH ALL FAULTS", BASED UPON THE CONDITION (PHYSICAL OR OTHERWISE) OF THE PROPERTY AS OF THE DATE OF THIS AGREEMENT, REASONABLE WEAR AND TEAR AND, SUBJECT TO THE PROVISIONS OF SECTION 13 OF THIS AGREEMENT, LOSS BY CONDEMNATION EXCEPTED. PURCHASER ACKNOWLEDGES AND AGREES THAT ITS OBLIGATIONS UNDER THIS AGREEMENT SHALL NOT BE SUBJECT TO ANY FINANCING CONTINGENCY OR OTHER CONTINGENCIES OR SATISFACTION OF CONDITIONS AND PURCHASER SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT OR RECEIVE A RETURN OF THE DEPOSIT (OR THE ACCRUED INTEREST THEREON) EXCEPT AS EXPRESSLY PROVIDED FOR IN SECTIONS 10(H), 12(A)(II), 13(A)(II), 20(B), AND 39(G). THE PROVISIONS OF THIS SECTION 11(B) SHALL SURVIVE CLOSING.

(c)    Seller hereby represents and warrants to Purchaser (each a "Representation" and collectively, the "Representations") that, as of the date hereof (unless any Representation is made as of a specified date, in which case, the same shall be made as of such date):

(i)    Subject to the entry of the Sale Order, (I) Seller has full power and authority to enter into and perform this Agreement in accordance with its terms, (II) this Agreement and all documents executed by Seller which are to be delivered to Purchaser at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Seller, and at the time of Closing will be the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, and do not and, at the time of Closing will not, violate any provision of any agreement or judicial order to which Seller or the Property is subject, except as such enforceability may be limited by (1) bankruptcy, insolvency or similar laws of general application relating to or affecting the enforcement of creditors' rights and (2) general principles of equity relating to the availability of equitable remedies. Subject to entry of the Sale Order, no other proceedings are necessary to authorize this Agreement and the transactions contemplated hereby, or the performance or compliance by each Seller Party with any of the terms, provisions or conditions hereof.

(ii)    To Seller's Actual Knowledge, (x) Schedule C is a true, correct and complete list of the Leases, and (y) Seller has delivered to Purchaser, or made available to Purchaser for review, true and complete copies of all Leases set forth on Schedule C.

- 23 -

US\60742879.8

EXHIBIT 1 PAGE 257

NFMC_000681

(iii)    (x) Schedule D is a true, correct and complete list of the Contracts in effect as of the date hereof which are not intended to be terminated as of the Closing and (y) Seller has delivered to Purchaser, or made available to Purchaser for review, true and complete copies of all Contracts set forth on Schedule D.

(iv)    Schedule E is a true, correct and complete list of the security deposits currently held by Seller under the Leases.

(v)    Schedule F is a tenant arrearage schedule which was true, correct and complete in all material respects as of the date set forth thereon.

(vi)    There are no pending condemnation or eminent domain proceedings against the Premises as to which Seller has received written notice.

(vii)    There are no employees at the Premises who are union personnel.

Any and all uses of the phrase, "to Seller's Actual Knowledge" or other references to Seller's knowledge in this Agreement, shall mean the actual, present, conscious knowledge of Michael Sklar (the "Seller Knowledge Individual") as to a fact at the time given without any investigation or inquiry.  Without limiting the foregoing, Purchaser acknowledges that the Seller Knowledge Individual has not performed and is not obligated to perform any investigation or review of any files or other information in the possession of Seller, or to make any inquiry of any persons, or to take any other actions in connection with the representations and warranties of Seller set forth in this Agreement.  Neither the actual, present, conscious knowledge of any other individual or entity, nor the constructive knowledge of the Seller Knowledge Individual or of any other individual or entity, shall be imputed to the Seller Knowledge Individual.

The representations and warranties of Seller contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing and from and after such date Seller's representations and warranties shall automatically be null and void and of no further force and effect.

(d)    The representations and warranties of Seller set forth in Section 11(c) are subject to the following limitations: (i) subject to the express provisions of Section 9(b), Seller does not represent or warrant that any particular Lease or Contract will be in force or effect as of the Closing or that the tenants or contractors thereunder, as applicable, will not be in default thereunder, (ii) to the extent that Seller has delivered or made available to Purchaser (or to any Diligence Party (as defined below)) any Leases, Contracts or other information with respect to the Property at any time prior to the date hereof, and such Leases, Contracts or other information contain provisions inconsistent with any of such representations and warranties, then such representations and warranties shall be deemed modified to conform to such provisions and Purchaser shall be deemed to have knowledge thereof , (iii) Seller shall not be deemed in breach of its representations and warranties contained in Section 11(c)(iii) if Seller does not require Purchaser to assume the Contract(s) which violate(s) such representations and warranties and  (iv) in the event that, prior to the Closing, Purchaser or any Diligence Party shall obtain knowledge of any information that is contradictory to, and would constitute the basis of a breach of, any

- 24 -

US\60742879.8

EXHIBIT 1 PAGE 258

NFMC_000682

representation or warranty or failure to satisfy any condition on the part of Seller, then, promptly thereafter (and, in all events, prior to Closing), Purchaser shall deliver to Seller notice of such information specifying the representation, warranty or condition to which such information relates, and Purchaser further acknowledges that such representation, warranty or condition will not be deemed breached in the event Purchaser shall have, prior to Closing, obtained knowledge of any information that is contradictory to such representation or warranty and shall have failed to disclose to Seller as required hereby and Purchaser shall not be entitled to bring any action after the Closing Date based on such representation, warranty or condition. Without limiting the generality of the foregoing, Purchaser shall be deemed to know that any representation or warranty contained herein is untrue, inaccurate or breached to the extent that (1) Purchaser or any Diligence Party has knowledge of any fact or information which is inconsistent with such representation or warranty or (2) this Agreement or any Leases, Contracts or other information with respect to the Property delivered or made available to Purchaser or any Diligence Party contain provisions inconsistent with any of such representations and warranties. "<u>Diligence Party</u>" shall mean any of the following: (i) Purchaser, (ii) [_____] *__[Note: Add Purchaser individuals involved in discussions regarding this Agreement or due diligence]__* and (iii) any direct or indirect officers, directors, employees, agents, consultants, affiliates, attorneys and representatives of Purchaser, or [_____] who were involved in the negotiation of this Agreement, reviewed any Leases, Contracts or other information relating to the Property, were involved in the preparation of the Diligence Reports or the performance of the due diligence conducted in order to prepare the same, or who otherwise approved the transactions contemplated hereunder. "<u>Diligence Reports</u>" mean the results of any examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations prepared by or for or otherwise obtained by or on behalf of Purchaser in connection with the Property.

(e) The provisions of <u>Sections 11(a)</u> and <u>11(b)</u> shall be deemed incorporated by reference and made a part of all documents or instruments delivered by Seller to Purchaser in connection with the sale of the Property. Except for the representations and warranties contained in <u>Section 11(c)</u> (as modified by the Schedules hereto), neither Seller nor any other person makes any other express or implied representation or warranty with respect to Seller, the Property, any assumed liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in <u>Section 11(c)</u> hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Property (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its affiliates). The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The provisions of this <u>Section 11(e)</u> shall survive Closing.

US\60742879.8

EXHIBIT 1 PAGE 259

NFMC_000683

(f)     Purchaser hereby represents and warrants to Seller as of the date hereof and as of Closing that:

(i)     Purchaser is duly formed and in good standing under the laws of the State of *[Purchaser to advise:* _____] and is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.

(ii)     Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms and this Agreement and all documents executed by Purchaser which are to be delivered to Seller at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Purchaser and are, and at the time of Closing will be the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

(iii)     Neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited, or requires Purchaser to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser. The person signing this Agreement on behalf of Purchaser is authorized to do so.

(iv)     There are no judgments, orders or decrees of any kind against Purchaser unpaid and unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, which would have a material adverse effect on Purchaser, its financial condition or its ability to consummate the transactions contemplated by this Agreement.

(v)     Purchaser is not acquiring the Property with the assets of (a) an employee benefit plan (as defined in <u>Section 3(3)</u> of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>")), whether or not subject to Title I of ERISA, (b) a plan as defined in <u>Section 4975(e)(1)</u> of the Internal Revenue Code of 1986, as amended, or (c) an entity the assets of which, under applicable law, are deemed to constitute the assets of a plan described in the foregoing clauses (a) or (b).

