# EXHIBIT 2

| Branton Ex. No. | Date | Description | Beg Bates | End Bates |
|---|---|---|---|---|
| BX-1 | 8/18/2022 | Listing Agreement | BR002094 | BR002105 |
| BX-2 | 8/31/2022 | Order Authorizing the Retention and Employment of Branton as Real Estate Broker and Sales Agent to NFMC [Docket No. 181] | N/A | N/A |
| BX-3 | Undated | Branton Offering Memorandum | BR002348 | BR002419 |
| BX-4 | Multiple | Branton's Updates to NFMC on Sales Process | Multiple | Multiple |
| BX-5 | 7/28/2022 | Email from E. Westfried to M. Sklar re: Resi Plan | NFMC_000119 | NFMC_000119 |
| BX-6 | 8/18/2022 | Email from W. Heller to A. Glenn re: Referral | BR002324 | BR002325 |
| BX-7 | 8/18/2022 | Email from A. Glenn to W. Heller re: Referral | BR002320 | BR002320 |
| BX-8 | 8/31/2022 | Email from M. Sklar to W. Heller, S. Sklar re: Referral | BR002254 | BR002257 |
| BX-9 | 9/12/2022 | Email from M. Sklar to W. Heller, S. Sklar, R. Sklar, A. Glenn, T. Flemming re: Prior Offers | NFMC-06612 | NFMC-06621 |
| BX-10 | 9/14/2022 | Email from S. Sklar to W. Heller and M. Sklar re: Referral | BR002142 | BR002143 |
| BX-11 | 9/15/2022 | Email from M. Sklar to W. Heller re: Referral | BR002299 | BR002303 |
| BX-12 | 9/22/2022 | Email from S. Sklar to A. Glenn, W. Heller, M. Sklar re: Failure to Refer | BR002144 | BR002144 |
| BX-13 | 10/24/2022 | Email from M. Sklar to H. Dalton, W. Heller, S. Sklar re: Referral | BR002129 | BR002129 |
| BX-14 | 10/24/2022 | Email from M. Sklar to W. Heller and S. Sklar re: Referral | BR002258 | BR002259 |
| BX-15 | 11/15/2022 | Email from S. Sklar to W. Heller and Z. Herring re: Referral | BR002295 | BR002295 |
| BX-16 | 11/15/2022 | Email from M. Sklar to W. Heller, S. Sklar, A. Kahn, T. Flemming re: Referral | BR002291 | BR002292 |
| BX-17 | 12/19/2022 | Email from S. Sklar to W. Heller, M. Sklar, A. Lunzer re: Referral | BR002147 | BR002148 |
| BX-18 | 12/27/2022 | Application to Employ Two Bins Capital LLC as Financing Broker for DIP Financing [Docket No. 200] | N/A | N/A |
| BX-19 | 1/9/2022 | Order Authorizing the Retention and Employment of Two Bins Capital LLC as Financing Broker [Docket No. 205] | N/A | N/A |
| BX-20 | 1/25/2023 | Email from S. Sklar to W. Heller, M. Sklar, R. Sklar, A. Glenn, T. Flemming re: Failure to Refer | BR002261 | BR002262 |
| BX-21 | 5/5/2023 | Email from S. Sklar to W. Heller, M. Sklar, T. Taylor re: Referral | BR002141 | BR002141 |
| BX-22 | 5/1/2023 | NFMC Application to Amend Branton Retention [Docket No. 234] | N/A | N/A |
| BX-23 | 5/25/2022 | Order Amending the Order Authorizing Branton Retention [Docket No. 243] | N/A | N/A |
| BX-24 | 6/26/2023 6/27/2023 | Emails Between M. Sklar and W. Heller re: 2nd-Round Bid Process | NFMC-06564 NFMC-06632 | NFMC-06565 NFMC-06633 |
| BX-25 | 6/27/2023 | Email from S. Sklar to W. Heller and M. Sklar re: Referral | BR002293 | BR002293 |
| BX-26 | 9/6/2023 | Email from M. Sklar to W. Heller and S. Sklar re: Referral | BR002145 | BR002146 |
| BX-27 | 11/3-29/2023 | Text Messages Between M. Sklar and E. Westfried | NFMC_000043 | NFMC_000044 |
| BX-28 | 11/7/2023 | Calls between M. Sklar and E. Westfried Call between M. Sklar and W. Heller | Verizon000022 | Verizon000022 |
| BX-29 | 11/12/2023 | Call between M. Sklar and W. Heller | Verizon000023 | Verizon000023 |
| BX-30 | 11/14/2023 | Call between M. Sklar and W. Heller | Verizon000025 | Verizon000025 |
| BX-31 | 11/16/2023 | Email from M. Sklar to S. Sklar re: Branton - Woody | NFMC-06576 | NFMC-06576 |
| BX-32 | 11/27/2023 | Email from E. Westfried to M. Sklar re: Zoom Call | NFMC_000562 | NFMC_000562 |
| BX-33 | 11/28/2023 | Zoom Invitation for Call Between M. Sklar, S. Sklar, and E. Westfried | NFMC_000563 | NFMC_000564 |
| BX-34 | 11/28/2023 | Email from M. Sklar to E. Westfried attaching 95 Madison Plans | NFMC_000566 | NFMC_000569 |
| BX-35 | 11/30/2023 12/5/2023 12/8/2023 12/11/2023 | Calls between M. Sklar and E. Westfried Call betwween M. Sklar and W. Heller | Verizon000027 | Verizon000028 |
| BX-36 | 12/8/2023 12/11/2023 | Text Messages Between M. Sklar and E. Westfried | NFMC_000044 | NFMC_000045 |
| BX-37 | 12/6/2023 | Call between E. Westfried and L. Zhuo | Verizon000146 | Verizon000146 |
| BX-38 | 12/11/2023 | Email from M. Sklar to S. Sklar re: Woody | NFMC-06634 | NFMC-06634 |
| BX-39 | 12/13/2023 | Calls between E. Westfried and S. Sklar | Verizon000157 | Verizon000157 |
| BX-40 | 12/18/2023 | Calls between M. Sklar and W. Heller | Verizon000032 | Verizon000032 |
| BX-41 | 12/18/2023-2/2/2024 | Text Messages Between M. Sklar and E. Westfried | NFMC_000045 | NFMC_000049 |
| BX-42 | 12/19/2023 12/20/2023 | Call between M. Sklar and W. Heller Call between M. Sklar and E. Westfried | Verizon000033 | Verizon000033 |

EXHIBIT 2 PAGE 1

| Branton Ex. No. | Date | Description | Beg Bates | End Bates |
|---|---|---|---|---|
| BX-43 | 12/19/2023 | Email from E. Westfried to J. Chou attaching 95 Madison Plans | TB_EW_000007 | TB_EW_000010 |
| BX-44 | 12/21/2023 | Call between E. Westfried and L. Zhuo | Verizon000165 | Verizon000165 |
| BX-45 | 12/21/2023 | Email from M. Sklar to S. Sklar re: Ideas to Move Forward | NFMC-06566 | NFMC-06566 |
| BX-46 | 12/26/2023 12/27/2023 | Calls between M. Sklar and W. Heller | Verizon000034 | Verizon000034 |
| BX-47 | 12/26/2023 | Email from W. Heller to M. Sklar, S. Sklar, A. Glenn re: Update | BR000011 | BR000012 |
| BX-48 | 12/26/2023 | Email from W. Heller to A. Glenn re: CNY LOI | BR001244 | BR001255 |
| BX-49 | 12/27/2023 | Email from W. Heller to M. Sklar, S. Sklar re: Attorneys | BR001242 | BR001242 |
| BX-50 | 12/27/2023 | Emails from M. Sklar and S. Sklar to W. Heller re: CNY | BR002042 | BR002044 |
| BX-51 | 12/27/2023 12/28/2023 | Text Messages Between E. Westfried M. Sklar, S. Sklar re: Tour for the Ultimate Purchaser | TB_EW_003190 | TB_EW_003190 |
| BX-52 | 12/27/2023 12/28/2023 | Emails between W. Heller, M. Sklar, S. Sklar re: Tours for Other Prospects | BR002420 | BR002421 |
| BX-53 | 12/28/2023 | Email from W. Heller to M. Sklar, S. Sklar re: CNY LOI | BR000501 | BR000504 |
| BX-54 | 12/29/2023 | Calls between M. Sklar and E. Westfried | Verizon000034 | Verizon000034 |
| BX-55 | 1/1/2024 | Email from M. Sklar to E. Westfried re: NDA | NFMC_000582 | NFMC_000582 |
| BX-56 | 1/1/2024 | Email from E. Westfried to L. Zhuo and J. Chou re: Tour & NDA | TB_EW_000013 | TB_EW_000013 |
| BX-57 | 1/2/2024 | Email from E. Westfried to M. Sklar attaching Signed NDA | NFMC_000583 | NFMC_000587 |
| BX-58 | 1/2/2024 | Email from M. Sklar to E. Westfried attaching Due Diligence Materials | NFMC_000599 | NFMC_000600 |
| BX-59 | 1/2/2024 | Email from M. Sklar to E. Westfried attaching Ceiling Height Info | NFMC_000588 | NFMC_000589 |
| BX-60 | 1/2/2024 | Email from M. Sklar to E. Westfried attaching Residential Plans & Square Foot Calculations | NFMC_000590 | NFMC_000598 |
| BX-61 | 1/2/2024 1/4/2024 | Calls between M. Sklar and E. Westfried Calls between M. Sklar and W. Heller | Verizon000036 | Verizon000036 |
| BX-62 | 1/4/2024 | Email from W. Heller to M. Sklar, S. Sklar, R. Sklar, A. Glenn re: Post-Termination Protected Prospects | BR002116 | BR002117 |
| BX-63 | 1/4/2024 | Email from W. Heller to A. Glenn re: Post-Termination Protected Prospects | BR002118 | BR002120 |
| BX-64 | 1/8/2024 | Email from E. Westfried to M. Sklar attaching Sunlight $58M Offer | NFMC_000612 | NFMC_000630 |
| BX-65 | 1/9/2024 | Email from M. Sklar to E. Westfried re: CNY Offer | NFMC_000650 | NFMC_000651 |
| BX-66 | 1/9/2024 | Email from M. Sklar to W. Heller, M. Lefkowitz, A. Glenn, S. Sklar attaching Executed CNY LOI | BR001226 | BR001231 |
| BX-67 | 1/9/2024 | Calls between M. Sklar and E. Westfried | Verizon000038 | Verizon000038 |
| BX-68 | 1/9/2024 1/10/2024 | Calls between E. Westfried and L. Zhuo | Verizon000175 | Verizon000176 |
| BX-69 | 1/9/2024 1/10/2024 | Text Messages Between E. Westfried and L. Zhuo re: CNY Offer | S00308 | S00310 |
| BX-70 | 1/12/2024 | Call between E. Westfried and L. Zhuo | Verizon000179 | Verizon000179 |
| BX-71 | 1/12/2024 | Call between M. Sklar and E. Westfried | Verizon000039 | Verizon000039 |
| BX-72 | 1/12/2024 | Email from L. Zhuo to E. Westfried attaching Sunlight $60M Offer | TB_EW_000121 | TB_EW_000122 |
| BX-73 | 1/12/2024 | Email from E. Westfried to M. Sklar attaching Sunlight $60M Offer | NFMC_000652 | NFMC_000653 |
| BX-74 | 1/23/2024 | Email from M. Lefkowitz to M. Sklar, S. Sklar, A. Glenn, W. Heller, C. Rashkover Extending the Exclusivity Period to January 31 | BR000876 | BR000876 |
| BX-75 | 1/19/2024 1/20/2024 1/24/2024 1/26/2024 | Calls between M. Sklar and E. Westfried Calls between M. Sklar and W. Heller | Verizon000042 | Verizon000044 |
| BX-76 | 2/12/2024 2/2/2024 | Calls between M. Sklar and E. Westfried | Verizon000045 | Verizon000046 |
| BX-77 | 2/1/2024 2/2/2024 | Calls between E. Westfried and L. Zhuo | Verizon000197 | Verizon000199 |
| BX-78 | 2/1/2024 | Email from M. Sklar to E. Westfried re: $62.8M Offer | TB_EW_000199 | TB_EW_000199 |
| BX-79 | 2/2/2024 | Calendar Invite for "Dinner with Emanuel/ Lin and Michael (95 Madison Deal)" | TB_EW_000203 | TB_EW_000203 |
| BX-80 | 2/2/2024 | Email from J. Chou to L. Zhuo and E. Westfried re: PSA | TB_EW_000372 | TB_EW_000372 |
| BX-81 | 2/15/2024 | Calendar Invite for Dinner between M. Sklar and E. Westfried | TB_EW_001662 | TB_EW_001662 |
| BX-82 | 3/1/2024 | NFMC's Sale Motion to Madison 29 [Docket No. 325] | N/A | N/A |
| BX-83 | 4/17/2024 | Email from M. Sklar to A. Glenn, E. Westfried, S. Sklar re: CNY Offer | TB_EW_003036 | TB_EW_003036 |

