LOCATION

## HOTELS

**When the Ace Hotel, at 20 West 29th Street opened its doors in 1999, it helped establish the prototype for a hip hotel with a lobby scene that required a velvet rope for admission and an award-winning chef who became a celebrity in her own right.** Followed shortly thereafter by the NoMad Hotel, with its restaurant that was consistently listed among the Top 50 Restaurants in the world and its famous bar that was ranked the best in North America in 2017, the area soon attracted hotels such as the 250- room Ritz Carleton New York NoMad at 25 West 28th Street, the 271-room New York Edition at 5 Madison Avenue, and the 460-room Virgin Hotel at 1227 Broadway. In addition, the 1980's vintage single-room occupancy hotels in the area converted to boutique hotels such as the Giraffe Hotel at 365 Park Avenue South, the Arlo Hotel at 11 East 31st Street and the Made Hotel at 44 West 29th Street.


Ace Hotel

## A TOURIST DESTINATION

**On a busy day, 60,000 people find themselves in Madison Square Park, many of them tourists.** They come for the beautiful green space as well as for art exhibitions from world-famous artists including Maya Lin and Mark di Suvero. But NoMad has numerous other attractions that lure tourists. The first Shake Shack was born in Madison Square Park, famously attracting diners willing to spend up to an hour waiting on line for Shack Burgers and Chicago Dogs. The first Eataly in the United States, at 23rd Street and Fifth Avenue, has been filled with both tourists and locals from the day the doors were opened in 2010. Other attractions in the area include the Harry Potter Experience, The Morgan Library, The Museum of Sex, the Rizzoli Book Store...and did we mention the plethora of restaurants and bars? Which is why hotels from the hip-Ace Hotel to the luxurious Ritz-Carlton have made NoMad their home.


Madison Square Park


60

EXHIBIT 2 PAGE 80



# CONCLUSION

From a neighborhood that was best avoided 20 years ago, NoMad has become the location of choice for premiere restaurants, luxury residences, boutique and luxury hotels, and world-class office tenants. It is now also a major tourist attraction and has as dense an array of restaurants as any neighborhood in New York City, spurred in part by the fact that the multi-use nature of the area provides restaurants with one of the rare opportunities to have both an active daytime and nighttime traffic.

61

EXHIBIT 2 PAGE 81



95

# TENANCY





**At present, the Property is 12% leased to the following three tenants:**



**1. Vitra:** A high-end furniture and design company with approximately 3,988 usable square feet ("USF") of showroom space on the ground floor, and approximately 11,133 rentable square feet ("RSF") on the second floor. Vitra's lease commenced in June 2016 and expires in May 2023.

**2. Lee & Low Books:** The largest publisher of multicultural children's books in the United States, occupies 5,889 RSF on the 12th floor through October 2030.

**3. Douglas Lister Architect:** An architectural firm that took occupancy of 1,471 RSF in March 2022 and who's lease expires in August 2024.

62

EXHIBIT 2 PAGE 82



BR002410



**Douglas Lister Architect**

12th FL
1,471SF
Aug-2024

**Lee & Low Books Inc.**

12th FL
5,889SF
Oct-2030

**Vitra**

15,121SF
Aug-2028

**Vacant**

63

EXHIBIT 2 PAGE 83

# RENT ROLL — NOVEMBER 2022

| Floor | Tenant | SF[1] | LXD | Annual Base Rent |
|---|---|---|---|---|
| **Cellar[3]** | Vacant | 5,225 | - | - |
| **Ctr Store & 2nd[2]** | Vitra Inc. | 15,121 | May-2023 | $932,723 |
| **Cr Store & Mezz[4]** | Vacant | 4,133 | - | - |
| **3rd** | Vacant | 11,133 | - | - |
| **4th-11th** | Vacant | 89,208 | - | - |
| **Pt-12** | Douglas Lister Architect | 1,471 | Aug-2024 | $48,000 |
| **Pt-12** | Lee & Low Books Inc. | 5,889 | Oct-2030 | $312,520 |
| **Pt-12** | Vacant | 3,791 | - | - |
| **13th-15th** | Vacant | 33,453 | - | - |
| **16th** | Vacant | 10,464 | - | - |
| **Total / Wtd. Avg.** | | **179,888** | **-** | **$1,293,242** |
| **Occupied** | 12% | 22,481 | | |
| **Vacant** | 88% | 157,407 | | |

1. All measurements are approximate and subject to verification. Usable SF for cellar and retail, 27% loss factor for full floor office space above.
2. 3,988 SF of retail space and 11,133 SF on second floor per the architect's measurement study, but the lease says 14,160
3. Two contiguous units of 2,752 and 2,764 SF which can be leased separately or together
4. 3,241SF of retail space and 892 SF on Mezzanine
5. Includes RE tax and fuel escalations, as applicable; electric charges are separate

64

EXHIBIT 2 PAGE 84

| Annual Rent Steps | Base Rent PSF | Escalations | Gross Rent PSF[5] | Options |
|---|---|---|---|---|
| | - | - | - | |
| 3.15% effective June 1 | $62 | RET & Fuel | $68 | 5-year renewal option @ 92.5% FMV, upwards adjustable only |
| | - | - | - | |
| | - | - | - | |
| | - | - | - | |
| | $33 | None | $33 | Landlord termination option |
| 3.00% effective November 1 | $53 | RET & Fuel | $53 | Landlord relocation option |
| | - | - | - | |
| | - | - | - | |
| | - | - | - | |
| | $58 | | $62 | |
| | | | | |
| | | | | |

65

EXHIBIT 2 PAGE 85



BR002413

# FINANCIAL

## REAL ESTATE TAXES

### Real Estate Taxes

A real estate tax certiorari proceeding was just completed for 2022/23 and the total actual assessment was reduced from $15,291,000 to $14,320,000. As part of the settlement, all prior proceedings were discontinued.

### ICAP Abatement Program

The ICAP (NYC Industrial and Commercial Abatement Program) is an abatement credit against real estate taxes that runs with the land and is available for the construction or renovation of commercial or industrial uses (not residential uses).

- Application for the ICAP must be made by 3/1/25.
- In Manhattan, it is for properties below 59th Street and the abatement typically runs for a period of 10 years.
- The real estate tax credit applies to the assessment of the building not the land.
- To qualify, a renovation must have costs of at least 30% of the pre-renovation tax year assessment and cannot expand the space of the building by more than 30%.
- The formula for calculating the credit amount (the "Abatement Base") is:
  - Abatement Base = Tax based on the assessment of the Building Post-Construction less 115% of the Tax based on the assessment of the Building Pre-Construction
  - The 10-year schedule provides for an abatement of a percentage of the Abatement Base against real estate taxes as follows:

    100% in years 1-5

    80% in year 6

    60% in year 7

    40% in year 8

    20% in years 9 & 10

# HISTORIC TAX CREDIT INCENTIVES

## Historic Tax Credit

The Property may qualify for the historic tax credits shown below. Please note that none of these programs have been utilized to date, and further information about them is available at https://parks.ny.gov/shpo/tax-credit-programs/.

## Federal Historic Preservation Tax Credit Program for Income Producing Properties

Owners of income producing real properties listed on the National Register of Historic Places may be eligible for a 20% federal income tax credit for the substantial rehabilitation of historic properties. The final dollar amount is based on the cost of the rehabilitation; in effect, 20% of the rehab costs will be borne by the federal government. The work performed (both interior and exterior) must meet the Secretary of the Interior's Standards for Rehabilitation and be approved by the National Park Service.

## New York State Historic Preservation Tax Credit Program for Income Producing Properties

Owners of income producing properties that have been approved to receive the 20% federal rehabilitation tax credit can additionally claim a state tax credit if the property is located in a qualifying census tract. Owners can receive an additional state credit of 20% or 30% of the qualified rehabilitation expenditure up to $5,000,000. To qualify for the 20% credit, the placed-in-service date must be after January 1, 2010. For the 30% credit, the placed-in-service date must be after January 1, 2022, and the total QREs cannot exceed $2.5 million. There is no application form for the state credit, applicants just need to comply with the agency media agreement and submit the applicable review fees (refer to Fee Schedule and Media Agreements). After Part 3 of the federal application is approved by the National Park Service and, the state fees are paid, the New York State Office of Parks, Recreation, and Historic Preservation (OPRHP) will issue a certification allowing owners to claim the state credit.

## Important Changes to the NYS Rehabilitation Tax Credit for Commercial Properties

New York State has extended the availability of this program until December 31, 2024. The legislation also makes the commercial tax credit refundable for rehabilitation projects placed in service on or after 2015. Unused credits from projects placed in service before 2015 can be carried forward indefinitely. The change in the law include updating the eligible census tracts using the most recent data available.

68

EXHIBIT 2 PAGE 88



69

EXHIBIT 2 PAGE 89

## Available on the RCM due diligence website:

- *Asbestos*
- *Boiler*
- *Building Contracts*
- *Chimney*
- *CofO*
- *Electric*
- *Elevators*
- *Energy Performance*
- *Environmental Report*
- *Façade*
- *Fire Alarm*
- *Floor Plans*
- *Gas*
- *House Water Tank*
- *Landmark Reports*
- *Leases*
- *Life Safety*
- *Oil Tank*
- *Photoluminescence*
- *SF Measurement Chart*
- *Sidewalk*
- *Sprinkler & Standpipe*
- *Steam Riser*
- *Title Report*

The material contained in this Offering Memorandum is confidential, furnished solely for the purpose of considering a transaction ("Transaction") involving the real property described herein, and is not to be used for any other purposes or made available to any other person without the express written consent of Branton Realty Services LLC, ("Branton").

Interested parties ("Counterpart(s)") should be aware that the property known as 95 Madison Avenue, New York, NY ("Property"), should be considered in its "as is" condition without representations or warranties of any kind or nature.  Counterpart will be given a reasonable opportunity to inspect and investigate the Property and all improvements thereon, either independently or through agents of the Counterpart's choosing.  In addition to the first sentence of this paragraph, but without limiting the generality thereof, Counterpart shall not be entitled to, and should not, rely on Ninety-Five Madison Company, L.P. ("Owner") or its affiliates or agents as to (i) the quality, nature, adequacy and physical condition of the Property including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, HVAC, plumbing, sewage, and utility systems, facilities and appliances; (ii) the quality, nature, adequacy, and physical condition of soils, ground water, and geology; (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Property; (iv) the development potential of the Property, its habitability, merchantability, or fitness, suitability, or adequacy of the Property for any particular purpose; (v) the zoning or the legal status of the Property; (vi) the Property's or its operation's compliance with applicable codes, laws, regulations, statutes, ordinances, covenants, conditions, and restrictions of any governmental, quasi-governmental entity or any other person or entity, (vii) the quality of any labor and materials furnished at or to the Property, (viii) the compliance of the Property with any environmental protection, pollution, or land use laws, rules, regulations orders or requirements including, but not limited to, those pertaining to the handling, generating, storing, or disposing of any hazardous materials, or the Americans with Disabilities Act; and (ix) except as expressly provided otherwise in an executed contract of sale, the condition of title and the nature, status and extent of any right-of-way, lease, right of retention, possession, lien, encumbrance, license, reservation, covenant, condition, restriction, and any other matter affecting the title.  Although Owner and Owner's predecessors may have performed work or contracted for work performed by third parties in connection with the Property, Owner and its agents shall not be responsible to Counterpart or any successor on account of any errors or omissions or construction defects of such predecessors and/or third parties.

Owner reserves the right to withdraw from a Transaction with respect to the Property being marketed at any time without notice, to reject all offers, and to accept any offer without regard to the relative price and terms of any other offer. Any offer must be: (i) presented in the form of a non-binding letter of intent; (ii) incorporated into a formal written agreement to be prepared by the Counterpart and executed by both parties; and (iii) approved by Owner and such other parties who may have an interest in the Property. Neither Counterpart nor Owner shall be bound until full execution and delivery of the agreement, which agreement shall supersede prior discussions and writings and shall constitute the sole agreement of the parties. Counterparts shall be responsible for their costs and expenses of investigating the Property and all other expenses, professional or otherwise, incurred by them.

The information provided herein, and which may hereafter be provided with respect to the Property being marketed, was obtained from a variety of sources. Neither Owner nor Branton has made any independent investigation or verification of the information presented or to be presented with respect to the Property. Neither Owner nor Branton makes any representations or warranties as to the accuracy or completeness of such information. Recipient acknowledges that it will rely solely on the results of its own investigations notwithstanding the delivery of these materials.

71

EXHIBIT 2 PAGE 91



BR002419

EXHIBIT 3 PAGE 92



# 95 MADISON AVE
## NEW YORK, NY

**CONTACT:**

**WOODY HELLER**
Branton Realty
wheller@brantonrealty.com
(917) 612 1230



BRANTON
REALTY

| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar; ritasklar@gmail.com; ritasklar@aol.com; Fleming, Thomas J. |
| **Subject:** | 95 Madison - Status Report #1 |
| **Date:** | Thursday, December 8, 2022 1:52:31 AM |

I'm happy to report that we have officially been in the market for several weeks and are enjoying a strong response from the marketplace. The most important highlights of the marketing efforts to date are summarized in the paragraphs below.

- Marketing:
  - We officially launched the marketing on 11/11/22 to approximately 260 groups
  - We pre-marketed the property starting in September, but only to approximately 15 groups who approached us either because they had already been pursuing the property, or had ready about it in the bankruptcy filings and reached out.
- Status of Bidders:
  - In addition to two who have made preliminary offers, there are:
    - 12 groups that are actively pursuing the property
    - 23 groups in the earlier stages of review that are considering it
    - 16 groups that have declined
    - And 6 groups who are in the midst of negotiating their confidentiality agreements
- Types of Bidders:
  - Most of the bidders are developers given the profile and condition of the building
  - In addition, we are in front of various money sources who I can match with the developers that are most credible and aggressive to offer them equity or debt financing
  - And a few developers that are institutional in nature and in their financial capacity, such that they can close and fund the construction costs without financing
  - The majority of bidders are considering converting the building to residential or hotel use, the balance intend to keep it as an office building and renovate it.
- Tours given to date:
  - 18 groups
  - 2 groups have toured 4 times
  - 3 Groups have toured 3 times
  - 2 Groups have toured 2 times
  - The relevance of the multiple tours by individual groups is that it's an indication of sincere interest versus preliminary interest or simple curiosity
- The Online deal room:
  - Once bidders execute the confidentiality agreement, they are given access to our online deal room which contains the offering memorandum and a robust collection of 24 folders of property data
  - Some additional information will be added once the settlement agreed with Vitra is executed
- Offers / Timing:
  - I intend to call for offers in January, as we previously discussed
  - Having said that, we have received 2 unsolicited offers, neither of which are acceptable in their current form, and I am trying to improve the terms of both before presenting them to ownership

**Exhibit BX - 4**

EXHIBIT 2 PAGE 9

BR000069

- In addition, I expect to receive other offers before the January bid date, some in the next few weeks
- While I normally do not encourage pre-emptive bids, they could be of significant advantage to us for the following reasons:
  - If we conduct a traditional auction process, the "winning" bidder will likely want a due diligence process. Given all the physical issues associated with the building, despite my best efforts and all the property information we've posted in the online deal room, that process could easily lead to a price reduction.
  - Alternatively, if we're entertaining a pre-emptive bid, I would tell that bidder that we WON'T stop marketing the property while they're conducting their due diligence, so that if they come back for a price reduction and try to be "wise-guys", we'll turn down their request, lose no momentum in the market, and proceed with the other bidders. That takes the leverage away from them and keeps them honest in the process. The only concession I'd be prepared to offer, is to not sign an agreement with another bidder for an agreed period of time, while they complete their due diligence and negotiate the transaction documents. Hence, if they perform as promised – great! If not, we proceed and there's no loss of momentum in the marketplace. There's a ton of details that accompany this concept, but that's the spirit of the pre-emptive advantage and the reason that I'm softly encouraging bids now before the to-be-determined January bid date.
- Tenants:
  - Bidders are aware that we are about to sign a settlement with Vitra, and that they will vacate 5/31/23
  - They are also aware that the architectural firm on 12 has a LL termination clause, and that the publishing firm on 12 has a LL relocation clause. As a result, most are assuming the building will be vacant, and some may want us to vacate the two 12th floor tenants
- Deal Structure:
  - As we've discussed, given the low basis of the majority of the LLC interest holders, an outright sale is not financially attractive given the burdensome tax consequences
  - Further, given that neither a 1031 or partnership contribution transaction seems to be of interest, I've instructed most bidders to approach the transaction as a ground lease, which will not incur a capital gains tax, as it's a lease and not a sale
  - The lease will be accompanied by a partial prepayment in an amount equal to the amount of the DIP loan plus the \transaction costs. As we've discussed, that is called a 467 lease, which is a standard ground lease which also includes a partial prepayment
- Pricing Impact of a ground lease:
  - The consequence of a ground lease versus an outright sale, is that if the "buyer" wants to do a residential conversion, they can't convert into a condo, just a rental / multifamily apartment building
  - Most bidders who are contemplating a residential conversion intend to make it a rental building, so the ground lease is of little consequence. Some of the converters, however, would like to do a condo, and have expressed that the building is worth more to them on that basis, which would require an outright sale. When asked, they confirm that their price increment is less than the taxes associated with an outright sale, and

therefore, on an after-tax basis, a ground lease is still more attractive to the owner.

- A few bidders think they have transaction structures that would allow the owner to fashion the transaction as an outright sale without incurring gains taxes. I've invited them to present a written description of their transaction structures for review by our tax counsel.

- Pricing advantage of a leasehold to the owner:
  - As we've discussed, while the sales price of the building has decreased as a result of market conditions, interest rates have risen which means that ground rents have increased as a percentage of building value. By way of example, if the building was worth $90M but ground rent was calculated at 2.5%, the ground rent (ignoring the prepaid component) would be $2.25 million. Conversely, if the building is worth $60 million but the ground rent is now calculated at 5%, then the ground rent will be $3 million. Hence, the change in market conditions is offset by increases in interest rates, which works to our advantage.
  - If we assume a prepayment of $10 million to satisfy the mortgage and cover transaction costs, and a building price of $60 million, then then transaction looks like this:
    - $10 million paid upfront – no tax consequences
    - $50 million in value x 5% = a starting ground rent or $2.5 million / year, with increases as described below
    - If the building value is $70 million, then the ground rent would start at $60 million x 5% = $3 million / year

- Ground Rent increases:
  - I'm telling bidders that increases in the ground rent are likely to take the following form:
    - Fixed increased every 5 or 10 years – smaller increases if every 5 years, larger increases if every 10 years
    - A periodic upwards-only CPI adjustment every 20 or 25 years, such that if the cumulative fixed increases are less than the increase in CPI, then the ground rent will be increased to keep pace with inflation
    - Buyers are eager to have the ability to purchase interests in the LLC when those respective interests have a step-up in basis. I've told them that the interests that currently have a stepped-up basis are not available for sale at present, but should that change, they would have an ability to purchase them. This purchase provision is important to "buyers" as it makes it easier for them to secure financing.

- Financing:
  - Having discussed the tax advantage to the owner of a leasehold versus a sale, there is also an important advantage to the "purchaser". They only need to come to the closing with the amount of the prepaid ground rent, which I'm approximating to be $10 million dollars, rather than $60 million in my first example above. Hence the "buyer" only needs construction financing, not acquisition financing. Admittedly, unsubordinated construction financing in this market will be a challenge, and hence I will be extremely mindful of financial capability when selecting which "buyer" to eventually recommend.
  - As mentioned above, it's important to us that any financing be subordinate to our

BR000071

EXHIBIT 2 PAGE 95

ground lease, meaning that if the leaseholder defaults on their mortgage, the lender would have to keep paying our ground rent, or assign that obligation to someone else, rather than be able to foreclose on us.

- Pricing:
  - As mentioned in the example above, I'm giving price guidance to bidders that the market is valuing the building at $350 to $400 psf, based on the above net rentable measurement of 175,000 square feet, which equates to $60 to $70 million.
  - The major factor in determining pricing at this point, is the anticipated cost to renovate or convert the building, which is considerable. Some bidders take the position that the cost to convert the building is equivalent to the cost of new construction, and therefore the price of the building should equal the value of land. Even if that is true, the building is overbuilt, meaning it is larger than what could be built from scratch today, and therefore there is more "land" in the existing building than there would be attributable to a vacant site which makes the building more valuable than vacant land. I am closely monitoring what different bidders think these construction costs will be, both to ensure that the estimates are not unrealistically high and therefore depress the price, or unrealistically low which would likely lead to a re-trade later on. More to follow on this as conversations with bidders continue to advance.

I realize this is a lot of information and I'd be delighted to schedule a call with the group to review it in more detail and answer questions.

Woody Heller

woody.heller@outlook.com

917-612-1230

BR000072

EXHIBIT 2 PAGE 96

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar; ritasklar@gmail.com; ritasklar@aol.com |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | Update #3 |
| **Date:** | Tuesday, January 31, 2023 7:34:34 PM |
| **Attachments:** | image001.png |

Rita, Michael & Sharan,

- Marketing Status:
  - As of today, I have given 64 tours to dozens of groups. They consist of developers, owners and money sources.
  - There is strong interest in the property, and most of the groups that have toured the property remain interested in pursuing a transaction.
- Potential Uses:
  - The few groups that were interested in converting the building to a hotel, have now shifted to residential conversion.
  - There are still some groups considering renovating the building for office use.
  - The groups pursuing the building as a residential conversion fall into two categories: for-rent multifamily or for-sale condos.
    - The majority of the residential converters favor a condo conversion and will most likely offer the highest price. The challenge is that the tax structure required, and the economics associated therewith, result in a complicated transaction absent an outright sale.
    - The simpler approach is a for-rent multifamily conversion, because that can be done with a simpler leasehold structure.
- Tax Structures - the basic structures we've discussed include:
  1. An outright sale, which would trigger full taxes.
  2. Contribute 95 Madison into a partnership with a developer and participate in the potential upside of converting the property, in a fully passive limited partner role. This would shelter your gain and offer potential upside but expose you to some degree of market and development risk.
  3. Create a ground lease with a partial prepayment of roughly $10 million, as we've discussed, which at closing would payoff your DIP financing, your other outstanding creditors and pay your transaction costs. It would then provide long-term ground lease income which would increase over time pursuant to a pre-agreed formula. The ground rent would be taxed as ordinary income, but there would be no gains tax as the property will not have been sold.
  4. Create a ground lease with a large prepayment of up to 85-90% of the building value. Those proceeds would be tax free, as this is structured as a lease not a sale, and therefore, no reinvestment property would be needed to shelter the gain. If you received 85% of the building value, there would still be a ground lease generating ground rent based on the remaining 15% of the building value. That annual ground rent would be treated as ordinary income. The 85% prepayment would also be treated as though it was being received in even annual increments over the term of the ground lease (presumably 99 years), hence you would also pay annual ordinary income tax on 1/99th of the prepaid amount every year. I know this is complicated and we can discuss

if further. In summary:

i. You get most (85-90%) of the building value paid to you at closing, which gives you tax free use of those proceeds to invest as you wish.

ii. You don't have to worry about how the leaseholder operates the building, because you've already received most of your money. And if they default, you get the building back!

iii. Plus, you get annual ground rent based on 10-15% of the building value.

iv. The downside is that you pay annual ordinary income tax based on BOTH: 1) the actual 10-15% ground rent, and 2) 1/99th of the prepaid amount.

