| | |
|---|---|
| **From:** | emanuel@twobinscapital.com |
| **Sent:** | Tue, 19 Dec 2023 20:01:29 -0500 (EST) |
| **To:** | Jimmy Chou <lgcenterprise@gmail.com> |
| **Subject:** | 95 Madison Ave Plans |
| **Attachments:** | 231113-95 Madison_Update.pdf |

Sent from my iPhone



**Exhibit
BX - 43**

EXHIBIT 2 PAGE 315

TB_EW_000007



EXISTING STAIR
TO REMAIN

EXISTING FREIGHT (1ST
TO CELLAR)

EXISTING FREIGHT (1ST
TO 16FL)

**COMMERCIAL**
3501 SF

**AMENITY**
2845 SF

EXTEND EXISTING
ELEVATOR TO CELLAR

EXISTING STAIR CORE TO REMAIN

**CELLAR FLOOR**

29TH STREET

MADISON AVENUE

---

29TH STREET

**COMMON**
1028 SF

EXISTING STAIR TO
REMAIN TO CELLAR

EXISTING FREIGHT (1ST
TO CELLAR)

EXISTING FREIGHT (1ST
TO 16FL)

EXISTING STAIR TO
REMAIN (UP)

**COMMERCIAL**
7289 SF

MADISON AVENUE

RESIDENTIAL
ENTRY

**COMMON**
1235 SF

2  1

EXISTING ELEVATOR &
STAIR CORE TO REMAIN

13' - 4 3/4"

**1ST FLOOR**

---

SCHEMATIC STUDY - CELLAR & 1 FL

SK-02

PROJECT NUMBER   2114
DATE   11/13/23
Project Status
Owner

SCALE   1" = 20'-0

95 MADISON AVE, NY

Workshop Design +
Architecture, PLLC

98 Fourth Street,
Brooklyn NY 11231
P: (646) 863-5853
F: (646) 863-5873

workshop

Copyright © 2015 Workshop DA

11/13/2023 11:01:08 AM

EXHIBIT 2 PAGE 316

TB_EW_000008



**2-15 FLOOR**

- 2BR 1190 SF
- 1BR 994 SF
- 1BR 862 SF
- 0BR 825 SF
- 1BR 810 SF
- 1BR 858 SF
- 2BR 1247 SF
- 0BR 584 SF

30' - 5 1/4"  25' - 8"  22' - 0"  18' - 4 3/4"

39' - 8 3/4"
23' - 0"
32' - 7 3/4"

29TH STREET
MADISON AVENUE

EXISTING ELEVATOR &
STAIR CORE TO REMAIN

REFUSE AREA

EXISTING FREIGHT
ELEV. & STAIR
CORE TO REMAIN

REMOVED: 2-15 FL

2ND FLOOR ROOF

COURT-YARD

EXISTING 39' - 8 1/2"
EXISTING 22' - 1 3/4"

REMOVED: 2ND FL

**16TH FLOOR**

- 2BR 1177 SF
- 1BR 1030 SF
- 1BR 881 SF
- 0BR 820 SF
- 1BR 848 SF
- 2BR 1185 SF
- 2BR 1224 SF

29TH STREET
MADISON AVENUE

EXISTING ELEVATOR &
STAIR CORE TO REMAIN

REFUSE AREA

EXISTING FREIGHT
ELEV. & STAIR
CORE TO REMAIN

REMOVED: 16 FL

COURTYARD

ROOF TERRACE

EXISTING 39' - 8 1/2"
25' - 7 3/4"
EXISTING

**SCHEMATIC STUDY - 2ND TO 16TH FLOORS**

SK-03

PROJECT NUMBER   2114
DATE   11/13/23
Project Status
Owner

SCALE   1" = 20'-0"

**95 MADISON AVE, NY**

Workshop Design +
Architecture, PLLC

98 Fourth Street,
Brooklyn, NY 11231
P: (646) 863-5853
F: (646) 863-5873

workshop

Copyright © 2015 Workshop DA

11/13/2023 11:01:09 AM

EXHIBIT 2 PAGE 317

TB_EW_000009

98' - 9"

ROOF

ELEVATOR BULKHEAD

STAIR 1 BULKHEAD

ROOF TERRACE
7878 SF

MIN 50%
COMMON ROOF
TERRACE

ELEVATOR & STAIR
BULKHEAD



Workshop Design +
Architecture, PLLC

98 Fourth Street,
Brooklyn, NY 11231
P: (646) 863-5853
F: (646) 863-5873

workshop

95 MADISON AVE, NY

SCHEMATIC STUDY - ROOF

| PROJECT NUMBER | 2114 | |
|---|---|---|
| DATE | 11/13/23 | SK-04 |
| Project Status | | |
| Owner | | SCALE 1" = 20'-0" |

Copyright © 2015 Workshop DA

TB_EW_000010

EXHIBIT 2 PAGE 318

# Talk activity (cont.)

**Emanuel Westfried**
**917-282-8726**
**IPHONE 12 PRO MAX**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Dec 21 | 11:29 AM | 917-514-7302 | Queens, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 11:30 AM | 917-434-5545 | Queens, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 11:31 AM | 516-361-3405 | Bayside, NY | Mineola, NY | 2 | -- | -- | -- |
| Dec 21 | 11:33 AM | 917-282-6270 | Bayside, NY | New York, NY | 1 | -- | -- | -- |
| Dec 21 | 11:35 AM | 917-579-7386 | Bayside, NY | Queens, NY | 3 | -- | -- | -- |
| Dec 21 | 11:50 AM | 917-682-0806 | Bayside, NY | New York, NY | 3 | -- | -- | -- |
| Dec 21 | 11:54 AM | 516-361-3405 | Bayside, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 11:56 AM | 646-688-3130 | Bayside, NY | New York, NY | 2 | -- | -- | -- |
| Dec 21 | 12:00 PM | 917-972-4314 | Bayside, NY | Incoming, CL | 3 | -- | -- | -- |
| Dec 21 | 12:08 PM | 917-514-7302 | Bayside, NY | Incoming, CL | 13 | -- | -- | -- |
| Dec 21 | 12:19 PM | 917-204-9192 | Bayside, NY | New York, NY | 11 | -- | -- | -- |
| Dec 21 | 12:20 PM | 917-514-7302 | Bayside, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 12:20 PM | 917-514-7302 | Bayside, NY | New York, NY | 10 | -- | -- | -- |
| Dec 21 | 12:30 PM | 203-858-1108 | Bayside, NY | Norwalk, CT | 1 | -- | -- | -- |
| Dec 21 | 12:30 PM | 516-361-3405 | Bayside, NY | Incoming, CL | 3 | -- | -- | -- |
| Dec 21 | 12:32 PM | 917-514-7302 | Bayside, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 12:40 PM | 203-858-1108 | Bayside, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 12:42 PM | 917-579-7386 | Bayside, NY | Queens, NY | 1 | -- | -- | -- |
| Dec 21 | 1:25 PM | 646-688-3130 | Rye, NY | New York, NY | 19 | -- | -- | -- |
| Dec 21 | 1:46 PM | 917-514-7302 | Harrison, NY | New York, NY | 1 | -- | -- | -- |
| Dec 21 | 1:47 PM | 917-682-0806 | Rye Brook, NY | New York, NY | 1 | -- | -- | -- |
| Dec 21 | 1:48 PM | 917-682-7913 | Rye Brook, NY | Incoming, CL | 3 | -- | -- | -- |
| Dec 21 | 1:56 PM | 917-682-0806 | Harrison, NY | New York, NY | 4 | -- | -- | -- |
| Dec 21 | 1:57 PM | 347-672-2588 | Harrison, NY | Incoming, CL | 4 | -- | -- | -- |
| Dec 21 | 2:00 PM | 347-672-2588 | Harrison, NY | Incoming, CL | 3 | -- | -- | -- |
| Dec 21 | 2:02 PM | 917-682-0806 | Harrison, NY | New York, NY | 6 | -- | -- | -- |
| Dec 21 | 2:07 PM | 516-361-3405 | Harrison, NY | Incoming, CL | 4 | -- | -- | -- |
| Dec 21 | 2:10 PM | 917-514-7302 | Harrison, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 2:11 PM | 917-682-7913 | Rye Brook, NY | New York, NY | 3 | -- | -- | -- |
| Dec 21 | 2:18 PM | 425-941-0248 | Harrison, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 2:21 PM | 917-514-7302 | Harrison, NY | Incoming, CL | 6 | -- | -- | -- |
| Dec 21 | 2:26 PM | 917-682-0806 | Harrison, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 2:28 PM | 516-361-3405 | Harrison, NY | VM Deposit, CL | 1 | -- | -- | -- |
| Dec 21 | 2:28 PM | 917-204-9192 | Harrison, NY | New York, NY | 1 | -- | -- | -- |
| Dec 21 | 2:29 PM | 917-682-7913 | Harrison, NY | New York, NY | 2 | -- | -- | -- |
| Dec 21 | 2:30 PM | 917-514-7302 | Harrison, NY | New York, NY | 2 | -- | -- | -- |
| Dec 21 | 2:32 PM | 917-841-3782 | Harrison, NY | New York, NY | 2 | -- | -- | -- |
| Dec 21 | 2:34 PM | 646-688-3130 | Harrison, NY | New York, NY | 3 | -- | -- | -- |
| Dec 21 | 2:36 PM | 516-361-3405 | Harrison, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 2:40 PM | 412-999-5930 | Harrison, NY | Pittsburgh, PA | 4 | -- | -- | -- |
| Dec 21 | 2:47 PM | 917-514-7302 | Harrison, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 2:48 PM | 917-204-9192 | Harrison, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 21 | 2:58 PM | 646-688-3130 | Harrison, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 21 | 3:02 PM | 516-361-3405 | Harrison, NY | Mineola, NY | 6 | -- | -- | -- |
| Dec 21 | 3:09 PM | 917-974-1666 | Harrison, NY | Brooklyn, NY | 10 | -- | -- | -- |