(vi)     Purchaser is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "<u>Person</u>") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "<u>U.S. Person</u>"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("<u>OFAC</u>") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC "<u>Specially Designated Nationals and Blocked</u>

- 26 -

US\60742879.8

EXHIBIT 1 PAGE 260

NFMC_000684

Persons") or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser (other than the owner of publicly traded shares) (collectively, a "Purchaser Party") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("Financial Institution"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(vii)    Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Subsection (f), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(viii)    Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(ix)    Purchaser is not partnering nor has it colluded with, whether directly or indirectly, any general partner of Seller including, but not limited to, any of Rita A. Sklar, Michael Sklar and/or Sharan Sklar, and/or any of their affiliates in connection with Purchaser's offer or negotiation of this Agreement, the consummation of the transaction contemplated hereunder and/or the ownership or operation of the Property thereafter.

(g)    Notwithstanding anything to the contrary set forth in this Agreement, Seller makes no warranty with respect to the absence or presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Premises (or any parcel in proximity thereto) or in any water on or under the Premises. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined) including, without limitation, any action brought by any governmental authority. The term "Hazardous Materials" means (a) those substances that are now or may hereafter be included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes,"

- 27 -

US\60742879.8

EXHIBIT 1 PAGE 261

NFMC_000685

and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) mold, (h) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (i) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "Environmental Laws" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes. Except with respect to any claims arising out of any breach of covenants, representations or warranties expressly with respect thereto set forth in Section 11(c) above, and subject to the other provisions of this Agreement limiting or eliminating Seller's liability with respect thereto, Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller, and the other Seller Related Parties from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Property, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The provisions of this Section 11(g) shall survive Closing.

- 28 -

US\60742879.8

EXHIBIT 1 PAGE 262

NFMC_000686

12. <u>DAMAGE AND DESTRUCTION</u>.

(a)     If all or any part of the Building is damaged by fire or other casualty occurring on or after the date hereof and prior to the Closing Date, whether or not such damage affects a material part of the Building, then:

(i)     if the estimated cost of repair or restoration is less than or equal to twenty-five percent (25%) of the Purchase Price neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage. In such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building and/or to rebuild the Building to substantially the same condition as it existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Premises or to repair or restore any damages, in no event to exceed the amount of the loss. In the event such amount spent by Seller shall exceed the amount of the deductible on such casualty insurance policy, then Purchaser shall deliver such excess amount to Seller, within five (5) business days of its receipt of any casualty insurance proceeds received on account of such casualty.

(ii)     if the estimated cost of repair or restoration exceeds twenty-five percent (25%) of the Purchase Price, each party shall have the option, exercisable on or prior to the Casualty Election Date (as defined below), time being of the essence, to terminate this Agreement by delivering notice of such termination to the other party, whereupon the Deposit (together with any interest accrued thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other in respect thereof except for such provisions which are expressly provided in this Agreement to survive the termination hereof. If a fire or other casualty described in this <u>clause (ii)</u> shall occur and neither party shall timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage and, in such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building and/or to rebuild the Building to substantially the same condition as existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Premises or to repair or restore any damages, in no event to exceed the amount of the loss. In the event such amount spent by Seller shall exceed the amount of the deductible on such casualty insurance policy, then Purchaser shall deliver such excess

- 29 -

US\60742879.8

EXHIBIT 1 PAGE 263

NFMC_000687

amount to Seller, within five (5) business days of its receipt of any casualty insurance proceeds received on account of such casualty.

(b)     The estimated cost to repair and/or restore contemplated in <u>clause (a)</u> above shall be established by estimates obtained by Seller from independent contractors and shall be conclusive.

(c)     The provisions of this <u>Section 12</u> supersede any law applicable to the Premises governing the effect of fire or other casualty in contracts for real property.

(d)     "<u>Casualty Election Date</u>" means (i) the tenth (10th) day following Seller's delivery of the estimates as described in <u>clause (b)</u> above or, (ii) if Purchaser timely delivers a Restoration Dispute Notice, the tenth (10th) business day following final resolution of such dispute by arbitration determination or agreement of the parties.

(e)     In the event of any fire or other casualty occurring within ten (10) business days of the then Scheduled Closing Date, the Scheduled Closing Date shall then be extended to the tenth (10th) business day following the Casualty Election Date; provided, however, the Scheduled Closing Date shall not be extended if the damage caused by such fire or other casualty has been substantially restored prior to the Scheduled Closing Date.

13.     <u>CONDEMNATION</u>.

(a)     If, prior to the Closing Date, any part of the Premises is taken (other than a temporary taking), or if Seller shall receive an official notice from any governmental authority having eminent domain power over the Premises of its intention to take, by eminent domain proceeding, any part of the Premises (a "<u>Taking</u>"), then:

(i)     if such Taking involves ten percent (10%) or less of the rentable area of the Building as determined by an independent architect chosen by Seller (which determination shall be conclusive), neither party shall have any right to terminate this Agreement, and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (A) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (B) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for the reasonable expenses incurred by Seller in connection with such Taking.

(ii)     if such Taking involves more than ten percent (10%) of the rentable area of the Building as determined by an independent architect chosen by Seller (which determination shall be conclusive), each party shall have the option, exercisable on or prior to the Condemnation Election Date (as defined below), time being of the essence, to terminate this Agreement by delivering notice of such termination to the other party, whereupon the Deposit (together with any interest earned thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither party shall have any further rights

- 30 -

US\60742879.8

EXHIBIT 1 PAGE 264

NFMC_000688

or liabilities against or to the other in respect thereof except pursuant to the provisions of this Agreement which are expressly provided to survive the termination hereof. If a Taking described in this clause (ii) shall occur and neither party shall timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (A) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (B) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for the reasonable expenses incurred by Seller in connection with such Taking.

(b)     The provisions of this Section 13 supersede any law applicable to the Premises governing the affect of condemnation in contracts for real property.

(c)     "Condemnation Election Date" means (x) the tenth (10th) business day following Seller's delivery of an independent architect's determination as described in clause (a)(ii) above or, (y) if Purchaser timely delivered a notice disputing such independent architect's determination, the tenth (10th) business day following final resolution of such dispute by arbitration determination or agreement of the parties.

(d)     In the event of any Taking occurring within ten (10) business days of the then Scheduled Closing Date, the Scheduled Closing Date shall then be extended to the tenth (10th) business day following the Condemnation Election Date.

14.     BROKERS AND ADVISORS.

(a)     Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with this Agreement or the transactions contemplated hereby other than Branton Realty Services LLC ("Seller's Broker"). Purchaser hereby agrees to indemnify, defend and hold Seller, Seller's Broker and the other Seller Related Parties harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (other than Seller's Broker) engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the transactions contemplated hereby.

(b)     Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any Broker in connection with this Agreement or the transactions contemplated hereby other than Seller's Broker. Seller hereby agrees to indemnify, defend and hold Purchaser and its direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors and any successors or assigns of the foregoing, harmless from and against any and all claims, demands, causes of action, losses, costs and expenses (including reasonable attorneys' fees, court costs and disbursements)

US\60742879.8

EXHIBIT 1 PAGE 265

NFMC_000689

arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (including Seller's Broker) engaged by or claiming to have dealt with Seller in connection with this Agreement or the transactions contemplated hereby.

(c)    The provisions of this Section 14 shall survive the termination of this Agreement or the Closing.