EXHIBIT 2 PAGE 2

| Branton Ex. No. | Date | Description | Beg Bates | End Bates |
|---|---|---|---|---|
| BX-84 | 4/17/2024 | Email from A. Glenn to M. Missry, M. Lefkowitz, E. Westfried, M. Sklar, J. Lau, L. Zhuo, S. Sklar, E. Vallely, S. Cohen, and brett@getconciergelaw.com re: CNY Offer | TB_EW_002798 | TB_EW_002800 |
| BX-85 | 4/18/2024 | Transcript of Hearing on NFMC's Motion to Approve Sale of Property to Madison 29 | N/A | N/A |
| BX-86 | 4/18/2024 | Email from A. Glenn to E. Westfried re: CNY Offer | TB_EW_003042 | TB_EW_003044 |
| BX-87 | 5/2/2024 | Order Approving Sale of Property to Madison 29 [Docket No. 358] | N/A | N/A |
| BX-88 | 6/3/2024 | Amended Order Approving Sale of Property to Madison 29 [Docket No. 361] | N/A | N/A |
| BX-89 | Undated | Branton's Unreimbursed Expenses | N/A | N/A |
| BX-90 | 6/5/2024 | NFMC-Madison 29 Closing Statement [Docket No. 385] | N/A | N/A |
| BX-91 | 7/24/2023 7/25/2023 | Emails between M. Sklar, S. Sklar, A. Glenn, R. Sklar, T. Flemming, W. Heller re: Rita | N/A | N/A |

EXHIBIT 2 PAGE 3

**LISTING AGREEMENT FOR SALE** (this "**Agreement**") dated as of August _18_ 2022 (**Effective Date**") between Branton Realty Services LLC, a New York limited liability company ("**Branton**"), and Ninety-Five Madison Company, L.P., a New York limited partnership ("**Owner**").

### Background

Owner owns the property known as 95 Madison Avenue, New York, New York (the "**Property**") and desires to engage Branton to arrange a sale or other disposition of all or a portion of the Property to a counterparty (a "**Counterparty**") upon the terms and provisions more fully set forth herein. As used herein, Counterparty includes affiliates, designees, nominees and assignees thereof. On March 22, 2021, Owner filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York (Case No. 21-10529) (the "Bankruptcy Court").

### Agreement

1.      **Appointment.** Subject to the conditions and limitations contained in this Agreement, and the approval of the Bankruptcy Court, as hereinafter set forth, Owner hereby appoints Branton, and Branton hereby accepts appointment, as Owner's exclusive agent and as an advisor, with the exclusive right to market the Property for a sale, as defined in the third paragraph of Exhibit A (any such transaction being a "**Transaction**"). The terms and conditions of any proposed Transaction shall be subject to review and acceptance by Owner in its sole and absolute discretion. Owner shall have the right to refuse to negotiate or enter into any Transaction with any party for any reason or for no reason, in its sole and absolute discretion. Branton shall coordinate and work with Owner's designated tax advisor, as necessary, with respect to a Transaction.

2.      **Term.** The term of Branton's appointment hereunder (the "**Term**") shall commence on the date hereof and end on December 31, 2023, except for the provisions of this Agreement which expressly survive the expiration of the Term or sooner termination of the Term.

3.      **Referrals.** Owner shall refer to Branton all inquiries regarding a Transaction received during the Term and negotiations shall be conducted by or through Branton (subject to direction and input from Owner). Branton shall submit to Owner in writing any offers that Branton receives with respect to the Property during the Term.

4.      **Owner Information.** Owner shall furnish to Branton such information with respect to the Property in writing as Branton may reasonably request in order to render its services effectively. Branton shall under all circumstances (i) be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all written information that has been furnished to it by Owner, (ii) have no obligation to verify the accuracy or completeness of any such information, and (iii) not be responsible for the inaccuracy or incompleteness of any such information provided. All documents and other materials, investigations, reports and information with respect to the Property or Owner shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner, after written authorization from Owner and after delivering an executed confidentiality agreement form (typically acceptable in the ordinary course



**Exhibit
BX - 1**

BR002094

EXHIBIT 2 PAGE 4

in similar transactions), and Owner shall be solely responsible for the accuracy of the contents of the same. Subject to the rights of any tenants, Owner shall provide reasonable access to the Property for Branton and, as arranged by Branton, prospective Counterparties.

5. **Compensation**. Branton shall be entitled to, and Owner shall pay, the fee described in Exhibit A (the "Commission") as the sole compensation due from Owner to which Branton is entitled upon the closing of any Transaction during the Term or as otherwise provided in the paragraph immediately below.

Within ten (10) days after the expiration of the Term, Branton shall deliver to Owner in writing a list (the "**List**") of the names of parties who physically toured the Property during the Term with respect to the Transaction. If within one year after the expiration of the Term, a contract or other agreement for a Transaction is signed with a party on said List or its designee, or if a contract has been signed at the time of expiration, Branton shall be entitled to the Commission provided for herein.

6. **Brokers**.

a. Branton is authorized to cooperate with outside brokers ("**Outside Brokers**") representing Counterparties in connection with a proposed Transaction. Branton shall obtain from any Outside Broker an agreement, in form and substance reasonably satisfactory to Owner, providing that the Outside Broker shall look solely to the Counterparty for any commissions due to such Outside Broker in connection with the Transaction. Any transaction document executed shall contain an indemnity from the Counterparty in favor of both Owner and Branton against claims of any Outside Broker.

b. Branton agrees to indemnify, defend and hold Owner harmless from and against all liabilities, losses, costs and expenses (including, without limitation, attorneys' fees, disbursements and court costs) incurred by and/or asserted against Owner arising out or relating to any claim for fees and/or commissions relating to the Property asserted against Owner by any broker(s) with whom Branton has dealt unless Owner enters into a Transaction document with a Counterparty without getting an indemnity against the claims of any Outside Broker.

c. Since Owner dealt with other brokers prior to Effective Date with respect to the Property, Owner shall be responsible for any commissions owed to such brokers. Owner agrees to indemnify and hold Branton harmless from and against all claims, actual out-of-pocket costs, liabilities, settlements, and judgments (collectively "claims"), and all costs of defense against such claims (including reasonable attorneys' fees and disbursements), by such other brokers.

7. **Marketing & Expenses**. Owner shall pay the fees and disbursements of legal counsel, engaged by Owner. Owner authorizes Branton to market the Property, including preparing offering materials, all of which materials are to be approved or disapproved in writing

#11386827 v6 029230 0008

2

BR002095

EXHIBIT 2 PAGE 5

by Owner (in its sole and absolute discretion) in writing within five (5) business days of presentation to Owner from Broker prior to digital distribution and if not disapproved in writing within five (5) business days same shall be deemed approved. All such materials about the Property or the Transaction whether prepared by Branton or Owner will identify Branton as the exclusive broker for the Property. Owner shall reimburse Branton or pay directly, when billed, Branton's reasonable actual out-of-pocket costs and expenses incurred in preparation of the offering materials and marketing the Property, which costs and expenses have all been approved in writing by Owner (the "**Marketing Costs**") including, but not limited to (a) the cost of producing and distributing descriptive materials (including the costs of photographs, maps, renderings, plot plans and blueprints), (b) cost of producing graphics for the offering materials and (c) third party websites that coordinate marketing efforts, distribute confidentiality agreements and host offering and due diligence materials (like DropBox). Branton shall provide a detailed line-item budget of proposed expenses for Owner's prior written approval. Within five (5) business days of presentation of a budget of proposed expenses Owner shall approve or disapprove in writing such expenses, and if not so disapproved in writing same shall be deemed approved, and Branton shall only expend such amounts as are set forth in the written budget approved by Owner, unless otherwise approved in advance by Owner. The Marketing Costs shall be reimbursed or paid by Owner whether or not a Transaction occurs. The parties anticipate the budget for marketing expenses to be approximately $50,000.00 to $75,000.00.

        8.     **Representations**. Other than as set forth in paragraph 21, each party represents and warrants to the other that the representing party has full right and authority to enter into and perform its obligations under this agreement, and that the same does not violate or conflict with, or require any consents or approvals under any Agreements by which the representing party is governed or bound.

        9.     **Confidentiality; Press Releases.** Branton acknowledges that Branton's services under this Agreement may provide Branton with access to confidential business, professional, personal or private information concerning Owner and its direct or indirect owners and/or their family members. Branton acknowledges the confidential nature of such information and agrees that Branton and Branton's agents will not issue any press releases, grant any interviews or release any other information or announcements to the press or the public or issue any other form of publicity, or otherwise publish or disclose to any third person, any such confidential information, except as specifically required to perform Branton's obligations under this Agreement. Notwithstanding the foregoing, the Parties specifically acknowledge that Branton shall be permitted to issue press releases and market the Property consistent with this Agreement provided that Branton does not disclose any information which would otherwise be deemed confidential pursuant to this Paragraph.

        10.    **Indemnification**. Owner acknowledges that Branton is not obligated to and has made no independent investigation regarding the condition of the Property (including structural, mechanical, soils, subsurface or environmental matters and hazardous substances) or any present or future title, legal, financial, zoning, real estate tax entitlements or environmental matters relative

#11186827 v6 \029230 0008

3

EXHIBIT 2 PAGE 6

BR002096

to the Property or any of the leases, license or other agreements to which the Property is or may be subject (all of the foregoing being called "**Property Conditions**"). Owner agrees to disclose to Branton any and all information which Owner has regarding the Property Conditions and Branton is authorized to disclose any such information to prospective Counterparties, upon the prior written approval of Owner, which approval shall remain in effect until revoked in writing. All documents, materials, investigations, reports and information with respect to Property Conditions shall be prepared by or for Owner and shall be furnished to prospective Counterparties on behalf of Owner only with the initial and prior written approval of Owner and Owner shall be solely responsible for same. Owner agrees to indemnify and hold Branton harmless from and against all claims, and all actual out-of-pocket costs of defense against such claims (including reasonable attorneys' fees and disbursements), suffered or incurred by Branton which arise out of or relate to any of the Property Conditions. This paragraph shall survive the expiration of this Agreement for the period of the applicable statute of limitations as to any such claims.

11.  **Notices.** Any notices required to be given by either party under this Agreement shall be in writing and sent by (i) messenger/personal delivery, (ii) certified mail return receipt requested, (iii) nationally recognized overnight courier service or (iv) email, addressed to the parties as provided below. Notices shall be deemed given upon receipt or rejection, if given by personal delivery; on the day that is five (5) business days following delivery to the postal authorities, if mailed as provided herein; on the business day following delivery to the courier service, if given by overnight courier as provided herein or when sent by e-mail provided no automatic bounce back is received, and further provided that any e-mail sent after 5:00 PM in the recipient's time zone on a business day or at any time on a non-business day shall be deemed given on the next business day. Notwithstanding anything to the contrary contained herein, notice by email pursuant to (iv) above shall not be an acceptable method of providing any legal notice, default notice or termination notice hereunder and the same shall be required to be sent by one of the methods set forth in (i)-(iii) of the first sentence of this paragraph.

> If to Owner, Ninety-Five Madison Company, L.P., 95 Madison Avenue, Suite 609, New York, New York 10016, with a copy by email to: Rita Sklar (ritasklar@gmail.com); Sharan Sklar (ssklar@ninetyfivemadison.com) and Michael Sklar (msklar@ninetyfivemadison.com).
>
> with a copy to:
>
> Rosenberg & Estis, P.C., 733 Third Avenue, New York, New York 10017, Attention: Michael E. Lefkowitz, Esq., email: mlefkowitz@rosenbergestis.com and
>
> Olshan, 1325 Avenue of the Americas, New York, New York 10019, Attention: Thomas J. Fleming, Esq., email: tfleming@olshanlaw.com

$\sqrt{k_1}$ /

BR002097

EXHIBIT 2 PAGE 7

If to Branton, at 1080 Fifth Avenue, Apt. 2B, New York, New York 10128, Attention: Mr. Warren Heller, email: woody.heller@outlook.com and wheller@brantonrealty.com.

With a copy to:

Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, New York, 10022-4784, Attention: Mr. Jonathan Margolis, email: jmargolis@morrisoncohen.com.