5. An outright sale followed by the acquisition of highly leveraged (presumably 85%), long-term, net-leased, single-tenant 1031 exchange properties. This should enable you to sell 95 Madison for the highest possible price to a condo converter and buy the exchange properties with only 15% of the sale proceeds. The 85% debt would self-amortize (pay itself off) over the term of the net leases. Hence, at the end of the net lease term (say 20 years), the debt would be fully repaid, and you could re-lease or sell those properties with no further debt obligations. To continue sheltering your gain, if the properties are sold, you'd need to purchase new 1031 properties. Given that you'd have tax-free use of 85% of the sale proceeds from 95 Madison, those proceeds should have generated more than enough funds to purchase a second-round of 1031 properties in the distant future.

6. There are more complicated options, but those are better discussed than described in email.

- Next Steps:
  - It's time to call for initial offers as we have many groups interested in the property who are eager to present their bids and concerned that their capital sources will lose interest if the process drags on much longer.
  - The first-round bids are intended to get a sense of who's seriously interested in the building, on what basis (meaning: use, structure, etc.) and at what price. I intend to ask bidders to indicate:
    - The price they'd pay to purchase the building outright.
    - The financial terms they'd agree to for a partial prepaid ground lease – option 3 above.
    - The amount of due diligence they've performed to date, which is important with regard to the validity of their pricing.
    - And how they intend to fund the transaction
  - With that feedback, we can work with our tax advisor to analyze the various structuring options, based on actual market pricing, to determine the after-tax results and associated risk of our various options.

Let's schedule a meeting this Thursday evening to address your questions. Feel free to forward to Tom Fleming if he's still involved. Thanks.

**Woody Heller**
Founding Partner



Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

BR000198

EXHIBIT 2 PAGE 98

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | "Michael Sklar"; Sharan Sklar; ritasklar@gmail.com; ritasklar@aol.com |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | Update #4 |
| **Date:** | Thursday, February 23, 2023 12:21:01 AM |
| **Attachments:** | image001.png |

Rita, Michael & Sharan,

- Marketing Status:
    - As of today, I have given 72 tours. The most I've given of any building, even during the best periods of the market cycle.
    - Many groups have toured multiple times with their architects, contractors, lenders and partners.
    - At this point I get several calls and emails each day asking when the bid date will be announced.
- Bid Date:
    - It's time to set a date and move forward.
    - As I mentioned in my prior update, the purpose of the first-round bids is to determine the following:
        - The price levels being offered for the property, and more specifically the premium, if any, that bidders will pay for an outright purchase rather than a ground lease.
            - If there's a meaningful premium, then it's worth considering the tax-sensitive options to enable an outright sale. I've addressed some of these deal structures in my prior update, and I've also asked bidders to identify potential 1031 properties within their own portfolios.
            - If the premium is insignificant, then we can continue forward with a ground lease.
            - I've simplified my recommendation of the type of ground lease if we're not trying to accommodate a condo conversion. Rather than a partially prepaid 467 lease, I'm recommending a simpler, traditional ground lease, with contractual increases subject to periodic upward CPI adjustments.
                - In this scenario, the funds needed at closing can be borrowed on a short-term basis from a third-party interim lender rather than from the leaseholder. This offers you two benefits:
                    - It enables bidders to increase their offers because it reduces the funds required to complete the transaction.
                    - Second, when the renovation is complete and the building is leased, the interim loan can be refinanced on a long-term basis, and presumably at a lower rate because: the property will be stabilized and therefore less risky, and interest rates are expected to go back down in a few years. The refinanced loan can self-amortize, paying itself off during its term, such that the fee interest of the building will again be debt free at loan maturity, and will hopefully also provide cash flow along the way.
        - The second objective of the bid date is of course to determine which groups are

EXHIBIT 2 PAGE 99

BR000199

  most relevant to us based on their: pricing, credibility, business plan, and ability to execute.
- It's important to note that new bidders are entering the process all the time, and I'll encourage them to continue doing so until we accept an offer. This is the result of: new bidders entering the marketplace, groups breaking off from larger entities to start their own firms, and groups that I'd previously contacted that change their mind and become interested based on changes in their funding or business plan. It's important, however, to start the bidding process so we don't lose the interest of those who have been engaged in the process since we began.
- My intent is to set the bid date for roughly two weeks after I send out the notice.
- Tax Analysis:
  - Once we have the bids, we will work with our tax counsel to examine the tax implications of the various offers, determine the optimal structures, as needed, to maximize your after-tax proceeds and minimize your risk.

I look forward to reviewing the above at your convenience.

---

**Woody Heller**
Founding Partner


Tel:  (917) 612-1230
Email:  wheller@brantonrealty.com
Website: brantonrealty.com

BR000200

EXHIBIT 2 PAGE 100

| From: | Woody Heller |
| --- | --- |
| To: | ritasklar@gmail.com; ritasklar@aol.com; Michael Sklar; Sharan Sklar |
| Subject: | Update #5 |
| Date: | Monday, March 6, 2023 10:10:32 AM |
| Attachments: | image001.png |

Rita, Michael & Sharan,

- Bid date:
  - As instructed, I sent the bid date instructions last Friday morning
  - The bid date is next Thursday March 16th - roughly two weeks after the announcement
  - Once received:
    - I will contact the bidders to clarify their offers and assess their price tolerance
    - I will then prepare an Excel sheet Bid Summary, comparing the bids
    - Following that, the Bid Summary and bids themselves will be distributed to the group so that we can review the bids together in detail
    - Afterwards, we can seek tax counsel, as needed, to evaluate the after-tax results of each option
  - Based on that review, I will gather your feedback and recommend the next step(s)
- In the interim:
  - I will be contacting all the groups to whom I sent the bid letter to:
    - Ensure they received it
    - See what additional information they need
    - Provide additional tours as necessary
    - Make sure they're incorporating all the value-add opportunities into their bids
  - I will also continue to encourage any new entrants into the process, as I've been doing all along
- Market Conditions:
  - Market conditions remain challenged as we've discussed throughout the process
  - This is predominantly the result of rising interest rates and the uncertain regarding future office demand
  - As reported in the press, certain owners are giving back properties to their lenders, but this is the result of current debt maturities. Properties without floating interest rates or that have long-term, fixed-rate debt, are fine.
  - With regard to the leasing market, no one thinks that office demand is going away, it's just a question of the degree to which it may be reduced as a result of the changes in work patterns
  - In fact, certain sectors of the market remain strong, such as the class A+ office market, where rents in certain buildings and submarkets continue to achieve all-time highs.
  - Even in the class-C prewar category there remains good tenant demand, particularly in buildings that have found ways to distinguish themselves, and I've composed the tours of 95 Madison to highlight these opportunities
  - Separate from office, there continues to be great market enthusiasm for residential use, which is attracting many bidders for residential conversion
  - Residential rents remain high, and in many markets are at the highest levels ever achieved. The condo market is somewhat less certain, but still very strong in Nomad.
  - In general, it's much easier for buyers to secure both equity and debt for residential

use, for all the reasons mentioned above
  - While few prewar office buildings make perfect residential buildings because of their floor depth, I've been told by residential marketing agents and architects that 95 Madison is one of the best office building conversion candidates they've ever seen, and is certainly the best one on the market. Hence the predominant focus on residential conversion in the market.
  - Having said that, some bidders are being very successful leasing their office buildings in the surrounding submarket, and will be bidding based on office use.
- Market Response to 95 Madison:
  - Per the comments above, market response continues to be strong, and I expect bids based on all three approaches: office, multifamily and condo
  - I've now given 73 tours and have more scheduled
  - With regard to the challenges posed by increased interest rates, as we've discussed before, this works to our advantage in the event of a ground lease, because it supports higher ground rent.
  - Estreich also confirms that he has been able to raise debt for both office and residential redevelopments, but that it's easier for residential than office, and more difficult for leaseholds, regardless of use
- We can discuss this further, and I look forward to speaking this afternoon at 5pm

---

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR000202

EXHIBIT 2 PAGE 102

| From: | Woody Heller |
|---|---|
| To: | ritasklar@gmail.com; Michael Sklar; Sharan Sklar; ritasklar@aol.com |
| Subject: | Update #6 |
| Date: | Sunday, March 12, 2023 11:39:08 PM |
| Attachments: | image001.png |

Rita, Michael & Sharan,

- Bid date:
  - Bidders continue to ask questions:
    - Have my pricing expectations changed?
    - Are we still asking for the $10M upfront payment? If not, should they indicate their willingness to provide it?
    - What structures should they mention beyond the simple Safehold formula I outlined in the bid instructions?
    - Will this be the only round of bidding?
    - What attorneys are we using?
  - There continue to be requests for additional tours
    - Bidders are bringing their financial partners, consultants, engineers, architects, etc.
  - New bidders continue to emerge, as will continue to be the case until we close, and which I encourage
- Market Update:
  - Little has changed in the real estate market since my update last week, but what has changed is the financial world since the Silicone Valley Bank failure last Friday
  - Thankfully, the Fed announced at 7pm Sunday, that they will make funds available to repay in full, the deposits of the bank's customers.
  - The Fed also closed Signature Bank on Sunday, whose troubles seem more closely tied to crypto concerns, but the Fed has announced it will refund those deposits in full as well.
  - The other bank in question has been Republic National Bank, which was rumored to be close to failure last Friday evening, but which received funding over the weekend to secure its position. This was of particularly relevance since they've been an active real estate lender.
  - So, it seems that the Fed is taking every action possible to support the financial system and avert turmoil in the financial markets and for the borrowers of those three banks.
  - What do I see as the impact of these occurrences during the last four days?
    - It seems clear that the banking problems are isolated to the regional banks, not the major money center banks, which is good. It also seems clear that the problems these banks are having is the result of bad investment choices, not a fundamental flaw in the financial system.
    - The Fed took a very strong stand this evening, which seems to be calming the market and is already resulting in a rise in stock futures, and a lowering of short-term interest rates.
    - It now seems clear that the Fed raised interest rates too quickly, which is the root cause of this problem, and hence, the expectation is that they will either stop increasing rates or do so much more slowly.

What concerns does this create for real estate?

- In general, market volatility is bad, as it makes investors tentative, particularly in an already uncertain market.
- Lenders may become increasingly reticent to lend, which would make it harder for our bidders to finance the renovation / conversion of the building.
- Further, it appears that the industry sector that is most negatively impacted is technology, given that its primary regional bank was the first to fail. Further, the business plan for tech startups has changed from growth to income, has put that sector of the industry at risk. As a result, continued growth from that sector is less certain, and given that technology was the fastest growing consumer of office space over the last few years, both nationally and in NYC particularly, that is problematic for future office demand.
- If the Fed has to stop increasing interest rates, or decrease the pace of those increases, then it may take longer for inflation to abate.

- Is there a silver lining? YES!
  - Short-term interest rates have already started to decrease this evening and given that the construction loan needed by our bidders is a short-term facility, that means their costs should be lower.
  - The strong message of strength that the Fed sent out tonight is comforting, and sends the financial world several important messages:
    - The Fed will intervene to stabilize the market and, most importantly, maintain liquidity.
    - The Fed acted quickly – within four days, to secure the markets and protect depositors.
    - And the major money center banks were not in danger, which sends a strong signal of strength for the major financial institutions, and most importantly, that this is not 2008 all over again.
  - One can make the argument that the residential market is unharmed, and possibly helped by a decrease in interest rates, which should increase the pace of condo sales, strengthening that sector of the residential market.

- In summary, a major problem seems to have been quickly averted, which should calm the market and hopefully keep us on track to conclude a transaction.

I look forward to speaking at 5pm on Monday evening.

---

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

BR000205

EXHIBIT 2 PAGE 104

| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar; ritasklar@aol.com; ritasklar@gmail.com |
| **Subject:** | 95 Mad: Update #7 - Summary of Bids |
| **Date:** | Monday, March 20, 2023 11:23:30 AM |
| **Attachments:** | image001.png |

**Introduction:**

The following is a summary of the offers received to date. Not all the interested groups have submitted bids, either because they need more time to complete their underwriting or because they haven't yet decided whether to bid. As you'll see below, I've broken the bids into six categories, which include three uses: office, multifamily and condo, and two structures: an outright fee-simple purchase and a leasehold. I did this to help us understand how bidders value the different uses, and therefore the degree to which an office bid is discounted relative to multifamily or condo, and secondly, the discount for a ground lease versus an outright purchase. As we discussed, if these discounts are substantial, we may want to consider a structure which allows us to sell all or part of the building to capture the highest price. Such options include a 1031 tax-free exchange and other more complicated tax structures.

Thus far I've received offers from **20 groups**. Two of the 20 groups bid earlier during the marketing period, and hence we've received 22 offers in total. But while I mention the earlier offers to illustrate how conditions have changed, my comments below reflect only the most recent 20 offers. A third group of the 20 also bid earlier during the marketing period, but has not yet refreshed their bid, which I anticipate them doing this coming week. Additionally, another two of the 20 groups submitted bids prior to my involvement, and would only make verbal bids at this time. Finally, and as mentioned above, there are 5 additional groups still deciding whether to bid. Hence, the number of groups bidding may increase to 25 for a total of 28 bids.

**Marketing Recap:**

We launched our marketing effort in mid-November, sending preliminary materials to approximately **250 investors**. Not surprisingly, most owners are playing defense with their own portfolios, and are hence not particularly acquisitive at present. In fact, virtually none of the groups that bid on the building prior to my engagement are still interested, some because of changes in market conditions, and others who became frustrated by their failed prior attempts to purchase the building. Nevertheless, we were successful in getting **83 groups to engage** in our process, during which we gave an unprecedented **76 tours**. Equally extraordinary is getting 20 bids given the current market conditions. In my professional career, and even at the best moments in the markets, I have never received more than 20 bids or given more than 50 tours of any building, including when I sold the Chrysler building! And despite the stock prices of all the major **New York City REITs being at all-time lows**, including during COVID, and some of the strongest owners in the marketplace voluntarily surrendering office buildings to their lenders, and the dearth of available financing in the capital markets, we still have strong interest in 95 Madison.

**Pricing:**

As you'll see from the pricing below, the bids range from **$17 to $70 million**, which is an extraordinarily wide range. The bids vary by use and structure, which illustrates the value of breaking them into the six categories mentioned above. The offers mentioned below reflect pricing that has not yet been negotiated, and hence, that I hope to improve in subsequent discussions. The terms of the offers, and all the relevant details, are being input into an **Excel spreadsheet**. There is detail about the offers that I'm still in the process of collecting, and imperfections with the proposed terms

that I'm attempting to change. The spreadsheet will be ready for distribution once that information has been obtained and entered.

**A few additional points worth noting:**

- Not surprisingly, and consistent with current market conditions, the greatest interest is from residential converters. As a result, and as we anticipated, the highest prices are for conversion to condos, then for conversion to multifamily, and finally, the lowest is for office use.
- Condo pricing is the highest because condo buyers are more accepting than renters of deep apartments - consistent with 95 Madison's floorplate, and secondly, condos have a higher $psf value than multifamily apartments.
- Consequently, I've asked each group hoping to purchase the building outright for condo conversion or otherwise, to indicate whether they have building(s) that might be suitable for a 1031 tax-free exchange. I understand that none of the three of you want a transaction that requires you to find an exchange candidate within a finite time post-closing. However, if such building(s) could be identified in advance, then perhaps that would be acceptable, and create the opportunity to sell 95 Madison for the highest price.
- Some of the bids contemplate more than one use, as well as one or both structures, and therefore fall into multiple categories.
- All bidders prefer a partnership to a purchase, where the building would be contributed to a newly formed partnership at an agreed value, with the developer partner contributing the debt and equity needed to execute the business plan. I've advised all who have asked that this is not of interest to current ownership.

**Pricing by Category:**

- **Office:**
  - We received 7 bids.
    - Three bids indicate multiple uses: office or multifamily, office and multifamily, and office and condo.
    - Two bids indicate both fee-simple and leasehold structures.
  - Fee Simple:
    - 6 of the 7 bids are for an outright fee-simple purchase.
    - Those offers range from **$30 to $62 million**.
    - The $62 million offer contemplates multifamily use with a few floors of office on the bottom floors of the building. Hence the range of pure office is **$30 to $38 million**.
    - The $38 million offer is from a group that specified either office or multifamily.
    - The bids from the strongest groups are at $30 million.
  - Leasehold:
    - 3 of the 7 bids are for a leasehold interest.
    - Those offers have implied valuations that range from **$30 to $40 million**, essentially the same as fee simple, which is unusual given that leaseholds typically trade at a discount.
    - Implied valuations are based on capping the starting ground rent at 5% and adding the upfront payment if one was specified.
    - The $40M implied valuation is from a group that has done less due diligence than the other two. Without this offer the valuations range from $30M to $32M.
    - The $62 million mostly multifamily bid mentioned above, could be structured as

an office leasehold condo on the bottom floors of the building. This could be helpful with one of the possible tax structures.

- In lieu of the proposed ground rent structure in the bid instructions, one group verbally offered:
  - $1 million of ground rent.
  - Lending all the funds needed for them to renovate the building.
  - And a 50% share of the cash flow after expenses & debt service on the funds provided.
  - They equate the value of this proposal to $30 million, and it offers the upside potential of being able to participate in the market's eventual recovery.

- **Multifamily:**
  - We received 9 bids.
    - A 10th offer is from a group that bid earlier, and hence, I'm only addressing the more recent 8 bids.
    - As mentioned above, four bids indicate multiple uses: office or multifamily, office and multifamily, and multifamily and condo.
    - Four offers indicate both fee-simple and leasehold structures.
  - Fee simple:
    - 6 of the 9 offers are for an outright fee-simple purchase.
    - Those offers range from **$23 to $62 million**, a surprisingly wide range.
    - The $62 million offer is for a combination of both multifamily and office.
    - The $60 million offer is for a combination of both multifamily and condo.
    - The highest offer for multifamily only is $54 million.
  - Leasehold:
    - 7 of the 9 offers are for a leasehold.
    - Implied valuations range from **$17 to $45 million**, again a very wide range.
    - The low offers in both the fee simple and leasehold scenarios are from the same bidder. Otherwise the ranges are much tighter.
    - There are two $50 million offers but they are initial offers from the two groups that bid earlier, and hence have been updated at lower amounts.
    - As mentioned above, the implied valuations are based on capping the starting ground rent at 5% plus the upfront payment if one was specified.

- **Condo:**
  - We received 8 bids.
    - As mentioned above, one offer anticipates combining condo and multifamily, another combines condo and office. As mentioned above, combinations are relevant as they might be helpful with one of the possible tax structures.
    - One offer is both on a fee-simple and leasehold basis, albeit at different valuations.
  - Fee simple:
    - 7 of the 8 offers are for an outright fee-simple purchase, as would be anticipated given that condos require at least a portion of fee ownership.
    - Those offers range from **$46 to $70 million**.
    - There is only one offer at $70 million, who previously indicated that they were

BR000031

EXHIBIT 2 PAGE 107

negotiable, but they need to raise almost all of the equity from third-parties. As a result, they may have the highest execution risk, which is consistent with their request for a long due diligence and closing period to give them time to secure investors.

- If we remove the bottom and top offers, the remaining five are in the range of $53 to $63 million, which are more realistic.
- 6 of the 8 groups making fee-simple offers have offered potential properties they own that we could consider for 1031 tax-free exchanges.

○ Leasehold:
- One offer at **$60 million** is only on a leasehold basis and incorporates one of complex tax structure.
- This offer contemplates splitting the building into two condominium units and using one as our 1031 tax-free exchange.

**Pricing Summary:**
- Office: **$30 - $40 million**
- Multifamily: $17 - $60 million, more realistically **$30 - $45 million**
- Condo: $46 - $70 million, more realistically **$46 - $63 million**

**Objectives:**
- My understanding of your objectives is as follows:
  ○ Maximize value.
  ○ Avoid paying capital gains taxes.
  ○ Generate upfront funds of $16-20 million.
  ○ Switch from active ownership to recurring passive income.
  ○ And potentially maintain an ongoing interest in the building.

**Likely Options:**
- A long-term **ground lease** at a lower valuation with or without some form of prepayment(s).
- Some for a **partnership** with a developer.
- A more **complicated tax structure** whereby you swap ownership of the whole unrenovated/unleased building, for a ground lease on a portion of the renovated/leased building, with some prepayment(s). This structure needs to be reviewed by Rick Wolfe, but is my recommendation if it can be fashioned to provide the necessary safeguards.
- Sell outright for the highest price and buy a **1031 exchange** – several options are available from the bidders and elsewhere.

While there's still a lot to be done and many choices to be made, the breadth and strength of the market's response suggests that there is a path to a transaction once we elect how we wish to proceed. I know this is a lot of information that takes time to review and absorb. I look forward to discussing it together on Monday's 5pm call.

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

BR000032

EXHIBIT 2 PAGE 108

**From:**     Woody Heller
**To:**       ritasklar@gmail.com; Michael Sklar; Sharan Sklar
**Subject:**  95 Mad: Update #8
**Date:**     Tuesday, April 4, 2023 4:37:36 PM
**Attachments:** image001.png
              95 Madison Avenue - Bid Instructions.pdf
              Office Space Challenges Jan 2023.pdf
              95 Madison Bid List 2023-04-04.pdf
              Comparison of Ground Rent to Ground Rent + Participation.pdf

Rita, Michael and Sharan,

Lots has happened in the last two weeks. I've been speaking to the various bidders to seek information that was missing from their bids, clarify things in their bids that were not clear, and attempt to understand their flexibility regarding structure, terms and pricing. Towards that end, I'm attaching a bid sheet that includes that information. I'm still waiting on feedback from several bidders, but the summary is current as of now.

Rita, I'm printing the bid sheet out for you on four 11x17 pages to make them easier to read. Lay the pages out vertically and spread them left to right – pages 1 to 4. I'll drop your papers off this evening.

In addition, I'm attaching a copy of the bid instructions, so you can see how I asked bidders to compose their proposals.