**Michael Sklar**

**From:** Michael Sklar
**Sent:** Thursday, December 21, 2023 7:49 AM
**To:** Sharan Sklar
**Subject:** Ideas top move forward.

We should make a list and pick a direction . Sometimes it clarifies the thought  The vultures are calling .

1) Emanuell
2) Woody
3) City
4) ???
5) Shulsky Properties

Michael Sklar
Sole  Member
Michael  Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.

917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**Exhibit
BX - 45**

**NFMC-06566**

# Talk activity (cont.)

**Mike Sklar**
**917-270-6083**
**iPhone 8 Plus Sim Out**

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Dec 23 | 6:22 PM | 908-337-3469 | New York, NY | Incoming, CL | 9 | -- | -- | -- |
| Dec 24 | 11:26 AM | 610-294-9839 | New York, NY | Uhlerstown, PA | 1 | -- | -- | -- |
| Dec 24 | 11:26 AM | 610-294-9839 | New York, NY | Uhlerstown, PA | 1 | -- | -- | -- |
| Dec 24 | 11:27 AM | 212-979-6306 | New York, NY | New York, NY | 3 | -- | -- | -- |
| Dec 24 | 12:14 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 24 | 12:54 PM | 917-270-0923 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 24 | 2:23 PM | 212-979-6306 | New York, NY | New York, NY | 27 | -- | -- | -- |
| Dec 25 | 9:22 AM | 718-431-4844 | New York, NY | Brooklyn, NY | 2 | -- | -- | -- |
| Dec 26 | 10:34 AM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 26 | 10:36 AM | 212-979-6306 | New York, NY | Incoming, CL | 17 | -- | -- | -- |
| Dec 26 | 11:17 AM | 212-979-6306 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 26 | 11:58 AM | 908-581-3659 | New York, NY | Incoming, CL | 11 | -- | -- | -- |
| Dec 26 | 12:15 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 26 | 12:27 PM | 917-612-1230 | New York, NY | Incoming, CL | 22 | -- | -- | -- |
| Dec 26 | 1:37 PM | 212-979-6306 | New York, NY | Incoming, CL | 7 | -- | -- | -- |
| Dec 26 | 2:06 PM | 212-979-6306 | New York, NY | Incoming, CL | 2 | -- | -- | -- |
| Dec 26 | 4:04 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 26 | 4:41 PM | 212-979-6306 | New York, NY | New York, NY | 2 | -- | -- | -- |
| Dec 26 | 7:14 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 26 | 7:22 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 26 | 7:30 PM | 646-753-0632 | New York, NY | Nwyrcyzn01, NY | 1 | -- | -- | -- |
| Dec 27 | 9:00 AM | 917-612-1230 | New York, NY | New York, NY | 30 | -- | -- | -- |
| Dec 27 | 9:30 AM | 914-450-4019 | New York, NY | Wschstzn06, NY | 1 | -- | -- | -- |
| Dec 27 | 9:44 AM | 516-851-5553 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 27 | 12:40 PM | 212-979-6306 | New York, NY | New York, NY | 30 | -- | -- | -- |
| Dec 27 | 1:34 PM | 516-851-5553 | New York, NY | Nassauzn02, NY | 2 | -- | -- | -- |
| Dec 27 | 2:17 PM | 518-291-3004 | New York, NY | Catskill, NY | 1 | -- | -- | -- |
| Dec 27 | 2:18 PM | 561-343-0583 | New York, NY | Boca Raton, FL | 2 | -- | -- | -- |
| Dec 27 | 3:54 PM | 212-979-6306 | New York, NY | Incoming, CL | 19 | -- | -- | -- |
| Dec 27 | 4:48 PM | 646-753-0632 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 28 | 9:08 AM | 646-486-1048 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 28 | 11:21 AM | 212-979-6306 | New York, NY | Incoming, CL | 3 | -- | -- | -- |
| Dec 28 | 2:31 PM | 646-753-0632 | New York, NY | Nwyrcyzn01, NY | 3 | -- | -- | -- |
| Dec 28 | 4:01 PM | 917-755-6002 | New York, NY | Incoming, CL | 22 | -- | -- | -- |
| Dec 28 | 5:16 PM | 212-979-6306 | New York, NY | Incoming, CL | 51 | -- | -- | -- |
| Dec 28 | 8:07 PM | 212-979-6306 | New York, NY | New York, NY | 10 | -- | -- | -- |
| Dec 28 | 8:25 PM | 917-558-6347 | New York, NY | New York, NY | 12 | -- | -- | -- |
| Dec 29 | 10:57 AM | 917-282-8726 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 29 | 11:02 AM | 917-997-3101 | New York, NY | Incoming, CL | 1 | -- | -- | -- |
| Dec 29 | 12:42 PM | 917-282-8726 | New York, NY | New York, NY | 12 | -- | -- | -- |
| Dec 29 | 1:13 PM | 917-664-1881 | New York, NY | Nwyrcyzn01, NY | 1 | -- | -- | -- |
| Dec 29 | 1:17 PM | 917-664-1881 | New York, NY | Incoming, CL | 27 | -- | -- | -- |
| Dec 29 | 1:46 PM | 212-979-6306 | New York, NY | New York, NY | 33 | -- | -- | -- |
| Dec 29 | 2:18 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |
| Dec 29 | 2:24 PM | 212-979-6306 | New York, NY | New York, NY | 1 | -- | -- | -- |

**Exhibit
BX - 46**

**Verizon000034**

EXHIBIT 2 PAGE 321

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Michael Sklar; Sharan Sklar |
| **Cc:** | Andrew K. Glenn |
| **Subject:** | 95 Mad - Update #18 |
| **Date:** | Tuesday, December 26, 2023 3:49:04 PM |
| **Attachments:** | image001.png |
| | 95 Madison Bid List 2023-12-26.xlsx |

Attached is the most recent bid list. As before, all the fields highlighted in yellow reflect changes from the last version you received. A few general comments:

- We had 22 first-round bids in March. Since Labor Day, we've had 25, with several other groups in pursuit and preparing offers.
- The equity and debt markets have improved since the Fed's announcement a few weeks ago, sentiment is now clearly different.
- I have two new groups that reached out today. I don't know if I can get them into the building this week but would like to include them on my protection list if I can tour them after New Years.
- I'm sending two separate offers that I've received recently, with quick commentary in each cover email.