15.    TAX REDUCTION PROCEEDINGS.

Seller may file and/or prosecute an application for the reduction of the assessed valuation of the Premises or any portion thereof for real estate taxes or a refund of Property Taxes previously paid (a "Tax Certiorari Proceeding") to the City of New York for any fiscal year. Seller shall have the right to withdraw, settle or otherwise compromise Tax Certiorari Proceedings affecting real estate taxes assessed against the Premises (a) for any fiscal period prior to the fiscal year in which the Closing shall occur without the prior consent of Purchaser, and (b) for the fiscal year in which the Closing shall occur or any fiscal year thereafter, provided, in the case of this clause (b), Purchaser shall have consented with respect thereto, which consent shall not be unreasonably withheld or delayed. The amount of any tax refunds (net of attorneys' fees and other costs of obtaining such tax refunds) with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs shall be apportioned between Seller and Purchaser as of the Apportionment Date with a prior allocation of the portion thereof which must be returned to tenants pursuant to the terms of the Leases; Seller hereby agreeing to be responsible for the return of such refund to such tenants for the period up to and including the Apportionment Date and Purchaser having such obligation for the return of such refunds attributable to the period from and after the Closing Date. If, in lieu of a tax refund, a tax credit is received with respect to any portion of the Premises for the tax year in which the Apportionment Date occurs, then (i) within thirty (30) days after receipt by Seller or Purchaser, as the case may be, of evidence of the actual amount of such tax credit (net of attorneys' fees and other costs of obtaining such tax credit), the tax credit apportionment shall be readjusted between Seller and Purchaser, and (ii) upon realization by Purchaser of a tax savings on account of such credit, Purchaser shall pay to Seller an amount equal to the savings realized (as apportioned). All refunds, credits or other benefits applicable to any fiscal period prior to the fiscal year in which the Closing shall occur shall belong solely to Seller (and Purchaser shall have no interest therein) and, if the same shall be paid to Purchaser or anyone acting on behalf of Purchaser, same shall be paid to Seller within five (5) days following receipt thereof and, if not timely paid, with interest thereon from the fifth day following such receipt until paid to Seller at a rate equal to the Default Rate. Notwithstanding anything to the contrary contend herein, if any Tax Certiorari Proceeding in respect of the Premises, relating to the fiscal year in which the Closing shall occur or any fiscal year thereafter, are pending at the time of Closing, then, at Purchaser's request Seller shall, if possible, cause Purchaser to be substituted for Seller in such Tax Certiorari Proceeding, or if such substitution is not possible, Seller shall permit Purchaser to control the conduct of such Tax Certiorari Proceeding. Seller and Purchaser shall otherwise cooperate with each other with respect to all Tax Certiorari Proceeding. The provisions of this Section 15 shall survive the Closing.

- 32 -

US\60742879.8

EXHIBIT 1 PAGE 266

NFMC_000690

16. <u>TRANSFER TAXES AND TRANSACTION COSTS</u>.

(a)     Seller shall be responsible for and shall pay any New York State and New York City real estate and real property transfer taxes that are otherwise payable with respect to the sale (such transfer taxes, and any interest and penalties with respect thereto, the "<u>Transfer Taxes</u>") applicable to transfers pursuant to Chapter 11 of the Bankruptcy Code. Accordingly, Seller shall prepare, and at the Closing, Seller and Purchaser shall execute, acknowledge and deliver, and promptly following the Closing, Seller shall cause to be filed, all such returns required to be filed with New York State and New York City with respect to the sale of the Property by Seller to Purchaser (such returns so required to be filed, the "<u>Transfer Tax Returns</u>") reflecting that no Transfer Taxes are due and payable with respect to the sale by Seller to Purchaser of the Property, provided however, if any such Transfer Taxes are due, Seller shall be solely responsible for the payment thereof.

(b)     Seller shall be responsible for the costs of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property.

(c)     Except as otherwise provided above, Purchaser shall be responsible for (i) the costs and expenses associated with its due diligence, (ii) the costs and expenses of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property, (iii) all premiums and fees for title examination and title insurance and endorsements obtained and all related charges and survey costs in connection therewith, (iv) all costs and expenses incurred in connection with any financing obtained by Purchaser, including without limitation, loan fees, mortgage recording taxes, financing costs and lender's legal fees, (v) all escrow and/or closing fees, and (vi) any recording fees for documentation to be recorded in connection with the transactions contemplated by this Agreement.

(d)     If, on the Closing Date, any person listed on **<u>Exhibit 8</u>** attached hereto (each a "<u>Seller Party</u>") directly or indirectly owns (including through one or more entities) any beneficial interest in Purchaser or has an option, right or other agreement (collectively, an "<u>Option</u>") to acquire such a beneficial interest, then Purchaser will pay to Seller, as additional Purchase Price under this Agreement, an amount equal to (i) the excess, if any, of (A) the amount of federal income tax (and any interest and penalties with respect thereto) incurred by Seller and its direct or indirect beneficial owners pursuant to Section 707(b)(2) of the Code or Section 1239 of the Code, on the sale of the Property by Seller to Purchaser, as a result of a Seller Party owning or having an Option to acquire a direct or indirect beneficial interest in Purchaser, over (B) the amount of federal income tax that Seller and its direct or indirect beneficial owners would have incurred on the sale of the Property by Seller to Purchaser, if a Seller Party did not own a direct or indirect beneficial interest in Purchaser; multiplied by (ii) two (2). For purposes of clauses (A) and (B), the federal income tax incurred by Seller and its direct and indirect beneficial owners will be computed as though the income and gain from the sale of the Property by Seller to Purchaser was the only income and gain of the Seller and its direct and indirect beneficial owners. Notwithstanding anything to the contrary set forth in Section 37 or otherwise set forth in this Agreement, this <u>Section 16(d)</u> shall survive the Closing until the expiration of any applicable statute of limitations.

- 33 -

EXHIBIT 1 PAGE 267

US\60742879.8

NFMC_000691

(e)     The provisions of this <u>Section 16</u> shall survive the Closing provided that the provisions of <u>Section 16(d)</u> shall survive the Closing for the period set forth therein.

17.     <u>DELIVERIES TO BE MADE ON THE CLOSING DATE.</u>

(a)     <u>Seller's Documents and Deliveries</u>:  On the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)     A duly executed and acknowledged Bargain and Sale Deed Without Covenants Against Grantor's Acts in the form of **Exhibit 3** (the "<u>Deed</u>");

(ii)     A duly executed Bill of Sale in the form of **Exhibit 4**;

(iii)     Originals or, if originals are unavailable, copies, of the Leases and Contracts then in effect to the extent in Seller's possession;

(iv)     Letters to all tenants under the Leases in the form of **<u>Exhibit 5</u>**;

(v)     Originals or, if originals are unavailable, copies, of plans and specifications, technical manuals and similar materials for the Building to the extent same are in Seller's possession;

(vi)     A completed and duly executed Internal Revenue Service Form W-9;

(vii)     The cash security deposits (together with interest accrued thereon less any permitted administrative fee) and letters of credit, if any, held by Seller as security under the Leases, but only to the extent the same have not been applied in accordance with the Leases or returned to tenants and relate to tenants occupying space in the Building on the Closing Date pursuant to Leases then in effect (the "<u>Transferred Security Deposits</u>");

(viii)     Originals or, if originals are unavailable, copies, of all permits, licenses and approvals relating to the ownership, use or operation of the Premises, to the extent same are in Seller's possession;

(ix)     Keys and combinations in Seller's possession relating to the operation of the Premises; and

(x)     Original Tenant Estoppel Letters from each Tenant, if available.

Seller shall be deemed to have delivered the items set forth in <u>clauses (iii)</u>, <u>(v)</u>, <u>(viii)</u>, and <u>(ix)</u> above if the same are left in the Building management office on the Closing Date.

(b)     <u>Purchaser's Documents and Deliveries</u>:  On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following:

- 34 -

US\60742879.8

EXHIBIT 1 PAGE 268

NFMC_000692

(i)     Payment of the balance of the Purchase Price payable at the Closing by 1:00 P.M., Eastern Standard Time, on the Closing Date (time being of the essence), as adjusted for apportionments under Section 7, in the manner required under this Agreement;

(ii)     If required by the Company, then to the Company, if Purchaser is a corporation, (1) copies of the certificate of incorporation and by-laws of Purchaser and of the resolutions of the board of directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true and correct by the Secretary or Assistant Secretary of Purchaser; (2) a good standing certificate for Purchaser issued by the state of incorporation of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (if not incorporated in the State of New York) dated within thirty (30) days of the Closing Date; and (4) an incumbency certificate executed by the Secretary or Assistant Secretary of Purchaser with respect to those officers of Purchaser executing any documents or instruments in connection with the transactions contemplated herein;

(iii)     If required by the Company, then to the Company, if Purchaser is a partnership, (1) copies of Purchaser's partnership agreement and partnership certificate and consent of the partners of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, all of the foregoing being certified as true and correct by the general partner of Purchaser, (2) a good standing certificate issued for Purchaser by the state of organization of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (30) days of the Closing Date; and (4) with respect to the general partner of Purchaser, an incumbency certificate executed by an officer (if such general partner is a corporation) or manager(s)/managing member(s), as applicable (if such general partner is a limited liability company) of Purchaser with respect to individuals executing any documents or instruments on behalf of Purchaser in connection with the transactions contemplated herein; and

(iv)     If required by the Company, then to the Company, if Purchaser is a limited liability company, (1) copies of Purchaser's articles of organization and operating agreement and consent of the members of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement, all of the foregoing being certified as true and correct by the manager(s)/managing member(s), as applicable, of Purchaser; (2) a good standing certificate issued for Purchaser by the state of organization of Purchaser, dated within thirty (30) days of the Closing Date; (3) a good standing certificate for Purchaser issued by the State of New York (if not organized in the State of New York) dated within thirty (30) days of the Closing Date; and (4) an incumbency certificate executed by an officer or manager(s)/managing member(s), as applicable, of Purchaser with respect to individuals executing any documents or instruments on behalf of Purchaser in connection with the transactions contemplated herein.