A party may change the address to which notices/service of process shall be sent to or served on it by five (5) days' prior written notice to the other party. Any notice served by an attorney representing a party (as set forth in Paragraph 11 above) shall have the effect of a notice served by the party.

12. **OFAC**. Each party warrants and represents to the other that, the representing party and all parties owning (directly or indirectly) an ownership interest in the representing party (a) is not, and shall not become, a person or entity with whom the other party is prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order, or other governmental action; and (b) is not knowingly engaged in, and shall not knowingly engage in, any dealing or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13. **Governing Law, Venue, Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of laws). Any disputes related to or arising from this Agreement must be brought exclusively in New York County in the State of New York, to the jurisdiction of which each of the parties hereby submits. Branton and Owner each waive trial by jury in any action or proceeding under this Agreement.

14. **Fees and Interest.** If either party commences an action or proceeding against the other party to enforce its rights under the Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and disbursements from the other party. Any amount due under this Agreement and not paid when due shall bear interest at the rate of two percent per annum in excess of the prime commercial lending rate as published from time to time in *The Wall Street Journal (New York edition)*, but not in excess of the highest rate permitted by applicable law.

15. **Branton Duties**. In addition to the obligations set forth elsewhere in this Agreement, Branton hereby agrees to (i) host weekly conference calls as needed, based on the status of the project, on the same day and time each week during the Term, adjusting for an alternate day in a week in which a holiday occurs, or the availability of less than two (2) of the partners, (ii) distribute weekly reports, as applicable once marketing is underway (to be received one (1) business day prior to the weekly call or meeting provided for in (i)) with updates on market

#11386827 v6 \0292301 \obbgt

5

BR002098

EXHIBIT 2 PAGE 8

conditions, marketing, showings, offers, etc., and (iii) transmit all offers made by Counterparties to Owner in writing.

16. **Owner Designee**. Branton hereby acknowledges that Rita Sklar, Sharan Sklar and Michael Sklar are representatives ("Representatives") of the Owner. Such Representatives shall designate in writing to Branton a single person (the "Designee") to act on their behalf, and Branton is hereby authorized to act upon direction given by the Designee with respect to requests for information, arranging group calls and other similar non-substantive matters. The Representatives may periodically designate a new Designee, in which case all of the Representatives shall notify Branton in writing thereof, and Branton shall act upon the direction of the new Designee. Notwithstanding the foregoing, the Representatives may periodically request that Branton make itself available for conference calls with the Representatives to discuss any subject concerning the Transaction.

17. Branton shall look only and solely to Owner's estate and interest in and to the Property (which shall consist of (a) the proceeds, rents and profits therefrom, (b) the proceeds of any lease, sale, conveyance, assignment, transfer, mortgage or refinancing thereof and (c) any insurance proceeds or condemnation awards relating to any portion of the Property) for the satisfaction of any right of Branton arising out of this Agreement or for the collection of judgment or other judicial process or arbitration award requiring the payment of money by Owner and no other property or assets of Owner, Owner's agents, incorporators, shareholders, employees, officers, directors, partners, manager, agents, principals (disclosed or undisclosed), members, joint venturers, or affiliates (collectively, "Owner's Affiliates") shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Branton's rights and remedies under or with respect to this Agreement or any other liability of Owner to Branton.

18. Branton represents further that it is presently and will at all times remain a licensed real estate broker in the State of New York. As a material inducement to Owner to enter into this Agreement, Branton covenants that Woody Heller ("**Heller**") will be actively involved in performing the services required of Branton hereunder. In the event of Heller's death or incapacity, this Agreement shall automatically terminate and no Commission shall be due and owing (other than in connection with a pending Transaction or may be due and owing pursuant to the terms of paragraph 5 hereof).

19. It is understood that Branton is not granted any right or authority to assume or create any obligation or liability or make any representation, warranty or agreement (expressed or implied) on Owner's behalf or to bind Owner in any manner whatsoever.

20. Notwithstanding anything to the contrary, it is expressly understood and agreed that (i) Owner is under no obligation of any nature whatsoever to either (a) accept any Counterparty identified by Branton or anyone else as a counterparty and/or (b) accept any Counterparty procured by Branton or anyone else and/or to execute and/or deliver any contract of sale or other agreement, (ii) Owner shall have the absolute right in Owner's sole discretion, without explanation or liability

#11386827 v6 \0292 \1 \44\8

6

BR002099

EXHIBIT 2 PAGE 9

of any nature whatsoever to Branton, to, at any time, reject any Counterparty and/or the terms of any prospective contract of sale or other agreement with any Counterparty and (iii) Owner shall have no liability to Branton of any nature whatsoever should Owner fail for any reason whatsoever (except in the case of Owner's willful default) to either (i) accept any Counterparty and/or execute and deliver any contract of sale or other agreement and/or (ii) close upon the sale of the Property, it being agreed that if an agreement for a Transaction is executed and delivered with a Counterparty, but the closing thereunder fails to occur for any reason whatsoever (except in the case of Owner's willful default), then Branton shall not be entitled to any Commission whatsoever.

21.  **Bankruptcy Court Approval.** Notwithstanding anything to the contrary herein the terms and conditions of the Agreement in all respects are subject to the approval of, the Bankruptcy Court. Owner will, promptly after its execution of this Agreement, file an application and proposed order seeking from the Bankruptcy Court approval of its employment of Branton pursuant to the terms of this Agreement, and pursuant to, as applicable, Sections 329(a) and 328(a) of the Bankruptcy Code. Owner agrees and acknowledges to attach a complete copy of this Agreement to the application. Owner will provide Branton the application and proposed order authorizing this Agreement sufficiently in advance of their filing in order for Branton to have ample time to review and discuss any comments it may have with Owner, and the application shall be acceptable to Branton, in form and substance. The proposed order will include, without limitation, the following terms and conditions:  (a) finding that none of the fees or commissions payable to Branton hereunder constitute a "bonus" under applicable law; (b) directing that Branton will be exempt from keeping time records for its work hereunder (as Branton will not be billing on an hourly basis); (c) finding that the terms and conditions of this Agreement are reasonable; (d) that the Commission due hereunder to Branton will be paid at the closing of a Transaction with respect to the Property without a further application or order of the Bankruptcy Court; and (e) directing that any unpaid Commission or marketing expenses owed to Branton shall be treated as an administrative claim under Section 507(a)(1) of the Bankruptcy Code. If an order obtaining these terms is not obtained from the Bankruptcy Court within thirty (30) days after both parties have signed this Agreement, then Branton may terminate this Agreement. If Owner obtains an order of the Bankruptcy Court authorizing its use of cash collateral or debtor in possession financing and if the order requires submission of a proposed budget specifying post-petition expenditures, then Owner will include in the budget line items providing for the payment of the expenses to be paid or reimbursed as and when provided pursuant to this Agreement. All amounts projected to be paid to Branton under this Agreement will be included in the carve-out for professionals provided in Owner's bankruptcy case. Should the Bankruptcy Court order a sale of the Property at auction, Branton is authorized to and will act as the exclusive auctioneer upon the terms set forth herein. The Bankruptcy Court will retain jurisdiction over any disputes under this Agreement. If the bankruptcy case is dismissed and the Property is not disposed of under Bankruptcy Court jurisdiction, then any dispute between the parties arising under this Agreement will be resolved in the New York State Supreme Court, County of New York, Commercial Division.

311386827 v6 '029230  0008

7

BR002100

EXHIBIT 2 PAGE 10

22. **Miscellaneous**. This Agreement (i) expresses the parties' entire agreement on the matters covered herein, and (ii) supersedes all prior understandings between such parties on such matters. This Agreement may not be amended or modified except in writing signed by all of the parties. Neither party may assign this Agreement without the prior consent of the other party, which consent may be withheld in such party's sole discretion. This Agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.



#1138o827 v6 \929230 \0008

8

Executed by the parties to confirm the foregoing.

BROKER:

BRANTON REALTY SERVICES LLC

By _Clarence H. Heller_
Name: Warren Heller
Title: Manager

OWNER:

NINETY-FIVE MADISON COMPANY,
L.P.

By: Sharan Sklar Management LLC

    By: /s/ Sharan Sklar
    Name: Sharan Sklar
    Title: Manager

By: Michael Sklar Management LLC

    By: /s/ Michael Sklar
    Name: Michael Sklar
    Title: Manager

# Exhibit A
## Compensation

Branton shall earn, and Owner shall pay Branton, a fee upon the closing of any Transaction of $300,000.00 plus one (1%) percent of the gross sales price.

As used herein, "gross sales price" includes any mortgages, loans or other obligations of Owner which may be assumed by the Counterparty or which the Counterparty takes title "subject to", and any purchase money loans or mortgages taken back by Owner and the sales price of any fixtures and other personal property sold by separate agreement between Owner and the Counterparty as part of the overall sale of the real property.

For purposes of this Agreement, a sale shall also include, in addition to a conventional sale of a fee simple interest in the Property, a joint venture/recapitalization of the Property, a tax-deferred exchange, an UPREIT structure, and any other transaction (however characterized) by which Owner's interest in the Property is transferred to an unaffiliated third party for consideration. It is further agreed that if Owner enters into a Transaction involving the sale of less than 100% of the Property, or if such a Transaction is effected by a sale or assignment of an interest in Owner (including without limitation between owners of interests in Owner or their affiliates), or by a transaction or integrated set of transactions intended to have the effect of conveying to such Counterparty less than 100% of the Property or Owner's interest therein, the effective legal transfer of such portion of the Property or such interest shall be treated as if it were a sale of the entire Property for the purposes of entitlement to, and calculation and payment of, a commission hereunder, and the date of such effective legal transfer shall be deemed the closing date of such transaction. For the avoidance of doubt the intent of the above sentence is to calculate the value of 100% of the Property or 100% of Owner's interests in the Property to be sold and then pay the Broker a commission based 100% of such value, not the pro-rata percentage of such Property or interests that are actually sold. If a ground lease is entered into, the parties will use the agreed upon value of the Property in determining the compensation.

The intention of the foregoing is that Branton will be paid for any Transaction on the basis set forth in the first paragraph of this Exhibit A.

BR002103

EXHIBIT 2 PAGE 13

## Exhibit B

## TIMELINE*

- Assemble and create the marketing brochure and due diligence material: 4 weeks depending on what's available and what has to be ordered
    - o photos
    - o write the text
    - o prepare the graphics of the marketing brochure
    - o review and collect the due diligence reports
        - environmental
        - engineering report
        - review any existing proposals
        - set up the marketing and due diligence website
- Initiate the marketing process: 6 weeks but could be longer during the summer
    - o Email confidentiality agreements and a deal summary page
    - o Send the marketing brochure once the CAs are signed
    - o Start conducting tours
    - o Review our proposed structure with potential purchasers
    - o Address questions, collect whatever additional information is requested
    - o Proceed in primal selling mode
    - o Prepare draft purchase agreement
- Review first-round bids: 2 weeks
    - o Receive and review
    - o Prepare a bid summary sheet comparing the relevant metrics of the various purchase proposals
    - o Select a handful of bidders to proceed to a second-round bid or choose one bidder to move forward quickly ahead of the pack, or both, depending on the situation and bids received
    - o Provide the finalists with the purchase contract to review
- Review second-round bids: 1-2 weeks
    - o Review offers and contract comments
    - o Interview bidders, if needed/helpful
    - o Select a purchaser
    - o Finalize and execute a contract, likely subject to a due diligence, but hopefully not
- Buyer due diligence: 0-4 weeks
    - o This process is intended for buyers to confirm seller's representations, but most will actually use it to confirm their financing
    - o Finalize unconditional contract
- Proceed to Closing: 6-10 weeks
    - o Normally we should be able to close in 6-8 weeks, but given the financing markets, may need an extra month

#11386827 v6 9029230 36008

11

\* The parties hereto agree that the referenced timeline is a timeline example in normal market conditions; all parties recognize that the current market is not within normal conditions and marketing efforts may take longer than so indicated on this timeline.