Next, I'm attaching the chart we started to review on our call last Thursday, which compares the ground lease terms in the bid instructions to a ground lease with a lower starting rent in exchange for a participation in property cash flow. The term of the example lease is 99-years, and the valuation shown is $30 million, consistent with the participating ground lease proposal made by Gural. In the example shown, I'm comparing a simple ground lease with a starting ground rent of $1.5 million (5% of $30 million), to a ground lease with a start ground rent of $1 million (5% of $20 million), plus a 50% participation in cash flow. In this case, cash flow is defined as income after operating expenses, real estate taxes, and debt service on the money borrowed to renovate the building. As Rita correctly pointed out during our call, there are other costs that will need to be incurred over time, which this simple analysis doesn't include. Those additional costs, such as additional renovations in subsequent years, would further decrease the projected cash flows and resultant participation income. Despite this omission, the value of the ground lease **without** the participation is higher than the value of the ground lease with the participation in the overstated income. I show you this purely to give you an arithmetic comparison, given the interest shown in a participating ground lease. That participation would give you a participation in the future upside of the building. The analysis discounts the participation income at a higher rate than the more senior ground rent payments, and based on that methodology, suggests that the ground only scenario would be more valuable. The increases in the ground rent are: 2% per year, and an additional increase after every 10 years of up to 35% (versus 20%) if CPI has increased more than 20% during the prior 10-year period. Those increases every 10 years are capped at 35%, because banks will no longer finance ground leases with fair market resets or other forms of uncapped increases. In this analysis, all the assumptions are on the top left of the first page, and the actual cash flow projections are on the right side of the first page. The sensitivity analyses on the second page, and there graphs to visually illustrate relationships on the third page. The second page shows the change in value if virtually all of the relevant assumptions. In most scenarios, the non-participating model is more valuable, again, on a present value basis. The top chart on the third page shows, by decade, the relationship between the three income components: the ground rent that starts at $1.5 million

without a participation (in blue), versus the ground rent that starts at $1 million with a participation (in brown), and the participation income (in yellow). The second and third charts on the third page show that while the participation income is higher over the term on a gross basis, it isn't on a present value basis. I can explain that later.

Rita, I'm printing this on three 11x17 pages to make them easier to read.

Finally, I'm attaching a 5-page presentation that shows how the increase in interest rates and uncertainty surrounding office demand is negatively impacting the value of office buildings. The first page shows how investors have increased their leveraged return requirements (LIRR). The second page shows the degree to which cap rates have increased on office REIT nationally, not just in NYC. The third page compares the ongoing capital requirements of the various property types, and how office is the most expensive with the sole exception of hotels. The fourth page shows the increase in return requirements for different sectors of the office market. And the fifth page shows the impact of the changes in various underwriting assumptions as investors have become more cautious. The bottom line, as expected, is that this is not a NYC problem, this is a property sector problem, and that the impact is considerable with no clear sense as to whether or when it may change. This explains why none of the bidders who were interested in 95 Madison last summer, as an office building renovation, remain interested. Hence our focus on residential conversion.

This update contains a lot of information, and I welcome your questions and comments once you're had a chance to review it.

**Woody Heller**
Founding Partner



Tel:       (917) 612-1230
Email:     wheller@brantonrealty.com
Website:   brantonrealty.com

BR000038

EXHIBIT 2 PAGE 110

## 95 Madison - Bid Instructions

Thank you for your interest in 95 Madison Avenue. We invite you to submit a bid to purchase this property, or in the alternative a proposal for a ground lease or some other structure, all as follows:

- **Deadline:** Bids are due at **noon**, Thursday March 16, 2023
- **Submission:** Please submit to: wheller@brantonrealty.com
- **Business Plan:** Given that tax issues will probably require a ground lease structure, please outline your business plan, covering at least:
    - **Use**: Office, multifamily, condo, mixed use, other
    - **Renovation**: Core, lobbies, façade, exterior, major mechanicals, etc.
    - **Budget**: Major line items for likely renovation
    - **Timing**: Anticipated commencement and completion
    - **Incentives**: What programs, if any, you plan to utilize
- **Pricing**:
    - **Purchase Price** for outright fee-simple sale
    - **1031:** Any properties in your portfolio available for 1031 exchange
- **Ground Lease:**
    - **General:** The transaction will likely require a ground lease or other more complex structure, rather than a fee-simple purchase. Please confirm acceptance of the terms below. Alternatively, please submit other proposed terms or structure to achieve similar tax goals.
    - **Terms:** Modeled after Safehold:
        - **Duration**: 99 years
        - **Starting Rent**: 5% of proposed purchase price
        - **Annual Bumps**: 2%
        - **CPI Resets:** Every 10 years capped at 3.5% compounded annually
- **Capital Stack:**
    - **Composition:** Debt (mortgage/mezz) and equity (preferred/common) percentages
    - **Sources:** Type(s) of provider(s) (bank, hedge fund, etc.)
    - **Approvals:** What approvals, if any, your capital source(s) still require
- **Timing:**
    - **Due Diligence:** What you've done, what's left, how much more time you need
    - **Closing:** How quickly you can close once an unconditional PSA has been signed and nonrefundable deposit posted
- **Legal**: Anticipated transactional and tax counsel

Thank you very much. We look forward to receiving your bid by **noon on Thursday March 16**.

---

**Woody Heller**
Founding Partner



Tel:       (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR000039

EXHIBIT 2 PAGE 111

# ES Active Deals – LIRR vs. Occupancy



70% of all Transactions are underwriting to 20%+ LIRR

EXHIBIT 2 PAGE 112

BR000040

# Office REIT Cap Rate Movement (Dec-21 to Jan-23)



Source: Greenstreet Weekly REIT Pricing Review 12/30/2022

EXHIBIT 2 PAGE 113

BR000041

# Capex Requirements Remain Among the Highest of All Sectors



**Green Street NOI Growth Expectations and Capex Requirements**

- ■ Near-Term NOI Growth
- ● Capex as % of NOI

*Green Street: Commercial Property Outlook*

BR000042

EXHIBIT 2 PAGE 114

# Trophy vs. Everything Else

| Risk Profile | Single-Tenant | | Multi-Tenant | | | |
|---|---|---|---|---|---|---|
| | **Investment Grade** | **Non-Investment Grade** | **Core** | **Core-Plus** | **Value-Add** | **Opportunistic** |
| **Jan 2022 Return** | **4.00-4.25%** In-Place Cap Rate | **5.00-5.25%** In-Place Cap Rate | **+/-4.50%** In-Place Cap Rate | **+/-12%** Levered IRR | **+/-15%** Levered IRR | **20%+** Levered IRR |
| **Current Target Return** | **5.50-6.00%** In-Place Cap Rate | **6.75-7.25%** In-Place Cap Rate | **+/-6.00%** In-Place Cap Rate | **20%+** Levered IRR | **20%+** Levered IRR | **20%+** Levered IRR |
| **Value Impact** | **(15%-20%)** | **(20%+)** | **(15%-20%)** | **(~30%-40%)** | **(~25%-40%)** | **(20%+)** |

EXHIBIT 2 PAGE 115

BR000043

# Non-Trophy Multi-Tenant Office

Value Sensitivity Analysis – Potential Change in Investor Underwriting

| | Change | Impact to Pricing |
|---|---|---|
| **Leasing Assumptions** | | |
| **Market Rents** | (10%) | **(5% - 7%)** |
| **General Vacancy** | 5% → 10% | **(2% - 4%)** |
| **Leasing Costs (TI & LC)** | + 10% | **(3% - 5%)** |
| **Capital Expenditures** | 5% → 10% | **(3% - 5%)** |
| **Investor Metrics** | | |
| **Return on Cost** | + 150 Bps | **(10% - 12%)** |
| **Exit Cap Rates** | + 100 Bps | **(5% - 7%)** |
| **Debt** | | |
| **Cost of Debt** | + 300-500 Bps Rate | **(7% - 20%)** |
| **TOTAL\*** | | **+/- (35% - 50%)** |

*Depending on deal profile, a combination of variables is likely to be present resulting in various potential outcomes.*

* Impact to Pricing holds everything else constant, solving to same 5-Year LIRR for a +/- 75% leased building.

BR000044

EXHIBIT 2 PAGE 116

| Number | Investor Type | Date Submitted | Intended Use | # of Tours | Hard 2nd Round? | Price Tolerance | Fee Simple Price | Ground Lease | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Price | Prepayment | Net Price | Term | Starting Rent | Free Rent (months) | Rent Bumps | CPI Resets | Purchase Option |
| 1) | Experienced Private Developer | 3/16/2023 | Condo | 3 | Yes | ~$58M | $53M = $60M - $7M façade<br>or $40-45M = $10M + condo units - facade | | | | | | | | | |
| 2) | 2 Large , Experienced Developers | 3/15/2023 | Condo | 3 | Yes | $50Ms - underwriting condos @$1,900 psf | $45.8M | | | | | | | | | |
| 3) | 2 Small Private Developers | 3/31/2023<br>3/16/2023 | Condo | 2 | Yes | $62M "limited" and lower than $60M for outright purchase | N/A | $60M | $10M | $50M | 99 | $2,500,000<br>5.0% of net price | 12 + option to accrue GR during development | 2.0%<br>Annual<br>Starting Y4 | 10 Years<br>3.5% Compounded | None |
| 4) | 3 Private Developers | 3/16/2023<br>11/15/2022 | Condo | 6 | Maybe, needs partner consent | $72-3M | $70.0M | | | | | | | | | |
| 5) | Public Condo Developer | 3/16/2023 | Condo | 4 | No b/c of LM approval process | $65M | $60.0M | | | | | | | | | |
| 6) | Family Developer | 3/16/2023 | Condo & Multifamily | 1 | | Waiting: price, structure, hard round | $60.0M | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 7) | Private Local Developer w/Insitutional funding | 3/16/2023 | Condo & Office | 3 | Yes | ~$55M | $50.0M | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 8) | 2 Private Developers | 3/16/2023 | Condo or Multifamily | 2 | Yes | $60Ms for condo | $54M | $20M<br>(implied) | $10M | $10M<br>(implied) | 99 | $500,000 | None | 2%<br>Annual | 10 Years<br>3.5% Compounded | Mutual call/put options in 2 years @$54M - GR pymts |
| 9) | Experienced Private Developer | 3/16/2023 | Condo or Multifamily | 2 | Yes | $70-75M Condo<br>$60-65M MF | $62.5M | $50M<br>(implied) | None | $50M<br>(implied) | 99 | $2,523,438 | None | 2%<br>Annual | 10 Years<br>3.5% Compounded | None |
| 10) | Private National Developer | 3/16/2023<br>1/3/2023<br>(2 offers at different times) | Multifamily | 3 | Yes | Awaiting: pricing (I said $50-60Ms), purchase option, CPI reset | N/A | 1st - $45M (implied)<br>2nd - $50M (implied) | $0<br>$10,000,000 | $45M (implied)<br>$40M (implied) | 99 | $2,250,000<br>$2,000,000 | 0<br>12 | 2% Annual<br>10% / 5 years | None | 10th year + every 5 Years capping prior year's rent @10 Year T + 75 bps |
| 11) | Active Acquirer, limited experience | 11/30/2022 | Multifamily | 2 | N/A | Withdrew 3/21/2023 - pursuing less expensive opportunities | N/A | $50M<br>(implied) | $10M credited against years 3-6 GR | $50M<br>(implied) | 99 | $2,500,000 | 24 | 10%<br>every 15 years | None | 18% @$70M price for first 2 years<br>ROFR on balance during remaining term |
| 12) | Local Owner / Developer | 3/15/2023 | Multifamily | 3 | Yes | Awating: GL pricing of $55-60M | $38M | $32M | $12M | $20M | 99 | $1,000,000<br>5% of net price | 24 | 2%<br>Annual | 10 Years<br>3.5% Compounded<br>First Reset Y20 | N/A |
| 13) | National MF Developer w/4 investment funds | 3/16/2023 | Multifamily | 2 | | Awaiting: GR of $2.5M or $20M + $1.5M, CPI Resets of 3.5%/10 | N/A | $30M<br>(implied) | None | $30M<br>(implied) | 99 | $1,500,000 | None | 2%<br>Annual | None but seeking approval of 3.5% / 10 years | None |
| 14) | Huge Private Owner / Developer | 3/23/2023 | Multifamily | 1 | No | Awaiting: $45-50M, possibly participation | $43M | $43M<br>(implied) | None | $43M<br>(implied) | 99 | $2,160,000<br>5% | lesser of 4 years or final TCO of all resi units | 2%<br>Annual | Yes<br>Cap TBD | None |
| 15) | World Class Developer w/internal investment funds | 3/16/2023 | Multifamily | 6 | Yes | ~ $30-35M GL w/backend kicker & no purchase option | $23.0M | $17M<br>(implied) | $16M | $1.5M<br>(implied) | 99 | $75,000 | None | 3%<br>Annual | Years 25, 50 & 75<br>25% of prior 3-year average NOI capped at a 15% increase | After 20 years<br>100% of FMV based on current use |
| 16) | Private Developer | 3/17/2023 | Multifamily & Office | 2 | | ~$65M | $62M | | | | | | | | | |
| 17) | Inexperienced Owner w/capable local agent | 3/16/2023 | Multifamily or Office | 2 | | ? | $30.0M | $30M<br>(implied) | $10M credited against future rent pymts (mos 37-112) | $30M<br>(implied) | 99 | $1,500,000 | 36 | 10%<br>every 5 years | None | None |
| 18) | Very Experienced local Owner / Developer | 3/14/2023 | Office | Prior | | $30M | $30M | $30M<br>(implied) | None | GFP pays $1M GR, lends reno funds, splits distributions 50/50 | | $1,000,000 | | | | None |
| 19) | HNW Private Development Company | 3/16/2023 | Office | 1 | Yes if all bidders are office, otherwise refund their costs | $44-46M depending on financing<br>Maybe higher | N/A | $40M<br>(implied) | $10M | $30M<br>(implied) | 99 | $1,500,000 | None | 2.5%<br>Annual | 10 Years<br>3.5% Compounded | None |
| 20) | Huge Private Owner / Developer | 3/16/2023 | Office | 4 | Not Relevant | $30M | $30.0M | | | | | | | | | |
| 21) | Huge Private Owner / Developer | 3/16/2023 | Office | 1 | Not Relevant | Price too low to matter | $28M | Willing to consider but no terms specified | | | | | | | | |

| Number | DD Period (days) | Closing (days) | Deposit | Contingencies | Business Plan | Renovation Budget | Renovation Duration | Diligence Completed | Tax Incentives | CapStack Debt/Equity | Approvals Required | Clarification Required | 1031 Candidates | Pros | Cons |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1) | 60 | 60 after DD | $1M at PSA<br>+$5M after DD | Vacant possession | High-end condos | Façade costs are estimated at $7M | Not Specified | 3 Tours | Not Specified | close all cash<br>construction loan later<br>80-90% 3rd party equity | Not specified | Approvals | Chelsea bldg leased to a school for 19 years<br>or<br>Apt condo units | Experienced developer | Mid-level pricing |
| 2) | 60 | 90+30 | 10% | Vacant possession preferred, not required | 107 condo units, 5K SF retail, 8K SF amenities: ground/cellar & rooftop | $175-200M<br>Façade $2.5M | 33-40 months | Investment Committee approveal only | May explore Historic Tax Credits | Close all cash<br>50% LTC<br>$40M Purchaser equity | Investment Committee | Why 6 mos to close<br>Construction financing<br>2% deposit | NoMad condo units | Credible buyers | Long closing<br>Fee simple only<br>Pricing uncompetitive<br>Low deposit |
| 3) | 60 | DD + ? | $500K @LOI<br>$500K @GL | Not Specified | Residential and commercial condo units | $90-100M prelim budget. Assuming 10% contingency | 3 years | Not Specified | Not Specified | 60/40<br>Equity syndication<br>may need debt for $20M upfront pymt | | Credit for GR guarantee<br>Equity source(s) | | 12 mos GR guarantee | Rick Wolfe says structure not viable |
| 4) | 60 or 90 | 90 | $3.5M / $7M<br>5% / 10% | Not Specified | Condo conversion | $99M<br>Façade: $5M | 30 months | 70% Complete | None | 75/25<br>Equity - 80/20 - LP/GP<br>A specific Debt Fund has expressed interest | | | A recently completed LIC $75M apartment bldg | Pricing | Need to raise 98% of the equity |
| 5) | 45 after PSA | 90 after DD or 30 after possession<br>+ 30 - $500K deposit | $3M @PSA | Vacant possession<br>Purchaser gets MRT savings | 110 condo units, retail on grade & bsmt, | $435 psf<br>Abatement $3.4M<br>Façade $7M | 36 months | Extensive | Maybe some federal Historic Tax Credits | 60/40<br>Buyer 25% of 40%<br>a known investor for 15%<br>Need time to secure equity | LM approval<br>Internal approvals are almost complete | None | Retail condo @103rd & Bway, 15-year lease to CVS @$1.1M<br>or<br>many MF projects (4 in NYC) | Good fee-simple price<br>Public Co / Experienced developer<br>Extensive DD review<br>25% internal equity<br>many 1031 options | Fee-simple only |
| 6) | | 90 | Not Specified | Not Specified | Interiors, facade, mechanical, core | $450 psf hard<br>$150 psf soft contingencies, fees, demo & interest | 42 months | Not Specified | Historic Preservation Tax Credits | 60/40<br>Commercial Bank<br>Family & Friends | | Structure: ground lease on rental apt condo? | 21 Units in adjoining walk-up<br>First Avenue apt bldgs totaling 17K sqft | Quick response<br>Reasonable people | Early in their review |
| 7) | During PSA | 90 | 5% hard @PSA | Don't lease vacant units, Purchaser gets MRT savings | Office floors 1-8<br>Condo floors 9-16<br>Rents $50-55 psf, sellout $2,200 | Façade: $2.5M<br>know resi costs<br>office reno is minimal + heavy TI | Not Specified | Mostly Complete | Not Specified | 60-65 / 40-35<br>institutional equity sources | | Pricing | MF bldgs of $50-155M | 1031 options available | Mid-level pricing |
| 8) | During Ground Lease negotiation | 60 | Not Specified | Not Specified | Gut renovation and conversion to residential with retail on grade | Façade $5-10M from Compelli | 27-36 months | Quick, lots done already | Will explore Historic Preservation Tax Credits | $10M from Will, Larry & Pembroke, rest of equity ($44M) from PE partners; in discussions with lenders - seeking 65% LTC | equity investors & lender | Deposit / Budget | -- | Seller put option facilitates 1031 | ground lease discount vs fee simple: $20M vs $60M |
| 9) | 21 days | 60 + 30 w/add'l deposit | 5.0% after PSA<br>5.0% after DD | 1 - Vacant possession<br>2 - 50% Acq loan | Core, lobbies, façade, exterior, major mechanicals, etc. | To be provided | 30 months | Not Specified | Not Specified | 55% debt/45% equity<br>Equity investor will bridge & syndicate | Not Specified | Budget | N/A | Pricing<br>GL price & terms<br>DD speed | Bumpy ride but closes |
| 10) | 30 | 60 + 30<br>add'l $500K | Not Specified<br>$500K | Not Specified | Conversion to high-end MF apartments | $72M w/$5M for façade & windows | 36 months | All except: legal, titie, 3rd parties (environmental, etc.) | Not Specified | All Equity to Close<br>55% LTC bank construction loan | Satisfactory DD | Pricing<br>Purchase Option<br>CPI Resets | | All equity close | Pricing<br>Y10 purchase option<br>CPI Resets |
| 11) | 45 after LOI | 45 after PSA | Not Specified | | | | | | | No financing contingency | | | | | |
| 12) | 30 | 120 | $1.2M<br>10% of pre-pymt | Not Specified | Core, lobbies, façade, windows, mechanicals | HC + SC: $51mm<br>Carry Costs: $4mm<br>Int. Reserve: $7mm | 18-24 months | Not Specified | 421G? | 65/35<br>Bank<br>Private Investor | None | Pricing<br>Budget detail | Numerous residential, retail, and office assets available | Pricing if it improves<br>Upfront payment<br>CPI resets<br>no purchase option | Initial pricing<br>free rent<br>long closing |
| 13) | 45 days after ground lease execution | 60 | $750K soft after Ground Lease & after DD | Vacant possession - preference not requirement | 103 MF apartments health & fitness center rooftop deck | Core, lobbies, windows, façade, mechanicals<br>façade $3.5M<br>Abatement $3.7M | 23 months | Not Specified | None according to their historic tax credit consultant | 50% LTC;<br>Equity yet to be identified but have a deep roster of equity funds / partners to go to when deal is more certain | Mill Creek investment committee | | N/A | No purchase option | Modest pricing<br>No CPI reset |
| 14) | | | | | MF Conversion | $400 psf x $150 GSF = $60M | | Little | | 65% relaionship lender<br>all internal equity | None | | Retail condos in NYC portfolio | All internal equity<br>Structure flexibility<br>Certainty of execution | Price<br>No hard second round |
| 15) | During Ground Lease negotiation | 30 after GL execution | $1.5M hard after Ground Lease execution | Vacant possession | 150 MF units, lobby to 29th street, indoor & outdoor amenities | façade: down from $10M to $8.9M | 48 months | Mostly Complete | Not Specified | 55/45<br>Senior Lender<br>Buyer affiliated equity | TS Investment Committee | purchase option<br>reset caps<br>GL discount<br>reno budget | N/A | Highly credible<br>Very extensive DD | pricing<br>Ground Lease Terms<br>Resets<br>Purchase option |
| 16) | | | | | | | | | | | | | Retail condos in NYC bldgs but have to agree on valuation and some are financed | $40M of 1031 equity to invest | Very preliminary offer |
| 17) | 60 | 60 / 90 | $1M | Need to physically inspect façade | Conversion to MF, gut renovation, buildout of amenity center, grade retail | $325psf for entire project. $4.0-6.5M for façade. | 36 months | Not Specified | Historic Preservation Tax Credits<br>ICAP | Closing on sale that will net them $85-90M cash to apply to this project; unclear if reliant on 1031 $ | Not Specified | Capstack<br>GR prepymt credit<br>budget / DD completed<br>Approvals / CPI Resets | A Medical Center & 3 Supermarket properties | | Initial Pricing<br>3 years of free rent<br>No CPI resets<br>Inexperienced developer |
| 18) | | | | | | | | | | | | | | Participation in future upside<br>honest & experienced partner | modest valuation |
| 19) | 30 days for hard 2nd round | 45 after DD | Not Specified | | $65 office w/$100 TIs<br>$150 retail<br>Maximize NRA | $65M<br>$2M for façade | 1 year for renovation<br>1 year for lease-up | Limited | ICAP | 70/30<br>Buyer's own equity<br>Regional Bank or Debt Fund | Lender only | | N/A | All internal equity | Valuation<br>Preliminary proposal |
| 20) | During PSA | 60 + 90 add'l<br>5% deposit | 10% hard @PSA | None | Enlarge lobby<br>T lounge & conference amenities in Penthouse | $95M<br>$5M for façade | Not Specified | Underwriting is complete<br>Projecting $75 psf rents | ICAP | Buyer's equity only + low leverage construction financing | | None | Buyer is willing to consider one of their existing bldgs | Close all cash w/internal equity<br>DD complete<br>Highly experienced<br>Successful projects nearby<br>Partnership possible | Modest price |
| 21) | | | | | | | | | | | | | Many options listed | All internal equity | Low price<br>Little specificity in the offer |