We'll review everything at 5 during our zoom, and then speak to CNY at 6pm which I think will be instructive.

**Woody Heller**
Founding Partner



Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

**Exhibit
BX - 47**

BR000011

EXHIBIT 2 PAGE 322

| Company | Vintage | Pricing | Nature of Indication | Comments |
|---|---|---|---|---|
| CNY Group | New | $60M | Written Offer | 12/22/23:<br>1. As of last friday they said they had selected their financial partner, I've asked for an update on exactly where that stands - have they verbally "shaken hands", have they completed an LOI, etc.<br>2. As of Sunday, they had attorneys standing by for our contract comments to sign and go hard by 12/31/23. That means they would sign our unconditional contract and post their non-refundable letter of credit deposit, which they reiterated they would do without having completed a JV agreement with their partner - this is unusual and in our favor.<br>4. They ask me every day now when we will sign their LOI - I understand our position, you saw my comments about this from last sunday.<br>5. I will go back to them about Lee & Low after we speak. I also plan to go back to them about their overall requests in the contract, but I need detailed feedback from Andrew as to the ways in which the court can assist with both Lee & Low and the issues they are asking us to rep in the contract. That might be a solution to getting you what you want - no ongoing liability post-closing |
| Sumaida & Khurana | New | $55M | Verbal Indication | Still searching for a financial partner<br>No word yet, but checking with them regularly<br>High-end condo developers / very capable |
| Klosed Proerties / Hakimian | New | $52M | Written Offer | As mentioned in my cover letter when I sent the offer, $52M is contingent on them being able to secure Historic Tax Credits which they're working on. |
| Sugar Hill Capital Partners | New | $52-47M | Written Offer | 12/23/23:<br>I've forwarded their written offer letter 12/26/23<br>Their offer has four options: an outright purchase with and without vacant possession - $47/$44M & and a staged purchase funded $15M at closing, 5% per year during construction, and the balance upon TCO - $52/$49M<br>They value vacant possession at $3M<br>They want 120 days to close in either scenario with a 5% deposit at contract execution |

EXHIBIT 2 PAGE 323

| | | | | |
|---|---|---|---|---|
| Torkian Group | New | $51-2M | Verbal Indication | 12/21/23:<br>1. They called me last Thursday to say that they'd received their construction budget from their contractor and will come back to us shortly.<br>2. As I previously mentioned, they think the facade cost is >$4M, I don't have the number yet and I offered Tom Finneman, and will continue to do so once I get their offer<br>3. I don't know where they stand with designing their apt layouts but will ask.<br>4. As mentioned before, they claim they will close all cash with their existing partner.<br>5. They sent me a "happy holidays" email on saturday and I replied that I wanted their response today, I think that was an ambitious request by me but I made it anyway. |
| OCS | New | $50M | Written Offer | 12/22/23:<br>1. I toured with their final partner on Friday, He is very interested in moving forward with the purchase, and said that he'd be speaking to his investor group today to prepare a revised LOI.<br>2. The final partner (Yan Moshe) runs medical clinics throughout NYC and would use the bottom three floors for that purpose. He liked the building very much and said if it can physically accommodate his use. He then asked whether his use was permitted per zoning. He didn't know his use-group so I advised he seek counsel to confirm and then we could check if is permitted in a C5-2 zone.<br>2. They're prior LOI did NOT specify vacant possession<br>3. I'm told the new LOI will be more in the form I've specified than their first offer, meaning - not subject to a DD period, etc., but I'm waiting to see.<br>4. He mentioned that they're trying to confirm their facade cost estimate which is currently at $6-8M, and they're trying to get comfortable at $6M, which will improve their bid from $50-52M. I reiterated the suggestion that they speak to Tom Finneman. |
| Handler | Revised | $50M | Written Offer | Offer made 5/9/2023<br>I have no confidence in the bidder |

EXHIBIT 2 PAGE 324

| | | | | |
|---|---|---|---|---|
| Treun Realty Investments | New | <$50M | Verbal Indication | 12/26/23:<br>1. They have an investor group composed of Mendy Chudaitov of Lefferts and Alex Solovey<br>2. They toured last week with their lender from Bank of China, which will only fund once they have condo documents, which will be in time for the construction but not acquisition loan.<br>3. They're pricing is <$50M, but with some form of staged payments or seller financing they may be willing to pay $50M |
| Glacier | New | $47M | Verbal Offer | 12/21/23:<br>Not worried about raising the money, but their partners have minimum return thresholds for getting involved - 20% IRR & 2x equity multiple, and their price is predicated on that<br>they're in the middle of a conversion right now and would like to undertake a second<br>they're comfortable with the conversion costs<br>facade costs they priced as a piece of the entire construction budget - all in $82.5M including hard & soft costs = $550 psf<br>need 30 days DD, won't proceed w/o it<br>can they get to $50M? They'd have to speak to their capital partner<br>he's discussed $47-8M with them to date<br>acquisition financing? not necessary with their capital partners<br>most capital partners want financing, some all cash<br>if they can do a quick deal with a lender, great, if not all cash<br>time to close: 45 days + 15 days TOE |
| Empire | Revised | $47M | Verbal Offer | 1. They have introduced several groups as potential third-party partners.<br>2. They claim that their internal friends & family investors, together their main investor (Egal) are interested at $47M, but they're trying to confirm whether they would put up the funds to close all cash<br>3. They claim their offer would be w/o DD. |
| Slate | Revised | $47.5M | Verbal Indication | Prior bid was $50M below |
| Rockefeller Group | Revised | $46M | Written Offer | As I mentioned in a separate email, I saw Meg Brod at the REBNY function and had a long discussion with her about the property. They remain engaged with Rita and will explore trying get their pricing to $50M. |

EXHIBIT 2 PAGE 325

| | | | | |
|---|---|---|---|---|
| HJ Development | New | $45M | Written Offer | 12/21/23:<br>1. Called to reiterate that they are no longer seeking a financial partner, and claim that they will close quickly with their own equity, but that their price is $45M, the offer they submitted was at $43M so this is an improvement. |
| Legacy Holdings | New | $42.5M | Written Offer | 1. This is the group that threatened to submit their LOI to the court<br>2. They texted me over the weekend but I didn't respond. Please tell me if you want me to do otherwise. |
| Azur | New | $40Ms | Verbal Indication | No recent communication, I assume they're out |
| Toll Brothers | Revised | $40Ms | Verbal Indication | <$45M - their prior bid |
| Banyan | Revised | $40M | Written Offer | Reduced their prior bids below |
| Bash/Skylight | Revised | $40M | Verbal Indication | They may increase their offer based on LM's response to the façade application Michael sent me. I'm waiting to hear back<br>Offering Participation in capex savings & sellout pricing above a threshold |
| Toll Brothers | Revised | $40M | Verbal Indication | Toll is willing to JV with Owner but at a valuation of $40M |