(c)     Jointly Executed Documents:  Seller and Purchaser shall, on the Closing Date, each execute, acknowledge (as appropriate) and exchange the following documents:

(i)     The Transfer Tax Returns;

- 35 -

US\60742879.8

EXHIBIT 1 PAGE 269

NFMC_000693

(ii)   *[TBD which Contracts, if any, will be assumed by Buyer:* An Assignment and Assumption of Leases and Contracts in the form of **Exhibit 6**; and

(iii)   Any other affidavit, document or instrument required to be delivered by Seller or Purchaser or reasonably requested by the Company (so long as such request does not add additional warranties or covenants to Seller), pursuant to the terms of this Agreement or applicable law in order to effectuate the transfer of title to the Premises.

18.   CLOSING DATE.

(a)   The closing of the transactions contemplated hereunder (the "Closing") shall occur, and the documents referred to in Section 17 shall be delivered upon tender of the Purchase Price provided for in this Agreement, at 10:00 A.M., Eastern Standard Time, on the date that is sixty (60) days from the entry of the Sale Order, or the date Seller sets for the Closing if Seller shall elect to extend this date pursuant to the terms of this Agreement, (such date being referred to in this Agreement as the "Scheduled Closing Date"; and the actual date of the Closing, the "Closing Date"), at the offices of Seller's attorneys, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 or, at Seller's election, 375 Park Avenue, New York, New York.   TIME IS OF THE ESSENCE as to the Purchaser's obligation to close the transactions contemplated hereunder on the Scheduled Closing Date (or, if Seller shall have extended the original Scheduled Closing Date pursuant to the terms of this Agreement, on such extended Scheduled Closing Date so designated by Seller).   Seller shall have a one-time right to extend the Scheduled Closing Date by up to thirty (30) days, such right exercisable by Seller giving notice thereof to Purchaser at least fifteen (15) days prior to the then Scheduled Closing Date.

(b)   Notwithstanding anything to the contrary set forth in Section 18(a) hereof, Purchaser shall have a one-time right to extend the Closing Date for a period of thirty (30) days from the then Scheduled Closing Date (the "Extended Closing Date"), such right (the "Extension Right") to be exercised by Purchaser upon written notice to Seller (such notice, the "Extension Notice") no later than five (5) days prior to the then Scheduled Closing Date and by depositing within one business day following Purchaser's delivery of the Extension Notice an additional deposit in an amount equal to five percent (5%) of the Purchase Price (the "Extension Deposit") to the escrow account of Escrow Agent in accordance with the wire instructions set forth on **Exhibit 1**.   Upon Purchaser's timely delivery of the Extension Deposit and the exercise by Purchaser of the Extension Right, the Closing shall occur on the Extended Closing Date, TIME BEING OF THE ESSENCE as to the Purchaser's and Seller's obligations to close the transactions contemplated hereunder by no later than the Extended Closing Date (subject only to Seller's express rights to adjourn the Closing hereunder).

19.   NOTICES.

All notices, demands, requests or other communications (collectively, "Notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, (b) national overnight delivery service, or (c) personal delivery, addressed as per the below, and in each case of clauses

- 36 -

US\60742879.8

EXHIBIT 1 PAGE 270

NFMC_000694

(a) - (c) immediately preceded by a corresponding e-mail notice to the e-mail address(es) set forth below:

| | |
|---|---|
| If given to Seller,: | Ninety-Five Madison Company, L.P.<br>95 Madison Company, Suite 609<br>New York, New York 10016<br>Attention: Michael Sklar and Sharan Sklar<br>Email: msklar@ninetyfivemadison.com<br>ssklar@ninetyfivemadison.com |
| With a copy being simultaneously delivered by the same method of delivery to: | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Attention:  Jonathan Mechanic, Esq. and Alexander Sutherland, Esq.<br>Email: Jonathan.Mechanic@friedfrank.com and Alexander.Sutherland@friedfrank.com |
| With a copy being simultaneously delivered by the same method of delivery to: | Glenn Agre Bergman & Fuentes<br>1185 Avenue of the Americas<br>New York, New York 10036<br>Attention:  Andrew Glenn, Esq.<br>Email: aglenn@glennagre.com |
| If given to Purchaser: | _____<br>_____<br>_____ |

Any Notice so sent by certified or registered mail, national overnight delivery service or personal delivery shall be deemed given on the date of receipt or refusal as indicated on the return receipt, or the receipt of the national overnight delivery service or personal delivery service.  A Notice may be given either by a party or by such party's attorney.  Seller or Purchaser may designate, by not less than five (5) business days' notice given to the others in accordance with the terms of this <u>Section 19</u>, additional or substituted parties to whom Notices should be sent hereunder.

20.     <u>DEFAULT BY PURCHASER OR SELLER.</u>

(a)     If (i) Purchaser shall default in the payment of the Purchase Price or in the performance of any of its other obligations to be performed on the Closing Date, or (ii) Purchaser shall (x) default in the performance of any of its material obligations to be performed prior to the Closing Date or (y) breach Purchaser's representation and warranty set forth in <u>Section 11(f)(ix)</u> hereof, and, with respect to any default under <u>clause (ii)(x)</u> only, such default shall continue for five (5) business days after notice to Purchaser (provided that in no event shall a breach of Purchaser's representation set forth in <u>Section 11(f)(ix)</u> be deemed to be curable),

- 37 -

EXHIBIT 1 PAGE 271

US\60742879.8

NFMC_000695

Seller's sole remedy by reason thereof shall be to terminate this Agreement and, upon such termination, Seller shall be entitled to retain the Deposit (and any interest earned thereon) as liquidated damages for Purchaser's default and/or breach hereunder, it being agreed that the damages by reason of Purchaser's default and/or breach are difficult, if not impossible, to ascertain, and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement except for those that are expressly provided in this Agreement to survive the termination hereof. If Seller terminates this Agreement pursuant to a right given to it hereunder and Purchaser takes any action which interferes with Seller's ability to sell, exchange, transfer, lease, dispose of or finance all or any portion of the Property or take any other actions with respect thereto (including, without limitation, the filing of any lis pendens or other form of attachment against any portion of the Property), then the named Purchaser (and any permitted assignee of Purchaser's interest hereunder) shall be jointly and severally liable for all loss, cost, damage, liability or expense (including, without limitation, reasonable attorneys' fees, court costs and disbursements and actual damages, but in no event shall either party have any liability for consequential damages) incurred by Seller by reason of such action to contest by Purchaser. Notwithstanding the foregoing, none of the above liquidated damages shall be deemed to reduce, waive or limit in any respect the additional obligations of Purchaser to indemnify Seller as provided in this Agreement.