#11386827 v6 \029230 \0008

12

**21UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NINETY-FIVE MADISON COMPANY, L.P., | ) Case No. 21-10529 (DSJ) |
| | ) |
| Debtor. | ) |
| | ) |

### ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AUTHORIZING THE RETENTION AND EMPLOYMENT OF BRANTON REALTY SERVICES LLC AS REAL ESTATE BROKER AND SALES AGENT TO DEBTOR <u>NINETY-FIVE MADISON COMPANY, L.P. *NUNC PRO TUNC* TO AUGUST 17, 2022</u>

Upon consideration of the application (the "<u>Application</u>")[1] of Ninety-Five Madison Company, L.P. (the "<u>Debtor</u>"), the debtor and debtor in possession in this Chapter 11 case (the "<u>Chapter 11 Case</u>"), pursuant to Sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), for entry of an order (this "<u>Order</u>"): (a) authorizing the employment and retention of BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to *August 17*, 2022; (b) approving the terms of BRS's employment and retention, as memorialized in that certain engagement agreement dated August 18~~17~~, 2022 (the "<u>Engagement Agreement</u>"), attached as **Exhibit 1** to this Order, including the Fee Arrangement and Indemnification Provisions set forth in the Engagement Agreement; and (c) modifying the timekeeping requirements of Local Rule 2016-1 and the *General Order M-447 Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated January 29, 2013* (the "<u>Fee Guidelines</u>"), and any other applicable procedures and orders of the Court in connection with BRS's engagement; and upon the Declaration of Woody Heller (the "<u>Heller Declaration</u>"), which was filed with the Court as

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Application.

EXHIBIT 2 PAGE 16

Exhibit
BX - 2

**Exhibit B** to the Application; and the Court having reviewed the Application and the Heller Declaration; and the Court being satisfied, based on the representations made in the Application and in the Heller Declaration, that (i) BRS does not hold or represent any interest adverse to the Debtor's estate, and (ii) BRS is a "disinterested person" as that phrase is defined in Section 101(14) of the Bankruptcy Code; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; **and no objections to the Application having been timely filed;** and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtor's estate and all parties-in-interest and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **[DSJ 8/31/2022]**

It is hereby ORDERED that:

1.        The Application is granted to the extent set forth herein.

2.        In accordance with Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, the Debtor is hereby authorized and empowered to employ and retain BRS as real estate broker and sales agent for the Debtor, *nunc pro tunc* to August 17, 2022, in accordance with the terms and conditions set forth in the Engagement Agreement, and the Debtor is authorized to pay fees and reimburse expenses, and to provide indemnification, contribution, and/or reimbursement to BRS on the terms and at the times specified in the Engagement Agreement.

2

EXHIBIT 2 PAGE 17

3.      BRS shall be compensated for fees and reimbursed for out-of-pocket expenses by the Debtor in accordance with the terms and conditions of the Application and/or Engagement Agreement, and all fees and out-of-pocket expense reimbursements to be paid to BRS, including without limitation the Commission Fee, shall be subject to Section 328(a) of the Bankruptcy Code.

4.      Notwithstanding anything to the contrary contained herein or in the Application and/or Engagement Agreement, BRS shall file a final fee application for allowance of its compensation and expenses pursuant to Section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines and any other procedures or orders of the Court; provided, however, that BRS shall not be required to keep or submit detailed time records as part of its fee application.

5.      In the event that, during the pendency of these cases, BRS seeks reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys, appropriately redacted to preserve applicable privileges, shall be included in BRS's fee applications and such invoices and time records shall be in compliance with the Local Rules, and shall be subject to the Fee Guidelines and approval of the Court under the standards of Bankruptcy Code Sections 330 and 331, without regard to whether such attorney has been retained under Bankruptcy Code Section 327 and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code; *provided*, *however*, that BRS shall not seek reimbursement from the Debtor's estate for any attorney's fees incurred in defending against objections to any of BRS's fee applications filed in these cases;

6.      Notwithstanding anything to the contrary in the Application, the Heller Declaration, or the Engagement Agreement, during the pendency of this Chapter 11 Case, the Indemnification Provisions of the Engagement Agreement are hereby modified as follows:

3

EXHIBIT 2 PAGE 18

(a)    All requests by indemnified persons for the payment of indemnification as set forth in the Engagement Agreement (such persons, the "Indemnified Persons") shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Agreement **and this Order** and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, and in no case shall an Indemnified Person be indemnified if any losses, claims, damages, liabilities or expenses are finally judicially determined to have resulted from such Indemnified Person's gross negligence, bad faith, or willful misconduct; and **[DSJ 8/31/2022]**

(b)    In the event that an Indemnified Person seeks reimbursement from the Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Engagement Agreement, the invoices and supporting time records from such attorneys shall be included in BRS's own applications, both interim and final, and such invoices and time records shall be subject to the applicable Fee Guidelines and the approval of the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

7.    Any limitation of liability pursuant to the terms and conditions set forth in the Engagement Agreement are hereby eliminated for the duration of this Chapter 11 Case.

8.    Notwithstanding anything to the contrary in the Application and/or Engagement Agreement, to the extent that BRS uses the services of independent contractors or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, BRS (i) shall pass-

4

EXHIBIT 2 PAGE 19

through the cost of such Contractors to the Debtors at the same rate that BRS pays the Contractors; (ii) shall seek reimbursement for actual out-of-pocket expenses only; and (iii) shall ensure that the Contractors are subject to the same conflict checks and disclosures as required of BRS by Rule 2014 of the Bankruptcy Rules.

9.      The Debtor and BRS are authorized and empowered to take all actions necessary to effectuate the relief granted by this Order.

10.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.     The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

12.     **In the event of a conflict between this Order and the Application and/or Engagement Agreement, the terms of this Order shall govern. [DSJ 8/31/2022]**

Dated: New York, New York
       August 31, 2022

                           _____s/ David S. Jones_____
                           HONORABLE DAVID S. JONES
                           UNITED STATES BANKRUPTCY JUDGE

EXHIBIT 2 PAGE 20





**95 MADISON AVE**
NEW YORK, NY

CONFIDENTIAL
OFFERING
MEMORANDUM

**Exhibit**
BX - 3



EXHIBIT 2 PAGE 21



# TABLE OF CONTENTS

1. **Executive Summary** 4
2. **Investment Highlights** 7
3. **Property Description** 12
   a. *Introduction*
   b. *Measurement Chart & Sample Floor Plans*
   c. *Conversion to Alternate Uses*
   d. *Construction Detail*
   e. *Mechanical Detail*
   f. *Operational Detail*
4. **Location / Market** 38
   a. *Overview*
   b. *Nomad – North of Madison Square Park*
   c. *Central Location*
   d. *It's Hip to Be Square*
   e. *Transportation Options Abound*
   f. *Restaurants*
   g. *Nightlife*
   h. *Residential*
   i. *Retail*
   j. *An Office Destination*
   k. *Hotels*
   l. *A Tourist Destination*
   m. *Conclusion*
5. **Tenancy** 62
   a. *Tenant Summary*
   b. *Rent Roll*
6. **Financial** 67
   a. *Real Estate Taxes*
   b. *ICAP Real Estate Tax Abatement Program*
   c. *NYS & NYC Historic Tax Credit Programs*

BROOKLYN

WILLIAMSBURG
BRIDGE

EXHIBIT 2 PAGE 22

N

95 MADISON AVE
NEW YORK, NY

NEW JERSEY

DOWNTOWN

PIER 40

UNION
SQUARE

FLATIRON

MADISON
SQUARE PARK

FIFTH AVE

NOMAD

BROADWAY

3



# EXECUTIVE SUMMARY

As exclusive agent, **Branton Realty** Services is pleased to offer an exceptional redevelopment opportunity at **95 Madison** (the "Property") in New York's revitalized NoMad submarket. Prominently situated on a square lot at the corner of Madison Avenue and 29th Street, **the 16-story Property currently operates as an office building with grade-level retail and boasts one of New York City's most ornate landmarked façades.** All three property types: office, residential, and hotel, have enjoyed great success in the neighborhood, and the opportunity exists to convert the Property to either of the two alternate uses.

| PROPERTY SNAPSHOT | |
|---|---|
| Year Built | 1912 |
| Lot Area | 9,875 SF |
| Block / Lot | 858 / 58 |
| Zoning | C5-2 |
| FAR | 10.0 |
| Stories | 16 |
| Rentable SF (RSF) above grade | ~175,000 |
| Usable SF (USF) below grade | ~5,000 |
| Typical Floorplate (RSF) | 11,151 |
| Current Occupancy | 12% |
| Number of Tenants | 3 |
| Conversion to Residential / Hotel | Permitted |
| Individual Landmark | Yes |
| Landmark District | No |

4



EXHIBIT 2 PAGE 24



BR002352

EXHIBIT 2 PAGE 25



EXHIBIT 2 PAGE 26

# INVESTMENT HIGHLIGHTS

## BUILDING FEATURES:

**Will the Real Office Buildings please stand up:**

Unlike much of the Midtown South and NoMad office stock, the Property was initially constructed as a commercial office building, rather than a converted, midblock, light-manufacturing building. Therefore, the Property offers ample core elements and the traditional features sought by office tenants. Not surprisingly, given that Midtown South and NoMad include fewer than 10 institutional-class buildings under 20 years old, the best-in-class assets are those in the best locations that were recently and spectacularly renovated.

**Architecture Matters:**

As recently noted by our photographer, the building has the most exquisite façade he's ever seen in his decades of working as an architectural photographer. Not surprisingly, the Property's façade has been designated as an individual New York City Landmark, and the designation report is included in the due diligence website. While typically visible only from the street, the ornate and figurative façade elements extend outward from the façade and can be seen along the sides of the windows from inside the tenant space. For those who appreciate these pre-war elements, this adds an unusual visual point of distinction.

**Let there be Light:**

A typical limitation of masonry facades as compared to modern curtainwalls, is the lower number of windows and the wider spacing between them. Such is not the case at the Property, which features 41 tightly spaced windows per typical floor and allows for maximize flexibility in dividing the interior space. Further, the unusually tall windows allow natural light to extend deeper into the space than is normally found, even on the courtyard side of the building. And finally, the windows are double-hung and operable, which is both more suitable for residential conversion and allows office tenants the luxury of fresh air.

**Ready for Retail:**

The Property enjoys 100' of frontage on Madison Avenue, and the grade level has 17' ceilings and tall windows which enhances visibility from the street and increases the prominence of the two retail units. In addition, there are two combinable basement storage units of roughly 2,500 usable square feet each, with 11' ceiling heights, which can be accessed via either of the two stairwells on the east wall of the Property, or via a courtyard elevator which serves the basement through the third floor.



Madison Ave & 29th St

7

EXHIBIT 2 PAGE 27



**INVESTMENT HIGHLIGHTS**

## VALUE-ADD OPPORTUNITIES:

**Did Someone say Residential?**

The Property has residential in its blood, as the original developer built and used the top floor as his apartment. Further, with the surge of residential development in the surrounding neighborhood, the area enjoys among Manhattan's highest concentration of residential new construction, multifamily refurbishments, and office conversions. In that spirit, the Property has the benefit of not only being well suited for continued office use but also for a successful residential conversion.

**Zoning Favors the Flexible:**

Not only does the Property's C5-2 zoning allow as-of-right residential use, but under the Loft Law, the existing density can be converted to residential or hotel use, despite the Property being over-built. Further, the Loft Law also allows for the conversion of existing core areas into rentable space, which is particularly relevant given that the Property is over-served by three stairwells and five elevators, in addition to the courtyard elevator mentioned above. These changes would both increase the amount of rentable area and enhance the residential layouts.

**Never enough Retail:**

Given the Property's entrances on both Madison Avenue and on 29th Street, and the two large freight elevators accessible from 29th Street, the Property's main entrance could be moved to the side street to create additional retail space on Madison Avenue. In fact, due to the residential renaissance in the surrounding neighborhood, retail tenancies have expanded beyond the traditional home furnishing industry, for which the area has been known, and is expanding to include more traditional residential retailers such as the new Whole Foods on Madison one block south. Not surprisingly, numerous boutique food retailers are sprouting up on the side streets, such as: coffee houses, bakeries, and even a high-end gelateria called La Mama del Gelato. Perhaps most importantly, NoMad's main commercial artery on Broadway between 25th and 32nd Street, two blocks west, has become one of, if not the only, neighborhoods where restaurants have sufficient demand for both lunch and dinner servings, which augments the list of neighborhood amenities and has drawn a plethora of new fine and fast-casual restaurants.

**The Amenity Races:**

Perhaps the most coveted amenity for both office and residential tenants, is outdoor space. The Property has both a setback terrace on the 16th floor, and in addition, multiple roof areas that could be used for roof decks. Further, it may be possible to extend elevator service to the roof by raising one of the elevator machine rooms. In addition, the roof has a large sprinkler tank room with interesting and enclosed side cavities. The tanks could be replaced with pumps in the cellar which would enable the space to be repositioned as an amenity area. As mentioned above, the basement also has approximately 5,000 usable square feet of storage space that could be used for tenant amenities if not combined with the retail spaces.