# Ground Rent vs Ground Rent & % Participation

Assumptions & CF Summary ($ in 000s)

## Assumptions

| Assumptions | 1 - Ground Rent | 2 - GR & % Partic. |
|---|---|---|
| **Ground Rent:** | | |
| Valuation | $30M | $30M |
| Valuation for Ground Rent | $30M | $20M |
| Starting Ground Rent (% of PP) | 5.0% | 5.0% |
| Starting Annual Ground Rent | $1.5M | $1.0M |
| Annual Escalations | 2.0% | 2.0% |
| CPI Reset % / Frequency | 3.5% / 10 yrs. | 3.5% / 10 yrs. |
| Ground Lease Term | 99 | 99 |
| | | |
| **CF Participation:** | | |
| CF Participation (%) | | 50% |
| Use | | Multifamily |
| Residential SF | | 135,000 |
| Number of Units | | 135 |
| Gross Rent (PSF) | | $95 |
| Real Estate Taxes (PSF) | | $29 (30%) |
| Operating Expenses (PSF) | | $10 (10%) |
| NOI (PSF) | | $57 (60%) |
| I&E Growth Rate | | 3.0% |
| Conversion / Renovation Costs | | $75M |
| LTC | | 60.0% |
| Interest Rate | | 6.0% |
| Type (I/O or Amortizing) | | 30-Year Amort. |
| Lease Term (months) | | 18.0 |
| Free Rent & Downtime (months) | | 1.0 |
| | | |
| **Discount Rates:** | | |
| Ground Rent | 5.0% | 5.0% |
| CF Participation | | 5.0% |

| NPV | 1 - Ground Rent | 2 - GR & % Partic. |
|---|---|---|
| Ground Rent | $166M | $111M |
| CF Participation (@ 50%) | | $124M |
| **Total** | **$166M** | **$235M** |
| | | + 42% |

| Nominal CF Distributed | 1 - Ground Rent | 2 - GR & % Partic. |
|---|---|---|
| Ground Rent | $5.03B | $3.36B |
| CF Participation (@ 50%) | | $2.02B |
| **Total** | **$5.03B** | **$5.37B** |
| | | + 7% |

| | | 1 - Ground Rent | 2 - GR & % Partic. | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Year | Ground Rent | Ground Rent | Revenue | Expenses | NOI | Debt Service | Cash Flow | CF @ 50% |
| 0 | 2023 | - | - | - | - | - | | - | - |
| 1 | 2024 | $1,500 | $1,000 | $12,150 | ($5,130) | $7,020 | ($3,269) | $3,751 | $1,875 |
| 2 | 2025 | $1,530 | $1,020 | $12,515 | ($5,284) | $7,231 | ($3,269) | $3,961 | $1,981 |
| 3 | 2026 | $1,561 | $1,040 | $12,890 | ($5,442) | $7,448 | ($3,269) | $4,178 | $2,089 |
| 4 | 2027 | $1,592 | $1,061 | $13,277 | ($5,606) | $7,671 | ($3,269) | $4,402 | $2,201 |
| 5 | 2028 | $1,624 | $1,082 | $13,675 | ($5,774) | $7,901 | ($3,269) | $4,632 | $2,316 |
| 6 | 2029 | $1,656 | $1,104 | $14,085 | ($5,947) | $8,138 | ($3,269) | $4,869 | $2,434 |
| 7 | 2030 | $1,689 | $1,126 | $14,508 | ($6,125) | $8,382 | ($3,269) | $5,113 | $2,557 |
| 8 | 2031 | $1,723 | $1,149 | $14,943 | ($6,309) | $8,634 | ($3,269) | $5,365 | $2,682 |
| 9 | 2032 | $1,757 | $1,172 | $15,391 | ($6,499) | $8,893 | ($3,269) | $5,624 | $2,812 |
| 10 | 2033 | $1,792 | $1,195 | $15,853 | ($6,695) | $9,160 | ($3,269) | $5,891 | $2,945 |
| 11 | 2034 | $1,828 | $1,219 | $16,329 | ($6,894) | $9,434 | ($3,269) | $6,165 | $3,083 |
| 12 | 2035 | $1,865 | $1,243 | $16,818 | ($7,101) | $9,717 | ($3,269) | $6,448 | $3,224 |
| 13 | 2036 | $1,902 | $1,268 | $17,323 | ($7,314) | $10,009 | ($3,269) | $6,740 | $3,370 |
| 14 | 2037 | $1,940 | $1,293 | $17,843 | ($7,534) | $10,309 | ($3,269) | $7,040 | $3,520 |
| 15 | 2038 | $1,979 | $1,319 | $18,378 | ($7,760) | $10,618 | ($3,269) | $7,349 | $3,675 |
| 16 | 2039 | $2,018 | $1,345 | $18,929 | ($7,992) | $10,937 | ($3,269) | $7,668 | $3,834 |
| 17 | 2040 | $2,059 | $1,372 | $19,497 | ($8,232) | $11,265 | ($3,269) | $7,996 | $3,998 |
| 18 | 2041 | $2,100 | $1,400 | $20,082 | ($8,479) | $11,603 | ($3,269) | $8,334 | $4,167 |
| 19 | 2042 | $2,142 | $1,428 | $20,685 | ($8,733) | $11,951 | ($3,269) | $8,682 | $4,341 |
| 20 | 2043 | $2,185 | $1,457 | $21,305 | ($8,995) | $12,310 | ($3,269) | $9,040 | $4,520 |
| 21 | 2044 | $2,229 | $1,486 | $21,944 | ($9,265) | $12,679 | ($3,269) | $9,410 | $4,705 |
| 22 | 2045 | $2,273 | $1,516 | $22,603 | ($9,543) | $13,059 | ($3,269) | $9,790 | $4,895 |
| 23 | 2046 | $2,319 | $1,546 | $23,281 | ($9,830) | $13,451 | ($3,269) | $10,182 | $5,091 |
| 24 | 2047 | $2,365 | $1,577 | $23,979 | ($10,124) | $13,855 | ($3,269) | $10,585 | $5,293 |
| 25 | 2048 | $2,412 | $1,608 | $24,698 | ($10,428) | $14,270 | ($3,269) | $11,001 | $5,501 |
| 26 | 2049 | $2,461 | $1,641 | $25,439 | ($10,741) | $14,698 | ($3,269) | $11,429 | $5,715 |
| 27 | 2050 | $2,510 | $1,673 | $26,203 | ($11,063) | $15,139 | ($3,269) | $11,870 | $5,935 |
| 28 | 2051 | $2,560 | $1,707 | $26,989 | ($11,395) | $15,593 | ($3,269) | $12,324 | $6,162 |
| 29 | 2052 | $2,611 | $1,741 | $27,798 | ($11,737) | $16,061 | ($3,269) | $12,792 | $6,396 |
| 30 | 2053 | $2,663 | $1,776 | $28,632 | ($12,089) | $16,543 | ($3,269) | $13,274 | $6,637 |
| 31 | 2054 | $2,716 | $1,811 | $29,491 | ($12,452) | $17,039 | - | $17,039 | $8,520 |
| 32 | 2055 | $2,770 | $1,847 | $30,376 | ($12,825) | $17,551 | - | $17,551 | $8,775 |
| 33 | 2056 | $2,825 | $1,884 | $31,287 | ($13,210) | $18,077 | - | $18,077 | $9,039 |
| 34 | 2057 | $2,882 | $1,922 | $32,226 | ($13,606) | $18,619 | - | $18,619 | $9,310 |
| 35 | 2058 | $2,940 | $1,960 | $33,193 | ($14,015) | $19,178 | - | $19,178 | $9,589 |
| 36 | 2059 | $2,998 | $1,999 | $34,188 | ($14,435) | $19,753 | - | $19,753 | $9,877 |
| 37 | 2060 | $3,058 | $2,039 | $35,214 | ($14,868) | $20,346 | - | $20,346 | $10,173 |
| 38 | 2061 | $3,119 | $2,080 | $36,271 | ($15,314) | $20,956 | - | $20,956 | $10,478 |
| 39 | 2062 | $3,182 | $2,121 | $37,359 | ($15,774) | $21,585 | - | $21,585 | $10,792 |
| 40 | 2063 | $3,245 | $2,164 | $38,479 | ($16,247) | $22,233 | - | $22,233 | $11,116 |
| 41 | 2064 | $3,310 | $2,207 | $39,634 | ($16,734) | $22,900 | - | $22,900 | $11,450 |
| 42 | 2065 | $3,377 | $2,251 | $40,823 | ($17,236) | $23,586 | - | $23,586 | $11,793 |
| 43 | 2066 | $3,444 | $2,296 | $42,047 | ($17,753) | $24,294 | - | $24,294 | $12,147 |
| 44 | 2067 | $3,513 | $2,342 | $43,309 | ($18,286) | $25,023 | - | $25,023 | $12,511 |
| 45 | 2068 | $3,583 | $2,389 | $44,608 | ($18,835) | $25,774 | - | $25,774 | $12,887 |
| 46 | 2069 | $3,655 | $2,437 | $45,946 | ($19,400) | $26,547 | - | $26,547 | $13,273 |
| 47 | 2070 | $3,728 | $2,485 | $47,325 | ($19,982) | $27,343 | - | $27,343 | $13,672 |
| 48 | 2071 | $3,803 | $2,535 | $48,745 | ($20,581) | $28,164 | - | $28,164 | $14,082 |
| 49 | 2072 | $3,879 | $2,586 | $50,207 | ($21,198) | $29,008 | - | $29,008 | $14,504 |
| 50 | 2073 | $3,956 | $2,637 | $51,713 | ($21,834) | $29,879 | - | $29,879 | $14,939 |
| 51 | 2074 | $4,035 | $2,690 | $53,264 | ($22,489) | $30,775 | - | $30,775 | $15,388 |
| 52 | 2075 | $4,116 | $2,744 | $54,862 | ($23,164) | $31,698 | - | $31,698 | $15,849 |
| 53 | 2076 | $4,198 | $2,799 | $56,508 | ($23,859) | $32,649 | - | $32,649 | $16,325 |
| 54 | 2077 | $4,282 | $2,855 | $58,204 | ($24,575) | $33,629 | - | $33,629 | $16,814 |
| 55 | 2078 | $4,368 | $2,912 | $59,950 | ($25,312) | $34,638 | - | $34,638 | $17,319 |
| 56 | 2079 | $4,455 | $2,970 | $61,748 | ($26,071) | $35,677 | - | $35,677 | $17,838 |
| 57 | 2080 | $4,544 | $3,030 | $63,601 | ($26,854) | $36,747 | - | $36,747 | $18,373 |
| 58 | 2081 | $4,635 | $3,090 | $65,509 | ($27,659) | $37,849 | - | $37,849 | $18,925 |
| 59 | 2082 | $4,728 | $3,152 | $67,474 | ($28,489) | $38,985 | - | $38,985 | $19,492 |
| 60 | 2083 | $4,822 | $3,215 | $69,498 | ($29,344) | $40,154 | - | $40,154 | $20,077 |
| 61 | 2084 | $4,919 | $3,280 | $71,583 | ($30,224) | $41,359 | - | $41,359 | $20,680 |
| 62 | 2085 | $5,017 | $3,345 | $73,730 | ($31,131) | $42,600 | - | $42,600 | $21,300 |
| 63 | 2086 | $5,117 | $3,412 | $75,942 | ($32,065) | $43,878 | - | $43,878 | $21,939 |
| 64 | 2087 | $5,220 | $3,480 | $78,221 | ($33,026) | $45,194 | - | $45,194 | $22,597 |
| 65 | 2088 | $5,324 | $3,550 | $80,567 | ($34,017) | $46,550 | - | $46,550 | $23,275 |
| 66 | 2089 | $5,431 | $3,621 | $82,984 | ($35,038) | $47,946 | - | $47,946 | $23,973 |
| 67 | 2090 | $5,539 | $3,693 | $85,474 | ($36,089) | $49,385 | - | $49,385 | $24,692 |
| 68 | 2091 | $5,650 | $3,767 | $88,038 | ($37,172) | $50,866 | - | $50,866 | $25,433 |
| 69 | 2092 | $5,763 | $3,843 | $90,679 | ($38,287) | $52,392 | - | $52,392 | $26,196 |
| 70 | 2093 | $5,879 | $3,919 | $93,400 | ($39,435) | $53,964 | - | $53,964 | $26,982 |
| 71 | 2094 | $5,996 | $3,998 | $96,202 | ($40,618) | $55,583 | - | $55,583 | $27,792 |
| 72 | 2095 | $6,116 | $4,078 | $99,088 | ($41,837) | $57,251 | - | $57,251 | $28,625 |
| 73 | 2096 | $6,238 | $4,159 | $102,060 | ($43,092) | $58,968 | - | $58,968 | $29,484 |
| 74 | 2097 | $6,363 | $4,242 | $105,122 | ($44,385) | $60,737 | - | $60,737 | $30,369 |
| 75 | 2098 | $6,490 | $4,327 | $108,276 | ($45,716) | $62,559 | - | $62,559 | $31,280 |
| 76 | 2099 | $6,620 | $4,414 | $111,524 | ($47,088) | $64,436 | - | $64,436 | $32,218 |
| 77 | 2100 | $6,753 | $4,502 | $114,870 | ($48,501) | $66,369 | - | $66,369 | $33,185 |
| 78 | 2101 | $6,888 | $4,592 | $118,316 | ($49,956) | $68,360 | - | $68,360 | $34,180 |
| 79 | 2102 | $7,025 | $4,684 | $121,865 | ($51,454) | $70,411 | - | $70,411 | $35,206 |
| 80 | 2103 | $7,166 | $4,778 | $125,521 | ($52,998) | $72,523 | - | $72,523 | $36,262 |
| 81 | 2104 | $7,309 | $4,873 | $129,287 | ($54,588) | $74,699 | - | $74,699 | $37,350 |
| 82 | 2105 | $7,456 | $4,971 | $133,165 | ($56,225) | $76,940 | - | $76,940 | $38,470 |
| 83 | 2106 | $7,605 | $5,070 | $137,160 | ($57,912) | $79,248 | - | $79,248 | $39,624 |
| 84 | 2107 | $7,757 | $5,172 | $141,275 | ($59,650) | $81,626 | - | $81,626 | $40,813 |
| 85 | 2108 | $7,912 | $5,275 | $145,513 | ($61,439) | $84,074 | - | $84,074 | $42,037 |
| 86 | 2109 | $8,070 | $5,381 | $149,879 | ($63,282) | $86,597 | - | $86,597 | $43,298 |
| 87 | 2110 | $8,232 | $5,488 | $154,375 | ($65,181) | $89,195 | - | $89,195 | $44,597 |
| 88 | 2111 | $8,396 | $5,598 | $159,006 | ($67,136) | $91,870 | - | $91,870 | $45,935 |
| 89 | 2112 | $8,564 | $5,710 | $163,777 | ($69,150) | $94,627 | - | $94,627 | $47,313 |
| 90 | 2113 | $8,736 | $5,824 | $168,690 | ($71,225) | $97,465 | - | $97,465 | $48,733 |
| 91 | 2114 | $8,910 | $5,941 | $173,751 | ($73,361) | $100,389 | - | $100,389 | $50,195 |
| 92 | 2115 | $9,089 | $6,059 | $178,963 | ($75,562) | $103,401 | - | $103,401 | $51,700 |
| 93 | 2116 | $9,270 | $6,181 | $184,332 | ($77,829) | $106,503 | - | $106,503 | $53,251 |
| 94 | 2117 | $9,456 | $6,304 | $189,862 | ($80,164) | $109,698 | - | $109,698 | $54,849 |
| 95 | 2118 | $9,645 | $6,430 | $195,558 | ($82,569) | $112,989 | - | $112,989 | $56,495 |
| 96 | 2119 | $9,838 | $6,559 | $201,425 | ($85,046) | $116,379 | - | $116,379 | $58,189 |
| 97 | 2120 | $10,035 | $6,690 | $207,467 | ($87,597) | $119,870 | - | $119,870 | $59,935 |
| 98 | 2121 | $10,235 | $6,824 | $213,691 | ($90,225) | $123,466 | - | $123,466 | $61,733 |
| 99 | 2122 | $10,440 | $6,960 | $220,102 | ($92,932) | $127,170 | - | $127,170 | $63,585 |
| **Total** | | **$5,033M** | **$3,356M** | **$7,152M** | **($3,020M)** | **$4,132M** | **($98M)** | **$4,034M** | **$2,017M** |
| **NPV** | | **$166M** | **$111M** | | | | | **$248M** | **$124M** |

# Ground Rent vs Ground Rent & % Participation
Financial Analysis

## Scenario 1: Ground Rent Only

| Ground Rent | | NPV | $1.0M | $1.5M | $2.0M | $2.5M | $3.0M |
|---|---|---|---|---|---|---|---|
| GR | 4% | | $192M | $289M | $385M | $481M | $577M |
| Discount | 5% | | $111M | $166M | $221M | $276M | $332M |
| Rate | 6% | | $69M | $103M | $137M | $171M | $206M |
| | 7% | | $46M | $69M | $92M | $115M | $138M |

| CPI Reset (10-Year CAGR Cap) | | NPV | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|---|---|
| Annual | 2.5% | | $108M | $134M | $169M | $217M | $284M |
| GR | 2.0% | | $87M | $106M | $131M | $166M | $213M |
| Escalations | 1.5% | | $72M | $86M | $104M | $129M | $162M |

## Scenario 2: Part Ground Rent & % Participation

| Ground Rent | | GR NPV | $500K | $750K | $1.00M | $1.25M | $1.50M |
|---|---|---|---|---|---|---|---|
| GR | 4% | | $192M | $241M | $289M | $337M | $385M |
| Discount | 5% | | $111M | $138M | $166M | $193M | $221M |
| Rate | 6% | | $69M | $86M | $103M | $120M | $137M |
| | 7% | | $46M | $57M | $69M | $80M | $92M |

| CPI Reset (10-Year CAGR Cap) | | GR NPV | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
|---|---|---|---|---|---|---|---|
| Annual | 2.5% | | $72M | $89M | $113M | $145M | $189M |
| GR | 2.0% | | $58M | $71M | $88M | $111M | $142M |
| Escalations | 1.5% | | $48M | $57M | $69M | $86M | $108M |

| Gross Rent (PSF) | | % Partic. NPV | $80 | $85 | $90 | $95 | $100 |
|---|---|---|---|---|---|---|---|
| % Partic. | 5.0% | | $122M | $123M | $124M | $124M | $125M |
| Discount | 7.5% | | $57M | $57M | $57M | $58M | $58M |
| Rate | 10.0% | | $34M | $34M | $34M | $35M | $35M |
| | 12.5% | | $24M | $24M | $24M | $24M | $24M |

| LTC / Loan Amount | | % Partic. NPV | 70% / $53M | 65% / $49M | 60% / $45M | 55% / $41M | 50% / $38M |
|---|---|---|---|---|---|---|---|
| Interest | 5% | | $34M | $35M | $36M | $37M | $39M |
| Rate | 6% | | $32M | $33M | $35M | $36M | $37M |
| (Fixed) | 7% | | $30M | $32M | $33M | $34M | $36M |
| | 8% | | $28M | $30M | $31M | $33M | $34M |

| % Participation | | % Partic. NPV | 40% | 45% | 50% | 55% | 60% |
|---|---|---|---|---|---|---|---|
| I&E | 4% | | $34M | $39M | $43M | $47M | $51M |
| Growth | 3% | | $28M | $31M | $35M | $38M | $42M |
| Rate | 2% | | $23M | $26M | $28M | $31M | $34M |

| Conversion / Renovation Costs | | % Partic. NPV | $125M | $100M | $75M | $50M | $25M |
|---|---|---|---|---|---|---|---|
| Interest | Interest Only | | $24M | $30M | $35M | $40M | $45M |
| Rate | 30-Yr. Self-Amort. | | $28M | $32M | $37M | $41M | $46M |

## Scenario 1 vs. Scenario 2

| Valuation | | Sc. 1 vs. 2 NPV | $20M | $30M | $40M | $50M | $60M |
|---|---|---|---|---|---|---|---|
| % Partic. | 8% | | $111M / $107M | $166M / $162M | $221M / $218M | $276M / $273M | $332M / $328M |
| Discount | 10% | | $111M / $90M | $166M / $145M | $221M / $201M | $276M / $256M | $332M / $311M |
| Rate | 12% | | $111M / $81M | $166M / $136M | $221M / $192M | $276M / $247M | $332M / $302M |

| Ground Rent | | Sc. 2 NPV | $1.00M | $1.10M | $1.20M | $1.30M | $1.40M |
|---|---|---|---|---|---|---|---|
| % CF | 70% | | $159M | $170M | $181M | $192M | $203M |
| Participation | 60% | | $152M | $163M | $174M | $185M | $196M |
| | 50% | | $145M | $156M | $167M | $178M | $189M |

# <u>Ground Rent</u> vs <u>Ground Rent & % Participation</u>

Financial Analysis

**Scenario 1 vs Scenario 2: Cash Flow Comparison**

**Scenario 2: Part Ground Rent & % Participation - Nominal Cash Flows**

**Scenario 2: Part Ground Rent & % Participation - Discounted Cash Flows**



| From: | Woody Heller |
|---|---|
| To: | Troy Taylor; Michael Sklar; Sharan Sklar; ritasklar@gmail.com |
| Subject: | Update #9 |
| Date: | Wednesday, April 26, 2023 12:22:42 AM |
| Attachments: | image001.png |
| | 1031 Exchange - Sample Portfolio.pdf |

**Bidder Update:**

The following bidder numbers correspond with the bid sheet you previously received.

#1: They are probably out not because they are only interested in an outright purchase to convert to condos, but because they insist that we bear the cost and overrun risk of the façade repair. They are the only group with this requirement.

#2: they were only interested in condos and an outright sale, and their pricing was in the low $50Ms. When I spoke to them today, I convinced them to price the project as multifamily and asked them to come back to me before 5pm tomorrow with their pricing based on a $20M and 85/90% prepayment. They also control a LOT of properties around the country that could work for a 1031 exchange.