EXHIBIT 2 PAGE 326

| | | | | |
|---|---|---|---|---|
| Lincoln Equities | New | $40-45M | Verbal Indication | 12/26/23:<br>got their construction budget and can't pay $55M<br>$2,200 sellout<br>$550 for condo spec<br>$450 for rental spec<br>6 months longer for construction<br>$500K for environmental<br>$9M for the all facades<br>1 year precon<br>18 months for construction<br>3 year sellout<br>can only pay $40-45M and then as rental so don't have to pay taxes on unit sales<br><br>12/19/23:<br>1. Their potential investors have been waiting on their construction budget from their construction contractor, which they received at the end of last week.<br>2. They continue to reiterate that several of their investor groups show strong interest, and many of the people leading the deal team at those firms used to work for the Lincoln deal lead who I've known for 30 years and completed deals with.<br>3. They said they will try to reach their investors this week but doubt they'll be able to make progress.<br>4. They've said that they'll continuing to trying to get this done until I tell them otherwise. |
| Vanbarton | New | $35M | Written Offer | Multifamily |
| TF Cornerstone | Revised | $32.5M | Verbal Indication | Multifamily, close all cash |
| Romanoff Equities | New | $30Ms | Verbal Indication | |
| Hines | Revised | $30Ms | Verbal Indication | <$35M - their prior bid - Multifamily |
| Arcade | Revised | $30M | Verbal Indication | Seeking a new partner to support $50Ms |

EXHIBIT 2 PAGE 327

| | | | | |
|---|---|---|---|---|
| Aurora Capital Associates | Revised | TBD | Indication | Aurora is a division of the Cayre family, which is a large owner of real estate. They had looked at the property in the beginning of 2023, but thought they wouldn't be competitive in pricing so didn't continue pursuing it. They Re-engaged a few weeks ago to satisfy a 1031 need, thinking that on that basis they could be competitive. I had hoped to get their bid by this week, but the patriarch of the Aurora side of the Cayre family is very ill, and they're not able to focus at present. |
| Cohen Equities & Dan Oelsner | Revised | TBD | Pursuing | Meir Cohen looked at the building in the past, but invited Dan Oelsner to look at it with him. Dan used to be with Elad who converted the Plaza Hotel and has worked with other major firms and is in the middle of several conversions at present. They toured last week and I don't have their feedback yet but they are seriously pursuing the project. |
| DDC NYC/Los Angeles | Revised | TBD | Pursuing | They are one of the largest home furnishing retailers in the US with operations in NYC, LA & Miami. They looked at the property several weeks ago but were only interested in the retail. They reached out to me last week again to see if they could buy the retail, and I ask them to identify what floors they want and their pricing. They said they will come back to the building and then prepare an offer. |
| East End Capital | Revised | TBD | Pursuing | East End Capital has been focused on developing film studios, largely on the west coast, but has re-engaged with office buildings and office to residential conversions. They're toured the property twice, the second time with their conversion team, and I expect to hear back from them shortly with their sense of pricing. |
| Others actively pursuing | | | | Douglaston Development<br>Drake Street Partners<br>Gemini Rosemont<br>Macklowe Properties |

## First Round Bids

| | | | | |
|---|---|---|---|---|
| Albanese | | | | Withdrew a while ago for multiple reasons including unwillingness to take façade cost risk. Had been @$53M, then said their pricing had fallen, then withdrew |
| Rockefeller Group / Midwood | | | | See Above |

EXHIBIT 2 PAGE 328

| | | | | |
|---|---|---|---|---|
| Skylight RE Partners / Bash Capital | | | | See Above |
| Somerset / JMH / Hildreth | | | | Was @$70M but withdrew based on unconditional contract with a hard deposit, and concern over ability to raise money |
| Toll Brothers | | | | See Above |
| Anbau | | | | See Above |
| Slate | | | | See Above |
| Arcade / Pembroke | | | | See Above |
| JDS | | | | Inactive, was @$70M and stopped responding |
| Banyan - 2 written offers | | | | See Above |
| Empire | | | | See Above |
| Gorjian | | | | Checked in, then never followed up. They were ~$40M |
| Hines | | | | See Above |
| Mill Creek Residential | | | | Too low to revisit - $30M |
| TF Cornerstone | | | | See Above |
| Tishman Speyer | | | | Too low to revisit - $28M |
| Soho Properties | | | | Discussed $53M, then withdrew due to other deal challenges |
| Handler | | | | See Above |
| GFP Holdings (Verbal Offer) | | | | Too low to revisit - $30M |
| Kushner | | | | Waiting for Feedback - was at $45M |
| Rockrose | | | | Too low to revisit - $30M |
| Stellar | | | | Too low to revisit - ~$27M |

EXHIBIT 2 PAGE 329

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Andrew K. Glenn |
| **Subject:** | Offer from CNY Group |
| **Date:** | Tuesday, December 26, 2023 4:14:50 PM |
| **Attachments:** | image001.png |
| | Offer Letter_95 Madison_revised 12-5-23.docx |
| | #235164964v2_hkdocs.hklaw.com_ - 95 Madison_Memo re PSA comments - Preliminary Business Comments f:om Seller.docx |
| | #235164964v2_hkdocs.hklaw.com_ - 95 Madison_Memo re PSA comments MLS 122023.docx |

Andrew,

This is the third version of CNY Group's LOI as submitted by the broker representing them. CNY is negotiating a four-building programmatic equity and debt partnership with two potential capital partners – Fortress and Ares, both multi-billion, highly credible funds, to convert four office buildings to residential, of which we would be the first. They are leaning towards Fortress. Both financial partners have been approached about 95 Madison by various operators. I approached Ares directly myself and have a CA executed by them. The fellow who co-heads their real estate group is a long-term friend of mine with whom I've discussed the deal at length over the last year, but they would only pursue it with an operating partner. Both partners are skeptical about spending time on the deal based on what they've heard in the marketplace about the Sklars. CNY has pitched the building to these financial partners as being vacant, so they start the project right away and minimize carry costs, which helps them offer a higher price - $60M. At Michael's request I've asked if they'd buy it without the vacant possession requirement and they've said no.

CNY Group is an experienced construction company who did the conversion of the Woolworth Building for Alchemy – the developer. They are familiar with the various challenges and, as Michael says, they can do the job faster and cheaper than other developers because of their construction expertise. We arranged two calls for them with our code and environmental consultants, they were unprepared and asked unimpressive questions. When I speak to the CEO however, who was not on those calls, he's very impressive.

I'm also attaching their list of contract comments with my responses. Most of the comments are business issues, but some are also legal. I'm attaching Michael's response as well to show you the minimal feedback and direction that I get from him. After spending several hours on Saturday preparing my comments to send back to him, he then insisted to review them, so I sent them to him Saturday afternoon and still have not heard back. CNY is admittedly quite concerned and wondering what's going on.

This will give you a sense of what's transpired recently, as will the updated bid sheet I just copied you on and two offers I received last week. The deal with CNY is one that we should make every effort to complete, and as quickly as possible, with your help to stimulate a response from the tenant.

Thanks.

**Woody Heller**
Founding Partner



Tel: (917) 612-1230
Email: wheller@brantonrealty.com
Website: brantonrealty.com

**Exhibit BX - 48**

BR001244

EXHIBIT 2 PAGE 330

**ARIES CAPITAL CORP**
425 W 23rd Street, Suite 1
New York, NY 10011
Tel: 212-956-3050

Mr. Woody Heller                                                    December 5, 2023
Branton Realty

Subject: Acquisition of 95 Madison Avenue, New York, NY 10016

Dear Mr. Heller:

I am writing this Letter of Intent (LOI) on behalf of Madison 95 Associates LLC, (an SPE formed whose members include principals of CNY Group and Equity Partner) hereinafter referred to as (The "Buyer") to express our interest in acquiring the 16-story building located at 95 Madison Avenue, New York, NY 10016 ("The Property"). We believe this sale and acquisition aligns with our strategic goals and represents a significant opportunity for growth for both parties.