(b)     If (i) Seller shall default in any of its obligations to be performed on the Closing Date or (ii) Seller shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this clause (y) only, such default shall continue for five (5) business days after notice to Seller, Purchaser as its sole remedy by reason thereof (in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, the right to bring such actions or proceedings being expressly and voluntarily waived by Purchaser following and upon advice of its counsel) shall have the right subject to the other provisions of this Section 20(b) (A) to seek to obtain specific performance of Seller's obligations hereunder, provided that any action for specific performance shall be commenced within thirty (30) days after such default, and if Purchaser prevails thereunder, Seller shall reimburse Purchaser for all reasonable legal fees, court costs and all other reasonable costs of such action, (B) to terminate this Agreement and receive a return of the Deposit (together with any interest earned thereon), it being understood that if Purchaser fails to commence an action for specific performance within thirty (30) days after such default, Purchaser's sole remedy shall be to receive a return of the Deposit (together with any interest earned thereon), or (C) to waive such default and close hereunder without any reduction in the Purchase Price. If Purchaser elects to seek specific performance of this Agreement pursuant to clause (A) above, then as a condition precedent to any suit for specific performance, Purchaser shall on or before the Closing Date, time being of the essence, fully perform all of its obligations hereunder which are capable of being performed (other than the payment of the Purchase Price, which shall be paid as and when required by the court in the suit for specific performance). If Purchaser elects to terminate the Agreement pursuant to clause (B) above, upon such return and delivery of the Deposit (together with any interest accrued thereon), this Agreement shall terminate and neither party hereto shall have any further obligations hereunder except for those that are expressly provided in this Agreement to survive the termination hereof. Notwithstanding the foregoing, Purchaser shall have no right to seek specific performance, if Seller shall be prohibited from performing its obligations hereunder by reason of any law, regulation, or other legal requirement applicable to Seller.

US\60742879.8

EXHIBIT 1 PAGE 272

NFMC_000696

(c)    The provisions of this <u>Section 20</u> shall survive the termination hereof.

21.    <u>FIRPTA COMPLIANCE</u>.

Seller shall comply with the provisions of the Foreign Investment in Real Property Tax Act, Section 1445 of the Internal Revenue Code of 1986 (as amended, "<u>FIRPTA</u>").  Seller acknowledges that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  To inform Purchaser that withholding of tax is not required upon the disposition of a United States real property interest by Seller, Seller hereby represents and warrants that Seller is not a foreign person as that term is defined in the Internal Revenue Code and Income Tax Regulations.  On the Closing Date, Seller shall deliver to Purchaser a completed and duly executed Internal Revenue Service Form W-9.

22.    <u>ENTIRE AGREEMENT; ACCEPTANCE OF DEED</u>.

(a)    This Agreement contains all of the terms agreed upon between Seller and Purchaser with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, between Seller and Purchaser are merged into this Agreement.

(b)    All agreements, covenants, liabilities, indemnities, representations, warranties and other obligations of Seller under this Agreement shall merge with the Deed and have no further effect or validity after Closing, and the acceptance of the Deed by Purchaser shall be deemed full compliance by Seller with all of Seller's obligations hereunder and an acknowledgement and agreement by Purchaser that Seller is discharged therefrom and shall have no further obligation or liability with respect thereto, except for those provisions of this Agreement which expressly shall survive the Closing.

(c)    The provisions of this <u>Section 22</u> shall survive the Closing or the termination hereof.

23.    <u>AMENDMENTS</u>.

This Agreement may not be changed, modified or terminated, except by an instrument executed by Seller and Purchaser.  The provisions of this <u>Section 23</u> shall survive the Closing or the termination hereof.

24.    <u>WAIVER</u>.

No waiver by either party of any failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent failure or refusal to so comply. The provisions of this <u>Section 24</u> shall survive the Closing or the termination hereof.

US\60742879.8

EXHIBIT 1 PAGE 273

NFMC_000697

25. <u>PARTIAL INVALIDITY</u>.

If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law. The provisions of this <u>Section 25</u> shall survive the Closing or the termination hereof.

26. <u>SECTION HEADINGS</u>.

The headings of the various sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. The provisions of this <u>Section 26</u> shall survive the Closing or the termination hereof.

27. <u>GOVERNING LAW</u>.

This Agreement shall be governed by the laws of the State of New York without giving effect to conflict of laws principles thereof except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The provisions of this <u>Section 27</u> shall survive the Closing or the termination hereof.

28. <u>PARTIES; ASSIGNMENT AND RECORDING</u>.

(a)     Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed), except: (a) the rights and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (b) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; and (c) as otherwise provided in this Agreement. Seller hereby agrees that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, none of the representations or warranties made by Seller hereunder shall inure to the benefit of any person or entity that may, after the Closing Date, succeed to Purchaser's interest in the Property.

(b)     Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in Purchaser, without first obtaining Seller's consent thereto.

(c)     Neither this Agreement nor any memorandum hereof may be recorded without first obtaining Seller's consent thereto. Any breach of the provisions of this

- 40 -

US\60742879.8

EXHIBIT 1 PAGE 274

NFMC_000698

clause (c) shall constitute a default by Purchaser under this Agreement. Purchaser agrees not to file any lis pendens or other instrument against all or a portion of the Premises in connection herewith. In furtherance of the foregoing, Purchaser (i) acknowledges that the filing of a lis pendens or other evidence of Purchaser's rights or the existence of this Agreement against all or a portion of the Premises could cause significant monetary and other damages to Seller, and (ii) hereby agrees to indemnify Seller from and against any and all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees incurred in the enforcement of the foregoing indemnification obligation) arising out of the breach by Purchaser of any of its obligations under this <u>clause (c)</u>.

(d)     The provisions of <u>Section 28(a)</u> and <u>28(c)</u> shall survive the Closing or the termination hereof. The provisions of <u>Section 28(b)</u> shall survive the termination hereof.

## 29.     CONFIDENTIALITY AND PRESS RELEASES.

(a)     Until the Closing and except for any disclosures that are necessary or required pursuant to the Bankruptcy Case, Purchaser and its partners, members, attorneys, agents, employees and consultants will treat the information disclosed to it by Seller, or otherwise gained through Purchaser's access to the Property and Seller's books and records, as confidential, giving it the same care as Purchaser's own confidential information, and make no use of any such disclosed information not independently known to Purchaser from a third party not under an obligation of confidentiality to Seller or its affiliates except in connection with the transactions contemplated hereby. In the event of a termination of this Agreement, Purchaser shall promptly return all such confidential information to Seller. ***[Relevant Confidentiality Agreement to be referenced:*** Nothing contained herein shall limit or otherwise affect the provisions of that certain confidentiality agreement dated [_____] between [_____].

(b)     Neither Purchaser nor Seller shall issue any press releases (or other public statements) with respect to the transaction contemplated in this Agreement without approval of the other party, provided that in no event shall any press release (or other public statements) with respect to this transaction indicate the Purchase Price (or any of the other terms hereof) or, at Seller's request, the identity of the Seller.

(c)     The provisions of <u>Section 29(a)</u> shall survive the termination of this Agreement and the provisions of <u>Section 29(b)</u> shall survive the termination hereof or the Closing.

## 30.     FURTHER ASSURANCES.

Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement. The provisions of this <u>Section 30</u> shall survive the Closing.

## 31.     THIRD PARTY BENEFICIARY.

This Agreement is an agreement solely for the benefit of Seller and Purchaser (and their permitted successors and/or assigns). No other person, party or entity shall have any rights hereunder nor shall any other person, party or entity be entitled to rely upon the terms, covenants

- 41 -

US\60742879.8

EXHIBIT 1 PAGE 275

NFMC_000699

and provisions contained herein. The provisions of this <u>Section 31</u> shall survive the Closing or the termination hereof.

32.     <u>JURISDICTION AND SERVICE OF PROCESS</u>.

    The parties hereto agree to submit to personal jurisdiction in the State of New York in any action or proceeding arising out of this Agreement and, in furtherance of such agreement, the parties hereby agree and consent that without limiting other methods of obtaining jurisdiction, personal jurisdiction over the parties in any such action or proceeding may be obtained within or without the jurisdiction of any court located in New York and that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the parties by registered or certified mail to or by personal service at the last known address of the parties, whether such address be within or without the jurisdiction of any such court. Any legal suit, action or other proceeding by one party to this Agreement against the other arising out of or relating to this Agreement shall be instituted only in the Bankruptcy Court and each party hereby waives any objections which it may now or hereafter have based on venue and/or forum non-conveniens of any such suit, action or proceeding and submits to the jurisdiction of such courts. The provisions of this <u>Section 32</u> shall survive the Closing or the termination hereof.

33.     <u>WAIVER OF TRIAL BY JURY</u>.

    Seller and Purchaser hereby irrevocably and unconditionally waive any and all right to trial by jury in any action, suit or counterclaim arising in connection with, out of or otherwise relating to this agreement. The provisions of this <u>Section 33</u> shall survive the Closing or the termination hereof.