8

EXHIBIT 2 PAGE 28



BR002356



## LOCATION / MARKET:

**Office Resiliency:**

Stimulated by the revitalization of **Madison Square Park**, office renovation and new construction in buildings such as: **One Madison, 360 Park Avenue South, 11 Madison, and 200 Fifth**, has attracted several significant tenants, such as: Credit Suisse, Tiffany, Sony, Apple, IBM, Grey Advertising, Franklin Templeton, and Google. Employers have discovered that their employees love working in an area that has so many amenities and that is so easily accessed from all parts of the New York City.

**Residential Renaissance:**

As mentioned above, the area surrounding the Property has become one of Manhattan's most vibrant and dynamic residential neighborhoods, with more new construction, multifamily renovations, and office to residential conversions than virtually any other neighborhood in Manhattan. This is evidenced by the recent conversion of 404 Park Avenue South which is literally caddy corner on the same block on the northwest corner of 28th street. Condo sales in that building one year ago averaged $2,350 per square foot, which is close to the current pricing of Rose Hill, the new condo tower immediately to the east of the Property on 29th street. In addition, the multifamily Anagram Nomad at 10 East 29th street, a half block to the west, has active listings asking an average of $109 per square foot. In short, there is nothing pioneering about residential in this neighborhood, and retailers, such as a new Whole Foods a block from the Property, have responded, as have condo buyers such as Jeff Bezos and Rupert Murdoch, not to mention apartment renters. Interestingly, there have been fewer residential conversions than new condo construction, and as evidenced by the chart of average unit prices for converted versus new construction residential, there's a strong desire and appetite for distinctive historic conversions.



One Madison



360 Park Avenue South



11 Madison



200 Fifth

9

EXHIBIT 2 PAGE 29

**No reasonable Use refused:**

In addition to apartments and office space, the area has spawned a plethora of successful new hotels, which again include new construction, renovations, and conversions. In fact, one of the closest newly renovated boutique hotels is The James New York – NoMad, located directly across the street, which features Scarpetta, one of the most successful restaurants in both the neighborhood and New York, with other locations in many other major markets. The long-awaited Virgin Hotel is only two blocks to the west between 29th and 30th streets, joined by the new Ritz Carlton one block north of Virgin. These new developments, joining such groundbreaking boutique hotels as The Ace and The Ned Nomad, speak to the desirability of the neighborhood and its transformation into a destination location.

**Neighborhood Ecosystem:**

No building is an island, and the choice of where to live and work is as much a function of the neighborhood as it is the building – "Marry the neighborhood, date the building". The combination of the multiple uses: retail, residential, office and hotel; and the vibrant amenities: restaurants, bars, coffee shops, spas, and other boutique retail and service offerings; and finally, the ability to live, work, and play in the same area, has created an ecosystem of "NoMadic" energy which accounts for the popularity and success of the neighborhood.

**Outdoor Space on Steroids:**

The Property is only three blocks from Madison Square Park, which is maintained though its own Business Improvement District, is home to Danny Meyer's original Shake Shack, and is one of the most coveted neighborhood amenities.

**MTA to the Rescue:**

Located on the southeast corner of 29th street, the Property benefits from convenient and proximate access to multiple forms of public transportation. In addition to the Lexington Avenue Subway stop (the 6 train) one block southeast on 28th street and Park Avenue South, there is the N-R train stop on 28th Street and Broadway, there are three buses that stop (M1, M2, and M3) directly outside the Property's main lobby, one of which is for the M2 Limited. The Property is also proximate to four of the region's major transportation hubs: Grand Central Terminal, Penn Station, The Port Authority, and Union Square. This provides quicker access to more neighborhoods in New York City and the Greater Metropolitan Area than most other locations throughout Manhattan.

10



EXHIBIT 2 PAGE 30





**95 MADISON AVE**
NEW YORK, NY

## LEASES:

**Path to Possession:**

The building is occupied by three tenants comprising only 12% of the space. The partial retail tenant – Vitra Show Rooms, will vacate May 2023. Contained in the leases for the two tenants that collectively occupy only part of the 12th floor, is in one case a landlord termination right, and in the other lease, a landlord relocation right. The tenant with the relocation right is paying approximately $55 psf.

## TRANSACTION STRUCTURE:

**Death & Taxes:**

Given that the Property has been in the same ownership for over 45 years, the family has virtually no tax basis, and therefore, a tax-sensitive transaction structure will be necessary. One such option is the creation of a ground lease, which given the recent rise in interest rates and limited availability of traditional debt, may prove to serve as a welcome form of underlying long-term financing.

11

EXHIBIT 2 PAGE 31





# PROPERTY DESCRIPTION

### INTRODUCTION

The Property is an iconic Neo-Renaissance skyscraper designed by John Stewart Barney and Stockton Beekman Colt, constructed between 1911 and 1912 for Thomas Addis Emmet, a prominent and pioneering surgeon. In the early 1900s, as new businesses were entering the area north of Madison Square, Dr. Emmet decided to form a real estate company with his son and commissioned this commercial building. Located on a corner site, the sixteen-story building was designed to include 15 floors for offices and wholesale showrooms, as well as a lavish penthouse apartment and rooftop garden for Dr. Emmet. The building features a tripartite organization with heavy corner bays framing three center bays. The Emmet Building combines Early French Renaissance ornament with a Neo-Gothic vertical effect created by the columns running uninterrupted from the fourth to the eleventh story. It also features medieval figures, canopies, and gargoyles on the lower stories. At the time of its completion, the Emmet Building was a unique example of an office building developed by an individual with his own residential space included. Owned and operated by the Seller since the 1940s, the Emmet Building is a remarkably intact example of early 20th century commercial architecture in New York.

12

EXHIBIT 2 PAGE 32

BR002360



13

EXHIBIT 2 PAGE 33

| | |
|---|---|
| **Tax Lot** | Block 858, Lot 58 |
| **Lot Size** | The plot contains approximately 9,875 square feet on a square lot. The building footprint covers the entire site except for a rear courtyard. |
| **Location / Frontage** | The Property is located at the southeast corner of Madison Avenue and East 29th Street. The Property features frontage of 100' along Madison Avenue and 98'9"'on East 29th Street. |
| **Zoning** | The Property is in a C5-2 zoning district which allows for commercial and residential use buildings up to a floor area ratio (FAR) of 10, which would allow for a building of 98,750 zoning square feet. As such, the Property enjoys the benefit of being overbuilt, and fortunately, according to the Loft Law, all existing density can be maintained for residential use if the Property is converted. Further, any core areas that are taken out of service, can also be converted to allowable rentable area regardless of use. |
| **Landmark Designation** | On June 13, 2018, 95 Madison Avenue was designated an individual New York City Landmark. |
| **Height / Setbacks** | The Property is a 16-story office building and is approximately 220' tall. The Property has a setback on the 16th floor. |
| **Net Rentable Area** | The Property contains approximately 175,000 square feet above grade, plus approximately 5,000 square feet below grade. Floors 2 – 16 are measured based on a 27% loss factor; cellar, grade and mezzanine are measured based on usable square feet. |

| Floors | Gross SF | Deductions | Retail/ Storage USF | Office USF | Loss factor | Rentable SF |
|---|---|---|---|---|---|---|
| Sub-Cellar | 2,256 | 2,256 | 0 | 0 | 0.00% | 0 |
| Cellar | 8,793 | 3,568 | 5,225 | 0 | 0.00% | 5,225 |
| Retail - Grade | 9,650 | 2,421 | 7,229 | 0 | 0.00% | 7,229 |
| Retail - Mezzanine | 892 | 0 | 892 | 0 | 0.00% | 892 |
| Floors 2-3 | 9,111 | 984 | 0 | 8,127 | 27.00% | 11,133 |
| Floors 4-15 | 9,024 | 884 | 0 | 8,140 | 27.00% | 11,151 |
| Floor 16 | 8,502 | 863 | 0 | 7,639 | 27.00% | 10,464 |
| Total | 156,603 | 21,684 | 13,346 | 121,573 | | 179,888 |

14

EXHIBIT 2 PAGE 34

## FLOOR PLANS

Sample floor plans are shown below. A full set of pdf floor plans are available on the due diligence website, which will eventually be followed by CAD files. The plans below include floors: cellar, grade, 2, 3-15, 16, and roof. Floors 3 through 7 vary slightly as the eastern facing windows on the north side of the floor clear the adjacent building starting on the 7th floor, and the courtyard windows clear the courtyard elevator mechanical room starting on the 5th floor, with the exterior staircase leading up to the equipment room affecting some of the courtyard windows on floors 2 through 4.

**CELLAR**



N

SUB-CELLAR

TOTAL RETAIL USF = 5,225

15

EXHIBIT 2 PAGE 35



**1ST FLOOR**

N

29TH STREET

RETAIL SPACE USF = 3,241
(WITHOUT MEZZANINE)

RETAIL SPACE USF = 3,988

MADISON AVENUE

16

EXHIBIT 2 PAGE 36



LOBBY

95 MADISON AVENUE

17

EXHIBIT 2 PAGE 37

## 2ND FLOOR

N 



**COURTYARD**

**29TH STREET**

**TOTAL RSF = 11,133**

**MADISON AVENUE**

EXHIBIT 2 PAGE 38



**3-15TH FLOOR**

N 

COURTYARD

ROOF OF ELEVATOR SHAFT BELOW

STAIR C

4    5

STAIR D

BLOCKED WINDOW

BLOCKED WINDOW

STAIR B

BLOCKED WINDOW

1

2

3

BLOCKED WINDOW

BLOCKED WINDOW

**TOTAL RSF = 11,151**

29TH STREET

**MADISON AVENUE**

*The 3rd floor is 11,133 square feet

19

EXHIBIT 2 PAGE 39

## 16TH FLOOR

N 



COURTYARD

ROOF OF
ELEVATOR
SHAFT BELOW

29TH STREET

TOTAL RSF = 10,464

MADISON AVENUE

20

EXHIBIT 2 PAGE 40

**ROOF**

N 





BR002369

**16TH FLOOR**

22

EXHIBIT 2 PAGE 42



23

EXHIBIT 2 PAGE 43

# CONVERSION TO ALTERNATE USES

**Residential / Hotel**

As mentioned above in the Zoning section, the Loft Law allows for the Property's overbuilt density to be maintained, even if the use is changed. Further, the density attributable to existing core areas is also allowed to be maintained and used as rentable space if the core areas are eliminated, regardless of whether the use is changed. By way of example, were the use to be changed to residential or hotel, a developer may elect to reduce the number of interior elevators from five to two or three. Similarly, the three interior staircases might be reduced to two. These changes could both increase the amount of rentable area and improve the efficiency of the floors.





24

EXHIBIT 2 PAGE 44



BR002372





16TH FLOOR

N

29TH STREET

MADISON AVENUE

| 2BR | 1BR | 1BR | 0BR |
| 1177 SF | 1030 SF | 881 SF | 820 SF |

1BR
848 SF

2BR
1267 SF

REMOVED: 16 FL

EXISTING 39' - 8 1/2"

2BR
1112 SF

COURTYARD

ROOF
TERRACE

22' - 1 1/2"

ELEVATOR &
STAIR 1 & REFUSE

25' - 7 3/4"
EXISTING

25

EXHIBIT 2 PAGE 45



**PROPERTY DESCRIPTION**

## RENDERING OF CONVERSION TO ALTERNATE USES

26

EXHIBIT 2 PAGE 46



EXHIBIT 2 PAGE 47



## CONSTRUCTION DETAIL

**Structure**

The Property is constructed of steel framing members, concrete, masonry block, brick and glass. It has a basement level and sub-basement level with concrete and masonry walls and concrete floor slabs.

**Exterior Finish**

The Property's landmarked exterior consists of terracotta masonry construction with stone and metal sections. The first floor of the Property is faced with limestone, marble, cast iron, granite and large glass display windows. Above the first floor are an abundance of classically themed terracotta ornaments, which featured prominently in the Property's Landmark designation.

**Ceiling Heights**

| Floor | Area | Height [1] |
|---|---|---|
| Sub-cellar | Mechanical | 16'-10 1/2" |
| Cellar | Storage | 11'-5" |
| Retail [2] | Full Height | 16'-8 1/2" |
| | Below Mezz | 7'4" |
| | Above Mezz | 8'6" |
| Typical 2-13 | Office | 11'-3" |
| 14 | Office | 11'-4" |
| 15 | Office | 13'-4 1/2" |
| 16 | Office | 11'-8 1/2" |
| 16 | Solarium [3] | 13'-6" |
| Roof | Tank Room | 13'-1" |

1. Measured from the top of the floor slab to the bottom of the ceiling slab
2. At the rear of the corner retail there is an 892 sqft mezzanine
3. Measured to the bottom of the skylights

28

EXHIBIT 2 PAGE 48



**VACANT CORNER RETAIL UNIT**

The corner vacant retail unit has an 892 square foot mezzanine level in the back of the space with adequate ceiling height to be used for restaurant seating or similar uses, similar to Union Square Café on Park Avenue South and 19th street.