#3: They are only interested in the leasehold / condo structure that Rick Wolfe says is too aggressive for us to pursue. They are not interested in an outright purchase, so unless Rick changes his view, I don't think there's a path forward with this group.

#4: They are eager to purchase the properties and have made one of the higher offers. They have offered a recently completed and leased multifamily building in Brooklyn which I am touring Wednesday morning.

#5: They are eager to purchase the building and called me again yesterday to reiterate their interest and understand the timing of our process going forward. Their pricing as an outright purchase for a condo conversion is $60M with a stretch price to $65M. The issue with their offer, however, is that their business plan involves putting two additional floors on the roof of the building, and that requires landmark approval. Before going hard, they want to get verbal approval on a staff level from landmarks. This requires preparation of architectural plans to show landmarks, that whole process will take 6+ weeks. They don't want to go forward with this in a hard second round process given the associated cost and time commitment required. That therefore limits our options on how we go forward with this group.

#6: They rang me yesterday to better understand how the deposit is handled in a hard second round, which they now understand . They strongly prefer to purchase the building and are looking at it as a conversion to multifamily ("MF") on the bottom half and condo on the top half. They propose that we split the building into two separate condo units – MF on bottom and condo on top. They will start the conversion process under a ground lease structure on both condo units, and once the MF unit is completed and leased, they propose to swap fee simple ownership of the entire unfinished building for the finished MF condo unit on the bottom half of the building. I think we touched on this structure with Rick but would need to discuss it further with him as he said he wanted some time to reflect on it further.

#7: They have looked at the building multiple ways, and I've spoken to them several times on Friday, over the weekend, yesterday, and today. They originally proposed condo apartments on floors 9-16, and MF apartments on floors 2-8. That didn't move their price meaningfully above their $50M bid. They then explored MF only, with lower conversion costs for MF rather than condo finishes. That also didn't result in a higher bid. They've agreed to stretch to $52.5M for an outright purchase, but that's as high as they'll go. Separately, they suggested a JV structure which is outlined below.

EXHIBIT 2 PAGE 121

BR000206

#8: They are only interested in purchasing the building because they think the real estate taxes compromise the value of the building as a MF leasehold, which is true. They would buy it now, or in two years subject to an interim ground lease, and their pricing has increased from their original offer of $54M to $60M or possibly low $60Ms.

#9: They have been hard to reach as they were awarded the development contract on one of Signature Bank's large conversion projects in NYC, which will be publicly announced shortly. Having said that, they claim to have capacity for both and say that their money partner is still committed. They've already underwritten the ground lease with a $20M prepayment, but I've asked them to see if they can prepay 85/90% of the ground lease value. I asked them to get back to me tomorrow before 5pm, and there's a chance they will.

#10: This group is struggling with not having a purchase option, which apparently their funding source requires. I've asked them to price the ground lease with a purchase option on 30% when basis of that interest steps up. I've also told them we need a $20M prepayment and asked them to price an 85/90% prepayment, as well as an outright purchase. I'm waiting to hear back from them on all scenarios.

#11: They came back to tour the property last Monday and said they'd be submitting an updated offer. I emailed them again last Friday and haven't yet heard back. They think our ground lease terms are too aggressive, I'll continue to seek their feedback.

#12: This is the group that was hoping to attract a new capital source that would enable them to increase their offer from $38M to $55-60M after Passover. When I spoke to them yesterday, they said that their capital source declined, saying that our pricing is too "rich" compared to other properties they're seeing become available in the market and concern over the complexities of the ground lease. I said that we were considering an outright sale, particularly since they have a large stable of 1031 type properties, but they said their investors have mentally moved on and wasn't sure if they'd still be interested. Given their prior interest level at $38M to purchase and $32M to lease, I said we'd come back to them is we're interesting in pursuing it further.

#13: They bid $30M for the ground lease and have four captive discretionary funds, so no issue raising the capital. I went back to them trying to increase their pricing to at least $50M for the leasehold, and after a week or two of consideration they confirmed that they cannot increase they offer.

#14: They reached out to me again this morning to see where things stand. Their offer is $45M as a ground lease, less free rent during the conversion period, which could mean 2-4 years or $4.5 – 9M. The resultant net pricing of the leasehold at $36-40M seems uncompetitive with the rest of the market, although they have the cash and don't need financing. They could prepay $20M without issue, I didn't push them about an 85/90% prepayment because I think their pricing is too low but am happy to go back to them if we'd consider their offer.

#15: I have not pursued them further given that their offer is the lowest at $23M to purchase and $17M for the leasehold. They subsequently said they might be able to push to $30-35M for the leasehold, possibly with some form of backend kicker and without the purchase option, but again, I didn't push them to pursue it further given their pricing.

#16: They are eager to purchase and have $40M of 1031 cash from another sale but need to purchase not lease. Their offer was $62M and I think they would stretch to $65M. They've done very little due diligence, and I think underestimate the cost of the work required.

#17: They offered $30M either as an outright purchase or as a leasehold, and I had lunch with their agent last Friday to search for ways for them to increase their offer. They also have incoming 1031

BR000207

EXHIBIT 2 PAGE 122

cash from another sale of between $80 and $90M. They strike me as inexperienced and a bit naïve, so I wouldn't want to lease to them, but would consider selling to them if their price became competitive.

#18: This is the Gural family who we've discussed at length before. Their offer is $30M either as an outright purchase as a lease with a lower ground rent but a cash flow participation.

#19: They are interested in an office renovation, not a conversion, and bid $40M for the ground lease, indicating that they might be able to stretch to ~$45M depending on what financing terms are available. They have the financial capability to do a prepayment, but I haven't asked them about an 85/90% prepayment. My last email to them on Friday asked them whether they could increase their price for an outright purchase and they said yes but haven't responded yet to my request for a more specific answer. I'm waiting to hear back from them on that as well as the 85/90% prepayment.

#20: I've spoken to them several times during the last week and was with them last Thursday. They remain interested in moving forward but only at $30M and have no interest in increasing their price.

#21: @$28M, I haven't pursued them further.

## 1031 Options:

I have been in touch with the leading firm that specializes in 1031 exchange properties across the country. I was very impressed with their approach and think they can be extremely helpful. They helped a friend of mine find dozens of properties for his family and my friend was extremely happy with the results. I'm attaching a brochure which explains the 1031 rules, their process for identifying properties, and a sample portfolio they assembled for an unnamed client. I'd be happy to set up a call with them to discuss this further. In addition, and as we've discussed, I've asked the bidders to identify properties they have which might be appropriate 1031 exchange properties, one of which I'm touring Wednesday morning.

## JV Structures:

As mentioned above, bidder #7 has proposed an alternate to an outright purchase or ground lease. This involves us contributing the building and them providing the additional capital (debt & equity) needed for a MF conversion. They would pay us $20M at closing, perhaps as a loan for tax protection (to be discussed with Rick). When the conversion is completed and the building is leased, we could theoretically refinance the property at an amount which would enable us to buy out the developer's interest (repay their $20M prepayment to us and provide a return on their equity), and we would then have a finished income-producing apartment building with a 60-65% LTV mortgage. Virtually every bidder would consider some version of this structure if it's something we would consider. Note that in this structure, they run the conversion and initial renting of the building, and as a passive partner with limited control rights, we share the development risk. This is not entirely different than the risk of us subordinating our fee interest to a construction lender, as Troy correctly explained earlier. We can discuss this further on our next call.

I hope this is helpful.

---

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

BR000208

EXHIBIT 2 PAGE 123

| From: | Woody Heller |
|---|---|
| To: | Sharan Sklar; Michael Sklar; ritasklar@gmail.com |
| Subject: | 95 Mad - Update #10 |
| Date: | Friday, May 19, 2023 9:52:43 PM |
| Attachments: | image001.png |

Based on my follow up discussions with the various bidders, below is where things stand at present:

**Outright Sale:**

- Bidders seeking to purchase @$70M:
  - #9:
    - Due diligence: 3-4 weeks
    - Close: "whenever we want"
    - Deposit: 10%
    - Equity: has his equity partner in place
    - He's willing to participate in a hard second round – meaning competing simultaneously with other bidders and signing an unconditional contract and posting a hard deposit when final bids are submitted
    - Conditions: vacant possession
  - #4:
    - Due diligence: requested 60-90 days, but they're willing to participate in a shorter hard second round, so presumably 30-60 days
    - Close: requested 90 days
    - Deposit: 10%
    - Equity: will put up 20% of the equity themselves, need additional third-party equity
    - Conditions: nothing mentioned
- Bidders seeking to purchase @$60M+
  - #5:
    - Price: $65M
    - Due diligence: 45-60 days because need verbal landmarks approval to add additional floors
    - Closing: 90 days after DD, or 30 days after vacant possession
    - Deposit: $3M but should be willing to increase
    - Conditions: vacant possession
    - Not willing to participate in a hard second round
  - #8:
    - Price: $60M+
    - DD: probably 30 days
    - Closing 60 days
    - Deposit: 5-10%
    - Conditions: not specified
    - Willing to participate in hard second round
  - #16
    - Price: ~$65M
    - DD: not specified
    - Closing: will be guided by his 1031

- Deposit: will be guided by me
  - Conditions: not specified
  - Probably willing to participate in a hard 2nd round
  - Issues: facing foreclosure on another property
- Bidders seeking to purchase @$50M+
  - #6
    - Price: $50-60M
    - Exasperated by process, won't run additional assumptions / scenarios w/o our decision on deal structure
    - They anticipated making a staged payment of the price, not a full payment at closing
  - #7
    - $52M
    - Multiple 1031 options available
  - #2
    - ~$50M
  - #17
    - $50M
- **Bidders seeking to ground lease @$40M+**
  - #9
    - $60M – starting rent of $3M
    - Prepymt: $20M, possibly $25M
    - Insists we subordinate to construction lender, not permanent lender
    - Conditions: vacant possession
  - #2
    - $55M
    - **Prepymt: $50M** (this is >90% and has to be approved by Rick Wolfe)
    - Starting rent: $250K based on remaining $5M of price that is not prepaid
    - DD: 60 days to: finalize DD, negotiate the ground lease, negotiate their JV w/partner, prepare for their internal investment committee approval.
    - Deposit: 10% but can't post until have IC approval in 60 days
    - Close: later of 30 days after DD or complete ground lease
    - **Financing: not needed for the $50M pymt at ground lease signing.**
    - **Subordination: we will have to subordinate to their construction lender, but that subordination would expire upon stabilization or refi w/permanent lender. Additionally, as Rick said, if we're largely prepaid, the subordination risk is minor.**
    - Conditions: **not insisting on vacant possession**
    - Hard 2nd round: yes but: 60 days, they win if they perform per the outline above, and we give them draft ground lease at the start of the process which determine is reasonable.
  - #7
    - ~$50M
    - Willing to do the complicated condo/leasehold structure that Rick advises against

BR000006

EXHIBIT 2 PAGE 125

- #19
  - $45M
  - Prepymt: whatever % we want. They completed a 85/90% 467 lease recently
  - DD: 30 days
  - Closing: 45 days after DD
  - Conditions: they want to feel comfortable that construction financing is available
  - Process: hard 2nd round ok if only seeking bids for office use. If we change our minds we have to reimburse their costs
- TFC - #14
  - $45M
  - Prepymt: whatever % we want.
  - Free rent: 2-4 year during construction, but with a 90% prepymt, that doesn't represent a large sum
  - Conditions: none specified
  - Process: originally said no to hard 2nd round
- Banyan - #10
  - 3 options below, all based on the following:
    - 99 year lease
    - No free rent
    - Standard ground rent increases
    - Partial prepymts possible, none specified
    - No conditions or contingencies other than DD & documentation
  - The options:
    1. 99-year ground lease with NO purchase option = **$1,900,000 annual ground rent**
    2. 99-year ground lease with purchase option in year 25 = **$2,075,000 annual ground rent**
    3. 99-year ground lease with purchase option at the earlier of 15 years or the passing of the mother = **$2,250,000 annual ground rent**

I think our best options are:
- An outright sale to:
  - Bidder #9 at $70M
  - Bidder #5 at $65M
- The heavily prepaid ground lease to:
  - Bidder #2 at $55M

Let's find a time to talk on Monday afternoon so we can plan a path forward. Have a nice weekend.

---

**Woody Heller**
Founding Partner

BRANTON REALTY

Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | ritasklar@gmail.com; Michael Sklar; Sharan Sklar |
| **Subject:** | 95 Mad - Update #11 |
| **Date:** | Friday, May 26, 2023 12:47:44 AM |
| **Attachments:** | image001.png |

In response to the questions and concerns raised earlier about the subordination feature in the $55M ground lease offer, made by bidder #2, with the $50M prepayment, I have convinced them to agree that we do **NOT have to subordinate** to the construction or permanent lender(s). This puts to rest the concerns about having our lease structure collapsed if the tenant defaults on their loan, because the lender(s) will NOT be able to foreclose on the land or collapse the ground lease. The lenders will be able to step into the tenant's position in the leasehold to defend themselves, and sell the leasehold to someone else, but the ground lease itself will NOT be disturbed. As a result, we should not have to worry about cost overruns or tenant defaults. Bidder #2 is continuing to perform their preliminary due diligence, so there may be some slippage in pricing, but they are the only bidder at this price level willing to make a 90% prepayment, not require vacant possession, and not require that we subordinate to the construction lender. Their amended offer is below.

- #2
  - $55M
  - **Prepymt: $50M** (this is >90% and has to be approved by Rick Wolfe)
  - Starting rent: $250K based on remaining $5M of price that is not prepaid
  - DD: 60 days to: finalize DD, negotiate the ground lease, negotiate their JV w/partner, prepare for their internal investment committee approval.
  - Deposit: 10% but can't post until have IC approval in 60 days
  - Close: later of 30 days after DD or complete ground lease
  - **Financing: not needed for the $50M pymt at ground lease signing.**
  - **Subordination:** we will **NOT** have to subordinate to their construction or permanent lender(s).
  - Conditions: **not insisting on vacant possession**
  - Hard 2nd round: yes but: 60 days, they win if they perform per the outline above, and we give them draft ground lease at the start of the process which determine is reasonable.

Provided their pricing holds and they get Investment Committee ("IC") approval, this appears to be the most attractive ground lease offer.

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar |
| **Cc:** | Sharan Sklar; Andrew K. Glenn; Sernau, Ronald D.; Rita Sklar |
| **Subject:** | RE: 95 Madison Disposition |
| **Date:** | Thursday, July 6, 2023 12:17:17 PM |
| **Attachments:** | 95 Madison - Update #11.pdf |
| | 95 Madison - Update #11 redline.pdf |
| | image001.png |

Per Michael's request, attached is an update of the last update (#10) which I sent on 5/19/23. I'm sending it in pdf both as a clean document and tracking changes from Update #10.

At this point, the bidders have responded to my multiple requests to revise their bids based on different structures and scenarios and are now pencils down until they hear how we wish to proceed with regard to structure and process.

Happy to discuss further.

**Woody Heller**
Founding Partner

**BRANTON REALTY**

Tel:        (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Sent:** Thursday, July 6, 2023 8:14 AM
**To:** Woody Heller <woody.heller@outlook.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>; Andrew K. Glenn <aglenn@glennagre.com>; Sernau, Ronald D. <RSernau@proskauer.com>; Rita Sklar <ritasklar@gmail.com>
**Subject:** RE: 95 Madison Disposition

Woody :

Please update spread sheet .

Michael Sklar

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

P A little green reminder: Please consider the environment before printing this email

**From:** Michael Sklar
**Sent:** Wednesday, July 5, 2023 11:12 AM
**To:** Woody Heller <woody.heller@outlook.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>; Sernau, Ronald D. <RSernau@proskauer.com>; Rita Sklar <ritasklar@gmail.com>
**Subject:** 95 Madison Disposition

Woody :

Please update the spreadsheet of interested parties and redistribute. Ron (cc'd) represents Rita .

Michael Sklar

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

P A little green reminder: Please consider the environment before printing this email

BR000130

EXHIBIT 2 PAGE 129

**95 Madison**
**New York, NY**

**<ins>Update #11 - 7/6/2023</ins>**

**Outright Sale:**
- Bidders seeking to purchase @$70M:
  - #9:
    - Due diligence: 3-4 weeks
    - Close: "whenever we want"
    - Deposit: 10%
    - Equity: has his equity partner in place
    - He's willing to participate in a hard second round – meaning competing simultaneously with other bidders and signing an unconditional contract and posting a hard deposit when final bids are submitted
    - Conditions: vacant possession
  - #4:
    - Due diligence: requested 60-90 days, but they're willing to participate in a shorter hard second round, so presumably 30-60 days
    - Close: requested 90 days
    - Deposit: 10%
    - Equity: will put up 20% of the equity themselves, need additional third-party equity
    - Conditions: nothing mentioned

- Bidders seeking to purchase @$60M+
  - #5:
    - Price: $65M
    - Due diligence: 45-60 days because need verbal landmarks approval to add additional floors
    - Closing: 90 days after DD, or 30 days after vacant possession
    - Deposit: $3M but should be willing to increase
    - Conditions: vacant possession
    - Not willing to participate in a hard second round
  - #8:
    - Price: $60M+
    - DD: probably 30 days
    - Closing 60 days
    - Deposit: 5-10%
    - Conditions: not specified
    - Willing to participate in hard second round
  - #16
    - Price: ~$65M
    - DD: not specified
    - Closing: will be guided by his 1031
    - Deposit: will be guided by me
    - Conditions: not specified
    - Probably willing to participate in a hard 2nd round
    - Issues: facing foreclosure on another property

1

BR000131

EXHIBIT 2 PAGE 130

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- UPDATE: I don't know the timing of his 1031 need, and whether 95 Mad is still a candidate to satisfy it.

- Bidders seeking to purchase @$50M+
  - #6
    - Price: $50-60M
    - Exasperated by process, won't run additional assumptions / scenarios w/o our decision on deal structure
    - They anticipated making a staged payment of the price, not a full payment at closing
  - #7
    - $52M
    - Multiple 1031 options available
  - #2
    - ~$50M
  - #17
    - $50M

- **Bidders seeking to ground lease @$40M+**
  - #9
    - $60M – starting rent of $3M
    - Prepymt: $20M, possibly $25M
    - Insists we subordinate to construction lender, not permanent lender
    - Conditions: vacant possession
    - UPDATE: I haven't spoken to them lately. During my last discussion, they found our structure complicated, and were frustrated by our lack of direction. I can go back to them again, but only with a final instruction of what we want to do.
  - #2
    - $55M
    - **Prepymt: $50M** (this is >90% and has to be approved by Rick Wolfe)
    - Starting rent: $250K based on remaining $5M of price that is not prepaid
    - DD: 60 days to: finalize DD, negotiate the ground lease, negotiate their JV w/partner, prepare for their internal investment committee approval.
    - Deposit: 10% but can't post until have IC approval in 60 days
    - Close: later of 30 days after DD or complete ground lease
    - **Financing: not needed for the $50M pymt at ground lease signing.**
    - **Subordination: we will have to subordinate to their construction lender, but that subordination would expire upon stabilization or refi w/permanent lender. Additionally, as Rick said, if we're largely prepaid, the subordination risk is minor.**
    - Conditions: **not insisting on vacant possession**
    - Hard 2nd round: yes but: 60 days, they win if they perform per the outline above, and we give them draft ground lease at the start of the process which determine is reasonable.

BR000132

EXHIBIT 2 PAGE 131

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- UPDATE: Sadly this offer has been withdrawn.  When I was negotiating it with them there were two DD items they needed to confirm: the efficiency of the apartment layouts and façade costs.  We agreed that if the façade costs were not >$5M it wouldn't change their bids.  Additionally, they were going to complete their apartment layouts and come back to me within a week.  Three weeks later they finally responded to say that the apartments were not as efficient as they had hoped, and that they had (finally) reached out to Marcus & Pollack, only to learn that real estate taxes would be higher than they had underwritten.  I was shocked that they hadn't already done their homework on RETs, and surprised that anything Marcus and Pollack told them would be different than what they would have underwritten.  They also told me that they had lost their equity partner.  As a result, their ground lease value fell from $55M to the low $40Ms.  I suggested almost three weeks ago that they come back to me based on a lower upfront prepayment of only $15-20M, per instruction from Michael and Sharan, but have not yet heard the result of that adjustment.  Instead I learned that the delay is the result of them finding a new potential partner who I toured through the building last Thursday.  I don't expect their revised bid to be competitive and I sense that Michael and Sharan have lost confidence in them.
  - #7
    - ~$50M
    - Willing to do the complicated condo/leasehold structure that Rick advises against
    - Are thinking about office & retail use on the first 8 floors, and condo above.  To do this we could break the building into two condo units, sell the top floors for the condo, and ground lease the bottom 8 floors.  They are smart and flexible with regard to structure.
  - #19
    - $45M
    - Prepymt: whatever % we want.  They completed a 85/90% 467 lease recently
    - DD: 30 days
    - Closing: 45 days after DD
    - Conditions: they want to feel comfortable that construction financing is available
    - Process: they know that their bid is not competitive with residential use.  Therefore, they're only willing to participate in a hard 2nd round if we're only seeking bids for office use.  If we change our minds and accept a bid based on residential use, we'll have to reimburse their deals costs related to participating in our process.
  - #14
    - $45M
    - Prepymt: whatever % we want.
    - Free rent: 2-4 year during construction, but with a 90% prepymt, that doesn't represent a large sum.  Some view the amount of the free rent as a reduction of the value of their lease

3

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- Conditions: none specified
- Process: originally said no to hard 2nd round
  - #10
    - 3 options below, all based on the following:
      - 99-year lease
      - No free rent
      - Standard ground rent increases
      - Partial prepymts possible, none specified
      - No conditions or contingencies other than DD & documentation
    - The options:
      1. 99-year ground lease with NO purchase option = **$1,900,000 annual ground rent = $38M**
      2. 99-year ground lease with purchase option in year 25 = **$2,075,000 annual ground rent = $40.15M**
      3. 99-year ground lease with purchase option at the earlier of 15 years or the passing of the mother = **$2,250,000 annual ground rent = $45M**

I thought our best options were:
- Outright sales to:
  - Bidder #9 & #4 at $70M
  - Bidder #5 at $65M
  - Bidder #8 at $60M+
- The heavily prepaid ground lease to:
  - Bidder #2 at $55M – which is no longer available

BR000134

EXHIBIT 2 PAGE 133

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

**Outright Sale:**
- Bidders seeking to purchase @$70M:
  - #9:
    - Due diligence: 3-4 weeks
    - Close: "whenever we want"
    - Deposit: 10%
    - Equity: has his equity partner in place
    - He's willing to participate in a hard second round – meaning competing simultaneously with other bidders and signing an unconditional contract and posting a hard deposit when final bids are submitted
    - Conditions: vacant possession
  - #4:
    - Due diligence: requested 60-90 days, but they're willing to participate in a shorter hard second round, so presumably 30-60 days
    - Close: requested 90 days
    - Deposit: 10%
    - Equity: will put up 20% of the equity themselves, need additional third-party equity
    - Conditions: nothing mentioned

- Bidders seeking to purchase @$60M+
  - #5:
    - Price: $65M
    - Due diligence: 45-60 days because need verbal landmarks approval to add additional floors
    - Closing: 90 days after DD, or 30 days after vacant possession
    - Deposit: $3M but should be willing to increase
    - Conditions: vacant possession
    - Not willing to participate in a hard second round
  - #8:
    - Price: $60M+
    - DD: probably 30 days
    - Closing 60 days
    - Deposit: 5-10%
    - Conditions: not specified
    - Willing to participate in hard second round
  - #16
    - Price: ~$65M
    - DD: not specified
    - Closing: will be guided by his 1031
    - Deposit: will be guided by me
    - Conditions: not specified
    - Probably willing to participate in a hard 2nd round
    - Issues: facing foreclosure on another property

1

BR000135

EXHIBIT 2 PAGE 134

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- UPDATE: I don't know the timing of his 1031 need, and whether 95 Mad is still a candidate to satisfy it.