Terms of the proposed acquisition are as follows:

1. Property Details: The Buyer wishes to acquire the entire building located at 95 Madison Avenue, New York, NY 10016

2. Consideration: The Buyer agrees to purchase the building for a total consideration of $60,000,000.

3. Delivery: The Seller, Ninety-Five Madison Company, L.P., shall deliver The Building as follows:

   (i)      The Seller shall ensure The Building is delivered fee simple to The Buyer.
   (ii)     The Seller will deliver The Building and title free and clear of all liens and encumbrances.
   (iii)    It has been represented to The Buyer there are several violations on the building, both physical and financial. The Seller will provide an updated report to show which violations are still in place.
   (iv)     It has been represented to The Buyer that there are two office tenants remaining on the 12th floor; (a) Tenant A whose lease expires end of year 2024 with a landlord termination option to terminate the lease in 120 days of due notice and the payment of $5,000 (b) and Tenant B occupying 5,900sf whose lease matures in 2030 and who has indicated their willingness to surrender their space for a small payment. The Buyer will pay up to $250,000 to have stipulations for Tenant B to surrender the 5,900sf space and an Agreement with The Seller shall establish Tenant B will vacate within 6 months of the closing. Tenant B Agreement to vacate shall be a condition of closing. The Seller shall be responsible for evidencing an Agreement with Tenant A and Tenant B to surrender their space within 6 months of the closing.
   (v)      The Seller has provided the GRS environmental report dated 10/12/22 in the Seller's data room which can be certified to The Buyer at a cost of approximately $500 to be paid for at The Buyer's expense.

4. Due Diligence: During our diligence, currently underway, The Buyer will pay for various costs of the investigation of The Property. The Seller will provide all information including but not limited to all tenant leases, all landmark documentation or any other city agency mandatory repairs (i.e. Local Law 11 & 10) that have been performed in conjunction with landmarks, any other mandated municipal requirements landmark or otherwise, any information and documentation on any violations, outstanding levies, real estate taxes, union agreements, labor agreements or any bankruptcy related documentation. During this period, The Seller shall provide Buyer with access to all necessary documents, records, and information related to The Property. We realize the majority of the information is contained in the Seller's data room; The Seller will provide any additional information not contained in the Seller's data room upon request and The Seller shall provide the Buyer with access to any/all information not contained its data room.

BR001245

EXHIBIT 2 PAGE 331

5. Equity Partner: The Buyer will disclose their Equity Partner as soon as possible, however, in any event, within 7 business days of the date of this LOI.  Upon disclosure of Buyer's Equity Partner and Seller's due diligence of the Equity Partner confirming funds to close are in place; The Seller and The Buyer will discuss and negotiate terms for a period of time for Exclusivity, to be agreed upon by both parties.

6. Good Faith Negotiations: The parties will negotiate the final PSA to be signed by December 31, 2023.

7. Purchase Sale Agreement: The Seller has provided a copy of the PSA prepared by Seller's counsel for review by Buyer's counsel.

8. Deposit:  The Buyer agrees to a 10% deposit upon signing of a PSA in the form of a Letter of Credit to be held in escrow by The Buyer's title company.  Upon approval by the Bankruptcy Court of this purchase, The Letter of Credit will convert to a cash deposit.  The Seller will confirm the Letter of Credit is acceptable to the bankruptcy court judge.

9. Closing: The closing of the purchase shall occur within 60 days of and receipt of (i) Bankruptcy Court approval of the purchase and stipulation from Bankruptcy Court that Tenant A and Tenant B will vacate within 6 months of closing (ii) Tenant B Agreement to vacate pursuant to paragraph 3 above.  Upon satisfactory receipt and confirmation of these items, the closing shall be Time of the Essence within 60 days of the above referenced conditions having been met.  The closing shall be subject to the satisfaction of all necessary legal and regulatory requirements.

10. Confidentiality: Both parties agree to keep the terms and details of this LOI and the ensuing negotiations strictly confidential, except as required by law or with the prior written consent of the other party.

11.  Brokers:  It is understood that Branton Realty, Mr. Woody Heller, is the exclusive representative for The Seller of The Property and Aries Capital Corp., Mr. Nicholas Barone is the exclusive representative for The Buyer of The Property; both The Seller and The Buyer will be responsible for paying their respective brokers.

This LOI is non-binding and is intended to outline the general terms and conditions of the proposed transaction. It is not a contract and does not create any legally binding obligations between the parties. Any final agreement shall be subject to the negotiation and execution of a mutually acceptable purchase sale agreement.

We believe that this acquisition presents a unique opportunity for both parties, and we look forward to working closely with you to a successful sale and acquisition for both parties.  Should you have any questions or require additional information, please do not hesitate to contact me.

Thank you for considering our proposal. We anticipate a positive response and the opportunity to proceed with the necessary negotiations.

Sincerely yours,
ARIES CAPITAL CORP

BR001246

EXHIBIT 2 PAGE 332

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Renee Covitt
(212) 513-3260
renee.covitt@hklaw.com

**MEMORANDUM**

| | |
|---|---|
| To: | Nicholas Barone |
| | Kenneth Colao |
| From: | Stuart Saft and Renee Covitt |
| Date: | December 19, 2023 |
| Subject: | 95 Madison Avenue, New York, NY |

We have reviewed the Purchase and Sale Agreement for 95 Madison Avenue, New York, New York (the "PSA"). Below please find our comments. For detailed information regarding any of the provisions contained therein, reference should be made to the actual provisions of the PSA.

General Note: The PSA does not include the provisions regarding the termination of the leases contained in the offer letter. PSA should include a provision addressing the termination of existing leases. Language can follow what was provided in Aries Capital December 5, 2023 LOI letter: $5,000 buyout of Tenant A whose lease expires the end of 2024 and up to $250,000 contribution to buyout Tenant B whose lease expires in 2030, this being -condition of closing. Ken agreed that tenant issues would be addressed in a side letter.

1) Section 3(b): The Purchaser should have Building access during reasonable business hours with 24 hours' notice. Ken and I agreed 2 business days' notice.
 Purchaser's contact with Seller's agents can be conditioned with Seller's approval not being unreasonably withheld or delayed. Seller self-manages the building, there are no agents. Purchaser is welcome to continuing contacting me, as stipulated in the contract, with any questions and I will respond as quickly as I'm able to get the information requested.
In the end Seller should provide access to these potential resources for information. As discussed with Ken and Nick, virtually all information the Seller has is already available on the website, access to which, has already been provided. In addition, Purchaser asked to be put in touch with two of the Seller's service providers. Those discussions took place last week as requested.
Important to get current information of Building's performance, costs of carry, deferred maintenance and repairs, etc. As promised, I will shortly be sending Nick the information requested regarding the costs of carry. As for building performance, deferred maintenance and repairs, that information is in reports on the due diligence website which the Purchaser says they've reviewed, further, the Purchaser inspected the property numerous times, and finally, as I continue to offer, I'm happy to arrange additional tours per the notice provision above.

2) Section 3(b): All inspection fees, appraisal fees, engineering fees, etc. are at Purchaser's cost. General note: if the Bankruptcy Court does not approve the sale, there should be a breakup fee, especially since Purchaser is being required to deliver to Seller all results of testing, etc. in the event the Closing doesn't occur. As discussed with Ken on our most recent call, this is a new request which is not included in the LOI and has not been approved by the Seller. Second, any reimbursement would be contingent upon the Purchaser being in full compliant with the terms of the LOI and executed contract. And finally, any reimbursement would be limited to actual third-party costs, as evidenced by receipts, and subject to a cap that has not yet been agreed. Ken is to suggest an amount for me to discuss with Seller.