34.     <u>MISCELLANEOUS</u>.

    (a)    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. PDF signatures to this Agreement transmitted via e-mail and/or DocuSign shall be deemed original signatures for all purposes hereunder.

    (b)    Any consent or approval to be given hereunder (whether by Seller or Purchaser) shall not be effective unless the same shall be given in advance of the taking of the action for which consent or approval is requested and shall be in writing. Except as otherwise expressly provided herein, any consent or approval requested of Seller or Purchaser may be withheld by Seller or Purchaser in its sole and absolute discretion.

    (c)    Escrow Agent is hereby designated the "real estate reporting person" for purposes of Section 6045 of the Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Agent shall so provide. Upon the consummation of the transaction contemplated by this Agreement, Escrow Agent shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation. Seller and Purchaser shall promptly furnish their federal tax identification numbers to Escrow Agent and shall otherwise reasonably cooperate with Escrow Agent in connection with Escrow Agent's duties as real estate reporting person.

- 42 -

(d) Notwithstanding anything in this Agreement to the contrary, Seller shall have the right to consummate the transactions contemplated by this Agreement in a manner that qualifies as a tax-deferred exchange, in whole or in part, under the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations thereunder, and IRS Revenue Procedure 2000-37 (a "1031 Transaction"). Without limiting the foregoing, Seller shall have the right to assign or transfer all or any portion of its rights under this Agreement to a qualified intermediary, an exchange accommodation title holder or one or more single member limited liability companies that are owned by any of the foregoing persons in accordance with the provisions of Section 1031 of the Code, the Treasury Regulations thereunder, and IRS Revenue Procedure 2000-37, provided that no such assignment or transfer of rights under this Agreement shall effect a release of Seller from its obligations under this Agreement or impose any additional obligation or liability except to a de minimis extent on Purchaser. Purchaser shall cooperate with Seller with respect to any 1031 Transaction, including executing any and all documents reasonably requested in connection therewith and making any payments due under this Agreement to or at the direction of the qualified intermediary or the exchange accommodation title holder. All agreements and other documents necessary for Seller to effect its 1031 Transaction shall be prepared at the expense of Seller, by Seller's counsel. Seller agrees to pay or cause to be paid, and indemnify and hold harmless Purchaser from and against, any and all liability, claim, action, damage, cost and expense (including reasonable attorneys' fees), fine or penalty related to, arising out of or in connection with Purchaser's cooperation in effectuating any 1031 transaction requested by Seller.

(e) The parties acknowledge that each party and its counsel have reviewed and approved this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement (or any amendments, exhibits or schedules hereto) or of any agreements entered into arising from, relating to or in connection with this Agreement.

(f) If any payment to be made under this Agreement shall not be paid when due hereunder, the same shall bear interest (which shall be paid together with the applicable payment hereunder) from the date due until so paid at a rate per annum equal to the Prime Rate (as such rate may vary from time to time) as reported in *The Wall Street Journal* plus 5% (the "Default Rate"). To the extent a payment provision in this Agreement does not specify a period for payment, then for purposes hereof such payment shall be due within five (5) business days of the date such payment obligation is triggered.

(g) The provisions of this Section 34 shall survive the Closing or the termination hereof.

35. ATTORNEYS' FEES.

In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation.

- 43 -

US\60742879.8

EXHIBIT 1 PAGE 277

NFMC_000701

36.     EXCULPATION.

Purchaser agrees that it does not have and will not have any claims or causes of action against any Seller Related Party arising out of or in connection with this Agreement or the transactions contemplated hereby.  Without limiting the generality of the foregoing provisions of this Section 36, Purchaser hereby unconditionally and irrevocably waives any and all claims and causes of action of any nature whatsoever it may now or hereafter have against the Seller Related Parties, and hereby unconditionally and irrevocably releases and discharges such Seller Related Parties from any and all liability whatsoever which may now or hereafter accrue in favor of Purchaser against such Seller Related Parties, in connection with or arising out of this Agreement or the transactions contemplated hereby.  The provisions of this Section 36 shall survive the termination of this Agreement and the Closing.

37.     NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

38.     NO CONSEQUENTIAL DAMAGES.

Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof (provided that such limitation with respect to lost profits shall not limit Seller's right to recover contract damages in connection with Purchaser's failure to close in violation of this Agreement).

39.     SUBMISSION FOR COURT APPROVAL.

(a)     Purchaser and Seller acknowledge that this Agreement and the transactions contemplated hereby are subject to approval by the Bankruptcy Court and entry of the Sale Order.  In the event of any discrepancy between this Agreement and the Sale Order, the Sale Order shall govern.  For purposes of this Agreement, a "Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Seller and Purchaser each in their reasonable discretion and substantially in the form attached hereto as **Exhibit 7**.

(b)     Seller shall file a motion (the "Motion") with the Bankruptcy Court seeking the entry of the Sale Order as promptly as practicable, but no later than fourteen (14) days after Escrow Agent notifies Seller of receipt of Purchaser's delivery of the Second Deposit (which notification may be via e-mail).

- 44 -

(c)     Seller shall use commercially reasonable efforts to have the Bankruptcy Court hold a hearing to consider the entry of the Sale Order as promptly as practicable, but no later than forty-five (45) days after the filing of the Motion.

(d)     From and after the Effective Date, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order. Purchaser has not colluded in connection with its offer or negotiation of this Agreement.  From and after the Effective Date, Purchaser shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order or consummation of the transactions contemplated hereby.

(e)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Purchaser or Seller be required to agree to any amendment of this Agreement.

(f)     Seller further covenants and agrees that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan Seller submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the transactions contemplated hereby.

(g)     Seller will use commercially reasonable efforts to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable. Notwithstanding anything in this Agreement to the contrary, in the event (I) the Sale Order has not been entered into, on, or before the date that is seventy-five (75) after the filing of the Motion (such date, the "Sale Order Outside Date") or if such Sale Order is subject to a stay or injunction on the Sale Order Outside Date, or (II) if there is conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (III) if there is a dismissal of the Bankruptcy Case, then in each case, Purchaser shall have the right to terminate this Agreement upon the delivery of written notice within five (5) business day following the Sale Order Outside Date/conversion/dismissal of the Bankruptcy Case and receive a return of the Deposit (together with any interest earned thereon). If Purchaser elects to terminate the Agreement in accordance with this Section 39(g), upon such return and delivery of the Deposit (together with any interest accrued thereon), this Agreement shall terminate and neither party hereto shall have any further obligations hereunder except for those that are expressly provided in this Agreement to survive the termination hereof.

*[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]*

- 45 -

US\60742879.8

EXHIBIT 1 PAGE 279

NFMC_000703

**IN WITNESS WHEREOF**, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

<div style="margin-left:45%">

**SELLER:**

**NINETY-FIVE MADISON COMPANY, L.P.,** a New York limited partnership

By: Sharan Sklar Management LLC

By: _____
    Name: Sharan Sklar
    Title: Manager

By: Michael Sklar Management LLC

By: _____
    Name: Michael Sklar
    Title: Manager

**PURCHASER:**

[_____], a [_____]

By: _____
    Name:
    Title:

</div>

The undersigned hereby acknowledges and consents to the provisions of Sections 4(b) and 34(c):

**OLD REPUBLIC NATIONAL TITLE COMPANY**, as Escrow Agent

By: _____
    Name:
    Title:

*(95 Madison - Signature Page to Purchase and Sale Agreement)*

## SCHEDULE A

## <u>Description of the Land</u>

US\60742879.8

EXHIBIT 1 PAGE 281

NFMC_000705

# SCHEDULE B

## Seller's Excluded Personalty

US\60742879.8

EXHIBIT 1 PAGE 282

NFMC_000706

SCHEDULE C

<u>List of Leases</u>

US\60742879.8

EXHIBIT 1 PAGE 283

NFMC_000707

SCHEDULE D

<u>List of Contracts</u>

US\60742879.8

EXHIBIT 1 PAGE 284

**NFMC_000708**

SCHEDULE E

<u>List of Security Deposits</u>

US\60742879.8

EXHIBIT 1 PAGE 285

**NFMC_000709**

SCHEDULE F

<u>Arrearage Schedule</u>

US\60742879.8

EXHIBIT 1 PAGE 286

NFMC_000710

SCHEDULE G

Specified Encumbrances

US\60742879.8

EXHIBIT 1 PAGE 287

NFMC_000711

# EXHIBIT 1

## Escrow Agent's Wire Instructions

US\60742879.8

EXHIBIT 1 PAGE 288

NFMC_000712

EXHIBIT 2

<u>Title Report</u>

US\60742879.8

EXHIBIT 1 PAGE 289

**NFMC_000713**

## EXHIBIT 3

### Form of Deed

THIS INDENTURE, made as of the _____ day of _____, by [_____], having an address c/o [_____] (hereinafter referred to as "Grantor"), to [_____], a [_____] having an address c/o [_____] (hereinafter referred to as "Grantee").