29

EXHIBIT 2 PAGE 49



BR002377

**Entrances**

The Property's lobby
entrance is on Madison
Avenue and the service
entrance is on East
29th Street. The three
passenger elevators
are accessed through
the lobby, and the two
freight elevators are
accessed through the
service entrance.

30

EXHIBIT 2 PAGE 50



**11TH FLOOR**

## Windows

The Property has tall, single-pane, double-hung, operable, calamine windows. The east elevation has fire-rated steel windows. The windows are typically rectangular in shape except for the 14th floor which has vaulted windows. On a typical floor there are 45 windows, some of which on the east and south sides of the Property are blocked by neighboring buildings. The windows facing south don't start to clear the southern neighbor until the 14th floor, and the windows facing east that are on the northern side of the core, clear the eastern neighbor on the 7th floor. Most of the windows are closely clustered into sets of four between the support columns. This increases the flexibility with which you can divide the floors and increase their efficiency. In addition, the height of the windows, relative to the ceiling height, allows natural light to travel deep into the tenant space, even from the eastern windows that face the courtyard.

31

EXHIBIT 2 PAGE 51



**PROPERTY DESCRIPTION**

EXHIBIT 2 PAGE 52



### Certificate of Occupancy

Given that the Property was constructed in 1912, it does not have a Certificate of Occupancy. However, there are two documents on the Due Diligence website which confirm that: a) a CofO does not exist, and b) that the Department of Buildings has no objection to the commercial use of the building on floors cellar through 16.

### Lobby

The ground floor lobby entrance is on Madison Avenue and is accessed through three metal and glass swing-type doors that open into a vestibule, with a second set of two doors from the vestibule into the lobby.

### Roof

The Property has a flat, low-slope-type roof on the 17th floor. Exterior masonry walls extend above the roof level to form parapets and are finished with stone copings, exposed brick and roofing membrane in some locations. The Mansard section of the roof is accented on top with copper coping. Rooftop appurtenances and structures include steel support framing for rooftop mechanical equipment, rooftop bulkhead structures finished with stucco and metal-panel surfaces, parapets, and railings.

### Stairs

The building has three stairwells, one of which is designated as the fire tower. All three staircases have egress to either the lobby or service entrance. Stairs are of steel construction, with masonry walls and black stone steps. Additionally, interior stairs connect the 13th and 14th floors within the tenant space, as well as an interior space connecting the middle retail space to the 2nd floor. Finally, an exterior courtyard staircase accesses the mechanical room on top of the courtyard elevator, at a height equivalent to the fourth floor of the building.

33

EXHIBIT 2 PAGE 53

**PROPERTY DESCRIPTION**

## MECHANICAL DETAIL

### Elevators

The Property has three passenger elevators, all of which are accessed from the lobby. Two of the elevators service the grade level to the 15th floor, and one services the grade level to the 16th floor. There are two freight elevators, both of which are accessed from the service entrance. One the freight elevators services the grade level to the 15th floor, and the other services cellar to the 16th floor. The elevator machine rooms for both sets of elevators are on the roof. There is also a courtyard elevator that services the basement through the 3rd floor, the equipment for which is located above the elevator shaft on the 4th floor. Both freight elevators have 4,000 pound capacities, and the three passenger elevators have 3,000 pound capacities. All three passenger elevators have new motors and controllers; one of the three is not operational at present.



34

EXHIBIT 2 PAGE 54



## HVAC

Heating for the Property is provided by one #2 oil-fired boiler located in the sub-basement boiler room. The boiler is a Federal A.L. Eastmond & Sons Inc. unit, model FST-200, with Industrial Combustion Inc. burners. The boiler is rated at 200 horsepower, with an input of 8,400 MBH and output of 5,198 MBH. The boiler was manufactured in 2011. Oil for the boiler is stored in an 8,000-gallon storage tank in the sub-basement, with fill ports and vent pipes on the north side of the property. Heating is distributed by piping and cast-iron radiators.

Cooling is provided on some floors by independent air-cooled package units, typically two 15-ton units per floor, that vent into the courtyard. The ground and 16th floors are cooled by split system compressors, located on the first-floor setback roof and the 16th floor main roof. Distribution is provided by ductwork and ceiling air devices. All of these air-cooled units allow tenants the luxury of operating air conditioning all year-round at their discretion.

35

EXHIBIT 2 PAGE 55

| | |
|---|---|
| **Electricity** | Electric service is provided underground by Con Edison from East 29th Street to metering and service equipment located in the basement. All tenant electric consumption, including HVAC, is sub-metered. |

ConEd provides 8 service sets of 475-amp each, for a total of 3,800 amps coming into the building. There are 7 service switches:

1. SSW 100A
2. SSW 400A
3. SSW 400A
4. SSW 600A
5. SSW 1,200A
6. SSW 400A
7. SSW 2,500A

| | |
|---|---|
| **Water** | Domestic water and sewer services are provided to the building by New York City water and sewer. Piping materials for the plumbing system include: copper, cast iron and galvanized steel. Domestic water pressure is maintained by pump equipment which feeds one wood 5,000-gallon gravity tank on the roof. All water tanks are located on the roof. Domestic hot water is provided both by individual hot water heaters on some floors, and separately by the building boiler in the winter and from a hot water tank in the summer. |
| **Life Safety** | The Property is fully sprinklered and has wet type fire sprinklers and fire standpipe risers. As mentioned above, there are two 9,000-gallon steel pressure tanks for the sprinkler system located on the roof, and one 5,000-gallon gravity storage tank for the fire standpipe system and domestic water. Exterior fire department connections are provided along both adjacent streets. |
| | Fire extinguishers are provided in the building common area tenant spaces and in the stairwells. There is an existing advisory Class E system that includes a central fire alarm system with a fire alarm control panel in the lobby, wall mounted speakers and strobes, pull stations, and smoke detectors. |

## OPERATIONAL DETAIL

| | |
|---|---|
| **Security** | Given the low occupancy, the lobby is attended from 7am until the last tenant leaves during the weekdays. |
| **Staffing** | There is no union presence in the building, which is manned by four staff members: the handyman and two cleaners are employed by Avison Young, and the concierge is employed by the security company. |

36

EXHIBIT 2 PAGE 56



BR002384





37

EXHIBIT 2 PAGE 57

# LOCATION

## OVERVIEW

In 1998, before the famed restaurateur Danny Meyer signed the leases for the world famous Eleven Madison Park and Tabla restaurants at 11 Madison Avenue, Madison Square Park and the surrounding neighborhood, not yet named NoMad, was derelict and uninviting. The signing of those leases began one of the most remarkable transformations of a neighborhood New York had ever seen. The area had been a center for textile and toy/tabletop industries but had seen better days and during the late 1980's and 1990's, when the City had seen fit to populate the area with many Single Room Occupancy hotels. As a result, employees at New York Life on 26th Street and Madison Avenue were warned to stay out of the park and security personnel patrolled the streets at 5PM.opportunity exists to convert the Property to either of the two alternate uses.



BROOKLYN

WILLIAMSBURG BRIDGE

95 MADISON AVE
NEW YORK, NY

NOMAD

38

EXHIBIT 2 PAGE 58



N

Notwithstanding this dismal history, there were several underlying features to the area which served as the foundation for the area's stunning renaissance. Ringing the Park were the headquarters of two of New York's most important financial institutions – Metropolitan Life and New York Life. In addition, the Rudin Family, one of New York's most important real estate developers, had built the Merchandise Mart in between New York Life and Metropolitan Life's headquarters. Further, the stunning architecture from the turn of the century, when Madison Square Park was home to New York's most prosperous families, gave the neighborhood extraordinary bones that just needed a little tender care.

DOWNTOWN

NEW JERSEY

UNION SQUARE

PIER 40

FLATIRON

MADISON SQUARE PARK

39

EXHIBIT 2 PAGE 59

# NOMAD – NORTH OF MADISON SQUARE PARK

**NoMad is the neighborhood bordered by 25th Street to the South, 32nd Street to the North, Sixth Avenue to the West and Lexington Avenue to the East, is at the junction of multiple, dynamic Manhattan neighborhoods, including Gramercy Park, Chelsea, the Flatiron District, and Greenwich Village.** The neighborhood enjoys unparalleled transportation access from all over the Greater Metropolitan Area and is easily reached from a wide variety of neighborhoods throughout Manhattan, Brooklyn, and Queens. In addition, it is close to major commuter hubs accessing Long Island, Connecticut, and New Jersey. NoMad is unique in New York City in that it contains a wide variety of office, residential, hotel, retail, and other tourist uses that result in a vibrant submarket characterized by an active daytime and nighttime population.

**NoMad is also home to some of the best restaurants and nightlife in the New York City, including Eleven Madison Park, ranked the number one restaurant in the world in 2017.** From the birth of Silicon Alley to the revitalization of Madison Square Park, with its world-class public art exhibitions, and the renaissance of Broadway between 23rd and 34th Streets with its cool and high-end hotels and boutiques, NoMad has become one of the most sought-after neighborhoods in New York for office users, residents, and tourists.

# CENTRAL LOCATION

**The Property is centrally located in one of New York's most dynamic neighborhoods for both commercial and residential uses. It lies a short distance from three of the busiest transportation hubs in the region: Grand Central Terminal, Penn Station and Union Square, and is as easily accessed from all reaches of the Greater Metropolitan Area as any neighborhood in New York City.**

Grand Central Terminal anchors the Western Hemisphere's largest office district and provides a direct transportation link to Westchester and Southern Connecticut. Penn Station is the hub into Manhattan from New Jersey and Long Island and the area surrounding Penn Station is undergoing one of the largest rezonings in the City's history. Union Square, New York's fourth busiest subway station, is a major shopping, nightlife, and dining destination surrounded by its own corporate hub. Further, it is adjacent to the Flatiron District, also known as Silicon Alley, which holds the City's highest concentration of tech companies. The high levels of residential, office, and retail density in NoMad makes it distinct among New York City neighborhoods and produces a 'round the clock level of energy in contrast to most other sub-markets that are busy either just during the day (i.e. Midtown) or at night (i.e. Greenwich Village).

Renovated and revitalized in the early 2000's, Madison Square Park, surrounded by award-winning restaurants, exuberant nightlife and newly minted residences, is only a few blocks southwest and has been the fulcrum for billions of dollars of economic development over the past 20 years. It is home to major corporations such as Credit Suisse, Sony, Tiffany & Co., and Grey Advertising, as well as some of the City's most expensive residences. It also harbors a third cohort: tourists, who flock to Eataly, the Flatiron Building, the Harry Potter Experience, and the Park's world-class public art programs. The Park welcomes as many as 60,000 people each day.

The renewal of Madison Square Park and the surrounding area in the early 2000's also brought an explosion of new restaurants and residential buildings to a neighborhood that had previously been a dining and residential wasteland, adding hundreds of new establishments and dozens of new residential buildings. One example: when the popular Hill Country Barbecue Market opened in 2007, it was the only restaurant on West 26th Street between Broadway and Sixth Avenue. Ten years later there were not only 14 other restaurants on the same block, but 64 new restaurants had opened in a four-block radius of Hill Country, an extraordinary level of growth that is a testament to the desirability, density and vibrancy of the area.

Finally, the Property's convenient location affords its tenants an amenity never more coveted than today: the ability to walk to work as well as the ability to have a fun night on the town without leaving the neighborhood.

40

EXHIBIT 2 PAGE 60



BR002388

25TH STREET

23RD STREET

FLATIRON

NOMAD

Madison Square Park

Union Square

Grand Central Terminal

Penn Station

LOCATION

# IT'S HIP TO BE SQUARE

**Madison Square Park:**

Historic Madison Square Park is located a few blocks southwest of the Property, encompassing 6.2 acres between 23rd and 26th Streets and Fifth and Madison Avenues. This location puts it well within dog-walking and stroller distance of the Property. It is one of the great restoration stories in the City and has generated billions of dollars in economic development. In 2001 the Park emerged from a two-year, multi-million-dollar restoration program that included a new reflecting pool, new greenery, a restored fountain, and restored statues. Since then, it has been ringed with new and renovated office and residential buildings as it has claimed status as a premier green space in Manhattan.