**Formatted:** Indent: Left: 0.5", No bullets or

- **Bidders seeking to purchase @$50M+**
  - #6
    - Price: $50-60M
    - Exasperated by process, won't run additional assumptions / scenarios w/o our decision on deal structure
    - They anticipated making a staged payment of the price, not a full payment at closing
  - #7
    - $52M
    - Multiple 1031 options available
  - #2
    - ~$50M
  - #17
    - $50M

- **Bidders seeking to ground lease @$40M+**
  - #9
    - $60M – starting rent of $3M
    - Prepymt: $20M, possibly $25M
    - Insists we subordinate to construction lender, not permanent lender
    - Conditions: vacant possession
    - UPDATE: I haven't spoken to them lately. During my last discussion, they found our structure complicated, and were frustrated by our lack of direction. I can go back to them again, but only with a final instruction of what we want to do.
  - #2
    - $55M
    - **Prepymt: $50M** (this is >90% and has to be approved by Rick Wolfe)
    - Starting rent: $250K based on remaining $5M of price that is not prepaid
    - DD: 60 days to: finalize DD, negotiate the ground lease, negotiate their JV w/partner, prepare for their internal investment committee approval.
    - Deposit: 10% but can't post until have IC approval in 60 days
    - Close: later of 30 days after DD or complete ground lease
    - **Financing: not needed for the $50M pymt at ground lease signing.**
    - **Subordination: we will have to subordinate to their construction lender, but that subordination would expire upon stabilization or refi w/permanent lender. Additionally, as Rick said, if we're largely prepaid, the subordination risk is minor.**
    - Conditions: **not insisting on vacant possession**
    - Hard 2nd round: yes but: 60 days, they win if they perform per the outline above, and we give them draft ground lease at the start of the process which determine is reasonable.

2

EXHIBIT 2 PAGE 135

BR000136

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- UPDATE: Sadly this offer has been withdrawn. When I was negotiating it with them there were two DD items they needed to confirm: the efficiency of the apartment layouts and façade costs. We agreed that if the façade costs were not >$5M it wouldn't change their bids. Additionally, they were going to complete their apartment layouts and come back to me within a week. Three weeks later they finally responded to say that the apartments were not as efficient as they had hoped, and that they had (finally) reached out to Marcus & Pollack, only to learn that real estate taxes would be higher than they had underwritten. I was shocked that they hadn't already done their homework on RETs, and surprised that anything Marcus and Pollack told them would be different than what they would have underwritten. They also told me that they had lost their equity partner. As a result, their ground lease value fell from $55M to the low $40Ms. I suggested almost three weeks ago that they come back to me based on a lower upfront prepayment of only $15-20M, per instruction from Michael and Sharan, but have not yet heard the result of that adjustment. Instead I learned that the delay is the result of them finding a new potential partner who I toured through the building last Thursday. I don't expect their revised bid to be competitive and I sense that Michael and Sharan have lost confidence in them.

  o #7
    - ~$50M
    - Willing to do the complicated condo/leasehold structure that Rick advises against
    - Are thinking about office & retail use on the first 8 floors, and condo above. To do this we could break the building into two condo units, sell the top floors for the condo, and ground lease the bottom 8 floors. They are smart and flexible with regard to structure.

  o #19
    - $45M
    - Prepymt: whatever % we want. They completed a 85/90% 467 lease recently
    - DD: 30 days
    - Closing: 45 days after DD
    - Conditions: they want to feel comfortable that construction financing is available
    - Process: they know that their bid is not competitive with residential use. Therefore, they're only willing to participate in a hard 2nd round ok if we're only seeking bids for office use. If we change our minds and accept a bid based on residential use, we'll have to reimburse their deals costs related to participating in our process.

  o #14
    - $45M
    - Prepymt: whatever % we want.
    - Free rent: 2-4 year during construction, but with a 90% prepymt, that doesn't represent a large sum. Some view the amount of the free rent as a reduction of the value of their lease

**95 Madison**
**New York, NY**

**Update #11 - 7/6/2023**

- Conditions: none specified
- Process: originally said no to hard 2nd round
  - #10
    - 3 options below, all based on the following:
      - 99-year lease
      - No free rent
      - Standard ground rent increases
      - Partial prepymts possible, none specified
      - No conditions or contingencies other than DD & documentation
    - The options:
      1. 99-year ground lease with NO purchase option = **$1,900,000 annual ground rent = $38M**
      2. 99-year ground lease with purchase option in year 25 = **$2,075,000 annual ground rent = $40.15M**
      3. 99-year ground lease with purchase option at the earlier of 15 years or the passing of the mother = **$2,250,000 annual ground rent = $45M**

I ~~think~~ thought our best options ~~we~~are:
- ~~An O~~outright sale~~s~~ to:
  - Bidder #9 & #4 at $70M
  - Bidder #5 at $65M
  - Bidder #8 at $60M+
- The heavily prepaid ground lease to:
  - Bidder #2 at $55M – which is no longer available

4

| From: | Woody Heller |
|---|---|
| To: | Michael Sklar; Sharan Sklar; ritasklar@gmail.com; Sernau, Ronald D.; Andrew K. Glenn |
| Subject: | 95 Mad - Update #12 & Revised Bid Instructions |
| Date: | Thursday, August 3, 2023 3:14:39 PM |
| Attachments: | image001.png |

Based on the feedback from the interested bidders, there are no material changes since the revision to Update #11 sent 7/6/2023. Nevertheless, please note the following:

- As included in the Update #11 revision, and as we've discussed, the most relevant change from Update #11 is that the ground lease offer from bidder #2 has been reduced from $55M to the low $40Ms. In addition, and as shown in update #11, the $60M ground lease offer from bidder #9 requires that the ground lease subordinate to the construction loan, which negates its appeal. The next highest ground lease offer is $45M from bidder #19, but it requires that if a residential offer is accepted, then the seller must refund that bidder's due diligence costs.
- Therefore, as mentioned in Rick Wolfe's email on 7/14/2023, if an outright sale at $70M results in after tax proceeds of ~$53M (plus the tax savings discussed with Berdon last Friday), "then I don't see why, from a purely economic perspective, we'd do a ground lease at $50M." And as mentioned above, our acceptable ground lease offers are below $50M.

The updated Bid Process is outlined below:

1. The intent is that the process will commence tomorrow – Friday 8/4 or Monday 8/7, provided the contract is ready.
2. The targeted bid date is Thursday 9/14, the day before the eve of Rosh Hashanah.
3. The bids will be unconditional, meaning not subject to further conditions or due diligence.
4. Each prospective purchaser will submit their bid by executing an unconditional contract inclusive of their financial terms.
5. The process will commence with each bidder receiving bid instructions and the purchase contract which Fried Frank is close to completing, although as of this morning, a lease document remains outstanding.
6. By the end of the first week, bidders are invited to submit their contract comments, if any.
7. By the end of the second week, bidders should receive a revised contract inclusive of whatever comments are acceptable to seller.
8. During the process, bidders are to complete their due diligence and compose their capstack, as needed.
9. On the bid date, bidders will submit their executed, unconditional contract, inclusive of their financial terms – price, etc., together with a $1 million initial deposit.
10. The seller's process to select the winning bidder, if any, will be based on a number of factors, including: ability to close, price, deposit amount, additional contract comments, if any, etc.
11. Once selected, the winning bidder will have three (3) business days to post the balance of their full deposit (the contract will stipulate not less than 10%). If they don't perform, the initially selected bidder will forfeit their initial deposit, and the seller will select a replacement bidder and repeat the above process.
12. Once the full deposit is received, the seller will countersign the contract and the initial deposits will be returned to the other bidders.
13. The countersigned contract will then be submitted to the bankruptcy court for approval.
14. Once the contract has been approved, the process will proceed towards closing per the timing stipulated in the contract.

15. The bid instructions will include the following caveat: "**Please note that the seller will not be bound to proceed with any proposed transaction unless and until the seller executes and unconditionally delivers a counterpart of a definitive agreement, and, accordingly, the seller reserves the right not to proceed with any transaction in the seller's sole and absolute discretion.**"

Kindly confirm, by vote of the general partners, that Branton Realty is authorized to proceed with the process outlined above for the outright sale of 95 Madison Avenue. Thank you.

---

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR000010

EXHIBIT 2 PAGE 139

| From: | Woody Heller |
|-------|--------------|
| To: | Michael Sklar; Sharan Sklar; Andrew K. Glenn |
| Subject: | Update #13 |
| Date: | Monday, September 11, 2023 7:35:48 PM |
| Attachments: | image001.png |

Below is an update on where things stand with the second round, the active bidders, pricing, and the shift in market sentiment.

We originally sent bidding invitations to the following five groups:

- Somerset – Out, were @$70M+
    - They were one of the groups who pursued us aggressively even before we launched our formal marketing effort last November. They bid $70M in the first round and verbally indicated they could go a little higher. However, when they saw the terms of the second-round bid, and that they'd actually have to put money at risk while they tried to find their equity and debt, they backed out, just as I'd expected. Better that we found out now and not wait around for another 60-90 days, which is the DD time period they'd requested.
- JDS - $70M
    - Michael (Bumpy Ride) has been unusually difficult to communicate with but he confirmed this price with me again today. Apparently his 9-year-old is in the hospital in Boston with a neurological problem which he's been dealing with for several weeks. He had said he could go hard in three weeks, would put up a 10% deposit, and close in 60-90 days, but of course his contract markup didn't reflect these terms, to which he replied that "his team was working off an old term sheet". I've asked him to revise his contract and resubmit, but that hasn't happened. He's our highest price, and does get things done, he's just impossible to deal with, and hence the nickname. I will keep pursuing him but it's hard to predict what will happen.
- Arcade – Out, were @$60-65M
    - They found a new investor who I toured through the building the second week of August. In the course of their recent DD review, they sought feedback from a façade contractor (I've asked for the name) who gave them the following feedback:
        - "I received feedback from a top-notch façade consultant that specializes in terra cotta restorations. They reviewed the files in detail and did a visual inspection with binoculars from the street. Their opinion is that the repair and restoration will be a massive amount of time and money (3 years, $30 million). We are also concerned that no matter how much we put into the repair, there will likely be lawsuits from the ultimate buyers of the condo units (even if we have them sign a waiver for certain construction defects). While the building remains of interest, after we risk-adjust for façade/construction risks and higher costs of borrowing we are nowhere close to $60 million. We would also require a DD period to hang scaffolding to do a more comprehensive study of the façade, particularly the mansard roof and dormers."
- Soho Props – Probably out, were @$60M+
    - As I've mentioned before, Sharif had told me that he had a $40M 1031 need and was very eager to buy the building. I've since learned that isn't the case and I doubt both that he'll get attorney general approval to get the money for the non-profit he claims

to be working with, and second, I don't think he was successful in finding an investor to fund the balance of the purchase, based on the fact that he hasn't returned my calls or responded to my emails in the last two weeks. So, unless something changes, I think he's out.

- Banyan – Tentative @$60M+
  - They have been very skeptical about whether we're real sellers, given the multiple bid iterations and timing delays. As a result, they would not markup the contract, and it took a lot of effort to get their contract comments, which struck me as not even applying to this building. So at best they'll sign a term sheet subject to a DD review period, and maybe a refundable deposit, which I think is meaningless since it's refundable. When I emailed the CEO again last night, after speaking to him at the beginning of last week, he said they'd have feedback for me today, which I've yet to receive but have reached out to the deal contact to check on their timing.

Then during the Second-round two groups that previously bid have re-emerged:

- Empire - $?
  - They made two offers prior to our March 16th first-round bid date, but then didn't bid in the first round because their pricing was too low. I've stayed in touch with them steadily and they've now identified two new equity partners interested in condo conversions. I've tour with both of them in the last few weeks and hopefully at least one will come forward with an offer, but it won't be this week. I've told them pricing will be in the $60-70M range, consistent with the other bids.
- Bash/Skylight - $60M
  - They were previously only interested in a ground lease because it required less upfront cash, but this was based on the incorrect assumption that they could create a condo with a ground lease, which Rick Wolfe confirmed is not the case. I did not initially send them a bidding invitation because they weren't interested in an outright purchase, but after going back to them, I've gotten them to re-engage on that basis, and they claim their pricing hasn't changed from roughly $60M.

In the last few weeks, I've found a few new active bidders while I continue searching for others:

- Williams
  - Williams, the real estate service company was purchased by Colliers several years ago, but the family that owned Williams still owns a portfolio of prewar buildings around the city with their original group of investors. Most specifically they own 79 Madison Avenue, which had a large lease to WeWork who is now trying to vacate. This will create a large vacancy, which leads them to consider converting their building, and I'm trying to convince them that it's accretive to combine 79 with 95 Madison and convert them both together. They came to see the building last week and have come back with a series of questions which I've answered. I expect them to give me a sense of their pricing on Thursday, but nothing more than at that time. They toured the building with Shop Architects who are studying the plans to search for ways to make combining the floorplates collectively more efficient. At this point I have much more information about the relevant zoning nuances, which they are absorbing and confirming for themselves based on the information I've provided. These details are important because they create many important benefits, as Sharan and Karen heard when they toured with me after the Mayor's announcement.

BR000235

EXHIBIT 2 PAGE 141

- Azur
  - They used to be called DDG, but for reasons they haven't yet shared, they rebranded as Azur. They previously focused on new-construction condominiums, but are now interested in conversions, and have recently bought two, one in NYC and one in Miami. The CEO is a good friend of mine and shared with me that when they went out to raise equity and debt, they only got debt quotes from one lender, and on one of the two projects, they got no equity offers and had to put up all the equity themselves. They first saw 95 Mad last Wednesday and I hope to get a sense of their pricing by Thursday.
- Albert Sultan
  - This is the broker that reached out to Michael. He had represented the buyer of 149 Madison, so I contacted the selling broker on that property, who is a friend and gave me a favorable recommendation of Albert. He is representing a different buyer than the one on 149 Mad, and this tenant needs 70-100K sqft for their own occupancy and will lease out the balance. He's in the early stages but will hopefully continue to make progress.
- City Urban
  - This is the group that had reached out to Sharan. They are working with a home furnishing company which coincidentally used to occupy the retail space in another building I sold nearby. They own other properties and would expand into this one. I'm touring them through the building with their tenant on Thursday.

General Comments:
- It's quite frustrating that three of our original five bidders dropped out of the bidding after confirming to me, literally three weeks earlier, that their pricing had not changed and that their partners were still engaged.
- The buyer sentiment in the market has changed. Other than the concerns we've been hearing for months: interest rates are too high, debt and equity are hard to come by, etc., a new concern has arisen. This is the sense that prices are still falling and that buildings will be worth less if people wait. To date, lenders have been reluctant to take buildings back and have to resell them, so there's been little distressed selling. As of last week, however, that officially changed with the launch of the $33 billion sale of the Signature Bank portfolio by the FDIC. My response to all of this is simple: find a better residential conversion in Manhattan, there isn't one, and this one is only available now. Nevertheless, there is increased reluctance in the market.
- The other change in sentiment is that sellers are struggling and that this has become a very buyer-friendly market. As a result, buyers feel they can demand generous due diligence periods in their conditional contracts, and long time periods to close. I'll manage this as best I can, but this theme is echoed by many.
- Seasonality: buyers have been much more responsive post Labor Day, which is making it much easier to generate new interest. There was little I could do during the last few weeks of August as buyers were simply not engaged.
- As mentioned above, with regard to pricing, I'm telling bidders $60-70M. If I say higher I run the risk of scaring them away, which is the last thing I want to do. Conversely, I've got to re-create the competitive bidding I had in March, which means more time and, in the case of some groups, starting from scratch. I will obviously pursue the engaged groups as aggressively as possible, both with regard to price and timing, but I'm equally focused on finding new

bidders. I've discussed this with Andrew and he has a strategy for how best to manage this with the court.

Despite all the challenges mentioned above, I am hopeful that some of the engaged groups will come forward with attractive offers, am glad to have two user groups interested, as well as the strategic buyer next door. I remain confident and committed to making this happen, it will just take me some additional time to rebuild our prior momentum.

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR000237

EXHIBIT 2 PAGE 143

| From: | Woody Heller |
| To: | Michael Sklar; Sharan Sklar |
| Cc: | Andrew K. Glenn |
| Subject: | 95 Mad - Second Roung Bid Results & Path Forward |
| Date: | Wednesday, September 20, 2023 4:28:05 PM |
| Attachments: | image001.png |

Our second-round bid process ended last Thursday but sadly, did not elicit the desired result. That's a function of many factors having to do with the building, timing, and changes in market sentiment. The result it did generate, however, was feedback on market pricing, and hence, we need to decide whether we're prepared to sell the building at current market pricing. What follows is a more detailed explanation of where things stand, the challenges we face, and our options going forward.

**The Building:**

Everyone loves the building and the location, that's what led to the strong and broad response we've gotten and the request for 96 tours. As a point of reference, I gave less than 40 tours when I sold the Chrysler Building. One of the challenges with regard to the building is the uncertainty associated with the cost to repair the facade. When bidders show the façade materials to their experts, who then read the report and inspect the building, the cost estimates range from $5 to $30 million. This uncertainty and the amount of the estimates is negatively impacting our pricing, so at this point it would be helpful if we could engage both the engineers who inspected the building and prepared the reports, as well as the two contractors who provided the bids of $2 to $4 million to fix the façade, replace the window and the roof. I don't know how else to resolve this variable but am open to other suggestions.

**Timing:**

We called for first round bids in the middle of March, six months ago. I understand all the reasons why our second-round bid process was delayed six months, but in the interim, we lost some of the original bidders, and more importantly, their equity providers. The other issue we've faced is seasonality. Starting the second-round bid process in mid-August was going to be a challenge, but based on pressure from the bankruptcy court, we had to move forward once the decision had been made to sell the building. The market became more responsive post-Labor Day, but other concerns have emerged.

**Buyer Sentiment:**

There are several changes since we first went to market last November:

- The initial concerns we heard were:
  - interest rates are too high
  - limited liquidity in the marketplace
- More recently, a new concern has arisen - the sense that prices are falling, and buildings will be worth less tomorrow than they are today.
  - Thus far in this cycle, and in the proceeding downturn, lenders resisted taking buildings back from borrowers because they didn't want to incur the costs to fix and re-lease them, and then book a loss when selling them. As a result, borrowers had been able to extend their loans, which averted distressed selling.
- As of two weeks ago, however, that changed with the official launch of the FDIC's $33 billion sale of the Signature Bank portfolio. They claim that they will keep the rent stabilized portion of the portfolio, but the balance is still enormous. In addition, the soon to be announced sale of the Silicon Valley bank loans, will result in additional distressed sales of potentially $60 billion, all mandated by the government and sold without reserve. This is the definition of

distressed selling, the result of which is bidders are now less focused on elective sellers, and more focused on the distressed loan packages starting to come to market. To be clear, I'm not suggesting that those loans are on buildings more desirable than 95 Madison, but they will be at much lower prices. Please see two articles in today's The Real Deal (the leading real estate periodical):

- ○ https://therealdeal.com/new-york/2023/09/19/marathon-chasing-signature-banks-33b-loan-portfolio/
- ○ https://therealdeal.com/national/2023/09/20/distressed-commercial-real-estate-loans-surge-nationwide/

- In addition to the two articles above, note other articles about owners giving properties back to their lenders, again, all in the Real Deal yesterday and today!

  - ○ https://therealdeal.com/chicago/2023/09/20/lender-taking-over-palmer-house-retail-with-foreclosure-sale/
  - ○ https://therealdeal.com/new-york/2023/09/20/rent-stabilized-landlord-sells-portfolio-at-44-discount/
  - ○ https://therealdeal.com/new-york/2023/09/19/bad-loan-on-financial-district-office-building-for-sale/

- Note the following article about 1407 Broadway at 39th street. I sold this building to Shorenstein 5-10 years ago for $330 million. They then renovated it for $50-60 million. The NOI was $30 million on it's way to $35 million, so they were on course with their business plan. Then the changes caused by covid dropped the NOI to $20 million. Shorenstein can't cover their existing debt service, much less the increased debt service if they refinance it at today's rate. As a result, they've offered to give the property back to the lender. I had lunch today with the fellow who led the acquisition team when I sold it to them. He said they just raised their 14th fund to buy distressed office buildings, and that they'd rather put money into new distressed properties, then defend the office buildings they already own. Scary.

  - ○ https://therealdeal.com/new-york/2023/09/19/shorenstein-properties-delinquent-on-1407-broadway/

- I don't share all of this to upset or discourage you, but simply to share with you the negativity of the messaging in the market today, which is creating this negative sentiment.

- As a result of the above, buyers realize sellers are struggling, and the market has become more "buyer friendly", meaning:

  - ○ buyers want longer due diligence periods
  - ○ they're resistant to signing unconditional contracts without due diligence periods
  - ○ and they seek longer time periods to close

- Having said that, the final round of bidding for 100 Fifth Avenue (discussed below) was conducted using the same hard second-round process that we employed in August, and it was successful. The difference was that 100 Fifth had been institutionally owned and maintained, and was being purchased to stay office building. Therefore, buyers were not facing large capex / conversion costs, or façade repair uncertainty.