3) Section 3(c): Evidence of insurance coverages in form of COI will be required of trades and other parties conducting physical inspections along with hold harmless agreements. Ken and I interpreted this comment as confirming what is already stated in this section of the contract, not requesting a change. Please advise if this is not correct.

5) Section 4: Purchase Price in PSA is blank. Conform PSA to terms in Aries' December 5, 2023 LOI : 10% deposit upon signing the PSA in the form of a Letter of Credit held in escrow by Purchaser's title company. Upon approval by the Bankruptcy Court the LOC converts to a cash deposit – all providing the Court's approval of the arrangement. This has not been reviewed by Seller's counsel, and is therefore subject to their review, but is consistent with the non-binding conversations to date.

6) Section 5(a): Need copy of survey and current title report to review. Ken and Nick confirmed that this information is already available on the due diligence website and that no further action is required of Seller.

7) Section 5(a): Permitted Encumbrances: this should be limited to the permitted encumbrances listed on the title report. Standard, insurable encroachments, example, projections of roof cornices, vent pipes, easements, etc. which are recorded. The currently listed encumbrances include curable conditions including building violations, taxes, mechanic liens by tenants. Ken has confirmed before, and again on our most recent call on the evening of 12/22/23, that Purchaser is purchasing the property subject to all existing violations, which were reviewed by CNY Group with Seller's violation consultant on 12/19/23, and CNY Group is purchasing the property as-is. Further discussion on this matter should be had with Seller's counsel.

8) Section 6(a): Reference to a title commitment from Old Republic with Gotham Abstract & Settlement LLC as agent- this needs to be changed. Seller has the right to adjourn the Closing date for up to 90 days to eliminate title objections but is not required to bring an action or institute a proceeding, or incur any costs or expenses to eliminate title objections. This section should be revised. Should be Seller's obligation to cure Purchaser's title objections. If it can't eliminate conditions, Purchaser should have the right to terminate the Agreement with full return of deposit. Ken and I discussed that we need a $ threshold, below which this wouldn't be an issue.

9) Section 6(d) : If Seller refuses or is unable to resolve building violations, Seller to provide an escrow deposit of $1M from which Purchaser can use to cure the violations. As mentioned above, Ken agreed to take the building subject to violations so no escrow is needed.

2

BR001248

EXHIBIT 2 PAGE 334

10) Section 6(e):  If the Title Company is unwilling to remove any title objections, Seller should not have the right to substitute the title company.  Please see my response above to #8. Further, how else do you propose to resolve?

11)  Section 7(b)(i):  Base Rents collected after Closing should be applied to months following the Closing first and then to months prior to the Closing.  Need copies of books and records to identify any rent arrears and efforts to collect arrearage, if any, including litigation. As mentioned in the General Note before your comments, we are trying to vacate the tenants, so how we handle the collection of rent arrears, particularly given the small amount of their rents, is of minor importance. Having said that, I appreciate that the point is raised in the contract and therefore has to be addressed. I'm told that Lee & Low is current, and Lister is not. Ken and I agreed that this is not a material issue. I'll have to confirm with my client, but for the time being draft as you suggest in your comment with regard to Lee & Low and assume that Lister will either have vacated by closing or will not be pursued for any existing arrears prior thereto.

In the meantime Seller should be demonstrating to Purchaser it is using commercially reasonable efforts to collect past due Base Rent and Additional Rent including any operating costs. Seller is not and will not pursue Lister for arrears. Any arrears with Lee & Low will assist in compelling them to vacate.

12)  Section 7(b)(ii):  Still under review by Purchaser.

13)  Section 7(b)(iv): Still under review by Purchaser.

14)  Section 9(a)(i):  Purchaser should have the right to review any Seller engagement of other parties following the PSA up to Closing. In all events, agreements entered into by Seller in this interim must not hinder the Purchaser or interfere with the closing without Purchaser's written consent.  Seller should provide a representation regarding any past or present Union Service Agreements it was /is signatory to and identify any legacy obligations. There is a representation in 9 c vii that "there are no employees at the Premises who are union personnel". This is what I have repeatedly been told by Seller. I don't know what documentation exists, if any, so the best we may be able to do is limit it to the knowledge of the knowledge party.

15) Section 9(a)v):  Estoppel letters from Tenants should be a condition of closing.  NOTE: There is no language in the Agreement regarding the termination of the leases per the offer letter.  In addition, information contained in the estoppel letter should not supersede Seller's representations even if they are contrary to Seller's representations. Several points here: 1) the tenants delivered estoppel certificates earlier this year for the DIP lender, those should be available but I don't yet have copies. 2) per my comment above, as agreed by Ken, any language regarding vacating the tenant will be in a side letter. And 3) given that the intent is to vacate tenants, all we care about is that they don't have purchase options or material claims against Seller. Again, any rep by Seller, is limited to the knowledge party, and the Seller has reiterated that they are not comfortable with any ongoing liability, hence, as-is purchase, with 27 folders of property information on the due diligence website.

Formatte

3

16) Section 10(c):  Seller has the right to apply any security deposits held under the Leases to defaults by tenants under the leases- No.  Security deposits should be assigned to Purchaser and Seller continue to exercise best efforts to collect any rent arrears and advise if any other tenant has been defaulted and tenant's deposits are still in Landlord's account.  Again, there are two small tenants. Please don't win the battle and lose the war. Let's identify the deal breakers and otherwise move on.

17) Section 10(g)(i):  No- if there is a material and adverse breach of a representation, Seller shall be in default regardless of the reduction in the value of the Premises. Ken agrees that the breach has to be material, which means we need a $ threshold. Please see my prior comment. My client's comment was simply "No".

18)  Section 11:  Add the following: no tenants have a right to purchase, there are no notices from the tenants re a default on behalf of Seller; no litigation affecting the property; a complete list of violations; no rights of first refusal; representation that the building is non-union, list of judgments, Lis pendens, etc., as well as no other signed contracts of sale; brokerage commission disputes; tax appeal filings; representations on hazardous materials, oil spills; Michael Sklar is the correct knowledge individual, past or present Union Service Agreements it was /is signatory to and identify any legacy obligations;  any violations will not timely impede the issuance of necessary development and/or construction permits from agencies with jurisdiction.
1) As mentioned before, violations are a non-issue, Ken has agreed to accept them.
2) Purchaser can look to the estoppels for issues concerning tenants.
3) There is a 4,045-page environmental report that can be certified to the Purchaser. Further, Seller arranged a call this week with Purchaser and the company that prepared the report, and Purchaser had the opportunity to satisfy themselves regarding any of their questions.
4) Otherwise, the building is being purchased as-is out of bankruptcy.

20) Section 11(c)(vii):  The Seller's representations should survive the Closing.  Section 39 as well. No, addressed above. How does the bankruptcy court approval affect issues post-closing?

21) Section 11(d):  No, leases, contracts, etc do not modify reps and warranties. I can't opine on this

23)  Section 11(g):  No representation or warranty re the presence of hazardous materials- see above re representations. 4,045-page environmental report which the LOI says the Purchaser will pay to have certified to itself, and an asbestos report on the due diligence website. As-is. As discussed with Ken, Seller will not make an environmental rep.

24)  Section 12(a)(i):  Damage and Destruction:  if the cost to repair the Building is equal to or more than $3,000,000, Purchaser shall have the right to terminate the agreement. With respect, that threshold makes no sense. Ken to consider the nature of an occurrence or a realistic $ threshold.

Purchaser to confirm details of insurance is being carried by Seller and that the Property policies re paid for and in force. To be reviewed by client but draft in the contract.

4

25) Section 12(a)(ii):  $3,000,000- see above.  Please see my comment above.

29): Section 15:  Seller should not initiate such a proceeding without Purchaser's consent. Seller should represent if any tax certiorari proceedings have been filed.  This is public knowledge and doesn't require a rep.