WITNESSETH, that Grantor, in consideration of Ten Dollars ($10.00), lawful money of the United States, paid by Grantee, does hereby grant and release unto Grantee, the heirs or successors and assigns of Grantee forever:

ALL that certain plot, piece or parcel of land with the building and improvements thereon erected, situate, lying and being, more particularly described on Exhibit A attached hereto and made a part hereof (the "Premises");

TOGETHER WITH all right, title and interest, if any, of Grantor in and to any streets and roads abutting the Premises to the center lines thereof;

TOGETHER WITH the appurtenances and all the estate and rights of Grantor in and to the Premises.

TO HAVE AND TO HOLD the Premises unto Grantee, the heirs or successors and assigns of Grantee forever.

AND Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements at the Premises and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

IN WITNESS WHEREOF, Grantor has duly executed this deed the day and year first above written.

GRANTOR:      *[Seller's Signature Block to be confirmed:*

[_____]

By: _____
    Name:
    Title:

- 1 -

US\60742879.8

EXHIBIT 1 PAGE 290

NFMC_000714

STATE OF NEW YORK        )
                                          ) ss.:
COUNTY OF NEW YORK    )

        On the _____ day of _____ in the year 20___ before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.


_____
Signature and Office of individual taking
acknowledgment


**Bargain and Sale Deed**
Without Covenant Against Grantor's Acts

SECTION:    [_____]
BLOCK:       [_____]
LOT:           [_____]
COUNTY:    New York

[_____]

TO

[_____]

STREET
ADDRESS:    [_____]
New York, New York


RETURN BY MAIL TO:

[                                        ]

- 2 -

US\60742879.8

EXHIBIT 1 PAGE 291

NFMC_000715

Exhibit A

<u>Legal Description</u>
(see attached)

- 1 -

US\60742879.8

EXHIBIT 1 PAGE 292

NFMC_000716

# EXHIBIT 4

## FORM OF BILL OF SALE

[_____], having an office c/o [_____] ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by _____, a _____, having an address at _____ ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all Personalty (other than the Excluded Personalty) (as such terms are as defined in that certain Purchase and Sale Agreement dated _____, _____ between Seller and Purchaser) owned by Seller and which are located at, and used or usable in connection with, the real property known as _____, New York, New York.

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

This Bill of Sale is made by Seller without recourse and without any expressed or implied representation or warranty whatsoever.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of this ____ day of _____, 20__.

[_____]

By: _____
    Name:
    Title:

- 1 -

US\60742879.8

EXHIBIT 1 PAGE 293

NFMC_000717

[Schedule A]

US\60742879.8

EXHIBIT 1 PAGE 294

NFMC_000718

**EXHIBIT 5**

**NOTICE TO TENANTS**

[Date]

TO:
ALL TENANTS OF [_____],
NEW YORK, NEW YORK

      Re: _____

Dear Tenant:

This is to notify you that, today, the referenced property has been sold by [_____]
("Seller") to _____ ("Purchaser").  As of the date hereof, Seller's interest in
your lease has been assigned to Purchaser and Purchaser has assumed the obligations as landlord
under your lease which accrue from and after the date hereof.

      You are hereby authorized and directed to make all future rent payments to
_____.  Any future inquiries regarding
your lease should be directed to _____ at the aforementioned address.

      Very truly yours,

      [_____]

      By: _____
        Name:
        Title:

- 1 -

# EXHIBIT 6

<u>ASSIGNMENT AND ASSUMPTION OF LEASES</u> *[TBD if buyer assuming any contracts* <u>AND CONTRACTS*]*</u>

[_____],having an office c/o [_____] ("Assignor"), in consideration of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to _____, a _____ having an address at _____ ("<u>Assignee</u>"), (1) all right, title and interest of Assignor as lessor under all the leases, license agreements and other occupancy agreements (collectively, the "<u>Leases</u>") in effect for space at the real property located at [_____], New York, New York (the "<u>Premises</u>") and listed on Schedule A, and (2) all right, title and interest of Assignor under all of the service, maintenance, supply and other agreements (collectively, the "<u>Contracts</u>") in effect relating to the operation of the Premises and listed on <u>Schedule B</u>.

Assignee hereby expressly assumes (x) all of the obligations imposed upon the lessor under the Leases which accrue from and after the date hereof (including, without limitation, the lessor's obligation to return any Transferred Security Deposits (as defined in that certain Purchase and Sale Agreement between Assignor and Assignee dated as of _____ __, _____ (the "<u>Purchase Agreement</u>")) and (y) all of the obligations imposed upon the owner of the Premises under the Contracts which accrue from and after the date hereof. Without limiting Assignee's obligations hereunder or under the Purchase Agreement, Assignee expressly acknowledges, and agrees to perform, its obligation to pay Future Commissions and Future Tenant Inducement Costs (as defined in the Purchase Agreement) in accordance with the terms of Section 7(h) of the Purchase Agreement.

Assignee acknowledges that, simultaneously with the execution hereof, Assignee has received $_____ from Assignor and [the letters of credit set forth on Schedule C attached hereto] in respect of the Transferred Security Deposits.

This Assignment and Assumption of Leases and Contracts and is made by Assignor without recourse and without any express or implied representation or warranty whatsoever except to the extent expressly provided in the Purchase Agreement.

This Assignment and Assumption of Leases and Contracts shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Any inconsistency between the terms herein and the terms set forth in the Purchase Agreement shall be resolved in favor of the terms of the Purchase Agreement.

- 1 -

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Assumption of Leases and Contracts to be executed as of this _____ day of _____, 20__.

**ASSIGNOR:**

[_____]

By: _____
   Name:
   Title:

**ASSIGNEE:**

[_____]

By: _____
   Name:
   Title:

US\60742879.8

EXHIBIT 1 PAGE 297

NFMC_000721

SCHEDULE A

<u>Leases</u>

US\60742879.8

EXHIBIT 1 PAGE 298

NFMC_000722

SCHEDULE B

Contracts

US\60742879.8

EXHIBIT 1 PAGE 299

NFMC_000723

# SCHEDULE C

## Letters of Credit

US\60742879.8

EXHIBIT 1 PAGE 300

NFMC_000724

# EXHIBIT 7

## SALE ORDER

US\60742879.8

EXHIBIT 1 PAGE 301

NFMC_000725

## EXHIBIT 8

## <u>SELLER PARTIES</u>

1. Rita A. Sklar
2. Michael Sklar
3. Sharan Sklar

US\60742879.8

EXHIBIT 1 PAGE 302

NFMC_000726

62.8MM works . Can you get them to a 6MM deposit. Also , we would want to know their finance source . If we can get over the hump we can get this done . No DD , No finance contingency .