And when it is not serving as a verdant setting for the mid-day lunch crowd, it functions as the "backyard" for nearby office employees and apartment dwellers, with an abundance of free programs and amenities for both children and adults. Beginning in 2003, the Madison Square Park Conservancy, which manages the park, established a world-class public art program and the park has become one of the world's most important sites for the display of public monumental sculpture. In 2019, the Conservancy achieved the prized distinction at the world-famous Venice Biennale of being the cultural partner of the sculptor Martin Puryear, the United States' representative to the Biennale.



Madison Square Park

Union Square

**Union Square:**

Union Square, only 12 blocks due south, is a similar oasis of amenities. Gourmands not sated by Eataly's offerings can explore Union Square's legendary greenmarket, as well as Whole Foods and Trader Joe's. The restaurants around Union Square include some of New York's most popular, such as Union Square Cafe, ABC Kitchen, Gramercy Tavern, Cote Steakhouse, and Rosa Mexicano. Retailers seeking to capitalize on its incredible foot traffic include ABC Carpet & Home, Lululemon, Paragon Sporting Goods, Barnes & Noble, Filson, and Sephora. Much like its sister park at Madison Square, Union Square sponsors a delightful array of cultural and entertainment events for all ages, complementing the playground amenities designed for its younger patrons.



42



## TRANSPORTATION OPTIONS ABOUND

Historic Madison Square Park is located a few blocks The Property is proximate to a wide variety of transportation options befitting one of the most convenient locations in the City.

|  | Walking | Cab | Train |
|---|---|---|---|
|  | Time | Time | Time |
| #6 train at 28th St. and Park Ave. | 2 | NA | NA |
| N and R trains at 28th St. and Broadway | 6 | 7 | NA |
| #1 train at 28th St. and 7th Ave. | 11 | 7 | NA |
| F and M trains at 23rd St. and 6th Ave. | 11 | 6 | 13 |
| Penn Station (1, 2, 3, LIRR, PATH, NJ Transit) | 12 | 9 | 15 |
| Grand Central (4, 5, 6, 7, S, Metro North) | 15 | 7 | 8 |
| Union Square (4, 5, 6, L, N, R, Q, W) | 15 | 9 | 8 |
| Port Authority (A, C, E, NJ Transit) | 20 | 14 | 14 |
| Times Square (1, 2 3, 7, N, Q, R, S, W) | 20 | 11 | 9 |
| East River Ferry at 34th St. and the East River | 18 | 11 | 13* |

*via bus

43

EXHIBIT 2 PAGE 63



95 MADISON AVE
NEW YORK, NY

44

EXHIBIT 2 PAGE 64



DOWNTOWN

UNION SQUARE

FLATIRON

BROADWAY

MADISON SQUARE PARK

FIFTH AVE

45

EXHIBIT 2 PAGE 65



LOCATION

## Subway:

**The Property sits one block from the #6 train stop at Park Avenue South and 28th Street.** A few blocks west is the #1 train stop. The #1 and #6 trains run up and down the West and East Sides of Manhattan respectively, giving the property direct access from those living uptown and downtown on either side of the borough. In addition, the N and R station at 28th Street and Broadway and the F and M station at 23rd Street and Sixth Avenue provides services that crosses the City on a diagonal in certain areas, helping to make it easy to access most parts of the City from the Property. In contrast, access to most neighborhoods in Manhattan and other parts of New York City are often limited by only North-South transportation routes.

To the south of the Property is Union Square, home of the fourth busiest subway station in New York City, whose lines include the #4, #5, #6, N, R, Q, and W, as well as the L train which begins in Chelsea and provides access to Brooklyn neighborhoods such as Williamsburg, Greenpoint and Bushwick.

NoMad dwellers will quickly appreciate that the ready access to these subway lines makes it easy to commute to the east or west side of Midtown, and any location Downtown or Uptown. In fact, regardless of where one works, they can likely have an enviable commute of less than 30 minutes. This will broaden the audience of buyers and tenants and will spare couples from choosing between an easy commute for one and an arduous commute for the other.

46

EXHIBIT 2 PAGE 66



## Bus:

There are three buses that stop (M1, M2, and M3) directly outside the Property's main lobby, one of which is for the M2 Limited. The Property is also proximate to four of the region's major transportation hubs: Grand Central Terminal, Penn Station, The Port Authority, and Union Square. This provides quicker access to more neighborhoods in New York City and the Greater Metropolitan Area than most other locations throughout Manhattan.

## Commuter & Regional Rail:

The Property lies a short distance from three of the busiest transportation hubs in the region.



Grand Central Terminal, fewer than 10 minutes from the Property by subway or cab, is the central hub for commuters arriving into the City from Westchester and Southern Connecticut. With the shuttle service between Times Square and Grand Central Terminal, people coming from the West Side, as well as coming from New Jersey via the Port Authority, can be at the Property in under 15 minutes. Similarly, Penn Station, the primary hub for those commuting from Long Island and New Jersey, is just a 10-minute cab ride from the Property.

## Other Forms of Transport:

The Midtown Tunnel, less than 10 minutes from the Property via car, provides direct access to LaGuardia and JFK airports. The East River Ferry, a 10-minute car ride from the Property, provides another way for residents of Manhattan's Financial District, Brooklyn Heights, Williamsburg, DUMBO, and Greenpoint to access 95 Madison Avenue.



The location is also well-serviced by MTA bus routes along each of the major North-South avenues surrounding 95 Madison Avenue as well as the main East-West corridors at 23rd Street and 34th Street. In addition, there are dozens of Citi Bike stations sprinkled around the NoMad neighborhood, from which cyclists can avail themselves of relatively direct access to the Upper East and West Sides via the FDR Drive and the West Side Highway.

Cote Steakhouse, and Rosa Mexicano. Retailers seeking to capitalize on its incredible foot traffic include ABC Carpet & Home, Lululemon, Paragon Sporting Goods, Barnes & Noble, Filson, and Sephora. Much like its sister park at Madison Square, Union Square sponsors a delightful array of cultural and entertainment events for all ages, complementing the playground amenities designed for its younger patrons.



47

EXHIBIT 2 PAGE 67

## Car:

Every New Yorker knows that Park Avenue South is one of the easiest places to hail a taxi; largely because the Midtown Tunnel empties so close by and because of the variety of local destinations to which people are arriving. Additionally, luxury apartment buyers are likely to have vacation homes outside of the City and the Site's access to the Midtown Tunnel, fewer than ten blocks away, is a major amenity.



## Prime Location Proximate to Major Attractions

| Destination | Travel Time (Walking) |
|---|---|
| Madison Square Park | 3 Minutes |
| Herald Square | 8 Minutes |
| Empire State Building | 8 Minutes |
| Penn Station | 12 Minutes |
| Grand Central Terminal | 15 Minutes |
| Union Square | 15 Minutes |
| Gramercy Park | 15 Minutes |
| Bryant Park | 15 Minutes |
| Port Authority Bus Terminal | 20 Minutes |



Empire State Building



Herald Square

48

EXHIBIT 2 PAGE 68





E. 50th St
E. 48th St
GRAND
CENTRAL
METRO NORTH
E. 42nd St
TIMES
SQUARE
W. 42nd St
Broadway
PORT AUTHORITY
BRYANT PARK
15 MINUTES
10 MINUTES
Queens Midtown
Tunnel Entrance
EMPIRE
STATE
BUILDING
W.34th St
East River Ferry
LIRR
PATH
NJ Transit
PENN
STATION
W.32nd St
HERALD SQUARE
95 MADISON AVE
NEW YORK, NY
W.29th St
E. 29th St
NOMAD
9th Avenue
8th Avenue
7th Avenue
Avenue of the Americas (6th Avenue)
5th Avenue
Madison Avenue
Park Avenue South
Lexington Avenue
3rd Aveune
2nd Avenue
1st Avenue
CHELSEA
MADISON
SQUARE
PARK
W.23rd St
GRAMERCY
PARK
UNION
SQUARE
W.14th St

BR002397

Gramercy Tavern

## RESTAURANTS

**The Property sits in one of the most active and vibrant culinary and nightlife destinations in all of New York City. Almost 20% of Zagat's 50 most popular restaurants are in this area and are within walking distance of the Property.**

Eleven Madison Park, the number one ranked restaurant in the world in 2017, leads the list of many of the City's finest restaurants that are near the Property. In addition to Eleven Madison Park, other leading New York restaurants such as Gramercy Tavern, Scarpetta, Upland, and Atomix are a short walk from the Property. When Danny Meyer relocated his beloved Maialino from the Gramercy Park Hotel, he chose a location in the Redbury Hotel, just down the street from the Property. While these notable restaurants garner most of the attention, the area's residential growth has spurred many new relaxed and convenient dining options geared toward neighborhood regulars and families. NoMad is the coveted neighborhood of every fast casual restaurant looking to open in New York City. Why? The combination of residential and office worker density, a combination that is fairly unique to NoMad, produces one of the holy grails of the restaurant industry: a location that allows for a robust lunch and dinner service. This special locational feature has contributed to retail rents maintaining high levels even through the Pandemic. As people spend more time working out of their homes, having a wide array of lunchtime options becomes increasingly important in a neighborhood.



Upland



Scarpetta



Redbury Hotel

50

EXHIBIT 2 PAGE 70



Eleven Madison Park

Atomix



51

EXHIBIT 2 PAGE 71



AMENITY MAP

95 MADISON AVE
NEW YORK, NY

W.34th St

HERALD
SQUARE

W.32nd St

PENN
STATION

NOMAD

E. 29th St

W.29th St

CHELSEA

MADISON
SQUARE
PARK

8th Avenue

7th Avenue

Avenue of the Americas (6th Avenue)

5th Avenue

Madison Avenue

Park Avenue South

Lexington Avenue

3rd Avenue

2nd Avenue

W.23rd St

GRAMERCY
PARK

UNION
SQUARE

Ruby's Cafe

Whole Foods Market


BR002400

Royalton Park Ave


Fillstone Park Ave

## RETAIL

| # | |
|---|---|
| 1 | Whole Foods Market |
| 2 | Target |
| 3 | Macy's |
| 4 | Zara |
| 5 | Build-A-Bear Workshop |
| 6 | Bed Bath & Beyond |
| 7 | Trader Joe's |
| 8 | Kalustyan's |
| 9 | The Ups Store |
| 10 | Fairway Market Kips Bay |
| 11 | Sephora |
| 12 | H&M |
| 13 | Nike By Flatiron |
| 14 | Harry Potter New York |
| 15 | The Home Depot |
| 16 | Eataly Nyc Flatiron |
| 17 | P.c. Richard & Son |
| 18 | Best Buy |
| 19 | Petsmart |
| 20 | David's Bridal |
| 21 | Nordstrom Rack |
| 22 | Walgreens |
| 23 | Levi's Store |
| 24 | H Mart |
| 25 | The Lego® Store Distric |

## RESTAURANTS

| # | | # | |
|---|---|---|---|
| 1 | Hillstone | 26 | Cho Dang Gol |
| 2 | Upland | 27 | Tonchin New York |
| 3 | Atomix | 28 | Jongro Bbq |
| 4 | Maguro | 29 | Oscar Wilde |
| 5 | Penelope | 30 | The Smith |
| 6 | Ruby's Cafe | 31 | La Pecora Bianca Nomad |
| 7 | Jaiya | 32 | Wagamama |
| 8 | Tara Rose | 33 | Outback Steakhouse |
| 9 | Saravanaa Bhavan | 34 | Hawksmoor Nyc |
| 10 | Street Taco | 35 | Rolf's |
| 11 | Eleven Madison Park | 36 | Eleni's |
| 12 | The Clocktower | 37 | Il Mulino Prime |
| 13 | Royal 35 Steakhouse | 38 | Gramercy Tavern |
| 14 | Toledo | 39 | Barbounia |
| 15 | Rossini's | 40 | Boucherie Union Square |
| 16 | Wolfgang's Steakhouse | 41 | Tipsy Scoop |
| 17 | Franchia Vegan Café | 42 | Patrizia's |
| 18 | Scarpetta | 43 | The Flatiron Room |
| 19 | Nonono | 44 | El Rio Grande |
| 20 | Kazunori | 45 | Sarge's Delicatessen |
| 21 | Surreal Creamery | 46 | Zuma New York |
| 22 | One Two Thai | 47 | Thai Villa |
| 23 | Jackson Hole Burgers | 48 | Abc Kitchen |
| 24 | Murray Hill Diner | 49 | Cote Korean Steakhouse |
| 25 | Yoon Haeundae Galbi | 50 | Casa Mono |

## HOTEL

| # | |
|---|---|
| 1 | Royalton Park Ave |
| 2 | The Redbury New York |
| 3 | Mondrian New York Park Avenue |
| 4 | Hotel Aka Nomad |
| 5 | Arlo Nomad |
| 6 | Hotel 32|32 |
| 7 | Hilton Garden Inn New York |
| 8 | The Marmara Park Avenue |
| 9 | New York Manhattan Hotel |
| 10 | Hyatt Herald Square New York |
| 11 | The Paul Hotel Nyc |
| 12 | Made Hotel |
| 13 | Kimpton Hotel Eventi |
| 14 | Moxy Nyc Chelsea |
| 15 | Holiday Inn Manhattan |
| 16 | Innside New York Nomad |
| 17 | Doubletree |
| 18 | Fairfield Inn & Suites By Marriott |
| 19 | The Langham |
| 20 | Executive Hotel Le Soleil |
| 21 | Marriott Vacation Club Pulse |
| 22 | The Shelburne Sonesta |
| 23 | Park South Hotel - Jdv By Hyatt |
| 24 | Freehand New York |
| 25 | The Marcel At Gramercy Hotel |


Wolfgang's Steakhouse


Eleven Madison Park


Boucherie Union Square

53

EXHIBIT 2 PAGE 73

BR002401

LOCATION


Walker Tower


18 Gramercy Park

## Residential

Spurred by the revitalization of Madison Square Park, the conversion of historic loft buildings into luxury residential condominiums along with new construction, has created a highly sought-after neighborhood that has attracted the likes of Jeff Bezos and Rupert Murdoch. Buildings surrounding Madison Square Park, such as 212 Fifth Avenue, 15 East 26th Street, 225 Fifth Avenue, One Madison Avenue, among others, have achieved some of the highest prices for residential real estate in New York City. This has sparked both residential new construction and renovation along Park Avenue South, Fifth Avenue, Broadway, and several of the side streets.