**Resultant Pricing:**

- Needless to say, pricing has fallen. We no longer have buyers at $70 million, in fact, I'm now struggling to get a bid of $60 million. Several of the bidders have expressed interest at or above $50 million, and I think we have competitive bidding in the $50+ million range. There are still bidders working on their underwriting who haven't finalized their pricing, but I don't

think they'll be willing to pay $60 million. It's always possible that I'll be able to find someone at that level, but at this point, we need to decide whether we're prepared to move forward with a sales price between $50 and $60 million, as I have to give bidders a clear and definitive signal to get them to engage further.

- To give more context on pricing, the list below shows some samples of the few properties that have recently sold, and the indicative pricing of some that are just coming to market:
  - **Recently Sold:**
    - 529 Fifth:
      - 43rd to 44th Streets
      - Price: $105M, 285K sqft = $370 psf
      - Occupancy: 63%
      - Cap rate: 1% at closing, 12% projected at stabilization
    - 25 Water Street:
      - Downtown Manhattan
      - Being converted into 1,300 apartment units
      - Sold for $170 psf
      - 1.1 million sqft
  - **Under Contract:**
    - 100 Fifth:
      - 15th to 16th Streets
      - Price: $125M, 275K sqft = $450 psf
        - I sold the building 10 years ago for $230M
      - Occupancy: 79%, but the main tenant - Apple is vacating
      - Cap Rate: 10% at closing (based on $92 psf above-market rents
        - projected to stabilize at 8% when the space is re-leased at market rents
      - Condition: institutionally owned and maintained, no major capex, façade work or conversion costs required
    - 430 West 15th Street:
      - Between 9th and 10th Avenues
      - Price: $83M, 95K sqft = $875 psf – User sale to the existing tenant
        - While this is a high $psf, note the cap rate below (9%), meaning that the $psf price is all a function of the net rent
        - Note also, that the building sold 5 years ago for $160M with the same tenant occupying 100% of the building
      - Occupancy: 100% leased to Live Nation (owned by Jay-Z – Beyonce's husband)
      - Cap Rate: 9%
  - **Coming to Market:**
    - 1740 Bway:
      - 55th to 56th Streets
      - 550K sqft
      - Pricing expectation: $150 psf
      - Difficult to convert given floor depths and setbacks

BR000003

EXHIBIT 2 PAGE 146

80 Pine:
- Pricing aspiration: $175-200 psf
- Occupancy: 50%
- NOI: almost none
- Ability to convert: difficult given office tenants throughout the tower

- **Off-Market Discussions:**
  - 597 Fifth – The Scribner Building
    - 48th to 49th Streets
    - 2016 had offers for $240M, wanted $300M
    - Offers now are $40-60M

**Options to Move forward:**

1. There is a bidder from the first round, who wouldn't participate in the second round because they needed a due diligence period. At the time, they were at $60+ million, subject to a 6 to 8-week due diligence period to obtain certain approvals to execute their business plan. That would require us signing a conditional contract with them and essentially waiting to hear the outcome of their efforts. During that time, I can presumably continue speaking to other bidders to have backup bidders if they didn't elect to go forward.

2. As mentioned above, there a few existing bidders who are pricing the building in the $50+ million range, but who are reluctant to spend more time without knowing that we're receptive to a sale at that price level. My hope would be to get one of them to sign an unconditional contract with a full deposit, but an unconditional contract with a modest due diligence period may be the best we can do at present.

3. I am continuing to go back to bidders I contacted in the past, but who didn't engage at that time for various reasons, to see if they'd be interested in bidding now, with the revised pricing and outright sale versus a ground lease.

4. We should also re-examine the after-tax calculations of an outright sale at these price levels versus a ground lease. By way of example, Rick Wolfe mentioned in one of his recent emails that a sale at $70 million generated after-tax proceeds of approximately $52 million, and therefore, why would we consider a ground lease at $45 million of less. We need to know the after-tax results of a sale at: $65, $60, $55 and $50 million. Then I can go back to those who made the highest ground lease offers to confirm their current pricing if the after-tax numbers of a sale suggest that's worthwhile.

**Conclusion:**

- First: do the calculations in option 4 above to see if revisiting the ground lease has merit.
- Second: consider the comps mentioned above and the market's pricing feedback to determine if we're sellers at $50-60 million.
- Third: armed with the above two answers, we can decide how best to move forward.

I realize that this is a lot to think about. Give it some thought and then let's talk again soon. Time has been the enemy so let's not hesitate. Thanks

**Woody Heller**
Founding Partner



Tel:    (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

BR000004

EXHIBIT 2 PAGE 147

| | | |
|---|---|---|
| **From:** | Woody Heller | |
| **To:** | Michael Sklar; Sharan Sklar | |
| **Cc:** | Andrew K. Glenn | |
| **Subject:** | Updated Bid List | |
| **Date:** | Friday, October 6, 2023 5:08:15 PM | |
| **Attachments:** | 95 Madison Bid List 2023-10-5.xlsx | |
| | image001.png | |

As requested

**Woody Heller**
Founding Partner

Tel:      (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

EXHIBIT 2 PAGE 148

BR000238

| Company | Prior High Bid | Current Bid | Comments |
|---------|---------------|-------------|----------|
| **Out of Contention** | | | |
| Anbau | $60M - paid over time | As of July, 2023, $45M paid upfront | Interest rate Increases<br>Paid upfront rather than out of sale<br>Didn't go back to them recently based on prior price |
| Arcade | $60M+ | $30M | Maybe an incremental pymt if façade costs <$30M |
| Banyan | $65M verbal | $40M | 2 of their 3 investors pulled out, only willing to pay that amount |
| JDS | $70M | $70M | Nobody home |
| Soho Properties | ~$62M | $53M | Doubt he can close |
| Somerset / JMH / Hildreth | $70M+ | Withdrew | Not sure they can raise the money. Not willing to risk losing their deposit if they fail. |
| **Reviving** | | | |
| Rockefeller Group | $45.8M | Refreshing #s | Will keep Rita in retail condo + resi condo credits. Need 4 months DD to find partner & get approval. Anticipate $90-100M of equity, they'll invest 40-50%. Seeking 50% leverage |
| Skylight RE Partners / Bash Capital | ~$60M | $50M, hoping to get to $60M if can convince their equity investors | Waiting on comps from Douglas Elliman to support $2,700 psf sellout. IMO, that's not going to happen. |
| Toll Brothers | $65M | Waiting for feedback | Refreshing their pricing w/o the overbuild, w/an incremental pymt if successful |
| Slate | $50M | No further action | Will ask them to refresh |
| Empire | ~$50M | ? | Working with multiple "partners". One might be interested in low $50Ms, having difficulty getting them to focus |
| Carmel | NA | Wasn't previously interested but is revisiting | Can close all cash out of Fund 8 |
| RFR | NA | Revisiting their underwriting | |
| **New** | | | |
| Azur | NA | $mid $40Ms | Trying to get to $50M / reviewing hard costs<br>Solving for 24% IRR and just >2X equity<br>$2,300 sellout |
| Arc | NA | ? | Still reviewing underwriting |

EXHIBIT 2 PAGE 149

| | | | |
|---|---|---|---|
| City Urban | NA | ? | Considered whole bldg, now just interested in retail condo |
| Williams | NA | <$350 psf / $52.5M | Trying to get a bid<br>Own 79 Mad, joining bldgs not accretive<br>Using Shop Architects |
| Legacy Equity Holdings | NA | Running #s now | 3 HNW families / claim they can close all cash<br>eager to buy the bldg but I'm cautious about their pricing |
| **Didn't Revive** | | | |
| Albanese | $60M - façade (our risk) | No longer interested | Worried about the façade & being sued by condo buyers afterwards |
| GFP Holdings | $30M | No further action | |
| Gorjian | $32-38M | No further action | Fell off the truck long ago |
| Handler | $50M | No further action | No confidence in them |
| Hines | $22M | No further action | Loved the building, couldn't get the numbers to work |
| Kushner | $45M | No further action | All cash or ground lease.  Haven't been back to them |
| Mill Creek Residential | $30M | No further action | |
| Rockrose | $30M | No further action | |
| Stellar | $28M | No further action | |
| TF Cornerstone | $40M+ | No further action | |
| Tishman Speyer | $23M | No further action | |

EXHIBIT 2 PAGE 150

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar |
| **Cc:** | Sharan Sklar; Andrew K. Glenn |
| **Subject:** | RE: 95 Madison Update |
| **Date:** | Wednesday, October 18, 2023 11:23:41 AM |
| **Attachments:** | image001.png |

Morning. I thought I had sent this yesterday in response to your email, but apparently that was not the case so I'm resending today. The update at present is brief. I'm trying to revive as many of our previously interested parties as possible, but it's difficult given the long passage of time since the first bids in March, and the market changes in the interim. By way of example, on one of our last calls we discussed Toll Brothers who offered $65M in March, subject to landmarks approval for their proposed 2-floor overbuild and securing a financial partner. Per Michael's suggestion, I went back to them asking for their pricing without the additional two floors, and hence not making their offer subject to landmarks approval. I suggested an additional payment if they subsequently got landmarks approval, to which they didn't reply. I followed up again with them on Monday, and they are repricing the deal, updating their sellout projections and cost estimates, and speaking to possible financial partners, including one that had expressed interest previously. They said they don't have an answer for me yet but hope to shortly.

Additionally, I'm continuing interesting new groups, including those who'd passed on the property previously based on higher prices and the leasehold structure. I'm giving tours to new and "revived" groups as you know, with Karen joining me yesterday.

The pricing feedback at present is in the low $50Ms, and I'm trying to find our way to mid $50Ms. I remain confident that we can get this done, it's just going to take longer than we'd like given that I am somewhat starting over given the lapse in our bid process and having to start from scratch with the new prospects. I saw one of the new groups at the REBNY Board of Governors meeting I attended yesterday, and they said they were meeting internally to review construction cost estimates.

Needless to say, the events of the last two weeks haven't helped, as bidders express concern about an escalating crisis in the Mideast and what that will mean for interest rates, the economy, and future pricing. I had breakfast with one of my competitors this morning who said that they postponed launching a new marketing effort this week, in response to these events.

I have tours scheduled for today and tomorrow, am trying to schedule more this week, and will continue to keep you updated as I get more definitive feedback.

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Sent:** Tuesday, October 17, 2023 8:27 AM
**To:** Woody Heller <woody.heller@outlook.com>; Michael Sklar <msklar@ninetyfivemadison.com>
**Cc:** Sharan Sklar <ssklar@ninetyfivemadison.com>; Andrew K. Glenn <aglenn@glennagre.com>
**Subject:** 95 Madison
Woody :
Please send update . Are there any new interested parties? Are there any serious bids?
Michael Sklar

BR000140

EXHIBIT 2 PAGE 151

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

P A little green reminder: Please consider the environment before printing this email

BR000141

EXHIBIT 2 PAGE 152

| From: | Woody Heller |
| --- | --- |
| To: | Michael Sklar; Sharan Sklar |
| Cc: | Andrew K. Glenn |
| Subject: | 95 Mad Update #15 |
| Date: | Tuesday, November 7, 2023 9:03:39 PM |
| Attachments: | image001.png |

Below is an update on where we stand at present:

Tours: 107

- I gave my 104th tour this afternoon
- Karen was kind enough to give one
- My friend Bill gave two while I was traveling last week

Pricing:

- Most of the price talk is in the $40Ms, I'm focused on getting us into the $50Ms

Process:

- I don't have enough people ready to make bids yet to start a third round of bidding. Second, I don't want to repeat what happened in September when no one showed up, even after saying they would. Third, and most importantly, I don't think buyers are receptive to bidding processes given the current state of the market. Hence, in light of the timing with the court, and everyone's deal fatigue with the transaction, I'm inclined to pursue the first bid I find acceptable.
- Acceptable to me means:
  - Acceptable pricing
  - Financially qualified buyer
  - A buyer who has done their most of their homework and doesn't require long due diligence or closing periods

Structure:

- As before, I'm asking bidders to bid on the basis of an outright purchase
- Once we have that and can assess, on an apples-to-apples basis, who's pricing is most attractive, then we can explore structuring options. These may include:
  - As Michael said last night on our call, offering seller financing. This could take the form of bridge financing between purchase and construction loan, or from purchase all the way to condo sellout.
  - We could re-examine some form of partnership with one of the developers, wherein they would retire our debt and other obligations, and some balance of the remaining purchase price would be contributed to the development venture in a joint venture.
  - We could re-visit some form of 467 ground lease as a means of providing a different form of seller financing.
  - TBD other

Bidder Status:

- **Written Offers (Since 9/1/23):**
  - OCS/Steve DellaSalla: $50M
  - Banyan: $40M
  - Toll Bros: $30M
- **Verbal Indications:**
  - Legacy: $45M, maybe more if they can secure their potential user

Azur: $40M+, still waiting to hear where they are in the $40Ms
- ○ Anbau: <$45M, they were at $45M as of 7/23, now they're less but haven't quantified by how much
- ○ Bash/Skylight: $40M, they tried to get to $60M w/o success, thereafter were at $50M but their partners wanted better returns, hence $40M
- **Expecting Bids:**
  - ○ CNY Construction: hoping to get bid w/in the next week, and hoping it will be in the $50Ms
  - ○ HJ Justin Realty: don't have pricing indication but seriously pursuing. Pushing for offer but no further clarity yet
  - ○ Sumaida & Khurana: toured today with strong enthusiasm. They need façade info and to run their numbers
  - ○ Empire: they are working with a new Asian investor and hope to have a $50M offer w/in a week
  - ○ Arcade / Shorewood: toured yesterday with great interest. This is Arcade's fourth potential partner. Hopefully with greater success this time
- **Discussing:**
  - ○ Rock Group – I sent their most recent email response earlier today
  - ○ Hines – revisiting their numbers from 4/23 and will come back to me w/in a few days. Hines is one of the best developers in the world so hopefully their numbers will be attractive. If we were going to consider a JV, Hines would be one of my top choices
  - ○ Innovo – didn't pursue previously, I'm scheduled to speak to them on Friday
  - ○ MAG – in the midst of closing two other development projects, toured three weeks ago. Hard to get their attention but very competent and capable developers
  - ○ VanBarton – looked at it before but didn't pursue. I spoke to the CEO this evening and we're scheduling a tour for later this week when he's back in NYC.
- **Awaiting Response:**
  - ○ Carmel – reached out to revisit but struggling to get their focus. They bought the 1M sqft development site from me in Long Island City. They have a $1.8B discretionary fund and close all cash but are over-allocated in NYC with four other development projects which are now underwater given the increases in interest rates. Emailed them again this morning.
  - ○ L&M – looked at it earlier, trying to get them to re-engage now that we will definitely sell and possibly at lower pricing
  - ○ Romanoff Equities – looking to place equity. Saw the property years ago with Rita. Speaking to potential partners but I doubt they'll materialize
  - ○ 99c – reached out to me last week to revisit and update n our revised pricing and structure. I emailed him today for an update.
  - ○ Morris Bailey – has been hovering around the hoop for a while. He re-emerged a few weeks ago expressing interest. He has stories from dealing with Rita in the past. I emailed him again this morning.
  - ○ David Carlos – a former colleague that represents non-profit users. I reached out to see if any of his current clients might be interested. He's shown the building to three schools over the last year, but generally the building hasn't worked well for their specific space needs.

BR000014

EXHIBIT 2 PAGE 154

**Revisiting:**
- TFC: they bid $45M less free rent during construction when we were seeking a ground lease. I doubt their current pricing will be any better but they have infinite financial resources and would be a credible partner if we explore a JV.
- RXR: they were keenly interested in conversions and their CEO Scott Rechler told his team to contact me. They engaged but never pursued it. They have recently given back several office buildings to their lenders so they may be in damage control mode but I'll try again.
- Hudson: they looked at it briefly before but didn't pursue. They are mostly active in Brooklyn but I'll reach out again and see if I can refresh their appetite.
- Feil: expressed interest early in our process but then never pursued. He's in damage control mode with many of his office buildings but I'll reach out again.
- Slate: they bid before but were not competitive. I'll reach out again but they're going to need financing so it may require us doing some form of structured deal
- Kushner: bid $45M as an office building which wasn't competitive before. I'm checking in with them again.
- Shel Capital: they looked at it with their UK investors months ago wanting to purchase not lease. I went back to them about purchasing outright but they didn't respond. I'll try again.
- William Macklowe: Harry Macklowe's son. He looked at it early on but at pricing that wasn't competitive. Will revisit.
- LCOR: focused on large new construction projects. Given the current market, they may welcome a different strategy on a smaller scale. Very good developer and very institutional and professional. Could be a good partner for a JV. Are also backed by the second largest domestic pension fund so they are very financially capable.
- Capstone: small developer, didn't engage initially. Creative and good financial following. Will try again.
- RAL Companies: Didn't engage initially. Do a variety of residential projects. I sold them a similar size rental to condo conversion on the east side. Will revisit.
- Young Woo: one of the most creative developers in NYC. He wasn't interested initially but given the market change and pricing, he may also be considering smaller projects.

- **95M Facade info to:**
  - CNY Construction
  - HJ Justin Realty
  - Sumaida & Khurana
  - Empire
  - Arcade / Shorewood
  - Bash/Skylight
  - OCS/Steve DellaSalla

Hope this help and happy to discuss further.

---

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR000015

EXHIBIT 2 PAGE 155

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad Update #16 |
| **Date:** | Saturday, November 18, 2023 10:07:50 PM |
| **Attachments:** | image001.png |

Below is an update of what's transpired since update #15 on 11/7/2023:

- On 11/12 I sent a list of all the groups that have toured as of that date. Since then:
  - CNY Group tour a third time on 11/16
  - HJ Development is schedule to tour this Monday 11/20
- On 11/12 I sent a list of all the groups that have signed CAs as of that date. Since then:
  - Charney Companies has signed a CA
- The façade update was completed, has been uploaded to the website, and I've notified all the bidders who have been waiting on the information. I will send the bid leveling sheet to Tom Fenniman so he's familiar with our numbers before we ask him to speak to bidders.
- Timing Objective:
  - I'm telling bidders that our goal is to have a signed contract by the end of this calendar year
- Written Offers:
  - In addition to the three offers I sent in the prior update, I've forwarded new offers from:
    - $35M from VanBarton – their fund only does multifamily, not condo, hence their price is lower than from the condo developers
    - $42M from Empire – They could only convince their Asian partner to pay $42M, not the $52M they originally hoped
- Expecting Bids:
  - CNY Construction: took their third tour this week, this time with the two senior partners, I then spoke to the CEO at length on Friday, and are scheduled to speak to him again on Monday morning. They claim that they're willing to pay high $50Ms, possibly $60M, but subject to the following conditions:
    - 60-day DD, 90-day close, with DD starting 1/1/23
    - Vacate Lee & Low, to which I might be able to get them to contribute $
    - Feedback from Landmarks about their overall scope of work including but not limited to: façade, window, revolving door for service entrance, etc.
    I've told them that this timing doesn't work for us, and can give you more detail about the negotiations when we speak
  - HJ Justin: I've been pressing them to pay $55M, and on Friday they said they'd close "tomorrow" at $45M, and are not yet sure where they stand between those two prices. The patriarch – Henry Justin is touring Monday afternoon and I'll know more after that.
  - Sumaida & Khurana: I'm trying to get them to $55M as well. They claim to be willing to sign an unconditional contract without a DD period and a 10% non-refundable deposit. They have several HNW equity partners, one of which is Eric Schmidt of Google. They're speaking to him this week and will ring me Friday with an update.
  - Empire: they've been pursuing the deal now for over a year with multiple partners along the way. OCS is a group that has asked to deal with me directly, but was

EXHIBIT 2 PAGE 156

BR000016

introduced by them. As mentioned above their Asian investor proved to be a disappointment, and they told me on Friday that they'd buy it for $40M immediately with the partner with whom they've been most active.

- Arcade: have also been pursuing the deal for a long time and have pursued it with four different equity partners. The last two – Shorewood and PMG topped out at $30M. They emailed me Friday to say that their speaking to a fifth partner and will let me know if they make progress. They, themselves, are prepared to invest at $50M.
- City Urban reached out to me again on Friday regarding their interest in purchasing the retail condo for their client / maybe partner DDC – the furniture retailer that represents numerous international home furnishing companies and has a showroom a few blocks north. I invited them to send me an offer which might be accretive with one of the other offers.
- Lincoln Equities Group: they like the building and were initially only interested in backing another developer but have decided now to pursue directly themselves. I'm waiting to get price guidance from them shortly.

- Verbal Indications:
  - Legacy: still at $45M but claims they have a user who might be interested in the building, but who won't be in town to see it until after Thanksgiving. If the user is interested in moving forward, they'd be willing to increase their offer to the "$50Ms". They'll come back to me with a date/time to tour the building with the user.
  - Azur: has gone dark, probably can't raise the equity and may be too embarrassed to respond.
  - Anbau: called to check in. They were @$45M but haven't reviewed their pricing, but just know it would be less. I don't view them as being seriously interested.
  - Bash/Skylight: reiterated their offer @$40M, but with two participation features that they think might result in an overall higher price:
    - 67% of the savings if the façade costs $4M and not $15M. Later in the conversation it became clear that their $15M budget includes several things (façade, windows, roof, etc.) so the likelihood of a savings may be limited.
    - A 10-20% participation in the gross sales price of the units above an average price of $2,700 psf. The percentage is too low and the threshold is too high.
    After going back and forth, I think I can get them to sign a hard contract now with no additional DD, and close in 30-60 days, with a 10% deposit, but based on their offer I'm not sure it's relevant.
  - Hines: reiterated that like VanBarton, their fund can only do multifamily, and therefore their price can't compete with condominium pricing. They were at $35M at the first round, and all they said was that their pricing is less.
  - Dune: their conversion fund is also only for multifamily, so same pricing problem as Hines and VanBarton.
  - TF Cornerstone: they also want to do multifamily and are at $32.5M, but would close quickly, without acquisition financing, etc.
  - Romanoff Equities: in the $30Ms, but not pursuing further given their pricing.
  - Gotham: I reached back out to them as I promised I would, and they are at $25M as a multifamily conversion.

Summary:

- We have some new groups interested at what seems to be promising pricing.
- My primary focus is on moving things forward quickly, in the hope of signing a contract by year-end
- Bidders respond well to deadlines, but at present, not well to bid dates
- Instead, I'm using the natural deadline of year-end, plus the risk of losing the benefits to both sides of the bankruptcy court. Andrew, please correct me if I'm wrong, but in addition to our benefits in bankruptcy, aren't buyers safer purchasing a property out of bankruptcy in terms of it extinguishing any pre-existing claims? That's what I've been saying, please correct me if I'm wrong.