30)  Section 18(a):  delete adjournment rights.  What is the concern with Seller having a 30-day adjournment right? Seller may elect to find a 1031 exchange.

31) Section 28: Purchaser should have the right to assign to an affiliate or related entity with the same control group.  I don't know what "group" means, but conceptually this should be ok.

32) Section 39(e):  Purchaser agrees to take such actions as are reasonably required by Seller for the Sale Order.  This should be at Purchaser's discretion.  How can you ask for a breakup fee if the bankruptcy court doesn't approve the contract, and then not agree to cooperate with the approval process?

#235164964_v2#235164964_v2

Formatte

BR001251

EXHIBIT 2 PAGE 337

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Renee Covitt
(212) 513-3260
renee.covitt@hklaw.com

## MEMORANDUM

To:         Nicholas Barone
              Kenneth Colao
From:      Stuart Saft and Renee Covitt
Date:       December 19, 2023
Subject:   95 Madison Avenue, New York, NY

We have reviewed the Purchase and Sale Agreement for 95 Madison Avenue, New York, New York (the "PSA"). Below please find our comments. For detailed information regarding any of the provisions contained therein, reference should be made to the actual provisions of the PSA.

General Note: The PSA does not include the provisions regarding the termination of the leases contained in the offer letter. PSA should include a provision addressing the termination of existing leases. Language can follow what was provided in Aries Capital December 5, 2023 LOI letter: $5,000 buyout of Tenant A whose lease expires the end of 2024 and up to $250,000 contribution to buyout Tenant B whose lease expires in 2030, this being condition of closing. Need to resolve Lee & Low

1) Section 3(b): The Purchaser should have Building access during reasonable business hours with 24 hours' notice. Purchaser's contact with Seller's agents can be conditioned with Seller's approval not being unreasonably withheld or delayed. In the end Seller should provide access to these potential resources for information. This has been provided .Important to get current information of Building's performance, costs of carry, deferred maintenance and repairs, etc. Does not make sense. We have provided what we have on the masonry . The balance should be per renovaton .

2) Section 3(b): All inspection fees, appraisal fees, engineering fees, etc. are at Purchaser's cost. General note: if the Bankruptcy Court does not approve the sale, there should be a breakup fee, especially since Purchaser is being required to deliver to Seller all results of testing, etc. in the event the Closing doesn't occur. How much ?

3) Section 3(c): Evidence of insurance coverages in form of COI will be required of trades and other parties conducting physical inspections along with hold harmless agreements.

5) Section 4: Purchase Price in PSA is blank. Conform PSA to terms in Aries' December 5, 2023 LOI : 10% deposit upon signing the PSA in the form of a Letter of Credit held in escrow by

BR001252

EXHIBIT 2 PAGE 338

Purchaser's title company.  Upon approval by the Bankruptcy Court the LOC converts to a cash deposit – all providing the Court's approval of the arrangement. ok

6) Section 5(a):  Need copy of survey and current title report to review.  What we have  should be on due diligence web site.

7) Section 5(a):  Permitted Encumbrances: this should be limited to the permitted encumbrances listed on the title report.  Standard, insurable encroachments, example, projections of roof cornices, vent pipes, easements, etc. which are recorded. The currently listed encumbrances include curable conditions including building violations, taxes, mechanic liens by tenants. Masonry correction is by Purchaser

8) Section 6(a):  Reference to a title commitment from Old Republic with Gotham Abstract & Settlement LLC as agent- this needs to be changed.  Seller has the right to adjourn the Closing date for up to 90 days to eliminate title objections but is not required to bring an action or institute a proceeding, or incur any costs or expenses to eliminate title objections.  This section should be revised.  Should be Seller's obligation to cure Purchaser's title objections. If it can't eliminate conditions, Purchaser should have the right to terminate the Agreement with full return of deposit. Not is current  known .

9) Section 6(d) :  If Seller refuses or is unable to resolve building violations, Seller to provide an escrow deposit of $1M from which Purchaser can use to cure the violations. Not masonry . NOT FDNY

10) Section 6(e):  If the Title Company is unwilling to remove any title objections, Seller should not have the right to substitute the title company. Which objection ?

11) Section 7(b)(i):  Base Rents collected after Closing should be applied to months following the Closing first and then to months prior to the Closing.  Need copies of books and records to identify any rent arrears and efforts to collect arrearage, if any, including litigation. No litgatoon

In the meantime Seller should be demonstrating to Purchaser it is using commercially reasonable efforts to collect past due Base Rent and Additional Rent including any operating costs. Lee and low is current . we will deal with lister sepretaly. We are not suing Lister

12) Section 7(b)(ii):  Still under review by Purchaser.

13) Section 7(b)(iv): Still under review by Purchaser.

14) Section 9(a)(i):  Purchaser should have the right to review any Seller engagement of other parties following the PSA up to Closing. In all events, agreements entered into by Seller in this interim must not hinder the Purchaser or interfere with the closing without Purchaser's written consent.  Seller should provide a representation regarding any past or present Union Service Agreements it was /is signatory to and identify any legacy obligations. There is a representation in 9 c vii that "there are no employees at the Premises who are union personnel".

#235164964_v2

BR001253

EXHIBIT 2 PAGE 339

15) Section 9(a)v:  Estoppel letters from Tenants should be a condition of closing.  NOTE: There is no language in the Agreement regarding the termination of the leases per the offer letter.  In addition, information contained in the estoppel letter should not supersede Seller's representations even if they are contrary to Seller's representations.

16)  Section 10(c):  Seller has the right to apply any security deposits held under the Leases to defaults by tenants under the leases- No.  Security deposits should be assigned to Purchaser and Seller continue to exercise best efforts to collect any rent arrears and advise if any other tenant has been defaulted and tenant's deposits are still in Landlord's account.

17) Section 10(g)(i):  No- if there is a material and adverse breach of a representation, Seller shall be in default regardless of the reduction in the value of the Premises. No

18)  Section 11:  Add the following: no tenants have a right to purchase, there are no notices from the tenants re a default on behalf of Seller; no litigation affecting the property No; a complete list of violations purchaser can obtain ; no rights of first refusal; representation that the building is non-union ok , list of judgments, Lis pendens, etc., as well as no other signed contracts of sale; brokerage commission disputes; tax appeal filings; representations on hazardous materials, oil spills; Michael Sklar is the correct knowledge individual, past or present Union Service Agreements it was /is signatory to and identify any legacy obligations;  any violations will not timely impede the issuance of necessary development and/or construction permits from agencies with jurisdiction. No. They need to formulate their own opinion.

20) Section 11(c)(vii):  The Seller's representations should survive the Closing.  Section 39 as well.No

21) Section 11(d):  No, leases, contracts, etc do not modify reps and warranties.

23)  Section 11(g):  No representation or warranty re the presence of hazardous materials- see above re representations.

24)  Section 12(a)(i):  Damage and Destruction:  if the cost to repair the Building is equal to or more than $3,000,000, Purchaser shall have the right to terminate the agreement.

Purchaser to confirm details of insurance is being carried by Seller and that the Property policies re paid for and in force.

25)  Section 12(a)(ii):  $3,000,000- see above.

29): Section 15:  Seller should not initiate such a proceeding without Purchaser's consent. Seller should represent if any tax certiorari proceedings have been filed.ok

30)  Section 18(a):  delete adjournment rights.

31) Section 28: Purchaser should have the right to assign to an affiliate or related entity with the same control group.

#235164964_v2

BR001254

EXHIBIT 2 PAGE 340

32) Section 39(e): Purchaser agrees to take such actions as are reasonably required by Seller for the Sale Order. This should be at Purchaser's discretion.