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

REORGANIZED
DEBTOR'S
EXHIBIT

DX0048

EXHIBIT 1 PAGE 303

TB_EW_000199

| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Fri, 2 Feb 2024 18:16:24 -0500 (EST) |
| **To:** | lin@sunlightgroupny.com; "Michael Sklar" <msklar@ninetyfivemadison.com>, "Jimmy Chou" <lgcenterprise@gmail.com> |
| **Subject:** | Dinner with Emanuel / Lin and Michael (95 Madison Deal) |
| **Location:** | Asian Jewels Seafood Restaurant - 133-30 39th Ave, Flushing, NY 11354, United States |
| **Start Time:** | Tue, 6 Feb 2024 19:00:00 -0500 (EST) |
| **End Time:** | Tue, 6 Feb 2024 21:00:00 -0500 (EST) |
| **Attendees:** | Jimmy Chou, Michael Sklar, lin@sunlightgroupny.com |
| **Location:** | Asian Jewels Seafood Restaurant - 133-30 39th Ave, Flushing, NY 11354, United States |
| **Response Requested:** | True |
| **Show Time As:** | Tentative |
| **Recurrence Range Start:** | Wed, 07 Feb 2024 00:00:00 |
| **Recurrence Range End:** | Wed, 07 Feb 2024 02:00:00 |
| **Reminder Set:** | True |
| **Reminder Signal Time:** | Tue, 06 Feb 2024 23:00:00 |
| **Duration:** | 120 minutes |
| **Organizer:** | emanuel@twobinscapital.com |
| **Required Attendees:** | lin@sunlightgroupny.com, "Michael Sklar" <msklar@ninetyfivemadison.com>, "Jimmy Chou" <lgcenterprise@gmail.com> |
| **Subject:** | Dinner with Emanuel / Lin and Michael (95 Madison Deal) |



**REORGANIZED DEBTOR'S EXHIBIT**

**DX0049**

**EXHIBIT**
11

EXHIBIT 1 PAGE 304

TB_EW_000203

| From: | Google Calendar <calendar-notification@google.com> on behalf of Lin Zhuo <lin@sunlightgroupny.com> |
|---|---|
| Sent: | Fri, 2 Feb 2024 18.57.20 -0500 (EST) |
| To: | emanuel@twobinscapital.com |
| Subject: | Accepted: Dinner with Emanuel / Lin and Michael (95 Madison Deal) @ Tue Feb 6, 2024 7pm - 9pm (EST) (emanuel@twobinscapital.com) |
| Location: | Asian Jewels Seafood Restaurant - 133-30 39th Ave, Flushing, NY 11354, United States |
| Start Time: | Tue, 6 Feb 2024 19:00:00 -0500 (EST) |
| End Time: | Tue, 6 Feb 2024 21:00:00 -0500 (EST) |
| Location: | Asian Jewels Seafood Restaurant - 133-30 39th Ave, Flushing, NY 11354, United States |
| Response Requested: | True |
| Show Time As: | Tentative |
| Recurrence Range Start: | Wed, 07 Feb 2024 00:00:00 |
| Recurrence Range End: | Wed, 07 Feb 2024 02:00:00 |
| Reminder Signal Time: | Tue, 06 Feb 2024 23:45:00 |
| Response Status: | Accepted |
| Attachments: | invite.ics |

Lin Zhuo has accepted this invitation.

When

(Tuesday Feb 6, 2024  7pm – 9pm (Eastern Time - New York)

Location

Asian Jewels Seafood Restaurant - 133-30 39th Ave, Flushing, NY 11354, United States
View map

Guests

rowilzen  emanuel@twobinscapital.com
Creator  Lin Zhuo
lgcenterprise@gmail.com
Michael Sklar
View all guest info

EXHIBIT 1 PAGE 305

TB_EW_000369

It's time to rock and roll gents.

Sent from my iPhone

> On Feb 2, 2024, at 6:53 PM, emanuel@twobinscapital.com wrote:

Sent from my iPhone

Begin forwarded message:

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Date:** February 2, 2024 at 6:29:39 PM EST
**To:** emanuel@twobinscapital.com
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject: 95 Mad PSA Sunlight development 0202245**

Emanuel:

Attached is PSA .

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

<95 Madison - PSA (Sunlight Development LLC)-5366090-v1.docx>

REORGANIZED
DEBTOR'S
EXHIBIT

DX0050

EXHIBIT 1 PAGE 306

TB_EW_000372

**From:** "Andrew K. Glenn" <aglenn@glennagre.com>
**Sent:** Wed, 17 Apr 2024 22:08:17 -0400 (EDT)
**To:** Morris Missry <MISSRY@wmllp.com>; "Lefkowitz, Michael E."<mlefkowitz@rosenbergestis.com>
**Cc:** "emanuel@twobinscapital.com" <emanuel@twobinscapital com>; Michael Sklar<msklar@ninetyfivemadison.com>; Jay Lau <Jlau@laupc.com>; Lin Zhuo<lin@sunlightgroupny.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>; Erick Vallely <evallely@vallelylaw.com>; "brett@getconciergelaw.com"<brett@getconciergelaw.com>; Steven Cohen <cohen@wmllp.com>
**Subject:** Re: [EXTERNAL] Re: 95 Madison - PSA

I hereby confirm the following:

If Sunrise agrees to match the $65 million proposal we received this afternoon, 95 Madison agrees to the following:

1. It will immediately disengage from any negotiations with the competing purchaser.
2. We will proceed with the hearing tomorrow at 10 a.m. to obtain court approval of your revised proposal.
3. Your offer is conditioned on approval tomorrow. If the Court decides to adjourn the auction, your offer can be withdrawn at your election.
4. We will provide you with a 5% break-up fee (the maximum generally allowed in Section 363 sales).

Please confirm asap that this is acceptable.

Thanks.


Andrew K. Glenn
Managing Partner
aglenn@glennagre.com
W: (212) 970-1601
M: (908) 581-3659

1185 Avenue of the Americas
New York, NY 10036

REORGANIZED
DEBTOR'S
EXHIBIT

DX0051



---

**From:** Morris Missry <MISSRY@wmllp.com>
**Sent:** Wednesday, April 17, 2024 9:52 PM
**To:** Lefkowitz, Michael E. <mlefkowitz@rosenbergestis.com>
**Cc:** emanuel@twobinscapital.com <emanuel@twobinscapital.com>; Michael Sklar <msklar@ninetyfivemadison.com>; Jay Lau <Jlau@laupc.com>; Lin Zhuo <lin@sunlightgroupny.com>; Andrew K. Glenn <aglenn@glennagre.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>; Erick Vallely <evallely@vallelylaw.com>; brett@getconciergelaw.com <brett@getconciergelaw.com>; Steven Cohen <cohen@wmllp.com>
**Subject:** Re: [EXTERNAL] Re: 95 Madison - PSA

**[EXTERNAL EMAIL]** This email originated from outside of the organization. Do not click links or open attachments unless

EXHIBIT 1 PAGE 307                                                                TB_EW_002798

you recognize the sender and know the content is safe.

+Steve Cohen

**Morris Missry, Esq.**
WACHTEL MISSRY LLP
One Dag Hammarskjold Plaza
885 2nd Avenue | New York, NY 10017
Telephone:  212 909-9557
Facsimile:  212 909-9448
Website:  www.wmllp.com

On Apr 17, 2024, at 9:50 PM, Lefkowitz, Michael E. <mlefkowitz@rosenbergestis.com> wrote:

Caution: This is an external email. Please take care when clicking links or opening attachments. When in doubt, contact IT.

Adding Morris Missry as Morris has advised earlier this evening that he is counsel for the purchaser under the PSA.

**Michael E. Lefkowitz**



T: +1 (212) 551-8436
mlefkowitz@rosenbergestis.com
733 Third Avenue, New York, NY 10017



ROSENBERG & ESTIS, P.C. 

 

On Apr 17, 2024, at 9:37 PM, emanuel@twobinscapital.com wrote:

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

we'd like to have a call tomorrow at 8:30am to have a follow up conversation based on the call we had earlier. Please confirm everyone is available. Thanks.

Sent from my iPhone

> On Apr 17, 2024, at 6:25 PM, Michael Sklar <msklar@ninetyfivemadison.com> wrote:
>
> Lin , Jay , Emanuel :

EXHIBIT 1 PAGE 308

TB_EW_002799

Can we have a zoom call. Something has come up regarding the PSA. We need to speak now. Can we talk at 6:45 ?

Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com
<mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

*******************************************************************
This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please delete it and notify us immediately.

Important Notice: Always independently confirm wiring instructions in person or via a telephone call to a trusted and verified phone number.
*******************************************************************

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

*************************************
U.S. Treasury Circular 230 Notice: Any U.S. federal tax advice included in this communication was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal tax penalties.
*************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

*****************************Important Notice *****************************
This email and any files transmitted with it are confidential and may be subject to the attorney-client or other privileges. Use or disclosure of this email or any such files by anyone other than the intended recipient is prohibited. If you are not the intended recipient, please notify the sender immediately and delete this message from your system.

EXHIBIT 1 PAGE 309                                    TB_EW_002800