## Conversion Unit Sales Since 2018

| | Property | Sales Volume | # of Sales | Avg. Unit Price |
|---|---|---|---|---|
| 1 | Walker Tower | $177,432,405 | 11 | $16,130,219 |
| 2 | 18 Gramercy Park | $46,875,000 | 3 | $15,625,000 |
| 3 | 212 Fifth Avenue | $315,379,275 | 23 | $13,712,142 |
| 4 | Ten Madison Square West | $216,518,750 | 32 | $6,766,211 |
| 5 | 31 West 21st Street | $31,607,000 | 5 | $6,321,400 |
| 6 | 1 Gramercy Park West | $5,400,000 | 1 | $5,400,000 |
| 7 | 50 Madison Avenue | $4,350,000 | 1 | $4,350,000 |
| 8 | 36 Gramercy Park East | $73,841,616 | 18 | $4,102,312 |
| 9 | 50 Gramercy Park North | $31,697,000 | 8 | $3,962,125 |
| 10 | 45 Gramercy Park | $26,010,000 | 7 | $3,715,714 |
| 11 | 15 Madison Square North | $54,677,377 | 15 | $3,645,158 |
| 12 | 88 Lexington Ave | $103,615,525 | 29 | $3,572,949 |
| 13 | 109 West 26th Street | $21,340,000 | 6 | $3,556,667 |
| 14 | 260 Park Avenue South | $119,380,893 | 34 | $3,511,203 |
| 15 | Madison House | $501,473,053 | 155 | $3,235,310 |
| 16 | The Grand Madison | $12,355,000 | 4 | $3,088,750 |
| | | $1,741,952,894 | 352 | $4,948,730 |

Source: REBNY RLS & Marketproof

54

EXHIBIT 2 PAGE 74



212 Fifth Avenue | Ten Madison Square West | 277 Fifth Avenue

One Madison | Madison Square Park Tower | 21 West 20th Street

A recent testament to the desirability of NoMad is that the when the Ritz Carlton New York NoMad opened this Fall, 75% of the residences that are part of the development were presold at approximately $4,000 per square foot. Interestingly, the average unit prices for condos sold since 2018, have been higher in converted buildings than they were in new construction. While we don't have the apartment sizes to make a more precise comparison, we do have a sample set of 623 units, which reinforce both the demand for and appreciation of high-quality conversions in distinctive pre-was buildings.

### New Construction Unit Sales Since 2018

| | Property | Sales Volume | # of Sales | Avg. Unit Price |
|---|---|---|---|---|
| 1 | **One Madison** | $169,603,936 | 21 | $8,076,378 |
| 2 | **Madison Square Park Tower** | $275,869,030 | 39 | $7,073,565 |
| 3 | **21 West 20th Street** | $11,869,603 | 2 | $5,934,802 |
| 4 | **277 Fifth Avenue** | $429,060,077 | 106 | $4,047,737 |
| 5 | **400 Park Avenue South** | $18,324,990 | 5 | $3,664,998 |
| 6 | **323 Park Avenue South** | $12,410,000 | 4 | $3,102,500 |
| 7 | **240 Park Avenue South** | $30,390,000 | 10 | $3,039,000 |
| 8 | **Rose Hill** | $247,195,899 | 84 | $2,942,808 |
| | | $1,194,723,535 | 271 | $4,408,574 |

Source: REBNY RLS & Marketproof

55

EXHIBIT 2 PAGE 75



**LOCATION**

Porcelanosa

## Retail

In addition to the myriad nightlife options, NoMad offers excellent shopping. Said differently, it's as easy to spend money there during the day as it is at night. High-end furniture and furnishings purveyors abound. Nearby outlets of Ligne Roset, Porcelanosa, BlueDot and Poggenpohl are some of the most prominent examples. ABC Home & Carpet is 10 blocks south. Add in the abundant side-street stores in the Flatiron District and it is conceivable a resident will be able to furnish his entire apartment without having to use a taxi or the subway.

The nearby Flatiron/Fifth Avenue apparel shopping district also offers numerous choices to a variety of buying audiences. An area once known as the Ladies' Mile, famous for grand turn-of-the-century buildings that had department stores on grade and haberdasheries above, has evolved into a premier shopping district. Over the last 25 years developers have upgraded the office and residential spaces in this area, which has improved demographics and brought the attention of national retailers. Fashionable men's appetites are sated by Todd Snyder, two blocks South of the Property, while more traditional apparel is available from familiar names like Banana Republic, the Gap and Zara. Women's fashion is in similar abundance with Theory, Coach, Club Monaco, Anthropologie, Chico's, and other trendy outlets lining Fifth Avenue. Perhaps most important for female shoppers, the City's famous sample sales often take place in loft buildings a few blocks west of the Property.

56

EXHIBIT 2 PAGE 76

BR002404

## MADISON AVENUE RETAIL

A map of noteworthy existing retail along Madison Avenue in the Property's vicinity is shown below.



| 35th STREET | | 35th STREET |
| --- | --- | --- |
| NEW YORK PUBLIC LIBRARY OF SCEINCE | | EYES ON MADISON |
| | | FedEx Kinko's |
| | | citibank |
| 34th STREET | | 34th STREET |
| WELLS FARGO | | TINA'S CUBAN CUISINE |
| | | DENTISTS ON MADISON |
| 209 NYC DENTAL | | nanoosh 7-ELEVEN |
| 33rd STREET | | 33rd STREET |
| THE PARLOR | BoConcept | BUTTERCUP BAKESHOP LEON BANILIVI RUGS |
| | Molteni&C | MIDTOWN EAST PHARMACY VIOLETTA WINES |
| | FLORIM | FENDI CASA |
| 32nd STREET | | 32nd STREET |
| FIVE GUYS | | LAZZONI |
| | Minotti | AVANT gallery |
| | ddc | B&B |
| 31st STREET | | 31st STREET |
| CONSTRUCTION BELLA NAPOLI | | THE ROGER HOTEL |
| TASTY CAFE | | BAPTIST CHURCH |
| ACADEMY | | FLOWER SHOP TRUMAN'S |
| NONONO | | BLANK SLATE |
| 30th STREET | | 30th STREET |
| Poliform | | NATUZZI |
| TAKE 31 GRANADA SALES CORP RIMADESIO | | MOROSO |
| LIAIGRE | | HAB AMERICAN BANK |
| 29th STREET | | 29th STREET |
| MILLESIME BRASSERIE SMALLBONE SPA 28 DOMEL | | M&T Bank vitra. PRANNA WE WORK (SECOND FLOOR) |
| 28th STREET | | 28th STREET |
| SEVEN GRAMS ROCCO STEAKHOUSE BRADELIS CHOZA TAQUERIA SHORTY'S CREAM LINE | | WHOLE FOODS |
| 27th STREET | | 27th STREET |

MADISON AVENUE

95 MADISON AVE NEW YORK, NY


Molteni & C


DDC


Natuzzi, NoMad


Poliform, NoMad

57

EXHIBIT 2 PAGE 77

## An Office Destination

**NoMad and Midtown South are headquarters to major corporations such as New York Life, Credit Suisse (US HQ), Sony (US HQ), Tiffany, and Grey Advertising.** Even as Manhattan's smallest major office submarket, comprising only 67.6 million square feet, pockets of this area have become increasingly desirable office locations. Silicon Alley, the area in and around the Flatiron Building, just blocks from the Property, is one of the densest collections of tech start-ups and companies in the City. As a generation eschews the suburbs to remain in Manhattan, areas such as NoMad, Chelsea, Greenwich Village, Gramercy Park, Soho and Tribeca have exploded with residential demand. Not surprisingly, these moneyed residents seek the ability to walk to work, just as a prior generation enjoyed when the Plaza office district was established near the Upper East Side. The Property could seek to capitalize on this trend, with only four new major office buildings having been delivered between 34th Street and Houston Street in the last ten years (Zero Irving, 61 Ninth Avenue, 412 West 15th Street, and 512 West 22nd Street).

This destination is increasingly coveted by brand name tenants, with IBM and Apple's recent large space commitments in the area solidifying the point. To further illustrate the point, a sample of the area's largest office tenants is shown in the chart below. Interestingly, the tenants on the chart comprise 11% of the office inventory referenced above, which speaks to the diversification of risk between the various tenants, and the wide range of industries represented in the neighborhood, such as: finance, healthcare, advertising, entertainment, technology, education, furniture, and fashion. Finally, it's noteworthy that two of the large tenants own their buildings, further reinforcing their commitment to the neighborhood.

| | Sample Office Tenants >100K SF | Address | SF Occupied |
|---|---|---|---|
| 1) | Credit Suisse | 11 Madison Ave | 1,200,000 |
| 2) | Church of Saviour | 59 Park Ave | 825,000 |
| 3) | NYU Langone | One Park Ave | 650,000 |
| 4) | Interpublic Group of Companies | 100 W 33rd St | 630,000 |
| 5) | Sony | 11 Madison Ave | 580,000 |
| 6) | 1199 SEIU | 498 Seventh Ave | 530,000 |
| 7) | Wells Fargo[1] | 500 Seventh Ave | 445,000 |
| 8) | Apple | 11 Penn Plaza | 395,000 |
| 9) | Franklin Templeton | One Madison Ave | 345,000 |
| 10) | City University of New York | 131-135 E 22nd St | 345,000 |
| 11) | IBM | One Madison Ave | 330,000 |
| 12) | NYC Department of Health[1] | 327 E 26th St | 310,000 |
| 13) | Tiffany & Co. | 200 Fifth Ave | 290,000 |
| 14) | Yelp | 11 Madison Ave | 190,000 |
| 15) | Grey Advertising | 200 Fifth Ave | 160,000 |
| 16) | Endeavor | 11 Madison Ave | 105,000 |
| 17) | Deam Suntory | 11 Madison Ave | 100,000 |
| | | | 7,430,000 |

1) Owner occupied

58

EXHIBIT 2 PAGE 78



TIMES
SQUARE
W. 42nd St

GRAND
CENTRAL

E. 42nd St

BRYANT PARK

7

6

2

EMPIRE
STATE
BUILDING

W.34th St

95 MADISON AVE
NEW YORK, NY

4

PENN
STATION

W.32nd St

8

HERALD SQUARE

3

W.29th St

NOMAD

E. 29th St

Broadway

7th Avenue

Avenue of the Americas (6th Avenue)

5th Avenue

Madison Avenue

Park Avenue South

Lexington Avenue

3rd Avenue

2nd Avenue

1st Avenue

12

CHELSEA

MADISON
SQUARE
PARK

13, 15

1, 5, 14, 16, 17

W.23rd St

9, 11

10

GRAMERCY
PARK

59

UNION
SQUARE

W.14th St

EXHIBIT 2 PAGE 79