Let me know if still want to speak this week, I had emailed my availability in response to one of your emails last week. Thanks

---

**Woody Heller**
Founding Partner



Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

BR000018

EXHIBIT 2 PAGE 158

| **From:** | Woody Heller |
|---|---|
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad Update #17 |
| **Date:** | Friday, November 24, 2023 11:12:29 AM |
| **Attachments:** | 95 Mad - Tours.msg |
| | image001.png |
| | 95 Mad - Signed CAs.msg |
| | 95 Mad Update #16.msg |

Morning Michael, I hope you had a nice thanksgiving and thank you again for arranging for Felix to come in yesterday so that I could give the tour. It seems to have gone well and hopefully will result in the desired outcome.

Per your email below, I sent you the requested information last weekend. I've attached it to this email in case you missed my prior emails.

I'm not sure to which spreadsheet you're referring, but a list of the interested groups, and those that have made offers was outlined in detail in my last update. I've attached a copy of that email as well. I've sent you copies of all the offers received since September, including the one received this Wednesday for $43/5M from HJ Development, which is outlined at the bottom of this email chain.

The only offer at $50M or above is from OCS Development, and that offer is in the process of being modified per my request, with regards to: process, timing, and hopefully price. I haven't received the revised version yet but will forward it when I receive it. The other conversations that I'm having at $50M or above are with:

- Legacy Holdings – they're touring again on Monday and are trying to get to $52.5M.
- Empire, they're touring again this Wednesday, and I don't know where their pricing is coming in but they know I'm seeking offers in the $50Ms.
- Sumaida & Khurana, they toured with one of their potential investors yesterday, and the conversation has been at $55M, but nothing yet in writing.
- CNY Group, who last toured Thursday 11/16. The conversation with them has been at $60M, but they haven't yet submitted a written offer. I may be speaking to them again today or this weekend.
- Lincoln Equities, they are still completing their financial review, so I don't yet know their pricing.

There are several groups who have submitted offers in the $40Ms and $30Ms but Sharan has indicated that those are not of interest. Please advise if that is no longer the case.

Please confirm receipt of this email and let me know if there's a better way to send the information you request to ensure that you see it. Thank you.

**Woody Heller**
Founding Partner

**BRANTON REALTY**

Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Sent:** Friday, November 24, 2023 8:47 AM
**To:** Woody Heller <wheller@brantonrealty.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
**Cc:** Andrew K. Glenn <aglenn@glennagre.com>
**Subject:** RE: 95 Mad Offer

Woody :

EXHIBIT 2 PAGE 159

BR000019

Please update your spreadsheet . It will make it easier to see where we are. Also , please send.

1. Entities that have toured property.
2. Entities that have signed confidentiality agreement
3. Entities that have accessed the Marketing website .

We need a full picture where we stand today .

Michael Sklar

Sole Member

Michael Sklar Management LLC

as a General Partner of Ninety-Five Madison Company, L.P.

Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>

P A little green reminder: Please consider the environment before printing this email

**From:** Woody Heller <wheller@brantonrealty.com>
**Sent:** Wednesday, November 22, 2023 3:32 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>; Sharan Sklar <sklar@ninetyfivemadison.com>
**Cc:** Andrew K. Glenn <aglenn@glennagre.com>
**Subject:** 95 Mad Offer

Offer attached from Henry Justin of HJ Development. They've been looking at the building for a several weeks and took their second tour this Monday. Their price is $43M but are willing to go to $45M. I'm not recommending the offer, just passing it along.

---

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website:  brantonrealty.com

BR000020

EXHIBIT 2 PAGE 160

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad - Tours |
| **Date:** | Sunday, November 12, 2023 2:47:33 PM |
| **Attachments:** | image001.png |

As requested, the principal groups that have toured the building are as follows:

| Groups that have toured: | Number of Tours: |
|---|---|
| 60 Guilders | 1 |
| 99c LLC | 1 |
| Albanese Development Corp. | 3 |
| Alchemy Properties | 1 |
| Anbau | 1 |
| Arc Real Estate | 1 |
| Arcade Capital & Various Partners | 2 |
| Atlantic Development | 1 |
| Aurora Group | 1 |
| Azur | 1 |
| Banyan Street Capital | 2 |
| Baruch College | 1 |
| Bash Capital | 3 |
| Carmel Partners | 1 |
| CNY Group | 3 |
| Cohen Equities | 1 |
| Core Home | 1 |
| Emmes Asset Management | 1 |
| Empire Capital & Various Partners | 5 |
| Frond Capital Partners LLC | 1 |
| Gensler | 1 |
| George Comfort & Sons | 3 |
| Global Holdings | 1 |
| Gorjian Real Estate Group | 3 |
| Gotham Organization | 1 |
| Handler Real Estate Organization | 2 |
| Heights Advisors | 1 |
| Hildreth Advisors | 4 |
| Hines | 1 |
| HJ Development | 1 |
| Innovo Property Group | 1 |
| JDS Development | 2 |
| Kaufman Investments | 4 |
| Kushner Realty Acquisitions LLC | 1 |
| L+M Development Partners | 1 |
| Legacy Holdings | 1 |
| Lincoln Equities | 1 |
| MAG Partners | 1 |
| Meyer Equities LLC | 1 |
| Michael Ashkenazy | 1 |
| Midwood Management Corporation | 1 |
| Mill Creek Residential | 2 |
| Morris Bailey | 1 |
| Newbond Holdings | 1 |
| Nightingale Properties | 1 |
| Northwood Investors | 1 |
| OCS Construction | 1 |
| Pembroke Realty Capital LLC | 1 |
| Property Markets Group | 1 |
| Rabina Properties, LLC | 1 |
| RFR Holding Corporation | 1 |
| Rockefeller Group | 2 |
| Rockrose | 3 |
| Shel Capital | 1 |

BR000021

EXHIBIT 2 PAGE 161

| | |
|---|---|
| Shorewood Real Estate Group LLC | 1 |
| Silverstein Properties | 1 |
| Skylight Real Estate Partners | 1 |
| Slate Properties | 3 |
| Soho Properties | 4 |
| Somerset Partners | 3 |
| Spector Group | 1 |
| Stellar Management | 1 |
| Sumaida and Khurana | 1 |
| Tavros Holdings LLC | 2 |
| TF Cornerstone | 1 |
| Tishman Speyer Properties | 5 |
| Toll Brothers | 4 |
| Tribeca Associates, LLC | 1 |
| VanBarton | 2 |
| William Macklowe Company | 1 |
| Williams Real Estate | 1 |
| **Total** | **115** |

The groups that were introduced by brokers are as follows:

| Brokerage Firms: | Number of Tours: | Brokers: | Clients: |
|---|---|---|---|
| Aires Capital Advisors | 0 | Nick Barone | CNY Group |
| City Urban Realty | 1 | Harry Hochman & Michael Alvandi | Undisclosed Furniture tenant |
| Cushman & Wakefield | 2 | Andrew Kahn | Various undisclosed retail tenants |
| KSR | 0 | Albert Sultan | Frond Capital Partners LLC |
| Meridian Capital | 0 | Abie Kassin | Core Home |
| Newmark | 0 | Ron Solarz | HJ Development |
| Newmark | 0 | Ron Solarz | Sumaida and Khurana |
| RDE Advisors | 1 | Ali Reslan | Undisclosed Retail Tenant |
| Savills | 2 | Ira Schuman & David Carlos | Baruch College & other potential users |
| Upland Property Advisors | 0 | Glen Tolchin & Yoav Oelsner | Toll Brothers |
| **Total** | **6** | | |

With regard to the list of brokers:
- Where the number of tours = 0, that is to avoid double counting as the client names are already included in the main list above. When the name of the client was not disclosed, the number of tours is shown in the brokerage firm grouping immediately above.
- All of the brokers have signed confidentiality agreements confirming they are to be paid by the buyers and not by Owner or Branton.

---

**Woody Heller**
Founding Partner



Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

BR000022

EXHIBIT 2 PAGE 162

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad - Signed CAs |
| **Date:** | Sunday, November 12, 2023 10:55:41 PM |
| **Attachments:** | image001.png |

Per your request, below is a list of companies that have signed CAs and have access to the due diligence website.

| Company |
|---|
| 33 Equities |
| 60 Guilders, LLC |
| 99c llc |
| Albanese Organization, Inc |
| Alchemy-ABR Investment Partners |
| Anbau |
| APF Properties |
| ARC Real Estate Group |
| Arcade Capital |
| Ares Management L.P. |
| Aries Capital Corp |
| Avdoo & Partners Development |
| Azur |
| Bailey Acquisitions, LLC |
| Banyan Street Capital |
| Bash Capital |
| Carmel Partners |
| Certes Management, Inc. |
| City Urban Realty |
| Cohen Equities |
| EJM Development |
| Emmes Asset Management |
| Empire Capital Holdings |
| Feil Organization |
| George Comfort & Sons, Inc. |
| GFPRE Holdings LLC |
| Glenwood Management Corporation |
| Global Holdings |
| Gorjian Real Estate Group |
| Gotham Organization |
| Handler Real Estate Services |
| Haymes Investment Company |
| Heights Advisors |
| Hildreth Advisors |

| |
|---|
| Hines |
| HJ Development, LLC |
| Innovo Property Group |
| Jack Resnick & Sons, Inc. |
| Jay Fehskens LLC |
| JDS Development |
| JMH Development |
| Kaufman Investments |
| KPG Funds |
| Kushner Realty Acquisitions LLC |
| L+M Development Partners |
| Legacy Equity Holdings |
| Lincoln Equites Group |
| Madigan Development |
| MAG Partners |
| Metro Loft Management |
| Midwood Investment & Development |
| Mill Creek Residential Trust |
| Moinian Group |
| Newmark |
| Nightingale |
| Northwood Investors |
| Omnispective |
| Pembroke Commercial Realty Corp. |
| Peregrine Funding |
| Principal Global Investors |
| Quinlan Development Group, LLC |
| Rabina Properties, LLC |
| Real Estate Investment & Advisory LLC |
| RFR Holding LLC |
| Rockefeller Group |
| Rockrose |
| Romanoff Equities |
| Rose Associates |
| RXR Realty |
| Sagehall Partners |
| Sequoia Development Group |
| SHEL Capital |
| Shorewood Real Estate Group, LLC. |
| Silverstein Properties |
| Skylight Real Estate Partners |
| Slate Properties |
| SLATE Property Group |

EXHIBIT 2 PAGE 164

BR000024

| |
|---|
| Soho Properties |
| Somerset Realty Advisors LLC |
| Sovereign Partners, LLC |
| Stawski Partners |
| Stellar Management |
| Sumaidak Khurana |
| Tavros Capital Partners |
| TF Cornerstone Inc. |
| The Cayre Group, Ltd |
| The Hudson Companies |
| The Naftali Group |
| Tishman Speyer |
| Toll Brothers |
| Tribeca Investment Group |
| Vanbarton Group |
| William Macklowe Company |
| Williams Equities |

**Woody Heller**
Founding Partner



Tel:        (917) 612-1230
Email:     wheller@brantonrealty.com
Website: brantonrealty.com

BR000025

EXHIBIT 2 PAGE 165

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad - Update #18 |
| **Date:** | Tuesday, December 26, 2023 3:49:04 PM |
| **Attachments:** | image001.png |
| | 95 Madison Bid List 2023-12-26.xlsx |

Attached is the most recent bid list. As before, all the fields highlighted in yellow reflect changes from the last version you received. A few general comments:

- We had 22 first-round bids in March. Since Labor Day, we've had 25, with several other groups in pursuit and preparing offers.
- The equity and debt markets have improved since the Fed's announcement a few weeks ago, sentiment is now clearly different.
- I have two new groups that reached out today. I don't know if I can get them into the building this week but would like to include them on my protection list if I can tour them after New Years.
- I'm sending two separate offers that I've received recently, with quick commentary in each cover email.

We'll review everything at 5 during our zoom, and then speak to CNY at 6pm which I think will be instructive.

**Woody Heller**
Founding Partner



Tel:       (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

| Company | Vintage | Pricing | Nature of Indication | Comments |
|---|---|---|---|---|
| CNY Group | New | $60M | Written Offer | 12/22/23:<br>1. As of last friday they said they had selected their financial partner, I've asked for an update on exactly where that stands - have they verbally "shaken hands", have they completed an LOI, etc.<br>2. As of Sunday, they had attorneys standing by for our contract comments to sign and go hard by 12/31/23. That means they would sign our unconditional contract and post their non-refundable letter of credit deposit, which they reiterated they would do without having completed a JV agreement with their partner - this is unusual and in our favor.<br>4. They ask me every day now when we will sign their LOI - I understand our position, you saw my comments about this from last sunday.<br>5. I will go back to them about Lee & Low after we speak. I also plan to go back to them about their overall requests in the contract, but I need detailed feedback from Andrew as to the ways in which the court can assist with both Lee & Low and the issues they are asking us to rep in the contract. That might be a solution to getting you what you want - no ongoing liability post-closing |
| Sumaida & Khurana | New | $55M | Verbal Indication | Still searching for a financial partner<br>No word yet, but checking with them regularly<br>High-end condo developers / very capable |
| Klosed Proerties / Hakimian | New | $52M | Written Offer | As mentioned in my cover letter when I sent the offer, $52M is contingent on them being able to secure Historic Tax Credits which they're working on. |
| Sugar Hill Capital Partners | New | $52-47M | Written Offer | 12/23/23:<br>I've forwarded their written offer letter 12/26/23<br>Their offer has four options: an outright purchase with and without vacant possession - $47/$44M & and a staged purchase funded $15M at closing, 5% per year during construction, and the balance upon TCO - $52/$49M<br>They value vacant possession at $3M<br>They want 120 days to close in either scenario with a 5% deposit at contract execution |

EXHIBIT 2 PAGE 167

| | | | | |
|---|---|---|---|---|
| Torkian Group | New | $51-2M | Verbal Indication | 12/21/23:<br>1. They called me last Thursday to say that they'd received their construction budget from their contractor and will come back to us shortly.<br>2. As I previously mentioned, they think the facade cost is >$4M, I don't have the number yet and I offered Tom Finneman, and will continue to do so once I get their offer<br>3. I don't know where they stand with designing their apt layouts but will ask.<br>4. As mentioned before, they claim they will close all cash with their existing partner.<br>5. They sent me a "happy holidays" email on saturday and I replied that I wanted their response today, I think that was an ambitious request by me but I made it anyway. |
| OCS | New | $50M | Written Offer | 12/22/23:<br>1. I toured with their final partner on Friday, He is very interested in moving forward with the purchase, and said that he'd be speaking to his investor group today to prepare a revised LOI.<br>2. The final partner (Yan Moshe) runs medical clinics throughout NYC and would use the bottom three floors for that purpose. He liked the building very much and said if it can physically acommodate his use. He then asked whether his use was permitted per zoning. He didn't know his use-group so I advised he seek counsel to confirm and then we could check if is permitted in a C5-2 zone.<br>2. They're prior LOI did NOT specify vacant possession<br>3. I'm told the new LOI will be more in the form I've specified than their first offer, meaning - not subject to a DD period, etc., but I'm waiting to see.<br>4. He mentioned that they're trying to confirm their facade cost estimate which is currently at $6-8M, and they're trying to get comfortable at $6M, which will improve their bid from $50-52M. I reiterated the suggestion that they speak to Tom Finneman. |
| Handler | Revised | $50M | Written Offer | Offer made 5/9/2023<br>I have no confidence in the bidder |

EXHIBIT 2 PAGE 168

| | | | | |
|---|---|---|---|---|
| Treun Realty Investments | New | <$50M | Verbal Indication | 12/26/23:<br>1. They have an investor group composed of Mendy Chudaitov of Lefferts and Alex Solovey<br>2. They toured last week with their lender from Bank of China, which will only fund once they have condo documents, which will be in time for the construction but not acquisition loan.<br>3. They're pricing is <$50M, but with some form of staged payments or seller financing they may be willing to pay $50M |
| Glacier | New | $47M | Verbal Offer | 12/21/23:<br>Not worried about raising the money, but their partners have minimum return thresholds for getting involved - 20% IRR & 2x equity multiple, and their price is predicated on that<br>they're in the middle of a conversion right now and would like to undertake a second<br>they're comfortable with the conversion costs<br>facade costs they priced as a piece of the entire construction budget - all in $82.5M including hard & soft costs = $550 psf<br>need 30 days DD, won't proceed w/o it<br>can they get to $50M? They'd have to speak to their capital partner<br>he's discussed $47-8M with them to date<br>acquisition financing? not necessary with their capital partners<br>most capital partners want financing, some all cash<br>if they can do a quick deal with a lender, great, if not all cash<br>time to close: 45 days + 15 days TOE |
| Empire | Revised | $47M | Verbal Offer | 1. They have introduced several groups as potential third-party partners.<br>2. They claim that their internal friends & family investors, together their main investor (Egal) are interested at $47M, but they're trying to confirm whether they would put up the funds to close all cash<br>3. They claim their offer would be w/o DD. |
| Slate | Revised | $47.5M | Verbal Indication | Prior bid was $50M below |
| Rockefeller Group | Revised | $46M | Written Offer | As I mentioned in a separate email, I saw Meg Brod at the REBNY function and had a long discussion with her about the property. They remain engaged with Rita and will explore trying get their pricing to $50M. |

EXHIBIT 2 PAGE 169

| | | | | |
|---|---|---|---|---|
| HJ Development | New | $45M | Written Offer | 12/21/23:<br>1. Called to reiterate that they are no longer seeking a financial partner, and claim that they will close quickly with their own equity, but that their price is $45M, the offer they submitted was at $43M so this is an improvement. |
| Legacy Holdings | New | $42.5M | Written Offer | 1. This is the group that threatened to submit their LOI to the court<br>2. They texted me over the weekend but I didn't respond. Please tell me if you want me to do otherwise. |
| Azur | New | $40Ms | Verbal Indication | No recent communication, I assume they're out |
| Toll Brothers | Revised | $40Ms | Verbal Indication | <$45M - their prior bid |
| Banyan | Revised | $40M | Written Offer | Reduced their prior bids below |
| Bash/Skylight | Revised | $40M | Verbal Indication | They may increase their offer based on LM's response to the façade application Michael sent me. I'm waiting to hear back<br>Offering Participation in capex savings & sellout pricing above a threshold |
| Toll Brothers | Revised | $40M | Verbal Indication | Toll is willing to JV with Owner but at a valuation of $40M |

EXHIBIT 2 PAGE 170

| | | | | |
|---|---|---|---|---|
| Lincoln Equities | New | $40-45M | Verbal Indication | 12/26/23:<br>got their construction budget and can't pay $55M<br>$2,200 sellout<br>$550 for condo spec<br>$450 for rental spec<br>6 months longer for construction<br>$500K for environmental<br>$9M for the all facades<br>1 year precon<br>18 months for construction<br>3 year sellout<br>can only pay $40-45M and then as rental so don't have to pay taxes on unit sales<br><br>12/19/23:<br>1. Their potential investors have been waiting on their construction budget from their construction contractor, which they received at the end of last week.<br>2. They continue to reiterate that several of their investor groups show strong interest, and many of the people leading the deal team at those firms used to work for the Lincoln deal lead who I've known for 30 years and completed deals with.<br>3. They said they will try to reach their investors this week but doubt they'll be able to make progress.<br>4. They've said that they'll continuing to trying to get this done until I tell them otherwise. |
| Vanbarton | New | $35M | Written Offer | Multifamily |
| TF Cornerstone | Revised | $32.5M | Verbal Indication | Multifamily, close all cash |
| Romanoff Equities | New | $30Ms | Verbal Indication | |
| Hines | Revised | $30Ms | Verbal Indication | <$35M - their prior bid - Multifamily |
| Arcade | Revised | $30M | Verbal Indication | Seeking a new partner to support $50Ms |

EXHIBIT 2 PAGE 171

| | | | | |
|---|---|---|---|---|
| Aurora Capital Associates | Revised | TBD | Indication | Aurora is a division of the Cayre family, which is a large owner of real estate. They had looked at the property in the beginning of 2023, but thought they wouldn't be competitive in pricing so didn't continue pursuing it. They Re-engaged a few weeks ago to satisfy a 1031 need, thinking that on that basis they could be competitive. I had hoped to get their bid by this week, but the patriarch of the Aurora side of the Cayre family is very ill, and they're not able to focus at present. |
| Cohen Equities & Dan Oelsner | Revised | TBD | Pursuing | Meir Cohen looked at the building in the past, but invited Dan Oelsner to look at it with him. Dan used to be with Elad who converted the Plaza Hotel and has worked with other major firms and is in the middle of several conversions at present. They toured last week and I don't have their feedback yet but they are seriously pursuing the project. |
| DDC NYC/Los Angeles | Revised | TBD | Pursuing | They are one of the largest home furnishing retailers in the US with operations in NYC, LA & Miami. They looked at the property several weeks ago but were only interested in the retail. They reached out to me last week again to see if they could buy the retail, and I ask them to identify what floors they want and their pricing. They said they will come back to the building and then prepare an offer. |
| East End Capital | Revised | TBD | Pursuing | East End Capital has been focused on developing film studios, largely on the west coast, but has re-engaged with office buildings and office to residential conversions. They're toured the property twice, the second time with their conversion team, and I expect to hear back from them shortly with their sense of pricing. |
| Others actively pursuing | | | | Douglaston Development<br>Drake Street Partners<br>Gemini Rosemont<br>Macklowe Properties |

| **First Round Bids** | | | | |
|---|---|---|---|---|
| Albanese | | | | Withdrew a while ago for multiple reasons including unwillingness to take façade cost risk. Had been @$53M, then said their pricing had fallen, then withdrew |
| Rockefeller Group / Midwood | | | | See Above |

EXHIBIT 2 PAGE 172

| | | | | |
|---|---|---|---|---|
| Skylight RE Partners / Bash Capital | | | | See Above |
| Somerset / JMH / Hildreth | | | | Was @$70M but withdrew based on unconditional contract with a hard deposit, and concern over ability to raise money |
| Toll Brothers | | | | See Above |
| Anbau | | | | See Above |
| Slate | | | | See Above |
| Arcade / Pembroke | | | | See Above |
| JDS | | | | Inactive, was @$70M and stopped responding |
| Banyan - 2 written offers | | | | See Above |
| Empire | | | | See Above |
| Gorjian | | | | Checked in, then never followed up. They were ~$40M |
| Hines | | | | See Above |
| Mill Creek Residential | | | | Too low to revisit - $30M |
| TF Cornerstone | | | | See Above |
| Tishman Speyer | | | | Too low to revisit - $28M |
| Soho Properties | | | | Discussed $53M, then withdrew due to other deal challenges |
| Handler | | | | See Above |
| GFP Holdings (Verbal Offer) | | | | Too low to revisit - $30M |
| Kushner | | | | Waiting for Feedback - was at $45M |
| Rockrose | | | | Too low to revisit - $30M |
| Stellar | | | | Too low to revisit - ~$27M |

EXHIBIT 2 PAGE 173