4

#235164964_v2

BR001255

EXHIBIT 2 PAGE 341

**From:** Woody Heller
**To:** Michael Sklar; Sharan Sklar
**Subject:** Moving Forward this morning
**Date:** Wednesday, December 27, 2023 8:25:42 AM
**Attachments:** image001.png

Good morning. The first steps:

1. Decide about counsel. My view: Lefkowitz and Fried Frank are both great choices. I don't know the cost difference if that's the issue. FF has the advantage of knowing the contract since they wrote it, and they have an army of lawyers to deal simultaneously with the three documents: LOI, escrow agreement and PSA. I don't know Lefkowitz's availability and size of his team. If you want to switch firms, one of you needs to speak to Rick Wolfe as he may resign. If Ken is willing to accommodate Rita's request – letting her swap her interest for apartment credits, we'll need a tax attorney's help to figure out how to do that.

2. We need to provide the entity names for escrow agreements so the drafting of that can begin.

3. We need to have our attorney start reviewing the contract comments so the other side can start redrafting the contract - this will save you money and they are standing by ready to do it.

Even with the one-week extension, this is still a lot of work so best to address this morning. Michael I just tried to ring you to get your thoughts, kindly advise.

**Woody Heller**
Founding Partner



Tel:      (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

**Exhibit
BX - 49**

BR001242

EXHIBIT 2 PAGE 342

| | |
|---|---|
| **From:** | Woody Heller |
| **To:** | Sharan Sklar; Michael Sklar |
| **Subject:** | RE: Success! |
| **Date:** | Wednesday, December 27, 2023 11:43:28 AM |
| **Attachments:** | image001.png |

Thanks for your feedback. My responses below highlighted in yellow. I spoke to Michael about his questions earlier, happy to review them with you if you like.

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:   wheller@brantonrealty.com
Website: brantonrealty.com

**From:** Sharan Sklar <ssklar@ninetyfivemadison.com>
**Sent:** Wednesday, December 27, 2023 10:53 AM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>; Woody Heller <wheller@brantonrealty.com>
**Subject:** Re: Success!

See comments in bold…

-- **Sharan Sklar**
Sole Member
Sharan Sklar Management LLC
as a General Partner of Ninety-Five Madison, L.P.
**Ninety-Five Madison Company, L.P.**
212.979.6306 (c) | ssklar@ninetyfivemadison.com

**From:** Michael Sklar <msklar@ninetyfivemadison.com>
**Date:** Wednesday, December 27, 2023 at 5:43 AM
**To:** Woody Heller <wheller@brantonrealty.com>, Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** RE: Success!

In blue.
Michael Sklar
Sole Member
Michael Sklar Management LLC
as a General Partner of Ninety-Five Madison Company, L.P.
Ninety-Five Madison Company, L.P.
917.270.6083 (c) | Msklar@ninetyfivemadison.com <mailto:Msklar@ninetyfivemadison.com>
P A little green reminder: Please consider the environment before printing this email

**From:** Woody Heller <wheller@brantonrealty.com>
**Sent:** Tuesday, December 26, 2023 11:46 PM
**To:** Michael Sklar <msklar@ninetyfivemadison.com>; Sharan Sklar <ssklar@ninetyfivemadison.com>
**Subject:** Success!

Ken is willing to move forward on the basis of relocating L&L if we're unable to get them to leave the building. Lots of details to work through but here's the basis outline:

- We would make best efforts / commercial efforts to convince them to vacate. To the extent that we're unsuccessful, Ken might want the opportunity to approach them himself, which in

Exhibit
BX - 50

theory should be ok with us. **Ok , who bears the cost ?**

- If that fails, we will send them a relocation notice, probably after the court approves the transaction. We would move them into the retail space as we discussed on the call. Ok,best efforts . Who is responsible. When would deal close?
- Ken will decide whether to put them in the corner or center unit. The center unit, by way of example is ~4,000 usable square feet, which on a 27% loss factor is 5,400 rentable square feet, roughly equivalent to what they have now. To the extent Ken wants them in the corner unit, he would move the demising wall to create the space needed. We'd want to keep their square footage the same, as a deterrent to them staying in the building.ok **The corner space has elevator to 2nd floor.** The center space has the courtyard elevator that services basement through 3, and the interior staircase to the second floor. Corner space has the mezzanine but no access to 2nd floor.
- The cost adjustment of Ken's compromise is that we would pay for the rent difference between what they're paying now and market rent for the retail space. I discussed with Ken that market rent is $125 psf, and if they're paying $55 psf then it's $70 psf x 5,800 sqft x ~7 years, discounted back to the closing date at a to-be-agreed discount rate. That equates to $2-2.5M, plus the cost to move them and renovate their space. He would do the work, as he'll be the owner and not want a separate construction team working in the space while he's converting it. **Not sure I understand. If we are paying the difference on the retail, would that not start when the building is ready, at least 2 years. So would that not start in 2026 which would make that 4 years not 7. Also, 70**5900*7 = $2,842,000 .** Second question first. Your math is correct, but as mentioned below, if we make an upfront payment the amount would be discounted which is why I said $2-2.5M. If we leave an escrow in place that's drawn on incrementally over 7 years, then you're correct. First question: I raised this point with Ken and he pushed back. His point being that this is a major concession, and he's foregoing use of the retail. I'm happy to push back on this but didn't want to do it last night given his accommodation.
- I mentioned the point you've raised Michael, that Ken's getting their extra income during construction, when the space would otherwise be vacant, so that income should reduce the price reduction. Ken views their presence as an impediment to the deal and resisted the argument.
- I also mentioned to Ken that once construction is completed, he might want to move them upstairs to the second or third floor, to liberate the retail space, but only if that's financially worthwhile given that he'd have to postpone selling the units that L&L occupy, and lose interest on the value of the money. We'll have to do the math on that and see if Fortress will agree to not selling everything as quickly as possible. 1) You can do the risers then move them . 2) They will have a sell duration that they have budgeted . 3) On their time line 2 years to sell . I would guess another 2 years to complete the sell. **Stupid question, but could they do they start the risers 1-2 floor and then move them down?** This is a question for Mike, but I think they're doing transfer lines in the ceiling of the first floor rather than running directly through the space, in which case it wouldn't be necessary.
- In theory if they were willing to move L&L upstairs, we could minimize the lost rent in the retail, but we'll have to figure all that out.
- The mechanics of this probably results in an escrow account that is created at closing, holding the amount of money in question for the worst-case scenario, and then direct the money over

BR002043

EXHIBIT 2 PAGE 344

time to the appropriate recipient based on how things work out. In practice, none of think this will happen, because L&L will move out, but that's an option for how the apportionments can be handled.

- I forgot to mention to Ken the possibility of Rita keeping her interest in the deal, which I briefly mentioned to him earlier. He wasn't against it but said he'd have to speak to Fortress and give it some more thought. I email Nick/Ken about it when I got home this evening, asking Ken to give it some thought. **If they are doing codos (selling everything), could Rita keep retail?** ==They do not want her having the retail, nor does Rockefeller. It's considered the "signature" of the building and too impactful if she messes it up.==
- Nick is going to redraft the LOI, and after reviewing it with Ken send it over. Ok .

Moving forward:

- The three main things we need to accomplish are:
  - LOI- **Need to work on the details**
  - Escrow agreement for the title company holding the deposit
  - Purchase & Sale agreement ("PSA")
- You need to decide on your choice of attorney(s)
- With regards to timing, Ken asked if we could extend the deadline, given all that needs to be done within the next few days. We discussed extending it one week until Monday 1/8/24, which hopefully will give us enough time if we work hard and quickly.

Let's talk in the morning to think things through and get everything underway.

---

**Woody Heller**
Founding Partner



Tel:     (917) 612-1230
Email:    wheller@brantonrealty.com
Website: brantonrealty.com

BR002044

EXHIBIT 2 PAGE 345